No. 2024-____

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

APPLE INC.,

*Appellant*,

*v.*

INTERNATIONAL TRADE COMMISSION,

*Appellee*,

On Appeal from the United States International Trade Commission
in Investigation No. 337-TA-1276

**APPELLANT APPLE INC.'S NON-CONFIDENTIAL EMERGENCY
MOTION TO STAY ENFORCEMENT OF ITC'S ORDERS
PENDING REVIEW**

JOSEPH J. MUELLER
SARAH R. FRAZIER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

DAVID P. YIN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington DC  20037
(202) 663-6000

December 26, 2023

MARK D. SELWYN
THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA  94306
(650) 858-6000

DEREK GOSMA
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 S. Grand Avenue, Suite 2400
Los Angeles, CA  90071
(213) 443-5300

*Attorneys for Appellant Apple Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................... iii

FEDERAL CIRCUIT RULE 18 STATEMENT ................................... 1

INTRODUCTION ............................................................................ 1

BACKGROUND .............................................................................. 4

    A.   Products At Issue .................................................................. 4

    B.   Commission Investigation ..................................................... 5

ARGUMENT ................................................................................... 5

I.    THE COMMISSION'S ORDERS WILL LIKELY BE REVERSED ON
    APPEAL ...................................................................................... 6

    A.   The Commission erred in holding the domestic industry
        requirement satisfied even though no patent-practicing
        article existed at the time of the complaint .......................... 6

    B.   The Commission erred by rubber-stamping Masimo's
        attempts to stretch clinical-focused patents to cover
        consumer products ............................................................. 11

    1.   The Commission erred in concluding the patents-in-suit
        are valid ............................................................................ 11

        a.   The Commission erred by requiring the prior art to
           enable more than the patents require or enable
           themselves ................................................................... 11

        b.   The Commission's other validity rulings were also
           error ............................................................................ 14

    2.   The Commission erred in concluding that the patent
        laches doctrine did not apply ............................................. 15

II.    THE COMMISSION'S ORDERS ARE CAUSING, AND WILL CAUSE, IRREPARABLE HARM TO APPLE ....................................................................18

III.   A STAY WILL NOT HARM MASIMO ...............................................................20

IV.    THE PUBLIC INTEREST SUPPORTS A STAY ....................................................21

CONCLUSION .........................................................................................................23

CERTIFICATE OF INTEREST

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

**Rule 25.1(e)(1)(B) Statement:**  The material omitted on pages 2 and 20 describes details of a confidential product redesign.  The material omitted on page 7 and 9 contains information that complainants Masimo Corporation and Cercacor Laboratories, Inc. designated as Confidential Business Information under the Administrative Protective Order in effect in ITC Investigation No. 1276.

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Asyst Techs., Inc. v. Emtrak, Inc.*,
   544 F.3d 1310 (Fed. Cir. 2008) ...................................................15

*Broadcom Corp. v. ITC*,
   28 F.4th 240 (Fed. Cir. 2022) .........................................................6

*Brown v. 3M*,
   265 F.3d 1349 (Fed. Cir. 2001) ...................................................12

*Celsis In Vitro v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012) ......................................................18

*Certain Digital Models*,
   Inv. No. 337-TA-833, Comm'n Op., 2014 WL 12890480 (June
   11, 2014) .......................................................................................23

*ClearCorrect v. ITC*,
   810 F.3d 1283 (Fed. Cir. 2015) ......................................................7

*Finnigan Corp. v. ITC*,
   180 F.3d 1354 (Fed. Cir. 1999) ...................................................18

*Hazani v. ITC*,
   126 F.3d 1473 (Fed. Cir. 1997) ...................................................18

*Impax Laboratories, Inc. v. Aventis Pharmaceuticals Inc.*,
   545 F.3d 1312 (Fed. Cir. 2008) ...................................................13

*In re Certain Tobacco Heating Articles*,
   Comm'n Op., 2022 WL 279056 (Jan. 20, 2022)...........................18

*In re Epstein*,
   32 F.3d 1559 (Fed. Cir. 1994) ...............................................3, 13

*In re Motupalli*,
   791 F. App'x 895 (Fed. Cir. 2019) (nonprecedential)...................18

*In re Paulsen*,
        30 F.3d 1475 (Fed. Cir. 1994) ....................................................13

*In re Theresa*,
        720 F. App'x 634 (Fed. Cir. 2018) (nonprecedential)....................12

*KSR Int'l Co. v. Teleflex Inc.*,
        550 U.S. 398 (2007)......................................................................14

*Metalcraft of Maryville, Inc. v. Toro Co.*,
        848 F.3d 1358 (Fed. Cir. 2017) .............................................18, 19

*Microsoft Corp. v. ITC*,
        731 F.3d 1354 (Fed. Cir. 2013) .............................................3, 6

*Motiva, LLC v. ITC*,
        716 F.3d 596 (Fed. Cir. 2013) .....................................................7

*Nken v. Holder*,
        556 U.S. 418 (2009)........................................................................6

*OSI Pharms., LLC v. Apotex Inc.*,
        939 F.3d 1375 (Fed. Cir. 2019) ..................................................10

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
        57 F.4th 1346 (Fed. Cir. 2023) ........................................3, 15, 16

*Sitrick v. Dreamworks, LLC*,
        516 F.3d 993 (Fed. Cir. 2008) ....................................................12

*Sonos v. Google LLC*,
        2023 WL 6542320 (N.D. Cal. Oct. 6, 2023) ...............................16

*Standard Havens Prods., Inc. v. Gencor Indus.*,
        897 F.2d 511 (Fed. Cir. 1990) .........................................6, 11, 21

*Symbol Techs., Inc. v. Lemelson Med.*,
        422 F.3d 1378 (Fed. Cir. 2005) .............................................16, 17

## STATUTES, RULES, AND REGULATIONS

19 C.F.R. Part 177.......................................................................20

19 C.F.R. §210.43(b)(2).............................................................17

19 U.S.C. §1337 ............................................................................3, 5, 6, 7

## FEDERAL CIRCUIT RULE 18 STATEMENT

Pursuant to Federal Rule of Appellate Procedure 18(a) and Federal Circuit Rule 18, Appellant Apple Inc. seeks an emergency stay pending appeal of Appellee International Trade Commission's Final Determination, including a stay as to its Limited Exclusion Order (Stay-Add-26-29) and Cease and Desist Order (Stay-Add-17-24). The Orders were issued by the Commission on October 26, 2023 and went into full effect earlier today. They are both premised on the Commission's Opinion (Stay-Add-31-154) adopting in part the Administrative Law Judge's Final Initial Determination (Stay-Add-156-497).

Apple filed a similar stay motion with the Commission on October 30, 2023, which was denied. Stay-Add-2-15.[1] The Commission and the parties that requested the Commission's investigation (Masimo Corporation and Cercacor Laboratories (collectively, "Masimo")) have indicated they oppose this motion and will file a response.

## INTRODUCTION

As of early this morning, the Orders bar importation and sale of Apple's flagship Watch products that include the Blood Oxygen feature. Unless this Court

---

[1] No public version of the Commission's decision was available at the time of this filing. Apple has accordingly filed the decision under seal and refrained from quoting it directly or referencing any material Masimo has previously claimed to be confidential.

stays the Orders (or U.S. Customs and Border Protection approves a redesign to redesign details ), Apple will be unable to import and sell these products in the U.S. for the foreseeable future, depriving consumers of the health, wellness, and safety features that they provide.[2] For its part, Masimo offers no reasonable substitute for Apple Watch. Nor can any other company provide a substitute, in a commercially reasonable amount of time, to fill the gap in supply that a ban on Apple Watch would cause.

The evidence shows that Masimo delayed twelve years in filing the applications for the two patents for which the Commission's Final Determination found a violation. As Commission Chairman Johanson summarized in dissent, Masimo's case rests on "late added claims … added by amendment years after the original priority date" and that "reach beyond any disclosure fairly described by the specification and figures." Stay-Add-95-96 n.43. In fact, Masimo first filed its patent applications only after the launch of Apple Watch 6, the earliest of the accused products. And when Masimo triggered the ITC's investigation, it had no device matching the alleged domestic industry product depicted in the CAD images

---

[2] On October 27, 2023, Apple asked the Exclusion Order Enforcement Branch of U.S. Customs and Border Protection to rule that redesigned versions of the Apple Watch products at issue are not covered by the Commission's Orders. The Branch has scheduled oral argument for December 28, 2023 and has set a target date of January 12, 2024 for a ruling. *See infra* pp. 19-20.

attached to its complaint.  The watch product Masimo now refers to as "Masimo W1" is both different and was undisputedly built months after Masimo's complaint was filed.  Even today, it is not being sold in more than *de minimis* quantities.

This Court is likely to reverse the Commission's final determination following merits briefing for at least three reasons.  *First*, the Commission's decision cannot be squared with the plain text of 19 U.S.C. §1337(a), which required Masimo to show a domestic industry "relating to the *articles* protected by the patent[s] … exist[ed]" when the complaint was filed.  *See Microsoft Corp. v. ITC*, 731 F.3d 1354, 1361-1362 (Fed. Cir. 2013) (complainant must identify an "actual article").  *Second*, the Commission's ruling contravenes this Court's precedent that while a prior art reference need only enable one of the embodiments claimed in a patent to invalidate it, a patent must enable all embodiments covered by the claims.  *In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994).  *Third*, the Commission's decision ignores that a patent is unenforceable when "a patentee's conduct 'constitutes an egregious misuse of the statutory patent system.'"  *Personalized Media Commc'ns, LLC v. Apple Inc.*, 57 F.4th 1346, 1354 (Fed. Cir. 2023).

The equities also favor a stay pending appeal.  The Orders are already causing Apple irreparable harm to its goodwill and reputation, as Apple is now unable to supply U.S. consumers with flagship Apple Watch products that were on the market as recently as last week.  In contrast, Masimo will not suffer any harm from a stay

because the purported "article" that it filed suit to protect (the Masimo W1 watch) is not being sold in more than, at most, negligible quantities in the U.S.

Finally, the public faces significant harm absent a stay. The flagship Watches subject to the Orders contain a host of health and wellness features that are valuable to both consumers and the major medical studies that depend on the accused products for data. More broadly, Apple's U.S.-based component suppliers and third-party developers and accessory manufacturers will suffer severe economic harm and consumers will be unable to find a comparable wearable product to purchase instead of Apple Watch within a commercially reasonable period of time.

## BACKGROUND

### A.    Products At Issue

When Apple released the first Apple Watch ("Series 0") almost nine years ago, it was praised as "the first mainstream wearable computer."[3] Over time, Apple added numerous improvements and features to Apple Watch, including a Blood Oxygen feature that allows users to measure the oxygen saturation of their blood on demand or in the background. When it was released in September 2020, Apple Watch Series 6 was the first commercially available smartwatch with the ability to measure blood oxygen. The Commission's Orders target the Series 6 and

---

[3] Manjoo, "Apple Watch Review: Bliss, but Only After a Steep Learning Curve," *N.Y. Times* (Apr. 8, 2015), https://tinyurl.com/e7bnxtmz.

subsequent models of Apple Watch with the Blood Oxygen feature: Series 7-9, Ultra, and Ultra 2. *See* Stay-Add-18; Stay-Add-27.

### B.    Commission Investigation

In July 2021, Masimo filed an amended complaint (the "Complaint") with the Commission alleging that Apple Watch products containing the Blood Oxygen feature violated 19 U.S.C. §1337 by infringing over a hundred patent claims from five patents. The ALJ's Final Initial Determination found that Section 337 was violated by only two claims, claims 24 and 30 of the U.S. Patent No. 10,945,648 (the "'648 patent"). Stay-Add-34; Stay-Add-495-496.

The Commission affirmed the ALJ's finding as to a violation of claims 24 and 30 of the '648 patent. Stay-Add-52-53. In a split decision, it also reversed the ALJ's findings of invalidity based on lack of written description for several other claims. Stay-Add-90-95 & n.43. The Commission ultimately found that five claims satisfied Section 337: claims 22 and 28 of U.S. Patent No. 10,912,502 (the "'502 patent") and claims 12, 24, and 30 of the '648 patent. Stay-Add-153.

### ARGUMENT

This Court considers four factors in determining whether to grant a stay pending appeal: (1) "whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits," (2) "whether the applicant will be irreparably injured absent a stay," (3) "whether issuance of the stay will substantially injure the

other parties interested in the proceeding," and (4) "the public interest." *Standard Havens Prods., Inc. v. Gencor Indus.*, 897 F.2d 511, 512 (Fed. Cir. 1990); *accord Nken v. Holder*, 556 U.S. 418, 434 (2009).

I.     THE COMMISSION'S ORDERS WILL LIKELY BE REVERSED ON APPEAL[4]

A.     **The Commission erred in holding the domestic industry requirement satisfied even though no patent-practicing article existed at the time of the complaint**

Section 337 grants the Commission authority to remedy the unfair importation of "***articles***" into the United States when that importation infringes upon an intellectual property right, such as a patent. 19 U.S.C. §1337(a)(1). The Commission's authority is subject to an important caveat: "[A] company seeking section 337 protection must … provide evidence … relat[ing] to an actual article that practices the patent, … manufactured domestically or abroad." *Microsoft*, 731 F.3d at 1362 (quoting 19 U.S.C. §1337(a)(2)-(3)). In other words, it is not enough that a ***hypothetical article*** embodies the patent; the question is whether the patented invention was "actually implemented." *Id.* at 1364; *see also Broadcom Corp. v. ITC*, 28 F.4th 240, 250 (Fed. Cir. 2022) (similar). And, importantly, the "relevant date at which to determine if the domestic industry requirement of Section 337 was

---

[4] For concision, this motion addresses only three potential grounds for reversal. Apple will raise additional grounds in its merits brief, as the Commission's rulings on domestic industry, validity, and infringement were riddled with error.

satisfied" is "the date of the filing of [the] complaint." *Motiva, LLC v. ITC,* 716 F.3d 596, 601 n.6 (Fed. Cir. 2013).

Here, Masimo initiated this litigation by claiming that "the Masimo Watch is protected by one or more of claims" of the asserted patents, and "'drawings' of the "Masimo Watch … are attached." Stay-Add-500-505 ¶¶ 47, 54, 61, 68, 86, 89 (Complaint). Drawings alone, however, cannot qualify as "articles" because that term "means 'material things.'" *ClearCorrect v. ITC*, 810 F.3d 1283, 1286, 1294-1295 (Fed. Cir. 2015). Any other interpretation would render nonsensical large swathes of Section 337. For example, 19 U.S.C. §1337(i) provides that the Commission may order "any article imported in violation" of Section 337 seized and forfeited—a CAD drawing is unlikely to move in commerce and cannot be seized or forfeited in any meaningful way. *See id.* at 1295 (applying this reasoning to hold that "digital models" are not "articles").

Masimo's Complaint also stated that a "Masimo Confidential Business Information Masimo Confidential Business Information available upon request." Stay-Add-500-503 ¶¶ 47, 54, 61, 68. However, there was no "Masimo Watch" matching the Complaint's description when the Complaint was filed, nor has any such "Masimo Watch" ever existed. As the ALJ explained, the watch Masimo now refers to as the "Masimo W1" was not actually built until "several months after the complaint was filed." Stay-Add-219. Nor did Masimo ever possess a physical device that matched the drawings in Masimo's

complaint.  Masimo's Director of Sensor Design, Mr. Scruggs, testified under oath that he was "not aware of ***any*** devices that – in existence that are exactly the same as depicted" in the Complaint's CAD drawings.  Stay-Add-510 (175:4-11) (Scruggs Dep.) (emphasis added); Stay-Add-517-518 (454:8-455:13) (Scruggs Tr.) (similar).

The Commission's stay ruling did not address Mr. Scruggs' testimony.  Nor did it identify a specific device matching the "Masimo Watch" design in Masimo's Complaint; rather, it merely stated that the Commission believes multiple alleged domestic industry articles existed at the time of the Complaint and cross-referenced 29 pages of the ALJ's opinion.  Stay-Add-7.[5]  But the ALJ's opinion makes clear that there was no direct evidence showing that any of the purported "articles" Masimo eventually offered at the hearing both existed at the time of the Complaint and practiced the patents at issue.

Indeed, of the eight different purported "articles" ultimately offered by Masimo, only one of them—the "RevA" sensor—existed at the time of the Complaint in the form relied on at the hearing.  As the diagram below demonstrates, RevA (left) looks nothing like the "Masimo Watch" alleged in the Complaint (right).

---

[5] Masimo's response in front of the Commission was that the differences between the CAD drawings and the physical items are "small."  But neither Section 337 nor this Court's case law holds that "close enough" is sufficient to satisfy the actual article requirement.



The remaining seven items put forth by Masimo at the hearing were, at the time of the Complaint, (1) admittedly non-existent; (2) non-operational; or (3) not shown to exist at the time of the complaint in the form on which Masimo relied. For example, the "RevD" item could not have existed at the time of the Complaint because it had been loaded with software—which it needed to operate—that did not exist until July 30, 2021. Stay-Add-519-520 (459:4-460:12) (Scruggs Tr.). Similarly, Masimo failed to show that the three "RevE" items existed before the Complaint was filed. Stay-Add-516 (398:20-23) (Scruggs testifying RevE sensors were "built between May and September of 2021"). Masimo's witness testified unequivocally that one of the RevE sensors was "created in September 2021,"—months after the Complaint—and the ALJ found that the remaining two RevE items

were at least "altered after the filing of the complaint" with different software. Stay-Add-244 & n.23.

Given the weakness of Masimo's case, the ALJ was only able to find (and the Commission was only able to affirm) an "actual article" existed by relying on unexplained speculation. Specifically, the ALJ asserted that "*circumstantial evidence*" showed that "prototype devices with designs that are *consistent with* the asserted domestic industry products"—i.e., *not* the specific RevA, RevD, and RevE items that Masimo identified or produced during discovery—"were operational before the filing of the complaint and subject to testing." Stay-Add-244 n.22; *see also id.* at Stay-Add-221-222 & n.16 (similar reliance on "circumstantial" evidence).

"Mere speculation is not substantial evidence." *See OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019). If there actually was a patent-practicing physical article at the time of the complaint, the ALJ should not have needed to resort to "circumstantial evidence" and speculative inferences. Apple is not aware of any decision from this Court that rests on such evidence in addressing the actual article requirement. For good reason—the inquiry is a yes/no question. The article either exists or it does not. That Masimo was unable to provide direct evidence of a single pre-Complaint item that matched the CAD drawing or practiced the claims should have ended the inquiry.

Although Apple raised all the above points about the ALJ's reliance on speculation in its stay motion, the Commission's ruling had no substantive answer beyond—once again—merely cross-referencing the ALJ's opinion. Stay-Add-7. The Commission apparently declined to substantively address this argument because it believed it raised a question of fact rather than law. But while the Commission's precedent *permits* it to grant a stay based on "difficult legal questions," the movant can also meet its burden by more broadly showing a likelihood of success on the merits. *See* Stay-Add-5-6 (citing *Standard Havens*). This Court has found the merits factor satisfied by a dispute over factual considerations. *See Standard Havens*, 897 F.2d at 514 (whether particular piece of prior art rendered patent obvious).

### B. The Commission erred by rubber-stamping Masimo's attempts to stretch clinical-focused patents to cover consumer products

#### 1. The Commission erred in concluding the patents-in-suit are valid

##### a. *The Commission erred by requiring the prior art to enable more than the patents require or enable themselves*

Of the 103 patent claims that Masimo originally asserted, the ALJ found a violation based on infringement of just two—dependent claims 24 and 30 of the '648 patent. The ALJ's ruling on those two claims (as well as claim 12 of the '648 patent

and claims 22 and 28 of the '502 patent)[6] rested in large part on the legal error that prior art references must render obvious *more* than the challenged patents enable— or, indeed, more than the challenged claims require. The Commission likewise erred by adopting the ALJ's holding without modification. Stay-Add-53.

When asserted claims encompass a range of embodiments (here, for example, the category of "user-worn devices"), the prior art invalidates the claims so long as it discloses even a single embodiment. *See, e.g.*, *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001); *In re Theresa*, 720 F. App'x 634, 637 (Fed. Cir. 2018). In contrast, "[a] patentee who chooses broad claim language must make sure the broad claims are fully enabled"; a patent claim is invalid if it does not provide enough detail to enable all embodiments. *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008).

Taking these two legal principles together, a patent challenger cannot be required to show that the prior art enables more than the patent-at-issue. This Court has accordingly rejected the argument that prior art is not enabling when the patent owner "did not provide the type of detail in his specification that he now argues is

---

[6] The ALJ's validity analysis for these three claims became relevant only once the Commission decided to reverse the ALJ's separate written description finding. Stay-Add-95.

necessary in prior art references." *In re Epstein*, 32 F.3d at 1568; *accord In re Paulsen*, 30 F.3d 1475, 1481 (Fed. Cir. 1994) (similar).

Here, the invalidity ruling is directly contrary to the Federal Circuit's guidance in cases like *Sitrick*, *Epstein*, and *Paulsen*. Specifically, the ALJ found the asserted claims of the '648 and '502 patents were not obvious because Apple's prior art reference (Lumidigm) purportedly does not enable taking an "oxygen saturation" measurement "at the wrist." *E.g.*, Stay-Add-273-277. However, none of the claims for which a violation was found recites a wrist-based blood oxygen measurement. The '502 and '648 patent claims merely require a "***user-worn*** device."

The Commission's stay decision sought to justify the ALJ's ruling on the grounds that Apple purportedly based its invalidity case on a wrist-based embodiment. Stay-Add-10. But as the evidence established, Lumidigm discloses that (1) its sensor can be incorporated into *any* "portable electronic device," including wearable devices and (2) its wristwatch embodiment can include "'extended functionality' including measurements of 'oxygenation and/or hemoglobin levels in the blood.'" Stay-Add-631-665 at Figs. 8A-E, Fig. 9., 3:35-37, 12:56-13:14, 11:60-12:2 (Lumidigm reference); Stay-Add-527-528 (1205:12-1206:7) (Warren Tr.); Stay-Add-562 (1152:4-24) (Rowe Tr.). Such explicit disclosure is presumptively enabling, *Impax Labys., Inc. v. Aventis Pharms. Inc.*,

545 F.3d 1312, 1316 (Fed. Cir. 2008), and indisputably more enabling than the disclosures in Masimo's specification, which does not mention the "wrist" at all.

        **b.**      ***The Commission's other validity rulings were also error***

The Commission also erred by concluding that the Lumidigm reference did not render obvious another limitation—i.e., that the invention includes "transmissive windows" or "optically transparent material" extending across openings. *See* Stay-Add-59-73 (discussing elements 19D, 28G, 8F, and 20D of the asserted claims).

The ALJ weighed the evidence and rightly held the Lumidigm reference satisfies the limitations in question. *See* Stay-Add-281-284, Stay-Add-291; *see also* Stay-Add-654 (8:19-26) (Lumidigm reference); Stay-Add-525-26, Stay-Add-529-530 (1193:24-1194:25, 1221:16-1222:25) (Warren Tr.) (Apple expert testifying that POSITA would understand an optical relay to be optically transparent/transmissive). The Commission reversed on the ground that Apple did not present sufficient evidence that a POSITA would have had reason to use multiple windows/pieces of material for each of the separate openings. Stay-Add-66-67. But Lumidigm expressly references the use of "fiber optic face plates," which could be implemented as either (1) a single face plate or (2) as individual faceplates over each opening. Stay-Add-529-530 (1221:16-1222:25) (Warren Tr.). Under *KSR* and its progeny, where a small number of alternatives are known in the art and a POSITA would know how to implement them, all those alternatives are obvious. *E.g.*, *KSR Int'l Co.*

- 14 -

*v. Teleflex Inc.*, 550 U.S. 398, 401 (2007); *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1315 (Fed. Cir. 2008).

Finally, the Commission erred by affirming the ALJ's conclusion that Lumidigm did not render obvious claim 22 of the '502 patent's requirement that there be "optically transparent material *within* each of the openings." Stay-Add-65; *see* Stay-Add-281-284. A POSITA would have understood that an optical relay— particularly if it were in the form of "fiber bundles"—could be placed within the openings and used to "essentially direct light from a portion of the tissue straight to the detector as a means to optimize the detection process." Stay-Add-529-530 1221:16-1222:25 (Warren Tr.). Neither the ALJ nor the Commission directly addressed this testimony.

### 2.     The Commission erred in concluding that the patent laches doctrine did not apply

Prosecution laches applies if "(1) the patentee's delay in prosecution … [is] unreasonable and inexcusable under the totality of the circumstances" and "(2) the accused infringer … suffered prejudice attributable to the delay." *See Personalized Media*, 57 F. 4th at 1354.

As to the first factor, Masimo delayed for twelve years in filing the asserted claims—with no apparent reason for doing so beyond gamesmanship. Masimo filed the original provisional applications to which the '502 and '648 patents claim priority in mid-2008. For the patents here asserted, Masimo delayed over a decade

after the original provisional application (but waited just one week after the September 2020 release of Apple Watch Series 6, the oldest accused product)—to file what eventually became the '502 and '648 patents. Masimo introduced no evidence—and its witnesses provided no reason—why the applications could not have been filed earlier. Stay-Add-559-560 (1029:12-1030:17) (Cromar Tr.); Stay-Add-567 (153:16-23) (Kiani Tr.). The only explanation apparent is that Masimo was stretching beyond its actual invention to draft claims in an attempt to cover Apple's products. This inference is borne out by the fact that, as Commissioner Johansen noted in dissent, several asserted claims from 2020 "reach beyond any disclosure fairly described by the specification and figures" from 2008. Stay-Add-96 n.43. Such a lengthy, unjustifiable delay satisfies the first laches factor. *See, e.g.*, *Symbol Techs., Inc. v. Lemelson Med.*, 422 F.3d 1378, 1385 (Fed. Cir. 2005) (patent laches applied in cases "involv[ing] a nine-and-a-half-year delay and an eight-year delay"); *see also Sonos v. Google LLC,* 2023 WL 6542320, at *16 (N.D. Cal. Oct. 6, 2023) ("inexcusable delay" where patents-in-suit issued thirteen years after provisional application and after purported infringer brought accused product to market).

Apple suffered significant prejudice due to Masimo's misconduct because it "invested in, worked on, or used the claimed technology during the period of delay." *Personalized Media*, 57 F.4th at 1357. During the time between the 2008 provisional

applications and the proximate applications filed in 2020, Apple expended tremendous time and cost in developing Apple Watch and improving on the technology from generation to generation.  Stay-Add-540-545 (923:7-926:6, 933:12-934:10) (Waydo Tr.); Stay-Add-547-556 (954:23-955:9, 957:2-959:13, 962:15-966:6) (Land Tr.).  But for Masimo's bad-faith actions, Apple could have altered its product design, or gone in an entirely different direction, to avoid any potential conflict with the asserted claims.

The Commission's stay ruling did not address any of the facts summarized above.[7]  Instead, it adopted Masimo's novel argument that Apple waived the ability to raise laches—purportedly because Apple's petition for Commission review only incorporated the laches argument by reference.  In reality, Apple's petition concisely briefed the issue, just as the Commission's regulations require.  *See* 19 C.F.R. §210.43(b)(2) (petition "must present a concise argument").  Here, the petition identified the proper legal standard and noted why it was satisfied.  *See* Stay-Add-571-574 (citing *Personalized Media* and explaining that Masimo's strategy of lying in wait until Apple further developed its wearable technology was unreasonable and prejudicial).  Neither the Commission nor Masimo identified any authority that has

---

[7] Masimo has pointed to the ALJ's finding that there was a "continuous" chain of prosecution.  Stay-Add-332.  But co-pendency in applications does not answer whether laches applies.  *See, e.g., Symbol Techs.*, 422 F.3d at 1380.

found waiver under similar circumstances, likely because the term "incorporation by reference" describes citing to another brief without analysis—not a succinct summary of one's legal position that happens to refer the reader to another document for more detail. *E.g.*, *In re Motupalli*, 791 F. App'x 895, 897 (Fed. Cir. 2019) (phrase "Appellant reasserts arguments at [J.A.] 2279[-]81" was incorporation by reference).[8]

## II. THE COMMISSION'S ORDERS ARE CAUSING, AND WILL CAUSE, IRREPARABLE HARM TO APPLE

"Where the injury cannot be quantified, no amount of money damages is calculable, and therefore the harm cannot be adequately compensated and is irreparable." *Metalcraft of Maryville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017).

Here, Apple is losing goodwill and suffering reputational damage from being unable to provide U.S. consumers with its flagship Apple Watch products. *See Celsis In Vitro v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("loss of goodwill" and "damage to reputation" are irreparable harm). The affected Watch models account for millions of the smartwatches sold in the U.S. each year. Stay-

---

[8] The Commission cited three cases, but all involved a party's complete failure to raise an issue. *See In re Certain Tobacco Heating Articles*, Comm'n Op. at 10, 2022 WL 279056, at *5-6 (Jan. 20, 2022) (issue waived because not timely raised with ALJ); *Hazani v. ITC*, 126 F.3d 1473, 1476-1477 (Fed. Cir. 1997) (same); *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1362-1363 (Fed. Cir. 1999) (issue waived because not raised in petition in any way).

Add-595 (Davies Decl. ¶18).  Supply chain constraints will make it difficult to

produce non-infringing Watches in a reasonable amount of time to make up for the

sudden shortfall in supply.  Stay-Add-595-596 (Davies Decl. ¶19).  And the abrupt

withdrawal and continuing absence of Apple Watch products will inevitably harm

the public's perception of Apple.  Apple will lose goodwill it has built over the

decades of providing high quality, innovative electronics in a timely manner, leading

potential customers not to purchase any smartwatch at all.  *Metalcraft*, 848 F.3d at

1369 (affirming finding of irreparable harm on the grounds that "the loss of

customers may have far-reaching, long-term impact on [the movant's] future

revenues").[9]

Allowing the Orders to remain in effect is particularly problematic in the short

term because it will cut Apple off from the marketplace just a few weeks before U.S.

Customs and Border Protection is scheduled to rule on Apple's proposed redesign.

Specifically, Apple filed a request with the Exclusion Order Enforcement Branch on

---

[9] The Commission faulted Apple for not providing "evidence" in support of the common-sense point that placing an obstacle in the way of a company's ability to sell one of its most popular products will have substantial and unpredictable deleterious consequences.  Stay-Add-11.  *Metalcraft*, however, did not cite any direct evidence for this basic point; the only "evidentiary" support was the purported infringer's banal observation that "[s]ome customers 'prefer to purchase an entire line of products from the same manufacturer for consistency.'"  848 F.3d at 1368-1369.  The same could be said here.  *E.g.*, Stay-Add-588 (Desai Decl. ¶ 31) (noting that it would be "highly disruptive" for Apple Watch users to "switch[] to another device"); *see also* Stay-Add-610-611 (Davies Decl. ¶ 100) (similar).

October 27, 2023 requesting a ruling under 19 C.F.R. Part 177 that Apple's redesigned Watches fall outside the Commission's Orders because they ███redesign details███ **redesign details** the Commission found to be infringing. Although Apple proposed an expedited briefing schedule under which the Branch would have issued its ruling before the Orders went into effect, the Branch has set the target date for its ruling as January 12, 2024. If this Court is disinclined to stay the Orders in their entirety, it should at least grant a limited stay of the Orders until the time that the Exclusion Order Enforcement Branch issues its ruling on Apple's proposed redesign.

### III.    A STAY WILL NOT HARM MASIMO

In stark contrast to Apple (or the public, *see infra* pp. 18-20), Masimo will not suffer any cognizable harm if this Court enters a stay. The W1 Watch is not selling in the United States in any meaningful quantities and Mr. Kiani has acknowledged that Masimo did not put the W1 watch into the consumer channel; rather Mr. Kiani indicated that Masimo intends to market a *different* product to consumers—the "Freedom" watch. Stay-Add-599 (Davies Decl. ¶48). The Freedom Watch itself has not even been released. *Id.* (discussing "future Freedom Watch"). Tellingly, the Commission itself acknowledged that Masimo would not suffer any significant monetary harm from a stay. Stay-Add-12-13. Although the Commission found that Masimo would suffer the generic harm any patentee does when it cannot make full

use of its patent, that cannot be enough to justify denial of a stay standing alone. If such garden-variety considerations sufficed, "no stay pending appeal could ever issue in an infringement case." *Standard Havens*, 897 F.2d at 515.

## IV.    THE PUBLIC INTEREST SUPPORTS A STAY

Millions of would-be Watch purchasers will rely on the accused products to stay connected, to monitor their individual health and wellness, and to fulfill a host of other needs (from navigation to payment) that go far beyond the invention claimed by the five remaining claims. *E.g.*, Stay-Add-594, Stay-Add-597-598 (Davies Decl. ¶¶15, 27-30). The Apple Watch models at issue also contain potentially lifesaving features—such as the Irregular Heart Rhythm Notification feature and the ECG app—which can provide notification of a fatal cardiac condition and allow users to monitor their heart rhythm. Stay-Add-585-587 (Desai Decl. ¶¶ 14-16); Stay-Add-607-609 (Davies Decl. ¶¶ 73-78).

The lack of a stay would also pose an immediate setback for medical research, where Apple Watch plays a critical role. At a minimum, there are several major medical studies now underway that rely on Apple Watch to collect data, including (1) an NIH-funded study related to stroke prevention, (2) a Yale study to study the effects of treatment on symptoms of atrial fibrillation, and (3) a Mayo Clinic study to evaluate the use of Apple Watch with ECG to assess cardiovascular health and detect unknown and asymptomatic diseases. Stay-Add-595, Stay-Add-599-606

(Davies Decl. ¶¶ 17, 50-72) (discussing, *inter alia*, NIH and Mayo clinic studies).[10] There are also a number of ongoing studies relying on Apple Watch.[11]  Apple Watch is vital to these studies, as it is a product the test subjects may already own (cutting down on expenses), data can be collected remotely, and researchers can review multiple health and wellness metrics at the same time.  *See, e.g.*, Stay-Add-600 (Davies Decl. ¶ 52)

Finally, the Commission's orders will have a significant, negative effect on the economy.  Apple "supports more than 450,000 jobs through U.S.-based suppliers"—and a significant portion of those relate to Apple Watch.  *See* Stay-Add-611 (Davies Decl. ¶101).  For example, U.S.-based components suppliers have already invested heavily in manufacturing products to Apple's specifications and "will likely experience negative impacts due to an exclusion order."  Stay-Add-591-592 (Schafer Decl. ¶12).  The Commission's orders will have a similar detrimental impact on the healthcare field—which has already invested in research and other projects that rely on Apple Watch—and on third-party developers and accessory

---

[10] *See also* ClinicalTrials.gov, "Heart Watch Study: A Pragmatic Randomized Controlled Trial," http://tinyurl.com/5xytt92v (Yale study).

[11] *See, e.g.*, ClinicalTrials.gov, "Apple Heart & Movement Study," http://tinyurl.com/466fjrxs; ClinicalTrials.gov, "Apple Women's Health Study," http://tinyurl.com/3hrhjpw9.

manufacturers that make products specific to the accused products.  Stay-Add-599-606, Stay-Add-609, Stay-Add-611 (Davies Decl. ¶¶ 50-72, 81, 101).

The Commission's stay decision did not substantively address any of these points.   Stay-Add-13-14.   Instead, it noted the general interest in enforcing intellectual property rights and stated that it had already rejected Apple's public interest arguments in its opinion (in discussing the statutory public interest considerations under Section 337).  Stay-Add-14.  But as Apple pointed out, the Commission has long held that "the public interest factor in the stay analysis is broader than the statutory analysis under section 337"—indeed, it has granted a stay despite ruling against the movant on the public-interest statutory considerations. *Certain Digital Models*, Inv. No. 337-TA-833, Comm'n Op. at 9-10, 2014 WL 12890480, at *5 (June 11, 2014).   The Commission had no answer to its own authority.

## CONCLUSION

For the foregoing reasons, Apple respectfully requests that the Court stay the Commission's Orders pending appeal.  At a minimum, Apple requests this Court stay the Orders until the Exclusion Order Enforcement Branch has ruled on Apple's proposed redesign.

Respectfully submitted,

/s/ Mark D. Selwyn

JOSEPH J. MUELLER
SARAH R. FRAZIER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

MARK D. SELWYN
THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA  94306
(650) 858-6000

DAVID P. YIN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington DC  20037
(202) 663-6000

DEREK GOSMA
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 S. Grand Avenue, Suite 2400
Los Angeles, CA  90071
(213) 443-5300

*Attorneys for Appellant Apple Inc.*

December 26, 2023

# CERTIFICATE OF INTEREST

Counsel for Appellant Apple Inc. certifies the following:

**1.    Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Apple Inc.

**2.    Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

**3.    Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3).  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4.    Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

WILMER CUTLER PICKERING HALE AND DORR LLP:  Mark D. Selwyn, Joseph J. Mueller, Sarah D. Frazier, Thomas G. Sprankling, Derek Gosma, David P. Yin, Michael D. Esch, David L. Cavanaugh, Richard Goldenberg

**5.    Related Cases**.  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

[X] Yes (file separate notice; see below)    [ ] No    [ ] N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  Please do not duplicate information.  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

Notice will be filed immediately after case is docketed.

**6.    Organizational Victims and Bankruptcy Cases**.    Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None.

Dated:  December 26, 2023          /s/ Mark D. Selwyn
                                   MARK D. SELWYN
                                   WILMER CUTLER PICKERING
                                     HALE AND DORR LLP
                                   2600 El Camino Real, Suite 400
                                   Palo Alto, CA  94306
                                   (650) 858-6000

# ADDENDUM

No. 2024-____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

APPLE INC.,

*Appellant*,

*v.*

INTERNATIONAL TRADE COMMISSION,

*Appellee*,

On Appeal from the United States International Trade Commission
in Investigation No. 337-TA-1276

## DECLARATION OF MARK D. SELWYN IN SUPPORT OF APPELLANT APPLE INC.'S EMERGENCY MOTION TO STAY ENFORCEMENT OF ITC'S ORDERS PENDING REVIEW

I, Mark D. Selwyn, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am a partner at Wilmer Cutler Pickering Hale and Dorr LLP, counsel to Appellant Apple Inc. in the above-captioned appeal.  I have personal knowledge of the facts set forth below.

2.     Attached hereto as Exhibit 1 (filed under seal) is a true and correct copy of the Commission Opinion Denying Respondent's Motion to Stay the Remedial Orders, dated December 20, 2023, in Investigation No. 337-TA-1276, *In the Matter of Certain Light-Based Physiological Measurement Devices and Components*

*Thereof* (hereinafter "1276 Investigation*")*.  No public version of this document is currently available.

3.     Attached hereto as Exhibit 2 is a true and correct copy of the Cease and Desist Order, dated October 26, 2023, filed the 1276 Investigation.

4.     Attached hereto as Exhibit 3 is a true and correct copy of the Limited Exclusion Order, dated October 26, 2023, filed in the 1276 Investigation.

5.     Attached hereto as Exhibit 4 is a true and correct copy of the Commission Opinion, dated October 26, 2023, filed in the 1276 Investigation.  This exhibit contains confidential information, which has been redacted in the public version filed in the record for the 1276 Investigation.

6.     Attached hereto as Exhibit 5 is a true and correct copy of the Final Initial Determination on Violation of Section 337, dated January 10, 2023, filed in the 1276 Investigation.  This exhibit contains confidential information, which has been redacted in the public version filed in the record for the 1276 Investigation.

7.     Attached hereto as Exhibit 6 is a true and correct copy of an excerpted version of the First Amended Complaint Under Section 337 of the Tariff Act of 1930, as Amended, dated July 7, 2021, which was filed in the 1276 Investigation. This exhibit contains confidential information, which has been redacted in the public version filed in the record for the 1276 Investigation.

8. Attached hereto as Exhibit 7 is a true and correct copy of an excerpted version of the deposition transcript of Stephen Scruggs, dated January 6, 2022, which was taken in the 1276 Investigation. This exhibit contains confidential information. No public version of this document is currently available.

9. Attached hereto as Exhibit 8 is a true and correct copy of an excerpted version of the June 7, 2022 trial transcript in the 1276 Investigation. This exhibit contains confidential information, which has been redacted.

10. Attached hereto as Exhibit 9 is a true and correct copy of an excerpted version of the June 10, 2022 trial transcript in the 1276 Investigation.

11. Attached hereto as Exhibit 10 is a true and correct copy of the Notice of the Commission's Final Determination Finding a Violation of Section 337; Issuance of a Limited Exclusion Order and a Cease and Desist Order; Termination of the Investigation, dated October 26, 2023, which was filed in the 1276 Investigation.

12. Attached hereto as Exhibit 11 is a true and correct copy of an excerpted version of the June 9, 2022 trial transcript in the 1276 Investigation. This exhibit contains confidential information, which has been redacted.

13. Attached hereto as Exhibit 12 is a true and correct copy of an excerpted version of the June 6, 2022 trial transcript in the 1276 Investigation.

14.     Attached hereto as Exhibit 13 is a true and correct copy of an excerpted version of Apple Inc.'s Petition for Review of the Initial Determination of Violation of Section 337, dated January 23, 2023, which was filed the 1276 Investigation. This exhibit contains confidential information, which has been redacted in the public version filed in the record for the 1276 Investigation.

15.     Attached hereto as Exhibit 14 is a true and correct copy of an excerpted version of the June 6, 2022 trial transcript in the 1276 Investigation. This exhibit contains confidential information. No public version of this document is currently available.

16.     Attached hereto as Exhibit 15 is a true and correct copy of an excerpted version of Apple Inc.'s Response to the Commission's Notice to Review in Part a Final Initial Determination and Request for Written Submissions, including the Declaration of Sumbul Desai, M.D., dated June 5, 2023; Declaration of Aaron Schafer, dated June 5, 2023; Declaration of Michael A.M. Davies, dated June 5, 2023; and the Declaration of Christian M. Dippon, PhD, dated June 5, 2023, which was filed in the 1276 Investigation. This exhibit contains confidential information, which has been redacted in the public version filed in the record for the 1276 Investigation.

17.     Attached hereto as Exhibit 16 is a true and correct copy of United States Patent No. 7,620,212, which is referred to in the Commission's and ALJ's decisions as the Lumidigm reference.

18.     Attached hereto as Exhibit 17 is a true and correct copy of United States Patent No. 10,912,502.

19.     Attached hereto as Exhibit 18 is a true and correct copy of United States Patent No. 10,945,648.

Executed on:  December 26, 2023          /s/ Mark D. Selwyn
                                         Mark D. Selwyn

# LIST OF EXHIBITS

| 1 | Commission Opinion Denying Respondent's Motion to Stay the Remedial Orders Dec. 20, 2023 | Stay-Add-1-15 |
|---|---|---|
| 2 | Cease and Desist Order, Oct. 26, 2023 | Stay-Add-16-24 |
| 3 | Limited Exclusion Order, Oct. 26, 2023 | Stay-Add-25-29 |
| 4 | Commission Opinion, Oct. 27, 2023 | Stay-Add-30-154 |
| 5 | Final Initial Determination on Violation of Section 337, Jan. 10, 2023 | Stay-Add-155-497 |
| 6 | First Amended Complaint Under Section 337, July 7, 2021, excerpted | Stay-Add-498-507 |
| 7 | Deposition of Stephen Scruggs, Jan. 6, 2022, excerpted | Stay-Add-508-511 |
| 8 | ITC Trial Transcript, Open and Closed Sessions, June 7, 2022, excerpted | Stay-Add-512 -521 |
| 9 | ITC Trial Transcript, Open Sessions, June 10, 2022, excerpted | Stay-Add-522 -531 |
| 10 | Notice of the Commission's Final Determination, Oct. 26, 2023 | Stay-Add-532-536 |
| 11 | ITC Trial Transcript, Open and Closed Sessions, June 9, 2022, excerpted | Stay-Add-537-563 |
| 12 | ITC Trial Transcript, Open Sessions, June 6, 2022, excerpted | Stay-Add-564-568 |
| 13 | Respondent Apple Inc.'s Petition for Review of the Initial Determination of Violation of Section 337, Jan. 23, 2023, excerpted | Stay-Add-569-575 |
| 14 | ITC Trial Transcript, Closed Sessions, June 6, 2022, excerpted | Stay-Add-576-581 |

| 15 | Respondent Apple Inc.'s Response to the Commission's Notice to Review in Part a Final Initial Determination and Request for Written Submissions, June 5, 2023, excerpted | Stay-Add-582-629 |
| 16 | U.S. Patent No. 7,620,212 | Stay-Add-630-665 |
| 17 | U.S. Patent No. 10,912,502 | Stay-Add-666-775 |
| 18 | U.S. Patent No. 10,945,648 | Stay-Add-776-885 |

**Rule 25.1(e)(1)(B) Statement:** The material omitted from Addendum pages Stay-Add-2-15 is the Commission Opinion Denying Respondent's Motion to Stay the Remedial Orders, dated December 20, 2023, in ITC Investigation No. 1276. No public version of this document is currently available. The material omitted from Addendum pages Stay-Add-97-98, Stay-Add-144-145, Stay-Add-217, Stay-Add-222, Stay-Add-229, Stay-Add-331, Stay-Add-334, Stay-Add-360, Stay-Add-361, Stay-Add-366, Stay-Add-433-441, Stay-Add-459-461, Stay-Add-464, Stay-Add-466-471, Stay-Add-473, Stay-Add-475-483, Stay-Add-487-495, Stay-Add-500-505, Stay-Add-509, Stay-Add-510, Stay-Add-511, Stay-Add-516-520, Stay-Add-572, Stay-Add-577-581 contains information that complainants Masimo Corporation and Cercacor Laboratories, Inc. designated as Confidential Business Information under the Administrative Protective Order in effect in ITC Investigation No. 1276. The material omitted from Addendum pages Stay-Add-44, Stay-Add-132, Stay-Add-164, Stay-Add-191, Stay-Add-196-199, Stay-Add-201-203, Stay-Add-263, Stay-Add-274, Stay-Add-276, Stay-Add-277, Stay-Add-305, Stay-Add-306, Stay-Add-308-313, Stay-Add-342-345, Stay-Add-347-349, Stay-Add-351, Stay-Add-353, Stay-Add-373, Stay-Add-375-377, Stay-Add-420-431, Stay-Add-540-545, Stay-Add-552-556 contains confidential competitively sensitive product information subject to the Administrative Protective Order. The material omitted from Addendum Stay-Add-75-76, Stay-Add-128, Stay-Add-131-132, Stay-Add-135, Stay-Add-595-597, Stay-Add-614-615 contains confidential competitively sensitive financial and sales information subject to the Administrative Protective Order.

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | **Inv. No.  337-TA-1276** |

**ORDER NO. 1:        PROTECTIVE ORDER**

(August 18, 2021)

WHEREAS, documents and information may be sought, produced or exhibited by and among the parties to the above captioned proceeding, which materials relate to trade secrets or other confidential research, development or commercial information, as such terms are used in the Commission's Rules, 19 C.F.R. § 210.5;

IT IS HEREBY ORDERED THAT:

1.  Confidential business information is information which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, or other information of commercial value, the disclosure of which is likely to have the effect of either (i) impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions; or (ii) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such

information.  The term "confidential business information" includes "proprietary information" within the meaning of section 777(b) of the Tariff Act of 1930 (19 U.S.C. § 1677f(b)).

2(a).  Any information submitted, in pre hearing discovery or in a pleading, motion, or response to a motion either voluntarily or pursuant to order, in this investigation, which is asserted by a supplier to contain or constitute confidential business information shall be so designated by such supplier in writing, or orally at a deposition, conference or hearing, and shall be segregated from other information being submitted.  Documents shall be clearly and prominently marked on their face with the legend: "CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER," or a comparable notice.  Such information, whether submitted in writing or in oral testimony, shall be treated in accordance with the terms of this protective order.

(b).  The Administrative Law Judge or the Commission may determine that information alleged to be confidential is not confidential, or that its disclosure is necessary for the proper disposition of the proceeding, before, during or after the close of a hearing herein.  If such a determination is made by the Administrative Law Judge or the Commission, opportunity shall be provided to the supplier of such information to argue its confidentiality prior to the time of such ruling.

3.  In the absence of written permission from the supplier or an order by the Commission or the Administrative Law Judge, any confidential documents or business information submitted in accordance with the provisions of paragraph 2 above shall not be disclosed to any person other than:  (i) outside counsel for parties to this investigation, including necessary secretarial and support personnel assisting such counsel; (ii) qualified persons taking testimony involving such documents or information and necessary stenographic and clerical personnel thereof; (iii)

technical experts and their staff who are employed for the purposes of this litigation (unless they are otherwise employed by, consultants to, or otherwise affiliated with a non-governmental party, or are employees of any domestic or foreign manufacturer, wholesaler, retailer, or distributor of the products, devices or component parts which are the subject of this investigation); (iv) the Commission, the Administrative Law Judge, the Commission staff, and personnel of any governmental agency as authorized by the Commission; (v) the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this investigation or related proceedings, or (b) in internal investigations, audits, reviews, evaluations relating to the programs, personnel, and operations of the Commission including under to 5 U.S.C. Appendix 3; and (vi) U.S. government employees and contract personnel, solely for cybersecurity purposes.[1]

4.    Confidential business information submitted in accordance with the provisions of paragraph 2 above shall not be made available to any person designated in paragraph 3(i)[2] and (iii) unless he or she shall have first read this order and shall have agreed, by letter filed with the Secretary of this Commission:  (i) to be bound by the terms thereof; (ii) not to reveal such confidential business information to anyone other than another person designated in paragraph 3; and (iii) to utilize such confidential business information solely for purposes of this investigation. The letter shall also include the following acknowledgement:

I, the undersigned, on behalf of _____, acknowledge that information submitted for purposes of this Investigation may be disclosed to and used:

(i) by the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this or a related proceeding, or (b) in

---

[1] *See* Commission Administrative Order 16-01 (Nov. 7, 2015).
[2] Necessary secretarial and support personnel assisting counsel need not sign onto the protective order themselves because they are covered by counsel's signing onto the protective order.

internal investigations, audits, reviews, and evaluations relating to the programs, personnel, and operations of the Commission including under 5 U.S.C. Appendix 3; or

(ii) by U.S. government employees and contract personnel, solely for cybersecurity purposes. I understand that all contract personnel will sign appropriate nondisclosure agreements.

5.   If the Commission or the Administrative Law Judge orders, or if the supplier and all parties to the investigation agree, that access to, or dissemination of information submitted as confidential business information shall be made to persons not included in paragraph 3 above, such matter shall only be accessible to, or disseminated to, such persons based upon the conditions pertaining to, and obligations arising from this order, and such persons shall be considered subject to it, unless the Commission or the Administrative Law Judge finds that the information is not confidential business information as defined in paragraph 1 thereof.

6.   (a). Any confidential business information submitted to the Commission or the Administrative Law Judge in connection with a motion or other proceeding within the purview of this investigation shall be submitted under seal pursuant to paragraph 2 above.  Any portion of a transcript in connection with this investigation containing any confidential business information submitted pursuant to paragraph 2 above shall be bound separately and filed under seal.  When any confidential business information submitted in accordance with paragraph 2 above is included in an authorized transcript of a deposition or exhibits thereto, arrangements shall be made with the court reporter taking the deposition to bind such confidential portions and separately label them "CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER."  Before a court reporter or translator receives any such information, he or she shall have first read this order and shall have agreed in writing to be bound by the terms thereof.  Alternatively, he or she shall sign the agreement included as Attachment A hereto.

Copies of each such signed agreement shall be provided to the supplier of such confidential business information and the Secretary of the Commission.

(b).    Submitters[3] are strongly encouraged to encrypt nonpublic documents that are electronically transmitted to the Commission to protect your sensitive information from unauthorized disclosure. The USITC secure drop-box system and the Electronic Document Information System (EDIS) use Federal Information Processing Standards (FIPS) 140-2 cryptographic algorithms to encrypt data in transit. Submitting your nonpublic documents by a means that does not use these encryption algorithms (such as by email) may subject your firm's nonpublic information to unauthorized disclosure during transmission. If you choose a non-encrypted method of electronic transmission, the Commission warns you that the risk of such possible unauthorized disclosure is assumed by you and not by the Commission.

7.  The restrictions upon, and obligations accruing to, persons who become subject to this order shall not apply to any information submitted in accordance with paragraph 2 above to which the person asserting the confidential status thereof agrees in writing, or the Commission or the Administrative Law Judge rules, after an opportunity for hearing, was publicly known at the time it was supplied to the receiving party or has since become publicly known through no fault of the receiving party.

8.  The Commission, the Administrative Law Judge, and the Commission investigative attorney acknowledge that any document or information submitted as confidential business information pursuant to paragraph 2 above is to be treated as such within the meaning of 5 U.S.C. § 552(b)(4) and 18 U.S.C. § 1905, subject to a contrary ruling, after hearing, by the

---

[3] "Submitters" of confidential business information are the same as "suppliers" of confidential business information as that term is used in the context of this order.  *See* Commission Administrative Order 16-01 (Nov. 7, 2015).

Commission or its Freedom of Information Act Officer, or the Administrative Law Judge. When such information is made part of a pleading or is offered into the evidentiary record, the data set forth in 19 C.F.R. § 201.6 must be provided except during the time that the proceeding is pending before the Administrative Law Judge. During that time, the party offering the confidential business information must, upon request, provide a statement as to the claimed basis for its confidentiality.

9.   Unless a designation of confidentiality has been withdrawn, or a determination has been made by the Commission or the Administrative Law Judge that information designated as confidential, is no longer confidential, the Commission, the Administrative Law Judge, and the Commission investigative attorney shall take all necessary and proper steps to preserve the confidentiality of, and to protect each supplier's rights with respect to, any confidential business information designated by the supplier in accordance with paragraph 2 above, including, without limitation:  (a) notifying the supplier promptly of (i) any inquiry or request by anyone for the substance of or access to such confidential business information, other than those authorized pursuant to this order, under the Freedom of Information Act, as amended (5 U.S.C. § 552) and (ii) any proposal to redesignate or make public any such confidential business information; and (b) providing the supplier at least seven days after receipt of such inquiry or request within which to take action before the Commission, its Freedom of Information Act Officer, or the Administrative Law Judge, or otherwise to preserve the confidentiality of and to protect its rights in, and to, such confidential business information.

10.  If while an investigation is before the Administrative Law Judge, a party to this order who is to be a recipient of any business information designated as confidential and submitted in accordance with paragraph 2 disagrees with respect to such a designation, in full or in part, it

shall notify the supplier in writing, and they will thereupon confer as to the status of the subject information proffered within the context of this order.  If prior to, or at the time of such a conference, the supplier withdraws its designation of such information as being subject to this order, but nonetheless submits such information for purposes of the investigation; such supplier shall express the withdrawal, in writing, and serve such withdrawal upon all parties and the Administrative Law Judge.  If the recipient and supplier are unable to concur upon the status of the subject information submitted as confidential business information within ten days from the date of notification of such disagreement, any party to this order may raise the issue of the designation of such a status to the Administrative Law Judge who will rule upon the matter.  The Administrative Law Judge may sua sponte question the designation of the confidential status of any information and, after opportunity for hearing, may remove the confidentiality designation.

11.  No less than 10 days (or any other period of time designated by the Administrative Law Judge) prior to the initial disclosure to a proposed expert of any confidential information submitted in accordance with paragraph 2, the party proposing to use such expert shall submit in writing the name of such proposed expert and his or her educational and detailed employment history to the supplier.  If the supplier objects to the disclosure of such confidential business information to such proposed expert as inconsistent with the language or intent of this order or on other grounds, it shall notify the recipient in writing of its objection and the grounds therefore prior to the initial disclosure.  If the dispute is not resolved on an informal basis within ten days of receipt of such notice of objections, the supplier shall submit immediately each objection to the Administrative Law Judge for a ruling.  If the investigation is before the Commission the matter shall be submitted to the Commission for resolution.  The submission of such confidential business information to such proposed expert shall be withheld pending the ruling of the

Commission or the Administrative Law Judge.  The terms of this paragraph shall be inapplicable to experts within the Commission or to experts from other governmental agencies who are consulted with or used by the Commission.

12.   If confidential business information submitted in accordance with paragraph 2 is disclosed to any person other than in the manner authorized by this protective order, the party responsible for the disclosure must immediately bring all pertinent facts relating to such disclosure to the attention of the supplier and the Administrative Law Judge and, without prejudice to other rights and remedies of the supplier, make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

13.   Nothing in this order shall abridge the right of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Commission, its Freedom of Information Act Officer, or the Administrative Law Judge concerning the issue of the status of confidential business information.

14.   Upon final termination of this investigation, each recipient of confidential business information that is subject to this order shall assemble and return to the supplier all items containing such information submitted in accordance with paragraph 2 above, including all copies of such matter which may have been made.  Alternatively, the parties subject to this order may, with the written consent of the supplier, destroy all items containing confidential business information and certify to the supplier (or his counsel) that such destruction has taken place. This paragraph shall not apply to the Commission, including its investigative attorney, and the Administrative Law Judge, which shall retain such material pursuant to statutory requirements and for other recordkeeping purposes, but may destroy such material (including electronic media containing such information) in its possession which it regards as surplusage.

Notwithstanding the above paragraph, confidential business information may be transmitted to a district court pursuant to Commission Rule 210.5(c).

15.   If any confidential business information which is supplied in accordance with paragraph 2 above is supplied by a nonparty to this investigation, such a nonparty shall be considered a "supplier" as that term is used in the context of this order.

16.   Each nonparty supplier shall be provided a copy of this order by the party seeking information from said supplier.

17.   The Secretary shall serve a copy of this order upon all parties.


Charles E. Bullock
Chief Administrative Law Judge

Attachment A

NONDISCLOSURE AGREEMENT FOR REPORTER/STENOGRAPHER/TRANSLATOR

I, _____, do solemnly swear or affirm that I will not divulge

any information communicated to me in any confidential portion of the investigation or hearing

in the matter of *Certain_____,* Investigation No. 337-TA-_1276_ except as permitted in the
CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF

protective order issued in this case.  I will not directly or indirectly use, or allow the use of such

information for any purpose other than that directly associated with my official duties in this

case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any

person reveal the nature or content of any information communicated during any confidential

portion of the investigation or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the

participants in said investigation.

I am aware that the unauthorized use or conveyance of information as specified above is

a violation of the Federal Criminal Code and punishable by a fine of up to $10,000,

imprisonment of up to ten (10) years, or both.

Signed _____

Dated _____

Firm or affiliation _____

<u>**PUBLIC CERTIFICATE OF SERVICE**</u>

      I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served upon the following parties as indicated, on **August 18, 2021**.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

<u>**On Behalf of Complainants Masimo Corporation and**</u>
<u>**Cercacor Laboratories, Inc.:**</u>

Jonathan Bachand, Esq.           ☐ Via Hand Delivery
**KNOBBE, MARTENS, OLSON & BEAR, LLP**    ☐ Via Express Delivery
1717 Pennsylvania Avenue, NW, Suite 900     ☐ Via First Class Mail
Washington, DC 20006                 ☒ Other: Email Notification
Email: Jonathan.Bachand@knobbe.com      of Availability for Download

<u>**Respondent:**</u>

Apple Inc.                            ☐ Via Hand Delivery
One Apple Park Way               ☐ Via Express Delivery
Cupertino, CA 95014              ☐ Via First Class Mail
                                       ☒ Other: Service to Be
                                       Completed by Complainants

# EXHIBIT 1

**CONFIDENTIAL INFORMATION REDACTED**

**CONFIDENTIAL INFORMATION REDACTED**

CONFIDENTIAL INFORMATION REDACTED

CONFIDENTIAL INFORMATION REDACTED

**CONFIDENTIAL INFORMATION REDACTED**

**CONFIDENTIAL INFORMATION REDACTED**

CONFIDENTIAL INFORMATION REDACTED

**CONFIDENTIAL INFORMATION REDACTED**

**CONFIDENTIAL INFORMATION REDACTED**

**CONFIDENTIAL INFORMATION REDACTED**

**CONFIDENTIAL INFORMATION REDACTED**

**CONFIDENTIAL INFORMATION REDACTED**

**CONFIDENTIAL INFORMATION REDACTED**

**CONFIDENTIAL INFORMATION REDACTED**

# EXHIBIT 2

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| |
|---|
| **In the Matter of** |
| **CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** |

**Investigation No. 337-TA-1276**

## <u>CEASE AND DESIST ORDER</u>

**IT IS HEREBY ORDERED THAT RESPONDENT** Apple, Inc. of Cupertino, California cease and desist from conducting any of the following activities in the United States: importing, selling, offering for sale, marketing, advertising, distributing, transferring (except for exportation), soliciting United States agents or distributors, and aiding or abetting other entities in the importation, sale for importation, sale after importation, transfer (except for exportation), or distribution of certain light-based physiological measurement devices and components thereof (as defined in Definition (G) below) that infringe one or more of claim 28 of U.S. Patent No. 10,912,502 and claims 12, 24, and 30 of U.S. Patent No. 10,945,648 ("Asserted Patents") in violation of section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337).

**I.**
**Definitions**

As used in this order:

(A)     "Commission" shall mean the United States International Trade Commission.

(B)     "Complainant" shall mean Masimo Corporation and Cercacor Laboratories, Inc., both of Irvine, California.

(C)     "Respondent" shall mean Apple, Inc. of Cupertino, California.

(D)     "Person" shall mean an individual, or any non-governmental partnership, firm, association, corporation, or other legal or business entity other than Respondent or its majority-owned or controlled subsidiaries, successors, or assigns.

(E)     "United States" shall mean the fifty States, the District of Columbia, and Puerto Rico.

(F)     The terms "import" and "importation" refer to importation for entry for consumption under the Customs laws of the United States.

(G)     The term "covered products" shall mean light-based physiological measurement devices and components thereof that infringe one or more of claims 22 and 28 of U.S. Patent No. 10,912,502 and claims 12, 24, and 30 of U.S. Patent No. 10,945,648.  The light-based physiological measurement devices and components thereof subject to this order are as follows:  wearable electronic devices with light-based pulse oximetry functionality and components thereof.  Covered products shall not include articles for which a provision of law or license avoids liability for infringement.

## II.
## Applicability

The provisions of this Cease and Desist Order shall apply to Respondent and to any of its principals, stockholders, officers, directors, employees, agents, distributors, controlled (whether by stock ownership or otherwise) and majority-owned business entities, successors, and assigns, and to each of them, insofar as they are engaging in conduct prohibited by section III, *infra*, for, with, or otherwise on behalf of, Respondent.

2

## III.
## Conduct Prohibited

The following conduct of Respondent in the United States is prohibited by this Order.

For the remaining terms of the Asserted Patents, Respondent shall not:

(A)     import or sell for importation into the United States covered products;

(B)     market, distribute, sell, offer to sell, or otherwise transfer (except for exportation) in the United States imported covered products;

(C)     advertise imported covered products;

(D)     solicit U.S. agents or distributors for imported covered products; or

(E)     aid or abet other entities in the importation, sale for importation, sale after importation, transfer (except for exportation), or distribution of covered products.

## IV.
## Conduct Permitted

Notwithstanding any other provision of this Order, specific conduct otherwise prohibited by the terms of this Order shall be permitted if:

(A)     in a written instrument, the owner of the Asserted Patents licenses or authorizes such specific conduct;

(B)     such specific conduct is related to the importation or sale of covered products by or for the United States; or

(C)     such specific conduct is limited to importation, sale, and provision of parts necessary to repair covered products purchased by consumers prior to the date this Order becomes final within the meaning of 19 U.S.C. § 1337(j)(4), or limited to importation and provision of covered products that are replacements for covered products purchased by consumers prior to the date this Order becomes final

3

within the meaning of 19 U.S.C. § 1337(j)(4), provided that replacement is pursuant to a warranty for the replaced article.

## V.
### Reporting

For purposes of this requirement, the reporting periods shall commence on January 1 of each year and shall end on the subsequent December 31. The first report required under this section shall cover the period from the date of issuance of this order through December 31, 2023. This reporting requirement shall continue in force until such time as Respondent has truthfully reported, in two consecutive timely filed reports, that it has no inventory (whether held in warehouses or at customer sites) of covered products in the United States.

Within thirty (30) days of the last day of the reporting period, Respondent shall report to the Commission: (a) the quantity in units and the value in dollars of covered products that it has (i) imported and/or (ii) sold in the United States after importation during the reporting period, and (b) the quantity in units and value in dollars of reported covered products that remain in inventory in the United States at the end of the reporting period.

When filing written submissions, Respondent must file the original document electronically on or before the deadlines stated above. Submissions should refer to the investigation number ("Inv. No. 337-TA-1276") in a prominent place on the cover pages and/or the first page. *See* Handbook for Electronic Filing Procedures, http://www.usitc.gov/secretary/fed_reg_notices/rules/handbook_on_electronic_filing.pdf. Persons with questions regarding filing should contact the Secretary (202-205-2000). If Respondent desires to submit a document to the Commission in confidence, it must file the

4

original and a public version of the original with the Office of the Secretary and must serve a copy of the confidential version on Complainant's counsel.[1]

Any failure to make the required report or the filing of any false or inaccurate report shall constitute a violation of this Order, and the submission of a false or inaccurate report may be referred to the U.S. Department of Justice as a possible criminal violation of 18 U.S.C. § 1001.

## VI.
## Record-Keeping and Inspection

(A)     For the purpose of securing compliance with this Order, Respondent shall retain any and all records relating to the sale, marketing, or distribution in the United States of covered products, made and received in the usual and ordinary course of business, whether in detail or in summary form, for a period of three (3) years from the close of the fiscal year to which they pertain.

(B)     For the purposes of determining or securing compliance with this Order and for no other purpose, subject to any privilege recognized by the federal courts of the United States, and upon reasonable written notice by the Commission or its staff, duly authorized representatives of the Commission shall be permitted access and the right to inspect and copy, in Respondent's principal offices during office hours, and in the presence of counsel or other representatives if Respondent so chooses, all books, ledgers, accounts, correspondence, memoranda, and other records and documents, in detail and in summary form, that must be retained under subparagraph VI(A) of this Order.

---

[1] Complainants must file a letter with the Secretary identifying the attorney to receive reports and bond information associated with this Order. The designated attorney must be on the protective order entered in the investigation.

5

## VII.
## Service of Cease and Desist Order

The Secretary shall serve copies of this Order upon each party of record in this investigation that has retained counsel or otherwise provided a point of contact for electronic service. While temporary remote operating procedures are in place in response to COVID-19, the Office of the Secretary is not able to serve parties that have not retained counsel or otherwise provided a point of contact for electronic service. Accordingly, pursuant to Commission Rules 201.16(a) and 210.7(a)(1) (19 C.F.R. §§ 201.16(a), 210.7(a)(1)), the Commission orders that the Complainant complete service of this Order for any party without a method of electronic service noted on the attached Certificate of Service and shall file proof of service on the Electronic Document Information System (EDIS).

Respondent is ordered and directed to:

(A)    Serve, within fifteen (15) days after the effective date of this Order, a copy of this Order upon each of its respective officers, directors, managing agents, agents, and employees who have any responsibility for the importation, marketing, distribution, transfer, or sale of imported covered products in the United States;

(B)    Serve, within fifteen (15) days after the succession of any persons referred to in subparagraph VII(A) of this order, a copy of the Order upon each successor; and

(C)    Maintain such records as will show the name, title, and address of each person upon whom the Order has been served, as described in subparagraphs VII(A) and VII(B) of this order, together with the date on which service was made.

The obligations set forth in subparagraphs VII(B) and VII(C) shall remain in effect until the expiration of the Asserted Patents.

6

## VIII.
## Confidentiality

Any request for confidential treatment of information obtained by the Commission pursuant to section VI of this order should be made in accordance with section 201.6 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 201.6).  For all reports for which confidential treatment is sought, Respondent must provide a public version of such report with confidential information redacted.

## IX.
## Enforcement

Violation of this order may result in any of the actions specified in section 210.75 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 210.75), including an action for civil penalties under section 337(f) of the Tariff Act of 1930 (19 U.S.C. § 1337(f)), as well as any other action that the Commission deems appropriate.  In determining whether Respondent is in violation of this order, the Commission may infer facts adverse to Respondent if it fails to provide adequate or timely information.

## X.
## Modification

The Commission may amend this order on its own motion or in accordance with the procedure described in section 210.76 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 210.76).

## XI.
## Bonding

The conduct prohibited by section III of this order may be continued during the sixty (60) day period in which this Order is under review by the United States Trade Representative, as delegated by the President (70 Fed. Reg. 43,251 (Jul. 21, 2005)), subject to Respondent's posting

7

of a bond in the amount of zero percent (0%, *i.e.*, no bond) of their entered value. This bond

provision does not apply to conduct that is otherwise permitted by section IV of this Order.

Covered products imported on or after the date of issuance of this Order are subject to the entry

bond as set forth in the exclusion order issued by the Commission, and are not subject to this

bond provision.

By order of the Commission.


Lisa R. Barton
Secretary to the Commission

Issued: October 26, 2023

8

# EXHIBIT 3

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

In the Matter of

**CERTAIN LIGHT-BASED**
**PHYSIOLOGICAL MEASUREMENT**
**DEVICES AND COMPONENTS**
**THEREOF**

**Investigation No. 337-TA-1276**

## LIMITED EXCLUSION ORDER

The United States International Trade Commission ("Commission") has determined that there is a violation of section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337), in the unlawful importation, sale for importation, or sale within the United States after importation by respondent Apple, Inc. of Cupertino, California ("Respondent") of certain light-based physiological measurement devices and components thereof (as defined in paragraph 2 below) that infringe one or more of claims 22 and 28 of U.S. Patent No. 10,912,502 and claims 12, 24, and 30 of U.S. Patent No. 10,945,648 ("Asserted Patents").

Having reviewed the record in this investigation, including the written submissions of the parties, the Commission has made its determinations on the issues of remedy, the public interest, and bonding. The Commission has determined that the appropriate form of relief is a limited exclusion order prohibiting the unlicensed entry of infringing light-based physiological measurement devices and components thereof manufactured by or on behalf of Respondent or any of its affiliated companies, parents, subsidiaries, agents, or other related business entities, or its successors or assigns.

The Commission has also determined that the public interest factors enumerated in 19 U.S.C. § 1337(d) do not preclude the issuance of the limited exclusion order, and that the

bond during the period of Presidential review shall be in the amount of zero percent (0%, *i.e.*, no bond) of the entered value of the entered value of the articles subject to this Order.

Accordingly, the Commission hereby **ORDERS** that:

1.     Light-based physiological measurement devices and components thereof that infringe one or more of claims 22 and 28 of U.S. Patent No. 10,912,502 and claims 12, 24, and 30 of U.S. Patent No. 10,945,648 and are manufactured abroad by, or on behalf of, or imported by or on behalf of Respondent or any of its affiliated companies, parents, subsidiaries, agents, or other related business entities, or its successors or assigns, are excluded from entry for consumption into the United States, entry for consumption from a foreign-trade zone, or withdrawal from a warehouse for consumption, for the remaining terms of the Asserted Patents, except under license from, or with the permission of, the patent owner or as provided by law; and except for parts necessary to service and repair covered products purchased by consumers prior to the date this Order becomes final within the meaning of 19 U.S.C. § 1337(j)(4), and except for covered products that are replacements for covered products purchased by consumers prior to the date this Order becomes final within the meaning of 19 U.S.C. § 1337(j)(4), provided that replacement is pursuant to a warranty for the replaced article.

2.     The light-based physiological measurement devices and components thereof subject to this exclusion order (*i.e.*, "covered articles") are as follows:  wearable electronic devices with light-based pulse oximetry functionality and components thereof.

3.     Notwithstanding paragraph 1 of this Order, covered articles are entitled to entry into the United States for consumption, entry for consumption from a foreign trade zone, or withdrawal from a warehouse for consumption, under bond in the amount of zero percent (0%, *i.e.*, no bond) of their entered value, pursuant to subsection (j) of section 337 (19 U.S.C.

2

§ 1337(j)) and the Presidential Memorandum for the United States Trade Representative of July 21, 2005 (70 Fed. Reg. 43,251), from the day after this Order is received by the United States Trade Representative until such time as the United States Trade Representative notifies the Commission that this Order is approved or disapproved but, in any event, not later than sixty (60) days after the receipt of this Order. All entries of covered articles made pursuant to this paragraph are to be reported to U.S. Customs and Border Protection ("CBP"), in advance of the date of the entry, pursuant to procedures CBP establishes.

4.      At the discretion of CBP and pursuant to the procedures it establishes, persons seeking to import articles may be required to certify that they are familiar with the terms of this Order, that they have made appropriate inquiry, and thereupon state that, to the best of their knowledge and belief, the products being imported are not excluded from entry under paragraph 1 of this Order. At its discretion, CBP may require persons who have provided the certification described in this paragraph to furnish such records or analyses as are necessary to substantiate the certification.

5.      In accordance with 19 U.S.C. § 1337(l), the provisions of this Order shall not apply to covered articles that are imported by and for the use of the United States, or imported for and to be used for, the United States with the authorization or consent of the Government.

6.      The Commission may modify this Order in accordance with the procedures described in Rule 210.76 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 210.76).

7.      The Secretary shall serve copies of this Order upon each party of record in this investigation that has retained counsel or otherwise provided a point of contact for electronic service and upon CBP.

3

8.      Notice of this Order shall be published in the Federal Register.

By order of the Commission.


Lisa R. Barton
Secretary to the Commission


Issued:  October 26, 2023

4

# EXHIBIT 4

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

In the Matter of

**CERTAIN LIGHT-BASED**
**PHYSIOLOGICAL MEASUREMENT**
**DEVICES AND COMPONENTS**
**THEREOF**

**Investigation No. 337-TA-1276**

## COMMISSION OPINION

### TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 2
II.   BACKGROUND ................................................................. 2
      A.   Procedural History ................................................... 2
      B.   The Asserted Patents ................................................ 7
      C.   The Accused Products ............................................... 13
      D.   The Domestic Industry Products ................................... 14
III.  COMMISSION REVIEW OF THE FINAL ID ................................ 14
IV.   ANALYSIS OF THE ISSUES UNDER REVIEW ............................ 15
      A.   Subject Matter Jurisdiction ........................................ 15
      B.   Obviousness of the Asserted Claims of the '501 Patent, the '502 Patent, and the '648 Patent ................................................ 16
      C.   Non-Obviousness of the Asserted Claims of the '745 Patent ..... 49
      D.   Written Description Support of Claim 28 of the '502 Patent and Claim 12 of the '648 Patent ............................................... 53
      E.   Claim Construction and Infringement Regarding the '745 Patent ... 66
      F.   The Domestic Industry Issues Under Review—The Poeze Patents and the '745 Patent ...................................................... 66
V.    REMEDY, THE PUBLIC INTEREST, AND BONDING ..................... 69
      A.   Remedy ............................................................ 69
      B.   Public Interest ..................................................... 76
      C.   Bonding ........................................................... 119
VI.   CONCLUSION .................................................................. 123

1

## I.    INTRODUCTION

On May 15, 2023, the Commission determined to review in part the final initial

determination ("ID") issued by the presiding administrative law judge ("ALJ") on January 10,

2023.  88 Fed. Reg. 32243 (May 19, 2023).  On review, the Commission has determined that

there has been a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C.

§ 1337, with respect to U.S. Patent Nos. 10,945,648 ("the '648 patent") and 10,912,502 ("the

'502 patent"), but not with respect to U.S. Patent Nos. 10,912,501 ("the '501 patent"),

10,687,745 ("the '745 patent"), and 7,761,127 ("the '127 patent").  This opinion sets forth the

Commission's reasoning in support of that determination.

## II.    BACKGROUND

### A.    Procedural History

The Commission instituted this investigation on August 18, 2021, based on an amended

and supplemented complaint ("Complaint") filed by complainants Masimo Corporation

("Masimo") and Cercacor Laboratories, Inc. ("Cercacor," collectively, "Complainants").[1, 2, 3]  86

Fed. Reg. 46275–76 (Aug. 18, 2021).  The Complaint alleged violations of section 337 of the

---

[1] The original public complaint was filed on June 30, 2021.  *See* EDIS Doc. ID 745713 (June 30, 2021).  On July 7, 2021, Complainants filed an "Amendment to the Public Complaint, with Amended Exhibit 2 and Appendix C."  *See* EDIS Doc. ID 746186.  And on July 12, 2021, Complainants filed a "Confidential Amendment to the Public Complaint and Exhibits."  *See* EDIS Doc. ID 746514.  The Commission has determined that the filing date of the Complaint is July 12, 2021.  *See, e.g.*, 86 Fed. Reg. at 46275; Final ID at 84 (including n.24).

[2] Supplement to the Confidential Amended Complaint and Exhibits, EDIS Doc. ID 747244 (July 19, 2021); Supplement to the Amended Public Complaint and Exhibits, EDIS Doc. ID 747240 (July 19, 2021).

[3] Masimo is the owner of the '501 patent (JX-0001), '502 patent (JX-0002), '648 patent (JX-0003), and '745 patent (JX-0009).  Compl. at ¶ 4.  Cercacor is the owner of the '127 patent (JX-0007).  *Id.*  Masimo and Cercacor have rights to each of the Asserted Patents through a cross-licensing agreement.  *Id.* at ¶¶ 4, 77; CX-1612C.

2

Tariff Act of 1930, as amended, 19 U.S.C. § 1337, based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain light-based physiological measurement devices and components thereof by reason of infringement of certain claims of the '501 patent; the '502 patent; the '648 patent; the '745 patent; and the '127 patent (collectively, the "Asserted Patents"). *Id.* The Complaint further alleged that an industry in the United States exists and/or is in the process of being established. *Id.* The notice of investigation named Apple Inc. of Cupertino, California as the sole respondent ("Apple"). *Id.* at 46276. The Office of Unfair Import Investigations is not participating in this investigation. *See id.*

Prior to the issuance of the Final ID, the investigation terminated as to several claims. Order No. 25 (Mar. 23, 2022), *unreviewed by* Comm'n Notice (Apr. 12, 2022); Order No. 33 (May 20, 2022), *unreviewed by* Comm'n Notice (June 10, 2022). At the time of the hearing on June 6–10, 2022, only the following claims remained at issue: claim 12 of the '501 patent, claims 22 and 28 of the '502 patent, claims 12, 24, and 30 of the '648 patent, claims 9, 18,[4] and 27 of the '745 patent, and claim 9 of the '127 patent.

---

[4] Complainants proceeded at the hearing as to claim 18 of the '745 patent for domestic industry purposes only. *See, e.g.*, Final ID at 176. In other words, Complainants did not allege that Apple violated section 337 by infringing that claim.

On May 13, 2022, Complainants and Apple filed their pre-hearing briefs.[5]  The parties

filed initial post-hearing briefs on June 27, 2022,[6] and the parties filed post-hearing reply briefs

on July 11, 2022.[7]

On January 10, 2023, the ALJ issued the Final ID,[8] which found that Apple violated

section 337 as to only claims 24 and 30 of the '648 patent.  *See* Final ID at 335–36.  The Final ID

found that Complainants did not establish a violation as to the other remaining asserted claims.

*E.g.*, *id.*

On January 24, 2023, the ALJ issued the Recommended Determination on Remedy and

Bonding ("RD").[9]  The RD recommended that, if the Commission finds a violation, it should

---

[5] Complainants' Pre-Hearing Brief, EDIS Doc. ID 770786 (May 13, 2022) ("CPreHBr.");
Respondent Apple Inc.'s Pre-Hearing Brief, EDIS Doc. ID 770790 (May 13, 2022).  On May 16,
2022, Apple filed a corrected pre-hearing brief.  Respondent Apple Inc.'s Corrected Pre-Hearing
Brief, EDIS Doc. ID 770874 (May 16, 2022) ("RPreHBr.").

[6] Complainants' Initial Post-Hearing Brief, EDIS Doc. ID 774000 (June 27, 2022);
Respondent Apple Inc.'s Post-Hearing Brief, EDIS Doc. ID 774025 (June 27, 2022).  On July
14, 2022, Complainant filed a corrected opening post-hearing brief.  Complainants' Corrected
Initial Post-Hearing Brief, EDIS Doc. ID 775422 (July 14, 2022) ("CPHBr.").  On September 2,
2022, Apple filed a second corrected opening post-hearing brief.  Respondent Apple Inc.'s
Second Corrected Post-Hearing Brief, EDIS Doc. ID 779376 (Sept. 2, 2022) ("RPHBr.").

[7] Complainants' Reply Post-Hearing Brief, EDIS Doc. ID 775058 (July 11, 2022)
("CPHBr. (Reply)"); Respondent Apple Inc.'s Reply Post-Hearing Brief, EDIS Doc. ID 775073
(July 11, 2022).  On September 2, 2022, Apple filed a corrected post-hearing reply brief.
Respondent Apple Inc.'s Corrected Post-Hearing Reply Brief, EDIS Doc. ID 779379 (Sept. 2,
2022) ("RPHBr. (Reply)").

[8] Final Initial Determination on Violation of Section 337, EDIS Doc. ID 787653 (Jan. 10,
2023); *see also* Final Initial Determination on Violation of Section 337, EDIS Doc. ID 789795
(Feb. 7, 2023) (Public Version).

[9] Recommended Determination on Remedy and Bonding, EDIS Doc. ID 788506 (Jan. 24,
2023); *see also* Recommended Determination on Remedy and Bonding, EDIS Doc. ID 790079
(Feb. 10, 2023) (Public Version).

issue a limited exclusion order ("LEO") directed to certain wearable electronic devices with light-based pulse oximetry functionality and components thereof that are imported, sold for importation, and/or sold after importation by Apple; and a cease and desist order ("CDO") directed to Apple. *See* RD at 2–5. The RD additionally recommended that the Commission set a 0% bond (*i.e.*, no bond) during the sixty-day period of Presidential review. *See id.* at 6–7. The Commission's notice of investigation did not instruct the ALJ to make findings and recommendations concerning the public interest. *See* 86 Fed. Reg. at 46275–76.

On January 23, 2023, Complainants and Apple each filed a petition for review of the Final ID.[10] On January 31, 2023, Complainants and Apple each filed responses to the other respective petition.[11]

On January 24 and 30, 2023, (after the Final ID issued and petitions for review were filed), the United States Patent and Trademark Office ("USPTO") denied Apple's request for the institution of *inter partes* review proceedings ("IPRs") as to the '501, '502, and '648 patents based on a combination of references that included the same primary reference as one of the

---

[10] Complainants' Petition for Review of the Final Initial Determination on Violation of Section 337, EDIS Doc. ID 788456 (Jan. 23, 2023) ("CPet."); Complainants' Summary of Petition for Review of the Final Initial Determination on Violation of Section 337, EDIS Doc. ID 788457 (Jan. 23, 2023); Respondent Apple Inc.'s Petition for Review of the Initial Determination of Violation of Section 337, EDIS Doc. ID 788470 (Jan. 23, 2023) ("RPet."); Respondent Apple Inc.'s Summary of Petition for Review of the Initial Determination of Violation of Section 337, EDIS Doc. ID 788474 (Jan. 23, 2023).

[11] Complainants' Response to Apple Inc.'s Petition for Review of the Final Initial Determination on Violation of Section 337, EDIS Doc. ID 789044 (Jan. 31, 2023) ("CResp."); Complainants' Summary of Response to Apple Inc.'s Petition for Review of the Final Initial Determination on Violation of Section 337, EDIS Doc. ID 789045 (Jan. 31, 2023); Respondent Apple Inc.'s Response to Complainants' Petition for Review, EDIS Doc. ID 789061 (Jan. 31, 2023) ("RResp."); Respondent Apple Inc.'s Summary of Its Response to Complainants' Petition for Review, EDIS Doc. ID 789067 (Jan. 31, 2023).

combinations of references asserted against the asserted claims of those patents in this investigation. *See Apple Inc. v. Masimo Corp.*, IPR2022-01272 (USPTO Jan. 24, 2023) ('501 patent) (available at CResp. at Appx. B); *Apple Inc. v. Masimo Corp.*, IPR2022-01274 (USPTO Jan. 24, 2023) ('502 patent) (available at CResp. at Appx. C); *Apple Inc. v. Masimo Corp.*, IPR2022-01276 (USPTO Jan. 30, 2023) ) ('648 patent) (available at CResp. at Appx. A).

On February 23, 2023, the parties filed their public interest statements pursuant to 19 C.F.R. § 210.50(a)(4).[12] The Commission received numerous comments on the public interest from non-parties, discussed below in the public interest section of this Opinion.

On May 15, 2023, after considering the parties' petitions and responses thereto, the Commission determined to review the Final ID in part. *See* 88 Fed. Reg. at 32243–46. In particular, the Commission determined to review: (1) the domestic industry with regard to the '501 patent, the '502 patent, the '648 patent, and the '745 patent; (2) obviousness with regard to the '501 patent, the '502 patent, the '648 patent, and the '745 patent; (3) written description with regard to claim 28 of the '502 patent and claim 12 of the '648 patent; (4) claim construction and infringement with regard to the '745 patent; and (5) subject matter jurisdiction. *Id.* at 32244. The Commission determined not to review the remaining findings of the Final ID, including the finding of no violation as to the '127 patent. *Id.* The Commission requested briefing on certain issues under review and also on remedy, the public interest, and bonding. *See id.* at 32244-46. The Commission's public interest briefing request also solicited input from non-parties. *See id.*

---

[12] Complainants' Statement on the Public Interest, EDIS Doc. ID 791050 (Feb. 23, 2023) ("CStmt."); Respondent Apple Inc.'s Public Interest Statement, EDIS Doc. ID 791062 (Feb. 23, 2023) ("RStmt.").

On June 5, 2023, the parties filed their written submissions on the issues under review and on remedy, public interest, and bonding,[13] and on June 12, 2023, the parties filed their reply submissions.[14] The Commission additionally received numerous comments on the public interest from non-parties, which are discussed below in the public interest section of this Opinion.

### B.    The Asserted Patents

The technology at issue in this investigation relates to user-worn devices for noninvasively measuring physiological parameters of a user.

### 1.    U.S. Patent Nos. 10,912,501; 10,912,502; and 10,945,648:  The "Poeze Patents"

The '501 patent (JX-0001), '502 patent (JX-0002), and '648 patent (JX-0003) share a common specification, claiming priority to an application filed on July 3, 2008.  These patents are titled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User" and name as inventors Jeroen Poeze, *et al*.  These patents are referred to herein as the "Poeze patents."

---

[13] Complainants' Submission in Response to the Commission's May 15, 2023 Notice of Commission Determination to Review in Part, EDIS Doc ID 797853 (June 5, 2023) ("CBr."); Respondent Apple Inc.'s Response to the Commission's Notice to Review in Part a Final Initial Determination and Request for Written Submissions, EDIS Doc ID 797870 (June 5, 2023) ("RBr.").

[14] Complainants' Reply to Apple Inc.'s Response to the Commission's Notice to Review in Part a Final Initial Determination and Request for Written Submissions, EDIS Doc ID 798353 (June 12, 2023) ("CBr. (Reply)"); Respondent Apple Inc.'s Reply to Complainants' Response to the Commission's Notice to Review in Part a Final Initial Determination and Request for Written Submissions, EDIS Doc ID 798383 (June 12, 2023) ("RBr. (Reply)").

Complainants assert claim 12 of the '501 patent, which depends from claim 1. *See* CPHBr. at 53-66. Claim 12 is reproduced below in a claim/element identifier chaii that includes the element designations used by the pa1iies and the Final ID.

| U.S. Patent No. 10,912,501 ||
|---|---|
| **Identifier** | **Claim/Element** |
| **Claim 12** ||
| **[1PRE]** | A user-worn device configured to noninvasively measure a physiological pai·ameter of a user, the user-worn device comprising: |
| **[1A]** | at least three light emitting diodes (LEDs); |
| **[1B]** | at least three photodiodes aiTanged on an interior surface of the user-worn device and configured to receive light attenuated by tissue of the user; |
| **[1C]** | a protrusion aiTanged over the interior surface, the protrnsion comprising a convex surface and |
| **[1D]** | a plurality of openings extending through the protrusion and positioned over the three photodiodes, |
| **[1E]** | the openings each comprising an opaque lateral surface, the plurality of openings configured to allow light to reach the photodiodes, the opaque lateral surface configured to avoid light piping through the protrusion; and |
| **[1F]** | one or more processors configured to receive one or more signals from the photodiodes and calculate a measurement of the physiological parameter of the user. |
| **[12]** | The user-worn device of Claim 1, wherein the convex surface of the protrusion is an oute1most surface configured to contact the tissue of the user and confo1m the tissue into a concave shape. |

Complainants also asse1i claim 22 of the '502 patent, which depends from claims 19, 20, and 21, and claim 28, a sepai·ate independent claim. *See* CPHBr. at 66-77. These claims are reproduced below.

| **U.S. Patent No. 10,912,502** |
|---|---|
| **Identifier** | **Claim/Element** |
| **Claim 22** |
| **[19PRE]** | A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user worn device comprising: |
| **[19A]** | a plurality of emitters configured to emit light, each of the emitters comprising at least two light emitting diodes (LEDs); |
| **[19B]** | four photodiodes ananged within the user-worn device and configured to receive light after at least a po1iion of the light has been attenuated by tissue of the user; |
| **[19C]** | a protrusion comprising a convex surface including separate openings extending through the protrusion and lined with opaque material, each opening positioned over a different one of the four photodiodes, the opaque material configured to reduce an amount of light reaching the photodiodes without being attenuated by the tissue; |
| **[19D]** | optically transparent material within each of the openings; and |
| **[19E]** | one or more processors configured to receive one or more signals from at least one of the four photodiodes and output measurements responsive to the one or more signals, the measurements indicative of the oxygen saturation of the user. |
| **[20]** | The user-worn device of claim 19 further comprising a thennistor. |
| **[21]** | The user-worn device of claim 20, wherein the one or more processors are fuiiher configured to receive a temperature signal from the thennistor and adjust operation of the user-worn device responsive to the temperature signal. |
| **[22]** | The user-worn device of claim 21, wherein the plurality of emitters comprise at least four emitters, and wherein each of the plurality of emitters comprises a respective set of at least three LEDs. |

9

| U.S. Patent No. 10,912,502 | |
|---|---|
| **Identifier** | **Claim/Element** |
| | **Claim 28** |
| **[28PRE]** | A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user worn device comprising: |
| **[28A]** | a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength; |
| **[28B]** | a second set of LEDs spaced apa1t from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength; |
| **[28C]** | four photodiodes ananged in a quadrant configuration on an interior surface of the user-worn device and configured to receive light after at least a po1tion of the light has been attenuated by tissue of the user; |
| **[28D]** | a thermistor configured to provide a temperature signal; |
| **[28E]** | a protrusion ananged above the interior smface, the protr11sion comprising: a convex surface; |
| **[28F]** | a plurality of openings in the convex surface, extending through the protrusion, and aligned with the four photodiodes, each opening defined by an opaque surface configured to reduce light piping; and |
| **[28G]** | a plurality of u·ansmissive windows, each of the tr·ansmissive windows extending across a different one of the openings; |
| **[28H]** | at least one opaque wall extending between the interior surface and the protr11sion, wherein at least the interior surface, the opaque wall and the protr11sion fonn cavities, wherein the photodiodes are ananged on the interior surface within the cavities; |
| **[281]** | one or more processors configured to receive one or more signals from at least one of the photodiodes and calculate an oxygen saturation measurement of the user, the one or more processors fmther configured to receive the temperature signal; |
| **[28J]** | a network interface configured to wirelessly communicate the oxygen saturation measurement to at least one of a mobile phone or an electr·onic network; |
| **[28K]** | a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the oxygen saturation measurement of the user; |
| **[28L]** | a storage device configured to at least temporarily store at least the measurement; and |
| **[28M]** | a su·ap configured to position the user-worn device on the user. |

Complainants further asse1t claim 12 of the '648 patent, which depends from claim 8, and

claims 24 and 30, which depend from claim 20.  *See* CPHBr. at 77-83.  These claims are

reproduced below.

| U.S. Patent No. 10,945,648 ||
|---|---|
| **Identifier** | **Claim/Element** |
| Claim 12 ||
| **[8PRE]** | A user-worn device configured to non-invasively dete1mine measurements of a physiological parameter of a user, the user-worn device comprising: |
| **[SA]** | a first set of light emitting diodes (LEDs), the first set comprising at least an LED configured to emit light at a first wavelength and at least an LED configured to emit light at a second wavelength; |
| **[8B]** | a second set of LEDs spaced apa1t from the first set of LEDs, the second set of LEDs comprising an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength; |
| **[SC]** | four photodiodes; |
| **[8D]** | a protrusion comprising a convex surface, at least a po1tion of the protrusion comprising an opaque material; |
| **[SE]** | a plurality of openings provided through the protr11sion and the convex surface, the openings aligned with the photodiodes; |
| **[SF]** | a separate optically tr·anspanent window extending across each of the openings; |
| **[8G]** | one or more processors configured to receive one or more signals from at least one of the photodiodes and output measurements of a physiological parameter of a user; |
| **[SH]** | a housing; and |
| **[81]** | a strap configured to position the housing proximate tissue of the user when the device is worn. |
| **[12]** | The user-worn device of Claim 8, wherein the physiological parameter comprises oxygen or oxygen saturation. |

11

| U.S. Patent No. 10,945,648 | |
|---|---|
| **Identifier** | **Claim/Element** |
| **Claims 24 and 30** | |
| **[20PRE]** | A user-worn device configured to non-invasively dete1mine measurements of a user's tissue, the user-worn device comprising: |
| **[20A]** | a plurality of light emitting diodes (LEDs); |
| **[20B]** | at least four photodiodes configured to receive light emitted by the LEDs, the four photodiodes being airnnged to capture light at different quadrants of tissue of a user; |
| **[20C]** | a protrusion comprising a convex surface and |
| **[20D]** | a plurality of through holes, each through hole including a window and nanged over a different one of the at least four photodiodes; and |
| **[20E]** | one or more processors configured to receive one or more signals from at least one of the photodiodes and detennine measurements of oxygen saturation of the user. |
| **[24]** | The user-worn device of Claim 20, wherein the protrusion comprises opaque material configured to substantially prevent light piping. |
| **[30]** | The user-worn device of Claim 20, wherein the protrusion further comprises one or more chainfered edges. |

## 2.　　U.S. Patent No. 10,687,745

The '745 patent (JX-0009) is titled "Physiological Monitoring Devices, Systems, and Methods," claims priority to an application filed on June 28, 2016, and names Ammar Al-Ali as the sole inventor. Complainants asse1i that Apple infringes claims 9 and 27, and they rely on claim 18 for domestic industry purposes only. Claim 9 is reproduced below as representative of the asse1ied claims of the '745 patent.

12

| U.S. Patent No. 10,687,745 | |
|---|---|
| **Identifier** | **Claim/Element** |
| **Claim 9** | |
| **[1PRE]** | A physiological monitoring device comprising: |
| **[1A]** | a plurality of light-emitting diodes configured to emit light in a first shape; |
| **[1B]** | a material configured to be positioned between the plurality of light-emitting diodes and tissue on a wrist of a user when the physiological monitoring device is in use, the material configured to change the first shape into a second shape by which the light emitted from one or more of the plurality of light-emitting diodes is projected towards the tissue; |
| **[1C]** | a plurality of photodiodes configured to detect at least a po1iion of the light after the at least the po1iion of the light passes through the tissue, the plurality of photodiodes finiher configured to output at least one signal responsive to the detected light; |
| **[1D]** | a surface comprising a dark-colored coating, the surface configured to be positioned between the plurality of photodiodes and the tissue when the physiological monitoring device is in use, wherein an opening defined in the dark-colored coating is configured to allow at least a po1iion of light reflected from the tissue to pass through the surface; |
| **[1E]** | a light block configured to prevent at least a po1iion of the light emitted from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the tissue; |
| **[1F]** | and a processor configured to receive and process the outputted at least one signal and detennine a physiological parameter of the user responsive to the outputted at least one signal. |
| [9] | The physiological monito1ing device of claim 1, wherein the physiological parameter comprises oxygen saturation. |

### 3.    U.S. Patent No. 7,761,127

The '127 patent (JX-0007) is titled "Multiple Wavelength Sensor Substrate," issued from

an application filed on March 1, 2006, and names as inventors Ammar Al-Ali, *et al*.

Complainants asse1i claim 9 of the '127 patent, which depends from claim 7.

### C.    The Accused Products

Complainants accuse certain Apple Watches of infringing the Asse1ied Patents, including

the Apple Watch Series 6, the Apple Watch Series 7, and ce1iain prototype Apple Watch

13

**CONFIDENTIAL INFORMATION REDACTED**

products with project names ▓▓▓▓▓▓▓▓▓▓▓▓▓ (collectively, the "Accused Products").

CPHBr. at 37–39. The parties have stipulated that the Accused Products are materially identical

for the purposes of infringement in this investigation. *See* Joint Stipulation of Facts at ¶¶ 11–13,

EDIS Doc. ID 770692 (May 13, 2022); CX-1259C at ¶¶ 7–8. Notably, the parties do not dispute

that the currently-existing Apple Watch Series SE does not infringe the Asserted Patents because

it is not equipped to measure the blood oxygen saturation of a user.

### D.    The Domestic Industry Products

With respect to the '501, '502, '648, and '745 patents, Complainants rely on their

"Masimo Watch" products. CPHBr. at 26–35. These Masimo Watch products include certain

prototypes identified as the "Circle Sensor" (CPX-0021C), the "Wings Sensor" (CPX-0029C),

the "RevA Sensor" (CPX-0052C), the "RevD Sensor" (CPX-0058C), the "RevE Sensors" (CPX-

0019C, CPX-0020C, CPX-0065C) (collectively, the "Masimo Watch Prototypes"), and a product

identified as the "W1 Watch" (CPX-0146C). CPHBr. at 30–35. The Masimo Watch Prototypes

were developed as part of an iterative design process that resulted in the W1 Watch, which was

not completed until after the Complaint was filed. *Id.* at 62 n.16, 18.

With respect to the '127 patent, Complainants rely on certain of Masimo's "Rainbow®

Sensors." *Id.* at 36.

## III.    COMMISSION REVIEW OF THE FINAL ID

When the Commission reviews an initial determination, in whole or in part, it reviews the

determination *de novo. Certain Soft-Edged Trampolines & Components Thereof*, Inv. No. 337-

TA-908, Comm'n Op. at 4 (May 1, 2015). Upon review, the "Commission has 'all the powers

which it would have in making the initial determination,' except where the issues are limited on

notice or by rule." *Certain Flash Memory Circuits & Prods. Containing Same*, Inv. No. 337-

TA-382, USITC Pub. No. 3046, Comm'n Op. at 9–10 (July 1997) (quoting *Certain Acid-Washed*

PUBLIC VERSION

*Denim Garments & Accessories*, Inv. No. 337-TA-324, Comm'n Op. at 5 (Nov. 1992)).  With

respect to the issues under review, "the Commission may affirm, reverse, modify, set aside or

remand for further proceedings, in whole or in part, the initial determination of the administrative

law judge."  19 C.F.R. § 210.45(c).  The Commission also "may take no position on specific

issues or portions of the initial determination," and "may make any findings or conclusions that

in its judgment are proper based on the record in the proceeding."  *Id.*; *see also Beloit Corp. v.

Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984).

## IV.    ANALYSIS OF THE ISSUES UNDER REVIEW

The Commission's findings, conclusions, and supporting analysis follow.  The

Commission affirms and adopts the ID's findings, conclusions, and supporting analysis that are

not inconsistent with the Commission's opinion.

### A.    Subject Matter Jurisdiction

The Final ID found that the Commission has "subject matter jurisdiction over this

investigation."  Final ID at 336.  The Commission reviewed this finding.  88 Fed. Reg. at 32244.

On review, the Commission vacates the Final ID's "subject matter jurisdiction" finding and

instead finds that the Commission has statutory authority, rather than subject matter jurisdiction,

over the present investigation.  *See Certain Video Security Equipment & Sys., Related Software,*

*Components Thereof, & Prods. Containing Same*, Inv. No. 337-TA-1281, Comm'n Op. at 9–10

(Apr. 19, 2023).  The Commission and ALJs have used the term "jurisdiction" in the past as a

shorthand for statutory authority.  Executive agencies, of course, do not have jurisdiction, but

rather are creatures of statute that cannot exceed their statutory authority.

15

**B.    Obviousness of the Asserted Claims of the '501 Patent, the '502 Patent, and the '648 Patent**

The Final ID found that claim 12 of the '501 patent would have been invalid as obvious over combinations of references primarily based on "Lumidigm,"[15] but claims 22 and 28 of the '502 patent and claims 12, 24, and 30 of the '648 patent would not have been invalid as obvious over those combinations. *E.g.*, Final ID at 88, 336. The Commission reviewed this finding. 88 Fed. Reg. at 32244. On review, the Commission affirms the Final ID's conclusions as to obviousness with the modifications and supplements discussed herein.

**1.    The Applicable Law**

A party cannot be held liable for infringement if the asserted patent claim is invalid. *See Pandrol USA, LP v. AirBoss Ry. Prods., Inc.*, 320 F.3d 1354, 1365 (Fed. Cir. 2003). Patent claims are presumed valid (35 U.S.C. § 282), so a respondent challenging validity must overcome this statutory presumption by "clear and convincing" evidence of invalidity. *Checkpoint Sys., Inc. v. Int'l Trade Comm'n*, 54 F.3d 756, 761 (Fed. Cir. 1995). One such ground for invalidity is that the claimed invention would have been obvious under 35 U.S.C. § 103.

Under 35 U.S.C. § 103(a), a patent is valid unless "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made" to a person having ordinary skill in the art. 35 U.S.C. § 103(a). The ultimate question of obviousness is a question of law, but "it is well understood that there are factual issues underlying the ultimate obviousness decision."

---

[15] U.S. Patent No. 7,620,212 (RX-0411), titled "Electro-Optical Sensor," which issued from an application filed on August 12, 2003.

*Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997) (citing *Graham v.*

*John Deere Co.*, 383 U.S. 1, 17 (1966)).

After claim construction:

> The second step in an obviousness inquiry is to determine whether the claimed invention would have been obvious as a legal matter, based on underlying factual inquiries including: (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) secondary considerations of non-obviousness.

*Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1354 (Fed. Cir. 1999) (citing

*Graham*, 383 U.S. at 17). The existence of secondary considerations, or objective indicia of non-

obviousness, does not control the obviousness determination, because a court (and the

Commission) must consider "the totality of the evidence" before reaching a decision on

obviousness. *Richardson-Vicks*, 122 F.3d at 1483.

The Supreme Court clarified the obviousness inquiry in *KSR Int'l Co. v. Teleflex Inc.*,

550 U.S. 389 (2007). There, the Supreme Court said:

> When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill. *Sakraida*[16] and *Anderson's-Black Rock*[17] are illustrative—a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions.
>
> Following these principles may be more difficult in other cases than it is here because the claimed subject matter may involve more than the simple

---

[16] *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273 (1976).

[17] *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57 (1969).

PUBLIC VERSION

substitution of one known element for another or the mere application of a
known technique to a piece of prior art ready for the improvement. Often,
it will be necessary for a court to look to interrelated teachings of multiple
patents; the effects of demands known to the design community or present
in the marketplace; and the background knowledge possessed by a person
having ordinary skill in the art, all in order to determine whether there was
an apparent reason to combine the known elements in the fashion claimed
by the patent at issue. To facilitate review, this analysis should be made
explicit.

. . .

The obviousness analysis cannot be confined by a formalistic conception
of the words teaching, suggestion, and motivation, or by overemphasis on
the importance of published articles and the explicit content of issued
patents. The diversity of inventive pursuits and of modern technology
counsels against limiting the analysis in this way. In many fields it may
be that there is little discussion of obvious techniques or combinations,
and it often may be the case that market demand, rather than scientific
literature, will drive design trends. Granting patent protection to advances
that would occur in the ordinary course without real innovation retards
progress and may, in the case of patents combining previously known
elements, deprive prior inventions of their value or utility.

*KSR*, 550 U.S. at 417–19.

The Federal Circuit has since held that when a patent challenger contends that a patent is
invalid for obviousness based on a combination of several prior art references, "the burden falls
on the patent challenger to show by clear and convincing evidence that a person of ordinary skill
in the art would have had reason to attempt to make the composition or device, or carry out the
claimed process, and would have had a reasonable expectation of success in doing so."
*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007) (citations
omitted).

The TSM[18] test, flexibly applied, merely assures that the obviousness test
proceeds on the basis of evidence—teachings, suggestions (a tellingly
broad term), or motivations (an equally broad term)—that arise before the

---

[18] "TSM" is an acronym for "teaching, suggestion, or motivation."

time of invention as the statute requires.  As *KSR* requires, those
teachings, suggestions, or motivations need not always be written
references but may be found within the knowledge and creativity of
ordinarily skilled artisans.

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008).

### 2.    Introduction

#### a.    Lumidigm

Lumidigm is titled "Electro-Optical Sensor."  *See* RX-0411 (Lumidigm).  Lumidigm's

Abstract is reproduced below:

> Methods and systems are provided that extend the functionality of electro-
> optical sensors.  A device has . . . multiple light sources, a light detector,
> and a processor configured to operate the light sources and the light
> detector to perform distinct functions.  At least one of the distinct
> functions includes a biometric identification function in which light is
> propagated from the plurality of light sources through presented material.
> The propagated light is received with the light detector, with the presented
> material being identified from the received light.  Another of the distinct
> functions includes a nonidentification function performed with the light
> sources and the light detector.

RX-0411 (Lumidigm) at Abstract.

Figure 2 of Lumidigm is reproduced below:



**FIG. 2**

RX-0411 (Lumidigm) at Fig. 2.  Figure 2 depicts a "cross-sectional view of a biometric sensor

element couple[d] to a tissue surface showing multiple mean optical paths."  *Id.* at 4:45–47.

19

Sensor head 32 includes light sources 41, 43, 45, 47, 49, and 51 and detector 36. *Id.* at 7: 5–10.

These light sources correspond to the claimed "LEDs," and detector 36 corresponds to a claimed

"photodiode." Optical paths 42, 44, 46, 48, 50, and 52 show light passing through tissue 40 of a

user. *Id.* Sensor head 32 is formed of optically opaque material 37, corresponding to the

claimed "opaque material."

Figures 6 and 7A of Lumidigm are reproduced below:



FIG. 6                     FIG. 7A

RX-0411 (Lumidigm) at Figs. 6 and 7A. Figures 6 and 7A illustrate top-views of biometric

sensors according to two embodiments of the invention. *Id.* at 4:60–67. In Figure 6, biometric

sensor 80 includes light sources/LEDs 82, 84, and 86 positioned relative to detectors/photodiodes

20

81, 83,[19] and 85.  *Id.* at 9:14–17.  In Figure 7A, biometric sensor 91 includes four rows of light sources/LEDs 93 and one row of detectors/photodiodes 95.  *Id.* at 9:27–30.

Figure 8B, reproduced below, depicts a wrist-watch embodiment:



**FIG. 8B**

RX-0411 (Lumidigm) at Fig. 8B (depicting biometric system 110 including wristwatch 112, biometric reader 111, illumination system 104, and detection/diode system 106).

**b.    Summary of the Commission's Conclusions**

As noted above, the Final ID found that claim 12 of the '501 patent would have been invalid as obvious over combinations of references primarily based on Lumidigm, but claims 22 and 28 of the '502 patent and claims 12, 24, and 30 of the '648 patent would not have been invalid as obvious over those combinations.  *E.g.*, Final ID at 88, 336.  The Commission reviewed this finding.  88 Fed. Reg. at 32244.

On review, the Commission affirms the Final ID's findings as to *prima facie* obviousness of claim 12 of the '501 patent in its entirety.  *See* Final ID at 89–113.  Secondary considerations are discussed separately below.

---

[19] The item number "82" for the dark circle at approximately 2 o'clock of Figure 6 is a typographical error.  It is apparent that that item number was intended to be "83."

21

Regarding claim 28 of the '502 patent and claims 12, 24, and 30 of the '648 patent, these claims recite, *inter alia*, a "user-worn device" comprising (1) "four photodiodes," (2) a "protrusion," (3) an "opening" or "through hole" "extending through" or "provided through" the protrusion and "aligned with" or "over" each of the four photodiodes, and (4) a separate "transmissive window" or "optically transparent material" "extending across" or "arranged over" each of the openings or though holes. *See* JX-0002 ('502 patent) at claim 28, elements [28C], [28E], [28F], and [28G]; JX-0003 ('648 patent) at claim 12, elements [8C], [8D], [8E], and [8F], and claims 24 and 30, elements [20B], [20C], and [20D]. Claim 22 of the '502 patent is similar, but more narrowly requires that an "optically transparent material" be included "*within* each of the openings." *See* JX-0002 ('502 patent) at claim 22, elements [19B], [19C], and [19D].

The Commission concludes that Lumidigm and combinations of references therewith teach or suggest (1) the four photodiodes, and (2) the protrusion, but the combinations of references do not teach or suggest (4) a separate transmissive window or optically transparent material within, extending across, or over each of the openings or though holes. The Commission, however, takes no position on the Final ID's finding that the combinations of references do not teach or suggest (3) an opening or through hole extending through or provided through the protrusion and aligned with or over each of the four photodiodes. *See Beloit*, 742 F.2d at 1423. In doing so, the Commission slightly modifies the Final ID, as discussed below.

Regarding claims 22 and 28 of the '502 patent and claims 12, 24, and 30 of the '648 patent, these claims also recite, *inter alia*, various limitations directed at the claimed user-worn devices being configured to measure the oxygen saturation of the user. JX-0002 ('502 patent) at claim 22, elements [19PRE] and [19E], and at claim 28, elements [28PRE], [28I], [28J], and

PUBLIC VERSION

[28K]; JX-0003 ('648 patent) at claim 12, elements [12], and claims 24 and 30, element [20E].[20] The Final ID found that neither Lumidigm nor combinations therewith teach or suggest these claim limitations. *See* Final ID at 113–18, 124, 128, 132–33, 140, 142. The Final ID also found that element [24] of claim 24 of the '648 patent was not taught or suggested by Lumidigm or combinations of references therewith. *See id.* at 142–44. The Commission affirms these findings for the reasons given in the Final ID.

Regarding the Final ID's analysis of objective indicia of non-obviousness, the Commission alters the Final ID's findings as to commercial success, and it does so by affirming those findings with the modifications discussed below.

Because the Commission modifies or supplements the Final ID's findings as to the *prima facie* obviousness and/or secondary considerations of these claims, the Commission evaluates anew (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) secondary considerations of non-obviousness, to determine whether Apple has shown by clear and convincing evidence that these claims are invalid for obviousness. In doing so, the Commission concludes, as did the Final ID, that claim 12 of the '501 patent would have been invalid as obvious over combinations of references primarily based on Lumidigm, but claims 22 and 28 of the '502 patent and claims 12, 24, and 30 of the '648 patent are not invalid as obvious over those combinations of references.

Below, the Commission provides its analysis regarding *prima facie* obviousness of the above-mentioned structural limitations, and then discusses the objective evidence of non-

---

[20] As the Final ID noted, the parties stipulated that the preambles of the asserted patents are limiting. *See* Final ID at 180 n.66.

Case: 24-1285     Document: 7     Page: 105     Filed: 12/26/2023

PUBLIC VERSION

obviousness. Last, the Commission provides its analysis as to whether, in view of its underlying findings, Apple has shown by clear and convincing evidence that the asserted claims of the Poeze patents are invalid. In sum, the Commission concludes that Apple has not met its burden, except with respect to claim 12 of the '501 patent. The Commission affirms the Final ID as to *prima facie* obviousness and secondary considerations over Lumidigm and combinations of references therewith to the extent it is not modified or reversed herein.

**3.** ***Prima Facie* Obviousness Over Lumidigm and Combinations Therewith**

**a.     The "Openings" or "Through Holes" Limitations**

As noted above, the claims recite an "opening" or "through hole" "extending through" or "provided through" the protrusion and "aligned with" or "over" each of the photodiodes. More specifically, the claims recite (with added emphasis) as follows:

- Element [1D] of claim 12 of the '501 patent: "*a plurality of openings extending through the protrusion and positioned over the three photodiodes*."

- Element [19C] of claim 22 of the '502 patent: "a protrusion comprising a convex surface[21] including *separate openings extending through the protrusion* and lined with opaque material, *each opening positioned over a different one of the four photodiodes*."

- Element [28F] of claim 28 of the '502 patent: "*a plurality of openings* in the convex surface, *extending through the protrusion*, and *aligned with the four*

---

[21] The Commission affirms the Final ID's finding that Lumidigm combined with prior art knowledge teaches or suggests a "protrusion" having a "convex surface." *E.g.*, Final ID at 101–03. The Final ID found that known ergonomic and contact benefits would provide persons of ordinary skill in the art a reason to modify Lumidigm to include a convex surface, as argued by Apple. *See id.*

24

Case: 24-1285     Document: 7     Page: 105     Filed: 12/26/2023

PUBLIC VERSION

obviousness. Last, the Commission provides its analysis as to whether, in view of its underlying findings, Apple has shown by clear and convincing evidence that the asserted claims of the Poeze patents are invalid. In sum, the Commission concludes that Apple has not met its burden, except with respect to claim 12 of the '501 patent. The Commission affirms the Final ID as to *prima facie* obviousness and secondary considerations over Lumidigm and combinations of references therewith to the extent it is not modified or reversed herein.

**3.** ***Prima Facie* Obviousness Over Lumidigm and Combinations Therewith**

**a.     The "Openings" or "Through Holes" Limitations**

As noted above, the claims recite an "opening" or "through hole" "extending through" or "provided through" the protrusion and "aligned with" or "over" each of the photodiodes. More specifically, the claims recite (with added emphasis) as follows:

- Element [1D] of claim 12 of the '501 patent: "*a plurality of openings extending through the protrusion and positioned over the three photodiodes*."

- Element [19C] of claim 22 of the '502 patent: "a protrusion comprising a convex surface[21] including *separate openings extending through the protrusion* and lined with opaque material, *each opening positioned over a different one of the four photodiodes*."

- Element [28F] of claim 28 of the '502 patent: "*a plurality of openings* in the convex surface, *extending through the protrusion*, and *aligned with the four*

---

[21] The Commission affirms the Final ID's finding that Lumidigm combined with prior art knowledge teaches or suggests a "protrusion" having a "convex surface." *E.g.*, Final ID at 101–03. The Final ID found that known ergonomic and contact benefits would provide persons of ordinary skill in the art a reason to modify Lumidigm to include a convex surface, as argued by Apple. *See id.*

24

*photodiodes*, each opening defined by an opaque surface configured to reduce light piping."

- Element [8E] of claim 12 of the '648 patent: "a *plurality of openings provided through the protrusion* and the convex surface, *the openings aligned with the photodiodes*."

- Element [20D] of claims 24 and 30 of the '648 patent: "a *plurality of through holes*, each through hole including a window and *arranged over a different one of the at least four photodiodes*."

### i. The "Openings" in the "Three Photodiode" Claim (Claim 12 of the '501 Patent)

The Final ID first analyzed the "openings" limitations in its discussion of claim 12 of the '501 patent, which claims a "user-worn device" that, unlike the other asserted claims of the Poeze patents, has "at least three photodiodes," as opposed to "four photodiodes." The "openings" limitation of that claim is included in element [1D], which recites "a plurality of openings extending through the protrusion and positioned over the three photodiodes." *See* JX-0001 ('501 patent) at claim 12, element [1D]. The Final ID found that Lumidigm teaches or suggests this limitation, *see* Final ID at 104–06, contrary to its conclusions as to the four photodiode claims, *see id.* at 120–21, 130, 139, 142.

Before the ALJ, Apple argued that element [1D] of the '501 patent was taught by Lumidigm because Lumidigm expressly states that photodiode/detector 36 in Figure 2 (annotated version provided below showing detector 36 in purple) "may comprise . . . a plurality of discrete elements" and Figure 6 (annotated version also provided below) illustrates an embodiment having three such detectors (also shown in purple). *See* RPHBr. at 76.

25



**FIG. 2**                    **FIG.6**

RX-0411 (Lumidigm) at Fig. 2 and Fig. 6 (identifying light sources/LEDs 82, 84, and 86 and detectors/photodiodes 81, 82 [sic],[22] and 85). For their part, Complainants argued that element [ID] was not met because Figure 2, which undisputedly shows a side view "opening" over a single photodiode, is allegedly in no way linked to Figure 6, which shows a top-down view of three photodiodes. *See* CPHBr. (Reply) at 48.

The Final ID accepted Apple's arguments, reasoning that "Figure 2 corresponds to the source-detector arrangement of Figure 3, and that ... arrangement of three sources and three detectors in Figure 6 is a disclosed alternative to Figure 3." *See* Final ID at 105-06. Figure 3 is reproduced below.

---

[22] As noted above, item number 82 should be item number 83.



**FIG. 3**

RX-0411 (Lumidigm) at Fig. 3 (depicting photodiodes/detectors 36 and LEDs/light sources 34).

The Final ID therefore determined that element [1D] was met. *See id.*

No party petitioned for the Commission to review this finding, so the Commission has determined to affirm this finding.

### ii.        The Openings in the "Four Photodiode" Claims

The Final ID found that the openings or through holes limitations in elements [19C] and [28F] of the '502 patent and elements [8E] and [20D] of the '648 patent were not taught or suggested by the prior art.

Before the ALJ, Apple argued that Lumidigm explains that, for any of the "reflectance" type sensor heads shown in its figures, reflected light on the top surface of the tissue can be "detrimental" to optical measurements, and thus the detectors should be "recessed from the sensor surface" in "optically opaque material" to "minimize[ ] the amount of light that can be detected after reflecting off the first (epidermal) surface of the tissue" and to provide "optical blocking." RPHBr. at 72–74, 82–83 (quoting and citing RX-0411 (Lumidigm) at 7:64–8:1). Apple further argued that a person of ordinary skill in the art would have understood that, for the

27

embodiments with multiple photodiodes, the protrusion would include separate openings positioned over each of the photodiodes. RPHBr. at 75–77, 83.

The Final ID disagreed with Apple, finding that the evidence does not show that the "array"-type detectors in Lumidigm relied upon by Apple for element [19B] of the '502 patent for identification of the "four photodiodes" would be formed with "separate openings" through the protrusion for individual photodiodes in the array, as required by element [19C] of the '502 patent. Final ID at 120–21 (citing RPHBr. at 82; CPHBr. at 143; CPHBr. (Reply) at 55). The Final ID also rejected Apple's argument that these limitations are obvious based on the combination of Lumidigm with Cramer. *E.g.*, Final ID at 121.

Apple petitioned for the Commission to review these findings. RPet. at 21–26.

The Commission has determined to take no position as to the openings or through holes limitations of the asserted claims of the '502 patent and '648 patent. *See Beloit*, 742 F.2d at 1423. Specifically, the Commission has determined to take no position on the Final ID's findings as to the following "openings" and "through hole" limitations: (1) element [19C] of claim 22 of the '502 patent: "a protrusion comprising a convex surface including separate openings extending through the protrusion and lined with opaque material, *each opening positioned over a different one of the four photodiodes*"; (2) element [28F] of claim 28 of the '502 patent: "a plurality of openings in the convex surface, extending through the protrusion, and *aligned with the four photodiodes*, each opening defined by an opaque surface configured to reduce light piping"; (3) element [8E] of claim 12 of the '648 patent: "a plurality of openings provided through the protrusion and the convex surface, *the openings aligned with the photodiodes*"; and (4) element [20D] of claims 24 and 30 of the '648 patent: "a plurality of

28

through holes, each through hole including a window and *arranged over a different one of the at least four photodiodes*."

As explained below, the Commission affirms the Final ID's findings that Lumidigm and combinations therewith fail to teach or suggest several other limitations in claims 22 and 28 of the '502 patent and claims 12, 24, and 30 of the '648 patent. The Commission therefore takes no position on whether Lumidigm, or Lumidigm in combination with other prior art references, discloses the openings or through holes limitations of the '502 and '648 patents.

### b. The "Transmissive Window" or "Optically Transparent Material" Limitations

The asserted claims of the '502 and '648 patents also recite a separate "transmissive window" or "optically transparent material" "within," "extending across," or "arranged over" each of the "openings" or "though holes." More specifically, the claims recite as follows:

- Element [19D] of claim 22 of the '502 patent: "optically transparent material within each of the openings."

- Element [28G] of claim 28 of the '502 patent: "a plurality of transmissive windows, each of the transmissive windows extending across a different one of the openings."

- Element [8F] of claim 12 of the '648 patent: "a separate optically transparent window extending across each of the openings."

- Element [20D] of claims 24 and 30 of the '648 patent: "each through hole including a window and arranged over a different one of the at least four photodiodes."

The Final ID found that the "extending across" and "arranged over" limitations (element [28G] of claim 28 of the '502 patent, element [8F] of claim 12 of the '648 patent, and element

29

[20D] of claims 24 and 30 of the '648 patent) were taught by Lumidigm or combinations therewith, but that the "within" limitation (element [19D] of claim 22 of the '502 patent) was not. *See* Final ID at 130 (element [28G] of claim 28 of the '502 patent), 139 (element [8F] of the '648 patent), 142 (element [20D] of claims 24 and 30 of the '648 patent), 121–24 (element [19D] of claim 22 of the '502 patent).

As discussed below, on review, the Commission finds that none of these limitations are taught by Lumidigm or combinations therewith.

### i.    Element [19D] of Claim 22 of the '502 Patent

### a)    The Final ID

With respect to element [19D] of the '502 patent (an "optically transparent material within each of the openings"), Apple identified as the "optically transparent material" Lumidigm's disclosure of an "optical relay" positioned "between the sensor surface 39 and the skin 40" that "transfers the light . . . from the skin back to the detector(s)." RPHBr. at 84–85; RX-0411 (Lumidigm) at 8:19–23; Final ID at 121. Lumidigm provides examples of "optical relays," including "fiber-optic face plates and tapers, individual optical fibers and fiber bundles, light pipes and capillaries, and other mechanisms known to one of skill in the art." RX-0411 (Lumidigm) at 8:23–26; *see also* Final ID at 121–22. Apple relied on Dr. Warren's testimony that one of ordinary skill in the art would have understood an "optical relay" to be an optically transparent material. RPHBr. at 84–85; Final ID at 122; Tr. (Warren[23]) at 1221:16–1222:25. Apple further argued that these limitations would be obvious because the use of optically transparent materials within openings

---

[23] Steven Warren was admitted as an Apple expert witness in biomedical engineering, medical monitoring systems, biomedical instrumentation, biomedical optics, light issue interaction, diagnostic systems, wearable sensors, and biomedical signal processing. *E.g.*, Final ID at 6–7.

over photodiodes and the use of transmissive or transparent windows arranged over or extending across openings over photodiodes was well-known at the time of the Poeze patents. RPHBr. at 111–13; Tr. (Warren) at 1193:23–1194:14, 1221:16–1222:9; RDX-8C at .11 (citing, *inter alia*, RX-0670 (Cramer[24]); RX-0665 (Nippon[25]); RX-0666 (Seiko 131[26]); RX-1221 (CLT 2160[27]); *see also* Final ID at 122–23. According to Apple, a person of ordinary skill in the art would have been motivated to combine Lumidigm's wristwatch with teachings from Seiko 131 and Cramer because "(1) Lumidigm expressly states that its sensor can include an optical relay; and (2) a [person of ordinary skill in the art] would have independently looked to literature like Seiko 131 and Cramer for this element as the benefits were well-known." RPHBr. at113. Those alleged benefits are protecting the photodiodes from dirt and helping to transfer light. *E.g.*, RResp. at 17–18 (citing Tr. (Warren) at 1193:24–1194:14, 1221:16–1222:9).

For their part, Complainants argued that Lumidigm's disclosure of an "optical relay" does not meet the "optically transparent material" limitation and, in any event, is not disclosed in connection with Lumidigm's wristwatch embodiment. CPHBr. at 138–39 (citing Tr.

---

[24] U.S. Patent No. 4,224,948, titled "Wrist Borne Pulse Meter/Chronometer," issued to Frank B. Cramer, *et al.*, on September 30, 1980, from an application filed on November 24, 1978 (RX-0670).

[25] U.S. Patent No. 4,880,304, titled "Optical Sensor for Pulse Oximeter," issued to Jonathan P. Jaeb, *et al.*, on November 14, 1989, from an application filed on April 1, 1987 (RX-0665). The face of the patent indicates that Nippon is assigned to Nippon Colin Co., Ltd.

[26] U.S. Patent No. 5,766,131, titled "Pulse-Wave Measuring Apparatus," issued to Yutaka Kondo, *et al.*, on June 16, 1998, from an application filed on July 30, 1996 (RX-0666). The face of the patent indicates that Seiko 131 is assigned to Seiko Epson Corporation and Seiko Instruments, Inc.

[27] "CLT 2160" is a datasheet introduced by Apple. RX-1221. The Final ID found the datasheet to be reliable evidence. Final ID at 109 n.38.

31

(Madisetti[28]) at 1330:2–5); *see also* Final ID at 123. Complainants further argued that Seiko 131 fails to disclose multiple openings or optically transparent material within multiple openings. CPHBr. at 148–49; *see also* Final ID at 123. Complainants further argued that, with respect to Cramer, the alleged windows are between the annular rings and are not "within" the openings. CPHBr. at 146–47; *see also* Final ID at 123.

The Final ID found that Lumidigm clearly discloses "optically transparent material" over openings associated with photodiodes, but that the evidence does not clearly and convincingly show a reason to incorporate such material "within" each opening. Final ID at 123. According to the Final ID, Lumidigm describes an optical relay that is comprised of optically transparent material. *Id.* at 123 (citing RX-0411 (Lumidigm) at 8:19–26; Tr. (Warren) at 1221:16–1222:25). However, the Final ID found that the optical relay is not "within" the opening depicted in Figure 2, rather, it is located "between the sensor surface 39 and the skin 40." *Id.* (quoting RX-0411 (Lumidigm) at 8:19–26) (citing RX-0411 (Lumidigm) at Fig. 2).

The Final ID likewise found that Seiko 131 similarly discloses a "light transmittance plate" that is positioned above its sensor, but that plate is not "within" any opening. *Id.* at 123 n.47 (citing RX-0666 (Seiko 131), at 10:30–32). And the Final ID also found that Cramer discloses annular windows, but those windows do not appear to be associated within "each" opening. *Id.* (citing Tr. (Warren) at 1234:22–1235:12; RDX-8C at .73; RX-0670 (Cramer) at Fig. 6). The Final ID added that "Apple appears to have identified transparent windows within an opening in Cramer's preferred photodiode, the CLT 2160, but did not provide a clear and convincing reason to modify Lumidigm to include such material within the openings or to

---

[28] Vijay Madisetti is Complainants' expert witness and was admitted as an expert in the field of physiological monitoring technologies. Final ID at 6.

incorporate the CLT 2160 photodiode in Lumidigm." *Id.* at 123–24 (citing RX-0670 (Cramer) at 5:33–35, Fig. 6; RX-1221 (CLT 2160); RPHBr. at 112–13).

Apple petitioned for review of the Final ID's findings regarding Lumidigm alone and Lumidigm combined with Cramer. *See* RPet. at 96–97.

### b)     Apple's Petition

Regarding Lumidigm alone, Apple's petition argued that Lumidigm teaches an optical relay to "transfer[ ] the light from the light sources to the skin and from the skin back to the detector(s) while minimizing light loss and spreading." RPet. at 96 (quoting RX-0411 (Lumidigm) at 8:19–26) (citing Tr. (Warren) at 1221:16–1222:25, 1235:14–1236:2). Apple further asserted that a person of ordinary skill in the art would have understood that an optical relay could be added to Lumidigm's sensor. *Id.* (citing RX-0411 (Lumidigm) at 8:19–26, Fig. 2; Tr. (Warren) at 1221:16–1222:25). Apple further argued that a person of ordinary skill in the art would have further understood that the optical relay could be placed over or within the openings to "transfer light" from the tissue to the photodiodes and "protect the detector from dust and debris and dirt." *Id.* (citing Tr. (Warren) at 1193:24–1194:7, 1221:16–1222:16).

Regarding Lumidigm in combination with Cramer, Apple argued that the "use of optically transparent materials extending across or within opening[s] associated with photodiodes was well known in the art prior to 2008 and taught by Lumidigm." RPet. at 97 (citing Tr. (Warren) at 1221:16–1222:9, 1193:24–1194:14; RX-0411 (Lumidigm) at 8:19–26, Fig. 2). Apple added that a person of ordinary skill in the art:

> would have naturally looked to other references in the field to improve on Lumidigm's teachings and would recognize the CLT 2160 taught by Cramer as a "can" detector and would understand that each can would include a lens at the top end of the can, that the detector would be positioned inside the can at the focal point of the lens, and that there would be a gap between the detector and the lens, creating an opening between the detector and the lens.

*Id.* (citing RX-0670 (Cramer) at Fig 6; Tr. (Warren) at 1231:23–1232:9, 1234:3–8, 1234:22–

1235:12).  Thus, according to Apple, a person of ordinary skill in the art would have been

motivated to combine Lumidigm with Cramer because "Lumidigm expressly teaches the benefits

of transparent material within openings over photodiodes and, more generally, because the

benefits were well known." *Id.* (citing Tr. (Warren) at 1235:14–1236:2).

<h4 align="center">c)    Complainants' Response</h4>

In response, Complainants argued that the evidence refutes Apple's argument that

Lumidigm alone teaches or suggests that the optical relay would be *within* the opening.  CResp.

at 95 (citing RX-0411 (Lumidigm) at 8:19–26, Fig. 2; Tr. (Madisetti) at 1330:2–5, 1343:1–4; Tr.

(Warren) at 1221:16–1221:25) (emphasis added); Final ID at 123–24.  Complainants presented a

similar argument regarding the combination of Lumidigm with Cramer.  *See id.* (citing RX-0411

(Lumidigm) at 8:19–26, Fig. 2; RX-0670 (Cramer) at Fig. 6; Tr. (Madisetti) at 1330:2–5,

1334:15–1335:25, 1343:1–4; Tr. (Warren) at 1221:16–1221:25, 1235:24–1236:2); Final ID at

123–24 (including n.47).  Complainants further pointed out that the USPTO, in denying

institution of Apple's IPR petitions, found that "none of the prior art on which [Apple] relies[,

including Lumidigm,] discloses a convex protrusion with multiple openings or windows for

multiple detectors." *Id.* at 95–96 (citing CResp. Appx. A, at 17; Appx. B, at 16; Appx. C, at 16)

(emphasis omitted).

Relatedly (but more specifically directed to element [28G] of claim 28 of the '502

patent),[29] Complainants argue that Apple's witness, Dr. Warren, testified only about what a

---

[29] Recall that that claim language recites:  "a plurality of transmissive windows, each of
the transmissive windows *extending across* a different one of the openings."  This language
differs from that of element [19D] of claim 22 of the '502 patent only in that it does not require
the window or optically transparent material to be "*within*" the through holes or openings.

34

person of ordinary skill in the art *could do*, and not what such a person would have been motivated to do or have a reason to do. *E.g.*, CPet. (Summary) at 3 (citing Final ID at 131); *see also* CPet. at 23–24. Complainants argued that Apple provided no evidence that a person of ordinary skill in the art "*would have* modified Lumidigm's face plate into multiple windows with a reasonable expectation of success ([RPHBr.] at 84–85), and the [Final] ID made no findings regarding reasonable expectation of success for such a modification." CPet. (Summary) at 3 (citing Final ID at 131) (emphasis added); *see also* CPet. at 23–24.

### d)      Analysis

The Commission has determined to affirm and adopt the Final ID's findings and conclusion that neither Lumidigm nor a combination of Lumidigm and other prior art teaches or suggests an "optically transparent material *within* each of the openings." Final ID at 121–24. The Commission has considered Apple's arguments that the Final ID erred as to this limitation and finds them unpersuasive.

The Commission has further determined to supplement the Final ID. Beyond the prior art not teaching or suggesting the optically transparent material within each of the openings, Apple failed to show that the prior art provides a reason to use a separate optically transparent material or window for each of the separate openings or through holes. *See* CPet. at 23–24. First, none of the prior art cited by Apple teaches or suggests separate optically transparent materials (or windows), and Apple has not shown by clear and convincing evidence that a person of ordinary skill at the time of the claimed inventions would have arrived at these limitations, as claimed. Apple acknowledges that Lumidigm does not teach the separate optically transparent materials (or windows). *E.g.*, RResp. at 18–19 (relying on knowledge in the art to modify Lumidigm to arrive at separate windows). Moreover, neither Cramer nor Seiko 131 disclose the separate optically transparent materials (or windows). As the Final ID properly found, Apple has failed to

clearly and convincingly show that Cramer teaches or suggests a protrusion with separate openings or through holes over separate photodiodes. *See* Final ID at 103 n.36; CPHBr. at 144–46; Tr. (Warren) at 1231:18–22; Tr. (Madisetti) at 1334:23–1335:2. Thus, Cramer cannot teach separate optically transparent materials (or windows) within (or over or extending across) the claimed separate openings or through holes. Additionally, Complainants correctly point out that Seiko 131 discloses only a singular phototransistor and light transmittance plate and thus does not teach the separate optically transparent materials (or windows) within (or over or extending across) the claimed separate openings or through holes. *See* CPHBr. at 148–50. CLT 2160 similarly discloses only a single window and photodiode. *See* RX-1221 (CLT 2160).

Second, Apple has not shown by clear and convincing evidence that, at the time of the claimed inventions, a person of ordinary skill in the art would have had a reason to use a separate optically transparent material (or window) within (or over or extending across) each of the separate openings (or through holes). As Complainants point out, Dr. Warren testified only about what a person of ordinary skill in the art *could* do, not what such a person *would* do. *See* CPet. (Summary) at 3; CPet. at 23–24; *see also* RPet. at 96–97 (discussing and citing Dr. Warren's testimony); Tr. (Warren) at 1193:24–1194:14 (stating only that windows were well known); *id.* at 1221:16–1222:25 (stating only a person of ordinary skill in the art "*could use*" an individual faceplate for each of the individual openings (emphasis added)); *id.* at 1235:24–1236:2 (stating that a person of ordinary skill in the art "would have known that windows *could be used*" (emphasis added)). Apple's asserted motivation for including the optical relay (allowing for the transfer of light and to protect the detector from dust and dirt), could be obtained with a single optically transparent material (or window) over the surface, as opposed to separate optically transparent materials (or windows). And, Apple's "convoluted combination of

36

modifications" is driven by improved contact and comfort from the claimed "convex surface,"
yet Apple has not shown why that improved contact and comfort would remain with the further
modification to have multiple distinct openings and windows. *See Apple Inc. v. Masimo Corp.*,
IPR2022-01274 (available at CResp. at Appx. C) (discussed below); Final ID at 101–03 (finding
that a person of ordinary skill in the art would be motivated to implement a convex surface to
obtain better contact and comfort). Moreover, as noted above, neither Cramer nor Seiko 131
teach the separate optically transparent material (or windows), and Apple points to no specific
teachings of those references, or any other reference, that suggests using separate optically
transparent materials (or windows). Apple has thus failed to present clear and convincing
evidence that a person of ordinary skill in the art *would have* implemented Lumidigm's "optical
relay" as separate optically transparent materials (or windows) within (or over or extending
across) each of the separate openings (or through holes), as opposed to a single optical relay
covering the entire convex surface. *See, e.g.*, RResp. at 17–19; RPet. at 96–97; Final ID at 121–
24.

   Although not binding on the Commission,[30] the Commission notes that its decision
herein is consistent with the USPTO's denial of Apple's petitions for an IPR to review claims 1–
30 of the '502 patent over combinations of references where Lumidigm serves as the primary
reference. *See generally Apple Inc. v. Masimo Corp.*, IPR2022-01274 (available at CResp. at

_____

   [30] *See, e.g.*, *Certain Hybrid Electric Vehicles & Components Thereof*, Inv. No. 337-1042,
Notice of Investigation at 1 (Mar. 7, 2017) (Commission instituting investigation over proposed
Respondents' objection that asserted claims had been found unpatentable in IPR proceedings and
were on appeal to Federal Circuit).

Appx. C).  There, Apple argued that based on the combined teachings of Lumidigm and

"Kotanagi"[31] the following figures emerge:



*Id.* at 15.

In this investigation, Apple's Lumidigm-based theories of obviousness rely on the same

modified version of Lumidigm.  In denying institution, the USPTO agreed with Complainants

that "none of the prior art on which [Apple] relies discloses a convex protrusion with multiple

openings or windows for multiple detectors," and that Apple "simply does not explain

adequately why such configuration results from the actual teachings of the prior art."  *Id.* at 16;

*see also id.* at 16–19.  The USPTO reasoned that, "[w]ithout the guidance provided by the claims

of the '502 patent, it is difficult to conclude that [Apple's] postulation as to a particular structure

---

[31] PCT Application No. WO 2005/092182.

that results from combining the teachings of Lumidigm [and the other prior art] is based on an objective assessment of what those teachings would have conveyed to a skilled artisan." *Id.* at 16. In other words, Apple's arguments there were "grounded in hindsight rather than based on due consideration of the teachings of the pertinent prior art." *Id.* at 19. The same is true here.

While Apple alleges that both the evidentiary record and the obviousness theory before the USPTO and the Commission are different, *see* RResp. at 17 n.4, there are no notable differences. The above-shown modification of Lumidigm presented to the USPTO is based almost entirely on Lumidigm, *see Apple*, IPR2022-01274 at 16–19 (available at CResp. at Appx. C), as is Apple's Lumidigm-based obviousness theory in this investigation. And while Apple relied on Kotanagi for the "convex surface" modification of Lumidigm before the USPTO (as opposed to other knowledge in the prior art, as it does before the Commission), Apple relied on the same reason for that modification of Lumidigm both before the USPTO and here—"better contact" and "comfort." *Compare id.* at 16–17, *with* Final ID at 99, 101–02 (incorporating ergonomic features and optical and mechanical coupling). Accordingly, the Commission's rejection of Apple's Lumidigm-based theory for the obviousness of claim 22 of the '502 patent is consistent with the USPTO's denial of Apple's petition to institute an IPR over combinations of references involving Lumidigm.[32]

---

[32] Complainants assert that the USPTO's denial of the institution of Apple's petition for an IPR over Lumidigm-based combinations of references as to the claims of the '501 patent suggests that the Commission should also reverse the Final ID as to its obviousness finding as to claim 12 of the '501 patent. CResp. at 3 n.2. However, in Apple's petition related to the '501 patent and Lumidigm, Apple's theory was different than the Lumidigm-based theory that it presented in this investigation as to the '501 patent. Significantly, in that petition, Apple presented a Lumidigm-based theory that is similar to the one it presents in this investigation as to the asserted claims of the '502 and '648 patents (*see Apple Inc. v. Masimo Corp.*, IPR 2022-01272 (USPTO Jan. 24, 2023) (available at CResp. at Appx. B)), which as discussed in this section, lacks a reason for a person of ordinary skill in the art to arrive at the claimed subject

PUBLIC VERSION

ii.    **Element [28G] of the '502 Patent—"Each of the Transmissive Windows Extending Across a Different One of the Openings"**

a)    **The Final ID**

Regarding element [28G] of claim 28 of the '502 patent, which uses the phrase "extending across," the Final ID found that Lumidigm discloses an "optical relay" that is transmissive and is positioned above an opening for a detector. Final ID at 131 (citing RX-0411 (Lumidigm) at 8:19–26; Tr. (Warren) at 1221:16–1222:25). The Final ID recognized that Lumidigm discloses a single window, but found, based on Dr. Warren's testimony, that "a person of skill would know that you could do an individual faceplate for each of the individual openings as a means to provide light but still optimize the process." *Id.* (citing, *inter alia*, Tr. (Warren) at 1221:1–1222:25, 1193:23–1194:14; RDX-8C at .11; RX-0670 (Cramer); RX-0666 (Seiko 131)).

Complainants petitioned for review the Final ID's findings regarding Lumidigm. *See* CPet. at 23–24.

b)    **Complainants' Petition**

Complainants' petition is largely the same as its argument discussed in the previous section. Complainants argued that the Final ID "legally erred by finding that Lumidigm satisfied the requirements of Element [28G] based on [Dr.] Warren's testimony about what a [person of ordinary skill in the art] 'could do.'" CPet. (Summary) at 3 (quoting Final ID at 131); *see also* CPet. at 23–24. Complainants further argued that the Final ID also legally erred because Apple

---

matter. In other words, while claim 12 of the '501 patent does not recite the separate windows, Apple's IPR petition depended on proving that a person of ordinary skill in the art would arrive at a device that contained that limitation.

40

provided no evidence that a person of ordinary skill in the art "would have modified Lumidigm's face plate into multiple windows with a reasonable expectation of success ([RPHBr.] at 84–85), and the [Final] ID made no findings regarding reasonable expectation of success for such a modification." CPet. (Summary) at 3 (citing Final ID at 131); *see also* CPet. at 23–24. Complainants further argue that "[t]he Patent Office's recent rejection of Apple's IPR petitions challenging the Poeze Patents confirms that Apple's obviousness theories are without merit and based in hindsight." CResp. at 8.

### c)    Apple's Response

Apple's response is also largely the same argument as the one discussed in the previous section.  According to Apple, Dr. Warren explained that this limitation was known in the prior art "both to help transfer light and to protect the photodiodes from dirt or debris." RResp. at 17–18 (citing Tr. (Warren) at 1193:24–1194:14, 1221:16–1222:9; RX-0411 (Lumidigm) at 8:19–23).  Apple also relied on Dr. Warren's testimony that the listed examples were well known "and could be placed within or arranged over the openings to transfer light and to protect the photodiodes." *Id.* at 18–19 (quoting Tr. (Warren) at 1221:16–1222:25).  Apple further argued that a person of ordinary skill in the art would have "understood that the fiber optics face plates referenced in Lumidigm could be implemented as a single faceplate or as individual faceplates over each opening and would have been motivated to implement either alternative." *Id.* at 19 (citing Tr. (Warren) at 1221:16–1222:25, 1193:24–1194:14).

### d)    Analysis

For the reasons discussed above as to element [19D] of the '502 patent, the Commission finds that Apple has not shown, by clear and convincing evidence, that, at the time of the claimed invention, the prior art teaches separate transmissive windows for each of the openings or that a person of ordinary skill in the art would have had any reason or motivation to arrive at this

PUBLIC VERSION

limitation, as claimed.  Additionally, for the same reasons noted above for element [19D] of

the '502 patent, the Commission's determination is consistent with the USPTO's denial of

Apple's petition requesting the institution of an IPR proceeding regarding the claims of the '502

patent.  *See generally Apple Inc. v. Masimo Corp.*, IPR2022-01274 (available at CResp. at Appx.

C).

> ### iii.  Element [8F] of Claim 12 of the '648 Patent—"A Separate Optically Transparent Window Extending Across Each of the Openings"; and Element [20D] of Claims 24 and 30 of the '648 Patent—"Each Through Hole Including a Window and Arranged Over a Different One of the at Least Four Photodiodes"

Regarding element [8F] of claim 12 of the '648 patent, which also uses the phrase

"extending across," the Final ID held:

> For the same reasons discussed above in the context of the "plurality of openings" limitations of '502 patent claim 19 (Element [19C]), the evidence fails to show, clearly and convincingly, a "plurality of openings" with a "separate optically transparent window extending across each of the openings" in combination with the "four photodiodes" embodiments of Lumidigm relied upon by Apple.

Final ID at 139 (citing RPHBr. at 82, 91, 98).  The Final ID made a similar conclusion regarding

element [20D] of claims 24 and 30 of the '648 patent.  *See* Final ID at 142.  Thus, while the Final

ID found that, *e.g.*, "a separate optically transparent window extending across each of the

openings" limitation was taught (consistent with its finding as to element [28G] of the '502

patent, *see id.* at 131), the Final ID found that that limitation was not taught in a "four

photodiode" embodiment having, *e.g.*, "openings aligned with the [four] photodiodes," *see, e.g.*,

*id.* at 120–21.

As noted above, the Commission has determined to take no position as to the Final ID's

underlying finding that the openings in these claims (elements [19C] and [28F] of the '502 patent

and elements [8E] and [20D] of the '648 patent) were not taught or suggested by the prior art.

However, the Commission has determined to affirm the Final ID for the alternative basis that

because, for the reasons discussed above as to element [19D] of claim 22 of the '502 patent and

element [28G] of claim 28 of the '502 patent, Apple did not present clear and convincing

evidence that, at the time of the claimed invention, the prior art taught the claimed separate

optically transparent windows extending across each of the openings, or that a person of ordinary

skill in the art would have had any reason or motivation to arrive at this limitation. Additionally,

for the same reasons noted above for element [19D] of the '502 patent and element [28G] of

claim 28 of the '502 patent, the Commission's determination is consistent with the USPTO's

denial of Apple's petition requesting the institution of an IPR proceeding regarding the claims of

the '648 patent. *See generally Apple Inc. v. Masimo Corp.*, IPR2022-01276 (USPTO Jan. 30,

2023) (available at CResp. at Appx. A).

### iv. Conclusions Regarding *Prima Facie* Obviousness and the Asserted Claims of the '501, '502, and '648 Patents

In sum, regarding *prima facie* obviousness and the asserted claims of the '502 and '648

patents, the Commission concludes that, although Lumidigm and combinations of references

therewith teach or suggest (1) the four photodiodes and (2) the protrusion, the combinations of

references do not teach or suggest (4) a separate "transmissive window" or "optically transparent

material" "within," "extending across," or "arranged over" each of the openings or though holes.

The Commission takes no position on whether Lumidigm and combinations of references

therewith teach or suggest an opening or through hole extending through or provided through the

protrusion and aligned with or over each of the four photodiodes. Thus, Apple has not shown by

clear and convincing evidence that these claims are *prima facie* obvious.

43

Regarding claim 12 of the '501 patent, the Commission affirms the Final ID's conclusion that Apple has shown by clear and convincing evidence that this claim is *prima facie* obvious.

### 4.    Objective Evidence of Non-Obviousness

#### a.    Introduction

As noted above, the Commission must consider "the totality of the evidence" before reaching a decision on obviousness, and that totality of evidence includes the existence of secondary considerations, or objective indicia of non-obviousness. *E.g.*, *Richardson-Vicks*, 122 F.3d at 1483.

Also, as noted above, before the ALJ, Complainants presented evidence of objective indicia of non-obviousness that allegedly showed the following: (1) skepticism and unexpected results related to the "convex protrusion" claim limitations; (2) skepticism and failures of others related to measuring pulse oximetry at the wrist; (3) Apple's alleged copying of Masimo's technology; and (4) the commercial success of the Apple Watch products once Apple implemented that technology. *See, e.g.*, Final ID at 145–56, 240–241.

Regarding Complainants' evidence, the Final ID agreed with Apple that Complainants failed to show that there was skepticism in the industry regarding convex surfaces. *See* Final ID at 147. And regarding Complainants evidence of skepticism and failures of others related to measuring pulse oximetry at the wrist, the Final ID found that this evidence does not significantly show non-obviousness because the asserted claims apply to any "user-worn device," including user-worn devices that are not worn on the wrist. *Id.* at 150–51. As for copying, the Final ID found that there was no significant credible evidence that Apple copied Masimo's patented technology. *Id.* at 153–54. Last, regarding commercial success, because the Final ID found that "there is little evidence of a significant nexus between Apple's commercial success and the allegedly non-obvious features of the asserted Poeze patent claims," the Final ID

44

**CONFIDENTIAL INFORMATION REDACTED**

found that this evidence "does not meaningfully affect the obviousness analysis." *Id.* at 156. Overall, the Final ID found that this evidence did not meaningfully alter the obviousness analysis. *See id.*

Complainants petitioned the Commission to review the Final ID's findings related to commercial success, *see* CPet. at 25–29; skepticism regarding convex surfaces, *id.* at 30–32; and skepticism regarding pulse oximetry at the wrist, *id.* at 33. Complainants did not petition for review of the Final ID's finding related to copying. *See generally id.* Accordingly, any such argument is waived. *Finnigan*, 180 F.3d at 1362–63.

The Commission has determined to affirm, without modifications, the Final ID as to (1) skepticism and unexpected results related to the "convex protrusion" claim limitations; (2) skepticism and failures of others related to measuring pulse oximetry at the wrist; and (3) Apple's alleged copying of Masimo's technology. Thus, the Commission adopts the Final ID's findings as to that evidence. For the reasons discussed below, the Commission has determined to affirm, with modifications, the Final ID's conclusion that Complainants' evidence of commercial success provides at most minimal weight due to the lack of a nexus to the claimed and novel features. *See* Final ID at 153–56.

### b.    Commercial Success

### i.    The Final ID

Before the ALJ, Complainants argued that the commercial success of the Apple Watch Series 6 and 7 is objective evidence of non-obviousness. CPHBr. at 173–75; CPHBr. (Reply) at 95–96; Final ID at 154–56. According to Daniel McGavock, Complainants' expert witness, sales of the Apple Watch Series 6 ███████████████████████████, and Apple advertised the blood oxygen feature as the key differentiator of the Series 6 over the previous series, Series 5. Tr. (McGavock) at 1416:10–21, 1422:8–1425:13; CX-0252; CX-1451; CX-

45

**CONFIDENTIAL INFORMATION REDACTED**

1532; CX-1289. Dr. Madisetti agreed with Mr. McGavock that there was a nexus between the blood oxygen feature of Apple Watch Series 6 and its commercial success. Tr. (Madisetti) at 1380:14–1381:4.

The Final ID found that the Apple Watch Series 6 was commercially successful and that "this may be due in some part to its blood oxygen monitoring features." Final ID at 155. The Final ID also found that the evidence does not persuasively indicate that the ▇▇▇▇ "sales of the Apple Watch Series 6 are largely attributable to the blood oxygen feature, as market analysts have recognized the Apple Watch's 'blend of sleek design, good usability on a small screen, and a growing portfolio of health and fitness apps.'" *Id*. (quoting CX-1644 (Strategy Analytics)). The Final ID added that it is not "clear that the Apple Watch Series 6 was significantly more successful than other smartwatches." *Id*. (citing CX-1644 (Strategy Analytics)). According to the Final ID, the evidence "shows that much of the success of the Apple Watch Series 6 can be attributed to the growing market for smartwatches rather than the specific implementation of the pulse oximetry feature claimed in the patents-at issue." *Id*. (citing, *inter alia*, CX-1644 (Strategy Analytics)). Thus, the Final ID discounted Complainants' evidence of commercial success, finding that it does not "meaningfully affect the obviousness analysis." *Id*. at 155–56 (citing *Ormco Corp. v. Align Tech., Inc*., 463 F.3d 1299, 1313 (Fed. Cir. 2006)).

Because the Final ID found that "there is little evidence of a *significant nexus* between Apple's commercial success and the allegedly non-obvious features of the asserted Poeze patent claims, particularly for claim 12 of the '501 patent (which is not limited to blood oxygen measurements)," the Final ID found that this evidence "does not meaningfully affect the obviousness analysis above." Final ID at 156 (emphasis added).

As noted above, Complainants petitioned for review of this finding. *See* CPet. at 25–29.

46

### ii.    Complainants' Petition

In their petition for review of the Final ID, Complainants argued that the Final ID erroneously required that "there be a 'significant' nexus in order to be objective evidence of non-obviousness." CPet. at 25 (citing Final ID at 155, 156). According to Complainants, obviousness law does not require that "the patented invention be solely responsible for the commercial success[ ] in order for this factor to be given weight appropriate to the evidence." *Id*. at 26 (citing *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.3d 1264, 1273 (Fed. Cir. 1991); *Apple Inc. v. Samsung Elecs. Co., Ltd*., 839 F.3d 1034, 1055–56 (Fed. Cir. 2016) (en banc)). Next, Complainants argued that the Final ID made clearly erroneous factual findings regarding commercial success. CPet. at 26–29.

### iii.    Analysis

On review, the Commission has determined to affirm the Final ID with modifications. The Commission agrees with Complainants that the standard for "commercial success" does not require a showing of "significant nexus." *See* CPet. at 25. However, the Commission agrees with the Final ID that Complainants' evidence is consistent with increased sales of smartwatches in general and was likely based on the Apple Watches' "blend of sleek design, good usability on a small screen, and a growing portfolio of health and fitness apps." *See, e.g.*, Final ID at 155–56. Accordingly, the Commission concludes that Complainants' evidence of commercial success is entitled to minimal weight due to Complainants' failure to show a nexus between the alleged commercial success and the alleged claimed and novel features.

### 5.    Overall Conclusion as to Obviousness

Because the Commission modifies and/or supplements the Final ID's findings as to the asserted claims of the Poeze patents regarding *prima facie* obviousness and/or secondary considerations, the Commission evaluates anew (1) the scope and content of the prior art, (2) the

47

level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) secondary considerations of non-obviousness, to determine whether Apple has shown by clear and convincing evidence that these claims are invalid for obviousness.

In doing so, the Commission concludes, as did the Final ID, that claim 12 of the '501 patent would have been invalid as obvious over combinations of references primarily based on Lumidigm, but that claims 22 and 28 of the '502 patent and claims 12, 24, and 30 of the '648 patent are not invalid as obvious over those combinations of references.

Regarding claim 12 of the '501 patent, Apple has shown that this claim would have been *prima facie* obvious to a person of ordinary skill in the art. And, as discussed above, Complainants' objective evidence of non-obviousness has minimal weight. In view of these underlying findings, the Commission concludes that Apple has shown that this claim would have been invalid by clear and convincing evidence.

Regarding claim 28 of the '502 patent, Apple has not shown that this claim would have been *prima facie* obvious to a person of ordinary skill in the art. For example, Apple has failed to show that the prior art teaches or suggests elements [28PRE], [28G], [28I], [28J], and [28K]. Also, Complainants' evidence of secondary considerations has minimal weight. In view of these underlying findings, the Commission concludes that Apple has not shown that this claim would have been invalid by clear and convincing evidence.

Regarding claim 22 of the '502 patent, Apple has not shown that this claim would have been *prima facie* obvious to a person of ordinary skill in the art. Apple has failed to show that the prior art teaches or suggests elements [19PRE], [19D], and [19E]. Also, Complainants' evidence of secondary considerations has minimal weight. In view of these underlying findings,

48

the Commission concludes that Apple has not shown that this claim would have been invalid by clear and convincing evidence.

Regarding claim 12 of the '648 patent, Apple has not shown that this claim would have been *prima facie* obvious to a person of ordinary skill in the art. Apple has failed to show that the prior art teaches or suggests elements [8F] and [12]. Also, Complainants' evidence of secondary considerations has minimal weight. In view of these underlying findings, the Commission concludes that Apple has not shown that this claim would have been invalid by clear and convincing evidence.

Regarding claims 24 and 30 of the '648 patent, Apple has not shown that these claims would have been *prima facie* obvious to a person of ordinary skill in the art. For example, Apple has failed to show that the prior art teaches or suggests elements [20D], [20E], and [24]. Also, Complainants' evidence of secondary considerations has minimal weight. In view of these underlying findings, the Commission concludes that Apple has not shown that these claims would have been invalid by clear and convincing evidence.

### C.     Non-Obviousness of the Asserted Claims of the '745 Patent

#### 1.     Introduction

The Final ID found that claims 9, 18, and 27 of the '745 patent have not been shown to be invalid. Final ID at 336. The Commission reviewed this finding. 88 Fed. Reg. at 32244. On review, the Commission affirms this finding with modifications.

Before the ALJ, Apple argued that claims 9 and 27 of the '745 patent would have been obvious in view of the Apple Watch Series 0 and that claims 9, 18, and 27 of the '745 patent

would have been obvious in view of U.S. Patent No. 8,670,819 to Iwamiya *et al*. (RX-0130[33]) in combination with U.S. Patent No. 9,392,946 to Sarantos *et al.* (RX-0366[34]) and U.S. Patent No. 8,998,815 to Venkatraman *et al*., (RX-0368[35]).  *E.g.*, Final ID at 209.

Regarding claims 9 and 27 in view of the Apple Watch Series 0, the Final ID found that the prior art did not teach or suggest elements [1B], [1D], and [9] of claim 9 or elements [20B] and [20D] of claim 27.  *See* Final ID at 212–14, 215–16, 218–20, 221, 222.  Regarding claims 9, 18, and 27 and combinations based on Iwamiya, the Final ID found that the prior art did not teach or suggest element [9] of claim 9, element [18] of claim 18, and element [27] of claim 27. *See id.* at 228–31, 235–36, 239–40.  Apple petitioned the Commission to review these findings. *See* RPet. at 62–70.

Complainants again presented objective evidence of non-obviousness.  *See* CPHBr. at 233–34, CPHBr. (Reply) at 132–33.  Complainants presented evidence allegedly showing Apple's skepticism and failures in implementing wrist-based pulse oximetry, the commercial success of the Apple Watch Series 6, and Apple's alleged copying of Masimo's technology.  *See* CPHBr. at 233–34, CPHBr. (Reply) at 132–33.  The Final ID concluded that, "[f]or the reasons discussed above in the context of the Poeze patents, this evidence does not weigh significantly against a finding of obviousness."  Final ID at 241.  The Final ID added that the "evidence of

---

[33] U.S. Patent No. 8,670,819, titled "Optical Biological Information Detecting Apparatus and Optical Biological Information Detecting Method," issued to Hiroshi Iwamiya *et al*., on March 11, 2014, from an application filed on June 29, 2010.

[34] U.S. Patent No. 9,392,946, titled "Heart Rate Sensor with High-Aspect-Ratio Photodetector," issued to Chris H. Sarantos, *et al*., on July 19, 2016, from an application filed on May 28, 2015.

[35] U.S. Patent No. 8,998,815, titled "Wearable Heart Rate Monitor," issued to Subramaniam Venkatraman, *et al*., on April 7, 2015, from an application filed on June 3, 2014.

commercial success is not relevant because the Accused Products have not been shown to practice claims of the '745 patent." *Id.* at 241 n. 87. Complainants petitioned for review of the Final ID's findings as to Complainants' objective evidence of non-obviousness. *See* CPet. at 45.

Based on the totality of the evidence, the Final ID found that Apple did not show by clear and convincing evidence that the asserted claims of the '745 patent are obvious. Final ID at 240. Apple petitioned for review of this finding. *See* RPet. at 62–70.

As noted above, the Commission determined to review the Final ID's obviousness findings as to the '745 patent. 88 Fed. Reg. at 32244. On review, the Commission has determined to affirm the Final ID's findings regarding *prima facie* obviousness of the asserted claims of the '745 patent. The Commission has considered Apple's petition for review and found its arguments that the Final ID erred to be unpersuasive. As to Complainants' evidence of secondary considerations, the Commission has determined to affirm in part and reverse in part the Final ID for the reasons discussed below. After considering the totality of the evidence, the Commission has further determined to affirm the Final ID's finding that Apple has not shown that the asserted claims of the '745 patent are obvious.

### 2.     Objective Evidence of Non-Obviousness

In their petition for review, Complainants point out that the Final ID rejected its arguments for the '745 patent "[f]or the reasons discussed above in the context of the Poeze patents." CPet. at 45 (quoting Final ID at 150). Complainants argue that the Final ID's reasoning for the Poeze patents as to skepticism and failures of others in implementing wrist-based pulse oximetry does not apply to claims 9 and 18 of the '745 patent. CPet. at 45 (quoting Final ID at 150). Complainants point out that the Final ID discounted Complainants' evidence regarding the claims of the Poeze patents because the Poeze claims are not limited to pulse oximetry at "the wrist." *Id.* (citing Final ID at 150). Complainants then argue that, on the other

51

hand, claims 9 and 18 of the '745 patent are limited to pulse oximetry at the wrist. *See id.*; *see also* JX-0009 ('745 patent) at claim 9, element [1B] ("a material configured to be positioned between the plurality of light-emitting diodes and tissue on *a wrist of a user* when the physiological monitoring device is in use" (emphasis added)); *id.* at claim 18, elements [15A] and [15B] ("a plurality of light-emitting diodes configured to emit light proximate *a wrist of a user*; a light diffusing material configured to be positioned between the plurality of light-emitting diodes and a tissue measurement site on *the wrist of the user* when the physiological monitoring device is in use" (emphasis added)). Thus, according to Complainants, the Final ID "erred by failing to properly weigh the objective evidence of skepticism and failure of others in evaluating Claims 9 and 18." CPet. at 45.

The Commission agrees with Complainants. *See id.* Moreover, to the extent Apple disputes the Final ID's finding that Complainants have shown evidence of skepticism of Apple engineers regarding pulse oximetry at the wrist and the relevance thereof, *see* RResp. at 41–43, the Commission finds Apple's argument unpersuasive. The Final ID properly evaluated the evidence and arrived at its conclusion. In any event, this evidence does not meaningfully alter the obviousness analysis, as stated in the next sub-section.

The Commission affirms the Final ID's findings as to Complainants' other objective evidence of non-obviousness, including commercial success and Apple's alleged copying of Masimo's technology. *See* Final ID at 241. The Final ID found that this evidence does not support non-obviousness. *See id.*

### 3.    Overall Conclusion as to Obviousness

Because the Commission alters the Final ID's findings as to the asserted claims of the '745 patent regarding secondary considerations, the Commission evaluates anew (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between

52

the claimed invention and the prior art, and (4) secondary considerations of non-obviousness, to determine whether Apple has shown by clear and convincing evidence that these claims are invalid for obviousness.

Like the Final ID, the Commission finds, regarding claims 9 and 27 in view of the Apple Watch Series 0, that the prior art does not teach or suggest elements [1B], [1D], and [9] of claim 9 or elements [20B] and [20D] of claim 27. *See* Final ID at 212–14, 215–16, 218–20, 221, 222. And like the Final ID, regarding claims 9, 18, and 27 and combinations based on Iwamiya, the Commission finds that the prior art does not teach or suggest element [9] of claim 9, element [18] of claim 18, and element [27] of claim 27. *See id.* at 228–31, 235–36, 239–40. Regarding claims 9 and 18, the objective evidence of skepticism and failure of others regarding implementing wrist-based pulse oximetry weighs in favor of a finding of non-obviousness. Thus, in view of these underlying findings, taken as a whole, the Commission concludes that Apple has not shown that any of these claims are invalid by clear and convincing evidence. Last, we note that the Commission's conclusion would remain the same even if the objective evidence of skepticism and failure of others regarding implementing wrist-based pulse oximetry was not considered.

**D.      Written Description Support of Claim 28 of the '502 Patent and Claim 12 of the '648 Patent**

The Final ID found that claim 28 of the '502 patent is invalid for lacking written description support as to elements [28A] and [28B] and also found that claim 12 of the '648 patent is invalid for lacking written description support as to elements [8A] and [8B], from which claim 12 depends. *E.g.*, Final ID at 336. The Commission reviewed this finding and requested briefing from the parties. *See* 88 Fed. Reg. at 32244. On review, the Commission reverses the Final ID for the reasoning provided below. In view of this conclusion and the Commission's

PUBLIC VERSION

other conclusions herein, the Commission finds that Complainants have shown that Apple violated section 337 as to claims 22 and 28 of the '502 patent and claim 12 of the '648 patent, in addition to claims 24 and 30 of the '648 patent.

### 1.    The Applicable Law

35 U.S.C. § 112 declares that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same. . . ." 35 U.S.C. § 112. "[T]his statutory language mandates satisfaction of two separate and independent requirements:  an applicant must both describe the claimed invention adequately and enable its reproduction and use." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) (citing *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991)).  The purpose of the written description requirement is to "ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 920 (Fed. Cir. 2004).

To comply with the written description requirement, a patent applicant must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the [claimed] invention." *Vas-Cath*, 935 F.2d at 1563–64 (emphasis omitted). The test for written description "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  "[T]he applicant [for a patent] may employ 'such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention.'" *In re Skvorecz*, 580 F.3d 1262, 1269 (Fed. Cir. 2009) (citing *In re Alton*, 76 F.3d 1168, 1172 (Fed. Cir. 1996)); *see also Enzo Biochem*, 323 F.3d at

964 (declaring that the written description may also be met by other "sufficiently detailed, relevant identifying characteristics," such as "physical and/or chemical prope1iies, functional characteristics when coupled with a known or disclosed con-elation between function and structure, or some combination of such characteristics") (emphasis omitted)). Compliance with the written description requirement is a question of fact, and in order to overcome the presumption of validity, a party must set forth clear and convincing evidence. *Centocor Ortho Biotech, Inc.* v. *Abbott Labs.,* 636 F.3d 1341, 1347 (Fed. Cir. 2011).

### 2.    **The Final** ID

As noted above, the Final ID concluded that claim 28 of the '502 patent is invalid for lacking written description suppo1i as to elements [28A] and [28B] and that claim 12 of the '648 patent is invalid for lacking written description suppo1i as to elements [8A] and [8B]. *See* Final ID at 156-70. As shown in the table below, these pairs of claim limitations require two separate sets of LEDs, each with an LED "configured to emit light at a first wavelength" and an LED "configured to emit light at a second wavelength."

| Elements [28A] and [28B] of Claim 28 of the '502 Patent | |
|---|---|
| **[28A]** | a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength; |
| **[28B]** | a second set of LEDs spaced apa1i from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength; |
| | |
| Elements [SA] and [SB] of Claim 12 of the '648 Patent | |
| **[SA]** | a first set of light emitting diodes (LEDs), the first set comprising at least an LED configured to emit light at a first wavelength and at least an LED configured to emit light at a second wavelength; |
| **[SB]** | a second set of LEDs spaced apaii from the first set of LEDs, the second set of LEDs comprising an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength; |

Before the ALJ, Apple argued that the disputed limitations lack written description support because the specifications fail to disclose separate sets of LEDs emitting at the same "first wavelength" and the same "second wavelength." *E.g.*, RPHBr. at 151–52; RPHBr. (Reply) at 75. Apple relied on the testimony of its expert witness, Dr. Warren, who testified that there was no support for these limitations. *See* Tr. (Warren) at 1247:13–17.

In reply, Complainants argued that Dr. Warren's testimony was conclusory and therefore insufficient for Apple to show invalidity by clear and convincing evidence. *E.g.*, CPHBr. at 179. Complainants further argued that their expert, Dr. Madisetti, identified support for the disputed limitations. *See, e.g.*, *id.* (citing Tr. (Madisetti) at 1349:7–1350:3); Final ID at 163. Complainants also relied on the specification, pointing to the two emitters (each having item number "104") depicted in Figures 7A and 7B, as well as, for example, the related disclosure that "the emitter 104 includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation." *See, e.g.*, CPHBr. at 179 (citing JX-0001 ('501 patent[36]) at 12:9–12, Fig. 7A, Fig. 7B). Figure 7B is reproduced below:

_____

[36] As noted above, the '501, '502, and '648 patents share a common specification. The parties agree that citations to the '501 patent are also applicable to the '502 and '648 patents.



**FIG. 7B**

JX-0001 ('501 patent) at FIG. 7B. Figure 7A is largely identical to Figure 7B, with the most

notable and relevant difference being that, in Figure 7A, the "emitters 104" are indicated as

"LEDs 104." Complainants also cited other portions of the specification. *See, e.g.*, CPHBr. at

179–80 (citing JX-0001 ('501 patent) at 9:60–63, 12:13–25, 13:16–21, 21:51–54, 33:30–38,

38:8–22); Final ID at 163.

The Final ID agreed with Apple, concluding that the claim language at issue requires two

different matching pairs of wavelengths between the two sets of LEDs. *See* Final ID at 163–65.

In other words, the first wavelength of an LED in the first set of LEDs must match the first

wavelength of an LED in the second set of LEDs, and the second wavelength of an LED in the

first set of LEDs must match the second wavelength of an LED in the second set of LEDs. *See*

Stay-Add-87

*id.*[37]  The Final ID next found that there is no such disclosure in the specifications of the Poeze

patents.  *See id.*  The Final ID acknowledged that, "[w]hen describing emitters that are capable of

emitting visible and near-infrared optical radiation, the specification describes two different

wavelengths, three different wavelengths, or up to eight different wavelengths," but then found

that the "specification does not describe any two LEDs having the same wavelength."  *Id.* at 164.

### 3.    Complainants' Petition

In their petition for review, Complainants argued that the Final ID "failed to acknowledge

that the presumption of validity carries with it a presumption that the specification has an

adequate written description as required by 35 U.S.C. § 112."  CPet. at 34.  Complainants also

argued that the Federal Circuit has repeatedly held that conclusory expert opinion testimony

cannot overcome this presumption and the associated burden of "clear and convincing evidence."

*See id.* at 34–35 (citing, *inter alia*, *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1338–39 (Fed. Cir.

2016); *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1155 (Fed. Cir. 2004)).

According to Complainants, the Final ID cited no evidence of what a person of ordinary skill in

the art would understand from reading the specification, let alone any evidence supporting that a

person of ordinary skill in the art would find no written description support for the disputed

limitations.  *Id*. at 37.  Complainants added that the specification "discloses that emitter 104 can

include 'sets of optical sources that are capable of emitting visible and near-infrared [light]'—

*i.e.*, emitting light at a first wavelength and a second wavelength," and it teaches "exemplary

LED sets."  *Id.* (citing JX-0001 ('501 patent) at 12:9–12, 4:55–57, 26:32).  Complainants further

argued that the "specification provides additional examples where the emitter 104 includes sets

---

[37] Neither party contests this interpretation of the claim language, either in their petitions
for review of the Final ID or in their briefing in response to the Commission's notice of review.

58

of LEDs to emit light at two or more different wavelengths," including that "emitter 104 can emit [light] at or about 1610 nm, about 1640 nm, *and* about 1665 nm." *Id.* (citing JX-0001 ('501 patent) at 12:38–40, 12:64–13:1, 13:5–7) (emphasis added). Thus, according to Complainants, the specification "discloses an emitter 104 including a set of LEDs that emits light at a first wavelength and a second wavelength." *Id.* (emphasis omitted).

Complainants further argued that Figure 7B shows two such emitters, each labeled 104, and that USPTO rules provide a presumption that each emitter set 104 is identical. CPet. at 38 (citing 37 C.F.R. § 1.84(p)(4)[38]). Complainants then concluded that, by virtue of Figure 7B, the specification "discloses that the first and second wavelengths of the set of LEDs of one emitter 104 are the same as (*i.e.*, match) the first and second wavelengths of the corresponding set of LEDs of the other emitter 104." *Id.* at 39.

### 4. Apple's Response

In reply, Apple argued that the Final ID properly acknowledged the presumption of validity and properly found that the claim language "does not merely require that there be two sets of LEDs, each emitting light at two different wavelengths," but instead also "requires matching wavelengths in each set of LEDs." RResp. (Summary) at 4. Apple further argued that Dr. Warren's testimony supports that the claims lack written description, and here, "no more elaboration was required." *See* RResp. at 30–31. According to Apple, the only relevant issue was whether the specification disclosed the recited feature, and "there was nothing more that Dr. Warren could have said because, at the time he presented his testimony, Complainants had not

---

[38] 37 C.F.R. § 1.84(p)(4) recites: "The same part of an invention appearing in more than one view of the drawing must always be designated by the same reference character, and the same reference character must never be used to designate different parts."

even challenged the point that he confirmed in his testimony—namely, that there was no written description support for two sets of LEDs each with LEDs emitting at the same 'first wavelength' and 'second wavelength.'" *Id.* at 30–32 (citing, *inter alia*, Tr. (Warren) at 1247:13–17; CPreHBr. at 126;[39] CPHBr. at 179–80).

Apple further argued that the Final ID relied on more than just Dr. Warren's testimony by walking "through the portions of the specification that Complainants had identified in their post-hearing briefs" and confirming, based on that analysis, and "consistent with Dr. Warren's testimony, that none [of those cited portions] discloses two sets of LEDs each with LEDs emitting at the same 'first wavelength' and 'second wavelength.'" *Id.* at 32 (citing Final ID at 163–64); *see also id.* at 32–35. Apple also asserted that, in Complainants' petition for review of the Final ID, Complainants "offer[ed a] lengthy, entirely new analysis of the Poeze specification," but this new analysis was allegedly waived for not being presented to the ALJ. *Id.* at 32 (citing, *inter alia*, CPreHBr. at 123–27; CPHBr. at 175–80; Order No. 4 (Ground Rules), at Ground Rules 9.2 and 13.1; *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1362 (Fed. Cir. 2012)); *see also id.* at 32–35.

### 5.    Analysis

The Commission has determined to reverse the Final ID and conclude that Apple did not carry its burden of proving, by clear and convincing evidence, that claim 28 of the '502 patent and claim 12 of the '648 patent are invalid for lacking written description support. As noted

---

[39] The Commission notes that, contrary to Apple's argument, Complainants' pre-hearing brief declared: "A [person of ordinary skill in the art] would . . . understand from the disclosure of emitter 'sets' that *corresponding LEDs in each set have the same wavelength* to allow the sensor to collect data from multiple measurement sites with multiple light paths." CPreHBr. at 126 (emphasis added).

above, because patent claims are presumed valid under 35 U.S.C. § 282, a party challenging the validity of a patent(s), including for lack of written description, must demonstrate by clear and convincing evidence that challenged patents are invalid. *See Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1351 (Fed. Cir. 2011) ("To overcome the presumption of validity of patents, the accused must show that the claims lack a written description by clear and convincing evidence."). The Commission finds that Apple did not meet its burden of proof because it relied on conclusory expert witness testimony and then on attorney argument alone to explain why Complainants' citations to the specification did not provide written description support, *see, e.g.*, RPHBr. (Reply) at 75, and Complainants' citations to the specification and its expert witness's testimony tend to show that the disputed limitations have written description support.

As an initial matter, the Commission agrees with Complainants that Apple's expert's testimony is conclusory. Dr. Warren simply stated:

> Q......... Have you identified any discussion in the Poeze specification of the use of multiple sets of LEDs each with LEDs emitting at a first wavelength and a second wavelength?
>
> A. I have not found one, no.

Tr. (Warren) at 1247:14–17. While, as Apple points out, reliance on expert testimony is not always necessary to find a claim invalid for written description,[40] in this case, Apple's expert witness testimony is conclusory, and, as discussed below, it is not clear from the face of the patents that the disputed claims lack written description. Thus, the expert testimony here is

---

[40] *See* RBr. at 30–31 (citing, *inter alia*, *Centocor*, 636 F.3d 1341, 1347; *Certain Beverage Brewing Capsules, Components Thereof, & Prods. Containing the Same*, Inv. No. 337-TA-929, Comm'n Op., 2016 WL 9751230, at *18 (Apr. 5, 2016), *aff'd by Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315 (Fed. Cir. 2017)).

distinguishable from that in *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1325 (Fed. Cir. 2000), relied upon by the Final ID (*see* Final ID at 164–65), where the trial judge relied on extensive expert testimony and other prior art documents.

Turning to the evidence cited by Complainants to the ALJ, Figures 7A and 7B show two emitters or two LEDs, each labeled 104:



**FIG. 7A**          **FIG. 7B**

*See* CPHBr. at 179; *E.g.*, JX-0001 ('501 patent) at Figs. 7A, 7B. The fact that the LEDs and the emitters share the number (104) across the two figures, suggests that they are the same (*i.e.*, both can include sets of LEDs). *See, e.g.*, JX-0001 ('501 patent) at 13:16–21 ("[T]he emitter 104 can include sets of light-emitting diodes (LEDs) as its optical source."). Even more than that, within Figure 7A, the two LEDs share the same label "LEDs 104," and within Figure 7B, the two

emitters share the same label "Emitters 104."  This suggests that the two LEDs in Figure 7A are the same, and the two emitters in Figure 7B are the same.[41]

The specifications further explain that:  "In an embodiment, the emitter 104 includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation."  *E.g.*, JX-0001 ('501 patent) at 12:9–12; *see also, e.g.*, *id.* at 9:60–63, 13:16–21; Tr. (Madisetti) at 1349:7–1350:3.  If the two sets of LEDs or the two emitters having sets of optical sources are the same, then they must emit the same visible and near-infrared optical radiation, *i.e.*, at the same two respective wavelengths.  At a minimum, the specifications do not clearly and convincingly show that these respective wavelengths of visible and near-infrared optical radiation are different between the identically-labelled LEDs or optical emitters.

Apple also responds that "'visible and near-infrared light' are not specific wavelengths," and thus the sets of LEDs do not include matching pairs of wavelengths.  *See* RBr. at 52–53.  The Commission agrees with Apple that "visible light" and "near-infrared light" both refer to ranges of wavelengths.  However, because Figures 7A and 7B each show two sets of the same LEDs or optical emitters, the Commission finds that the LEDs/optical emitters in the first set would emit the same light as the LEDs/optical emitters in the second set.  The fact that this disclosure *could be* interpreted by a skilled artisan, as Apple suggests, to encompass situations where the first LED set emits visible light at one wavelength and near-infrared at a second wavelength, and the second LED set emits visible light at a third wavelength and near-infrared

---

[41] The Commission's conclusion is based on the specifications themselves, not on 37 C.F.R. § 1.84(p)(4), which Complainants cited for the first time in their petition for review of the ALJ's Final ID.  Thus, while the parties contest whether a waiver by Complainants prevents the Commission from relying on that rule, those arguments are moot because, in view of the specifications, the Commission need not and does not rely on that rule.

light at a fourth wavelength, does not mean that this is how a skilled artisan would understand the disclosure, especially when there is no testimony to this effect. Again, at a minimum, the specifications do not clearly and convincingly show that these respective wavelengths of visible and near-infrared optical radiation are not the same between the sets of LEDs/optical emitters.

Thus, in view of Complainants' above-discussed citations to the specification and Apple's conclusory expert testimony, the Commission concludes that Apple has not met its burden of proof to show by clear and convincing evidence that Complainants did not convey with reasonable clarity to those skilled in the art that, as of the filing date sought, the applicants were in possession of the claimed inventions.

In their petition for review and in their briefing to the Commission, Complainants cite additional passages from the specification that, although not necessary to sustain the Commission's conclusion, further support it. CBr. at 42–48 (citing JX-0001 ('501 patent) at 4:55–57, 9:4–6, 12:5–9, 12:26–32, 12:38–40, 12:64–13:6, 13:21–25, 29:19–22, 33:26–36). Apple alleges that Complainants waived reliance on these passages because Complainants cite these passages for the first time in their petition for review. The Commission notes, however, that these passages are intrinsic evidence within the four corners of the patent and they merely reinforce Complainants' general argument to the ALJ. *See, e.g.*, Order No. 4 (Ground Rules), EDIS Doc. ID 752396, at Ground Rule 13.1 (Initial Post-hearing Briefs; Filing and Content) (declaring only an *issue* is waived when that *issue* is not "included in the pre-hearing brief"). Thus, under these circumstances, the Commission declines to find Complainants' reliance on this evidence waived.

Complainants' newly-cited passages of the specification show that, in Figure 7B, each emitter 104 includes sets of LEDs that can emit light "at or about 1610 nm, about 1640 nm, *and*

about 1665 nm." JX-0001 ('501 patent) at 12:38–40 (emphasis added); *see also, e.g.*, CBr. at 42–48. Complainants additionally rely on JX-0001 ('501 patent) at 4:55–57, 9:4–6, 12:5–9, 12:26–32, 12:38–40, 12:64–13:6, 13:21–25, 29:19–22, 33:26–36. Complainants reason that Figure 7B shows two emitters, so each emitter 104 would have an LED with *each* of those three wavelengths, *i.e.*, at or about 1610 nm, at or about 1640 nm, *and* at or about 1665 nm, JX-0001 ('501 patent) at 12:5–9, 12:38–40, and thus the two emitters include at least matching pairs of wavelengths.[42] *Id.* at 43–44. This evidence further confirms the Commission's conclusion that Apple has not shown by clear and convincing evidence that the relevant claims are invalid for lacking written description support.[43]

---

[42] Regarding the wavelengths disclosed in these passages, Apple argues that the passages relate to measuring "analytes like glucose," not "oxygen" or "oxygen saturation," as the claims require, and thus those teachings cannot provide written description support here. *See* RBr. at 51–52 (citing JX-0001 ('501 patent) at 12:26–44). The Commission, however, agrees with Complainants that the specific wavelengths mentioned in the specification are "irrelevant because specific wavelengths are not claimed," as the "claims merely recite that the two wavelengths used in the first set of LEDs—whatever they may be—are the same wavelengths used in the second set." CBr. (Reply) at 26. Other portions of the specification, including those cited by Complainants, recite that the emitters 104 can have other matching wavelengths. JX-0001 ('501 patent) at 12:60–13:7 ("Due to the different responses of analytes to the different wavelengths, certain embodiments of the data collection system 100 can advantageously use the measurements at these different wavelengths to improve the accuracy of measurements.").

[43] Chairman Johanson would not reverse the ALJ's well-reasoned determination that claim 28 of the '502 patent and claim 12 of the '648 patent are invalid for lacking written description support.

The written description requirement "is part of the *quid pro quo* of the patent grant and ensures that the public receives a meaningful disclosure in exchange for being excluded from practicing an invention for a period of time." *Ariad*, 598 F.3d at 1354. While the requirement does not demand any particular form of disclosure, "a description that merely renders the invention obvious does not satisfy the requirement." *Id.* at 1352.

In finding support for disputed claims in the original specification, the majority relies heavily on the specification's teaching that "[i]n an embodiment, the emitter 104 includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation," JX-0002 ('502 patent) at col. 12:9–12, and Figures 7A and 7B. The majority, noting that Figure 7B has two structures designated 104, concludes that "[i]f the two sets of LEDs or the two emitters

65

### E.    Claim Construction and Infringement Regarding the '745 Patent

The Final ID found that the Accused Products have not been shown to infringe claims 9 or 27 of the '745 patent. *E.g.*, Final ID at 336. The Commission determined to review this finding of the Final ID. *See* 88 Fed. Reg. at 32244. On review, the Commission has determined to affirm the Final ID without modification, thus adopting the Final ID's analysis.

### F.    The Domestic Industry Issues Under Review—The Poeze Patents and the '745 Patent

The Final ID found that the technical prong of the domestic industry requirement has been satisfied for claim 12 of the '501 patent, claim 28 of the '502 patent, claims 12, 24, and 30 of the '648 patent, and claim 18 of the '745 patent, and that the economic prong of the domestic industry requirement has been satisfied with respect to the '501, '502, '648, and '745 patents.

---

having sets of optical sources are the same, then they must emit the same visible and near-infrared optical radiation." There is, however, no teaching that the emitters are the same. *See* Final ID at 164 ("there is no disclosure of two separate sets of LEDs using the same wavelengths in each set"). Rather, the specification and figures use "emitters" as a broad term for any light source of any frequency. Indeed, element 104 is used inconsistently in the figures relied upon by the majority. *Compare* Figure 7A with 7B.

Moreover, both Figures 7A and 7B depict embodiments that differ meaningfully from that of claim 28 of the '502 patent (which requires four photodiodes with aligned openings) or claim 12 of the '648 patent (similar limitations). This suggests a failure to describe each claim as an "integrated whole." *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1349 (Fed. Cir. 2013) ("Taking each claim—as we must—as an integrated whole rather than as a collection of independent limitations, one searches the 2000 application in vain for the disclosure of even a single species that falls within the claims.").

The majority further relies on Respondents' expert testimony being "conclusory." This is not persuasive. Caselaw is plain that no expert testimony is necessary to show a failure to comply with the written description requirement. *See, e.g.*, *Centocor*, 636 F.3d at 1347. Further, Complainants' expert testimony lacks any discussion of the import of the disclosure found in column 12 relied on by the majority. *See* Tr. (Madisetti) at 1350:22–1352:4.

Considered as a whole, the evidence suggests that these late added claims (added by amendment years after the original priority date) reach beyond any disclosure fairly described by the specification and figures. Accordingly, Chairman Johanson would affirm the ALJ's determination that these claims are not fully supported by the original disclosure.

**CONFIDENTIAL INFORMATION REDACTED**

*E.g.,* Final ID at 336. The Commission detennined to review these findings of the Final ID. *See* 88 Fed. Reg. at 32244.

On review, the Commission has detennined to take no position regarding the Final !D's findings as to (1) whether post-Complaint evidence can be considered in satisfying the domestic industry requirement in this case with respect to the '501, '502, '648, and '745 patents; and (2) whether Complainants had shown a domestic industry in the process of being established. *See* 19 U.S.C. § 1337(a)(2); *Beloit,* 742 F.2d at 1423; *see also, e.g.,* Final ID at *56-59,,* 62 n.16, 85-87, 209,302 n.116, 319,324.

The Commission affnms, however, the Final !D's finding that Complainants have shown the existence of a domestic industry by way of significant employment of labor with respect to Masimo's investments in research and development for the Masimo Watch, but with the following modified reasoning. Final ID at 317-18.

The Final ID found that Complainants' employment of labor was significant, in pa.ii, because it involved ▌ employees ▌full-time equivalents) representing over-percent of Masimo's research and development engineers. Final ID at 317. The Commission additionally finds that Complainants' employment of labor is quantitatively significant because the identified employment of labor is ▌ percent domestic. As the Final ID found,-research and development of the Masimo Watch has occurred in the United States. *Id.* (citing CPHBr. at 307); *see also* Tr. (Kiani[44]) at 321:23-322:5 (testifying that reseai·ch and development occuned in Ilvine, Califomia).[45]

---

[44] Joe Kiani is the chai1man and chief executive officer of Masimo and Cercacor. *E.g.,* Final ID at 5.

[45] The Final ID recognized that Complainants presented evidence regarding **approximately-in** payments to ce1iain third-paiiy fnms for "design" work on the

**CONFIDENTIAL INFORMATION REDACTED**

The Commission finds that the fact that research and development of the Masimo Watch occurs ▮▮▮▮▮▮ percent in the United States, combined with the qualitative significance of research and development to the Masimo Watch (Final ID at 318), shows that Complainants' employment of labor is significant. *See* Final ID at 317 (citing *Gas Spring Nailer Prods. & Components Thereof,* Inv. No. 337-TA-1082, Comm'n Op. at 83 (Apr. 28, 2020) (finding quantitative significance where "all, *i.e.,* 100 percent, of Kyocera's R&D and engineering expenditures relating to complainant's [domestic industiy products] occurs in the United States"), *vacated and remanded on other grounds, Kyocera Senco Indus. Tools v. Int'l Trade Comm'n,* 22 F.4th 1369 (Fed. Cir. 2022)).

The Commission othe1wise affnms the Final !D's domestic industiy analysis as to the '501, '502, '648, and '745 patents, including the Final !D's finding that Complainants' plant and equipment investments were not significant. *See* Final ID at 315. Because the Final ID found that Complainants satisfied the domestic industiy requirement as to these patents based only on pre-Complaint investments, the Commission dete1mines that Complainants have satisfied the domestic industiy requirement as to the '501, '502, '648, and '745 patents based on an "existing" domestic industiy. *See* 19 U.S.C. § 1337(a)(3).

---

Masimo Watch *(see* CBr. at 26), but did not credit that evidence towards a domestic industiy because it was unclear if those fnms perfo1med design work in the United States. Final ID at 313-14. However, even **if ▮ nts** were directed to foreign labor, they are an order of magnitude smaller than the ▮ ▮ employment of research and development labor at Masimo's U.S. facilities. *Id.* (finding that "these ex enditures are relatively small in comparison to Masimo's R&D expenditures"). Thus, the ▮ ▮ of Complainants' employment of labor is domestic and Complainants' domestic industiy is therefore significant.

PUBLIC VERSION

## V.      REMEDY, THE PUBLIC INTEREST, AND BONDING

The Commission has determined to issue an LEO and a CDO.  Both remedial orders include a service, repair, and replacement exemption (discussed below in the context of the public interest), and will go into effect, without delay, at the end of the period of Presidential review.  The Commission has concluded that the public interest does not counsel against providing Complainants this remedy.  The Commission has also determined that the bond during the period of Presidential review shall be in the amount of zero percent (0%, *i.e.*, no bond) of the entered value of the articles subject to the LEO.

### A.      Remedy

The Commission has "broad discretion in selecting the form, scope, and extent of the remedy." *Viscofan, S.A. v. US. Int'1 Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986).

#### 1.      Limited Exclusion Order

As discussed below, the Commission has determined to issue an LEO directed to covered products that infringe any of claims 22 and 28 of the '502 patent and claims 12, 24, and 30 of the '648 patent.  The LEO includes the standard certification provision; includes a service, repair, and replacement exemption for infringing articles purchased prior to the expiration of the period of Presidential review; and is to go into effect without delay.

##### a.      The Applicable Law

Section 337(d)(1) provides that "[i]f the Commission determines, as a result of an investigation under this section, that there is a violation of this section, it shall direct that the articles concerned, imported by any person violating the provision of this section, be excluded from entry into the United States, unless, after considering the [public interest], it finds that such articles should not be excluded from entry."  19 U.S.C. § 1337(d)(1).

### b.    The RD

Before the ALJ, Complainants requested that the Commission issue an LEO to remedy Apple's section 337 violation. *E.g.*, RD at 1; CPHBr. at 310–11.  For its part, Apple argued that any LEO should include an exemption for "the continued service, repair, or replacement of previously purchased products, including software maintenance and updates." *E.g.*, RD at 1; RPHBr. at 279.  Apple further requested that any LEO include the standard certification provision and be no broader in scope than the scope of the investigation. *E.g.*, RD at 1–2; RPHBr. at 175, 279.

The RD recommended that any LEO be directed to Apple's importation of infringing wearable electronic devices with light-based pulse oximetry functionality and components thereof.  RD at 2 (citing 86 Fed. Reg. at 46275 (defining scope of investigation)).  The RD additionally declared that the record at the time did not include evidence to support an exemption for service, repair, or replacement.  *Id.* at 2–3.  The ALJ further recommended that any LEO include the standard certification provision. *Id.* at 3–4 (citing *Certain Composite Aerogel Insulation Materials & Methods for Manufacturing the Same*, Inv. No. 337-TA-1003, Comm'n Op. at 62–63, EDIS Doc. ID 637154 (Feb. 22, 2018); RPHBr. at 279).  In doing so, the RD properly recognized that any non-adjudicated redesigns would not be subject to certification.  *Id.* at 4 (citing *Certain Automated Teller Machines, ATM Modules, Components Thereof & Prods. Containing the Same*, Inv. No. 337-TA-972, Comm'n Op. at 26–27 and n.18, EDIS Doc. ID 613988 (June 12, 2017)).

### c.    The Parties' Arguments

In their briefing to the Commission, Complainants again request that the Commission issue an LEO.  *See* CBr. at 87–88.  Complainants accept the RD's recommendation that the LEO include a certification provision. *See id.* (citing RD at 4).  Complainants further declare that the

LEO should not include any exemption for a service, repair, or replacement for the reasons it discusses related to the public interest, discussed below. *See id.* at 88; *see also* CBr. (Reply) at 42–43. Complainants additionally argue that the LEO should state that no infringing articles should be allowed to be imported for any purpose, including the importation of any unreleased products for "engineering validation testing," "design validation testing," or "product validation testing" prior to commercial launch. CBr. at 88. Complainants further argue that the Commission should reject Apple's request for an enforcement delay. *See* CBr. (Reply) at 40–41.

Apple argues that, for public interest reasons (discussed below), the Commission should decline to issue a remedy, or at least suspend enforcement of any remedy for twelve months and/or include an exemption allowing for the service, repair, and replacement of customers' Apple Watches. *E.g.*, RBr. at 88–90, 67–72. Apple additionally declares that any LEO should contain the standard certification provision. *See id.* at 90–91. Apple further argues that Complainants' "proposed LEO and CDO fail to conform the orders with the scope of the Investigation as defined in the Notice of Investigation: 'wearable electronic devices with light-based pulse oximetry functionality and components thereof.'" *Id.* at RBr. (Reply) at 49 (quoting 86 Fed. Reg. at 46276) (citing *Certain Automated Mechanical Transmission Sys.*, Inv. No. 337-TA-503, Comm'n Op. at 4 (May 9, 2005)). Apple further points out Complainants' requested remedial orders improperly seek to cover "hardware and *software* components thereof." *Id.* (quoting CBr. at Appx. A, B) (Apple's emphasis). Regarding "software components," Apple argues that those, as "electronic transmissions," are outside the scope of the Commission's jurisdiction. *Id.* (citing *ClearCorrect Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283, 1286 (Fed. Cir. 2015)). Apple further addresses Complainants' assertion that any LEO should provide "that no infringing articles should be imported for any purpose." *Id.* at 50 (quoting CBr.

PUBLIC VERSION

at 88). Apple declares that it is "unaware of any instance in which the Commission has included such additional language in the past, and Complainants offer no proper basis to do so in this case." *Id.*

### d.     Analysis

The Commission has determined to issue an LEO directed to covered products that infringe any of claims 22 and 28 of the '502 patent and claims 12, 24, and 30 of the '648 patent. Consistent with standard practice, the Commission defines "covered products" in accordance with the plain language description of the accused products in the Complaint (*see* 19 C.F.R. § 210.10(b)(1)), which is "wearable electronic devices with light-based pulse oximetry functionality and components thereof." 86 Fed. Reg. at 46276. The Commission also agrees with Apple that the LEO (and CDO) should not cover "software components." *See* RBr. (Reply) at 49 (citing *ClearCorrect*, 810 F.3d at 1286 (Fed. Cir. 2015)); *see also, e.g.*, *Certain Wearable Electronic Devices with ECG Functionality & Components Thereof*, Inv. No. 337-TA-1266, Comm'n Op. at 50 n.33 (Jan. 20, 2023) ("Commission exclusion orders, however, do not extend to electronic transmissions.").

The issued LEO also includes the standard certification. Neither party has shown a valid basis for deviating from the Commission's standard practice. Complainants argue that the LEO should include language that "clarifies that Apple cannot use the certification procedure for redesigns that have not been adjudicated as non-infringing." *See* CBr. at 87. While the Commission declines to adopt that language as part of the Order itself, as the RD correctly recognized, the standard certification does not apply to redesigns that have not been adjudicated as non-infringing. *See* RD at 4 (citing *Automated Teller Machines*, Inv. No. 337-TA-972, Comm'n Op. at 26–27 (including n.18) ("The standard certification language does not apply to redesigns that have not been adjudicated as non-infringing." (Internal quotations removed))).

72

Should the Commission or U.S. Customs and Border Protection ("CBP") later determine that a redesigned article presented for adjudication does not infringe, the certification provision can operate to exempt those articles.

Complainants argue that the LEO should explicitly state that no infringing articles should be allowed to be imported "for any purpose." CBr. at 88. However, Complainants have shown no valid reason for why the Commission's LEO should include this non-standard language. Moreover, Complainants' request is inconsistent with section 337, which does not allow the Commission to bar, for example, products "imported by and for the use of the United States." 19 U.S.C. § 1337(l).

For the reasons discussed below in the context of the public interest,[46] the LEO includes a service, repair, and replacement exemption. *See infra* section V.B.4.a.iii. However, also for the reasons discussed below in the context of the public interest, the Commission denies Apple's request that the LEO be subject to a twelve-month delay.

### 2. Cease and Desist Order

As discussed below, the Commission has determined to issue a CDO directed to Apple and covered products that infringe any of claims 22 and 28 of the '502 patent and claims 12, 24, and 30 of the '648 patent. The CDO includes a service, repair, and replacement exemption for

---

[46] Commissioner Kearns disagrees with the Commission majority's position that public interest is the sole statutory ground for exemptions from the scope of remedial orders. As he explained in *Certain Cloud-Connected Wood-Pellet Grills & Components Thereof*, Inv. No. 337-TA-1237 ("*Grills*") (joined by Commissioner Karpel), the Commission's reviewing court has stated that the Commission has "broad discretion in selecting the form, scope, and extent of the remedy." *Grills,* Comm'n Op. at 11–12 (including n.10) (May 24, 2022). Moreover, they observed that "the Commission has repeatedly indicated that it has granted warranty and repair exemptions 'when unopposed, in view of the public interest, or upon some showing of a need for service and repair.'" *Grills*, Comm'n Op. at 11 n.10.

infringing articles purchased prior to the expiration of the period of Presidential review, and the CDO is to go into effect without delay.

### a. The Applicable Law

Section 337(f)(1) provides that in addition to, or in lieu of, the issuance of an exclusion order, the Commission may issue a CDO as a remedy for a violation of section 337. *See* 19 U.S.C. § 1337(f)(1). CDOs are generally issued when, with respect to the imported infringing products, the respondents maintain commercially significant inventories in the United States or have significant domestic operations that could undercut the remedy provided by an exclusion order.[47] *See, e.g.*, *Certain Table Saws Incorporating Active Injury Mitigation Technology & Components Thereof*, Inv. No. 337-TA-965, Comm'n Op. at 4–6 (Feb. 1, 2017); *Certain Protective Cases & Components Thereof*, Inv. No. 337-TA-780, USITC Pub. No. 4405, Comm'n Op. at 28 (Nov. 19, 2012) (citing *Certain Laser Bar Code Scanners & Scan Engines, Components Thereof & Prods. Containing Same*, Inv. No. 337-TA-551, Comm'n Op. at 22 (June 24, 2007)). Complainants bear the burden on this issue: "[a] complainant seeking a [CDO] must demonstrate, based on the record, that this remedy is necessary to address the violation found in the investigation so as to not undercut the relief provided by the exclusion order." *Table Saws*, Inv. No. 337-TA-965, Comm'n Op. at 5 (citing *Certain Integrated Repeaters, Switches,*

---

[47] When the presence of infringing domestic inventory or domestic operations is asserted as the basis for a CDO under section 337(f)(1), Commissioner Schmidtlein does not adopt the view that the inventory or domestic operations needs to be "commercially significant" in order to issue the CDO. *See, e.g.*, *Certain Magnetic Tape Cartridges and Components Thereof*, Inv. No. 337-TA-1058, Comm'n Op. at 65 n.24 (Apr. 9, 2019); *Table Saws*, Inv. No. 337-TA-965, Comm'n Op. at 6 n.2 (Feb. 1, 2017). In Commissioner Schmidtlein's view, the presence of some infringing domestic inventory or domestic operations, regardless of its commercial significance, provides a basis to issue a CDO. *Id.*

*Transceivers, & Prods. Containing Same*, Inv. No. 337-TA-435, USITC Pub. No. 3547 (Oct. 2002), Comm'n Op. at 27 (Aug. 16, 2002); H.R. REP. No. 100-40, at 160 (1987)).

### b.    The RD

Before the ALJ, Complainants sought a CDO based on evidence of Apple's significant inventory of Accused Products. *E.g.*, RD at 4 (citing CPHBr. at 311). For its part, Apple argued that any CDO should include service, repair, and replacement exemption that permits "the continued service, repair, or replacement of previously purchased products, including software maintenance and updates." *Id.* (quoting RPHBr. at 279).

The RD found that "[t]here is no dispute that Apple maintains a significant commercial inventory of Accused Products." *Id.* at 5 (citing CPHBr. at 311; CX-0128C at ¶ 5). The RD further found that there is also "evidence that Apple has significant domestic operations, because Apple is headquartered in California and has over 75,000 U.S. employees." *Id.* (citing RStmt.). Thus, the RD recommended the issuance of a CDO against Apple. *Id.*

### c.    The Parties' Arguments

Complainants request that the Commission issue a CDO directed to Apple. *See* CBr. at 87–88. The parties make the same arguments as to the scope of the CDO that they made for the LEO. *See id.* at 88; RBr. at 88–90, 67–72. Apple does not dispute the RD's findings that it maintains a significant commercial inventory of Accused Products and has significant domestic operations. *See generally* RBr.; RBr. (Reply); *see also* RD at 5.

### d.    Analysis

The Commission has determined to issue a CDO directed to Apple and covered products that infringe any of claims 22 and 28 of the '502 patent and claims 12, 24, and 30 of the '648

patent.[48]  The Commission adopts the undisputed findings in the RD that Apple maintains a commercially significant inventory of Accused Products and has significant domestic operations. RD at 5; *see also generally* RBr. (not disputing that it maintains a commercially significant inventory or has significant domestic operations); RBr. (Reply) (same).  The issued CDO directs Apple to cease and desist from conducting any of the following activities in the United States:  importing, selling, offering for sale, marketing, advertising, distributing, transferring (except for exportation), soliciting United States agents or distributors, and aiding or abetting other entities in the importation, sale for importation, sale after importation, transfer (except for exportation), or distribution of wearable electronic devices with light-based pulse oximetry functionality and components thereof that infringe claims 28 of the '502 patent or any of claims 12, 24, and 30 of the '648 patent.  The language of the CDO is consistent with the Commission's standard practice of using the plain language description of the accused products in the Complaint as the definition of "covered products."  *See* 19 C.F.R. § 210.10(b)(1).  The scope of the CDO, like the LEO, is discussed below in the context of the public interest.

### B.    Public Interest

To prevent any harm from the remedial orders to the public health and welfare and to United States consumers, the Commission's LEO and CDO each include a service, repair, and replacement exemption.  In view of this exemption, the public interest factors do not counsel against providing Complainants a remedy.  Apple has not shown any reason why the Commission should delay the enforcement of its remedy.

---

[48] Commissioner Schmidtlein agrees that a CDO should issue directed to Respondent Apple, but she differs from the majority with respect to the basis for that determination.  *See supra* note 47 ("[T]he presence of some infringing domestic inventory or domestic operations, regardless of its commercial significance, provides a basis to issue a CDO.").

PUBLIC VERSION

**1.     The Applicable Law**

Section 337 requires that the Commission, upon finding a violation of section 337, issue

an LEO "unless, after considering the effect of such exclusion upon the public health and

welfare, competitive conditions in the United States economy, the production of like or directly

competitive articles in the United States, and United States consumers, it finds that such articles

should not be excluded from entry." 19 U.S.C. § 1337(d)(l).  Similarly, the Commission must

consider these public interest factors before issuing a CDO.  19 U.S.C. § 1337(f)(1).

Under appropriate facts and circumstances, the Commission may determine that no

remedy should issue because of the adverse impacts on the public interest.  *See, e.g.*, *Certain

Fluidized Supporting Apparatus & Components Thereof*, Inv. Nos. 337-TA-182/188, USITC

Pub. 1667, Comm'n Op. at 1–2, 23–25 (Oct. 1984) (finding that the public interest warranted

denying complainant's requested relief).  Moreover, when the circumstances of a particular

investigation require, the Commission has tailored its relief in light of the statutory public

interest factors.  For example, the Commission has allowed continued importation for ongoing

medical research, exempted service parts, grandfathered certain infringing products, and delayed

the imposition of remedies to allow affected third-party consumers to transition to non-infringing

products.  *E.g.*, *Certain Microfluidic Devices*, Inv. No. 337-TA-1068 Comm'n Op. at 1, 22–48,

53–54 (analyzing the public interest, discussing applicable precedent, and ultimately issuing a

tailored LEO and a tailored CDO); *Certain Road Milling Machines & Components Thereof*, Inv.

No. 337-TA-1067, Comm'n Op. at 32–33 (July 18, 2019) (exempting service parts); *Certain

Baseband Processor Chips & Chipsets, Transmitter, & Receiver (Radio) Chips, Power Control

Chips, & Prods. Containing Same, Including Cellular Tel. Handsets*, 337-TA-543, USITC Pub.

No. 4258, comm'n Op. at 150–51 (Oct. 2011) (grandfathering certain products); *Certain*

*Personal Data & Mobile Comm'n Devices & Related Software*, 337-TA-710, USITC Pub. No. 4331, Comm'n Op., at 72–73, 80–81 (June 2012) (delaying imposition of remedy).

The statute requires the Commission to consider and make findings on the public interest in every case in which a violation is found regardless of the quality or quantity of public interest information supplied by the parties. *See* 19 U.S.C. § 1337(d)(l), (f)(l). Thus, the Commission publishes a notice inviting the parties as well as interested members of the public and interested government agencies to gather and present evidence on the public interest at multiple junctures in the proceeding. *See* 19 U.S.C. § 1337(d)(l) & (f)(l).

### 2. Non-Party Comments on the Public Interest

The Commission's solicitation of public interest comments following the ALJ's RD (88 Fed. Reg. 6312, 6312–13 (Jan. 31, 2023)) resulted in numerous submissions on the public interest from non-parties, including:

(1)   Public Interest Comments of David Albert, EDIS Doc. ID 790883 (Feb. 22, 2023) ("Albert Stmt.");

(2)   Public Interest Statement of the Alliance for U.S. Startups and Inventors for Jobs, EDIS Doc. ID 791674 (Mar. 3, 2023) ("Alliance for U.S. Startups Stmt.");

(3)   Statement of Non-Party American Heart Association on the Public Interest of the Recommended Remedial Orders But Not in Support of Any Party, EDIS Doc. ID 791476 (Mar. 1, 2023) ("AHA Stmt.");

(4)   Public Interest Letter from the Honorable Ken Buck, Henry C. Johnson, Jr., and Katie Porter, EDIS Doc. ID 791047 (Feb. 23, 2023) ("Buck Stmt.");

(5)   Public Interest Comments from C4IP, EDIS Doc. ID 791567 (Mar. 2, 2023) ("C4IP Stmt.");

(6)   Public Interest Comments of Bill Carpou from Octane, EDIS Doc. ID 790962 (Feb. 23, 2023) ("Carpou Stmt.);

(7)   Statement of Third Party Computer and Communications Industry Association in Response to the Commission's January 31, 2023, Notice of Request for Statements on the Public Interest, EDIS Doc. ID 791054 (Feb. 23, 2023) ("CCIA Stmt.");

(8)     Public Interest Statement of Consumer Federation of America, EDIS Doc. ID 791163 (Feb. 27 2023) ("CFA Stmt.");

(9)     Public Comments from California Life Sciences, EDIS Doc. ID 791012 (Feb. 23, 2023) ("CLS Stmt.");

(10)    Letter of Support from Cure HHT, EDIS Doc. ID 790394 (Feb. 15, 2023) ("Cure HHT Stmt.");

(11)    Public Interest Statement of David Dinielli and Michael Enseki-Frank, EDIS Doc. ID 791686 (Mar. 3, 2023) ("Dinielli Stmt.");

(12)    Public Interest Statement of Ryan Drant from Questa Capital, EDIS Doc. ID 790991 (Feb. 23, 2023) ("Drant Stmt.");

(13)    Public Interest Statement of Non-Party Mitchell Goldstein, M.D., EDIS Doc. ID 791179 (Feb. 27, 2023) ("Goldstein Stmt.");

(14)    Public Interest Comments from Innovation Alliance, EDIS Doc. ID 791048 (Feb. 23, 2023) ("Innovation Alliance Stmt.");

(15)    Public Interest Statement of Josh Malone, EDIS Doc. ID 790787 (Feb. 21, 2023) ("Malone Stmt.");

(16)    Christopher McCarthy Public Interest Statement Points Supporting Masimo, EDIS Doc. ID 789080 (Feb. 1, 2023) ("McCarthy Stmt.");

(17)    Public Interest Statement of Non-Party of Medical Device Manufacturers Association (MDMA), EDIS Doc. ID 791167 (Feb. 27, 2023) ("MDMA Stmt.");

(18)    Public Interest Statement of Richard Milani, M.D., EDIS Doc. ID 791665 (Mar. 2, 2023) ("Milani Stmt.");

(19)    Statement of Third Party Law Professors Adam Mossof and Kristen Osenga in Response to the Commission's Notice of Request for Statements on the Public Interest and Reply to Respondent's Statement of February 22, 2023, EDIS Doc. ID 791069 (Feb. 23, 2023) ("Mossof Stmt.");

(20)    National Jewish Health Support for the Apple Watch for Use in Tracking Physiologic Features in Medical Patients, EDIS Doc. ID 790602 (Feb. 17, 2023) ("NJH Stmt.," letter authored by Russell Bowler, M.D., Ph.D.);

(21)    Cynthia Persaud Comments for Inv. 337-1276, EDIS Doc. ID 789338 (Feb. 3, 2023) ("Persaud Stmt.");

(22)    Public Interest Statement of Non-Party Peter Pronovost, M.D., EDIS Doc. ID 791162 (Feb. 27, 2023) ("Pronovost Stmt.");

(23) Public Interest Statement of Non-Party Patient Safety Movement Foundation, EDIS Doc. ID 791175 (Feb. 27, 2023) ("PSMF Stmt.," letter authored by Dr. Michael Ramsay);

(24) Stanford University Medical Center Letter in Support of Apple Watch, EDIS Doc. ID 791060 (Feb. 23, 2023) ("Stanford Stmt.," letter authored by Stephen Ruoss, MD);

(25) StopAFib.org Letter of Support, EDIS Doc. ID 790642 (Feb. 21, 2023) ("StopAFib.org Stmt.");

(26) University of Michigan Health Letter of Support for Apple Watch, EDIS Doc. ID 790641 (Feb. 21, 2023) ("Univ. of Mich. Stmt.," letter authored by Jessica R. Golbus MD, MS);

(27) Public Interest Comments of US Inventor, Inc., EDIS Doc. ID 791041 (Feb. 23, 2023) ("US Inventor Stmt.");

(28) Dr. Robert M. Watcher Letter in Support of Apple and Public Interest, EDIS Doc. ID 790510 (Feb. 16, 2023) ("Wachter Stmt.");

(29) Public Interest Statement of Kevin R. Ward, MD, EDIS Doc. ID 790884 (Feb. 22, 2023) ("Ward Stmt.");

(30) Comments from Dr. Adam Waddell, MD, EDIS Doc. ID 789029 (Jan. 31, 2023) ("Waddell Stmt.");

(31) Public Interest Statement of Non-Party Bobby Yazdani, EDIS Doc. ID 791177 (Feb. 27, 2023) ("Yazdani Stmt.").

The Commission's notice of review (88 Fed. Reg. at 32243–46 (May 19, 2023)) also

resulted in several submissions from third parties:

(1) Public Interest Comments from Council for Innovation Promotion (C4IP), EDIS Doc. ID 797854 (June 5, 2023) ("C4IP Comments");

(2) Public Interest Comments from Hugh Calkins, M.D., EDIS Doc. ID 797827 (June 5, 2023) ("Calkins Comments");

(3) Public Interest Comments from Nelson Freimer, M.D., EDIS Doc. ID 797817 (June 5, 2023) ("Freimer Comments");

(4) Public Interest Comments from Calum A. MacRae, MD, PhD, EDIS Doc. ID 797826 (June 5, 2023) ("MacRae Comments");

(5) Public Interest Comments from Rod S. Passman, M.D., M.S.C.E., EDIS Doc. ID 797813 (June 5, 2023) ("Passman Comments");

(6)     Comments on Public Interest from Leslie A. Saxon, M.D., EDIS Doc. ID 797811 (June 5, 2023) ("Saxon Comments");

(7)     Public Interest Comments from Professors Francisco J. Valero-Cuevas, PhD and Najmedin Meshkati, PhD, CPE, EDIS Doc. ID 798257 (June 12, 2023) ("Valero-Cuevas Comments").

The Commission has considered all of these submissions in making its final determination.

### 3.     Whether Apple is Collaterally Estopped from Arguing the Merits of the Public Interest

As a preliminary matter, Complainants allege that Apple is collaterally estopped from arguing the merits of its public interest arguments. *E.g.*, CBr. at 56–57. As discussed below, the Commission disagrees.

### a.     The Parties' Arguments

Complainants argue that Apple should be estopped from arguing the merits of the public interest, reasoning that Apple already presented its arguments to the Commission in *Wearable Electronic Devices*, Inv. No. 337-TA-1266, where the Commission concluded that the public interest did not weigh against excluding the infringing Apple Watches.[49] *See* CBr. at 56–57. Complainants argue that the Commission has previously applied collateral estoppel when: (1) the issue decided in the prior litigation is identical to that before the tribunal; (2) the issue was actually litigated in the prior proceeding; (3) the resolution of the issue in the prior litigation was necessary to its resulting judgment; and (4) the party against whom collateral estoppel is

---

[49] In that investigation, the complainant (AliveCor, Inc.) accused the Apple Watch Series 4, 5, 6, and 7. *Wearable Elec. Devices*, Inv. No. 337-TA-1266, Comm'n Op. at 9. The Commission issued remedial orders with a service, repair, and replacement exemption, although the remedial orders remain suspended pending final resolution of the complainant's appeal of the USPTO's final written decisions finding the asserted claims invalid. *See id.* at 86–87.

asserted had a full and fair opportunity to litigate its position. *Id.* at 56 (citing *Certain Three-Dimensional Cinema Sys*. *& Components Thereof*, Inv. No. 337-TA-939, EDIS Doc. ID 588763, Comm'n Op. at 53 (Aug. 23, 2016)). According to Complainants, all of those elements are satisfied here, and the Commission therefore should likewise conclude that no public interest concerns warrant denying their requested remedy. *See id.* at 56–57.

In reply, Apple asserts that collateral estoppel does not apply here. *See* RBr. (Reply) at 35–36. Apple reasons that the public interest issues now at issue are different from the ones in *Wearable Electronic Devices*, Inv. No. 337-TA-1266, where Commission briefing was completed months earlier and related to a different feature. *Id.* at 35. Apple further alleges that, in assessing the "propriety of remedial orders, the Commission should consider public interest issues on an ongoing basis, based on the present facts." *Id.* Apple points out that the Commission has never applied collateral estoppel regarding the public interest, and Apple further asserts that the Commission has rejected the application of estoppel to the public interest in the past. *Id.* (citing, *inter alia*, *Certain Mobile Elec. Devices & Radio Frequency & Processing Components Thereof (II)*, Inv. No. 337-TA-1093, Final ID, 2019 WL 2058009, at *23 (Mar. 26, 2019)). Apple further argues that the particular public interest questions "posed in the Commission's Notice of Review indicate that issues specific to this Investigation will bear on the Commission's findings," and the Commission should therefore consider that briefing. *Id.* at 36.

**b.    Analysis**

The Commission concludes that collateral estoppel does not bar Apple from arguing the merits of the public interest. The statutory language of section 337 requires the Commission to consider the public interest in each investigation before issuing a remedy. *See, e.g.*, 19 U.S.C. § 1337(d)(1) ("If the Commission determines, as a result of an investigation under this section, that there is a violation of this section, it shall direct that the articles concerned . . . be excluded

82

from entry . . . *unless, after considering* the effect of such exclusion upon the [public interest factors], it finds that such articles should not be excluded from entry." (Emphasis added)). Relying on the Commission's decision in previous investigations alone does not satisfy the statutory mandate to consider the public interest. *See Microfluidic Devices*, Inv. No. 337-TA-1068, Comm'n Op at 28 ("[T]he statute requires the Commission to consider and make findings on the public interest in every case in which a violation is found."), 28 n.25 ("The Commission has a statutory duty to consider the public interest."). While the Commission's reasoning in *Wearable Electronic Devices* is in some instances applicable here (as discussed below), the Commission will consider Apple's arguments anew. Furthermore, unlike the arguments in *Wearable Electronic Devices*, the public interest arguments here involve both the Apple Watches' blood oxygen feature and electrocardiogram ("ECG") recording feature. Moreover, any estoppel would be inapplicable to non-party comments.

### 4.     The Public Interest Factors

### a.     Public Health and Welfare

In general, Apple argues that Complainants' requested remedy will adversely affect the public health and welfare because it will "prevent consumers and medical researchers from future access not only to the Blood Oxygen feature[50] that Complainants have accused of infringement, but also to a host of other health, wellness, and safety features—including ones known to be lifesaving." RBr. at 83. Apple primarily points to the ECG recording feature that was at issue in *Wearable Electronic Devices*, Inv. No. 337-TA-1266. Apple further explains that, "[i]n addition to numerous consumer connectivity functions—including cellular capability,

---

[50] The "Blood Oxygen feature" refers to the infringing pulse oximetry feature.

messaging, email, access to the Internet, and navigation," the Apple Watches subject to exclusion "also offer the IRN[51] feature and the ECG app, which provide notification of a potentially fatal cardiac condition (atrial fibrillation)[52] and allow users to monitor their heart rhythm and share the data with their doctors." *Id.* Apple further argues that Complainants' proposed exclusion order would also be a "major setback for medical research, where Apple Watch plays a critical role." *Id.* at 84.

Apple additionally argues that any remedial order should include a service, repair, and replacement exemption for consumers who have permissibly obtained an Apple Watch with the accused blood oxygen feature. *E.g.*, *id.* at 74. Apple also argues that the enforcement of any remedial order should be delayed for twelve months to "allow other device manufacturers to scale up their production capacity and address supply chain constraints that will limit supply of alternatives" and to "allow Apple sufficient time to prepare and implement its proposed design-around, and to allow the design-around to go through the necessary approval process." *E.g.*, *id.* at 89.

As discussed below, the Commission has determined that any adverse effect on the public health and welfare from the Commission's remedial orders can be mitigated by the provided service, repair, and replacement exemption. There are numerous reasonable substitutes for infringing Apple Watches available in the United States for both Apple Watch users who use the devices for personal, health-related use and for users who are using infringing Apple Watches to participate in medical studies. Additionally, the Commission's remedial orders, in view of the

---

[51] "IRN" stands for "irregular rhythm notification." The Apple Watch SE, which is not subject to the Commission's remedial order includes the IRN feature. *See* RBr. at 84 n.51.

[52] "Atrial fibrillation" is sometimes abbreviated herein as "AFib."

service, repair, and replacement exemption, will have no meaningful effect on medical research. Last, Apple has not shown the need for any delay in the enforcement of the Commission's remedy.

### i.      Reasonable Substitutes

#### a)      The Parties' Arguments

##### *Apple's Arguments*

Regarding the scope of reasonable substitutes, Apple asserts that the Accused Products "include numerous features pertinent to public health and public welfare, and relevant to the reasonable substitute inquiry," such as: (1) they are smartwatches (*i.e.* they have "features similar to a smartphone," including telecommunications and location-sharing capabilities and accessibility features that may assist the hearing or visually-impaired); (2) they are "fitness tracking devices"; and (3) they are "health and wellness devices" that include, for example, ECG, IRN, and HHRN[53] features, and have also been authorized by the FDA.  RBr. at 64–66. Apple declares that, "[b]ecause the Accused Apple Watches are multi-featured devices intended to serve a wide spectrum of potential users, consumers purchase the Accused Apple Watches to obtain different combinations of the above-described features."  *Id.* at 66; *see also id.* at 66–67. And, according to Apple, while "[o]ther smartwatches . . . share some functionality with Apple Watches," they "may lack crash-detection or AFib History, and many of them lack ECG, temperature tracking, and/or fall detection features."  *Id.* at 70.  Apple further argues that Complainants erroneously "attempt to narrow the range of features relevant to the public interest inquiry to only 'health, safety, and wellness features.'"  RBr. (Reply) at 40 (citing

---

[53] "HHRN" stands for "high heart rate notification."  The non-infringing Apple Watch SE includes this feature. *See* CBr. (Reply) at Ex. 93 (McGavock Declaration) at ¶ 39 (Table 1).

*Thermoplastic-Encapsulated Motors*, Inv. No. 337-TA-1073, RD, 2018 WL 10758211, at *5 (Nov. 27, 2018); *Elec. Digital Media Devices*, Inv. No. 337-TA-796, Comm'n Op., 2013 WL 10734395 at *80 (Nov. 27, 2018)). Apple explains that "[t]he protected interest is the public's ability to access the numerous relevant features in the Accused Apple Watches, just as the public was interested in accessing the relevant active safety system functionality in *Certain Table Saws*." *Id.* at 42.

Apple specifically argues that Masimo's W1 Watch should not be considered a reasonable substitute because (1) it is not available to U.S. consumers in "any material quantity," (2) it is not a "smartwatch," (3) it allegedly has not been shown to "reliably measure physiological parameters," and (4) it is allegedly not manufactured in sufficient quantity to meet the demand created by an exclusion order. RBr. at 63.

### *Complainants' Arguments*

Complainants argue that "reasonable substitutes" should be defined the same way as in *Wearable Electronic Devices*, *i.e.*, as watches with a "range of health, safety, and wellness features." CBr. at 81 (citing *Wearable Elec. Devices*, Inv. No. 337-TA-1266, Comm'n Op. at 75). Complainants explain that, under *Table Saws*, a "reasonable substitute" is defined by the "protected interest" in the features benefitting the public health and welfare. *Id.* (citing *Table Saws*, Inv. No. 337-TA-965, Comm'n Op. at 3). Complainants then declare that the public health and welfare is not impacted by consumers' inability to have smartwatches generally, and thus, "reasonable substitutes" should be defined as they were in *Wearable Electronic Devices*. *See* CBr. (Reply) at 37.

Regarding specific substitutes, Complainants rely in part on following chart from the Commission's Opinion in *Wearable Electronic Devices*, Inv. No. 337-TA-1266:

## TABLE 1: SELECTED SMARTWATCH FEATURES PROMOTED BY DEVICE MANUFACTURERS

| | Apple | | Competitors | | | | |
|---|---|---|---|---|---|---|---|
| | Apple Watch (Series 8) [A] | Apple Watch (SE 2nd Gen) [B] | Samsung Galaxy (Watch 5) [C] | Fitbit (Sense2) [D] | Fossil (Gen 6) [E] | Garmin (Venu 2 Plus) [F] | Zepp (Amazfit GTS4) [G] |
| GPS | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Emergency SOS Capability | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ | ✗ |
| Water Resistant | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Speaker and Microphone | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| 24+ Hour Battery Life | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| iOS Compatability | ✓ | ✓ | ✗ | ✓ | ✓ | ✓ | ✓ |
| Cellular Connectivity | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Personalizable Design | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Health Functions** | | | | | | | |
| ECG | ✓ | ✗ | ✓ | ✓ | ✗ | ✗ | ✗ |
| HHRN | ✓ | ✓ | ✓ | ✓ | - | ✓ | ✓ |
| IRN | ✓ | ✓ | - | ✓ | - | ✓ | ✓ |
| Low Cardio Fitness Notifications | ✓ | ✓ | - | ✓ | - | ✓ | ✓ |
| Blood Oxygen | ✓ | ✗ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Fall Detection | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ | ✓ |
| Crash Detection | ✓ | ✓ | ✗ | ✗ | ✗ | ✓ | ✓ |
| Wrist Temperature | ✓ | ✗ | ✓ | ✓ | ✗ | ✗ | ✗ |
| Sleep Monitoring | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

CBr. at 83; *Wearable Elec. Devices*, Inv. No 337-TA-1266, Comm'n Op. at 77. Complainants point out that most of these watches offer the blood oxygen feature and at least the Samsung Galaxy (Watch 5) and Fitbit (Sense 2) include an ECG recording feature. Complainants allege that "[a]ll of the wearables manufactured by third parties identified in the above chart would be reasonable substitutes for the infringing Apple Watches." *Id.* Aside from reliance on *Wearable Electronic Devices*, Complainants argue:

> Garmin's vivoactive®, Fenix®, epix™, Venu®, and Forerunner® series all have watches that include a blood oxygen feature. Google's Pixel watch[ ] includes a blood oxygen feature. Samsung's Galaxy 5 watch contains a blood oxygen feature. The Fitbit Versa 4™, Sense 2™, and Charge 5™ also contain blood oxygen features. The Fossil Gen6 contains a blood oxygen feature as well. These smartwatches contain many of the features found in the Apple Watch and many sell at lower prices. Masimo's W1, available directly to consumers, offers continuous clinical-grade pulse oximetry as well as other health features. It is currently used in hospitals as well, outside the United States. . . . Masimo's Freedom smartwatch will also include pulse oximetry and other health features and is expected to launch in the Fall of this year. Moreover, Masimo offers its

> blood oxygen sensor as a module to third parties who can integrate the
> module in their own smartwatches.
>
> Numerous other competitive products are reasonable substitutes for the
> ECG functionality of the infringing products. This includes the Garmin
> Venu 2 Plus, Google Pixel, Samsung Galaxy 5, Fitbit Sense 2, and Fitbit
> Charge 5. As the Commission held in [*Wearable Electronic Devices*], the
> public's interest in these health features of the Apple Watch is insufficient
> to overcome the statutory remedy given the availability of competing
> substitutes.

*Id.* at 64–65 (citations and footnotes omitted).

Complainants also specifically argue that Masimo's W1 Watch is a reasonable substitute for the infringing Apple Watches because it offers many of the same health features that the public would be interested in having access to, including blood oxygen measurements. *See* CBr. at 83–84. Complainants point out that the Final ID found that the W1 Watch can reliably measure physiological parameters, such as blood oxygen levels. *Id.* (citing, *inter alia*, Final ID at 60–63); *see also id.* at 38–39. Complainants further argue that the W1 Watch should not be outside the scope of reasonable alternatives for not being produced in a sufficient quantity alone to meet all consumer demand created by any exclusion order because the Commission does not require any alleged substitute to satisfy that demand alone. *See* CBr. (Reply) at 37.

Complainants further argue that there is no evidence that other manufacturers of suitable alternatives do not have capacity to meet consumer demands." CBr. (Reply) at 39; *see also id.* at 39–41. Complainants point out that Apple itself could manufacture its Apple Watch SE, "which contains virtually all the same features as the infringing products, or return to producing the Apple Watch Series 4 or 5, which also included ECG," but not blood oxygen measurements. *Id.* (citing CBr. Ex. 93 at ¶¶ 22–24).

### b)    Non-Party Comments

Some researchers stated that other devices can replace Apple Watches:

> Given our combined expertise in the theory, design, financing, execution, and dissemination of medical research, we see no reason why it is not possible to replace the Apple Watch in pending health applications with alternative wearable devices from *Fitbit, Withings, Garmin* and others that are able to provide human motion, heart function and oxygen saturation information. Several of these companies also readily provide the Application Programming Interface (API) code that allows connectivity and data transfer to the investigator's systems.

Valero-Cuevas Comments, EDIS Doc. ID 798257, at 2; *see also id.* at 2–3. Other researchers, medical professionals, and commenters submitted filings indicating a preference for Masimo's technology, with some going so far as discouraging reliance on Apple's blood oxygen saturation feature. *See, e.g.*, McCarthy Stmt., EDIS Doc. ID 789080; Waddell Stmt., EDIS Doc. ID 789029; Albert Stmt., EDIS Doc. ID 790883; Ward Stmt., EDIS Doc. ID 790884; Yazdani Stmt., EDIS Doc. ID 791177; Goldstein Stmt., EDIS Doc. ID 791179; MDMA Stmt., EDIS Doc. ID 791167; PSMF Stmt., EDIS Doc. ID 791175; Pronovost Stmt., EDIS Doc. ID 791162.

Still other researchers indicated a preference for the Apple Watch. *See, e.g.*, NJH Stmt., EDIS Doc. ID 790602, at 1; Passman Comments, EDIS Doc. ID 797813, at 1–2; Freimer Comments, EDIS Doc. ID 797817, at 1–2; Calkins Comments, EDIS Doc. ID at 797827, at 1–2; MacRae Comments, EDIS Doc. ID 797826, at 1–2; Saxon Comments, EDIS Doc. ID 797811, at 1–2; AHA Stmt., EDIS Doc. ID 791476, at 3.

### c)     Analysis

The Commission assesses the scope of reasonable alternatives from the perspective of public interest concerns raised in an investigation. *See Wearable Electronic Devices*, Inv. No. 337-TA-1266, Comm'n Op. at 73–74 (assessing the scope of reasonable substitutes from the perspective of each of the three public interest concerns raised by Apple); *Table Saws*, Inv. No. 337-TA-965, Comm'n Op. at 9 ("The protected [public health and welfare] interest here is the public's ability to purchase table saws with [active injury management technology ('AIMT')]

89

functionality, not the ability to purchase AIMT table saws with a specific feature set that is unrelated to the efficacy of the AIMT functionality."). The Commission notes that Apple argues, regarding the public health and welfare, that the Apple Watches' ECG feature should also be considered because all accused Apple Watches that have the blood oxygen feature also have the ECG feature, and thus an exclusion order affecting blood oxygen feature-containing Apple Watches would also result in the exclusion of ECG feature-containing Apple Watches. RBr. at 60. Therefore, for the purposes of the public health and welfare factor, because the ECG feature is a health related feature, the Commission considers the scope of "reasonable substitutes" to include substitutes that offer a wide range of health, safety, and wellness features, including those that allow consumers to measure blood oxygen levels and that can record ECGs, although a single device need not have the capability to measure both oxygen levels and record ECGs. *See Wearable Electronic Devices*, Inv. No. 337-TA-1266, Comm'n Op. at 75. While it is not ideal for an individual or research participant to wear two wearable electronic devices to obtain all of the desired features, the inconvenience of doing so is not significant enough to rise to the level of a public interest concern, especially in view of the countervailing interest of protecting intellectual property rights. *See, e.g.*, *Certain Two-Handle Centerset Faucets & Escutcheons & Components Thereof*, Inv. No. 337-TA-422, Comm'n Op. at 9 (July 21, 2000); *Microfluidic Devices*, Inv. No. 337-TA-1068, Comm'n Op. at 45–46.

Apple stretches the public health and welfare public interest factor too far by seeking to require reasonable substitutes for this factor to also have telecommunications features, location tracking features, "smart" wallet and keys features, and accessibility features. The connection to the public health and welfare with those features is too attenuated to rise to the level of a public interest concern, especially when some of those alleged Apple Watch features require a paired

iPhone (which can independently perform many of those functions). *See* CBr. (Reply) at 37.

And again, "[t]he correct assessment . . . for 'reasonable substitutes for the devices subject to the

exclusion order,' [is] not whether 'every consumer cannot obtain the exact device desired.'"

*Fitness Devices*, Inv. No. 337-TA-1265, Comm'n Op., at 85 (quoting *Elec. Digital Media*

*Devices*, Inv. No. 337-TA-796, Comm. Op. at 120, and citing *Table Saws*, Inv. No. 337-TA-965,

Comm'n Op. at 9).[54]

    In view of the above, the scope of reasonable substitutes for the public health and

wellness factor in this investigation include: Masimo's W1 and Freedom Watches (blood

oxygen feature), Google's Pixel watch (blood oxygen and ECG features),[55] Samsung Galaxy

Watch 5 (blood oxygen and ECG features),[56] Fitbit (Versa 4™ (blood oxygen feature), Sense

2™ (blood oxygen and ECG features), and Charge 5™ (blood oxygen and ECG features)),[57]

---

[54] While "reasonable substitutes" also considers "price points," *Table Saws*, Inv. No. 337-TA-965, Comm'n Op. at 8, Apple appears to allege that price point is an issue regarding only Masimo's soon-to-be-released Freedom Watch. While the Freedom Watch will be priced higher than the base infringing Apple Watch models (*see* RBr. at Ex. 3 at ¶ 25 ($999 for the Freedom Watch compared to the Apple Watch Series 8, which starts at $399)), infringing Apple Watch models can be comparable in price ($799) based on consumer choices (*see* RBr. at 77 (citing, *inter alia*, RBr. at Ex. 4 (Watkins Decl.) at ¶ 21; RX-0333 at .0011). Other reasonable substitutes are even more comparable in price. For example, the Garmin Venu® 2 Plus is available for $449, s*ee* CBr. at Ex. 49 (https://www.garmin.com/en-US/p/730659), and the Garmin vivoactive® is available for $349, *see* CBr. at Ex. 7 (https://www.garmin.com/en-US/p/643399).

[55] CBr. at Ex. 12 (https://store.google.com/product/google_pixel_watch_specs?hl=en-US); CBr. at Ex. 50 (https://support.google.com/googlepixelwatch/answer/12759285?hl=en).

[56] CBr. at Ex. 13 (https://www.gadgetstowear.com/measure-blood-oxygen-on-galaxy-watch-5/); CBr. at Ex. 51 (https://www.androidcentral.com/wearables/measure-ecg-samsung-galaxy-watch-5).

[57] CBr. at Ex. 14 (https://www.fitbit.com/global/us/products/smartwatches/versa4?sku=523BKBK); CBr. at Ex. 52 (https://help.fitbit.com/articles/en_US/Help_article/2457.htm).

Fossil (Gen 6) (blood oxygen feature),[58] Garmin (vivoactive® (blood oxygen feature),[59] Fenix®

(blood oxygen feature),[60] epix™ (blood oxygen feature),[61] Venu® (blood oxygen feature),[62]

Venu® 2 Plus (ECG feature),[63] and Forerunner®[64] series (blood oxygen feature)), and Zepp

(Amazefit GTS4).  *See* CBr. at 64–66; CBr. (Reply) at 37 (citing *Wearable Elec. Devices*, Inv.

No. 337-TA-1266, Comm'n Op. at 37).  These watches (alone or combined with each) include

one or both of the blood oxygen features and the ECG features (as well as the IRN, HHRN, or

other features), and thus are reasonable substitutes.[65]

   The Commission agrees with Complainants that the W1 Watch can serve as a reasonable

substitute for the infringing Apple Watches as to the public health and welfare factor. *See, e.g.*,

CBr. (Reply) at 38–39.  In protesting against the suitability of this product, Apple asserts that the

W1 Watch "has not been shown to reliably measure physiological parameters." RBr. at 68.

---

[58] CBr. at Ex. 15 (https://www.fossil.com/en-us/watches/learn-more/gen-6-wellness/).

[59] CBr. at Ex. 7 (https://www.garmin.com/en-US/p/643399).

[60] CBr. at Ex. 8 (https://www.garmin.com/en-US/p/735542).

[61] CBr. at Ex. 9 (https://www.garmin.com/en-US/p/760778).

[62] CBr. at Ex. 10 (https://www.garmin.com/en-US/p/801643).

[63] CBr. at Ex. 49 (https://www.garmin.com/en-US/p/730659).

[64] CBr. at Ex. 11 (https://www.garmin.com/en-US/p/886785).

[65] We note that Complainants argue, in response to Apple's arguments regarding the ECG feature, that the Apple Watch SE should be considered a reasonable substitute for purposes of the public health and welfare factor because it was considered a substitute in *Wearable Electronic Devices*, Inv. No. 337-TA-1266. *E.g.*, CBr. at 66. However, in that investigation, the record included specific, reliable evidence that the Apple Watch SE, when combined with accessories, could be used to record ECGs and therefore was a reasonable substitute. *E.g.*, *Wearable Elec. Devices*, Inv. No. 337-TA-1266, Comm'n Op. at 75–76 (including n.39). Complainants point to no such evidence in the record in this investigation.  Accordingly, the Commission rejects this argument.

However, the Final ID properly found that "the variation in the measurements [of oxygen saturation by the W1 Watch] appears to be consistent with FDA guidance regarding pulse oximetry." Final ID at 62 n.18. And, regarding Masimo's Freedom Watch, Masimo's Chief Operating Officer, Bilal Muhsin, stated in a declaration:

> In Fall 2023, Masimo intends to launch the Masimo Freedom smartwatch. The Masimo Freedom grew out of the Masimo W1, and will also provide clinical-grade pulse oximetry, as well as unparalleled real-time health indicators such as pulse rate, and unique scores and indexes such as Hydration Index, and Stress Index. The Masimo Freedom will be capable of measuring all the same variables as the Masimo W1, but will also include other traditional smartwatch capabilities, and safety features such as fall detection.

CBr. at Ex. 53 at ¶ 5. Apple acknowledges that the Freedom Watch is a planned replacement for the W1 Watch. *See* RBr. at 87, 88 n.54 (noting a March 28, 2023 Masimo press release regarding pre-sale launch of the Freedom Watch). Thus, the Freedom Watch is also a reasonable substitute.

### ii.    The Remedial Orders Will Have at Most a Minimal Adverse Effect on Medical Research

In brief, the Commission finds that its remedial orders will have, at most, a minimal adverse effect on medical research.

### a)    The Parties' Arguments

#### *Apple's Arguments*

Apple argues that Complainants' requested remedial orders will adversely affect medical studies using the infringing blood oxygen feature, as well as studies using the ECG recording feature, of the accused Apple Watches. *See* RBr. at 57–62. Apple reasons that studies using the Apple Watches' ECG feature should also be considered in assessing impact on the public health and welfare because all accused Apple Watches that have the blood oxygen feature also have the ECG feature, and thus an exclusion order affecting blood oxygen feature-containing Apple

93

Watches would also result in the exclusion of ECG feature-containing Apple Watches. *See id.* at 60. Apple further alleges that a "key benefit of [the] Apple Watch for . . . studies is that researchers can use the multiple health and wellness metrics available through the Accused Apple Watches (as opposed to a single data field), helping to advance scientific discovery by identifying how various metrics relate to certain conditions." *Id.* at 58. Apple points to several specific studies. *See id.* at 57–61. Apple further points to certain research areas for which it believes the accused Apple Watches "could potentially be impactful," including those related to racial disparities in pulse oximetry measurement accuracy. *Id.* at 59–60. Apple further argues that "the broad availability of [the] Apple Watch to consumers enables researchers more generally to conduct decentralized research, which helps promote higher enrollment and more diverse patient populations." *Id.* at 61. Apple thus concludes that the Commission should find that Complainants' requested remedial orders would undermine important medical studies, and because it would allegedly not be practical to tailor any remedial orders to permit the importation or sale of Apple Watch models for use in clinical trials and other medical research, the Commission should deny Complainants a remedy altogether. *See id.* at 62.

### *Complainants' Arguments*

Complainants acknowledge that ClinicalTrials.gov, a governmental database of clinical trials maintained by the U.S. National Library of Medicine, lists 109 studies that use or have used the Apple Watch, including 67 that remain ongoing. CBr. at 77 (citing CBr. at Ex. 24 and Ex. 25). However, Complainants state that most of these ongoing studies focus on heart rate features that are also available on the Apple Watch SE, which the parties agree would not be subject to exclusion. *Id.* Complainants declare that, while nine studies use the blood oxygen feature of the infringing Apple Watches, none of those studies will be affected by any exclusion

94

order because they have already ended, are conducted outside of the United States, and/or do not require pulse oximetry measurements specifically from the infringing Apple Watches (as opposed to reasonable substitutes). *See id.* at 78–79; *see also* CBr. (Reply) at 30–35. As for studies using the ECG feature, Complainants argue that the Commission already rejected those arguments made by Apple in *Wearable Electronic Devices*, Inv. No. 337-TA-1266. *See* CBr. (Reply) at 30. Last, Complainants address Apple's argument that the "broad availability of Apple Watch to consumers enables researchers more generally to conduct decentralized research." *Id.* at 36 (quoting RBr. at 61). In response, Complainants assert that there are reasonable substitutes available, "including the Apple Watch SE and third-party devices from Samsung, Google, Fitbit, and others." *Id.* (citing CBr. at 64–67, 82–84; CBr. at Ex. 93 at Table 1, ¶¶ 28–39).

### b) Non-Party Comments

Some non-party researchers have stated that the Apple Watch is important to their studies. *See, e.g.*, NJH Stmt., EDIS Doc. ID 790602, at 1 ("[M]y research group has found the Apple Watch to be an exceptional device that accurately measures important parameters such as heart rate, physical activity, and oxygen saturation."); Stanford Stmt., EDIS Doc. ID 791060, at 1 ("The oxygen saturation feature of the Apple Watch is a highly accurate device feature, with performance characteristics fully comparable to medical device standards for oximeters."); Passman Comments, EDIS Doc. ID 797813, at 1–2 ("[I]f Apple Watch is excluded for an extended period of time, our REACT-AF study and other critical research that uses this technology will be altogether shut down."); Freimer Comments, EDIS Doc. ID 797817, at 1–2; Calkins Comments, EDIS Doc. ID at 797827, at 1–2; MacRae Comments, EDIS Doc. ID 797826, at 1–2; Saxon Comments, EDIS Doc. ID 797811, at 1–2; AHA Stmt., EDIS Doc. ID 791476, at 3–4.

95

On the other hand, some researchers have stated that other devices can replace infringing

Apple Watches:

> Given our combined expertise in the theory, design, financing, execution, and dissemination of medical research, we see no reason why it is not possible to replace the Apple Watch in pending health applications with alternative wearable devices from *Fitbit, Withings, Garmin* and others that are able to provide human motion, heart function and oxygen saturation information.  Several of these companies also readily provide the Application Programming Interface (API) code that allows connectivity and data transfer to the investigator's systems.

Valero-Cuevas Comments, EDIS Doc. ID 798257, at 2; *see also id.* at 2–3.  Other researchers

and commenters have expressed a preference for Masimo's technology and even discouraged the

reliance on Apple's blood oxygen feature.  *See* Ward Stmt., EDIS Doc. ID 790884, at 2 ("I

am . . . very concerned about the proliferation of 'medical devices' like the Apple Watch with

pulse oximetry.  These are not 'medical devices' as the FDA would use the term.  Indeed, I

understand only software associated with the ECG feature of certain Apple Watches is FDA

cleared. . . .  Despite this, it is my belief that confusion abounds in that many patients and

medical professionals believe or at least use devices such as the Apple Watch as if they are FDA

approved."); *see also* Goldstein Stmt., EDIS Doc. ID 791179.

### c)     Analysis

The Commission finds that the remedial orders will have only a minimal effect on

formally planned or ongoing medical studies that will not rise to the level that warrants denying a

remedy.[66]

---

[66] Recall that Apple asserts that it "would not be practical to tailor any remedial orders to permit importation or sale of Apple Watch models for use in clinical trials and other medical research."  RBr. at 62.

96

PUBLIC VERSION

First, even without the service, repair and replacement exemption, any limited exclusion order would cover only new imports of infringing Apple Watches after the expiration of the period of Presidential review (estimated to be late 2023) until the earlier of Apple's clearance of a redesign or the expiration of the patents subject to the section 337 violation (August 2028). *See Wearable Elec. Devices*, Inv. No. 337-TA-1266, Comm'n Op at 70–71. Thus, the Commission's remedy will not prevent current study participants using infringing Apple Watches from continuing to participate in research studies. *See id.* Further, with this exemption, current research study participants who are using infringing Apple Watches who encounter a need for service, repair, or replacement of their device to continue participation in that study will be able to obtain such service, repair, or replacement. *See id.* Moreover, as Complainants point out, there is little evidence of ongoing studies that require infringing Apple Watches, as opposed to any of the many reasonable alternative devices (discussed above). *See* CBr. at 77–79; CBr. (Reply) at 31–35. Thus, ongoing research studies that are not enrolling new participants will not be affected by the Commission's remedial orders.

Second, the Commission's remedial orders will have at most a minimal adverse effect on ongoing studies that remain open to new participants. As just noted, the Commission's remedy will not prevent current study participants using infringing Apple Watches from continuing to participate in research studies using those infringing devices. *See Wearable Elec. Devices*, Inv. No. 337-TA-1266, Comm'n Op. at 70–71. Also as just noted, current owners of infringing Apple Watches will not lose their devices as a result of the Commission's remedial orders, and the Commission's remedial orders will also allow those owners to have their products serviced, repaired, or replaced. Moreover, potential new participants who already own or may own infringing Apple Watches as of the date the Commission's remedial orders become final within

**CONFIDENTIAL INFORMATION REDACTED**

the meaning of 19 U.S.C. § 1337(j)(4) will still be able to participate in those studies. *See id.*

And the record reflects that there are at least ████ such potential participants. *See* RBr. at

Ex. 6 (Dippon[67] Decl. ████████████████████████████████

████████████████████████████████████████████████

████. Furthermore, the ████ figure undercounts the number of potential participants

because it does not capture approximately a year's-worth of imports of infringing Apple

Watches. Thus, to the extent any study depends on having a large number of participants with

infringing Apple Watches, a large number of potential participants is already present in the

United States. Additionally, the record includes no specific evidence providing a reasoned basis

why the already large number of infringing Apple Watches in the United States is insufficient for

any such study. In any event, as Complainants point out, there is little evidence of ongoing

studies that are accepting new participants who are located inside of the United States. *See* CBr.

at 77–79; CBr. (Reply) at 31–35. In sum, the Commission's remedial orders will have at most a

minimal adverse effect on ongoing studies that remain open to new participants.

Third, the Commission's remedial orders will also have, at most, a minimal adverse

effect on formally planned but not yet started studies that are enrolling participants. As noted

above, there are likely well over ████ potential participants in the United States, and the

Commission's orders will also allow those owners to have their products serviced, repaired, or

replaced. Thus, to the extent any studies depend on having a large number of participants with

infringing Apple Watches, infringing Apple Watches have already been broadly sold in the

United States such that there are already a large number of potential study participants. Neither

---

[67] Christian M. Dippon, PhD, is an Apple expert witness on the public interest. *See* RBr.
at Ex. 5 (Dippon Decl.) at ¶¶ 1.

Apple nor the non-party commenters have shown that the already large number of infringing

Apple Watches in the United States is insufficient for any study. Additionally, as Complainants

point out, there is little evidence of formally planned but not yet started studies that are enrolling

participants and that require the infringing Apple Watches, as opposed to non-infringing Apple

Watches or reasonable alternative devices. *See* CBr. at 77–79; CBr. (Reply) at 31–35. And

again, the Commission's remedial orders will have no effect on ongoing research studies that are

accepting new participants when those participants use an Apple Watch that they owned prior to

the date the Commission's remedial orders becomes final within the meaning of 19 U.S.C.

§ 1337(j)(4), as discussed in more detail in the following subsection. In sum, the Commission's

remedial orders will also have, at most, a minimal adverse effect on formally planned, but not yet

started, studies that are enrolling participants.

As for studies that have not yet been formally planned, the Commission finds that any

alleged harm related to the public health and welfare is too speculative to rise a public interest

concern.

### iii.    The Service, Repair, and Replacement Exemption

The Commission has determined that its remedial orders shall include a service, repair,

and replacement exemption that allows for (1) providing infringing articles specifically for the

service, repair, and/or replacement of Apple Watches purchased prior to the expiration of the

period of Presidential review (*i.e.*, prior to the date the order becomes final within the meaning of

19 U.S.C. § 1337(j)(4)) and issuance of the orders when those imports are to service, repair,

and/or replace Apple Watches pursuant to warranty obligations; and (2) providing infringing

articles specifically for the service and/or repair of Apple Watches purchased prior to the

expiration of the period for Presidential review when those imports are to service and/or repair

PUBLIC VERSION

Apple Watches outside of warranty obligations.[68] While the parties' arguments regarding the service, repair, and replacement exemption primarily relate to the United States consumers public interest factor, it is also relevant to the public health and welfare factor as the exemption allows research participants using infringing Apple Watches pursuant to a research study to have that device at least serviced and repaired, and replaced if it is under warranty, such that they may be able to continue the study using the same device they started with. That said, the parties' arguments and our analysis in this section primarily relate to the United States consumers public interest factor, which is discussed more fully below in section V.B.4.d.

a)      **The Parties' Arguments**

*Apple's Arguments*

Apple argues that "[a]ny remedial order should protect consumers who have permissibly obtained an Apple Watch with the accused Blood Oxygen feature by permitting Apple to provide technical support, service, repair, and replacement services, both with respect to units under warranty or other applicable service and repair obligations, and to units no longer under warranty." RBr. at 74 (citing, *inter alia*, *Fitness Devices*, Inv. No. 337-TA-1265, Comm'n Op. at 88–92). Apple asserts that the "accused Apple Watches are subject to a manufacturer's warranty that requires Apple to repair or replace products for one or two years, depending on the model." *Id.* at 74–75 (citing RBr. at Ex. 4 (Watkins[69] Decl.) at ¶¶ 7–15; RX-0930 at .0003; RX-

---

[68] As explained *infra* at note 72, Commissioner Kearns does not join the ajority's determination to set the cutoff date for the exemption to the expiration of the period of Presidential review.

[69] Mr. Scott Watkins is an Apple employee. *See* RBr. at Ex. 4 (Watkins Decl.). He is "legal counsel for AppleCare at Apple Inc." *Id.* at ¶ 2.

100

**CONFIDENTIAL INFORMATION REDACTED**

0926 at .0002; RX-0929 at .003; RX-0926 at .0003; RX-0927; Tr. (Land[70]) at 968:11–18).

Apple explains that, under Apple's warranties, "consumers expect that if Apple replaces their

Watch having the Blood Oxygen feature with 'the same model,' the replacement Watch will also

include the Blood Oxygen feature." *Id.* at 75 (citing RBr. at Ex. 4 (Watkins Decl.) at ¶ 11).

Apple further argues that "[m]any consumers also purchase extended service and support

coverage for their Watch devices through Apple's AppleCare+ program." *Id.* (citing RBr. at Ex.

4 (Watkins Decl.) at ¶¶ 16–24; RX-0926 at .0004)). Apple further declares that it "provides out-

of-warranty repair and replacement for Watch devices that are beyond the warranty period," for

up to five years. *Id.* (citing RBr. at Ex. 4 (Watkins Decl.) at ¶¶ 25–27, 30–33; RX-0927 at

.0002–0003; RX-0928C; Tr. (Land) at 968:19–969:1. While Apple's warranties provide a

refund option in place of repairing or replacing, Apple asserts that some U.S. states require

product manufacturers to make available service parts for repair for five to seven years,

regardless of warranty status, and a refund is also not a suitable option for consumers who

purchased AppleCare+. *Id.* Apple further points out that "some consumers purchase warranties

or insurance contracts through third party vendors, such as mobile device carriers and resellers,

████████████████████████████████████████████████████████████

██████████████████████████████████████████████ *Id.* at 77 (citing RBr. at Ex. 4

(Watkins Decl.) at ¶¶ 28–29).

Next, Apple argues that the repair and replacement exemption should cover both repair

and replacement to protect consumers. *See* RBr. at 79–80. Apple asserts that the

"[manufacturer's suggested retail price] of Apple Watch devices with the accused Blood Oxygen

---

[70] Brian Land leads a health sensing hardware group at Apple. *See, e.g.*, Final ID at 6.

**CONFIDENTIAL INFORMATION REDACTED**

feature is not insignificant," ranging from $399 to $799, which includes a price range consistent with previous Commission repair and replacement exemptions. *Id.* at 77 (citing, *inter alia*, RBr. at Ex. 4 (Watkins Decl.) at ¶ 21; RX-0333 at .0011; *Certain Robotic Floor Cleaning Devices & Components Thereof*, Inv. No. 337-TA-1252, Comm'n Op. at 77–78 (Apr. 13, 2023)). Apple adds that "[r]equiring Apple to refund the purchase price rather than repair or replace a consumer's Watch could adversely impact consumers who may need a replacement Watch to allow them to continue ongoing monitoring and collection of health, wellness, and fitness data." *Id.* at 78. Apple then declares that ███████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ *Id.* (citing RBr. at Ex. 4 (Watkins Decl.) at ¶¶ 31–33). According to Apple, "[e]xcluding replacement units from an exemption would be contrary to millions of consumers' expectations." *Id.* at 79 (citing RBr. at Ex. 4 (Watkins Decl.) at ¶¶ 6, 15, 24, 27–29, 34; RX-0926; RX-0927; RX-0929; RX-0930).

Apple next argues that the cutoff date for a repair and replacement exemption should be the date that any remedial orders become final within the meaning of 19 U.S.C. § 1337(j)(4), in other words, the end of the period of Presidential review. RBr. at 80 (citing, *inter alia*, *Fitness Devices*, Inv. No. 337-TA-1265, Notice of Comm'n Determination to Reconsider the Original Remedial Orders and to Issue Orders Modifying Those Remedial Orders, 88 Fed. Reg. 30158, at 30158–59 (May 10, 2023)). According to Apple, "[t]his cutoff date protects consumers who— through no fault of their own—purchase an Accused Apple Watch between the date of any remedial order and when it becomes final." *Id.*; *see also id.* at 80–81. Apple asserts that "[a]ny remedy should also include an exemption permitting continued sale of new AppleCare+ service

and repair plans during and after the Presidential Review Period for any permissibly obtained Apple Watch devices." *Id.* at 81.

Apple further argues that the exemption should apply to any products imported prior to the end of the period of Presidential review, regardless of whether they were purchased by users prior to that cutoff date. RBr. at 81–82. According to Apple, Apple Watches are sold by Apple directly to consumers and also through other retail channels such as retailers who may continue to receive shipments of imported Apple Watch devices up through the Presidential Review Period, subject to the posting of any required bond. *Id.* at 81. Apple declares that "[t]hese retailers, which were not named as respondents and will not be subject to any CDO, may then continue to sell the subject Watch devices," and consumers "purchasing these Watch devices should also be protected by an exemption for repair or replacement" because "[t]hey will have the same legitimate expectation regarding the availability of repairs or replacements as consumers who purchased an article before the cutoff date." *Id.* at 81–82.

### *Complainants' Arguments*

Complainants argue that "Apple presented no evidence of consumer harm that would justify an exemption for repair or replacement of infringing articles or parts." CBr. at 85–86 (citing *Fitness Devices*, Inv. No. 337-TA-1265, Comm'n Op. at 88–92; *see also* CBr. (Reply) at 43 (citing *Wearable Elec. Devices*, Inv. No. 337-TA-1266, Comm'n Op. at 50). Complainants add that the Commission should not allow an exemption for repair or replacement of products under warranty because "Apple's warranties provide an option for a refund, rather than a replacement." CBr. (Reply) at 86 (quoting RX-0925 at .003 at (iii); RX-0929 at .003; RX-0930). Complainants further declare that "[t]here is no evidence in the record that consumers expect

103

PUBLIC VERSION

repair or replacement for products under warranty, and Apple's refund provision gives consumers an alternative option." *Id.*

Complainants further argue that, if the Commission were to provide a service, repair, and replacement exemption, the "cutoff date for any repair and replacement should follow Commission precedent and apply to products sold to an end user before the date of the remedial orders." CBr. at 86 (citing *Fitness Devices*, Inv. No. 337-TA-1265, Comm'n Op. at 88–90). Complainants additionally assert that any "exemption should not apply broadly to all imported products and should be limited to products sold to an end user, because there is no consumer need for repair or replacement of products that have been imported, but not yet sold." *Id.* In arguing that the exemption should not extend through the period of presidential review, Complainants point out that "Apple can inform customers by providing notice of the remedial order." CBr. (Reply) at 43.

### b)     Analysis

The Commission has concluded that its remedial orders shall include a service, repair, and replacement exemption that allows for (1) providing infringing articles specifically for the service, repair, and/or replacement of Apple Watches purchased prior to the expiration of the period of Presidential review (*i.e.*, prior to the date the order becomes final within the meaning of 19 U.S.C. § 1337(j)(4)) when those imports are to service, repair, and/or replace Apple Watches pursuant to warranty obligations (regardless of whether the warranty was purchased through Apple or a third party vendor); and (2) providing infringing articles specifically for the service and/or repair of Apple Watches purchased prior to the expiration of the period for Presidential review when those imports are to service and/or repair Apple Watches outside of any warranty obligations. *See Wearable Elec. Devices*, Inv. No. 337-TA-1266, Comm'n Op. at 80–81; *Fitness Devices*, Inv. No. 337-TA-1265, Comm'n Op. at 89–92.

104

PUBLIC VERSION

**CONFIDENTIAL INFORMATION REDACTED**

Here, also like in *Wearable Electronic Devices*, the service, repair, and replacement

exemption is also justified as to the United States consumers public interest factor based on

consumers' reasonable expectations. *See id.* at 80–81; *see also Fitness Devices*, Inv. No. 337-

TA-1265, Comm'n Op. at 89–92. Apple Watches are subject to a manufacturer's warranty that

requires Apple to repair or replace products for one or two years, depending on the model. RBr.

at Ex. 4 (Watkins[71] Decl.) at ¶¶ 7–15; RX-0930 at .0003; RX-0926 at .0002; RX-0929 at .003;

RX-0926 at .0003; RX-0927; Tr. (Land) at 968:11–18; *see also Wearable Elec. Devices*, Inv. No.

337-TA-1266, Comm'n Op. at 80–81. Many consumers have also purchased extended service

and support coverage (*i.e.*, warranty coverage) for their Apple Watch devices through Apple's

AppleCare+ program. RBr. at Ex. 4 (Watkins Decl.) at ¶¶ 16–24; RX-0926 at .0004). And some

consumers have purchased warranties or insurance contracts through third party vendors, such as

mobile device carriers and resellers, which Apple ultimately supports by ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

RBr. at Ex. 4 (Watkins Decl.) at ¶¶ 28–29. Under these warranty programs (such as

AppleCare+), consumers expect that, if Apple replaces their device, it will do so with the same

model. RBr. at Ex. 4 (Watkins Decl.) at ¶ 11; *see also Wearable Elec. Devices*, Inv. No. 337-

TA-1266, Comm'n Op. at 80–81. Moreover, the cost of infringing Apple Watches is not

insignificant, ranging from $399 to $799. RBr. at Ex. 4 (Watkins Decl.) at ¶ 21; RX-0333 at

.0011. Accordingly, in view of these reasonable consumer expectations, the cost of the

infringing Apple Watches, and the Commission's recent decision in *Wearable Electronic*

*Devices*, the Commission has determined to provide a service, repair, and replacement

---

[71] Mr. Scott Watkins is an Apple employee. *See* RBr. at Ex. 4 (Watkins Decl.). He is
"legal counsel for AppleCare at Apple Inc." *Id.* at ¶ 2.

105

exemption. *E.g.*, *Wearable Elec. Devices*, Inv. No. 337-TA-1266, Comm'n Op. at 80–81;

*Robotic Floor Cleaning Devices*, Inv. No. 337-TA-1252, Comm'n Op. at 77–78.

However, the Commission declines to apply the replacement exemption to devices that

are outside of warranty. Replacement for products outside of warranty, in view of the fee

required by Apple's policies (*see* RBr. at Ex. 4 (Watkins Decl.) at ¶ 25), is tantamount to

allowing consumers to purchase a new infringing article, which is outside of the scope of

reasonable consumer expectations. *See Fitness Devices*, Inv. No. 337-TA-1265, Comm'n Op. at

89–92.

Apple additionally requests that the exemption allow Apple to continue to sell "new

AppleCare+ service and repair plans during and after the Presidential Review Period for any

permissibly obtained Apple Watch devices." RBr. at 81. The Commission declines Apple's

request to permit the sale of AppleCare+ service and repair plans beyond the expiration of the

period of Presidential review. If customers have not yet purchased the plans as of the expiration

of that period, those customers have no reasonable expectation of those benefits, and Apple can

simply stop selling those plans for infringing Apple Watches once the period of Presidential

review expires. Moreover, customers will still receive the regular Apple warranty, and having

the ability to encourage customers to purchase service and repair plans after this timeframe

would give Apple a disproportionate benefit.

For their part, Complainants argue that a refund would suffice instead of a repair or

replacement. *E.g.*, CBr. (Reply) at 86. However, the Commission has recently considered and

rejected that same argument regarding the same warranties in *Wearable Electronic Devices*. *See*

*Wearable Elec. Devices*, Inv. No. 337-TA-1266, Comm'n Op. at 81. Here, like in that

investigation, Complainants have failed to show that a refund will be adequate to compensate

consumers who are seeking to maintain their Apple Watches or to participate in ongoing health-related studies using the Apple Watch. *See id.*

Next, the parties dispute the appropriate cutoff date for the Commission's service, repair, and replacement exemption. *E.g.*, RBr. at 80; CBr. at 86. In order to mitigate the impact of the remedial orders on United States consumers, the Commission has determined that the exemption shall apply to articles purchased prior to the expiration of the period for Presidential review (*i.e.*, prior to the date the order becomes final within the meaning of 19 U.S.C. § 1337(j)(4)). *See Fitness Devices*, Inv. No. 337-TA-1265, Comm'n Notice (May 5, 2023); 88 Fed. Reg. 30158–60 (Notice of a Commission Determination to Reconsider the Original Remedial Orders and to Issue Orders Modifying Those Remedial Orders) (May 10, 2023).[72]

---

[72] Commissioner Kearns does not join the majority in determining to set the cutoff date for the Commission's service, repair, and replacement exemption as the expiration of the period for Presidential review. He would instead use the date the Commission's orders issue. In his view, the Commission's service, repair, and replacement exemption is intended to mitigate the harm to U.S. consumers who—through no fault of their own—would lose access to repair components or replacement devices for articles they purchased at a time when those articles had not been found to have violated section 337. As of the date of the Commission's orders, however, the public is put on notice of a violation that must be remedied, *i.e.* by an exclusion order. He finds that extending the service, repair, and replacement exemption beyond the issuance of the Commission's orders undercuts that remedy to the detriment of the intellectual property holder. Thus, in order to balance the impact of the remedial orders on United States consumers with the public interest in protecting Complainants' intellectual property rights, he would determine that the exemption should only apply to articles purchased prior to the date of the Commission's determination of violation and issuance of the orders. He further notes that this approach is consistent with the Commission's recent approach to this issue. *See, e.g., Certain Variable Speed Wind Turbine Generators & Components Thereof*, Inv. No. 337-TA-1218, Limited Exclusion Order at 2 (Jan. 18, 2022); *Certain Road Milling Machines & Components Thereof*, Inv. No. 337-TA-1067 (Remand), Limited Exclusion Order at ¶ 1 (Nov. 4, 2021); *Microfluidic Devices*, Inv. No. 337-TA-1068, Comm'n Op. (Revised) at 46 (Jan. 10, 2020); *Certain Magnetic Data Storage Tapes & Cartridges Containing the Same*, Inv. No. 337-TA-1012, Limited Exclusion Order at 2 (Mar. 8, 2018). In his view, the majority's approach here, and in *Fitness Devices*, Inv. No. 337-TA-1265, is thus a departure from the Commission's normal practice. *See Fitness Devices*, Notice of Comm'n Determination to Reconsider the

PUBLIC VERSION

Apple further requests that the exemption apply to infringing Apple Watches imported prior to the end of the period of Presidential review, but then purchased by customers after the end of the period of Presidential review. *See* RBr. at 81–82. The Commission denies Apple's request for this extension to the exemption. The Commission notes that, after the Presidential review period has expired, if the orders are not disapproved, Apple will not be permitted to sell infringing articles that it imported during the Presidential review period.

Accordingly, as noted above, the Commission's remedial orders include a service, repair, and replacement exemption that allows for (1) providing infringing articles specifically for the service, repair, and/or replacement of Apple Watches purchased prior to the expiration of the period of Presidential review (*i.e.*, prior to the date the order becomes final within the meaning of 19 U.S.C. § 1337(j)(4)) when those imports are to service, repair, and/or replace Apple Watches pursuant to warranty obligations; and (2) providing infringing articles specifically for the service and/or repair of Apple Watches purchased prior to the expiration of the period of Presidential review when those imports are to service and/or repair Apple Watches outside of warranty obligations. This exemption protects reasonable consumer expectations, and also mitigates potential harm to the public health and welfare by allowing research participants using infringing Apple Watches pursuant to a research study to have that device repaired or replaced such that they may be able to continue the study using the same device they started with.

### iv.     Apple Has Not Shown That a Delay Is Warranted

In brief, the Commission declines Apple's request that enforcement of the Commission's remedy be delayed for twelve months.

─────────────────────

Original Remedial Orders and to Issue Orders Modifying Those Remedial Orders, 88 Fed. Reg. 30158, at 30160 n.2 (May 10, 2023) (dissenting views of Commissioner Kearns).

PUBLIC VERSION

### a)    The Parties' Arguments

*Apple's Arguments*

Apple requests that the Commission delay the enforcement of its remedial order so that manufacturers of the reasonable alternatives to the infringing Apple Watches (discussed above) can ramp up supply of those alternatives such that they can fill any void created by the Commission's exclusion of the infringing Apple Watches. *See, e.g.*, RBr. at 70. According to Apple, "there simply will not be enough supply to fill the massive demand gap that will result from the supply shock of an exclusion order." RBr. at 70. Apple alleges that, in addition to any ordinary difficulty in meeting demand, "the well-documented global semiconductor shortage, after-effects from COVID-19 lockdowns in China, natural disasters (including severe weather events), and delays in procuring integrated circuits and other necessary components" will further complicate matters. *Id.* at 71. Apple further argues that "[t]here is no evidence that supply can be ramped up fast enough to meet anywhere close to the entirety of consumer demand in view of the enormity of the immediate shortfall the exclusion order would create." *Id.* Apple asserts that it will take years to ramp up production to compensate for the exclusion of the Accused Products. *Id.* at 71–72. Thus, Apple requests that the Commission delay the implementation of any remedy for at least twelve months. *E.g.*, *id.* at 71–72, 89.

*Complainants' Arguments*

For their part, Complainants argue that the Commission should reject "Apple's unsubstantiated arguments regarding the capacity of third-party manufacturers to meet consumer demands." CBr. (Reply) at 39; *see also id.* at 39–41. Complainants further point out that Apple "fails to provide any reason it could not increase production of the Series SE, which contains virtually all the same features as the infringing products, or return to producing the Apple Watch Series 4 or 5, which also included ECG," but not blood oxygen measurements. *Id.* (citing CBr.

109

Ex. 93 at ¶¶ 22–24).  Regarding Apple's argument related to a potential semiconductor shortage,
Complainants allege that Apple overlooks that semiconductors no longer used by Apple will then
become available to manufacturers of substitute products.  *Id.*

### b)     Analysis

The Commission declines Apple's request that the Commission's remedy be delayed for
twelve months.  The Commission has recently considered and rejected Apple's argument in
*Wearable Electronic Devices*, Inv. No. 337-TA-1266, Comm'n Op. at 74–75.  Moreover, like in
*Wearable Electronic Devices*, Apple failed to substantiate its position that manufacturers of
suitable alternative products lack the manufacturing capability to ramp up production to meet
any demand.  *See Wearable Elec. Devices*, Inv. No. 337-TA-1266, Comm'n Op at 74–75; RBr.
at 69–72.  Additionally, to the extent any global events have caused any component shortages,
*see* RBr. at 71, those events would affect Apple as well as other manufacturers.  Accordingly,
Apple has not shown any basis for the Commission to delay the effect of its remedy.

### v.     Conclusion

To mitigate any public health and welfare concerns, the Commission provides within its
remedial orders a service, repair, and replacement exemption.  *See supra* section V.B.4.a.iii.  In
view of the provided exemption, the Commission finds that its remedial orders will not raise any
public health or welfare concerns that warrant denying Complainants a remedy.  There are
numerous reasonable substitutes available to users and research participants in the United States,
and there is at most scant evidence that the Commission's remedial orders will have any
meaningful adverse impact on medical studies in the United States.  Furthermore, the public
interest of supporting strong intellectual property rights further supports the Commission's
conclusion.  *E.g.*, *Centerset Faucets*, No. 337-TA-422, Comm'n Op. at 9; *Microfluidic Devices*,

Inv. No. 337-TA-1068, Comm'n Op. at 45–46.  Additionally, Apple has shown no reason for the

Commission to delay the imposition of its remedy.

### b.    Competitive Conditions in the United States Economy

In brief, the Commission finds that the remedial orders in this investigation will not have

an adverse impact on competitive conditions in the United States economy.

### i.    The Parties' Arguments

Apple argues that remedial orders would harm competitive conditions in the United

States economy, asserting that the Apple Watch contributes to thousands of jobs across the

United States.  RBr. at 86; *see also id.* at 86–87.  Apple argues that "excluding the Accused

Apple Watches would distort market incentives, further harming competitive conditions." *Id.* at

86 (citing RBr. at Ex. 5 (Dippon Decl.) at ¶¶ 22–56).  According to Apple, "[r]emoving a

product as popular as [the] Apple Watch would lessen competition, and a sudden shortfall of

smartwatches would likely yield higher prices, which would impose further harm on US

consumer." *Id.* at 87 (citing RBr. at Ex. 5 (Dippon Decl.) at ¶¶ 22–24, 46–55) (internal

quotations omitted).

For their part, Complainants argue that their requested remedy would not harm

competitive conditions in the United States economy, but instead would benefit those conditions.

*See* CBr. at 71–75.  Complainants first allege that "major companies offer[ ] substitute

smartwatches" and consumers who prefer the Apple ecosystem can still purchase the Apple

Watch SE.  *See id.* at 72.  Complainants add that, in view of the impending remedial orders,

Apple has had ample time to release non-infringing versions of its products, and "legitimate

design-around efforts should always be encouraged as a path to spur further innovation."  *See id.*

(quoting *Tivo, Inc. v. EchoStar Corp.*, 646 F.3d 869, 883 (Fed. Cir. 2011) (en banc); *see also id.*

at 72–73 (citing, *inter alia*, Alliance for U.S. Startups Stmt., EDIS Doc. ID 791674, at 2

111

(asserting that the Commission should not support Apple's "efficient infringement"); Innovation Alliance Stmt., EDIS Doc. ID 791048, at 1 (same)). Complainants additionally assert that issuing their requested remedial orders would encourage companies to "re-shore manufacturing to the United States" and otherwise improve competitive conditions because "America's innovation economy and global competitiveness are dependent on the continued robust enforcement of inventors' intellectual property rights." *Id.* at 73 (quoting Innovation Alliance Stmt., EDIS Doc. ID 791048, at 2). Complainants add that "[h]olding Apple accountable for its 'efficient infringement' would also curtail Apple's exploitation of third parties who rely on the Apple platform." *Id.* Complainants further argue that Apple's violation of intellectual property rights "raises prices, denies consumers choice, lowers quality, and dampens the incentive of sellers of complementary, or competing products to innovate." *Id.* at 74 (quoting CFA Stmt., EDIS Doc. ID 791163, at 3). Complainants allege that allowing the continued importation of infringing Apple Watches will "give Apple an unfair competitive advantage in the narrow market for smartwatches and in the adjacent market for device ecosystems." CBr. at 74 (quoting Dinelli Stmt., EDIS Doc. ID 791686, at 4). As a result, according to Complainants, consumers are "likely to experience long term harm from reduced competition and innovation." *Id.* (quoting Dinelli Stmt., EDIS Doc. ID 791686, at 4).

### ii.     Non-Party Comments

Non-parties have filed comments stating that issuing remedial orders would have a positive impact on competitive conditions in the United States. *See, e.g.*, Alliance for U.S. Startups Stmt., EDIS Doc. ID 791674, at 2 (asserting that the Commission should not support Apple's "efficient infringement"); Buck Stmt., EDIS Doc. ID 791047 ("As members of Congress, it is our duty to ensure that patent laws are duly enforced, particularly when enforcement is against companies that engage in monopolistic and anti-competitive conduct.

112

The American public ultimately bears the cost of the monopolistic behaviors of some of the largest technology firms that, as a business model, work to consolidate market power, stifle innovation, and crush competitors."); Innovation Alliance Stmt., EDIS Doc. ID 791048, at 1 ("Vigorous enforcement and protection of intellectual property rights are essential to the competitive viability of innovative companies within the United States."); CFA Stmt., EDIS Doc. ID 791163, at 3; Dinelli Stmt., EDIS Doc. ID 791686, at 4; US Inventor Stmt., EDIS Doc. ID 791041 ("A healthy and thriving innovation ecosystem in the United States is in the public interest.").

### iii.      Analysis

The Commission finds, consistent with its holding in *Wearable Electronic Devices*, that its remedial orders in this investigation will not have any adverse impact on competitive conditions in the United States economy. *See Wearable Elec. Devices*, Inv. No. 337-TA-1266, Comm'n Op. at 79–80. As was the case in that investigation, here there are also numerous suitable alternatives to the excluded Apple Watches (as discussed above in relation to the public health and welfare public interest factor and below as to the United States consumers public interest factor).

Apple argues that the remedial orders will harm competitive conditions by jeopardizing United States jobs. *See* RBr. at 86. However, Apple does not specify how many jobs are particularly related to the infringing Apple Watches, as opposed to non-infringing Apple Watches (such as the Apple Watch SE) or researching and developing future non-infringing models, or supporting versions of the Apple Watch earlier than the Apple Watch Series 6), Apple Watch accessories (such as watch bands), or other Apple products beyond the Apple Watch altogether. *See id.* Moreover, Apple does not address whether any lost jobs due to the exclusion of the infringing Apple Watches will be counterbalanced by increased United States jobs for

**CONFIDENTIAL INFORMATION REDACTED**

manufacturers of reasonable substitutes.  Apple further asserts that excluding Apple Watches

would "lessen competition" and "likely yield higher prices."  *Id.* at 86–87.  However, as noted

above and below, there is ample competition and not all Apple Watches will be excluded, as at

least the Apple Watch SE would not be subject to exclusion.  Thus, the Commission finds that

the remedial orders in this investigation will not have any adverse impact on competitive

conditions in the United States economy.

c.     **The Production of Like or Directly Competitive Articles in the United States**

The Commission finds that its remedial orders in this investigation will not have any

adverse impact on the production of like or directly competitive articles in the United States.

i.     **The Parties' Arguments**

Apple does not contest that it does not manufacture any products in the United States.

*See generally* RBr.; RBr. (Reply).  Instead, Apple argues:

> The competitive harms will not be offset by substantial "production of like
> or directly competitive articles," 19 U.S.C. § 1337(d)(1), because Apple's
> primary smartwatch competitors, for example, do not manufacture their
> products in the United States.  And while the Masimo W1 is manufactured
> in the United States, it is not a reasonable substitute.

RBr. at 73.  Apple explains that, "[a]lthough Complainants claim that the Masimo W1 is made in

the U.S., the W1 is not a smartwatch and not a reasonable substitute for smartwatch consumers

who want the Accused Apple Watches."  RBr. (Reply) at 44.  Apple adds that, regardless,

"Complainants have not described how many [W1 Watch] units are manufactured in the U.S. or

how many more units it would expect to manufacture in the U.S (as opposed to its ▓▓▓▓▓▓▓

▓▓▓▓)."  *Id.*  Thus, according to Apple, "no evidence exists that an exclusion order would have

any meaningful impact on U.S. production."  *Id.*

114

Complainants point out that neither the Apple Watches nor any smartwatches made by Samsung, Fitbit, or Garmin are produced in the United States, but that Masimo produces its W1 Watch in the United States and ███████████████████████████████████ ████████████████ *Id.* (citing CBr. at Ex. 53 (Muhsin Decl.) at ¶ 5). Thus, according to Complainants, "the only impact an exclusion order would have on like or directly competitive articles made in the United States is that Masimo likely will be able to continue to build its domestic industry in its intellectual property because of the increased competition in the market caused by exclusion of Apple's infringing products." *Id.*

### ii.     Analysis

The Commission finds that the "production of like or directly competitive products in the United States" public interest factor does not weigh against the Commission's remedy in this investigation. As the parties appear to agree, neither the Apple Watch nor smartwatches made by Samsung, Fitbit, or Garmin are produced in the United States. *See* CBr. at 75; RBr. at 73. Moreover, there is no evidence suggesting that any reasonable substitute for excluded Apple Watches, aside from Masimo's W1 Watch or Freedom Watch, ████████████████████████ ███████████ *See, e.g.*, CBr. at 75; RPHBr. at 251–52 (disputing only the extent that Masimo's domestic facilities are used for production of the W1 Watch); RBr. (Reply) at 45 (asserting only that Complainants did not identify how many units it has produced or plans to produce in the United States).

And as for the W1 Watch and Freedom Watch, Complainants do not provide quantitative evidence regarding the extent of any United States production of these watches or the extent that potential customers would choose Masimo's W1 Watch or Freedom Watch as a substitute for excluded Apple Watches. Therefore, the Commission cannot assess the extent to which Complainants' requested remedial orders would result in increased domestic production of

suitable substitutes to the excluded Apple Watches.  However, based on the absence of domestic production of excluded products, the remedial orders in this investigation will not have an adverse impact on the production of like or directly competitive articles.

### d.    United States Consumers

In brief, in view of the exemption for service, repair, and replacement (discussed above), any effect of the Commission's remedial orders on United States consumers does not rise to the level of a public interest concern.

### i.    The Parties' Arguments

Apple argues, that "[b]eyond the potential effects on the health of U.S. consumers, an exclusion order would further harm those consumers by impeding access to the valuable, tightly integrated suite of features that drive demand for these devices."  RBr. at 85.  According to Apple, "[m]illions of Americans rely on [the] Apple Watch to stay connected, and in addition to the Blood Oxygen feature at the heart of this Investigation and the health features described above, [the] Apple Watch also contains a complement of features consumers enjoy—including productivity, payment, navigation, safety, and accessibility functions."  *Id.*  Apple then declares that "[a]n exclusion order would take those features out of the hands of American consumers."  *Id.* at 86.

For their part, Complainants argue that their requested remedy would benefit United States consumers by removing Apple's alleged poor-performing blood oxygen feature from the marketplace while not interfering with their access to non-infringing Apple Watches.  *See* CBr. at 75.  Complainants further argue that consumers would benefit "in the long run by encouraging investment in the next generation of healthcare innovation."  *Id.*  Complainants additionally urge the Commission to reject any argument that remedial orders should be denied based on the widespread use of the Apple Watch.  *Id.* at 75–76 (citing MDMA Stmt., EDIS Doc. ID 791167,

116

at 4 (declaring that "[t]hat would be tantamount to arguing if you can infringe in a huge way, then you should escape the consequences"); C4IP Stmt., EDIS Doc. ID 791567, at 3–4 (similar)). Complainants then assert that "many consumers desire to have an Apple Watch only because of the benefits of having multiple devices within Apple's device ecosystem," and "[c]onsumers would benefit by expanding their choices to other device makers and those that choose to continue using Apple devices still would be able to select non-infringing Apple Watches like the SE." *Id.* at 76 (citing Dinielli Stmt., EDIS Doc. ID 791686, at 3).

### ii.     Non-Party Comments

Non-parties filed submissions commenting on the United States consumers public interest factors both in support of Complainants and Apple. *See, e.g.*, Dinielli Stmt., EDIS Doc. ID 791686, at 4 (declaring that allowing Apple to import infringing Apple Watches would give Apple an unfair competitive advantage and will likely cause United States consumers "long term harm from reduced competition and innovation"); Saxon Comments, EDIS Doc. ID 797811 (asserting that consumers benefit from having "more accurate tools, not fewer . . . to help identify cardiac ailments").

### iii.     Analysis

In view of the exemption for service, repair, and replacement (discussed above), any effect of the Commission's remedial orders on United States consumers does not rise to the level of a public interest concern.

First, there are numerous reasonable substitutes for the infringing Apple Watches available to United States consumers. Looking beyond the public health and wellness aspects of the Apple Watch (as those are considered separately in the public health and welfare public interest factor, discussed above in section V.B.4.a.), the scope of reasonable substitutes includes general purpose smartwatches. *See Fitness Devices*, Inv. No. 337-TA-1265, Comm'n Op., at 85

117

("The correct assessment . . . for 'reasonable substitutes for the devices subject to the exclusion order,' [is] not whether 'every consumer cannot obtain the exact device desired.'" (quoting *Elec. Digital Media Devices*, Inv. No. 337-TA-796, Comm. Op. at 120) (citing *Table Saws*, Inv. No. 337-TA-965, Comm'n Op. at 9)). Thus, United States consumers have as reasonable substitutes at least the Apple Watch SE, the Samsung Galaxy Watch, and the Google Pixel Watch. Second, to reduce the impact of the remedial orders on United States consumers, the Commission has provided a service, repair, and replacement exemption. *See supra* section V.B.4.a.iii. Accordingly, any impact of the Commission's remedial orders on United States consumers will not rise to the level of a public interest concern.

### 5. Conclusion

In accordance with its statutory duty, the Commission has considered the effect of its remedial orders "upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, [and whether] it finds that such articles should not be excluded from entry." 19 U.S.C. §§ 1337(d)(l), (f)(1). To prevent any harm from the remedial orders to the public health and welfare and to United States consumers, the Commission's LEO and CDO each include an exemption for service, repair, and replacement. *See supra* section V.B.4.a.iii. As in *Wearable Electronic Devices*, this exemption mitigates potential harm to the public health and welfare by allowing research participants using infringing Apple Watches pursuant to a research study to have that device serviced and repaired or have it replaced, if it is under warranty, such that they may be able to continue the study using the same device they started with. *See Wearable Elec. Devices*, Inv. No. 337-TA-1266, Comm'n Op. at 70–71, 80–81. Additionally, Apple has not shown any reason why the Commission should delay the enforcement of its remedy.

PUBLIC VERSION

### C.      Bonding

As discussed below, the Commission has determined that the bond during the period of Presidential review shall be in the amount of zero percent (0%, *i.e.*, no bond) of the entered value of the articles subject to the LEO.

### 1.      The Applicable Law

If the Commission enters an exclusion order or a CDO, a respondent may continue to import and sell its products during the 60-day period of Presidential review under a bond in an amount determined by the Commission to be "sufficient to protect the complainant from any injury." 19 U.S.C. § 1337(j)(3); *see also* 19 C.F.R. § 210.50(a)(3). When reliable price information is available in the record, the Commission has often set the bond in an amount that would eliminate the price differential between the domestic product and the imported, infringing product. *See Certain Microsphere Adhesives, Processes for Making Same, & Prods. Containing Same, Including Self-stick Repositionable Notes*, Inv. No. 337-TA-366, USITC Pub. No. 2949, Comm'n Op. at 24 (Jan. 16, 1996). The Commission also has used a reasonable royalty rate to set the bond amount where a reasonable royalty rate could be ascertained from the evidence in the record. *See, e.g., Certain Audio Digital-to-Analog Converters & Prods. Containing Same*, Inv. No. 337-TA-499, Comm'n Op. at 25 (Mar. 3, 2005). Where the record establishes that the calculation of a price differential is impractical or there is insufficient evidence in the record to determine a reasonable royalty, the Commission has imposed a one hundred percent (100%) bond. *See, e.g., Certain Liquid Crystal Display Modules, Prods. Containing Same, & Methods Using the Same*, Inv. No. 337-TA-634, Comm'n Op. at 6–7 (Nov. 24, 2009). The complainant, however, bears the burden of establishing the need for a bond. *Certain Rubber Antidegradants, Components Thereof & Prods. Containing Same*, Inv. No. 337-TA-533, USITC Pub. No. 3975, Comm'n Op. at 40 (July 21, 2006).

## 2.    The RD

Before the ALJ, Complainants sought a bond in the amount of 100 percent of the entered value of the Accused Products because the accused Apple Watch products are allegedly "harming the public's perception of pulse oximetry."  RD at 5 (quoting CPHBr. at 312 and citing CPHBr. (Reply) at 182–83).  For its part, Apple argued that a zero percent bond is appropriate because Complainants have not identified any domestic industry products that compete with the Accused Products.  *Id.* (citing RPHBr. at 280).  Apple further argued that Complainants' theory of harm to public perception is unsubstantiated and is, in any event, not an appropriate basis for requiring a bond.  *Id.* (citing RPHBr. at 280–81; RPHBr. (Reply) at 175–76).

The RD found that Complainants did not meet their burden of establishing the need for a bond.  RD at 6.  The RD pointed out that Complainants did not argue that a bond is needed to protect any of its own competing products during the period of Presidential review.  *Id.* (citing CPHBr. at 312).  The RD further pointed out that Complainants did not present any evidence or argument regarding (1) the pricing (or expected pricing) of any such competing product; (2) the possibility (or impossibility) of performing a price differential analysis based on any such pricing; or (3) any reasonable royalty analysis.  *Id.* at 6 n.5 (citing CPHBr. at 312; CPHBr. (Reply) at 182–83; *Certain Network Devices, Related Software & Components Thereof (II)*, Inv. No. 337-TA-945, Comm'n Op., 2017 WL 3614521, at *75 ("*Network Devices (II)*").  The RD further observed that, at the time of the hearing, the W1 Watch was not available for sale to consumers on the open market.  *Id.* at 6 (citing, *inter alia*, Tr. (Kiani) at 179:17–22).  The RD additionally declared that Complainants' alleged harm to the "the public's perception of pulse oximetry" based on the alleged inaccuracy of the Apple Watch's pulse oximetry measurements is not an appropriate basis for setting a bond because the "purpose of bonding is to protect complainants from injury—not to remedy harms to public perception."  *Id.*  The RD further

120

added that "[i]t is not clear from the record that the alleged harm to public perception causes injury to Complainants." *Id.* The RD additionally declared that "Complainants also have identified no clear evidence of current competition between the Apple Watch and Masimo rainbow® sensors." *Id.* at 6 n.7 (citing, *inter alia*, CPHBr. at 312). Thus, the RD found that Complainants have failed to establish the need for a bond. *Id.* at 7.

### 3.    The Parties' Arguments

Before the Commission, Complainants again request that the Commission require bond to "protect Masimo from the detrimental impact of Apple's continued importation of infringing Apple Watches that do not reliably measure oxygen saturation." CBr. at 87 (citing CX-1616, CX-1293, CX-1606). Regarding an alleged competitive injury, Complainants rely on purported concessions by Apple that (1) it, like Complainants, sell "direct-to-consumer devices that measure wellness parameters (including blood oxygen)" and (2) it acknowledged that "Masimo plans to launch a product that competes directly with the Apple Watch later this year." *Id.* (citing Respondent's Motion to Preclude Stephen Jensen from Access to Apple's Confidential Business Information under the Protective Order (Order No. 1), EDIS Doc. ID 750872, at 4, 11 (Sept. 2, 2021)). Complainants additionally assert that they will be injured by a lack of bond because of the "competitive status of the parties," citing a Delaware litigation in which Apple's financial expert described Masimo's "ongoing and escalating sales of W1," "Masimo's serious and long-term intentions to pivot into the smartwatch segment," and Masimo's access to 20,000 points of distribution for the W1. CBr. (Reply) at 50 (citing CBr. (Reply) at Ex. 91 at 33, 36, 37).

For its part, Apple supports the RD's recommendation that bond be set at zero percent. *See* RBr. at 91–92. Apple asserts that "Complainants have not met their burden of establishing the need for a bond," *id.* at 91 (quoting RD at 6), reasoning that Complainants failed to identify

121

PUBLIC VERSION

any domestic industry products that "compete with the accused Apple Watch products" and to

"present any argument concerning pricing of competing products or reasonable royalty analysis,"

*id.* (citing RD at 6 & n.5; *Certain Elec. Devices, Including Wireless Comm'n. Devices, Portable*

*Music & Data Processing Devices, and Tablet Computs.*, Inv. No. 337-TA-794, Comm'n Op. at

118–19 (July 5, 2013); *Network Devices (II)*, Inv. No. 337-TA-945, Comm'n Op. at 129–30).

Apple further agrees with the RD that the alleged harm to the public perception of pulse

oximetry is not a proper basis for justifying bond.  *Id.* (citing RD at 6–7).  Apple adds that, at the

time of the hearing, Complainants did not have a competing product available for sale to

consumers in the United States on the open market.  *Id.* at 92 (citing RD at 6).  Apple further

contests that the Apple Watches cause harm to the consumer perception of pulse oximetry.  *See*

RBr. (Reply) at 47–48.  Apple asserts that Complainants' assertion is based on "non-scientific

news media articles" and "was addressed at the hearing and thoroughly debunked during the

cross-examination of Complainants' economic expert, who conceded that his opinion on 'harm

to consumer perception' was not based on testing or technical expert testimony."  *Id.* (citing,

*inter alia*, CX-1616, CX-1293, CX-1606; Tr. (McGavock[73]) at 552:22–553:14).  Apple adds that

the "accuracy and reliability of the Blood Oxygen feature on Apple Watch is well documented."

*Id.*

    **4.**    **Analysis**

    The Commission has determined that the bond during the period of Presidential review

shall be in the amount of zero percent (0%, *i.e.*, no bond) of the entered value of the articles

---

[73] Daniel McGavock is Complainants' expert witness, who was admitted as an expert in financial matters, offering testimony regarding economic domestic industry, bond, and commercial success.  *E.g.*, Final ID at 6.

subject to the LEO. The Commission agrees with the RD that the alleged harm to the public's perception of pulse oximetry is not a cognizable basis for establishing the need for bond and has nevertheless not been substantiated as causing any harm (quantifiable or otherwise) to Complainants. *See* RD at 6. The Commission additionally agrees with the RD that Complainants have not shown any basis for supporting any specific bond based on pricing information or reasonable royalty rates. *See, e.g.*, RD at 5; *Microsphere Adhesives*, Inv. No. 337-TA-366, Comm'n Op. at 24 (basing bond on price differential when such information is available); *Audio Digital-to-Analog Converters*, Inv. No. 337-TA-499, Comm'n Op. at 25 (relying on a reasonable royalty analysis when pricing information was not available). Complainants' vague assertions as to the "competitive status of the parties" (*see* CBr. (Reply) at 50) are insufficient to establish a bond amount sufficient to protect Complainants from any injury during the period of Presidential review. Accordingly, the Commission has determined that the bond during the period of Presidential review shall be in the amount of zero percent (0%, *i.e.*, no bond) of the entered value of the articles subject to the LEO.

## VI.    CONCLUSION

The Commission has considered all of the other arguments by the parties and does not find them persuasive. Therefore, for the reasons set forth herein, the Commission determines that Complainants have established a violation of section 337 by Apple with respect to claims 22 and 28 of the '502 patent and claims 12, 24, and 30 of the '648 patent, but not with respect to claim 12 of the '501 patent and claims 9 and 27 of the '745 patent. Accordingly, the investigation is terminated with a finding of a violation of section 337. The Commission determines that the appropriate remedy is an LEO and a CDO to Apple; that the public interest does not preclude that remedy; and the bond during the period of Presidential review is set at zero percent (*i.e.*, no bond) of the entered value.

123

PUBLIC VERSION

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued:  November 14, 2023

# EXHIBIT 5

**PUBLIC VERSION**

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## Washington, D.C.

| | |
|---|---|
| **In the Matter of** | |
| **CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | **Inv. No.  337-TA-1276** |

## FINAL INITIAL DETERMINATION ON VIOLATION OF SECTION 337

Administrative Law Judge Monica Bhattacharyya

(January 10, 2023)

**Appearances**:

<u>*For Complainants Masimo Corporation and Cercacor Laboratories, Inc.:*</u>

Stephen C. Jensen, Joseph R. Re, Irfan A. Lateef, Sheila N. Swaroop, Ted M. Cannon, Brian C. Claassen, Alan G. Laquer, Kendall M. Loebbaka, Daniel C. Kiang, and Douglas B. Wentzel of Knobbe, Martens, Olson & Bear, LLP in Irvine, CA; William R. Zimmerman and Jonathan E. Bachand of Knobbe, Martens, Olson & Bear, LLP in Washington, DC; Carol Pitzel Cruz of Knobbe, Martens, Olson & Bear, LLP in Seattle, WA; and Karl W. Kowallis and Matthew S. Friedrichs of Knobbe, Martens, Olson & Bear in New York, NY.

<u>*For Respondent Apple Inc.:*</u>

Mark D. Selwyn of Wilmer Cutler Pickering Hale and Dorr LLP in Palo Alto, CA; Joseph J. Mueller, Richard Goldenberg, and Sarah R. Frazier of Wilmer Cutler Pickering Hale and Dorr LLP in Boston, MA; and Michael D. Esch and David Cavanaugh of Wilmer Cutler Pickering Hale and Dorr LLP in Washington, DC.

Pursuant to the Notice of Investigation (EDIS Doc. ID 749538), 86 Fed. Reg. 46275-76 (Aug. 18, 2021), and Commission Rule 210.42, this is the administrative law judge's final initial determination on violation in the matter of *Certain Light-Based Physiological Measurement Devices and Components Thereof,* Commission Investigation No. 337-TA-1276. 19 C.F.R. § 210.42(a)(1)(i).

For the reasons discussed herein, it is the undersigned's final initial determination that there has been a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, and/or the sale within the United States after importation of certain wearable electronic devices with light-based pulse oximetry functionality and components thereof by reason of infringement of certain claims of U.S. Patent No. 10,945,648.

It is also the undersigned's final initial determination that there has been no violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, and/or the sale within the United States after importation of certain wearable electronic devices with light-based pulse oximetry functionality and components thereof with respect to U.S. Patent Nos. 10,912,501, U.S. Patent No. 10,912,502, U.S. Patent No. 10,687,745, and U.S. Patent No. 7,761,127.

**TABLE OF CONTENTS**

I.     BACKGROUND ........................................................................................... 1
    A.   Procedural History ............................................................................... 1
    B.   The Parties .......................................................................................... 3
    C.   Asserted Patents .................................................................................. 4
    D.   Products at Issue ................................................................................. 4
    E.   Witness Testimony .............................................................................. 5
II.     JURISDICTION AND IMPORTATION ................................................. 8
    A.   Personal Jurisdiction .......................................................................... 8
    B.   *In Rem* Jurisdiction and Importation ................................................. 8
III.    LEGAL STANDARDS ............................................................................. 8
    A.   Infringement ........................................................................................ 8
    B.   Invalidity ........................................................................................... 11
    C.   Inequitable Conduct .......................................................................... 16
    D.   Domestic Industry ............................................................................. 17
IV.    POEZE PATENTS .................................................................................. 19
    A.   Specification ...................................................................................... 20
    B.   Asserted claims ................................................................................. 21
    C.   Level of Ordinary Skill in the Art .................................................... 25
    D.   Claim Construction ........................................................................... 26
    E.   Infringement ...................................................................................... 33
    F.   Domestic Industry—Technical prong ............................................... 55
    G.   Invalidity – Anticipation/Obviousness .............................................. 88
    H.   Invalidity – Written Description and Enablement ........................... 156
    I.   Prosecution Laches and Unclean Hands .......................................... 170
V.     U.S. PATENT NO. 10,687,745 .............................................................. 174
    A.   Specification .................................................................................... 174
    B.   Claims .............................................................................................. 176
    C.   Level of Ordinary Skill in the Art .................................................. 179
    D.   Claim Construction ......................................................................... 179
    E.   Infringement .................................................................................... 180
    F.   Domestic Industry—Technical Prong .............................................. 199
    G.   Invalidity – Obviousness ................................................................. 209
    H.   Invalidity – Written Description and Enablement ........................... 241
    I.   Prosecution Laches .......................................................................... 245
VI.    U.S. PATENT NO. 7,761,127 ................................................................ 246
    A.   Specification .................................................................................... 247
    B.   Claims .............................................................................................. 248
    C.   Level of Ordinary Skill in the Art .................................................. 249
    D.   Claim Construction ......................................................................... 250
    E.   Infringement .................................................................................... 259
    F.   Domestic Industry—Technical Prong .............................................. 273
    G.   Invalidity .......................................................................................... 283
VII.   DOMESTIC INDUSTRY – ECONOMIC PRONG (MASIMO WATCH) ............. 301
    A.   The "Masimo Watch" Articles ........................................................ 301

B.   Disputed Background Issues Regarding Domestic Industry Investments ...................... 302
C.   Domestic Industry Existing at the Time of the Complaint ............................................. 305
D.   Domestic Industry in the Process of Being Established ................................................ 319
**VIII.  DOMESTIC INDUSTRY – ECONOMIC PRONG ('127 PATENT)........................ 324**
A.   Domestic Industry Existing at the Time of the Complaint ............................................. 324
B.   Domestic Industry in the Process of Being Established ................................................ 326
C.   Asserted Domestic Industry Expenditures.................................................................... 327
**IX.   CONCLUSIONS OF LAW........................................................................................ 335**

The following abbreviations may be used in this Initial Determination:

| | |
|---|---|
| **Tr.** | Hearing Transcript |
| **Dep. Tr.** | Deposition Transcript |
| **JX** | Joint Exhibit |
| **CX** | Complainants' exhibit |
| **CPX** | Complainants' physical exhibit |
| **CDX** | Complainants' demonstrative exhibit |
| **RX** | Respondents' exhibit |
| **RPX** | Respondents' physical exhibit |
| **RDX** | Respondents' demonstrative exhibit |
| **CPHB** | Complainants' pre-hearing brief (EDIS Doc. ID 770786) |
| **CIB** | Complainants' corrected initial post-hearing brief (EDIS Doc. ID 775422) |
| **CRB** | Complainants' post-hearing reply brief (EDIS Doc. ID 775058) |
| **RPHB** | Respondents' corrected pre-hearing brief (EDIS Doc. ID 770874) |
| **RIB** | Respondents' second corrected initial post-hearing brief (EDIS Doc. ID 779376) |
| **RRB** | Respondents' corrected post-hearing reply brief (EDIS Doc. ID 779379) |

## I.    BACKGROUND

### A.    Procedural History

The Commission instituted this investigation in response to a complaint filed by Complainants Masimo Corporation and Cercacor Laboratories, Inc. on June 30, 2021, with an amended complaint filed on July 12, 2021 (the "Amended Complaint," EDIS Doc. ID 746186), and supplemented on July 19, 2021.  Notice of Investigation at 1, EDIS Doc. No. 749538 (Aug. 13, 2021); 86 Fed. Reg. 46275-76 (Aug. 18, 2021).  The complaint, as amended, alleges violations of section 337 of the Tariff Act of 1930, as amended, by reason of infringement of certain claims of U.S. Patent No. 10,912,501 ("the '501 patent"), U.S. Patent No. 10,912,502 ("the '502 patent"), U.S. Patent 10,945,648 ("the '648 patent"), U.S. Patent No. 10,687,745 ("the '745 patent"), and U.S. Patent No. 7,761,127 ("the '127 patent").  *Id.*  The Commission ordered institution of this investigation to determine "whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products . . . by reason of infringement of one or more of claims 1-9 and 11-30 of the '501 patent; claims 1-2, 4-6, 8-12, 14-22, 24-26, and 28-30 of the '502 patent; claims 1-17 and 19-30 of the '648 patent; claims 1-6, 8-9, 11, 14, 20-24, and 26-27 of the '745 patent; and claims 7-9 of the '127 patent; and whether an industry in the United States exists as required by subsection (a)(2) of section 337."  *Id.* at 2.  The investigation was instituted upon publication of the Notice of Investigation in the *Federal Register* on Monday, August 18, 2021.  86 Fed. Reg. 46275-76.

Respondent Apple Inc. filed a response to the Amended Complaint and Notice of Investigation on September 7, 2021 (the "Response to Complaint"), disputing Complainants'

allegations with respect to infringement and domestic industry and asserting affirmative defenses of invalidity and unenforceability.  *See* EDIS Doc. ID 752521.[1]

Pursuant to Order No. 3 (Sept. 1, 2021), the target date of this investigation was set to be December 16, 2022.  On September 13, 2021, the investigation was assigned by then Chief Administrative Law Judge Bullock to the undersigned.  *See* Notice to the Parties, EDIS Doc. ID 751531 (Sept. 13, 2021).  Pursuant to Order No. 5 (Sept. 22, 2021), the target date was extended to January 16, 2023.  *See* Comm'n Notice (Oct. 12, 2021), EDIS Doc. ID 754020.

A technology tutorial and *Markman* hearing was held on February 17, 2022.  *See Markman* Tr., EDIS Doc. ID 763489.[2]

Pursuant to Order No. 25 (Mar. 23, 2022), Complainants withdrew their allegations of infringement with respect to claims 2, 4, 5, 7, 11, 16, 19, 20, and 22-30 of the '501 patent, claims 1-2, 4-6, 8-12, 14-18, 20, 25, and 26 of the '502 patent, claims 3, 4, 6, 7, 9, 10, 13-17, 19, 22, and 25-28 of the '648, and claims 1, 3-6, 8, 11, 14, 20-24, and 26 of the '745 patent.  *See* Comm'n Notice, EDIS Doc. ID 768023 (Apr. 12, 2022).  Pursuant to Order No. 33 (May 20, 2022), Complainants withdrew their allegations of infringement with respect to claims 1, 3, 6, 8, 9, 13-15, 17, 18, and 21 of the '501 patent, claims 19, 21, 24, 29, and 30 of the '502 patent, claims 1, 2, 5, 8, 11, 20, 21, 23, and 29 of the '648, and claim 2 of the '745 patent.  *See* Comm'n Notice, EDIS Doc. ID 772826 (Jun. 10, 2022).

---

[1] The affirmative defenses based on inequitable conduct were stricken pursuant to Order No. 9 (Dec. 20, 2021), and Respondent was subsequently granted leave to add certain inequitable conduct defenses pursuant to Order No. 23 (Mar. 23, 2022).

[2] All of the claim construction disputes raised at the *Markman* hearing were subsequently mooted by the withdrawal of asserted claims or by agreement of the parties.  *See infra*.

An evidentiary hearing was held on June 6-10, 2022. The parties filed initial post-hearing briefs on June 27, 2022, and filed post-hearing reply briefs on July 11, 2022. Additional exhibits were admitted pursuant to Order No. 50 (Jun. 16, 2022) and Order No. 56 (Aug. 31, 2022). The hearing transcript was amended pursuant to Order No. 51 (Jun. 23, 2022) and Order No. 52 (Jun. 27, 2022). The parties' post-hearing briefs were amended pursuant to Order No. 54 (Jul. 14, 2022), Order No. 55 (Jul. 14, 2022), and Order No. 57 (Aug. 31, 2022).

Pursuant to Order No. 58 (Sept. 12, 2022), Order No. 59 (Oct. 24, 2022), and Order No. 61 (Dec. 9, 2022), the target date was extended to May 10, 2023. *See* Comm'n Notice, EDIS Doc. ID 787448 (Jan. 6, 2023).

### B.    The Parties

#### 1.    Complainants

The Complainants are Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Complainants"). Notice of Investigation at 2. Masimo and Cercacor are both Delaware corporations having their principal places of business in Irvine, California. Complaint ¶ 9. Masimo is the owner of the '501 patent (JX-0001), '502 patent (JX-0002), '648 patent (JX-0003), and '745 patent (JX-0009). *Id*. ¶ 4. Cercacor is the owner of the '127 patent (JX-0007). *Id*. Masimo and Cercacor have rights to each of the asserted patents through a cross-licensing agreement. *Id*. ¶¶ 4, 77; CX-1612C.

#### 2.    Respondent

The Respondent is Apple Inc. ("Apple"). Notice of Investigation at 2. Apple is a California corporation having its principal place of business in Cupertino, California. Response to Complaint ¶ 21.

CONFIDENTIAL INFORMATION REDACTED

### C.    Asserted Patents

The '501 patent, '502 patent, and '648 patent share a common specification, claiming priority to an application filed on July 3, 2008.  JX-0001; JX-0002; JX-0003.  These patents are entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," naming inventors Jeroen Poeze *et al.*, and are referenced herein as the "Poeze patents."  *Id.*

The '745 patent is entitled "Physiological Monitoring Devices, Systems, and Methods," and claims priority to an application filed on June 28, 2016, naming inventor Ammar Al-Ali. JX-0009.

The '127 patent is entitled "Multiple Wavelength Sensor Substrate" and issued from an application filed on March 1, 2006, naming inventors Ammar Al-Ali *et al.*  JX-0007.

### D.    Products at Issue

The products at issue are "wearable electronic devices with light-based pulse oximetry functionality and components thereof."  Notice of Investigation at 2.

### 1.    Accused Products

Complainants accuse Apple Watch products of infringing the asserted patents, including the Apple Watch Series 6, the Apple Watch Series 7, and certain prototype Apple Watch products █████████████████████████ ("Next Generation Apple Watches").  CIB at 37-39.  Apple has stipulated to the importation of the Apple Watch Series 6, Apple Watch Series 7, and Next Generation Apple Watches (collectively, the "Accused Products").  *See* CX-0128C (Stipulation Regarding Importation and Inventory) at ¶¶ 2-4; CX-1259C (Stipulation Relating to Next-Generation Watches) at ¶¶ 5-6.  The parties have stipulated that the Accused Products are materially identical for the purposes of infringement in this investigation.  *See* Joint Stipulation of Facts at ¶¶ 11-13, EDIS Doc. ID 770692 (May 13, 2022); CX-1259C at ¶¶ 7-8.

### 2.    Domestic Industry Products

With respect to the '501, '502, '648, and '745 patents, Complainants rely on certain "Masimo Watch" products.  CIB at 26-35.  These Masimo Watch products include certain prototypes identified as the "Circle Sensor" (CPX-0021C), the "Wings Sensor" (CPX-0029C), the "RevA sensor" (CPX-0052C), the "RevD sensor" (CPX-0058C), the "RevE sensors" (CPX-0019C, CPX-0020C, CPX-0065C), and a product identified as the Masimo W1 Watch (CPX-0146C).  CIB at 30-35.  With respect to the '127 patent, Complainants rely on certain of Masimo's rainbow® sensors.  *Id*. at 36.

### E.    Witness Testimony

The undersigned received testimonial evidence in this investigation in the form of live testimony and deposition designations.

### 1.    Fact Witnesses

The first witness at the hearing was Joe Kiani, the chairman and chief executive officer of Masimo and Cercacor.  Tr. at 79-189.  Complainants also presented testimony from Mohamed Diab, an engineer at Masimo, *id*. at 190-246; Ammar Al-Ali, who oversees technology development at Masimo, *id*. at 247-340; and Bilal Muhsin, who is the chief operating officer of Masimo.  *Id*. at 341-89.  Complainants further presented testimony from Stephen Scruggs, the director of sensor design at Masimo, *id*. at 390-479; Micah Young, who is Masimo's chief financial officer and executive vice president, *id*. at 481-520; and Jeroen Hammarth, the chief financial officer of Cercacor.  *Id*. at 521-33.

Apple presented testimony from several of its employees, including Vivek Venugopal, an optical engineer, *id*. at 816-49; Saahil Mehra, who manages product design for the Apple Watch health sensors, *id*. at 850-94; Ueyn Block, who worked on the optical architecture for the Apple

Watch health sensors, *id*. at 895-917; Stephen Waydo, who is the director of a human interface device (HID) health group at Apple, *id*. at 918-51; Brian Land, who leads a health sensing hardware group at Apple, *id*. at 952-92; and Paul Mannheimer, a sensor architect and scientist at Apple, *id*. at 993-1025. Apple's counsel also examined Scott Cromar, the prosecuting attorney for the '501 patent, '502 patent, and '648 patent. *Id*. at 1026-41. Apple further presented testimony from Robert Rowe, who was the named inventor of certain asserted prior art. *Id*. at 1141-53; *see id*. at 1174:3-1175:7 (no cross-examination for Mr. Rowe).

## 2.    Expert Witnesses

Complainants rely on the testimony of Daniel McGavock, who was admitted as an expert in financial matters, offering testimony regarding economic domestic industry, bond, and commercial success. Tr. at 533-76 (expert qualification at 534:25-535:6), 1416-42. With respect to the '127 patent, Complainants rely on the testimony of Jack Goldberg, who was admitted as an expert in the field of physiological monitoring technologies. *Id*. at 612-63 (expert qualification at 614:3-11), 1391-1408. With respect to the '501 patent, '502 patent, '648 patent, and '745 patent, Complainants rely on the testimony of Vijay Madisetti, who was admitted as an expert in the field of physiological monitoring technologies. *Id*. at 664-813 (*voir dire* and expert qualification at 666:10-674:12). Complainants also rely on the testimony of Robert Stoll, who was admitted as an expert on Patent Office practice and procedure. *Id*. at 1409-15 (expert qualification at 1409:23-1410:4).

Apple relies on the testimony of Majid Sarrafzadeh, who was admitted as an expert in physiological monitoring technologies including the design of pulse oximetry sensors, with respect to the '745 patent and '127 patent. *Id*. at 1042-1138 (expert qualification at 1046:5-12). With respect to the '501 patent, '502 patent, and '648 patent, Apple relies on the testimony of

Steven Warren, who was admitted as an expert in biomedical engineering, medical monitoring systems, biomedical instrumentation, biomedical optics, light issue interaction, diagnostic systems, wearable sensors, and biomedical signal processing. *Id*. at 1181-1282 (expert qualification at 1187:20-1188:11). Apple also relies on the testimony of Vincent Thomas, who was admitted as an expert in the field of economics and financial analysis, with respect to the economic prong of the domestic industry requirement. *Id*. at 1282-1389 (expert qualification at 1283:11-17).

### 3.   Deposition Designations

Complainants submitted several designated deposition transcripts that were received into evidence without a sponsoring witness: CX-0273C (Amor Dep. Tr.); CX-0281C (Block Dep. Tr.); CX-0275C (Caldbeck Dep. Tr.); CX-0283C (Charbonneau-Lefort Dep. Tr.); CX-0285C (Dua Dep. Tr.); CX-0287C (Land Dep. Tr.); CX-0289C (Mannheimer Dep. Tr.); CX-0291C (Mehra Dep. Tr.); CX-0293C (Rollins Dep. Tr.); CX-0279C (Rowe Dep. Tr.); CX-0295C (Shui Dep. Tr.); CX-0297C (Venugopal Dep. Tr.); CX-0299C (Waydo Dep. Tr.). *See* Tr. at 291:22-299:5. Apple also submitted several designated deposition transcripts that were received into evidence without a sponsoring witness: RX-1195C (Abdul-Hafiz Dep. Tr.); RX-1296C (Al-Ali Dep. Tr.); RX-1200C (Diab Dep. Tr.); RX-1201C (Hammarth Dep. Tr.); RX-1202C (Kaufman Dep. Tr.); RX-1204C (Kiani Dep. Tr.); RX-1206C (Muhsin Dep. Tr.); RX-1209C (Scruggs Dep. Tr.); RX-1210C (Scruggs 2nd Dep. Tr.); RX-1211C (Young Dep. Tr.). *See* Tr. at 1323:24-1324:20.

## II. JURISDICTION AND IMPORTATION

### A. Personal Jurisdiction

Apple has submitted to the personal jurisdiction of the Commission by answering the Complaint and Notice of Investigation, participating in discovery, appearing at hearings, and filing motions and briefs. *See Certain Miniature Hacksaws*, Inv. No. 337-TA-237, USITC Pub. No. 1948, Initial Determination at 4, 1986 WL 379287, *1 (Oct. 15, 1986), *not reviewed in relevant part by* Comm'n Action and Order, 1987 WL 450871 (Jan. 15, 1987). Apple does not dispute the Commission's jurisdiction in this investigation. *See* RIB at 18.

### B. *In Rem* Jurisdiction and Importation

The Commission has *in rem* jurisdiction over the accused products by virtue of their importation into the United States. *See Sealed Air Corp. v. U.S. Int'l Trade Comm'n*, 645 F.2d 976, 985-86 (C.C.P.A. 1981) (holding that the ITC's jurisdiction over imported articles is sufficient to exclude such articles). Apple has stipulated to the importation of the Accused Products. CX-0128C at 1-2; CX-1259C ¶¶ 5-6. Apple does not dispute the Commission's jurisdiction in this investigation. *See* RIB at 18.

## III. LEGAL STANDARDS

### A. Infringement

Section 337(a)(1)(B)(i) prohibits "the importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that – (i) infringe a valid and enforceable United States patent or a valid and enforceable United States copyright registered under title 17." 19 U.S.C. §1337(a)(1)(B)(i). The Commission has held that the word "infringe" in Section 337(a)(1)(B)(i) "derives its legal meaning from 35 U.S.C. § 271, the section of the Patent Act that defines patent infringement."

*Certain Elec. Devices with Image Processing Sys., Components Thereof, and Associated Software*, Inv. No. 337-TA-724, Comm'n Op. at 13-14, EDIS Doc. ID 467105 (Dec. 21, 2011).

Infringement must be proven by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988). The preponderance of the evidence standard "requires proving that infringement was more likely than not to have occurred." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005).

## 1.    Claim Construction

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) (citation omitted). "[T]he construction of claims is simply a way of elaborating the normally terse claim language[] in order to understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (alterations in original) (quoting *Scripps Clinic v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991)). "[O]nly those [claim] terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). The words of a claim "'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in art" as of the date that the patent application was filed. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

## 2.      Direct and Indirect Infringement

A patent claim is directly infringed when a respondent "makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention" without consent of the patent owner.  35 U.S.C. § 271(a)

In addition to direct infringement, a respondent may be liable for indirect infringement, including induced infringement, which is defined in section 271(b) of the Patent Act: "Whoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b). *See DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc) ("To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they actively and knowingly aided and abetted another's direct infringement.") (citations omitted).  "The mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven."  *Id.* (citations omitted).  The Supreme Court has held that induced infringement "requires knowledge that the induced acts constitute patent infringement."  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).  In *Suprema, Inc. v. Int'l Trade Comm'n*, the Federal Circuit upheld the Commission's interpretation of the section 337 language "articles that infringe" in the context of induced infringement, holding that the statute "covers goods that were used by an importer to directly infringe post-importation as a result of the seller's inducement."  796 F.3d 1338, 1352-53 (Fed. Cir. 2015).

Another form of indirect infringement is contributory infringement, defined in section 271(c) of the Patent Act: "Whoever offers to sell . . . or imports into the United States a component of a patented machine, . . . or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or

especially adapted for use in an infringement of such patent, and not a staple article or

commodity of commerce suitable for substantial noninfringing use, shall be liable as a

contributory infringer."  35 U.S.C. § 271(c).  The intent requirement for contributory

infringement requires that respondent knows "that the combination for which [the] component

was especially designed was both patented and infringing." *Global-Tech*, 563 U.S. at 763.  A

violation of section 337 based on contributory infringement requires that "the accused infringer

imported, sold for importation, or sold after importation within the United States, the accused

components that contributed to another's direct infringement."  *Spansion, Inc. v. Int'l Trade

Comm'n*, 629 F.3d 1331, 1353 (Fed. Cir. 2010).

### 3.   Literal Infringement and the Doctrine of Equivalents

A complainant must prove either literal infringement or infringement under the doctrine

of equivalents.  Literal infringement requires the patentee to prove that the accused device meets

each and every limitation of the asserted claim(s).  *Frank's Casing Crew & Rental Tools, Inc. v.

Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004).  "If even one limitation is missing

or not met as claimed, there is no literal infringement." *Elkay Mfg. Co. v. EBCO Mfg. Co.*, 192

F.3d 973, 980 (Fed. Cir. 1999).  Literal infringement is a question of fact.  *Finisar Corp. v.

DirecTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008).  Under the doctrine of equivalents, "a

product or process that does not literally infringe upon the express terms of a patent claim may

nonetheless be found to infringe if there is 'equivalence' between the elements of the accused

product or process and the claimed elements of the patented invention."  *Warner-Jenkinson Co.

v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997).

### B.   Invalidity

It is the respondents' burden to prove invalidity, and the burden of proof never shifts to

the patentee to prove validity. *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d

1365, 1380 (Fed. Cir. 2008). "Under the patent statutes, a patent enjoys a presumption of

validity, *see* 35 U.S.C. § 282, which can be overcome only through facts supported by clear and

convincing evidence . . . ." *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir.

2006); *see also Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100-114 (2011) (upholding the

"clear and convincing" standard for invalidity).

The clear and convincing evidence standard placed on the party asserting an invalidity

defense requires a level of proof beyond the preponderance of the evidence. Although not

susceptible to precise definition, "clear and convincing" evidence has been described as evidence

that produces in the mind of the trier of fact "an abiding conviction that the truth of a factual

contention is 'highly probable.'" *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (quoting

*Buildex, Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463 (Fed. Cir. 1988)).

### 1.    Anticipation

Pursuant to 35 U.S.C. § 102, a patent claim is invalid as anticipated if:

> (1) the claimed invention was patented, described in a printed publication,
> or in public use, on sale, or otherwise available to the public before the
> effective filing date of the claimed invention; or
>
> (2) the claimed invention was described in a patent issued under section
> 151, or in an application for patent published or deemed published under
> section 122(b), in which the patent or application, as the case may be,
> names another inventor and was effectively filed before the effective filing
> date of the claimed invention.

35 U.S.C. § 102 (2012). "A patent is invalid for anticipation if a single prior art reference discloses

each and every limitation of the claimed invention. Moreover, a prior art reference may anticipate

without disclosing a feature of the claimed invention if that missing characteristic is necessarily

present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citations omitted).

## 2. Obviousness

Section 103 of the Patent Act states:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.

35 U.S.C. § 103(a) (2012).

"Obviousness is a question of law based on underlying questions of fact." *Scanner Techs.*, 528 F.3d at 1379. The underlying factual determinations include: "(1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) objective indicia of non-obviousness." *Id.* at 1380 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)). These factual determinations are often referred to as the "*Graham* factors."

A critical inquiry in determining the differences between the claimed invention and the prior art is whether there is a reason to combine the prior art references. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-21 (2007). In *KSR*, the Supreme Court rejected the Federal Circuit's rigid application of a "teaching-suggestion-motivation" test—while the Court stated that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does," it described a more flexible analysis:

> Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue . . . . As our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.

*Id.* at 418. Applying *KSR*, the Federal Circuit has held that, where a patent challenger contends that a patent is invalid for obviousness based on a combination of prior art references, "the burden falls on the patent challenger to show by clear and convincing evidence that a person of ordinary skill in the art would have had reason to attempt to make the composition or device . . . and would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).

In addition to demonstrating that a reason exists to combine prior art references, the challenger must demonstrate that the combination of prior art references discloses all of the limitations of the claims. *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1373-1374 (Fed. Cir. 2010), *abrogated on other grounds by Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014) (upholding finding of non-obviousness based on substantial evidence that the asserted combination of references failed to disclose a claim limitation); *Velander v. Garner*, 348 F.3d 1359, 1363 (Fed. Cir. 2003) (explaining that a requirement for a finding of obviousness is that "all the elements of an invention are found in a combination of prior art references").

### 3.    Indefiniteness

"The Patent Act requires that a patent specification 'conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention.'" *Nautilus, Inc. v. Biosig Instruments, Inc.,* 572 U.S. 898 (2014)

(quoting 35 U.S.C. § 112, ¶ 2). "[T]he second paragraph of § 112 contains two requirements: first, [the claim] must set forth what the applicant regards as his invention, and second, it must do so with sufficient particularity and distinctness, *i.e.*, the claim must be sufficiently definite." *Allen Eng'g Corp. v. Bartell Indus., Inc,*. 299 F.3d 1336, 1348 (Fed. Cir. 2002) (citation and internal quotation marks omitted) (alteration in original). A claim does not satisfy the second requirement and is thereby indefinite "if read in light of the specification delineating the patent, and the prosecution history, [the claim] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 534 U.S. at 901. Indefiniteness is a question of law, subject to a determination of underlying facts. *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.,* 811 F.3d 1334, 1343-44 (Fed. Cir. 2016). The party challenging the validity of a claim bears the burden of establishing indefiniteness. *Id.*

## 4.     Written Description

Under 35 U.S.C. § 112, ¶ 1, the specification must provide a written description of the claimed invention that "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*). Determining whether the written description requirement has been satisfied "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art" to determine whether the specification "show[s] that the inventor actually invented the invention claimed." *Id.*

## 5.     Enablement

The enablement requirement is set forth in 35 U.S.C. § 112, ¶ 1 and provides in pertinent part that the specification shall describe "the manner and process of making and using [the

invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the [invention]." The "enablement requirement is satisfied when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003). Whether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

### C.    Inequitable Conduct

A patent containing a claim obtained through inequitable conduct is unenforceable. *Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276, 1288-89 (Fed. Cir. 2011) (en banc). "Moreover, the taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family." *Id.* (*citing Consol. Aluminum Corp. v. Foseco Int'l Ltd.,* 910 F.2d 804, 808-12 (Fed. Cir. 1990)).

"To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Id.* at 1287. The failure to disclose a reference to the PTO constitutes inequitable conduct only if "the applicant *made a deliberate decision* to withhold a known material reference." *Id.* at 1290 (quoting *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1182 (Fed. Cir. 1995)) (internal quotation marks omitted; emphasis in original). "In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Id.* Inequitable conduct based on the failure to disclose a reference requires a showing of "but for" materiality for the reference. *Id.* at 1291. The "but for" materiality requirement is satisfied "if the PTO

would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* In determining whether "but for" materiality requirement is satisfied, the "the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction." *Id.* at 1291-92.

While deceptive intent may be inferred solely from circumstantial evidence, "[t]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* (quoting *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)).

### D.    Domestic Industry

In patent-based proceedings under section 337, a complainant must establish that an industry "relating to the articles protected by the patent . . . exists or is in the process of being established" in the United States.  19 U.S.C. § 1337(a)(2).  Under Commission precedent, the domestic industry requirement of section 337 consists of a "technical prong" and an "economic prong."  *See, e.g., Alloc, Inc. v. Intl Trade Comm'n,* 342 F.3d 1361, 1375 (Fed. Cir. 2003).

To meet the technical prong, the complainant must establish that it practices at least one claim of the asserted patent.  *Certain Point of Sale Terminals and Components Thereof*, Inv. No. 337-TA-524, Order No. 40 at 17-18, EDIS Doc. ID 230409 (Apr. 11, 2005).  "The test for satisfying the 'technical prong' of the industry requirement is essentially [the] same as that for infringement, *i.e.*, a comparison of domestic products to the asserted claims."  *Alloc*, 342 F.3d at 1375.

With respect to the "economic prong," subsection (3) of Section 337(a) provides:

> For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned –

(A) significant investment in plant and equipment;

(B) significant employment of labor or capital; or

(C) substantial investment in its exploitation, including engineering,
research and development, or licensing.

19 U.S.C. § 1337(a)(3).

Expenditures may be counted toward satisfaction of the domestic industry requirement "as long as those investments pertain to the complainant's industry with respect to the articles protected by the asserted IP rights." *Certain Television Sets, Television Receivers, Television Tuners, and Components Thereof*, Inv. No. 337-TA-910, Comm'n Op. at 68, 2015 WL 6755093, at *36 (Oct. 30, 2015); *accord, e.g., Certain Marine Sonar Imaging Devices, Including Downscan and Sidescan Devices, Prods. Containing the Same, and Components Thereof*, Inv. No. 337-TA-921, Comm'n Op., 2016 WL 10987364, at *40 (Jan. 6, 2016) ("Navico's allocation methodology reasonably approximates the warranty and technical customer support expenditures relating to the LSS-1 product.") (*citing Certain Ground Fault Circuit Interrupters and Prods. Containing Same,* Inv. No. 337-TA-739, Comm'n Op. at 74-75, 79-81 (June 8, 2012)). Subsections (A), (B), and (C) are listed in the disjunctive, and accordingly, the domestic industry investments in plant and equipment or labor and capital can include expenditures that relate to engineering or research and development. *Certain Solid State Storage Drives, Stacked Electronics Components, and Products Containing Same*, Inv. No. 337-TA-1097, Comm'n Op. at 14, EDIS Doc. ID 649139 (June 29, 2018) ("[T]he text of the statute, the legislative history, and Commission precedent do not support narrowing subsections (A) and (B) to exclude non-manufacturing activities, such as investments in engineering and research and development.").

Whether a complainant satisfies the economic prong is not analyzed according to a rigid mathematical formula. *Certain Male Prophylactic Devices*, Inv. No. 337-TA-546, Comm'n Op.

at 39, EDIS Doc. ID 279161 (Aug. 1, 2007). The decision is made on a case-by-case basis and

requires "an examination of the facts in each investigation, the article of commerce, and the

realities of the marketplace." *Id.* Although Section 337(a)(3) describes the economic activities

as "significant" and "substantial," a complainant does not need to show any "minimum monetary

expenditure," and a complainant does not "need to define or quantify the industry itself in

absolute mathematical terms." *Stringed Musical Instruments & Components Thereof* ("*Stringed*

*Musical Instruments*")*,* Inv. No. 337-TA-586, Comm'n Op. at 26, EDIS Doc. ID 300615 (May

16, 2008). "A precise accounting [of the complainant's domestic investments] is not necessary,

as most people do not document their daily affairs in contemplation of possible litigation." *Id.* at

17.

The Commission has held that "[o]rdinarily, the relevant date at which to determine if the

domestic industry requirement of section 337 is satisfied is the filing date of the complaint."

*Certain Thermoplastic-Encapsulated Electric Motors, Components Thereof, and Products and*

*Vehicles Containing the Same*, Inv. No. 337-TA-1073, Comm'n Op. at 6-7, EDIS Doc. ID

684974 (Aug. 12, 2019). In *Stringed Musical Instruments*, the Commission held that a domestic

industry is in the process of being established when (1) a complainant takes "the necessary

tangible steps to establish such an industry in the United States," and (2) there is a "significant

likelihood that the industry requirement will be satisfied in the future." Inv. No. 337-TA-586,

Comm'n Op. at 14-17, EDIS Doc. ID 300615 (May 16, 2008).

## IV. POEZE PATENTS

The '501 patent, '502 patent, and '648 patent are entitled "User-Worn Device for

Noninvasively Measuring a Physiological Parameter of a User," sharing a common specification

and naming inventors Jeroen Poeze *et al.* JX-0001; JX-0002; JX-0003. These patents are

collectively referred to herein as the "Poeze patents." The Poeze patents issued from applications filed on September 24, 2020, claiming priority to earlier patent applications, with the earliest provisional application filed on July 3, 2008. *See Id.*

A.    **Specification**

The Poeze patents' specification describes non-invasive physiological sensors for measuring blood constituents or analytes using multi-stream spectroscopy. JX-0001 at 7:18-26. These sensors use an emitter that can uses optical radiation at different wavelengths to measure blood analytes like glucose, hemoglobin, or oxygen saturation. *Id.* at 12:13-13:58. The sensors are connected to handheld or portable monitoring devices that can be attached to a patient's body. *Id.* at 16:31-17:19. In one embodiment, the housing is designed to receive a patient's finger, which can be placed on a protrusion (305) that includes openings or windows (320, 321, 322, and 323) that allow light from the emitter to reach photodetectors. *Id.* at 19:13-20:15.



**FIG. 3C**

*Id*. at Fig. 3C. One portion of the housing may include LEDs that emit optical radiation passing

through a finger before being received by the photodetectors on the other portion of the housing.

*Id*. at 26:30-27:41.



**FIG. 7A**

*Id*. at Fig. 7A.

B.    **Asserted claims**

Masimo asserts claim 12 of the '501 patent, which depends from claim 1. *See* CIB at 53-

66. Claims 1 and 12 of the '501 patent are recited below:

> 1. A user-worn device configured to non-invasively measure a physiological
>   parameter of a user, the user-worn device comprising:
>
> at least three light emitting diodes (LEDs);
>
> at least three photodiodes arranged on an interior surface of the user-worn device
>   and configured to receive light attenuated by tissue of the user;

a protrusion arranged over the interior surface, the protrusion comprising a convex surface and a plurality of openings extending through the protrusion and positioned over the three photodiodes, the openings each comprising an opaque lateral surface, the plurality of openings configured to allow light to reach the photodiodes, the opaque lateral surface configured to avoid light piping through the protrusion; and

one or more processors configured to receive one or more signals from the photodiodes and calculate a measurement of the physiological parameter of the user.

JX-0001 at 45:2-19.

12. The user-worn device of claim 1, wherein the convex surface of the protrusion is an outermost surface configured to contact the tissue of the user and conform the tissue into a concave shape.

*Id.* at 46:4-8.

Masimo also asserts claim 22 of the '502 patent, which depends from claims 19, 20, and 21, and claim 28, a separate independent claim. *See* CIB at 66-77. These claims of the '502 patent are recited below:

19. A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user-worn device comprising:

a plurality of emitters configured to emit light, each of the emitters comprising at least two light emitting diodes (LEDs);

four photodiodes arranged within the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user;

a protrusion comprising a convex surface including separate openings extending through the protrusion and lined with opaque material, each opening positioned over a different one associated with each of the four photodiodes, the opaque material configured to reduce an amount of light reaching the photodiodes without being attenuated by the tissue;

optically transparent material within each of the openings; and

one or more processors configured to receive one or more signals from at least one of the four photodiodes and output measurements responsive to the one or more signals, the measurements indicative of the oxygen saturation of the user.

20. The user-worn device of claim 19 further comprising a thermistor.

21. The user-worn device of claim 20, wherein the one or more processors are further configured to receive a temperature signal from the thermistor and adjust operation of the user-worn device responsive to the temperature signal.

22. The user-worn device of claim 21, wherein the plurality of emitters comprise at least four emitters, and wherein each of the plurality of emitters comprises a respective set of at least three LEDs.

JX-0002 at 46:22-54.

28. A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes arranged in a quadrant configuration on an interior surface of the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user;

a thermistor configured to provide a temperature signal;

a protrusion arranged above the interior surface, the protrusion comprising:

a convex surface;

a plurality of openings in the convex surface, extending through the protrusion, and aligned with the four photodiodes, each opening defined by an opaque surface configured to reduce light piping; and

a plurality of transmissive windows, each of the transmissive windows extending across a different one of the openings;

at least one opaque wall extending between the interior surface and the protrusion, wherein at least the interior surface, the opaque wall and the protrusion form cavities, wherein the photodiodes are arranged on the interior surface within the cavities;

one or more processors configured to receive one or more signals from at least one of the photodiodes and calculate an oxygen saturation measurement of the user, the one or more processors further configured to receive the temperature signal;

a network interface configured to wirelessly communicate the oxygen saturation measurement to at least one of a mobile phone or an electronic network;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the oxygen saturation measurement of the user;

a storage device configured to at least temporarily store at least the measurement; and

a strap configured to position the user-worn device on the user.

*Id*. at 47:13-23.

Masimo further asserts claim 12 of the '648 patent, which depends from claim 8, and claims 24 and 30, which depend from claim 20. *See* CIB at 77-83. These claims of the '648 patent are recited below:

8. A user-worn device configured to non-invasively determine measurements of a physiological parameter of a user, the user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set comprising at least an LED configured to emit light at a first wavelength and at least an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes;

a protrusion comprising a convex surface, at least a portion of the protrusion comprising an opaque material;

a plurality of openings provided through the protrusion and the convex surface, the openings aligned with the photodiodes;

a separate optically transparent window extending across each of the openings;

one or more processors configured to receive one or more signals from at least one of the photodiodes and output measurements of a physiological parameter of a user;

a housing; and

a strap configured to position the housing proximate tissue of the user when the device is worn.

JX-0003 at 45:45-46:3.

12. The user-worn device of claim 8, wherein the physiological parameter comprises oxygen or oxygen saturation.

*Id*. at 46:15-16.

20. A user-worn device configured to non-invasively determine measurements of a user's tissue, the user-worn device comprising:

a plurality of light emitting diodes (LEDs);

at least four photodiodes configured to receive light emitted by the LEDs, the four photodiodes being arranged to capture light at different quadrants of tissue of a user;

a protrusion comprising a convex surface and a plurality of through holes, each through hole including a window and arranged over a different one of the at least four photodiodes; and

one or more processors configured to receive one or more signals from at least one of the photodiodes and determine measurements of oxygen saturation of the user.

*Id*. at 46:34-49.

24. The user-worn device of claim 20, wherein the protrusion comprises opaque material configured to substantially prevent light piping.

*Id*. at 46:59-61.

30. The user-worn device of claim 20, wherein the protrusion further comprises one or more chamfered edges.

*Id*. at 47:6-7.

## C.    Level of Ordinary Skill in the Art

The parties have stipulated to a level of ordinary skill in the art for the Poeze patents:

[A] person with a working knowledge of physiological monitoring technologies. The person would have had a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two

> years of related work experience with capture and processing of data or
> information, including but not limited to physiological monitoring
> technologies. Alternatively, the person could have also had a Master of
> Science degree in a relevant academic discipline with less than a year of
> related work experience in the same discipline.

Joint Stipulation of Facts ¶ 12, EDIS Doc. ID 770692 (May 13, 2022).

### D.    Claim Construction

The parties dispute the construction of the terms "over"/"above" and the terms

"openings"/"through holes" in the claims of the Poeze patents.  *See* CIB at 42-53; RIB at 26-39;

CRB at 13-19; RRB at 23-34.[3]

### 1.    "over"/"above"

Several of the asserted claims of the Poeze patents contain limitations describing a

protrusion that is "arranged over" or "arranged above" an interior surface.  *See* '501 patent claim

1 ("a protrusion arranged over the interior surface"); '502 patent claim 28 ("a protrusion

arranged above the interior surface").  Other limitations describe openings that are "positioned

over" or "arranged over" photodiodes.  *See* '501 patent claim 1 ("a plurality of openings

extending through the protrusion and positioned over the three photodiodes"); '502 patent claim

19 ("each opening positioned over a different one associated with each of the four photodiodes");

'648 claim 20 ("each through hole including a window and arranged over a different one of the

at least four photodiodes").

---

[3] The parties both argue that certain claim construction arguments were waived because they were not previously raised, *see* RIB at 37-38, CRB at 19 n.4, RRB at 31 n.17, 33 n.22, but these claim construction disputes were clearly addressed in the parties' pre-hearing briefs and pertain to the plain and ordinary meaning of the terms at issue.  *See* CPBH at 39-43; RPHB at 8-15.  Ground Rule 9.2 does not preclude parties from citing additional evidence that was admitted at the hearing to support arguments that are consistent with their pre-hearing briefs.

Apple interprets the "over" and "above" limitations to require that the claimed features be arranged vertically when the claimed device is in use. RIB at 26-34. Complainants argue that these terms refer to "the configuration of features of the device relative to each other, not to the position of the device relative to the Earth." CIB at 43. Both parties purport to rely on the ordinary meaning of these terms, without proposing any explicit construction. CIB at 42-49; RRB at 21.

Apple relies on the preambles of the asserted claims describing "a user-worn device configured to non-invasively measure a physiological parameter" to argue that the orientation of the claimed features must be considered when a device is in use. RIB at 27-28. Complainants dispute this interpretation, arguing that "configured to" refers to the design of the product, not the orientation of components. CIB at 45. Complainants argue that the devices described in the specification do not have a fixed orientation and that the embodiments of the invention show "that the protrusion is arranged over the photodiodes and their interior surface by extending across that surface." *Id*. at 43. Complainants note that the patent specification describes a variety of measurement sites without reference to any specific orientation. CRB at 14 (citing JX-0001 at 8:21-23, 10:15-27, 10:62-11:3, 11:45-55). Complainants cite an example in one embodiment of a material described as "over" the glass layer when it is depicted as below the layer in Figure 7A. *Id*. at 45-46 (citing JX-0001 at 27:59-62, Fig. 7A). Dr. Madisetti testified that Complainants' interpretation is consistent with the ordinary meaning of "over," citing the example of a bandage over a wound, explaining that "the Band-Aid is always over the scratch [ir]respective of the orientation of my hand." Tr. at 701:22-18.

Complainants also cite extrinsic evidence in Apple patents and prior art using the terms "over" and "above" to describe the arrangement of features similar to those claimed in the Poeze

patents. CIB at 46-49. *See, e.g.,* U.S. Patent No. 10,687,718 (CX-0118) at 32:17-23 ("For example, a back surface may comprise a first semi-circular protrusion that extends over the portions of the back surface."), 35:38-55 (FIG. 222A depicts . . . a protrusion 2202 disposed over an optical opening 2204."); U.S. Patent App. Pub. No. 2021/0093237 (CX-0103) at ¶ 0065 ("In some embodiments, windows 1220 over the emitters may be integral with the back cover 107 and windows 120 over the detectors may be inset within the back cover 107."); U.S. Patent App. Pub. No. 2017/03255744 (CX-1806) at ¶ 0044 ("For example, the back surface can include one or more cavities having a corresponding opening and a protrusion located over each of the openings."); U.S. Patent No. 4,224,948 (RX-0670) at 9:51-56 ("wherein said first and second light obstructing means comprise a pair of annular rings extending above the surface of the lower face of said case whereby said rings are in contact with the skin of the wearer").

Apple argues that Complainants' interpretation of the "over" and "above" limitations would render these terms meaningless. RRB at 23-24. Apple cites figures in the specification that consistently describe the claimed protrusion and openings located on top of the photodiodes. *Id*. at 24-26 (citing JX-0001 at 24:28-33, Figures 3C, 4C, 7B). Apple argues that the specification's use of the term "over" within the phrase "spread over" is irrelevant to the meaning of the claim phrases "positioned over" and "arranged over." RIB at 25-26. Apple further argues that in the Apple patents and patent applications using the term "over," the descriptions refer to devices that are depicted in a face-down position, not when they are configured to measure blood oxygen. *Id*. at 26-28. Apple argues that the "configured to" language in the claims requires that that the features have a specific orientation when the device is in use. *Id*. at 28-29.

In consideration of the parties' arguments and the evidence of record, the undersigned agrees with Complainants that the claim limitations using the terms "over" and "above" do not require a vertical arrangement of features in the context of the Poeze patents. The terms "over" and "above" are commonly understood words with ordinary meanings that can be understood by a lay judge. *See Phillips*, 415 F.3d at 1314. The undersigned agrees with Apple that the word "over" may be used to describe a vertical arrangement, but "over" can also be used to describe an arrangement where one feature covers another, as recognized by Dr. Madisetti's example of a bandage over a wound. Tr. (Madisetti) at 701:22-18. This is a common usage of the term "over" in the field of wearable medical equipment, *e.g.*, a mask over one's mouth, or in the field of optical sensors, *e.g.*, a filter over a lens. This is consistent with how the term "over" is used in the asserted claims of the Poeze patents, describing "a protrusion arranged over the interior surface" and openings "positioned over" or "arranged over" photodiodes. In the context of this claim language, the term "over" refers to an arrangement where one feature covers another—not the relative arrangement of these features in a vertical direction.[4] The ordinary meaning of the claim language does not restrict the orientation of these features, and whether the claimed photodiodes

---

[4] The term "above" is only used in asserted claim 28 of the '502 patent to refer to "a protrusion arranged above the interior surface." The undersigned agrees with Complainants that the patent specification does not require any specific orientation of the device and that the term "above" thus refers to a position relative to the device's features and not to its orientation relative to the Earth. *See* CIB at 43-49; CRB at 15-16. This is also consistent with the usage of the term in a prior art reference relied upon for invalidity purposes by Apple where the term "above" is used to refer to rings that extend beyond a surface, regardless of vertical orientation. *See* RX-0670 (Cramer) at claim 5 ("a pair of annular rings extending above the surface of the lower face of said case"). It is also consistent with the testimony of Apple's expert, Dr. Warren, that "[a] detector can't detect light without some sort of opening above it." Tr. (Warren) at 1193:5-6; *see also* RIB at 61 (same). Apple argues that "Cramer does not disclose restrictions on orientation" (RRB at 29) but this fact weighs against Apple's proposed construction: if the Cramer device can be in any orientation, the term "above" should have a meaning independent from orientation.

are facing upward or downward in relation to the Earth does not affect a device's satisfaction of this limitation.[5]

Accordingly, the undersigned finds that the terms "over" and "above" have their plain and ordinary meaning and do not require a vertical arrangement of features in a particular orientation.

### 2.    "openings"/"through holes"

Several of the asserted claims (or claims from which the asserted claims depend) contain limitations describing "openings" that extend "through the protrusion." *See* '501 patent claim 1 ("a plurality of openings extending through the protrusion"); '502 patent claim 19 ("separate openings extending through the protrusion"), claim 28 ("a plurality of openings in the convex surface, extending through the protrusion"); '648 patent claim 8 ("a plurality of openings provided through the protrusion and the convex surface"). Claim 20 of the '648 patent describes "a plurality of through holes, each through hole including a window."

Apple argues that the claimed "openings" or "through holes" must not contain any material, such as glass or plastic. RIB at 34-39; RRB at 30-34; *id.* at 30 n.16 ("openings—like holes—require an absence of material"). Complainants submit that the claimed "openings" or "through holes" can contain a window of transparent material. CIB at 49-53; CRB at 17-18. Both parties purport to rely on the ordinary meaning of these terms, without proposing any explicit construction. CIB at 53; RRB at 30-31.

Complainants cite evidence in the claims and specification of the Poeze patents that the claimed "openings" and "through holes" can contain a window of transparent material. CIB at

---

[5] Apple's arguments regarding the "configured to" language of the claim preambles are thus irrelevant to the construction of this limitation.

CONFIDENTIAL INFORMATION REDACTED

49-51.  Complainants submit that the purpose of these openings is to allow light to pass through,

citing claim 1 of the '501 patent, which describes "the plurality of openings configured to allow

light to reach the photodiodes."  JX-0001 at claim 1.  Complainants cite examples in the claims

and specification of the Poeze patents describing transparent windows in the relevant openings

and through holes.  CIB at 49-51.  Complainants further identify Apple patents that refer to

"openings" and "windows."  *Id*. at 52-53.  In reply, Apple cites testimony of its engineers

describing ███████████████████████████████████████████.  RRB at 33-34.

Apple argues that an opening or a hole is "an absence of material, into which something can be

placed."  *Id*. at 32.

In consideration of the parties' arguments and the evidence of record, the undersigned

agrees with Complainants that the ordinary meaning of "openings" and "through holes" in the

context of the Poeze patents does not preclude transparent material placed in the claimed

"openings" or "through holes."  An "opening" or "hole" can refer to an absence of material, but

this is not necessarily a requirement.  For example, a skylight would still be an "opening" in a

roof after a glass window is installed, and a swimming hole is still a "hole" when it is filled with

water.  The undersigned agrees with Complainants that the ordinary meaning of the terms

"opening" and "hole" can include openings and holes that include material.

The claims and specification of the Poeze patents use the terms "openings" and "holes" in

a way that is consistent with this ordinary meaning by referring to "openings" and "through

holes" that may contain transparent material.  *See, e.g.,* '502 patent claim 19 ("optically

transparent material within each of the openings"), claim 28 ("a plurality of transmissive

windows, each of the transmissive windows extending across a different one of the openings");

'648 patent claim 8 ("a separate optically transparent window extending across each of the

openings"), claim 20 ("each through hole including a window").  The specification explicitly

provides that "[t]he openings can be made from glass to allow attenuated light from a

measurement site, such as a finger, to pass through to one or more detectors."  JX-0001 at 8:26-

30; *see also* JX-0001 at 19:38-48 (describing "openings or windows," which "allow light to pass

from the measurement site to the photodetectors"), 27:20-27 ("One or more components of

conductive glass 730b can be provided in the openings 703.").  Figure 7B depicts conductive

glass provided in the identified opening:



**FIG. 7B**

JX-0001 at Fig. 7B; *see id*. at 27:13-32.  In view of these disclosures, the undersigned agrees

with the testimony of Dr. Madisetti that the claimed "openings" and "through holes" in the Poeze

patents can be made of glass or transparent material that allows light to pass through to the

detectors.  *See* Tr. (Madisetti) at 702:8-703:10.

Apple argues that a "window" is something different from an "opening" or "hole," RIB at 37-38, but none of the statements in the specification cited by Apple suggest that an "opening" can no longer be referred to as an "opening" when filled with glass or covered by a window. To the contrary, the specification describes conductive glass that "can be provided in the openings." JX-0001 at 27:20-22. The claims of the Poeze patents repeatedly describe "windows extending across . . . the openings." '502 patent claim 28; *see also* '648 patent claim 8 (same); '648 patent, claim 20 ("each through hole including a window"). Claim 19 of the '502 patent describes "optically transparent material within each of the openings." The intrinsic evidence supports Complainants' interpretation of these terms to include "openings" and "through holes" that contain transparent material allowing for the transmission of light to the photodiodes.

Accordingly, the undersigned finds that the claimed "openings" and "through holes" can contain transparent material.

### E.    Infringement

Complainants allege that the Accused Products infringe claim 12 of the '501 patent, claims 22 and 28 of the '502 patent, and claims 12, 24, and 30 of the '648 patent. CIB at 53-83. There is no dispute with respect to the structure and operation of the Accused Products, and Apple only disputes infringement with respect to the "over"/"above" and "openings"/"through holes" limitations addressed above in the context of claim construction. RIB at 26-39; RRB at 20-34. Based on the evidence of record, and because Apple's proposed claim constructions have been rejected, the undersigned finds that these limitations are met, and that the Accused Products thus infringe each of the asserted claims, as discussed below.[6]

---

[6] Apple's opening brief argues, in addition, that there is no indirect infringement of claim 28 of the '502 patent. *See* RIB at 39-40. Complainants do not provide any argument regarding indirect infringement.

1.      **'501 Patent Claim 12[7]**

a.      **Element [1 preamble]: "A user-worn device configured to noninvasively measure a physiological parameter of a user, the user-worn device comprising:"[8]**

There is no dispute that the Accused Products meet the limitations of the preamble of claim 1, which requires "[a] user-worn device configured to non-invasively measure a physiological parameter of a user." *See* CIB at 59-60. Dr. Madisetti determined that the Accused Products are watches configured to measure blood oxygen saturation, relying on Apple's marketing materials and technical documentation. Tr. (Madisetti) at 679:12-680:5; CX-0281C (Block Dep. Tr.) at 71:21-72:5, 87:10-14, 177:10-178:7, 251:4-7; CX-1451 (Apple Watch advertisement) at 1:49; CX-1406 (Apple Watch User Guide); CX-1726 (Apple Watch Series 7 Technical Specifications). The evidence of record shows that this limitation is met.

b.      **Element [1A]: "at least three light emitting diodes (LEDs)"**

There is no dispute that each of the Accused Products contains a sensor module with at least three LEDs. *See* CIB at 60-61. Dr. Madisetti identified four clusters of LEDs in each Accused Product, with each cluster containing three LEDs of different wavelengths. Tr. (Madisetti) at 680:6-22; CX-1548C (Apple Watch teardown photographs); CX-0281C (Block Dep. Tr.) at 65:5-67:20; CX-0026C (Apple Engineering Requirement Specification) at 7-8, 30-

---

Apple does not explain why an indirect infringement finding is needed to find a violation as to claim 28 of the '502 patent, or as to any other asserted claim (which are all apparatus claims).

[7] Because claim 12 of the '501 patent depends from claim 1, the infringement, technical prong and invalidity analyses address the limitations of both claims 1 and 12. *See* CIB at xxvi.

[8] The parties have stipulated that all preambles of all asserted claims are limiting. *See* Joint Stipulation of Facts ¶ 9, EDIS Doc. ID 770692 (May 13, 2022).

32; CX-0059C (Apple Watch Series 7 Engineering Drawings) at 1-3.  The evidence of record shows that this limitation is met.

### c.     Element [1B]: "at least three photodiodes arranged on an interior surface of the user-worn device and configured to receive light attenuated by tissue of the user"

There is no dispute that each of the Accused Products contains at least three photodiodes on an interior surface that are configured receive light that has passed through the user's tissue.  *See* CIB at 61-62.  Dr. Madisetti identified four photodiodes arranged on Apple Watch sensor boards that are configured to receive light emitted from the LEDs after it has passed through the user's tissue.  Tr. (Madisetti) at 680:23-681:11; CX-0281C (Block Dep. Tr.) at 70:13-16, 86:2-87:18; CX-0026C (Apple Engineering Requirement Specification) at 7-8, 30-32; CX-0059C (Apple Watch Series 7 Engineering Drawings) at 1-3.  The evidence of record shows that this limitation is met.

### d.     Element [1C]: "a protrusion arranged over the interior surface, the protrusion comprising a convex surface"

Complainants identify a domed surface in the Accused Products as the claimed protrusion with a convex surface.  CIB at 54-57.  Dr. Madisetti identified this domed surface arranged over the interior surface of the Accused Products where the photodiodes are located.  Tr. (Madisetti) at 681:12-682:11.

CONFIDENTIAL INFORMATION REDACTED



CDX-0011C.016 (citing CX-1646C at 4; CX-1548C at 3; CX-0063C at 1).

Apple argues that the identified protrusion is not "over" the interior surface when the Accused Products are being used for blood oxygen monitoring (with the photodiodes pointed down toward the user's wrist). RIB at 26-34; RRB at 21-29. There is no dispute regarding the orientation of the Accused Products, but as discussed above in the context of claim construction, the claim term "over" does not require a particular vertical arrangement—the protrusion is "over" the interior surface because it is covering the interior surface.

Accordingly, the undersigned finds that the Accused Products meet the limitation requiring "a protrusion arranged over the interior surface."

      e.      **Element [1D]: "a plurality of openings extending through the protrusion and positioned over the three photodiodes"**

Complainants identify openings in the Accused Products that are positioned over the four photodiodes. CIB at 57-59. Dr. Madisetti identified evidence ████████████████████

CONFIDENTIAL INFORMATION REDACTED

████████████████████████████████ that allow light to pass through to the

photodiodes.  Tr. (Madisetti) at 682:12-683:17.



CDX-0011C.017 (citing CX-1646C at 4; CX-1548C at 3; CX-0026C at 8, 31).

Apple argues that the alleged "openings" do not infringe this limitation because they are

████████████████████████████████████████████████████████████

RIB at 34-39; RRB at 29-34.  Apple engineer Ueyn Block explained: ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████  Tr. (Block) at 901:16-902:3. Apple also argues that the openings are not

positioned "over" the photodiodes when the Accused Products are being used for blood oxygen

monitoring (with the photodiodes pointed down toward the user's wrist).  RIB at 26-39; RRB at

21-29.

As discussed above in the context of claim construction, the undersigned finds that the

claimed "openings" can contain transparent material.  The fact that the openings in the Accused

37

**CONFIDENTIAL INFORMATION REDACTED**

Products ███████████████████████████████████████████ does not

mean that these are not "openings" in accordance with the claim language. There is no dispute

that the ██████████ within the openings is transparent and allows for light to reach the

photodiodes. *See* CX-0281C (Block) at 272:2-9. There is also no dispute that each opening has

an opaque lateral surface separating the opening from the surrounding material. *See* CIB at 62-

64; Part IV.E.1.f (Element 1E) *infra*.

      The undersigned also finds that the openings are positioned "over" the four photodiodes.

As discussed above in the context of claim construction, the claim term "over" does not require a

particular vertical arrangement—the openings are positioned "over" the photodiodes because

they are aligned with the photodiodes and covering them.

      Accordingly, the Accused Products meet the plurality of openings" limitation of '501

patent claim 1.

        **f.**      **Element [1E]: "the openings each comprising an opaque lateral surface, the plurality of openings configured to allow light to reach the photodiodes, the opaque lateral surface configured to avoid light piping through the protrusion"**

      There is no dispute that the Accused Products have opaque lateral surfaces in their

alleged openings that are configured to avoid light piping. *See* CIB at 62-64. Apple engineers

described a █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████ *see also* CX-0070C at 1; CX-0189C at 2; CX-1548C

at 3; CX-0072C at 26, 29-30. Dr. Madisetti considered this evidence to identify █████████

**CONFIDENTIAL INFORMATION REDACTED**

█ as opaque lateral surfaces meeting this limitation. Tr. (Madisetti) at 683:18-685:3. The

evidence of record shows that this limitation is met.

> **g.** **Element 1[F]: "one or more processors configured to receive one or more signals from the photodiodes and calculate a measurement of the physiological parameter of the user"**

There is no dispute that the Accused Products have processors that receive signals from

the photodiodes and calculate measurements of physiological parameters. *See* CIB at 64-65.

Dr. Madisetti identifies an █ application processor running Apple's █ algorithm to

calculate oxygen saturation and pulse rate. Tr. (Madisetti) at 685:4-25; *see* CX-0013C (Apple

Engineering Requirements Specification) at 12; CX-0100C (Apple Engineering Requirements

Specification) at 6-31; CX-0072C at 3 (Apple Watch Series 6 BOM); CX-1726 (Apple Watch

Series 7 Technical Specifications) at 2; CX-0299C (Waydo Dep. Tr.) at 38:10-40:6, 50:11-52:4.

The evidence of record shows that this limitation is met.

> **h.** **Element [12]: "wherein the convex surface of the protrusion is an outermost surface configured to contact the tissue of the user and conform the tissue into a concave shape"**

Claim 12 of the '501 patent depends from claim 1, further requiring that "the convex

surface of the protrusion is an outermost surface configured to contact the tissue of the user and

conform the tissue into a concave shape." There is no dispute that the Accused Products meet

this limitation. *See* CIB at 65-66. As discussed above, Dr. Madisetti identified a convex

protrusion in the Accused Products, and Apple documents and testimony confirm that the

protrusion is designed ████████████████████████████. *See*

Tr. (Madisetti) at 686:1-18; CX-0281 (Block Dep. Tr.) at 200:6-14; CX-0063C (Apple Watch

Series 7 Engineering Drawings) at 1; CX-1548C (photographs of Apple Watch Series 7) at 3;

CX-0070C (Apple Watch Series 7 Engineering Drawings) at 1; CX-0010 (Apple website) at 3.

The evidence of record shows that this limitation is met.

*** 

Accordingly, because each limitation of claims 1 and 12 are satisfied, the Accused

Products infringe claim 12 of the '501 patent.

> 2.    **'502 Patent Claim 22[9]**
>
> > a.    **Element [19 preamble]: "A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user worn device comprising:"**

There is no dispute that the Accused Products meet the limitations of the preamble of

'502 patent claim 19, which requires "[a] user-worn device configured to non-invasively

measure an oxygen saturation of a user." *See* CIB at 67. The relevant evidence was discussed

above in the context of the preamble of '501 patent claim 1. The evidence of record shows that

this limitation is met.

> > b.    **Element [19A]: "a plurality of emitters configured to emit light, each of the emitters comprising at least two light emitting diodes (LEDs)"**

There is no dispute that each of the Accused Products contains clusters of LEDs, with

each cluster containing three LEDs. *See* CIB at 68. The relevant evidence was discussed above

in the context of the "LEDs" limitation of '501 patent claim 1. The evidence of record shows

that this limitation is met.

---

[9] Because claim 22 of the '502 patent depends from claims 19, 20, and 21, the infringement, technical prong and invalidity analyses address the limitations of claims 19, 20, 21, and 22. *See* CIB at xxvii.

CONFIDENTIAL INFORMATION REDACTED

      c.      **Element [19B]: "four photodiodes arranged within the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user"**

There is no dispute that each of the Accused Products contains four photodiodes configured to receive light that has been attenuated by tissue of the user. *See* CIB at 68. The relevant evidence was discussed above in the context of the "photodiodes" limitation of '501 patent claim 1. The evidence of record shows that this limitation is met.

      d.      **Element [19C]: "a protrusion comprising a convex surface including separate openings extending through the protrusion and lined with opaque material, each opening positioned over a different one associated with each of the four photodiodes, the opaque material configured to reduce an amount of light reaching the photodiodes without being attenuated by the tissue"**

There is no dispute that each of the Accused Products contains a protrusion comprising a convex surface, as discussed above in the context of the "protrusion" limitation of '501 patent claim 1. *See* CIB at 66. With respect to the '502 patent claim 19 limitation requiring "openings extending through the protrusion," Complainants identify the same "openings" that are discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1. *See* CIB at 66-67. Complainants further identify the same             discussed above in the context of the "opaque lateral surfaces" limitation of '501 patent claim 1. *Id.*

Apple disputes infringement of this limitation based on its erroneous proposed constructions of the claim terms "over" and "openings." *See* RIB at 26-39; RRB at 21-34. These arguments have been rejected, however, as discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1 and in the claim construction analysis above. *See* Part IV.D, *supra*. Accordingly, the undersigned finds that the Accused Products meet the limitation in '502 patent claim 19 requiring a "protrusion" including "openings extending

**CONFIDENTIAL INFORMATION REDACTED**

through the protrusion" that are "lined with opaque material," and "each opening positioned over" the photodiodes.

       e.       **Element [19D]: "optically transparent material within each of the openings"**

There is no dispute that each of the Accused Products contains optically transparent material within each of the identified openings. *See* CIB at 68. The evidence for the presence of ████████████████ in these openings was discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1. The evidence of record shows that this limitation is met.

       f.       **Element [19E]: "one or more processors configured to receive one or more signals from at least one of the four photodiodes and output measurements responsive to the one or more signals, the measurements indicative of the oxygen saturation of the user"**

There is no dispute that each of the Accused Products contain processors that receive signals from the photodiodes and output measurements of oxygen saturation. *See* CIB at 68. The relevant evidence was discussed above in the context of the "processors" limitation of '501 patent claim 1. The evidence of record shows that this limitation is met.

       g.       **Element [20]: "further comprising a thermistor"**

Claim 20 of the '502 patent depends from claim 19, further requiring a thermistor. There is no dispute that the Accused Products include a thermistor. *See* CIB at 68-69. Dr. Madisetti identified a ████████████████████ of the Accused Products. Tr. (Madisetti) at 688:18-689:8; *see* CX-0026C (Apple Engineering Requirement Specification) at 31; CX-1548C (Apple Watch teardown photographs) at 37; CX-0059C (Apple Watch Series 7 Engineering Drawings) at 1-5. The evidence of record shows that this limitation is met.

CONFIDENTIAL INFORMATION REDACTED

    h.    **Element [21]: "wherein the one or more processors are further configured to receive a temperature signal from the thermistor and adjust operation of the user-worn device responsive to the temperature signal"**

Claim 21 of the '502 patent depends from claim 20, further requiring that "the one or more processors are further configured to receive a temperature signal from the thermistor and adjust operation of the user device responsive to the temperature signal." There is no dispute that the Accused Products ████████████████████████████████████████

██████████████████████████████. *See* CIB at 69-70. Dr. Madisetti identified Apple documents and testimony showing that a processor in the Accused Products ████████████

████████████████████████████████████████████████████████████

████████████████████████████████ Tr. (Madisetti) at 689:17-690:16 (citing CX-0100C (Apple Engineering Requirement Specification) at 8; *see also* CX-0281C (Block Dep. Tr.) at 62:3-64:17; CX-0283C (Charonneau-LeFort Dep. Tr.) at 78:4-79:18, 123:6-12; CX-0299C (Waydo Dep. Tr.) at 84:2-85:22; CX-0285C (Dua Dep. Tr.) at 139:1-15. The evidence of record shows that this limitation is met.

    i.    **Element [22]: "wherein the plurality of emitters comprise at least four emitters, and wherein each of the plurality of emitters comprises a respective set of at least three LEDs"**

Claim 22 of the '502 patent depends from claim 21, further requiring that "the plurality of emitters comprise at least four emitters, and wherein each of the plurality of emitters comprises a respective set of at least three LEDs." There is no dispute that the plurality of emitters in the Accused Products comprise four sets of three LEDs. *See* CIB at 70-71. The relevant evidence was discussed above in the context of the "LEDs" limitation of '501 patent claim 1. The evidence of record shows that this limitation is met.

***

Accordingly, because each limitation of claims 19, 20, 21, and 22 are satisfied, the

undersigned finds that the Accused Products infringe claim 22 of the '502 patent.

### 3.     '502 Patent Claim 28

#### a.     Element [28 preamble]: "A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user worn device comprising:"

There is no dispute that the Accused Products meet the limitations of the preamble of

'502 patent claim 28, which requires "[a] user-worn device configured to non-invasively

measure an oxygen saturation of a user." *See* CIB at 72.  The relevant evidence was discussed

above in the context of the preamble of '501 patent claim 1. The evidence of record shows that

this limitation is met.

#### b.     Element [28A]: "a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength"

There is no dispute that each of the Accused Products contains four sets of LEDs, with

each set containing three LEDs emitting light at different wavelengths. *See* CIB at 72.  The

relevant evidence was discussed above in the context of the "LEDs" limitation of '501 patent

claim 1. The evidence of record shows that this limitation is met.

#### c.     Element [28B]: "a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength"

There is no dispute that each of the Accused Products contains four sets of LEDs, with

each set containing three LEDs emitting light at different wavelengths. *See* CIB at 72.  The

relevant evidence was discussed above in the context of the "LEDs" limitation of '501 patent

claim 1, and Dr. Block confirmed that the wavelengths in each of the LED groups is the same--

containing one infrared LED, one red LED, and one green LED. *See* CX-0281C (Block Dep.

Tr.) at 65:5-67:20. The evidence of record shows that this limitation is met.

### d. Element [28C]: "four photodiodes arranged in a quadrant configuration on an interior surface of the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user"

There is no dispute that each of the Accused Products contains four photodiodes arranged

in a quadrant configuration receiving light that has been attenuated by tissue of the user. *See*

CIB at 72-73. The relevant evidence was discussed above in the context of the "photodiodes"

limitation of '501 patent claim 1, and Dr. Madisetti identified photographs of the sensor board of

the Accused Products showing the quadrant configuration of the photodiodes. Tr. (Madisetti) at

692:3-16; CX-1548C. The evidence of record shows that this limitation is met.

### e. Element [28D]: "a thermistor configured to provide a temperature signal"

There is no dispute that each of the Accused Products contains a thermistor that provides

a temperature signal. *See* CIB at 73. The relevant evidence was discussed above in the context

of '502 patent claim 20. The evidence of record shows that this limitation is met.

### f. Element [28E]: "a protrusion arranged above the interior surface, the protrusion comprising: a convex surface"

There is no dispute that each of the Accused Products contains a protrusion comprising a

convex surface, as discussed above in the context of the "protrusion" limitation of '501 patent

claim 1. *See* CIB at 71. Apple disputes infringement of this limitation based on its erroneous

proposed construction of the term "above." *See* RIB at 26-34; RRB at 21-29. These arguments

have been rejected, however, as discussed above in the context of the "protrusion" limitation of

'501 patent claim 1 and in the claim construction analysis above. *See* Part IV.D.1, *supra*.

Accordingly, the undersigned finds that the Accused Products meet the limitation in '502 patent claim 28 requiring a "protrusion arranged over the interior surface."

> g.    **Element [28F]: "a plurality of openings in the convex surface, extending through the protrusion, and aligned with the four photodiodes, each opening defined by an opaque surface configured to reduce light piping"**

With respect to the "plurality of openings" limitation of '502 patent claim 28, Complainants identify the same "openings" that are discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1. *See* CIB at 71. There is no dispute that these openings are aligned with the four photodiodes. *See id*. Apple disputes infringement of this limitation based on its erroneous proposed construction of the term "openings." *See* RIB at 34-39; RRB at 29-34. These arguments have been rejected, however, as discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1. Accordingly, the undersigned finds that the Accused Products meet the limitation in '502 patent claim 28 requiring a "plurality of openings in the convex surface, extending through the protrusion, and aligned with the four photodiodes." Further, there is no dispute that the Accused Products have opaque surfaces surrounding the openings that are configured to reduce light piping, as discussed above in the context of the "opaque lateral surface" limitation of '501 patent claim 1. *See* CIB at 71. Accordingly, the evidence shows that this limitation is met by the Accused Products.

> h.    **Element [28G]: "a plurality of transmissive windows, each of the transmissive windows extending across a different one of the openings"**

There is no dispute that each of the Accused Products contains transmissive windows extending across each of the identified openings. *See* CIB at 73. The evidence for the presence of transparent windows in these openings was discussed above in the context of the "plurality of

openings" limitation of '501 patent claim 1. The evidence of record shows that this limitation is met.

> **i.** **Element [28H]: "at least one opaque wall extending between the interior surface and the protrusion, wherein at least the interior surface, the opaque wall and the protrusion form cavities, wherein the photodiodes are arranged on the interior surface within the cavities"**

There is no dispute that each of the Accused Products contains an opaque wall between the interior surface and the protrusion that forms a cavity for the photodiodes. *See* CIB at 74. Dr. Madisetti identified the opaque wall in photographs of the Accused Products. Tr. (Madisetti) at 692:17-693:13; *see* CX-1646C (Complaint Exhibit 18) at 4; CX-0026C (Apple Engineering Requirement Specification) at 7-8, 30-32; CX-0059C (Apple Watch Series 7 Engineering Drawings) at 1-3; *see also* CX-0283C (Charbonneau-Lefort Dep. Tr.) at 87:5-8, 105:22-106:7. The evidence of record shows that this limitation is met.

> **j.** **Element [28I]: "one or more processors configured to receive one or more signals from at least one of the photodiodes and calculate an oxygen saturation measurement of the user, the one or more processors further configured to receive the temperature signal"**

There is no dispute that each of the Accused Products contains processors that receive signals from the photodiodes and output measurements of oxygen saturation, and there is no dispute that the processors receive a temperature signal. *See* CIB at 74. The relevant evidence was discussed above in the context of the "processors" limitations of '501 patent claim 1 and '502 patent claim 21. The evidence of record shows that this limitation is met.

k.    **Element [28J]: "a network interface configured to wirelessly communicate the oxygen saturation measurement to at least one of a mobile phone or an electronic network"**

There is no dispute that the Accused Products have a network interface that can wirelessly communicate oxygen saturation measurements to a mobile phone or electronic network. *See* CIB at 74-75. Dr. Madisetti identifies Bluetooth and Wi-Fi interfaces that communicate SpO2 measurements to an Apple iPhone. Tr. (Madisetti) at 693:14-694:11; *see* CX-0010 (Apple website) at 5; CX-1726 (Apple Watch Series 7 Technical Specifications) at 21. This operation of the Accused Products was confirmed by the testimony of Apple engineers. *See* CX-0299C (Waydo Dep. Tr.) at 74:20-75:17 (SpO2 measurements "stored in the HealthKit database on the Watch will also eventually make its way to the phone" via "Wi-Fi or Bluetooth"); CX-0285C (Dua) at 144:9-14 ("the heart rate along with the SpO$_2$ that's measured at the same time are both communicated to the iPhone"). The evidence of record shows that this limitation is met.

l.    **Element [28K]: "a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the oxygen saturation measurement of the user"**

There is no dispute that the Accused Products have a touch-screen display that shows oxygen saturation measurements. *See* CIB at 75-76. Dr. Madisetti identified Apple documents showing that Apple Watches have touch-screen displays that can show an SpO2 measurement. Tr. (Madisetti) at 694:12-22 (citing CX-1407 at 3); *see also* CX-0281C (Block Dep. Tr. at 237:11-238:8); CX-0010 (Apple webpage). The evidence of record shows that this limitation is met.

m.   **Element [28L]: "a storage device configured to at least temporarily store at least the measurement"**

There is no dispute that the Accused Products store the blood oxygen measurement in memory. *See* CIB at 76. Apple engineers confirmed that the SpO2 values are stored in the memory of the Accused Products. *See* CX-0299C (Waydo Dep. Tr.) at 74:17-19; CX-0285C (Dua Dep. Tr.) at 131:8-15; *see also* CX-1726 at 1-2 (identifying memory in Apple Watch Series 7). The evidence of record shows that this limitation is met.

n.   **Element [28M]: "a strap configured to position the user-worn device on the user"**

There is no dispute that the Accused Products have a strap. *See* CIB at 76. Dr. Madisetti identified a strap configured to hold the Accused Products in place on a user's wrist. Tr. (Madisetti) at 695:11-20; *see* CX-0010 (Apple website) at 4; CX-1726 (Apple Watch Series 7 Technical Specifications) at 3. The evidence of record shows that this limitation is met.

*** 

Accordingly, because each limitation of the claim is satisfied, the undersigned finds that the Accused Products infringe claim 28 of the '502 patent.

4.   **'648 Patent Claim 12[10]**

a.   **Element [8 preamble]: "A user-worn device configured to non-invasively determine measurements of a physiological parameter of a user, the user-worn device comprising:"**

There is no dispute that the Accused Products meet the limitations of the preamble of '648 patent claim 8, which requires "[a] user-worn device configured to non-invasively determine measurements of a physiological parameter of a user." *See* CIB at 77. The relevant

---

[10] Because claim 12 of the '648 patent depends from claim 8, the infringement, technical prong and invalidity analyses address the limitations of claims 8 and 12. *See* CIB at xxix.

evidence was discussed above in the context of the preamble of '501 patent claim 1. The

evidence of record shows that this limitation is met.

**b.    Element [8A]: "a first set of light emitting diodes (LEDs), the first set comprising at least an LED configured to emit light at a first wavelength and at least an LED configured to emit light at a second wavelength"**

There is no dispute that each of the Accused Products contains four sets of LEDs, with

each set containing three LEDs emitting light at different wavelengths. *See* CIB at 78. The

relevant evidence was discussed above in the context of the "LEDs" limitation of '501 patent

claim 1. The evidence of record shows that this limitation is met.

**c.    Element [8B]: "a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength"**

There is no dispute that each of the Accused Products contains four sets of LEDs, with

each set containing three LEDs emitting light at different wavelengths. *See* CIB at 78. The

relevant evidence was discussed above in the context of the "LEDs" limitation of '501 patent

claim 1 and the "second set of LEDs" limitation of '502 patent claim 28. The evidence of record

shows that this limitation is met.

**d.    Element [8C]: "four photodiodes"**

There is no dispute that each of the Accused Products contains four photodiodes. *See*

CIB at 78. The relevant evidence was discussed above in the context of the "photodiodes"

limitation of '501 patent claim 1. The evidence of record shows that this limitation is met.

**e.    Element [8D]: "a protrusion comprising a convex surface, at least a portion of the protrusion comprising an opaque material"**

There is no dispute that each of the Accused Products contains a protrusion comprising a

convex surface, which includes a portion with opaque material. *See* CIB at 78. The relevant

evidence was discussed above in the context of the "protrusion" and "openings" limitations of
'501 patent claim 1. The evidence of record shows that this limitation is met.

        f.        **Element [8E]: "a plurality of openings provided through the protrusion and the convex surface, the openings aligned with the photodiodes"**

With respect to the "plurality of openings" limitation of '648 patent claim 8,
Complainants identify the same "openings" that are discussed above in the context of the
"plurality of openings" limitation of '501 patent claim 1. *See* CIB at 77. There is no dispute that
these openings are aligned with the four photodiodes. *See id.* Apple disputes infringement of
this limitation based on its erroneous proposed construction of the term "openings." *See* RIB at
34-39; RRB at 29-34. These arguments have been rejected, however, as discussed above in the
context of the "plurality of openings" limitation of '501 patent claim 1 and in the claim
construction analysis above. *See* Part IV.D.2, *supra.* Accordingly, the undersigned finds that the
Accused Products meet the limitation in '648 patent claim 8 requiring a "a plurality of openings
provided through the protrusion and the convex surface, the openings aligned with the
photodiodes."

        g.        **Element [8F]: "a separate optically transparent window extending across each of the openings"**

There is no dispute that each of the Accused Products contains optically transparent
windows extending across each of the identified openings. *See* CIB at 78. The evidence for the
presence of transparent windows in these openings was discussed above in the context of the
"plurality of openings" limitation of '501 patent claim 1. The evidence of record shows that this
limitation is met.

h.    **Element [8G]: "one or more processors configured to receive one or more signals from at least one of the photodiodes and output measurements of a physiological parameter of a user"**

There is no dispute that each of the Accused Products contains processors that receive signals from the photodiodes and output measurements of oxygen saturation. *See* CIB at 79. The relevant evidence was discussed above in the context of the "processors" limitation of '501 patent claim 1. The evidence of record shows that this limitation is met.

i.    **Element [8H]: "a housing"**

There is no dispute that the Accused Products have a housing. *See* CIB at 79. Dr. Madisetti identified a photograph of the housing for the Accused Products. Tr. (Madisetti) at 697:17-24 (citing CX-1548C at 3). The evidence of record shows that this limitation is met.

j.    **Element [8I]: "a strap configured to position the housing proximate tissue of the user when the device is worn"**

There is no dispute that the Accused Products have a strap. *See* CIB at 80. The relevant evidence was discussed above in the context of the "strap" limitation of '502 patent claim 28. The evidence of record shows that this limitation is met.

k.    **Element [12]: "the physiological parameter comprises oxygen or oxygen saturation"**

There is no dispute that the Accused Products meet the limitations of '648 patent claim 12, which depends from claim 8 and requires that "the physiological parameter comprises oxygen or oxygen saturation." *See* CIB at 80. The relevant evidence was discussed above in the context of the preamble and the "physiological parameter" limitation of '501 patent claim 1. The evidence of record shows that this limitation is met.

\*\*\*

Accordingly, because each of the limitations of claims 8 and 12 are satisfied, the undersigned finds that the Accused Products infringe claim 12 of the '648 patent.

5.      **'648 Patent Claim 24[11]**

    a.      **Element [20 preamble]: "A user-worn device configured to non-invasively determine measurements of a user's tissue, the user-worn device comprising:"**

There is no dispute that the Accused Products meet the limitations of the preamble of '648 patent claim 20, which requires "[a] user-worn device configured to non-invasively determine measurements of a user's tissue." *See* CIB at 81.  The relevant evidence was discussed above in the context of the preamble of '501 patent claim 1.  The evidence of record shows that this limitation is met.

    b.      **Element [20A]: "a plurality of light emitting diodes (LEDs)"**

There is no dispute that each of the Accused Products has LEDs. *See* CIB at 82.  The relevant evidence was discussed above in the context of the "LEDs" limitation of '501 patent claim 1.  The evidence of record shows that this limitation is met.

    c.      **Element [20B]: "at least four photodiodes configured to receive light emitted by the LEDs, the four photodiodes being arranged to capture light at different quadrants of tissue of a user"**

There is no dispute that each of the Accused Products contains four photodiodes arranged in quadrants. *See* CIB at 82.  The relevant evidence was discussed above in the context of the "photodiodes" limitation of '501 patent claim 1 and the "photodiodes" limitation of '502 patent claim 28.  The evidence of record shows that this limitation is met.

    d.      **Element [20C]: "a protrusion comprising a convex surface"**

There is no dispute that each of the Accused Products contains a protrusion comprising a convex surface. *See* CIB at 80-81.  The relevant evidence was discussed above in the context of

---

[11] Because claim 24 of the '648 patent depends from claim 20, the infringement, technical prong and invalidity analyses address the limitations of claims 20 and 24. *See* CIB at xxix.

the "protrusion" limitation of '501 patent claim 1. The evidence of record shows that this limitation is met.

> e.    **Element [20D]: "a plurality of through holes, each through hole including a window and arranged over a different one of the at least four photodiodes"**

With respect to the '648 patent claim 20 limitation requiring "a plurality of through holes," Complainants identify the holes in the protrusion that are discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1. *See* CIB at 81. Apple disputes infringement of this limitation based on its erroneous proposed constructions of the claim terms "over" and "through holes." *See* RIB at 26-39; RRB at 21-34. These arguments have been rejected, however, as discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1 and in the claim construction analysis above. *See* Part IV.D, *supra*. Accordingly, the undersigned finds that the Accused Products meet the limitation in '648 patent claim 20 requiring a "a plurality of through holes, each through hole including a window and arranged over a different one of the at least four photodiodes."

> f.    **Element [20E]: "one or more processors configured to receive one or more signals from at least one of the photodiodes and determine measurements of oxygen saturation of the user"**

There is no dispute that each of the Accused Products contains processors that receive signals from the photodiodes and output measurements of oxygen saturation. *See* CIB at 82. The relevant evidence was discussed above in the context of the "processors" limitation of '501 patent claim 1. The evidence of record shows that this limitation is met.

> g.    **Element [24]: "wherein the protrusion comprises opaque material configured to substantially prevent light piping"**

Claim 24 of the '648 patent depends from claim 20, further requiring that "the protrusion comprises opaque material configured to substantially prevent light piping." There is no dispute

that the identified protrusion in the Accused Products has a coating and ink that is configured to prevent light piping, as discussed above in the context of the "opaque lateral surface" limitation of '501 patent claim 1. *See* CIB at 82. The evidence of record shows that this limitation is met.

*** 

Accordingly, because each of the limitations of claims 20 and 24 are satisfied, the undersigned finds that the Accused Products infringe claim 24 of the '648 patent.

### 6.     '648 Patent Claim 30

Claim 30 of the '648 patent depends from claim 20, further requiring that "the protrusion further comprises one or more chamfered edges." There is no dispute that the identified protrusion in the Accused Products has chamfered edges. *See* CIB at 82-83. Dr. Madisetti identified chamfered edges on engineering drawings for the Accused Products. Tr. (Madisetti) at 699:4-19; CX-0063C (Apple Watch Series 7 Engineering Drawings) at 2; *see also* CX-1548C (Apple Watch Series 7 Photographs) at 3; CX-0070C (Apple Watch Series 7 Engineering Drawings) at 1. The evidence of record shows that this limitation is met.

***

Accordingly, because each of the limitations of claims 20 and 30 are satisfied, the undersigned finds that the Accused Products infringe claim 30 of the '648 patent.

### F.     Domestic Industry—Technical prong

The domestic industry products that Complainants rely on for the Poeze patents are the RevA sensor (CPX-0052C), the RevD sensor (CPX-0058C), the RevE sensors (CPX-0019C, CPX-0020C, CPX-0065C), and the Masimo W1 (CPX-0146C). CIB at 26-35. Complainants allege that the RevA, RevD, RevE, and Masimo W1 devices practice claim 12 of the '501 patent and claims 12, 24, and 30 of the '648 patent; and that the RevD, RevE, and Masimo W1 devices

practice claim 28 of the '502 patent. CIB at 85-117. For the reasons discussed below, the evidence shows, by a preponderance, that Complainants have satisfied the technical prong with respect to certain claims of the Poeze patents.

1. **Consideration of Post-Complaint Evidence**

As an initial matter, the parties dispute whether evidence of post-complaint activities can be considered in the context of the domestic industry requirement. *See* RIB at 18-21; RRB at 17-18, 154; CRB at 11-13.

Apple argues that the only evidence that should be considered with respect to the alleged domestic industry is evidence of activities that pre-date the filing of the complaint, citing Commission precedent requiring that satisfaction of the domestic industry requirement be assessed at the time of the complaint. RIB at 18-21. Apple relies on *Certain Thermoplastic-Encapsulated Electric Motors, Components Thereof, and Products and Vehicles Containing the Same* ("*Thermoplastic-Encapsulated Electric Motors*"), where the Commission stated that "[o]rdinarily, the relevant date at which to determine if the domestic industry requirement of section 337 is satisfied is the filing date of the complaint." Inv. No. 337-TA-1073, Comm'n Op. at 6-7, EDIS Doc. ID 684974 (Aug. 12, 2019). Apple argues that the date of the complaint is the relevant timeframe for evaluating the domestic industry, and that the Commission has held that it "will consider post-complaint evidence regarding domestic industry only in very specific circumstances, *i.e.*, 'when a significant and unusual development has occurred after the complaint has been filed.'" *Certain Collapsible Sockets for Mobile Electronic Devices and Components Thereof*, Inv. No. 337-TA-1056, Comm'n Op. at 15 n.10, EDIS Doc. ID 649819 (July 9, 2018) (quoting *Certain Television Sets, Television Receivers, Television Tuners, and*

CONFIDENTIAL INFORMATION REDACTED

*Components Thereof*, Inv. No. 337-TA-910, Comm'n Op. at 72, EDIS Doc. ID 568157 (Oct. 30, 2015)).

With respect to the technical prong, Complainants contend that post-complaint evidence can be considered in this investigation because the Masimo W1 (a post-complaint product) has been shown to practice claims of the asserted patents, in contrast to the post-complaint products in *Thermoplastic-Encapsulated Electric Motors*. CRB at 12. With respect to the economic prong, Complainants also distinguish the facts in *Thermoplastic-Encapsulated Electric Motors* because ███████████████████████████████████████. *Id.* Complainants further argue that Masimo has made certain investments that represent significant and unusual developments, including investments in ████████████████████████, ███████████████████████ and the acquisition of Sound United. *See* Tr. (Scruggs) at 433:13-15; Tr. (McGavock) at 543:16-544:14, 545:3-17; Tr. (Al-Ali) at 323:18-324:25; Tr. (Muhsin) at 344:14-345:1; CX-1637 (Masimo 2021 Earnings Presentation) at 19-20; Tr. (Young) at 482:14-25.

Consistent with Commission precedent, evidence regarding Complainants' post-complaint activities will not be considered with respect to the domestic industry in this investigation.

The Commission has held that, "as a general matter, the only activities that are relevant to the determination of whether a domestic industry exists or is in the process of being established are those that occurred before the complaint was filed." *Certain Video Game Systems and Controllers*, Inv. No. 337-TA-743, Comm'n Op., 2012 WL 13171643, at *3 (Jan. 20, 2012). However, "in appropriate situations, based on the specific facts and circumstances of an investigation, the Commission may consider activities and investments beyond the filing of the

complaint." *Id.*[12]  The Commission has held that such "facts and circumstances" may be shown

by "a significant and unusual development" such as circumstances pertaining to "bankruptcy, a

change in patent ownership, manufacturing, or licensing activity." *Certain Television Sets,*

*Television Receivers, Television Tuners, and Components Thereof*, Inv. No. 337-TA-910,

Comm'n Op., 2015 WL 6755093 (Oct. 30, 2015).  Where there has been no showing of

significant and unusual developments, the Commission has held that it would be error to

"consider[] evidence as of the close of discovery, rather than as of the complaint filing date."

*Certain Televisions, Remote Controls, and Components Thereof*, Inv. No. 337-TA-1263,

Comm'n Op., 2022 WL 17486245, at *13 (Nov. 30, 2022) ("*Certain Televisions*").

Complainants have not made a showing of significant and unusual developments in the

present investigation.[13]  Complainants rely on developments with respect to the manufacturing of

"Masimo Watch" products, CIB at 289-90, but to the extent that the Commission has considered

post-complaint evidence due to unusual developments regarding manufacturing, this has been in

circumstances involving the cessation of domestic manufacturing.  *See, e.g., Certain Video*

*Graphics Display Controllers, and Products Containing Same,* Inv. No. 337-TA-412, Initial

Determination at 12-13, EDIS Doc. ID 172529 (May 17, 1999) (unreviewed in relevant part);

*Certain Variable Speed Wind Turbines and Components Thereof*, Inv. No. 337-TA-376,

---

[12] The Federal Circuit has similarly affirmed the Commission's use of the complaint's filing date for assessing domestic industry under the facts and circumstances of the cases at issue.  *See Bally/Midway Mfg. v. U.S. Int'l Trade Comm'n*, 714 F.2d 1117, 1120 (Fed Cir. 1983) (holding that, "under the circumstances of this case," the proper date for assessing the domestic "industry" was the filing date of the complaint, where a different position would undercut the purposes of Section 337); *Motiva, LLC v. Int'l Trade Comm'n*, 716 F.3d 596, 601 n.6 (Fed. Cir. 2013) (affirming Commission's use of the complaint's filing date as the relevant date for the domestic industry determination).

[13] Apple argues that Complainants have waived any contention regarding "significant and unusual developments" because this argument was not raised in Complainants' pre-hearing brief.  *See* RRB at 154.  Complainants did not waive this argument.  *See* CPHB at 229-231.

Comm'n Op. 4, 10-13, EDIS Doc. ID 44138 (Aug. 21, 1997). Masimo's post-complaint progress towards the manufacture of "Masimo Watch" products appears to be consistent with Masimo's pre-complaint plans and projections for these products—there is nothing significant or unusual about these developments. *See* RIB at 19. Accordingly, post-complaint evidence regarding the alleged domestic industry will not be considered. *Cf. Certain Televisions*, 2022 WL 17486245, Comm'n Op. at *13 (holding that, in the context of considering whether the technical prong of the domestic industry had been shown, the ID erred to the extent post-complaint evidence was considered).[14]

Masimo's asserted pre-complaint domestic industry products are the RevA (CPX-0052C), RevD (CPX-0058C), and RevE prototypes (CPX-0019C, CPX-0020C, CPX-0065C). There is no dispute that the RevA and RevD sensors were made before the filing of the complaint—Mr. Scruggs explained that Masimo built the RevA sensor in November 2020, and the RevD sensor in April 2021. Tr. (Scruggs) at 396:2-13, 397:7-24. Masimo contends that two of the RevE prototypes were created pre-complaint. *See* CRB at 31-32.[15]

The undersigned will not consider any evidence regarding the Masimo W1 product, because this product made in December 2021, several months after the complaint was filed. *See* Tr. (Kiani) at 124:5-24; Tr. (Scruggs) at 398:24-399:400:2.

---

[14] The underlying Initial Determination reviewed by the Commission, like the investigation here, included a claim for a domestic industry in the process of being established. *See Certain Televisions, Remote Controls, and Components Thereof*, Inv. No. 337-TA-1263, Initial Determination, at 89-92, 144-145 (June 28, 2022) (EDIS Doc. ID 775506).

[15] Apple contends that the software installed on the RevD sensor has a most recent date of July 30, 2021, and that the software installed on the RevE sensors was not loaded until September and October 2021, with an earliest "known date" of July 9, 2021—after the filing of the complaint. *See* RIB at 42-43. This issue is discussed *infra* in the context of whether a domestic industry existed at the time of the complaint.

A limitation-by-limitation analysis for the RevA, RevD, and RevE devices is set forth below.

### 2. '501 Patent Claim 12

#### a. Element [1 preamble]: "A user-worn device configured to noninvasively measure a physiological parameter of a user, the user-worn device comprising:"

The preamble of '501 patent claim 1 requires "[a] user-worn device configured to non-invasively measure a physiological parameter of a user." Complainants submit that the RevA, RevD, and RevE devices meet this limitation because they are configured to measure the oxygen saturation and pulse rate of a user. CIB at 86-87; *see also* CIB at 30-35. Complainants rely on testimony from Mr. Scruggs and Mr. Muhsin describing the functionality of each of the Masimo devices. Tr. (Scruggs) at 407:22-408:4, 410:1-4, 405:8-406:11; Tr. (Muhsin) at 346:6-15. Dr. Madisetti observed a demonstration of the RevA, RevD, and RevE by Mr. Scruggs and determined that these devices each calculate oxygen saturation. Tr. (Madisetti) at 715:20-716:21; CDX-0011C.054. Mr. Al-Ali described internal testing of the oxygen saturation measurements of Masimo's prototype sensors that was presented in October 2020. Tr. (Al-Ali) at 272:16-277:13; CX-0378C at 32. He described this presentation as relating to a sensor with a design consistent with the RevA device (CPX-0052C). *See* Tr. (Al-Ali) at 270:17-22 (referencing *id*. at 260:11-25:14 (discussing CX-0375C; CPX-0052C)). He also described testing of other prototype Masimo Watch devices in early 2021. Tr. (Al-Ali) at 265:15-268:21, 276:12-278:3; CX-0433C. Mr. Al-Ali further described testing of RevE devices in June 2021. Tr. (Al-Ali) at 316:2-317:20; CX-0494C. Masimo submits that the test results for the domestic industry products show a degree of accuracy that is consistent with FDA guidance. CIB at 85 (citing CX-0269).

Apple argues that Complainants have not met their burden to show that any of the domestic industry products measure oxygen saturation. RIB at 46-52. Apple submits that Complainants failed to identify the source code in the domestic industry products that calculates any physiological parameter. *Id.* at 47-48; *see* Tr. (Sarrafzadeh) at 1124:24-1125:11. Apple's experts testified that their observations of demonstrations of the domestic industry products were insufficient to determine whether oxygen saturation or pulse rate were being measured. Tr. (Warren) at 1254:8-1256:25; Tr. (Sarrafzadeh) at 1122:20-1126:20. They further testified that certain measurements of blood oxygen relied upon by Complainants were "inconsistent" with reference measurements from another Masimo device. Tr. (Sarrafzadeh) at 1126:7-20; Tr. (Warren) at 1256:2-25; RDX-0008.149C.

With respect to the RevA and RevD sensors, Apple disputes whether these are "user-worn" devices, because the devices were produced without a strap or any other means for being worn by a user. RIB at 45-46. Complainants submit that each of these sensors includes mechanisms for attaching a strap, and Mr. Scruggs testified that they each had straps "at one point in time." Tr. (Scruggs) at 405:8-406:3, 406:23-407:18; CIB at 89.

In consideration of this evidence, the undersigned finds that Complainants have shown by a preponderance of the evidence that the RevA, RevD, and RevE devices measure blood oxygen saturation. The testimony of Masimo's witnesses is credible regarding the design and testing of these products with respect to measuring blood oxygen, and is supported by the results of the testing described in Masimo's documents. In particular, Mr. Al-Ali explicitly identified testing of blood oxygen functionality conducted in 2020 using prototype designs consistent with the RevA sensor, additional testing in the timeframe of the RevD devices in early 2021, and further testing of RevE devices in June 2021. Tr. (Al-Ali) at 260:11-25:14, 265:15-268:21, 270:17-22,

276:12-278:3, 315:16-316:18; CX-0375C; CX-0378C; CX-0433C; CX-0494C.[16] Dr. Madisetti

observed a demonstration of the RevA, RevD, and RevE by Mr. Scruggs and determined that

these devices each calculate oxygen saturation. Tr. (Madisetti) at 715:20-716:21; CDX-

0011C.054.[17] Apple's experts also attended a demonstration of the RevA, RevD, and RevE by

Mr. Scruggs, although their observations were inconclusive. Tr. (Warren) at 1254:4-1256:25;

Tr. (Sarrafzadeh) at 1122:20-1126:20; RDX-0007C.154; RX-1470; see Tr. (Warren) at 1258:9-

17 ("My opinion is that these DI articles do not implement the functionality in that's in the

claims, because I was not able to establish that they were producing physiological

parameters.").[18] The testimony of Mr. Ali-Ali regarding Masimo's internal testing, together with

Dr. Madisetti's testimony, credibly indicate that Masimo's sensors are configured to make

oxygen saturation measurements. See Tr. (Ali-Ali) at 272:16-275:12, 276:12-278:3, 318:15-22;

---

[16] This testing included a ▮▮▮▮▮▮▮▮ that, Mr. Ali-Ali explained, provided measurements "well within acceptable numbers for a hospital product." See Tr. (Ali-Ali) at 274:11-275:3. Apple argues that this testing is not clearly linked to the specific domestic industry prototypes produced, CRB at 41-42, but the timing of these testing results matches with the development of the RevA, RevD, and RevE devices, and the fact that Masimo was able to test the blood oxygen functionality of multiple prototypes during this time is strong circumstantial evidence that the RevA, RevD, and RevE devices were capable of measuring blood oxygen, particularly given the evidence that these devices were not separate products, but part of an iterative design process. See, e.g., Tr. (Scruggs) at 394:13-398:23. Moreover, as discussed infra, a domestic industry in the process of being established does not require the current existence of a physical article. Thus, this testing also strongly supports a finding that Masimo had, at the time of filing the complaint, taken necessary tangible steps to develop a product that will practice this limitation of the patent and a significant likelihood of success in doing so.

[17] Apple cites the fact that Dr. Madisetti was unable to identify the correct Masimo source code at hearing. See CRB at 33-34. This does not undercut the demonstrated evidence that Masimo tested its devices to measure blood oxygen saturation.

[18] Apple's experts identified differences in the oxygen saturation measurements of a commercially available pulse oximeter in comparison to the Masimo W1, but this post-complaint device is not being considered as part of the asserted domestic industry. See RDX-0008.149C. Moreover, the variation in the measurements appears to be consistent with FDA guidance regarding pulse oximetry—an FDA document identified by Complainants states: "For example, if an FDA-cleared pulse oximeter reads 90%, then the true oxygen saturation in the blood is generally between 86%-94%." CX-0269 (FDA Safety Communication) at 4.

CX-0378C at 32; CX-0494C; Tr. (Madisetti) at 715:20-716:20; CDX-0011C.054.  The evidence of record is sufficient to show, by a preponderance, that the RevA, RevD, and RevE sensors measure blood oxygen.

With respect to the "user-worn" limitation, there is no dispute that the RevE sensors have straps that allow these devices to be worn.  *See* Tr. (Scruggs) at 408:20-409:14; CPX-0019C; CPX-0020C; CPX-0065C.  The RevA and RevD sensors produced in discovery do not have straps, but these devices have attachment mechanisms for a strap, and Mr. Scruggs testified that these devices had straps "at one point in time."  Tr. (Scruggs) at 405:8-406:3, 406:23-407:18, 460:13-17.  Moreover, as discussed above, Mr. Al-Ali described testing relating to the Masimo's RevA and RevD sensors in the fall of 2020 and early 2021.  Tr. (Al-Ali) at 260:11-25:14, 265:15-268:21, 270:17-22, 276:12-278:3.  His description of this testing suggests that the devices were "user-worn."  *See Id*. at 278:5-13 (describing placement of devices on user's wrist).[19]  The evidence is sufficient to show, by a preponderance, that the RevA, RevD, and RevE sensors meet the "user-worn" limitation.

Accordingly, a preponderance of the evidence of record shows that the RevA, RevD, and RevE sensors meet the limitations of the preamble of '501 patent claim 1.

**b.     Element [1A]: "at least three light emitting diodes (LEDs)"**

There is no dispute that the RevA, RevD, and RevE devices each contain a sensor module with at least three LEDs.  *See* CIB at 89-91; RIB at 45-54.  Dr. Madisetti identified two clusters of LEDs in each of these devices, with each cluster containing four or five LEDs.  Tr. (Madisetti) at 711:14-712:4, 712:20-713:15; CDX-0011C.09 (citing CX-1111C (RevA CAD); CX-1124C

---

[19] The testing data for the sensor consistent with the RevA device includes "Motion Analysis," including "Walking/Running."  CX-0378C at 27.

(RevD CAD); CX-1125C (RevE CAD); *see* CPX-0052C (RevA); CPX-0058C (Rev D); CPX-0019C, CPX-0020C, CPX-0065C (RevE).  The evidence of record shows that this limitation is met by the RevA, RevD, and RevE devices.

> **c.    Element [1B]: "at least three photodiodes arranged on an interior surface of the user-worn device and configured to receive light attenuated by tissue of the user"**

Dr. Madisetti identified at least three photodiodes on an interior surface in each of the RevA, RevD, and RevE devices.  Tr. (Madisetti) at 712:5-19.  He relied on photographs and schematics of the devices to identify the photodiodes.  *Id.*; CDX-0011C.050 (for RevA citing CPX-0052C; CX-0661C (photo)); CX-0473C (schematic) at 1, 3; CX-1111C (CAD) at 3, 5, 6; for RevD citing CPX-0058C; CX-0389C (schematic) at 1, 3; CX-1124C (CAD) at 3-4, 8; for RevE citing CPX-0019C, CPX-0020C, CPX-0065C; CX-0653C, CX-0655C, CX-0676C (photos); CX-0390C (schematic) at 1, 3; CX-1125C (CAD) at 2, 6, 7); *see generally* CIB at 91-92.

Apple argues that the evidence produced by Complainants is insufficient to show that these devices each have at least three photodiodes, because these elements are not visible from the outside of the devices and the schematics and technical drawings are allegedly unreliable.  RIB at 52-54.  Mr. Scruggs admitted that there were certain discrepancies between Masimo's CAD files and the actual RevA, RevD, and RevE sensors, recognizing that the devices represented "what we were able to manufacture at the time."  RX-1209C (Scruggs Dep. Tr.) at 91:18-92:24; *see also* Tr. (Scruggs) at 465:2-467:18 (confirming "there are some differences" between the CAD files and the prototype products).  Dr. Warren was unable to confirm whether the devices had photodiodes through a visual inspection.  Tr. (Warren) at 1259:12-23.

In consideration of the parties' arguments, the undersigned finds that Complainants have shown by a preponderance of the evidence that the RevA, RevD, and RevE devices each have at least three photodiodes meeting this claim limitation. Although there are some discrepancies between the physical prototypes and Masimo's schematics and technical drawings, there is no evidence that the layout of the photodiodes is inaccurate. Mr. Scruggs testified that "the essential meat and potatoes stuff, like the sensor, it's very accurately reflected" by the CAD drawings, because "that's very important for the devices." Tr. (Scruggs) at 467:2-7, 477:9-478:8; *see also* Tr. (Al-Ali) at 313:144-314:7 (confirming the accuracy of the CAD drawings for the RevE sensors).

Accordingly, the evidence shows, by a preponderance, that each of the RevA, RevD, and RevE devices meet the "at least three photodiodes" limitation of '501 patent claim 1.

>    **d.    Element [1C]: "a protrusion arranged over the interior surface, the protrusion comprising a convex surface"**

There is no dispute that the RevA, RevD, and RevE devices each contain a convex protrusion. *See* CIB at 92-93. Dr. Madisetti identified convex protrusions in each of these devices, relying on photographs and the physical devices. Tr. (Madisetti) at 713:16-714:7; CDX-0011C.051 (citing CX-0813C (RevA); CX-0815C (RevD); CX-0812C (RevE); *see* CPX-0052C (RevA); CPX-0058C (Rev D); CPX-0019C, CPX-0020C, CPX-0065C (RevE). The evidence of record shows that this limitation is met by the RevA, RevD, and RevE devices.

>    **e.    Element [1D]: "a plurality of openings extending through the protrusion and positioned over the three photodiodes"**

In the convex protrusion of the RevA, RevD, and RevE devices, Dr. Madisetti identified openings with transparent windows, relying on technical drawings and the physical devices. Tr. (Madisetti) at 714:8-24; CDX-0011C.052 (citing CX-1111C (RevA); CX-1124C (RevD); CX-

1125C (RevE)); *see* CPX-0052C (RevA); CPX-0058C (Rev D); CPX-0019C, CPX-0020C,

CPX-0065C (RevE); CIB at 93-95. Apple argues that these features are not "openings,"

referencing its non-infringement arguments for this limitation. RRB at 43. This argument is

inconsistent with the claim construction for "openings" adopted above, and accordingly, the

evidence shows that the RevA, RevD, and RevE devices meet the plurality of openings"

limitation of '501 patent claim 1.

    f.  **Element [1E]: "the openings each comprising an opaque lateral surface, the plurality of openings configured to allow light to reach the photodiodes, the opaque lateral surface configured to avoid light piping through the protrusion"**

  Mr. Scruggs described a "light barrier" present in the RevA, RevD, and RevE devices

that is a "black feature that surrounds the emitters so it separates the LEDs from the

photodiodes." Tr. (Scruggs) at 400:3-24; CDX-005C.002. He explained that the light barrier

was configured "so that light would travel only into the skin and . . . to minimize light traveling

within the sensor." *Id.* Dr. Madisetti identified these features in technical drawings for the

RevA, RevD, and RevE devices and testified that these were opaque lateral surfaces configured

to allow light to reach the photodiodes and to avoid light piping through the protrusion. Tr.

(Madisetti) at 714:25-19; CDX-0011C.053 (citing CX-1111C (RevA); CX-1124C (RevD); CX-

1125C (RevE)).

  Apple argues that the evidence produced by Complainants is insufficient to show that

these devices have the claimed opaque lateral surfaces, because these features are not visible

from the outside of the devices, and the schematics and technical drawings are allegedly

unreliable. RIB at 52-54; RRB at 43-44. For the same reasons discussed above in the context of

the "at least three photodiodes" limitation, Complainants have shown by a preponderance of the

evidence that the RevA, RevD, and RevE devices each have opaque lateral surfaces meeting this

claim limitation. The undersigned finds Mr. Scruggs's testimony regarding these features to be credible and Masimo's CAD drawings to be reliable with respect to these features.

Accordingly, the evidence shows by a preponderance that each of the RevA, RevD, and RevE devices meet the "opaque lateral surface" limitation of '501 patent claim 1.

> g.    **Element [1F]: "one or more processors configured to receive one or more signals from the photodiodes and calculate a measurement of the physiological parameter of the user"**

Dr. Madisetti identifies processors in the RevA, RevD, and RevE devices that receive signals from photodiodes and calculate oxygen saturation. Tr. (Madisetti) at 715:20-716:21. Dr. Madisetti relies on documentation for each of these products. *Id.*; CDX-0011C.054 (for RevA: CX-0701C at 2, CPX-012C, and CX-0836C at 4; for RevD: CX-0710C at 2-3, CX-1062C at 48, and CX-1074C; for RevE: CX-0705C at 2-3, CX-1062C at 30, 35). Mr. Scruggs described the measurement of oxygen saturation and pulse rate in each iteration of the Masimo Watch. Tr. (Scruggs) at 393:17-394:3. He described the sensor board of the RevA device including two processors on the sensor board responsible for calculating the pulse oximetry measurement. *Id.* at 406:4-11. He also identified two processors on the sensor board of the RevD device. *Id.* at 408:11-19.

As discussed above in the context of the preamble, Apple argues that Complainants have not met their burden to show that any of the domestic industry products measure oxygen saturation. RIB at 46-52. For the reasons discussed above, however, the undersigned finds that Complainants have met their burden to show, by a preponderance, that the RevA, RevD, and RevE devices calculate oxygen saturation. The record evidence further shows, by a preponderance, that the RevA, RevD, and RevE each contain processors for receiving signals from the photodiodes and calculating oxygen saturation.

Accordingly, the evidence shows that each of the RevA, RevD, and RevE devices meet the "one or more processors" limitation of '501 patent claim 1.

### h. Element [12]: "wherein the convex surface of the protrusion is an outermost surface configured to contact the tissue of the user and conform the tissue into a concave shape"

Claim 12 of the '501 patent depends from claim 1, further requiring that "the convex surface of the protrusion is an outermost surface configured to contact the tissue of the user and conform the tissue into a concave shape." There is no dispute that this limitation is practiced by the RevA, RevD, and RevE devices. *See* CIB at 102. As discussed above, Dr. Madisetti identified a convex protrusion in these products, and his analysis confirms that the protrusion is designed to contact a user's wrist and conform the skin into a concave shape. *See* Tr. (Madisetti) at 716:24-717:13; CDX-0011C.055 (citing CX-0813C (RevA); CX-0815C (RevD); CX-0812C (RevE)).

*** 

Accordingly, because each limitation of claims 1 and 12 are satisfied by a preponderance of the evidence, the undersigned finds that the RevA, RevD, and RevE devices practice claim 12 of the '501 patent.

### 3. '502 Patent Claim 28

### a. Element [28 preamble]: "A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user worn device comprising:"

The preamble of '502 patent claim 28 requires "[a] user-worn device configured to non-invasively measure an oxygen saturation of a user." The parties' disputes with respect to this preamble are the same as those addressed above in the context of the preamble of '501 patent claim 1. *See* CIB at 102; RIB at 54. As discussed above in the context of the preamble of '501

CONFIDENTIAL INFORMATION REDACTED

patent claim 1, Complainants have shown by a preponderance of the evidence that the RevD and

RevE devices are user-worn devices that measure blood oxygen saturation, meeting the

limitations of the preamble of '502 patent claim 28.[20]

> **b.    Element [28A]: "a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength"**

There is no dispute that the RevD and RevE devices contain LEDs, as discussed above in

the context of the "LEDs" limitation of '501 patent claim 1. *See* CIB at 103. Dr. Madisetti

identified two clusters of LEDs in each of these devices, with each cluster containing four or five

LEDs. Tr. (Madisetti) at 711:14-712:4, 712:20-713:15; CDX-0011C.09 (citing CX-1111C

(RevA CAD); CX-1124C (RevD CAD); CX-1125C (RevE CAD); CX-1128C (Masimo W1

CAD); *see* CPX-0052C (RevA); CPX-0058C (Rev D); CPX-0019C, CPX-0020C, CPX-0065C

(RevE)). Complainants rely on the testimony of Mr. Scruggs with respect to the wavelengths of

light in these LEDs, identifying clusters of four LEDs in the RevD and RevE devices with

wavelengths of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Tr. (Scruggs) at 406:23-407:18, 408:20-

409:14. Apple argues that Dr. Madisetti did not identify any evidence of these wavelengths and

that the arrangement of the LEDs could not be confirmed by a visual inspection, RIB at 55, but

Mr. Scruggs's testimony and Masimo's schematics are sufficient to show, by a preponderance,

that the RevD and RevE devices meet this limitation of '502 patent claim 28.

---

[20] Complainants do not assert that the RevA device practices claim 28 of the '502 patent. *See* CIB at 102-112.

c.    **Element [28B]: "a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength"**

As discussed above in the context of the "LEDs" limitation of '501 patent claim 1 and the "first set of LEDs" limitation of '502 patent claim 28, the evidence shows that the RevD and RevE devices each have two separate clusters of LEDs, and Mr. Scruggs described these clusters as having the same sets of wavelengths. *See* Tr. (Scruggs) at 406:23-407:18, 408:20-409:14, 410:5-24. Accordingly, the evidence shows, by a preponderance, that the RevD and RevE devices meet the "second set of LEDs" limitation of '502 patent claim 28.

d.    **Element [28C]: "four photodiodes arranged in a quadrant configuration on an interior surface of the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user"**

With respect to the "four photodiodes" limitation of '502 patent claim 28, Complainants rely on the same evidence discussed above in the context of the "at least three photodiodes" limitation of '501 patent claim 1. *See* CIB at 103-04. Complainants identify a "quadrant configuration" in schematics of these products that were reviewed by Dr. Madisetti. *Id.* (citing CDX-0011C.050; CX-1111C; CX-1124C; CX-1125C; CX-1128C). Apple argues that Complainants' evidence with respect to this limitation is unreliable, *see* RIB at 54-55, but for the same reasons discussed above in the context of the "at least three photodiodes" limitation of '501 patent claim 1, the undersigned finds that Complainants have shown by a preponderance of the evidence that the RevD and RevE devices each have four photodiodes arranged in a quadrant configuration that meet this claim limitation.

e.    **Element [28D]: "a thermistor configured to provide a temperature signal"**

Dr. Madisetti identified thermistors in the RevD and RevE devices, relying on schematics and technical drawings.  Tr. (Madisetti) at 720:21-721:5; CDX-0011C.059 (for RevD citing CX-1124C (CAD) at 3, 8; CX-0536C (schematic) at 1, 3; CX-0710C (schematic) at 3, 7; for RevE citing CX-1125C (CAD) at 2, 7; CX-0705C (schematic) at 3, 7; CX-0390C (schematic) at 3).  Mr. Scruggs identified two thermistors in the RevD and RevE devices.  Tr. (Scruggs) at 406:23-407:18 (RevD), 408:20-409:14 (RevE); *see generally* CIB at 104-106.

Apple argues that the evidence produced by Complainants is insufficient to show that these devices have the claimed thermistors, because these features are not visible from the outside of the devices, and the schematics and technical drawings are allegedly unreliable.  RIB at 54-55.  For the same reasons discussed above in the context of the photodiode limitations of '501 patent claim 1, the undersigned finds Mr. Scruggs's testimony regarding these features to be credible and Masimo's CAD drawings to be reliable with respect to these features.

Accordingly, the undersigned finds that each of the RevD and RevE devices meet the "thermistor" limitation of '502 patent claim 28.

f.    **Element [28E]: "a protrusion arranged above the interior surface, the protrusion comprising: a convex surface"**

There is no dispute that each of the RevD and RevE devices contain a protrusion comprising a convex surface that is arranged above the interior surface, as discussed above in the context of the "protrusion" limitation of '501 patent claim 1.  *See* CIB at 106.  The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

g.    **Element [28F]: "a plurality of openings in the convex surface, extending through the protrusion, and aligned with the four photodiodes, each opening defined by an opaque surface configured to reduce light piping"**

There is no dispute that each of the RevD and RevE devices have a "plurality of openings" extending through the protrusion and aligned with the photodiodes, as discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1, and these openings are defined by opaque surfaces, as discussed above in the context of the "opaque lateral surface" limitation of '501 patent claim 1. *See* CIB at 106. The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

h.    **Element [28G]: "a plurality of transmissive windows, each of the transmissive windows extending across a different one of the openings"**

There is no dispute that each of the RevD and RevE devices have a "plurality of transmissive windows," as discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1. *See* CIB at 106-07. The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

i.    **Element [28H]: "at least one opaque wall extending between the interior surface and the protrusion, wherein at least the interior surface, the opaque wall and the protrusion form cavities, wherein the photodiodes are arranged on the interior surface within the cavities"**

There is no dispute that each of the RevD and RevE devices contain an opaque wall between the interior surface and the protrusion, as discussed above in the context of the "opaque lateral surface" limitation of '501 patent claim 1. *See* CIB at 107-08. Dr. Madisetti further identifies cavities formed by the opaque wall and the protrusion, relying on schematics and technical drawings. Tr. (Madisetti) at 721:6-25; CDX-0011C.060 (for RevD citing CX-1124C (CAD); CX-0666C (schematic); for RevE citing CX-1125C (CAD); CX-1038C (schematic)).

72

The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

> **j.**   **Element [28I]: "one or more processors configured to receive one or more signals from at least one of the photodiodes and calculate an oxygen saturation measurement of the user, the one or more processors further configured to receive the temperature signal"**

There is no dispute that each of the RevD and RevE devices contain processors that receive signals from the photodiodes, as discussed above in the context of the "processors" limitation of '501 patent claim 1. *See* CIB at 108. Apple disputes whether these processors calculate oxygen saturation, RIB at 54, but as discussed above in the context of the preamble of the '501 patent claim 1, a preponderance of the evidence shows that the RevD and RevE devices measure and calculate oxygen saturation. Moreover, there is no dispute that the processors receive a temperature signal, as discussed above in the context of the "thermistor" limitation. *See id.* at 104-108. The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

> **k.**   **Element [28J]: "a network interface configured to wirelessly communicate the oxygen saturation measurement to at least one of a mobile phone or an electronic network"**

There is no dispute that the RevD and RevE devices contain network interfaces that can communicate with a mobile device via Bluetooth. *See* CIB at 108-110. Dr. Madisetti identified evidence that these devices have a network interface. Tr. (Madisetti) at 722:1-24; CDX-0011C.061 (citing CX-0709C (RevD and RevE sensor board schematic); CX-0836C (RevE demonstration photographs) at 9, 12, 13). Mr. Scruggs described the wireless communication capability of the RevD and RevE devices. Tr. (Scruggs) at 406:23-407:18, 408:20-409:14. The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

l.    **Element [28K]: "a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the oxygen saturation measurement of the user"**

There is no dispute that the RevD and RevE devices have a touch-screen display that shows oxygen saturation measurements. *See* CIB at 111. Dr. Madisetti identified evidence that these devices have touch-screen displays that can show an SpO2 measurement. Tr. (Madisetti) at 722:1-24; CDX-0011C.061 (citing CPX-058C (RevD device); CX-1062C (photographs); CPX-019C, CPX-020C, CPX-065C (RevE devices); CX-1068C, CX-1069C, CX-1072C (RevE device videos)). The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

m.    **Element [28L]: "a storage device configured to at least temporarily store at least the measurement"**

There is no dispute that the RevD and RevE devices store the blood oxygen measurement in memory. *See* CIB at 111. Dr. Madisetti identified evidence that these devices have memory to store the SpO2 measurement. Tr. (Madisetti) at 722:1-24; CDX-001C.061 (citing CX-0709C (RevD and RevE sensor board schematic)). The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

n.    **Element [28M]: "a strap configured to position the user-worn device on the user"**

There is no dispute that the RevE have straps for a user's wrist. *See* CIB at 112; CPX-019C, CPX-020C, CPX-065C. With respect to the RevD device, Complainants identify a mechanism for attaching a strap and rely on Mr. Scruggs's testimony that it had a strap "at some point." *See* Tr. (Scruggs) at 406:23-407:18. As discussed above in the context of the preamble of '501 patent claim 1, the undersigned finds that a preponderance of the evidence shows that the RevD device also had a strap.

***

Accordingly, because each limitation of the claim is satisfied, the undersigned finds that

the RevD and RevE products practice claim 28 of the '502 patent.

### 4.    '648 Patent Claim 12

#### a.    Element [8 preamble]: "A user-worn device configured to non-invasively determine measurements of a physiological parameter of a user, the user-worn device comprising:"

The preamble of '648 patent claim 8 requires "[a] user-worn device configured to non-

invasively determine measurements of a physiological parameter of a user."  The parties'

disputes with respect to this preamble are the same as those addressed above in the context of the

preamble of '501 patent claim 1.  *See* CIB at 112; RIB at 55-56.  As discussed above in the

context of the preamble of '501 patent claim 1, the undersigned finds that Complainants have

shown by a preponderance of the evidence that the RevA, RevD, and RevE devices are user-

worn devices that measure blood oxygen saturation, meeting the limitations of the preamble of

'502 patent claim 28.

#### b.    Element [8A]: "a first set of light emitting diodes (LEDs), the first set comprising at least an LED configured to emit light at a first wavelength and at least an LED configured to emit light at a second wavelength"

There is no dispute that the RevA, RevD, and RevE devices each contain LEDs, as

discussed above in the context of the "LEDs" limitation of '501 patent claim 1.  *See* CIB at 112-

13.  Apple disputes whether the LEDs meet each of these limitations, *see* RIB at 56, but as

discussed in the context of the "first set of LEDs" limitation of '502 patent claim 28, the

evidence shows that the LEDs are arranged in clusters in the RevD and RevE devices and have a

first and second wavelength.  In addition, the evidence shows that the LEDs in the RevA device

have wavelengths that are the same as the RevD and RevE devices, as discussed by Mr. Scruggs. *See* Tr. (Scruggs) at 405:8-406:3.

          c.      **Element [8B]: "a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength"**

There is no dispute that the RevA, RevD, and RevE devices each contain clusters of LEDs, as discussed above in the context of the "LEDs" limitation of '501 patent claim 1. *See* CIB at 112-13. Moreover, the undersigned finds that there is a second set of LEDs in the RevD and RevE devices meeting his limitation, as discussed in the context of the "second set of LEDs" limitation of '502 patent claim 28. *See* CIB at 113. In addition, the evidence shows that there is a second set of LEDs in the RevA device with the same wavelengths as the first set, as discussed by Mr. Scruggs. *See* Tr. (Scruggs) at 405:8-406:3.

          d.      **Element [8C]: "four photodiodes"**

Complainants identify four photodiodes in each of the RevA, RevD, and RevE devices, citing the same evidence discussed above in the context of the "photodiodes" limitation of '501 patent claim 1. *See* CIB at 113. Apple disputes whether the evidence is sufficient to show the presence of these photodiodes, *see* RIB at 56, but the evidence shows, by a preponderance, that the RevA, RevD, and RevE devices each contain four photodiodes, for the reasons discussed above in the context of the "photodiodes" limitation of '501 patent claim 1.

          e.      **Element [8D]: "a protrusion comprising a convex surface, at least a portion of the protrusion comprising an opaque material"**

There is no dispute that the RevA, RevD, and RevE devices each contain a protrusion comprising a convex surface, which includes a portion with opaque material, as discussed above in the context of the "protrusion" and "openings" limitations of '501 patent claim 1. *See* CIB at

113. The evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

        **f.**      **Element [8E]: "a plurality of openings provided through the protrusion and the convex surface, the openings aligned with the photodiodes"**

Complainants identify a "plurality of openings" in the RevA, RevD, and RevE devices, citing the same evidence discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1. *See* CIB at 113. Apple disputes this limitation based on its erroneous construction for the term "openings." *See* RRB at 46. As discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1, the evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

        **g.**      **Element [8F]: "a separate optically transparent window extending across each of the openings"**

There is no dispute that the RevA, RevD, and RevE devices each contain optically transparent windows extending across each of the identified openings, as discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1. *See* CIB at 113-14. The evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

        **h.**      **Element [8G]: "one or more processors configured to receive one or more signals from at least one of the photodiodes and output measurements of a physiological parameter of a user"**

There is no dispute that the RevA, RevD, and RevE devices each contain processors that receive signals from the photodiodes, as discussed above in the context of the "processors" limitation of '501 patent claim 1. *See* CIB at 114. Apple disputes whether these processors calculate oxygen saturation, RIB at 56, but as discussed above in the context of the preamble of the '501 patent claim 1, a preponderance of the evidence shows that the RevA, RevD, and RevE

devices measure and calculate oxygen saturation. The evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

### i.    Element [8H]: "a housing"

There is no dispute that the RevA, RevD, and RevE devices each have a housing. *See* CIB at 114-15. Dr. Madisetti identified photographs of the housing for the RevA, RevD, and RevE devices. Tr. (Madisetti) at 725:19-726:1; CDX-0011C.066 (citing CX-0661C; CX-1058C; CX-1415C; CX-0784C); *see also* CPX-052C; CPX-058C; CPX-019C; CPX-020C; CPX-065C. Mr. Scruggs also testified that the RevA, RevD, and RevE devices each have a housing. Tr. (Scruggs) at 405:8-06:3, 406:23-407:18, 408:20-409:14. The evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

### j.    Element [8I]: "a strap configured to position the housing proximate tissue of the user when the device is worn"

There is no dispute that the RevE devices have straps for a user's wrist. *See* CIB at 115; CPX-019C, CPX-020C, CPX-065C. In addition, as discussed above in the context of the preamble of '501 patent claim 1, the undersigned finds that the record evidence is sufficient to find that the RevA and RevD devices had straps.

### k.    Element [12]: "the physiological parameter comprises oxygen or oxygen saturation"

Claim 12 of the '648 patent depends from claim 8 and requires that "the physiological parameter comprises oxygen or oxygen saturation." There is no dispute with respect to this limitation, except to the extent that Apple disputes the satisfaction of the preamble limitation regarding the measurement of a physiological parameter. *See* CIB at 115; RIB at 56. The undersigned finds that the RevA, RevD, and RevE devices are configured to determine

measurements of blood oxygen for the same reasons discussed above in the context of the preamble and the "physiological parameter" limitation of '501 patent claim 1.

***

Accordingly, because each limitation of the claim is satisfied, the undersigned finds that the RevA, RevD, and RevE devices practice claim 12 of the '648 patent.

### 5.     '648 Patent Claim 24

#### a.     Element [20 preamble]: "A user-worn device configured to non-invasively determine measurements of a user's tissue, the user-worn device comprising:"

The preamble of '648 patent claim 20 requires "[a] user-worn device configured to non-invasively determine measurements of a user's tissue." The parties' disputes with respect to this preamble are the same as those addressed above in the context of the preamble of '501 patent claim 1. *See* CIB at 115; RIB at 55-56. As discussed above in the context of the preamble of '501 patent claim 1, Complainants have shown by a preponderance of the evidence that the RevA, RevD, and RevE devices are user-worn devices that measure blood oxygen saturation, meeting the limitations of the preamble of '648 patent claim 20.

#### b.     Element [20A]: "a plurality of light emitting diodes (LEDs)"

There is no dispute that the RevA, RevD, and RevE devices each contain LEDs, as discussed above in the context of the "LEDs" limitation of '501 patent claim 1. *See* CIB at 115.

#### c.     Element [20B]: "at least four photodiodes configured to receive light emitted by the LEDs, the four photodiodes being arranged to capture light at different quadrants of tissue of a user"

With respect to the "four photodiodes" limitation of '648 patent claim 20, Complainants rely on the same evidence discussed above in the context of the "four photodiodes" limitation of '502 patent claim 28 for the RevD and RevE devices. *See* CIB at 115-16. Complainants further

submit that the RevA has four photodiodes arranged in a quadrant configuration, citing a photograph and technical drawings. *See* CX-0661C (photo); CX-0473C (schematic) at 1, 3; CX-1111C (CAD). Apple argues that Complainants' evidence with respect to this limitation is unreliable, *see* CIB at 56, but for the same reasons discussed above in the context of the "at least three photodiodes" limitation of '501 patent claim 1, Complainants have shown by a preponderance of the evidence that the RevA, RevD, and RevE devices each have four photodiodes arranged in a quadrant configuration that meet this claim limitation.

> d.      **Element [20C]: "a protrusion comprising a convex surface"**

There is no dispute that the RevA, RevD, and RevE devices each contain a protrusion comprising a convex surface, which includes a portion with opaque material, as discussed above in the context of the "protrusion" limitation of '501 patent claim 1. *See* CIB at 116. The evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

> e.      **Element [20D]: "a plurality of through holes, each through hole including a window and arranged over a different one of the at least four photodiodes"**

Complainants identify "through holes" in the RevA, RevD, and RevE devices, citing the same evidence discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1. *See* CIB at 116. Apple disputes this limitation based on its erroneous construction for the term "openings." *See* RRB at 46. As discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1, the evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

f.    **Element [20E]: "one or more processors configured to receive one or more signals from at least one of the photodiodes and determine measurements of oxygen saturation of the user"**

There is no dispute that the RevA, RevD, and RevE devices each contain processors that receive signals from the photodiodes, as discussed above in the context of the "processors" limitation of '501 patent claim 1. *See* CIB at 116-17. Apple disputes whether these processors calculate oxygen saturation, RIB at 56, but as discussed above in the context of the preamble of the '501 patent claim 1, a preponderance of the evidence shows that the RevA, RevD, and RevE devices measure and calculate oxygen saturation. The evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

g.    **Element [24]: "wherein the protrusion comprises opaque material configured to substantially prevent light piping"**

Claim 24 of the '648 patent depends from claim 20, further requiring that "the protrusion comprises opaque material configured to substantially prevent light piping." There is no dispute that the identified protrusion in the RevA, RevD, and RevE devices meets this limitation, as discussed above in the context of the "opaque lateral surface" limitation of '501 patent claim 1. *See* CIB at 117.

\*\*\*

Accordingly, because each of the limitations of claims 20 and 24 are satisfied, the undersigned finds that the RevA, RevD, and RevE devices practice claim 24 of the '648 patent.

**6.    '648 Patent Claim 30**

Claim 30 of the '648 patent depends from claim 20, further requiring that "the protrusion further comprises one or more chamfered edges." There is no dispute that the identified protrusions in the RevA, RevD, and RevE devices have chamfered edges. *See* CIB at 117. Dr. Madisetti identified chamfered edges on engineering drawings for the RevA, RevD, and

RevE. Tr. (Madisetti) at 726:2-14; CDX-0011C.067 (citing CX-1111C (RevA); CX-1124C (RevD); CX-1125C (RevE)).

***

Accordingly, because each of the limitations of claims 20 and 30 are satisfied, the undersigned finds that the RevA, RevD, and RevE devices practice claim 30 of the '648 patent.

### 7.    Domestic Industry Existing at the Time of the Complaint

Apple argues that no patent-practicing domestic industry article existed at the time of the complaint. RIB at 42-45; RRB at 12-14. Complainants dispute Apple's contentions. CRB at 30-32. As discussed above, Complainants have shown by a preponderance of the evidence that the RevA, RevD, and RevE devices practice claim 12 of the '501 patent and claims 12, 24, and 30 of the '648 patent, and that the RevD and RevE devices also practice claim 28 of the '502 patent.

With respect to a domestic industry that is alleged to exist at the time of the complaint, the Commission has held that a domestic industry article must exist at that time. *See Thermoplastic-Encapsulated Electric Motors*, Comm'n Op. at 9, EDIS Doc. ID 684974 ("Both Federal Circuit law and Commission precedent require the existence of actual 'articles protected by the patent' in order to find that a domestic industry exists.") (citing *Microsoft Corp. v. Int'l Trade Comm'n*, 731 F.3d 1354 (Fed. Cir. 2013) ("[a] company seeking section 337 protection must . . . provide evidence that . . . relates to an actual article that practices the patent")); *id.* at 10 (finding that no domestic industry "exists" relating to the articles protected by the patent where evidence failed to show "the presence of an article protected by the patent at the time of the complaint").

In consideration of the parties' arguments, the undersigned finds that the RevA, RevD, and RevE devices have been shown to be articles protected by claims of the Poeze patents existing at the time of the complaint. As discussed *supra*, although the RevA and RevD devices were produced in discovery without a strap, a preponderance of the evidence shows that these devices were user-worn devices before the filing of the complaint. *See* Tr. (Scruggs) at 405:8-406:3, 406:23-407:18, 460:13-17; Tr. (Al-Ali) at 260:11-25:14, 265:15-268:21, 270:17-22, 276:12-278:3; CX-0378C at 27.

Apple further argues that the laptop Mr. Scruggs used to display the oxygen saturation measurement from the RevA sensor during discovery was not used with this sensor before the filing of the complaint, RIB at 43-44, but this laptop is not part of the domestic industry article protected by the identified claims of the Poeze patents (Complainants do not assert that the RevA practices claim 22 of the '502 patent, which requires a display). *See* CRB at 30-31. Mr. Scruggs's laptop was part of the demonstration showing that the RevA sensor was configured as required by the claims, *see* Tr. (Madisetti) at 757:16-23; CX-0836C (demonstration photos) at 4, but the laptop is not part of the domestic industry article—the RevA had the required configuration even in the absence of the laptop.[21]

With respect to the RevD sensor, Apple argues that software was loaded on this device on July 30, 2021, after the complaint was filed. RIB at 42-43; *see* Tr. (Scruggs) at 459:4-460:7; Tr. (Sarrafzadeh) at 1121:9-24; RX-1183C.0035-39. As discussed above, however, Mr. Al-Ali described testing of RevD sensors in early 2021—before the filing of the complaint. Tr. (Al-Ali)

---

[21] As described by Mr. Al-Ali, an October 2020 presentation describes internal testing of the oxygen saturation measurements of prototype sensors consistent with the RevA design. Tr. (Al-Ali) at 272:16-277:13; CX-0378C at 32.

at 276:17-278:13. A preponderance of the evidence thus shows that the RevD existed prior to the complaint.[22]

With respect to the RevE devices, Apple argues that the software installed on these devices has a "known date" of July 9, 2021, and this software was loaded on these devices in September and October 2021. *See* RIB at 42-43; Tr. (Scruggs) at 457:12-25, 458:1-459:2, 460:23-461:16; Tr. (Sarrafzadeh) at 1121:9-24; RX-1183C.0035-39. At the hearing, Mr. Scruggs could not specifically identify a date when the RevE devices were made, stating that they were "built between May and September 2021," a range of dates that includes the date the complaint was filed. Tr. (Scruggs) at 398:20-23; *see id.* at 458:1-459:3 (admitting that CPX-0020C was created in September 2021). The evidence shows that at least one of the RevE devices produced (CPX-0019C) existed at the time of the complaint—the evidence shows that software was loaded on this device on July 9, 2021,[23] which pre-dates the filing date of the amended complaint, July 12, 2021, as recognized in the Commission's Notice of Institution. 86 Fed. Reg. 46275.[24] Moreover, Mr. Al-Ali described testing of RevE devices (though not the

---

[22] Apple's arguments focus on the physical devices produced in discovery, *e.g.*, CPX-0058C, which were loaded with specific software, but the circumstantial evidence regarding testing shows, by a preponderance of the evidence, that prototype devices with designs that are consistent with the asserted domestic industry products were operational before the filing of the complaint and subject to testing. *See* Tr. (Ali-Ali) at 272:16-275:12, 276:12-278:3, 318:15-22; CX-0378C at 32; CX-0494C; n.16 *supra*.

[23] Complainants acknowledge that these devices were altered after the filing of the complaint with "different firmware versions prior to and subsequent to that version for development," but have represented that the July 9 version of the software was restored in October 2021. *See* RX-1183C.0037-.0039; Tr. (Scruggs) at 457:9-21 (software was installed on physical 19 on July 9, 2021).

[24] The original complaint was filed on June 30, 2021, with a redacted public version of an amended complaint filed July 7, 2021, a full confidential version of the amended complaint filed on July 12, 2021, and a supplement to the complaint filed on July 19, 2021. *See* EDIS Doc. ID 745713, 746186, 746514, 747244. *See In re Samsung Electronics Co., Ltd.*, 2 F.4th 1371, 1376 (Fed. Cir. 2021) (amended complaints supersede the original complaint); *Nolen v. Lufkin Indus., Inc.*, 466 Fed. Appx. 895, 898 (Fed. Cir. 2012) ("Generally, an amended pleading supersedes the original for all purposes").

specific devices produced) in June 2021.  Tr. (Al-Ali) at 316:2-317:20 (citing CX-0494C and explaining "that data was collected on June 29th).  This record is sufficient to show, by a preponderance of the evidence, that RevE devices existed and practiced asserted claims of Poeze patents at the time the complaint was filed.

* * *

Accordingly, Complainants have shown that the technical prong of the domestic industry requirement is satisfied with respect to a domestic industry existing at the time of the complaint for the Poeze patents.

### 8.    Domestic Industry in the Process of Being Established

Complainants have separately alleged that there is a domestic industry in the process of being established.  CIB at 305-09; *see* Amended Complaint ¶ 86.  In *Certain Stringed Musical Instruments & Components Thereof* ("*Stringed Instruments*"), the Commission held that a domestic industry is in the process of being established when (1) a complainant takes "the necessary tangible steps to establish such an industry in the United States," and (2) there is a "significant likelihood that the industry requirement will be satisfied in the future."  Inv. No. 337-TA-586, Comm'n Op. at 14-17, EDIS Doc. ID 300615 (May 16, 2008).  The Commission recently declined to adopt an ID's finding that a currently existing article must exist at the time of the complaint to show a domestic industry in the process of being established.  *Certain Televisions, Remote Controls, and Components Thereof*, Comm'n Op., Inv. No. 337-TA-1263, 2022 WL 17486245, at *15 (Nov. 30, 2022) ("The Commission, however, does not adopt the ID's finding that a currently existing physical article must exist at the time of the complaint filing to show a domestic industry in the process of being established.").  The Commission further found that a domestic industry in the process of being established had not been shown because

the record lacked sufficient evidence of a future physical article that would practice the patent. *See id.* (Roku failed to produce "sufficient evidence of how . . . [the] domestic industry device . . . *will operate* so as to allow the parties to probe in discovery, and the Commission to make a determination, as to whether Gazelle *will practice* the '875 patent") (emphasis added).[25] The Commission's discussion indicates that a physical article practicing the patent need not yet exist to prove a "process of being established claim."[26]

Following this guidance, the evidence of record shows, by a preponderance, that the technical prong of the domestic industry requirement is satisfied based on an industry in the process of being established. As discussed *supra*, the evidence shows that the RevA device practices claim 12 of the '501 patent and claims 12, 24, and 30 of the '648 patent. Similarly, the RevD and RevE devices meet all of the limitations of claim 12 of the '501 patent, claim 28 of the '502 patent, and claims 12, 24, and 30 of the '648 patent.

Even if certain of the Masimo Watch prototypes were missing limitations of the Poeze patents, *e.g.*, the "user-worn" limitation in the claim preambles, the evidence shows that at the

---

[25] *See also id.* ("'Respondents have had no opportunity to evaluate . . . whether Roku's future promised product actually would practice the claims of the '875 patent'") (quoting ID with approval); *id.* (finding that Roku failed to meet its burden of showing "that there was a significant likelihood that the Gazelle Remote (or any other physical article) would practice one or more claims of the '875 patent in the future"); *id.* ("Evidence of a complainant's progress towards an article that will practice one or more claims of the asserted patent as of the complaint filing date is relevant to whether the complainant has taken the necessary tangible steps to establish an industry, and whether there is a significant likelihood that the domestic industry requirement will be satisfied in the future").

[26] At the time the parties filed their post-hearing briefs, the Commission had not yet addressed in this manner "the circumstances, if any, in which a complainant can demonstrate a domestic industry in the process of being established absent the existence of a protected article." *Thermoplastic-Encapsulated Motors*, Comm'n Op. at 11-12, 2019 WL 9596564, at *7 (EDIS Doc. ID 684974); *cf. Certain Mobile Devices with Multifunction Emulators*, Inv. No. 337-TA-1170, Initial Determination at 148-52, EDIS Doc. ID 738549 (Mar. 16, 2021) (finding satisfaction of the technical prong in the absence of a physical article based on complainants' "tangible and necessary steps to practice the claim" and a "significant likelihood that the practice will occur."), *reviewed and taking no position on this issue*, Comm'n Notice, EDIS 747056 (July 16, 2021).

time of the complaint, Masimo had taken necessary "tangible steps" in engineering and research and development towards a product that practiced claims of the Poeze patents. As described above, Masimo's design documents and testing results show that the Masimo Watch prototypes in development meet the limitations of the Poeze patents.[27] Mr. Scruggs described the development process for Masimo Watch prototypes as an iterative process. *See id.* at 393:12-20 ("we've designed, built, and tested many iterations of the Masimo Watch"), 402:2-12 (describing "the progression of the different sensor designs"); *see also* Tr. (Muhsin) at 342:25-343:7 (describing "many iterations of wrist sensors"), 345:2-7 (describing "[m]any iterations on the watch through the design phases"); Tr. (Al-Ali) at 275:13-276:11 (describing ongoing testing of sensor designs, and with each subsequent design, "[i]t gets a little bit better"). Thus, even if the evidence were insufficient to show that the RevA, RevD, and RevE devices existing at the time of the complaint practiced each of the limitations of the asserted claims, the evidence would be sufficient to show a domestic industry in the process of being established.

Accordingly, the undersigned finds that Complainants have satisfied the technical prong with respect to claim 12 of the '501 patent, claim 28 of the '502 patent, and claims 12, 24, and 30 of the '648 patent, for a domestic industry in the process of being established based on the RevA, RevD, and RevE devices.

---

[27] Apple argues that its experts were not allowed certain access to the prototypes (*see* RIB at 48-49), but Complainants produced schematics, source code, and the data from Masimo's testing regarding these prototypes in discovery, and provided witnesses for deposition. *See* CRB at 29-30, 33-34. Many of Apple's complaints regarding domestic industry discovery were addressed in the context of Apple's motion for sanctions and Apple's motion to strike domestic industry contentions. *See* Order No. 31 (Apr. 8, 2022); Order No. 32 (May 5, 2022). The record shows that Apple was provided a reasonable opportunity to evaluate whether Masimo's development activities would result in a product practicing the asserted claims. *See Certain Televisions, Remote Controls, and Components Thereof*, Inv. No. 337-TA-1263, Comm'n Op., 2022 WL 17486245, at *15 (Nov. 30, 2022) (noting that respondents should be given an "opportunity to evaluate in fact or expert discovery whether [complainant]'s future promised product actually would practice the claims").

### G.      Invalidity – Anticipation/Obviousness

Apple alleges that the asserted claims of the Poeze patents are invalid as anticipated in view of U.S. Patent No. 7,620,212 (RX-0411), entitled "Electro-Optical Sensor," which issued from an application filed on August 12, 2003, identifying assignee Lumidigm, Inc. (RX-0411 is referenced herein as "Lumidigm").  RIB at 67-103.  There is no dispute that Lumidigm is prior art to the Poeze patents.

Apple further alleges that the asserted claims of the Poeze patents are invalid as obvious in view of Lumidigm alone or in combination with U.S. Patent No. 5,766,131 (RX-0666, "Seiko '131"), which issued from an application filed on July 30, 1996; U.S. Patent No. 4,224,948 (RX-0670, "Cramer"), which issued from an application filed on November 24, 1987, the textbook *Design of Pulse Oximeters* by J.G. Webster (RX-0035, "Webster"), published in 1997; and/or U.S. Patent No. 9,001,047 (RX-0673, "Apple '047"), which issued from an application filed on January 4, 2008.  RIB at 67-103.  There is no dispute that these references are prior art to the Poeze patents.

The undersigned finds that Lumidigm does not anticipate any asserted claim of the Poeze patents at least because, as discussed below, it does not include the required "protrusion" with a "convex" surface as set forth in all asserted claims.  Accordingly, the relevant analysis for all asserted claims is an obviousness assessment.  For the reasons discussed below, the evidence shows, clearly and convincingly, that '501 patent claim 12 is invalid as obvious.  Apple has not shown, clearly and convincingly, that any of the asserted claims of the '502 patent or the '648 patent is invalid as obvious.

1.    **'501 Patent Claim 12**

      a.    **Element [1 preamble]: "A user-worn device configured to noninvasively measure a physiological parameter of a user, the user-worn device comprising:"**

Apple submits that Lumidigm discloses a "user-worn device configured to noninvasively measure a physiological parameter of a user" in Figure 8B, a "biometric reader" that "is built into the case of a wristwatch." RX-0411 at 11:60-12:2; *see* Tr. (Warren) at 1207:23-1208:13; RDX-8C.23.



**FIG. 8B**

This device "operates based upon signals detected from the skin in the area of the wrist." RX-0411 at 11:60-63. Apple submits that Lumidigm discloses embodiments in which the sensor is incorporated into a user-worn wristwatch, and that in certain embodiments, Lumidigm's sensor uses those signals to "measure physiological parameters, based on the 'concentration of a substance in the individual's tissue,' including 'oxygenation and/or hemoglobin levels in the blood.'" RIB at 70 (citing RX-0411 at 19: 16-28, 11:61-64, Tr. (Warren) at 1208:1-13, 1214:12-1215:4); *see also* RIB at 68.

Complainants argue that Lumidigm fails to disclose non-invasively measuring a physiological parameter in the wristwatch embodiment of Figure 8B. CIB at 124-26. Complainants submit that the "biometric reader" of Lumidigm is used to identify a user based on "tissue spectral data" and not to measure a physiological parameter. *Id.* (citing RX-0411 at

10:42-59, 5:30-44, 11:15-28, 11:60-61); *see* Tr. (Madisetti) at 1340:17-25, 1341:8-12.

Complainants argue that the "extended functionality" of Lumidigm is not disclosed in connection

with the wristwatch embodiment. *See* Tr. (Madisetti) at 1330:6-8, 1330:20-1331:11, 1340:17-

1341:14. Complainants describe these functionalities as part of a "brainstorming session,"

relying on the testimony of Robert Rowe, one of the named inventors of Lumidigm. *See* Tr.

(Rowe) at 1146:18-1147:3.

      In consideration of the parties' arguments, the undersigned finds that Lumidigm meets

the limitations of the preamble of '501 patent claim 1 by disclosing a user-worn wristwatch

embodiment with a biometric sensor configured to measure a physiological parameter. *See* RX-

0411 at 3:35-47, 11:60-12:2, 19:18-28; Tr. (Warren) at 1208:1-12; RDX-8.20 (identifying, *inter*

*alia*, incorporation of a "alcohol-monitor function" and a "bilirubin-monitor function").

Lumidigm describes the measurement of such parameters as a non-invasive "spectroscopic

function." *Id*. at 3:45-47, 19:18-28. The undersigned agrees with Complainants that the primary

focus of Lumidigm is a biometric sensor for identification, but Lumidigm clearly discloses

additional "extended functionality" using "the spectral-analysis capabilities of the biometric

sensor," including where "the spectral analysis is used to identify a physiological state of an

individual." *Id*. at 18:26-28. Lumidigm provides that "identification of such a physiological

state may be made by measuring the spectral variation of a measured spectrum for light scattered

by the tissue of the individual, and comparing it with a reference spectral variation." *Id*. at

18:29-32. Lumidigm describes, *inter alia*, examples of a bilirubin monitor and a blood-alcohol

monitor. *Id*. at 19:29-50.

      These disclosures of physiological monitoring are in the "extended functionality" section

of the Lumidigm specification, which are clearly applicable to the user-worn wristwatch

Case: 24-1285    Document: 7    Page: 302    Filed: 12/26/2023
**PUBLIC VERSION**

embodiment, with the specification stating that the extended functionalities are "especially suitable when the biometric sensor is comprised by a portable device, such as a portable electronic device." *Id*. at 17:67-18:2. The specification explicitly identifies "a watch" as an example of a "portable electronic device having extended functionality." *Id.* at 3:21-37. These extended functionalities, in combination with biometric functions, are also reflected in the claims of the Lumidigm patent, which claim a device "further configured to operate the biometric sensor to perform a nonbiometric function," and providing a limited set of nonbiometric functions including "an alcohol-monitor function, a bilirubin-monitor function," and "a hemoglobin-monitor function." *Id*. at 25:35-45 (claims 11 and 12).

Complainants cite evidence that the Lumidigm inventors never developed a device with the described extended functionalities, *see* CIB at 126-27, but "the invention in a prior art publication need not have actually been made or performed to satisfy enablement." *In re Antor Media Corp.*, 689 F.3d 1282, 1290 (Fed. Cir. 2012). Moreover, there is a "presumption . . . that both the claimed and unclaimed disclosures in a prior art patent are enabled." *Amgen Inc. v. Hoechst Marison Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003).[28]

---

[28] While this statement in *Amgen* arose in the context of an anticipation analysis, it is relevant to obviousness as well. While a non-enabled prior art reference can be used in an obviousness analysis for what it teaches, "the evidence of record must still establish that a skilled artisan could have made the claimed invention." *Raytheon Techs. Corp. v. GE Co.*, 993 F.3d 1374, 1381 (Fed. Cir. 2021) ("even though a non-enabling reference can play a role in an obviousness analysis, the evidence of record must still establish that a skilled artisan could have made the claimed invention"). The Federal Circuit has held that "[i]n the absence of . . . other supporting evidence to enable a skilled artisan to make the claimed invention, a standalone § 103 reference must enable the portions of its disclosure being relied upon . . . the same standard applied to anticipatory references." *Id.* at 1381. This holding indicates that the same presumption applied to asserted anticipation references can be applied to an embodiment disclosed in a prior art obviousness reference. *See also In re Kumar*, 418 F.3d 1361, 1368 (Fed. Cir. 2005) ("when a *prima facie* case of obviousness is deemed made . . . rebuttal may take the form of evidence that the prior art does not enable the claimed subject matter . . . [t]he applicant has the burden of coming forward with evidence in rebuttal").

91

**Stay-Add-251**

Complainants identify evidence that measuring blood oxygen at the wrist would have been unlikely to be successful at the time of the Poeze patents, *see* CIB at 127-29, but claim 1 of the '501 patent is not limited to blood oxygen—the preamble limitations can be met by a device that measures any "physiological parameter." Lumidigm describes functionality for measuring several different physiological parameters, *e.g.*, hemoglobin levels, bilirubin, and blood alcohol, and Complainants have not offered any evidence to rebut the presumption that these functionalities are enabled by Lumidigm's disclosure.[29] Accordingly, the undersigned finds that Lumidigm clearly and convincingly discloses the preamble limitation of claim 1.

b.    **Element [1A]: "at least three light emitting diodes (LEDs)"**

There is no dispute that Lumidigm discloses at least three LEDs. *See* CIB at 71-72. Lumidigm describes a "sensor assembly" that "comprises a plurality of light sources." RX-0411 at 6:22-24. Lumidigm explicitly states that these light sources "may comprise light emitting diodes ('LEDs')." *Id*. at 6:38-43. There are more than three light sources depicted in the wristwatch embodiment in Figure 8B, and Lumidigm provides that "FIG. 8B again shows the equidistant-sensor geometry of FIG. 4 for illustrative purposes only; more generally, any of the sensor geometries previously disclosed or other equivalent configurations can be used for this application." *Id*. at 11:65-12:2. One such alternative to the sensor geometry of Figure 4 is depicted in Figure 6, which shows 3 light sources:

---

[29] Complainants' arguments regarding blood oxygen are discussed *infra* in relation to the '502 and '648 patents. As set forth therein, the undersigned agrees with Complainants that there is no prior art enablement of a wristwatch that measures blood oxygen.



**FIG. 6**

*Id*. at Fig. 6, 9:12-25 (identifying "light sources 82, 84, 86"). Moreover, Lumidigm explicitly

discloses that "any of the sensor geometries previously disclosed or other equivalent

configurations can be used for" the wristwatch embodiment. *Id*. at 11:65-12:2. Given this

explicit statement, the evidence indicates that Lumidigm discloses the wristwatch embodiment

using the sensor geometry of Figure 6.

      c.      **Element [1B]: "at least three photodiodes arranged on an
interior surface of the user-worn device and configured to
receive light attenuated by tissue of the user"**

    Apple contends that Lumidigm discloses "at least three photodiodes." RIB at 72-74; *see*

Tr. (Warren) at 1208:25-1209:17. Apple cites to Figure 6 of Lumidigm, depicted above, which

shows "three detectors 81, 83, 85." RX-0411 at 9:15-18. Lumidigm also discloses that "[t]he

detector type and material is chosen to be appropriate to the source wavelengths and the

Stay-Add-253

measurement signal and timing requirements," providing examples of "PbS, PbSe, InSb,

InGaAs, . . . ," and for a "spectral range from about 350 nm to about 1100 nm, a suitable detector

material is silicon." *Id*. at 6:56-63. Dr. Warren testified at the hearing that a detector made of

indium gallium arsenide (InGaAs) or silicon would be a photodiode. Tr. (Warren) at 1209:14-

17. This testimony is corroborated by references to silicon photodiodes in other prior art

references. *See* RX-0035.0053 ("The photodetector is a silicon photodiode"); RX-1221 ("silicon

NPN planar epitaxial phototransistors").

Apple further contends that the photodiodes disclosed in Lumidigm are "arranged on an

interior surface," citing Figure 2, which depicts "the detector 36 recessed from the sensor surface

39 in optically opaque material 37 that makes up the body of the sensor head 32." RX-0411 at

8:1-4.



**FIG. 2**

*Id*. at Fig. 2; RIB at 73-74. Lumidigm describes this "optical geometry" as a "diffuse reflectance

sampling geometry where the light sources and detector lie on the same side of the tissue." RX-

0411 at 7:12-14. While one detector is depicted in Figure 2, Apple cites Lumidigm's disclosure

that "[t]he detector 36 may comprise a single element, a plurality of discrete elements, or a one-

or two-dimensional array of elements." *Id*. at 4:54-56.

Complainants argue that there is no explicit disclosure of photodiodes in Lumidigm and there is no disclosure of three photodiodes arranged on an interior surface in connection with the wristwatch embodiment. CIB at 130; CRB at 46.

In consideration of the parties' arguments, the undersigned finds that Lumidigm meets the "at least three photodiodes" limitation of '501 patent claim 1. Lumidigm clearly discloses silicon detectors, and Complainants fail to offer any rebuttal to Mr. Warren's testimony, corroborated by other prior art disclosures, that the silicon detectors are photodiodes. *See* Tr. (Warren) at 1209:14-17. Three photodiodes are explicitly disclosed in Figure 6 of Lumidigm. *See* RX-0411 at 9:15-25. As discussed above, Lumidigm contains an express disclosure that "any of the sensor geometries previously disclosed or other equivalent configurations can be used for" the wristwatch embodiment. *Id*. at 11:65-12:2.

Although there is no explicit depiction of three detectors arranged on an interior surface like the single detector in the cross-section of Figure 2, the Federal Circuit has held that "a reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015). Relying on this precedent, the Federal Circuit upheld a finding of anticipation based on prior art that "explicitly contemplates the combination of the disclosed functionalities." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1343 (Fed. Cir. 2016). Lumidigm's Figure 2 is a cross-sectional view of the arrangement of light sources and detector depicted in Figure 3, *id*. at 8:33-42, and the arrangement of three light sources and three detectors in Figure 6 is one specifically disclosed alternative to Figure 3. *See id*. at 9:12-25; Tr. (Warren) at 1211:15-20 (cross-section for Fig. 6 would be similar to Fig.

2).[30]  As recognized by Dr. Warren, Lumidigm expressly discloses the use of these source-detector arrangements in the wristwatch embodiment.  *See* Tr. (Warren) at 1214:12-1215:4; RX-0411 at 11:65-12:2.[31]  Accordingly, the undersigned finds that Lumidigm's disclosures meet this limitation in the context of Lumidign's wristwatch embodiment.

> **d.      Element [1C]: "a protrusion arranged over the interior surface, the protrusion comprising a convex surface"**

Apple contends that Lumidigm discloses a protrusion meeting the limitations of '501 patent claim 1.  RIB at 74-75.  Apple points to sensor head 32 depicted in Figure 2 of Lumidigm, citing a statement in the specification that "[t]he sensor head 32 may also have a compound curvature on the optical surface to match the profile of a device in which it is mounted, to incorporate ergonomic features that allow for good optical and mechanical coupling with the tissue being measured, or for other technical or stylistic reasons."  RX-0411 at 7:57-63.  Apple relies on Dr. Warren's testimony that a person of ordinary skill in the art would read the disclosure of a "compound curvature" and "realize that a practical implementation of this would be a convex surface."  Tr. (Warren) at 1211:2-8.

Complainants argue that Lumidigm's sensor head 32 is flat, and there is no explicit disclosure of a protrusion comprising a convex surface.  RIB at 130-32.  Dr. Madisetti testified that Lumidigm's description of curvature to match the profile of a wristwatch would likely result in a concave shape, citing the deposition testimony of Robert Rowe, one of the Lumidigm

---

[30] Figures 3, 4, and 6 all depict source-detector arrangements in a circular shape that appears the same as the back of the wristwatch depicted in Figure 8B.  *See* RX-0411 at Fig. 3, Fig. 4, Fig. 6, Fig. 8B.

[31] In addition, the evidence shows that Figure 2 depicts sensor surface 39 above an "interior surface" where detector 36 is located.  *See* RX-0411 at 8:1-4 ("FIG. 2 illustrates a sensor-head geometry wherein the detector 36 is recessed from the sensor surface 39 in optically opaque material 37 that makes up the body of the sensor head 32."); Tr. (Warren) at 1209:19-1210:11; RIB at 73-74.

inventors.  Tr. (Madisetti) at 1331:12-1332:24 (citing CX-0279C (Rowe Dep. Tr.) at 69:8-21).

Complainants further argue that the statement regarding Lumidigm's wristwatch embodiment

describing different configurations of "sensor geometries" only refers to the arrangement of light

sources and detectors—not to the shape of the surface of the sensor head.  CIB at 132.

      In consideration of the parties' arguments, the undersigned finds that the evidence fails to

show, clearly and convincingly, that Lumidigm alone discloses the claimed "protrusion

comprising a convex surface" limitation of '501 patent claim 1.  As depicted in Figure 2 of

Lumidigm, sensor surface 39 of sensor head 32 is flat.  While the description of "compound

curvature" in Lumidigm's specification allows for the possibility of a convex shape, this is

insufficient to show that this limitation is inherent in Lumidigm.  *See Guangdong Alison Hi-Tech

Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1364 (Fed. Cir. 2019) ("An element may be

inherently disclosed only if it is necessarily present, not merely probably or possibly present, in

the prior art." (internal quotations removed)).  Apple has not shown, clearly and convincingly,

that a convex protrusion is either explicitly or inherently disclosed in Lumidigm.

      Apple further contends that modifying Lumidigm to include the claimed protrusion

would be obvious because a protrusion with a convex surface was a "well-known idea" in the

prior art.  RIB at 104-107.  Dr. Warren testified that "it was already well-known that a convex

curvature itself could be a useful element in increasing signal quality."  Tr. (Warren) at 1211:2-8.

He further identified convex protrusions in prior art references Seiko 131 and Cramer.  *Id*. at

1230:18-1233:14; RDX-8C.67.  Seiko 131 provides that "[w]hen the outside surface of the light

transmittance plate is a convex surface, pressure is applied to the light transmittance plate by

simply holding the outside surface of the light transmittance plate lightly against the body

surface, and positive contact between the body surface and outside surface of the light transmittance plate can therefore be improved."  RX-0666 at 3:22-28.



**FIG._28**

*Id*. at Fig. 28, 19:5-8 ("outside surface 341A of light transmittance plate 34A may also be convex as shown in FIG. 28.").  Dr. Warren testified that "the purpose of this convex surface, as stated in Seiko, is to move residual blood out of the way and increase the quality of the measurement."  Tr. (Warren) at 1231:4-8; RDX-8.67.

Cramer discloses raised portions identified as "boss 22" and "boss 22A," wherein "boss 22 serves to isolate the infra-red detector from ambient light" and "boss 22A prevents direct transmission of light between source 24 and detectors 23."  RX-0670 at 5:45-51.



FIG. 2

FIG. 3

*Id*. at Fig. 2, Fig. 3. Cramer further states that "[t]he coaxial arrangement of these three elements provides a relatively large contact surface area resulting in not only effective sensing of a pulse rate but minimum discomfort to the wearer." *Id*. at 5:48-51. Cramer also states that "[t]he circular array of the detector 23 allows the detection of pulses in a substantial arteriolar-capillary bed within the hemispherical region denoted in Fig. 6 for increased signal to noise ratio and energy utilization." *Id*. at 5:51-56. Another prior art reference, U.S. Patent No. 4,880,304 (RX-0665, "Nippon"), describes an embodiment where "the portion of the sensor face containing the LEDs and the optical detector protrudes into the tissue slightly, thereby increasing the signal strength of the detected signal." RX-0665 at 5:12-17, Fig. 3b; Tr. (Warren) at 1245:8-16 (Nippon . . . conveys the idea that, if the detector protrudes slightly into tissue, not only can you get more repeatable coupling, but you can increase the sensitivity of the sensor").

Complainants argue that the claimed protrusion is not obvious in view of Lumidigm. CIB at 130-36. Dr. Madisetti testified that Lumidigm's description of curvature to match the

profile of a wristwatch would likely result in a concave shape, citing the deposition testimony of Robert Rowe, one of the Lumidigm inventors. Tr. (Madisetti) at 1331:12-1332:24 (citing CX-0279C (Rowe Dep. Tr.) at 69:8-21). Complainants argue that the reference to curvature on Lumidigm's "optical surface" is not the same as Lumidigm's "sensor surface 39." CIB at 131. Complainants further argue that the statement regarding Lumidigm's wristwatch embodiment describing different configurations of "sensor geometries" only refers to the arrangement of light sources and detectors—not to the shape of the surface of the sensor head. *Id.* at 132; *see* Tr. (Rowe) at 1152:7-21 (referring to the "sensor geometries previously disclosed as Figs. 3 through 7," without referencing Figure 2). Complainants argue that there is no motivation to modify Lumidigm to have a convex surface, because such a shape would not match the profile of a user's wrist and would add to the form factor of a wristwatch. RIB at 133-34; Tr. (Madisetti) at 1331:20-25. In addition, Dr. Madisetti identified a prior art reference expressing skepticism of pulse oximetry when there are "[v]ariations in contact pressure between the sensor and the skin," which would be caused by a convex protrusion. Tr. (Madisetti) at 1338:6-13; CDX-0012C.013 (citing CX-1733 at 2:47-57). Joe Kiani testified that Cercacor engineers had preferred concave surfaces for noninvasive sensors before conducting experiments showing that a convex protrusion produced a better signal. Tr. (Kiani) at 98:9-99:16.

With respect to Cramer, Complainants submit that the convex protrusions are annular rings that are not compatible with the other limitations of the Poeze patents (including Element 1[D] of the '501 patent), such as "openings" or "holes" through the protrusion. CIB at 144-46; CRB at 59. With respect to Seiko 131, Complainants submit that the identified convex protrusion is merely a single transparent window without "openings" or "holes" or "opaque lateral surfaces" (as required by Element [1E] of the '501 patent). CIB at 148-49 (identifying

"transparent window" in Seiko 131). Complainants further note that Seiko 131 describes a sensor worn on a user's finger, not on the wrist. CRB at 59. Complainants argue that Apple has failed to identify any reason or motivation to modify Lumidigm's wristwatch to incorporate a convex protrusion as disclosed in Cramer or Seiko 131. CIB at 133-34, 151-52; CRB at 60. Complainants further argue that Apple has failed to show that any such combination would have a reasonable expectation of success. CIB at 135, 152-53.

In reply, Apple argues that the "optical surface" described by Lumidigm is the same as the "sensor surface 39" depicted in Figure 2. RRB at 53. Apple further identifies Lumidigm's disclosure of an optical relay "between the sensor surface 39 and the skin 40," wherein "[t]he surface of the light relay can be contoured to fit specific product applications and ergonomic requirements." RX-0411 at 8:19-28. Apple disputes Complainants' interpretation of Mr. Rowe's testimony. RRB at 53-54. Apple further argues that Lumidigm expressly discloses the use of other "geometries" with its wristwatch embodiment. *Id.* Apple submits that there is no evidence that the prior art "taught away" from convex protrusions and cites prior art references recognizing the benefits of convex surfaces applying pressure to a user's skin. *Id.* at 55. Apple argues that both Cramer and Seiko 131 disclose convex protrusions and a person of ordinary skill would have been motivated to combine these structures with Lumidigm with a reasonable expectation of success. *Id.* at 60-62.

In consideration of the parties' arguments, the undersigned finds that Lumidigm's disclosure that the optical surface of its sensor head "may also have a compound curvature," together with prior art knowledge, would have provided one of ordinary skill in the art reason to implement the optical surface in a convex shape for the reasons that are explicitly disclosed in Lumidigm: "to match the profile of a device in which it is mounted, to incorporate ergonomic

features that allow for good optical and mechanical coupling with the tissue being measured, or for other technical or stylistic reasons." RX-0411 at 7:57-63. In particular, Dr. Warren offers credible testimony that one of ordinary skill in the art would have recognized the benefits of a convex surface at the time of the Poeze patents in terms of signal quality, which is consistent with the disclosures in several prior art references. *See* Tr. (Warren) at 1244:11-1246:3. Seiko 131 identifies a convex surface that improves "positive contact between the body surface and outside surface of the light transmittance plate." RX-0666 at 3:22-28, Fig. 28.[32] Prior art reference Nippon similarly describes increased signal strength from a protrusion into the tissue. *See* RX-0665 at 5:12-17, Fig. 3b; RIB 117, 146; Tr. (Warren) at 1245:8-16. These prior art disclosures show, clearly and convincingly, that one of ordinary skill in the art would have had "technical or stylistic reasons" for implementing a convex curvature for Lumidigm's sensor surface. *See* Tr. (Warren) at 1233:1-14; RX-0411 at 7:57-63.[33]

The evidence of "teaching away" offered by Complainants is not supported by the record evidence. Dr. Madisetti cites a prior art reference that raises concerns about "[v]ariations in contact pressure between the sensor and the skin," but this reference does not discuss convex surfaces. *See* CX-1733 at 2:47-57. Mr. Kiani's testimony that concave surfaces were preferred before the invention of the Poeze patents is not corroborated by any evidence from the relevant

---

[32] Lumidigm also discloses a "force sensing functionality . . . to ensure firm contact between the sensor and the skin," RX-0411 at 8:11-14, which addresses a stated goal of Seiko 131 to achieve "sufficient pressure against light transmittance plate 34A." RX-0666 at 19:8-13.

[33] The undersigned agrees with Apple that the "optical surface" and "sensor surface 39" refer to the same surface in the context of Lumidigm's Figure 2. *See* RRB at 53-54. In addition, Figure 2 depicts sensor surface 39 above an "interior surface" where detector 36 is located. *See* RX-0411 at 8:1-4 ("FIG. 2 illustrates a sensor-head geometry wherein the detector 36 is recessed from the sensor surface 39 in optically opaque material 37 that makes up the body of the sensor head 32.").

CONFIDENTIAL INFORMATION REDACTED

timeframe.[34]  Even if a concave shape would be more likely to conform to the shape of a user's

wrist, as argued by Complainants, this does not establish that one of ordinary skill in the art

would have avoided a convex shape.  As discussed above, several prior art references describe

technical benefits associated with a convex protrusion for sensors on the skin.[35]

    The undersigned also finds that one of ordinary skill in the art would have been able to

implement a convex optical surface in Lumidigm's wristwatch with a reasonable expectation of

success.  *See* Tr. (Warren) at 1238:1-6.  Lumidigm explicitly discloses that its sensor head could

have a "compound curvature on the optical surface."  *See* RX-0411 at 7:57-63.[36]

---

[34] Complainants cite evidence from Apple's ████████████████████████████████ several
years after the priority date for the Poeze patents.  This evidence is addressed *infra* in the context of
objective indicia of non-obviousness.

[35] There is no evidence that the "form factor" of a convex protrusion would have been relevant to persons
of ordinary skill in the art at the time of the Poeze patents—the only evidence that Complainants cite is
Dr. Madisetti's conclusory testimony and a statement from Apple's prehearing brief related to the
development of the Apple Watch, ████████████████████████████████████████████████████
████████████.  *See* CIB at 134; RRB at 55.  In any case, this issue would not preclude a reason to
modify Lumidigm in the manner described above.  *See Allied Erecting and Dismantling Co., Inc., v.
Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) ("a given course of action often has
simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to
combine") (internal quotation omitted).

[36] It is unclear whether Apple argues for a specific physical combination of Lumidigm and Cramer, *e.g.*,
by applying Cramer's structure of annular rings and photodiodes to the Lumidigm wristwatch.  *See* RIB at
103-113.  However, to the extent this combination is proposed, Apple does not explain how this
combination would fit with the multiple LED/multiple photodiode arrangement relied upon for claim
elements [1A] and [1B], particularly because Cramer's raised annular rings are designed to separate
Cramer's single LED from Cramer's set of equidistant four photodiodes.  *See* RX-0679 at 5:46-48 ("The
boss 22A prevents direct transmission of light between source 24 and detectors 23.").  In contrast, claim 1
requires at least three LEDs.  Similar issues exist for the "protrusion" elements of the '502 and '648
patents, which also require multiple LEDs and photodiodes.  *See* CIB at 143 (claim must be considered as
a whole).  Moreover, the evidence does not clearly and convincingly show that Cramer discloses a
protrusion with openings or through holes within it over photodiodes (as required for Elements [1D],
[19C], [28F], [8E], [20C-D]).  *See* CIB at 144-146.  Dr. Warren states that Cramer "describes what it calls
a raised boss area, which is essentially a convex protrusion" that "consists of two concentric raised
annular areas of opaque material."  Tr. (Warren) at 1231:18-22.  Dr. Madisetti similarly testified that the
alleged protrusion is "just two rings."  Tr. (Madisetti) at 1334:23-1335:2.  The evidence does not clearly
and convincingly show that the two raised rings of Cramer would be considered a single "protrusion."

Based on the above, the evidence shows clearly and convincingly that Lumidigm's disclosure of an optical surface that can have "compound curvature" would have provided a reason for one of ordinary skill in the art to modify the optical surface of Lumidigm's wristwatch embodiment to form a "protrusion comprising a convex surface," and this modification would have had a reasonable expectation of success.

e.     **Element [1D]: "a plurality of openings extending through the protrusion and positioned over the three photodiodes"**

With respect to the "plurality of openings" limitation, Apple cites to Lumidigm Figure 2, which depicts "the detector 36 recessed from the sensor surface 39 in optically opaque material 37 that makes up the body of the sensor head 32." RX-0411 at 8:1-4. While one detector is depicted in Figure 2, Apple cites Lumidigm's disclosure that "[t]he detector 36 may comprise a single element, a plurality of discrete elements, or a one- or two-dimensional array of elements." *Id*. at 4:54-56. Apple submits that Lumidigm thus discloses openings positioned over one photodiode or multiple photodiodes. RIB at 75-76.

Apple further contends that the use of openings and holes for photodiodes was well known in the art and disclosed in Cramer and Seiko 131. RIB at 107-110. Dr. Warren testified that openings over photodiodes were well-known at the time of the Poeze patents, recognizing that "[a] detector can't detect light without some sort of opening above it." Tr. (Warren) at 1192:25-1193:6. He identified U.S. Patent No. 3,769,974 (RX-0473, "Smart") as a prior art reference with an example of an opening for a photodiode. *Id*. at 1193:7-18; RDX-8C.10; *see* RX-0473 at Fig. 1, 3:17-19 ("An annular inner wall 59 is formed of opaque epoxy and blocks the direct transmission of light from the diodes 16 to the phototransistor sensor 28."). In Seiko 131, Apple identifies an opening between the detector and the user's tissue. RIB at 108 (citing RX-0666 at Fig. 28). With respect to Cramer, Apple cites a datasheet for a detector identified in

Cramer—the CLT 2160 detector, which was described by Dr. Warren as a "can detector" that includes an opening between the photodiode and the surface of the detector. Tr. (Warren) at 1231:23-1232:9, 1234:3-8; *see* RX-0670 at 5:33-35 ("A suitable detector is the type CLT 2160 photo diode produced by Clairex Electronics, Inc."); RX-1221 (CLT 2160 datasheet).

Complainants dispute Lumidigm's disclosure of this limitation, arguing that there is no protrusion meeting the limitations of the claim and because three photodiodes are not explicitly disclosed in the configuration of Figure 2 or in connection with the wristwatch embodiment. CIB at 138.

With respect to Seiko 131, Complainants argue that there is only one photodiode and one opening, which does not extend through the light transmittance plate identified as the claimed convex surface. CIB at 148-49; CRB at 60-61. With respect to Cramer, Complainants argue that the openings over the photodiodes are between the "boss 22" and "boss 22A" that are identified as convex protrusions and thus do not extend through these protrusions. CIB at 145-46. Complainants further argue that the CLT 2160 datasheet is undated and was not authenticated by any witness. CRB at 63-64.

In consideration of the parties' arguments, the evidence clearly and convincingly shows that Lumidigm meets the "plurality of openings . . . positioned over the three photodiodes" limitation of '501 patent claim 1. As discussed above, the undersigned agrees with Complainants that there is no convex protrusion in Lumidigm, but Lumidigm discloses an opening extending through a protrusion that is positioned over a detector in Figure 2, and as discussed above in the context of the "at least three photodiodes" limitation, Lumidigm clearly shows that the placement of the detector in Figure 2 corresponds to the source-detector arrangement of Figure 3, and that the arrangement of three sources and three detectors in Figure

6 is a disclosed alternative to Figure 3 for use in the wristwatch embodiment. *See* RX-0411 at 7:5-9:25, 11:65-12:2, Fig. 2, Fig. 3, Fig. 4, Fig. 6, Fig. 8B. Under this arrangement, there is an opening positioned over each photodiode. *See* Tr. (Warren) at 1211:15-20 (cross-section in Fig. 6 would be similar to Fig. 2, with each photodiode recessed an opening over each photodiode). Dr. Warren's testimony and the disclosures in prior art references such as Smart also confirm that such openings over photodiodes were known in the art at the time of the Poeze patents. *See* Tr. (Warren) at 1192:25-1193:18; RX-0473 at 3:17-19, Fig. 1.

Further, as discussed in Part IV.E.1.d *supra*, a person of skill in the art would have reason to implement to modify the optical surface 39 of Lumidigm to form a "protrusion comprising a convex surface." This modified optical surface of the sensor head, like the optical surface of Lumidigm shown in Fig. 2, would extend over the photodiodes and the openings over them. *See* Tr. (Warren) at 1210:13-1211:14; *id.* at 1212:4-10 (sensor head would have same number of openings as photodiodes); RIB at 75. Accordingly, the evidence clearly and convincingly shows that this limitation of '501 patent claim 1 is met by Lumidigm's disclosures.

        **f.**      **Element [1E]: "the openings each comprising an opaque lateral surface, the plurality of openings configured to allow light to reach the photodiodes, the opaque lateral surface configured to avoid light piping through the protrusion"**

With respect to the "opaque lateral surface" limitation, Apple again cites to Lumidigm Figure 2, which depicts "the detector 36 recessed from the sensor surface 39 in optically opaque material 37 that makes up the body of the sensor head 32." RX-0411 at 8:1-4. Lumidigm further provides that "[t]he recessed placement of detector 36 minimizes the amount of light that can be detected after reflecting off the first (epidermal) surface of the tissue." *Id.* at 8:4-7. Lumidigm notes that "reflections from the top surface of tissue (known as 'specular' or 'shunted' light) are

detrimental to most optical measurements." *Id*. at 7:66-8:1. The effect of the recessed placement of the detector is described as an "optical blocking effect." *Id*. at 8:7-10.

Complainants argue that Lumidigm's disclosure of "optical blocking" is directed to light that is reflected off the surface of the tissue, which is distinct from "light piping." CIB at 139-40; *see* Tr. (Madisetti) at 1340:8-10. Complainants cite the specification of the Poeze patents, which describes "light piping (e.g., light that bypasses measurement site 102)." JX-001 at 22:48-50. At the hearing, Mr. Kiani described light piping as "light that goes from the LED directly to the photodetector, without going through the tissue." Tr. (Kiani) at 100:14-24.

The evidence clearly and convincingly shows that Lumidigm meets the "opaque lateral surface" limitation of '501 patent claim 1. There is no dispute that Lumidigm discloses an opaque lateral surface in the opening for a detector in Figure 2. Complainants argue that Lumidigm fails to explicitly recognize that this surface is "configured to avoid light piping," but Dr. Warren testified at the hearing that the "shunted" light described in Lumidigm "is what is called light piping in this matter." Tr. (Warren) at 1212:22-1213:3. The undersigned finds Dr. Warren's testimony on this issue to be credible and convincing, and Lumidigm's descriptions of reflections that are "specular" or "shunted" light are consistent with the meaning of "light piping" as that term is used in the context of the Poeze patents, because Lumidigm recognizes that this light bypasses the measurement site inside the user's tissue. *See* JX-0001 at 22:48-50; RX-0411 at 7:66-8:7. This is also consistent with Mr. Kiani's testimony regarding "light piping," because the "shunted" light described in Lumidigm goes from the emitters to the detector without passing through the tissue. Tr. (Kiani) at 100:14-24 (goal is to avoid light that has not gone "through the tissue"). Moreover, Lumidigm expressly discloses that the placement

of the detector creates an "optical blocking effect" that avoids "specular" or "shunted" light, *id.* at 7:66-8:10, and the evidence shows that this configuration would avoid light piping.

Apple also points to lateral surfaces in other prior art references, arguing that this limitation is obvious in combination with Seiko 131 or Cramer. Apple cites lateral surfaces around the photodiode disclosed in Seiko 131. RIB at 108 (citing RX-0666 at 10:30-36, Fig. 28). With respect to Cramer, Apple relies on the datasheet for the CLT 2160 detector, which was described by Dr. Warren as a "can detector" that "would be made from aluminum or stainless steel or some material that was impervious to light as a means to prevent light piping." Tr. (Warren) at 1231:23-1232:9, 1234:3-8; *see* RX-0670 at 5:33-35 ("A suitable detector is the type CLT 2160 photo diode produced by Clairex Electronics, Inc."); RX-1221 (CLT 2160 datasheet). Apple also cites Cramer's disclosure of "light blocking rings" that "isolate the photo detector from direct view from the light source and from view of the ambient light when the lower face is in contact with the wearer's body e.g. the wrist." RX-0670 at 2:46-51. One of these rings identified as "boss 22A prevents direct transmission of light between source 24 and detectors 23." *Id.* at 5:46-48. Apple further cites disclosures in Webster recognizing the problem of an "optical shunt," which is "when some of the light from the LEDs reaches the photodiode without passing through an arteriolar bed." RX-0035.0202. Webster recommends that "[o]ximeter probes should be manufactured of black opaque material that does not transmit light, or enclosed in an opaque plastic housing." *Id.*

Complainants argue that the alleged opaque lateral surfaces in Seiko 131 were not previously identified in Apple's prehearing brief or in any hearing testimony and are not supported by any teachings in Seiko 131. CRB at 63. With respect to Cramer, Complainants

argue that there is no explicit disclosure of opaque material and further argue that the CLT 2160 datasheet is unreliable. *Id.* at 63-64.

Because the claimed opaque lateral surfaces are set forth in Lumidigm, it is unnecessary to address whether they are disclosed by Lumidigm in combination with Seiko 131 or Cramer. However, the undersigned agrees with Complainants that Apple has failed to identify any opaque lateral surfaces in Seiko 131.[37] With respect to Cramer, the undersigned agrees with Apple that one of ordinary skill in the art would have recognized that the CLT 2160 detectors have opaque lateral surfaces. *See* Tr. (Warren) at 1234:3-8; RX-1221.[38] Webster's reference to an "optical shunt" is consistent with the description of light piping discussed above.

Accordingly, the undersigned finds that the "opaque lateral surface" limitation of '501 patent claim 1 is disclosed in Lumidigm in the context of Lumidigm's wristwatch embodiment.

g.    **Element [1F]: "one or more processors configured to receive one or more signals from the photodiodes and calculate a measurement of the physiological parameter of the user"**

With respect to the "one or more processors" limitation, Apple cites to Lumidigm's disclosure that its "portable electronic device comprises an electronic arrangement for performing a standard function of the portable electronic device, a biometric sensor, and a processor," and "[t]he processor is configured to operate the electronic arrangement to perform the standard function and to operate the biometric sensor." RX-0411 at 3:21-31; RIB at 77-79. Lumidigm further discloses that after light signals are detected, "the signals can be digitized and

---

[37] Regardless of whether Apple's contentions are timely, Apple's shading of unlabeled structures in Figure 28 of Seiko 131 that are allegedly opaque lateral surfaces does not appear to be supported by the evidence of record. *See* RIB at 108.

[38] The undersigned finds the CLT 2160 datasheet to be reliable evidence. Complainants have not identified any timely-raised objection to the admission of RX-1221, and this exhibit appears to be reliable on its face.

recorded by standard techniques," and "[t]he recorded data can then be processed directly or converted." *Id.* at 9:58-62. A schematic for managing the functionality of the biometric sensor is illustrated in Figure 9, which depicts a "computer system" with "hardware elements that are electrically coupled via bus 342, which is also coupled with the biometric sensor 356." *Id.* at 12:56-66, Fig. 9. "The hardware elements include processor 332" and a "processing acceleration unit 346 such as a DSP or special-purpose processor." *Id.* at 12:66-13:14; *see* Tr. (Warren) at 1213:4-1214:1.

Complainants argue that Lumidigm fails to explicitly disclose that its processor calculates a measurement of a physiological parameter and does not explicitly describe a processor in the "wristwatch" embodiment. CRB at 49; *see* CIB at 124-29.

In consideration of the parties' arguments, the undersigned finds that Lumidigm meets the "one or more processors" limitation of '501 patent claim 1. Complainants' arguments were addressed above in the context of the preamble, and as discussed above, Lumidigm teaches that the "wristwatch" embodiment is one of the "portable devices" suitable for functionalities including the measurement of a physiological parameter. *See* RX-0411 at 3:35-47, 11:60-12:2, 19:18-28. With respect to the processing hardware depicted in Figure 9, Lumidigm explicitly notes that some of the components could be used in portable devices. *Id.* at 12:58-61. Moreover, a "processor" is explicitly claimed in Lumidigm as part of a "portable electronic device," where the processor "is further configured to operate the biometric sensor to perform a nonbiometric function," including a "spectrometer function," with examples provided of "an alcohol-monitor function, a bilirubin-monitor function," and "a hemoglobin-monitor function."

*Id.* at 25:32-45 (claims 10, 11, 12).[39] Dr. Warren testified that this limitation is met by Lumidigm with respect to calculating a measurement of a physiological parameter. *See* Tr. (Warren) at 1213:4-1214:1. Accordingly, Lumidigm clearly discloses a "processor" that receives signals from a sensor and calculates a measurement of a physiological parameter.

The undersigned further finds that, to the extent Lumidigm does not disclose such a processor, one of ordinary skill in the art would have had a reason to implement such calculations and a reasonable expectation of success in Lumidigm's "wristwatch" embodiment, because Lumidigm explicitly notes that its extended functionality is "especially suitable" for mobile devices. *See id.* at 17:67-18:2.

Accordingly, the undersigned finds that the "one or more processors" limitation of '501 patent claim 1 is met by Lumidigm.

> h.    **Element [12]: "wherein the convex surface of the protrusion is an outermost surface configured to contact the tissue of the user and conform the tissue into a concave shape"**

Claim 12 of the '501 patent depends from claim 1, further requiring that "the convex surface of the protrusion is an outermost surface configured to contact the tissue of the user and conform the tissue into a concave shape." As discussed above in the context of the "protrusion" limitation of '501 patent claim 1, the undersigned finds that a convex protrusion is neither explicitly nor inherently disclosed in Lumidigm but that one of ordinary skill in the art would have reason to modify Lumidigm's optical surface to form a convex protrusion.

Apple contends that this limitation is obvious in view of Lumidigm alone or in combination with Seiko 131 or Cramer, because a person of ordinary skill in the art would have

---

[39] As discussed above in the context of the preamble, there is a presumption that these functions are enabled, and Complainants have not provided evidence rebutting Lumidigm's enablement of measurements for physiological parameters other than blood oxygen.

understood that a convex protrusion would conform the user's tissue into a concave shape. RIB at 79, 106. Dr. Warren described the limitation in claim 12 as "an obvious statement," recognizing that "if you have a convex surface and you position it next to tissue, any pressure at all will conform the tissue into a concave shape." Tr. (Warren) at 1214:2-11. Complainants do not raise any arguments with respect to claim 12 that are significantly different from those addressed above in the context of claim 1. *See* CRB at 46-47, 71-73. Accordingly, in view of the unrebutted testimony of Dr. Warren, the undersigned finds that one of ordinary skill in the art would have known that a convex surface in contact with the tissue of the user would conform the tissue into a concave shape.

***

As discussed above, Lumidigm explicitly discloses a user-worn wristwatch device configured to non-invasively measure physiological parameters of a user that meets the limitations of claim 1 requiring at least three LEDs, at least three photodiodes, a plurality of openings for each photodiode with opaque lateral surfaces, and a processor configured to calculate measurements of physiological parameters, and the evidence shows that one of ordinary skill in the art would have reason to modify the optical surface of the sensor head in Lumidigm's wristwatch to form the claimed protrusion comprising a convex surface based on Lumidigm's explicit suggestion of a sensor head with a "compound curvature" for "technical or stylistic reasons." RX-0411 at 7:57-63. For these and the other reasons discussed above, the evidence thus shows that a combination of elements disclosed in Lumidigm and known in the prior art would have yielded a wristwatch meeting each limitation of claims 1 and 12, and one of ordinary skill in the art would have had a reasonable expectation of success in making such a combination. Further, as discussed *infra*, secondary considerations of non-obviousness do not

weigh significantly against a finding that claim 12 of the '501 patent is obvious. Accordingly, the undersigned finds that claim 12 of the '501 patent is invalid as obvious.

### 2. '502 Patent Claim 22

As discussed below, the evidence fails to clearly and convincingly show that claim 22 of the '502 patent is rendered obvious by Lumidigm alone or in combination with other prior art.

#### a. Element [19 preamble]: "A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user worn device comprising:"

The preamble of '502 patent claim 19 requires "[a] user-worn device configured to non-invasively measure an oxygen saturation of a user." As discussed above in the context of the preamble of '501 patent claim 1, Lumidigm discloses a user-worn wristwatch embodiment with a biometric sensor configured to measure a physiological parameter. *See* RX-0411 at 3:35-47, 11:60-12:2, 19:18-28, claim 12. With respect to measuring oxygen saturation, Apple cites Lumidigm's teaching that "changes in blood flow cause spectroscopic changes that may be detected" with its biometric sensor, noting that "these spectroscopic changes are correlated with oxygenation and/or hemoglobin levels in the blood." RX-0411 at 19:22-26. Apple relies on Dr. Warren's opinion that one of ordinary skill in the art would have been able to implement pulse oximetry functionality in Lumidigm's wristwatch. Tr. (Warren) at 1216:10-25. Dr. Warren points to efforts by his students to measure blood oxygen at the wrist as early as 2002, *id.* at 1195:24-1196:10, and Apple cites prior art reflectance pulse oximeters that existed decades before the Poeze patents. *See* RX-0484.

Complainants argue that Lumidigm's disclosure is insufficient to teach a blood oxygen measurement in a wristwatch. CIB at 126-29; CRB at 44-46. Dr. Madisetti characterizes Lumidigm's description of an oxygen saturation measurement as "vague" and "aspirational." Tr.

**CONFIDENTIAL INFORMATION REDACTED**

(Madisetti) at 1330:20-1331:11. Complainants further argue that a person of ordinary skill would not have known how to implement the measurement of oxygen saturation or any other physiological parameter in Lumidigm's wristwatch embodiment and that Lumidigm provides no motivation for doing so. CIB at 128-29; Tr. (Madisetti) at 1340:20-1341:14. Complainants argue that implementing such functionalities in a wristwatch would not have a reasonable expectation of success, citing testimony from Apple engineers expressing skepticism that blood oxygen could be measured at the wrist. CIB at 129. Complainants cite evidence that Apple took ███████████████████████████████████████. *See* CRB at 86-87.

In reply, Apple argues that using Lumidigm's wristwatch to measure a physiological parameter such as blood oxygen would have been obvious to one of skill in the art. RRB at 51-52. Apple cites evidence that Dr. Warren experimented with measuring pulse oximetry on the wrist with his students at Kansas State University in 2002. Tr. (Warren) at 1195:24-1196:10, 1216:10-25; RX-0632 (2002 photograph); RX-0504 (2005 poster); RX-0508 (2005 article). Apple submits that the development timeline for implementing pulse oximetry in the Apple Watch is not relevant to the obviousness of the Poeze patents, because the ██████████████ ████████████████████████████████████. RIB at 144-46; RRB at 68-69.

In consideration of the parties' arguments, the undersigned finds that the evidence of record fails to show that one of ordinary skill would have been enabled to measure oxygen saturation in the Lumidigm wristwatch. As discussed above in the context of the '501 patent, Lumidigm describes "extended functionality" including measurements of "oxygenation and/or hemoglobin levels in the blood," and states that such functionalities are "especially suitable when the biometric sensor is comprised by a portable device, such as a portable electronic device."

RX-0411 at 17:64-18:2, 19:18-28. The specification explicitly identifies "a watch" as an example of a "portable electronic device having extended functionality." *Id.* at 3:21-37. Lumidigm thus contemplates blood oxygen measurement in a wristwatch as one implementation of its "extended functionality," but the Federal Circuit has held that "when the prior art includes a method that appears, on its face, to be capable of producing the claimed composition," the patentee may rebut this evidence by presenting "sufficient reason or authority or evidence, on the facts of the case, to show that the prior art method would not produce or would not be expected to produce the claimed subject matter." *In re Kumar*, 418 F.3d 1361, 1368 (Fed. Cir. 2005); Part IV.G.1.a *supra* (discussing additional relevant authority).

In rebuttal to Lumidigm's blood oxygen disclosure, Complainants have presented persuasive evidence that persons of ordinary skill in the art would not have expected to successfully measure blood oxygen in a wristwatch at the time of the Poeze patents. *See* CIB at 126-29; CRB at 44-46. Mr. Rowe, the "primary inventor" of Lumidigm, *see* Tr. (Rowe) at 1146:18-1147:3, acknowledged that he never made a device that calculated blood oxygen at Lumidigm, Inc. CX-0297C (Rowe Dep. Tr.) at 118:4-119:8.[40] Complainants have also cited testimony from numerous Apple engineers describing the significant difficulty of performing pulse oximetry at the wrist. *See* Tr. (Mannheimer) at 1012:12-1013:6 (admitting that in 2014, he believed that pulse oximetry at the wrist would be a challenge, that he "did not know if it could be done," that "the wrist is just enormously different from the physiological perspective," and

---

[40] There is little to no technical description of the blood oxygen functionality in Lumidigm, let alone in the wristwatch embodiment specifically. *See* CIB at 126; RX-0411 at 19:24-28.

CONFIDENTIAL INFORMATION REDACTED

that the signal at the wrist is "enormously weak")[41]; *see also id.* at 998:21-999:6 (products he

previously worked on "operated on a much more vascularized tissue bed, usually fingers or

forehead . . . [t]he wrist is "just an incredibly different beast"); CX-0299C (Waydo Dep. Tr.) at

166:4-167:5 ("The wrist is one of the most difficult places on the body to do almost every

physiological measurement"); CX-0295C (Shui Dep. Tr.) at 108:13-21 ("█████████████

████████████████████████████████████████████████████. The watch is

worn on the wrist, and the wrist is well known for its lack of signal."). The blood oxygen

measurement described in Lumidigm is characterized as relying on "spectrographic changes that

may be detected" by its biometric sensor, which are "correlated with oxygenation and/or

hemoglobin levels." RX-0411 at 19:22-26. The testimony of Apple engineers shows the

difficulty in calculating blood oxygen from such spectra if obtained at the wrist, █████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████; Tr. (Land) at 983:2-12 ████████

███████████████████████████; *see* CIB at 169-171.

    Apple counters this evidence with Dr. Warren's testimony describing pulse oximetry

experiments at Kansas State University in 2002-05, RRB at 52-53, but there is little evidence that

wrist-based blood oxygen levels were successfully measured in a watch-type environment. With

---

[41] Dr. Mannheimer had worked on pulse oximetry technology at Nellcor from 1987 to 2008, before
joining Apple. *See* Tr. (Mannheimer) at 994:9-25, 1009:2-8. He was hired by Apple because of his
"extensive experience" in pulse oximetry and biosensing in general. Tr. (Land) at 963:10-15.

**CONFIDENTIAL INFORMATION REDACTED**

respect to the work done with Professor Warren's undergraduate students cited by Respondents

(*see* RRB at 52), Dr. Warren testified that his students "worked with [these sensors] on their

wrists" (Tr. at 1216:23-25) and took measurements from various locations on the body, including

wrists (Tr. at 1186:8-16, 1196:8-10, RDX-8.88).  He provided no testimony regarding the results

of those measurements.  Apple also does not identify measurements of oxygen saturation at the

wrist in the corroborating documents provided by Dr. Warren. *See* RIB at 64-67; RRB at 52-53;

CRB at 45-46; RX-0504 (referencing wrist as a "viable" measuring site but only presenting data

from finger and head); RX-0508.0007, .0012 (referencing "different body locations (*e.g.*, wrist,

forehead or ear lobe) that have noticeably different vascular profiles" and presenting data from

the thumb).  Apple also argues that methods for pulse oximetry were well-known at the time of

the Poeze patents, RRB at 51, but Apple's evidence for prior art blood oxygen measurements

relies on measurements at other locations on the body—not at the wrist. *See, e.g.,* RX-0484

(describing measurement of blood oxygen at the finger).[42,43]

On the evidence of record, the presumption of enablement is overcome with respect to

configuring Lumidigm's wristwatch to measure blood oxygen at the time of the Poeze patents.

---

[42] Apple argues that its engineers' testimony related solely to "adding that known functionality into the limited space of a small consumer device" (RRB at 47), but the testimony at issue indicates broader signal issues.

[43] Mr. Kiani testified at the hearing that he could have done a "conventional pulse oximeter" on the wrist "30 years ago" (Tr. (Kiani) at 114:20-22), but this testimony is less persuasive on this issue than the testimony of the Apple engineers, particularly given Mr. Kiani's testimony that many conventional pulse oximetry devices do not work. *See* Tr. (Kiani) at 102:20-21, 121:18-24. As discussed above, Apple documents ███████████████████████████████████████. CX-0177C at 13.

Accordingly, Apple has not shown that the preamble limitations of '502 patent claim 19 are met by Lumidigm.[44]

> **b.    Element [19A]: "a plurality of emitters configured to emit light, each of the emitters comprising at least two light emitting diodes (LEDs)"**

There is no dispute that Lumidigm discloses a plurality of emitters. *See* RIB at 80-82; CIB at 123.  As discussed above in the context of the LEDs limitation of '501 patent claim 1, Lumidigm discloses "a plurality of light sources" that "may comprise light emitting diodes ('LEDs')," including "sets of LEDs."  RX-0411 at 6:22-53.  Lumidigm discloses several configurations with light sources arranged in sets of at least two:



**FIG. 3**                          FIG. 7A

*Id*. at 8:33-42 (Fig. 3), 9:26-34 (Fig. 7A); *see also* RIB at 81 (identifying Figs. 3, 5, 7A, and 7B).

Lumidigm explicitly discusses the benefits of pairs of light sources, noting that two light sources

---

[44] The evidence regarding the difficulty in achieving blood oxygen measurements at the wrist, as discussed above, also shows the lack of clear and convincing evidence of a reasonable expectation of success for the asserted obviousness arguments.

having the same wavelength "can be combined to increase the resulting signal-to-noise ratio of the measurement," while two light sources with different wavelengths can "provide unique and useful information about the tissue optical properties." *Id.* at 7:34-53.

> **c.** **Element [19B]: "four photodiodes arranged within the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user"**

As discussed above in the context of the "photodiodes" limitation of '501 patent claim 1, the evidence shows that Lumidigm discloses silicon detectors that are photodiodes, and the sensor geometries disclosed in Lumidigm's specification can be used in the "wristwatch" embodiment in a configuration for receiving light that has been attenuated by tissue of the user. *See* RX-0411 at 6:56-63, 11:65-12:2. Lumidigm discloses two specific configurations with arrays of at least four detectors:



FIG. 7A                    FIG. 7B

*Id.* at 9:26-45, Fig. 7A, Fig. 7B; Tr. (Warren) at 1221:10-15; RDX-8.37; RIB at 82. Lumidigm describes the benefits of such detector arrays, wherein "[t]he signal detected at each of the array

elements then represents a different source-detector separation with respect to the light from a

given light source." *Id*. at 9:39-41.

> **d.     Element [19C]: "a protrusion comprising a convex surface including separate openings extending through the protrusion and lined with opaque material, each opening positioned over a different one associated with each of the four photodiodes, the opaque material configured to reduce an amount of light reaching the photodiodes without being attenuated by the tissue"**

As discussed above in the context of the "protrusion" limitation of '501 patent claim 1,

Lumidigm's disclosures provide a reason to modify the optical surface of Lumidigm to form a

protrusion comprising a convex surface. *See* Part IV.E.1.d. However, the evidence does not

clearly and convincingly show how or why the "array"-type detectors in Lumidigm relied upon

by Apple for Element [19B] would be formed with separate openings through the protrusion for

individual photodiodes in the array. *See* RIB at 82; CIB at 143 (noting requirement to treat each

claim as an integrated whole); CRB at 55 (same). For this limitation, Apple simply refers to the

reasoning provided for the three-photodiode configuration relied upon for Element [1B] (which

relies on the single diode example in Figure 2 of Lumidigm), but that configuration does not

appear similar to the "array" configurations cited by Respondents for Element [19B], and no

clear and convincing testimony linking Figs. 7A and 7B to separate "openings" through the

protrusion for individual (or subsets of) diodes in an array has been provided.[45]  *See* RIB at 72-

---

[45] Lumidigm explains that "detector 36" may be "a single element, a plurality of discrete elements, or a one- or two-dimensional array of elements." RX-0411 at 6:54-56. Fig. 2 shows a single opening over detector 36 which, if anything, would appear to suggest a single opening over an array, rather than separate openings over individual diodes in the array. While Apple argues that the Figs. 7A and 7B are merely "illustrative," and that Lumidigm's sensor "can include any number and arrangement of photodiodes" (RIB at 82), Apple did not clearly present any other specific LED/photodiode arrangement in its analysis of Element [19B] for assessment in view of the claim as a whole. *See* Tr. (Warren) at 1221:10-15 and RDX-8.37; RIB at 82.

74, 83-84; RX-0411 at 9:26-45 (discussing the "detector array" structure); CIB at 143 (arguing that Apple does not show obviousness based on claim as an integrated whole).

With regard to Figure 7B, Dr. Warren testified with regard to a different limitation that "one of ordinary skill could essentially choose any four of the photodiodes within this arrangement . . . and then include an opening over each one" (Tr. (Warren) at 1225:23-1226:1) but this testimony of what one of ordinary skill in the art could theoretically do is insufficient to clearly and convincingly show that Lumidigm discloses this arrangement, or provide a reason for one of ordinary skill in the art to modify Lumidigm to do so. *See Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1359 ("The obviousness inquiry does not merely ask whether a skilled artisan could combine the references, but instead asks whether 'they would have been motivated to do so.'").

Apple also argues that Element [19C] is rendered obvious based on a combination with Cramer, which Apple contends includes four diodes in a circular array, with separate openings with opaque lateral surfaces positioned over each of the photodiodes. *See* RIB at 108-110. As discussed above in Part IV.E.1.d, the evidence does not clearly and convincingly show that one of skill in the art would have a reason to combine the specific structures of Cramer with Lumidigm, and Cramer only includes one LED (which would not meet the "plurality of emitters" requirement of Element [19A])). *See* n.36 *supra*.

e. **Element [19D]: "optically transparent material within each of the openings"**

With respect to the "optically transparent material" limitation of '502 patent claim 19, Apple identifies Lumidigm's disclosure of "an optical relay (not shown) between the sensor surface 39 and the skin 40" that "transfers the light . . . from the skin back to the detector(s)." RX-0411 at 8:19-23; RIB at 84-85. Lumidigm provides examples of these optical relays, including "fiber-optic face plates and tapers, individual optical fibers and fiber bundles, light

pipes and capillaries, and other mechanisms known to one of skill in the art." *Id*. at 8:23-26.

Dr. Warren testified at the hearing that one of ordinary skill in the art would understand an

"optical relay" to be an optically transparent material. Tr. (Warren) at 1221:16-1222:25; RIB at

84-85.

Apple further argues that this limitation would be obvious because the use of transparent

materials within openings was well-known at the time of the Poeze patents. RIB at 111-113; Tr.

(Warren) at 1193:23-1194:14, 1221:16-1222:9; RDX-8C.11 (citing RX-0670; RX-0665; RX-

0666; RX-0667; RX-0648). Apple also points to the "light transmittance plate" disclosed in

Seiko 131, wherein "[a] transparent window is formed on the top of sensor frame 36 . . . by

means of light transmittance plate 34, which is a glass plate." RX-0666 at 10:30-32. With

respect to Cramer, Apple identifies the datasheet for the CLT 2160, which depicts a "window on

top of can." RX-1221; *see* RX-0670 at 5:33-35.



PHYSICAL DIMENSIONS — in accord-
ance with JEDEC (T016) outline except
for window on top of can.
   All dimensions in inches. Collector elec-
trically connected to case. Leads gold
plated Kovar.

RX-1221. Apple further argues that Cramer discloses a further layer of clear transparent windows between the detectors and the skin. Tr. (Warren) at 1234:22-1235:12; RDX-8C.73 (citing RX-0670 at Fig. 6).

Complainants argue that Lumidigm's disclosure of an "optical relay" does not meet the "optically transparent material" limitation and is not disclosed in connection with Lumidigm's "wristwatch" embodiment. CIB at 138-39. Dr. Madisetti does not agree with Dr. Warren's opinions with respect to this limitation. *See* Tr. (Madisetti) at 1330:2-5.[46] Complainants argue that Seiko 131 fails to disclose multiple openings or optically transparent material within multiple openings. CIB at 148-49. Complainants argue that with respect to Cramer, the alleged windows are between the annular rings and are not "within" the openings. CIB at 146-47.

In consideration of the parties' arguments, the undersigned finds that Lumidigm clearly discloses "optically transparent material" over openings associated with photodiodes, but the evidence does not clearly and convincingly show a reason to incorporate such material "within" each opening. Lumidigm describes an optical relay that is comprised of optically transparent material. *See* RX-0411 at 8:19-26; *see* Tr. (Warren) at 1221:16-1222:25. The optical relay in Lumidigm is not "within" the opening depicted in Figure 2, however—it is located "between the sensor surface 39 and the skin 40." RX-0411 at 8:19-26, Fig. 2.[47] Apple appears to have

---

[46] Complainants argue that Apple should be precluded from arguing that Lumidigm discloses a "lens" because this contention was not disclosed in Apple's pre-hearing brief, RIB at 138-39, but there was no objection to Dr. Warren's testimony regarding a "lens" at the hearing, and Apple explains that the testimony merely represents Dr. Warren's opinion that one of ordinary skill in the art would understand Lumidigm's "optical relay" to be a "lens." RRB at 57-58.

[47] Seiko 131 similarly discloses a "light transmittance plate" that is positioned above its sensor but is not "within" any opening. *See* RX-0666 at 10:30-32. Cramer also discloses annular windows that do not appear to be associated within "each" opening. *See* Tr. (Warren) at 1234:22-1235:12; RDX-8C.73 (citing RX-0670 at Fig. 6).

identified transparent windows within an opening in Cramer's preferred photodiode, the CLT 2160, but did not provide a clear and convincing reason to modify Lumidigm to include such material within the openings or to incorporate the CLT 2160 photodiode in Lumidigm. *See* RX-0670 at 5:33-35, Fig. 6; RX-1221; RIB at 112-113.[48,49]

> **f.     Element [19E]: "one or more processors configured to receive one or more signals from at least one of the four photodiodes and output measurements responsive to the one or more signals, the measurements indicative of the oxygen saturation of the user"**

As discussed above in the context of the preamble limitations, the evidence indicates that one of skill in the art would not have been enabled to use the Lumidigm wristwatch embodiment to measure oxygen saturation. In particular, Lumidigm only discloses that spectroscopic changes correlated with oxygenation "may be detected according to the methods described above." RX-0411 at 19:22-26. Complainants have presented credible evidence that one of ordinary skill in the art would not have been able to successfully implement this detection in a wristwatch at the time of the Poeze patents. *See* CIB at 126-29; CRB at 44-46. Accordingly, for the same reasons discussed above in the context of the preamble, Apple has not shown by clear and convincing evidence that the "one or more processors" limitation of '502 patent claim 19 is met by Lumidigm.

---

[48] As discussed above in the context of the "opaque lateral surfaces" limitation of '501 patent claim 1, the undersigned finds the CLT 2160 datasheet to be reliable evidence for the structure of the photodiode disclosed in Cramer. *See* Part IV.G.1.f *supra*.

[49] Apple identifies a similar "can package" photodiode with a window described in Webster. RX-0035.0094-95 ("In the can package . . ., the photodiode chip is mounted on a metallic stem and is sealed with a cap that has a window to allow incident light to reach the semiconductor surface.").

g.     **Element [20]: "further comprising a thermistor"**

Claim 20 of the '502 patent depends from claim 19, further requiring a thermistor.  With

respect to this limitation, Apple identifies Lumidigm's disclosure of "preprocessing steps"

including "performing explicit corrections to account for sensor-to-sensor variations or

environmental influences of temperature, humidity, and pressure."  RX-0411 at 14:21-28.

Lumidigm notes that "[t]hese and other techniques are well known in the art," *id*. at 14:29, and

Dr. Warren testified that "a person of ordinary skill would realize that such a temperature

measurement could easily be done with a thermistor."  Tr. (Warren) at 1223:1-20.  Apple

identifies examples of suitable thermistors in Webster, which explicitly discloses a thermistor to

compensate for LED temperature changes: "One way to compensate for LED temperature

changes is to have a temperature sensor built into the probe along with the LEDs and

photodiode."  RX-0035.0085 (citation omitted).  A thermistor is also identified as part of an

oxygen sensor in a different chapter of Webster.  *Id*. at 42.  Apple submits that one of ordinary

skill in the art would have been motivated to use one of the thermistors disclosed in Webster in

Lumidigm's wristwatch embodiment with a reasonable expectation of success.  RIB at 123-24;

Tr. (Warren) at 1239:22-1240:3.

Complainants argue that Lumidigm fails to disclose or suggest a thermistor.  *See* CIB at

140.  With respect to Webster, Complainants submit that the two thermistors identified by Apple

are in separate chapters describing different devices.  *Id*. at 153-54; *see* Tr. (Madisetti) at 1336:5-

18.

In consideration of the parties' arguments, the undersigned finds that Lumidigm includes

an explicit suggestion to account for environmental influences including temperature in the

operation of its biometric sensor, *see* RX-0411 at 14:21-28, and Apple has shown that one of

ordinary skill in the art would have had reason to use a thermistor to achieve this goal. *See* Tr. (Warren) at 1223:1-20. Moreover, the undersigned finds that one of ordinary skill in the art would have had a reasonable expectation of success adding a thermistor to Lumidigm's wristwatch embodiment, because it involves "the mere application of a known technique to a piece of prior art ready for the improvement." *KSR*, 500 U.S. at 417. In the context of accounting for environmental influences, Lumidigm recognizes that "[t]hese and other techniques are well known in the art," *id*. at 14:29, and this is corroborated by Webster, which describes the use of a thermistor to "compensate for LED temperature changes." RX-0035.0085. In a separate chapter, Webster also discloses a thermistor that is used with an oxygen sensor. *Id*. at 42. The undersigned agrees with Complainants that Apple has failed to show that any of the thermistors disclosed in Webster could be directly implemented in Lumidigm's device, but "it is not necessary that [two pieces of prior art] be physically combinable to render obvious" the asserted patent. *Allied Erecting and Dismantling Co., Inc. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) (quoting *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983)). The disclosures in Webster provide clear evidence that thermistors would have been known to persons of ordinary skill in the art to measure the temperature described in Lumidigm.

> **h.** **Element [21]: "wherein the one or more processors are further configured to receive a temperature signal from the thermistor and adjust operation of the user-worn device responsive to the temperature signal"**

Claim 21 of the '502 patent depends from claim 20, further requiring that "the one or more processors are further configured to receive a temperature signal from the thermistor and adjust operation of the user device responsive to the temperature signal." The evidence shows that this limitation to be met for the same reasons discussed above in the context of '502 patent claim 20. In particular, Lumidigm explicitly discloses "preprocessing steps" including

"performing explicit corrections to account for sensor-to-sensor variations or environmental influences of temperature, humidity, and pressure." RX-0411 at 14:21-28. One of ordinary skill in the art would have recognized that these preprocessing steps would have been performed by the processor disclosed in Lumidigm, as discussed above in the context of the "one or more processors" limitation, using a temperature signal from a thermistor, as discussed above in the context of '502 patent claim 20.

> i.   **Element [22]: "wherein the plurality of emitters comprise at least four emitters, and wherein each of the plurality of emitters comprises a respective set of at least three LEDs"**

Claim 22 of the '502 patent depends from claim 21, further requiring that "the plurality of emitters comprise at least four emitters, and wherein each of the plurality of emitters comprises a respective set of at least three LEDs." As discussed above in the context of the "plurality of emitters" limitation, Lumidigm discloses "a plurality of light sources" that "may comprise light emitting diodes ('LEDs')," including "sets of LEDs." RX-0411 at 6:22-53. Figure 7A of Lumidigm discloses an embodiment with four sets of eight LEDs. *Id.* at 9:26-34 (Fig. 7A). *See* Tr. (Warren) at 1220:13-1221:6; RDX-8.36. As discussed above, the Figure 7A embodiment also meets the "four photodiodes" requirement of element [19B]. *See* RDX-8.37 (identifying Figure 7A and 7B as meeting the four photodiodes limitation).

* * *

For the reasons discussed above, the evidence fails to clearly and convincingly disclose a combination of elements meeting the limitations of claim 22 of the '502 patent, and Apple has not shown a reasonable expectation of success in achieving a combination of these elements in Lumidigm's wristwatch embodiment.

3.      '502 Patent Claim 28

As discussed below, the evidence fails to clearly and convincingly show that claim 28 of

the '502 patent is rendered obvious by Lumidigm alone or in combination with other prior art.

       a.      **Element [28 preamble]: "A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user worn device comprising:"**

For the same reasons discussed above in the context of the preamble limitations of '502

patent claim 19 (Element 19 [Preamble]), the preamble limitations of '502 patent claim 28 are

not met by Lumidigm because one of ordinary skill in the art would not have been enabled to

measure oxygen saturation using the Lumidim watch embodiment.

       b.      **Element [28A]: "a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength"**

With respect to the first LEDs limitation of '502 patent claim 28, Apple identifies

Lumidigm's disclosure that its light sources "can each have the same wavelength characteristics

or can be comprised of sources with different center wavelengths in a spectral range from about

300 nm to about 10,000 nm."  RX-0411 at 6:43-46; RIB at 88-90. Lumidigm provides that "the

collection of light sources 34 can include some sources that have the same wavelengths as others

and some sources that are different."  *Id.* at 6:46-48.  Lumidigm explicitly discusses the benefits

of pairs of light sources, noting that two light sources having the same wavelength "can be

combined to increase the resulting signal-to-noise ratio of the measurement," while two light

sources with different wavelengths can "provide unique and useful information about the tissue

optical properties."  *Id.* at 7:34-53.  There is no dispute that Lumidigm thus discloses LEDs

emitting at different wavelengths, and Apple identifies the sensor geometries in Figs. 3, 5-6, and

7A-B of Lumidigm as meeting this limitation.  RIB at 89-90.  Lumidigm provides that "any of

the sensor geometries previously disclosed or other equivalent configurations can be used" in the

wristwatch embodiment. *Id.* at 11:65-12:2.

    c.    **Element [28B]: "a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength"**

With respect to the second LEDs limitation of '502 patent claim 28, Apple identifies

Lumidigm's disclosure of "sets of LEDs . . . with differing wavelength characteristics that lie

within the spectral range from about 350 nm to about 1100 nm." RX-0411 at 6:48-55.

Lumidigm explicitly discusses the benefits of pairs of light sources, noting that two light sources

having the same wavelength "can be combined to increase the resulting signal-to-noise ratio of

the measurement," while two light sources with different wavelengths can "provide unique and

useful information about the tissue optical properties." *Id.* at 7:34-53. Apple further cites U.S.

Patent Application No. 10/262,403, which is incorporated by reference in Lumidigm, *see* RX-

0411 at 1:40-44, and explicitly discloses multiple sets of LEDs with the same wavelengths

emitted by LEDs in each set. *See* RX-0460 at ¶ 54, Fig. 6. There is no dispute that Lumidigm

thus discloses a second set of LEDs emitting at the same wavelengths as the first set of LEDs,

and Apple identifies the sensor geometries in Figs. 3, 5-6, and 7A-B of Lumidigm as meeting

this limitation. Lumidigm states that in "any of the sensor geometries previously disclosed or

other equivalent configurations can be used" in the wristwatch embodiment. *Id.* at 11:65-12:2.

    d.    **Element [28C]: "four photodiodes arranged in a quadrant configuration on an interior surface of the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user"**

As discussed above in the context of the "photodiodes" limitations of '501 patent claim 1

and '502 patent claim 19, the undersigned finds that Lumidigm discloses silicon detectors that

are photodiodes. *See* RX-0411 at 6:56-63, 9:26-45. With respect to the claimed "quadrant configuration," Apple points to Lumidigm's Figure 7B, where detectors are arranged in a two-dimensional array. *See* Tr. (Warren) at 1225:13-1226:1; RDX-8C.44; RX-0411 at 9:34-45, Fig. 7B; RIB at 91.

<blockquote>

**e.    Element [28D]: "a thermistor configured to provide a temperature signal"**
</blockquote>

As discussed above in the context of '502 patent claims 20 and 21, the undersigned finds that Lumidigm, in combination with Webster, provides a reason to modify Lumidigm to include a thermistor and shows a reasonable expectation of success. *See* RX-0411 at 14:21-28; RX-0035.0085.

<blockquote>

**f.    Element [28E]: "a protrusion arranged above the interior surface, the protrusion comprising: a convex surface"**
</blockquote>

As discussed above in the context of the "protrusion" limitation of '501 patent claim 1, the undersigned finds that one of skill in the art would have reason to modify Lumidigm to achieve this limitation, and a reasonable expectation of success. *See* RX-0411 at 4:54-56, 8:1-10, Fig. 2; RX-0666 at 19:5-8, Fig. 28; RX-0670 at 5:45-51, Fig. 3, Fig. 6.

<blockquote>

**g.    Element [28F]: "a plurality of openings in the convex surface, extending through the protrusion, and aligned with the four photodiodes, each opening defined by an opaque surface configured to reduce light piping"**
</blockquote>

As discussed above in the context of the "plurality of openings" limitation of claim 22 (Element [19C]), the evidence fails to clearly and convincingly show a plurality of openings aligned with the four photodiodes in the context of the "four photodiode" embodiments relied upon by Apple for Element [28C].

      h.    **Element [28G]: "a plurality of transmissive windows, each of the transmissive windows extending across a different one of the openings"**

As discussed above in the context of the "optically transparent material" limitation of '502 patent claim 19 (Element [19D]), Lumidigm clearly discloses an "optical relay" that is transmissive and is positioned above an opening for a detector. *See* RX-0411 at 8:19-26; *see* Tr. (Warren) at 1221:16-1222:25. Lumidigm discloses a single window, but Dr. Warren suggests that "a person of skill would know that you could do an individual faceplate for each of the individual openings as a means to provide light but still optimize the process." Tr. (Warren) at 1221:1-1222:25. Dr. Warren identifies several prior art references with such windows extending across openings over photodiodes. *Id.* at 1193:23-1194:14; RDX-8C.11 (citing RX-0670; RX-0666; RX-0667).

      i.    **Element [28H]: "at least one opaque wall extending between the interior surface and the protrusion, wherein at least the interior surface, the opaque wall and the protrusion form cavities, wherein the photodiodes are arranged on the interior surface within the cavities"**

For the reasons discussed above in the context of the "opaque lateral surface" limitation of '501 patent claim 1 and the "opaque material" limitation of '502 patent claim 19 (Elements [1E] and [19C]), the undersigned finds Lumidigm, in combination with the other prior art, discloses the requirements of this limitation. *See* RX-0411 at 7:66-8:11, Fig. 2; RX-0670 at 2:46-51, 5:33-35, 5:46-48, Fig. 3, Fig. 6; RX-1221.

> j.  **Element [28I]: "one or more processors configured to receive one or more signals from at least one of the photodiodes and calculate an oxygen saturation measurement of the user, the one or more processors further configured to receive the temperature signal"**

As discussed above in the context of the "one or more processors" limitation of '502 patent claim 19 (Element [19E]), Lumidigm does not disclose a processor configured to calculate an oxygen saturation measurement.[50,51]

> k.  **Element [28J]: "a network interface configured to wirelessly communicate the oxygen saturation measurement to at least one of a mobile phone or an electronic network"**

With respect to the "network interface" limitation, Apple identifies a "communications system 344" disclosed in Lumidigm and depicted on Figure 9, which "may comprise a wired, wireless, modem, and/or other type of interfacing connection and permits data to be exchanged with external devices." RX-0411 at 13:9-12, Fig. 9. In the context of a key fob embodiment, Lumidigm discloses "short-range wireless techniques based upon RF signals 103 . . . to communicate between the fob and a corresponding reader." *Id*. at 11:38-42. In this embodiment, the transmission can be "a simple confirmed or denied signal" or "the most recent measured spectrum is transmitted to the reader and the comparison and decision is accomplished at the reader or at a host to which the reader is connected." *Id*. at 11:49-55. Apple further

---

[50] As discussed above in the context of the "one or more processors" limitation of '501 patent claim 1 (Element [1F]), Lumidigm does disclose a "processor" that receives signals from a sensor and outputs measurements indicative of physiological parameters. *See* RX-0411 at 12:56-13:14.

[51] As discussed above in the context of the "thermistor" limitations of '502 patent claims 20 and 21 (Elements [20] and [21]), the evidence shows that one of ordinary skill in the art would have reason to incorporate a thermistor in the Lumidigm wristwatch embodiment. *See* RX-0411 at 14:21-28; RX-0035.0085.

submits that "RF signals 103" are depicted in Figure 8B in the context of the wristwatch embodiment.



**FIG. 8B**

*Id.* at Fig. 8B; RIB at 94-95. Complainants dispute whether Lumidigm discloses this limitation in combination with the wristwatch embodiment and/or the extended functionality for measuring physiological parameters. CIB at 141-42; CRB at 51.

In consideration of the parties' arguments, the undersigned finds that Lumidigm clearly discloses a network interface for wireless communication with an electronic network in its wristwatch embodiment. *See* RX-0411 at 11:38-55, Fig. 8B. This does not include the communication of an oxygen saturation measurement, however, because no such measurement is disclosed in Lumidigm, for the reasons discussed above in the context of the preamble of '502 patent claim 19 (Element [19 preamble]).

l.    **Element [28K]: "a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the oxygen saturation measurement of the user"**

With respect to the "user interface comprising a touch-screen display" limitation, Apple points to Lumidigm's disclosure of embodiments of "a personal electronic device that may be configured with biometric capability in the form of a PDA" and "a combined cellular telephone/PDA." RX-0411 at 12:21-48, Fig. 8D, Fig. 8E. Apple argues that such devices were

known to have touchscreen displays.  RIB at 95-96; *see* Tr. (Warren) at 1226:23-1227:3.  Apple

further cites an embodiment disclosed in Lumidigm wherein the portable electronic device can

access the internet "to display the retrieved information on the portable electronic device."  RX-

0411 at 21:29-33.  Apple further asserts the widespread availability of touch-screen user

interfaces, and Dr. Warren testified that a person of ordinary skill would have been able to

incorporate a touch-screen into any portable device.  RIB at 129-33; *see* Tr. (Warren) at 1226:23-

1227:5.  Apple identifies a touch-screen disclosed in U.S. Patent No. 9,001,047 (RX-0673,

"Apple '047), and Dr. Warren testified that it would have been obvious to incorporate such a

touch-screen with the display of a blood oxygen measurement disclosed in Lumidigm.  Tr.

(Warren) at 1240:4-1242:9.  Apple also identifies certain references to "touch buttons" in

Webster.  RIB at 133 (citing RX-0035 at 114, 137, 218-223).

Complainants argue that Lumidigm provides no clear disclosure of a touch-screen in

combination with its wristwatch embodiment and/or the extended functionality for measuring

physiological parameters.  CIB at 141-42; CRB at 51.  With respect to Apple '047, Complainants

argue that there is no disclosure of a user-worn device or any display of a physiological

parameter such as an oxygen saturation measurement.  CIB at 156-57; *see* Tr. (Madisetti) at

1337:3-11.  Complainants argue that Apple has failed to show any motivation to combine or

likelihood of success in adding a touch-screen to the wristwatch embodiment in Lumidigm.  CIB

at 157; CRB at 84-85.

In consideration of the parties' arguments, the undersigned agrees with Complainants that

Lumidigm fails to disclose a touch-screen user interface for display of an oxygen saturation

measurement in conjunction with the wristwatch embodiment, and Apple has not clearly and

convincingly shown that this addition would be obvious.  Dr. Warren's testimony on this issue is

conclusory.  *See* Tr. (Warren) at 1226:22-1227:7, 1240:4-17, 1241:1-17; RDX-8.83-84.  Apple

relies on Lumidigm's identification of certain portable electronic devices with screens, but with

no reference to touch-screen input.  *See* RIB at 131 (citing RX-0411 Figs. 8B-8E, 3:35-37,

21:29-36).  Moreover, the cellular phone and PDA embodiments are identified as separate from

the wristwatch embodiment, with no suggestion that parts of these different portable electronic

devices should be combined.  *See id*. at 10:42-13:26.  Lumidigm's wristwatch embodiment is

depicted as an analog clock face with no screen for displaying any measurement.  *See id*. at

11:60-12:2, Fig. 8B.[52]

        The undersigned further finds that Apple has not clearly and convincingly identified a

reason one of ordinary skill would have combined Lumidigm's wristwatch with the touch-screen

interface disclosed in Apple '047 and shown that such a combination would have had a

reasonable expectation of success.  Dr. Warren's testimony on these issues is conclusory and

fails to offer any reason for adding a touch-screen to Lumidigm's wristwatch—he merely offers

his opinion that a touch-screen "is a well-known mechanism" and that "a person of ordinary skill

would realize that, to add the features of . . . [a] touchscreen to Lumidigm, they could look to a

number of references, but . . . Apple would be an obvious choice."  Tr. (Warren) at 1240:4-

1242:9.  With respect to this limitation, Dr. Warren appears to have relied on the "touch-screen

display" in the claim language as his only reason for incorporating this feature, and the Federal

Circuit has held that such an approach is inadequate to prove obviousness.  *See InTouch Techs.,*

*Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014) (reversing jury's finding of

---

[52] As discussed above regarding Element [28J], Lumidigm discloses a network interface for wirelessly communicating the measurement of a physiological parameter from the wristwatch to an external device (where it can be read).  *See* Element [28J] *supra*; RX-0411 at 11:38-55; RIB at 94-95.

obviousness where expert used the asserted patent as a "roadmap" and her "testimony primarily consisted of conclusory references to her belief that one of ordinary skill in the art could combine these references, not that they would have been motivated to do so.").

Apple '047 also fails to disclose any use of a touch-screen in a wristwatch—it is primarily directed to "a rectangular touch screen display with a portrait view and a landscape view." *See* RX-0673 at 2:53-3:57 (describing embodiments of rectangular touch screen displays), Fig. 2; *see* Tr. (Warren) at 1240:18-25 (describing Apple '047). Apple's prior art touch-screen does not appear to be compatible with the wristwatch disclosed in Lumidigm, which has an analog clock face with a circular shape, and Dr. Warren did not provide testimony addressing this issue. *See* RX-0411 at Fig. 8B. Moreover, to the extent that Apple relies on Webster, Apple has not shown that any of the displays or user interfaces identified in Webster are touch-screens. *See* RX-0035 at 114, 137, 218-223.[53]

      **m.**    **Element [28L]: "a storage device configured to at least temporarily store at least the measurement"**

With respect to the "storage device" limitation, Apple identifies Lumidigm's disclosure of computer hardware elements in Figure 9, including storage device 338, memory 348, and computer-readable storage medium 340b. RX-0411 at 12:63-13:9. Lumidigm provides that "[t]he storage devices typically hold information defining the stored spectra as well as any personalized-setting information that may be used." *Id.* at 13:12-14. Complainants dispute this limitation, arguing that there is no clear disclosure of the storage devices in Figure 9 in

---

[53] Complainants argue that Apple failed to cite Webster with respect to this limitation in its pre-hearing brief. *See* CRB at 84. The undersigned agrees with Complainants that this contention is untimely, but even if these disclosures in Webster were considered, it would not change the determination regarding obviousness.

combination with the wristwatch embodiment and/or the extended functionality for measuring physiological parameters.  CIB at 141-42; CRB at 51.

In consideration of the parties' arguments, the undersigned finds that Lumidigm discloses a storage device configured to store measurements from its biometric sensor.  As discussed above in the context of the "one or more processors" limitation of '501 patent claim 1, Lumidigm explicitly notes that some of the components in Figure 9 could be used in portable devices, which includes the "wristwatch" embodiment.  RX-0411 at 13:21-37 (identifying a "second set of embodiments" involving "a portable electronic device having extended functionality," and including "a cellular telephone, a personal digital assistant, an electronic fob, and a watch" as examples of the "electronic arrangement"), 2:58-61, 17:67-18:2.  Lumidigm explicitly provides that "[t]he storage devices typically hold information defining the stored spectra," and the blood oxygen measurement described in Lumidigm is defined by "spectroscopic changes" that are "correlated with oxygenation."  *Id.* at 13:12-14, 19:24-26.  Accordingly, the "storage device" limitation of '502 patent claim 28 is disclosed in Lumidigm, except to the extent that this limitation requires storage of an oxygen saturation measurement.

n.    **Element [28M]: "a strap configured to position the user-worn device on the user"**

With respect to the "strap" limitation, Apple identifies the strap depicted in Lumidigm's "wristwatch" embodiment.  *See* RX-0411 at 11:60-64, Fig. 8B.  There is no dispute that Lumidigm meets the "strap" limitation of '502 patent claim 28.

\* \* \*

For the reasons discussed above, the evidence fails to clearly and convincingly disclose a combination of elements meeting the limitations of claim 28 of the '502 patent, and Apple has

137

not shown a reasonable expectation of success in achieving a combination of these elements in Lumidigm's wristwatch embodiment.

### 4.     '648 Patent Claim 12

As discussed below, the evidence fails to clearly and convincingly show that claim 12 is obvious in view of Lumidigm alone or in combination with other asserted prior art.

#### a.     Element [8 preamble]: "A user-worn device configured to non-invasively determine measurements of a physiological parameter of a user, the user-worn device comprising:"

For the same reasons discussed above in the context of the preamble limitations of '501 patent claim 1 (Element 1[A]), Lumidigm meets the preamble limitations of '648 patent claim 8 requiring a "user-worn device configured to non-invasively determine measurements of a physiological parameter of a user."

#### b.     Element [8A]: "a first set of light emitting diodes (LEDs), the first set comprising at least an LED configured to emit light at a first wavelength and at least an LED configured to emit light at a second wavelength"

For the same reasons discussed above in the context of Element [28A] of the '502 patent, the evidence shows that this limitation is met by Lumidigm.

#### c.     Element [8B]: "a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength"

For the same reasons discussed above in the context of Element [28B] of the '502 patent, the evidence shows that this limitation is met by Lumidigm.

#### d.     Element [8C]: "four photodiodes"

For the same reasons discussed above in the context of the "four photodiodes" limitations of '502 patent claim 19 (Element [19B]), the undersigned finds that the "four photodiodes" limitation of '648 patent claim 8 is met by Lumidigm.

138

  e.  **Element [8D]: "a protrusion comprising a convex surface, at least a portion of the protrusion comprising an opaque material"**

For the same reasons discussed above in the context of the "protrusion" and "opaque lateral surface" limitations of '501 patent claim 1 (Elements [1C], [1D], and [1E]), the evidence shows that Lumidigm, in view of the prior art, provides a reason to modify the optical surface to form a "protrusion comprising a convex surface" with a portion of the protrusion (the openings) comprising an opaque material.

  f.  **Element [8E] and Element [8F]: "a plurality of openings provided through the protrusion and the convex surface, the openings aligned with the photodiodes" and "a separate optically transparent window extending across each of the openings"**

For the same reasons discussed above in the context of the "plurality of openings" limitations of '502 patent claim 19 (Element [19C]), the evidence fails to show, clearly and convincingly, a "plurality of openings" with a "separate optically transparent window extending across each of the openings" in combination with the "four photodiodes" embodiments of Lumidigm relied upon by Apple. *See* RIB at 82, 91, 98.

  g.  **Element [8G]: "one or more processors configured to receive one or more signals from at least one of the photodiodes and output measurements of a physiological parameter of a user"**

For the same reasons discussed above in the context of the "one or more processors" limitation of '501 patent claim 1 (Element [1F]), the undersigned finds that the "one or more processors" limitation of '648 patent claim 8 is met by Lumidigm.

  h.  **Element [8H]: "a housing"**

With respect to the "housing" limitation, Apple identifies Lumidigm's disclosure that "the biometric reader 111 is built in the case of a wristwatch 112." RX-0411 at 11:60-64, Fig.

8B. There is no dispute that Lumidigm thus discloses a housing in its "wristwatch" embodiment. The evidence shows that this limitation is met by Lumidigm.

### i.    Element [8I]: "a strap configured to position the housing proximate tissue of the user when the device is worn"

For the same reasons discussed above in the context of the "strap" limitation of '502 patent claim 28 (Element [28M]), the evidence shows that the "strap" limitation of '648 patent claim 8 is met by Lumidigm.

### j.    Element [12]: "wherein the physiological parameter comprises oxygen or oxygen saturation"

'648 patent claim 12 depends from claim 8 and further requires that "the physiological parameter comprises oxygen or oxygen saturation." For the same reasons discussed above in the context of the preamble limitations of '502 patent claim 19, this limitation is not met by Lumidigm, because the evidence shows that one of ordinary skill would not have been able to successfully configure Lumidigm's wristwatch to measure blood oxygen.

### 5.    '648 Patent Claim 24

As discussed below, the evidence fails to clearly and convincingly show that claim 24 of the '648 patent is rendered obvious by Lumidigm alone or in combination with other prior art.

### a.    Element [20 preamble]: "A user-worn device configured to non-invasively determine measurements of a user's tissue, the user-worn device comprising:"

Complainants dispute this limitation on the grounds that Lumidigm does not disclose measurement of a "physiological parameter" (*see* CIB at 124-125). For the same reasons discussed above in the context of the preamble limitations of '501 patent claim 1, Lumidigm discloses the preamble limitations of '648 patent claim 20 requiring a "user-worn device configured to non-invasively determine measurements of a user's tissue." Moreover, the preamble language of Element [20 preamble] does not necessarily require measurement of a

"physiological parameter," only "measurements of a user's tissue." Lumidigm clearly shows that the biometric functionality of the wristwatch embodiment requires "measurements of a user's tissue," and Complainants do not dispute that the wristwatch embodiment of Lumidigm performs biometric functionality. *See* RX-0411 at 5:30-44 (describing biometric identification of an individual based on comparing "tissue spectral data taken at the time of use and compared to stored tissue spectral data from prior ***measurement***") (emphasis added); CIB at 125 (describing Lumidigm's wristwatch as "identifying a user or authorizing them to do something using 'tissue spectral data'").

### b. Element [20A]: "a plurality of light emitting diodes (LEDs)"

For the same reasons discussed above in the context of Element [1A] of the '501 patent claim 1, this limitation is met by Lumidigm.

### c. Element [20B]: "at least four photodiodes configured to receive light emitted by the LEDs, the four photodiodes being arranged to capture light at different quadrants of tissue of a user"

For the same reasons discussed above in the context of Element [28C] of the '502 patent, the evidence shows that this limitation is met by Lumidigm.

### d. Element [20C]: "a protrusion comprising a convex surface"

For the same reasons discussed above in the context of the "protrusion" limitation of '501 patent claim 1 (Element [1C]), the evidence clearly and convincingly shows that Lumidigm's disclosures, in view of the prior art, provide a reason to modify Lumidigm's "optical surface" to form a protrusion comprising a convex surface, and a reasonable expectation of success in doing so.

e.   **Element [20D]: "and a plurality of through holes, each through hole including a window and arranged over a different one of the at least four photodiodes"**

For the same reasons discussed above in the context of Element [19C] of the '502 patent, the evidence is insufficient to show, clearly and convincingly, that the prior renders obvious a protrusion comprising a plurality of through holes where each through hole is "arranged over a different one of the at least four photodiodes," in combination with all other elements of this claim.

f.   **Element [20E]: "one or more processors configured to receive one or more signals from at least one of the photodiodes and determine measurements of oxygen saturation of the user"**

For the same reasons discussed above in the context of the preamble of '502 patent claim 19, the undersigned finds that the "one or more processors" limitation of '648 patent claim 20 is not met by Lumidigm, because one of ordinary skill would not have been able, without undue experimentation, to configure Lumidigm's wristwatch to determine measurements of oxygen saturation.

g.   **Element [24]: "wherein the protrusion comprises opaque material configured to substantially prevent light piping"**

Claim 24 of the '648 patent depends from claim 20, further requiring that "the protrusion comprises opaque material configured to substantially prevent light piping." For the same reasons discussed above in the context of the "opaque lateral surface" limitation of '501 patent claim 1 (Element [1E]), the undersigned finds that "opaque material configured to substantially prevent light piping" is disclosed by Lumidigm, but not in combination with all the other elements of claim 20.

6.     **'648 Patent Claim 30**

Claim 30 of the '648 patent depends from claim 20, further requiring that "the protrusion further comprises one or more chamfered edges." Apple contends that chamfered edges were well-known in the art. *See* Tr. (Warren) at 1228:24-1229:10. Apple further submits that chamfered edges are depicted in Seiko 131 and in Cramer. *See* RX-0666 at Fig. 5; RX-0670 at Fig. 3; Tr. (Warren) at 1236:3-16. Dr. Warren explained that such features would be implemented for comfort, in accordance with Lumidigm's teaching that modifications to the sensor surface could be made "to incorporate ergonomic features." Tr. (Warren) at 1228:24-1229:10 (quoting RX-0411 at 7:57-63). Dr. Warren further testified that "a person of ordinary skill would understand that chamfered edges have been around for many decades as a means to soften transitions between surfaces and make items such as watches more wearable." *Id*. at 1236:17-1237:3.

Complainants argue that Lumidigm fails to disclose or suggest a chamfered edge. CIB at 142-43. Complainants argue that the chamfered edges disclosed in Cramer are not on the alleged protrusions. *Id*. at 147. Similarly, Complainants argue that the chamfered edges disclosed in Seiko 131 are not on the alleged protrusion. *Id*. at 150. Complainants argue that Apple has failed to show why a person of ordinary skill would have been motivated to use a chamfered edge in Lumidigm's wristwatch embodiment with a reasonable expectation of success. CRB at 76-78.

In consideration of the parties' arguments, the evidence shows that chamfered edges were known in the prior art, and one of ordinary skill in the art would have reason to implement a chamfered edge on the sensor surface of Lumidigm's wristwatch for ergonomic reasons with a reasonable expectation of success. The record contains numerous examples of chamfered edges

in the prior art, including on the front face of Lumidigm's wristwatch and on the back face of Cramer's wristwatch. *See* RX-0411 at Fig. 8B; RX-0670 at Fig. 3.[54] This is clear evidence that chamfered edges were used in wristwatches and would have been known to persons of ordinary skill in the art. *See* Tr. (Warren) at 1228:24-1229:10, 1236:17-1237:3. Lumidigm provides an express motivation to modify the curvature of its sensor surface "to incorporate ergonomic features that allow for good optical and mechanical coupling with the tissue being measured, or for other technical or stylistic reasons." RX-0411 at 7:58-63.

\*\*\*

Although the prior art provides a reason to incorporate a chamfered edge into a protrusion on the back face of a wristwatch, with a reasonable expectation of success, the evidence fails to show that this limitation in combination with the other limitations of claim 30 (including all limitations of independent claim 20) are rendered obvious. Accordingly, Apple has not shown that claim 30 of the '648 patent is invalid for obviousness.

### 7.    Objective Indicia of Non-Obviousness

Complainants contend that the asserted claims of the Poeze patents are not obvious in view of certain objective indicia of non-obviousness, including skepticism and failure of others, unexpected results, copying, and commercial success. CIB at 158-75; CRB at 85-96. For the

---

[54] Complainants argue that the chamfered edges in Cramer are not on the alleged convex portions of the protrusion, CIB at 147, but claim 30 does not require the chamfered edge and the convex surface to be on the same part of the protrusion—the claim language recites "a protrusion comprising a convex surface," and "wherein the protrusion further comprises one or more chamfered edges." *See* '648 patent claim 20, claim 30.

CONFIDENTIAL INFORMATION REDACTED

reasons set forth below, the evidence regarding the objective indicia of non-obviousness do not weigh significantly against an obviousness finding.

a.     **Skepticism and Unexpected Results for Convex Protrusions**

Complainants contend that there was skepticism in the industry for convex protrusions, citing evidence from Apple's development of the Apple Watch wherein Apple engineers identified ████████████████████████████████████████

████████████████. *See* CX-1789C; CX-1790C. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ CX-0114C at 2-3.  An Apple patent application filed in July 2016 described benefits of a convex protrusion: "A convex shape can enable improved contact with the user's skin and can be more comfortable for the user than other shapes." CX-1569 at 9:35-37.  Another Apple patent filed in May 2016 described a protrusion "configured to create pressure to skin." CX-1806 at ¶ [0033].  "By applying localized pressure to the individual's skin, the pressure gradient across arterial walls can be reduced, which can lead to an increase in pulsatile (AC) signal." *Id.* at ¶ [0032].

Complainants also contend that the results of a convex protrusion were unexpected within Cercacor. *See* CIB at 162.  Mr. Kiani testified that Cercacor engineers were surprised that they achieved a stronger signal when trying to measure hemoglobin and glucose levels using a protrusion that applied pressure to a finger. Tr. (Kiani) at 98:9-99:16.  Complainants argue that this result conflicts with a prior art patent, U.S. Patent No. 6,801,799 (CX-1733, "Mendelson"), which warned against pressure on the skin during pulse oximetry measurements. *See* CX-1733 at 2:47-57 ("[V]ariations in contact pressure between the sensor and the skin can cause large

CONFIDENTIAL INFORMATION REDACTED

errors in reflection pulse oximetry (as compared to transmission pulse oximetry) since some of the blood near the superficial layers of the skin may be normally displaced away from the senor housing towards deeper subcutaneous structures."); *see* Tr. (Madisetti) at 1374:9-12. Complainants also cite the testimony of Robert Rowe, one of the Lumidigm inventors, who described a shape that matches the skin, *e.g.*, a concave shape to match a cylindrical body part, as a way to achieve "good coupling." RX-0279C (Rowe Dep. Tr.) at 69:8-21.

Apple disputes Complainants' interpretation of Apple's engineering documents, asserting that Apple engineers ███████████████████████████████████████████████ RRB at 66-67. ███████████████████████████████████████████████████ ████████████████████████████████████████████████████ Tr. (Block) at 905:23-907:24. With respect to the documents describing the effect of ████████ ████████████████████████████████████████████████████████████ ████████████████████ CX-0281C (Block Dep. Tr.) at 218:16-219:5. Apple argues that there is no evidence in the prior art for skepticism regarding a convex protrusion. RIB at 146-47; RRB at 67-68. Apple submits that the Mendelson patent cited by Dr. Madisetti does not disclose or discuss a convex protrusion. *See* Tr. (Warren) at 1244:18-1245:7 (discussing CX-1733/RX-0688). Apple cites another prior reference, Nippon, which describes the benefits of pressure on the skin for increasing signal strength. RX-0665 at 5:12-17, Fig. 3b; *see* Tr. (Warren) at 1245:8-16. Apple further cites the convex protrusions disclosed in Seiko 131 and Cramer. *See* RX-0666 at 3:22-28, 19:6-8, Fig. 28; RX-0670 at 5:45-51, Fig. 3, Fig. 6; *see* Tr. (Warren) at 1194:15-1195:5, 1245:1-1246:12. Apple argues that Mr. Kiani's surprise regarding the effect of a convex protrusion does not reflect the knowledge of one of skill in the art. RRB at 67. Apple disputes Complainants' characterization of Mr. Rowe's testimony, which did not explicitly reference any

concave shape.  *Id*.  With respect to the Apple patent applications describing convex protrusion, Apple argues that these features were not individually claimed to be novel.  *Id*. at 68.

In reply, Complainants argue that Mendelson teaches the undesirability of displacing blood away from the sensor, which would be caused by a convex protrusion.  CRB at 91.  Complainants contend that Nippon fails to disclose a convex protrusion and was considering during the prosecution of the Poeze patents.  *Id*. at 91-92.  Complainants submit that Mr. Rowe's testimony is consistent with the teachings in Mendelson and that Mr. Kiani's testimony regarding the surprising benefits of a convex protrusion is consistent with the advantages described in Apple's patent applications.  *Id*. at 92-94.

In consideration of the parties' arguments, the evidence does not show that there was skepticism in the industry regarding convex surfaces.  As discussed above in the context of the "protrusion" limitation of '501 patent claim 1, there is no evidence in the prior art that convex surfaces were disfavored before the invention of the Poeze patents.  The parties have identified prior art physiological sensors with concave, convex, and flat surfaces, which is convincing evidence that the shape of the sensor surface was a design choice for persons of ordinary skill in the art "to match the profile of a device in which it is mounted, to incorporate ergonomic features that allow for good optical and mechanical coupling with the tissue being measured, or for other technical or stylistic reasons."  RX-0411 at 7:57-63; *see also* RX-0666 at 3:22-28, Fig. 28; RX-0670 at 5:45-51, Fig. 3; RX-0665 at 5:12-17, Fig. 3b.  The Apple engineering documents that Complainants cite to show alleged skepticism are not clearly directed to the accused convex protrusions, and the undersigned agrees with Apple that this evidence should be discounted in view of the evidence that the back surface of the Apple Watch had a convex shape even before the pulse oximetry feature was implemented.  *See* RRB at 66-67.

CONFIDENTIAL INFORMATION REDACTED

In addition, the undersigned finds that Complainants have not shown that a gain in signal strength with convex surfaces was an unexpected result that demonstrates non-obviousness. Complainants have identified evidence that both Cercacor engineers and Apple engineers were

█████████████████████████████████████████████████████████████████

but the evidence in the prior art is mixed on the question of whether this result should have been unexpected. *Compare* CX-1733 at 2:47-57 (describing "large errors" caused by "variations in contact pressure") *to* RX-0665 at 5:12-17 (recognizing that a detector that "protrudes into the tissue slightly" has the effect of "increasing the signal strength of the detected signal.").[55] Moreover, to the extent that an improvement in signal strength is attributable to the increased pressure caused by a convex protrusion, the record shows that this effect was recognized in the prior art: Seiko 131 identifies a convex surface that improves "positive contact between the body surface and outside surface of the light transmittance plate." RX-0666 at 3:22-28, Fig. 28.; and Nippon describes increased signal strength from a protrusion into the tissue. RX-0665 at 5:12-17, Fig. 3b. The Federal Circuit has discounted evidence of unexpected results when the result was produced by a feature known in the prior art. *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1385 (Fed. Cir. 2015) ("[T]he offered secondary consideration actually results from something other than what is both claimed and novel in the claim, so there is no nexus to the merits of the claimed invention." (citing *In re Huai–Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (internal quotations removed)).

---

[55] In the pulse oximeter described in the specification of the Poeze patents, the benefits of a convex protrusion are attributed to the reduced thickness of the finger—not the pressure on the skin. *See* JX-0001 at 21:9-34 (describing signal gain in the context of the Beer Lambert law, which relates transmittance to the path length traveled by the light: "In an embodiment where the protrusion 305 is a convex bump, the thickness of the finger can be reduced to 10 mm (from 12 mm) for some fingers and the effective light mean path is reduced to about 16.6 mm from 20 mm.").

CONFIDENTIAL INFORMATION REDACTED

   b.    **Skepticism and Failures Measuring Pulse Oximetry at the Wrist**

Complainants further cite evidence that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮  in the Apple Watch is evidence that measuring pulse oximetry at the wrist

would have been non-obvious.  CIB at 165-72; CRB at 85-88.  Complainants identify evidence

that Apple ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* CX-

1793C (▮▮▮▮▮▮▮▮▮▮▮▮).  Paul Mannheimer was hired to be Apple's sensor architect

in 2014, and he expressed skepticism that pulse oximetry could be successfully implemented in a

wristwatch.  Tr. (Mannheimer) at 996:25-997:5.  Stephen Waydo, the director of Apple's team

for health algorithms, also expressed skepticism that blood oxygen could be measured on the

wrist, calling the development this feature "extremely challenging."  Tr. (Waydo) at 938:21-24.

This skepticism was shared by other Apple engineers.  *See* CX-0295C (Shui Dep. Tr.) at 108:13-

21; CX-0283C (Lefort) at 198:8-199:2.  Apple did not implement a blood oxygen feature in any

of the first six Apple Watches that were commercially released from 2015 to 2019.  Tr.

(Mannheimer) at 1013:7-20.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  CX-

0177C at 13; *see* Tr. (Mannheimer) at 1015:9-19; Tr. (Land) at 982:3-983:12.  Apple engineers

filed for a patent on a sensor window design for the Apple Watch in July 2016, which issued as

U.S. Patent No. 10,702,211 in July 2020.  CX-1569.  The first Apple Watch with a pulse

oximetry feature was released in September 2020: the Apple Watch Series.  RX-0333.

Apple argues that the skepticism of its engineers regarding the implementation of pulse

oximetry in the Apple Watch was related to "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  RRB at 52-53.  Dr. Warren cited

evidence that his own students had built pulse oximeters that could take measurements at the wrist as early as 2002. Tr. (Warren) at 1216:10-25; RX-0632; RX-0504; RX-0508. Apple further argues that the evidence regarding the Apple Watch is irrelevant, because the Poeze Patents provide no teachings for measuring blood oxygen on the wrist. RRB at 68.

In consideration of the parties' arguments, the undersigned finds that the skepticism of Apple engineers regarding pulse oximetry at the wrist (and discussed in Part IV.G.2.a *supra*) is consistent with the finding *supra* that Lumidigm's wristwatch embodiment, as modified in view of the combinations Apple proposes, does not disclose or render obvious a device for measuring blood oxygenation at the wrist. However, while this evidence is highly relevant to the obviousness determination for the reasons discussed in Parts IV.G.2-6 above,[56] this evidence does not weigh significantly in terms of objective indicia of non-obviousness because the asserted claims apply to any "user-worn device," including user-worn devices that are not on the wrist. *See Therasense Inc. v. Becton Dickinson and Co.*, 593 F.3d 1325, 1336 (Fed. Cir. 2010) (objective evidence of non-obviousness should be "commensurate in scope with the claims which the evidence is offered to support"); *id.* (evidence of long-felt but unsolved need to solve "short fill" problem did not weigh against obviousness finding where the claims "are not limited to sensors that prevent short fill");'501 patent at 11:45-48 ("In some embodiments, the measurement site 102 is located somewhere along a non-dominant arm or a non-dominant hand, e.g., a right-handed person's left arm or left hand."); *id.* at 8:21-23 (discussing "measurement sites, including, for example, a finger, toe, hand, foot, ear, forehead, or the like"); *id.* at 10:22-24

---

[56] As discussed *supra*, Apple's obviousness arguments rely on the wristwatch embodiment of Lumidigm as the primary reference.

CONFIDENTIAL INFORMATION REDACTED

("[m]any of the foregoing arrangements allow the sensor to be attached to the measurement site while the device is attached elsewhere on the patient, such as the patient's arm").[57]

### c.    Apple's Alleged Copying of Masimo Technology

Complainants further allege that Apple copied Masimo's patented technology in its development of the pulse oximetry feature in the Apple Watch. CIB at 172-73; CRB at 94-96. Complainants cite testimony and evidence showing that Apple ████████████ ████████████████████████████████████████████████████████████████████. ████. *See* Tr. (Waydo) at 945:10-946:6; CX-0125C; CX-0126C.  Beginning in 2013, Apple met with Masimo employees ████████████████████████████. *See* CX-1793C (████████████████); CX-0185C at 20 (████████████████████████ ████████); Tr. (Kiani) at 104:14-22, 107:1-108:18.  Apple hired several Masimo employees, including Masimo's Chief Medical Officer, Michael O'Reilly, and one of the named inventors of the Poeze patents, Steve Lamego. *See* Tr. (Kiani) at 110:23-111:23; CX-1615C.  Complainants allege that Apple sought to obtain Masimo's technology by hiring Dr. Mannheimer from Nellcor, a Masimo competitor that was found to have infringed Masimo's patents in 2004.  CIB at 168-69.  Complainants submit that Apple has provided no credible explanation for the convex shape of the back crystal in the design of the Apple Watch and argue that an inference of copying is appropriate.  CRB at 95.  Complainants cite evidence that ████████████████████████ ████████████████████████████████████████.  *See* CX-0285C (Dua Dep. Tr.) at 105:22-107:9; CX-0096C.  Complainants further submit that ████████████████████████

---

[57] In addition, the asserted claim of the '501 patent is not limited to devices that perform pulse oximetry.

**CONFIDENTIAL INFORMATION REDACTED**

[REDACTED]

*See* Tr. (Waydo) at 932:19-933:4; CX-0127C; CX-0097C at 3; CX-0094C.

Apple argues that the pulse oximetry features of the Apple Watch could not have been copied from the Poeze patent claims, because the applications reciting these claims were not filed until after the Apple Watch Series 6 had been released. RIB at 140. Apple further argues that it could not have copied the patented features from any Masimo product, because the first Masimo product embodying the asserted claims was not released to the public until January 2022—during discovery in this investigation. *Id.* Apple's engineers have consistently testified that they did not copy Masimo or any other company's technology. *Id.* at 140-41 (citing Tr. (Block) at 902:10-12, 914:1-7; Tr. (Waydo) at 932:6-9, 933:8-11; Tr. (Land) at 972:19-22, 991:23-25; Tr. (Venugopal) at 833:13-17; Tr. (Mehra) at 893:15-17; Tr. (Mannheimer) at 1007:22-1008:7; CX-0283C (Charbonneau-Lefort Dep. Tr.) at 171:21-173:8, 201:10-19; CX-0285C (Dua Dep.) at 160:20-161:5). Apple contends that [REDACTED] was not related to the development of the pulse oximetry feature for the Apple Watch and argues that there is no evidence that this product practices any asserted claim. RIB at 142.

[REDACTED]

[REDACTED]

[REDACTED] . *Id.* at 143; RRB at 70 (citing Tr. (Diab) at 243:9-17; Tr. (Scruggs) at 446:8-23). Apple submits that none of the employees hired from Masimo contributed to the design of the pulse oximetry feature in the Apple Watch. RIB at 142-43. (citing Tr. (Land) at 972:23-973:3, Tr. (Waydo) at 950:1-15; Tr. (Venogupal) at 833:14-17. Apple explains that [REDACTED] during the development of the Apple Watch to avoid the disclosure of information regarding an "unreleased feature." CX-0285C (Dua Dep. Tr.) at

**CONFIDENTIAL INFORMATION REDACTED**

105:22-107:9. With respect to Dr. Waydo's discussion of ████████████████

███████, Apple submits that this was related to the problem of taking measurements during

motion, which was not implemented in the Apple Watch. CX-0299C (Waymo Dep. Tr.) at

173:3-174:8; Tr. (Waydo) at 932:6-18.

In consideration of the parties' arguments, the undersigned finds no significant credible

evidence that Apple copied Masimo's patented technology. Complainants accuse numerous

former Masimo employees of copying Masimo's technology but fails to identify the patented

features that were allegedly copied. Complainants' theory that Apple's hiring of

Dr. Mannheimer from Nellcor was motivated by a desire to copy Masimo's technology lacks

evidentiary support. The allegation that Apple copied the convex shape of the Apple Watch's

back crystal from Masimo is purely speculative, and as discussed above, such convex surfaces

were known in the prior art. Complainants fail to identify which features of the ████████████

███████████████████ pulse oximeters used as benchmarks were allegedly copied by

Apple, and there is no evidence that any of these products practices asserted claims of the Poeze

patents. Complainants' allegations are insufficient to demonstrate copying. *See Iron Grip*

*Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) ("Not every

competing product that arguably falls within the scope of a patent is evidence of copying.

Otherwise every infringement suit would automatically confirm the nonobviousness of the

patent."); *see also Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) ("Our case

law holds that copying requires evidence of efforts to replicate a specific product, which may be

demonstrated through internal company documents, direct evidence such as disassembling a

patented prototype, photographing its features, and using the photograph as a blueprint to build a

replica, or access to the patented product combined with substantial similarity to the patented product.").

### d.     Commercial Success of Apple Watch Products

Complainants allege that the commercial success of the Apple Watch Series 6 and 7 products is objective evidence of non-obviousness. CIB at 173-75; CRB at 95-96. According to Complainants' expert Daniel McGavock, sales of the Apple Watch Series 6 far exceeded the sales of previous Apple Watches, and Apple advertised the blood oxygen feature as the key differentiator of the Series 6 over the Series 5. Tr. (McGavock) at 1416:10-21, 1422:8-1425:13; CX-0252; CX-1451; CX-1532; CX-1289. Mr. McGavock referenced third party reviews identifying the blood oxygen feature as the key feature for the Apple Watch Series 6. Tr. (McGavock) at 1418:21-1419:8 (citing CX-1634; CX-1301). Dr. Madisetti agreed with Mr. McGavock that there was a nexus between the blood oxygen feature of Apple Watch Series 6 and its commercial success. Tr. (Madisetti) at 1380:14-1381:4.

Apple argues that the commercial success of the Apple Watch Series 6 and 7 is attributable to many features. RIB at 144; RRB at 71; *see* Tr. (Warren) at 1242:16-25; Tr. (Land) at 970:10-971:6. According to Deidre Caldbeck, Apple's Director of Product Marketing for the Apple Watch, pulse oximetry is "not even in the top 30 use apps on Apple Watch." CX-0275 (Caldbeck Dep. Tr.) at 65:21-22, 66:3-12. Apple argues that its marketing materials describe many different features of the Apple Watch Series 6 in addition to pulse oximetry. *See, e.g.*, CX-1447; CX-0252; CX-1532; CX-1451. Apple further points out that Mr. McGavock cited certain third-party reviews of the Apple Watch that criticized the pulse oximetry feature of the Apple Watch Series 6. *See* Tr. (McGavock) at 550:20-551:17 (citing CX-1616; CX-1293; CX-1409).

In consideration of the parties' arguments and the record evidence, the undersigned finds that the Apple Watch Series 6 was commercially successful and that this may be due in some part to its blood oxygen monitoring features. There is no dispute that the Apple Watch Series 6 was commercially successful. *See* Tr. (McGavock) at 1419:9-1420:1; CX-1285 (*AppleInsider*: "Apple Watch far outsold all other smartwatches in Q4 2020"). Apple's marketing materials upon introduction of the Apple Watch Series 6, as well as certain third-party reviewers, identified the measurement of blood oxygen as a key new feature. *See, e.g.,* CX-0252; CX-1289; CX-1451; CX-1301 (*New York Times*: "The new Apple Watch can be summed up in two words: blood oxygen."); CX-1643 (*Independent*: "it's the blood oxygen sensor that dominated the introduction, and which is the new feature that Apple has spent the most time talking about.").

The evidence does not persuasively indicate, however, that the sales of the Apple Watch Series 6 are largely attributable to the blood oxygen feature, as market analysts have recognized the Apple Watch's "blend of sleek design, good usability on a small screen, and a growing portfolio of health and fitness apps." CX-1644 (Strategy Analytics). Moreover, it is not clear that the Apple Watch Series 6 was significantly more successful than other smartwatches, because the growth in Apple's smartwatch sales from 2020 to 2021 is in line with the growth of smartwatch sales across the industry. *See id.* (Apple's growth in smartwatch sales is 46%, and the overall industry growth in smartwatch sales is 47%). This evidence shows that much of the success of the Apple Watch Series 6 can be attributed to the growing market for smartwatches rather than the specific implementation of the pulse oximetry feature claimed in the patents-at-issue. *See id.* ("Online sales of fitness-led devices that help to support personal healthcare remain popular and are the main driver of the smartwatch boom."); *see also* CX-0275 (Caldbeck Dep.) at 65:21-22, 66:3-12 (blood oxygen app in Apple Watch is "not even in the top 30 used

apps on Apple Watch"). The Federal Circuit has discounted evidence of commercial success in such circumstances, where "the evidence does not show that the commercial success was the result of claimed and novel features." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1313 (Fed. Cir. 2006) (recognizing that the commercial success was due in part to "aesthetic appeal and improved comfort" and features that were known in the prior art).

The undersigned thus finds that there is little evidence of a significant nexus between Apple's commercial success and the allegedly nonobvious features of the asserted Poeze patent claims, particularly for claim 12 of the '501 patent (which is not limited to blood oxygen measurements). Accordingly, this commercial success does not meaningfully affect the obviousness analysis discussed above.

### H.    Invalidity – Written Description and Enablement

Apple contends that the asserted claims of the Poeze patents are invalid for lack of written description and/or enablement pursuant to 35 U.S.C. § 112, relying on the testimony of Dr. Warren. RIB at 147-53; RRB at 73-76; Tr. (Warren) at 1246:24-1248:4. Complainants dispute Apple's allegations, identifying support in the specification of the Poeze patents and relying on the testimony Dr. Madisetti. CIB at 175-83; CRB at 100-105; Tr. (Madisetti) at 1347:14-1353:25. For the reasons discussed below, the evidence shows, clearly and convincingly, that '502 patent claim 28 and '648 patent claim 12 are invalid for lack of written description. The evidence does not show, clearly and convincingly, that the other asserted claims are invalid for lack of written description and/or lack of enablement.

#### 1.    Combination of LEDs, Photodiodes, and Openings (All Asserted Claims)

Apple argues that all of the asserted claims of the Poeze patents are invalid for lack of written description because the specification fails to disclose an embodiment that includes "(a)

multiple LEDs, (b) multiple photodiodes, and (c) a protrusion with a plurality of openings,

positioned or arranged over the photodiodes, each of which includes an opaque lateral surface or

is lined with an opaque material." RIB at 148. Apple further argues that the specification fails to

disclose sets of three or more LEDs or three or more photodiodes. *Id*. at 147-51; RRB at 73-75;

*see* Tr. (Warren) at 1246:24-1247:7

Complainants identify Fig. 7B of the Poeze patents, which depicts two emitters 104, two

photodiodes 106, one or more opening(s) 703, a protrusion 705b that is a "convex bump," and a

shielding enclosure 790. JX-001 at 27:13-41.



**FIG. 7B**

*Id*. at Fig. 7B. Figure 7B depicts two emitters and two detectors. *Id*. There are "one or more

openings 703b," and "each of the openings 703 can include a separate window of the conductive

glass 703b." *Id*. at 27:18-24. The specification provides that "shielding enclosure 790b . . . can

have all the features of the shielding enclosure 790a." *Id*. at 27:28-29. "The shielding or

enclosure a can include an opaque material to not only reduce electrical noise, but also ambient

optical noise." *Id.* at 27:1-3. The specification expressly provides that the sensors 701 depicted

in Figure 7A and 7B "can be implemented with any of the sensors 101, 201, 301 described

above." *Id.* at 26:25-26. One embodiment of sensor 301 is depicted in Figure 3C, which shows

four photodetectors in four separate openings. *Id.* at 19:38-48.



**FIG. 3C**

*Id.* at Fig. 3C. Complainants cite a disclosure from another part of the specification describing a

"system 100 that comprised four LEDs in emitter 104 and four independent detector streams

from detectors 106." *Id.* at 44:22-29, Fig. 21. Moreover, in Figure 13, "n emitters and n

detectors are shown," although "the number of emitters and detectors need not be the same in

certain implementations." *Id.* at 33:37-39, Fig. 13. Dr. Madisetti testified that these disclosures

provide full written description support for multiple LEDs, three or more photodiodes, and opaque lateral surfaces.  Tr. (Madisetti) at 1347:18-1349:6.

 In consideration of the parties' arguments, the evidence fails to show, clearly and convincingly, that the asserted claims reciting three or more LEDs, three or more photodiodes, and a protrusion with a plurality of openings over the photodiodes with opaque lateral surfaces lack written description.  The specification of the Poeze patents expressly states that Figure 3C and Figure 7B are not distinct embodiments—"[t]he features of the sensors 701 can be implemented with any of the sensors 101, 201, 301 described above.  JX-001 at 26:25-26. Figure 3C clearly depicts four photodiodes in separate openings.  *Id.* at 19:38-48, Fig. 3C. Figure 7B clearly depicts these openings in a convex protrusion with opaque lateral surfaces.  *Id.* at 27:13-41, Fig. 7B.  Although Figure 7B only depicts two emitters, the specification describes sensor 101 including an emitter 104, which "can include one or more sources of optical radiation, such as LEDs . . . ."  *Id.* at 12:5-9.  In one embodiment, "the emitter 104 can emit optical radiation at three (3) or more wavelengths . . . ."  *Id.* at 12:35-44.  Moreover, the specification discloses that the number of emitters can match the number of detectors in the context of Figure 13, which is described as "an example multi-stream operation of the system of FIG. 1."  *Id.* at 6:45-47, 33:37-39, Fig. 1, Fig. 13.  In view of these disclosures, the evidence fails to clearly and convincingly show that the inventors lacked possession of a device with three or more LEDs, three or more photodiodes, and a protrusion with a plurality of openings over the photodiodes with opaque lateral surfaces.  *Cf. Invidior Inc. v. Dr. Reddy's Labs., S.A.*, 930 F.3d 1325, 1349 (Fed. Cir. 2019) (finding disclosure "reasonably conveyed to a skilled artisan" the claimed films, and noting that "[t]he specification need not recite the claimed invention *in haec verba*").

Case: 24-1285    Document: 7    Page: 371    Filed: 12/26/2023
**PUBLIC VERSION**

Accordingly, the undersigned finds that Apple has not shown by clear and convincing evidence that the asserted claims of the Poeze patents are invalid for lack of written description with respect to the limitations requiring three or more LEDs, three or more photodiodes, and a protrusion with a plurality of openings over the photodiodes with opaque lateral surfaces.

### 2.    Four Sets of at Least Three LEDs ('502 patent claim 22)

Apple contends that '502 patent claim 22 is invalid for lack of written description, because the specification fails to disclose four sets of at least three LEDs. RIB at 151; RRB at 75. Dr. Warren testified that he found no such disclosure in the specification of the Poeze patents. Tr. (Warren) at 1247:8-12. Apple argues that Figure 7B only depicts two emitters and the specification's reference to "sets of optical sources" is insufficient to disclose the claimed "at least four emitters . . . wherein each of the plurality of emitters comprises a respective set of at least three LEDs." JX-002 at claim 22.

Complainants argue that Dr. Warren's conclusory testimony is insufficient to show lack of written description. CIB at 180. Dr. Madisetti identified disclosures in the specification where multiple emitters are disclosed and the emitters are described as sets of optical sources. Tr. (Madisetti) at 1349:7-1350:3. In particular, the specification provides that "the emitter 104 can include one or more sources of optical radiation, such as LEDs . . . ." JX-001 at 12:5-8. And "[i]n an embodiment, the emitter 104 includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation." *Id*. at 12:9-12. The specification incorporates by reference a patent application, U.S. Application No. 2006/0211924, which describes an array of emitters. *Id*. at 12:16-20. Figure 13 describes sets of emitters that are numbered to match the number of detectors. *Id*. at 33:37-39, Fig. 13.

160
**Stay-Add-320**

Here, the evidence of record fails to show, clearly and convincingly, that four sets of at least three LEDs claimed in '502 patent claim 22 lack written description in the specification of the Poeze patents. Although there is no explicit disclosure of the claimed four sets of at least three LEDs, the specification provides that "the emitter 104 can include one or more sources of optical radiation, such as LEDs . . . ." JX-001 at 12:6-9. The specification also provides that the "emitter 104 can include sets of light-emitting diodes (LEDs) as its optical source." JX-001 at 13:16-17; *see also id.* at 12:9-12 ("In an embodiment, the emitter 104 includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation."). Figure 13 depicts multiple "emitter set(s)" numbered 1 through n. *Id.* at 33:18-51.



**FIG. 13**

*Id*. at Fig. 13.  As discussed above, Figure 13 provides written description support for at least four sets of emitters, because the number of emitters matches the number of detectors, and the specification discloses at least four detectors.  *See id*. at 33:37-39, Fig. 13.  The specification further provides written description support for three LEDs in each set by referring to "sets of light-emitting diodes (LEDs)" with both "sets" and "LEDs" plural.  *See id*. at 13:16-17; *see also id*. at 12:9-12 ("sets of optical sources").  Apple has not identified any reason that one of ordinary skill would read the plural "LEDs" as being limited to sets of two, and sets of three or more would be consistent with the disclosure that the emitters can be arranged in an array.  *See id*. at 12:17-25.[58]  In view of these disclosures, the evidence fails to clearly and convincingly show that the inventors lacked possession of a device with four sets of at least three LEDs.  *Cf. Invidior v. Dr. Reddy's Labs.*, 930 F.3d at 1349.

Accordingly, Apple has not shown by clear and convincing evidence that '502 patent claim 22 is invalid for lack of written description with respect to the claimed four sets of three LEDs.

### 3.  Separate Sets of LEDs Emitting at a First Wavelength and a Second Wavelength ('502 patent claim 28; '648 patent claim 12)

Apple contends that '502 patent claim 28 and '648 patent claim 12 are invalid for lack of written description, because the specification fails to disclose separate sets of LEDs emitting at the same "first wavelength" and "second wavelength."  RIB at 151-52; RRB at 75.  Dr. Warren testified that he found no disclosure for this limitation in the specification of the Poeze patents.  Tr. (Warren) at 1247:13-17.  Apple argues that the specification's reference to "sets of optical

---

[58] U.S. Patent Application Publication No. 2006/0211924 is incorporated by reference as an example of emitters arranged in an array.

sources" is insufficient to disclose the claimed two sets of LEDs each with "an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength." JX-002 at claim 28; JX-003 at claim 12.

Complainants argue that Dr. Warren's testimony is conclusory and insufficient to show lack of written description. CIB at 179. Dr. Madisetti identified disclosures in the specification of the Poeze patents "including sets of LEDs with different wavelengths." Tr. (Madisetti) at 1349:7-1350:3. In their briefing, Complainants point to the two emitters depicted in Figures 7A and 7B and the disclosure that "[i]n an embodiment, the emitter 104 includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation." JX-001 at 12:9-12, Fig. 7A, Fig. 7B. Complainants also cite other disclosures describing different arrangements of emitters. *See id.* at 9:60-63, 12:13-25, 13:16-21, 21:51-54, 33:30-38, 38:8-22.

In consideration of the parties' arguments, the evidence of record shows, clearly and convincingly, that there is insufficient written description support for the limitations in '502 patent claim 28 and '648 patent claim 12 describing two sets of LEDs that each have LEDs emitting light at the same "first wavelength" and the same "second wavelength." This limitation does not merely require that there be two sets of LEDs, each emitting light at two different wavelengths—the claim language requires matching wavelengths in each set of LEDs, and there is no such disclosure in the specification of the Poeze patents. Complainants primarily rely on a disclosure in the specification that "[i]n an embodiment, the emitter 104 includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation." JX-001 at 12:9-12; CIB at 180. Another part of the specification describes an embodiment where "the plurality of sets of optical sources may each comprise at least one top-emitting LED and at least one super luminescent LED." *Id.* at 9:60-62. But while these portions of the specification describe sets of

LEDs that are capable of emitting at different wavelengths, there is no disclosure of two separate sets of LEDs using the same wavelengths in each set.[59]

The specification repeatedly describes multiple wavelengths of light in sets of LEDs, but there is no disclosure of matching wavelengths between sets of LEDs. When describing emitters that are capable of emitting visible and near-infrared optical radiation, the specification describes two different wavelengths, three different wavelengths, or up to eight different wavelengths. *Id.* at 12:60-13:7. The specification does not describe any two LEDs having the same wavelength, however, instead emphasizing "a variety of wavelengths of visible or near-infrared optical radiation." *Id.* Similarly, when describing emitters using super luminescent LEDs and top emitting LEDs, the specification describes the different capabilities of these LEDs. *See id.* at 13:16-25 (describing "top-emitting LEDs emitting light at about 850 nm to 1350 nm" for optical radiation and "SLEDs or side-emitting LEDs to transmit near infrared optical radiation because these types of sources can transmit at high power or relatively high power.").

Consistent with Dr. Warren's testimony, these disclosures would not convey to persons of ordinary skill in the art that sets of LEDs with matching wavelengths were part of the alleged invention—there is no suggestion that two LEDs emit the same wavelengths or any benefit ascribed to such a pairing. This is similar to the claim limitation that was found invalid for lack of written description in *Purdue Pharma L.P. v. Faulding Inc.*, where the Federal Circuit found "nothing in the written description . . . that would suggest to one skilled in the art that the [claimed] ratio is an important defining quality of the formulation, nor does the disclosure even

---

[59] As discussed above in the context of obviousness, LEDs meeting this limitation are explicitly disclosed in the prior art in Lumidigm. *See* RX-0411 at 6:43-48. The Federal Circuit has held, however, that "it is the specification itself that must demonstrate possession," and "a description that merely renders the invention obvious does not satisfy the requirement." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010).

motivate one to calculate the ratio." 230 F.3d 1320, 1327 (Fed. Cir. 2000); *see also Ariad*, 598

F.3d at 1352 (noting that a description that "merely renders the invention obvious does not

satisfy the requirement").[60]

Accordingly, the evidence shows, clearly and convincingly, that '502 patent claim 28 and

'648 patent claim 12 are invalid for lack of written description.

### 4.    Touch-Screen Display ('502 patent claim 28)

Apple contends that '502 patent claim 28 is invalid for lack of enablement, because the

specification fails to enable a "touch-screen display" that "displays indicia responsive" to any

"measurement." RIB at 152; RRB at 75-76. Dr. Warren testified that he only found two brief

references to touch-screens in the patent specification. Tr. (Warren) at 1247:18-23. Apple

argues that these disclosures are insufficient to enable a person of ordinary skill in the art to use a

touch-screen on a user-worn device to display an oxygen saturation measurement. RIB at 152.

Complainants argue that the specification discloses a touch-screen as one example of a user

interface and further provides that physiological measurements can be shown on a display. CIB

at 181-82; CRB at 104; *see* Tr. (Madisetti) at 1352:5-24, 1381:7-1382:8.

---

[60] Complainants argue that Dr. Warren's testimony at hearing was conclusory, but the specification clearly supports Dr. Warren's testimony that there is no disclosure in the specification of two sets of LEDs with matching wavelengths. *See* Tr. (Warren) at 1247:13-17. And Dr. Madisetti did not address this limitation in his rebuttal testimony, only identifying disclosures in the specification describing "sets of LEDs with different wavelengths" but failing to offer any opinion as to whether these disclosures support the claimed two sets of LEDs using the same two wavelengths. *See* Tr. (Madisetti) at 1349:7-1350:3, 1350:22-1352:4. Moreover, the written description analysis is not limited to expert testimony. *See, e.g., University of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 927 (Fed. Cir. 2004) ("[A] patent can be held invalid for failure to meet the written description requirement, based solely on the language of the patent specification. After all, it is in the patent specification where the written description requirement must be met.").

Case: 24-1285    Document: 7    Page: 377    Filed: 12/26/2023
**PUBLIC VERSION**

In consideration of the parties' arguments, the undersigned finds that the evidence fails to show, clearly and convincingly, the lack of an enabling disclosure for the claimed "touch-screen display" in the specification of the Poeze patents.

To prove a claim is invalid for lack of enablement, "a challenger must show by clear and convincing evidence that a person of ordinary skill in the art would not be able to practice the claimed invention without 'undue experimentation.'" *Amgen Inc. v. Sanofi, Aventisub LLC*, 987 F.3d 1080, 1084 (Fed. Cir. 2021) (internal quotations omitted). Whether undue experimentation is needed is "not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *Id.* (quoting *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988)). The "*Wands*" factors are: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *Id.* at 1084. The Federal Circuit has stated that "after the challenger has put forward evidence that some experimentation is needed to practice the patented claim, the factors set forth in *Wands* then provide the factual considerations that a court may consider when determining whether the amount of that experimentation is either 'undue' or sufficiently routine such that an ordinarily skilled artisan would reasonably be expected to carry it out." *Amgen*, 987 F.3d at 1084-85.

Here, Apple has not presented any argument regarding the majority of the *Wands* factors, instead citing to a single sentence of expert testimony regarding the lack of explicit guidance in the specification. Apple does not provide, for example, any supporting evidence regarding the state of the prior art with respect to touchscreens and their use, or the quantity of experimentation

166
**Stay-Add-326**

necessary.[61]  Further, the specification discloses a monitoring device 200a that includes a display 210a and "can employ any of a variety of user interface designs, such as frames, menus, touch-screens, and any type of button." JX-001 at 17:20-26.  The specification also discloses a monitor 209b, which "can include display 210b that can indicate a measurement for glucose," and "[o]ther analytes and forms of display can also appear on the monitor 209b." *Id*. at 17:67-18:3.  This monitor is part of the claimed user-worn device, as "the monitor 209b can include a belt clip or straps (see, e.g., FIG. 2C) that facilitate attachment to a patient's belt, arm, leg, or the like." *Id*. at 17:56-59.



**FIG. 2C**                    **FIG. 2D**

*Id*. at Fig. 2C, Fig. 2D.  Although these features are described in the context of different figures, the specification provides that "certain of the features of the monitoring devices 200 shown in FIGS. 2A through 2D can be combined with features of the other monitoring devices shown." *Id*. at 16:39-42.  Dr. Madisetti reviewed the disclosures of the patent and testified that "the

---

[61] To the contrary, Dr. Warren elsewhere testified that a touchscreen "could be incorporated in any visual depiction for a portable device." Tr. (Warren) at 1226:25-1227:7.

touchscreen display and indicia of measurement are fully enabled in the asserted claims." Tr. (Madisetti) at 1381:7-1382:8.

In view of the above, Apple has not shown, clearly and convincingly, that '502 patent claim 28 is invalid for lack of enablement with respect to the claimed "touch-screen display."

### 5.    Light Piping ('501 patent claim 12, '502 patent claim 28, '648 patent claim 24)

Apple contends that '501 patent claim 12, '502 patent claim 28, and '648 patent claim 24 are invalid for lack of enablement with respect to limitations describing opaque surfaces that "avoid" or "reduce" "light piping." RIB at 152-53; RRB at 76. Apple further contends that '648 patent claim 24 is invalid for lack of written description with respect to being "configured to substantially prevent light piping." *Id*. Dr. Warren testified that the specification only provides "a vague correlation" between the use of opaque materials and the reduction of light piping. Tr. (Warren) at 1247:24-1248:4.

Complainants argue that Dr. Warren's conclusory testimony is insufficient to meet Apple's clear and convincing burden. CIB at 182. Complainants submit that the specification explicitly teaches the use of a hard opaque plastic to reduce light piping. *Id*. at 183 (citing JX-0001 at 7:65-8:7, 43:32-36). Complainants further cite an embodiment described in the specification wherein adding height "assists in deflecting light piping through the sensor." JX-0001 at 25:47-62. Dr. Madisetti reviewed these disclosures and offered his opinion that the written description and enablement requirements have been met for each of the "light piping" limitations. Tr. (Madisetti) at 1350:4-21, 1352:25-1353:11.

In consideration of the parties' arguments, the evidence of record fails to show, clearly and convincingly, that the specification of the Poeze patents fails to enable the "light piping" limitations of the asserted claims or lacks adequate written description with respect to '648

patent claim 24. As with the "touchscreen" arguments, Apple has not presented any argument regarding the majority of the *Wands* factors, instead citing to a single sentence of expert testimony regarding the lack of explicit guidance in the specification. *See* RIB at 152-53; CRB at 104-105. Moreover, the specification explicitly teaches that "[t]he protrusion can advantageously include plastic, including a hard opaque plastic, such as a black or other colored plastic, helpful in reducing light noise," and "[s]uch light noise includes light piping." JX-0001 at 7:65-8:7. In reference to the Figure 3 embodiments, a "noise shield" is disclosed that "may be configured to reduce noise, such as from ambient light and electromagnetic noise." *Id*. at 43:30-33. The specification provides that the noise shield "may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping." *Id*. at 43:33-36. This teaching is also referenced in the context of Figures 7A and 7B, where the specification describes a "shielding enclosure" that "can include an opaque material to not only reduce electrical noise, but also ambient optical noise." *Id*. at 27:1-3.[62] *See generally* CIB at 182-183.

In view of the above, Apple has failed to show by clear and convincing evidence that any asserted claims are invalid for lack of enablement with respect to the "light piping" limitations.

Further, the undersigned finds that Apple has not shown by clear and convincing evidence that '648 patent claim 24 is invalid for lack of written description with respect to being "configured to substantially prevent light piping." Apple's written description argument is unclear and appears to be based on the same issues discussed with regard to enablement. *See* RIB at 152-53. For the reasons discussed *supra*, including the specification's descriptions

---

[62] In another embodiment where "an extension" is used "to increase the height of [a] partially cylindrical protrusion," "the added height assists in deflecting light piped through the sensor." JX-001 at 25:43-62.

regarding light piping and the lack of sufficient expert testimony or other record evidence, Apple has not met its burden.

## I.    Prosecution Laches and Unclean Hands

Apple argues that the Poeze patents are unenforceable due to prosecution laches and the doctrine of unclean hands because of Complainants' delays in patent prosecution.  RIB at 153-59; RRB at 77-79.

Apple submits that the provisional applications that led to the Poeze patents were filed in July and August 2008, and Masimo continued to file related continuations and continuations-in-part through July 2010.  *See* JX-001; JX-002; JX-003.  After a five-year gap (and after the first Apple Watch was released), Masimo filed a new continuation application in December 2015. *See* U.S. Patent App. No. 14/981,290 (cited in JX-001; JX-002; JX-003).  Masimo then filed several additional continuation applications between December 2018 and March 2020,[63] and then filed the applications leading to the three asserted Poeze patents on September 24, 2020, within days of the release of the Apple Watch Series 6.  *See* JX-001; JX-002; JX-003; RX-0333 (9/15/20 press release announcing Apple Watch Series 6).

Apple argues that the twelve-year delay between the 2008 filings of the original provisional applications and the 2020 filings of the continuation applications for the Poeze patents warrants a determination that the patents are unenforceable due to prosecution laches. RIB at 153-59.  Apple submits that Masimo has provided no credible explanation for the long delay in filing the continuation applications and that the totality of the circumstances shows that Masimo lacked diligence in prosecuting the Poeze patents.  *Id.* at 155-57.  Apple argues that the

---

[63] Apple argues that these continuation applications were filed after the release of version of the Apple Watch in 2018 and 2019.  *See* RDX-1.16.

**CONFIDENTIAL INFORMATION REDACTED**

timing of Masimo's patent application filings shows that the delays in prosecution were intentional—taking advantage of the growth in the market for wearable technology and allowing Masimo to draft claims targeting Apple Watch products after their release. *Id.* at 156-57.

Apple submits that it has suffered prejudice due to Masimo's patent prosecution delays, because Apple invested heavily in the development of the Apple Watch products, including the blood oxygen feature. RIB at 157-58; RRB at 78. Apple argues that Masimo gained an improper litigation advantage by waiting to draft its patent claims until after the release of the Apple Watch Series 6, noting that the prosecuting attorney for the Poeze patents admitted that he had ███████████████████ of the Apple Watch Series 6 during prosecution. *See* Tr. (Cromar) at 1031:13-22. Apple argues that the prosecution of other patents in the family of the Poeze patents is irrelevant to the inquiry into whether Masimo was diligent with respect to the prosecution of the asserted Poeze patents. RRB at 77-78.

Apple argues that Masimo's conduct with respect to the prosecution of the Poeze patents meets the legal requirements for unenforceability due to prosecution laches and also that this conduct should bar Complainants' claims for relief in this investigation under the doctrine of unclean hands. RIB at 158-59; RRB at 77-79.

Complainants argue that Apple has failed to meet its burden with respect to prosecution laches or unclean hands. CIB at 183-85; CRB at 105-108. Complainants submit that the prosecution of applications in the family of the Poeze patents was continuous throughout the alleged 12-year period identified by Apple. CIB at 183-84. Mr. Cromar testified that there were "a dozen applications being actively prosecuted" during the alleged five-year "gap" between 2010 and 2015. Tr. (Cromar) at 1039:7-12. Complainants' expert on PTO practice and procedure, Robert Stoll, testified that there was a "continuous unbroken chain of patent

prosecution" in the family of the Poeze patents. Tr. (Stoll) at 1415:2-10. Complainants argue that the legal precedent requires considering diligence with respect to all of these related patent applications. CRB at 106. Complainants dispute Apple's timeline tying patent application filings to versions of the Apple Watch, which were released every year from 2015 to 2020. *Id.* at 106-107. Complainants argue that there is nothing improper about drafting claims to cover competitors' products. *Id.* at 107-108. Complainants further argue that there can be no prejudice to Apple because the specification of the Poeze patents was published in February 2010. *See* CX-0137 (U.S. Patent Pub. No. 2010/0030040).

In consideration of the parties' arguments, the undersigned finds that Apple has not carried its burden to show that the Poeze patents should be found unenforceable due to prosecution laches or unclean hands. To establish a defense of prosecution laches, an accused infringer must show: (1) that the patentee's delay in prosecution was unreasonable and inexcusable under the totality of circumstances, and (2) that the accused infringer suffered prejudice attributable to the delay. *Cancer Rsch. Tech. Ltd. v. Barr Labs., Inc.*, 625 F.3d 724, 728-29 (Fed. Cir. 2010). The Federal Circuit has held that "an examination of the totality of the circumstances[] include[s] the prosecution history of all of a series of related patents." *Symbol Techs., Inc. v. Lemelson Med., Educ. & Rsch. Found.*, 422 F.3d 1378, 1386 (Fed. Cir. 2005) ("*Symbol Techs.*").

Here, the record evidence is insufficient to support a finding of unreasonable or inexcusable delay with respect to the prosecution of the Poeze patents. Apple cites a five-year delay in the filing of continuation applications between 2010 and 2015, but there was continuous prosecution activity in the family of the Poeze patents during this time. *See* Tr. (Cromar) at

1038:7-19.[64] The fact that the 2015 continuation application could have been filed earlier is not a sufficient basis for finding of prosecution laches, as the Federal Circuit has recognized that "[t]here are legitimate grounds for refiling a patent application which should not normally be grounds for a holding of laches, and … [t]he doctrine should be applied only in egregious cases of misuse of the statutory patent system . *Symbol Techs.*, 422 F.3d at 1385. The next application in the Poeze patent family was a divisional application (U.S. Patent Application No. 16/212,537) filed in December 2018, and the Federal Circuit has held that "[f]iling a divisional application in response to a requirement for restriction" is a "legitimate reason for refiling a patent application . . . even when one defers the filing of a divisional application until just before the issuance of the parent application." *Id.* In the context of this continuous prosecution activity in the family of the Poeze patents, Apple's arguments tying certain patent application filings to release dates for the Apple Watch is unpersuasive. *See* RDX-1C.16. Apple has failed to identify actions by Masimo that resemble the type of conduct recognized by the Federal Circuit as unjustifiable prosecution delay, such as refiling applications containing previously-allowed claims, repetitive filing of applications that were merely placeholders, or a "consistent pattern of receiving a rejection on an application, filing a continuation application without any amendments, and abandoning the original application." *See Hyatt v. Hirshfeld*, 998 F.3d 1347, 1361-62, 1366-69 (Fed. Cir.

---

[64] U.S. Patent Application No. 12/497,523, filed on July 2, 2009, issued as U.S. Patent No. 8,347,825 on May 7, 2013; U.S. Patent Application No. 12/497,528, filed on July 2, 2009, issued as U.S. Patent No. 8,577,431 on November 5, 2013; and U.S. Patent Application No. 12/829,352, filed on July 1, 2010, issued as U.S. Patent No. 9,277,880 on March 8, 2016. *See* JX-0001 (identifying continuation applications); JX-004 at 418-26 (information disclosure statement identifying Masimo's pending patent applications and issued patents).

**CONFIDENTIAL INFORMATION REDACTED**

2021).[65] The record evidence in this investigation is insufficient to support a finding of prosecution laches.

Moreover, because the undersigned does not find evidence of bad faith conduct by Masimo during the prosecution of the Poeze patents, there is no basis for any finding of unclean hands. Apple's unclean hands defense is based solely on Masimo's alleged misconduct during the prosecution of the Poeze patents, RIB at 158-59, and Apple does not argue that any particular conduct would be the basis for a finding of unclean hands without a finding of inequitable conduct.

## V.    U.S. PATENT NO. 10,687,745

The '745 patent is entitled "Physiological Monitoring Devices, Systems, and Methods," naming inventor Ammar Al-Ali and issuing from an application filed on March 31, 2020, claiming priority to a provisional application filed on July 2, 2015, and a non-provisional application filed on June 28, 2016. JX-009.

### A.    Specification

The specification of the '745 patent describes a method for pulse oximetry wherein an emitter irradiates a surface area on the skin. *See* JX-009 at 6:21-54, Fig. 2. The patent refers to this method as "three-dimensional (3D) pulse oximetry in which the emitted light irradiates a larger volume of tissue . . . as compared to the 2D point optical source approach." *Id.* at 6:21-26.

---

[65] Apple points to evidence that Masimo's patent prosecution counsel had ███████ during prosecution, Tr. (Cromar) at 1031:13-22, but the Federal Circuit has held that "there is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application." *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988). Moreover, Apple has not provided evidence showing that newly asserted claim limitations were specifically drawn to the Accused Products.

In one embodiment, a "light diffuser 304 receives the optical radiation emitted from the emitter 302 and spreads the optical radiation over an area." *Id*. at 7:42-44.



FIG. 3

*Id*. at Fig. 3. The specification provides examples of the diffuser distributing light "in a predefined geometry (e.g., a rectangle, square, or circle)." *Id*. at 8:9-12. The specification further describes a "light concentrator 308," which "is a structure to receive the emitted optical radiation, after attenuation by the tissue measurement site 102." *Id*. at 9:11-18.

In a separate embodiment, a "3D sensor 700 can be placed on a portion of the patient's body that has relatively flat surface, such as, for example a wrist, because emitter 702 and detector 710 are located on the same side of the tissue measurement site 102." *Id*. at 10:40-51.



**FIG. 7A**

*Id.* at Fig. 7A. This embodiment includes a "light diffuser 704" that "receives the optical

radiation emitted from the emitter 702 and homogenously spreads the optical radiation over a

wide, donut-shaped area." *Id.* at 10:65-11:9, Fig. 7B. This embodiment further comprises a

"light blocker 706" that "includes an annular ring having a cover portion 707 sized and shaped to

form a light isolation chamber for the light concentrator 708 and the detector 710." *Id.* at 11:11-

13.

**B.    Claims**

Complainants assert infringement of claims 9 and 27, and they rely on claim 18 for

domestic industry. Claim 9 depends from claim 1, recited below:

1. A physiological monitoring device comprising:

a plurality of light-emitting diodes configured to emit light in a first shape;

a material configured to be positioned between the plurality of light-emitting
diodes and tissue on a wrist of a user when the physiological monitoring device
is in use, the material configured to change the first shape into a second shape

176

by which the light emitted from one or more of the plurality of light-emitting diodes is projected towards the tissue;

a plurality of photodiodes configured to detect at least a portion of the light after the at least the portion of the light passes through the tissue, the plurality of photodiodes further configured to output at least one signal responsive to the detected light;

a surface comprising a dark-colored coating, the surface configured to be positioned between the plurality of photodiodes and the tissue when the physiological monitoring device is in use, wherein an opening defined in the dark-colored coating is configured to allow at least a portion of light reflected from the tissue to pass through the surface;

a light block configured to prevent at least a portion of the light emitted from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the tissue; and

a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal.

JX-009 at 15:31-61.

9. The physiological monitoring device of claim 1, wherein the physiological parameter comprises oxygen saturation.

*Id.* at 16:21-23.  Claim 18 depends from claim 15, recited below:

15. A physiological monitoring device comprising:

a plurality of light-emitting diodes configured to emit light proximate a wrist of a user;

a light diffusing material configured to be positioned between the plurality of light-emitting diodes and a tissue measurement site on the wrist of the user when the physiological monitoring device is in use;

a light block having a circular shape;

a plurality of photodiodes configured to detect at least a portion of the light emitted from the plurality of light-emitting diodes after the light passes through the light diffusing material and a portion of the tissue measurement site encircled by the light block, wherein the plurality of photodiodes are arranged in an array having a spatial configuration corresponding to a shape of the portion of the tissue measurement site encircled by the light block, wherein the plurality of photodiodes are further configured to output at least one signal

responsive to the detected light, and wherein the plurality of light-emitting diodes and the plurality of photodiodes are arranged in a reflectance measurement configuration;

wherein the light block is configured to optically isolate the plurality of light-emitting diodes from the plurality of photodiodes by preventing at least a portion of light emitted from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the portion of the tissue measurement site;

a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal; and

wherein the physiological monitoring device is configured to transmit physiological parameter data to a separate processor.

*Id*. at 16:36-17:3.

18. The physiological monitoring device of claim 15, wherein the physiological parameter comprises oxygen saturation.

*Id*. at 17:10-12.  Claim 27 depends from claim 20, recited below:

20. A system configured to measure one or more physiological parameters of a user, the system comprising:

a physiological monitoring device comprising:

a plurality of light-emitting diodes configured to emit light in a first shape;

a material configured to be positioned between the plurality of light-emitting diodes and tissue of the user when the physiological monitoring device is in use, the material configured to change the first shape into a second shape by which the light emitted from one or more of the plurality of light-emitting diodes is projected towards the tissue;

a plurality of photodiodes configured to detect at least a portion of the light after the at least the portion of the light passes through the tissue, the plurality of photodiodes further configured to output at least one signal responsive to the detected light;

a surface comprising a dark-colored coating, the surface configured to be positioned between the plurality of photodiodes and the tissue when the physiological monitoring device is in use, wherein an opening defined in the dark-colored coating is configured to allow at least a portion of light reflected from the tissue to pass through the surface;

a light block configured to prevent at least a portion of light from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the tissue; and

a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal; and

a processing device configured to wirelessly receive physiological parameter data from the physiological monitoring device, wherein the processing device comprises a user interface, a storage device, and a network interface configured to wirelessly communicate with the physiological monitoring device, and wherein the user interface includes a touch-screen display configured to present visual feedback responsive to the physiological parameter data.

*Id.* at 17:20-18:18.

27. The system of claim 20, wherein at least one of the plurality of light-emitting diodes is configured to emit light of a first wavelength and at least one of the plurality of light-emitting diodes is configured to emit light of a second wavelength, the second wavelength being different than the first wavelength.

*Id.* at 16:21-23.

## C. Level of Ordinary Skill in the Art

The parties have stipulated to the same level of ordinary skill in the art for the '745 patent

as the Poeze patents:

> [A] person with a working knowledge of physiological monitoring technologies. The person would have had a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies. Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline.

Joint Stipulation of Facts ¶ 10, EDIS Doc. ID 770692 (May 13, 2022).

## D. Claim Construction

The parties dispute the construction of the term "second shape" in claims 1 and 20, but

they agree that the differences between their proposed constructions do not affect any disputed

issue. *See* CIB at 185-86; RIB at 163-64. Accordingly, this term shall be construed to have its plain and ordinary meaning, which the parties agree is "a shape different from the first shape." *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (Claims must be construed "only to the extent necessary to resolve the controversy.").

### E.    Infringement

Complainants allege that the Accused Products infringe claims 9 and 27 of the '745 patent, relying on a theory of induced infringement with respect to claim 27. CIB at 188-202. Apple only disputes infringement with respect to the "first shape" and "second shape" limitations. RIB at 164-73; RRB at 81-88. For the reasons discussed below, the undersigned finds that Complainants have not shown, by a preponderance of the evidence, that the Accused Products infringe claims 9 or 27 of the '745 patent.

#### 1.    '745 Patent Claim 9

##### a.    Element [1 preamble]: "A physiological monitoring device comprising"

There is no dispute that each of the Accused Products is a "physiological monitoring device" as required by the preamble of claim 1. *See* CIB at 188.[66] Dr. Madisetti identified evidence that the Accused Products are devices that can measure blood oxygen. Tr. (Madisetti) at 729:24-730:6; CDX-0011C.073; CX-0241C (Apple Watch Series First Look); CX-1532 at 4-5 (Apple Watch Series 6 Press Release); CX-1447 at 7 (Apple Watch Series 7 website); CX-1449 at 2 (Apple Watch Series 7 website). Accordingly, the evidence of record shows that the preamble limitations are met by the Accused Products.

---

[66] The parties have stipulated that the preambles of the asserted patent claims are limiting. *See* Joint Stipulation of Facts ¶ 9, EDIS Doc. ID 770692 (May 13, 2022).

> **b.** **Element [1A] "a plurality of light-emitting diodes configured to emit light in a first shape"**

There is no dispute that each of the Accused Products has a plurality of light-emitting diodes emitting light in a shape. *See* CIB at 188-90. Dr. Madisetti identified four sets of red, infrared, and green LEDs on the sensor board of the Accused Products. Tr. (Madisetti) at 730:7-731:1.



CDX-0011C.074 (labeling LEDs on CX-1548C at 37); *see also* CX-0281C (Block Dep. Tr.) at 83:11-85:16 (identifying LEDs in the Accused Products); Tr. (Mehra) at 855:4-856:14 (describing LEDs in the Accused Products); CX-0057C at 2 (Series 6 schematic); CX-0059C at 2 (Series 7 schematic).

Dr. Madisetti also used a camera to capture images of the light emitted by the LEDs in the Accused Products. Tr. (Madisetti) at 724:14-729:23, 730:7-731:1.

CONFIDENTIAL INFORMATION REDACTED

| Green (Surface) | Red (Surface) | IR (Surface) |
|---|---|---|
|  |  |  |

CDX-0011C.074 (citing CX-1546C at 5, 15, 1); CIB at 189-90. Dr. Madisetti also captured

images of the light 2mm from the LEDs—before passing through a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Tr. (Madisetti) at 745:5-25.

| Green ▮▮▮▮▮▮▮▮ | Red ▮▮▮▮▮▮▮ | IR ▮▮▮▮▮▮▮ |
|---|---|---|
|  |  |  |

CX-1546C at 5, 15, 1; *see* CDX-0011C.091; CIB at 189-90.[67]  There is no dispute that this light

is emitted in a shape, and accordingly, the evidence of record shows that this limitation is met.

---

[67] As discussed *infra* in the context of the "material" limitation, the relevant "first shape" is the shape of the light before passing through the lens.

**CONFIDENTIAL INFORMATION REDACTED**

    c.    **Element [1B]: "a material configured to be positioned between the plurality of light-emitting diodes and tissue on a wrist of a user when the physiological monitoring device is in use, the material configured to change the first shape into a second shape by which the light emitted from one or more of the plurality of light-emitting diodes is projected towards the tissue"**

With respect to the "material configured to be positioned between the plurality of light-emitting diodes and tissue on a wrist of a user," Dr. Madisetti identified a ██████████ ██████ that is positioned between the LEDs and the wrist of the user. Tr. (Madisetti) at 731:25-732:24; CDX-0011C.076. Dr. Madisetti used a camera to capture images of the light 2mm from the LEDs—before passing through ██████. Tr. (Madisetti) at 745:5-25; CDX-0011C.091 (citing CX-1546C at 5, 15, 1). He also captured images of the light after passing through ██████ and compared the shape of the light at three locations—at the LEDs, before ██████ and after ██████. Tr. (Madisetti) at 732:25-733:18, 747:3-12.

| | Surface | Before ██ | After ██ |
|---|---|---|---|
| Red | ■ | ● | ● |
| Green | ■ | ● | ● |
| IR | ■ | ● | ● |

CONFIDENTIAL INFORMATION REDACTED

CDX-0011C.091 (citing CX-154C at 1, 5, 15). He offered his opinion that the "first shape" at the surface of the LEDs and before ▇▇▇▇ is different from the "second shape" after ▇▇▇▇. Tr. (Madisetti) at 732:25-733:18, 747:3-12. He testified at the hearing: "So you can see clearly with our naked eye that the shapes before ▇▇▇▇, which is the first shape, and the second shape, which is after ▇▇▇▇, are different." *Id*. at 733:15-17.

Apple argues that this limitation is not infringed for two reasons: (1) the "first shape" emitted by the LEDs is not the same "first shape" entering ▇▇▇▇; and (2) ▇▇▇▇ is not configured to change the "first shape" into a "second shape." RIB at 164-73; RRB at 81-88. These two issues are addressed separately below:

### (i)    "first shape"

Apple argues that the plain language of the claim requires the "first shape" of the light emitted at the LEDs to be the same "first shape" of the light received by ▇▇▇▇. RIB at 164-65. Apple points to Figure 7A, where there is no gap between the emission of light at LED 702 and the light diffuser 704 where the light is received. JX-009 at 10:65-11:2, Fig. 7B; *see* Tr. (Sarrafzadeh) at 1112:22-1113:10. Apple engineer Dr. Venugopal testified that the LEDs in the Accused Products "have a square shape" and emit light that "is square in shape." Tr. (Venugopal) at 830:4-5, 830:19-22. He further explained that the light emitted from the LEDs "spreads significantly in all direction[s] based on the physics of the LED surface and spreads towards the microlens array and assumes a generally circular shape." *Id*. at 830:25-831:3. Apple's expert Dr. Sarrafzadeh offered opinions that are consistent with Dr. Venugopal's testimony, identifying the square shape of light emitted from the LEDs, which "changes to more of a circular shape, as expected by Lambertian emission." Tr. (Sarrafzadeh) at 1115:2-15. He described the shape of the light at the LEDs as "more of a square shape-ish" and "a concave

CONFIDENTIAL INFORMATION REDACTED

polygon." *Id.* at 1115:25-1116:11. He described the shape of the light received by ▮▮▮▮▮ as "more of a closer to a circle shape" and a "convex polygon." *Id.* Relying on "fundamentals of geometry," he testified that "concave polygons are fundamentally different from convex polygons." *Id.* He offered his opinion that "the shape that is emitted at the surface of LED is fundamentally different from the shape that is received by ▮▮▮▮▮, as we saw in the three examples, and we know that because of physics." *Id.* at 1116:23-1117:8.

Complainants disagree with Apple's interpretation of this claim language, arguing that the designation of the "first shape" in the claims does not require that the shape be unchanged between the LEDs and ▮▮▮▮▮. CIB at 186. Complainants submit that the specification only discusses changes in shape caused by the "beam shaper" that receives light from the LEDs before reaching the user's skin. *See* JX-009 at 7:42-56. Complainants identify a gap between the light emitter and the beam shaper depicted in Figure 3 of the specification, arguing that Apple's interpretation of the claim language would exclude this embodiment. CIB at 187; *see* JX-009 at Fig. 3. Dr. Madisetti reviewed the disclosures in the specification and offered his opinion that the claims "do not require the material to receive light in the same shape that was emitted by the LEDs." Tr. (Madisetti) at 746:13-747:2. Complainants argue that the "first shape" is any shape emitted from the LEDs in between the LEDs and the material. *See* CRB at 110 ("In the claims, the 'first shape' refers to any shape of light emitted by the LEDs before the claimed 'material' changes it into a second shape.").

In consideration of the parties' arguments, the undersigned finds that the language of claim 1 does not require that the emitted light has the same "first shape" at the surface of the LEDs as it has at the surface of the "material configured to change the first shape into a second shape." The first limitation of the claim provides that the LEDs are "configured to emit light in a

first shape," but the term "emit" is not necessarily limited to the surface of the LEDs. There is light "emitted" from the LEDs described in several other limitations of the claim—light that has been changed into a second shape is described as "light emitted from one or more of the plurality of light-emitting diodes," and certain light that is affected by the light block is also described as "light emitted from the plurality of light-emitting diodes." *See* JX-009 at 15:38-41, 15:54-57. Accordingly, while Apple has offered a plausible interpretation of the claim language to refer to the shape of light at the surface of the LEDs, it is clear from other limitations of the claim that the term "emit" is not limited to this meaning.[68]

The specification of the '745 patent supports this interpretation of the "first shape" limitation. When describing the Figure 3 embodiment that is shown with a gap between the emitter and the light diffuser, the specification provides that "[t]he light diffuser 304 receives the optical radiation emitted from the emitter 302 and spreads the optical radiation over an area." JX-009 at 7:42-44, Fig. 3. The same language is used in the context of Figure 7A, which does not show a gap between the emitter and the light diffuser: "The light diffuser 704 receives the optical radiation emitted from the emitter 702 and homogenously spreads the optical radiation over a wide, donut-shaped area." *Id.* at 10:65-11:2, Fig. 7A. In both embodiments the light "emitted from" the LEDs is the light received at the light diffuser, which takes this light and spreads it into a wide shape. The spreading and/or shaping of light by the light diffuser is

---

[68] Claim 15 also refers to light that has passed through a light diffusing material as "light emitted from one or more of the plurality of light-emitting diodes," and certain light that is affected by the light block is also described as "light emitted from the plurality of light-emitting diodes." *See* JX-009 at 16:44-63.

CONFIDENTIAL INFORMATION REDACTED

emphasized in the specification,[69] and there is no discussion in the specification of the shape of the light at the surface of the LEDs.

The undersigned thus finds that the reading of the "first shape" limitation that most naturally aligns with the patent's description of the invention is that the light emitted by the LEDs in a "first shape" refers to the shape of the light that is received by the light diffuser, *i.e.* the claimed "material," which is "configured to change the first shape into a second shape."[70] The undersigned thus finds that both Complainants' and Apple's proposed constructions are incorrect. The "first shape" does not refer to "any" shape of the light between the LEDs and the light diffuser, as proposed by Complainants (*see* CRB at 110), and there is no separate requirement that the shape of the light at the surface of the LEDs be the same as the shape of the light that is received by the light diffuser, as proposed by Apple. Accordingly, there is no basis for Apple's non-infringement argument regarding the "first shape."

### (ii)   "second shape"

With respect to the "second shape," Apple submits that ███████ is not configured to change the shape of the light passing through it. RIB at 170-73; RRB at 86-87. Dr. Venugopal testified that "██████████████████████████████████████████████

█████████████." Tr. (Venugopal) at 831:4-9. With respect to the shape of the light passing

through ███████, he testified that "████████████████████████████████████████

████████." *Id*. Reviewing Dr. Madisetti's images of the light before and after ███████

---

[69] The specification describes "the disclosed systems, devices and methods to implement three-dimensional (3D) pulse oximetry in which the emitted light irradiates a larger volume of tissue at the measurement site 102 as compared to the 2D point optical source approach," which is described as "conventional pulse oximetry." JX-009 at 6:21-25, 5:41-43, Fig. 1, Fig. 2.

[70] The cases that Apple cites regarding antecedent basis are consistent with this construction, *see* RIB at 164, because the two limitations of the claim refer to the same "first shape."

CONFIDENTIAL INFORMATION REDACTED

Dr. Sarrafzadeh offered his opinion that these were the same shape: "the input to ████

shapes are more or less a circular form, and as they exit ████ they are also more or less a

circular form." Tr. (Sarrafzadeh) at 1118:1-11. Dr. Sarrafzadeh acknowledges that there are

"dark spots" in the ████ images, but he explains that these are variations in intensity rather

than shape. *Id.* at 1119:24-1120:4. Apple further argues that Dr. Madisetti failed to explicitly

analyze the difference between the "first shape" before ████ and the "second shape" after

████. RIB at 172-73.

In reply, Complainants cite Dr. Madisetti's testimony that there is a change in shape

between the images before ████ and after ████. *See* Tr. (Madisetti) at 747:3-12; CDX-

0011C.091. Complainants dispute Dr. Sarrafzadeh's analysis of the dark spots in Dr. Madisetti's

images and argue that there is no support for his testimony that intensity variations are not a

change in shape. CRB at 115. Complainants cite the '745 patent specification's discussion of a

circle and donut as distinct shapes, arguing that a shape is not solely defined by its perimeter.

JX-009 at 10:65-11:2. Complainants argue that the difference in shape before and after ████

is "self-evident," and "readily apparent." CIB at 194; CRB at 118.

In consideration of the parties' arguments, the undersigned finds that Complainants have

failed to carry their burden to prove infringement with respect to the "second shape" limitation.

The undersigned agrees with Apple that Dr. Madisetti's analysis with respect to this limitation

was unreliable and conclusory. *See* RIB at 160-62. His primary infringement analysis compared

the images of the light at the LEDs with images of light after ████, *see* Tr. (Madisetti) at

733:5-18; CDX-0011C.077, but as discussed above, the relevant "first shape" is immediately

before ████, because it is ████ that must be configured to change the light from the

"first shape" to the "second shape." When Dr. Madisetti compared images of light immediately

**CONFIDENTIAL INFORMATION REDACTED**

before and after ▮▮▮▮▮, he only offered conclusory testimony that "you can clearly see that the shape changes." Tr. (Madisetti) at 747:3-12; CDX-0011C.091. Complainants rely on this testimony and argue that the difference between the shapes is "self-evident" or "readily apparent." CIB at 194; CRB at 118. Apple disputes Complainants' contentions, however, and Dr. Sarrafzadeh describes the shapes of the two sets of images as "more or less circular," with shapes that are "relatively the same." *Id*. at 1118:1-24.



RDX-0007.144C (citing CX-0307iC).

The undersigned finds that neither Dr. Madisetti nor Dr. Sarrafzadeh have disclosed a reliable methodology for identifying shapes or determining whether one shape is different from another. Their testimony at hearing comparing the "first shape" images to the "second shape" images was conclusory and unreliable, with Dr. Madisetti failing to even identify the allegedly different shapes that he observed. Indeed, on cross-examination, Dr. Madisetti was presented with several shape outlines and was asked for his opinion on whether the shapes were the same

or different.  Tr. (Madisetti) at 782:6-783:12.  Despite Complainants' argument that changes in shape are "self-evident," Dr. Madisetti could not offer an opinion as to whether certain at least somewhat different images represented a change in "shape."  *Id.* (stating that he could not say whether RDX-12.3 and RDX-12.5 showed a change in shape); *see also id.* at 1384:23-1385:10 (indicating that images in RDX-12.5 were known to him from his own testing).  Dr. Madisetti's inability to compare such shapes underscores the lack of any reliable methodology in his infringement analysis.  *See* RIB at 168-69.[71]

Moreover, the '745 patent specification describes shapes that are "substantially rectangular, square, circular, oval, or annular, among others."  JX-009 at 3:12-14; *see also id.* at 8:9-12 ("a predefined geometry (e.g., a rectangle, square, or circle)").  Another part of the specification describes "a wide, donut-shaped area."  *Id.* at 10:65-11:2.[72]  Dr. Madisetti did not use any such descriptors to identify shapes in his images of the emitted light in Accused Products—he only offered conclusory opinions that certain shapes were "different" or observing

---

[71] The specification indicates that that a diffuser may provide a "defined area shape" only in some embodiments of the invention.  *See* JX-009 at 3:5-14 ("In certain embodiments of the present disclosure, the diffuser comprises glass, ground glass, glass beads, opal glass, or a microlens-based, band-limited, engineered diffuser that can deliver efficient and uniform illumination.  ***In some embodiments, the diffuser is further configured to define a surface area shape*** by which the emitted spread light is distributed onto a surface of the tissue measurement site.  The defined surface area shape can include, by way of non-limiting example, a shape that is substantially rectangular, square, circular, oval, or annular, among others.").  This language also indicates that light diffusion, in itself, does not necessarily provide changes in "shape."  This is reflected in claim 15 of the '745 patent, which is asserted for domestic industry (as part of dependent claim 18) but not for infringement, requiring a "light diffusing material" without any limitations regarding the shape of the light.  *Id.* at 16:36-17:3.

[72] All of these references to shapes in the specification refer to the "second shape" after the light diffuser, which is projected on to the skin.  There is no discussion of the "first shape" of light before the light diffuser, except in the context of prior art "point optical sources," wherein the measurement site is an "irradiated circular area of the point optical source."  JX-009 at 5:54-0, Fig. 1.

**CONFIDENTIAL INFORMATION REDACTED**

"changes" between images. *See* Tr. (Madisetti) at 733:5-18, 747:3-12.[73] The undersigned agrees

with Complainants that there are differences in the emitted light before and after ████,[74] but

Complainants have failed to present sufficient credible evidence that these differences represent

two different "shapes." A preponderance of the evidence does not support a finding that the

Accused Products meet this limitation.

 In addition, there is no evidence in the record that Apple configured ████ to change

the shape of the light. Dr. Venugopal testified that ████ for the Apple Watch Series 6 was

designed "████████████████████████████████████

████." Tr. (Venugopal) at 826:13-829:14. Apple engineering documents corroborate

Dr. Venugopal's testimony—showing that Apple considered ████████████████

████████████. RX-0895C at 317. Complainants are not required

to prove intent with respect to an apparatus claim, but the Apple engineering documents in the

record are consistent with Dr. Venugopal's testimony that light passing through ████

████████████████████████" Tr. (Venugopal) at

831:4-9. It is Complainants' burden to prove that ████ is configured to change the emitted

light from a first shape to a second shape, and a preponderance of the evidence does not support

a finding that the Accused Products meet this limitation.

---

[73] Although it is not clear that he applied any reliable methodology, Dr. Sarrafzadeh was more willing to describe specific shapes in the images of the Accused Products, such as "a square shape," "square shape-ish," "closer to a circle shape," or "more or less a circular form." Tr. (Sarrafzadeh) at 1115:17-1118:11.

[74] One visible difference between the images is the pattern of light and dark spots in the "second shape" images. *See* CX-0307iC at 10-21. Dr. Sarrafzadeh stated that the images have "light there, but the cameras don't show them" due to camera "deficiencies." Tr. (Sarrafzadeh) at 1118:4-8, 1119:24-1120:4. Dr. Madisetti's testing shows that there is light in the dark spots when viewed with a lower intensity threshold. CX-0307iC at 11 (images showing no dark spots with "intensity threshold at 0.05"); *see* RRB at 86-87. In any case, it is unclear whether such spots indicate a change in "shape."

     **d.**    **Element [1C]: "a plurality of photodiodes configured to detect at least a portion of the light after the at least the portion of the light passes through the tissue, the plurality of photodiodes further configured to output at least one signal responsive to the detected light"**

There is no dispute that each of the Accused Products has four photodiodes configured to detect light after it passes through a user's tissue, outputting signals responsive to the detected light. *See* CIB at 196-77; *see* Tr. (Madisetti) at 733:19-734:15; CDX-0011C.078 (citing CX-1548C (Apple Watch Series 7 photograph) at 37; CX-1646C (Apple Watch Series 6 photograph); CX-0059C (Apple Watch Series 7 CAD drawings) at 2; CX-0057C (Apple Watch Series 6 CAD drawings); CX-0281C (Block Dep. Tr.) at 7:21-72:5; CX-0297C (Venugopal Dep. Tr.) at 95:5-96:11; CX-0299C (Waydo Dep. Tr.) at 28:22-29:8). The evidence of record shows that this limitation is met.

     **e.**    **Element [1D]: "a surface comprising a dark-colored coating, the surface configured to be positioned between the plurality of photodiodes and the tissue when the physiological monitoring device is in use, wherein an opening defined in the dark-colored coating is configured to allow at least a portion of light reflected from the tissue to pass through the surface"**

There is no dispute that each of the Accused Products has a surface with a dark-colored coating positioned between the photodiodes and the user's skin, with openings above each photodiode allowing light to pass through. *See* CIB at 197; Tr. (Madisetti) at 734:16-735:18; CDX-0011C.079 (citing CX-0070C (Apple Watch Series 7 Specification) at 5; CX-0068C (Apple Watch Series 6 Specification) at 5; CX-0297C (Venugopal Dep. Tr.) at 188:16-189:1, 192:14-194:15; CX-0291C (Mehra Dep. Tr.) at 105:20-106:14, 111:19-112:8); *see also* Tr. (Block) at 901:13-902:3. The evidence of record shows that this limitation is met.

CONFIDENTIAL INFORMATION REDACTED

f.    **Element [1E]: "a light block configured to prevent at least a portion of the light emitted from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the tissue"**

There is no dispute that each of the Accused Products has an optical barrier that blocks light from the LEDs from reaching the photodiodes without first reaching the user's tissue. *See* CIB at 198; Tr. (Madisetti) at 735:19-736:19; CDX-0011C.080 (citing CX-0059C (Apple Watch Series 7 CAD drawings) at 1; CX-0057C (Apple Watch Series 6 CAD drawings) at 1; CX-0297C (Venugopal Dep. Tr.) at 92:6-93:3; CX-0281C (Block Dep. Tr.) at 59:5-20, 61:3-6, 81:5-22). The evidence of record shows that this limitation is met.

g.    **Element [1F]: "a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal"**

There is no dispute that each of the Accused Products has a processor that receives and processes signals from the photodiodes and determines an oxygen saturation measurement. *See* CIB at 199; Tr. (Madisetti) at 736:20-737:12; CDX-0011C.081 (citing CX-0013C (ASIC schematic) at 12; CX-0100C (███████ ERS) at 7; CX-0299C (Waydo Dep. Tr. at 38:19-2, 39:2-6, 50:11-14, 68:12-21, 72:10-22, 73:16-19). The evidence of record shows that this limitation is met.

h.    **Element [9]: "wherein the physiological parameter comprises oxygen saturation"**

Claim 9 of the '745 patent depends from claim 1, "wherein the physiological parameter comprises oxygen saturation." There is no dispute that each of the Accused Products measures oxygen saturation. *See* CIB at 199; Tr. (Madisetti) at 737:13-23; CDX-0011C.082 (citing CX-1447 (Apple Watch Series 7 website) at 7; CX-1532 (Apple Watch Series 6 website) at 4). The evidence of record shows that this limitation is met.

***

Accordingly, the evidence does not show infringement of claim 9 because Complainants have not proven, by a preponderance, that the Accused Products have a material that is configured to change emitted light from a "first shape" into a "second shape," as required by claim 1.

2. **'745 Patent Claim 27**

a. **Element [20 preamble]: "A system configured to measure one or more physiological parameters of a user, the system comprising: a physiological monitoring device comprising:"**

The preamble of claim 20 of the '745 patent requires "[a] system configured to measure one or more physiological parameters of a user," including "a physiological monitoring device." The alleged "system" is an Accused Product in communication with an Apple iPhone. *See* CIB at 199-200. As discussed above in the context of the preamble of '745 patent claim 1, there is no dispute that the Accused Products are devices that can measure blood oxygen. *See* CIB at 201. Moreover, there is no dispute that the Accused Products can be used with an Apple iPhone. *Id*; *see* Tr. (Madisetti) at 738:25-740; CDX-0011C.085 (citing CX-1271 (Apple website) at 1; CX-0010 (Apple website) at 2-3; CX-0299C (Waydo Dep. Tr.) at 74:6-75:17). The evidence of record shows that this limitation is met.

b. **Element [20A]: "a plurality of light-emitting diodes configured to emit light in a first shape"**

Claim 20 has a "plurality of light-emitting diodes" limitation that is identical to the limitation of claim 1. As discussed above in the context of claim 1, there is no dispute that each of the Accused Products has a plurality of light-emitting diodes emitting light in a shape. *See* CIB at 201. The evidence of record shows that this limitation is met.

c.    **Element [20B]: "a material configured to be positioned between the plurality of light-emitting diodes and tissue of the user when the physiological monitoring device is in use, the material configured to change the first shape into a second shape by which the light emitted from one or more of the plurality of light-emitting diodes is projected towards the tissue"**

Claim 20 has a "material configured to change the first shape into a second shape" limitation that is identical to the limitation of claim 1. For the reasons discussed above in the context of claim 1, the undersigned finds that Complainants have not shown that the Accused Products have a material that is configured to change emitted light from a "first shape" into a "second shape."

d.    **Element [20C]: "a plurality of photodiodes configured to detect at least a portion of the light after the at least the portion of the light passes through the tissue, the plurality of photodiodes further configured to output at least one signal responsive to the detected light"**

Claim 20 has a "plurality of photodiodes" limitation that is identical to the limitation of claim 1. As discussed above in the context of claim 1, there is no dispute that each of the Accused Products has four photodiodes configured to detect light after it passes through a user's tissue, outputting signals responsive to the detected light. *See* CIB at 201. The evidence of record shows that this limitation is met.

e.    **Element [20D]: "a surface comprising a dark-colored coating, the surface configured to be positioned between the plurality of photodiodes and the tissue when the physiological monitoring device is in use, wherein an opening defined in the dark-colored coating is configured to allow at least a portion of light reflected from the tissue to pass through the surface"**

Claim 20 has a "surface comprising a dark-colored coating" limitation that is identical to the limitation of claim 1. As discussed above in the context of claim 1, there is no dispute that each of the Accused Products has a surface with a dark-colored coating positioned between the

photodiodes and the user's skin, with openings above each photodiode allowing light to pass

through. *See* CIB at 201. The evidence of record shows that this limitation is met.

      f.    **Element [20E]: "a light block configured to prevent at least a portion of the light emitted from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the tissue"**

Claim 20 has a "light block" limitation that is identical to the limitation of claim 1. As

discussed above in the context of claim 1, there is no dispute that each of the Accused Products

has an optical barrier that blocks light from the LEDs from reaching the photodiodes without

first reaching the user's tissue. *See* CIB at 201. The evidence of record shows that this

limitation is met.

      g.    **Element [20F]: "a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal"**

Claim 20 has a "processor" limitation that is identical to the limitation of claim 1. As

discussed above in the context of claim 1, there is no dispute that each of the Accused Products

has a processor that receives and processes signals from the photodiodes and determines an

oxygen saturation measurement. *See* CIB at 201. The evidence of record shows that this

limitation is met.

      h.    **Element [20G]: "a processing device configured to wirelessly receive physiological parameter data from the physiological monitoring device, wherein the processing device comprises a user interface, a storage device, and a network interface configured to wirelessly communicate with the physiological monitoring device, and wherein the user interface includes a touch-screen display configured to present visual feedback responsive to the physiological parameter data"**

There is no dispute that an Apple iPhone is a processing device with a user interface,

storage device, and wireless interface that can wirelessly communicate with the Accused

Products, receive oxygen saturation data and present an oxygen saturation measurement on a touch-screen display. *See* CIB at 201; Tr. (Madisetti) at 740:6-24; CDX-0011C.086 (citing CX-0010C (Apple website) at 5; CX-1492 (Apple website) at 4; CX-0299C (Waydo Dep. Tr.) at 74:11-75:17). The evidence of record shows that this limitation is met.

      **i.** **Element [27]: "wherein at least one of the plurality of light-emitting diodes is configured to emit light of a first wavelength and at least one of the plurality of light-emitting diodes is configured to emit light of a second wavelength, the second wavelength being different than the first wavelength"**

Claim 27 of the '745 patent depends from claim 20, further requiring that "at least one of the plurality of light-emitting diodes is configured to emit light of a first wavelength and at least one of the plurality of light-emitting diodes is configured to emit light of a second wavelength, the second wavelength being different than the first wavelength." There is no dispute that the Accused Products contain green (525 nm), red (660 nm), and infrared (850 nm) LEDs. *See* CIB at 202; Tr. (Madisetti) at 740:25-741:14; CDX-0011C.087 (citing CX-0059C (Apple Watch Series 7 drawing) at 2; CX-0057C (Apple Watch Series drawing) at 2; CX-0297C (Venugopal Dep. Tr.) at 53:1-55:14). The evidence of record shows that this limitation is met.

***

Accordingly, the evidence does not show direct infringement of claim 27 because Complainants have not proven, by a preponderance, that the Accused Products have a material that is configured to change emitted light from a "first shape" into a "second shape," as required by claim 20 (from which claim 27 depends).

      **3.** **Induced Infringement**

Complainants contend that Apple induces infringement of '745 patent claim 27 by importing the Accused Products to be used in connection with Apple iPhones. CIB at 199-200.

Complainants submit that Apple had knowledge of the '745 patent as of the filing of the original complaint on June 30, 2021. *See* CX-1254C (Apple interrogatory responses) at 35. Complainants identify documentation from Apple instructing users how to connect the Accused Products with Apple iPhones. *See* CX-1727 (Apple Watch User Guide) at 1. Dr. Madisetti identified documentation from Apple instructing users how to pair an Apple Watch with an iPhone and use the Health app to monitor blood oxygen on the iPhone. Tr. (Madisetti) at 738:25-740:5; CDX-0011C.085 (citing CX-1727 (Apple Watch User Guide) at 1; CX-0010 (Apple website) at 2-3; CX-0299C (Waydo Dep. Tr.) at 74:11-75:17).

Apple argues that Complainants failed to carry their burden to show that Apple had the necessary specific intent for induced infringement. RRB at 88. Apple argues that that there is no testimonial evidence that Apple actively induced its users to infringe or that Apple knew that its users' actions would constitute infringement. *Id.*

In consideration of the parties' arguments, the undersigned finds that a preponderance of the evidence supports a finding that Apple knew of the alleged infringement of claim 27 as of the filing of the Complaint, which contained allegations of infringement (including a claim chart for claim 27) similar to the evidence presented at the hearing. *See* Complaint Exhibit 18 (June 30, 2021). In addition, there is no dispute that Apple has provided instructions to its users for pairing the Accused Products with Apple iPhones to monitor blood oxygen through Apple's Health app. *See* CX-1727 (Apple Watch User Guide) at 1; CX-0010 (Apple website) at 2-3; CX-0299C (Waydo Dep. Tr.) at 74:11-75:17. The Commission has found induced infringement based on similar evidence when there has been an underlying finding of direct infringement. *See, e.g., Certain Beverage Brewing Capsules*, Inv. No. 337-TA-929, Comm'n Op. at 17-21, EDIS Doc. ID 577827 (Apr. 5, 2016).

The undersigned finds that Apple has not induced infringement of claim 27, however, because Complainants have not shown underlying direct infringement of this claim.

### F.    Domestic Industry—Technical Prong

The domestic industry products that Complainants rely on for the '745 patent are the Circle sensor (CPX-0021C) and the Wings sensor (CPX-0029C),[75] the RevA sensor (CPX-0052C), the RevD sensor (CPX-0058C), and the RevE sensors (CPX-0019C, CPX-0020C, CPX-0065C)(collectively, "the '745 DI Products").  CIB at 203.[76]  Complainants allege that each of the '745 DI Products practices '745 patent claim 18, which depends from claim 15. *Id.* at 203-11.

### 1.    '745 Patent Claim 18

#### a.    Element [15 preamble]: "A physiological monitoring device comprising:"

There is no specific dispute that each of the '745 DI Products is a "physiological monitoring device" as required by the preamble of claim 15. *See* CIB at 204; RIB at 175-77.[77] Mr. Scruggs testified that each of the '745 DI Products "supported the ability to measure oxygen saturation and pulse rate." Tr. (Suggs) at 393:17-20.  Dr. Madisetti also observed a demonstration by Dr. Scruggs of the RevA, RevD, and RevE devices measuring oxygen saturation.  Tr. (Madisetti) at 749:23-750:11. Dr. Madisetti also relied on a demonstration by Mr. Scruggs of the Circle and Wings sensors connected to a Rad-97 monitor. *Id.* at 754:24-

---

[75] Complainants assert that the Circle sensor and Wings sensor practice the '745 patent when connected to a Rad-97 monitor (CPX-0014a).  CIB at 203, 209-10.

[76] Complainants also rely on the Masimo W1 as a domestic industry product, but for the reasons discussed *supra* in the context of the Poeze patents, evidence regarding this product will not be considered.

[77] Apple disputes whether certain of the '745 DI Products were operable before the filing of the Complaint, *see* RIB at 174-75, and this issue is addressed *infra*, Section VII.

CONFIDENTIAL INFORMATION REDACTED

755:3. For these reasons and those discussed below with regard to Element [15H], the evidence of record shows that this limitation is met.

> b.    Element [15A]: "a plurality of light-emitting diodes configured to emit light proximate a wrist of a user"

There is no dispute that each of the '745 DI Products has a plurality of light-emitting diodes. *See* CIB at 204. Dr. Madisetti identified the LEDs in each of the '745 DI Products. Tr. (Madisetti) at 750:22-751:11; CDX-0011C.098. Mr. Scruggs testified that the '745 DI Products each contain LEDs. Tr. (Scruggs) at 393:12-394:3. The evidence of record shows that this limitation is met.

> c.    Element [15B]: "a light diffusing material configured to be positioned between the plurality of light-emitting diodes and a tissue measurement site on the wrist of the user when the physiological monitoring device is in use"

Mr. Scruggs identified "a diffusing media above the LEDs" in the '745 DI Products, which is ███████████████████████ for the Circle, Wings, RevA, RevD, and RevE sensors. Tr. (Scruggs) at 401:2-13. Dr. Madisetti observed the ██████████ "diffusing the light" in a demonstration by Mr. Scruggs. Tr. (Madisetti) at 760:18-22; *see also* RX-0266C (demonstration of RevA sensor); RX-0267C (demonstration of RevD sensor); RX-0268C (demonstration of RevE sensor). Dr. Madisetti identified the location of the diffusing material in each of the '745 DI Products. Tr. (Madisetti) at 751:12-752:2; CDX-011C.099 (citing CX-1132C (Circle CAD) at 2; CX-0656C (Circle photo); CX-1137C (Wings CAD) at 6; CX-0658C (Wings photo); CX-111C (RevA CAD); CX-0661C (RevA photo); CX-1058C (RevD photo) at 442; CX-0666C (RevD photo); CX-1125C (RevE CAD) at 2; CX-0653C (RevE photo); CX-0655C (RevE photo); CX-0676C (RevE photo); CX-1058C (RevE photo) at 593). Complainants

further submit that this material is located on the side of the product that contacts the user's wrist in each of the '745 DI Products, thus meeting this limitation.  CIB at 205-07.

Apple argues that Dr. Madisetti's analysis of photos and images is insufficient to prove that the material above the LEDs in the '745 DI Products is a "light diffusing material."  RIB at 175-76.  Dr. Sarrafzadeh called this analysis "unscientific" and "unreliable given that the components are actually quite small."  Tr. (Sarrafzadeh) at 1127:1-1128:4; RDX-7C.0162.  Dr. Sarrafzadeh further testified that ███████ is not always a diffusing material."  Tr. (Sarrafzadeh) at 1127:15-1128:8.  Apple further argues that the documentation for the '745 DI Products is unreliable because of certain discrepancies between the physical exhibits and Masimo's schematics.  RIB at 175.

In consideration of the parties' arguments, the undersigned finds that Complainants have shown, by a preponderance of the evidence, that the '745 DI Products have a "light diffusing material" meeting this limitation.  Mr. Scruggs described the diffusing material in each of the '745 DI Products, noting the "milky color" above the LEDs.  Tr. (Scruggs) at 401:2-13.  He specifically identified the ███████ material in the Circle, Wings, RevA, RevD, and RevE sensors.  Id.Dr. Madisetti confirmed the location of the material identified by Mr. Scruggs in photos and schematics of each of the '745 DI Products.  Tr. (Madisetti) at 751:12-752:2.  Dr. Sarrafzadeh raises some questions regarding the reliability of Dr. Madisetti's analysis, but the appearance of the '745 DI Products in videos and photographs is consistent with Mr. Scruggs's testimony.  See CDX-011C.099.  On this record, a preponderance of the evidence supports a finding that each of the '745 DI Products meets this claim limitation with a light diffusing material positioned between the LEDs and the user's wrist.

    d.        **Element [15C]: "a light block having a circular shape"**

There is no dispute that each of the '745 DI Products has a light block that forms a circular shape around the LEDs. *See* CIB at 207. Dr. Madisetti identified the circular light block photographs and schematics of each of the '745 DI Products. Tr. (Madisetti) at 752:3-10; CDX-0011C.100. Mr. Scruggs described a "light barrier . . . that surrounds the emitters so it separates the LEDs from the photodiodes." Tr. (Scruggs) at 400:9-12. The evidence of record shows that this limitation is met.

    e.        **Element [15D]: "a plurality of photodiodes configured to detect at least a portion of the light emitted from the plurality of light-emitting diodes after the light passes through the light diffusing material and a portion of the tissue measurement site encircled by the light block, wherein the plurality of photodiodes are arranged in an array having a spatial configuration corresponding to a shape of the portion of the tissue measurement site encircled by the light block"**

There is no dispute that each of the '745 DI Products has photodiodes that are arranged in a circular array around the light block that are configured to detect light that is reflected from the user's skin. *See* CIB at 207-08. Dr. Madisetti identified the arrangement of photodiodes in photographs and schematics of each of the '745 DI Products. Tr. (Madisetti) at 752:22-754:8; CDX-0011C.101. The evidence of record shows that this limitation is met.

    f.        **Element [15E]: "wherein the plurality of photodiodes are further configured to output at least one signal responsive to the detected light"**

There is no specific dispute that the photodiodes in each of the '745 DI Products are configured to output a signal responsive to detected light. *See* CIB at 208; RIB at 175-77. Dr. Madisetti identified circuit diagrams showing the output of the photodiodes in the RevA, RevD, and RevE devices. Tr. (Madisetti) at 754:9-755:6; CDX-0011C.102 (citing CX-0701C (RevA diagram) at 2, 6; CX-0710C (Rev D diagram) at 3, 7; CX-0705C (RevE diagram). With

respect to the Circle and Wings sensors, Dr. Madisetti relied on a demonstration by Mr. Scruggs

showing these sensors outputting oxygen saturation information to a separate Rad-97 monitor.

Tr. (Madisetti) at 754:24-755:3. Mr. Scruggs explained that "the signal from the photodiodes

was transmitted through a cable to the Rad-97 instrument." Tr. (Scruggs) at 403:18-404:2

(describing Circle sensor), 404:14-19 (describing Wings sensor). For these reasons, and those

discussed in relation to Element [15H], the evidence of record shows that this limitation is met.

> g.    **Element [15F]: "wherein the plurality of light-emitting diodes and the plurality of photodiodes are arranged in a reflectance measurement configuration"**

There is no dispute that the photodiodes in each of the '745 DI Products are located on

the same side as the LEDs and are thus arranged to detect light that is reflected from the user's

wrist. *See* CIB at 209; Tr. (Madisetti) at 755:7-25; CDX-0011C.103. The evidence of record

shows that this limitation is met.

> h.    **Element [15G]: "wherein the light block is configured to optically isolate the plurality of light-emitting diodes from the plurality of photodiodes by preventing at least a portion of light emitted from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the portion of the tissue measurement site"**

There is no dispute that the light block in each of the '745 DI Products separates the

LEDs from the photodiodes, blocking at least a portion of light from reaching the photodiodes

without first reaching the user's skin. *See* CIB at 209; Tr. (Madisetti) at 756:1-15; CDX-

0011C.104. The evidence of record shows that this limitation is met.

i.    **Element [15H]: "a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal"**

Dr. Madisetti identified processors for each of the '745 DI Products that receive and process signals from the photodiodes. Tr. (Madisetti) at 756:16-757:13; CDX-0011C.105. For the Circle sensor and Wings sensor, Mr. Scruggs explained that the relevant processor is in the Rad-97 instrument, which is connected to the sensors via a cable. Tr. (Scruggs) at 403:11-404:2 ("So the Circle sensor gathered the raw physiological data from the wrist using the LEDs and detectors, and the signal from the photodiodes was transmitted through a cable to the Rad-97 instrument. And then the Rad-97 instrument uses its processors, and the Masimo SET pulse oximetry algorithm to calculate oxygen saturation and pulse rate."), 405:1-7 (same for Wings sensor). Dr. Madisetti also relied on a demonstration by Mr. Scruggs of the Circle and Wings sensors connected to a Rad-97 monitor. *Id*. at 754:24-755:3. Dr. Madisetti also observed a separate demonstration by Dr. Scruggs of the RevA, RevD, and RevE devices measuring oxygen saturation. Tr. (Madisetti) at 749:23-750:11. Mr. Al-Ali described internal testing of the oxygen saturation measurements of Masimo sensors at the time of the RevA sensors. Tr. (Al-Ali) at 271:16-277:13; CX-0378C at 32. He also described testing relevant to the RevD sensors and the RevE sensors. Tr. (Al-Ali) at 276:12-278:3, 316:2-317:20; CX-0494C. Complainants submit that this evidence shows that each of the '745 DI Products has a processor that receives and processes signals from the photodiodes to calculate oxygen saturation. CIB at 209-11; CRB at 121.

Apple argues that the evidence in the record is insufficient to show that any of the '745 DI Products calculates oxygen saturation. RIB at 176-77. As discussed above in the context of the Poeze patents, Apple submits that Complainants failed to identify the source code in the

domestic industry products that calculates any physiological parameter. *Id*. at 47-48; *see* Tr. (Sarrafzadeh) at 1124:24-1125:11. Dr. Sarrafzadeh offered his opinion that the evidence presented by Complainants was insufficient to determine whether the '745 DI Products calculated oxygen saturation. Tr. (Sarrafzadeh) at 1122:20-1126:20. He specifically highlights an erroneous oxygen saturation reading of "81" during a demonstration of the Wings sensor. *Id*. at 1124:12-23. With respect to the Circle sensor and Wings sensor, Apple argues that the claim limitation is not satisfied because the identified "processor" is not in the sensor but in the separate Rad-97 instrument. RIB at 177; RRB at 91.

In consideration of the parties' arguments, the undersigned finds that Complainants have shown by a preponderance of the evidence that each of the '745 DI Products has a processor that receives signals from the photodiodes and determines an oxygen saturation measurement. With respect to the Circle sensor and Wings sensor, claim 15 does not preclude the "physiological-monitoring device" from comprising a sensor that is connected to a separate instrument via a cable. As discussed above in the context of the Poeze patents, the testimony of Mr. Scruggs and Mr. Al-Ali regarding the design, testing, and operation of Masimo's products is sufficient to show that the '745 DI Products measure oxygen saturation. The demonstrations of the '745 DI Products during discovery further confirm the operation of these products, and the minor inconsistencies identified by Dr. Sarrafzadeh do not refute Complainants' affirmative evidence that these products measure oxygen saturation.

Accordingly, the evidence shows by a preponderance that each of the '745 DI Products has a processor that receives signals from the photodiodes and determines an oxygen saturation measurement.

CONFIDENTIAL INFORMATION REDACTED

j.    **Element [15I]: "wherein the physiological monitoring device is configured to transmit physiological parameter data to a separate processor"**

There is no specific dispute that the '745 DI Products are configured to transmit oxygen saturation data to an additional processor. *See* CIB at 211; RIB at 175-77. For the Circle and Wings sensors, Dr. Madisetti identified Wi-Fi and Bluetooth functionality in the Rad-97 instrument that would facilitate transmission of oxygen saturation data. Tr. (Madisetti) at 758:8-11; CDX-0011C.107 (citing CX-0679 at 96, 99). For the RevA sensor, Dr. Madisetti identified a laptop that received oxygen saturation data during a demonstration by Mr. Scruggs. Tr. (Madisetti) at 757:16-23; CDX-0011C.106 (citing CX-0836C (demonstration photos) at 4). Dr. Madisetti identified two separate processors in the RevD and RevE sensors, explaining that oxygen saturation data is sent from the ████████ processor to the ████████ processor. Tr. (Madisetti) at 757:14-758:6; CDX-0011C.106 (citing CX-0709C (RevD schematic) at 3). For the RevE sensor, Dr. Madisetti further identifies a phone that received oxygen saturation during a demonstration by Mr. Scruggs. Tr. (Madisetti) at 757:24-758:4; CDX-0011C.106 (citing CX-0836C (demonstration photos) at 8-13). For these reasons, and those discussed in relation to Element [15H], the evidence of record shows that this limitation is met by the '745 DI Products.

k.    **Element [18]: "wherein the physiological parameter comprises oxygen saturation"**

Claim 18 of the '745 patent depends from claim 15, "wherein the physiological parameter comprises oxygen saturation." As discussed above in the context of the "processor" limitation, the undersigned finds that the '745 DI Products measure oxygen saturation.

\*\*\*

Accordingly, because each limitation of claims 15 and 18 are satisfied, the evidence

shows, by a preponderance, that each of the '745 DI Products practice claim 18 of the '745

patent.

### 2.    Status of DI Products at the Time of the Complaint

Apple argues that no patent-practicing domestic industry article existed at the time of the

complaint.  RIB at 174-75; RRB at 12-14.  Complainants dispute Apple's contention.  CRB at

119-20.  Specifically, Apple disputes whether the Circle and Wings sensors were operable with

the Rad-97 monitor before the complaint was filed.  RIB at 174-75.  Apple further disputes

whether the RevA sensor was operable with a laptop before the complaint was filed.  *Id*.

Complainants rely on Mr. Scruggs's testimony that the Circle sensor, Wings sensor, RevA

sensor, and RevD sensor were built before the complaint was filed.  Tr. (Scruggs) at 394:12-

397:24.  Complainants further rely on Mr. Al-Ali's testimony regarding clinical testing of

Masimo Watch devices.  Tr. (Al-Ali) at 262:7-264:13, 268:22-278:13, 313:14-318:22.

Mr. Scruggs also testified that the Circle sensor was used in clinical studies at Masimo in

October 2019.  Tr. (Scruggs) at 475:8-15.

In consideration of the parties' arguments, the undersigned finds that at least the RevA,

RevD, and RevE sensors were articles protected by the '745 patent that existed before the filing

of the complaint.  As discussed above in the context of the Poeze patents, the record evidence is

sufficient to show that the RevA, RevD, and RevE devices existed prior to the filing of the

complaint.  Apple argues that the laptop Mr. Scruggs used to display the oxygen saturation

measurement from the RevA sensor was not used with the RevA sensor before the filing of the

complaint, RIB at 174, but this laptop is not part of the domestic industry article protected by

claim 18 of the '745 patent.  Mr. Scruggs's laptop was only used to demonstrate the final

limitation of claim 15 [15I], which requires that the RevA sensor is "configured to transmit physiological parameter data to a separate processor." *See* Tr. (Madisetti) at 757:16-23; CX-0836C (demonstration photos) at 4.  Mr. Scruggs's laptop was part of the demonstration showing that the RevA sensor was configured as required by the claims, but the laptop is not part of the domestic industry article—the RevA had the required configuration even in the absence of the laptop.[78]  With respect to the RevD and RevE sensors, Apple argues that software was loaded on these devices after the complaint was filed, RIB at 42-43, but as discussed above in the context of the Poeze patents, *supra* Section IV.F.7, the evidence shows that these devices were tested before the filing of the complaint.  *See* Tr. (Al-Ali) at 276:17-278:13, 316:2-317:20 (citing CX-0494C).  Moreover, at least one of the RevE devices produced in discovery (CPX-0019C) can be considered to represent devices that existed at the time of the complaint, based on software that is dated July 9, 2021.

With respect to the Circle sensor and the Wings sensor, the associated Rad-97 monitor is necessary to the practice of the "determine a physiological parameter" limitation [15H], and the protected domestic industry article thus comprises the sensors together with the Rad-97 monitor. Although Complainants have identified some evidence that the Circle and Wings sensors were used in testing in 2019 and 2020, there is no evidence that these sensors were used together with the identified Rad-97 monitor in those tests.  *See* Tr. (Scruggs) at 475:8-15; Tr. (Al-Ali) at 262:7-263:10.  Mr. Scruggs explained how the Circle and Wings sensor could have worked with the Rad-97, but he never confirmed that these sensors were used with a Rad-97 monitor at any time

---

[78] As described by Mr. Al-Ali, an October 2020 presentation describes internal testing of the oxygen saturation measurements of prototype sensors consistent with the RevA design.  Tr. (Al-Ali) at 272:16-277:13; CX-0378C at 32.

before the filing of the complaint. *See* Tr. (Scruggs) at 403:11-404:2 ("It could work with many of the Masimo instruments. One example of that would be the Rad-97."). Complainants have not shown that the asserted domestic industry articles—the Circle sensor connected to the Rad-97 monitor and the Wings sensor connected to the Rad-97 monitor—existed as articles protected by claim 18 of the '745 patent before the filing of the complaint.

Accordingly, Complainants have shown that at least with respect to the RevA, RevD, and RevE sensors, domestic industry articles protected by the '745 patent existed before the filing of the complaint, and Complainants have thus satisfied the technical prong for the '745 patent with respect to a domestic industry existing at the time of the complaint.

Moreover, for the same reasons discussed above in the context of the Poeze patents, *supra* Part IV.F.7-8, the evidence shows satisfaction of the technical prong for a domestic industry in the process of being established. In particular, the evidence shows, by a preponderance, that Masimo has taken the necessary tangible steps to develop a product that will practice claim 18 of the '745 patent and shows a significant likelihood that this product development will lead to a device that practices the claim.

### G.    Invalidity – Obviousness

Apple contends that claims 9 and 27 of the '745 patent are obvious in view of the Apple Watch Series 0 and that claims 9, 18, and 27 of the '745 patent are obvious in view of U.S. Patent No. 8,670,819 to Iwamiya *et al.* (RX-0130, "Iwamiya") in combination with U.S. Patent No. 9,392,946 to Sarantos *et al.* (RX-0366, "Sarantos") and U.S. Patent No. 8,998,815 to Venkatraman *et al.*, (RX-0368, "Venkatraman"). RIB at 178-201; RRB at 94-110. Complainants dispute Apple's allegations of obviousness, identifying certain objective indicia of non-obviousness in support of their arguments. CIB at 212-34; CRB at 121-33.

### 1.    Apple Watch Series 0

The Apple Watch Series 0 was the first commercial Apple Watch, and Apple submits that it went on sale to the public on April 24, 2015, citing an Apple press release and the testimony of Apple and Masimo witnesses.  RX-0023 (Apple Press Release); Tr. (Block) at 910:22-911:2; Tr. (Kiani) at 138:1-4.  Complainants dispute whether Apple has shown that the Apple Watch Series 0 was publicly available before the priority date of the '745 patent in July 2015.  CIB at 212-13.  Complainants argue that the press release only describes an expected release date and that Apple's witness testimony is uncorroborated.  *Id.*; CRB at 123.

The record shows clear and convincing evidence that the Apple Watch Series 0 was publicly on sale by April 24, 2015.  Apple's press release represents that the Apple Watch will be "Available for Purchase Online April 24."  RX-0023.  Complainants argue that the statement in this press release was made in advance of the release date, but the April 2015 release date for the Apple Watch Series 0 was further corroborated by the testimony of Dr. Block and Dr. Venugopal.  Tr. (Block) at 910:22-24 ("It was released in the spring of 2015."); Tr. (Venugopal) at 818:10-15 ("The first customer ship for Series 0 was in April of 2015.").  Complainants have identified no evidence that the announced release date for the Apple Watch Series 0 was delayed and no reason to doubt the testimony of Apple's witnesses—when Mr. Kiani was asked about his knowledge of the release of the first Apple Watch, he testified that "I don't remember the exact timing, but I'm sure those dates are correct."  Tr. (Kiani) at 138:1-4.  The evidence thus shows that the Apple Watch Series 0 was publicly available in April 2015, which qualifies it as prior art under 35 U.S.C. § 102(a)(1).

Complainants further argue that Apple has failed to introduce reliable evidence for the structure and operation of the Apple Watch Series 0, identifying several discrepancies between

the product photos relied upon by Dr. Sarrafzadeh and the features described in Apple schematics. CIB at 213-18. The undersigned agrees with Apple, however, that the discrepancies identified by Complainants are irrelevant to the asserted claims of the '745 patent. *See* RRB at 95-97. The parties' disputes regarding the structure and operation of the Apple Watch Series 0 that are relevant to the limitations of the asserted claims are addressed below.

### a.     '745 patent, claim 9

#### (i)     Element [1 preamble]: "A physiological monitoring device comprising"

Apple contends that the Apple Watch Series 0 is a "physiological monitoring device" because it contains a heart rate sensor. RIB at 179; *see* Tr. (Sarrafzadeh) at 1092:7-13; Tr. (Waydo) at 937:2-8; Tr. (Land) at 957:5-15; RX-0396.0011C (Apple specification). Complainants do not specifically dispute this preamble limitation. *See* CIB at 212-24; CRB at 122-27.

#### (ii)     Element [1A]: "a plurality of light-emitting diodes configured to emit light in a first shape"

Apple contends that the Apple Watch Series 0 has four LEDs that emit light in a shape. RIB at 179; *see* Tr. (Sarrafzadeh) at 1092:15-21; Tr. (Land) at 959:3-13; Tr. (Block) at 897:15-898:1. Dr. Venugopal testified that the Apple Watch Series 0 contained green and infrared LEDs, and the shape of the LEDs was square. Tr. (Venugopal) at 819:1-7, 820:16-821:11; RX-0392C.006 (Apple specification) at Fig. 2. Complainants do not specifically dispute this limitation. *See* CIB at 212-24; CRB at 122-27.

     **(iii)**    **Element [1B]: "a material configured to be positioned between the plurality of light-emitting diodes and tissue on a wrist of a user when the physiological monitoring device is in use, the material configured to change the first shape into a second shape by which the light emitted from one or more of the plurality of light-emitting diodes is projected towards the tissue"**

Apple submits that the Apple Watch Series 0 has a "Fresnel lens" positioned between the LEDs and the user's wrist, which changes the shape of the light from the LEDs. RIB at 108-81. Dr. Venugopal identified the Fresnel lens as part of the Apple Watch Series 0. Tr. (Venugopal) at 819:1-7. Apple relies on an engineering requirement specification document for Apple's "Generation 1" optical sensing module, which was identified by Dr. Venugopal as applying to the Apple Watch Series 0 through 3. *Id.* at 820:10-15 (citing RX-0392C). Dr. Venugopal explained that "[t]he Fresnel lens had two purposes," which were "cosmetic obscuration" and "to have light emitted from the green LED to be collimated." *Id.* at 821:12-21. The green light is "positioned under the optical center," and "gets restricted to a certain angle so that most of it gets out of the window." *Id.* at 821:22-4, 822:22-25; RX-0392C.007 at Fig. 3. With respect to the infrared LED in the optical sensing module, Dr. Venugopal explained that "because it is not passing through an optical center, gets thrown off in a different direction, and it exits the watch and hits the skin a little bit further away." Tr. (Venugopal) at 823:4-9. He testified that the infrared light "has a crescent shape." *Id.* Dr. Sarrafzadeh relied on the Apple specification document and offered his opinion that the "Fresnel lens has these grooves as highlighted here, and these grooves take the shape of the LED and transform that into a crescent type of a shape." Tr. (Sarrafzadeh) at 1092:23-1093:8 (citing RX-0392C); *see* RDX-7.86C, RDX-7.87C.

    Complainants argue that the testimony of Dr. Venugopal and Dr. Sarrafzadeh are insufficient to show that the Apple Watch Series 0 meets this limitation by clear and convincing

**CONFIDENTIAL INFORMATION REDACTED**

evidence. CIB at 220-22. Complainants contend that there are no documents or testing to corroborate Apple's contention that the Fresnel lens changes the shape of the infrared light in the Apple Watch Series 0. *Id.* Complainants further cite an Apple patent (naming Dr. Venugopal among the inventors) describing a Fresnel lens whose effect is for a "light emitter to retain its optical power, collection efficiency, beam shape, and collection area such that the light undergoes minimal change." CX-1806 at ¶ 53.

Apple argues in reply that Dr. Sarrafzadeh's opinions are corroborated by the placement of the infrared LED in relation to the Fresnel lens shown in Apple's engineering documents, highlighting a close-up of the lens and the placement of the LEDs. RRB at 99-100.



RX-0392C.00 at Fig. 2. Apple submits that Dr. Sarrafzadeh and Dr. Venugopal explained how the offset placement of the infrared LED causes a change in shape as the light passes through a crescent-shaped portion of the Fresnel lens. *See* Tr. (Sarrafzadeh) at 1093:4-8; Tr. (Venugopal) at 823:4-9.

In consideration of the parties' arguments, the undersigned finds that Apple has failed to offer clear and convincing evidence that the Fresnel lens changes the shape of the light emitted by the infrared LED in the Apple Watch Series 0. Dr. Sarrafzadeh's testimony is conclusory—

he asserts that the grooves on the Fresnel lens transforms the light "into a crescent type of a shape," but he merely showed a demonstrative with a drawing of a crescent that was not shown to be the result of any testing or observation of the Apple Watch Series 0. Tr. (Sarrafzadeh) at 1093:4-8; RDX-7.87C; Tr. (Madisetti) at 1358:3-5. Dr. Venugopal explained how the Fresnel lens collimates the green light at the optical center while throwing off the infrared light in a different direction because it is off-center, but he only offers a short conclusory statement about the shape of the infrared light: "It has a crescent shape." Tr. (Venugopal) at 821:22-823:9. Changing the shape of the infrared light is not one of the two purposes that Dr. Venugopal described for the Fresnel lens. *See id.* at 821:12-21.[79] The record contains no images of the light passing through the Fresnel lens or any explanation for why Apple would have designed the Fresnel lens to change the shape of the infrared light, and the conclusory testimony of Dr. Sarrafzadeh and Dr. Venugopal falls short of the clear and convincing standard necessary to prove invalidity. *See Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345, 1349 (Fed. Cir. 2013) (where expert's testimony was "a single sentence, without explanation," finding that the ALJ and Commission did not "act unreasonably in finding this conclusory sentence did not rise to the level of clear and convincing evidence").

> **(iv)** **Element [1C]: "a plurality of photodiodes configured to detect at least a portion of the light after the at least the portion of the light passes through the tissue, the plurality of photodiodes further configured to output at least one signal responsive to the detected light"**

Apple contends that the Apple Watch Series 0 has two photodiodes that detect light after it interacts with the user's tissue. RIB at 181; *see* Tr. (Sarrafzadeh) at 1093:9-12; Tr. (Land) at

---

[79] The Apple patent application cited by Complainants is consistent with Dr. Venugopal's testimony that the purpose of the Fresnel lens is to obscure internal components and to retain optical power. *See* CX-1806 at ¶ 53.

CONFIDENTIAL INFORMATION REDACTED

959:3-13; Tr. (Venugopal) at 819:1-7; RX-0392C.006 at Fig. 2.  Complainants do not

specifically dispute this limitation.  *See* CIB at 212-24; CRB at 122-27.

> **(v)    Element [1D]: "a surface comprising a dark-colored coating, the surface configured to be positioned between the plurality of photodiodes and the tissue when the physiological monitoring device is in use, wherein an opening defined in the dark-colored coating is configured to allow at least a portion of light reflected from the tissue to pass through the surface"**

Apple submits that the Apple Watch Series 0 has a ███████ back crystal, which is

positioned between the photodiodes and the user's wrist and has openings to allow light reflected

from the tissue to reach the photodiodes.  RIB at 181-82; RRB at 101; *see* Tr. (Sarrafzadeh) at

1093:13-21; Tr. (Land) at 959:3-13.  Dr. Sarrafzadeh testified that "the first layer of the ████

████ is a dark-colored coating."  Tr. (Sarrafzadeh) at 1093:13-21; RDX-7.89C.[80]  In the

alternative, he offered his opinion that "one of ordinary skill knows that you can easily and low-

tech add dark-colored coating to it."  *Id.*  Apple argues that dark-colored coatings were well-

known in the prior art and would have been obvious to a person of ordinary skill in the art.  RRB

at 101 (citing RX-0366 (Sarantos) at 17:12-16; RX-0035.0202 (Webster)).  Complainants

dispute Apple's contentions, arguing that there is no evidence that the ███████ surface of

the Apple Watch Series 0 has layers and that Dr. Sarrafzadeh's testimony is insufficient to

establish that adding a dark-colored coating would have been obvious.  CIB at 222-23.

In consideration of the parties' arguments, the undersigned agrees with Complainants that

Apple has failed to show, clearly and convincingly, that the ███████ back crystal of the

Apple Watch Series 0 is a "coating."  There is no evidence that the ███████ back crystal

---

[80] Complainants note that the image on RDX-7.89C is an Apple Watch Series 1, not an Apple Watch Series 0.  *See* CIB at 215.

CONFIDENTIAL INFORMATION REDACTED

comprises layers that can be described as a "coating," and Apple has failed to offer clear and convincing evidence that one of ordinary skill in the art would have added a dark-colored coating to the surface of the back crystal in the Apple Watch Series 0. *See, e.g.*, JX-0009 at 9:32-34 (referring to a "top surface coated with a light-absorbing material"). Dr. Sarrafzadeh offers conclusory testimony that a person of ordinary skill in the art would have been able to add a "low-tech" coating to the Apple Watch Series 0, but even if this opinion were reliable, Dr. Sarrafzadeh fails to identify any reason to add such a coating. Such testimony is insufficient to carry Apple's burden to prove obviousness by clear and convincing evidence. *See InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014) (reversing obviousness finding where expert's "testimony primarily consisted of conclusory references to her belief that one of ordinary skill in the art could combine these references, not that they would have been motivated to do so.").

      **(vi)**    **Element [1E]: "a light block configured to prevent at least a portion of the light emitted from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the tissue"**

With respect to the "light block" limitation, Apple relies on an Apple specification that depicts blocks labeled " ▮▮▮▮▮ " between the emitters and detectors.

CONFIDENTIAL INFORMATION REDACTED



RX-0396C.0017 at Fig. 6. █████████████████████████████████

████████████████████████████████████████████████████████████ .” Tr. (Land)

at 961:22-962:13; *see also* Tr. (Sarrafzadeh) at 1093:22-1094:3. Complainants argue that the

Apple specification cited by Mr. Land is unreliable, because it is dated July 2013—two years

before the release of the Apple Watch Series 0—and it does not show the convex back surface

that is in the final product. CIB at 216-17; CRB at 127; *see* Tr. (Madisetti) at 1356:10-22.

In consideration of the parties' arguments, the undersigned finds that Apple has shown by

clear and convincing evidence that the Apple Watch Series 0 meets the "light block" limitation

of the '745 patent claim 1. Mr. Land identified the Apple engineering requirement specification

document as one that corresponds to the Apple Watch Series 0. Tr. (Land) at 961:7-21

(identifying RX-0396C). He described the optical path diagram in that document as "a

schematic for some of the major elements in the Apple Watch." *Id*. at 961:22-962:13. The fact

that the diagram does not show other features of the Apple Watch, such as the curved back crystal, is irrelevant to this limitation. Mr. Land's testimony and the diagram from Apple's specification clearly show that the Apple Watch Series 0 had the claimed "light block."

### (vii)  Element [1F]: "a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal"

Apple contends that the Apple Watch Series 0 has a processor that receives signals from the photodiodes and calculates a pulse rate. RIB at 183; *see* Tr. (Sarrafzadeh) at 1094:4-9; Tr. (Land) at 959:3-13; RX-0392C.011. Complainants do not specifically dispute this limitation. *See* CIB at 212-24; CRB at 122-27.

### (viii)  Element [9]: "wherein the physiological parameter comprises oxygen saturation"

Claim 9 of the '745 patent depends from claim 1, "wherein the physiological parameter comprises oxygen saturation." The Apple Watch Series 0 does not measure oxygen saturation, but Dr. Sarrafzadeh offered his opinion that pulse oximetry would have been obvious to a person of ordinary skill in the art because such devices have been known since the 1970s. Tr. (Sarrafzadeh) at 1094:10-17. Apple cites testimony from Dr. Mehra that "pulse oximetry as a feature is essentially heart rate sensing, but comparing the amplitude of the signal at two different colors of light or wavelengths of light." Tr. (Mehra) at 852:7-17. Dr. Waydo testified that Apple's later development of a blood oxygen sensor built on its work on heart rate detection, because "the blood oxygen sensor is a PPG of photoplethysmography sensor, much like the heart rate sensors." Tr. (Waydo) at 923:12-23. Dr. Mannheimer testified that "putting a couple of LEDs in a Series 0 watch form factor" would produce a blood oxygen measurement, "but not to the level that we were looking for." Tr. (Mannheimer) at 1015:9-19.

Complainants argue that Apple failed to identify what modifications to the Apple Watch Series 0 would be necessary to measure oxygen saturation. CIB at 218-20. Complainants further identify evidence that Apple engineers expressed skepticism regarding Apple's likelihood of success in implementing an oxygen saturation measurement in the Apple Watch. *See* Tr. (Mannheimer) at 1012:12-16; CX-0299C (Waydo Dep. Tr.) at 166:4-167:5; CX-0295C (Shui Dep. Tr.) at 108:15-21. Complainants argue that it is unlikely that one of ordinary skill in the art would have been successful in modifying the Apple Watch Series 0 to measure oxygen saturation when the record shows that Apple's team of engineers worked for several years after the Apple Watch's release to implement this feature. CIB at 220.

In consideration of the parties' arguments, the undersigned finds that Apple has failed to offer clear and convincing evidence that one of ordinary skill in the art would have modified the Apple Watch Series 0 to measure oxygen saturation with a reasonable expectation of success. Apple cites the testimony of its engineers that adding some LEDs would make it possible to measure oxygen saturation, but there is no clear explanation of the modifications that would be necessary. *See* Tr. (Mannheimer) at 1015:9-19. The Federal Circuit has found such generalized arguments for combining prior art features to be insufficient, holding that it may be necessary to provide "a clear, evidence-supported account of the contemplated workings of the combination" as "a prerequisite to adequately explaining and supporting a conclusion that a relevant skilled artisan would have been motivated to make the combination and reasonably expect success in doing so." *Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 994 (Fed. Cir. 2017). Here, Apple has failed to explain how the addition of LEDs for measuring blood oxygen would have been implemented, and whether these modifications would affect other limitations of the '745

patent—such as the Fresnel lens that Apple relies on for the "second shape" limitation.[81]  In addition, the record contains testimony from multiple Apple engineers expressing skepticism regarding the implementation of pulse oximetry in the Apple Watch.  *See* Tr. (Mannheimer) at 1012:12-16; CX-0299C (Waydo Dep. Tr.) at 166:4-167:5; CX-0295C (Shui Dep. Tr.) at 108:15-21.  Apple has thus failed to show how one of ordinary skill in the art would have modified the Apple Watch Series 0 to measure blood oxygen and has failed to show, clearly and convincingly, that that there would have been a reasonable expectation of success in making any such modifications.

***

Accordingly, the evidence fails to show that claim 9 of the '745 patent is obvious in view of the Apple Watch Series 0, because Apple has not clearly and convincingly shown that the Apple Watch Series 0 has a material that changes emitted light from a "first shape" to a "second shape," or that it would have been obvious for one of ordinary skill in the art to modify the Apple Watch Series 0 to have a "dark-colored coating" or to measure oxygen saturation.

**b.      '745 Patent Claim 27**

**(i)      Element [20 preamble]: "A system configured to measure one or more physiological parameters of a user"**

The preamble of claim 20 of the '745 patent requires "[a] system configured to measure one or more physiological parameters of a user," including "a physiological monitoring device." As discussed above in the context of the preamble of '745 patent claim 1, there is no dispute that the Apple Watch Series 0 is a "physiological monitoring device" because it contains a heart rate sensor.  *See* RIB at 184.

---

[81] When Apple implemented a blood oxygen feature in the Apple Watch Series 6, the Fresnel lens was removed in favor of a microlens array.  *See* Tr. (Venugopal) at 836:3-838:25.

      (ii)      **Element [20A]: "a plurality of light-emitting diodes configured to emit light in a first shape"**

Claim 20 has a "plurality of light-emitting diodes" limitation that is identical to the limitation of claim 1. As discussed above in the context of claim 1, there is no dispute that the Apple Watch Series 0 has four LEDs that emit light in a shape. *See* RIB at 179, 185.

      (iii)     **Element [20B]: "a material configured to be positioned between the plurality of light-emitting diodes and tissue of the user when the physiological monitoring device is in use, the material configured to change the first shape into a second shape by which the light emitted from one or more of the plurality of light-emitting diodes is projected towards the tissue"**

Claim 20 has a "material configured to change the first shape into a second shape" limitation that is identical to the limitation of claim 1. For the reasons discussed above in the context of claim 1, the undersigned finds that Apple has not shown that the Apple Watch Series 0 has a material that changes a "first shape" into a "second shape."

      (iv)     **Element [20C]: "a plurality of photodiodes configured to detect at least a portion of the light after the at least the portion of the light passes through the tissue, the plurality of photodiodes further configured to output at least one signal responsive to the detected light"**

Claim 20 has a "plurality of photodiodes" limitation that is identical to the limitation of claim 1. As discussed above in the context of claim 1, there is no dispute that the Apple Watch Series 0 has two photodiodes that detect light after it interacts with the user's tissue. *See* RIB at 181, 185.

      **(v)**      **Element [20D]: "a surface comprising a dark-colored coating, the surface configured to be positioned between the plurality of photodiodes and the tissue when the physiological monitoring device is in use, wherein an opening defined in the dark-colored coating is configured to allow at least a portion of light reflected from the tissue to pass through the surface"**

Claim 20 has a "surface comprising a dark-colored coating" limitation that is identical to the limitation of claim 1. For the reasons discussed above in the context of claim 1, Apple has not shown that the Apple Watch Series 0 has a surface comprising a dark-colored coating or that one of ordinary skill in the art would have added such a coating.

      **(vi)**     **Element [20E]: "a light block configured to prevent at least a portion of the light emitted from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the tissue"**

Claim 20 has a "light block" limitation that is identical to the limitation of claim 1. For the reasons discussed above in the context of claim 1, the evidence shows that the Apple Watch Series 0 has a light block that prevents at least a portion of light from the LEDs from reaching the photodiodes.

      **(vii)**    **Element [20F]: "a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal"**

Claim 20 has a "processor" limitation that is identical to the limitation of claim 1. As discussed above in the context of claim 1, there is no dispute that the Apple Watch Series 0 has a processor that receives signals from the photodiodes and calculates a pulse rate. *See* RIB at 183, 185.

> **(viii)** **Element [20G]: "a processing device configured to wirelessly receive physiological parameter data from the physiological monitoring device, wherein the processing device comprises a user interface, a storage device, and a network interface configured to wirelessly communicate with the physiological monitoring device, and wherein the user interface includes a touch-screen display configured to present visual feedback responsive to the physiological parameter data"**

Apple contends and provided testimony that the Apple Watch Series 0 wirelessly communicates with an Apple iPhone comprising a user interface including a touch-screen display, a storage device, and a wireless interface. RIB at 185; *see* Tr. (Sarrafzadeh) at 1095:17-1096:5. Complainants dispute whether Apple has shown that an iPhone could display the pulse rate measurement of an Apple Watch Series 0, however, arguing that Apple failed to identify any application on the iPhone for presenting any visual feedback responsive to any physiological parameter data. CIB at 223.[82] In his testimony, Dr. Sarrafzadeh stated that the Apple Watch could wirelessly communicate with a cell phone such as an iPhone, and that "the app can provide a visual feedback to show the physiological parameters," thus showing that this limitation is met. *See* Tr. (Sarrafzadeh) at 1095:17-1096:5; RDX-7.94C. While Dr. Sarrafzadeh did not identify a particular app for these application, his testimony is unrebutted, and Apple's public statements at the time of the release of the Apple Watch Series 0 described "Apple Watch's health and fitness features" and offered customers assistance "to pair their Apple Watch with their iPhone." RX-0023.

---

[82] Apple argues that this argument has been waived, RRB at 102, but Complainants' pre-hearing brief includes a contention that "Apple provides no evidence to show how an iPhone meets the elements within [20G]." CPHB at 164.

(ix)    **Element [27]: "wherein at least one of the plurality of light-emitting diodes is configured to emit light of a first wavelength and at least one of the plurality of light-emitting diodes is configured to emit light of a second wavelength, the second wavelength being different than the first wavelength"**

Claim 27 of the '745 patent depends from claim 20, further requiring that "at least one of the plurality of light-emitting diodes is configured to emit light of a first wavelength and at least one of the plurality of light-emitting diodes is configured to emit light of a second wavelength, the second wavelength being different than the first wavelength." Apple submits that the Apple Watch Series 0 has green and infrared LEDs. RIB at 185; *see* Tr. (Sarrafzadeh) at 1096:6-10; Tr. (Land) at 959:3-13; Tr. (Venugopal) at 819:1-7, 820:16-821:11; RX-0392C.006 (Apple specification) at Fig. 2. Complainants do not specifically dispute this limitation. *See* CIB at 212-24; CRB at 122-27.

*** 

For the reasons discussed above, the evidence of record fails to show that claim 27 of the '745 patent is obvious in view of the Apple Watch Series 0. Apple has not shown, clearly and convincingly, that the Apple Watch Series 0 has a material that changes emitted light from a "first shape" to a "second shape," and Apple has not shown, clearly and convincingly, that it would have been obvious to modify the Apple Watch Series 0 to have a "dark-colored coating" as required by the limitations of claim 20.

### 2.    Iwamiya

U.S. Patent No. 8,670,819 is entitled "Optical Biological Information Detecting Apparatus and Optical Biological Information Detecting Method," naming inventors Hiroshi Iwamiya and Shuji Nakajima, and assignee Casio Computer Co. Ltd. RX-0130 ("Iwamiya"). Iwamiya issued on March 11, 2014, from an application filed on June 29, 2010, *id.*, and

accordingly it is prior art to the '745 patent pursuant to 35 U.S.C. § 102(a)(1).  Apple contends

that claims 9, 18, and 27 of the '745 patent are obvious in view of Iwamiya in combination with

other prior art patents.  RIB at 186-99; RRB at 102-09.

        a.      **'745 Patent Claim 9**

              (i)      **Element [1 preamble]: "A physiological monitoring device comprising"**

There is no dispute that Iwamiya discloses a "physiological monitoring device" because it

discloses an "optical biological information detecting apparatus."  RX-0130; *see* RIB at 186; Tr.

(Sarrafzadeh) at 1098:8-12; Tr. (Madisetti) at 1359:8-1365:6.

              (ii)      **Element [1A]: "a plurality of light-emitting diodes configured to emit light in a first shape"**

There is no dispute that Iwamiya discloses light-emitting diodes emitting light in a shape.

RX-0130 at 6:7-11, Fig. 4; *see* RIB at 186; Tr. (Sarrafzadeh) at 1098:13-18; RDX-7.100C; Tr.

(Madisetti) at 1359:8-1365:6.

              (iii)     **Element [1B]: "a material configured to be positioned between the plurality of light-emitting diodes and tissue on a wrist of a user when the physiological monitoring device is in use, the material configured to change the first shape into a second shape by which the light emitted from one or more of the plurality of light-emitting diodes is projected towards the tissue"**

There is no dispute that Iwamiya discloses an "annular light guide unit" that is positioned

between the light-emitting diodes and a user's wrist and changes the shape of the light into an

annular shape.  RX-0130 at 6:11:14 ("an annular guide unit 7 that guides the observation light

emitted from the light emitting units 6 and annularly diffuses and irradiates the observation light

with respect to a skin H"), 6:22-31 (describing location of light guide unit 7), *see* RIB at 186-87;

Tr. (Sarrafzadeh) at 1098:19-1099:2; RDX-7.101C; Tr. (Madisetti) at 1359:8-1365:6.



**FIG.4**

RX-0130 at Fig. 4.

> **(iv)**   **Element [1C]: "a plurality of photodiodes configured to detect at least a portion of the light after the at least the portion of the light passes through the tissue, the plurality of photodiodes further configured to output at least one signal responsive to the detected light"**

There is no dispute that Iwamiya discloses a plurality of photodiodes that output a signal responsive to light that is reflected from a user's tissue.  RX-0130 at 8:20-23, Fig. 4; *see* RIB at 187-88; Tr. (Sarrafzadeh) at 1099:3-6, 1105:12-16; RDX-7.102C; Tr. (Madisetti) at 1359:8-1365:6.

> **(v)**   **Element [1D]: "a surface comprising a dark-colored coating, the surface configured to be positioned between the plurality of photodiodes and the tissue when the physiological monitoring device is in use, wherein an opening defined in the dark-colored coating is configured to allow at least a portion of light reflected from the tissue to pass through the surface"**

Apple identifies a "light shielding frame" that surrounds the photodiodes in Iwamiya, RX-0130 at 8:38-42, and Dr. Sarrafzadeh testifies that it would have been obvious to add a dark-colored coating to this surface, and one example of such a coating is disclosed in Sarantos.  Tr.

(Sarrafzadeh) at 1099:7-15; RDX-7.103C (citing RX-0366 at 17:6-16, Fig. 22).[83]

Dr. Sarrafzadeh submits that both Iwamiya and Sarantos are wrist-worn physiological monitoring devices, and one of ordinary skill in the art would have been motivated to add a dark-colored coating to Iwamiya to enhance the light shielding. Tr. (Sarrafzadeh) at 1100:15-1101:4. Dr. Sarrafzadeh testified that one of ordinary skill in the art would have expected success in implementing the "low-tech" and "low cost" addition of a dark-colored coating. *Id.* at 1101:5-10. Dr. Sarrafzadeh further cites Webster's disclosure that "black opaque material" can be an effective light shield. *Id.* at 1100:22-1101:4; RDX-7.109C; RX-0035 at 202.

Complainants argue that one of ordinary skill in the art would not have been motivated to add a dark-colored coating to Iwamiya because Iwamiya discloses "light shielding" that uses a reflective material. *See* Tr. (Madisetti) at 1361:9-12 (citing RX-0130 at 18:61-65). In reply, Apple argues that the reflective light shielding is disclosed in a separate embodiment of Iwamiya that is not relevant to the Figure 4 embodiment identified by Dr. Sarrafzadeh. RRB at 106-07.

In consideration of the parties' arguments, the undersigned finds that the evidence clearly and convincingly shows a reason to use a dark-colored coating for the "light shielding frame" in Figure 4. Dr. Sarrafzadeh convincingly explains that one of ordinary skill in the art would have reason to use a dark-colored coating, such as that disclosed in Sarantos, to improve the light-shielding properties of the Figure 4 embodiment, and that one of ordinary skill in the art would have expected success in implementing this change. While Iwamiya discloses a reflective light shielding component with respect to another embodiment (RX-0130 at 18:61-65), this does not

---

[83] Sarantos is U.S. Patent No. 9,392,946, which names inventors Chris W. Sarantos and Peter W. Richards, and issued from an application filed on May 28, 2015. RX-0366. Accordingly, Sarantos is prior art to the '745 patent pursuant to 35 U.S.C. § 102(a)(2).

teach away from the use of other light shielding options or enhancements known in the art,

particularly with respect to the Figure 4 embodiment, which does not mention "reflective"

shielding. *See, e.g., Syntex (U.S.A.) LLC v. Apotex*, 407 F.3d 1371, 1379 (Fed. Cir. 2005)

("What a reference teaches a person of ordinary skill is not . . . limited to what a reference

specifically 'talks about' . . . a reference will teach way when it suggests that the developments

flowing from its disclosures are unlikely to produce the objective of the applicant's

invention . . .").

        **(vi)**    **Element [1E]: "a light block configured to prevent at least a portion of the light emitted from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the tissue"**

There is no dispute that Iwamiya discloses reflection layers 13 and 15 that are light

blocks configured to prevent light from the light-emitting diodes from reaching the photodiodes

without first reaching the tissue. RX-0130 at 6:67-7:3, 7:45-49, Fig. 3; *see* RIB at 189-90; Tr.

(Sarrafzadeh) at 1099:16-21; RDX-7.104C; Tr. (Madisetti) at 1359:8-1365:6.

        **(vii)**    **Element [1F]: "a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal"**

There is no dispute that Iwamiya discloses a CPU that receives and processes signals

from the photodiodes and "outputs the data as biological information" that represents a

physiological parameter. RX-0130 at 9:40-43, Fig. 10; *see* RIB at 190-91; Tr. (Sarrafzadeh) at

1099:22-1100:1; RDX-7.105C; Tr. (Madisetti) at 1359:8-1365:6.

        **(viii)**    **Element [9]: "wherein the physiological parameter comprises oxygen saturation"**

Claim 9 of the '745 patent depends from claim 1, "wherein the physiological parameter

comprises oxygen saturation." Dr. Sarrafzadeh testified that this limitation is obvious in view of

Iwamiya's disclosure of a measurement of "biological information," because oxygen saturation is a type of biological information. Tr. (Sarrafzadeh) at 1100:2-8; RDX-7.106C; *see* RX-0130 at 9:1-7. Apple further submits that the prior art Sarantos reference explicitly discloses a measurement of oxygen saturation, explaining that "[i]f multiple light-emitting devices are used . . . photoplethysmographic techniques may also be used to measure other physiological parameters besides heart rate, such as blood oxygenation levels." RX-0366 at 13:44-47; *see* Tr. (Sarrafzadeh) at 1100:9-14. Dr. Sarrafzadeh offered his opinion that one of ordinary skill in the art would have been motivated to use the teaching in Sarantos to measure oxygen saturation in Iwamiya because both references describe wrist-worn physiological monitoring devices, and measuring oxygen saturation would enhance Iwamiya's device. Tr. (Sarrafzadeh) at 1100:15-20, 1101:12-19. Dr. Sarrafzadeh also offered his opinion that such a combination would be successful based on Sarantos's suggestion and the existence of oxygen saturation measurement devices in the prior art. *Id*. at 1101:20-1102:1.

Complainants argue that Iwamiya's disclosure of a measurement of "biological information" is insufficient to show a measurement of oxygen saturation. CIB at 225-26. Dr. Madisetti explained that Iwamiya only disclosed the use of one wavelength of light, which would be insufficient for measuring oxygen saturation. Tr. (Madisetti) at 1359:22-1361:1; CDX-0012C.065. Moreover, the only "biological information" disclosed in Iwamiya is heart rate. RX-0130 at 9:1-7 ("pulse wave"); *see* Tr. (Madisetti) at 1360:2-4. Complainants further identify an optical filter disclosed in Iwamiya that would block light below 900nm, which would preclude the wavelengths necessary for pulse oximetry. CIB at 227 (citing RX-0130 at 8:42-47, 18:55-60). Sarantos is also not primarily designed for the wavelengths necessary for pulse oximetry, noting that "[t]he aspect ratios and dimensional values discussed herein are tailored

based on the green/yellow light spectrum and are not tailored for use in other spectrums, such as the red or infrared spectra." RX-0336 at 18:48-51. Complainants further argue that Apple has failed to identify a reason for combining Iwamiya and Sarantos or to show that such a combination would have a reasonable expectation of success. CIB at 228-30; CRB at 128-29.

In consideration of the parties' arguments, the undersigned finds that Apple has failed to show by clear and convincing evidence that it would have obvious for one of ordinary skill to combine Iwamiya and Sarantos to measure oxygen saturation. Because Iwamiya only discloses the use of one wavelength of light, the evidence indicates that one of ordinary skill in the art would not have been able to use the device in Iwamiya to measure oxygen saturation. Tr. (Madisetti) at 1359:22-1361:1. Moreover, Iwamiya operates at wavelengths that are not appropriate for pulse oximetry. *See* RX-0130 at 8:42-47; CIB at 227 (Iwamiya blocks light below 900 nm). Sarantos includes a suggestion to use multiple emitters with PPG sensors to measure blood oxygenation levels, but the only reason that Dr. Sarrafzadeh identifies for adding such a feature is that it "would enhance, by way of example, what the biological information of Iwamiya is." Tr. (Sarrafzadeh) at 1101:12-19. The Federal Circuit has held that such generic expert testimony is insufficient for obviousness. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012) (where expert testified that a motivation would have been "to build something better," the court found that "[t]his testimony is generic and bears no relation to any specific combination of prior art elements.").[84]

---

[84] Moreover, Apple fails to explain how the multiple emitters described in Sarantos would have been implemented in Iwamiya in a way that is compatible with the annular light guide that is necessary to meet the "second shape" limitation. *See Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 994 (Fed. Cir. 2017) (reversing a finding of obviousness where the record lacked "a clear, evidence-supported account of the contemplated workings of the combination").

Apple also has not clearly and convincingly shown that one of ordinary skill in the art would have had a reasonable expectation of success in modifying Iwamiya to measure oxygen saturation—the record contains testimony from multiple Apple engineers expressing skepticism regarding the implementation of pulse oximetry in a wrist-worn device. *See* Tr. (Mannheimer) at 1012:12-16; CX-0299C (Waydo Dep. Tr.) at 166:4-167:5; CX-0295C (Shui Dep. Tr.) at 108:15-21.

***

Accordingly, Apple has failed to show that claim 9 of the '745 patent is obvious in view of Iwamiya in combination with Sarantos, because Apple has not shown, clearly and convincingly, that it would have been obvious to one of ordinary skill in the art to modify the device disclosed in Iwamiya with the teachings in Sarantos regarding a measurement of oxygen saturation with a reasonable expectation of success.

### b.    '745 Patent Claim 18

#### (i)    Element [15 preamble]: "A physiological monitoring device comprising:"

There is no dispute that Iwamiya discloses a "physiological monitoring device" as required by the preamble of claim 15, as discussed above in the context of the preamble of claim 1. *See* RIB at 193.

#### (ii)    Element [15A]: "a plurality of light-emitting diodes configured to emit light proximate a wrist of a user"

There is no dispute that Iwamiya discloses light emitting diodes, as discussed above in the context of claim 1. *See* RIB at 193. Moreover, there is no dispute that Iwamiya discloses a device that is worn on the wrist. *See* RX-0130 at 4:54-5, Fig. 4.

#### (iii)    Element [15B]: "a light diffusing material configured to be positioned between the plurality of light-emitting diodes and a

> **tissue measurement site on the wrist of the user when the**
> **physiological monitoring device is in use"**

There is no dispute that Iwamiya discloses an "annular light guide" that "annularly diffuses and irradiates the observation light." RX-0130 at 6:10-14, Fig. 4; *see* Tr. (Sarrafzadeh) at 1103:10-15; RDX-7.116C. Moreover, there is no dispute that this annular light guide is positioned between the light-emitting diodes and the user's wrist, as discussed above in the context of claim 1. *See* RIB at 193.

> (iv)     **Element [15C]: "a light block having a circular shape"**

There is no dispute that Iwamiya discloses reflection layers 13 and 15 that are light blocks, as discussed above in the context of claim 1. *See* RIB at 193-94. Figures 2 and 3 of Iwamiya show that these light blocks are arranged around the annular light guide in a circular shape. RX-0130 at 6:67-7:3, 7:45-49, Fig. 2, Fig. 3; *see* Tr. (Sarrafzadeh) at 1103:16-21; RDX-7.117C.

> (v)     **Element [15D]: "a plurality of photodiodes configured to detect**
> **at least a portion of the light emitted from the plurality of**
> **light-emitting diodes after the light passes through the light**
> **diffusing material and a portion of the tissue measurement site**
> **encircled by the light block, wherein the plurality of**
> **photodiodes are arranged in an array having a spatial**
> **configuration corresponding to a shape of the portion of the**
> **tissue measurement site encircled by the light block"**

There is no dispute that Iwamiya discloses a plurality of photodiodes configured to detect light that is reflected from a user's tissue, as discussed above in the context of claim 1. *See* RIB at 194-95. Iwamiya further describes "the plural light receiving units **9** preferably disposed on the same circumference centered on an optical axis of the scattered light taking unit **8**." RX-0130 at 14:39-41, Fig. 4; *see* Tr. (Sarrafzadeh) at 1103:22-1104:5; RDX-7.118C. Dr. Sarrafzadeh testified that he believes this limitation is indefinite but that "using Masimo's

interpretation," this limitation is disclosed by Iwamiya. See Tr. (Sarrafzadeh) at 1103:23-5;
RDX-7.118C.

Complainants argue that the disclosure in Iwamiya identified by Apple is insufficient to
teach a plurality of photodiodes "arranged in an array having a spatial configuration
corresponding to a shape of the portion of the tissue measurement site encircled by the light
block." CIB at 232; CRB at 130-31. Complainants submit that Iwamiya only depicts a single
light receiving unit. See Tr. (Madisetti) at 1364:7-8. Complainants further cite a statement in the
prosecution history of a parent application to the '745 patent explaining that the plurality of
detectors "must include sufficient detectors to represent such shapes." CX-1760 at 322; see Tr.
(Madisetti) at 1366:13-1367:19.

In consideration of the parties' arguments, the undersigned finds that Iwamiya clearly
discloses "plural light receiving units." See RX-0130 at 14:36-41; Tr. (Sarrafzadeh) at 1103:23-
1104:5; RDX-7.118C (citing RX-0130 at 14:39-41). These plural light receiving units are
further described as "disposed on the same circumference centered on an optical axis of the
scattered light taking unit." Id. at 14:39-41; Tr. (Sarrafzadeh) at 1103:23-1104:5; RDX-7.118C.
This disclosure of "plural" photodiodes that are "on the same circumference" at least renders the
limitation requiring "a spatial configuration corresponding to a shape . . . encircled by the light
block" to be *prima facie* obvious. See CRB at 131 (to meet [15D], "a plurality of photodiodes
would need to be arranged in a circular-shaped array"). Iwamiya's "plural light receiving units"
is a plurality,[85] and the "same circumference" corresponds to a shape encircled by the light
block. See RX-0130 at 14:36-41.

---

[85] Complainants cite statements in the prosecution history of a parent application to the '745 patent where
the applicant suggested that up to six detectors may be needed to represent a circular shape. See CX-1760

    **(vi)**    **Element [15E]: "wherein the plurality of photodiodes are further configured to output at least one signal responsive to the detected light"**

There is no dispute that the photodiodes in Iwamiya are configured to output a signal responsive to the detected light, as discussed above in the context of claim 1. *See* RIB at 195.

    **(vii)**    **Element [15F]: "wherein the plurality of light-emitting diodes and the plurality of photodiodes are arranged in a reflectance measurement configuration"**

There is no dispute that the light-emitting diodes in Iwamiya are arranged in a reflectance measurement configuration with the photodiodes on the same side of the tissue. *See* RIB at 195; Tr. (Sarrafzadeh) at 1104:11-15; RDX-7.119C; Tr. (Madisetti) at 1359:8-1365:6.

    **(viii)**    **Element [15G]: "wherein the light block is configured to optically isolate the plurality of light-emitting diodes from the plurality of photodiodes by preventing at least a portion of light emitted from the plurality of light-emitting diodes from reaching the plurality of photodiodes without first reaching the portion of the tissue measurement site"**

There is no dispute that the light blocks in Iwamiya are configured to prevent light from the light-emitting diodes from reaching the photodiodes without first reaching the tissue, as discussed above in the context of claim 1. *See* RIB at 195-96.

    **(ix)**    **Element [15H]: "a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal"**

There is no dispute that Iwamiya discloses a CPU that receives and processes signals from the photodiodes and determines a physiological parameter, as discussed above in the context of claim 1. *See* RIB at 196.

---

at 322. Both a "plural" and a "plurality" could include six photodiodes. *See In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) ("In cases involving overlapping ranges, we and our predecessor courts have consistently held that even a slight overlap in range establishes a prima facie case of obviousness.").

(x)    **Element [15I]: "wherein the physiological monitoring device is configured to transmit physiological parameter data to a separate processor"**

Apple relies on Venkatraman in combination with Iwamiya for the limitation requiring that the physiological parameter can be transmitted to a separate processor. RIB at 196-97.[86] Venkatraman discloses a biometric device that can communicate with a secondary device (e.g., a smartphone) through a wired or wireless connection. RX-0368 at 30:66-31:35. "The biometric monitoring device may send biometric and other data to the smartphone in real-time or with some delay." *Id.* at 57:44-46. Venkatraman describes numerous benefits to using a biometric device with a smartphone app. *See id.* at 57:20-59:13. Dr. Sarrafzadeh testified that it would have been obvious to one of ordinary skill in the art to combine Iwamiya's device with the secondary device of Venkatraman because such connections were well known to enhance such devices. Tr. (Sarrafzadeh) at 1105:24-1106:7, 1108:9-18. Dr. Sarrafzadeh also testified that a person of ordinary skill in the art would have had a reasonable expectation of success, "because adding these external devices was known for quite a bit of time." *Id.* at 1106:8-11, 1108:19-23. Complainants do not dispute that the evidence shows a reason to combine Iwamiya with Venkatraman, and a reasonable expectation of success, with regard to this limitation. *See* Tr. (Madisetti) at 1359:8-1365:6.

(xi)    **Element [18]: "wherein the physiological parameter comprises oxygen saturation"**

Claim 18 of the '745 patent depends from claim 15, "wherein the physiological parameter comprises oxygen saturation." Apple submits that the measurement of oxygen saturation is

---

[86] Venkatraman is U.S. Patent No. 8,998,815, which names inventors Subramaniam Venkatraman and Shelten Gee Jao Yuen, and issued on April 7, 2015. RX-0368. Accordingly, Venkatraman is prior art to the '745 patent pursuant to 35 U.S.C. § 102(a)(1).

obvious in view of Iwamiya in combination with Sarantos. *See* RIB at 197. For the reasons

discussed above in the context of claim 9, Apple not shown, clearly and convincingly, that it

would have been obvious to one of ordinary skill in the art to modify the device disclosed in

Iwamiya with the teachings in Sarantos to implement a measurement of oxygen saturation with a

reasonable expectation of success.

***

Accordingly, the evidence fails to clearly and convincingly show that claim 18 of the

'745 patent is obvious in view of Iwamiya in combination with Sarantos and Venkatraman.

> c.    **'745 Patent Claim 27**

>> (i)    **Element [20 preamble]: "A system configured to measure one or more physiological parameters of a user, comprising:"**

The preamble of claim 20 of the '745 patent requires "[a] system configured to measure

one or more physiological parameters of a user," including "a physiological monitoring device."

As discussed above in the context of the preamble of '745 patent claim 1, the evidence shows

that Iwamiya discloses a "physiological monitoring device" because it contains a heart rate

sensor. *See* RIB at 186, 197.

>> (ii)    **Element [20A]: "a plurality of light-emitting diodes configured to emit light in a first shape"**

Claim 20 has a "plurality of light-emitting diodes" limitation that is identical to the

limitation of claim 1. As discussed above in the context of claim 1, there is no dispute that

Iwamiya discloses light-emitting diodes emitting light in a shape. *See* RIB at 186, 197.

>> (iii)    **Element [20B]: "a material configured to be positioned between the plurality of light-emitting diodes and tissue of the user when the physiological monitoring device is in use, the material configured to change the first shape into a second shape by which the light emitted from one or more of the**

> **plurality of light-emitting diodes is projected towards the tissue"**

Claim 20 has a "material configured to change the first shape into a second shape" limitation that is identical to the limitation of claim 1. As discussed above in the context of claim 1, there is no dispute that Iwamiya discloses an "annular light guide unit" that is positioned between the light-emitting diodes and a user's wrist and changes the shape of the light from a first shape to a second shape. *See* RIB at 186-87, 197

> **(iv)    Element [20C]: "a plurality of photodiodes configured to detect at least a portion of the light after the at least the portion of the light passes through the tissue, the plurality of photodiodes further configured to output at least one signal responsive to the detected light"**

Claim 20 has a "plurality of photodiodes" limitation that is identical to the limitation of claim 1. As discussed above in the context of claim 1, there is no dispute that Iwamiya discloses a plurality of photodiodes that output a signal responsive to light that is reflected from a user's tissue. *See* RIB at 187-88, 197.

> **(v)    Element [20D]: "a surface comprising a dark-colored coating, the surface configured to be positioned between the plurality of photodiodes and the tissue when the physiological monitoring device is in use, wherein an opening defined in the dark-colored coating is configured to allow at least a portion of light reflected from the tissue to pass through the surface"**

Claim 20 has a "surface comprising a dark-colored coating" limitation that is identical to the limitation of claim 1. For the reasons discussed above in the context of claim 1, the undersigned finds that one of ordinary skill in the art would have had a reason to use a dark-colored coating in the device disclosed in Iwamiya and would have had a reasonable expectation of success.

> **(vi)    Element [20E]: "a light block configured to prevent at least a portion of the light emitted from the plurality of light-emitting**

> **diodes from reaching the plurality of photodiodes without first reaching the tissue"**

Claim 20 has a "light block" limitation that is identical to the limitation of claim 1. As discussed above in the context of claim 1, there is no dispute that Iwamiya discloses light blocks configured to prevent light from the light-emitting diodes from reaching the photodiodes without first reaching the tissue. *See* RIB at 189-90, 197.

> **(vii)    Element [20F]: "a processor configured to receive and process the outputted at least one signal and determine a physiological parameter of the user responsive to the outputted at least one signal"**

Claim 20 has a "processor" limitation that is identical to the limitation of claim 1. As discussed above in the context of claim 1, there is no dispute that Iwamiya discloses a CPU that receives and processes signals from the photodiodes to determine a physiological parameter. *See* RIB at 190-91, 197.

> **(viii)   Element [20G]: "a processing device configured to wirelessly receive physiological parameter data from the physiological monitoring device, wherein the processing device comprises a user interface, a storage device, and a network interface configured to wirelessly communicate with the physiological monitoring device, and wherein the user interface includes a touch-screen display configured to present visual feedback responsive to the physiological parameter data"**

Apple relies on Venkatraman in combination with Iwamiya for the limitation that the physiological parameter can be transmitted to a separate processing device. RIB at 197-98; Tr. (Sarrafzadeh) at 1108:1-23; RDX-7.129C. Apple identifies disclosures in Venkatraman describing a connection between a biometric monitoring device and a smartphone. *See* RX-0368 at 30:66-31:35, 57:20-59:13. Complainants argue that Apple has failed to show that Venkatraman discloses a "touch-screen display configured to present visual feedback responsive to the physiological parameter data." CRB at 132.

In consideration of the parties' arguments, and for the reasons discussed above in the context of claim 15, the undersigned finds that one of skill in the art would have reason to connect the biometric device in Iwamiya with a smartphone as taught in Venkatraman with a reasonable expectation of success. *See* Tr. (Sarrafzadeh) at 1105:24-1106:11. The undersigned finds that one of ordinary skill in the art would have understood that a smartphone is a processing device comprising a user interface, a storage device, and a network interface. *See id.* at 1108:1-8. Moreover, Venkatraman explicitly discloses a smartphone app that displays biometric information on a touchscreen. *See* RX-0368 at 57:54-58:6 ("The user may be able to see these and other metrics on the dashboard . . . They may be able to access previous days by pressing a button or icon on a touchscreen."). Accordingly, each of the elements of the "processing device" limitation are clearly disclosed in Venkatraman, and one of ordinary skill would have reason to connect the biometric device in Iwamiya with a smartphone as taught in Venkatraman with a reasonable expectation of success.

       **(ix)**    **Element [27]: "at least one of the plurality of light-emitting diodes is configured to emit light of a first wavelength and at least one of the plurality of light-emitting diodes is configured to emit light of a second wavelength, the second wavelength being different than the first wavelength"**

Claim 27 of the '745 patent depends from claim 20, further requiring that "at least one of the plurality of light-emitting diodes is configured to emit light of a first wavelength and at least one of the plurality of light-emitting diodes is configured to emit light of a second wavelength, the second wavelength being different than the first wavelength." There is no dispute that Iwamiya only discloses the use of one wavelength of light. *See* Tr. (Madisetti) at 1359:22-1366:1; RX-0130 at 10:34-38. Apple contends that this limitation would have been obvious to one of ordinary skill in the art in view of Iwamiya in combination with Sarantos, which provides

that "it may be desirable to include separate light-emitting devices that are each able to emit different wavelengths of light" to measure other physiological parameters, such as blood oxygenation levels. RX-0366 at 13:44-58. Complainants argue that Apple has failed to show that one of ordinary skill in the art would have combined Iwamiya with Sarantos with a reasonable expectation of success. CIB at 228-30; CRB at 128-30.

For the same reasons discussed above in the context of '745 patent claim 9, the undersigned finds that Apple has not shown by clear and convincing evidence that one of ordinary skill would have been able to combine Iwamiya and Sarantos to use two wavelengths of light with a reasonable expectation of success. The only specific motivation for using multiple emitters disclosed in Sarantos is for measuring oxygen saturation, *see* RX-0366 at 13:44-47, and as discussed *supra*, the evidence does not clearly and convincingly show that one of ordinary skill in the art would have had a reasonable expectation of success in modifying Iwamiya to measure oxygen saturation.

***

Accordingly, the evidence fails to show that claim 27 of the '745 patent is obvious in view of Iwamiya in combination with Sarantos, because Apple has not shown, clearly and convincingly, that one of ordinary skill in the art would have had a reason to modify the device disclosed in Iwamiya with the teachings in Sarantos regarding the use of two wavelengths with a reasonable expectation of success.

### 3. Objective Considerations of Non-Obviousness

Complainants contend that certain objective indicia discussed above in the context of the Poeze patents support a finding of non-obviousness for the claims of '745 patent, including Apple's skepticism and failures in implementing wrist-based pulse oximetry and the commercial

success of the Apple Watch Series 6.  CIB at 233-34; CRB at 132-33.  Apple disputes whether this evidence is relevant to the obviousness of the '745 patent claims.  RIB at 199-201; RRB at 109-110.

For the reasons discussed above in the context of the Poeze patents, this evidence does not weigh significantly against a finding of obviousness.[87]  For the reasons discussed above, however, the evidence does not provide a clear and convincing showing of obviousness for the claims of '745 patent.

### H.    Invalidity – Written Description and Enablement

Apple contends that the asserted claims of the '745 patent are invalid for lack of written description and/or indefiniteness pursuant to 35 U.S.C. § 112.  RIB at 201-04; RRB at 110-11.

### 1.    Written Description (Claims 1, 9, 20, 27)

Apple argues that claims 1 and 20 of the '745 patent, from which asserted claims 9 and 27 depend, are invalid for lack of written description with respect to a "surface comprising a dark-colored coating . . . wherein an opening defined in the dark-colored coating is configured to allow at least a portion of light reflected from the tissue to pass through the surface" in an embodiment where the sensors are in a reflectance configuration.  RIB at 201-02.  In the context of the fingertip sensor 300 depicted in Figures 3 and 4, the specification describes a "light-absorbing detector filter 306 "having a top surface coated with a "light-absorbing material" that "can be a black opaque material or coating or any other dark color or coating configured to absorb light."  JX-009 at 9:31-36, Fig. 3, Fig. 4A.  The specification describes a separate embodiment depicted in Figures 7A and 7B that is "a 3D reflective pulse oximetry sensor 700"

---

[87] The evidence of commercial success is not relevant because the Accused Products have not been shown to practice claims of the '745 patent.

with an annular "light block 706." *Id.* at 10:40-51, Fig. 7A, Fig. 7B. Dr. Sarrafzadeh testified that "there is no description on how to combine these embodiments in the description of the patent." Tr. (Sarrafzadeh) at 1110:24-1111:2. Apple argues that the specification thus fails to describe the claimed invention "as an integrated whole" with a dark-colored coating used with a reflectance sensor. RIB at 202; RRB at 110 (citing *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1349 (Fed. Cir. 2013).

Complainants submit that the specification explicitly links the two embodiments together: "In other embodiments, for example, as describe [sic] below with respect to FIGS. 7A and 7B, the 3D sensor 300 can be arranged to detect light that is reflected by the tissue measurement site 102." JX-009 at 7:4-14. Dr. Madisetti identified a light concentrator (labeled 308 and 708 in the specification) that is common to both the Figure 3 and Figure 7 embodiments and "links all these embodiments together." Tr. (Madisetti) at 1365:7-1366:8 (citing JX-009 at 9:30-40). Complainants argue that these disclosures show that the two embodiments are not distinct but are linked together. CIB at 235-36; CRB at 133-34.

The evidence fails to show, clearly and convincingly, a lack of adequate written description support for the "dark-colored coating" limitations of claims 1 and 20. The undersigned agrees with Complainants that the specification describes common elements in the Figure 3 fingertip sensor and the Figure 7 reflectance sensor, explicitly suggesting that "the 3D sensor 300 can be arranged to detect light that is reflected by the tissue measurement site," thus supporting Dr. Madisetti's opinion that one of ordinary skill would link these embodiments. JX-009 at 7:4-14; Tr. (Madisetti) at 13:65:7-1366:8. Moreover, with respect to the light blocker 706 in the Figure 7 embodiment, the specification explicitly provides that "[t]he light blocker 706 and the cover 707 can be made of any material that optically isolates the light concentrator 708

and the detector 710." *Id*. at 11:14-16, Fig. 7B.[88]  This disclosure of "any material" for light

blocking further supports Dr. Madisetti's opinion that the "light-absorbing material" described

earlier in the specification in reference to Figure 4A, including "a black opaque material or

coating or any other dark color or coating configured to absorb light," is linked to the Figure 7

embodiment.  JX-009 at 9:31-36; Tr. (Madisetti) at 1365:7-1366:8; CDX-0012C.081.  The

Federal Circuit has held that "the description requirement does not demand any particular form

of disclosure, or that the specification recite the claimed invention *in haec verba*." *Ariad*, 598

F.3d at 1352 (citations removed).  Apple's argument that the dark-colored coating is distinct

from the reflectance sensor embodiment is unconvincing in view of these disclosures in the

specification.

Accordingly, based on the evidence of record, Apple has not shown clearly and

convincingly that claims 1 or 20 of the '745 patent are invalid for lack of written description.

## 2.    Indefiniteness (Claims 15, 18)

Apple argues that claim 15 of the '745 patent, from which asserted claim 18 depends, is

invalid for indefiniteness with respect to the limitation requiring a plurality of photodiodes

"arranged in an array having a spatial configuration corresponding to a shape of the portion of

the tissue measurement site encircled by the light block."  RIB at 202-04; RRB at 110-11.

Dr. Sarrafzadeh testified that one of ordinary skill in the art would not have been able to

determine which shape corresponds to an arrangement of photodiodes, providing an example of

four photodiodes that could correspond to many different shapes.  Tr. (Sarrafzadeh) at 1111:3-

18; RDX-7.134C.  Apple argues that this ambiguity regarding how a spatial configuration

---

[88] Figure 7 also appears to show shows a positioning of a surface of the light blocker 706 between the tissue and photodiode, similar to the positioning of element 306 in Fig. 3.

corresponds to a shape renders this limitation indefinite, because one of skill in the art would not be able to determine the scope of the invention with reasonable certainty. RIB at 202-04 (citing *Nautilus, Inc. v. Biosig Instruments, Inc.*, 57 U.S. 898, 910 (2014)).

Complainants argue that Apple has not met its clear and convincing burden to prove indefiniteness. CIB at 236-38. Complainants submit that Dr. Sarrafzadeh failed to consider the surrounding claim language and other evidence in the intrinsic record defining the scope of this limitation. *Id*. at 237-38. Complainants submit that the "shape" of the configuration of photodiodes is defined by the light block, which has "a circular shape." *See* JX-009 at 16:43-52. Complainants further rely on statements in the prosecution history of the '745 patent that discuss "sufficient detectors to represent such shapes," with an example that "six or more detectors could be arranged in an annular shape and meet the recited limitation." CX-1760 at 322; *see also id.* (indicating that two or three detectors would be insufficient). Dr. Madisetti relied on these disclosures and offered his opinion that this limitation "would be understood by a person having ordinary skill in the art as requiring a sufficient number of detectors, such that when arranged together in an array can match -- have a close similarity or present the at least partially circular shape of the irradiated portion of the tissue measurement site." Tr. (Madisetti) at 1366:13-1367:19.

In consideration of the parties' arguments, the undersigned agrees with Complainants that Apple has not shown, clearly and convincingly, that the claimed arranged of photodiodes in a "spatial configuration corresponding to a shape" is indefinite. In particular, Dr. Sarrafzadeh's testimony relying on hypothetical shapes drawn through an arrangement of photodiodes fails to read this term within the context of claim 15's surrounding language. *See* CIB at 236-37. The "shape" referenced in this limitation is "a shape of the portion of the tissue measurement site

encircled by the light block." To determine whether a device meets this limitation, one of ordinary skill in the art would not draw arbitrary shapes around the photodiodes, as Dr. Sarrafzadeh appears to suggest, but would rather assess this limitation in relation to the "tissue measurement site encircled by the light block." *See* Tr. (Madisetti) at 1366:13-1367:10. Apple has failed to show that one of ordinary skill in the art would be unable to determine whether the limitation is met by comparing the arrangement of photodiodes to the shape of the encircled tissue.[89]

Accordingly, Apple has not shown by clear and convincing evidence that claim 15 of the '745 patent is invalid for indefiniteness.

### I.    Prosecution Laches

Apple contends that the asserted claims of the '745 patent are unenforceable due to prosecution laches. RIB at 204-05. Apple identifies the filing dates for provisional applications and continuation applications in the family of the '745 patent and ties them to the release dates for Apple Watch products. *Id.* Apple argues that the '745 patent should be held unenforceable due to prosecution laches because the application for the '745 patent was filed nearly five years after the first provisional patent application in the family, and during this timeframe Apple invested heavily in the development of Apple Watch products and growing the market for wearable technology. *Id.*; RRB at 112.

Complainants argue that Apple has failed to show any unreasonable or unexplained delay in the prosecution of the '745 patent. CIB at 238-39. Mr. Stoll described a "continuous

---

[89] As discussed above in the context of the domestic industry requirement, this limitation is met by photodiodes arranged in a circular array around the light block in the '745 DI Products. As discussed above in the context of obviousness, this limitation is, at least, *prima facie* obvious in view of Iwamiya's description of "plural light receiving units" that are "disposed on the same circumference" as the light block.

unbroken chain of patent prosecution." Tr. (Stoll) at 1415:2-10; *see* CX-1760 ('745 patent

prosecution history). Complainants submit that the filing dates for applications in the '745

patent family in 2015, 2016, 2018, 2019, and 2020 demonstrate active prosecution of patents in

this family. CRB at 134.

In consideration of the parties' arguments, the undersigned finds that Apple has failed to

show that the '745 patent should be found unenforceable due to prosecution laches. As

discussed above in the context of the Poeze patents, prosecution laches requires a showing of

unreasonable and inexcusable delay, and evidence sufficient to make that showing is lacking

here. The record shows continuous prosecution activity from the filing of the original

provisional application in 2015 to the issuance of the '745 patent in 2020. *See* JX-009; CX-

1760. Apple's arguments tying certain patent application filings to release dates for the Apple

Watch is unpersuasive, and the timeline is not consistent with Apple's allegations that Masimo

drafted claims to cover the Apple Watch. *See* CIB at 204-05.[90] Apple has not identified delay in

the prosecution of the '745 patent that would warrant a finding of prosecution laches.

## VI.    U.S. PATENT NO. 7,761,127

The '127 patent is entitled "Multiple Wavelength Sensor Substrate," naming inventors

Ammar Al-Ali, Mohamed Diab, Marcelo Lamego, James P. Coffin, and Yassir Abdul-Hafiz and

claiming priority to a provisional application filed on March 1, 2005, and a non-provisional

application filed on March 1, 2006. JX-007.

---

[90] As discussed above, the Apple Watch Series 0 is prior art to the '745 patent, so any claims drafted to cover this product would have been invalid as anticipated. In addition, the '745 patent issued before the release of the Apple Watch Series 6 and the other Accused Products in this investigation, so the claims of the '745 patent could not have been drafted based on any released Apple Watch with a blood oxygen feature.

A. **Specification**

The specification of the '127 patent describes a physiological sensor with emitters transmitting radiation at multiple wavelengths and a thermal mass that stabilizes a bulk temperature for the emitters. JX-007 at Abstract, 10:22-26, Fig. 12. "A temperature sensor 1230 is thermally coupled to the thermal mass 1220" to measure the bulk temperature. *Id*. at 10:26-31. The specification explains that the wavelengths of the light emitters "are determinable as a function of the drive currents 1210 and the bulk temperature 1202." *Id*.



FIG. 12

*Id*. at Fig. 12. In particular, the operating wavelength $\lambda_a$ of each light emitter is determined according to a function of the bulk temperature $T_b$, the drive current for the light emitter $I_{drive}$, and the total drive current for all light emitters $\Sigma I_{drive}$. *Id*. at 10:32-39.

The specification describes one embodiment where LEDs are mounted on a substrate, which is "configured with a relatively significant thermal mass, which stabilizes and normalizes the bulk temperature so that the thermistor measurement of bulk temperature is meaningful." *Id*.

247

at 10:67-11:4.  A substrate depicted in Figure 14 has "a component layer 1401, inner layers 1402-1405, and a solder layer 1406." *Id*. at 11:5-10.



*Id*. at Fig. 14, Fig. 18.  Figure 18 depicts inner layer 1402 having "substantial metallized areas 1411 that provide a thermal mass 1220 (FIG. 12) to stabilize a bulk temperature for the emitter array 700 (FIG. 12)." *Id*. at 11:10-13.

## B.    Claims

Complainants assert claim 9 of the '127 patent, which depends from claim 7.  The limitations of these claims are recited below:

> 7. A physiological sensor capable of emitting light into tissue and producing an output signal usable to determine one or more physiological parameters of a patient, the physiological sensor comprising:
>
> a thermal mass;

a plurality of light emitting sources, including a substrate of the plurality of light emitting sources, thermally coupled to the thermal mass, the sources having a corresponding plurality of operating wavelengths, the thermal mass disposed within the substrate;

a temperature sensor thermally coupled to the thermal mass and capable of determining a bulk temperature for the thermal mass, the operating wavelengths dependent on the bulk temperature; and

a detector capable of detecting light emitted by the light emitting sources after tissue attenuation, wherein the detector is capable of outputting a signal usable to determine one or more physiological parameters of a patient based upon the operating wavelengths.

JX-007 at 19:35-53.

9. The physiological sensor of claim 7 wherein the temperature sensor comprises a thermistor.

*Id.* at 19:58-59.

### C.    Level of Ordinary Skill in the Art

There is no dispute regarding the appropriate level of ordinary skill in the art for the '127 patent in this investigation.  *See* CIB at 239; RIB at 209.  Dr. Sarrafzadeh testified that a person of ordinary skill in the art would be a person with "working knowledge of physiological monitoring and thermal management technology, … a Bachelor of Science in an academic discipline emphasizing design of electrical and thermal technologies in combination with training or at least one or two years of related work experience with processing of data information, including but not limited to physiological monitoring technology" and "if somebody had a Master of Science in relevant academic discipline with less than a year of related work experience, that would qualify."  Tr. (Sarrafzadeh) 1047:17-1048:4.  Mr. Goldberg used this same level of ordinary skill for his analysis.  *See* Tr. (Goldberg) at 1391:22-24.

### D.    Claim Construction

The parties have agreed that a "plurality of wavelengths" is "two or more operating wavelengths." *See* CIB at 239; RIB at 209; Updated Joint Proposed Claim Construction Chart at 1, EDIS Doc. ID 763856 (Feb. 23, 2022).

In their post-hearing briefs, the parties dispute the construction of two terms in claim 7 of the '127 patent: "thermal mass" and "bulk temperature for the thermal mass." CIB at 239-47; RIB at 213-15; CRB at 135-41; RRB at 114-23.[91]

#### 1.    "thermal mass"

"[A] thermal mass" is the first limitation in the body of claim 7, and the term "thermal mass" also appears in the "plurality of light emitting sources" limitation, requiring a substrate of the light emitting sources to be "thermally coupled to the thermal mass," and in the "temperature sensor" limitation of claim 7, which requires "a temperature sensor thermally coupled to the thermal mass and capable of determining a bulk temperature for the thermal mass, the operating wavelengths dependent on the bulk temperature." JX-007 at 19:39-48.[92]

Apple contends that a "thermal mass" is a component that stabilizes a bulk temperature. RIB at 213-14; RRB at 116-19. Apple states that the claimed thermal mass "stabilizes a bulk

---

[91] Complainants argue that Apple never identified the terms "thermal mass" and "bulk temperature" during claim construction but relied on certain constructions to argue non-infringement. CIB at 239. Apple argues that Complainants' proposed claim constructions are untimely and that, "[p]rior to Complainants' initial post-hearing brief, no party requested constructions of 'thermal mass' or 'bulk temperature for the thermal mass.'" RRB at 114. Given that, *inter alia*, both parties addressed claim construction in their initial post-hearing briefs, and testimony regarding this issue was presented at the hearing without objection, the parties' claim construction arguments will be considered. *See, e.g.*, Tr. (Goldberg) at 618:9-21, 624:10-25; Tr. (Sarrafzadeh) at 1069:2-14, 1081:20-1082:8.

[92] These limitations mirror disclosures in the specification, wherein "[a] temperature sensor 130 is thermally coupled to the thermal mass 1220, wherein the temperature sensor 1232 provides a temperature sensor output 1232 responsive to the bulk temperature 1202 so that the wavelengths are determinable as a function of the drive currents 1210 and the bulk temperature 1202." JX-007 at 10:26-31.

temperature," such that "the thermistor is then able to meaningfully measure that 'bulk temperature.'" RIB at 213. Apple argues that the term "thermal mass" does not refer simply to "the physical property of 'thermal mass' that is possessed by all objects with mass." *Id.* Apple further contends that the existence of a thermal mass cannot simply be assumed "if the sensor estimates wavelength using a temperature measurement." RRB at 117. In the context of invalidity, Apple argues that Complainants' interpretation of the "thermal mass" limitation would cover any circuit board with multiple layers. RIB at 234-35. Apple submits that the consistent disclosures in the specification of the '127 patent requires that the "thermal mass" is a component that stabilizes a bulk temperature. *Id.* at 213-14; RRB at 116-19.

Complainants propose to construe "thermal mass" to mean a "mass that provides a bulk temperature that can be used to reliably estimate the operating wavelengths of the LEDs." CIB at 240-44; CRB at 136-38. Complainants argue that the term "thermal mass" is "described in terms of the ability to estimate wavelength from the temperature measurement of the thermal mass." CIB at 243. Complainants do not specifically dispute that the "thermal mass" stabilizes a bulk temperature but argue that the temperature is not required to be constant—only sufficient to be used to reliably estimate the operating wavelengths of the LEDs. *Id.* at 234-44; CRB at 136-37. Complainants also argue that there is no basis for any requirement that the "thermal mass" have a minimum thickness. CIB at 234; CRB at 136.

Upon review of the parties' submissions, the undersigned finds that the term "thermal mass" refers to a mass that stabilizes a bulk temperature. This is consistent with the use of the term within the specification, which provides that "[a] thermal mass 1220 is disposed proximate

to the emitters 710 so as to stabilize a bulk temperature 1202 for the emitters." *Id.* at 10:24-26.[93]
The specification further describes a substrate that is "configured with a relatively significant thermal mass, which stabilizes and normalizes the bulk temperature so that the thermistor measurement of bulk temperature is meaningful." *Id.* at 10:67-11:4. In a specific embodiment, a layer of a substrate is described as having "substantial metallized areas 1411 that provide a thermal mass 1220 (FIG. 12) to stabilize a bulk temperature for the emitter array 700 (FIG. 12)." *Id.* at 11:10-13.

The specification thus clearly describes a "thermal mass" that stabilizes a bulk temperature, and the parties do not appear to dispute this fact, although only Apple's construction explicitly incorporates temperature stabilization. *See* RRB at 116-17; CIB at 240 (citing the specification's disclosures that the "thermal mass" as "disposed proximate the emitters so as to stabilize a bulk temperature for the emitters" and "relatively significant so as to stabilize and normalize the bulk temperature.").[94] Both Dr. Sarrafzadeh and Mr. Goldberg agreed that the '127 patent describes the claimed thermal mass as stabilizing a bulk temperature. *See* Tr. (Sarrafzadeh) at 1069:7-22; Tr. (Goldberg) at 643:4-12.[95]

---

[93] Claims 1 and 26 include "thermal mass" limitations that mirror these specification disclosures, describing "a thermal mass disposed proximate to the emitters and within the substrate so as to stabilize a bulk temperature for the emitters." JX-007 at 19:9-11 (claim 1), 21:5-7 (claim 26).

[94] In the context of invalidity, Complainants argue that prior art references lack a "thermal mass" that "would stabilize a bulk temperature of the substrate," or a component "that functions as a thermal mass by stabilizing a bulk temperature." CIB at 279, 281.

[95] The parties also agree that the term "thermal mass," as used in the patent, does not correspond simply to a physical property possessed by any mass. *See* Tr. (Goldberg) at 639:24-640:3 (noting distinction between "thermal mass in the context of the patent or the thermal mass . . . as a scientific principle of physics"); Tr. (Sarrafzadeh) at 1071:17-21 (distinguishing between "thermal mass of the patent" and the physical property of thermal mass of "any material"); RRB at 124-25.

While Complainants do not explicitly dispute that the claimed thermal mass stabilizes a bulk temperature, they argue that Apple's interpretation of stabilization is too narrow, requiring a minimum thickness for the thermal mass or stabilization at a constant temperature. CIB at 243; CRB at 136. Apple's proposed construction does not require a minimum thickness or a constant temperature, however. *See* RRB at 118-19. Dr. Sarrafzadeh merely offered his opinion that certain metal layers could not be a "thermal mass" where "[t]hey are not really thick enough to provide any . . . thermal stability." Tr. (Sarrafzadeh) at 1066:4-9.[96] The undersigned thus agrees with Apple that the claimed "thermal mass" is a mass that stabilizes a bulk temperature.[97]

Complainants fail to explain why their proposed construction omits any requirement for temperature stabilization, arguing only that the "thermal mass" is a "mass that provides a bulk temperature that can be used to reliably estimate the operating wavelengths of the LEDs." CIB at 240; *see* CRB at 136-38. Complainants further define "bulk temperature" to be "a single temperature used to estimate the operating wavelengths of all the LEDs." CIB at 244. Substituting this definition into Complainants' construction of "thermal mass," Complainants' proposed definition of "thermal mass" becomes "a mass that provides a single temperature used to estimate the operating wavelengths of all the LEDs, that can be used to reliably estimate the

---

[96] He also observed temperature variations in a circuit board, finding that it was "not at a uniform temperature through time or spatially" and that the temperature "is not stabilized." *Id.* at 1078:23-1079:9. Dr. Sarrafzadeh's analysis is consistent with Apple's proposed construction and the specification's description of "a relatively significant thermal mass, which stabilizes and normalizes the bulk temperature." JX-007 at 10:67-11:4, 11:10-13.

[97] Apple's proposed construction describes the "thermal mass" as a "component" that stabilizes a bulk temperature, RIB at 213-14, but Apple does not explain why the claim term "mass" has been replaced with the word "component," which does not appear in the claims or the relevant portions of the specification. Complainants have used the word "mass" in their proposed construction, *see* CIB at 240, and there does not appear to be any meaningful dispute regarding the meaning of the word "mass." Accordingly, the undersigned shall construe the term "thermal mass" without substituting another word for "mass."

operating wavelengths of the LEDs" —or, effectively, "a mass that provides a single temperature used to reliably estimate the operating wavelengths of all the LEDs." Complainants also make clear that the "single temperature" required for a bulk temperature need not be a uniform temperature but is simply a "single measurement." *See* CIB at 246 ("bulk temperature" need not be a "uniform or average temperature."); *id.* at 247 (explaining that bulk temperature "is a single measurement for the thermal mass").

The intrinsic evidence fails to indicate that any mass of a non-uniform temperature, from which a single temperature measurement can be provided to estimate the operating wavelengths of all LEDs is, *ipso facto*, a "thermal mass."

First, Complainants' construction merely restates the language in the "temperature sensor" limitation of claim 7 while providing no meaning to the limitation requiring a "thermal mass." *See* JX-007 at 19:45-48 (claim 7 requiring "a temperature sensor thermally coupled to the thermal mass and capable of determining a bulk temperature for the thermal mass, the operating wavelengths dependent on the bulk temperature"). The Federal Circuit has held that "[i]t is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." *Wasica Finance GmbH v. Continental Automotive Systems, Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017).

Further, the prosecution history of the '127 patent weighs against Complainants' approach. Complainants rely on the prosecution history to show that the claims of the '127 patent were distinguished from prior art without a "thermal mass," CIB at 242, CRB at 137-38, but it is clear from this record that the examiner did not understand the term "thermal mass" to only require an estimate of the operating wavelengths of the LEDs based on a single temperature measurement. In the relevant portion of the prosecution history of the '127 patent, the examiner

considered a prior art reference, U.S. Patent No. 5,259,381 to Cheung et al. (RX-0406,

"Cheung"), finding that Cheung "discloses all the elements of the current invention . . . except

for the sensor comprising a thermal mass disposed proximate the emitters, wherein the thermal

mass stabilizes a bulk temperature of the emitters." JX-008 at 363, 433 (MASITC_00077988,

00078058) (rejecting, *inter alia*, prosecution claim 5, which ultimately issued in amended form

as claim 7).[98] When discussing the prosecution history at the hearing, Mr. Goldberg agreed that

"Cheung does not have a thermal mass." Tr. (Goldberg) at 1395:13-15. Despite the lack of a

"thermal mass," the examiner recognized that Cheung discloses a "temperature sensor" and a

method for "determining a plurality of operating wavelengths of the light emitting sources so that

one or more physiological parameters can be determined based upon the operating wavelengths."

JX-008 at 362 (MASITC_00077987); *see* RX-0406 at Abstract ("[A] temperature sensor (50) is

included in the sensor (12) to produce a signal indicative of sensor temperature. This signal is

interpreted by the oximeter circuitry including, for example, a microcomputer (16), where the

effect of temperature on wavelength is compensated for."). In response to this rejection and

following an interview with the examiner, Complainants' counsel amended all of the

independent claims of the '127 patent. JX-008 at 399-407.[99]

　　　Cheung's temperature sensor measures a single temperature that is used to "accurately

determine" the wavelengths of two LEDs for oxygen saturation measurements. *See* RX-0406 at

---

[98] Prosecution claim 5 at that time required, *inter alia*, "a temperature sensor thermally coupled to the thermal mass and capable of determining a bulk temperature for the thermal mass, the operating wavelengths dependent on the bulk temperature" and the determination of "one or more physiological parameters of a patient based upon the operating wavelengths." JX-008, at 38 (MASITC_00077663).

[99] In response to rejections based on obviousness in view of Cheung in combination with additional prior art references, including U.S. Patent No. 6,360,113 ("Dettling '113") and U.S. Patent Pub. No. 2002/0154665 ("Funabashi et al. '665), the claims were amended to specify that the thermal mass is disposed within a substrate. *See* JX-008 at 363-64, 399-407.

13:20-32 ("[A] temperature sensor 50 . . . is employed to produce a signal that indicates the temperature of sensor assembly 48. . . . [T]his signal, when combined with information about the coding resistor 52 value, allows microcomputer 16 to accurately determine the wavelengths of the light emitted by LEDs 40 and 42 and subsequently produce an accurate determination of oxygen saturation."); RRB at 115 (quoting Cheung). Complainants' proposed construction would thus fail to distinguish claim 7's requirement for a "thermal mass" over a reference that the examiner (and Complainants' expert) recognized does not have a thermal mass. Accordingly, Complainants' proposed construction is unsupported—a "thermal mass" is not merely any mass from which a single temperature measurement can be used to estimate the operating wavelengths of the LEDs.[100]

\* \* \*

Accordingly, "thermal mass" shall be construed to mean a mass that stabilizes a bulk temperature.

### 2.    "bulk temperature for the thermal mass"

The "temperature sensor" limitation of claim 7 describes "a bulk temperature for the thermal mass, the operating wavelengths dependent on the bulk temperature." JX-007 at 19:45-

---

[100] To the extent Complainants seek to argue that their proposed construction requires, in addition, "reliably" estimating wavelength in a manner that improves over Cheung (*see* CIB at 285), such an addition is not supported by the evidence. As discussed above, the examiner viewed Cheung as meeting the claim requirements except for that of a "thermal mass" stabilizing a bulk temperature. Complainants' proposed claim construction, moreover, does not include any proviso requiring a greater degree of accuracy than Cheung. Complainants' infringement analysis also does not provide any comparison of the Accused Products to the accuracy provided in Cheung. Moreover, even if greater accuracy were shown in the Accused Products, the evidence shows that there are multiple ways to achieve greater accuracy in wavelength estimation apart from inclusion of a thermal mass, and some of these methods can be used in combination with a temperature measurement. *See* RRB at 115-16; RX-0035.0086. The existence of a thermal mass does not simply follow, as a matter of logic, from reliable wavelength estimation using, *inter alia*, a single temperature measurement. *See* RIB at 114-115.

48. As discussed above in the context of "thermal mass," the specification provides that "[a] thermal mass 1220 is disposed proximate to the emitters 710 so as to stabilize a bulk temperature 1202 for the emitters." *Id*. at 10:24-26. The specification further provides that "[a] temperature sensor 130 is thermally coupled to the thermal mass 1220, wherein the temperature sensor 1230 provides a temperature sensor output 1232 responsive to the bulk temperature 1202 so that the wavelengths are determinable as a function of the drive currents 1210 and the bulk temperature 1202." *Id*. at 10:26-31. The specification describes two distinct methods for determining the wavelengths of the emitters, distinguishing between a method using the bulk temperature ($T_b$) and a method using the temperatures of individual light emitters ($T_a$). *Id*. at 10:32-48. In a "bulk temperature" embodiment, a thermistor is used "to determine the bulk temperature of LEDs 801 (FIG. 8) mounted on the substrate 1200," and "[t]he substrate 1200 is configured with a relatively significant thermal mass, which stabilizes and normalizes the bulk temperature so that the thermistor measurement of bulk temperature is meaningful." *Id*. at 10:67-11:4.

Apple does not propose an explicit construction for "bulk temperature" but argues that the "bulk temperature for the thermal mass" should follow the 'ordinary usage of the adjective 'bulk,' which is the majority or greater part." RIB at 215. Apple, in support, cites certain deposition testimony of one of the named inventors indicating that it is an "average" or "representative" temperature. *Id*. (citing RX-1195C (Abdul-Hafiz Dep. Tr.) at 99:1-19 ("[T]he bulk temperature means . . . I call it the representative temperature . . . a representative temperature of the whole bulk, and that's what we call bulk temperature.")) Apple also relies on a statement made by Complainants' counsel at the Markman hearing that "people understand bulk is the vast majority." Markman H'rng Tr. at 42:6-9. Apple further distinguishes a "bulk temperature" from "a local temperature" for one part of the mass. RIB at 215 ("the temperature

sensor measures a 'bulk temperature' that is different from a regular temperature measurement by a temperature sensor, which is a local temperature measurement"); *see also* RIB at 214-15; RRB at 116-19.

Complainants argue that a "bulk temperature" is "a single temperature used to estimate the operating wavelength of all the LEDs." CIB at 244. Complainants argue that the claimed bulk temperature does not need to be an average temperature or a uniform temperature for the thermal mass, relying on the claim language describing the "bulk temperature" as a single temperature used to estimate the operating wavelengths of all the LEDs. CIB at 244-47; CRB at 138-41. Complainants argue that the "bulk temperature" is not necessarily an "average" temperature, but rather is a "single, 'representative' measurement." CIB at 244-45. Complainants rely on the testimony of Yassir Abdul-Hafiz, one of the named inventors, who described a "bulk temperature" as the "representative temperature," which is different from a "local temperature" at a "spot that we are measuring." RX-1195C (Abdul-Hafiz Dep. Tr.) at 99:1-15. He further explained that the temperature of a "thermal mass" can be "a representative temperature of the whole bulk, and that's what we call bulk temperature." *Id.* at 99:16-19. His co-inventor Mr. Diab described the "bulk temperature" as a "baseline that is defined by this substrate, and what we found in this invention is that if you measure that baseline and -- with a certain quality for the substrate, . . . you can have a very good correlation to the inside temperature of each LED." RX-1200C (Diab Dep. Tr.) at 137:12-138:8.

In consideration of the parties' arguments, the undersigned construes "bulk temperature of the thermal mass" to mean a representative temperature for the thermal mass. The parties do not appear to dispute that the "bulk temperature" claimed in the '127 patent is a representative temperature for the thermal mass, in accordance with Mr. Abdul-Hafiz's testimony. This

construction is also consistent with the "bulk temperature" embodiment in the specification, where a thermistor is used "to determine the bulk temperature of LEDs 801 (FIG. 8) mounted on the substrate 1200," and "[t]he substrate 1200 is configured with a relatively significant thermal mass, which stabilizes and normalizes the bulk temperature so that the thermistor measurement of bulk temperature is meaningful." *Id.* at 10:67-11:4.[101] Complainants' proposed construction improperly reads out the "thermal mass" from the limitation "bulk temperature for the thermal mass." This is improper, for the same reasons discussed above in the context of the construction for "thermal mass," because it would fail to give meaning to these terms and would be inconsistent with the prosecution history. Complainants' proposed construction requiring only that the bulk temperature be used to estimate the operating wavelength of all the LEDs would be met by Cheung, which does not include a "thermal mass." *See* RX-0406 at 13:20-32.[102]

* * *

Accordingly, "bulk temperature for the thermal mass" shall be construed to mean a representative temperature for the thermal mass.

### E.    Infringement

Complainants allege that the Accused Products infringe claim 9 of the '127 patent, relying on the testimony of Mr. Goldberg. CIB at 248-66; CRB at 141-54; Tr. (Goldberg) at 612:9-626:16. Apple disputes whether the Accused Products meet the limitations requiring a

---

[101] Complainants argue that Apple's proposed interpretation of this limitation would read out the preferred embodiment in the specification using a single thermistor, CIB at 246-47, but Apple agrees that "a 'bulk temperature' could be measured by a properly positioned single thermistor if the thermal mass were stabilized at the bulk temperature." RRB at 122.

[102] Complainants' proposed construction would also be superfluous, because the subsequent language in the claim already requires "the operating wavelengths dependent on the bulk temperature." *See* JX-007 at 19:45-49.

**CONFIDENTIAL INFORMATION REDACTED**

"thermal mass" and a temperature sensor "capable of determining a bulk temperature for the thermal mass," relying on the testimony of Dr. Sarrafzadeh. RIB at 209-24; RRB at 114-30; Tr. (Sarrafzadeh) at 1064:8-1084:5. For the reasons discussed below, the undersigned finds that the Accused Products have not been shown to infringe claim 9 of the '127 patent by a preponderance of the evidence.

### 1.     Element [7 preamble]: "physiological sensor"

There is no dispute that the Accused Products meet the limitations of the preamble of claim 7, describing "[a] physiological sensor capable of emitting light into tissue and producing an output signal usable to determine one or more physiological parameters of a patient."[103] Complainants identify evidence that the Accused Products have LEDs capable of emitting light to a user's wrist that is reflected back to photodiodes and used to determine blood oxygen levels. CIB at 254; Tr. (Goldberg) at 616:4-16; CDX-0013C.007; CX-1724 at 3. Accordingly, the evidence shows that the Accused Products have physiological sensors that meet the preamble limitations of claim 7.

### 2.     Element [7A]: "a thermal mass"

Mr. Goldberg identified "███████████████" of a printed circuit board ("PCB") in the Accused Products, which Complainants identify as the claimed "thermal mass." CIB at 254-58; Tr. (Goldberg) at 617:9-618:21. Mr. Goldberg identified "████████████ ████████████████████████████." Tr. (Goldberg) at 617:9-21.

---

[103] The parties have stipulated that the preambles of the asserted patents are limiting. *See* Joint Stipulation of Facts ¶ 9, EDIS Doc. ID 770692 (May 13, 2022).

**CONFIDENTIAL INFORMATION REDACTED**



CDX-0013C.008 (citing CX-0193C).  He further identified "█████████████████

████." Tr. (Goldberg) at 617:9-21.

CDX-0013C.008 (citing CX-0195C).  Mr. Goldberg performed tests confirming that the ████

████ in the Accused Products are coupled to each other and to the LEDs and a thermistor.  Tr.

(Goldberg) at 20:17-021:15; CDX-0013C.013 (citing CX-0839C; CX-0840C).

Mr. Goldberg further identified an Apple document describing a "████████████████

██████████████████████████████ Tr. (Goldberg) at 622:4-18;

CDX-0013C.015 (citing CX-0012C at 22).  He cites another ████████████████

██████████████████████████████,

explaining "that there's a balance in the thermal properties of the printed circuit board that needs

to be maintained in order for such formulations to work."  Tr. (Goldberg) at 622:22-623:7; CDX-

0013C.016 (citing CX-0011C at 23).  Complainants note that in this document, Apple uses the

CONFIDENTIAL INFORMATION REDACTED

term "thermal mass." CX-0011C at 23. Mr. Goldberg recognized that the Accused Products use a single thermistor to measure the temperature of the PCB, and "the thermal mass is configured in a manner that the thermal coupling between the LEDs and the thermistor are such that the bulk temperature as measured by the thermistor is meaningful, and that meaningfulness has to do with being able to use that bulk temperature to determine the operating wavelengths." Tr. (Goldberg) at 624:7-25. Complainants argue that ███████████████████████████████████ ███████████████████████████████████████████ that allows for the measurement of a single temperature that can be used to reliably estimate the wavelengths of the plurality of LEDs. CRB at 141-43, 147-48.

Apple argues that Mr. Goldberg failed to show that the Accused Products have the accused "thermal mass." RIB at 218-19. Apple cites testimony from named inventor Mohamed Diab, who agreed that "some form of experiment" would be necessary to determine whether an object stabilizes temperatures in accordance with the invention. *See* Tr. (Diab) at 238:15-19. Apple argues that Mr. Goldberg only performed tests regarding thermal conductivity, which are not sufficient to show temperature stabilization. *See* Tr. (Sarrafzadeh) at 1070:22-1071:5, 1080:11-1081:18; RDX-7.70. Apple submits that Complainants have failed to articulate what thermal properties would be sufficient to establish that a "thermal mass" stabilizes a bulk temperature. RRB at 123-24. With respect to the use of the term "thermal mass" in an Apple presentation, Dr. Mannheimer explained that the term referred to a physical property related to an object's heat capacity, and not to the "thermal mass" referenced in the '127 patent. CX-0289C (Mannheimer Dep. Tr.) at 148:8-156:1; *see also* CX-0291C (Mehra Dep. Tr.) at 180:8-182:17 ("I don't know what that refers to"); Tr. (Sarrafzadeh) at 1071:13-1072:7 ("the thermal mass here is not the thermal mass of the patent"). ███████████████████████

**CONFIDENTIAL INFORMATION REDACTED**

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████  Tr. (Sarrafzadeh) at 1074:8-1078:22; RDX-7.65C; RDX-7.66C.

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

CX-0322b-C.0010.

Apple also argues that the ████████████ in the PCB of the Accused Products do not

comprise a "thermal mass" because ████████████ to stabilize a bulk temperature.  RIB at 215-

19.  Apple relies on the testimony of one of its engineers, Saahil Mehra, who testified that the

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

CONFIDENTIAL INFORMATION REDACTED



██████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████. Tr. (Sarrafzadeh) at 1065:16-1066:9; RDX-

7.49. Dr. Sarrafzadeh compared the thickness of the ████████ in the Accused Products with

the thickness of Masimo's early rainbow® sensors, finding that the "rainbow sensor thickness is

████████████████████" than the Accused Products. Tr. (Sarrafzadeh) at 106:10-21;

RDX-7.51C. Dr. Sarrafzadeh submits that because the Accused Products have more LEDs than

the rainbow sensors, thicker layers would likely be needed to provide the same level of thermal

stability. Tr. (Sarrafzadeh) at 1067:4-13. He relied on testimony from Masimo engineers

discussing the thickness of the rainbow sensor boards to support his opinion. *Id*. at 1068:14-25.

Apple cites the testimony of Mr. Diab, who was asked whether Masimo designed the rainbow

sensor circuit boards to be "as thin as possible." RX-1200C (Diab Dep. Tr.) at 108:12-15. At

the hearing, Mr. Diab testified that whether a mass of ████ is sufficient to stabilize a bulk

temperature depends on "how much heat you are pumping into the sensor, and that[] typically

has to do with the number of LEDs." Tr. (Diab) at 238:9-14.

In consideration of the parties' arguments, the undersigned finds that Complainants have

not shown, by a preponderance of the evidence, that ████████████ in the PCB of the Accused

Products meet the "thermal mass" limitation. As discussed above, "thermal mass" has been

construed to mean a mass that stabilizes a bulk temperature. Complainants have failed to show

temperature stabilization in the Accused Products. ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

**CONFIDENTIAL INFORMATION REDACTED**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

Complainants disagree with Dr. Sarrafzadeh's opinion regarding temperature stabilization, but

they rely only on attorney argument to characterize ████████████████████████████ *See*

CRB at 142-43. ████████████████████████████████████

████████████████████████████████████ RX-0093C.0009-10.

Mr. Goldberg admitted that he "did not do any tests that address stabilization or

normalization." Tr. (Goldberg) at 649:4-11; *see also id*. at 618:1-21 (disagreeing with Apple's

understanding that stabilization and normalization were required for a "thermal mass.").

Complainants rely on the fact the Accused Products use a single temperature sensor to determine

the wavelengths of the LEDs but as discussed above in the context of claim construction, this is

insufficient to prove the existence of a "thermal mass"—during prosecution, for example, the

examiner recognized that the Cheung prior art estimated such wavelengths without a "thermal

mass." *See* JX-008 at 363; RX-0406 at 13:20-32. Complainants have failed to present any

affirmative evidence of temperature stabilization, and accordingly, they have not met their

burden to show that the Accused Products contain a "thermal mass."[104]

---

[104] Complainants also acknowledge that the presence of metallized layers does not show the existence of a thermal mass. *See* CRB at 162 (rejecting argument that "*any* metallized layers in a PCB can be a thermal mass").

CONFIDENTIAL INFORMATION REDACTED

There is further evidence in the record to support a finding of non-infringement with respect to the "thermal mass" limitation. Dr. Mehra testified that ██████████ of the PCB in the Accused Products ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Tr. (Sarrafzadeh) at 1065:15-1066:21; RDX-7.49C; RX-0087C; RX-0338C.[105] A preponderance of the evidence does not support a finding that the Accused Products meet the "thermal mass" limitation.

### 3. Element [7B]: "a plurality of light emitting sources, including a substrate of the plurality of light emitting sources, thermally coupled to the thermal mass"

With respect to the "plurality of light emitting sources" limitation, Mr. Goldberg identified 4 sets of 3 LEDs in the Accused Products, which are attached to the ████████ of the PCB with thermally conductive epoxy. Tr. (Goldberg) at 618:22-619:9; CDX-0013C.09 (citing CX-0057C; CX-0025C; CX-0198C at 17-18; CX-0199C). Mr. Goldberg further conducted testing to show that the LEDs are thermally coupled to the ████████ of the PCB. 620:17-621:15; CDX-0013C.013 (citing CX-0839C; CX-0840C). Apple only disputes infringement with respect to the "thermal mass" within this limitation. See CIB at 258-59; RIB at 215-19. Accordingly, the evidence shows that the "plurality of light emitting sources" limitation is met by the Accused Products.

---

[105] Apple argues that the rainbow® sensors were designed to be ████████████, RRB at 126-27, citing the testimony of Mohamed Diab who stated at his deposition: "I think that was one of the requirements." RX-1200C (Diab Dep. Tr) at 108:12-15.

CONFIDENTIAL INFORMATION REDACTED

4.    **Element [7C]: "the sources having a corresponding plurality of operating wavelengths"**

With respect to the "plurality of operating wavelengths" limitation, Mr. Goldberg

identified red, green, and infrared LEDs in the Accused Products. Tr. (Goldberg) at 619:10-17;

CDX-0013C.010 (citing CX-0057C; CX-0025C). There is no dispute with respect to this

limitation. *See* CIB at 259. Accordingly, the evidence shows that the "plurality of operating

wavelengths" limitation is met by the Accused Products.

5.    **Element [7D]: "the thermal mass disposed within the substrate"**

With respect to the "thermal mass disposed within the substrate" limitation, Mr. Goldberg

identified the ▮▮▮▮▮ within the PCB substrate of the Accused Products. Tr. (Goldberg) at

619:18-620:3; CDX-0013C.011 (citing CX-0105C; CX-0193C). Apple does not dispute that the

▮▮▮▮▮ are disposed within the PCB substrate, but as discussed above, Complainants have

not shown that these layers comprise a "thermal mass." *See* CIB at 260-61; RIB at 215-19.

Accordingly, the evidence shows that the "disposed within the substrate" limitation is met by the

Accused Products, but Complainants have not shown that the Accused Products have a "thermal

mass."

6.    **Element [7E]: "a temperature sensor thermally coupled to the thermal mass"**

With respect to the "temperature sensor thermally coupled to the thermal mass"

limitation, Mr. Goldberg identified a thermistor near the center of the sensor board of the

Accused Products. Tr. (Goldberg) at 620:4-16; CDX-0013C.012 (citing CX-0057C; CX-

0025C). He performed testing to show that the thermistor is thermally coupled to the ▮▮▮▮

▮▮▮ of the PCB. Tr. (Goldberg) at 620:17-621:15; CDX-0013C.013 (citing CX-0839C; CX-

0840C). As discussed above, Complainants have not shown that the ▮▮▮▮▮ of the PCB

**CONFIDENTIAL INFORMATION REDACTED**

comprise a "thermal mass," although Apple does not dispute that the thermistor is thermally

coupled to the ███████ . *See* CIB at 261-62; RIB at 215-19.  Accordingly, the evidence

shows that the "temperature sensor" limitation is met by the Accused Products, but Complainants

have not shown that the Accused Products have a "thermal mass."

> 7.    **Element [7F]: the temperature sensor "capable of determining a bulk temperature for the thermal mass, the operating wavelengths dependent on the bulk temperature"**

With respect to the "bulk temperature" limitation, Complainants identify the temperature

measured by the thermistor in the Accused Products.  CIB at 262-65. ████████

████████████████████████████

███████████████████████████

█████████████████████████████

███████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████

███████████████████████████

█████████████████████████████

█████████████████████████████

█████████████████████████████

██████████████████████████████

███████████████████████████████

█████████████████████     Complainants argue that the ████████████

measured by the thermistor is the claimed "bulk temperature," because it is a single temperature

**CONFIDENTIAL INFORMATION REDACTED**

for the thermal mass that is used to estimate the wavelengths of the LEDs. CIB at 262-65; CRB at 149-54.



CONFIDENTIAL INFORMATION REDACTED

In consideration of the parties' arguments, the undersigned finds that Complainants have not shown, by a preponderance of the evidence, that the thermistor in the Accused Products determines a "bulk temperature for the thermal mass." As discussed above in the context of claim construction, the claimed "bulk temperature" must be a representative temperature for the thermal mass. Complainants have not shown, however, that the Accused Products have a "thermal mass" that stabilizes a bulk temperature. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████ Complainants disagree with Dr. Sarrafzadeh's conclusion, arguing that the observed temperature variation is "remarkably uniform" and "very stable." CRB at 145-46. But Complainants' contentions are only attorney argument, without any expert testimony. *See* RRB at 128-29. Apple documents contradict Complainants' contentions, █████████████████████████████████████████████ ████████████████████" RX-0093C.0009-10.

Mr. Goldberg admitted that he did not perform any tests to show whether a thermal mass stabilizes or normalizes a bulk temperature in the Accused Products. Tr. (Goldberg) at 649:4-11. His infringement analysis instead relied on the fact that the "temperature as measured by the

CONFIDENTIAL INFORMATION REDACTED

thermistor is meaningful, and that meaningfulness has to do with being able to use that bulk temperature to determine the operating wavelengths." Tr. (Goldberg) at 624:7-25. This evidence may indicate that the temperature sensor in the Accused Products measures a representative temperature for the LEDs, but it does not show a representative temperature for the "thermal mass." As discussed above in the context of the "thermal mass" limitation, the fact that a temperature is used to determine the operating wavelengths of LEDs is insufficient to prove that the temperature is "a bulk temperature for the thermal mass." The determination of operating wavelengths is a separate requirement of this limitation,[106] and the examiner recognized that calculation of wavelengths using a representative temperature was known in the prior art. *See* JX-008 at 338 (MASITC_00077663), 363 (MASITC_00077988); RX-04.06 at 13:20-32. Accordingly, in addition to the failure to show that the Accused Products have a "thermal mass," Complainants have failed to show by a preponderance of the evidence that the temperature measured by the thermistor is a "bulk temperature for the thermal mass."[107]

### 8. Element [7G]: "a detector capable of detecting light emitted by the light emitting sources after tissue attenuation"

With respect to the "detector" limitation, Mr. Goldberg identified four photodiodes in the Accused Products. Tr. (Goldberg) at 625:1-9; CDX-0013C.018 (citing CX-0057C; CX-0025C).



---

[106]

[107] Apple separately argues in its post-hearing briefs that ████████████████████████ ████████████ and that Complainants were required to show that one of these measurements is the "bulk temperature." RIB at 224; RRB at 129-30. This non-infringement argument was not raised in Apple's pre-hearing brief, however, and accordingly, it has been waived pursuant to Ground Rule 9.2. *See* CRB at 153-54.

Complainants further cite the testimony of Apple witnesses confirming that the photodiodes in the Accused Products detect light that is emitted by the LEDs and attenuated by the user's tissue. *See, e.g.,* CX-0281C (Block Dep. Tr.) at 86:17-87:14; CX-0289C (Mannheimer Dep. Tr.) at 133:2-134:12. There is no dispute with respect to this limitation. *See* CIB at 265; RIB at 215-19. Accordingly, the evidence shows that the "detector" limitation is met by the Accused Products.

> **9.    Element [7H]: "wherein the detector is capable of outputting a signal usable to determine one or more physiological parameters of a patient based upon the operating wavelengths"**

With respect to the "outputting a signal" limitation, Mr. Goldberg identified "PPG signals" described in Apple documents corresponding to the output of the photodiodes, which are used to determine blood oxygen saturation in combination with the wavelength estimates for the LEDs. Tr. (Goldberg) at 625:10-25; CDX-0013C.019 (citing CX-0100C at 5-8; CX-0012C at 21). Complainants further cite the testimony of Apple witnesses confirming that signals from the photodiodes are used to determine blood oxygen saturation. *See, e.g.,* CX-0281C (Block Dep. Tr.) at 72:10-73:7; CX-0289C (Mannheimer Dep. Tr.) at 134:14-138:1. There is no dispute with respect to this limitation. *See* CIB at 266; RIB at 215-19. Accordingly, the evidence shows that the "outputting a signal" limitation is met by the Accused Products.

> **10.    Element [9]: "a thermistor"**

Claim 9 further requires that the "temperature sensor" of claim 7 is a thermistor. As discussed above in the context of the "temperature sensor" limitation, there is no dispute that the Accused Products have a temperature sensor that is a thermistor. *See* Tr. (Goldberg) at 626:3-16; CDX-0013C.020 (citing CX-0057C at 1-2; CX-0025C at 31). Accordingly, the evidence shows that the "thermistor" limitation of claim 9 is met by the Accused Products.

**CONFIDENTIAL INFORMATION REDACTED**

\*\*\*

As discussed above, because Complainants have not shown by a preponderance of the evidence that the "thermal mass" and "bulk temperature for the thermal mass" limitations of claim 7 are met by the Accused Products, the undersigned finds that the Accused Products have not been shown to infringe claim 9 of the '127 patent.

### F.   Domestic Industry—Technical Prong

Complainants allege that Masimo's rainbow® sensors practice claim 9 of the '127 patent, relying on the testimony of Mr. Diab and Mr. Goldberg.  CIB at 266-74; CRB at 154-60; *see* Tr. (Diab) at 216:15-226:19; Tr. (Goldberg) at 627:3-635:11.  Apple disputes whether the rainbow® sensors meet the limitations requiring a "thermal mass" and a temperature sensor "capable of determining a bulk temperature for the thermal mass," relying on the testimony of Dr. Sarrafzadeh.  RIB at 224-32; RRB at 130-36; Tr. (Sarrafzadeh) at 1084:6-1087:12.  For the reasons discussed below, the undersigned finds that only some of Masimo's rainbow® sensors have been shown to practice claim 9 of the '127 patent.

### 1.   Domestic Industry Products

Mr. Diab explained that there are two different LED assemblies used in Masimo's rainbow® sensors —early rainbow® sensors dating back to 2005 used ▮▮▮▮▮▮▮ in a substrate, and current rainbow® sensors use a ▮▮▮▮▮▮▮.  Tr. (Diab) at 216:15-219:5; *see* Tr. (Goldberg) at 627:4-13; CDX-0013C.021.Apple argues that Complainants have failed to identify the Masimo rainbow® sensors by product number and have failed to specify which products are "early" or "current" rainbow® sensors.  RIB at 224-24; RRB at 130-31. Complainants submit that the rainbow® sensors have been identified on a sales spreadsheet. CRB at 9; CX-0649C.  Complainants contend that "pre-2009 sales are for early rainbow®

CONFIDENTIAL INFORMATION REDACTED

sensors and later sales are for current rainbow® sensors," citing the testimony of Mr. Diab.  CRB

at 10 (citing Tr. (Diab) at 216:15-218:1, 220:4-221:10).  Mr. Diab testified at the hearing: "My

understanding is that . . . we have switched to the ████████ in around 2009."  Tr. (Diab)

at 233:16-20.  Masimo's sales spreadsheet (CX-0649C) shows continuous sales of rainbow®

sensors from 2008 through 2012, with no indication of distinct product numbers for early

rainbow® sensors and current rainbow® sensors.  *See* CX-0649C.  The undersigned agrees with

Apple that the record lacks any straightforward identification of Masimo's rainbow® sensors,

but the sales data, as explained by Mr. Diab's testimony, is sufficient to infer that the design of

Masimo's rainbow® sensors was changed in 2009 such that "early" rainbow® sensors before

2009 were comprised of ███████, but all of the rainbow® sensors made and sold after 2009

are "current" rainbow® sensors with a ██████████.

### 2.    Element [7 preamble]: "physiological sensor"

There is no dispute that the early and current rainbow® sensors meet the limitations in

the preamble of claim 7, describing "[a] physiological sensor capable of emitting light into tissue

and producing an output signal usable to determine one or more physiological parameters of a

patient."  *See* CIB at 266-67.[108]  Mr. Goldberg identified evidence that the rainbow® sensors

contain a photodetector that detects light emitted by LEDs and produces a signal that is used to

determine "patient measurement values."  Tr. (Goldberg) at 627:14-22; CDX-0013C.022 (citing

CX-0430C at 5).  Accordingly, the evidence shows that the preamble limitations of claim 7 are

met by each of the rainbow® sensors.

---

[108] The parties have stipulated that the preambles of the asserted patent claims are limiting.  *See* Joint
Stipulation of Facts ¶ 9, EDIS Doc. ID 770692 (May 13, 2022).

Stay-Add-434

CONFIDENTIAL INFORMATION REDACTED

3.     **Element [7A]: "a thermal mass"**

With respect to the "thermal mass" limitation, Complainants rely on different structures in the current rainbow® sensors and the early rainbow® sensors. CIB at 267-69. Mr. Diab described an ███████████ material that is used in the substrate of the current rainbow® sensors, "because it has very good heat conduction." Tr. (Diab) at 220:4-222:1 (citing CX-0454C; CX-0589C). Mr. Goldberg identified this ██████████ as the claimed "thermal mass" in the current rainbow® sensors, relying on Masimo documents and Mr. Diab's testimony. Tr. (Goldberg) at 627:23-628:24; CDX-0013C.023 (citing CX-0590C; CX-135C at 81, 98). With respect to the early rainbow® sensors, Mr. Diab identified ████████████████, which are "connected with . . . through-holes to make sure that there is a good heat conduction throughout the system." Tr. (Diab) at 216:15-219:5 (citing CX-0397C; CX-0588C). Mr. Goldberg identified the ███████████████ as the claimed "thermal mass" in the early rainbow® sensors. Tr. (Goldberg) at 628:25-629:18; CDX-0013C.024 (citing CX-0588C).

Apple argues that Complainants have failed to show that the rainbow® sensors have a "thermal mass." RIB at 226-29, 230-32. Apple submits that Complainants failed to provide any analysis of the thermal properties of the substrate in the current rainbow® sensors or the early rainbow® sensors. *Id*. at 226-279, 230-32 *see* Tr. (Sarrafzadeh) at 1084:22-1085:11 (noting the Mr. Goldberg "did not do any simulation or any other analysis"). Apple contrasts the lack of analysis for the current rainbow® sensors with Mr. Diab's extensive testing and simulation in the development of the early rainbow® sensors. RIB at 227-29. Apple further argues that Mr. Goldberg did not rely on any of Mr. Diab's testing and simulation for his opinions. RRB at 131-35.

CONFIDENTIAL INFORMATION REDACTED

In consideration of the parties' arguments, the undersigned finds that Complainants have shown by a preponderance of the evidence that the early rainbow® sensors had a "thermal mass," but Complainants have failed to show that the current rainbow® sensors meet this limitation. Although Mr. Goldberg's testimony on this limitation did not rely on testing or detailed analysis of the substrates in the rainbow® sensors, his testimony is supported by other evidence in the record, including Masimo documents and Mr. Diab's testimony. In particular, Mr. Diab testified at his deposition that the early rainbow® sensors were designed to have a relatively significant thermal mass. RX-1200C (Diab Dep. Tr.) at 110:7-11. Mr. Diab also described testing and simulations that he performed in the development of the early rainbow® sensors, where he modeled the temperature of the "thermal mass" to observe the relationship between the temperature of the thermistor and the temperature of the LEDs. *Id*. at 121:4-122:3; Tr. (Diab) at 200:17-203:6 (citing CX-0342C). He observed ███████████████████ ████████████████████████████████████████ finding ████ ████████████████████████████████████████████████ ████ *Id*. at 201:19-203:6. Apple argues that these simulations were only performed with a prototype design and not an actual product, RIB at 232 n.32, but Mr. Diab's description of the metal layers in his simulation matches his description of the structure of the early rainbow® sensors, and this is confirmed in the underlying documents. *Compare* Tr. (Diab) at 201:2-20 *to id*. at 216:15-218:21; CX-0342C at 6; CX-0588C. Apple argues that the rainbow® sensors have more LEDs than in Mr. Diab's simulations, but Mr. Diab explained that the amount of ████ was designed to account for up to 16 LEDs. RX-1200C (Diab Dep. Tr.) at 110:7-112:1. Mr. Diab further described testing on the early rainbow® sensors where he verified that the wavelength of the LEDs could be accurately determined with an equation using the measured

CONFIDENTIAL INFORMATION REDACTED

temperature, confirming that the actual products work in accordance with his simulations.  Tr.

(Diab) at 203:7-204:11.  Apple has offered no independent testing to refute Mr. Diab's testimony

regarding the thermal mass in the early rainbow® sensors.  *See* CRB at 156.  Accordingly, the

undersigned finds that Complainants have shown by a preponderance of the evidence that this

limitation is met by the early rainbow® sensors.

The evidence from Mr. Diab's simulations is not applicable to the current rainbow®

sensors, however.  Mr. Goldberg and Mr. Diab described different structures for the alleged

"thermal mass" in the current rainbow® sensors, which have a ███████████.  Tr. (Goldberg)

at 627:3-13; Tr. (Diab) at 220:25-222:1.  The ████████ of the current rainbow® sensors

is supplied by a ████████████  *Id.* at 221:19-222:1; CX-0598C.  Mr. Diab could not find

any analysis of temperature stabilization for the ████████.  Tr. (Diab) at 240:4-11.  To

show the presence of a "thermal mass," Complainants merely rely on the undisputed fact that the

substrate is composed of interconnected metal layers, *see* Tr. (Goldberg) at 627:23-628:13, and

Mr. Diab's testimony that the current rainbow® sensors are tested to verify the accuracy of the

calculation of wavelengths for the LEDs.  *See* Tr. (Diab) at 246:7-19.  As discussed above in the

context of infringement, this is insufficient to prove that this limitation is met.  Accordingly,

Complainants have failed to show by a preponderance of the evidence that the current rainbow®

sensors have a "thermal mass."

4.      **Element [7B]: "a plurality of light emitting sources, including a substrate of the plurality of light emitting sources, thermally coupled to the thermal mass"**

There is no dispute that the early and current rainbow® sensors meet the "plurality of

light emitting sources" limitation.  *See* CIB at 269-70.  Mr. Diab testified that all of Masimo's

rainbow® sensors have more than two LEDs.  Tr. (Diab) at 211:17-23.  He described the

CONFIDENTIAL INFORMATION REDACTED

placement of the LEDs in the early rainbow® sensors, *id.* at 216:15-217:8 (citing CX-0397C), and the current rainbow® sensors. *Id.* at 220:4-24 (citing CX-0454C). Mr. Goldberg identified Masimo documents showing the LEDs attached to the substrate of the rainbow® sensors using "thermally and electrically conductive epoxy." Tr. (Goldberg) at 629:19-630:12; CDX-0013C.025 (citing CX-0454C); CDX-0013C.026 (citing CX-0397C). Accordingly, the evidence shows that the "plurality of light emitting sources" limitation is met by each of the rainbow® sensors, except to the extent that the current rainbow® sensors have not been shown to have a "thermal mass."

### 5.    Element [7C]: "the sources having a corresponding plurality of operating wavelengths"

There is no dispute that the early and current rainbow® sensors meet the "plurality of operating wavelengths" limitation. *See* CIB at 271. Mr. Goldberg cites Masimo schematics showing the multiple wavelengths of light for the LEDs in the rainbow® sensors. Tr. (Goldberg) at 630:13-24; CDX-0013C.027 (citing CX-0454C); CDX-0013C.028 (citing CX-0397C). Accordingly, the evidence shows that the "plurality of operating wavelengths" limitation is met by each of the rainbow® sensors.

### 6.    Element [7D]: "the thermal mass disposed within the substrate"

There is no dispute that the early and current rainbow® sensors meet the "disposed within the substrate" limitation. *See* CIB at 271. Mr. Goldberg identified the ████████████ ███ between the top and bottom of the substrate in the current rainbow® sensors. Tr. (Goldberg) at 630:25-31:6; CDX-0013C.029 (citing CX-0590C). He identified the ████████ between the top and bottom of the substrate in the early rainbow® sensors. Tr. (Goldberg) at 631:9-16; CDX-0013C.030 (citing CX-0588C). Accordingly, the evidence shows that the "thermal mass disposed within the substrate" limitation is met by the early rainbow® sensors,

CONFIDENTIAL INFORMATION REDACTED

and the ▓▓▓▓▓▓▓▓▓▓ of the current rainbow® sensors are also "disposed within a substrate," although they have not been shown to be a "thermal mass."

### 7. Element [7E]: "a temperature sensor thermally coupled to the thermal mass"

There is no dispute that the early and current rainbow® sensors have "a temperature sensor thermally coupled to the thermal mass." *See* CIB at 271. Mr. Goldberg identified a thermistor on the substrate in the current rainbow® sensors and the early rainbow® sensors. Tr. (Goldberg) at 631:17-632:16; CDX-0013C.031 (citing CX-0454C); CDX-0013C.032 (citing CX-0397C). Accordingly, the evidence shows that the "thermally coupled" limitation is met by each of the rainbow® sensors, except to the extent that the current rainbow® sensors have not been shown to have a "thermal mass."

### 8. Element [7F]: the temperature sensor "capable of determining a bulk temperature for the thermal mass, the operating wavelengths dependent on the bulk temperature"

With respect to the "bulk temperature" limitation, Complainants identify the temperature measured by the thermistor in the rainbow® sensors. CIB at 271-73. Mr. Goldberg identifies Masimo documentation showing that the output from the thermistor in the rainbow® sensors is used "so that adjustments can be made to account for the temperature." Tr. (Goldberg) at 632:17-633:12; CDX-0013C.033 (citing CX-0430C). He further relies on Masimo source code that shows a calculation of wavelengths for the LEDs using the thermistor temperature. Tr. (Goldberg) at 633:13-24; CDX-0013C.034 (citing CPX-0152C; CPX-0151C). His analysis is the same for the early rainbow® sensors and the current rainbow® sensors. Tr. (Goldberg) at 633:25-634:2. Mr. Diab explained that in the development of the early rainbow® sensors, Masimo engineers developed an equation for predicting the wavelength of LEDs using a temperature measurement from a thermistor. Tr. (Diab) at 198:12-200:13. They were able to

CONFIDENTIAL INFORMATION REDACTED

confirm that the equation correctly estimated the wavelengths using a spectrometer. *Id.* at 203:7-204:1. Mr. Diab explained that he wrote "[t]he original code for all of the rainbow [sensors] including the wavelength correction," and the code on the current rainbow® sensors is a "modified version." Tr. (Diab) at 212:21-213:6.

Apple argues that Complainants have not shown that the rainbow® sensors are capable of determining a "bulk temperature," because Mr. Goldberg did not perform any testing on the thermistor or the "thermal mass" in these products. RIB at 229-30; RRB at 135-36. Dr. Sarrafzadeh offered his opinion that the thermistor in the rainbow® sensors measures a "local temperature" and not a "bulk temperature." Tr. (Sarrafzadeh) at 1086:11-21. Apple further argues that Mr. Goldberg's testimony regarding the determination of operating wavelengths was conclusory. RRB at 136.

In consideration of the parties' arguments, the undersigned finds that Complainants have shown by a preponderance of the evidence that the thermistors in the early rainbow® sensors are capable of measuring a "bulk temperature" that is a representative temperature for the "thermal mass" in the substrate of these products. As discussed above in the context of the "thermal mass" limitation, Mr. Diab described "hundreds of experiments" in simulations for the design of the early rainbow® sensors. Tr. (Diab) at 199:17-200:13 (citing CX-0342C). In those simulations, he observed that ███████████████████████████████████████ ██████████████████████████████ *Id.* at 201:19-203:6. Mr. Diab also described testing on the early rainbow® sensors where he verified that the wavelength of the LEDs could be accurately determined with an equation using the measured temperature. Tr. (Diab) at 203:7-204:11.

**CONFIDENTIAL INFORMATION REDACTED**

Apple's arguments primarily rely on Complainants' alleged failure of proof for this limitation—the only affirmative evidence that Apple cites is Dr. Sarrafzadeh's opinion that the thermistor measures a "local temperature" rather than a "bulk temperature." Tr. (Sarrafzadeh) at 1086:11-21. As discussed above in the context of infringement, however, Apple concedes that "a 'bulk temperature' could be measured by a properly positioned single thermistor if the thermal mass were stabilized at the bulk temperature," RRB at 122, and the "bulk temperature" embodiment in the specification is based on a single thermistor. *See* JX-007 at 10:62-11:4, Fig. 16. Mr. Diab testified that Masimo's design of the early rainbow® sensors was based on the use of a single thermistor after recognizing that it would be difficult ███████████████ ████████████████ Tr. (Diab) at 198:12-199:16. Mr. Diab's testimony further confirms that the bulk temperature from the thermistor in the early rainbow® sensors was used to determine the operating wavelengths of LEDs. *See* Tr. (Diab) at 203:7-204:11. Accordingly, a preponderance of the evidence shows that the early rainbow® sensors meet the limitation requiring a temperature sensor to determine a "bulk temperature" for the thermal mass, and the wavelengths of the LEDs are dependent on the bulk temperature.

As discussed above in the context of the "thermal mass" limitation, however, Complainants have not shown that the current rainbow® sensors have a "thermal mass" that stabilizes a "bulk temperature." Complainants did not present any analysis of temperature stabilization on the ████████████ of the current rainbow® sensors, and accordingly, Complainants have not shown, by a preponderance of the evidence, that the current rainbow® sensors meet the "bulk temperature" limitation.

9. **Element [7G]: "a detector capable of detecting light emitted by the light emitting sources after tissue attenuation"**

There is no dispute that the early and current rainbow® sensors have "a detector capable of detecting light emitted by the light emitting sources after tissue attenuation." *See* CIB at 273-74. Mr. Goldberg identified detectors in the rainbow® sensors that detect "modulated LED light, which passes through the tissue." Tr. (Goldberg) at 634:3-635:11; CDX-0013C.035 (citing CX-0440C); CDX-0013C.03 (citing CX-0430C at 2, 5). Accordingly, the evidence shows that the "detector" limitation is met by each of the rainbow® sensors.

10. **Element [7H]: "wherein the detector is capable of outputting a signal usable to determine one or more physiological parameters of a patient based upon the operating wavelengths"**

There is no dispute that the detector in the rainbow® sensors outputs a signal that is used to determine physiological parameters. *See* CIB at 273-74. Complainants identify a Masimo specification describing the signal from the detectors, stating that "[t]he OEM Board uses this signal to compute patient measurement values." CX-0430C at 5; *see* Tr. (Goldberg) at 634:22-635:11; CDX-0013C.03 (citing CX-0430C at 2, 5). Accordingly, the evidence shows that the "signal usable to determine one or more physiological parameters" limitation is met by each of the rainbow® sensors.

11. **Element [9]: "a thermistor"**

Claim 9 further requires that the "temperature sensor" of claim 1 is a thermistor. As discussed above in the context of the "temperature sensor" limitation, and there is no dispute that the temperature sensor in the rainbow® sensors is a thermistor. Tr. (Goldberg) at 631:17-632:16; CDX-0013C.031 (citing CX-0454C); CDX-0013C.032 (citing CX-0397C). Accordingly, the evidence shows that the "thermistor" limitation of claim 9 is met by each of the rainbow® sensors.

***

Accordingly, because each limitation of claims 1 and 9 is met, the undersigned finds that Complainants have shown by a preponderance of the evidence that the early rainbow® sensors practice claim 9 of the '127 patent. For the reasons discussed above in the context of the "thermal mass" and "bulk temperature" limitations, Complainants have not shown by a preponderance of the evidence that the current rainbow® sensors practice claim 9 of the '127 patent.

## G.    Invalidity

Apple contends that claim 9 of the '127 patent is obvious in view of several prior art references. RIB at 233-45; RRB at 136-50. Apple's contentions primarily rely on two references: an article published in 1991 by Yitzhak Mendelson (RX-0458, "Mendelson"); and a Japanese patent application published in 2004 naming inventor Yukio Yamada (RX-0381, "Yamada"). Apple relies on the testimony of Dr. Sarrafzadeh to support its invalidity contentions. Tr. (Sarrafzadeh) at 1046:14-1064:7.

### 1.    Mendelson

Apple contends that claim 9 of the '127 patent is obvious in view of an article entitled "Invasive and Noninvasive Blood Gas Monitoring" authored by Yitzhak Mendelson and published in *Bioinstrumentation and Biosensors* in 1991 (RX-0458 "Mendelson"), in combination with the textbook *Design of Pulse Oximeters* by J.G. Webster, published in 1997 (RX-0035, "Webster"). RIB at 233-39; RRB at 140-46. Mendelson and Webster are both prior art to the '127 patent pursuant to 35 U.S.C. § 102(b).[109]

---

[109] The pre-AIA version of 35 U.S.C. § 102 is applicable to the '127 patent. *See* America Invents Act, 35 USCA § 100 Note, § 3(n)(1), 125 Stat. 284 (Sept. 16, 2011).

Complainants argue that Apple has not shown claim 9 to be obvious in view of Mendelson and Webster because Mendelson does not disclose the claimed "thermal mass," "thermal mass disposed within the substrate," or a "temperature sensor." CIB at 277-78; CRB at 161-62. Complainants further argue that the combination of Mendelson and Webster fails to meet the "thermal mass" limitations and the limitations requiring a temperature sensor "thermally coupled to the thermal mass and capable of determining a bulk temperature for the thermal mass." CIB at 279-80; CRB at 162-64. Complainants argue that Webster's disclosures are cumulative of U.S. Patent No. 5,259,381 to Cheung (RX-0406, "Cheung"), a prior art patent that was considered during the prosecution of the '127 patent. CIB at 275-76.

### a.    Element [7 preamble]: "physiological sensor"

There is no dispute that Mendelson meets the limitations of the preamble of claim 7, describing "[a] physiological sensor capable of emitting light into tissue and producing an output signal usable to determine one or more physiological parameters of a patient." *See* CIB at 277-80; CRB at 161-64. Dr. Sarrafzadeh identified a "noninvasive reflection $SaO_2$ sensor" disclosed in Mendelson. Tr. (Sarrafzadeh) at 1049:9-13; RX-0458 at 266-71, Fig. 10.16. He described the operation of a pulse oximeter as depicted in Mendelson, where LEDs emit light to the tissue, "and there are a collection of photodiodes that collect the light after it has been through the tissue, and they make a determination of physiological parameters based on the optical light received by the photodiodes." Tr. (Sarrafzadeh) at 1049:14-23.

### b.    Element [7A]: "a thermal mass"

Apple identifies the ceramic substrate depicted in Mendelsohn as the claimed "thermal mass." RIB at 234-35. Dr. Sarrafzadeh offers his opinion that the circuit board in Mendelsohn would provide thermal connectivity and that one of ordinary skill in the art would have known to

add a "metal core or thermal core" to provide "thermal management." Tr. (Sarrafzadeh) at 1049:24-1051:12. He references a textbook, *The Multilayer Printed Circuit Board Handbook* by J.A. Scarlett, which describes thermal cores that can be manufactured within substrates for heat conduction. RX-0397.0122 (recognizing that "the popular epoxy fiberglass substrates are notably poor heat conductors and therefore cannot provide a sufficient heat extraction," and describing "an integral heat conductor, i.e., a metal core, within the structure, to alleviate this problem"). Apple also compares Mendelsohn's disclosure of a printed circuit board with Complainants' contentions that the metal layers in the printed circuit boards of the Accused Products and the rainbow® sensors meet the "thermal mass" limitation, arguing that Mendelsohn would meet this limitation for the same reasons. CIB at 234-35; *see* Tr. (Sarrafzadeh) at 1050:25-1051:12.

Complainants argue that Mendelsohn does not disclose a "thermal mass" because there is no disclosure of thermal properties or any description of thermal coupling. CIB at 277-78. Complainants submit that Dr. Sarrafzadeh failed to provide any testing or simulations of the ceramic substrate in Mendelsohn. *Id.* at 278. Complainants argue that Apple mischaracterizes Mr. Goldberg's infringement and domestic industry analysis, which does not rely on an assumption that every multilayer circuit board contains a "thermal mass"—Complainants submit that Mr. Goldberg relied on evidence of the thermal coupling of components and the fact that the temperature of the board could be used to reliably estimate the operating wavelengths of the LEDs. *Id.* at 277-78. Complainants further argue that Apple should be precluded from relying on Scarlett as an obviousness ground, because it was not identified in Apple's invalidity contentions. *Id.* at 283-84. Even if Scarlett's disclosures were considered, Complainants submit that Apple failed to identify any reason to add a thermal core to Mendelsohn. CRB at 161.

Dr. Goldberg testified that the problem of heat removal addressed in Scarlett is different from the use of a "thermal mass" to facilitate a bulk temperature measurement. Tr. (Goldberg) at 1398:9-1399:8.

In consideration of the parties' arguments, the undersigned finds that Apple has not shown, by clear and convincing evidence, that Mendelsohn discloses a "thermal mass." The pulse oximeter depicted in Mendelsohn has a "ceramic substrate," but there is no description of the thermal characteristics of this substrate or any components thereon. *See* RX-0458 at 269-71. Dr. Sarrafzadeh's analysis of this element also contains no description of the thermal characteristics of Mendelsohn's substrate. *See* Tr. (Sarrafzadeh) at 1049:24-1052:2. Moreover, it is not clear that the addition of a metal core designed for heat removal in Scarlett would stabilize a bulk temperature, as required for the "thermal mass" limitation—neither Scarlett nor Mendelsohn describe such stabilization. *See* Tr. (Goldberg) at 1398:9-1399:8.

Apple has also failed to identify any clear reason for one of ordinary skill in the art to modify Mendelsohn to add a "thermal mass," merely relying on Dr. Sarrafzadeh's testimony that thermal cores were "known for many years," pointing to a description of a thermal core in Scarlett.[110] *Id.* (citing RX-0397 at 122). Dr. Sarrafzadeh suggests that adding a thermal core to Mendelsohn would provide "for better management," relying on disclosures in Scarlett. Tr. (Sarrafzadeh) at 1051:1-12. In particular, Scarlett describes the problem of "heat removal from tightly packaged components" on "epoxy fiberglass substrates," which can be addressed "[w]ith

---

[110] Complainants argue that Apple should be precluded from relying on Scarlett because no such combination was identified in Apple's invalidity contentions. CIB at 283-84. This argument was previously rejected in the context of Complainants' motion *in limine* no. 2, however, where Apple was allowed to present evidence relying on Scarlett and other prior art references in accordance with the arguments in its prehearing brief. *See* Order No. 40 at 2 (Jun. 1, 2022). Accordingly, Apple will not be precluded from relying on Scarlett in the context of its obviousness arguments.

an integral heat conductor, i.e., a metal core." RX-0397 at 122. It is not clear that "heat removal" is the same as temperature stabilization, however, and it is not clear that one of ordinary skill in the art would have been motivated to add a metal core to Mendelsohn for the purpose of temperature stabilization or heat removal. Dr. Sarrafzadeh's testimony that a metal core would be added for "better management" is the type of conclusory opinion that has been found to be insufficient to establish a motivation to combine. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012) (where expert testified that a motivation to combine would have been "to build something better," the court found that "[t]his testimony is generic and . . . fails to explain why a person of ordinary skill in the art would have combined elements from specific references in the way the claimed invention does").

Accordingly, Apple has failed to show by clear and convincing evidence that one of ordinary skill in the art would have modified the device in Mendelsohn to add a "thermal mass."

      **c.**      **Element [7B]: "a plurality of light emitting sources, including a substrate of the plurality of light emitting sources, thermally coupled to the thermal mass"**

There is no dispute that Mendelsohn discloses a device with a plurality of LEDs thermally coupled to a circuit board. *See* RIB at 235; CIB at 277-79. Dr. Sarrafzadeh identified red and infrared LEDs shown on a circuit board in Mendelsohn. Tr. (Sarrafzadeh) at 1052:3-8; RDX-7.20.



**Fig. 10.16** Noninvasive reflection SaO₂ sensor.

RX-0458.0024 at Fig. 10.16; *see also* RX-0458.0022 ("The basic optical sensor of a noninvasive pulse oximeter consists of a light source (typically, a pair of red and infrared LEDs) and a photodetector mounted inside a spring-loaded clip."). Dr. Sarrafzadeh explained that "[b]ecause of electrical connection, we know that the LEDs are connected by wires to the printed circuit board, and that's the thermal connection." Tr. (Sarrafzadeh) at 1052:9-13.

> **d.** **Element [7C]: "the sources having a corresponding plurality of operating wavelengths"**

There is no dispute that the LEDs in Mendelsohn have two different wavelengths. *See* RIB at 236; CIB at 277-79. Dr. Sarrafzadeh explains that Mendelsohn describes "red and infrared LEDs." Tr. (Sarrafzadeh) at 1052:18-22; RDX-7.21; RX-0458.0024 at Fig. 10.16; *see also* RX-0458.0022 (describing "a pair of red and infrared LEDs").

e.    **Element [7D]: "the thermal mass disposed within the substrate"**

Apple argues that the "thermal mass disposed within the substrate" limitation is obvious in view of Mendelsohn for the same reasons that as the "thermal mass" limitation. *See* RIB at 236; Tr. (Sarrafzadeh) at 1053:1-7. For the reasons discussed above in the context of the "thermal mass" limitation, the undersigned finds that Apple has not shown that "the thermal mass disposed within the substrate" is disclosed in Mendelsohn or that one of ordinary skill in the art would have modified the device in Mendelsohn to add a "thermal mass."

f.    **Element [7E]: "a temperature sensor thermally coupled to the thermal mass"**

Mendelsohn does not disclose a temperature sensor in its pulse oximetry device, but Apple argues that it would have been obvious to incorporate a temperature sensor in this device based on disclosures in Webster. RIB at 236-37. Dr. Sarrafzadeh identifies Webster's disclosure of a temperature sensor as a way to compensate for LED temperature changes that can affect pulse oximetry measurements. Tr. (Sarrafzadeh) at 1053:8-22; RDX-7.23. Webster explicitly states: "One way to compensate for LED temperature changes is to have a temperature sensor built into the probe along with the LEDs and photodiode." RX-0035.085. Dr. Sarrafzadeh explains that such a temperature sensor would have been electrically connected and thus thermally coupled to the LEDs and the circuit board of the device in Mendelsohn. Tr. (Sarrafzadeh) at 1053:8-22. Complainants dispute the alleged obviousness of a "temperature sensor" as disclosed in Webster, but their arguments appear to be directed to the "thermal mass" limitation and the "bulk temperature" limitation. CIB at 280; CRB at 162. There does not appear to be any dispute that Webster explicitly discloses a reason for incorporating a

temperature sensor in a pulse oximeter and that one of ordinary skill in the art would have expected success in doing so.

g.    **Element [7F]: the temperature sensor "capable of determining a bulk temperature for the thermal mass, the operating wavelengths dependent on the bulk temperature"**

With respect to the "bulk temperature" limitation, Apple cites Webster's recognition that "a shift in LED peak wavelength due to a change in temperature can cause erroneous SpO2 readings." RX-0035.085. Webster provides a solution to this problem: "One way to compensate for LED temperature changes is to have a temperature sensor built into the probe along with the LEDs and photodiode." *Id.* Webster further explains that "[t]emperature information is fed back to the microprocessor, which then estimates how much the peak wavelength of each LED has changed from its rated value." *Id.* Although Webster only describes one temperature sensor, Dr. Sarrafzadeh suggests that "one of ordinary skill in the art would know that . . . in order to get the bulk temperature in multiple locations, you would just add multiple temperature sensors of Webster." Tr. (Sarrafzadeh) at 1053:23-1054:11. He further testifies that the relationship between wavelength and temperature described in Webster is "a fact of physics that has been known for many years." *Id.* at 1054:20-1055:3. Apple argues that the single temperature sensor in Webster is similar to the single temperature sensor in the Accused Products, and if these products measure a "bulk temperature" then this limitation should also be met by Webster. RIB at 237; *see* Tr. (Sarrafzadeh) at 1054:14-19.

Complainants argue that Webster's disclosure of a temperature sensor relies on Cheung (RX-0406), which was considered during the prosecution of the '127 patent. CIB at 280, 275-76. Complainants further argue that Mendelson does not disclose a thermal mass, and that Apple does not rely on Webster as disclosing a thermal mass. *Id.* at 279-80.

In consideration of the parties' arguments, the undersigned finds that Apple has not shown, by clear and convincing evidence, that Webster discloses a temperature sensor capable of determining a "bulk temperature for the thermal mass." Webster does not describe a "thermal mass"—the temperature sensor is "built into the probe" and it is designed to estimate the temperature of the LEDs—not a "bulk temperature for the thermal mass." RX-0035.085.[111] Dr. Sarrafzadeh suggests that one of ordinary skill in the art would have added multiple sensors to obtain an average temperature, Tr. (Sarrafzadeh) at 1054:23-1054:7, but this opinion is not grounded in any prior art disclosure.[112] There is no clear disclosure of a measurement of a "bulk temperature for the thermal mass" in Webster.

> h.   **Element [7G]: "a detector capable of detecting light emitted by the light emitting sources after tissue attenuation"**

There is no dispute that Mendelsohn discloses photodiodes that are capable of detecting light from its LEDs after being attenuating by the user's tissue. *See* RIB at 238; CIB at 277-79. These photodiodes are depicted on Figure 10.16 in Mendelsohn. RX-0458.0024; *see* Tr. (Sarrafzadeh) at 1055:4-8.

> i.   **Element [7H]: "wherein the detector is capable of outputting a signal usable to determine one or more physiological parameters of a patient based upon the operating wavelengths"**

With respect to the "outputting a signal" limitation, Dr. Sarrafzadeh identified a block diagram (Fig. 10.12) in Mendelsohn depicting an ear oximeter that includes a processor and an output to a digital display. Tr. (Sarrafzadeh) at 1055:11-18; RX-0458.021. Complainants do not

---

[111] Webster notes the potential "difference between the sensed temperature and the actual temperature of the *p-n* junctions of the LEDs." RX-0035.085.

[112] Webster teaches away from the addition of multiple sensors or other components: "In addition, the sensor and additional wires needed will add cost to the probes, making a cost-benefit analysis of this method necessary before its inclusion in a pulse oximeter design." RX-0035.086.

dispute that Mendelsohn discloses a detector meeting this limitation but argues that

Dr. Sarrafzadeh incorrectly identified Mendelsohn's ear oximeter as a pulse oximeter.  CIB at

278-79; CRB at 164.

###### j.    Element [9]: "a thermistor"

Claim 9 further requires that the "temperature sensor" of claim 1 is a thermistor.

Complainants argue that a thermistor is not disclosed in Mendelsohn or in Webster.  CIB at 278,

280.  Apple relies on Dr. Sarrafzadeh's testimony that thermistors "have been known for many

years as a resistive circuit."  Tr. (Sarrafzadeh) at 1055:19-1056:1.  Apple cites a 2003 technical

dictionary describing a "thermistor," RX-0419, and a thermistor in a pulse oximeter disclosed in

Yamada.  RX-0381 at ¶ [0111].  As discussed below, Yamada's disclosure shows that

thermistors were known in the prior art and could be used in pulse oximeters.

***

As discussed above, Apple has not shown by clear and convincing evidence that claim 9

of the '127 patent is obvious in view of Mendelsohn in combination with Webster, because these

references fail to disclose a "thermal mass" or the measurement of a "bulk temperature for the

thermal mass," and Apple has not shown that it would have been obvious for one of ordinary

skill in the art to add these elements.

###### 2.    Yamada

Apple contends that claim 9 of the '127 patent is obvious in view of Japanese Patent

Application Publication No. 2004-337605A, entitled "Light Probe, Measuring System Using the

Same, and Reflected Light Detecting Method Using the Same," naming inventor Yukio Yamada

(RX-0381, "Yamada"), in combination with U.S. Patent No. 5,334,916, entitled "Apparatus and

Method for LED Mission Spectrum Control, naming inventor Masahiro Noguchi (RX-0353,

292

"Noguchi"). RIB at 239-43; RRB at 146-48. Yamada was published on December 2, 2004, and Noguchi issued on August 2, 1994. RX-0381; RX-0353. Yamada and Noguchi are prior art to the '127 patent pursuant to 35 U.S.C. § 102(b).[113]

Complainants argue that Apple has not shown claim 9 to be obvious in view of Yamada and Noguchi because these references fail to disclose the claimed "thermal mass" and the limitations requiring a temperature sensor "thermally coupled to the thermal mass and capable of determining a bulk temperature for the thermal mass." CIB at 280-83; CRB at 164-67.

### a.    Element [7 preamble]: "physiological sensor"

There is no dispute that Yamada meets the limitations of the preamble of claim 7 by describing a pulse oximeter, which is "[a] physiological sensor capable of emitting light into tissue and producing an output signal usable to determine one or more physiological parameters of a patient." *See* RIB at 239; CIB at 280-82; Tr. (Sarrafzadeh) at 1058:2-7; RDX-7.33C; RX-0381 at ¶ 0041, Fig. 1, Fig. 5.

### b.    Element [7A]: "a thermal mass"

With respect to the "thermal mass" limitation, Dr. Sarrafzadeh identifies Yamada's disclosure of LEDs and photodetectors mounted on a printed circuit board with electrical connections, wherein "the wires provide thermal connectivity." Tr. (Sarrafzadeh) at 1058:8-19. Dr. Sarrafzadeh testified that a person of ordinary skill in the art "would know that you can readily implement this in a multilayer fashion, also add thermal cores in order to provide better thermal management in the circuit." *Id.* Apple argues that Complainants have accused a similar multilayer printed circuit board of meeting this limitation in the context of infringement. RIB at 239-40; RRB at 146-47.

---

[113] *See supra* n.109.

Complainants argue that Yamada does not disclose a "thermal mass" because there is no description of the structure or thermal properties of Yamada's substrate. CIB at 281. Complainants submit that Dr. Sarrafzadeh's testimony is insufficient to show that Yamada's circuit board is a "thermal mass." *Id.* Mr. Goldberg testified that Yamada does not disclose a thermal mass "which stabilizes and normalizes in a manner that allows the bulk temperature as measured by the temperature sensor." Tr. (Goldberg) at 1396:22-1397:8. Complainants note that Yamada discloses a "thermal conductor" that "is able to adequately disperse heat from" Yamada's LED to the exterior. RX-0381 at ¶¶ 101-102. Complainants argue that this heat dispersal is different from the use of a thermal mass to stabilize a bulk temperature for measurement. CRB at 165-166; *see* Tr. (Goldberg) at 1398:9-1399:8.

In consideration of the parties' arguments, the undersigned finds that Apple has not shown, by clear and convincing evidence, that Yamada discloses a "thermal mass." For the same reasons discussed above in the context of Mendelsohn, Apple has failed to show that the circuit board in Yamada is a "thermal mass" and has failed to show that one of ordinary skill in the art would have modified Yamada to incorporate a "thermal mass." In particular, Apple has failed to identify any disclosure in Yamada that describes the stabilization of temperatures on its circuit board, and Dr. Sarrafzadeh's testimony with respect to modifying Yamada was conclusory and unsupported by disclosures in the prior art. Apple failed to identify any clear evidence that one of ordinary skill in the art would have modified Yamada to provide temperature stabilization— Yamada discloses a "thermal conductor" that "is able to adequately disperse heat," RX-0381 at ¶¶ 101-102, without any discussion of temperature stabilization and no identified need for additional thermal management.

c.   **Element [7B]: "a plurality of light emitting sources, including a substrate of the plurality of light emitting sources, thermally coupled to the thermal mass"**

There is no dispute that Yamada discloses a plurality of LEDs mounted on a substrate. *See* RIB at 240-41; CIB at 280-82. Dr. Sarrafzadeh identified two LEDs electrically and thermally connected to the circuit board in Yamada. Tr. (Sarrafzadeh) at 1058:20-1059:6; RDX-7.35C; RX-0381 at ¶ [0043], Fig. 5.

d.   **Element [7C]: "the sources having a corresponding plurality of operating wavelengths"**

There is no dispute that the LEDs in Yamada have two different wavelengths. *See* RIB at 241; CIB at 280-82. Dr. Sarrafzadeh identifies disclosures in Yamada describing wavelengths of red light and infrared light. Tr. (Sarrafzadeh) at 1059:10-16; RDX-7.36C; RX-0381 at ¶ [0043] ("The light a first wavelength may be, for example, red light with a wavelength near 660 [nm]. . . The light of a second wavelength may be, for example, near infrared light with a wavelength near 880 [nm].").

e.   **Element [7D]: "the thermal mass disposed within the substrate"**

Apple argues that the "thermal mass disposed within the substrate" limitation is obvious in view of Yamada for the same reasons that as the "thermal mass" limitation. *See* RIB at 241; Tr. (Sarrafzadeh) at 1059:18-25. For the reasons discussed above in the context of the "thermal mass" limitation, the undersigned finds that Apple has not shown that "the thermal mass disposed within the substrate" is disclosed in Yamada or that one of ordinary skill in the art would have modified Yamada to add a "thermal mass."

f.     **Element [7E]: "a temperature sensor thermally coupled to the thermal mass"**

With respect to the "temperature sensor" limitation, Apple points to Yamada's disclosure that "a temperature sensor maybe be attached to the light probe . . . to the surface of the substrate." RX-0381 at ¶ [0109]. Dr. Sarrafzadeh explains that this temperature sensor would be electrically attached and thus thermally coupled to the alleged "thermal mass." Tr. (Sarrafzadeh) at 1060:1-7; RDX-7.38C. Complainants dispute Yamada's disclosure of a "temperature sensor," but their arguments appear to be directed to the "thermal mass" limitation and the "bulk temperature" limitation. CIB at 281-82; CRB at 165. There does not appear to any dispute that Yamada explicitly discloses that a temperature sensor may be attached to the substrate.

g.     **Element [7F]: the temperature sensor "capable of determining a bulk temperature for the thermal mass, the operating wavelengths dependent on the bulk temperature"**

With respect to the "bulk temperature" limitation, Apple cites Yamada's disclosure of a temperature sensor attached to the light probe on the surface of the LED substrate. RIB at 241; Tr. (Sarrafzadeh) at 1060:8-17. Apple argues that Yamada's temperature sensor meets the "bulk temperature" limitation under the same theory that Complainants have asserted for infringement of this limitation. CIB at 242. Dr. Sarrafzadeh explains that the relationship between the temperature of an LED and its wavelength is a property of physics that would have been known to persons of ordinary skill in the art, and an equation defining this relationship is explicitly described in Noguchi. Tr. (Sarrafzadeh) at 1060:25-1061:9; RDX-7.40C; RX-0353 at 2:59-68. Noguchi describes "a temperature measurement means for measuring the temperature of an LED or for measuring the temperature in the environment in which the LED is disposed," adding that "[a] plurality of LEDs and a plurality of temperature measurement means can be utilized in the present invention." RX-0353 at 1:38-50. Dr. Sarrafzadeh testified that one of ordinary skill in

the art would have known from the teaching in Noguchi that a temperature measurement could be used to provide better wavelength estimation for the pulse oximeter in Yamada. Tr. (Sarrafzadeh) at 1061:10-1062:8. He explains that using Noguchi's wavelength estimation would have improved the functioning of Yamada's pulse oximeter and that this functionality would have been "easily added" by one of ordinary skill in the art. *Id.*

Complainants argue that the temperature sensor in Yamada does not measure a "bulk temperature." CIB at 281-82. Mr. Goldberg testified that Yamada's temperature sensor is only configured to detect "when the temperature gets too high for safety reasons," and not to measure a bulk temperature that "can be used for reliably estimating LED operating wavelengths." Tr. (Goldberg) at 1396:22-1397:8 (citing RX-0381 at ¶ [111]). Complainants note that Yamada discloses a "thermal conductor" for heat dispersal rather than to stabilize a bulk temperature for measurement. CRB at 165-166 (citing RX-0381 at ¶¶ 101-102); *see* Tr. (Goldberg) at 1398:9-1399:8. Complainants argue that Noguchi does not measure a "bulk temperature" for estimating wavelengths for multiple LEDs but merely discloses measuring the temperature of an LED to measure the wavelength for that LED. CIB at 283; CRB at 166-67; Tr. (Goldberg) at 1397:9-21. Complainants argue that Apple has failed to show a motivation to combine Yamada and Noguchi with an expectation of success. CRB at 167.

In consideration of the parties' arguments, the undersigned finds that Apple has not shown, by clear and convincing evidence, that Yamada in combination with Noguchi discloses a temperature sensor capable of determining a "bulk temperature for the thermal mass." Yamada does not disclose a measurement of temperature for a "thermal mass"—the temperature sensor is placed "to measure the temperature near the user" to "take action when the temperature gets too high, for example by sounding an alarm or halting light emission from the light-emitting

component." RX-0381 at ¶¶ 0901-0111. Noguchi similarly fails to disclose a measurement of temperature for a "thermal mass"—similar to Webster's disclosures discussed above, Noguchi describes the relationship between an LED's temperature and its operating wavelength, *see* RX-0353 at 1:38-50, 2:58-60, but Noguchi fails to disclose the measurement of a "bulk temperature for the thermal mass." Noguchi does not describe the use of a single representative temperature for a "thermal mass" but instead suggests direct temperature measurements of individual LEDs, describing "[a] plurality of LEDs and a plurality of temperature means." RX-0353 at 1:48-50. Dr. Sarrafzadeh's suggestion to average the readings from multiple temperature sensors to generate a "bulk temperature" is conclusory and is not supported by disclosures in the prior art. *See* Tr. (Sarrafzadeh) at 1060:8-16. Apple has not shown that any measurement of a "bulk temperature" is disclosed in Yamada or Noguchi, or that such a measurement would have been known to persons of ordinary skill in the art.

### h. Element [7G]: "a detector capable of detecting light emitted by the light emitting sources after tissue attenuation"

There is no dispute that Yamada discloses a detector that receives light from the LEDs after tissue attenuation. *See* RIB at 243; CIB at 280-82. Yamada explicitly discloses that "[a] portion of the light that traversed body tissue is received by the light-receiving component 12." RX-0381 at ¶ 0062; *see* Tr. (Sarrafzadeh) at 1062:9-14.

### i. Element [7H]: "wherein the detector is capable of outputting a signal usable to determine one or more physiological parameters of a patient based upon the operating wavelengths"

There is no dispute that the detector in Yamada is used to determine blood oxygen saturation based on the ratio of the fluctuation ranges of red and infrared light. *See* RIB at 243; CIB at 280-82. Yamada explicitly discloses that "a strength signal for the light is sent to the analysis component 2 in the form of an electrical signal," and "analysis component 2 determines

CONFIDENTIAL INFORMATION REDACTED

the range of fluctuation in the strength signal at each wavelength . . . .  The CPU 23 then searches the memory component 25 for the numerical value of the oxygen concentration level corresponding to the ratio of the fluctuation ranges, and outputs the result of the search."  RX-0381 at ¶ 0062, 0065; *see* Tr. (Sarrafzadeh) at 1062:15-24.

### j.    Element [9]: "a thermistor"

Claim 9 further requires that the "temperature sensor" of claim 1 is a thermistor.  There is no dispute that Yamada discloses the use of a thermistor as its temperature sensor.  *See* RIB at 243; CIB at 280-82.  Yamada explicitly provides examples of temperature sensors: "it is possible to use a thermistor, a metal resistance temperature detector, or a thermocouple as the temperature sensor."  RX-0381 at ¶ 0111; *see* Tr. (Sarrafzadeh) at 1062:21-25.

***

For the reasons discussed above, Apple has not shown by clear and convincing evidence that claim 9 of the '127 patent is obvious in view of Yamada in combination with Noguchi , because these references fail to disclose a "thermal mass" or the measurement of a "bulk temperature for the thermal mass," and Apple has not shown that it would have been obvious for one of ordinary skill in the art to add these elements.

### 3.    Objective Indicia of Non-Obviousness

Complainants identify evidence of commercial success and industry praise for Masimo's rainbow® sensors that support a finding of non-obviousness.  CIB at 285-87.  Masimo's financial records show that Masimo has earned ███████ in revenue from the sale of rainbow® sensors practicing claim 9 of the '127 patent, with a growth rate of ███████ from 2008 through 2014.  Tr. (McGavock) at 1426:9-1427:7; CDX-0019C.0012 (citing CX-0649C).  Complainants further cite evidence that the rainbow® sensors have won numerous awards,

CONFIDENTIAL INFORMATION REDACTED

including the 2006 Medical Design Excellence Gold Award, the 2007 LoneStar Award for

Innovation and Support, and the 2006 American Electronics Association Innovative Medical

Technology Award. CX-1378 at 62-68. In connection with a 2006 award from the Society for

Technology in Anesthesia, a study of a rainbow® sensor product found that the "technology

represents a major advance in the monitoring of oxygenation." *Id*. at 69. Mr. Goldberg testified

that the success of the rainbow® sensor products "obviously depended on them functioning to do

what they were meant to do, which was to measure a variety of physiological parameters in a

manner that hadn't been done before," and the patented features were ███████████

██████████████████████████████████████████

████ Tr. (Goldberg) at 1400:9-1401:18.[114] Apple argues that Complainants failed to show a

nexus between the invention of the '127 patent and the alleged commercial success and industry

praise, criticizing Mr. Goldberg's testimony as conclusory. CRB at 149.

    In consideration of the parties' arguments, the undersigned finds that the evidence of

commercial success and industry praise for the early rainbow® sensor products is consistent with

the findings of nonobviousness with respect to claim 9 of the '127 patent, although

Complainants' evidence for nexus is weak.[115] There is no explicit praise for the temperature-

based wavelength correction in the early rainbow® sensor products, but Complainants did

present testimony from Mr. Diab that the ████████████████████████████

██████████████████████████████████████████

---

[114] Complainants also identify evidence of teaching away, CIB at 287, but this evidence has been considered in the context of the *prima facie* case for obviousness with respect to the "bulk temperature" limitation allegedly disclosed in Webster. *See supra*, n.111, n.112.

[115] These secondary considerations are only relevant with respect to the early rainbow® sensors that have been found to practice claim 9 of the '127 patent. Accordingly, any post-2009 commercial success is not relevant to obviousness.

████████████████████████████████████ Tr. (Diab) at 204:2-11.  This

evidence shows that there may be some nexus between the invention of the '127 patent and the

commercial success and industry praise for the early rainbow® sensor products, although

inventor testimony is not the type of "objective" evidence that is generally considered by the

Federal Circuit.  *Cf. Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 957 (Fed. Cir.

1997) ("The so-called "secondary considerations" provide evidence of how the patented device

is viewed by the interested public: not the inventor, but persons concerned with the product in

the objective arena of the marketplace.").  Accordingly, the evidence of commercial success and

industry praise for the early rainbow® sensor products is not entitled to significant weight, but it

is consistent with the findings of nonobviousness above with respect to claim 9 of the '127

patent.

## VII.    DOMESTIC INDUSTRY – ECONOMIC PRONG (MASIMO WATCH)

With respect to the Poeze patents and the '745 patent, Masimo relies on "Masimo Watch"

products to satisfy the domestic industry requirement, including certain prototypes that were

developed between 2019 and 2021, and a final product that was manufactured in December

2021.  *See* CIB at 26-35, 288-309.

### A.    The "Masimo Watch" Articles

The earliest "Masimo Watch" prototype identified in this investigation is the "Circle

sensor" (CPX-0021C), which "would have been built in October 2019," according to Masimo

engineer Stephen Scruggs.  Tr. (Scruggs) at 394:12-18.  Masimo's next domestic industry

product is the "Wings sensor" (CPX-0029C), which "would have been built in January of 2020."

*Id*. at 395:7-15.  Both the Circle sensor and Wings sensor relied on an external device to

calculate oxygen saturation, but in November 2020, Masimo built the "RevA sensor" (CPX-

0052C), "which included onboard processing." *Id*. at 396:2-13. Then in April 2021, Masimo

added a display for the "RevD sensor" (CPX-0058C). *Id*. at 397:7-24. Between May and

September 2021, during the time the complaint was filed, Masimo developed the "RevE sensors"

(CPX-0019C, CPX-0020C, CPX-0065C), which included certain changes to the emitters and

photodiodes of the "RevD sensor." Tr. (Scruggs) at 398:1-23.[116]

## B.    Disputed Background Issues Regarding Domestic Industry Investments

As preliminary issues, the parties dispute (1) whether the investments in "Masimo

Watch" products can be aggregated for the economic prong analysis; and (2) whether Masimo's

pre-2018 investments regarding wrist-worn sensors should be considered. *See* RIB at 249-50,

256-57, 267-68; RRB at 155, 164; CIB at 301-05; CRB at 179-80. Each of these disputes is

addressed below.

### 1.    Aggregation of "Masimo Watch" Expenditures

Complainants have not separately accounted for domestic industry expenditures with

respect to each Masimo Watch prototype, relying on Masimo's aggregate investments because

the prototypes were part of a continuous design and development effort towards a commercial

product. CIB at 300-301 (citing Tr. (Muhsin) at 342:25-343:7 (describing "many iterations of

wrist sensors"), 345:2-7 (describing "[m]any iterations on the watch through the design phases");

Tr. (Scruggs) at 393:12-20 ("we've designed, built, and tested many iterations of the Masimo

Watch"), 402:2-12 (describing "the progression of the different sensor designs").

---

[116] Complainants also rely on the Masimo W1 as a domestic industry product, but for the reasons discussed *supra* in the context of the technical prong, evidence regarding this product will not be considered.

Apple argues that it was improper for Complainants to aggregate the Masimo Watch expenditures. RIB at 256-57. Apple cites *Certain Electronic Stud Finders, Metal Detectors, And Electrical Scanners*, where the Commission held that "aggregating investments in different domestic products that practice different patents effectively precludes the Commission from quantifying the amounts of the investments in each statutory category and determining the significance" of such investments. Inv. No. 337-TA-1221, Comm'n Op. at 48, EDIS Doc. ID 765331 (Mar. 14, 2022) ("*Electronic Stud Finders*").

In consideration of the parties' arguments, the undersigned finds that Masimo's investments in the development of Masimo Watch prototypes can be aggregated for the economic prong analysis. The record shows continuous development of such prototypes at Masimo—unlike the different products at issue in *Electronic Stud Finders*, the evidence indicates that the Masimo Watch prototypes are merely "iterations" of a product design that was continuously developed in the years leading up to the filing of the complaint. *See* Tr. (Muhsin) at 342:25-343:7, 345:2-7; Tr. (Scruggs) at 393:12-20, 402:2-12; Tr. (Al-Ali) at 275:13-276:11. The Circle sensor was built in October 2019, the Wings sensor in January 2020, the RevA sensor in November 2020, the RevD sensor in April 2021, and the RevE sensors between May and September 2021. *See* Tr. (Scruggs) at 394:12-18, 395:7-15, 396:2-13, 397:7-24, 398:1-23. Within such a development timeline, there is no reasonable way to delineate between work on separate prototypes—research and development activities within the Masimo Watch project between January 2020 and November 2020 are likely to involve both improvements to the Wings sensor and development of new features for the RevA sensor. Masimo's CFO, Micah Young, explained that Masimo's financial records did not track expenditures at this level of detail. *See* Tr. (Young) at 48:22-25.

CONFIDENTIAL INFORMATION REDACTED

With respect to the '745 patent, aggregation of the domestic industry expenditures is clearly appropriate because each of the identified prototypes has been found to practice claim 18 of the '745 patent.[117]  Complainants have not asserted that the Circle sensor or the Wings sensor practice claims of the Poeze patents, but the record shows that the development of these prototypes led to the development of the RevA, RevD, and RevE prototypes that Complainants have asserted as domestic industry products for the Poeze patents. *See* Tr. (Scruggs) at 394:12-398:23.  Accordingly, the undersigned finds that Masimo's pre-complaint investments in all of the identified prototype Masimo Watch products can also be considered as part of the domestic industry for the Poeze patents and the '745 patent.  The evidence shows that Masimo's investment in the development of these prototypes occurred in the most relevant timeframe for determining whether the domestic industry requirement has been satisfied—*i.e*.., the time period leading up to the date the complaint was filed in July 2021.

## 2.    Masimo's Pre-2018 Investments

Complainants have identified over ███████ in investments in research and development related to "wrist-worn parameter monitoring" dating back to 2001 and continuing up to 2018.  CIB at 305; CRB at 179-80.  Complainants submit that these research and development activities were "foundational" to the development of the Masimo Watch.  CRB at 179-80.  Apple argues that these investments pre-date any of the identified Masimo Watch prototypes and cannot be reasonably attributed to the asserted domestic industry articles.  RIB at 249-50, 267-68; RRB at 155, 164.

---

[117] Although the record is not clear as to whether the Circle sensor and Wings sensor were connected to the identified Rad-97 monitor before the filing of the complaint for satisfaction of the technical prong, there is evidence that these sensors were used with some external monitors to measure blood oxygen, *see* Tr. (Scruggs) at 403:11-404:2, and investments in these prototypes are thus "with respect to articles protected by" the '745 patent.

In consideration of the parties' arguments, Masimo's pre-2018 expenditures will be excluded from the domestic industry analysis. There is no specific evidence in the record describing Masimo's "wrist-worn" research and development activities, and Complainants have provided no clear explanation of the relationship between these activities and the identified Masimo Watch prototypes. *See* Tr. (Kiani) at 115:1-122:21.[118] The Commission has held that merely identifying expenditures with respect to general product lines is not sufficient to account for expenditures "with respect to" domestic industry articles. *See Certain Digital Media Devices, Including Televisions, Blu-Ray Disc Players, Home Theater Systems, Tablets and Mobile Phones, Components Thereof and Associated Software*, Inv. No. 337-TA-882, Final Initial Determination at 449-51, EDIS Doc. ID 539707 (July 7, 2014) (finding that investments that "are linked to broad product categories rather than to specific products" do not "form an adequate basis for a determination that a domestic industry exists"), *not reviewed in relevant part by* Comm'n Notice, EDIS Doc. ID 541887 (Sept. 11, 2014). Accordingly, Masimo's pre-2018 expenditures will not be considered as part of the domestic industry analysis.

### C.    Domestic Industry Existing at the Time of the Complaint

As discussed above in the context of the technical prong of the domestic industry requirement for the Poeze patents and the '745 patent, *supra* Section IV.F.7, Section V.F.2, Complainants have shown that Masimo Watch prototypes practicing claim 12 of the '501 patent, claim 28 of the '502 patent, claims 12, 24, and 30 of the '648 patent, and claim 18 of the '745 patent existed at the time of the filing of the complaint. Complainants rely on investments with

---

[118] There is evidence that there were separate concurrent projects in this timeframe related to wrist-based pulse oximetry at Masimo and Cercacor. *See* Tr. (Kiani) at 119:4-8 (describing a "friendly rivalry" with Cercacor in 2018). It is unclear whether some of these projects were related to product designs that are distinct from the asserted "Masimo Watch" prototypes.

CONFIDENTIAL INFORMATION REDACTED

respect to the development of "Masimo Watch" prototypes to show that a domestic industry existed at the time of the complaint. CIB at 288-309. Complainants rely on Masimo financial information that was presented in appendices to the complaint that were extracted from Masimo's records. Tr. (Young) at 485:10-488:17; CDX-0006C.002 (citing CX-0629C; CX-0635C; CX-0624C; CX-0623C; CX-0646C; CX-0632C; CX-0628C; CX-0638C); CDX-0006C.003 (citing CX-0641C; CX-0645C; CX-0644C; CX-0640C; CX-0648C; CX-0649C; CX-0642C). Complainants have separately identified investments with respect to plant and equipment and labor and capital. *See* CIB at 301-09.

### 1.    Plant and Equipment Expenditures

Mr. Kiani described research and development on wrist-based pulse oximetry at Masimo and Cercacor in Irvine, California. Tr. (Kiani) at 119:9-12. Mr. Young, Masimo's CFO and Executive Vice President, presented certain facility expenditures between the third quarter of 2019 and the first quarter of 2021 at Masimo's Irvine headquarters and a nearby manufacturing facility. Tr. (Young) at 481:17-20, 488:18-490:16; CDX-0006C.004. Complainants do not rely on the amounts reported by Mr. Young, however, instead identifying adjusted (and lower) amounts for plant and equipment investment that were calculated by its expert, Mr. McGavock. CIB at 301-02; *see* Tr. (McGavock) at 539:16-23; CDX-0015C.006. For the 2018-2021 timeframe, Masimo identifies ██████ in plant and equipment expenditures for Masimo Watch research and development at Masimo's headquarters (52 Discovery), and ██████ in plant and equipment expenditures for manufacturing at the Laguna Canyon Road facility. CIB at 301-02

Mr. McGavock testified that he "followed basically the same methodology as Mr. Young did." Tr. (McGavock) at 538:4-15. Mr. Young explained that he allocated the operating expenses at Masimo headquarters using the portion of square footage of the facility that was

CONFIDENTIAL INFORMATION REDACTED

dedicated to R&D and then the percentage of employee time that was spent on the Masimo

Watch.  Tr. (Young) at 489:22-16.  With respect to the Laguna Canyon Road facility, Mr. Young

allocated operating expenses based on an estimate that "about ███ percent of the square footage

of that facility is dedicated to the Masimo Watch project."  *Id*. at 489:10-16.  Mr. Young

explained that Masimo's operating expenses include "maintenance and utilities, property taxes,

and other facility-related costs."  *Id*. at 489:17-21.

Apple contends that Mr. McGavock's analysis was unreliable, arguing that it was based

on Masimo financial data that has not been verified and estimates from Masimo employees

without sufficient explanation.  RIB at 245-48; RRB at 152-54.  With respect to the allocation of

Masimo's facility operating expenses, Apple argues that there is no documentary evidence to

support the square footage allocations, such as floor plans.  RRB at 157.  Apple further identifies

evidence that the portion of the Laguna Canyon Road facility designated for Masimo Watch

manufacturing is shared by other projects.  RIB at 251 (citing CX-0629C).  A Masimo witness

admitted that the allocation percentage was based on projections, without confirming that the

space was used for the Masimo Watch.  RX-1202C (Kaufman Dep. Tr.) at 71:12-19.  With

respect to allocations of employee time, Apple argues that there is no documentary evidence in

the record, such as time sheets or calendar entries, to support these estimates, and the Masimo

witness testimony is insufficient to explain the basis for the allocations.  CRB at 152-54.

In consideration of the parties' arguments, the undersigned finds that Complainants have

provided a sufficiently reliable allocation of 2018-2021 facility operating expenses for research

and development at Masimo's headquarters for the Masimo Watch.  The time allocations relied

upon by Mr. McGavock appear to be reasonable, and the Commission has relied on similar

allocations of square footage and employee time based on witness testimony.  *See Certain Solid*

**CONFIDENTIAL INFORMATION REDACTED**

*State Storage Drives, Stacked Electronics Components, and Products Containing Same*, Inv. No. 337-TA-1097, Comm'n Op. at 17-20, EDIS Doc. ID 649139 (June 29, 2018) (relying on a manager's estimates for allocations of square footage and employee time); *see also Certain Electrical Connectors and Cages, Components, And Products Containing the Same Thereof*, Inv. No. 337-TA-1241, Final ID at 362-66, EDIS Doc. ID 767918 (Mar. 11, 2022) (finding "good faith" estimates of employee time to be reliable), *not reviewed in relevant part by* Comm'n Notice, EDIS Doc. ID 779717 (Sept. 8, 2022). Mr. Young explained that the time allocations were prepared with Masimo's "executive team members as well as leaders of different functions and departments across the organization." Tr. (Young) at 486:16-18; *see* Tr. (Scruggs) at 436:8-12 (estimated of square footage); Tr. (Al-Ali) at 322:6-14 (estimated headcounts and percentages of time for Masimo Watch engineers); Tr. (Muhsin) at 359:12-360:5 (estimated time for executives). The allocation of manufacturing expenses at the Laguna Canyon Road facility does not appear to be reliable, however, because it is based on a projection without confirmation that any of the Masimo Watch prototypes were manufactured there. *See* RX-1202C (Kaufman Dep. Tr.) at 71:12-72:15 (explaining that the ██ percent allocation was based on a projection of the square footage that would be used for Masimo Watch manufacturing). Complainants cite testimony from the hearing that Masimo Watch prototypes were manufactured at Masimo's California facilities, *see* CRB at 175, but there is no evidence specifically placing any manufacturing at the Laguna Canyon Road facility. These manufacturing-related expenditures cannot be considered part of the alleged domestic industry without evidence that operations in the Laguna Canyon Road facility were "with respect to" the domestic industry articles.

CONFIDENTIAL INFORMATION REDACTED

Accordingly, the qualifying plant and equipment expenditures for the Masimo Watch are limited to the ███ in operating expenses at Masimo's headquarters for Masimo Watch research and development from 2018-2021.[119]

### 2. Labor and Capital Expenditures

Complainants further rely on Masimo's employment of labor and capital with respect to the Masimo Watch. CIB at 303-05. Using a timeframe from the third quarter of 2019 to the first quarter of 2021, Mr. Young identified several categories of Masimo's labor and capital expenditures with respect to the Masimo Watch. Tr. (Young) at 488:18-496:19; CDX-0006.004. Using the projections and allocation methods described above, Mr. Young calculated ███ in operating expenditures for the Laguna Canyon Road manufacturing facility for the Masimo Watch at. Tr. (Young) at 489:2-21; CDX-0006C.005. Relying on estimates of square footage and employee time, Mr. Young calculated ███ in operating expenditures for research and development at Masimo's headquarters. Tr. (Young) at 489:22-490:15; CDX-0006C.004-.008; CX-0635C. Mr. Young calculated ███ in capital items expenditures related to the Masimo Watch, based on purchases of "new machinery that we used in production of the watch, as well as existing machinery that was repurchased." Tr. (Young) at 490:19-492:10; CDX-0006C.009-.010; CX-0635C; CX-0611C; CX-0835C. He also identified ███ spent on equipment supplies for the Masimo Watch. Tr. (Young) at 492:11-15; CDX-0006C.011. Mr. Young calculated ███ in labor expenditures for research and development related to the Masimo Watch, explaining that this amount was determined by using estimated time

---

[119] As discussed above, the most relevant timeframe for domestic industry expenditures is the period when the Masimo Watch prototypes were built between 2019 and 2021. Expenditures extending to 2018 may be less relevant, but the inclusion of this additional year in Masimo's plant and equipment investments does not affect the domestic industry analysis because, as discussed *infra*, Complainants have not identified any context for assessing the significance of these investments.

CONFIDENTIAL INFORMATION REDACTED

allocations for Masimo employees. Tr. (Young) at 492:20-493:7; CDX-0006C.012-.013; CX-0635C. He also identified ▆▆▆▆ in labor expenditures for ▆▆ executives who worked on Masimo Watch. Tr. (Young) at 493:8-494:17; CDX-0006C.014-.015; CX-0624C. Mr. Young further identified ▆▆▆▆ for clinical labor, ▆▆▆▆ for regulatory and quality assurance, and ▆▆▆▆ for recruiting labor for the Masimo Watch project. Tr. (Young) at 494:21-495:7; CDX-0006C.016-.018. Mr. Young calculated ▆▆▆▆ in expenditures for external watch design, which were paid by Masimo to third parties ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Tr. (Young) at 495:8-496:19; CX-0617C; CX-0620C.

Complainants also identify an estimated ▆▆▆▆ in investments in research and development for wrist-worn technology dating back to 2001, which was calculated by taking Masimo's total R&D investments in the United States and allocating the time of Masimo employees that was related to wrist-worn technology. CIB at 305; Tr. (Young) at 497:1-20.

Apple argues that Mr. Young's estimates are unreliable, contending that the amounts are based on Masimo financial data that has not been verified and estimates from Masimo employees without sufficient explanation. RIB at 245-48. Apple argues that there is no documentary evidence in the record, such as time sheets or calendar entries, to support Complainants' estimates of employee time, and that Masimo's witness testimony is insufficient to explain the basis for these allocations. CRB at 152-54. Apple further argues that Complainants improperly rely on expenditures related to early development of products that are not asserted to practice any claim of the Poeze patents or the '745 patent. RIB at 249-50; RRB at 155. With respect to the alleged manufacturing expenditures, Apple argues that the square footage allocation is unreliable and there is no evidence that prototypes were manufactured at that facility. RIB at 250-51; RRB at 156. With respect to Masimo's R&D expenditures, Apple argues that there is insufficient

CONFIDENTIAL INFORMATION REDACTED

evidence in the record describing the activities of Masimo employees or the use of Masimo facilities.  RIB at 252-53, 271; RRB at 157.  Apple argues that the alleged watch equipment supplies are not cognizable expenditures because there is no evidence in the record identifying the purchased supplies.  RIB at 267.  Apple contends that no consistent methodology was used to estimate the amount of executive labor, and it is not clear whether this includes non-cognizable expenditures, such as administrative overhead.  *Id*. at 269-70.  Apple further argues that there is insufficient evidence to substantiate Masimo's third-party payments for watch design or regulatory expenses.  *Id*. at 271-72.  Apple also argues that the estimate for recruiting labor expense is unreliable.  *Id*. at 272.

In consideration of the parties' arguments, the undersigned finds that a majority of Complainants' asserted labor and capital expenditures have been reliably quantified for consideration as part of the alleged domestic industry in this investigation.  As discussed above in the context of the plant and equipment expenditures, the time allocations for Masimo's employees are supported by the testimony of Masimo witnesses, which is similar to evidence that has been relied upon in other investigations.  *See* Tr. (Young) at 492:20-493:7 ("We worked with our leaders of engineering, and they put together a listing of all the employees working on the watch.  I think there's over ▇ employees on the spreadsheet.  They also provided the time allocation by month . . . And then we applied that to the compensation by each of those employees to come up with the allocation of R&D dollars.").  Complainants have identified the names and salaries of each employee involved in the Masimo Watch project with monthly estimates of their time from 2019 to 2021.  CX-0635C.  Complainants provide a similar

accounting for executive labor. CX-0624C.[120] Complainants further identify expenditures for recruiting engineers to work on the Masimo Watch. Tr. (Young) at 494:21-495:7; CDX-0006C.016-.018. Apple argues that Complainants have provided insufficient detail regarding the staffing of particular Masimo Watch projects or the specific activities of Masimo executives and employees, RIB at 269-71, but Mr. Young explained that such detailed information is not tracked in Masimo's financial records. Tr. (Young) at 484:22-25. As discussed above, Masimo engineers explained that the asserted Masimo Watch prototypes were "iterations" of a product design that was continuously developed in the years leading up to the filing of the complaint. *See* Tr. (Muhsin) at 342:25-343:7, 345:2-7; Tr. (Scruggs) at 393:12-20, 394:12-18, 395:7-15, 396:2-13, 397:7-24, 398:1-23, 402:2-12. Mr. Young further explained that with respect to the time allocations, he and other Masimo executives "were trying to also be conservative." Tr. (Young) at 493:14-494:6. With respect to Masimo's recruiting expenditures, the relevant human resources staff are identified in a spreadsheet, CX-0632C, and the allocations of time are supported by estimates made by Masimo employees. *See* RX-1202C (Kaufman Dep. Tr.) at 18:17-188:12. The Commission has held that with respect to domestic industry, "[a] precise accounting is not necessary, as most people do not document their daily affairs in contemplation of possible litigation." *Stringed Musical Instruments,* Inv. No. 337-TA-586, Comm'n Op., 2009 WL 5134139, at *17 (December 2009); *see also Certain Electronic Devices*, Inv. No. 337-TA-701, Order No. 58 at 5, EDIS Doc. ID 439031 (Nov. 18, 2010) ("[T]he Administrative Law

---

[120] Apple argues that the executive labor should be excluded because it may include "administrative overhead," RIB at 269-70, but the Commission's exclusion of "administrative overhead" concerns those activities "associated with importation of the domestic industry products." *Certain Bone Cements*, Inv. No. 337-TA-1153, Comm'n Op. at 22, EDIS Doc. ID 731649 (Jan. 25, 2021). Apple has not persuasively argued that administrative expenditures should be excluded for executives who are managing employees working on research and development in the United States.

CONFIDENTIAL INFORMATION REDACTED

Judge declines as a matter of law to give credence to Apple's pro forma objections that Nokia has failed to give a precise accounting or failed to provide underlying documentation for sworn witness testimony."), *not reviewed by* Comm'n Notice, EDIS Doc. ID 440675 (Dec. 20, 2010). The allocations for employee and executive labor expenditures are thus reasonable, and these expenditures account for a majority of the asserted labor and capital, with ███████ for employees engaged in Masimo Watch research and development, ███████ for executives involved with the Masimo Watch project, and ██████ in expenditures for recruiting. *See* CDX-0006C.012-.015, .016-.018.

With respect to the expenditures paid to outside firms for the design of the Masimo Watch, Apple argues that some of these may be foreign expenditures. RIB at 271-72. *See Certain Products Having Laminated Packaging, Laminated Packaging, and Components Thereof*, Inv. No. 337-TA-874, Comm'n Op. at 17, EDIS Doc. ID 517360 (Sept. 3, 2013) (finding that payments to vendors cannot be counted as part of the domestic industry where complainant "did not show that the . . . vendors manufacture the laminated packages in the United States"). Complainants submit that Masimo contracted with U.S.-based entities for these services, CRB at 176, but it is unclear whether the work will be conducted in the United States. The presentation from ██████ identifies a U.S. address, but with additional addresses in Germany and China. CX-0620C at 23. The contract with ██████ identifies a U.S. address, but the evidence is insufficient to show activities taking place in the United States before the time of the complaint. *See* CX-0617C (identifying ████████████ CX-0618C (describing design milestones extending to the end of 2021).[121] Based on this record, the

---

[121] Apple contends that ████████████████. RIB at 271.

undersigned agrees with Apple that these expenditures should not be counted as part of the alleged domestic industry. In any case, these expenditures are relatively small in comparison to Masimo's R&D expenditures, *see* CIB at 304-05, and whether these additional expenditures are counted as part of the domestic industry has no impact on the determination with respect to significance, *infra*, which is based on the number of Masimo employees engaged in R&D for the Masimo Watch in the United States.

Certain of Complainants' other claimed expenditures are also insufficiently supported by evidence in the record, and whether these additional expenditures are counted as part of the domestic industry has no impact on the determination with respect to significance, *infra*, which is based on Masimo's research and development activities. As discussed above in the context of plant and equipment, the operating expenses related to manufacturing are not supported by a reliable allocation or any evidence that the domestic industry articles were manufactured at the Laguna Canyon Road facility. In addition, Complainants have not identified evidence in the record cataloguing the capital items or the supplies that correspond to the asserted expenditures—Mr. Young's testimony only identifies one piece of machinery with a "picture of the piece of equipment being used in the production of the watch," Tr. (Young) at 491:14-23 (citing CX-0611C), but even for this piece of equipment, Complainants do not explain what it does or how it is related to any Masimo Watch prototypes. The claimed labor expenses related to clinical studies and regulatory and quality assurance appear to relate to the work of a small number of Masimo employees, but Complainants do not identify the employees or explain what they do. *See* CX-0623C; CX-0646C.

CONFIDENTIAL INFORMATION REDACTED

### 3. Significance of Investments

As discussed above, Complainants have identified approximately ▮▮▮ in qualifying plant and equipment expenditures based on operating expenses at Masimo's headquarters, and approximately ▮▮▮ in qualifying labor expenditures for employees, executives, and recruiting—each of these amounts relates to research and development of Masimo Watch prototype products.[122]

Complainants argue that Masimo's domestic investments are significant because 100% of the research and development activities for the Masimo Watch occur in the United States. CIB at 307; *see* Tr. (Kiani) at 321:23-322:5. Mr. McGavock testified that it was his understanding that the Masimo Watch was Masimo's ▮▮▮ Tr. (McGavock) at 543:1-544:14. Mr. Kiani described the Masimo Watch as ▮▮▮ ▮▮▮ Tr. (Kiani) at 126:19-23.

With respect to the labor expenditures, Complainants submit that the headcount of ▮▮▮ employees (▮ full-time equivalent) in the first quarter of 2021 is significant. CIB at 307; *see* Tr. (Young) at 504:9-13; CX-0648C. Complainants submit that ▮ percent of Masimo's R&D engineers were working on the Masimo Watch at that time. CIB at 308; *see* Tr. (McGavock) at 544:21-545:25; CDX-0015C.012.[123] For the Masimo engineers working on the Masimo Watch,

---

[122] Approximately ▮▮▮ in operating expenses is also asserted as a capital expenditure, representing the same expenditures recognized as investments in plant and equipment. Regardless of whether this amount is added to the labor expenditures under subparagraph (B), it would not affect the significance analysis below.

[123] There is a discrepancy between Mr. McGavock's testimony and his demonstrative regarding the "▮ percent" figure. He said: "The portion of the Masimo's R&D engineering time dedicated to the watch was ▮ percent at the first quarter of 2021." Tr. (McGavock) at 545:12-14. His demonstrative reads: "Portion of Masimo R&D engineers dedicated to the Watch: ▮ at Q1 2021." CDX-0015C.012. Apple does not appear to dispute that the ▮ refers to a percentage of Masimo R&D engineer headcount, as described in the demonstrative. *See* RIB at 274.

CONFIDENTIAL INFORMATION REDACTED

███ of their time was spent on the Masimo Watch. CIB at 308; *see* Tr. (McGavock) at 544:21-545:25; CDX-0015C.012. Mr. Al-Ali identified a specific team of engineers that █████ ████████████████████████ for the Masimo Watch. Tr. (Al-Ali) at 323:18-342:21; *see also* Tr. (Muhsin) at 34:14-345:1. Mr. McGavock identified ███████████, and Complainants argue that their work was significant. CIB at 308; Tr. (McGavock) at 544:21-545:25; CDX-0015C.012. Complainants argue that Masimo's investments are significant in absolute terms. CIB at 308-09.

Apple argues that Complainants have failed to demonstrate the significance of the claimed expenditures. RIB at 253-56, 272-74. With respect to plant and equipment, Apple argues that the facility operating expenditures related to research and development for the Masimo Watch only represent about ███ of Masimo's total facility operating expenditures. RIB at 255. Apple submits that Masimo's R&D investments with respect to the Masimo Watch represent only ███ of Masimo's overall R&D investments. RIB at 273; Tr. (Thomas) at 1305:2-9. Apple argues that there is no significance to Complainants' claim that the Masimo Watch represents Masimo's ███████████████████████ because Masimo has historically focused on clinical products. RIB at 254-55 (citing Tr. (Kiani) at 140:8-11). Apple argues that Complainants' reliance on allocation percentages to represent significance is unsupported and unreliable. RIB at 274; *see* Tr. (Thomas) at 1306:7-13 ("[U]sing percentages to arrive at a number and then circularly using those percentages to represent significance, I think, is misleading and inappropriate."). Apple argues that the employment of █████████ ██████ does not demonstrate significance, and there is no evidence for what those engineers are doing after completion of the ████████. RIB at 274; Tr. (Thomas) at 1306:14-18.

CONFIDENTIAL INFORMATION REDACTED

In consideration of the parties' arguments, the undersigned finds that Complainants have shown significant employment of labor with respect to Masimo's investments in research and development for the Masimo Watch. The ██████████ in labor expenditures is quantitatively significant in the context of Masimo's broader research and development efforts, because it involves ██ employees (██ full-time equivalent) representing over ██ percent of Masimo's research and development engineers. *See* Tr. (Young) at 504:9-13; Tr. (McGavock) at 545:12-14; CDX-0015C.012. Apple questions the reliability of Masimo's allocations of employee time, RIB at 274, but as discussed above, the allocations are supported by reliable witness testimony. *See* Tr. (Young) at 492:20-493:7. Apple argues that the investments in the Masimo Watch are a small fraction of Masimo's overall research and development budget, RIB at 273, but the fact that Masimo invests in other products does not diminish the significance of Masimo's investments in the Masimo Watch, because "[s]ignificance is based on the marketplace conditions regarding the articles protected by the Asserted Patents," and activities regarding "other products is not pertinent to this analysis." *Certain Carburetors and Products Containing Such Carburetors*, Inv. No. 337-TA-1123, Comm'n Op. at 28, EDIS Doc. ID 692517 (Oct. 28, 2019). The significance of Masimo's investments in the Masimo Watch is corroborated by qualitative evidence that this was Masimo's ████████████████████████████████ ███████████████████████████████████████████████████████████ *See* Tr. (Kiani) at 12:19-2; Tr. (McGavock) at 543:1-544:14. In addition, Masimo's investments are significant because all of the research and development for the Masimo Watch has occurred in the United States. CIB at 307; *see* Tr. (Kiani) at 321:23-322:5; *see Gas Spring Nailer Prods. and Components Thereof*, Inv. No. 337-TA-1082, Comm'n Op. at 83, EDIS Doc. ID 709073 (Apr. 28, 2020) (finding quantitative significance where "all, *i.e.*, 100 percent, of Kyocera's R&D and

CONFIDENTIAL INFORMATION REDACTED

engineering expenditures relating to complainant's [DI products] occurs in the United States."),
*vacated and remanded on other grounds*, 22 F.4th 1369 (Fed. Cir. 2022); *Certain Shingled Solar
Modules, Components Thereof, and Methods for Manufacturing the Same*, Inv. No. 337-TA-
1223, Initial Determination at 60, EDIS Doc. ID 756910 (Oct. 22, 2021) (finding quantitative
significance where 100% of research and development activities were based in the United
States), *not reviewed in relevant party by* Comm'n Notice, EDIS Doc. ID 762554 (Feb. 4, 2022).

Complainants also submit that Masimo's investments in research and development for
the Masimo Watch are qualitatively significant, because it represents ███████████
█████████████████████████████████████████████████████
███████  CIB at 307; Tr. (Kiani) at 121:11-123:16, 126:19-23; Tr. (McGavock) at 543:16-
544:14. Complainants also point to the "custom designing and building tools and equipment" for
the Masimo Watch. CIB at 307; Tr. (Scruggs) at 433:13-15; Tr. (McGavock) at 543:1-544:14.
In particular, Complainants cite the design of a ███████████  CIB at 307-08; Tr. (Al-Ali_ at
323:18-324:25; Tr. (Muhsin) at 344:14-345:1. These qualitative factors demonstrate the
importance of the Masimo Watch development to Masimo, and this supports the finding of
quantitative significance.

Complainants have not, however, persuasively shown that Masimo's investments and
plant and equipment are quantitatively significant. The floor space in Masimo's headquarters
that is attributable to work on the Masimo Watch only represents about ████ of the facility. *See*
RIB at 255; Tr. (Young) at 489:22-490:13 (allocating ████ percent of the floor space to R&D and
between ███████ percent of R&D to the Masimo Watch); CX-0635C. In their briefing,
Complainants have not placed their plant and equipment expenditures in any appropriate context
that shows significance. *See Certain Earpiece Devices and Components Thereof*, Inv. No. 337-

CONFIDENTIAL INFORMATION REDACTED

TA-1121, Comm'n Op. at 19, EDIS Doc. ID 693820 (Nov. 8, 2019) (remanding a summary

determination on the economic prong because complainant did "not provide context of the

company's operations, the marketplace, or the industry in question necessary to understand

whether the relative value of its domestic activities and investments is significant or

substantial.").[124]

\* \* \*

Accordingly, Complainants have met the economic prong of the domestic industry

requirement based on the existence of a domestic industry at the time of the complaint with

respect to significant investments in labor and capital for the research and development of the

Masimo Watch.  Complainants have thus satisfied the domestic industry requirement with

respect to the Poeze patents and the '745 patent.

### D.     Domestic Industry in the Process of Being Established

Complainants further argue that there is a domestic industry in the process of being

established based on Masimo's projected expenditures for the Masimo Watch.  CIB at 305-09.[125]

Mr. Young explained that at the time of the complaint, Masimo's financial department worked

with engineering leaders and other Masimo employees to create a forecast of expected

expenditures from the second quarter of 2021 to 2023.  Tr. (Young) at 500:23-503:3; CDX-

---

[124] Complainants' other arguments for significance fail for the same reasons.  It is unclear why the fact that engineers working on the Masimo Watch spend ▮ of their time on the Masimo Watch should be evidence for significance.  *See* CIB at 308; RIB at 274.  There is evidence that the design of a ▮ ▮ was qualitatively important to Masimo, but Complainants fail to explain why the work of these engineers is quantitatively significant.  *See* CIB at 308; RIB at 274.

[125] Masimo also relies on post-complaint evidence for the number of employees it has hired, a 2022 corporate acquisition, and a statement in Masimo's 2021 Earnings Presentation, CIB at 307-09, but this evidence will not be considered in the context of the economic prong, as discussed *supra*.  Whether Complainants have shown a domestic industry in the process of being established will be determined based on the projections made by Masimo before the filing of the complaint.

**CONFIDENTIAL INFORMATION REDACTED**

000C.030-.031. Masimo projected an increase in headcount from ▮ to ▮ for research and development on the Masimo Watch during this timeframe. Tr. (Young) at 502:7-18; CDX-000C.032. Masimo also projected production costs for the Masimo Watch, estimating that there would be between ▮▮▮▮ and ▮▮▮▮ in US-based production costs in 2022 and between ▮▮▮▮ and ▮▮▮▮ in US-based production costs in 2023. Tr. (Young) at 502:19-503:3; CDX-000C.033. Mr. McGavock relied on these projections to estimate that ▮▮▮ of the cost of goods for the Masimo Watch would be incurred in the United States. Tr. (McGavock) at 545:8-9; CDX-0015C.012. Complainants further argue that Masimo's growing number of Masimo Watch personnel and the expansion of the Laguna Canyon Road manufacturing facility shows that a domestic industry is in the process of being established. CRB at 176-77; *see* Tr. (McGavock) at 542:14-20, 563:8-13, 574:25-575:2.

Apple argues that Complainants have produced no definitive timeline for the completion of the Masimo Watch, citing the absence of business plans or other documentation in the evidentiary record. RIB at 258-60, 275; RRB at 158-59, 172. Apple further argues that Masimo's projected expenditures are unsupported and unreliable. RIB at 258-60; RRB at 151, 156, 169-70.[126] Apple argues that Complainants' projections for the share of domestic expenditures in the manufacturing of future Masimo Watch products is unreliable and notes that the ▮▮▮▮▮▮ for later versions of the Masimo Watch. CIB at 273 (citing CX-0629C). Apple suggests that Masimo Watch manufacturing would likely be ▮▮▮▮

---

[126] Apple argues that Masimo's projections for Masimo Watch manufacturing was ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮, RIB at 258-60, RRB at 169-70, but this post-complaint evidence will not be considered in the context of the economic prong analysis.

**CONFIDENTIAL INFORMATION REDACTED**

███████████████. *Id.* at 273-74; *see* RX-1211C (Young Dep. Tr.) at 84:14-17; Tr. (McGavock) at 570:7-10.

In consideration of the parties' arguments, the undersigned finds that Complainants have satisfied the economic prong of the domestic industry requirement with respect to a domestic industry in the process of being established for the Masimo Watch. The Commission has held that a domestic industry is in the process of being established when (1) a complainant takes "the necessary tangible steps to establish such an industry in the United States," and (2) there is a "significant likelihood that the industry requirement will be satisfied in the future." *Certain Stringed Musical Instruments & Components Thereof*, Inv. No. 337-TA-586, Comm'n Op. at 16-17, EDIS Doc. ID 300615 (May 16, 2008). For the reasons discussed below, the evidentiary record shows that Masimo has met both requirements based on evidence of activities and investments before the filing of the complaint and projections that were made at the time of the filing of the complaint.

Masimo's design and production of Masimo Watch prototypes represent tangible steps toward the establishment of a domestic industry with respect to the Masimo Watch. As explained by Mr. Scruggs, these prototypes were designed and built from 2019 through 2021, incorporating features asserted in the claims of the Poeze patents and the '745 patent. *See* Tr. (Scruggs) at 394:12-18, 395:7-15, 396:2-13, 397:7-24, 398:1-23. Mr. Kiani explained that these prototypes were part of the ongoing project to design and manufacture the Masimo Watch. Tr. (Kiani) at 121:7-122:8, 123:17-124:4; CX-0364C; CX-0783C. As discussed above in the context of Masimo's pre-complaint investments in labor, the research and development of the Masimo Watch prototypes involved up to ██ Masimo employees (working the equivalent of ██ full-time employees). *See* Tr. (Young) at 504:9-13. There is further evidence that at the time of the filing

CONFIDENTIAL INFORMATION REDACTED

of the complaint, Masimo planned to hire additional engineers to work on the Masimo Watch

project, *see* Tr. (Young) at 502:7-18, CDX-000C.032, and in preparation for this expanding

workforce, Masimo had taken the tangible step of hiring additional recruiting staff. *See* Tr.

(Young) at 495:3-7; RX-1202C (Kaufman Dep. Tr.) at 18:17-188:12; CX-0632C. Masimo has

also contracted with external design firms for work on future Masimo Watch products. *See* Tr.

(Young) at 495:16-496:19; CX-0617C; CX-0618C; CX-0620C.[127] The record thus shows that

Masimo was taking tangible steps towards the design and manufacture of the Masimo Watch at

the time of the complaint.

As discussed above, Masimo invested ███████ in labor expenditures in the years

leading up to the complaint for research and development with respect to Masimo Watch

prototypes, and this amount is both quantitatively and qualitatively significant in the context of

Masimo's research and development activities. The record further shows that Masimo projected

increased hiring for the Masimo Watch, and this further employment of labor would be

significant for the same reasons as Masimo's past employment of labor. *See* Tr. (Young) at

494:21-495:7; CDX-0006C.016-.018. Accordingly, there is a significant likelihood that the

economic prong of the domestic industry requirement will be satisfied in the future with respect

to the Masimo Watch based on Masimo's past and future investments in labor for research and

development.

In addition, Masimo's projected expenditures for manufacturing of the Masimo Watch

are further evidence for a significant likelihood that the domestic industry requirement will be

satisfied in the future. Masimo has projected that about ██ percent of its Laguna Canyon Road

---

[127] Even if this work is not conducted in the United States, *see* RIB at 271-72, the engagement of these
design firms is evidence of Masimo's plans for the Masimo Watch.

CONFIDENTIAL INFORMATION REDACTED

facility will be used for manufacturing the Masimo Watch. Tr. (Young) at 49:10-16; RX-1202C

(Kaufman Dep. Tr.) at 71:12-72:15. Masimo has also projected that ███ of the manufacturing

costs for the ███ Masimo Watch in 2021 would be domestic. Tr. (McGavock) at 545:8-9;

CDX-000C.033; CX-0629C. The domestic share of manufacturing costs was projected to ███

to ███ for a ███ Masimo Watch in 2022 and to ███ for a ███ Masimo Watch in 2023. *See*

RIB at 273; CX-0629C. Apple has identified reasons to be skeptical of the high projection for

the ███ Masimo Watch, *see* RIB at 273-74, Tr. (Thomas) at 1305:10-19, but even the ███

figure would likely support a finding that the domestic industry requirement has been satisfied.

*Cf. Certain Self-Anchoring Beverage Containers*, Inv. No. 337-TA-1092, Comm'n Op. at 13,

EDIS Doc. ID 683010 (Jul. 4, 2019) (finding domestic investments representing 9 percent of the

sales revenue for the domestic industry product to be significant). Moreover, even if Masimo's

domestic contribution to manufacturing the Masimo Watch dropped in the future, the domestic

industry requirement could still be satisfied based on Masimo's significant investments in

research and development, as long as Masimo was continuing to make appropriate qualifying

domestic investments. *See Certain Television Sets, Television Receivers, Television Tuners, and*

*Components Thereof*, Inv. No. 337-TA-910, Comm'n Op. at 68, 2015 WL 6755093, at *36 (Oct.

30, 2015) ("Past expenditures may be considered to support a domestic industry claim so long as

those investments pertain to the complainant's industry with respect to the articles protected by

the asserted IP rights and the complainant is continuing to make qualifying investments at the

time the complaint is filed."); *Hyosung TNS Inc. v. Int'l Trade Comm'n*, 926 F.3d 1353, 1362

(Fed. Cir. 2019) (affirming Commission's "conclusion that a past investment may, by virtue of

its connection to ongoing field service and assembly expenses, support a finding that the

economic prong of the domestic industry requirement is met."). Although the level of

investment can be disputed, the record unequivocally shows that Masimo expected to continue investing in the Masimo Watch in the United States with expenditures in research and development and manufacturing. *See* Tr. (Kiani) at 123:17-124:22 (describing 2020 presentation for Masimo Watch, CX-0783C); Tr. (Young) at 500:23-503:3 (describing projections for 2021-2023 spending).

\* \* \*

Accordingly, Complainants have identified investments and projections for investments at the time of the complaint showing, by a preponderance of the evidence, a domestic industry in the process of being established with respect to the Masimo Watch. As discussed above, Complainants have also shown that Masimo Watch products meeting the limitations of certain claims of the Poeze patents and the '745 patent were in the process of being developed at the time of the complaint. Complainants have thus satisfied the economic prong of the domestic industry requirement for the Poeze patents and the '745 patent based on an industry in the process of being established.

## VIII.   DOMESTIC INDUSTRY – ECONOMIC PRONG ('127 PATENT)

For the '127 patent, Complainants rely on investments with respect to research and development and manufacturing of Masimo's rainbow® sensors to satisfy the economic prong of the domestic industry requirement. *Id*. at 302-03, 309-10.

### A.   Domestic Industry Existing at the Time of the Complaint

As discussed above in the context of the technical prong, the domestic industry products include "early" rainbow® sensors sold before 2009, which have been shown to practice claim 9 of the '127 patent, and "current" rainbow® sensors sold after 2009, which have not been shown

to practice claim 9 of the '127 patent.[128,129] Complainants have not allocated their domestic industry expenditures between early and current rainbow® sensors, however, and this precludes any reliable domestic industry analysis. *See Certain Subsea Telecomm. Sys. and Components Thereof*, Inv. No. 337-TA-1098, Comm'n Op. at 41, EDIS Doc. ID 691678 (Oct. 21, 2019) ("The Commission has found that complainants have not satisfied the domestic industry requirement where the complainant failed to allocate expenses to account for non-domestic industry products that do not practice the patent.").

Even if Complainants had allocated their domestic industry expenditures between the early and current rainbow® sensors, Complainants cannot satisfy the domestic industry requirement based only on investments in the early rainbow® sensors, because the record indicates that these products were discontinued in favor of the current rainbow® sensors in 2009, more than a decade before the complaint in this investigation was filed. *See* CRB at 10; Tr. (Diab) at 233:16-20. In such circumstances, the Commission has required a showing of "ongoing qualifying activities under section 337(a)(3) at the time the complaint is filed." *See Certain Television Sets, Television Receivers, Television Tuners, and Components Thereof*, Inv. No. 337-TA-910, Comm'n Op. at 68, 2015 WL 6755093, at *37 (Oct. 30, 2015); *see also*

---

[128] The parties dispute whether Complainants have sufficiently identified which products comprise the asserted Masimo rainbow® sensors. CIB at 36; RIB at 261; RRB at 160. As discussed above in the context of the technical prong, the undersigned finds that Complainants have sufficiently identified the asserted rainbow® sensors on a sales spreadsheet. CX-0649C.

[129] Apple argues that there are at least two models of rainbow® sensors that have not been asserted to practice the '127 patent, RRB at 160, but Complainants have acknowledged that the rainbow® sensors relevant to this investigation exclude these two models. *See* CIB at 36 n.4 (citing Tr. (Diab) at 210:13-19 ("All of rainbow sensors use wavelength correction except for a couple of them. One is an acoustic sensor, and the other one, it's called Light Set 1, but the rest of them all use temperature correction.")). There is no indication that those two models are listed in the financial spreadsheet exhibit that lists the asserted rainbow® sensors. *See* CX-0649C.

*Certain Marine Sonar Imaging Devices, Including Downscan & Sidescan Devices, Prod.
Containing the Same, & Components Thereof,* Inv. No. 337-TA-921, Comm'n Op. at 55-57,
EDIS Doc. ID 571940 (Jan. 6, 2016) ("The Commission, thus, has found, in various
investigations, a domestic industry based on a complainant's past activities relating to a
discontinued product where the complainant has shown continuing qualifying investments.").
There is no evidence in the record showing that Masimo has continued to invest in the early
rainbow® sensors after their discontinuation. Complainants have not identified any continuing
investments in warranty, customer service, or maintenance of early rainbow® sensors—the
asserted domestic industry expenditures are related to research and development and
manufacturing—these activities appear to have been directed to the current rainbow® sensors
since 2009. CIB at 302-03, 309-10.

Accordingly, based on the present record, Complainants have failed to show that a
domestic industry existed at the time of the complaint with respect to the early rainbow® sensors
that have been shown to practice claim 9 of the '127 patent.

### B.    Domestic Industry in the Process of Being Established

Complainants also assert that there is a domestic industry in the process of being
established for the rainbow® sensors, relying on projections of expenditures after the time the
complaint was filed. CIB at 288, 299. These projected expenditures relate to research and
development and manufacturing, CIB at 302-03, 309-10, and as discussed above, such
expenditures appear to relate only to the current rainbow® sensors after 2009. Complainants
have not attempted to explain how a domestic industry could be in the process of being
established with respect to discontinued products. On this record, Complainants have failed to

CONFIDENTIAL INFORMATION REDACTED

show that a domestic industry was in the process of being established with respect to the early rainbow® sensors.

### C.    Asserted Domestic Industry Expenditures

As discussed above, Complainants have improperly aggregated their domestic industry expenditures for the early rainbow® sensors and the current rainbow® sensors, and there is insufficient evidence in the record to satisfy the economic prong of the domestic industry requirement with respect to the early rainbow® sensors alone.  In the event the current rainbow® sensors were found to practice the '127 patent as well, however, the undersigned addresses certain of Complainants' domestic industry expenditures below to determine whether the asserted domestic industry expenditures are significant pursuant to subparagraphs (A) and (B) of section 337(a)(3).  19 U.S.C. § 1337(a)(3).

### 1.    Plant and Equipment

Complainants identify Cercacor, which is headquartered in Irvine, California, as the developer of Masimo's rainbow® technology.[130]  CIB at 299 (citing Tr. (Kiani) at 94:8-17, 119:9-12).  Complainants further submit that Masimo manufactures the LEDs for the rainbow® sensors in a facility in Hudson, New Hampshire.  CIB at 299; CX-0636C.  Using allocations of square footage and employee time, Mr. McGavock calculated that Masimo invested ▮▮▮▮▮▮▮ in facility operating expenses at Masimo's headquarters for research and development of the rainbow® sensors between 2018 and the first quarter of 2021.  Tr. (McGavock) at 547:6-13; CDX-0015C.014; *see* CIB at 302-03.  He estimated ▮▮▮▮▮▮ in allocated research and development expenditures before 2018 at that facility and added an additional ▮▮▮▮▮ in

---

[130] Cercacor (formerly known as Masimo Laboratories) is a spinoff from Masimo that collaborates with Masimo on R&D for nonvital parameter monitoring.  *See* Tr. (Kiani) at 93:12-94:7; *see also* CX-1612C.

**CONFIDENTIAL INFORMATION REDACTED**

allocated research and development expenditures at an older Masimo facility. *Id.* He calculated

███████ in operating expenditures for manufacturing rainbow® sensors at Masimo's Laguna

Canyon Road facility between 2018 and the first quarter of 2021, and an additional ██████ in

expenditures before 2018. *Id.* He further calculated ███████ in operating expenditures for

manufacturing LEDs for rainbow® sensors at Masimo's New Hampshire facility between 2018

and the first quarter of 2021, and an additional ██████ in expenditures before 2018. *Id.* As a

measure of significance, Complainants submit that "███ of Masimo's facility investments for

rainbow® are in the U.S." CIB at 310; Tr. (McGavock) at 549:8-14; CDX-0015C.017.

Apple contends that Mr. McGavock's analysis was unreliable, arguing that it was based

on Masimo financial data that has not been verified with allocations that have not been

explained. RIB at 262-64; RRB at 160-62. Apple argues that Complainants have failed to offer

any documents or testimony explaining how employee time was estimated for rainbow® sensor

R&D. RIB at 263; RRB at 161. With respect to manufacturing expenses, Apple argues that

there is no explanation for how Complainants calculated the "standard cost" for the rainbow®

sensor products. RIB at 263-64; RRB at 162. Apple argues that Complainants have failed to

offer any evidence that explains how the LED manufacturing in New Hampshire relates to the

rainbow® sensors and questions the accuracy of certain calculations of expenditures. RIB at

264; RRB at 162. Apple further argues that Mr. McGavock's claim that Masimo's facility

expenses are ████ domestic is not explained in the record, and it is contradicted by evidence

that Masimo has significant manufacturing facilities in Mexico. RIB at 264-65; RRB at 163.

In consideration of the parties' arguments, the undersigned finds that Complainants'

asserted expenditures are sufficiently reliable for the domestic industry analysis. With respect to

these expenditures, Mr. McGavock explained that he "used the same methodology applied by

CONFIDENTIAL INFORMATION REDACTED

Mr. Young." Tr. (McGavock) at 546:12-18. Mr. Young explained that for R&D expenditures on the rainbow® sensors, he relied on time allocations "received from our engineering leadership and teams," explaining that these allocations were "ranges anywhere from ███ percent over time because that was a focus project for us." Tr. (Young) at 500:8-22. For manufacturing costs, Mr. Young explained that he relied on "the U.S. standard costs," which was pulled "from our financial data warehouse." *Id.* at 498:2-10. Mr. Young confirmed that the semiconductor LEDs for the rainbow® sensors are manufactured in Hudson, New Hampshire. *Id.* at 505:12-16, 507:7-15. He further confirmed that Masimo's engineering leads estimated that ██ percent of the Laguna Canyon Road facility and ██ percent of the Hudson facility was used to manufacture rainbow® sensors. *Id.* at 508:1-22. Although Masimo's estimates may not be precise, the record shows that Mr. McGavock and Mr. Young relied upon reasonable allocations of Masimo's expenditures to attribute the investments in plant and equipment to the rainbow® sensors.

There does not appear to be reliable support in the record, however, for Complainants' assertion that ███ of Masimo's facility investments for rainbow® are domestic. *See* CIB at 310; Tr. (McGavock) at 549:8-14; CDX-0015C.017; RIB at 264-65; RRB at 163. Mr. McGavock's testimony with respect to this figure is conclusory, with no explanation for how the percentage was calculated. *See* Tr. (McGavock) at 549:8-14; CDX-0015C.017. Complainants cite two spreadsheets in their brief, *see* CIB at 310 (citing CX-0633C; CX-0636C), but it is not clear from these spreadsheets how the ███ figure was derived. This is Complainants' only basis for significance that relies on investments in plant and equipment, and because this figure is unreliable, Complainants have failed to show significant investment in plant and equipment under subparagraph (A) of section 337(a)(3).

CONFIDENTIAL INFORMATION REDACTED

### 2.    Labor or Capital

With respect to employment of labor or capital, Complainants rely on investments by Cercacor in research and development for the rainbow® sensors. CIB at 309.[131]  Complainants claim that "Cercacor has employed the ███████████████████ to work on rainbow®."  CIB at 299 (citing CDX-0015C.015 (summarizing CX-0633C)).  As such, Complainants assert that Cercacor's expenditures in the employment of R&D labor or capital for the rainbow® sensors amounts to ████████ pre-2018 and ████████ from 2018-Q1 2021. *Id.* at 309 (citing CX-0633C at "R&D Spend History" tab; CX-0644C).  In addition, Complainants state that "Cercacor has performed the ████████ of its R&D on rainbow®, accounting for ████ in R&D through July of 2021." *Id.* at 310 (citing Tr. (Hammarth) at 524:25-525:5).

Apple argues that Complainants offer no corroborating documentation for these R&D expenses or explain how their calculation provides a reliable basis for allocations necessary for the economic prong requirement.  RIB at 276.  In addition, Apple contends that Complainants fail to show that the R&D projects identified in Cercacor's R&D expenditures are exclusively related to the rainbow® sensors, rather than to non-domestic industry products and projects. *Id.* For example, Apple asserts that Complainants' expenditures include Ember, a commercialized product sold by Cercacor that is not a domestic industry product. *Id.* (citing Tr. (Hammarth) at 532:5-13).  Similarly, Apple claims that Mr. Hammarth also identified ████████ as a ███████████████████████████████████████████████████████

---

[131] Complainants also set forth other labor or capital expenditures for the rainbow® sensors. *See* CIB at 309-10.  However, because the other expenditures appear to be less reliable and are not as closely tied to Complainants' asserted bases for significance, only Cercacor's employment of R&D labor or capital is addressed herein.

**CONFIDENTIAL INFORMATION REDACTED**

 as an ███████████████████

████ ; and █████ as related, in part, to Ember. *Id.* (citing RX-1201C at 81:21-83:5; Tr.

(Hammarth) at 527:12-528:22). Apple argues that Complainants allocate costs associated with

each of these products and projects to the rainbow® sensors without any allocation for the non-

domestic industry Ember product or any explanation for including R&D on █████████

████████ in the absence of any showing that any of the rainbow® sensors use that technology.

*Id.* at 276-77.

Contrary to Apple's assertions, the undersigned finds that a preponderance of the

evidence demonstrates that these R&D expenditures are reliable. According to Mr. Kiani, the

chairman and CEO of Masimo and Cercacor, Cercacor developed the rainbow® technology. Tr.

(Kiani) at 94:8-17. Apple does not dispute this. Mr. Jeroen Hammarth, the CFO of Cercacor,

testified that for the purposes of this investigation, Cercacor exported records from its ERP

system and used Excel records from various tax analysis that it had performed over the years in

the normal course of business. Tr. (Hammarth) at 523:22-524:2. He also testified that he

prepared a financial spreadsheet showing Cercacor's R&D spend.[132] *Id.* at 524:3-13; *see also*

CX-0633C.[133] Mr. Hammarth testified that Cercacor's total R&D on the rainbow sensors though

Q1 of 2021 was over ██████ . Tr. (Hammarth) at 525:3-5. This is consistent with the data in

---

[132] The undersigned finds that such evidence is reasonable under the circumstances of this investigation. As the Commission has stated, "there is no need to define or quantify the industry itself in absolute mathematical terms." *Certain Stringed Musical Instruments and Components Thereof*, Inv. No. 337-TA-586, Comm'n Op. at 26 (May 16, 2008) ("A precise accounting is not necessary, as most people do not document their daily affairs in contemplation of possible litigation.")

[133] Apple refers to exhibit CX-0633C and states that it "concerns Cercacor R&D Labor, with no apparent relevance." RRB at 163. Sworn testimony demonstrates that Cercacor developed the rainbow® technology, making Cercacor's investment in R&D labor related to rainbow®, *i.e.*, the subject of CX-0633C, relevant. *See* Tr. (Kiani) at 94:8-17, 119:9-12; Tr. (Hammarth) at 524:3-13.

**CONFIDENTIAL INFORMATION REDACTED**

the financial spreadsheet prepared by Mr. Hammarth, as well as the financial spreadsheet prepared to support Mr. Young's declaration to the complaint.[134] *See* CX-0633C; CX-0644C at Tab "Rainbow Chart" (showing that Cercacor's rainbow® R&D spend from 2007-2020 is about ███████); Tr. (Young) at 488:2-17. And according to Mr. Hammarth all of that R&D "was done in the U.S." Tr. (Hammarth) at 525:6-8.

Moreover, the undersigned disagrees with Apple that certain R&D projects need to be excluded from Cercacor's R&D expenditures. The undersigned finds that a preponderance of the evidence shows that Cercacor specifically allocated certain of its projects to the rainbow® sensors. *See, e.g.*, CX-0633 at Tab "Summary Calc" (showing subtotals for rainbow vs. non-rainbow). For example, Apple claims that the ███████████ project is outside the scope of the rainbow® sensors. However, Mr. Hammarth testified that the █████████████████ ████████ and the rainbow® sensor measures a collection of nonvital signs, including ████ ████.[135] *See* Tr. (Hammarth) at 528:1-6; *see also id.* at 528:23-529:2. Similarly, Mr. Hammarth testified that Ember is a Cercacor product that "incorporates our technologies for hemoglobin measurement, carbon monoxide measurement, and some others."[136] Tr. (Hammarth) at 532:5-13; *see also* RX-1201C at 25:10-17 ("Ember is a small device that measures a number of blood constituents noninvasively."). The evidence, including documents

---

[134] As with the Masimo Watch, Complainants prepared several financial spreadsheets detailing their domestic expenditures for the rainbow® sensors. *See* CIB at 299-300. While Apple argues that these spreadsheets are unreliable as to the rainbow® sensors, Apple's arguments are unpersuasive for the same reasons as discussed above with respect to the Masimo Watch. *See* Part VII.C. *supra*.

[135] The ████████████████████████████████████ *See* RX-1201C (Hammarth Dep.) at 82:2-4.

[136] ████ is the internal project name for the Ember product. *See* RX-1201C (Hammarth Dep.) at 82:8-10.

CONFIDENTIAL INFORMATION REDACTED

and sworn testimony, therefore shows that Cercacor accurately allocated certain R&D projects as related to the rainbow® sensors.

The evidence demonstrates that Cercacor's R&D investments in the rainbow® sensors are quantitatively and qualitatively significant.

Cercacor's largest project has been the rainbow® technology. For example, from 2005-2020, Cercacor spent a total net R&D expense of about ██████████, with about ██████████ of that dedicated to rainbow® technology. Tr. (Hammarth) at 524:16-525:5; CDX-0008C.002 (summarizing CX-0633C); CX-0633C. Moreover, as previously discussed, ████ of the investment in rainbow® technology was incurred in the U.S. Tr. (Hammarth) at 525:6-8; *see Gas Spring Nailer Prods. and Components Thereof*, Inv. No. 337-TA-1082, Comm'n Op. at 83, EDIS Doc. ID 709073 (Apr. 28, 2020) (finding quantitative significance where "all, *i.e.*, 100 percent, of Kyocera's R&D and engineering expenditures relating to complainant's [DI products] occurs in the United States."), *vacated and remanded on other grounds*, 22 F.4th 1369 (Fed. Cir. 2022); *Certain Shingled Solar Modules, Components Thereof, and Methods for Manufacturing the Same*, Inv. No. 337-TA-1223, Initial Determination at 60, EDIS Doc. ID 756910 (Oct. 22, 2021) (finding quantitative significance where 100% of research and development activities were based in the United States), *not reviewed in relevant party by* Comm'n Notice, EDIS Doc. ID 762554 (Feb. 4, 2022). Other than criticizing Complainants' other quantitative comparisons, or arguing that Complainants' expenditures are overstated and unreliable, Apple does not specifically rebut Complainants' contention that Cercacor's R&D investments are quantitatively

CONFIDENTIAL INFORMATION REDACTED

significant.[137]  *See, e.g.* RIB at 278; RRB at 174-75.  The evidence therefore demonstrates that Cercacor's domestic investments in R&D labor for rainbow® are quantitatively significant.

Cercacor's domestic R&D investments for the rainbow® sensors are also qualitatively significant.  Cercacor's R&D effort related to the rainbow technology has been a large part of its business, and again, was incurred entirely in the U.S.  *See, e.g., Certain Percussive Massage Devices*, Inv. No. 337-TA-1206, Comm'n Op. at 10-15, EDIS Doc. ID 759545 (Jan. 4, 2022) (affirming finding that complainant satisfied the economic prong of the domestic industry requirement and finding qualitative significance, in part, because complainant's domestic industry products "would not exist without [its] domestic operations and spending" because it "designed and developed the DI Products in the United States").  In addition, not only has it been Cercacor's largest project in terms of R&D spend, as explained above, but over the years, Cercacor has employed the ▮▮▮ of its employees to work on rainbow®.  *See* CDX-0015C.015 (summarizing CX-0633C) (showing that Cercacor has dedicated between ▮▮ and ▮▮ of its employees to rainbow®); CX-0633C.  In addition to Cercacor's domestic R&D labor investments, Masimo has also made domestic investments in R&D labor for rainbow®.  *See* Tr. (Young) at 499:15-500:7; CX-0644C.  Lastly, it is worth noting that Masimo also manufactures important components of the rainbow® sensors, semiconductor LEDs and optical packages of emitters and detectors, at its Hudson, New Hampshire facility in the U.S., distinguishing Complainants from a mere importer.  *See* Tr. (Young) at 507:7-15; *see also* CX-0636C; CX-0638C; *see Certain Toner Supply Containers and Components Thereof (II)*, Inv. No. 337-TA-1260, Comm'n Op. at 11-12, EDIS Doc. ID 777011 (Aug. 3, 2022) (finding qualitative

---

[137] Apple's arguments disputing quantitative significance focus on Complainant's cost of goods (COGS) analysis.  *See* RIB at 278.  The undersigned, however, is not relying on that analysis in finding quantitative significance.

CONFIDENTIAL INFORMATION REDACTED

significance where a domestic industry is based on "core manufacturing activities," affirming an initial determination finding that "[s]uch activities have long been recognized as a domestic industry within the meaning of section 337.").

In opposition, Apple argues that "Complainants ignore that rainbow® product revenues generally comprise only ███ of Masimo's total product revenues in 2020." *See* RIB at 278. Apple, however, fails to explain why this would be a more appropriate comparison under these circumstances. *See, e.g.*, *Certain Carburetors and Prods. Containing Such Carburetors*, Inv. No. 337-TA-1123, Comm'n Op. at 28 (Oct. 28, 2019) ("Significance is based on the marketplace conditions regarding the articles protected by the Asserted Patents. The fact that a complainant may have substantial sales of other products is not pertinent to this analysis.").

Accordingly, the undersigned finds that Complainants have demonstrated significant employment of labor or capital with respect to the rainbow® sensors. As discussed above, however, Complainants have not satisfied the domestic industry requirement with respect to the '127 patent because the current rainbow® sensors have not been shown to practice any claim of the '127 patent.

## IX. CONCLUSIONS OF LAW

Based on the foregoing, and the record as a whole, it is the undersigned's final initial determination that there has been a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, and/or the sale within the United States after importation of certain wearable electronic devices with light-based pulse oximetry functionality and components thereof by reason of infringement of claims 24 and 30 of the '648 patent. There has been no violation of the statute with respect to the asserted claims of the '501 patent, the '502 patent, the '745 patent, or the '127 patent.

This determination is based on the following conclusions of law:

1. The Commission has subject matter jurisdiction over this investigation.

2. The Accused Products have been imported into the United States, sold for importation, and/or sold within the United States after importation.

3. The Commission has *in rem* jurisdiction over the Accused Products.

4. The Accused Products infringe claim 12 of the '501 patent, claims 22 and 28 of the '502 patent, and claims 12, 24, and 30 of the '648 patent.

5. The technical prong of the domestic industry requirement has been satisfied for claim 12 of the '501 patent, claim 28 of the '502 patent, and claims 12, 24, and 30 of the '648 patent.

6. Claim 12 of the '501 patent, claim 28 of the '502 patent, and claim 12 of the '648 patent are invalid.

7. The '501 patent, '502 patent, and '648 patent have not been shown to be unenforceable.

8. The economic prong of the domestic industry requirement has been satisfied with respect to the '501 patent, the '502 patent, and the '648 patent.

9. The Accused Products have not been shown to infringe claims 9 or 27 of the '745 patent.

10. The technical prong of the domestic industry requirement has been satisfied for claim 18 of the '745 patent.

11. Claims 9, 18, and 27 of the '745 patent have not been shown to be invalid.

12. The '745 patent has not been shown to be unenforceable.

13. The economic prong of the domestic industry requirement has been satisfied with respect to the '745 patent.

14. The Accused Products have not been shown to infringe claim 9 of the '127 patent.

15. The technical prong of the domestic industry requirement has been satisfied for claim 9 of the '127 patent.

16. Claim 9 of the '127 patent has not been shown to be invalid.

17. The economic prong of the domestic industry requirement has not been satisfied with respect to the '127 patent.

The undersigned hereby certifies the record in this investigation to the Commission with the undersigned's final initial determination. Pursuant to Commission Rule 210.38, the record further comprises the complaint and exhibits thereto, and the exhibits attached to the parties' summary determination motions and the responses thereto. 19 C.F.R. § 210.38(a).

Pursuant to Commission Rule 210.42(h)(2), this initial determination shall become the determination of the Commission 60 days after the service thereof, unless a party files a petition for review pursuant to Commission Rule 210.43(a), the Commission orders its own review pursuant to Commission Rule 210.44. 19 C.F.R. § 210.42(h)(2).

This initial determination is being issued with a confidential designation pursuant to Commission Rule 210.5 and the protective order in this investigation. Within 10 days of the date of this document, the parties shall submit a joint statement as to whether or not they seek to have any portion of this document deleted from the public version. If the parties do seek to have portions of this document deleted from the public version, they must submit a single proposed public version of this final initial determination with any proposed redactions consistent with the manner specified by Ground Rule 1.9.[138] The submission shall be made by email to Bhattacharyya337@usitc.gov and need not be filed with the Commission Secretary.

**SO ORDERED.**

Monica Bhattacharyya
Administrative Law Judge

[138] Redactions should be limited to avoid obscuring the reasoning underlying the decision. Parties who submit excessive redactions may be required to provide an additional written statement, supported by declarations from individuals with personal knowledge, explaining why each proposed redaction meets the definition for confidential business information in 19 C.F.R. § 201.6(a).

# EXHIBIT 6

**CONFIDENTIAL INFORMATION REDACTED**

# UNITED STATES INTERNATIONAL TRADE COMMISSION
# WASHINGTON, D.C.

| | |
|---|---|
| **In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof** | Investigation No. 337-TA-_____ |

## FIRST AMENDED COMPLAINT UNDER SECTION 337 OF
## THE TARIFF ACT OF 1930, AS AMENDED

<u>Complainants:</u>

Masimo Corporation
52 Discovery
Irvine, CA 92618
Telephone: 949-297-7000

Cercacor Laboratories, Inc.
15750 Alton Pkwy
Irvine, CA 92618
Telephone: 800-610-8522

<u>Respondent:</u>

Apple Inc.
One Apple Park Way
Cupertino, CA 95014
Telephone:  408-996-1010

<u>Counsel for Complainants:</u>

Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA  92614
Telephone:  (949) 760-0404

Jonathan E. Bachand
KNOBBE MARTENS OLSON & BEAR, LLP
1717 Pennsylvania Ave NW, Suite 900
Washington DC, 20006
Telephone: (202) 640-6400

45.     Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '501 Patent. **Exhibit 12**.  No other foreign patents or patent applications corresponding to the '501 Patent are known to Masimo Corporation.

### 3.    <u>Non-Technical Description of the '501 Patent</u>

46.     The '501 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate.  The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors.  The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  This data is then processed by a processing device which outputs a measurement of the physiological parameter.  The '501 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements.  The '501 Patent also includes limitations to novel arrangements of light sources and photodetectors.  The '501 Patent also contains limitations to processors, network devices, and user interfaces, allowing the device to be easily used by consumers.

47.     In sum, the invention of the '501 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters.  

48.     The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '501 Patent.

CONFIDENTIAL INFORMATION REDACTED

████████████████████████████████████████████████

includes limitations to novel arrangements of light sources and photodetectors.  The '502 Patent

also contains limitations to processors, network devices, and user interfaces, allowing the device

to be easily used by consumers.

54.     In sum, the invention of the '502 Patent provides a novel combination of features

allowing for the measurement of a user's physiological parameters.  ███████████████████████

████████████████████████████████████████████████.

55.     The foregoing non-technical description of the patented technology is not intended

to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical

description in any way intended to construe or define any word, phrase, term, or limitation recited

in any claim of the '502 Patent.

### C.     U.S. Patent No. 10,945,648

#### 1.     Identification of the Patent and Ownership by Masimo Corporation

56.     Masimo Corporation owns by assignment the entire right, title, and interest in the

'648 Patent, entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter

of a User," which issued on March 16, 2021.  (*See* **Exhibit 3**).  The '648 Patent issued from U.S.

Patent Application Serial No. 17/031,316, filed on September 24, 2020.  The '648 Patent is a

continuation of is a continuation of U.S. Patent Application No. 16/834,538, filed March 30, 2020,

which is a continuation of U.S. Patent Application No. 16/725,292, filed December 23, 2019,

which is a continuation of U.S. Patent Application No. 16/534,949, filed August 7, 2019, which is

a continuation of U.S. Patent Application No. 16/409,515, filed May 10, 2019, which is a

continuation of U.S. Patent Application No. 16/261,326, filed January 29, 2019, which is a

continuation of U.S. Patent Application No. 16/212,537, filed December 6, 2018, which is a

continuation of U.S. Patent Application No. 14/981,290 filed December 28, 2015, which is a

**CONFIDENTIAL INFORMATION REDACTED**

███████████████████████████████████████████

### 3.    <u>Non-Technical Description of the '648 Patent</u>

60.    Like the '501 and '502 Patents, the '648 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate. The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors. The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection. This data is then processed by a processing device which outputs a measurement of the physiological parameter. The '648 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements. The '648 Patent also includes limitations to novel arrangements of light sources and photodetectors. The '648 Patent also contains limitations to processors, network devices, and user interfaces, allowing the device to be easily used by consumers.

61.    In sum, the invention of the '648 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters. ████████████████

██████████████████████████████████████████.

62.    The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '648 Patent.

### D.    <u>U.S. Patent No. 10,687,745</u>

#### 1.    <u>Identification of the Patent and Ownership by Masimo Corporation</u>

63.    Masimo Corporation owns by assignment the entire right, title, and interest in the '745 Patent, entitled "Physiological Monitoring Devices, Systems, and Methods," which issued on

*See* **Exhibit 12**. No other foreign patents or patent applications corresponding to the '745 Patent are known to Masimo Corporation.

### 3.     Non-Technical Description of the '745 Patent

67.     The '745 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate. The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors. The devices also include optical transmission materials configured to change the shape of the emitted light or diffusers to spread the light. The devices also contain light blocks to inhibit light from the optical sources from reaching the detectors before being attenuated by the user's skin. The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection. This data is then processed by a processing device which outputs a measurement of the physiological parameter. The '745 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements. The '745 Patent also includes limitations to novel arrangements of light sources and photodetectors.

68.     In sum, the invention of the '745 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters.

69.     The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '745 Patent.

### E.     U.S. Patent No. 7,761,127

### 1.     Identification of the Patent and Ownership by Cercacor

**CONFIDENTIAL INFORMATION REDACTED**

████████████████████████████████████████████

84.    Masimo has not licensed or otherwise authorized Respondent to make, use, sell, offer to sell, or import the Accused Products.

85.    Respondent has sought to capitalize on Masimo's extensive research and development efforts.

## VII.    THE DOMESTIC INDUSTRY RELATED TO ASSERTED PATENTS

86.    A domestic industry exists or is in the process of being established as defined by 19 U.S.C. §§ 1337(a)(2)–(3) relating to Masimo's significant investment in plant and equipment; significant employment of labor or capital; research and development activities; and substantial investment in exploitation of the patents, including engineering with respect to Masimo's physiological measurement devices and monitors.  With respect to the '501 Patent, the '502 Patent, the '648 Patent, and the '745 Patent, Masimo's activities in the United States with respect to ██ ██████████████████████████████████████████████—constitute a domestic industry for purposes of Section 337.  To the extent it is determined that a domestic industry ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ is protected by one or more claims of each of the '501 Patent, the '502 Patent, the '648 Patent, and the '745 Patent.

87.    With respect to the '127 Patent, Masimo's activities in the United States with respect to at least its rainbow® sensor technology constitute a domestic industry for purposes of Section 337.  Masimo's rainbow® sensors—including the, RD rainbow® Set-2, rainbow® R1, rainbow® R25, rainbow® R20, rainbow® DCI SC 200, rainbow® DCI SC 400, rainbow® DCI SC 1000, rainbow® DCI mini SC-200, rainbow® DCI mini SC-400, rainbow® DCI mini SC-1000,

rainbow® Super DCI mini SC-200, rainbow® Super DCI mini SC-400, rainbow® Super DCI mini-SC-1000, rainbow® DCI, rainbow® DCI-dc, RD rainbow® 8 λ SpCO Adhesive Sensor, LNCS-II™ rainbow® DCI 8λ SpHb, LNCS-II™ rainbow® DCIP® 8λ SpHb, LNCS-II™ rainbow® DCI® 8λ SpCO, and LNCS-II™ rainbow® DCIP® 8λ SpCO—are protected by at least one claim of the '127 Patent.

### A.     <u>Technical Prong</u>

88.     Masimo has designed and developed its domestic industry products through its extensive research and development efforts based almost entirely in the United States.  Moreover, Masimo ███████████████████████████████ in the United States and manufactures a material amount of the components of its rainbow® sensors in the United States. As set forth in more detail herein, Masimo's domestic industry products incorporate the inventions claimed in one or more claims of the Asserted Patents.

89.     Drawings, photographs, or other visual representations of representative Masimo domestic industry products (specifically, █████████ and certain rainbow® sensors) are attached hereto as **Confidential Exhibit 20 and Confidential Exhibit 21**.  Claim charts showing how a representative Masimo domestic industry product practices exemplary claims of the '501 Patent, the '502 Patent, the '648 Patent, the '745 Patent, and the '127 Patent are attached hereto as **Confidential Exhibits 15, 16, 17, 18 and 19**, respectively.  Additional information regarding the domestic industry products is found in the Declaration of Bilal Muhsin, attached hereto as **Confidential Exhibit 27**.

### B.     <u>Economic Prong</u>

90.     The domestic industry in this case is based on significant investments Masimo has made and/or plans to make and activities Masimo has undertaken and/or plans to undertake in the

e)  issue a permanent cease and desist order, pursuant to 19 U.S.C. § 1337(f), directing Respondent to cease and desist from importing, marketing, advertising, demonstrating, warehousing of inventory for distribution, sale, or use of certain light-based physiological measurement devices and components thereof that infringe one or more claims of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and/or 7,761,127;

f)  impose a bond upon Respondent should Respondent continue to import infringing articles during the 60-day Presidential Review period pursuant to 19 U.S.C. § 1337(j); and

g)  grant such other and further relief as the Commission deems appropriate and just under the law, based on the facts complained of herein and determined by the investigation.

Respectfully submitted,

Dated:  July 7, 2021

By: /s/ *Jonathan E. Bachand*
Jonathan E. Bachand
KNOBBE, MARTENS, OLSON & BEAR, LLP
1717 Pennsylvania Ave NW STE 900
Washington, DC 20006
Telephone: 202-640-6400
Facsimile: 949-760-9502

Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA  92614
Telephone:  (949) 760-0404
Facsimile:  (949) 760-9502

**CONFIDENTIAL INFORMATION REDACTED**

███████████████████████████████████████████████

## <u>VERIFICATION OF FIRST AMENDED COMPLAINT</u>

I, Jonathan E. Bachand, declare, in accordance with 19 C.F.R. §§ 210.4 and 210.12(a), under penalty of perjury, that the following statements are true:

1.      I am Counsel for Complainants Masimo Corporation and Cercacor Laboratories, Inc. and I am duly authorized to sign the First Amended Complaint on behalf of Complainants;

2.      I have read the foregoing First Amended Complaint;

3.      To the best of my knowledge, information, and belief, based upon reasonable inquiry, the foregoing First Amended Complaint is well-founded in fact and is warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law, or the establishment of new law;

4.      The allegations and other factual contentions have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

5.      The foregoing First Amended Complaint is not being filed for an improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation.

Executed this 7th day of July, 2021.


/s/ *Jonathan E. Bachand*
Jonathan E. Bachand
Counsel for Complainants
Masimo Corporation and Cercacor
Laboratories, Inc.


35273626

# EXHIBIT 7

CONFIDENTIAL INFORMATION REDACTED

CONFIDENTIAL INFORMATION REDACTED

CONFIDENTIAL INFORMATION REDACTED

# EXHIBIT 8

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

---

```
-------------------------------x
```

In the Matter of                    Investigation No.

CERTAIN LIGHT-BASED PHYSIOLOGICAL    337-TA-1276

MEASUREMENT DEVICES AND COMPONENTS

THEREOF

```
-------------------------------x
```

**OPEN/CLOSED SESSIONS**

Pages:    283 through 596

Place:    Washington, D.C.

Date:     June 7, 2022

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
contracts@hrccourtreporters.com

1                    O P E N   S E S S I O N

2

3          MS. SWAROOP:  Are we on the public record now?

4          JUDGE BHATTACHARYYA:  Yes, we are.

5          MS. SWAROOP:  Thank you, Your Honor.

6          Mr. Scruggs, do you have a binder with you there

7   in the room?

8          THE WITNESS:  Yes, I have a binder.

9          MS. SWAROOP:  We are ready to proceed.  Before we

10  begin, you're a little soft-spoken, so I would just ask that

11  you try and speak as close to the mic as you can.

12         THE WITNESS:  Sounds good.

13         JUDGE BHATTACHARYYA:  Welcome, Mr. Scruggs.  Do

14  you understand that you are under an obligation to tell the

15  truth here today?

16         THE WITNESS:  Yes, I do.

17                    STEPHEN SCRUGGS,

18         having been first duly sworn and/or affirmed

19  on his oath, was thereafter examined and testified as

20  follows:

21         JUDGE BHATTACHARYYA:  You may proceed, counsel.

22                   DIRECT EXAMINATION

23  BY MS. SWAROOP:

24     Q.  Good morning, Mr. Scruggs.  Could you please

25  state and spell your last name for the record?

1          A.   My name is Stephen Scruggs, and my last name is
2     spelled S-C-R-U-G-G-S.
3          Q.   Where do you work?
4          A.   I work at Masimo Corporation.
5          Q.   How long have you worked there?
6          A.   I've worked there for almost ten years now.  My
7     ten-year anniversary will be in July.
8          Q.   What is your current position at Masimo?
9          A.   I'm the Director of Sensor Design.
10         Q.   How long have you had that position?
11         A.   I have had that position for a little over a year
12    now.
13              MS. SWAROOP:  I am going to go on the Masimo CBI
14    record for essentially all of Mr. Scruggs' testimony, so I
15    would like to designate the record accordingly.
16              JUDGE BHATTACHARYYA:  Moving to the Masimo
17    confidential record.
18              (Whereupon, the hearing proceeded in confidential
19    session.)
20
21
22
23
24
25

CONFIDENTIAL INFORMATION REDACTED



CONFIDENTIAL INFORMATION REDACTED



CONFIDENTIAL INFORMATION REDACTED



CONFIDENTIAL INFORMATION REDACTED



CONFIDENTIAL INFORMATION REDACTED



1                    C E R T I F I C A T E

2    TITLE: CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES

3    AND COMPONENTS THEREOF

4    INVESTIGATION NO.:  337-TA-1276

5    HEARING DATE:  June 7, 2022

6    LOCATION:  Washington, D.C. - Remote

7    NATURE OF HEARING:  Evidentiary Hearing

8         I hereby certify that the foregoing/attached
     transcript is a true, correct and complete record of the
9    above-referenced proceedings of the U.S. International Trade
     Commission.
10   Date:   June 7, 2022
     Signed:
11   ss//   _____

12   Signature of the Contractor or the Authorized Contractor's
     Representative
13

14        I hereby certify that I am not the court reporter
     and that I have proofread the above-referenced transcript of
15   the proceedings of the U.S. International Trade Commission
     against the aforementioned court reporter's notes and
16   recordings for accuracy in transcription in the spelling,
     hyphenation, punctuation and speaker identification and did
17   not make any changes of a substantive nature.  The
     foregoing/attached transcript is a true, correct and
18   complete transcription of the proceedings.
     Signed:

19   ss//   Raymond G. Brynteson

20

21        I hereby certify that I reported the
     above-referenced proceedings of the U.S. International Trade
22   Commission and caused to be prepared from my record media
     and notes of the proceedings a true, correct and complete
23   verbatim recording of the proceedings.
     Signed:

24   ss//   Linda Kinkade

25

# EXHIBIT 9

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

---

```
-------------------------------x
In the Matter of                Investigation No.


CERTAIN LIGHT-BASED PHYSIOLOGICAL   337-TA-1276

MEASUREMENT DEVICES AND COMPONENTS

THEREOF

-------------------------------x
```

**OPEN SESSIONS**

Pages:    1168 through 1450 (with excerpts)

Place:    Washington, D.C.

Date:     June 10, 2022

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
contracts@hrccourtreporters.com

1    THE WITNESS:  Good morning, Your Honor.  Good

2    morning everyone.

3    JUDGE BHATTACHARYYA:  Do you understand that

4    you're under an obligation to tell the truth in your

5    testimony today?

6    THE WITNESS:  Yes.

7                    STEVE WARREN,

8    having been first duly sworn and/or affirmed

9    on his oath, was thereafter examined and testified as

10   follows:

11   JUDGE BHATTACHARYYA:  Thank you.  You may proceed

12   counsel.

13                 DIRECT EXAMINATION

14   BY MS. VREELAND:

15   Q.   Dr. Warren, could you begin by introducing

16   yourself to Her Honor?

17   A.   Yes.  My name is Steve Warren.  I'm a professor

18   at Kansas State University.

19   Q.   You got your K-State purple on today?

20   A.   I do, yes, I have to represent.

21   Q.   How long have you been a professor at K-State?

22   A.   I started in '99, so about 23 years.

23   Q.   And can you briefly describe your educational

24   background?

25   A.   Yes.  I have three degrees in electrical

1    of 2008, what was known about the use of openings with

2    opaque surfaces over photodiodes?

3        A.    Well, I would say in 2008 and many decades prior,

4    openings are a way for light or to allow light to get to a

5    detector.  A detector can't detect light without some sort

6    of opening above it.

7        Q.    And if we were to turn to the next slide, can you

8    provide some examples before 2008 -- July of 2008 -- of

9    devices that combine these concepts that you've been talking

10   about -- multiple LEDs, four or more photodiodes, and

11   openings over those photodiodes?

12       A.    Yes.  None of these tools existed in isolation.

13   A designer would have used a collection of a grouping or

14   permutation of many of them in their work.

15           One I really like a lot is Smart, RX-473, because

16   it incorporates the LEDs, the photodiodes, the opaque

17   material, the interior surfaces, the opaque surfaces, and

18   the openings all in one bundle, 50 years ago.

19       Q.    What are the others that you've identified on

20   this slide?  And just by name and exhibit number.

21       A.    Okay.  Haar, RX-667, and then McCarthy, RX-489,

22   Lumidigm, RX-411, and then finally Imai, RX-1220.

23       Q.    If we can turn to the next slide.

24           In July of 2008, what was known about the use of

25   transmissive coverings or windows over photodiodes?

1    A.    I noted earlier that you need an opening to allow

2    light to reach a detector.  A window is another way to allow

3    that to happen where a window is a physical piece of

4    material, or we call it a transmissive covering, where the

5    covering would allow light through, but it would also

6    physically protect the detector from dust and debris and

7    dirt, liquid, things of that nature.

8    Q.    What are your favorite examples here?

9    A.    I'll pick a few.  I really like Cramer RX-670 in

10    the upper left, because it's more than 40 years old.

11    Nippon, or what I call Jaib, RX-665, next to it.  Seiko,

12    we'll hear about in a moment, RX-666, and then also Haar,

13    RX-667.  And I might point out we also did this with Kansas

14    State, RX-648.

15    Q.    If we could turn to the last slide in this

16    series.

17          In July of 2008, what was known about the use of

18    structures protruding into the tissue in optical sensors?

19    A.    So a person of ordinary skill would have already

20    known that you could take a structure, we'll call it a

21    protrusion or a sensor head, and push that into tissue, and

22    what that would enable is that would push residual blood out

23    of the way and increase your AC-to-DC signal ratio, meaning

24    that you would see the tissue perfusion in a better way.

25          And there were a number of designs that did this.

1    Q.   Does Lumidigm say anything about when you might

2    want to use various of these iterations of LEDs and

3    photodiodes?

4    A.   Well, Lumidigm states that any one of the given

5    sources, for example, can be sets of LEDs, and any one of

6    the given detectors can be a single detector or a plurality

7    or an array of detectors.

8         And, generally, with regard to how they might be

9    used, there's a section in the spec called extended

10   functionality that speaks to many different application

11   areas.

12   Q.   We're going to put on the screen Figs. 8A, 8B,

13   and 8C from the Lumidigm patent.

14        What was Lumidigm illustrating in these figures?

15   A.   These three figures illustrate portable

16   embodiments of this particular sensing approach.  Key fob on

17   the left, Figure 8A, Figure 8B would be a watch embodiment,

18   and Figure 8C would be an embodiment on the surface of a

19   phone.

20   Q.   And what does Lumidigm say about the types of

21   LEDs and photodiodes you can use in any of these

22   embodiments?

23   A.   Lumidigm states, with regard to any of these

24   portable embodiments, that any of the sensor geometries that

25   are presented in the specification can be applied.

1    And what I mean by that specifically is Figs. 1
2  through 7, for example, all show different layouts of sensor
3  heads, but additionally the specification itself describes
4  different geometrical layouts, different signal management
5  techniques, including what it calls a compound curvature
6  that would essentially relate to the shape of the sensor
7  head itself.
8    Q.   We're going to turn to the next slide, then.
9         Were you here for Ms. Swaroop's opening
10 statement?
11   A.   I was, yes.
12   Q.   Did you hear her describe Lumidigm's functions as
13 a wish list?
14   A.   Yes, I did.
15   Q.   Have you studied the functions referenced in the
16 Lumidigm patent that these devices can perform?
17   A.   I have, yes.
18   Q.   And how would you characterize these functions?
19   A.   I would characterize these functions as known
20 applications in reflectance spectroscopy where one might
21 want to employ then a reflectance mode sensor.
22        A fruit ripeness example is a good one.  While
23 that sounds esoteric in this context, this has been used
24 with Japanese fruit markets forever as a means to assess
25 fruit quality.

1    Figures 3 and -- let's see, 5, 7A and 7B -- where Lumidigm

2    states that each of the locations for the LEDs, which,

3    again, are the red dots on these figures, each of those

4    locations can be comprised of LEDs with the same or

5    different wavelengths, but also the light sources themselves

6    can include sets of LEDs --

7         Q.    Why don't we go --

8         A.    -- at each location.

9         Q.    Let's go, then, to the next limitation.

10             How does Lumidigm teach element 19B?

11        A.    So this is the well-known idea of four

12   photodiodes arranged on the user-worn device.  Lumidigm

13   addresses this specifically in Fig. 7A and 7B, where 7A

14   incorporates five photodiodes in a linear arrangement, and

15   Fig. 7B incorporates an 8x8 grid of 64 photodiodes.

16        Q.    Let's turn, then, to element 19C or 19D, excuse

17   me.

18             How does Lumidigm teach this?

19        A.    The notion of an optically transparent material

20   is, again, quite well-known where the material is in each of

21   the openings.  Lumidigm states in column 8 that an optical

22   relay, which is not shown in the diagram, between the sensor

23   and sensor surface and the skin, and helped to transfer

24   light by directionally either from the light source from the

25   skin or from the skin back to the detector.

1       And I've illustrated, for example, a well-known

2   optical relay, which is a lens, in the opening of the

3   photodiode that's depicted in Fig. 2, but Lumidigm also

4   states that you can use fiber-optic faceplates for this

5   purpose, where you could use a single faceplate for multiple

6   openings or you could do an individual -- a person of skill

7   would know that you could do an individual faceplate for

8   each of the individual openings as a means to provide light

9   but still optimize the process.

10      Q.   And what about the example, the fiber bundle,

11  what would a person of skill in the art understand about

12  that?

13      A.   Right.  This is one that I mentioned in my report

14  where you could use a fiber bundle to essentially direct the

15  light from a portion of tissue straight to the detector as a

16  means to optimize the detection process.

17      Q.   And in July 2008, what materials would a person

18  of skill in the art recognize a fiber-optic faceplate or a

19  fiber bundle would be made of?

20      A.   The individual fibers would have a glass core and

21  then either a glass or a plastic cladding and then a

22  protective layer.  A fiber-optic faceplate, by the way, is

23  like a bundle of spaghetti that you hold in your hand and

24  you cut sideways so that you get all the little fibers lined

25  up with one another.

```
 1              C E R T I F I C A T E

 2   TITLE: CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES

 3   AND COMPONENTS THEREOF

 4   INVESTIGATION NO.:  337-TA-1276

 5   HEARING DATE:  June 10, 2022

 6   LOCATION:  Washington, D.C. - Remote

 7   NATURE OF HEARING:  Evidentiary Hearing

 8           I hereby certify that the foregoing/attached
     transcript is a true, correct and complete record of the
 9   above-referenced proceedings of the U.S. International Trade
     Commission.
10   Date:   June 10, 2022
     Signed:
11   ss//   _____

12   Signature of the Contractor or the Authorized Contractor's
     Representative
13

14           I hereby certify that I am not the court reporter
     and that I have proofread the above-referenced transcript of
15   the proceedings of the U.S. International Trade Commission
     against the aforementioned court reporter's notes and
16   recordings for accuracy in transcription in the spelling,
     hyphenation, punctuation and speaker identification and did
17   not make any changes of a substantive nature.  The
     foregoing/attached transcript is a true, correct and
18   complete transcription of the proceedings.
     Signed:

19   ss//   Raymond G. Brynteson

20

21           I hereby certify that I reported the
     above-referenced proceedings of the U.S. International Trade
22   Commission and caused to be prepared from my record media
     and notes of the proceedings a true, correct and complete
23   verbatim recording of the proceedings.
     Signed:

24   ss//   Linda Kinkade

25
```

# EXHIBIT 10

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

In the Matter of

**CERTAIN LIGHT-BASED**
**PHYSIOLOGICAL MEASUREMENT**
**DEVICES AND COMPONENTS**
**THEREOF**

**Investigation No. 337-TA-1276**

### NOTICE OF THE COMMISSION'S FINAL DETERMINATION FINDING A VIOLATION OF SECTION 337; ISSUANCE OF A LIMITED EXCLUSION ORDER AND A CEASE AND DESIST ORDER; TERMINATION OF THE INVESTIGATION

**AGENCY**:    U.S. International Trade Commission.

**ACTION**:    Notice.

**SUMMARY**:  Notice is hereby given that the U.S. International Trade Commission has found a violation of section 337 in the above-captioned investigation.  The Commission has determined to issue:  (1) a limited exclusion order ("LEO") prohibiting the unlicensed entry of infringing wearable electronic devices with light-based pulse oximetry functionality and components thereof covered by certain claims of U.S. Patent Nos. 10,912,502 or 10,945,648 that are manufactured by or on behalf of, or imported by or on behalf of, respondent Apple, Inc. ("Apple") or any of its affiliated companies, parents, subsidiaries, or other related business entities, or its successors or assigns; and (2) a cease and desist order ("CDO") directed against Apple and any of its affiliated companies, parents, subsidiaries, or other related business entities, or its successors or assigns.  This investigation is terminated.

**FOR FURTHER INFORMATION CONTACT**:  Ronald A. Traud, Esq., Office of the General Counsel, U.S. International Trade Commission, 500 E Street S.W., Washington, D.C. 20436, telephone (202) 205-3427.  Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at https://edis.usitc.gov.  For help accessing EDIS, please email EDIS3Help@usitc.gov. General information concerning the Commission may also be obtained by accessing its Internet server at https://www.usitc.gov.  Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205-1810.

**SUPPLEMENTARY INFORMATION**:  The Commission instituted this investigation on August 18, 2021, based on a complaint filed on behalf of Masimo Corporation and Cercacor Laboratories, Inc., both of Irvine, CA (collectively, "Complainants").  86 FR 46275 (Aug. 18, 2021).  The complaint, as amended, alleged violations of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, based upon the importation into the United States, the sale for

importation, and the sale within the United States after importation of certain light-based physiological measurement devices and components thereof by reason of infringement of certain claims of U.S. Patent No. 10,912,501 ("the '501 patent"); U.S. Patent No. 10,912,502 ("the '502 patent"); U.S. Patent No. 10,945,648 ("the '648 patent"); U.S. Patent No. 10,687,745 ("the '745 patent"); and U.S. Patent No. 7,761,127 ("the '127 patent"). *Id.* The amended complaint further alleged that an industry in the United States exists and/or is in the process of being established as required by section 337. *Id.* The notice of investigation named Apple of Cupertino, California as the sole respondent. *Id.* at 46276. The Office of Unfair Import Investigations is not participating in this investigation. *Id.*

Complainants previously withdrew certain asserted claims pursuant to Order No. 25 (Mar. 23, 2022), *unreviewed* by Comm'n Notice (Apr. 12, 2022), and Order No. 33 (May 20, 2022), *unreviewed* by Comm'n Notice (June 10, 2022). Only claim 12 of the '501 patent, claims 22 and 28 of the '502 patent, claims 12, 24, and 30 of the '648 patent, claims 9, 18, and 27 of the '745 patent, and claim 9 of the '127 patent remain in the investigation. Claim 18 of the '745 patent is still at issue for purposes of the domestic industry only.

On January 10, 2023, the presiding administrative law judge ("ALJ") issued the final initial determination ("Final ID"), which found that Apple violated section 337 as to claims 24 and 30 of the '648 patent, but not as to claim 12 of the '501 patent, claims 22 and 28 of the '502 patent, claim 12 of the '648 patent, claims 9 and 27 of the '745 patent, and claim 9 of the '127 patent. *See* Final ID at 335–36. On January 24, 2023, the ALJ issued a Recommended Determination on remedy and bonding ("RD") should a violation be found in the above-captioned investigation. The RD recommended that, if the Commission finds a violation, it should issue an LEO directed to certain wearable electronic devices with light-based pulse oximetry functionality and components thereof that are imported, sold for importation, and/or sold after importation by Apple; and a CDO directed to Apple. RD at 2, 5. The RD additionally recommended that the Commission set a zero percent (0%) bond (*i.e.*, no bond) during the sixty-day period of Presidential review. *Id.* at 6. In its notice instituting this investigation, the Commission did not instruct the ALJ to make findings and recommendations concerning the public interest. *See* 86 FR at 46275–76.

On January 23, 2023, Complainants and Apple each filed a petition for review. On January 31, 2023, Complainants and Apple each filed responses to the other party's petitions.

On February 23, 2023, the parties filed their public interest statements pursuant to 19 CFR 210.50(a)(4). The Commission received numerous comments on the public interest from non-parties.

On May 15, 2023, after considering the parties' petitions and responses thereto, the Commission determined to review the Final ID in part. *See* 88 FR 32243, 32243–46 (May 19, 2023). In particular, the Commission determined to review the following findings of the Final ID:

2

(1) the domestic industry with regard to the '501 patent, the '502 patent, the '648 patent, and the '745 patent;

(2) obviousness with regard to the '501 patent, the '502 patent, the '648 patent, and the '745 patent;

(3) written description with regard to claim 28 of the '502 patent and claim 12 of the '648 patent;

(4) claim construction and infringement with regard to the '745 patent; and

(5) subject matter jurisdiction.

*Id*. The Commission requested briefing on certain issues under review and on remedy, the public interest, and bonding. *See id*.

On June 5, 2023, the parties filed their written submissions on the issues under review and on remedy, public interest, and bonding, and on June 12, 2023, the parties filed their reply submissions. The Commission also received numerous comments on the public interest from non-parties.

Having reviewed the record in this investigation, including the written submissions of the parties, the Commission affirms with modifications the Final ID's domestic industry findings (both economic and technical prong) as to the '501, '502, '648, and '745 patents. The Commission additionally affirms with modifications the Final ID's conclusion that the asserted claims of the '501 patent are obvious, but the asserted claims of the '502, '648, and '745 patents are not obvious. The Commission has determined to reverse the Final ID's finding that Apple proved by clear and convincing evidence that claim 28 of the '502 patent and claim 12 of the '648 patent are invalid for lack of written description. Furthermore, the Commission affirms the Final ID's claim construction related to the recited term "first shape" and the related conclusion that the Accused Products do not satisfy elements [1B] and [20B] of the '745 patent. The Commission additionally vacates the Final ID's finding that the Commission has subject matter jurisdiction over the investigation and instead finds that the Commission has statutory authority over the investigation. The Commission affirms the remainder of the Final ID that is not inconsistent with the Commission's opinion issued concurrently herewith. As a result, the Commission finds that Apple has violated section 337 as to claims 22 and 28 of the '502 patent and claims 12, 24, and 30 of the '648 patent.

The Commission has determined that the appropriate form of relief is an LEO prohibiting (1) the unlicensed entry of infringing wearable electronic devices with light-based pulse oximetry functionality and components thereof manufactured by or on behalf of Apple or any of its affiliated companies, parents, subsidiaries, or other related business entities, or its successors or assigns. The Commission has also determined to issue a CDO against Apple. The Commission has determined to include an exemption to the remedial orders for service or repair

3

or, under warranty terms, replacement of products purchased prior to the end of the period of Presidential review.

The Commission has further determined that the public interest factors enumerated in subsections (d)(l) and (f)(1) (19 U.S.C. 1337(d)(l), (f)(1)) do not preclude issuance of the above-referenced remedial orders.  Additionally, the Commission has determined to impose a bond of zero (0%) (*i.e.*, no bond) of entered value of the covered products during the period of Presidential review (19 U.S.C. 1337(j)).  This investigation is terminated.

The Commission vote for this determination took place on October 26, 2023.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR Part 210).

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued:  October 26, 2023

4

# EXHIBIT 11

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

---

```
-------------------------------x

In the Matter of                Investigation No.

CERTAIN LIGHT-BASED PHYSIOLOGICAL   337-TA-1276

MEASUREMENT DEVICES AND COMPONENTS

THEREOF

-------------------------------x
```

**OPEN/CLOSED SESSIONS**

Pages:    862 through 1167

Place:    Washington, D.C.

Date:     June 9, 2022

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
contracts@hrccourtreporters.com

1                O P E N   S E S S I O N

2

3          MR. MUELLER:  Your Honor, for our next witness we

4    call Dr. Steve Waydo, and Ms. Garcia will do the

5    examination, Nina Garcia.

6          MS. GARCIA:  Good morning, Your Honor.  Nina

7    Garcia for Respondent Apple.

8          JUDGE BHATTACHARYYA:  Good morning, Dr. Waydo.  I

9    believe you're on mute.

10         THE WITNESS:  Good morning.

11         JUDGE BHATTACHARYYA:  Welcome.  Do you understand

12   that you are under an obligation to tell the truth here

13   today?

14         THE WITNESS:  I do.

15                    STEPHEN WAYDO,

16         having been first duly sworn and/or affirmed

17   on his oath, was thereafter examined and testified as

18   follows:

19         JUDGE BHATTACHARYYA:  You may proceed, counsel.

20                   DIRECT EXAMINATION

21   BY MS. GARCIA:

22     Q.   Good morning, sir.  Would you please introduce

23   yourself?  Where do you live?  Where do you work?

24     A.   My name is Stephen Waydo.  I live in Saratoga,

25   California, and I work for Apple.

CONFIDENTIAL INFORMATION REDACTED



CONFIDENTIAL INFORMATION REDACTED

924



Stay-Add-548

CONFIDENTIAL INFORMATION REDACTED



CONFIDENTIAL INFORMATION REDACTED



CONFIDENTIAL INFORMATION REDACTED



CONFIDENTIAL INFORMATION REDACTED



1  as its next witness Brian Land.

2        JUDGE BHATTACHARYYA:  Good morning, Mr. Land.  Do

3  you understand you're under an obligation to tell the truth

4  in your testimony today?

5        THE WITNESS:  Yes.

6                     BRIAN LAND,

7           having been first duly sworn and/or affirmed

8  on his oath, was thereafter examined and testified as

9  follows:

10        JUDGE BHATTACHARYYA:  Thank you.

11        MR. MUELLER:  May I proceed, Your Honor?

12        JUDGE BHATTACHARYYA:  Yes, please.

13                  DIRECT EXAMINATION

14  BY MR. MUELLER:

15    Q.   Good morning, Mr. Land.  Could you please

16  introduce yourself to Her Honor?

17    A.   Yes.  My name is Brian Land.  I live in Woodside,

18  California, and I work at Apple.

19    Q.   Sir, could you please describe your educational

20  background starting with college?

21    A.   Yes.  I have a Bachelor's of Science in Material

22  Science and Engineering from Cornell University, and I have

23  a Master of Science in Material Science and Engineering from

24  Stanford University.

25    Q.   Mr. Land, what year did you earn your Master's

 1    world at large, they tell us something about the outside

 2    world, and the world is complex, and, because it's complex,

 3    it's a challenging engineering problem.

 4         Q.    Now, sir, when did you leave Gyration to go to

 5    work at Apple?

 6         A.    It was spring of 2005.

 7         Q.    And why did you make the decision to join Apple?

 8         A.    Gyration was -- I really enjoyed working there,

 9    but it was a small company and the products that we sold

10    were sold in modest numbers, and we did excellent

11    engineering work, we made great products, but I felt like I

12    had an opportunity to make a bigger impact at a company like

13    Apple, which is, you know, has been a premier company in the

14    electronics and computer space for many years.

15         Q.    What is your current position at Apple?

16         A.    It's -- my title is distinguished engineer.

17         Q.    Sir, what does it mean to be a distinguished

18    engineer at Apple?

19         A.    It's a title and a job level that is granted upon

20    engineers and technical people at Apple who have achieved

21    technical excellence during their time at Apple in

22    developing Apple products.

23         Q.    And, Mr. Land, in your responsibilities as a

24    distinguished engineer today, which group do you work with

25    at Apple?

1      A.    I lead a hardware development team called Health

2  Sensing Hardware.

3      Q.    How many engineers work under your supervision?

4      A.    It's about 55 or 56.

5      Q.    Which Apple products does the Health Sensing

6  Hardware Group that you head up contribute to, which Apple

7  product in the market today?

8      A.    It's primarily the Apple Watch, the health

9  sensors for the Apple Watch.

10     Q.    Now I want to just briefly rewind to when you

11  joined the company and the period between when you joined

12  Apple and when you began working on Apple Watch.

13          Do you have that time period in mind?

14     A.    Yes.

15     Q.    In that time period, sir, what were some of the

16  other products that you worked on?

17     A.    I've worked on many types of Apple products.  I

18  worked on the first iPhone.  I've worked -- I developed -- I

19  was part of the team that developed the touchscreen for the

20  first iPhone.  I was part of the team that developed the

21  touchscreen for the first iPad.

22          I've also worked on optical sensors, such as an

23  optical proximity sensor, which would be used in a phone to

24  turn the screen off when you bring it near your head so your

25  cheek doesn't push a button by mistake.

1  exact date.

2      Q.   And when did you personally start work on what

3  became the Series 0?

4      A.   It would have been fall of 2012.

5      Q.   What were your responsibilities with respect to

6  the Series 0?

7      A.   I was in charge of the team that was tasked with

8  developing multiple optical sensors for the Apple Watch.

9  There were three.

10          One was the optical heart rate monitor, the

11 second was a optical, what we called wrist detection sensor,

12 which could determine when you removed the watch from your

13 wrist for purposes of data security, it would lock the watch

14 up if you removed it from your wrist, and I also worked on

15 the ambient light sensor for the Apple Watch.

16     Q.   Let's focus, if we could, on the heart rate

17 sensor.

18          What were some of the engineering challenges that

19 you and your colleagues confronted in designing the heart

20 rate sensor for the Series 0?

21     A.   Well, first of all, making a heart rate

22 measurement at the wrist was particularly challenging

23 because the wrist doesn't have a lot of blood volume there

24 to measure optically.  But even on top of that, which was

25 already a daunting problem, we had to fit into a very small

1    product.  As I mentioned, I've worked on many products, and

2    the watch was the smallest of all of them.  So we did not

3    have much space to fit the sensor itself.

4         The battery was small, so we had to make sure

5    that the heart rate worked with as low power as possible.

6    And we also had to work, because it was a mobile device, we

7    had to work in all these use cases throughout the day for

8    people, people are different size, different shapes, they

9    choose different bands, they choose different tightness of

10   bands, and we needed to make sure that the heart rate

11   monitor worked well in all the use cases that our customers

12   would expect.

13        Q.   Mr. Land, what was the engineering impact, if

14   any, of the industrial design of the Apple Watch?

15        A.   Yeah.  Industrial design is an important part of

16   the Apple product.  It defines, not only the outside shape

17   of the product, but the look and the feel, and the design

18   language, the aesthetics.

19        So we not only had to make a product that checked

20   all the boxes of low power, fit in this tiny form factor,

21   worked well across all the use cases, but we also had to

22   make sure that it was beautiful and compatible with the look

23   and feel of what the ID studio was going for for the product

24   vision.

25        Q.   Now you succeeded in meeting these challenges.

1    Do I have that right?

2        A.    Yes.

3        Q.    And what were some of the components in the heart

4    rate sensor for the Series 0 watch?

5        A.    We had an LED package, which had a couple of

6    different LED wavelengths in it, and we had packaged

7    photodiodes so LEDs emitted light, the photodiodes collected

8    the light.

9            We also had the apertures that the LEDs and

10   photodiodes were lined up to shine light through, and we

11   also had optical barriers to provide isolation internally.

12   And we built a custom electrical chipset that drove the LEDs

13   and processed signals from the photodiodes.

14       Q.    Mr. Land, what was the shape of the back crystal

15   in the Series 0 watch?

16       A.    It was dome-shaped.

17       Q.    Why was it dome-shaped?

18       A.    My understanding is the primary reason that it

19   was dome-shaped was to provide a little extra space to fit

20   the coils that were part of the wireless charging system.

21   The Apple Watch charges wirelessly through a dock that has a

22   complementary shape, and the dome-shape, when in combination

23   with the charging cradle, in addition to providing

24   additional space for the charging coils, it also provides a

25   self-centering mechanism so that, when you place it on the

CONFIDENTIAL INFORMATION REDACTED



CONFIDENTIAL INFORMATION REDACTED



CONFIDENTIAL INFORMATION REDACTED



CONFIDENTIAL INFORMATION REDACTED

965



CONFIDENTIAL INFORMATION REDACTED



1       A.    Okay.

2       Q.    Mr. Cromar, you are an attorney, correct?

3       A.    Yes, that's correct.

4       Q.    And you prosecute patents, right, sir?

5       A.    Yes.

6       Q.    You've prosecuted in the range of a hundred or so

7    patents for Masimo or Cercacor, correct?

8       A.    I don't know what the specific number is.  That

9    might be right.  Something like that, quite a few.

10      Q.    Now, sir, you're a partner at Knobbe Martens,

11   right?

12      A.    Yes, that's right.

13      Q.    That's the same firm as Mr. Re and Ms. Swaroop

14   and their colleagues, correct?

15      A.    Yes.

16      Q.    Now you, sir, were the prosecutor and helped

17   primary responsibility for the prosecution of three of the

18   patents in this investigation; is that fair?

19      A.    Yes, that's right.

20      Q.    The '501, '502, and '648, correct?

21      A.    Correct.

22      Q.    Now the original priority application for those

23   patents was filed in 2008, right?

24      A.    Are you referring to the provisionals that the

25   patents-in-suit claim priority to?

1    Q.    That's correct, sir.

2    A.    I believe there were multiple provisionals, so

3    they were -- I think they were filed in 2008 in different

4    times in 2008.

5    Q.    Now the '501, '502, and '648 were filed on

6    September 24th of the year 2000, right?  I'm sorry.  2020.

7    I misspoke.  2020.  Is that right, sir?

8    A.    That's consistent with my recollection at the

9    moment.  I would have to look at the files just to confirm

10   that that date is correct, but I believe that's correct.

11   Q.    Just to make this a little easier, if we could go

12   to tab 1 in the binder that you should have in front of you.

13   This is your deposition from this case.  You were deposed,

14   right, sir?

15   A.    Yes, I was deposed.  I don't know for sure which

16   binder you're referring to.  I have a binder that says

17   Cromar direct on it and there's also a sealed envelope.

18   Q.    You can open the sealed envelope right now, sir.

19   A.    Okay.  Let me grab that.  I was told that I

20   should open this on camera; is that correct?

21   Q.    Go right ahead.

22   A.    All right.  So I think, is this the binder that

23   you're referring to?

24   Q.    Yes, tab 1, please, sir.  Page 108, lines 14-17.

25   We can put these up on the screen too.

1         Question.  Okay.  So you filed the applications

2   for the '501, '502, and '648 patents on the same day, that

3   was September 24th, 2020, correct?

4         Answer.  I believe that's correct.

5         Does that refresh your memory, sir?

6    A.    Sorry.  You got a little ahead of me.  I was

7   trying to open to the correct page.  So you said it's page

8   108?

9    Q.    No -- that's right -- 108, lines 14-17, please,

10   sir.

11   A.    Okay.  I'm there now.

12   Q.    And you see here, you were asked whether you

13   filed these three patents on the same day, September 24th,

14   2020, correct?

15   A.    Correct.  I believe that's the correct date, but

16   I would have to go verify that by looking at the file

17   histories.

18   Q.    Now that's 12 years after 2008, right?

19   A.    Yes.  You're asking for the difference between

20   the year 2008 and the year 2020, correct?

21   Q.    Twelve years, right?

22   A.    That would be 12 years, that's right.

23   Q.    Now you couldn't identify at your deposition any

24   reason why, for example, the application for the '501 patent

25   could not have been filed earlier than September of 2020,

1  correct?

2      A.   I don't know that that's correct.  Can I refresh

3  my recollection, or do you have something that can remind

4  me?

5      Q.   Absolutely.  Let's go to page 90 in your

6  deposition, lines 2-11.

7           Question.  Sitting here today, you cannot

8  identify any reason why the application for the '501 patent

9  could not have been filed earlier than September 2020,

10  correct?

11          Yeah.  Again, I -- I haven't formed an opinion on

12  that, and I don't feel comfortable doing so as we sit here.

13          Were you asked that question and did you give

14  that answer?

15      A.   Yes, that's correct.  I believe my answer to the

16  question was that I haven't formed an opinion on it, and,

17  you know, at the time I hadn't formed an opinion on it.

18      Q.   Let's pull up CX-1287.  This is a press release

19  for the release of the Apple Watch Series 6.  Let me just

20  focus you on the date.

21          Do you see September 15th, 2020?

22      A.   Yeah, I see that on the screen.

23      Q.   That's nine days before you filed the

24  applications that led to the '501, '502, and '648 patents,

25  correct?

1    JUDGE BHATTACHARYYA:  That's fine.

2    MR. RAWSON:  Dr. Rowe, I just sent you an email

3    with that exhibit.

4    JUDGE BHATTACHARYYA:  Dr. Rowe, you might be on

5    mute.

6    Welcome, Dr. Rowe.  Do you understand that you

7    are under an obligation to testify truthfully here today?

8    THE WITNESS:  I do.

9                    ROBERT ROWE,

10        having been first duly sworn and/or affirmed

11   on his oath, was thereafter examined and testified as

12   follows:

13   JUDGE BHATTACHARYYA:  Thank you.  You may

14   proceed.

15   MS. VREELAND:  Thank you.

16                 DIRECT EXAMINATION

17   BY MS. VREELAND:

18   Q.   Dr. Rowe, if you could begin by introducing

19   yourself to Her Honor.

20   A.   Yes, Your Honor.  I'm Robert Rowe.

21   Q.   Dr. Rowe, I'd like to focus my questions today on

22   the Lumidigm patent, but before I do, could you briefly

23   describe your personal background beginning with your

24   educational history?

25   A.   Sure.  I have a undergraduate degree in

1    foundation.

2             MS. SWAROOP:  Thank you, Your Honor.

3             MS. VREELAND:  Thank you.

4        Q.   Why don't we just speed ahead and look at the

5    embodiment that you illustrate in Fig. 8B and describe in

6    the accompanying text at 1160 to 122.

7             What were you illustrating in Fig. 8B?

8        A.   So in 8B we're showing the electro-optic sensor

9    or one example of the electro-optic sensor on the back of a

10   wristwatch.

11       Q.   And in the accompanying text you say that any of

12   the sensor geometries previously disclosed can be used for

13   this application.

14            What sensor geometries had you previously

15   disclosed in the patent?

16       A.   The figures we were just -- we were just looking

17   at, the Figs. 3 through 7, I believe they were.

18       Q.   Okay.  So it would have been included the

19   illustrations that we previously discussed in Figs. 3

20   through 7B?

21       A.   Mm-hmm, correct.

22       Q.   And was there any previously disclosed discussion

23   of the sensor head?

24       A.   Yes.  Yes, quite a bit, yes.

25       Q.   Okay.  Great.

```
 1              C E R T I F I C A T E

 2   TITLE: CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES

 3   AND COMPONENTS THEREOF

 4   INVESTIGATION NO.:  337-TA-1276

 5   HEARING DATE:  June 9, 2022

 6   LOCATION:  Washington, D.C. - Remote

 7   NATURE OF HEARING:  Evidentiary Hearing

 8          I hereby certify that the foregoing/attached
     transcript is a true, correct and complete record of the
 9   above-referenced proceedings of the U.S. International Trade
     Commission.
10   Date:   June 9, 2022
     Signed:
11   ss//

12   Signature of the Contractor or the Authorized Contractor's
     Representative
13

14          I hereby certify that I am not the court reporter
     and that I have proofread the above-referenced transcript of
15   the proceedings of the U.S. International Trade Commission
     against the aforementioned court reporter's notes and
16   recordings for accuracy in transcription in the spelling,
     hyphenation, punctuation and speaker identification and did
17   not make any changes of a substantive nature.  The
     foregoing/attached transcript is a true, correct and
18   complete transcription of the proceedings.
     Signed:

19   ss//          Raymond G. Brynteson

20

21          I hereby certify that I reported the
     above-referenced proceedings of the U.S. International Trade
22   Commission and caused to be prepared from my record media
     and notes of the proceedings a true, correct and complete
23   verbatim recording of the proceedings.
     Signed:

24   ss//          Linda Kinkade

25
```

# EXHIBIT 12

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

---

```
-------------------------------x
In the Matter of                    Investigation No.

CERTAIN LIGHT-BASED PHYSIOLOGICAL    337-TA-1276

MEASUREMENT DEVICES AND COMPONENTS

THEREOF

-------------------------------x
```

**OPEN SESSIONS**

Pages:    1 through 282 (with excerpts)

Place:    Washington, D.C.

Date:     June 6, 2022

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
contracts@hrccourtreporters.com

1    than argue about their admissibility in advance.

2            JUDGE BHATTACHARYYA:  That's fine, if that's the

3    procedure -- that's fine.

4            MR. RE:  Yes.  There are four objected to

5    exhibits that I do want to introduce despite the objection,

6    and I'm ready to respond if argument is required.

7            JUDGE BHATTACHARYYA:  Okay.

8            MR. RE:  Thank you.

9            JUDGE BHATTACHARYYA:  Welcome, Mr. Kiani.  Do you

10   understand that you're under an obligation to tell the truth

11   here today?

12           THE WITNESS:  Yes, Your Honor.

13                   JOSEPH KIANI,

14           having been first duly sworn and/or affirmed

15   on his oath, was thereafter examined and testified as

16   follows:

17                DIRECT EXAMINATION

18   BY MR. RE:

19       Q.   Good morning, Mr. Kiani.  For the record, could

20   you please give your full name and spell your name?

21       A.   Yes.  My name is Massi Joseph E. Kiani,

22   M-A-S-S-I, Joseph, E, and K-I-A-N-I.

23       Q.   What are your current positions?

24       A.   I am chairman and CEO of Masimo and Cercacor.

25       Q.   For how long have you been the CEO of Masimo?

1    when they did it.

2        Q.   Well, let me take you to your deposition.  This

3    is RX-1204.  Let me take you to your deposition transcript

4    at page 175, lines 14-17.

5            MR. RE:  Objection.  One moment.  Mr. Kiani, do

6    you have a copy of your deposition with you?  It should be

7    in one of your notebooks.

8            THE WITNESS:  Well, yeah.  Which tab am I looking

9    at?

10       Q.   Tab 1 in your Cross-Examination Binder.  Take

11   your time.  Let me know when you're on page 175.

12       A.   Yes.

13       Q.   Are you there, sir?

14       A.   I am.

15       Q.   Line 14.

16            Question.  And is there any reason that you know

17   of that these three patents could not have been filed

18   earlier than September 24th, 2020?

19            Answer.  No.

20            Were you asked that question and did you give

21   that answer, sir?

22       A.   Yes, that is correct.  That is my understanding

23   at the time.  I did not know.

24       Q.   All right.  Thank you, sir.  You can put your

25   deposition transcript aside for the moment.

```
 1              C E R T I F I C A T E

 2   TITLE: CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES

 3   AND COMPONENTS THEREOF

 4   INVESTIGATION NO.:  337-TA-1276

 5   HEARING DATE:  June 6, 2022

 6   LOCATION:  Washington, D.C. - Remote

 7   NATURE OF HEARING:  Evidentiary Hearing

 8           I hereby certify that the foregoing/attached
     transcript is a true, correct and complete record of the
 9   above-referenced proceedings of the U.S. International Trade
     Commission.
10   Date:    June 6, 2022
     Signed:
11   ss//

12   Signature of the Contractor or the Authorized Contractor's
     Representative
13
             I hereby certify that I am not the court reporter
14   and that I have proofread the above-referenced transcript of
     the proceedings of the U.S. International Trade Commission
15   against the aforementioned court reporter's notes and
     recordings for accuracy in transcription in the spelling,
16   hyphenation, punctuation and speaker identification and did
     not make any changes of a substantive nature.  The
17   foregoing/attached transcript is a true, correct and
     complete transcription of the proceedings.
18   Signed:

19   ss//      Raymond G. Brynteson

20
             I hereby certify that I reported the
21   above-referenced proceedings of the U.S. International Trade
     Commission and caused to be prepared from my record media
22   and notes of the proceedings a true, correct and complete
     verbatim recording of the proceedings.
23   Signed:

24   ss//      Linda Kinkade

25
```

# EXHIBIT 13

PUBLIC VERSION

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

In the Matter of
**CERTAIN LIGHT-BASED PHYSIOLOGICAL
MEASUREMENT DEVICES AND
COMPONENTS THEREOF**

Inv. No. 337-TA-1276

**RESPONDENT APPLE INC.'S PETITION FOR REVIEW OF
THE INITIAL DETERMINATION OF VIOLATION OF SECTION 337**

PUBLIC VERSION

and intent elements of inducement. ID 198. Specifically, the ID found that the Complaint "contained allegations of infringement (including a claim chart for claim 27) similar to the evidence presented at the hearing." *Id.* But to support this finding, the ID cites only Complaint Exhibit 18, filed on June 30, 2021, and no other evidence. *Id.* This lone citation does not satisfy the "preponderance of evidence" standard, particularly where Complainants identified no testimony from any witness (including their own expert Dr. Madisetti) that Apple had the requisite knowledge to support a finding of inducted infringement. *See* RIB at 173; RRB at 88. Citation to *Certain Beverage Brewing Capsules*, Inv. No. 337-TA-929, Comm'n Op. at 19-21 (Apr. 5, 2016), is also inapt because Complainants failed to show by a preponderance of evidence that the "infringement allegations set forth in [their Complaint] claim charts are substantially similar to [] ultimate infringement findings" (*id.*), nor can they because Dr. Madisetti heavily relies on his post-complaint testing results to attempt to prove infringement.

### 4. The Economic Prong Is Not Satisfied.

Because it relies on overlapping groups of devices, the ID's finding that the economic prong was satisfied for the '745 patent is clear error for the same reasons as the Poeze patents. *See* Section IV.E, *supra.*

### 5. The '745 Patent Is Unenforceable.

For the reasons discussed in Apple's initial post-hearing brief (RIB at 204-205) and consistent with Federal Circuit precedent, as recently confirmed in Personalized Media Communications v. Apple, Inc., Case No. 21-2275, Dkt. 49 (Fed. Cir. Jan. 20, 2023), the ID erred in its finding that Apple had not shown the asserted Poeze patents unenforceable under the doctrine of prosecution laches and/or unclean hands. Complainants' five-year delay and strategy of waiting until Apple further developed its technology and fostered the market for wearable technology was

both unreasonable and prejudicial to Apple who invested heavily in developing that technology and growing the market while Masimo inexcusably delayed its prosecution.

### B.    U.S. PATENT NO. 7,761,127

The ID rightly found no violation of U.S. Patent No. 7,76,127 ("'127 patent") based on its correct claim constructions and finding that the Accused Apple Watches do not infringe over those constructions.  But if the Commission grants review of to this patent, it should correct errors in the ID's technical prong, invalidity and economic prong analyses.

### 1.    The Early Rainbow Sensor Do No Satisfy The Technical Prong.

Complainants alleged that two product groups—(1) the "early rainbow® sensors" that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and (2) the "current rainbow® sensors [that] use a ▮▮▮▮▮ ▮▮▮▮▮—practice claim 9 of the '127 patent for purposes of the domestic industry, technical prong requirement.  ID 273-275; CIB 36, 266-274.  The ID correctly determined that Complainants failed to show that the Current Rainbow Sensors meet Element 7[A], which requires a "thermal mass" that stabilizes a bulk temperature, and Element 7[F], which requires that the temperature sensor be "capable of determining a bulk temperature for the thermal mass" that is a representative temperature for the thermal mass.  ID 256, 259, 275-277, 279-281.  However, the ID clearly erred in finding that the Early Rainbow Sensors meet the "thermal mass" and "bulk temperature for the thermal mass" limitations (ID 281, 279-281).

### a.    Early Rainbow Sensors Do Not Meet "Thermal Mass" Limitation.

The ID clearly erred in finding that the Early Rainbow Sensors satisfy the "thermal mass" limitation.  ***First***, the ID erred in assuming that Mr. Diab's testimony regarding his simulations using ▮▮▮▮▮ software on a prototype "model of [a] sensor" (Tr. [Diab] 200:14-16; 201:2-202:2) applied to actual Early Rainbow Sensors.  ID 276.   Mr. Diab never testified that his simulations

in a user-worn device.  RRB 75-76.  The ID, again, erroneously imposed a higher scrutiny in its obviousness analysis compared to its analysis here.  Here, the ID found the scant references to a touch screen in the Poeze specification sufficiently enables a touch screen on a user-worn device but failed to find the same when examining the prior-art—which is arguably more detailed with respect to touch screens.  ID 133-36.  The ID was also inconsistent in its treatment of the underlying testimony.  While the ID credited Dr. Madisetti's enablement explanation—where he simply recited a list of specification citations and concluded they are enabling—the ID described Dr. Warren's testimony on the subject as "conclusory," despite providing more explanation than Dr. Madisetti.  *See* Tr. [Warren] 1226:22-1227:7, 1240:4-1242:9, 1241:1-17; RDX-8.83-84; Tr. [Madisetti] 1352:5-24; 1381:7-1382:8 (testimony cited by the ID concerning touch screens).

**The ID clearly erred in finding enablement for avoiding and reducing "light piping" ('501 claim 12, '502 claim 28, '648 claim 24) and sufficient written description support for substantially preventing light piping ('648 claim 24).**  ID 169.  The Poeze specification provides no guidance on how to avoid, reduce, or manage the problem of "light piping" aside from general reference to opaque materials.  Tr. [Warren] 1247:24-1248:4.  The specification fails to explain when "light piping" has been "substantially" prevented, how a POSITA accomplishes or determine this, and how the sensors were constructed to accomplish this limitation.

### 2.     The Poeze patents Are Unenforceable.

For the reasons discussed in Apple's initial post-hearing brief (RIB at 153-159) and consistent with Federal Circuit precedent regarding, as recently confirmed in *Personalized Media Communications* (No. 21-2275, Fed. Cir. Jan. 20, 2023), the ID erred in its finding that Apple had not shown the asserted Poeze patents unenforceable under the doctrine of prosecution laches and/or

PUBLIC VERSION

unclean hands.  Complainants' twelve-year delay in filing the applications for the asserted Poeze

patents was both unreasonable and prejudicial to Apple.

## VI.     CONCLUSION

For the foregoing reasons, Apple respectfully requests the Commission review and reverse

the ALJ's erroneous conclusions concerning validity, infringement, technical DI, and economic

DI for '648 patent.  Should the Commission take review of issues relating to the other patents—

though it need not do so—Apple further requests that the Commission review the additional issues

set forth in this Petition.

PUBLIC VERSION

Dated:  January 23, 2023

Respectfully Submitted,

*/s/ Sarah R. Frazier*
Mark D. Selwyn
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6031

Joseph J. Mueller
Richard Goldenberg
Sarah R. Frazier
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

Michael D. Esch
David Cavanaugh
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 663-6000

*Counsel for Respondent Apple Inc.*

# EXHIBIT 14

CONFIDENTIAL INFORMATION REDACTED

CONFIDENTIAL INFORMATION REDACTED

CONFIDENTIAL INFORMATION REDACTED

CONFIDENTIAL INFORMATION REDACTED

CONFIDENTIAL INFORMATION REDACTED

# EXHIBIT 15

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

| In the Matter of | |
| **CERTAIN LIGHT-BASED PHYSIOLOGICAL** | Inv. No. 337-TA-1276 |
| **MEASUREMENT DEVICES AND** | |
| **COMPONENTS THEREOF** | |

**RESPONDENT APPLE INC.'S RESPONSE TO THE COMMISSION'S NOTICE TO
REVIEW IN PART A FINAL INITIAL DETERMINATION AND REQUEST FOR
WRITTEN SUBMISSIONS**

## DECLARATION OF SUMBUL DESAI, M.D.

1.      My name is Sumbul Desai, M.D.  I am over 21 years of age, of sound mind, and make this declaration voluntarily and based upon my own personal knowledge.

2.      I received my M.D. from the Medical College of Virginia, VCU School of Medicine in 2008.  I completed a residency in Internal Medicine at the Stanford University School of Medicine.  During my residency, I was a Research Fellow in Public Policy at the Kaiser Family Foundation.

3.      Since 2011, I have been on faculty at the Stanford University School of Medicine as a clinical associate professor.  During my full-time tenure at Stanford, I served as the Vice Chair of Strategy and Innovation in the Department of Medicine, the Executive Director of the Stanford Center for Digital Health, and Associate Chief Medical Officer at Stanford Healthcare.

4.      I am the Vice President of Health at Apple.  In that role, I work every day to empower users with tools to improve their health.  I oversee health initiatives that include clinical product development, medical research, and innovative clinical partnerships.  I also lead the regulatory and quality teams at Apple.  Across all these efforts, we leverage the latest health science to create innovative technology.  We develop new products and services that give people everywhere actionable paths to healthier lives.  And we bring together teams of experts — including designers, engineers, scientists, clinicians and more — who lend their unique insights on how we can have the greatest positive impact on the world.

5.      Our work today builds on a longstanding commitment to the health space.  For nearly a decade, Apple has devoted significant talent, resources, and expertise to designing, developing, and producing products and services aimed at giving users more information about their own health.  We feel called to this work, first and foremost, because one of Apple's core

1

wearers of Apple Watch, Apple validated the performance of Apple Watch across a wide range of skin tones.  In October 2022, Apple released a white paper confirming that there is no "skin-tone dependence" in key metrics of accuracy.[4]

### Other Health Features, Including IRN and ECG

13.    Beyond the Blood Oxygen feature, the most recent versions of Apple Watch—Apple Watch Series 8 and Apple Watch Ultra—include a multitude of other wellness and health features, such as heart-rate tracking, fall detection, activity and workout tracking, sleep tracking, medication notifications, hand-washing reminders, and a "Medical ID" feature that allows first responders and emergency room staff to access critical medical information, such as name and emergency contact information, from a patient's Apple Watch without compromising the user's privacy.  One new feature, introduced in 2022, is the ability to detect wrist temperature; tracking nightly changes in wrist temperature can provide insight into a user's well-being, as wrist temperature can vary due to physiological factors such as menstrual cycles and illness.  Wrist temperature measurements can also be used for retrospective ovulation estimates, which can be very important for many users.

14.    Furthermore, the most recent versions of Apple Watch include two separate FDA-authorized software as a medical device (SaMD) features: (1) the PPG-based IRN feature, and (2) the ECG app.  Both those features have been available on Apple Watch since they were introduced on Apple Watch Series 4 in 2018.  Among the Apple Watch models currently sold by Apple, the ECG app is available only on the Apple Watch Series 8 and Ultra models—the same models that also feature the Blood Oxygen app.  IRN feature and ECG app are each standalone

---

[4] Apple Inc., *Blood Oxygen App on Apple Watch* (Oct. 2022), *available at* https://www.apple.com/healthcare/docs/site/Blood_Oxygen_app_on_Apple_Watch_October_2022.pdf.

SaMDs. As explained below, IRN feature and ECG app each separately underwent extensive clinical validation studies during development to test for safety and effectiveness. IRN feature and ECG app each were granted marketing authorization separately by FDA as SaMDs through the de novo authorization process in 2018.

15. ECG app is a SaMD developed internally by Apple engineers and clinicians that allows a user to record a thirty-second, single-lead ECG on their Watch. This is a test that many people never receive in their lifetimes, even though its results can be clinically meaningful and, in some cases, potentially lifesaving. Apple has made ECGs much more widely available by leveraging an electrical heart sensor on Apple Watch, which can measure the small change in electrical potential caused by the depolarization of the heart muscles as those muscles contract. To measure this change in electrical potential, a user makes contact with two electrodes, which then measure the electrical potential between those electrodes. On Apple Watch, one of the electrodes is on the back of the case and makes contact with the wrist, the other electrode is on the crown of the Watch case. The user opens the ECG app and touches that electrode on the crown of the Watch case with a finger from the opposite arm to "close the electrical loop" and take an ECG. In this way, recording an ECG requires an affirmative act by the user to open the ECG app and make contact with the electrodes. The app's algorithm on the Apple Watch then analyzes the electrical signals recorded to determine if the electrical signals show a normal heart rhythm, called Normal Sinus Rhythm, or if the electrical signals show signs of atrial fibrillation (AFib), which is the most common serious cardiac arrhythmia. The ECG app then provides a result of the analysis to the user on the Apple Watch, stores the ECG recording and result, and allows the user to log symptoms and convert that recording to a PDF to share with their healthcare provider.

16.    IRN is a separate SaMD feature, also developed internally by Apple engineers and clinicians, which gives users insights into their heart rhythms. If the IRN feature identifies heart rhythms suggestive of AFib, it notifies the user and prompts them to seek medical attention. To create this feature, Apple leveraged the PPG sensor on the back of Apple Watch, which shines light into the skin near blood vessels and measures the amount of light reflected back using photodiodes. The IRN feature's algorithm attempts to take a one-minute PPG recording, called a tachogram, about every two hours, assuming conditions are appropriate for the tachogram measurement. The IRN feature's algorithm then uses the PPG recording to calculate a user's pulse rate, which can also provide information about their heart rhythm. Finally, the IRN feature analyzes the heart rhythm data captured from the PPG using an Apple developed algorithm to determine if the user's heart rhythms are suggestive of AFib. Notably, all this happens in the background. A user simply must enable the feature once, wear Apple Watch, and the IRN feature will automatically and periodically attempt to measure their heart rhythms.

17.    In preparing its separate FDA authorization applications for ECG app and IRN feature, Apple conducted extensive clinical trials testing the safety and effectiveness of Apple's single-lead ECG and ECG app as measured against a traditional 12-lead ECG. Similarly, Apple conducted extensive clinical trials testing the safety and effectiveness of the IRN feature as measured against an ECG patch interpreted by a clinician.[5]

18.    All currently available Apple Watches also include the HHRN feature.[6] This is a health feature that is not an FDA-authorized medical device or SaMD, as it does not provide any

---

[5] *See* Apple Inc., *Using Apple Watch for Arrhythmia Detection* (Dec. 2020), *available at* https://www.apple.com/healthcare/docs/site/Apple_Watch_Arrhythmia_Detection.pdf.

[6] The HHRN feature was introduced with Apple Watch before the ECG app and IRN feature were introduced.

expressly made by Dr. Milani in his declaration to the Commission. Dr. Milani described the program he helped develop to use Apple Watch to reduce the risks of falls, especially for elderly or fragile patients, and reported that his patients have seen "tremendous improvement to their quality of life," including having a greater sense of security and empowerment that they will receive medical assistance if they do fall. Milani Declaration (Feb. 16, 2023) at 5.

30.     The benefits of the health and wellness features on Apple Watch are enhanced by Apple's long-standing commitment to the privacy of its users. Apple ensures that its users are the ones who decide what health information is stored, and who can access it. For example, Apple's Health app and HealthKit data-repository framework ensure that each user's health data is stored securely, in encrypted format, and Apple offers users granular controls to determine precisely what information can be read from or written to their health records.

31.     Furthermore, consumers rely on Apple Watch to provide important health benefits (and all of the other functionality of Apple Watch) for years after purchasing their device. For example, users can maintain their health data from Apple Watch longitudinally, using the Health and Fitness apps on iPhone, allowing them to monitor their health over time—including if they upgrade or replace their Apple Watch. Apple replaces Apple Watch devices in need of service, both in and out of warranty (sometimes for a fee), enabling users to continue enjoying the benefits of their devices. If Apple could not replace broken Apple Watch devices because of a remedial order in this Investigation, that would be highly disruptive to Apple Watch users who have come to rely on using Apple Watch as a health and wellness device, including because switching to another device from another manufacturer would disrupt the collection of their health data.

## CLINICAL RESEARCH USING APPLE WATCH

32.     Apart from the direct benefit to users, there is extensive clinical research that involves Apple Watch—including the Blood Oxygen feature, the ECG app, and IRN feature—

the potential to save lives while improving health monitoring and health outcomes. Removing these Apple Watch devices would also be devastating to the progress that is being made every day in this space, and the billions of dollars of investment in the U.S. that Apple has made and continues to make.

I declare, under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed on _____June 5_____, 2023, in _____Cupertino, CA_____.

Sumbul Desai, M.D.
Vice President of Health
Apple

23

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

---

**In the Matter of**
**CERTAIN LIGHT-BASED PHYSIOLOGICAL**
**MEASUREMENT DEVICES AND**
**COMPONENTS THEREOF**

Inv. No. 337-TA-1276

---

**DECLARATION OF AARON SCHAFER**

1.      My name is Aaron Schafer.  I am over 21 years of age, of sound mind, and make this declaration voluntarily and based upon my own personal knowledge.

2.      I received my Bachelor of Science degree in Engineering from Michigan State University in 1998.  I received a Masters in Business Administration from DePaul University in 2003.  I began working at Motorola Corporation in May 1998 in procurement and was involved primarily with supply chain operations.  I worked at Motorola until 2010.  In May 2010, I began working at Apple, and my current title is Senior Director.  My responsibilities include the procurement and operations of components for Apple products, primarily semiconductors ranging from off-the-shelf components to highly customized products that Apple develops internally or develops with its third-party partners.  By virtue of my responsibilities at Apple, I am familiar with manufacturing and supply chain issues associated with the production of Apple Watch.

3.      I understand that in this Investigation, Masimo Corporation and Cercacor Laboratories, Inc. (collectively "Masimo") seek to exclude from importation into the United States several generations of Apple Watch that include the Blood Oxygen feature, as well as Irregular

1

that use them to assemble the final Apple Watch product. Many components take weeks, if not months, to manufacture. And third, many contemporary raw material and component supply contracts are structured as "take or pay" agreements. Under such agreements, the purchasing party is required to pay for the products that it orders regardless of whether it actually takes possession of the products from the manufacturer. For example, if a component supplier orders 100,000 units of a semiconductor component from a foundry, it must pay for those units regardless of whether it actually has an OEM buyer. This creates an incentive for the component supplier to take possession of the product from the foundry, even if it has no immediate need for the component. Further downstream agreements may prevent the component supplier from diverting that component to a different OEM. Accordingly, when sales of end-user devices are significantly disrupted, such as by an import ban, these existing "take or pay" agreements prevent supply from being diverted to competitor products to meet any resulting increase in demand.

11.    Given the business model, supply, and contractual constraints I just described, which are common to all suppliers of complex consumer electronics products, and given the substantial and growing U.S. sales of Apple Watch, I estimate that it would take significant effort and time, on the order of at least twelve months or more, for other companies to scale production of existing products to entirely replace the volume of product that would be subject to the type of wholesale exclusion of the Apple Watch contemplated in this action. It very likely would take them even longer to launch entirely new products in comparable volumes, because of the complex supply factors such as component lead time and chip scarcity which I have outlined above that further impact ramping up volume production.

12.    Exclusion of Apple Watch from the United States would also likely have an impact on U.S. employment at a number of U.S.-based companies that are highly dependent upon Apple's

business, either because those companies manufacture products for Apple or are involved with Apple's research and development efforts.    For example, U.S.-based component suppliers for Apple Watch, such as Broadcom, Cirrus Logic, Skyworks, Qorvo, and Texas Instruments, will likely experience negative impacts due to an exclusion order against Apple Watch.

I declare, under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed on June _____, 2023.

------------------------------
Aaron Schafer
Senior Director
Apple Inc.

6

**Before the U.S. International Trade Commission**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | Investigation No. 337-TA-1276 |

**Declaration of Michael A.M. Davies**
**Concerning the Public Interest**
**June 5, 2023**

focused on the overall characteristics of Apple's business, its product strategy, technology strategy, R&D strategy and go-to-market strategy, and I have worked with a broad cross-section of device vendors and component vendors who compete with Apple or are partners of Apple.

## II.  IMPACT OF REQUESTED REMEDIES

14.    It is my opinion that Masimo's Requested Remedies, which seek to exclude from importation, distribution, marketing, sale, and support Apple Watch Series 6, 7, 8, and Ultra, would cause an immediate and massive shortfall in the supply of smartwatches available to U.S. consumers, and would thereby cause significant harm to the Public Interest. This shortfall of smartwatches would harm millions of U.S. consumers who depend on their smartwatch for health and fitness capabilities provided through monitoring and data-gathering, in combination with a broad variety of other capabilities that are important in many aspects of their daily lives.

15.    In addition to the important health benefits that smartwatches provide, U.S. consumers also depend on their smartwatch for productivity benefits provided through, for example, sending text messages, making phone calls and video calls, being alerted by and responding to notifications, and accessing their calendar and contacts. What distinguishes and differentiates Apple Watch from other wearable devices is that Apple Watch provides health and welfare benefits to U.S. consumers who are motivated to purchase a smartwatch because of the productivity capabilities that it provides, yet those same consumers would not purchase a wearable device that only provides specialized health capabilities, such as Masimo's W-1™.

16.    Masimo's Requested Remedies would harm both U.S. consumers who are existing users seeking to replace their device due to loss, damage, or functionality; and also those who are would-be adopters of smartwatches,

**CONFIDENTIAL INFORMATION REDACTED**

as the Requested Remedies would cause a sudden and massive shortfall of smartwatches available for purchase that cannot be mitigated within a commercially reasonable timescale. Without new or replacement devices available, these U.S. consumers would lose access to the important health and productivity capabilities provided by Apple Watch.

17.    As I elaborate below, this shortfall of smartwatches would also harm ongoing and future medical research in the United States, which is already making widespread use of smartwatches, and which is further broadening its use of smartwatches' monitoring and data-gathering capabilities. This shortfall would harm U.S. consumers through reduced choice of products, more limited availability of products, and higher prices for products. This shortfall would also harm the U.S. economy.

18.    The Accused Devices account for more than ▮▮▮▮▮▮▮▮ smartwatches sold in the United States each year.[2] As a result, mitigating the sudden and massive shortfall in supply would require a collective increase in the level of output of other smartwatches by Apple and other non-Respondent vendors of more than ▮▮▮▮▮▮ per year. Increasing production by this amount—▮▮▮▮ increase in the level of output—would be very difficult and very costly, would involve significant commercial risk, and would take years to achieve. Given that this very large increase in production would take years, the shortfall could not be mitigated "within a commercially reasonable time."

19.    This additional volume of production in the order of ▮▮▮▮▮▮▮▮ increase, could not be achieved within a commercially reasonable time due to long-established, continuing, and industry-wide constraints of the supply

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**CONFIDENTIAL INFORMATION REDACTED**

chain related to the production and distribution of smartwatches; I provide details of these constraints below.

20.     The Requested Remedies would especially harm U.S. consumers who are current users of Apple Watch or would-be adopters of Apple Watch. Given the sudden and massive shortfall in the supply of Apple Watches, every day nearly ████ Apple Watch users nationwide would be unable to obtain the smartwatch that meets their requirements.[3] The number of U.S. consumers affected would rise to nearly ██████ within the first month, and to nearly ███████ consumers before there was any meaningful mitigation of the sudden and massive shortfall in the supply of smartwatches.[4]

### III.  AVAILABILITY OF ALTERNATIVES FOR ACCUSED DEVICES

21.     Smartwatches, as all digital devices, provide both functionality and capabilities, the difference being functionality is what the device can do, such as connect to the Internet, while capabilities are what a user can do with the device, such as text a friend.

22.     For the purpose of assessing the impact of Masimo's Requested Remedies, a smart device can serve as a substitute for a different smart device only if the substitute device also provides **equivalent functionality and capabilities.** For example, although an analog watch is a functional substitute for smartwatch users who principally want a device that can tell time, a smartwatch's functionality and capabilities go far beyond time-telling—and in particular in combining health, fitness, and wellness



Stay-Add-596

**CONFIDENTIAL INFORMATION REDACTED**

Masimo Freedom™ at $999, cost more than the Accused Devices. The Apple Watch Series 8 starts at $399.

26.    **Volume** matters in determining whether any particular smartwatch could serve as a viable substitute for the Accused Devices because the substitute must be able to be made available at sufficient scale to effectively mitigate the effect of the exclusion of the Accused Devices. The required volume of devices is significant: Between 30% and 35% of U.S adult consumers now own a smartwatch or wearable,[7,8] and o█████████████████████████ ████████████████

**A.  U.S. consumers rely on many different smartwatch features**

27.    The Accused Devices are not devices that have single-point functionality, such as monitoring a cardiovascular condition. Rather, the Accused Devices are multi-purpose technologies that are designed to provide a wide range of functionality, thereby enabling various diverse capabilities to meet the requirements of U.S. consumers. For many U.S. consumers, their smartwatch's utility comes from its ability to combine both health and productivity capabilities, while at the same time offering a broad array of capabilities.

28.    With a cellular- or Wi-Fi-connected smartwatch, a user can send and receive texts, calls, and email; share health information with healthcare providers and family; access the Internet, their apps, and their calendar; stay current with news, weather, and sports; navigate with GPS; and stream music. Through its connectivity, a smartwatch user can also keep children

---

[7] https://datareportal.com/reports/digital-2023-deep-dive-the-rise-of-wearables

[8] https://cdn.newswire.com/files/x/3c/e9/d48aafa86cac1002ee98de669a22.pdf

[9] █████████████████

**Stay-Add-597**

and elderly family members safe through location and health alerts, such as
Fall Detection.

29.    Table 1 below, from a survey conducted by research firm Creative
Strategies, demonstrates the weekly use by Apple Watch users of the
various smartwatch capabilities.[10]

Table 1    *Apple Watch users' weekly use of features and capabilities[11]*

| Weekly Use of Features and Capabilities | % of Users |
|---|---|
| Check messages | 81% |
| Decline a call | 80% |
| **Check activity details** | 75% |
| **Workout tracking** | 74% |
| **Check heartrate** | 73% |
| Look at third-party app | 66% |
| Use non-fitness third-party apps | 61% |
| Check email | 57% |
| Set a reminder | 54% |
| Answer a call | 51% |
| Use the watch to find iPhone | 46% |
| Use Siri to send a text | 42% |
| Check social media | 40% |
| Use GPS | 34% |
| Use a scribble feature to write a text | 33% |
| Control a smart home device | 31% |

30.    Were the Requested Remedies to prevail, U.S. consumers who have
adopted the Apple Watch would be unable to replace their device if it were
lost, no longer functioned, or no longer met their requirements and became
obsolescent or obsolete. Therefore, excluding the Accused Devices would
harm millions of U.S. consumers who have invested time, energy, and
money into their own, personalized combination of devices.

---

[10] https://www.cultofmac.com/581078/people-love-declining-phone-calls-on-their-apple-watches/

[11] https://www.cultofmac.com/581078/people-love-declining-phone-calls-on-their-apple-watches/

Stay-Add-598

48.     Masimo has announced plans to launch another wearable in fall 2023, the Masimo Freedom™.[24] Like W1™, the Freedom™ would be a specialized niche device with health-monitoring features. Like W1™, the Freedom™ would fail to provide the communications and productivity capabilities that the Accused Devices provide to U.S. consumers. Although information about Freedom's™ complement of features has not yet been made available, the currently known differences between Freedom™ and W1™, as compared to Apple Watch, are that Freedom™ will require no subscription; Freedom™ will provide fall detection; and the price of Freedom™ will be double ($999) what the W1™ costs ($499).[25]

49.     Masimo admits that their consumer watch offerings are not intended as a general-purpose smartwatch. In a recent quarterly earnings call, Masimo CEO Joe Kiani, while referring to Masimo's watches, stated:

> As I've said before our customers that we're targeting are **people who have chronic illnesses** and need a serious monitor - that serious measurement - and they want it in a way that's unobtrusive.[26]

## IV. THE ACCUSED DEVICES PLAY A VITAL ROLE IN MEDICAL RESEARCH THAT CANNOT READILY BE REPLICATED

### A. Apple makes significant investments and has powerful positive impacts in medical research

50.     Apple Watch serves a critical role in the medical research landscape. Its importance comes from its combination of functionality, capabilities, and performance, all of which account for its widespread adoption by U.S. consumers.

---

[24] https://www.masimoconsumer.com/

[25] https://www.masimoconsumer.com/; https://www.masimopersonalhealth.com/products/masimo-w1

[26] https://events.q4inc.com/attendee/205736497/guest (emphasis added).

51. The Accused Devices' hardware, software, and open-source platform capabilities allow for decentralized and minimally invasive studies which are easy, quick, and lower cost for researchers, while also being significantly more inclusive and accessible for study participants than conventional trials.[27] The breadth of functionality and of consumer usage creates unprecedented opportunities in medical research.

52. Apple Watch is designed not only to track health metrics at an individual level, but to be a vehicle for large scale medical research as well. This research is generally implemented through Apple's ResearchKit, an open-source framework which allows developers to create program interfaces based on the collection of user data. ResearchKit allows for visual consent flows, which allows users to remotely consent to study participation. It can also be used for surveys. Building on Apple HealthKit and CareKit's tracking, centralization, and remote transmission of data, ResearchKit can be used to prompt a user or study participant to perform a dynamic task. Researchers and developers are also able to program custom tests and tasks, thereby harnessing the power of the smartwatch's functionality to collect topic-specific health metrics.[28]

53. Traditionally, trial participants have typically been required to physically travel to a given location, often on a regular basis. When recruiting a participant pool intended to be fully representative of the target population, these physical requirements have been a major limiting factor. Additionally, in studies conducted on patient populations with certain conditions, there may be health implications to travel which prevent or restrict patient

---

[27] https://www.fda.gov/about-fda/oncology-center-excellence/advancing-oncology-decentralized-trials; https://www.fda.gov/regulatory-information/search-fda-guidance-documents/decentralized-clinical-trials-drugs-biological-products-and-devices

[28] https://medium.com/kinandcartacreated/introductions-healthkit-researchkit-and-carekit-d72e2ac9ce2

Stay-Add-600

participation and contribute to high rates of drop-out and poor rates for follow-up. For example, almost 20% of oncology trials fail due to low recruitment, and one of the most significant factors for low accrual is distance from a clinic, along with participants' financial situation and health insurance obstacles, all of which may be mutually reinforcing.[29]

54.     ResearchKit and CareKit have negated many of those obstacles today. In conjunction with Apple Watch's health tracking functions, as implemented through application and study-specific software, the collective information generated by Apple Watch is remotely transmittable. The Apple Watch provides data at significantly more frequent intervals than traditional medical research and conventional approaches to clinical trials. Remote collection and transmission of data is a critical function used by researchers to transcend the limitations of traditional clinical trials and make unprecedented contributions to public and patient health.

**B. The widespread adoption by U.S. consumers of the Accused Devices benefits medical research**

55.     The Accused Devices' widespread adoption by consumers is one of the most important dimensions of their position in medical research, and one which cannot readily be replicated. Apple Watches are popular consumer devices that combine health capabilities with communications and productivity capabilities, and are purchased for a variety of reasons. As a result, the user base of U.S. consumers who have the Accused Devices is comprised of people with all levels of health and wellness, ranging from no or minimal medical conditions, through undiagnosed conditions, to chronic and acute conditions.

---

[29] https://www.fdamap.com/about-20-per-cent-of-cancer-clinical-trials-fail-due-to-low-patient-recruitment.html

56.     This diversity of existing users has important implications for medical research, particularly in combination with the broadened scope of study enrollment and frequent data collection allowed by remote transmission and device wearability. Researchers utilize the Accused Devices to study population-level impacts of wearable devices and their health features on preventative treatment and early and intervention.[30]

57.     For example, the American Heart association has stated:

> As prevalent consumer devices owned for reasons other than just their cardiac-data-related technologies, the user population is sufficiently large and representative of the subjects researchers seek to recruit, that they allow studies to be fully enrolled cost-effectively, facilitating research the AHA promotes. Additionally, the Devices and their users allow for types of research to occur that might not otherwise be attempted, or only attempted less frequently or with smaller sample sizes. Notably, they facilitate research into whether cardiac health outcomes can be improved by consumer devices detecting and triggering interventions. As the novelty of these devices has waned since their introduction, researchers benefit from and, to some extent, rely on the extent of consumer adoption of the Devices to design and recruit for research studies.[31]

## C. The ECG and SpO2 features on Accused Devices provide significant value for research and public health

58.     The ECG feature on Apple Watch has been FDA-authorized under Class II classification since 2018.[32] The functionality of this feature was powerfully affirmed during the COVID-19 public health emergency, when the FDA published guidance explicitly expanding and encouraging the use of certain technologies, including the ECG app, to assist in diagnosis and

---

[30] https://medium.com/kinandcartacreated/introductions-healthkit-researchkit-and-carekit-d72e2ac9ce2

[31] Public Interest Statement of Non-Party American Heart Association

[32] https://www.fiercebiotech.com/medtech/new-apple-watch-receives-fda-clearance-for-built-ecg

management of conditions by healthcare professionals.[33] The ECG feature is also critical to numerous medical studies.

59.  Many health studies are leveraging the ECG and SpO2 capabilities of the Accused Devices that are not available in the Apple Watch SE, or other devices such as the Masimo W1™.

60.  The Mayo Clinic is currently undertaking a study with 1 million participants studying how Apple Watch ECG data can be assessed by Artificial Intelligence algorithms for better prediction of heart disease.[34] The Mayo Clinic is also working with the FDA to use the Apple Watch ECG with a wide range of other features to study how to improve outcomes for patients with heart failure.[35]

61.  The American Heart Association is studying a drug with potential to treat atrial fibrillation, or AFib, by leveraging the ECG capabilities of the Accused Devices.[36]

62.  Northwestern University and Johns Hopkins received a $37 million grant for a seven-year study of stroke prevention and reducing the need for blood thinners among people with AFib by leveraging Apple Watch's ECG feature as well as its other sensors. "If proven effective, this new treatment paradigm will fundamentally change the standard of care for the millions of Americans living with AFib," said principal investigator Rod Passman, M.D., Northwestern Medicine's director of the Center for Arrhythmia Research and the Jules J. Reingold Professor of Electrophysiology. "Many of these patients are on blood thinners for the rest of their lives even if they

---

[33] https://www.apple.com/healthcare/docs/site/Apple_ECG_app_during_COVID-19.pdf

[34] https://clinicaltrials.gov/ct2/show/NCT05324566

[35] https://clinicaltrials.gov/ct2/show/NCT04191356

[36] https://clinicaltrials.gov/ct2/show/NCT04433091

have infrequent episodes of atrial fibrillation," Passman said. "If we can show this strategy is equally protective against stroke and reduces bleeding, that could save lives, reduce cost and improve quality of life."[37]

63.    Anthem Blue Cross Blue Shield and the University of California, Irvine, are using the SpO2 measurement feature of Apple Watch, along with many other health tracking features, to study how to improve asthma management. Rajeev Ronanki, Chief Digital Officer at Anthem, said, "Millions of Americans are struggling with their asthma condition each day and we're thrilled to collaborate with UCI, Apple and CareEvolution on studying new solutions."[38]

64.    The COVID-19 pandemic made clear the racial bias of many commercially available pulse oximeters.[39] Contrary to these products and competing wearable devices, the Apple Watch Series 6, 7, 8 and Ultra models' pulse oximeter technology were specifically designed and tested to ensure that results were not compromised by racial bias.[40]

65.    Asthma has been recognized for years as disproportionately affecting poor and minority communities, and as an issue of racial and environmental justice.[41,42] In the case of the Anthem and UC Irvine asthma study detailed above, disenfranchised communities stand to benefit from the results of accessible and diverse trial recruitment, especially as complemented by

---

[37] https://appleinsider.com/articles/22/08/29/new-apple-watch-study-aims-to-cut-blood-thinner-use-by-afib-patients; https://breakthroughsforphysicians.nm.org/northwestern-awarded-first-ever-national-grant-to-study-wearables-stroke-prevention-in-patients-with-atrial-fibrillation.html

[38] https://news.uci.edu/2020/09/16/anthem-uci-will-investigate-how-digital-tools-can-aid-asthma-management/

[39] https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2792653

[40] https://www.apple.com/healthcare/docs/site/Blood_Oxygen_app_on_Apple_Watch_October_2022.pdf

[41] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6042867/

[42] https://aafa.org/asthma-allergy-research/our-research/asthma-disparities-burden-on-minorities/

pulse oximetry technology that is better able to self-correct for skin color than others on the market.[43]

**D. Various medical research is at risk in the event the Requested Remedies prevail**

66.  The largest study ever conducted on Parkinson's disease, with 10,000 participants, was conducted with the ResearchKit-designed mPower app.[44] 93% of trial participants had never participated in a study before.

67.  A study of AFib published in the New England Journal of Medicine had 419,297 participants leveraging an Apple Watch. According to the study's Conclusions:

> This site-less (no on-site visits were required for the participants), pragmatic study design provides a foundation for large-scale pragmatic studies in which outcomes or adherence can be reliably assessed with user-owned devices.[45]

68.  This study is important as AFib can often show no symptoms, and about 700,000 people in the United States alone may have AFib and not know it.[46]

69.  An Apple Heart and Movement study with the American Heart Association studied 500,000 people used Apple Watch sensors to identify factors or early warning signs that impact heart health or mobility.[47]

70.  A study with Nightware used the Apple Watch to address nightmare disorders associated with post-traumatic stress. The study monitored the

---

[43] https://www.apple.com/healthcare/docs/site/Blood_Oxygen_app_on_Apple_Watch_October_2022.pdf

[44] https://www.apple.com/lae/researchkit/

[45] https://www.nejm.org/doi/10.1056/NEJMoa1901183

[46] https://www.webofscience.com/wos/woscc/full-record/WOS:000429791900022?SID=USW2EC0D3CU1Lq4JY6XtCADXotLHT

[47] https://clinicaltrials.gov/ct2/show/NCT04198194

sleeping patients via Apple Watch, which would vibrate when sensing a nightmare to disrupt the event without waking the participant.[48]

71.     A Stanford study used Apple Watch to improve care for spine surgery patients. Previously it was impossible for surgeons to track mobility of patients before and after surgery. According to the study's Intervention/treatment:

> The Apple Watch and App are used for this study to record patient's mobility information (e.g., step counts, heart rate, stairs climbed, distance traveled) as well as provide an additional platform for patients to complete questionnaires.[49]

72.     The studies mentioned above used Apple Watch for research into a range of different health issues, including asthma, Parkinson's, AFib, heart disease, nightmares, strokes, post-operative treatment, and general health and mobility. Those studies involved almost 2 million participants. Therefore, excluding the Accused Devices would have a significant and

---

[48] https://clinicaltrials.gov/ct2/show/NCT03828656

[49] https://clinicaltrials.gov/ct2/show/NCT04379921

negative impact on medical research. As Dr. Russell Bowler stated in his declaration:

> A key feature of consumer devices is their integration of multiple sensors and particularly oxygen saturation (SpO2) for patients with respiratory diseases. In these patients from our research studies and personally my research group has found the Apple Watch to be an exceptional device that accurately measures important parameters such as heart rate, physical activity, and oxygen saturation. Coupled with monitoring apps, these parameters help predict the onset of acute illness. The devices are also significantly less expensive than research only devices and depriving consumers of the devices might unnecessarily limit access to remote medical monitoring in underserved groups (e.g., rural patients) who do not have ready access to specialists.[50]

## V. THE ACCUSED DEVICES PROVIDE U.S. CONSUMERS WITH SIGNIFICANT HEALTH, WELLNESS, AND SAFETY BENEFITS

### A. Apple Watch can alert users to latent medical conditions

73.    The Apple Watch includes two FDA-authorized health apps: ECG and irregular heart rhythm notification (IRN).[51,] These are authorized as "software as a medical device" (SaMD)[52], and both can provide health-supporting and sometimes life-saving measurements of a user's heart function.

74.    An ECG can help diagnose many common heart problems, such as arrhythmias and coronary artery disease, as well as help monitor the effectiveness of heart disease treatments.[53] While some other

---

[50] Letter "Support for the Apple Watch for use in tracking physiologic features in medical patients." from Dr. Russell Bowler M.D., PhD., Director of COPD Clinic and Precision Medicine and Professor of Medicine of National Jewish Health

[51] https://www.apple.com/newsroom/2018/12/ecg-app-and-irregular-heart-rhythm-notification-available-today-on-apple-watch/

[52] https://www.fda.gov/medical-devices/digital-health-center-excellence/software-medical-device-samd

[53] https://www.mayoclinic.org/tests-procedures/ekg/about/pac-20384983

Stay-Add-607

smartwatches have FDA-authorized ECG monitoring, Apple Watch is the only general-purpose smartwatch with continuous monitoring that requires no user participation.[54]

75.     As IRN runs in the background of Apple Watch, a user may be alerted to a heart condition they otherwise would not know they had, such as AFib, which can lead to a stroke or heart attack. More than 454,000 hospitalizations occur each year where AFib is the primary diagnosis, yet the condition frequently goes undetected for lack of clear symptoms.[55]

76.     Such IRN alerts may have saved thousands of lives. For example, in the Stanford Apple Heart Study, 2,161 of the 400,000 participants were alerted by their Apple Watch of an irregular heart rhythm. Of those who received irregular notifications, 1,376 responded to a 90-day survey, and over 57% of these participants chose to seek medical attention they would not have otherwise sought and obtained.[56]

77.     There are other instances where IRN alerts are attributed to saving lives. In one case, a Maine resident received an alert and sought medical care that revealed a tumor on her heart. She underwent five hours of open-heart surgery at a Boston hospital.  The patient's surgeon assessed that she would have had "a massive stroke and died" if left untreated.[57]

78.     In another case, a woman felt tightness in her chest while her Apple Watch indicated a heart rate of 169 beats per minute. Tests revealed a blockage in her coronary arteries that was later successfully cleared in surgery.[58] In yet

---

[54] https://pocketnow.com/best-smartwatches-for-ecg/

[55] https://www.cdc.gov/heartdisease/atrial_fibrillation.htm

[56] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8112605/

[57] https://www.today.com/health/womens-health/heart-tumor-apple-watch-atrial-fibrillation-rcna39993

[58] https://www.wzzm13.com/article/news/health/norton-shores-woman-credits-apple-watch-for-detecting-heart-condition/69-6b2db4b5-2d3f-47f0-a069-2d0961bbec4b

another case, a teenage boy received an alert that his heart rate was spiking, which led to an eight-hour corrective surgery.[59] In contrast, Samsung Watch does not currently detect AFib.[60]

**B. Health and wellness tracking by Accused Devices is enabled by their wide range of sensors and capabilities, in particular relative to specialized single-purpose devices**

79.    The Masimo W1™ watch is a specialized device designed for users with specific medical requirements from their wearable. In comparison, the Accused Devices are constructed to meet a wide range of consumer requirements. Because of their more robust range of functionality and support for broader and deeper capabilities, the Accused Devices include several more sensors and capabilities than Masimo's watch.

80.    The Masimo W1™ can monitor SpO2 levels, pulse rate, heartrate, relative level of hydration, relative strength of pulse, pleth variability, sleep, and respiration rate.[61]

81.    In comparison, the newest of the Accused Devices, the Series 8 and the Ultra, have the following features: emergency calling, fall detection, crash detection, SpO2 sensor and app, electrical heart sensor, optical heart sensor, temperature sensor, ECG, heartrate notifications, irregular heart rhythm notification, sleep stage tracking, and fertility cycle tracking.[62] The Accused Devices also feature over 20,000 third-party apps to further meet the health and productivity requirements of U.S. consumers.[63]

---

[59] https://kfor.com/news/stratford-teen-spreads-heart-health-awareness-after-apple-watch-notifies-him-of-heart-rate/

[60] https://www.pcmag.com/news/samsung-galaxy-watch-gets-fda-clearance-to-monitor-for-afib

[61] https://www.masimopersonalhealth.com/products/masimo-w1

[62] https://www.apple.com/watch/compare/

[63] https://www.techradar.com/best/best-apple-watch-apps-2022

PUBLIC VERSION

other family members.[82] For parents and caregivers, a cellular-enabled Apple Watch with Family Setup allows their children and teenagers to stay connected without a smartphone. This allows parents to view their child's location, monitor their contacts, and provide emergency funds through Apple Cash.[83,84]

97.    Cellular-enabled smartwatches can be life-changing and potentially life-saving for older adults in the United States, a demographic of approximately 73 million; another approximately 365,000 U.S. consumers turn 65 each year.[85] The security of a cellular-enabled wrist device equipped with Family Setup functions such as locator capabilities, movement monitoring, and fall detection/alerts can facilitate greater independence for the wearer and offer peace of mind to their loved ones.

98.    In addition to those features available on all Apple Watches, the Apple Watch Ultra has a feature to turn on a siren that can be heard from 600 feet away.[86] This siren can be used to signal for help in an emergency.

99.    Exclusion of the Accused Devices could have potentially life-threatening consequences for U.S. consumers as access to these important safety features would become unavailable.

**E.  The Requested Remedies would mean the loss of continuous health-data tracking for existing users**

100.   Under an Exclusion Order, current users of the Accused Devices would be unable to replace their lost, stolen, or nonfunctioning smartwatch with a device that meets their requirements, as the Accused Devices would no

---

[82] https://www.epiwatch.com/home#anchor-1

[83] https://support.apple.com/en-us/HT211782

[84] https://support.apple.com/en-us/HT211768

[85] https://www.census.gov/library/stories/2019/12/by-2030-all-baby-boomers-will-be-age-65-or-older.html

[86] https://support.apple.com/en-us/HT213438

longer be available. Those users would be unable to continuously track important health data as they had in the past, or to access the Accused Devices' distinct health-enhancing and life-saving features.

## VI. THE REQUESTED REMEDIES WOULD HAVE A SIGNIFICANT ADVERSE IMPACT ON THE U.S. ECONOMY

### A. The Requested Remedies would impact U.S. employment

101.    The Requested Remedies, if granted, would have far-reaching impacts on the U.S. economy. According to Apple's most recent data, its "job footprint" equals 2.4 million jobs across all 50 states: 90,000 direct jobs and an anticipated 110,000 in 2023; 450,000 jobs through its 9,000 U.S. suppliers and manufacturers; and 1.9 million jobs in the app economy.[87] Apple's U.S. job footprint extents to many professions, including but not limited to software and hardware engineers, app developers, designers, scientists, manufacturing, construction, retail, customer support, and marketing.[88]

102.    Apple's 2020 Supplier List, the most recent available, includes companies from across the United States, many of them manufacturers: Alabama (3M); Arizona (Intel); California (IDEMIA, II-VI Inc., Microchip Tech. Inc., Pegatron Corp., Renesas, Skyworks); Colorado (Broadcom, Microchip Tech. Inc.); Florida (Qorvo); Georgia (Solvay); Idaho (ON Semiconductor Corp.); Illinois (II-VI Inc.); Indiana (SABIC Innovative Plastics); Iowa (3M); Kentucky (Corning); Maine (ON Semiconductor Corp., Texas Instruments); Massachusetts (Intel, Skyworks, Wickeder); Minnesota (3M, Henkel); New Hampshire (Henkel); New Jersey (II-VI Inc.); New Mexico (Intel); North Carolina (Qorvo); Ohio (3M, Solvay); Oregon (Alpha & Omega Semiconductor, Intel, Maxim, ON Semiconductor Corp., Qorvo);

---

[87] https://www.apple.com/newsroom/2019/08/apples-us-job-footprint-grows-to-two-point-four-million/

[88] https://www.apple.com/job-creation/

Stay-Add-611

smartwatches, this shortfall could not be mitigated within a commercially reasonable time.

143.    The Accused Devices are important to health and welfare of many U.S. consumers, and medical research.

I declare, under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed on June 5, 2023, in Cambridge, Massachusetts.

_____
Michael A. M. Davies Chairman
Endeavour Partners

PUBLIC VERSION

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, DC**

---

In the Matter of

**CERTAIN LIGHT-BASED**
**PHYSIOLOGICAL**
**MEASUREMENT DEVICES AND**
**COMPONENTS THEREOF**

**Inv. No. 337-TA-1276**

---

# DECLARATION OF CHRISTIAN M. DIPPON, PHD

1.   My name is Christian Dippon. I am over 21 years of age, of sound mind, and make this

declaration based upon my experience, training, and knowledge, as described below.

Apple Inc. (Apple or Respondent) retained me to examine the ramifications on the

statutory public interest factors if the International Trade Commission (ITC) approves

Masimo Corporation and Cercacor Laboratories, Inc.'s (Complainants) requested

exclusion or cease and desist order (collectively, requested remedial orders) pertaining to

the importation of Apple Watches with light-based pulse oximetry functionality and

components thereof (Accused Functionality).[1]

2.   I am an economist and a Senior Managing Director at the Washington, DC, office of

NERA Economic Consulting (NERA) where I also serve as Chair of the Global Energy,

Environment, Communications, and Infrastructure Practice and a member of its Board of

Directors. I have 27 years of experience in complex litigation disputes, competition cases,

and regulatory matters with a specialization in the communications, internet, and high-

---

[1] See Certain Light-Based Physiological Measurement Devices and Components Thereof,
Complainants' Statement on the Public Interest, Inv. No. 337-TA-1276, February 23, 2023, pp.
1–3 (hereinafter Complainants' Statement).

## II. GRANTING COMPLAINANTS' REQUESTS WOULD HARM SEVERAL DIMENSIONS OF THE PUBLIC INTEREST

22. Excluding Apple Watches with the Accused Functionality stands to fundamentally harm US consumers and competition in the United States, thereby harming the public interest. First, the substantial sales volumes of the accused Apple Watches signal that the devices offer US consumers important benefits that would be lost with a ban. Second, consumers for whom the accused Apple Watches maximize their personal satisfaction (utility) would necessarily be harmed because a ban would prevent them from achieving the maximum level of satisfaction. Third, removing a major provider of smartwatches would lessen competition, and a sudden shortfall of smartwatches would likely yield higher prices, which would impose further harm on US consumers. I discuss each of these public interest harms in turn.

### A. An Exclusion Order Would Remove a Significant Portion of Smartwatches

23. Complainants' requested Apple Watch ban would result in a substantial and immediate reduction of the available smartwatches in the United States. Although an exclusion order necessarily implies a reduction in the consumer choice sets, banning Apple Watches with the Accused Functionality would remove one of the most popular smartwatches in the United States.

24. Apple sells a substantial number of Apple Watches with the Accused Functionality to US consumers. In the nine quarters between the release of the Apple Watch Series 6 in September 2020 and December 2022, Apple sold approximately ██████ Apple Watches with the Accused Functionality in the US.[39] This, for example, compares to an

**CONFIDENTIAL INFORMATION REDACTED**

average 16.9 million imports of automobiles into the United States over a nine quarter period.[40] Based on US consumers' purchase patterns, I estimate that remedial orders would diminish smartwatch availability in the United States by some ███████ devices per year or ███████ devices over the five-year requested exclusion period.[41] As illustrated, the requested remedial orders would cause an immediate, significant shortfall of smartwatch supply in the United States and threaten a shortfall in supply over the five-year requested exclusion period. Given the broad reliance of US consumers on the accused products, their potential removal requires careful analysis because it could have public interest repercussions that extend far beyond the removal of just another electronic device.

### B.    An Exclusion Order Would Impose Significant Costs on US Consumers

25.    Complainants' requested Apple Watch ban stands to impose significant harm on US consumers and thus the public interest. The importance of Apple Watches to US consumers indicates that these devices maximize their economic utilities (i.e., satisfaction) and thus removing them will reduce consumer satisfaction, which implies harm to the public interest. Moreover, banning a major provider of smartwatches risks reducing competitive pressure, which would allow other device manufacturers to raise their prices. Higher retail prices would further diminish consumer satisfaction, which is also detrimental to the public interest.

---

[40] See "Number of motor vehicles imported by the United States from 2017 to 2020," Statista, September 30, 2022, https://www.statista.com/statistics/1280811/us-motor-vehicle-imports/.

[41] ████████████████████████████████████████████████████████████████

26.    To analyze these effects and the impact they have on the public interest requires an understanding of consumer surplus and more directly the loss in consumer surplus as a result of granting the requested remedial orders. The following sections explain the concept of consumer surplus and the critical role it plays in public policy analysis, merger analysis, and other public decision making and illustrates this principle in the context of the Commission's present Investigation.

### 1.    Importance of consumer surplus in a public interest analysis

27.    A consumer surplus analysis is fundamental when examining the repercussions of government actions. Consumer surplus is the net value a consumer gains from consuming a product or service.[42] In the present Investigation, it is the difference between the value a US consumer places on owning an Apple Watch with the Accused Functionality and the price they pay for the device.

28.    The concept of using consumer surplus analysis to understand the public interest ramifications of government actions is not new. In fact, several US government entities, including the Office of Management and Budget (OMB), the Department of Justice (DOJ), the Federal Trade Commission (FTC), and the FCC routinely apply consumer surplus analysis as part of their decision-making process. For instance, in 2003, during the George W. Bush administration, the OMB issued a Circular to federal agencies "designed to assist … regulatory agencies by defining good regulatory analysis."[43] The Circular highlighted the use of regulatory analysis as a tool "to anticipate and evaluate the

---

[42] See, e.g., Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization* (United Kingdom: Pearson/Addison Wesley, 2005), 70.

[43] Office of Management and Budget, Circular A-4, To the Heads Of Executive Agencies And Establishments, September 17, 2003, p. 1, https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4/.

PUBLIC VERSION

likely consequences of rules."[44] It explained that such analysis requires developing

benefit and cost estimates using consumer surplus analysis:

> "Opportunity cost" is the appropriate concept for valuing both benefits and
> costs. The principle of "willingness-to-pay" (WTP) captures the notion of
> opportunity cost by measuring what individuals are willing to forgo [pay]
> to enjoy a particular benefit. … Adoption of WTP as the measure of value
> implies that individual preferences of the affected population should be a
> guiding factor in the regulatory analysis.
>
> Market prices provide rich data for estimating benefits and costs based on
> willingness-to-pay if the goods and services affected by the regulation are
> traded in well-functioning competitive markets. The opportunity cost of an
> alternative includes the value of the benefits forgone as a result of
> choosing that alternative. The opportunity cost of banning a product – a
> drug, food additive, or hazardous chemical – is the forgone net benefit
> (i.e., lost consumer and producer surplus) of that product, taking into
> account the mitigating effects of potential substitutes.[45]

The current administration has recently released a draft of an updated version of the

Circular which retains consumer surplus analysis among the key concepts used to

estimate benefits and costs.[46]

29.     The FCC, an independent agency, also applies the concept of consumer surplus. The FCC

used a consumer surplus analysis in its decision on setting interstate rates for prison

inmate calling services as well as having presented it in its review of the T-Mobile–Sprint

merger application.[47]

---

[44] Ibid.

[45] Ibid, pp. 11–12 (footnote omitted).

[46] See Office of Management and Budget, "Circular A-4," Draft for Public Review, April
6, 2023, pp. 28–31.

[47] See Federal Communications Commission, *Rates for Interstate Inmate Calling
Services*, R&O/NPRM, 36 FCC Rcd 9519 (13) (2021), FCC-21-60A1_Rcd.pdf; see also
*Expanding Flexible Use of the 3.7 to 4.2 GHz Band*, Report And Order, Order Of Proposed
Modification, 35 FCC Rcd 2343 (3) (2020), FCC-20-22A1_Rcd.pdf; *Applications of T-Mobile
US, Inc. and Sprint Corporation For Consent to Transfer Control of the Licenses and
Authorizations*, Joint Opposition of T-Mobile US, Inc. And Sprint Corporation, WT Docket No.
18-197, September 17, 2018, pp. 71–72,
https://www.sec.gov/Archives/edgar/data/101830/000119312518296013/d614679d425.htm.

**PUBLIC VERSION**

30.     A member of the FTC staff, another independent agency, provided several additional examples of consumer surplus analyses. In an article published in a peer-reviewed journal, the FTC staffer described the FTC's approach in a deceptive advertising case the agency brought against Volkswagen pertaining to claims the car manufacturer made related to its diesel engines:

> The FTC's goal in the settlements was to compensate for consumer injury caused by the alleged deception. This involves comparing consumer surplus with the deceptive claims to consumer surplus in the counterfactual universe where product features are truthfully represented.[48]

The FTC viewed the potential injury to Volkswagen's consumers as including:

> (1) the price premium that consumers paid due to the deceptive claims, (2) the additional lost consumer surplus from driving the TDI diesels rather than the alternative (preferred) vehicle that consumers would have bought in the no-deception counterfactual….[49]

The author elaborates that the FTC applied similar consumer surplus analyses in matters pertaining to consumer data breaches.[50]

### 2.     A ban's harmful choice and price effects

31.     Granting the requested remedial orders would result in a *reduction* of consumer surplus and therefore represents a *harm* to the public interest. As with the Volkswagen example noted above, the consumer surplus loss would be twofold. First, a ban on Apple Watches would cause consumer surplus losses because it would remove the Apple Watch with the Accused Functionality from the US consumer choice set. I refer to this type of consumer surplus loss as the choice effect. Second, a ban on Apple Watches would reduce

---

[48] J. K. Pappalardo, "Economics of Consumer Protection: Contributions and Challenges in Estimating Consumer Injury and Evaluating Consumer Protection Policy," *Journal of Consumer Policy*, April 6, 2022, https://doi.org/10.1007/s10603-021-09482-4, p. 228.

[49] Ibid.

[50] Ibid, pp. 229–231.

**PUBLIC VERSION**

competition and exert upward pressure on retail price for alternatives. I refer to this type of consumer surplus loss as the price effect. The choice and price effects are additive, implying that the total consumer surplus loss from granting Complainants' requested remedial orders is the sum of the losses from a constriction of choice and higher retail prices.

32.    A first example illustrates the choice effect. Consider a consumer who decides to purchase an Apple Watch with the Accused Functionality. That consumer's purchase decision signals that the Apple Watch maximizes that consumer's total personal utility (satisfaction).[51] Assume the consumer is willing to pay $500 for the device, implying that the consumer values the full range of functionalities of an Apple Watch at $500. Also, assume the consumer pays $300 for the device. This implies that the consumer realized a net gain or consumer surplus of $500–$300=$200 for their Apple Watch purchase. Figure 1 depicts this baseline scenario.

**Figure 1: Consumer Surplus Is the Net Gain to Consumers**



Source: NERA

---

[51] See, e.g., "Economics Utility and Preferences," Cliff Notes, accessed May 30, 2023, https://www.cliffsnotes.com/study-guides/economics/theory-of-the-consumer/utility-and-preferences.

**PUBLIC VERSION**

33.    Now, assume an alternative scenario where the Apple Watch is not available for purchase because of an import ban. If so, the consumer must switch to a second-best choice. The second-best choice purchased by the consumer may include a range of different product alternatives, including smartwatches and fitness trackers, depending on the mix of specific features the consumer values most. However, by definition, the consumer surplus the consumer gains from a second-best alternative is less than the first choice. Assume, the consumer decides to purchase a second-best alternative for which the consumer is willing to pay $300. With a sale price of $150, the consumer nets a consumer surplus of $300–$150=$150 from the second-best alternative purchase. Thus, because the Apple Watch was not available for purchase, the consumer realized $150 in consumers surplus instead of $200, implying a consumer surplus loss of $200–$150=$50. Figure 2 depicts the choice effect.

**Figure 2: Fewer Choices Mean Less Consumer Surplus**



Source: NERA

34.    A second example illustrates the price effect. Consider, once more, the consumer who purchases the second-best alternative in the absence of the Apple Watch with the Accused Functionality. With a maximum willingness to pay of $300 and a retail price of

© NERA Economic Consulting                                                                18

**PUBLIC VERSION**

$150, the consumer realizes $300–$150=$150 in consumer surplus. However, if weakened competition brought about by a ban on Apple Watches allows the other providers to raise their prices, the consumer loses surplus. For instance, if the manufacturer of the second-best alternative charges $200 for the device, then the consumer realizes a $300–$200=$100 in consumer surplus, implying that this consumer lost $150–$100=$50 in consumer surplus because of banning the Apple Watch. Figure 3 depicts the price effect.

**Figure 3: Higher Prices Mean Less Consumer Surplus**



Source: NERA

35.    As noted, the choice and price effect are additive. To reuse the two examples, a consumer seeking to purchase an Apple Watch with the Accused Functionality would experience a consumer surplus loss of $50 because that consumer's utility-maximizing choice is not available *and* a consumer surplus loss of $50 because the consumer had to pay a higher price for the second-best alternative. This implies that the ban of the Apple Watch caused the consumer $50+$50=$100 in consumer surplus losses. Figure 4 depicts the total consumer surplus loss effect.

**Stay-Add-621**

**Figure 4: The Choice and Price Effects Are Additive**



Source: NERA

## III. GRANTING COMPLAINANTS' REQUESTS WOULD HARM THE STATUTORY PUBLIC INTEREST FACTORS

36.    Granting the requested remedial orders would harm at least three of the statutory public interest factors. First, the public interest would be harmed by removing a smartwatch with a comprehensive set of health-related apps. Second, the removal of Apple as a major smartwatch manufacturer would weaken competition. Third, as a consequence of the prior two sources of harm, US consumers will suffer from the choice effect, the price effect, and a reduction in innovation.

### A.    An Exclusion Order Would Present Public Health Concerns

37.    A ban on Apple Watches with the Accused Functionality would raise public health concerns because the Apple Watch serves as an indicator of certain illnesses and helps to advance clinical research. Although not a medical device, banning Apple Watches with the Accused Functionality deprives US consumers of the health-related benefits these devices provide.

38.    First, as an integrated device, removing the Apple Watch with the Accused Functionality not only removes the Accused Functionality but also all other health features that are part

**PUBLIC VERSION**

forgo other health-related functionalities. Consumers who opt for other substitute products would similarly forgo the value of other features.

**B.    An Exclusion Order Would Harm Competitive Conditions in the United States**

46.    Granting the requested remedial orders would cause significant disruptions in competitive conditions related to the sale of smartwatches. The requested remedial orders likely would create an artificial, immediate, and significant shortage of smartwatches. I have seen no evidence in the record indicating that it is reasonable to expect that other manufacturers of smartwatches can increase production by year-end 2023 or that other manufacturers would be able to completely replace the supply of excluded Apple Watches over the next five years. It is unlikely that these manufacturers could fill the void left by a ban on Apple Watches.

47.    Even if other manufacturers could increase production in time, which is unlikely, US consumers would still face surplus losses. Absent Apple Watches with the Accused Functionality, consumers would be forced to purchase their second-best alternative and would still face a likely retail price increase.

48.    Granting the requested remedial orders would also have a significant negative impact on competitive conditions related to the sale of smartwatches. First, removing Apple Watches with the Accused Functionality would eliminate millions of smartwatches that consumers have chosen as most desirable.

49.    Second, a ban would impede the progress of innovation that Apple has led. As illustrated in Figure 5, Apple has been at the forefront of innovation for many years. The company

PUBLIC VERSION

won the accolade of best invention of 2007 with its first iPhone.[79] Its iPad that it introduced three years later was the first in a category that later became the tablet category.[80] Apple, among other things, also introduced the app store, personal voice assistant, and digital wallet.[81] More important, Apple's innovations prompted competing firms to follow suit. For instance, following the introduction of the App store in 2008, Google introduced the Android Market (now known as Google Play). After Apple introduced its voice assistant Siri in 2011, Microsoft introduced Cortana in 2014 and Samsung introduced Bixby in 2017.

**Figure 5: A Ban Would Reduce Innovation in the United States**



Sources: NERA research.

---

[79] See Lev Grossman, "Invention of the Year: The iPhone," *Time*, November 1, 2007, https://content.time.com/time/specials/2007/article/0,28804,1677329_1678542_1677891,00.html.

[80] See Tom Warren, "Apple's iPad Changed the Tablet Game 10 Years Ago Today," *The Verge*, January 27, 2020, https://www.theverge.com/2020/1/27/21083369/apple-ipad-10-years-launch-steve-jobs-tablet-market.

[81] See "The App Store turns 10," Apple Newsroom, July 5, 2018, https://www.apple.com/newsroom/2018/07/app-store-turns-10/; see also "Siri," SRI International, accessed May 30, 2023, https://www.sri.com/hoi/siri/; see also Quina Baterna, "What is Apple Wallet and How Do You Use It?" *MUO*, June 23, 2021, https://www.makeuseof.com/what-is-apple-wallet/.

**Stay-Add-624**

50.    Apple's innovations are particularly pronounced in the field of health-related

functionalities. As summarized by *Forbes*, "The future of Apple's healthcare offerings

are [sic] incredibly bright" and "the drive with which the technology company is building

these products is inspiring, given the significant value these features may potentially

provide to millions of people."[82]

51.    Apple's innovations pertaining to smartwatches have also led other firms to follow suit.

For instance, Apple's ECG app gained FDA clearance in 2018 with Samsung and Fitbit

following in 2020 and Withings in 2021.[83] Similarly, in 2018, Apple became the first

smartwatch company to receive FDA clearance for its IRN feature.[84] Fitbit followed

several years later in 2022.[85]

---

[82] Sai Balasubramanian, "The Apple Watch Is A Promising Venture In Healthcare Technology," *Forbes*, April 29, 2022, https://www.forbes.com/sites/saibala/2022/04/29/the-apple-watch-is-a-promising-venture-in-healthcare-technology/?sh=22974133543c.

[83] See Letter from Angela C. Krueger (Office of Device Evaluation), Re: DEN180044, to Apple Inc, on September 11, 2018, https://www.accessdata.fda.gov/cdrh_docs/pdf18/DEN180044.pdf; Letter from Jennifer Shih (Office of Product Evaluation and Quality), Re: K201168, to Matthew Wiggins, Ph.D. (Samsung Electronics Co., Ltd) on August 4, 2020 (with Enclosure), https://www.accessdata.fda.gov/cdrh_docs/pdf20/K201168.pdf; see also Letter from Jennifer Shih Kozen (Office of Product Evaluation and Quality), Re: K200948, to Shruti Rajagopalan (Fitbit Inc.) on September 11, 2020 (with Enclosure), https://www.accessdata.fda.gov/cdrh_docs/pdf20/K200948.pdf; Letter from Jennifer Shih Kozen (Office of Product Evaluation and Quality), Re: K201456, to Debreuil Xavier (Withings SA) on October 5, 2021, https://www.accessdata.fda.gov/cdrh_docs/pdf20/K201456.pdf.

[84] See Letter from Angela C. Krueger (Office of Device Evaluation), Re: DEN180042, to Apple Inc, on September 11, 2018, https://www.accessdata.fda.gov/cdrh_docs/pdf18/DEN180042.pdf.

[85] See Letter from Jennifer Shih Kozen (Office of Product Evaluation and Quality), Re: K212372, to Randy Parry (Fitbit Inc.) on April 8, 2022, https://www.accessdata.fda.gov/cdrh_docs/pdf21/K212372.pdf.

PUBLIC VERSION

### C.     An Exclusion Order Would Harm US Consumers

52.     Considering the reduction of choice in smartwatches as well as the resulting competitive

distortions caused by the requested remedial orders, it follows that granting these requests

would have a significant and immediate negative impact on consumers. A ban on Apple

Watches with the Accused Functionality would harm consumers in several ways.

53.     First, as I detail in Section II.B, an import ban would harm US consumer welfare by

eliminating the preferred choices of smartwatch for a significant portion of US consumers

resulting in a loss of consumer surplus, which is the difference between the value

consumers place on Apple Watches with the Accused Functionality and the prices they

pay for these devices. Given the substantial number of US consumers that select the

Apple Watch over competing devices implies that this choice effect would impose

substantial harm on the public interest.

54.     Second, as detailed in Section II.B, US consumers would suffer further surplus losses

because of the higher prices they would likely pay for smartwatches in a post-ban

environment. Given the substantial number of US consumers that select the Apple Watch

over competing devices and considering the leading innovative role that Apple has played

in developing smartwatches and other devices, the competitive shift will be significant

with prices likely increasing. The price effect would impose substantial harm on the

public interest.

55.     Third, if the Commission were to grant the requested remedial orders, US consumers

would lose a substantial portion of the trade-in value of their existing Apple Watches.

Currently, Apple and Samsung both provide trade-in services for consumers purchasing a

new smartwatch. Apple accepts trade-ins for Apple Watches and offers up to $165 in

PUBLIC VERSION

trade-in credit for a Series 7 and $110 for a Series 6.[86] Samsung accepts trade-ins for its

own smartwatches and for Apple, Fitbit, Garmin, and Fossil smartwatches.[87] The highest

trade-in value Samsung offers for consumers purchasing a new smartwatch is $155 for

the Apple Watch Series 7. The other non-Apple (and non-Samsung) watches are only

eligible for $70 trade-ins.[88] A ban would diminish the trade-in value of the Apple Watch

in at least three respects. First, consumers would no longer be able to trade in their Apple

Watches to Apple because Apple would not be permitted to sell them a new Apple Watch

that included the same features as their trade in. Consequently, the company would have

the incentive to reduce its trade-in program. Second, other manufacturers would have

reduced incentives to attract Apple Watch users via trade-in programs. Smartwatch

sellers offer trade-ins as a method of keeping or attracting customers from competitors. If

Apple's competitiveness is diminished due to the inability to sell new Apple Watches

with the Accused Functionality, other manufacturers will not be as motivated to attract

users with Apple Watch trade-in programs. Third, US consumers owning an Apple

Watch would see a reduction in the Apple Watch's trade-in or resale value because of the

requested ban on the importation of component parts and replacement units.[89] Such a ban

---

[86] See "Apple Trade In, Apple Watch," accessed May 28, 2023, https://www.apple.com/shop/trade-in.

[87] There is also a category called Other. See "Galaxy Watch5, Trade-In Brands," Samsung website, accessed May 30, 2023, https://www.samsung.com/us/watches/galaxy-watch5/buy/.

[88] See "Galaxy Watch5, Apple Trade-In," Samsung website, accessed May 30, 2023, https://www.samsung.com/us/watches/galaxy-watch5/buy/.

[89] See Complainants' Statement, p. 2; see also Complaint, ¶ 7. Apple states, "Every Apple Watch, Apple Watch Nike, and Apple Watch Ultra comes with one year of hardware repair coverage through its limited warranty and up to 90 days of complimentary technical support." ("AppleCare Products–Watch," Apple, accessed May 28, 2023, https://www.apple.com/support/products/watch/.)

**PUBLIC VERSION**

would make it more difficult for Apple to repurpose trade-ins and thus diminishes the value of trade-ins.

## IV.    CONCLUSION

56.    Based on the analyses and considerations discussed herein, it is my expert opinion that the requested remedial orders pertaining to the current lineup of Apple Watches with the Accused Functionality as well as future Apple Watch models with the same functionalities would impose significant harm on the public interest. It would: (1) negatively impact public health by removing lifesaving functionalities, (2) impede clinical research, (3) distort competitive conditions, (4) create an immediate and significant shortfall of smartwatches, (5) harm US consumers by preventing them from buying an Accused Apple Watch and potentially requiring them to pay a higher price for whatever alternative they ultimately purchase, and (6) harm current Apple Watch users by diminishing the retail values of their Apple Watches.

**PUBLIC VERSION**

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed June 5, 2023, in Washington, District of Columbia.

_____
CHRISTIAN M. DIPPON

# EXHIBIT 16

(12) **United States Patent**
　　Allen et al.

(10) **Patent No.:**　　**US 7,620,212 B1**
(45) **Date of Patent:**　　**Nov. 17, 2009**

(54) **ELECTRO-OPTICAL SENSOR**

(75) Inventors: **Jeffrey G. Allen**, Albuquerque, NM
(US); **Stephen P. Corcoran**, Corrales,
NM (US); **David M. Gabel**,
Albuquerque, NM (US); **Damien M.
Gonzales**, Albuquerque, NM (US);
**Robert M. Harbour**, Santa Fe, NM
(US); **Shonn P. Hendee**, Albuquerque,
NM (US); **Kristin A. Nixon**,
Albuquerque, NM (US); **Robert E.
Ostrom**, Albuquerque, NM (US);
**Robert K. Rowe**, Corrales, NM (US);
**Timothy Rowe**, Cambridge, MA (US)

(73) Assignee: **Lumidigm, Inc.**, Albuquerque, NM (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 963 days.

(21) Appl. No.: **10/640,503**

(22) Filed: **Aug. 12, 2003**

**Related U.S. Application Data**

(60) Provisional application No. 60/460,247, filed on Apr.
4, 2003, provisional application No. 60/403,453, filed
on Aug. 13, 2002, provisional application No. 60/403,
452, filed on Aug. 13, 2002, provisional application
No. 60/403,593, filed on Aug. 13, 2002, provisional
application No. 60/403,461, filed on Aug. 13, 2002,
provisional application No. 60/403,449, filed on Aug.
13, 2002.

(51) **Int. Cl.**
　　*G06K 9/00*　　　　(2006.01)

(52) **U.S. Cl.** ..................... **382/115**; 340/5.53; 340/5.83;
713/186

(58) **Field of Classification Search** ......... 382/115–127;
340/5.1, 5.2, 5.52, 5.53, 5.8–5.86; 902/3;
356/71; 713/186
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 3,508,830 | A | 4/1970 | Hopkins el al. |
| 3,910,701 | A | 10/1975 | Henderson et al. |
| RE29,008 | E | 10/1976 | Ott |
| 4,035,083 | A | 7/1977 | Woodriff et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

EP　　0 280 418 A1　　8/1988

(Continued)

OTHER PUBLICATIONS

Zavala, Albert & Paley, James J. "Using fingerprint measures to
predict other anthropometric Variables" Human Factors, 1975, pp.
591-602, vol. 17, No. 6.

(Continued)

*Primary Examiner*—Aaron W Carter
(74) *Attorney, Agent, or Firm*—Townsend, Townsend & Crew
LLP

(57) **ABSTRACT**

Methods and systems are provided that extend the function-
ality of electro-optical sensors. A device has a multiple light
sources, a light detector, and a processor configured to oper-
ate the light sources and the light detector to perform distinct
functions. At least one of the distinct functions includes a
biometric identification function in which light is propagated
from the plurality of light sources through presented material.
The propagated light is received with the light detector, with
the presented material being identified from the received
light. Another of the distinct functions includes a nonidenti-
fication function performed with the light sources and the
light detector.

**19 Claims, 16 Drawing Sheets**



## US 7,620,212 B1
Page 2

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,142,797 A | 3/1979 | Astheimer |
| 4,169,676 A | 10/1979 | Kaiser |
| 4,260,220 A | 4/1981 | Whitehead |
| 4,427,889 A | 1/1984 | Muller |
| 4,537,484 A | 8/1985 | Fowler |
| 4,598,715 A | 7/1986 | Machler et al. |
| 4,653,880 A | 3/1987 | Sting et al. |
| 4,654,530 A | 3/1987 | Dybwad |
| 4,655,225 A | 4/1987 | Dahne et al. |
| 4,656,562 A | 4/1987 | Sugino |
| 4,657,397 A | 4/1987 | Oehler et al. |
| 4,661,706 A | 4/1987 | Messerschmidt et al. |
| 4,684,255 A | 8/1987 | Ford |
| 4,712,912 A | 12/1987 | Messerschmidt |
| 4,730,882 A | 3/1988 | Messerschmidt |
| 4,787,013 A | 11/1988 | Sugino et al. |
| 4,787,708 A | 11/1988 | Whitehead |
| 4,830,496 A | 5/1989 | Young |
| 4,853,542 A | 8/1989 | Milosevic et al. |
| 4,857,735 A | 8/1989 | Noller |
| 4,859,064 A | 8/1989 | Messerschmidt et al. |
| 4,866,644 A | 9/1989 | Shenk et al. |
| 4,867,557 A | 9/1989 | Takatani et al. |
| 4,882,492 A | 11/1989 | Schlager |
| 4,883,953 A | 11/1989 | Koashi et al. |
| 4,936,680 A | 6/1990 | Henkes et al. |
| 4,944,021 A | 7/1990 | Hoshino et al. |
| 4,975,561 A | 12/1990 | Robinson et al. |
| 5,015,100 A | 5/1991 | Doyle |
| 5,019,715 A | 5/1991 | Sting et al. |
| 5,028,787 A | 7/1991 | Rosenthal et al. |
| 5,051,602 A | 9/1991 | Sting et al. |
| 5,068,536 A | 11/1991 | Rosenthal |
| 5,070,874 A | 12/1991 | Barnes et al. |
| 5,158,082 A | 10/1992 | Jones |
| 5,163,094 A | 11/1992 | Prokoski et al. |
| 5,178,142 A | 1/1993 | Harjunmaa et al. |
| 5,179,951 A | 1/1993 | Knudson |
| 5,204,532 A | 4/1993 | Rosenthal |
| 5,222,495 A | 6/1993 | Clarke et al. |
| 5,222,496 A | 6/1993 | Clarke et al. |
| 5,223,715 A | 6/1993 | Taylor |
| 5,225,678 A | 7/1993 | Messerschmidt |
| 5,230,702 A | 7/1993 | Lindsay et al. |
| 5,237,178 A | 8/1993 | Rosenthal et al. |
| 5,243,546 A | 9/1993 | Maggard |
| 5,257,086 A | 10/1993 | Fateley et al. |
| 5,267,152 A | 11/1993 | Yang et al. |
| 5,268,749 A | 12/1993 | Weber et al. |
| 5,291,560 A | 3/1994 | Daugman |
| 5,299,570 A | 4/1994 | Hatschek |
| 5,303,026 A | 4/1994 | Strobl et al. |
| 5,311,021 A | 5/1994 | Messerschmidt |
| 5,313,941 A | 5/1994 | Braig et al. |
| 5,321,265 A | 6/1994 | Block |
| 5,331,958 A | 7/1994 | Oppenheimer |
| 5,348,003 A | 9/1994 | Caro |
| 5,351,686 A | 10/1994 | Steuer et al. |
| 5,355,880 A | 10/1994 | Thomas et al. |
| 5,360,004 A | 11/1994 | Purdy et al. |
| 5,361,758 A | 11/1994 | Hall et al. |
| 5,366,903 A | 11/1994 | Lundsgaard et al. |
| 5,372,135 A | 12/1994 | Mendelson et al. |
| 5,379,764 A | 1/1995 | Barnes et al. |
| 5,402,778 A | 4/1995 | Chance |
| 5,405,315 A | 4/1995 | Khuri et al. |
| 5,419,321 A | 5/1995 | Evans |
| 5,435,309 A | 7/1995 | Thomas et al. |
| 5,441,053 A | 8/1995 | Lodder et al. |
| 5,452,723 A | 9/1995 | Wu et al. |
| 5,459,317 A | 10/1995 | Small et al. |
| 5,459,677 A | 10/1995 | Kowalski et al. |
| 5,460,177 A | 10/1995 | Purdy et al. |
| 5,483,335 A | 1/1996 | Tobias |
| 5,494,032 A | 2/1996 | Robinson et al. |
| 5,505,726 A | 4/1996 | Meserol |
| 5,507,723 A | 4/1996 | Keshaviah |
| 5,515,847 A | 5/1996 | Braig et al. |
| 5,518,623 A | 5/1996 | Keshaviah et al. |
| 5,523,054 A | 6/1996 | Switalski et al. |
| 5,533,509 A | 7/1996 | Koashi et al. |
| 5,537,208 A | 7/1996 | Bertram et al. |
| 5,539,207 A | 7/1996 | Wong et al. |
| 5,552,997 A | 9/1996 | Massart |
| 5,559,504 A | 9/1996 | Itsumi et al. |
| 5,596,992 A | 1/1997 | Haaland et al. |
| 5,606,164 A | 2/1997 | Price et al. |
| 5,630,413 A | 5/1997 | Thomas et al. |
| 5,636,633 A | 6/1997 | Messerschmidt et al. |
| 5,655,530 A | 8/1997 | Messerschmidt |
| 5,672,864 A | 9/1997 | Kaplan |
| 5,672,875 A | 9/1997 | Block et al. |
| 5,677,762 A | 10/1997 | Ortyn et al. |
| 5,681,273 A | 10/1997 | Brown |
| 5,708,593 A | 1/1998 | Saby et al. |
| 5,719,399 A | 2/1998 | Alfano et al. |
| 5,719,950 A | 2/1998 | Osten et al. |
| 5,724,268 A | 3/1998 | Sodickson et al. |
| 5,737,439 A | 4/1998 | Lapsley et al. |
| 5,743,262 A | 4/1998 | Lepper, Jr. et al. |
| 5,747,806 A | 5/1998 | Khalil |
| 5,750,994 A | 5/1998 | Schlager |
| 5,751,835 A | 5/1998 | Topping et al. |
| 5,761,330 A | 6/1998 | Stoianov et al. |
| 5,782,755 A | 7/1998 | Chance et al. |
| 5,792,050 A | 8/1998 | Alam et al. |
| 5,792,053 A | 8/1998 | Skladnev et al. |
| 5,793,881 A | 8/1998 | Stiver et al. |
| 5,796,858 A | 8/1998 | Zhou et al. |
| 5,808,739 A | 9/1998 | Turner et al. |
| 5,818,048 A | 10/1998 | Sodickson et al. |
| 5,823,951 A | 10/1998 | Messerschmidt et al. |
| 5,828,066 A | 10/1998 | Messerschmidt |
| 5,830,132 A | 11/1998 | Robinson |
| 5,830,133 A | 11/1998 | Osten et al. |
| 5,850,623 A | 12/1998 | Carman, Jr. et al. |
| 5,853,370 A | 12/1998 | Chance et al. |
| 5,857,462 A | 1/1999 | Thomas et al. |
| 5,860,421 A | 1/1999 | Eppstein et al. |
| 5,867,265 A | 2/1999 | Thomas |
| 5,886,347 A | 3/1999 | Inoue et al. |
| 5,902,033 A | 5/1999 | Levis et al. |
| 5,914,780 A | 6/1999 | Turner et al. |
| 5,929,443 A | 7/1999 | Alfano et al. |
| 5,933,792 A | 8/1999 | Andersen et al. |
| 5,935,062 A | 8/1999 | Messerschmidt et al. |
| 5,945,676 A | 8/1999 | Khalil |
| 5,949,543 A | 9/1999 | Bleier et al. |
| 5,957,841 A | 9/1999 | Maruo et al. |
| 5,961,449 A | 10/1999 | Toida et al. |
| 5,963,319 A | 10/1999 | Jarvis et al. |
| 5,987,346 A | 11/1999 | Benaron et al. |
| 5,999,637 A | 12/1999 | Toyoda et al. |
| 6,005,722 A | 12/1999 | Butterworth et al. |
| 6,016,435 A | 1/2000 | Maruo et al. |
| 6,025,597 A | 2/2000 | Sterling et al. |
| 6,026,314 A | 2/2000 | Amerov et al. |
| 6,028,773 A | 2/2000 | Hundt |
| 6,031,609 A | 2/2000 | Funk et al. |
| 6,034,370 A | 3/2000 | Messerschmidt |
| 6,040,578 A | 3/2000 | Malin et al. |
| 6,041,247 A | 3/2000 | Weckstrom et al. |
| 6,041,410 A | 3/2000 | Hsu et al. |
| 6,043,492 A | 3/2000 | Lee et al. |

## US 7,620,212 B1
Page 3

| | | | |
|---|---|---|---|
| 6,044,285 | A | 3/2000 | Chaiken et al. |
| 6,045,502 | A | 4/2000 | Eppstein et al. |
| 6,046,808 | A | 4/2000 | Fately |
| 6,049,727 | A | 4/2000 | Crothall |
| 6,056,738 | A | 5/2000 | Marchitto et al. |
| 6,057,925 | A | 5/2000 | Anthon |
| 6,061,581 | A | 5/2000 | Alam et al. |
| 6,061,582 | A | 5/2000 | Small et al. |
| 6,066,847 | A | 5/2000 | Rosenthal |
| 6,069,689 | A | 5/2000 | Zeng et al. |
| 6,070,093 | A | 5/2000 | Oosta et al. |
| 6,073,037 | A | 6/2000 | Alam et al. |
| 6,088,605 | A | 7/2000 | Griffith et al. |
| 6,088,607 | A | 7/2000 | Diab et al. |
| 6,097,035 | A | 8/2000 | Belongie et al. |
| 6,100,811 | A | 8/2000 | Hsu et al. |
| 6,115,484 | A | 9/2000 | Bowker et al. |
| 6,115,673 | A | 9/2000 | Malin et al. |
| 6,122,042 | A | 9/2000 | Wunderman et al. |
| 6,122,394 | A | 9/2000 | Neukermans et al. |
| 6,122,737 | A | 9/2000 | Bjorn et al. |
| 6,125,192 | A | 9/2000 | Bjorn et al. |
| 6,141,101 | A | 10/2000 | Bleier et al. |
| 6,147,749 | A | 11/2000 | Kubo et al. |
| 6,148,094 | A | 11/2000 | Kinsella |
| 6,152,876 | A | 11/2000 | Robinson et al. |
| 6,154,658 | A | 11/2000 | Caci |
| 6,157,041 | A | 12/2000 | Thomas et al. |
| 6,159,147 | A | 12/2000 | Lichter et al. |
| 6,172,743 | B1 | 1/2001 | Kley et al. |
| 6,175,407 | B1 | 1/2001 | Sartor |
| 6,181,414 | B1 | 1/2001 | Raz et al. |
| 6,181,958 | B1 | 1/2001 | Steuer et al. |
| 6,188,781 | B1 | 2/2001 | Brownlee |
| 6,212,424 | B1 | 4/2001 | Robinson |
| 6,226,541 | B1 | 5/2001 | Eppstein et al. |
| 6,229,908 | B1 * | 5/2001 | Edmonds et al. ............ 382/124 |
| 6,230,034 | B1 | 5/2001 | Messerschmidt et al. |
| 6,230,126 | B1 * | 5/2001 | Kuroda ...................... 704/231 |
| 6,240,306 | B1 | 5/2001 | Rohrscheib et al. |
| 6,240,309 | B1 | 5/2001 | Yamashita et al. |
| 6,241,663 | B1 | 6/2001 | Wu et al. |
| 6,256,523 | B1 | 7/2001 | Diab et al. |
| 6,272,367 | B1 | 8/2001 | Chance |
| 6,280,381 | B1 | 8/2001 | Malin et al. |
| 6,282,303 | B1 | 8/2001 | Brownlee |
| 6,285,895 | B1 | 9/2001 | Ristolainen et al. |
| 6,292,576 | B1 | 9/2001 | Brownlee |
| 6,301,815 | B1 | 10/2001 | Sliwa |
| 6,304,767 | B1 | 10/2001 | Soller et al. |
| 6,307,633 | B1 | 10/2001 | Mandella et al. |
| 6,309,884 | B1 | 10/2001 | Cooper et al. |
| 6,317,507 | B1 | 11/2001 | Dolfing et al. |
| 6,324,310 | B1 | 11/2001 | Brownlee |
| 6,330,346 | B1 | 12/2001 | Peterson et al. |
| 6,404,904 | B1 | 6/2002 | Einighammer et al. |
| 6,419,361 | B2 | 7/2002 | Cabib et al. |
| 6,483,929 | B1 | 11/2002 | Murakami et al. |
| 6,504,614 | B1 | 1/2003 | Messerschmidt et al. |
| 6,560,352 | B2 | 5/2003 | Rowe et al. |
| 6,574,490 | B2 | 6/2003 | Abbink et al. |
| 6,628,809 | B1 | 9/2003 | Rowe et al. |
| 6,668,071 | B1 * | 12/2003 | Minkin et al. ............... 382/124 |
| 6,741,729 | B2 | 5/2004 | Bjorn et al. |
| 6,799,275 | B1 | 9/2004 | Bjorn |
| 6,813,010 | B2 * | 11/2004 | Kono et al. .................. 356/71 |
| 6,816,605 | B2 | 11/2004 | Rowe et al. |
| 6,829,375 | B1 * | 12/2004 | Higuchi ...................... 382/124 |
| 2002/0101566 | A1 | 8/2002 | Elsner et al. |
| 2002/0145507 | A1* | 10/2002 | Foster ........................ 340/5.53 |
| 2002/0171834 | A1 | 11/2002 | Rowe et al. |
| 2002/0183624 | A1 | 12/2002 | Rowe et al. |
| 2003/0016345 | A1 * | 1/2003 | Nagasaka et al. ............. 356/71 |

| | | | |
|---|---|---|---|
| 2003/0078504 | A1 | 4/2003 | Rowe et al. |
| 2003/0095325 | A1* | 5/2003 | Lavin et al. ................. 370/338 |
| 2004/0047493 | A1 | 3/2004 | Rowe et al. |
| 2004/0240712 | A1 | 12/2004 | Rowe et al. |
| 2005/0007582 | A1 | 1/2005 | Villers et al. |
| 2005/0205667 | A1 | 9/2005 | Rowe |
| 2006/0002597 | A1 | 1/2006 | Rowe |
| 2006/0002598 | A1 | 1/2006 | Rowe et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 426 358 B1 | 5/1991 |
| EP | 0 449 335 A2 | 10/1991 |
| EP | 0 573 137 A2 | 12/1993 |
| EP | 0 631 137 A2 | 12/1994 |
| EP | 0 670 143 A1 | 9/1995 |
| EP | 0 681 166 A1 | 11/1995 |
| EP | 0 757 243 A1 | 2/1997 |
| EP | 0 788 000 A2 | 8/1997 |
| EP | 0 801 297 A1 | 10/1997 |
| EP | 0 836 083 A1 | 4/1998 |
| EP | 0 843 986 A2 | 5/1998 |
| EP | 0 869 348 A2 | 10/1998 |
| EP | 0 897 164 A2 | 2/1999 |
| EP | 0 897 691 A2 | 2/1999 |
| EP | 0 317 121 B1 | 5/1999 |
| EP | 0 924 656 A2 | 6/1999 |
| EP | 0 982 583 A1 | 3/2000 |
| EP | 0 990 945 A1 | 4/2000 |
| WO | WO 92/00513 A1 | 1/1992 |
| WO | WO 92/17765 A1 | 10/1992 |
| WO | WO 93/00855 A1 | 1/1993 |
| WO | WO 93/07801 A1 | 4/1993 |
| WO | WO 95/22046 A1 | 8/1995 |
| WO | WO 97/23159 A1 | 7/1997 |
| WO | WO 97/27800 A1 | 8/1997 |
| WO | WO 97/28437 A1 | 8/1997 |
| WO | WO 97/28438 A1 | 8/1997 |
| WO | WO 98/01071 A1 | 1/1998 |
| WO | WO 98/37805 A1 | 9/1998 |
| WO | WO 98/40723 A1 | 9/1998 |
| WO | WO 99/09395 A1 | 2/1999 |
| WO | WO 01/15596 A1 | 3/1999 |
| WO | WO 99/37203 A2 | 7/1999 |
| WO | WO 99/43255 A1 | 9/1999 |
| WO | WO 99/46731 A1 | 9/1999 |
| WO | WO 99/55222 A1 | 11/1999 |
| WO | WO 99/56616 A1 | 11/1999 |
| WO | WO 01/18332 A1 | 3/2001 |
| WO | WO 01/27882 A2 | 4/2001 |
| WO | WO 01/52180 A1 | 7/2001 |
| WO | WO 01/52726 A1 | 7/2001 |
| WO | WO 01/53805 A1 | 7/2001 |
| WO | WO 02/084605 A2 | 10/2002 |
| WO | WO 02/099393 A2 | 12/2002 |
| WO | WO 2004/068388 A2 | 8/2004 |
| WO | WO 2004/068394 A1 | 8/2004 |

### OTHER PUBLICATIONS

Demos, S. G. et al., "Optical Fingerprinting Using Polarisation Contrast Improvement," Electronics Letters, vol. 33, No. 7, pp. 582-584, Mar. 27, 1997.

Marbach, Ralf, "Measurement Techniques for IR Spectroscopic Blood Glucose Determination," Fortschritt Bericht, Series 8: Measurement And Control Technology, No. 346, pp. cover and 1-158, Mar. 28, 1994.

Bantle, John P. at al., "Glucose Measurement in Patients with Diabetes Mellitus with Dermal Interstitial Fluid," Copyright © 1997 by Mosby-Year Book, Inc., 9 pages.

Berkoben et al., "Vascular Access for Hemodialysis", Clinical Dialysis, published on or before Oct. 30, 1997, 20 pages.

**US 7,620,212 B1**

Page 4

Bleyer et al., 'The costs of Hospitalizations Due to Hemodialysis Access Management', *Nephrology News & Issues*, Jan. 1995, pp. 19, 20 and 22.

Daugirdas at al., "Comparison of Methods to Predict the Equilibrated Kt/V (eKt/V) in the Hemo Study", National Institutes of Health, NIDDK, Bethesda, MD. Aug. 20, 1996.

Depner at al., "Clinical Measurement of Blood Flow in Hemodialysis Access Fistulae and Grafts by Ultrasound Dilution", from the Department of Nephrology, University of California, published bon or before Oct. 30. 1997, 4 pages.

Hakim et al., "Effects of Dose of Dialysis on Morbidity and Mortality", *American Journal of Kidney Diseases*, Vol. 23, No. 5, May 1994, pp. 661-669.

Jacobs, et al., "A Disposable Urea Sensor for Continuous Monitoring of Hemodialysis Efficiency", USAIO Journal, 1993. pp. M353-M358.

Keshaviah et al., "On-line monitoring of the delivery of the hemodialysis prescription", *Pediatric Nephrology*, vol. 9, 1995, pp. S2-S8.

Krivitski, "Theory and Validation of Access Flow Measurement by Dilution Technique During Hemodialysis", *Kidney International*, vol. 48, 1995, pp. 244-250.

Marbach, R. et al. "Optical Diffuse Reflectance Accessory for Measurements of Skin Tissue by Near-Infrared Spectroscopy," Applied Optics, vol. 34, No. 4, Feb. 1, 1995, pp. 610-621.

Mardia, K.V. at al., Multivariate Analysis, Academic Press (1979) pp. 300-325.

Nichols, et al., "Design and Testing of a White-Light, Steady-State Diffuse Reflectance Spectrometer for Determination of Optical Properties of Highly Scattering Systems," Applied Optics. 1 Jan. 1997. 36(1), pp. 93-104.

Ripley, B.D., *Pattern Recognition and Neural Networks*, Cambridge University Press (1996) pp. 91-120.

Ronco at al., "On-line urea monitoring: a further step towards adequate dialysis prescription and delivery", *Int'l. Journal of Artificial Organs*, vol. 18, No. 9, 1995, pp. 534-543.

Service, F. John et at., "Dermal Interstitial Glucose as an Indicator of Ambient Glycemia," *Diabetes Care*, vol. 20, No. 9, Sep. 1997, 9 pages.

Sherman, "Recirculation in the Hemodialysis Access", *Principles and Practice of Dialysis*, published on or before Oct. 30, 1997, 9 pages.

Sherman, "The Measurement of Dialysis Access Recirculation", *American Journal of Kidney Diseases*, vol. 22, No. 4, Oct. 1993, pp. 616-621.

Steuer et al., "A New Optical Technique for Monitoring Hematocrit and Circulating Blood Volume: Its Application in Renal Dialysis", *Dialysis & Transplantation*, vol. 22, No. 5, May 1993, 5 pages.

Webb, Paul, "Temperatures of Skin, Subcutaneous Tissue, Muscle and Core in Resting Men in Cold, Comfortable and Hot Conditions," *European Journal of Applied Physiology*, vol. 64 (1992) pp. 471-476. Brochure entitled "Determination of Delivered Therapy Through Measurement of Effective Clearance", Feresenius USA, Dec. 1994, 1 page.

U.S. Appl. No. 11/115,075, Office Action, 26 pages, Nov. 13, 2006.

U.S. Appl. No. 11/115,075, Office Action, 9 pages, May 1, 2007.

U.S. Appl. No. 11/115,075, Office Action, 7 pages, Aug. 31, 2007.

U.S. Appl. No. 11/115,075, Office Action, 9 pages, Feb. 1, 2008.

U.S. Appl. No. 11/115,075, Advisory Action, 3 pages, Apr. 24, 2008.

U.S. Appl. No. 11/115,100, Office Action, 30 pages, Nov. 14, 2006.

U.S. Appl. No. 11/115,100, Office Action, 10 pages, May 1, 2007.

U.S. Appl. No. 11/115,100, Office Action, 9 pages, Aug. 9, 2007.

U.S. Appl. No. 11/115,101, Office Action, 24 pages, Dec. 13, 2006.

U.S. Appl. No. 11/115,101, Office Action, 17 pages, May 9, 2007.

* cited by examiner



# FIG. 1



**FIG. 2**



# FIG. 3



**FIG. 4**



# FIG. 5



**FIG. 6**



**FIG. 7A**



## FIG. 7B



**FIG. 8A**



**FIG. 8B**



## FIG. 8C



**FIG. 8D**



**FIG. 8E**



**FIG. 9**



**FIG. 10**



**FIG. 11**

US 7,620,212 B1

**1**

**ELECTRO-OPTICAL SENSOR**

CROSS-REFERENCES TO RELATED
APPLICATIONS

This application is a nonprovisional of and claims the benefit of the filing date of each of the following provisional applications under 35 U.S.C. § 119(e): U.S. Prov. Pat. Appl. No. 60/403,453, entitled "BIOMETRIC ENROLLMENT SYSTEMS AND METHODS," filed Aug. 13, 2002 by Robert K. Rowe et al.; U.S. Prov. Pat. Appl. No. 60/403,452, entitled "BIOMETRIC CALIBRATION AND DATA ACQUISITION SYSTEMS AND METHODS," filed Aug. 13, 2002 by Robert K. Rowe et al.; U.S. Prov. Pat. Appl. No. 60/403,593, entitled "BIOMETRIC SENSORS ON PORTABLE ELECTRONIC DEVICES," filed Aug. 13, 2002 by Robert K. Rowe et al.; U.S. Prov. Pat. Appl. No. 60/403,461, entitled "ULTRA-HIGH-SECURITY IDENTIFICATION SYSTEMS AND METHODS," filed Aug. 13, 2002 by Robert K. Rowe et al.; U.S. Prov. Pat. Appl. No. 60/403,449, entitled "MULTIFUNCTION BIOMETRIC DEVICES," filed Aug. 13, 2002 by Robert K. Rowe et al; and U.S. Prov. Pat. Appl. No. 60/460,247, entitled "NONINVASIVE ALCOHOL MONITOR," filed Apr. 4, 2003 by Robert K. Rowe et al. The entire disclosure of each of these six provisional applications is incorporated herein by reference for all purposes.

This application is also related to the following commonly assigned applications and patents, the entire disclosure of each of which is incorporated herein by reference for all purposes: U.S. Pat. No. 6,560,352, entitled "APPARATUS AND METHOD OF BIOMETRIC IDENTIFICATION OR VERIFICATION OF INDIVIDUALS USING OPTICAL SPECTROSCOPY," filed Apr. 11, 2001 by Robert K. Row. et al.; U.S. patent application Ser. No. 09/415,594, entitled "APPARATUS AND METHOD FOR IDENTIFICATION OF INDIVIDUALS BY NEAR-INFRARED SPECTRUM," filed Oct. 8, 1999; U.S. patent application Ser. No. 09/874, 740, entitled "APPARATUS AND METHOD OF BIOMETRIC DETERMINATION USING SPECIALIZED OPTICAL SPECTROSCOPY SYSTEM," filed Jun. 5, 2001; U.S. patent application Ser. No. 10/262,403, entitled "SPECTROSCOPIC CROSS-CHANNEL METHOD AND APPARATUS FOR IMPROVED OPTICAL MEASUREMENTS OF TISSUE," filed Sep. 30, 2002 by Robert K. Rowe et al.; and U.S. patent application Ser. No. 10/407,589, entitled "METHODS AND SYSTEMS FOR BIOMETRIC IDENTIFICATION OF INDIVIDUALS USING LINEAR OPTICAL SPECTROSCOPY," filed Apr. 3, 2003 by Robert K. Rowe et al.

BACKGROUND OF THE INVENTION

This application relates generally to electro-optical sensors. More specifically, this application relates to electro-optical sensors for use in biometric analysis of optical spectra of tissue.

Biometric determination is generally defined as the process of measuring and using one or more physical or behavioral features or attributes to gain information about identity, age, or sex of a person, animal, or other biological entity. As well, in order to ensure security, the biometric determination task may include further tasks that ensure that the sample being measured is authentic and being measured on a living being. This latter test is referred to as a determination of liveness.

There are two common modes in which biometric determinations of identity occur: one-to-many (identification) and one-to-one (verification). One-to-many identification

**2**

attempts to answer the question of, "do I know you?" The biometric measurement device collects a set of biometric data and from this information alone it assesses whether the person is a previously seen ("authorized") individual. Systems that perform the one-to-many identification task, such as the FBI's Automatic Fingerprint Identification System (AFIS), are generally very expensive ($10 million or more) and require many minutes to detect a match between an unknown sample and a large database containing hundreds of thousands or millions of entries. The one-to-one mode of biometric analysis answers the question of, "are you who you say you are?" This mode is used in cases where an individual makes a claim of identity using a user name, a personal identification number (PIN) or other code, a magnetic card, or other means, and the device collects a set of biometric data which it uses to confirm the identity of the person. "Identification" will be used in this document to denote both identification and verification tasks.

Although in general the one-to-many identification task is more difficult than one-to-one, the two tasks become the same as the number of recognized or authorized users for a given biometric device decreases to just a single individual. Situations in which a biometric identification task has only a small number of entries in the authorization database are quite common. For example, biometric access to a residence, to a personal automobile, to a personal computer, to a cellular telephone, and to other such personal devices typically require an authorization database of just a few people.

Biometric identification and verification is useful in many applications. Examples include verifying identity prior to activating machinery or gaining entry to a secure area. Another example would be identification of an individual for matching that individual to records on file for that individual, such as for matching hospital patient records especially when the individual's identity is unknown. Biometric identification is also useful to match police records at the time a suspect is apprehended, but true identity of the suspect is not known. Additional uses of biometric identification or verification include automotive keyless start and entry applications, secure computer and network access applications, automated financial transaction applications, authorized handgun use applications, and time-and-attendance applications. In general, protected property will be the term used to describe all of the goods, places, services, and information that may require biometric authorization to access.

In addition to performing a biometric identification or verification and ensuring that the sample being measured is living tissue, there may also exist a need to determine an estimate of the age, sex, and other demographic characteristics of the person under test as part of the biometric determination task. For example, the U.S. Federal Trade Commission recently established a commission to examine the issue of remotely determining age of a person who is attempting to access a web site in order to block access by children to inappropriate sites. The Commission on Online Child Protection (COPA) heard testimony on Jun. 9, 2000 that indicated that then-known biometric techniques could not be used to aid the determination of a person's age based on any known biometric features.

BRIEF SUMMARY OF THE INVENTION

Embodiments of the invention thus provide methods and systems that extend the functionality of electro-optical sensors. In a first set of embodiments, a device is provided having such extended functionality. The device includes a plurality of light sources, a light detector, and a processor configured to operate the light sources and the light detector to perform a

US 7,620,212 B1

**3**

plurality of distinct functions. At least one of the distinct functions comprises a biometric identification function in which light is propagated from the plurality of light sources through presented material. The propagated light is received with the light detector, with the presented material being identified from the received light. Another of the distinct functions comprises a nonidentification function performed with the light sources and the light detector.

In some of the embodiments, the light detector may comprise a plurality of light detectors, which may further comprise an array of light detectors. In one embodiment, the nonidentification function comprises a liveness function to determine whether the presented material is alive. Such a determination may be used in some instances as part of providing operation of an optical switch having multistate functionality. In another embodiment, the nonidentification function comprises a nonbiometric function. For example, the nonidentification function may comprise operation of an optical communications port with the light sources and the light detector.

In a second set of embodiments, a portable electronic device having extended functionality is provided. The portable electronic device comprises an electronic arrangement for performing a standard function of the portable electronic device, a biometric sensor, and a processor. The biometric sensor includes a plurality of light sources and a light detector disposed relative to the light sources to detect light from the light sources that has propagated through tissue. The processor is configured to operate the electronic arrangement to perform the standard function and to operate the biometric sensor. Light is propagated from the plurality of light sources through the tissue and the propagated light is received with the light detector. The tissue is identified from the received light.

Examples of functions that may be performed by the electronic arrangement include functions of a cellular telephone, a personal digital assistant, an electronic fob, and a watch. In some instances, the processor may be further configured to operate the biometric sensor to perform a nonbiometric function. For example, the biometric sensor may be operated to perform a spectrometer function, such as a stress-detection function, a lie-detector function, a tanning-meter function, a complexion-monitor function, a toxicity-monitor function, an alcohol-monitor function, a bilirubin-monitor function, a hemoglobin-monitor function, a fruit-ripeness-monitor function, a counterfeit-document detection function, or a color-match function. In other instances, the nonbiometric function may use an illumination capacity of the plurality of light sources and use a detection capacity of the light detector, such as in performing an ambient-light-sensor function, an entertainment function, a personal-security function, a smoke-detector function, a motion-detection function, or an optical-strobe function. In some embodiments, the nonbiometric function may use an illumination capacity of the plurality of light sources, such as to provide an optical-ringer function, a flashlight function, or an optical-pointer function. In other embodiments, the nonbiometric function may use a detection capacity of the light detector, such as to provide a trickle-charge function or a light-meter function.

In a third set of embodiments, a method is provided for managing enrollment in a biometric identification system that accommodates extended functionality. A database is maintained that comprises spectrally derived biometric identification information for at least one individual and an identification of personalized settings for the at least one individual. Collected spectral data are correlated with the spectrally derived biometric identification information for the at least

**4**

one individual. Parameters of an object are adjusted in accordance with the personalized settings. The at least one individual may comprise a plurality of individuals. In some instances, changes to the parameters made by the at least one individual may be tracked so that the personalized settings may be modified in accordance with the changes.

In a fourth set of embodiments, a method is provided for identifying a physiological state of an individual. Electromagnetic radiation is propagated into tissue of the individual. A measured spectral variation is received in the form of electromagnetic radiation scattered from the tissue of the individual. The measured spectral variation is compared with a reference spectral variation over a predetermined wavelength interval by comparing, at each of a plurality of wavelengths within the predetermined wavelength interval, a property of the measured and reference spectral variations. The physiological state of the individual is determined from a consistency of the measured spectral variation with the reference spectral variation.

In some embodiments, the physiological state may indicate a stress level of the individual, while in other embodiments, the physiological state may indicate a level of truthfulness of a statement made by the individual. The measured and reference spectral variations may be acquired substantially contemporaneously, such as in a common session. In other instances, the physiological state may indicate a concentration of a substance in the tissue of the individual, such as a concentration of alcohol, bilirubin, or hemoglobin, among others.

BRIEF DESCRIPTION OF THE DRAWINGS

A further understanding of the nature and advantages of the present invention may be realized by reference to the remaining portions of the specification and the drawings wherein like reference numerals are used throughout the several drawings to refer to similar components. In some instances, a sublabel is associated with a reference numeral and follows a hyphen to denote one of multiple similar components. When reference is made to a reference numeral without specification to an existing sublabel, it is intended to refer to all such multiple similar components.

FIG. **1** provides a perspective view of a spectral biometric sensor used in embodiments of the invention;

FIG. **2** provides a schematic cross-sectional view of a biometric sensor element coupled to a tissue surface showing multiple mean optical paths;

FIG. **3** provides a schematic representation of a top view of a first embodiment of a biometric sensor incorporating multiple light sources arranged with variable source-detector distances;

FIG. **4** provides a schematic representation of a top view of a second embodiment of a biometric sensor incorporating multiple light sources arranged with a common source-detector distance;

FIG. **5** provides a schematic representation of a top view of a third embodiment of a biometric sensor incorporating multiple sources and a waveguide/aperture plate to provide variable source-detector distances;

FIG. **6** provides a schematic representation of a top view of a fourth embodiment of a biometric sensor including multiple sight sources and multiple detectors providing variable source-detector separations;

FIG. **7**A provides a schematic representation of a top view of a fifth embodiment of a biometric sensor incorporating multiple light sources and multiple detectors providing variable source-detector separations;

5

FIG. **7**B provides a schematic representation of a top view of a sixth embodiment of a biometric sensor incorporating multiple light sources and a detector array for providing variable source-detector separations;

FIG. **8**A provides a schematic representation of a personal biometric sensor built into a key fob;

FIG. **8**B provides a schematic representation of a personal biometric sensor built into a backplate of a wristwatch;

FIG. **8**C provides a schematic representation of a personal biometric sensor built into a cellular telephone;

FIG. **8**D provides a schematic representation of a personal biometric sensor built into a personal digital assistant;

FIG. **8**E provides a schematic representation of a personal biometric sensor built into a combined cellular telephone/ personal digital assistant;

FIG. **9** provides a schematic representation of a computer system that may be used to manage functionality of biometric sensors in accordance with embodiments of the invention;

FIG. **10** provides a flow diagram illustrating initial biometric enrollment processes in accordance with an embodiment; and

FIG. **11** provides a flow diagram illustrating biometric enrollment management processes in accordance with embodiments of the invention.

DETAILED DESCRIPTION OF THE INVENTION

1. Introduction

Embodiments of the invention are based on the recognition that an accurate, precise, and repeatable tissue spectrum of an individual in certain electromagnetic wavelength ranges contain spectral features and combinations of spectral features that are unique to the individual. In some embodiments, the wavelength ranges comprise the ultraviolet, visible, very-near-infrared, or near-infrared ranges, or combinations of these ranges. In addition, embodiments of the invention recognize that analysis, such as with discriminant-analysis techniques, can identify these unique features or combinations, which may not be readily apparent in visual analysis of a spectral output, so that an individual's identity may be determined by comparison of tissue spectral data taken at the time of use and compared to stored tissue spectral data from prior measurement.

In addition, the tissue spectrum has been found not only to contain information that is unique to an individual, but also to contain numerous features and combinations of features that indicate whether such spectral samples were taken while the sample was alive or not. The physiological effects that give rise to spectral features that indicate the "liveness" state of a sample, i.e. whether it is alive or dead, include, but are not limited to blood perfusion, temperature, hydration status, glucose and other analyte levels, and overall state of tissue decay. Thus, the biometric identification and verification methods of the present invention may also be used in conjunction with, or separately from, the determination of the state of the liveness of the tissue. Tissue from other biological systems, such as organs, animals, etc., has also been found to have spectral characteristics that are distinctly different from human skin due to differences in the tissue composition and form. Thus, the biometric identification methods of the present invention may also be used in conjunction with or separately from the determination of whether the sample is human skin or some other tissue. In addition, it has been found that tissue-like substances such as collagen gelatin, latex, water solutions, or others that have been used to attempt to spoof various biometric sensors have spectral characteristics that are distinctly

6

different that human tissue due to differences in composition and form. The biometric identification and verification methods of the present invention can thus be used with or separately from the determination whether the sample is actual tissue or some other substance.

The inventors have also found that other spectral features observed in the tissue spectrum relate to the age and sex of the person being measured. It is believed that these features are due in part to the differences in dermal thickness between young and old people and between males and females. Such changes in skin thickness and composition affect the optical characteristics of the tissue by affecting the scattering properties of the sample. These properties in turn impose distinct spectral shapes on the measured tissue spectra, which can be extracted and used by appropriate multivariate techniques to provide age and sex estimates.

2. Optical Devices

Referring now to FIG. **1**, a perspective view of an embodiment of a typical optical sensor head in one embodiment is shown. The sensor assembly **30** comprises a plurality of light sources **34** arranged in a selected manner on a sensor head **32**, which also contains one or more detectors **36**. The sensor assembly **30** may also include power conditioning electronics (not shown) that supply power to the light sources **34** and may also include signal processing electronics (not shown) that amplify the resulting signal from the detector **36**. A multiconductor cable **38** provides a means to power the sensor head and to transmit the detected signal back to a microprocessor or computer (not shown) that processes the spectral data. Alternatively, the power and/or signals to and from the sensor head can be achieved by a direct connection to the supporting electronics or through a variety of electrical interconnects such as PC boards, backplanes, wirebonds, IC connectors, as well as a variety of wireless connections including RF and optical.

The light sources **34** may comprise light emitting diodes ("LEDs"), laser diodes, vertical cavity surface emitting lasers ("VCSELs"), quartz tungsten halogen incandescent bulbs with optical pass-band filters which may optionally include optical shutters, or any of a variety of other optical sources known in the art. The light sources **34** can each have the same wavelength characteristics or can be comprised of sources with different center wavelengths in a spectral range from about 300 nm to about 10,000 nm. In general, the collection of light sources **34** can include some sources that have the same wavelengths as others and some sources that are different. In one embodiment, the light sources **34** includes sets of LEDs, laser diodes, VCSELs, or other solid-state optoelectronic devices with differing wavelength characteristics that lie within the spectral range from about 350 nm to about 1100 nm.

The detector **36** may comprise a single element, a plurality of discrete elements, or a one- or two-dimensional array of elements. The detector type and material is chosen to be appropriate to the source wavelengths and the measurement signal and timing requirements. These detectors can include PbS, PbSe, InSb, InGaAs, MCT, bolometers and micro-bolometer arrays. In one embodiment where the light sources **34** are solid-state optoelectronic devices operating in the spectral range from about 350 nm to about 1100 nm, a suitable detector material is silicon.

The light sources **34** can be sequentially illuminated and extinguished to measure the tissue properties for each source by turning power to each of them on and off. Alternatively, multiple light sources **34** can be electronically modulated

7

using encoding methods that are known to one knowledgeable in the art. These encoding patterns include Fourier intensity modulation, Hadamard modulation, random modulation, and other modulation methods.

FIG. 2 shows a cross-sectional view of the sensor head 32 of FIG. 1, for use in diffuse reflectance measurements. Also shown is tissue 40 in contact with the face 39 of the sensor head 32 and the mean optical paths 42, 44, 46, 48, 50, 52 of the light traveling from each light source 41, 43, 45, 47, 49, 51, respectively, to the detector 36. In acquiring tissue spectral data, measurements can be made in at least two different sampling modes. The optical geometry illustrated in FIG. 2 is known as diffuse reflectance sampling geometry where the light sources and detector lie on the same side of the tissue. An alternative method is known as transmission sampling, wherein light enters a thin tissue region such as an earlobe or a fingertip on one side and then is detected by a detector located on the other side of the tissue. Although light in such regions as the silicon-region can penetrate tissue to significant depths of one centimeter or more, depending upon the wavelength, transmission sampling of the tissue limits the region of the body that can be used. Thus, while either mode of sampling is within the scope of the present invention, and especially to analysis utilizing light in the silicon-region, a more versatile sampling method is based upon reflected light.

Referring to FIG. 2, when the tissue is illuminated by a particular light source 41, the resulting signal detected by detector 36 contains information about the tissue optical properties along a path between the source 41 and detector 36. The actual path of any given photon is highly erratic due to effects of optical scattering by the tissue, but the mean optical path 42 is a more regular and smooth curve, as shown in the figure.

This mean optical path is, in general, different for different source-detector separation distances. If another light source 51 is located at the same distance from the detector 36 as light source 41 and the two light sources have the same wavelength characteristics, the resulting signals can be processed as separate elements or can be combined to increase the resulting signal-to-noise ratio of the measurement. If light source 51 has a different wavelength characteristic than light source 41 then, in general, the resulting signals provide unique and useful information about the tissue optical properties, especially as they relate to spectral biometric determinations and may be analyzed as distinct data points. In a similar manner, if two light sources have the same wavelength characteristics and are positioned at different distances from the detector 36 (for example light sources 41 and 43) then the resulting information in the two signals is different and the measurements may be recorded and analyzed as distinct data points. Differences in both wavelength characteristics and source-detector separation provide useful information about the optical characteristics of the tissue 40.

In general, the detector 36 can be located in the center of the sensor head or it can be offset to one side of the sensor head 32 in order to provide for greater source-detector separation distances. The sensor head 32 may have other shapes, including oval, square and rectangular shapes. The sensor head 32 may also have a compound curvature on the optical surface to match the profile of a device in which it is mounted, to incorporate ergonomic features that allow for good optical and mechanical coupling with the tissue being measured, or for other technical or stylistic reasons.

Light that reflects from the topmost layer of skin does not contain significant information about the deeper tissue properties. In fact, reflections from the top surface of tissue (known as "specular" or "shunted" light) are detrimental to

8

most optical measurements. For this reason, FIG. 2 illustrates a sensor-head geometry wherein the detector 36 is recessed from the sensor surface 39 in optically opaque material 37 that makes up the body of the sensor head 32. The recessed placement of detector 36 minimizes the amount of light that can be detected after reflecting off the first (epidermal) surface of the tissue. It can be seen that the same optical blocking effect could be produced by recessing each of the light sources, or by recessing both the detector and the light sources. Other equivalent means of optical blocking can be readily established by one of ordinary skill in the art. Additionally, a force sensing functionality is sometimes built into the sensor to ensure firm contact between the sensor and the skin, minimizing the amount of shunted light. Such force sensing may be performed in various embodiments with electromechanical switches, capacitive sensors, piezoelectric sensors, or other mechanisms known to one of ordinary skill in the art.

One embodiment of the sensor incorporates an optical relay (not shown) between the sensor surface 39 and the skin 40. This optical relay transfers the light from the light sources to the skin and from the skin back to the detector(s) while minimizing light loss and spreading. Methods of performing this function include fiber-optic face plates and tapers, individual optical fibers and fiber bundles, light pipes and capillaries, and other mechanisms known to one of skill in the art. Optionally, the surface of the light relay can be contoured to fit specific product applications and ergonomic requirements. This has the advantage that the structure of the basic sensor can remain constant, but adapted to various product applications by mounting the sensor to one of a series of optical relay units.

FIG. 3 shows a top view of the sensor head 32 with a plurality of light sources 34 and a single detector 36 visible. This figure is intended to be representative of configurations that allow for a variety of sources 34 and detectors 36 that have variable spacing between them. In general, this configuration is most applicable in cases where a small number of light sources 34 with different wavelength characteristics are available. In these cases, the variable distance between sources 34 and detector 36 are used to gather additional optical information from the tissue.

FIG. 4 shows that the light sources 34 can also be arranged to be equidistant from the detector 36. This configuration is most appropriate in cases where each light source 34 is a different wavelength and sufficient light sources can be obtained to achieve the desired accuracy results for the system. An example of this occurs when the individual light sources are the result of combining optical filters with one or more broadband (e.g., incandescent) light sources. In this case, many unique wavelength bands can be defined and each of the sources 34 can be placed equidistantly from the central detector 36.

An alternative embodiment of a variable source-detector configuration is illustrated in FIG. 5, which schematically depicts a top view of a sensor 70 of this type. In this embodiment, multiple different light sources 71, 74, 77, 80 are arranged around a common detector 83. Four different light sources 71, 74, 77, 80 are shown for illustration but fewer or more can be used in different embodiments. Each of the light sources 71, 74, 77, 80 is optically coupled to a different optical waveguide 72, 75, 78, 81. Each waveguide 72, 75, 78, 81 has individually controllable electronic or mechanical optical shutters 73, 76, 79, 82. These optical shutters 73, 76, 79, 81 can be individually controlled to encode the light by allowing light to enter the tissue from a waveguide 72, 75, 78, 81 at a predetermined position or positions. One method for

US 7,620,212 B1

9

implementing optical shutters is using micro-electrome-chanical systems (MEMS) structures, which is a technology well known to one of ordinary skill in the art. In specific embodiments, the light sources **71**, **74**, **77**, **80** may comprise different LEDs, laser diodes or VCSELs. Alternatively, one or more incandescent sources with different optical filters can be used to generate light of different wavelength characteristics to couple into each of the waveguides **72**, **75**, **78**, **81**. As well, this MEMS aperture geometry could be used with other illu-mination sources and geometries illustrated in the other fig-ures in this application.

Alternatively, multiple source-detector distances can also be achieved by using a plurality of detector elements, as shown in FIG. **6**. This figure schematically depicts a top view of a sensor **80** of this type. In this embodiment, each of three different light sources **82**, **84**, **86** is positioned relative to three detectors **81**, **83**, **85** such that the spacing between a given light source and each of the detectors is different. For example, the source detector spacing for a light source **82** is shortest with respect to detector **85** and longest with respect to detector **83**. By turning on the light sources **82**, **84**, **86** in a sequential or encoded pattern and measuring the response at each of the three detectors **81**, **83**, **85**, the tissue characteristics for all of the available source-detector separations at all of the wavelengths can be measured.

Another example of the use of multiple source and detector elements that provide multiple source-detector distances is shown with the top view of FIG. 7A. In this embodiment, the sensor **91** includes a row of detectors **95** surrounded on either side by rows of light sources **93**. In the illustration, five detectors **95** are provided and two rows with eight sources **93** are provide on either side of the detector row, although other numbers and arrangements of the sources **93** and detectors **95** may alternatively be used. The use of multiple detector ele-ments and multiple illumination sources can be extended to using a detector array, as shown in FIG. **7**. This figure sche-matically depicts a top view of a sensor **90** of this type. In this embodiment, multiple light sources **92**, **94**, **96**, **98** are placed at the perimeter of a detector array **99**. The signal detected at each of the array elements then represents a different source-detector separation with respect to the light from a given light source. Many variants on this configuration exist including the use of one-dimensional (1D) or two-dimensional (2D) arrays, and placing sources within the array as well as on the periphery.

The detector(s) can be any material appropriate to the spectral region being detected. For light in the region from about 350 nm to about 1100 nm, a suitable detector material is silicon and can be implemented as a single-element device, a collection of discrete elements, or a 1D or 2D array, depend-ing upon the system configuration and encoding method used. For light in the region from about 1.25 to about 2.5 μm, a suitable detector material is InGaAs and can also be imple-mented as a single element, a collection of elements, or a 1D or 2D array. Additional detector materials and means of detection include InSb, Ge, MCT, PbS, PbSe, bolometers, and others known to one of ordinary skill in the art.

Once the light passing though the tissue is detected, the signals can be digitized and recorded by standard techniques. The recorded data can then be processed directly or converted into absorbance spectra or noised-scaled absorbance spectra as is known to one of ordinary skill in the art. The data can then be used for spectral identification or verification by the methods described in U.S. Pat. No. 6,560,352, U.S. patent application Ser. No. 09/415,594, and/or U.S. patent applica-tion Ser. No. 10/407,589, all of which have been incorporated herein by reference.

10

Because of the nature of optical spectroscopy, it is difficult to generate spectra of similar shape and absorbance charac-teristics without using similar material for the sample. For this reason, many common materials, such as latex and wax that are used to defeat other biometric systems such as fin-gerprint readers or hand geometry systems are ineffective tissue surrogates for a spectral biometric system. By perform-ing a spectral comparison, most non-tissue samples will be rejected, resulting in a strong countermeasure capability against potential intruders.

Similarly, many of the spectral features that are present in the wavelength ranges disclosed by this invention are indica-tive of living tissue. These features include oxy- and deoxy-hemoglobin bands, temperature effects, intracellular hydra-tion, and others. These effects contribute to the overall spectral signature of the sample being measured and ensure that a matching sample is one that is part of a living person and normally perfused. Thus, a good spectral comparison ensures the "liveness" of a sample and deters the use of dead or excised tissue as a means to circumvent the spectral biometric system.

In some applications, such as Internet access authorization, it may be useful to be able to verify the sex and/or age of the person using the spectral biometric system. Because of both age- and sex-specific difference in skin structure and compo-sition, the optical spectra change in systematic and indicative ways such that the age and sex can be estimated using the biometric spectral data.

In practicing embodiments of the present invention, the tissue spectral data is determined by measuring the light intensity received by the output sensor for the various light sources which give indications of the optical properties of the tissue at different wavelengths and/or at different source-detector separations. As is well known to one of ordinary skill in the art, the signal produced by the detector in response to the incident light levels can be converted into spectral data that can be recorded and used for subsequent analysis for enrollment or authorization of identity.

### 3. Exemplary Implementations

A small spectral biometric subassembly, such as those discussed above, can be embedded in a variety of systems and applications. The spectral biometric reader can be configured as a dedicated system that is connected to a PC or a network interface, an ATM, securing an entryway, or allowing access to a particular piece of electronics such as a cellular phone, personal digital assistant ("PDA"), electronic fob, or any other portable electronic device. In this mode, one or more people can be enrolled in the biometric system and use a particular reader to gain access to a particular function or area.

Alternatively, the spectral biometric system can configured as a personal biometric system that confirms the identity of a person authorized to use the device (who could be one of a plurality of people authorized by the device), and transmits this authorization and any necessary identifying information about the user to any properly equipped PC, ATM, entryway, or piece of electronics, that requires access authorization. The personal biometric could, after confirming the identity of the user, transmit user specific user information and device-specific information along with or instead of an authorization. User-specific information may include identity, financial informa-tion, medical information, or other pieces of personal infor-mation. Device-specific information may include serial number, tamper warnings, battery-low or other service mes-sages, and other pieces of information.

US 7,620,212 B1

11

Instead of performing the biometric authorization procedure onboard the personal biometric system, one can measure the spectral biometric data of the person and transmit the data and any associated identifying information about the user and device to the reader for authentication. One advantage of this latter approach is that the personal biometric system can transmit an identifying code to the reader unit and then use the biometric signal to confirm authorization, which implies that the system needs to perform a verification task rather than the more difficult identification task. Yet, from the user's perspective, the system recognizes the user without an explicit need to identify himself or herself. Thus, the system appears to operate in an identification mode, which is more convenient for the user.

An additional advantage of a personal biometric system is that if an unauthorized person is able to defeat the personal biometric system code for a particular biometric system-person combination, the personal biometric system can be reset or replaced to use a new identifying code and thus re-establish a secure biometric for the authorized person. This capability is in contrast to multi-person biometric systems that base their authorization solely on a biometric signature (spectral, as well as any of the other biometric techniques such as fingerprint, iris, facial, etc.). In this latter case, if an intruder is able to compromise the system by somehow imitating the signal from an authorized user, there is no capability to change the biometric code since it is based solely on a fixed physiological characteristic of a person.

FIG. 8A shows one embodiment of a personal spectral biometric system 100 in the configuration of an electronic key fob 102. The equidistant sensor configuration of FIG. 4 is shown for illustration purposes only; more generally, any of the disclosed sensor configurations (or other equivalent configurations) may be implemented in the electronic key fob. The illumination 104 and detection system 106 are built into the fob 102, as are the data collection and digitization devices for collecting and digitizing the spectral information. In one embodiment, short-range wireless techniques based upon RF signals 103 can be transmitted to communicate between the fob and a corresponding reader (not shown) that allows access to the PC, entryway, etc. In another embodiment, an infrared optical signal can be used to transmit the information between the fob and the reader. In another embodiment, a direct electrical connection is established between the personal biometric system and the reader. The actual comparison between the measured spectral data and the previously recorded enrollment spectrum (template) can be made either within the fob or at the reader. In the former case, the logical operations necessary to perform the comparison are done within the fob and then a simple confirmed or denied signal is transmitted to the reader. In the latter case, the most recent measured spectrum is transmitted to the reader and the comparison and decision is accomplished at the reader or at a host to which the reader is connected. In either case, the communication between the fob and the reader needs to be performed in a secure manner to avoid interception and unauthorized use of the system. Methods for ensuring secure communication between two devices are well known to one of ordinary skill in the art.

A second embodiment of a personal spectral biometric system 110 is depicted in FIG. 8B. In this case, the biometric reader 111 is built into the case of a wristwatch 112 and operates based upon signals detected from the skin in the area of the wrist. The operation of this system is identical to the operation described for the biometric fob. FIG. 8B again shows the equidistant-sensor geometry of FIG. 4 for illustration purposes only; more generally, any of the sensor geom-

12

etries previously disclosed or other equivalent configurations can be used for this application.

In addition to the watch or fob, similar biometric capability can be built into other personal electronic devices. For example, FIG. 8C provides side and back schematic illustrations of a cellular telephone 120 that comprises a biometric reader 122. In this instance, the biometric reader 122 is shown on the back of the cellular telephone 120, although it may be placed in other positions as well. FIG. 8C shows the variable-spacing sensor geometry of the biometric reader 122 described with respect to FIG. 3 for illustration purposes only; more generally, any of the sensor geometries previously disclosed or other equivalent configurations can be used for this application. The operation of the biometric reader 122 in the cellular telephone 120 may be similar to that described in connection with FIG. 8A for the fob, with data collection and digitization devices being included internal to the cellular telephone. Comparisons between measured spectral data and a previously recorded enrollment spectrum may be made within the cellular telephone 120 or at a separated reader.

FIG. 8D provides a further example of a personal electronic device that may be configured with biometric capability in the form of a PDA 130, with both side and front schematic views. In this instance, the biometric capability is provided with a biometric reader 132 on the side of the PDA 130, although other alternative positions may be used. The variable-spacing sensor geometry described with respect to FIG. 3 is used to illustrate one form of the biometric reader 132, in this case having light sources distributed elliptically about the detector; more generally, any of the sensor geometries previously disclosed or other equivalent configurations can be used for this application. As for the other devices, data collection and digitization devices may be included internally to the PDA 130 to perform data collection and digitization functions. Comparisons between measure spectral data and an enrollment spectrum may be made within the PDA 130 or at a separated reader.

Still another example of a personal electronic device configured with biometric capability in accordance with an embodiment of the invention is shown in FIG. 8E for a combined cellular telephone/PDA 140 with top and front views. The location of the biometric reader 142 may be in any suitable location, but is shown on the top for illustrative purposes. The illustration of the biometric reader 142 having the variable-spacing geometry described with respect to FIG. 3 is again not intended to be limiting since any of the previously disclosed sensor geometries or other equivalent configurations may alternatively be used.

Still other devices may be configured to include the biometric sensor in other embodiments. For example, the compact sensors disclosed can also be put into firearms to prevent unauthorized usage. In particular, the biometric sensor could be placed in the handgrip of a weapon such as a handgun or other firearm to sense tissue properties while the gun is being held in a normal manner.

Management of the functionality discussed herein for the biometric sensor may be performed with a computer system. The arrangement shown in FIG. 9 includes a number of components that may be appropriate for a larger system; smaller systems that are integrated with portable devices may use fewer of the components. FIG. 9 broadly illustrates how individual system elements may be implemented in a separated or more integrated manner. The computational device 330 is shown comprised of hardware elements that are electrically coupled via bus 342, which is also coupled with the biometric sensor 356. The hardware elements include a processor 332, an input device 334, an output device 334, a storage device

US 7,620,212 B1

13

**338**, a computer-readable storage media reader **340***a*, a communications system **344**, a processing acceleration unit **346** such as a DSP or special-purpose processor, and a memory **348**. The computer-readable storage media reader **340***a* is further connected to a computer-readable storage medium **340***b*, the combination comprehensively representing remote, local, fixed, and/or removable storage devices plus storage media for temporarily and/or more permanently containing computer-readable information. The communications system **344** may comprise a wired, wireless, modem, and/or other type of interfacing connection and permits data to be exchanged with external devices. The storage devices typically hold information defining the stored spectra as well as any personalized-setting information that may be used.

The computational device **330** also comprises software elements, shown as being currently located within working memory **350**, including an operating system **352** and other code **354**, such as a program designed to implement methods of the invention. It will be apparent to those skilled in the art that substantial variations may be used in accordance with specific requirements. For example, customized hardware might also be used and/or particular elements might be implemented in hardware, software (including portable software, such as applets), or both. Further, connection to other computing devices such as network input/output devices may be employed.

### 4. Enrollment Functions

a. Initial Enrollment

In FIG. **10** the major elements of a spectral biometric enrollment sequence **500** are shown. Since a successful enrollment authorizes the user for future access to the systems or services protected by the biometric, the enrollment sequence **500** is generally performed under secure means or controlled situations. Where applicable, enrollment might be supervised by an authorized person (e.g. for a bank clerk would have to supervise enrollment in a biometric system used for automated financial transactions) or take place in an authorized location (e.g. enrollment for a biometrically enabled automobile might have to occur at an authorized car dealership), or take place when an authorizing token is presented (e.g. a password or key is used to start the enrollment process), or take place under authorized conditions (e.g. a biometrically enabled cell phone can only initialized when located in a particular authorized household), or occur only when a device is first activated or reset.

Once the enrollment is enabled, the sequence **500** begins with the collection of personal information **502**, which is linked to the spectral biometric data. At a minimum, this personal information consists of a unique identifier that can be used by automated or manual means to refer to the particular biometric enrollment data. The personal information can also include items such as name, addresses, contact information, demographic information, medical information, passwords and PIN's for other systems, authorization codes, links to other databases or systems, and any other information pertinent to the particular biometric application. These information can be entered by a variety of means including manual entry during an enrollment interview, read automatically from a magnetic card, proximity card, or smart card, or downloaded from other systems and databases.

When the collection of personal information **502** is complete, the next block shown in the sequence is the acquisition of spectral data **504**. The acquisition commences when the person being enrolled places the appropriate portion of the hand or other body part in contact with the spectral biometric

14

sensor and a trigger is given. The trigger can be manually activated or based on a mechanical, optical, electrical or magnetic switch that senses contact between the sensor and the skin site being enrolled. As few as a single enrollment sample can be taken, but more typically two or more independent samples are taken to ensure that the samples are consistent, as explained later in the sequence. If multiple enrollment samples are taken, the person being enrolled typically withdraws their hand from the sensor and replaces it in order to collect a new independent sample.

Once the candidate enrollment sample or samples are collected, they may undergo one or more preprocessing operations **506**. Preprocessing of the spectral data may include a decoding step if the data were collected in an encoded fashion such as Hadamard, Fourier, frequency division multiplexing, spread spectrum techniques, and others of similar nature. Operations necessary to invert the encoding imposed by such techniques are well known to one of ordinary skill in the art. Other systems such as sequential illumination of different wavelength sources do not require decoding.

Whether or not the data are required to be decoded, additional preprocessing steps may include generating the ratio of the biometric spectra to an optical reference spectrum, performing a logarithmic transform of the spectral data, performing explicit corrections to account for sensor-to-sensor variations or environmental influences of temperature, humidity and pressure, scaling the data by some function, and selecting certain subsets of the spectral data for further processing. These and other techniques are well known in the art.

After preprocessing, if any, the spectra can then be checked for goodness **508**, which confirms that the candidate enrollment spectra have optical characteristics that are similar to the type of tissue for which the sensor is calibrated. In particular, if the goodness check **508** generates a metric or metrics that ensures that the enrollment samples have optical properties that are similar to living skin collected from a human hand (for example). As such, this procedure performs the spectral liveness determination for the enrollment data. In order to do this, the candidate enrollment samples are compared to calibration factors that describe the spectral qualities of the calibration samples (which in this example are presumed to be taken from the skin on one or more living human hands). These factors can be generated using a variety of standard techniques including principal component analysis, linear discriminant analysis, partial least squares, Fourier analysis, cluster analysis and other numerical modeling methods known to one of ordinary skill in the art.

Analyses and metrics that can used to ensure that the candidate enrollment samples are good (i.e. consistent with the calibration data) include Mahalanobis distance, Euclidean distance, residuals of the enrollment spectra when fit by the calibration factors, cluster analysis and other methods that are known to one of ordinary skill in the art (see for example, *Multivariate Calibration* by Martens and Naes, John Wiley & Sons, 1993, chapter 5, which is incorporated herein by reference). The goodness decision **510** is based on one or more of these metrics to determine if each of the candidate enrollment spectra is consistent with the calibration data set. If so, the enrollment process continues with a consistency check described below. If not, the candidate enrollment data are discarded at block **512** (either all enrollment samples or only the ones that are deemed to be not good) and new enrollment data are collected to replace them. There are also a variety of logical options that the enrollment process can be incorporated in this loop that are not shown, such as a try counter to permit a limited number of enrollment attempts before flagging an error condition.

US 7,620,212 B1

15

The next step in the enrollment process **500** is the generation of consistency metrics **514** followed by a consistency decision **516** based on those metrics. The consistency check confirms that the multiple candidate enrollment samples are sufficiently similar to each other to take them as valid. This portion over the overall procedure **500** is omitted in cases where the system operates with only a single candidate enrollment spectrum is taken. In cases where a consistency determination **516** is performed, the methods used can be similar to the methods used for goodness **510** with the difference being that the enrollment spectra are compared to themselves instead of compared to the calibration data. As an example, consider the case where Mahalanobis distance is used as a metric for both the goodness **508** and consistency **514** steps. In the case of goodness, the spectral mean of the calibration data is subtracted from each of the candidate enrollment data and the Mahalanobis distance of this difference is calculated. If the distance is consistent with the distances that the mean-centered calibration data produced, then the goodness according to this metric is acceptable. Conversely, when using the same data and same metric for a consistency check, the mean of the candidate enrollment spectra themselves are subtracted from each of the candidate spectra (or other similar operations can be performed such as subtracting on of the candidate spectra from each of the others). If the resulting Mahalanobis distances are sufficiently small, then the candidate enrollment spectra are deemed to be consistent in the consistency decision **516**.

The outcome of the consistency decision **516** has similar options and results as the goodness decision **510**. In the case where the candidate enrollment samples are found to be inconsistent, some or all of the samples are retaken. In the case where the samples are found to be consistent, then the enrollment process **500** may proceed to check for a match with the existing enrolled entries **518**. Determining where there is a match with the existing enrolled data is particularly important in a biometric system that is being used in an identification mode where participants may have an incentive to assume false identities. Examples of such situations include biometrics systems used to authorize voting, the issuance of a driver's license, identification card, passport, credit card, welfare benefits or other item of tangible value.

Matching against the enrolled database **518** relies on the use of specific, predetermined spectral features or factors. These factors are determined during an earlier calibration phase and are chosen to enhance person-to-person effects relative to typical spectral changes experienced by a single person or changes that occur within and between biometric sensors. Examples of techniques for generating the factors include principal component analysis, linear discriminant analysis, quadratic discriminant analysis, partial least squares, and other multivariate methods as is known to one of skill in the art. In one embodiment, the factors for determining a match to the enrolled database **518** are generated using principal component analysis (PCA) operating on a set of calibration data that have been collected from multiple people in multiple environmental conditions over time spans that are representative for the actual operation of the biometric sensor.

In the case where a close match is found, a properly authorized supervisor can examine the pertinent details at block **520** and decide whether to authorize the enrollment **522** based on any evidence of falsification. In the cases where either no close matches are found or a supervisor authorizes enrollment in the presence of a close match at block **522**, the enrollment data are stored in the enrollment database **524** and the enrollment process is completed.

16

b. Other Enrollment Functions

Several embodiments of the invention provide methods for managing enrollment. An outline of several aspects of such enrollment management is presented in FIG. **11**, which provides an overview of an identification or verification function in the form of a flow diagram. When the identity of an individual is to be checked to determine whether to allow or deny access, a tissue spectrum is collected from the individual at block **302** using one of the methods and systems described above. The collected tissue spectrum is compared with a set of one or more stored spectra at block **304**. Such a comparison includes extracting the relevant identification indicia from the spectra as described above and examining corresponding database entries. Identification of a match between the collected spectrum and a stored spectrum at block **306** generally comprises ensuring that the relevant identification indicia differ by less than a predetermined threshold.

If there is no match between the collected spectrum and any of the stored spectra, the individual is either allowed access or denied access in accordance with a default setting of the system. It is expected more usually that the inability of the system to identify the individual will result in a default denial of access. If a spectral match is found at block **306**, it is possible for the system to respond in a similar default manner, such as by providing access to any individuals that are properly identified. The flow diagram indicates additional embodiments, however, that provide for the possibility of specific denial of access to certain identified individuals. At block **308**, enrollment criteria for the identified individual indicating whether that person is to be allowed or denied access are examined. In accordance with the check at block **310**, access is either allowed or denied at block **312** or **314** depending on the enrollment type of the individual.

The ability to identify individuals who are explicitly to be denied access, as opposed to denying access on a default basis to those who cannot be identified, provides a number of advantages to the system. For example, if the biometric sensor is comprised by a handgun, the system may identify the owner as the only individual permitted to use the device, and may additionally explicitly prohibit individuals identified as the owner's children from using the device. Thus, in accordance with the flow diagram of FIG. **11**, when the owner wishes to use the device, his identity is confirmed at block **306** and he is allowed access at block **312**. When an unknown party attempts to use the device, he is denied access on a default basis at block **320**. When one of the identified owner's children attempts to use the device, however, access is denied explicitly at block **314**. Such explicit denial provides greater security against misuse of the device.

It is also possible to use the explicit-denial capability of a biometric system in a fixed installation such as a home, place of business, or an automobile. For example, a biometric system installed at the entryway of a place of business can be used to admit authorized employees and temporary workers. If an employee is fired or the term of the temporary employee expires, then their enrollment data can be shifted from the authorized to the unauthorized database, and an explicit check is made to deny access to the former employee if he or she attempts to enter.

In some embodiments, allowing access at block **312** may also comprise personalizing settings. For example, supplementary information regarding the identified individual may be stored in addition to storing identification indicia. This supplementary information may also be updated over time to reflect better identification of settings suitable for each individual. For example, in one embodiment the biometric sensor is comprised by an automobile that is used by multiple indi-

Stay-Add-658

US 7,620,212 B1

17                                                    18

viduals and acts as a security device. When one of those individuals accesses the automobile, she is not only provided with access to it at block **312**, but environmental aspects such as seat positions, radio settings, temperature, etc. and safety characteristics such as air-bag deployment profiles are automatically configured for her. In another embodiment, the biometric sensor is comprised by a television remote control and is positioned to identify the individual holding the device automatically. A processor programmed to track viewing habits is configured to discriminate by the identified individual. Thus, over time, whenever one of the individuals handles the remote control, it may automatically adjust settings, such as selecting certain preferred channels, volume levels, etc., that are individualized. The preceding are examples in which the biometric sensor is used to automatically personalize the device or environment to the specific person's requirements or tastes.

In applications that are dedicated to personalization tasks rather than providing security against unauthorized usage, a further processing step on initial enrollment may be performed. Once a good enrollment spectrum is collected, or an existing enrollment spectrum is updated, a mathematical analysis is initiated to determine features that best separate the existing enrolled users. The result of this discriminant analysis then modifies the calibration coefficients that are used in blocks **304** and **306** of FIG. **11** to determine a matching tissue spectrum. The ability to customize the calibration coefficients for a particular set of enrolled users in this way allows the overall performance of the personalization task to be improved.

Block **316** of FIG. **11** indicates another enrollment aspect included in certain embodiments of the invention. Over time, it is possible for changes to occur in any living system that may result in changes to the spectral identification indicia used in embodiments of the invention. These differences are generally insufficiently large to prevent a proper identification, but may accumulate over time. In a similar manner, small but progressive changes in the sensor due to aging, wear or environmental effects can also accumulate to significant levels. Thus, in either case, once a spectrum collected at block **302** is authenticated, an update may be performed of the stored spectrum at block **316** to reflect the differences between the current spectrum and the stored enrollment. While such an update could comprise substituting the stored spectrum with the collected spectrum, more generally the method uses a weighting averaging technique to mitigate sharp changes.

Such an updating technique may also be used in other embodiments. For example, spectral variations may also result from differences in individual biometric sensor arrangements. Thus, in one embodiment, a spectral profile for each individual is stored for each sensor, either locally to the sensor or centrally with an identification of the sensor. Updates are then performed for each sensor when an individual uses it for identification, having the effect of tuning each biometric sensor to its own individual characteristics.

The enrollment-management methods described with respect to FIG. **11** may be implemented on a computational device such as the one illustrated schematically in FIG. **9**.

5. Extended Functionality

A number of embodiments of the invention exploit the illumination and/or light-detection capabilities provided by the biometric sensor. These capabilities are used to provide functions that are supplementary to the identification and/or verification functions. As such, these embodiments are especially suitable when the biometric sensor is comprised by a portable device, such as a portable electronic device. In some embodiments, activation of the supplementary functions may be tied with a service contract. In these instances, some of the functions may be of interest to a customer for a modest increase in service fee even if the customer would not be inclined to purchase a separate device dedicated to performing those functions. For example, in one embodiment, the biometric sensor is comprised by a cellular telephone. The cell-phone provider offers extended functionality of the biometric sensor in accordance with the embodiments described below for the modest fee surcharge.

a. Spectrometer Capabilities

In one set of embodiments, the spectral-analysis capabilities of the biometric sensor are extended to spectral analysis of material other than tissue. While a number of specific examples are provided to illustrated such extended functionality, the examples are not intended to be limiting and several other examples will be evident to those of skill in the art after reading this description. In some of the embodiments, the spectral-analysis capabilities are to identify changes, such as for the detection of conditions in humans that manifest themselves through spectroscopic changes in skin or other tissue. In other embodiments, the spectral-analysis is performed according to an absolute scale where the specific spectral characteristics are independently relevant. In some of the specific embodiments discussed below, the spectral analysis is used to identify a physiological state of an individual. Identification of such a physiological state may be made by measuring the spectral variation of a measured spectrum for light scattered by tissue of the individual, and comparing it with a reference spectral variation. The consistency of the measured spectral variation with the reference spectral variation allows a determination of the physiological state.

For example, in one embodiment, the extended functionality comprises a stress and/or lie detector. It is known that stress in humans causes a characteristic change in skin color, usually reddening, that may be detected spectroscopically. The change in skin color is believed to result from changes in the flow of blood in tissue as a result of the stress. This extended functionality may be included in the device by storing a reference spectrum for individuals when they are not under stress. When a subsequent spectrum is measured in accordance with the descriptions above, it may be compared to the reference spectrum using an appropriate multivariate discrimination method such as linear or quadratic discriminant analysis to determine whether such indicia of stress are present. In some cases, the measured and reference spectra may be acquired close in time. For example, during a questioning session, an initial spectral baseline may be determined by having a subject respond to a base set of questions in a known manner, responding truthfully to some and falsely to others. These results then effectively provide a spectral calibration against which the response to questions whose truthfulness is unknown may be measured.

In another embodiment, the extended functionality comprises a tanning meter. Similar to the stress and/or lie detector, functionality as a tanning meter is included by identifying changes in skin color, in this instance in response to exposure to sunlight or other ultraviolet radiation, such as may be provided in a tanning booth. An advantage to this use of the device is that exposure levels may be quantified on an individual basis and close in time to the tanning activity in order to rapidly determine sufficient exposure and avoid overexposure. Other techniques for determining excessive exposure are qualitative, relying on such broad factors as general skin type, eye color, hair color, etc. These qualitative techniques

**Stay-Add-659**

US 7,620,212 B1

**19**

provide, at best, a crude estimation of excessive exposure. Use of the spectral analysis provided by embodiments of the invention instead provides much more accurate information.

In a further embodiment, the extended functionality comprises a complexion monitor. In a number of applications, notably in the cosmetics industry, skin color and composition are used as a guide, such as for choices in make-up color, hair-dye color, clothing color, etc. Qualities of the skin of interest in this application may include amount and type of collagen, melanin, elastin, sebum, hemoglobin, moisture content, skin surface characteristics, and other physiological, chemical, and structural characteristics of the skin. The ability of embodiments of the invention to quantify skin characteristics permits more reliable choices than provided by purely qualitative evaluations of skin color.

In some instances, the physiological state of an individual may be defined by concentration of a substance in the individual's tissue. For instance, the extended functionality may comprise a hemoglobin monitor. Similar to the effects of stress, increased activity levels in individuals as well as certain medical conditions are manifested by changes in blood flow in the body. Such changes in blood flow cause spectroscopic changes that may be detected according to the methods described above. According to this embodiment, these spectroscopic changes are correlated with oxygenation and/or hemoglobin levels in the blood. In addition to medical uses, the ability to quantify oxygenation levels is useful for individuals in monitoring exercise levels.

Spectroscopic changes associated with different physiological states in human tissue may also result from the release of certain pigments in response to pathological conditions. One example is provided by bilirubin, which is a reddish bile pigment that is released when liver tissue is diseased. The presence of the pigment causes a jaundicing of the affected person's skin. Such changes in skin color may be identified using the methods described above. Accordingly, in one embodiment, an extended functionality of the biometric sensor allows it to function as a bilirubin monitor. In other embodiments, levels of other pigments may similarly be monitored.

The presence of toxic substances in an individual's blood may also manifest itself spectroscopically because of the effect such toxins have on vascularity as well as a direct spectroscopic signature in certain cases. For example, increases in alcohol levels result in spectroscopic changes that may be observed, particularly in the infrared portion of the electromagnetic spectrum. Thus, a further extended functionality of the biometric sensor permits it to function as an alcohol monitor. In other embodiments, the levels of other toxins and/or drugs may be similarly monitored.

While the above examples have focused on uses that correspond to identifying conditions in humans, it will be appreciated that similar spectroscopic information permits the extended functionality also to be used for veterinary purposes. Moreover, spectroscopic information may also be used in quantifying the quality of plant tissues. For example, in one embodiment, the extended functionality comprises use as a fruit-ripeness monitor. Color changes are a natural part of the ripening process for fruit, and these changes may be detected using the methods described above. Accordingly, a portable electronic device that includes a sensor of the type described above may conveniently be used to test the ripeness of fruit.

Spectroscopic information is also of use in characterizing inorganic materials. Thus, in another embodiment, the device may be used for matching the colors of paints, textiles, and other materials. Such information can be used, for example, to match colors of paint and other coatings, or to determine

**20**

complimentary colors of textiles, clothing, etc. As a further example, ink colors used in documents such as currency and other government documents may be quantified. Comparison of measured spectra for such documents with stored spectral characteristics of approved inks permits the identification of counterfeit documents. Thus, a portable electronic device that includes a sensor of the type described above may be provided with extended functionality as a counterfeit-currency detector.

b. Combined Illumination and Detection Components

In other embodiments, additional extended functionality is provided by using combined illumination and detection capabilities of the biometric sensor. For example, in one embodiment, the device is used as a smart optical switch. In such an embodiment, the ability of the device to identify the liveness of tissue, as described above, is used so that an electronic device is turned on only when touched by living tissue, usually the finger of a person. Such functionality is particularly useful in the context of portable electronic devices, which are often left in purses, briefcases, pockets or other places where they may be activated inadvertently, possibly wasting significant battery life. Such inadvertent activation is avoided by the ability to confirm liveness of an object that touches the switch. As well, the smart switch functionality is applicable to power tools, manufacturing equipment, industrial machinery, and other potentially dangerous environments and conditions. In each of these cases, a smart switch can be used to ensure that the tool, piece of equipment, manufacturing station, etc. was turned on intentionally by a human hand or hands rather than by an accidental touch of an inanimate object. In cases where the smart switch functionality is the sole functionality required of the device, the configuration of the device can be simplified relative to a biometric sensor. More generally, however, the multifunction capabilities, including the smart optical switch, may be included with any implementation of the biometric sensor.

The optical switch may also be configured with trinary functionality in some embodiments. Such functionality may respond to different pressure levels with which a finger presses the optical switch. Such differences in pressure levels affect the optical properties of skin through a variety of physiological phenomena including changes in local tissue perfusion, changes in water volume, and other changes in the optical scattering and absorbance properties of the tissue that are close to the area in contact with the sensor. In general, these changes in the optical properties of the tissue are related to the pressure between the tissue and the sensor, and thereby the pressure can be ascertained optically. Thus, in one embodiment, the trinary functionality corresponds to the three states where (1) the switch is untouched, (2) the switch is touched lightly, and (3) the switch is touched firmly. Still more levels of functionality may be provided, such as where a fourth level corresponds to where the switch is touched with intermediate firmness. In principle, arbitrarily many levels of functionality may be included, although it is generally more difficult for an individual to discriminate levels of firmness if there are more than three or four levels. Since no moving parts are provided for the optical switch, there is no danger that mechanical parts will break or wear. In addition, the absence of mechanical parts makes the switch especially suitable for use with hermetically sealed packages where contamination by air and/or water is to be avoided.

In a further embodiment, the illumination and detection capabilities provided by the biometric sensor are combined to provide an ambient light sensor. In one such embodiment, the level of backlighting on a portable electronic device is adjusted in response to the ambient level of light in order to

US 7,620,212 B1

21

conserve battery life. For example, the backlight may be increased when the light level is low, such as in a dark room or at night, and decreased when the light level is high, such as during daytime.

In a specific embodiment, the device is configured to discriminate between darkness where the portable electronic device may be used, such as in a dark room or at night, and darkness where the portable electronic device is being stored, such as in a purse or briefcase. These different positions are distinguished by using a reflectance burst when darkness is identified. In a relatively small enclosed space, light is reflected back and detected by the light detector; in such cases, the backlighting is kept very low. In a larger space, such as a room or outdoors, the burst light is not reflected back to the device; accordingly, the backlighting is increased. Alternatively, the ambient sensing capability can be combined with a liveness sensing capability to sense the ambient light level only during or after the sensor has been activated by a genuine sample.

In another embodiment, the combined illumination and detection capabilities are used to provide extended functionality as a bar-code scanner. The bar code scanning capabilities are provided by using the light source to illuminate a bar code and by analyzing the spectrum received by the light detector to deduce the bar code. Such functionality may be used in numerous varied applications, some of which are indicated explicitly herein. For example, in one embodiment, the bar code scanning capability is used to provide an information service. For example, when the sensor is comprised by a portable electronic device that is equipped to access the Internet, scanning of a bar code causes the device to retrieve corresponding information from the Internet and to display the retrieved information on the portable electronic device. Alternatively, certain information may be retrieved directly from a storage device resident on the portable electronic device.

These capabilities permit a user to obtain product information quickly. In some instances, the request for information initiated by the scanning function is additionally recorded for marketing purposes. In particular, the scanning request, coupled with the biometric identification functions of the sensor provide information identifying a person and the type of information being requested. In some cases, this may also be coupled with location information, such as where the portable electronic device includes a GPS information. As information requests are made by the user, they may be compiled and subsequently analyzed for directed marketing.

In a particular embodiment, such directed marketing may be substantially contemporaneous with the scanning request. For example, a consumer may be shopping in a grocery store and is trying to decide which of several similar products to purchase. By scanning them to obtain additional information, a remote system may be provided with sufficient information to recognize the consumer's interest. Accordingly, an electronic coupon for a particular one of the products may be immediately directed to the consumer's portable electronic device for immediate use.

Another capability of the bar-code-scanning functionality may be illustrated in the form of a grocery-list compiler. For example, when this capability is enabled in a particular portable electronic device, a simple scan of an item in a household can be made whenever that item is depleted. A record is stored of the fact that the item is now needed, and these records accumulate over time. When the individual is ready to shop for groceries, a simple command on the portable electronic device provides the accumulated shopping list to identify those items for purchase. In an alternative embodiment,

22

items may be added to the list remotely when two portable electronic devices are equipped to communicate with each other. Such an embodiment is useful where a first person is already at the store shopping and a second individual identifies an additional item for purchase. The item is scanned at home and is immediately added to the list at the store.

A further extended functionality that uses the combined illumination and detection capabilities of the sensor permits it to be used as an optical communications port. In such embodiments, the light sources provide encoded optical signals for transmission over short-distance connections. Similarly, the light detectors receive the encoded optical signals from a similarly equipped device. Typical applications for this extended functionality are the ability to use a cellular telephone or PDA as a television remote control and to communicate reprogramming functions to device. In some instances, the light detectors may be configured to respond to certain wavelengths, enabling the implementation of high-bandwidth, full-duplex optical communication.

The functionality of the sensor may also be extended to provide various entertainment functions. For example, in some embodiments, it may be integrated as part of a game provided on a portable electronic device. One aspect of the sensor, in particular, that may be integrated into games is its multiplicity of distinct colors. There are numerous different games that may use such a color feature, one of which is a memory game that requires the player to repeat a color sequence, similar to the game "SIMON." Another game that integrates the functionality of the sensor is an increasingly popular version of "phone tag," in which participants use GPS systems to locate other participants on cellular telephones. Confirmation that a participant has been found may be confirmed by using the biometric sensor described herein. Another entertainment function may use the sensor as a mood meter, providing a description of an individuals mood based on a spectral analysis of her skin.

The functionality of the sensor may also be extended to provide personal-security functions. For example, if the biometric sensor is configured to operate at infrared wavelengths, it may not require actual physical contact in order to perform identifications, but may instead rely on reflected infrared light or even black-body emissions in the infrared region of the electromagnetic spectrum. A variation of this embodiment that provides personal security functions permits the biometric sensor to detect motion at infrared wavelengths. Such a function is useful, for example, for travelers. The motion detection may be integrated with an alarm function so that an alarm is sounded when motion is detected. If the sensor is comprised by a cellular telephone or other portable electronic device, it may alternatively be configured automatically to dial an emergency number.

Another variation of the remote security functionality is offered by configuring the biometric sensor to be sensitive to mid-infrared wavelengths. In this way emitted black-body radiation can be used as the illumination source and the biometric determination can be done remotely, without physically contacting the sensor. In cases where it is desirable to determine that something moved, it is possible to just monitor changes in the amount of reflected or emitted light over time. In other cases where it is important to ensure that the light passes through the skin before being detected (such as a biometric determination), it is also possible to configure a sensor with active illumination to operate remotely by ensuring that the illumination spot and the spot of skin being detected do not overlap. In this way, detected light is ensured to have traveled through the skin rather than simply reflected from the surface. Optical systems for performing such a

US 7,620,212 B1

23

remote measurement can be developed from lenses, mirrors or other optical elements as know to one of skill in the art.

A further example of a personal-security function that may be provided as part of the extended functionality is a smoke detector. Such a detector may emit light from the light source and be configured to detect light reflected from particles in air as would result from the presence of smoke in a room. Such a feature may also be integrated with an alarm function or with an automatic dial function to respond to presence of smoke.

An additional example of an extended functionality is provided by an optical-strobe function. This function may use the illumination components to produce strobed light and may provide a feedback function based on the detection of reflected light to tune the frequency of the strobe. Such tuning may be applied, for example, to tune strings on musical instruments, such as guitars.

c. Use of Illumination Component

In other embodiments of the invention, extended functionality is provided using only the illumination capabilities provided by the biometric sensor. A simple example that illustrates such extended functionality is a flashlight capability. This capability is achieved simply by activating the light source(s). In some instances, the light source(s) may be configured to be substantially monochromatic and/or to be highly directional, permitting operation as a laser pointer.

More complex extended functionality makes use of the different colors that are available with the light sources. For example, a cellular telephone may use the sensor as an optical ringer, which functions to alert the owner to an incoming call in addition to or instead of by issuing an audible noise. An optical ringer is especially useful in circumstances where an audible ring would be intrusive, such as in a meeting, or would be difficult to detect, such as in a noisy environment. An optical ringer may also be used by people having a hearing impairment, who may nevertheless use short message services ("SMS") that are available for cellular telephones. The color capability is used in certain embodiments to identify the caller by correlating the originating telephone number with a predefined color. Also, in certain embodiments, particular optical-ring patterns may be downloadable.

According to embodiments of the invention, specific sequences of colors may also be presented with the sensor as a form of branding to identify a product or service source. For example, in response to identifying an individual, a distinct temporal sequence of colors may be presented with the light sources. If the sensor is comprised by a product, such as a portable electronic device, the temporal sequence may be associated with the manufacturer of the product. If the sensor is positioned for use as part of a security screening system, such as in an airport, the temporal sequence may be associated with a security company that manages the screening system.

While the use of a temporal sequence of colors may be implemented with one of the sensor arrangements described above, the invention is not limited to such an implementation. More generally, embodiments of the invention include the broad use of any temporal sequence of colors as an identifier of a product or service source. In some embodiments, such a temporal sequence of colors may additionally be coupled with a temporal sequence of sounds. The combination of the temporal sequences of colors and sounds effectively provides a brief musical light show that serves a branding function.

d. Use of Optical Detection Component

In addition to embodiments where the extended functionality of the biometric sensor is provided with only the illumination component, the extended functionality may also be provided with only the optical detection component of the

24

sensor in other embodiments. In one such embodiment, the light detector comprised by the sensor is used as a light meter to quantify light levels. There are a number of applications for such a light meter that are within the scope of the invention, including use in photography applications, in opthalmology applications, and as a meter for quantifying sun exposure, among others.

The collection of light with the detector also provides a means for collecting a small amount of energy from impinging photons. In such embodiments, the detector effective functions as a trickle charger when it is not in active use for identification and verification functions. The available of such trickle charging is especially useful in applications where battery lifetime is a paramount concern, notably in portable electronic devices such as cellular telephones. When the biometric sensor is incorporated into such a portable electronic device, its impact on battery lifetime is substantially mitigated by the use of trickle charging to recover battery lifetime that might be used in operating the sensor.

Having described several embodiments, it will be recognized by those of skill in the art that various modifications, alternative constructions, and equivalents may be used without departing from the spirit of the invention. Accordingly, the above description should not be taken as limiting the scope of the invention, which is defined in the following claims.

What is claimed is:

1. A device comprising:

a plurality of light sources, wherein at least two of the plurality of light sources provide light with distinct wavelengths;

a light detector, wherein the distance between the light detector and at least one of the plurality of light sources is different than the distance between the light detector and another of the plurality of the light sources; and

a processor configured to operate the light sources and the light detector to perform a plurality of distinct functions, wherein at least one of the distinct functions comprises a biometric identification function comprising:

propagating light from the plurality of light sources into presented material, and diffusely reflecting the propagated light toward the light detector;

receiving the diffusely reflected light with the light detector; and

identifying the presented material from the received light based on the wavelength characteristics of the received light and the distance between the source and the detector; and

wherein another of the distinct functions comprises a non-identification function performed with the light sources and the light detector.

2. The device recited in claim 1 wherein the light detector comprises a plurality of light detectors.

3. The device recited in claim 2 wherein the plurality of light detectors comprises an array of light detectors.

4. The device recited in claim 1 wherein the nonidentification function comprises a liveness function to determine whether the presented material is alive.

5. The device recited in claim 4 wherein the nonidentification function comprises operation of an optical switch having multistate functionality.

6. The device recited in claim 1 wherein the nonidentification function comprises a nonbiometric function.

7. The device recited in claim 6 wherein the nonidentification function comprises operation of an optical communications port with the light sources and the light detector.

US 7,620,212 B1

25

**8**. A portable electronic device comprising:

an electronic arrangement for performing a standard function of the portable electronic device;

a biometric sensor having:

  a plurality of light sources, wherein at least two of the plurality of light sources provide light at distinct wavelengths; and

  a light detector disposed relative to the light sources to detect light from the light sources that has propagated through tissue, wherein the distance between the light detector and at least one of the plurality of light sources is different than the distance between the light detector and another of the plurality of the light sources; and

a processor configured to operate the electronic arrangement to perform the standard function and to operate the biometric sensor in accordance with the following:

  propagating light from the plurality of light sources into presented material, and diffusely reflecting the light toward the light detector;

  receiving the diffusely reflected light with the light detector; and

  identifying the presented material from the received light based on the wavelength characteristics of the received light and the distance between the source and the detector.

**9**. The portable electronic device recited in claim **8** wherein the electronic arrangement performs functions of a device selected from the group consisting of a cellular telephone, a personal digital assistant, an electronic fob, and a watch.

**10**. The portable electronic device recited in claim **8** wherein the processor is further configured to operate the biometric sensor to perform a nonbiometric function.

**11**. The portable electronic device recited in claim **10** wherein the nonbiometric function comprises a spectrometer function.

**12**. The portable electronic device recited in claim **11** wherein the spectrometer function is selected from the group consisting of a stress-detection function, a lie-detector function, a tanning-meter function, a complexion-monitor function, a toxicity-monitor function, an alcohol-monitor function, a bilirubin-monitor function, a hemoglobin-monitor function, a fruit-ripeness-monitor function, a counterfeit-document detection function, and a color-match function.

**13**. The portable electronic device recited in claim **10** wherein the nonbiometric function uses an illumination capacity of the plurality of light sources and uses a detection capacity of the light detector.

26

**14**. The portable electronic device recited in claim **13** wherein the nonbiometric function is selected from the group consisting of an ambient-light-sensor function, an entertainment function, a personal-security function, a smoke-detector function, a motion-detection function, and an optical-strobe function.

**15**. The portable electronic device recited in claim **10** wherein the nonbiometric function uses an illumination capacity of the plurality of light sources.

**16**. The portable electronic device recited in claim **15** wherein the nonbiometric function is selected from the group consisting of an optical-ringer function, a flashlight function, and a laser-pointer function.

**17**. The portable electronic device recited in claim **10** wherein the nonbiometric function uses a detection capacity of the light detector.

**18**. The portable electronic device recited in claim **17** wherein the nonbiometric function is selected from the group consisting of a trickle-charger function and a light-meter function.

**19**. A device for performing a biometric function for presented material, the device comprising:

a plurality of light sources arranged on a first side of the device, wherein at least two of the plurality of light sources provide light at distinct wavelengths;

at least one light detector arranged on the first side of the device, wherein the distance between the light detector and at least one of the plurality of light sources is different than the distance between the light detector and another of the plurality of the light sources; and

a processor configured to operate the light sources and the light detector to perform at least a first function and a second function,

wherein first function comprises a biometric identification function comprising:

  propagating light from the plurality of light sources toward the presented material;

  diffusely reflecting the propagated light from the presented material toward the light detector;

  receiving the diffusely reflected light with the light detector; and

  identifying the presented material from the received light based on the wavelength characteristics of the received light and the distance between the source and the detector; and

wherein the second function comprises a nonidentification function performed with the light sources and the light detector.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,620,212 B1                                                          Page 1 of  1
APPLICATION NO.  : 10/640503
DATED                   : November 17, 2009
INVENTOR(S)        : Jeffrey G. Allen et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:


Column 24, line 5, delete "opthalmology" and insert --ophthalmology--


Signed and Sealed this

Thirteenth Day of July, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,620,212 B1                                                    Page 1 of 1
APPLICATION NO.  : 10/640503
DATED            : November 17, 2009
INVENTOR(S)      : Allen et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title Page, Item [*]

Delete the phrase "by 963 days" and insert -- by 1631 days --.

Signed and Sealed this

Thirty-first Day of August, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

# EXHIBIT 17



US010912502B2

(12) **United States Patent**
    Poeze et al.

(10) **Patent No.:** **US 10,912,502 B2**
(45) **Date of Patent:** *\*Feb. 9, 2021**

(54) **USER-WORN DEVICE FOR NONINVASIVELY MEASURING A PHYSIOLOGICAL PARAMETER OF A USER**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/031,407**

(22) Filed: **Sep. 24, 2020**

(65) **Prior Publication Data**
    US 2021/0000392 A1    Jan. 7, 2021

**Related U.S. Application Data**

(60) Continuation of application No. 16/834,538, filed on Mar. 30, 2020, which is a continuation of application
(Continued)

(51) **Int. Cl.**
    *A61B 5/1455*    (2006.01)
    *A61B 5/145*    (2006.01)
    *A61B 5/00*    (2006.01)

(52) **U.S. Cl.**
    CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
    (Continued)

(58) **Field of Classification Search**
    CPC . A61B 5/1455; A61B 5/14546; A61B 5/6838; A61B 5/6816; A61B 5/6829;
    (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,452,215 A    6/1969    Alessio
3,760,582 A    9/1973    Thiess et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CA    2264029    3/1998
CN    1270793    10/2000
(Continued)

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57)    **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**30 Claims, 65 Drawing Sheets**



**US 10,912,502 B2**

Page 2

### Related U.S. Application Data

No. 16/725,292, filed on Dec. 23, 2019, now Pat. No. 10,624,564, which is a continuation of application No. 16/534,949, filed on Aug. 7, 2019, now Pat. No. 10,588,553, which is a continuation of application No. 16/409,515, filed on May 10, 2019, now Pat. No. 10,376,191, which is a continuation of application No. 16/261,326, filed on Jan. 29, 2019, now Pat. No. 10,292,628, which is a continuation of application No. 16/212,537, filed on Dec. 6, 2018, now Pat. No. 10,258,266, which is a division of application No. 14/981,290, filed on Dec. 28, 2015, now Pat. No. 10,335,068, which is a continuation of application No. 12/829,352, filed on Jul. 1, 2010, now Pat. No. 9,277,880, which is a continuation of application No. 12/534,827, filed on Aug. 3, 2009, now abandoned, and a continuation-in-part of application 12/497, 528, filed on Jul. 2, 2009, now Pat. No. 8,577,431, which is a continuation-in-part of application No. 29/323,408, filed on Aug. 25, 2008, now Pat. No. Des. 606,659, and a continuation-in-part of application No. 29/323,409, filed on Aug. 25, 2008, now Pat. No. Des. 621,516, said application No. 12/829,352 is a continuation-in-part of application No. 12/497,523, filed on Jul. 2, 2009, now Pat. No. 8,437,825, and a continuation-in-part of application No. 29/323,408, filed on Aug. 25, 2008, now Pat. No. Des. 606,659, and a continuation-in-part of application No. 29/323, 409, filed on Aug. 25, 2008, now Pat. No. Des. 621,516.

(60) Provisional application No. 61/086,060, filed on Aug. 4, 2008, provisional application No. 61/086,108, filed on Aug. 4, 2008, provisional application No. 61/086,063, filed on Aug. 4, 2008, provisional application No. 61/086,057, filed on Aug. 4, 2008, provisional application No. 61/091,732, filed on Aug. 25, 2008, provisional application No. 61/078,228, filed on Jul. 3, 2008, provisional application No. 61/078,207, filed on Jul. 3, 2008.

(52) **U.S. Cl.**
CPC ........ *A61B 5/14552* (2013.01); *A61B 5/6816* (2013.01); *A61B 5/6826* (2013.01); *A61B 5/6829* (2013.01); *A61B 5/6838* (2013.01); *A61B 5/6843* (2013.01); *A61B 2562/0233* (2013.01); *A61B 2562/04* (2013.01); *A61B 2562/046* (2013.01); *A61B 2562/146* (2013.01)

(58) **Field of Classification Search**
CPC . A61B 5/6843; A61B 5/6826; A61B 5/14551; A61B 5/14552; A61B 5/14532; A61B 2562/046; A61B 2562/04; A61B 2562/0233; A61B 2562/146
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,789,601 | A | 2/1974 | Bergey |
| 3,910,701 | A | 10/1975 | Henderson et al. |
| 4,015,595 | A | 4/1977 | Benjamin |
| 4,114,604 | A | 9/1978 | Shaw et al. |
| 4,129,124 | A | 12/1978 | Thalmann |
| 4,224,948 | A | 9/1980 | Cramer et al. |
| 4,258,719 | A | 3/1981 | Lewyn |
| 4,267,844 | A | 5/1981 | Yamanishi |
| 4,409,470 | A | 10/1983 | Shepard et al. |
| 4,438,338 | A | 3/1984 | Stitt |
| 4,444,471 | A | 4/1984 | Ford et al. |
| 4,447,150 | A | 5/1984 | Heinemann |
| 4,547,075 | A | 10/1985 | Fei |
| 4,653,498 | A | 3/1987 | New, Jr. et al. |
| 4,655,225 | A | 4/1987 | Dahne et al. |
| 4,684,245 | A | 8/1987 | Goldring |
| 4,709,413 | A | 11/1987 | Forrest |
| 4,755,676 | A | 7/1988 | Gaalema et al. |
| 4,759,369 | A | 7/1988 | Taylor |
| 4,781,195 | A | 11/1988 | Martin |
| 4,782,836 | A | 11/1988 | Alt |
| 4,802,486 | A | 2/1989 | Goodman et al. |
| 4,805,623 | A | 2/1989 | Jöbsis |
| 4,819,860 | A | 4/1989 | Hargrove et al. |
| 4,825,872 | A | 5/1989 | Tan et al. |
| 4,859,057 | A | 8/1989 | Taylor et al. |
| 4,865,038 | A | 9/1989 | Rich et al. |
| 4,867,557 | A | 9/1989 | Takatani et al. |
| 4,869,253 | A | 9/1989 | Craig, Jr. et al. |
| 4,880,304 | A | 11/1989 | Jaeb et al. |
| 4,903,701 | A | 2/1990 | Moore et al. |
| 4,928,692 | A | 5/1990 | Goodman et al. |
| 4,933,545 | A | 6/1990 | Saaski et al. |
| 4,938,218 | A | 7/1990 | Goodman et al. |
| 4,941,236 | A | 7/1990 | Sherman et al. |
| 4,945,239 | A | 7/1990 | Wist et al. |
| 4,955,379 | A | 9/1990 | Hall |
| 4,960,128 | A | 10/1990 | Gordon et al. |
| 4,960,314 | A | 10/1990 | Smith et al. |
| 4,964,408 | A | 10/1990 | Hink et al. |
| 5,007,423 | A | 4/1991 | Branstetter et al. |
| 5,025,791 | A | 6/1991 | Niwa |
| 5,028,787 | A | 7/1991 | Rosenthal et al. |
| 5,035,243 | A | 7/1991 | Muz |
| 5,041,187 | A | 8/1991 | Hink et al. |
| 5,043,820 | A | 8/1991 | Wyles et al. |
| 5,069,213 | A | 12/1991 | Polczynski |
| 5,069,214 | A | 12/1991 | Samaras et al. |
| 5,069,680 | A | 12/1991 | Grandjean |
| 5,077,476 | A | 12/1991 | Rosenthal |
| 5,086,229 | A | 2/1992 | Rosenthal et al. |
| 5,099,842 | A | 3/1992 | Mannheimer et al. |
| 5,109,849 | A | 5/1992 | Goodman et al. |
| D326,715 | S | 6/1992 | Schmidt |
| 5,122,925 | A | 6/1992 | Inpyn |
| 5,131,391 | A | 7/1992 | Sakai et al. |
| 5,137,023 | A | 8/1992 | Mendelson et al. |
| 5,158,082 | A | 10/1992 | Jones |
| 5,158,091 | A | 10/1992 | Butterfiled et al. |
| 5,159,929 | A | 11/1992 | McMillen et al. |
| 5,163,438 | A | 11/1992 | Gordon et al. |
| 5,176,137 | A | 1/1993 | Erickson et al. |
| 5,190,038 | A | 3/1993 | Polson et al. |
| 5,203,329 | A | 4/1993 | Takatani et al. |
| 5,218,962 | A | 6/1993 | Mannheimer et al. |
| 5,222,295 | A | 6/1993 | Dorris, Jr. |
| 5,222,495 | A | 6/1993 | Clarke et al. |
| 5,222,496 | A | 6/1993 | Clarke et al. |
| 5,228,449 | A | 7/1993 | Christ et al. |
| 5,249,576 | A | 10/1993 | Goldberger et al. |
| 5,250,342 | A | 10/1993 | Lang |
| 5,251,011 | A | 10/1993 | Fujiwara et al. |
| 5,254,388 | A | 10/1993 | Melby et al. |
| 5,254,992 | A | 10/1993 | Keen et al. |
| 5,273,036 | A | 12/1993 | Kronberg et al. |
| 5,278,627 | A | 1/1994 | Aoyagi et al. |
| 5,297,548 | A | 3/1994 | Pologe |
| 5,319,355 | A | 6/1994 | Russek |
| 5,333,616 | A | 8/1994 | Mills et al. |
| 5,337,744 | A | 8/1994 | Branigan |
| 5,337,745 | A | 8/1994 | Benaron |
| 5,341,805 | A | 8/1994 | Stavridi et al. |
| 5,355,242 | A | 10/1994 | Eastmond et al. |
| 5,358,519 | A | 10/1994 | Grandjean |
| 5,362,966 | A | 11/1994 | Rosenthal et al. |
| D353,195 | S | 12/1994 | Savage et al. |
| D353,196 | S | 12/1994 | Savage et al. |

**US 10,912,502 B2**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,372,135 A | 12/1994 | Mendelson et al. | |
| 5,377,676 A | 1/1995 | Vari et al. | |
| D356,870 S | 3/1995 | Ivers et al. | |
| D359,546 S | 6/1995 | Savage et al. | |
| 5,427,093 A | 6/1995 | Ogawa et al. | |
| 5,431,170 A | 7/1995 | Mathews | |
| 5,436,499 A | 7/1995 | Namavar et al. | |
| D361,840 S | 8/1995 | Savage et al. | |
| 5,437,275 A | 8/1995 | Amundsen et al. | |
| 5,441,054 A | 8/1995 | Tsuchiya | |
| D362,063 S | 9/1995 | Savage et al. | |
| 5,452,717 A | 9/1995 | Branigan et al. | |
| D363,120 S | 10/1995 | Savage et al. | |
| 5,456,252 A | 10/1995 | Vari et al. | |
| 5,462,051 A | 10/1995 | Oka et al. | |
| 5,479,934 A | 1/1996 | Imran | |
| 5,482,034 A | 1/1996 | Lewis et al. | |
| 5,482,036 A | 1/1996 | Diab et al. | |
| 5,490,505 A | 2/1996 | Diab et al. | |
| 5,490,506 A | 2/1996 | Takatani et al. | |
| 5,490,523 A | 2/1996 | Isaacson et al. | |
| 5,494,043 A | 2/1996 | O'Sullivan et al. | |
| 5,497,771 A | 3/1996 | Rosenheimer | |
| 5,511,546 A | 4/1996 | Hon | |
| 5,533,511 A | 7/1996 | Kaspari et al. | |
| 5,534,851 A | 7/1996 | Russek | |
| 5,542,146 A | 8/1996 | Hoekstra et al. | |
| 5,551,422 A | 9/1996 | Simonsen et al. | |
| 5,553,614 A | 9/1996 | Chance | |
| 5,553,615 A | 9/1996 | Carim et al. | |
| 5,553,616 A | 9/1996 | Ham et al. | |
| 5,555,882 A | 9/1996 | Richardson et al. | |
| 5,561,275 A | 10/1996 | Savage et al. | |
| 5,562,002 A | 10/1996 | Lalin | |
| 5,564,429 A | 10/1996 | Bornn et al. | |
| 5,581,069 A | 12/1996 | Shepard et al. | |
| 5,584,296 A | 12/1996 | Cui et al. | |
| 5,590,649 A | 1/1997 | Caro et al. | |
| 5,601,079 A | 2/1997 | Wong et al. | |
| 5,601,080 A | 2/1997 | Oppenheimer | |
| 5,602,924 A | 2/1997 | Durand et al. | |
| D378,414 S | 3/1997 | Allen et al. | |
| 5,623,925 A | 4/1997 | Swenson et al. | |
| 5,625,458 A | 4/1997 | Alfano et al. | |
| 5,632,272 A | 5/1997 | Diab et al. | |
| 5,635,700 A | 6/1997 | Fazekas | |
| 5,638,816 A | 6/1997 | Kiani-Azarbayjany et al. | |
| 5,638,818 A | 6/1997 | Diab et al. | |
| 5,645,440 A | 7/1997 | Tobler et al. | |
| 5,671,914 A | 9/1997 | Kalkhoran et al. | |
| 5,676,143 A | 10/1997 | Simonsen et al. | |
| 5,685,299 A | 11/1997 | Diab et al. | |
| 5,687,717 A | 11/1997 | Halpern et al. | |
| 5,699,808 A | 12/1997 | John | |
| 5,702,429 A | 12/1997 | King | |
| D390,666 S | 2/1998 | Lagerlof | |
| 5,719,557 A | 2/1998 | Rattman et al. | |
| 5,726,440 A | 3/1998 | Kalkhoran et al. | |
| 5,729,203 A | 3/1998 | Oka et al. | |
| D393,830 S | 4/1998 | Tobler et al. | |
| 5,743,262 A | 4/1998 | Lepper, Jr. et al. | |
| 5,746,206 A | 5/1998 | Mannheimer et al. | |
| 5,746,697 A | 5/1998 | Swedlow et al. | |
| 5,747,806 A | 5/1998 | Khalil et al. | |
| 5,750,927 A | 5/1998 | Baltazar | |
| 5,750,994 A | 5/1998 | Schlager | |
| 5,752,914 A | 5/1998 | Delonzor et al. | |
| 5,758,644 A | 6/1998 | Diab et al. | |
| 5,760,910 A | 6/1998 | Lepper, Jr. et al. | |
| 5,766,131 A | 6/1998 | Kondo et al. | |
| 5,769,785 A | 6/1998 | Diab et al. | |
| 5,782,757 A | 7/1998 | Diab et al. | |
| 5,785,659 A | 7/1998 | Caro et al. | |
| 5,791,347 A | 8/1998 | Flaherty et al. | |
| 5,792,052 A | 8/1998 | Isaacson et al. | |
| 5,795,300 A | 8/1998 | Bryars | |
| 5,797,841 A | 8/1998 | Delonzor et al. | |
| 5,800,348 A | 9/1998 | Kaestle | |
| 5,800,349 A | 9/1998 | Isaacson et al. | |
| 5,807,247 A | 9/1998 | Merchant et al. | |
| 5,810,734 A | 9/1998 | Caro et al. | |
| 5,817,008 A | 10/1998 | Rafert et al. | |
| 5,823,950 A | 10/1998 | Diab et al. | |
| 5,826,885 A | 10/1998 | Helgeland | |
| 5,830,131 A | 11/1998 | Caro et al. | |
| 5,830,137 A | 11/1998 | Scharf | |
| 5,833,618 A | 11/1998 | Caro et al. | |
| D403,070 S | 12/1998 | Maeda et al. | |
| 5,842,982 A | 12/1998 | Mannheimer | |
| 5,851,178 A | 12/1998 | Aronow | |
| 5,854,706 A | 12/1998 | Alb | |
| 5,860,919 A | 1/1999 | Kiani-Azarbayjany et al. | |
| 5,860,932 A | 1/1999 | Goto et al. | |
| 5,890,929 A | 4/1999 | Mills et al. | |
| 5,891,022 A | 4/1999 | Pologe | |
| 5,893,364 A * | 4/1999 | Haar | A61B 5/0059 |
| | | | 356/338 |
| 5,902,235 A | 5/1999 | Lewis et al. | |
| 5,903,357 A | 5/1999 | Colak | |
| 5,904,654 A | 5/1999 | Wohltmann et al. | |
| 5,911,689 A | 6/1999 | Smith et al. | |
| 5,919,134 A | 7/1999 | Diab | |
| 5,923,021 A | 7/1999 | Dvorkis et al. | |
| 5,924,979 A | 7/1999 | Swedlow et al. | |
| 5,934,925 A | 8/1999 | Tobler et al. | |
| 5,936,986 A | 8/1999 | Cantatore et al. | |
| 5,940,182 A | 8/1999 | Lepper, Jr. et al. | |
| 5,957,840 A | 9/1999 | Terasawa et al. | |
| D414,870 S | 10/1999 | Saltzstein et al. | |
| 5,987,343 A | 11/1999 | Kinast | |
| 5,991,467 A | 11/1999 | Kamiko | |
| 5,995,855 A | 11/1999 | Kiani et al. | |
| 5,997,343 A | 12/1999 | Mills et al. | |
| 6,002,952 A | 12/1999 | Diab et al. | |
| 6,010,937 A | 1/2000 | Karam et al. | |
| 6,011,986 A | 1/2000 | Diab et al. | |
| 6,018,403 A | 1/2000 | Shirakura et al. | |
| 6,018,673 A | 1/2000 | Chin et al. | |
| 6,022,321 A | 2/2000 | Amano et al. | |
| 6,027,452 A | 2/2000 | Flaherty et al. | |
| 6,031,603 A | 2/2000 | Fine et al. | |
| 6,035,223 A | 3/2000 | Baker | |
| 6,036,642 A | 3/2000 | Diab et al. | |
| 6,040,578 A | 3/2000 | Malin et al. | |
| 6,041,247 A | 3/2000 | Weckstrom et al. | |
| 6,045,509 A | 4/2000 | Caro et al. | |
| 6,049,727 A | 4/2000 | Crothall | |
| 6,058,331 A | 5/2000 | King | |
| 6,066,204 A | 5/2000 | Haven | |
| 6,067,462 A | 5/2000 | Diab et al. | |
| 6,081,735 A | 6/2000 | Diab et al. | |
| 6,088,607 A | 7/2000 | Diab et al. | |
| 6,102,856 A | 8/2000 | Groff et al. | |
| 6,110,522 A | 8/2000 | Lepper, Jr. et al. | |
| 6,115,673 A | 9/2000 | Malin et al. | |
| 6,122,042 A | 9/2000 | Wunderman et al. | |
| 6,122,536 A | 9/2000 | Sun et al. | |
| 6,124,597 A | 9/2000 | Shehada | |
| 6,126,595 A | 10/2000 | Amano et al. | |
| 6,128,521 A | 10/2000 | Marro et al. | |
| 6,129,675 A | 10/2000 | Jay | |
| 6,133,871 A | 10/2000 | Krasner | |
| 6,144,866 A | 11/2000 | Miesel et al. | |
| 6,144,868 A | 11/2000 | Parker | |
| 6,151,516 A | 11/2000 | Kiani-Azarbayjany et al. | |
| 6,152,754 A | 11/2000 | Gerhardt et al. | |
| 6,157,850 A | 12/2000 | Diab et al. | |
| 6,165,005 A | 12/2000 | Mills et al. | |
| 6,167,258 A | 12/2000 | Schmidt et al. | |
| 6,167,303 A | 12/2000 | Thompson | |
| 6,172,743 B1 | 1/2001 | Kley et al. | |
| 6,175,752 B1 | 1/2001 | Say et al. | |
| 6,178,343 B1 | 1/2001 | Bindszus et al. | |
| 6,181,958 B1 | 1/2001 | Steuer et al. | |

**US 10,912,502 B2**

Page 4

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,184,521 | B1 | 2/2001 | Coffin, IV et al. |
| 6,185,454 | B1 | 2/2001 | Thompson |
| 6,192,261 | B1 | 2/2001 | Gratton et al. |
| 6,198,951 | B1 | 3/2001 | Kosuda et al. |
| 6,198,952 | B1 | 3/2001 | Miesel et al. |
| 6,202,930 | B1 | 3/2001 | Plesko |
| 6,206,830 | B1 | 3/2001 | Diab et al. |
| 6,223,063 | B1 | 4/2001 | Chaiken et al. |
| 6,226,539 | B1 | 5/2001 | Potratz |
| 6,229,856 | B1 | 5/2001 | Diab et al. |
| 6,232,609 | B1 | 5/2001 | Snyder et al. |
| 6,236,872 | B1 | 5/2001 | Diab et al. |
| 6,241,680 | B1 | 6/2001 | Miwa |
| 6,241,683 | B1 | 6/2001 | Macklem et al. |
| 6,241,684 | B1 | 6/2001 | Amano et al. |
| 6,252,977 | B1 | 6/2001 | Salganicoff et al. |
| 6,253,097 | B1 | 6/2001 | Aronow et al. |
| 6,255,708 | B1 | 7/2001 | Sudharsanan et al. |
| 6,256,523 | B1 | 7/2001 | Diab et al. |
| 6,263,222 | B1 | 7/2001 | Diab et al. |
| 6,270,223 | B1 | 8/2001 | Del Bon et al. |
| 6,278,522 | B1 | 8/2001 | Lepper, Jr. et al. |
| 6,278,889 | B1 | 8/2001 | Robinson |
| 6,280,213 | B1 | 8/2001 | Tobler et al. |
| 6,280,381 | B1 | 8/2001 | Malin et al. |
| 6,285,896 | B1 | 9/2001 | Tobler et al. |
| 6,293,915 | B1 | 9/2001 | Amano et al. |
| 6,297,906 | B1 | 10/2001 | Allen et al. |
| 6,297,969 | B1 | 10/2001 | Mottahed |
| 6,301,493 | B1 | 10/2001 | Marro et al. |
| 6,304,766 | B1 | 10/2001 | Colvin, Jr. |
| 6,308,089 | B1 | 10/2001 | von der Ruhr et al. |
| 6,317,627 | B1 | 11/2001 | Ennen et al. |
| 6,321,100 | B1 | 11/2001 | Parker |
| D452,012 | S | 12/2001 | Phillips |
| 6,325,761 | B1 | 12/2001 | Jay |
| 6,334,065 | B1 | 12/2001 | Al-Ali et al. |
| 6,343,223 | B1 | 1/2002 | Chin et al. |
| 6,343,224 | B1 | 1/2002 | Parker |
| 6,345,194 | B1 | 2/2002 | Nelson et al. |
| 6,349,228 | B1 | 2/2002 | Kiani et al. |
| 6,351,217 | B1 | 2/2002 | Kuhn |
| 6,353,750 | B1 | 3/2002 | Kimura et al. |
| 6,356,203 | B1 | 3/2002 | Halleck et al. |
| 6,356,774 | B1 | 3/2002 | Bernstein et al. |
| 6,360,113 | B1 | 3/2002 | Dettling |
| 6,360,114 | B1 | 3/2002 | Diab et al. |
| 6,360,115 | B1 | 3/2002 | Greenwald et al. |
| D455,834 | S | 4/2002 | Donars et al. |
| 6,368,283 | B1 | 4/2002 | Xu et al. |
| 6,371,921 | B1 | 4/2002 | Caro et al. |
| 6,377,829 | B1 | 4/2002 | Al-Ali |
| 6,388,240 | B2 | 5/2002 | Schulz et al. |
| 6,393,311 | B1 | 5/2002 | Edgar et al. |
| 6,396,873 | B1 | 5/2002 | Goldstein et al. |
| 6,397,091 | B2 | 5/2002 | Diab et al. |
| 6,398,727 | B1 | 6/2002 | Bui et al. |
| 6,402,690 | B1 | 6/2002 | Rhee et al. |
| 6,411,373 | B1 | 6/2002 | Garside et al. |
| 6,415,166 | B1 | 7/2002 | Van Hoy et al. |
| 6,415,167 | B1 | 7/2002 | Blank et al. |
| 6,430,423 | B2 | 8/2002 | DeLonzor et al. |
| 6,430,437 | B1 | 8/2002 | Marro |
| 6,430,525 | B1 | 8/2002 | Weber et al. |
| D463,561 | S | 9/2002 | Fukatsu et al. |
| 6,463,187 | B1 | 10/2002 | Baruch et al. |
| 6,463,311 | B1 | 10/2002 | Diab |
| 6,470,199 | B1 | 10/2002 | Kopotic et al. |
| 6,470,893 | B1 | 10/2002 | Boesen |
| 6,473,008 | B2 | 10/2002 | Kelly et al. |
| 6,475,153 | B1 | 11/2002 | Khair et al. |
| 6,487,429 | B2 | 11/2002 | Hockersmith et al. |
| RE37,922 | E | 12/2002 | Sharan |
| 6,491,647 | B1 | 12/2002 | Bridger et al. |
| 6,501,975 | B2 | 12/2002 | Diab et al. |
| 6,505,059 | B1 | 1/2003 | Kollias et al. |
| 6,515,273 | B2 | 2/2003 | Al-Ali |
| 6,516,289 | B2 | 2/2003 | David et al. |
| 6,519,487 | B1 | 2/2003 | Parker |
| 6,522,521 | B2 | 2/2003 | Mizuno et al. |
| 6,525,386 | B1 | 2/2003 | Mills et al. |
| 6,526,300 | B1 | 2/2003 | Kiani et al. |
| 6,527,729 | B1 | 3/2003 | Turcott |
| 6,534,012 | B1 | 3/2003 | Hazen et al. |
| 6,541,756 | B2 | 4/2003 | Schulz et al. |
| 6,542,764 | B1 | 4/2003 | Al-Ali et al. |
| 6,553,242 | B1 | 4/2003 | Sarussi |
| 6,556,852 | B1 | 4/2003 | Schulze et al. |
| 6,580,086 | B1 | 6/2003 | Schulz et al. |
| 6,584,336 | B1 | 6/2003 | Ali et al. |
| 6,587,196 | B1 | 7/2003 | Stippick et al. |
| 6,587,199 | B1 | 7/2003 | Luu |
| 6,595,316 | B2 | 7/2003 | Cybulski et al. |
| 6,596,016 | B1 | 7/2003 | Vreman et al. |
| 6,597,932 | B2 | 7/2003 | Tian et al. |
| 6,597,933 | B2 | 7/2003 | Kiani et al. |
| 6,606,509 | B2 | 8/2003 | Schmitt |
| 6,606,511 | B1 | 8/2003 | Ali et al. |
| D481,459 | S | 10/2003 | Nahm |
| 6,632,181 | B2 | 10/2003 | Flaherty et al. |
| 6,635,559 | B2 | 10/2003 | Greenwald et al. |
| 6,636,759 | B2 | 10/2003 | Robinson |
| 6,639,668 | B1 | 10/2003 | Trepagnier |
| 6,639,867 | B2 | 10/2003 | Shim |
| 6,640,116 | B2 | 10/2003 | Diab |
| 6,640,117 | B2 | 10/2003 | Makarewicz et al. |
| 6,643,530 | B2 | 11/2003 | Diab et al. |
| 6,650,917 | B2 | 11/2003 | Diab et al. |
| 6,650,939 | B2 | 11/2003 | Takpke, II et al. |
| 6,654,624 | B2 | 11/2003 | Diab et al. |
| 6,658,276 | B2 | 12/2003 | Kiani et al. |
| 6,661,161 | B1 | 12/2003 | Lanzo et al. |
| 6,668,185 | B2 | 12/2003 | Toida |
| 6,671,526 | B1 | 12/2003 | Aoyagi et al. |
| 6,671,531 | B2 | 12/2003 | Al-Ali et al. |
| 6,678,543 | B2 | 1/2004 | Diab et al. |
| 6,681,133 | B2 | 1/2004 | Chaiken et al. |
| 6,684,090 | B2 | 1/2004 | Ali et al. |
| 6,684,091 | B2 | 1/2004 | Parker |
| 6,694,157 | B1 | 2/2004 | Stone et al. |
| 6,697,656 | B1 | 2/2004 | Al-Ali |
| 6,697,657 | B1 | 2/2004 | Shehada et al. |
| 6,697,658 | B2 | 2/2004 | Al-Ali |
| RE38,476 | E | 3/2004 | Diab et al. |
| 6,699,194 | B1 | 3/2004 | Diab et al. |
| 6,714,803 | B1 | 3/2004 | Mortz |
| 6,714,804 | B2 | 3/2004 | Al-Ali et al. |
| RE38,492 | E | 4/2004 | Diab et al. |
| 6,721,582 | B2 | 4/2004 | Trepagnier et al. |
| 6,721,585 | B1 | 4/2004 | Parker |
| 6,725,075 | B2 | 4/2004 | Al-Ali |
| 6,728,560 | B2 | 4/2004 | Kollias et al. |
| 6,735,459 | B2 | 5/2004 | Parker |
| 6,738,652 | B2 | 5/2004 | Mattu et al. |
| 6,745,060 | B2 | 6/2004 | Diab et al. |
| 6,748,254 | B2 | 6/2004 | O'Neil et al. |
| 6,751,283 | B2 | 6/2004 | van de Haar |
| 6,760,607 | B2 | 7/2004 | Al-Ali |
| 6,770,028 | B1 | 8/2004 | Ali et al. |
| 6,771,994 | B2 | 8/2004 | Kiani et al. |
| 6,785,568 | B2 | 8/2004 | Chance |
| 6,788,965 | B2 | 9/2004 | Ruchti et al. |
| 6,792,300 | B1 | 9/2004 | Diab et al. |
| 6,801,799 | B2 | 10/2004 | Mendelson |
| 6,811,535 | B2 | 11/2004 | Palti et al. |
| 6,813,511 | B2 | 11/2004 | Diab et al. |
| 6,816,010 | B2 | 11/2004 | Seetharaman et al. |
| 6,816,241 | B2 | 11/2004 | Grubisic et al. |
| 6,816,741 | B2 | 11/2004 | Diab |
| 6,822,564 | B2 | 11/2004 | Al-Ali |
| 6,826,419 | B2 | 11/2004 | Diab et al. |
| 6,830,711 | B2 | 12/2004 | Mills et al. |
| 6,831,266 | B2 | 12/2004 | Paritsky et al. |
| 6,850,787 | B2 | 2/2005 | Weber et al. |

# US 10,912,502 B2

Page 5

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,850,788 | B2 | 2/2005 | Al-Ali |
| 6,852,083 | B2 | 2/2005 | Caro et al. |
| 6,853,304 | B2 | 2/2005 | Reisman |
| D502,655 | S | 3/2005 | Huang |
| 6,861,639 | B2 | 3/2005 | Al-Ali |
| 6,871,089 | B2 | 3/2005 | Korzinov et al. |
| 6,876,931 | B2 | 4/2005 | Lorenz et al. |
| 6,882,872 | B2 | 4/2005 | Uchida et al. |
| 6,897,788 | B2 | 5/2005 | Khair et al. |
| 6,898,452 | B2 | 5/2005 | Al-Ali et al. |
| 6,912,413 | B2 | 6/2005 | Rantala et al. |
| 6,920,345 | B2 | 7/2005 | Al-Ali et al. |
| D508,862 | S | 8/2005 | Behar et al. |
| 6,931,268 | B1 | 8/2005 | Kiani-Azarbayjany et al. |
| 6,934,570 | B2 | 8/2005 | Kiani et al. |
| 6,939,305 | B2 | 9/2005 | Flaherty et al. |
| 6,943,348 | B1 | 9/2005 | Coffin, IV |
| 6,950,687 | B2 | 9/2005 | Al-Ali |
| D510,625 | S | 10/2005 | Widener et al. |
| 6,956,649 | B2 | 10/2005 | Acosta et al. |
| 6,961,598 | B2 | 11/2005 | Diab |
| 6,970,792 | B1 | 11/2005 | Diab |
| 6,979,812 | B2 | 12/2005 | Al-Ali |
| 6,985,764 | B2 | 1/2006 | Mason et al. |
| 6,990,364 | B2 | 1/2006 | Ruchti et al. |
| 6,993,371 | B2 | 1/2006 | Kiani et al. |
| D514,461 | S | 2/2006 | Harju |
| 6,995,400 | B2 | 2/2006 | Mizuyoshi |
| 6,996,427 | B2 | 2/2006 | Ali et al. |
| 6,997,879 | B1 | 2/2006 | Turcott |
| 6,998,247 | B2 | 2/2006 | Monfre et al. |
| 6,999,685 | B1 | 2/2006 | Kawase et al. |
| 6,999,904 | B2 | 2/2006 | Weber et al. |
| 7,003,338 | B2 | 2/2006 | Weber et al. |
| 7,003,339 | B2 | 2/2006 | Diab et al. |
| 7,015,451 | B2 | 3/2006 | Dalke et al. |
| 7,024,233 | B2 | 4/2006 | Ali et al. |
| 7,026,619 | B2 | 4/2006 | Cranford |
| 7,027,849 | B2 | 4/2006 | Al-Ali |
| 7,030,749 | B2 | 4/2006 | Al-Ali |
| 7,031,728 | B2 | 4/2006 | Beyer, Jr. |
| 7,039,449 | B2 | 5/2006 | Al-Ali |
| 7,041,060 | B2 | 5/2006 | Flaherty et al. |
| 7,044,918 | B2 | 5/2006 | Diab |
| 7,046,347 | B1 | 5/2006 | Amend et al. |
| 7,047,054 | B2 | 5/2006 | Benni |
| 7,048,687 | B1 | 5/2006 | Reuss et al. |
| 7,060,963 | B2 | 6/2006 | Maegawa et al. |
| 7,061,595 | B2 | 6/2006 | Cabuz et al. |
| 7,062,307 | B2 | 6/2006 | Norris et al. |
| 7,067,893 | B2 | 6/2006 | Mills et al. |
| D526,719 | S | 8/2006 | Richie, Jr. et al. |
| 7,088,040 | B1 | 8/2006 | Ducharme et al. |
| 7,092,735 | B2 | 8/2006 | Osann, Jr. |
| 7,092,757 | B2 | 8/2006 | Larson et al. |
| 7,096,052 | B2 | 8/2006 | Mason et al. |
| 7,096,054 | B2 | 8/2006 | Abdul-Hafiz et al. |
| 7,107,706 | B1 | 9/2006 | Bailey, Sr. et al. |
| 7,109,490 | B2 | 9/2006 | Fuchs et al. |
| 7,113,815 | B2 | 9/2006 | O'Neil et al. |
| D529,616 | S | 10/2006 | Deros et al. |
| 7,130,672 | B2 | 10/2006 | Pewzner et al. |
| 7,132,641 | B2 | 11/2006 | Schulz et al. |
| 7,133,710 | B2 | 11/2006 | Acosta et al. |
| 7,142,901 | B2 | 11/2006 | Kiani et al. |
| 7,149,561 | B2 | 12/2006 | Diab |
| D535,031 | S | 1/2007 | Barrett et al. |
| D537,164 | S | 2/2007 | Shigemori et al. |
| 7,186,966 | B2 | 3/2007 | Al-Ali |
| 7,190,261 | B2 | 3/2007 | Al-Ali |
| 7,215,984 | B2 | 5/2007 | Diab |
| 7,215,986 | B2 | 5/2007 | Diab |
| 7,220,254 | B2 | 5/2007 | Altshuler et al. |
| 7,221,971 | B2 | 5/2007 | Diab |
| 7,225,006 | B2 | 5/2007 | Al-Ali et al. |

| | | | |
|---|---|---|---|
| 7,225,007 | B2 | 5/2007 | Al-Ali |
| RE39,672 | E | 6/2007 | Shehada et al. |
| 7,227,156 | B2 | 6/2007 | Colvin, Jr. et al. |
| 7,228,166 | B1 | 6/2007 | Kawasaki et al. |
| 7,230,227 | B2 | 6/2007 | Wilcken et al. |
| D547,454 | S | 7/2007 | Hsieh |
| 7,239,905 | B2 | 7/2007 | Kiani-Azarbayjany et al. |
| 7,245,953 | B1 | 7/2007 | Parker |
| 7,251,513 | B2 | 7/2007 | Kondoh et al. |
| D549,830 | S | 8/2007 | Behar et al. |
| 7,252,639 | B2 | 8/2007 | Kimura et al. |
| 7,254,429 | B2 | 8/2007 | Schurman et al. |
| 7,254,431 | B2 | 8/2007 | Al-Ali |
| 7,254,433 | B2 | 8/2007 | Diab et al. |
| 7,254,434 | B2 | 8/2007 | Schulz et al. |
| D550,364 | S | 9/2007 | Glover et al. |
| D551,350 | S | 9/2007 | Lorimer et al. |
| 7,272,425 | B2 | 9/2007 | Al-Ali |
| 7,274,955 | B2 | 9/2007 | Kiani et al. |
| D553,248 | S | 10/2007 | Nguyen |
| D554,263 | S | 10/2007 | Al-Ali |
| 7,280,858 | B2 | 10/2007 | Al-Ali et al. |
| 7,289,835 | B2 | 10/2007 | Mansfield et al. |
| 7,292,883 | B2 | 11/2007 | De Felice et al. |
| 7,295,866 | B2 | 11/2007 | Al-Ali |
| D562,985 | S | 2/2008 | Brefka et al. |
| 7,328,053 | B1 | 2/2008 | Diab et al. |
| 7,332,784 | B2 | 2/2008 | Mills et al. |
| 7,340,287 | B2 | 3/2008 | Mason et al. |
| 7,341,559 | B2 | 3/2008 | Schulz et al. |
| 7,343,186 | B2 | 3/2008 | Lamego et al. |
| D566,282 | S | 4/2008 | Al-Ali et al. |
| D567,125 | S | 4/2008 | Okabe et al. |
| 7,355,512 | B1 | 4/2008 | Al-Ali |
| 7,356,365 | B2 | 4/2008 | Schurman |
| 7,365,923 | B2 | 4/2008 | Hargis et al. |
| D569,001 | S | 5/2008 | Omaki |
| D569,521 | S | 5/2008 | Omaki |
| 7,371,981 | B2 | 5/2008 | Abdul-Hafiz |
| 7,373,193 | B2 | 5/2008 | Al-Ali et al. |
| 7,373,194 | B2 | 5/2008 | Weber et al. |
| 7,376,453 | B1 | 5/2008 | Diab et al. |
| 7,377,794 | B2 | 5/2008 | Al Ali et al. |
| 7,377,899 | B2 | 5/2008 | Weber et al. |
| 7,383,070 | B2 | 6/2008 | Diab et al. |
| 7,395,158 | B2 | 7/2008 | Monfre et al. |
| 7,395,189 | B2 | 7/2008 | Qing et al. |
| 7,415,297 | B2 | 8/2008 | Al-Ali et al. |
| 7,428,432 | B2 | 9/2008 | Ali et al. |
| 7,438,683 | B2 | 10/2008 | Al-Ali et al. |
| 7,440,787 | B2 | 10/2008 | Diab |
| 7,454,240 | B2 | 11/2008 | Diab et al. |
| 7,467,002 | B2 | 12/2008 | Weber et al. |
| 7,469,157 | B2 | 12/2008 | Diab et al. |
| 7,471,969 | B2 | 12/2008 | Diab et al. |
| 7,471,971 | B2 | 12/2008 | Diab et al. |
| 7,483,729 | B2 | 1/2009 | Al-Ali et al. |
| 7,483,730 | B2 | 1/2009 | Diab et al. |
| 7,489,958 | B2 | 2/2009 | Diab et al. |
| 7,496,391 | B2 | 2/2009 | Diab et al. |
| 7,496,393 | B2 | 2/2009 | Diab et al. |
| D587,657 | S | 3/2009 | Al-Ali et al. |
| 7,499,741 | B2 | 3/2009 | Diab et al. |
| 7,499,835 | B2 | 3/2009 | Weber et al. |
| 7,500,950 | B2 | 3/2009 | Al-Ali et al. |
| 7,509,153 | B2 | 3/2009 | Blank et al. |
| 7,509,154 | B2 | 3/2009 | Diab et al. |
| 7,509,494 | B2 | 3/2009 | Al-Ali |
| 7,510,849 | B2 | 3/2009 | Schurman et al. |
| 7,514,725 | B2 | 4/2009 | Wojtczuk et al. |
| 7,519,327 | B2 | 4/2009 | White |
| 7,519,406 | B2 | 4/2009 | Blank et al. |
| 7,526,328 | B2 | 4/2009 | Diab et al. |
| D592,507 | S | 5/2009 | Wachman et al. |
| 7,530,942 | B1 | 5/2009 | Diab |
| 7,530,949 | B2 | 5/2009 | Al Ali et al. |
| 7,530,955 | B2 | 5/2009 | Diab et al. |
| 7,558,622 | B2 | 7/2009 | Tran |
| 7,563,110 | B2 | 7/2009 | Al-Ali et al. |

# US 10,912,502 B2
Page 6

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,593,230 | B2 | 9/2009 | Abul-Haj et al. |
| 7,596,398 | B2 | 9/2009 | Al-Ali et al. |
| 7,601,123 | B2 | 10/2009 | Tweed et al. |
| 7,606,606 | B2 | 10/2009 | Laakkonen |
| 7,606,608 | B2 | 10/2009 | Blank et al. |
| D603,966 | S | 11/2009 | Jones et al. |
| 7,613,490 | B2 | 11/2009 | Sarussi et al. |
| 7,618,375 | B2 | 11/2009 | Flaherty |
| 7,620,674 | B2 | 11/2009 | Ruchti et al. |
| D606,659 | S | 12/2009 | Kiani et al. |
| 7,629,039 | B2 | 12/2009 | Eckerbom et al. |
| 7,640,140 | B2 | 12/2009 | Ruchti et al. |
| 7,647,083 | B2 | 1/2010 | Al-Ali et al. |
| D609,193 | S | 2/2010 | Al-Ali et al. |
| 7,656,393 | B2 | 2/2010 | King et al. |
| 7,657,294 | B2 | 2/2010 | Eghbal et al. |
| 7,657,295 | B2 | 2/2010 | Coakley et al. |
| 7,657,296 | B2 | 2/2010 | Raridan et al. |
| 7,658,613 | B1 | 2/2010 | Griffin et al. |
| 7,676,253 | B2 | 3/2010 | Raridan, Jr. |
| 7,683,926 | B2 | 3/2010 | Schechterman et al. |
| D614,305 | S | 4/2010 | Al-Ali et al. |
| 7,697,966 | B2 | 4/2010 | Monfre et al. |
| 7,698,105 | B2 | 4/2010 | Ruchti et al. |
| 7,698,909 | B2 | 4/2010 | Hannula et al. |
| RE41,317 | E | 5/2010 | Parker |
| RE41,333 | E | 5/2010 | Blank et al. |
| 7,726,209 | B2 | 6/2010 | Ruotoistenmaki |
| 7,729,733 | B2 | 6/2010 | Al-Ali et al. |
| 7,734,320 | B2 | 6/2010 | Al-Ali |
| 7,740,588 | B1 | 6/2010 | Sciarra |
| 7,740,589 | B2 | 6/2010 | Maschke et al. |
| 7,761,127 | B2 | 7/2010 | Al-Ali et al. |
| 7,761,128 | B2 | 7/2010 | Al-Ali et al. |
| 7,764,982 | B2 | 7/2010 | Dalke et al. |
| 7,764,983 | B2 | 7/2010 | Mannheimer et al. |
| D621,516 | S | 8/2010 | Kiani et al. |
| 7,791,155 | B2 | 9/2010 | Diab |
| 7,801,581 | B2 | 9/2010 | Diab |
| 7,809,418 | B2 | 10/2010 | Xu |
| 7,822,452 | B2 | 10/2010 | Schurman et al. |
| RE41,912 | E | 11/2010 | Parker |
| 7,844,313 | B2 | 11/2010 | Kiani et al. |
| 7,844,314 | B2 | 11/2010 | Al-Ali |
| 7,844,315 | B2 | 11/2010 | Al-Ali |
| 7,862,523 | B2 | 1/2011 | Ruotoistenmaki |
| 7,865,222 | B2 | 1/2011 | Weber et al. |
| 7,869,849 | B2 | 1/2011 | Ollerdessen et al. |
| 7,873,497 | B2 | 1/2011 | Weber et al. |
| 7,880,606 | B2 | 2/2011 | Al-Ali |
| 7,880,626 | B2 | 2/2011 | Al-Ali et al. |
| 7,884,314 | B2 | 2/2011 | Hamada |
| 7,891,355 | B2 | 2/2011 | Al-Ali et al. |
| 7,894,868 | B2 | 2/2011 | Al-Ali et al. |
| 7,899,506 | B2 | 3/2011 | Xu et al. |
| 7,899,507 | B2 | 3/2011 | Al-Ali et al. |
| 7,899,510 | B2 | 3/2011 | Hoarau |
| 7,899,518 | B2 | 3/2011 | Trepagnier et al. |
| 7,904,130 | B2 | 3/2011 | Raridan, Jr. |
| 7,904,132 | B2 | 3/2011 | Weber et al. |
| 7,909,772 | B2 | 3/2011 | Popov et al. |
| 7,910,875 | B2 | 3/2011 | Al-Ali |
| 7,918,779 | B2 | 4/2011 | Haber et al. |
| 7,919,713 | B2 | 4/2011 | Al-Ali et al. |
| 7,937,128 | B2 | 5/2011 | Al-Ali |
| 7,937,129 | B2 | 5/2011 | Mason et al. |
| 7,937,130 | B2 | 5/2011 | Diab et al. |
| 7,941,199 | B2 | 5/2011 | Kiani |
| 7,951,086 | B2 | 5/2011 | Flaherty et al. |
| 7,957,780 | B2 | 6/2011 | Lamego et al. |
| 7,962,188 | B2 | 6/2011 | Kiani et al. |
| 7,962,190 | B1 | 6/2011 | Diab et al. |
| 7,976,472 | B2 | 7/2011 | Kiani |
| 7,988,637 | B2 | 8/2011 | Diab |
| 7,990,382 | B2 | 8/2011 | Kiani |
| 7,991,446 | B2 | 8/2011 | Ali et al. |
| 8,000,761 | B2 | 8/2011 | Al-Ali |
| 8,008,088 | B2 | 8/2011 | Bellott et al. |
| RE42,753 | E | 9/2011 | Kiani-Azarbayjany et al. |
| 8,019,400 | B2 | 9/2011 | Diab et al. |
| 8,028,701 | B2 | 10/2011 | Al-Ali et al. |
| 8,029,765 | B2 | 10/2011 | Bellott et al. |
| 8,036,727 | B2 | 10/2011 | Schurman et al. |
| 8,036,728 | B2 | 10/2011 | Diab et al. |
| 8,040,758 | B1 | 10/2011 | Dickinson |
| 8,044,998 | B2 | 10/2011 | Heenan |
| 8,046,040 | B2 | 10/2011 | Ali et al. |
| 8,046,041 | B2 | 10/2011 | Diab et al. |
| 8,046,042 | B2 | 10/2011 | Diab et al. |
| 8,048,040 | B2 | 11/2011 | Kiani |
| 8,050,728 | B2 | 11/2011 | Al-Ali et al. |
| 8,071,935 | B2 | 12/2011 | Besko et al. |
| RE43,169 | E | 2/2012 | Parker |
| 8,118,620 | B2 | 2/2012 | Al-Ali et al. |
| 8,126,528 | B2 | 2/2012 | Diab et al. |
| 8,126,531 | B2 | 2/2012 | Crowley |
| 8,128,572 | B2 | 3/2012 | Diab et al. |
| 8,130,105 | B2 | 3/2012 | Al-Ali et al. |
| 8,145,287 | B2 | 3/2012 | Diab et al. |
| 8,150,487 | B2 | 4/2012 | Diab et al. |
| 8,165,662 | B2 | 4/2012 | Cinbis et al. |
| 8,175,672 | B2 | 5/2012 | Parker |
| 8,177,720 | B2 | 5/2012 | Nanba et al. |
| 8,180,420 | B2 | 5/2012 | Diab et al. |
| 8,182,443 | B1 | 5/2012 | Kiani |
| 8,185,180 | B2 | 5/2012 | Diab et al. |
| 8,190,223 | B2 | 5/2012 | Al-Ali et al. |
| 8,190,227 | B2 | 5/2012 | Diab et al. |
| 8,203,438 | B2 | 6/2012 | Kiani et al. |
| 8,203,704 | B2 | 6/2012 | Merritt et al. |
| 8,204,566 | B2 | 6/2012 | Schurman et al. |
| 8,219,170 | B2 | 7/2012 | Hausmann et al. |
| 8,219,172 | B2 | 7/2012 | Schurman et al. |
| 8,224,411 | B2 | 7/2012 | Al-Ali et al. |
| 8,228,181 | B2 | 7/2012 | Al-Ali |
| 8,229,532 | B2 | 7/2012 | Davis |
| 8,229,533 | B2 | 7/2012 | Diab et al. |
| 8,233,955 | B2 | 7/2012 | Al-Ali et al. |
| 8,244,325 | B2 | 8/2012 | Al-Ali et al. |
| 8,244,326 | B2 | 8/2012 | Ninomiya et al. |
| 8,255,026 | B2 | 8/2012 | Al-Ali |
| 8,255,027 | B2 | 8/2012 | Al-Ali et al. |
| 8,255,028 | B2 | 8/2012 | Al-Ali et al. |
| 8,260,577 | B2 | 9/2012 | Weber et al. |
| 8,265,723 | B1 | 9/2012 | McHale et al. |
| 8,274,360 | B2 | 9/2012 | Sampath et al. |
| 8,280,473 | B2 | 10/2012 | Al-Ali |
| 8,289,130 | B2 | 10/2012 | Nakajima et al. |
| 8,301,217 | B2 | 10/2012 | Al-Ali et al. |
| 8,306,596 | B2 | 11/2012 | Schurman et al. |
| 8,310,336 | B2 | 11/2012 | Muhsin et al. |
| 8,315,683 | B2 | 11/2012 | Al-Ali et al. |
| RE43,860 | E | 12/2012 | Parker |
| 8,280,469 | B2 | 12/2012 | Baker, Jr. |
| 8,332,006 | B2 | 12/2012 | Naganuma et al. |
| 8,337,403 | B2 | 12/2012 | Al-Ali et al. |
| 8,343,026 | B2 | 1/2013 | Gardiner et al. |
| 8,346,330 | B2 | 1/2013 | Lamego |
| 8,352,003 | B2 * | 1/2013 | Sawada ............... A61B 5/0261 |
| | | | 600/310 |
| 8,353,842 | B2 | 1/2013 | Al-Ali et al. |
| 8,355,766 | B2 | 1/2013 | MacNeish, III et al. |
| 8,359,080 | B2 | 1/2013 | Diab et al. |
| 8,364,223 | B2 | 1/2013 | Al-Ali et al. |
| 8,364,226 | B2 | 1/2013 | Diab et al. |
| 8,364,389 | B2 | 1/2013 | Dorogusker et al. |
| 8,374,665 | B2 | 2/2013 | Lamego |
| 8,374,825 | B2 | 2/2013 | Vock et al. |
| 8,380,272 | B2 | 2/2013 | Barrett et al. |
| 8,385,995 | B2 | 2/2013 | Al-Ali et al. |
| 8,385,996 | B2 | 2/2013 | Smith et al. |
| 8,388,353 | B2 | 3/2013 | Kiani et al. |
| 8,399,822 | B2 | 3/2013 | Al-Ali |
| 8,401,602 | B2 | 3/2013 | Kiani |

## US 10,912,502 B2
Page 7

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,405,608 | B2 | 3/2013 | Al-Ali et al. |
| 8,414,499 | B2 | 4/2013 | Al-Ali et al. |
| 8,418,524 | B2 | 4/2013 | Al-Ali |
| 8,421,022 | B2 | 4/2013 | Rozenfeld |
| 8,423,106 | B2 | 4/2013 | Lamego et al. |
| 8,428,674 | B2 | 4/2013 | Duffy et al. |
| 8,428,967 | B2 | 4/2013 | Olsen et al. |
| 8,430,817 | B1 | 4/2013 | Al-Ali et al. |
| 8,437,825 | B2 | 5/2013 | Dalvi et al. |
| 8,452,364 | B2 | 5/2013 | Hannula et al. |
| 8,455,290 | B2 | 6/2013 | Siskavich |
| 8,457,703 | B2 | 6/2013 | Al-Ali |
| 8,457,707 | B2 | 6/2013 | Kiani |
| 8,463,349 | B2 | 6/2013 | Diab et al. |
| 8,466,286 | B2 | 6/2013 | Bellot et al. |
| 8,471,713 | B2 | 6/2013 | Poeze et al. |
| 8,473,020 | B2 | 6/2013 | Kiani et al. |
| 8,483,787 | B2 | 7/2013 | Al-Ali et al. |
| 8,487,256 | B2 | 7/2013 | Kwong et al. |
| 8,489,364 | B2 | 7/2013 | Weber et al. |
| 8,496,595 | B2 | 7/2013 | Jornod |
| 8,498,684 | B2 | 7/2013 | Weber et al. |
| 8,504,128 | B2 | 8/2013 | Blank et al. |
| 8,509,867 | B2 | 8/2013 | Workman et al. |
| 8,515,509 | B2 | 8/2013 | Bruinsma et al. |
| 8,515,511 | B2 | 8/2013 | Boutelle |
| 8,515,515 | B2 | 8/2013 | McKenna et al. |
| 8,523,781 | B2 | 9/2013 | Al-Ali |
| 8,529,301 | B2 | 9/2013 | Al-Ali et al. |
| 8,532,727 | B2 | 9/2013 | Ali et al. |
| 8,532,728 | B2 | 9/2013 | Diab et al. |
| D692,145 | S | 10/2013 | Al-Ali et al. |
| 8,547,209 | B2 | 10/2013 | Kiani et al. |
| 8,548,548 | B2 | 10/2013 | Al-Ali |
| 8,548,549 | B2 | 10/2013 | Schurman et al. |
| 8,548,550 | B2 | 10/2013 | Al-Ali et al. |
| 8,560,032 | B2 | 10/2013 | Al-Ali et al. |
| 8,560,034 | B1 | 10/2013 | Diab et al. |
| 8,570,167 | B2 | 10/2013 | Al-Ali |
| 8,570,503 | B2 | 10/2013 | Vo |
| 8,571,617 | B2 | 10/2013 | Reichgott et al. |
| 8,571,618 | B1 | 10/2013 | Lamego et al. |
| 8,571,619 | B2 | 10/2013 | Al-Ali et al. |
| 8,577,431 | B2 | 11/2013 | Lamego et al. |
| 8,581,732 | B2 | 11/2013 | Al-Ali et al. |
| 8,584,345 | B2 | 11/2013 | Al-Ali et al. |
| 8,588,880 | B2 | 11/2013 | Abdul-Hafiz et al. |
| 8,591,426 | B2 | 11/2013 | Onoe et al. |
| 8,600,467 | B2 | 12/2013 | Al-Ali et al. |
| 8,600,494 | B2 | 12/2013 | Schroeppel et al. |
| 8,602,971 | B2 | 12/2013 | Farr |
| 8,606,342 | B2 | 12/2013 | Diab |
| 8,611,095 | B2 | 12/2013 | Kwong et al. |
| 8,615,290 | B2 | 12/2013 | Lin et al. |
| 8,626,255 | B2 | 1/2014 | Al-Ali et al. |
| 8,630,691 | B2 | 1/2014 | Lamego et al. |
| 8,634,889 | B2 | 1/2014 | Al-Ali et al. |
| 8,641,631 | B2 | 2/2014 | Sierra et al. |
| 8,652,060 | B2 | 2/2014 | Al-Ali |
| 8,655,004 | B2 | 2/2014 | Prest et al. |
| 8,663,107 | B2 | 3/2014 | Kiani |
| 8,666,468 | B1 | 3/2014 | Al-Ali |
| 8,667,967 | B2 | 3/2014 | Al-Ali et al. |
| 8,668,643 | B2 | 3/2014 | Kinast |
| 8,670,811 | B2 | 3/2014 | O'Reilly |
| 8,670,814 | B2 | 3/2014 | Diab et al. |
| 8,676,286 | B2 | 3/2014 | Weber et al. |
| 8,682,407 | B2 | 3/2014 | Al-Ali |
| RE44,823 | E | 4/2014 | Parker |
| RE44,875 | E | 4/2014 | Kiani et al. |
| 8,688,183 | B2 | 4/2014 | Bruinsma et al. |
| 8,690,799 | B2 | 4/2014 | Telfort et al. |
| 8,700,111 | B2 | 4/2014 | LeBoeuf et al. |
| 8,700,112 | B2 | 4/2014 | Kiani |
| 8,702,627 | B2 | 4/2014 | Telfort et al. |
| 8,706,179 | B2 | 4/2014 | Parker |
| 8,712,494 | B1 | 4/2014 | MacNeish, III et al. |
| 8,715,206 | B2 | 5/2014 | Telfort et al. |
| 8,718,735 | B2 | 5/2014 | Lamego et al. |
| 8,718,737 | B2 | 5/2014 | Diab et al. |
| 8,718,738 | B2 | 5/2014 | Blank et al. |
| 8,720,249 | B2 | 5/2014 | Al-Ali |
| 8,721,541 | B2 | 5/2014 | Al-Ali et al. |
| 8,721,542 | B2 | 5/2014 | Al-Ali et al. |
| 8,723,677 | B1 | 5/2014 | Kiani |
| 8,740,792 | B2 | 6/2014 | Kiani et al. |
| 8,754,776 | B2 | 6/2014 | Poeze et al. |
| 8,755,535 | B2 | 6/2014 | Telfort et al. |
| 8,755,856 | B2 | 6/2014 | Diab et al. |
| 8,755,872 | B1 | 6/2014 | Marinow |
| 8,760,517 | B2 | 6/2014 | Sarwar et al. |
| 8,761,850 | B2 | 6/2014 | Lamego |
| 8,764,671 | B2 | 7/2014 | Kiani |
| 8,768,423 | B2 | 7/2014 | Shakespeare et al. |
| 8,768,426 | B2 | 7/2014 | Haisley et al. |
| 8,771,204 | B2 | 7/2014 | Telfort et al. |
| 8,777,634 | B2 | 7/2014 | Kiani et al. |
| 8,781,543 | B2 | 7/2014 | Diab et al. |
| 8,781,544 | B2 | 7/2014 | Al-Ali et al. |
| 8,781,549 | B2 | 7/2014 | Al-Ali et al. |
| 8,788,003 | B2 | 7/2014 | Schurman et al. |
| 8,790,268 | B2 | 7/2014 | Al-Ali |
| 8,801,613 | B2 | 8/2014 | Al-Ali et al. |
| 8,821,397 | B2 | 9/2014 | Al-Ali et al. |
| 8,821,415 | B2 | 9/2014 | Al-Ali et al. |
| 8,830,449 | B1 | 9/2014 | Lamego et al. |
| 8,831,700 | B2 | 9/2014 | Schurman et al. |
| 8,838,210 | B2 | 9/2014 | Wood et al. |
| 8,840,549 | B2 | 9/2014 | Al-Ali et al. |
| 8,847,740 | B2 | 9/2014 | Kiani et al. |
| 8,849,365 | B2 | 9/2014 | Smith et al. |
| 8,852,094 | B2 | 10/2014 | Al-Ali et al. |
| 8,852,994 | B2 | 10/2014 | Wojtczuk et al. |
| 8,868,147 | B2 | 10/2014 | Stippick et al. |
| 8,868,150 | B2 | 10/2014 | Al-Ali et al. |
| 8,870,792 | B2 | 10/2014 | Al-Ali et al. |
| 8,886,271 | B2 | 11/2014 | Kiani et al. |
| 8,888,539 | B2 | 11/2014 | Al-Ali et al. |
| 8,888,701 | B2 | 11/2014 | LeBoeuf et al. |
| 8,888,708 | B2 | 11/2014 | Diab et al. |
| 8,892,180 | B2 | 11/2014 | Weber et al. |
| 8,897,847 | B2 | 11/2014 | Al-Ali |
| 8,909,310 | B2 | 12/2014 | Lamego et al. |
| 8,911,377 | B2 | 12/2014 | Al-Ali |
| 8,912,909 | B2 | 12/2014 | Al-Ali et al. |
| 8,920,317 | B2 | 12/2014 | Al-Ali et al. |
| 8,920,332 | B2 | 12/2014 | Hong et al. |
| 8,921,699 | B2 | 12/2014 | Al-Ali et al. |
| 8,922,382 | B2 | 12/2014 | Al-Ali et al. |
| 8,929,964 | B2 | 1/2015 | Al-Ali et al. |
| 8,929,967 | B2 | 1/2015 | Mao et al. |
| 8,942,777 | B2 | 1/2015 | Diab et al. |
| 8,948,834 | B2 | 2/2015 | Diab et al. |
| 8,948,835 | B2 | 2/2015 | Diab |
| 8,965,471 | B2 | 2/2015 | Lamego |
| 8,983,564 | B2 | 3/2015 | Al-Ali |
| 8,989,831 | B2 | 3/2015 | Al-Ali et al. |
| 8,996,085 | B2 | 3/2015 | Kiani et al. |
| 8,998,809 | B2 | 4/2015 | Kiani |
| 9,005,129 | B2 | 4/2015 | Venkatraman et al. |
| 9,028,429 | B2 | 5/2015 | Telfort et al. |
| 9,037,207 | B2 | 5/2015 | Al-Ali et al. |
| 9,060,721 | B2 | 6/2015 | Reichgott et al. |
| 9,063,160 | B2 | 6/2015 | Stamler et al. |
| 9,066,666 | B2 | 6/2015 | Kiani |
| 9,066,680 | B1 | 6/2015 | Al-Ali et al. |
| 9,072,437 | B2 | 7/2015 | Paalasmaa |
| 9,072,474 | B2 | 7/2015 | Al-Ali et al. |
| 9,078,560 | B2 | 7/2015 | Schurman et al. |
| 9,081,889 | B2 | 7/2015 | Ingrassia, Jr. et al. |
| 9,084,569 | B2 | 7/2015 | Weber et al. |
| 9,095,316 | B2 | 8/2015 | Welch et al. |
| 9,106,038 | B2 | 8/2015 | Telfort et al. |
| 9,107,625 | B2 | 8/2015 | Telfort et al. |

# US 10,912,502 B2
Page 8

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,107,626 | B2 | 8/2015 | Al-Ali et al. |
| 9,113,831 | B2 | 8/2015 | Al-Ali |
| 9,113,832 | B2 | 8/2015 | Al-Ali |
| 9,119,595 | B2 | 9/2015 | Lamego |
| 9,131,881 | B2 | 9/2015 | Diab et al. |
| 9,131,882 | B2 | 9/2015 | Al-Ali et al. |
| 9,131,883 | B2 | 9/2015 | Al-Ali |
| 9,131,917 | B2 | 9/2015 | Telfort et al. |
| 9,138,180 | B1 | 9/2015 | Coverston et al. |
| 9,138,182 | B2 | 9/2015 | Al-Ali et al. |
| 9,138,192 | B2 | 9/2015 | Weber et al. |
| 9,142,117 | B2 | 9/2015 | Muhsin et al. |
| 9,153,112 | B1 | 10/2015 | Kiani et al. |
| 9,153,121 | B2 | 10/2015 | Kiani et al. |
| 9,161,696 | B2 | 10/2015 | Al-Ali et al. |
| 9,161,713 | B2 | 10/2015 | Al-Ali et al. |
| 9,167,995 | B2 | 10/2015 | Lamego et al. |
| 9,176,141 | B2 | 11/2015 | Al-Ali et al. |
| 9,186,102 | B2 | 11/2015 | Bruinsma et al. |
| 9,192,312 | B2 | 11/2015 | Al-Ali |
| 9,192,329 | B2 | 11/2015 | Al-Ali |
| 9,192,351 | B1 | 11/2015 | Telfort et al. |
| 9,195,385 | B2 | 11/2015 | Al-Ali et al. |
| 9,210,566 | B2 | 12/2015 | Ziemianska et al. |
| 9,211,072 | B2 | 12/2015 | Kiani |
| 9,211,095 | B1 | 12/2015 | Al-Ali |
| 9,218,454 | B2 | 12/2015 | Kiani et al. |
| 9,226,696 | B2 | 1/2016 | Kiani |
| 9,241,662 | B2 | 1/2016 | Al-Ali et al. |
| 9,245,668 | B1 | 1/2016 | Vo et al. |
| 9,259,185 | B2 | 2/2016 | Abdul-Hafiz et al. |
| 9,267,572 | B2 | 2/2016 | Barker et al. |
| 9,277,880 | B2 | 3/2016 | Poeze et al. |
| 9,289,167 | B2 | 3/2016 | Diab et al. |
| 9,295,421 | B2 | 3/2016 | Kiani et al. |
| 9,307,928 | B1 | 4/2016 | Al-Ali et al. |
| 9,311,382 | B2 | 4/2016 | Varoglu et al. |
| 9,323,894 | B2 | 4/2016 | Kiani |
| D755,392 | S | 5/2016 | Hwang et al. |
| 9,326,712 | B1 | 5/2016 | Kiani |
| 9,333,316 | B2 | 5/2016 | Kiani |
| 9,339,220 | B2 | 5/2016 | Lamego et al. |
| 9,339,236 | B2 | 5/2016 | Frix et al. |
| 9,341,565 | B2 | 5/2016 | Lamego et al. |
| 9,351,673 | B2 | 5/2016 | Diab et al. |
| 9,351,675 | B2 | 5/2016 | Al-Ali et al. |
| 9,357,665 | B2 | 5/2016 | Myers et al. |
| 9,364,181 | B2 | 6/2016 | Kiani et al. |
| 9,368,671 | B2 | 6/2016 | Wojtczuk et al. |
| 9,370,325 | B2 | 6/2016 | Al-Ali et al. |
| 9,370,326 | B2 | 6/2016 | McHale et al. |
| 9,370,335 | B2 | 6/2016 | Al-Ali et al. |
| 9,375,185 | B2 | 6/2016 | Ali et al. |
| 9,386,953 | B2 | 7/2016 | Al-Ali |
| 9,386,961 | B2 | 7/2016 | Al-Ali et al. |
| 9,392,945 | B2 | 7/2016 | Al-Ali et al. |
| 9,397,448 | B2 | 7/2016 | Al-Ali et al. |
| 9,408,542 | B1 | 8/2016 | Kinast et al. |
| 9,436,645 | B2 | 9/2016 | Al-Ali et al. |
| 9,445,759 | B1 | 9/2016 | Lamego et al. |
| 9,466,919 | B2 | 10/2016 | Kiani et al. |
| 9,474,474 | B2 | 10/2016 | Lamego et al. |
| 9,480,422 | B2 | 11/2016 | Al-Ali |
| 9,480,435 | B2 | 11/2016 | Olsen |
| 9,489,081 | B2 | 11/2016 | Anzures et al. |
| 9,492,110 | B2 | 11/2016 | Al-Ali et al. |
| 9,497,534 | B2 | 11/2016 | Prest et al. |
| 9,510,779 | B2 | 12/2016 | Poeze et al. |
| 9,517,024 | B2 | 12/2016 | Kiani et al. |
| 9,526,430 | B2 | 12/2016 | Srinivas et al. |
| 9,532,722 | B2 | 1/2017 | Lamego et al. |
| 9,538,949 | B2 | 1/2017 | Al-Ali et al. |
| 9,538,980 | B2 | 1/2017 | Telfort et al. |
| 9,549,696 | B2 | 1/2017 | Lamego et al. |
| 9,553,625 | B2 | 1/2017 | Hatanaka et al. |
| 9,554,737 | B2 | 1/2017 | Schurman et al. |
| 9,560,996 | B2 | 2/2017 | Kiani |
| 9,560,998 | B2 | 2/2017 | Al-Ali et al. |
| 9,566,019 | B2 | 2/2017 | Al-Ali et al. |
| 9,579,039 | B2 | 2/2017 | Jansen et al. |
| 9,591,975 | B2 | 3/2017 | Dalvi et al. |
| 9,593,969 | B2 | 3/2017 | King |
| 9,622,692 | B2 | 4/2017 | Lamego et al. |
| 9,622,693 | B2 | 4/2017 | Diab |
| D788,312 | S | 5/2017 | Al-Ali et al. |
| 9,636,055 | B2 | 5/2017 | Al-Ali et al. |
| 9,636,056 | B2 | 5/2017 | Al-Ali |
| 9,649,054 | B2 | 5/2017 | Lamego et al. |
| 9,651,405 | B1 | 5/2017 | Gowreesunker et al. |
| 9,662,052 | B2 | 5/2017 | Al-Ali et al. |
| 9,668,676 | B2 | 6/2017 | Culbert |
| 9,668,679 | B2 | 6/2017 | Schurman et al. |
| 9,668,680 | B2 | 6/2017 | Bruinsma et al. |
| 9,668,703 | B2 | 6/2017 | Al-Ali |
| 9,675,286 | B2 | 6/2017 | Diab |
| 9,681,812 | B2 | 6/2017 | Presura |
| 9,684,900 | B2 | 6/2017 | Motoki et al. |
| 9,687,160 | B2 | 6/2017 | Kiani |
| 9,693,719 | B2 | 7/2017 | Al-Ali et al. |
| 9,693,737 | B2 | 7/2017 | Al-Ali |
| 9,697,928 | B2 | 7/2017 | Al-Ali et al. |
| 9,699,546 | B2 | 7/2017 | Qian et al. |
| 9,700,249 | B2 | 7/2017 | Johnson et al. |
| 9,716,937 | B2 | 7/2017 | Qian et al. |
| 9,717,425 | B2 | 8/2017 | Kiani et al. |
| 9,717,448 | B2 | 8/2017 | Frix et al. |
| 9,717,458 | B2 | 8/2017 | Lamego et al. |
| 9,723,997 | B1 | 8/2017 | Lamego |
| 9,724,016 | B1 | 8/2017 | Al-Ali et al. |
| 9,724,024 | B2 | 8/2017 | Al-Ali |
| 9,724,025 | B1 | 8/2017 | Kiani et al. |
| 9,730,640 | B2 | 8/2017 | Diab et al. |
| 9,743,887 | B2 | 8/2017 | Al-Ali et al. |
| 9,749,232 | B2 | 8/2017 | Sampath et al. |
| 9,750,442 | B2 | 9/2017 | Olsen |
| 9,750,443 | B2 | 9/2017 | Smith et al. |
| 9,750,461 | B1 | 9/2017 | Telfort |
| 9,752,925 | B2 | 9/2017 | Chu et al. |
| 9,775,545 | B2 | 10/2017 | Al-Ali et al. |
| 9,775,546 | B2 | 10/2017 | Diab et al. |
| 9,775,570 | B2 | 10/2017 | Al-Ali |
| 9,778,079 | B1 | 10/2017 | Al-Ali et al. |
| 9,781,984 | B2 | 10/2017 | Baranski et al. |
| 9,782,077 | B2 | 10/2017 | Lamego et al. |
| 9,782,110 | B2 | 10/2017 | Kiani |
| 9,787,568 | B2 | 10/2017 | Lamego et al. |
| 9,788,735 | B2 | 10/2017 | Al-Ali |
| 9,788,768 | B2 | 10/2017 | Al-Ali et al. |
| 9,795,300 | B2 | 10/2017 | Al-Ali |
| 9,795,310 | B2 | 10/2017 | Al-Ali |
| 9,795,358 | B2 | 10/2017 | Telfort et al. |
| 9,795,739 | B2 | 10/2017 | Al-Ali et al. |
| 9,801,556 | B2 | 10/2017 | Kiani |
| 9,801,588 | B2 | 10/2017 | Weber et al. |
| 9,808,188 | B1 | 11/2017 | Perea et al. |
| 9,814,418 | B2 | 11/2017 | Weber et al. |
| 9,820,691 | B2 | 11/2017 | Kiani |
| 9,833,152 | B2 | 12/2017 | Kiani et al. |
| 9,833,180 | B2 | 12/2017 | Shakespeare et al. |
| 9,838,775 | B2 | 12/2017 | Qian et al. |
| 9,839,379 | B2 | 12/2017 | Al-Ali et al. |
| 9,839,381 | B1 | 12/2017 | Weber et al. |
| 9,847,002 | B2 | 12/2017 | Kiani et al. |
| 9,847,749 | B2 | 12/2017 | Kiani et al. |
| 9,848,800 | B1 | 12/2017 | Lee et al. |
| 9,848,806 | B2 | 12/2017 | Al-Ali et al. |
| 9,848,807 | B2 | 12/2017 | Lamego |
| 9,848,823 | B2 | 12/2017 | Raghuram et al. |
| 9,861,298 | B2 | 1/2018 | Eckerbom et al. |
| 9,861,304 | B2 | 1/2018 | Al-Ali et al. |
| 9,861,305 | B1 | 1/2018 | Weber et al. |
| 9,866,671 | B1 | 1/2018 | Thompson et al. |
| 9,867,575 | B2 | 1/2018 | Maani et al. |
| 9,867,578 | B2 | 1/2018 | Al-Ali et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,872,623 | B2 | 1/2018 | Al-Ali |
| 9,876,320 | B2 | 1/2018 | Coverston et al. |
| 9,877,650 | B2 | 1/2018 | Muhsin et al. |
| 9,877,686 | B2 | 1/2018 | Al-Ali et al. |
| 9,891,079 | B2 | 2/2018 | Dalvi |
| 9,891,590 | B2 | 2/2018 | Shim et al. |
| 9,895,107 | B2 | 2/2018 | Al-Ali et al. |
| 9,898,049 | B2 | 2/2018 | Myers et al. |
| 9,913,617 | B2 | 3/2018 | Al-Ali et al. |
| 9,918,646 | B2 | 3/2018 | Singh Alvarado et al. |
| 9,924,893 | B2 | 3/2018 | Schurman et al. |
| 9,924,897 | B1 | 3/2018 | Abdul-Hafiz |
| 9,936,917 | B2 | 4/2018 | Poeze et al. |
| 9,943,269 | B2 | 4/2018 | Muhsin et al. |
| 9,949,676 | B2 | 4/2018 | Al-Ali |
| 9,952,095 | B1 | 4/2018 | Hotelling et al. |
| 9,955,937 | B2 | 5/2018 | Telfort |
| 9,965,946 | B2 | 5/2018 | Al-Ali |
| 9,980,667 | B2 | 5/2018 | Kiani et al. |
| D820,865 | S | 6/2018 | Muhsin et al. |
| 9,986,919 | B2 | 6/2018 | Lamego et al. |
| 9,986,952 | B2 | 6/2018 | Dalvi et al. |
| 9,989,560 | B2 | 6/2018 | Poeze et al. |
| 9,993,207 | B2 | 6/2018 | Al-Ali et al. |
| 10,007,758 | B2 | 6/2018 | Al-Ali et al. |
| D822,215 | S | 7/2018 | Al-Ali et al. |
| D822,216 | S | 7/2018 | Barker et al. |
| 10,010,276 | B2 | 7/2018 | Al-Ali et al. |
| 10,024,655 | B2 | 7/2018 | Raguin et al. |
| 10,032,002 | B2 | 7/2018 | Kiani et al. |
| 10,039,080 | B2 | 7/2018 | Miller et al. |
| 10,039,482 | B2 | 8/2018 | Al-Ali et al. |
| 10,039,491 | B2 | 8/2018 | Thompson et al. |
| 10,052,037 | B2 | 8/2018 | Kinast et al. |
| 10,055,121 | B2 | 8/2018 | Chaudhri et al. |
| 10,058,275 | B2 | 8/2018 | Al-Ali et al. |
| 10,064,562 | B2 | 9/2018 | Al-Ali |
| 10,066,970 | B2 | 9/2018 | Gowreesunker et al. |
| 10,076,257 | B2 | 9/2018 | Lin et al. |
| 10,078,052 | B2 | 9/2018 | Ness et al. |
| 10,086,138 | B1 | 10/2018 | Novak, Jr. |
| 10,092,200 | B2 | 10/2018 | Al-Ali et al. |
| 10,092,244 | B2 | 10/2018 | Chuang et al. |
| 10,092,249 | B2 | 10/2018 | Kiani et al. |
| 10,098,550 | B2 | 10/2018 | Al-Ali et al. |
| 10,098,591 | B2 | 10/2018 | Al-Ali et al. |
| 10,098,610 | B2 | 10/2018 | Al-Ali et al. |
| 10,111,591 | B2 | 10/2018 | Dyell et al. |
| D833,624 | S | 11/2018 | Dejong et al. |
| 10,117,587 | B2 | 11/2018 | Han |
| 10,123,726 | B2 | 11/2018 | Al-Ali et al. |
| 10,123,729 | B2 | 11/2018 | Dyell et al. |
| 10,130,289 | B2 | 11/2018 | Al-Ali et al. |
| 10,130,291 | B2 | 11/2018 | Schurman et al. |
| D835,282 | S | 12/2018 | Barker et al. |
| D835,283 | S | 12/2018 | Barker et al. |
| D835,284 | S | 12/2018 | Barker et al. |
| D835,285 | S | 12/2018 | Barker et al. |
| 10,149,616 | B2 | 12/2018 | Al-Ali et al. |
| 10,154,815 | B2 | 12/2018 | Al-Ali et al. |
| 10,159,412 | B2 | 12/2018 | Lamego et al. |
| 10,165,954 | B2 | 1/2019 | Lee |
| 10,188,296 | B2 | 1/2019 | Al-Ali et al. |
| 10,188,331 | B1 | 1/2019 | Kiani et al. |
| 10,188,348 | B2 | 1/2019 | Al-Ali et al. |
| RE47,218 | E | 2/2019 | Ali-Ali |
| RE47,244 | E | 2/2019 | Kiani et al. |
| RE47,249 | E | 2/2019 | Kiani et al. |
| 10,194,847 | B2 | 2/2019 | Al-Ali |
| 10,194,848 | B1 | 2/2019 | Kiani et al. |
| 10,201,286 | B2 | 2/2019 | Waydo |
| 10,201,298 | B2 | 2/2019 | Al-Ali et al. |
| 10,205,272 | B2 | 2/2019 | Kiani et al. |
| 10,205,291 | B2 | 2/2019 | Scruggs et al. |
| 10,213,108 | B2 | 2/2019 | Al-Ali |
| 10,215,698 | B2 | 2/2019 | Han et al. |
| 10,219,706 | B2 | 3/2019 | Al-Ali |
| 10,219,746 | B2 | 3/2019 | McHale et al. |
| 10,219,754 | B1 | 3/2019 | Lamego |
| 10,226,187 | B2 | 3/2019 | Al-Ali et al. |
| 10,226,576 | B2 | 3/2019 | Kiani |
| 10,231,657 | B2 | 3/2019 | Al-Ali et al. |
| 10,231,670 | B2 | 3/2019 | Blank et al. |
| 10,231,676 | B2 | 3/2019 | Al-Ali et al. |
| RE47,353 | E | 4/2019 | Kiani et al. |
| 10,247,670 | B2 | 4/2019 | Ness et al. |
| 10,251,585 | B2 | 4/2019 | Al-Ali et al. |
| 10,251,586 | B2 | 4/2019 | Lamego |
| 10,255,994 | B2 | 4/2019 | Sampath et al. |
| 10,258,265 | B1 | 4/2019 | Poeze et al. |
| 10,258,266 | B1 | 4/2019 | Poeze et al. |
| 10,265,024 | B2 | 4/2019 | Lee et al. |
| 10,271,748 | B2 | 4/2019 | Al-Ali |
| 10,278,626 | B2 | 5/2019 | Schurman et al. |
| 10,278,648 | B2 | 5/2019 | Al-Ali et al. |
| 10,279,247 | B2 | 5/2019 | Kiani |
| 10,285,626 | B1 | 5/2019 | Kestelli et al. |
| 10,292,628 | B1 | 5/2019 | Poeze et al. |
| 10,292,657 | B2 | 5/2019 | Abdul-Hafiz et al. |
| 10,292,664 | B2 | 5/2019 | Al-Ali |
| 10,299,708 | B1 | 5/2019 | Poeze et al. |
| 10,299,709 | B2 | 5/2019 | Perea et al. |
| 10,299,720 | B2 | 5/2019 | Brown et al. |
| 10,305,775 | B2 | 5/2019 | Lamego et al. |
| 10,307,111 | B2 | 6/2019 | Muhsin et al. |
| 10,325,681 | B2 | 6/2019 | Sampath et al. |
| 10,327,337 | B2 | 6/2019 | Triman et al. |
| 10,327,713 | B2 | 6/2019 | Barker et al. |
| 10,332,630 | B2 | 6/2019 | Al-Ali |
| 10,335,033 | B2 | 7/2019 | Al-Ali |
| 10,335,068 | B2 | 7/2019 | Poeze et al. |
| 10,335,072 | B2 | 7/2019 | Al-Ali et al. |
| 10,342,470 | B2 | 7/2019 | Al-Ali et al. |
| 10,342,487 | B2 | 7/2019 | Al-Ali et al. |
| 10,342,497 | B2 | 7/2019 | Al-Ali et al. |
| 10,349,895 | B2 | 7/2019 | Telfort et al. |
| 10,349,898 | B2 | 7/2019 | Al-Ali et al. |
| 10,354,504 | B2 | 7/2019 | Kiani et al. |
| 10,357,206 | B2 | 7/2019 | Weber et al. |
| 10,357,209 | B2 | 7/2019 | Al-Ali |
| 10,366,787 | B2 | 7/2019 | Sampath et al. |
| 10,368,787 | B2 | 8/2019 | Reichgott et al. |
| 10,376,190 | B1 | 8/2019 | Poeze et al. |
| 10,376,191 | B1 | 8/2019 | Poeze et al. |
| 10,383,520 | B2 | 8/2019 | Wojtczuk et al. |
| 10,388,120 | B2 | 8/2019 | Muhsin et al. |
| 10,388,527 | B2 | 8/2019 | Togawa et al. |
| 10,390,716 | B2 | 8/2019 | Shimuta |
| 10,398,320 | B2 | 9/2019 | Kiani et al. |
| 10,398,383 | B2 | 9/2019 | van Dinther et al. |
| 10,405,804 | B2 | 9/2019 | Al-Ali |
| 10,406,445 | B2 | 9/2019 | Vock et al. |
| 10,413,666 | B2 | 9/2019 | Al-Ali et al. |
| 10,416,079 | B2 | 9/2019 | Magnussen et al. |
| 10,420,493 | B2 | 9/2019 | Al-Ali et al. |
| D864,120 | S | 10/2019 | Forrest et al. |
| 10,433,776 | B2 | 10/2019 | Al-Ali |
| 10,441,181 | B1 | 10/2019 | Telfort et al. |
| 10,441,196 | B2 | 10/2019 | Eckerbom et al. |
| 10,448,844 | B2 | 10/2019 | Al-Ali et al. |
| 10,448,871 | B2 | 10/2019 | Al-Ali |
| 10,456,038 | B2 | 10/2019 | Lamego et al. |
| 10,463,284 | B2 | 11/2019 | Al-Ali et al. |
| 10,463,340 | B2 | 11/2019 | Telfort et al. |
| 10,470,695 | B2 | 11/2019 | Al-Ali |
| 10,471,159 | B1 | 11/2019 | Lapotko et al. |
| 10,478,107 | B2 | 11/2019 | Kiani et al. |
| 10,503,379 | B2 | 12/2019 | Al-Ali et al. |
| 10,505,311 | B2 | 12/2019 | Al-Ali et al. |
| 10,512,436 | B2 | 12/2019 | Muhsin et al. |
| 10,524,671 | B2 | 1/2020 | Lamego |
| 10,524,706 | B2 | 1/2020 | Telfort et al. |
| 10,524,738 | B2 | 1/2020 | Olsen |
| 10,531,811 | B2 | 1/2020 | Al-Ali et al. |

## US 10,912,502 B2

Page 10

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 10,531,819 | B2 | 1/2020 | Diab et al. |
| 10,531,835 | B2 | 1/2020 | Al-Ali et al. |
| 10,532,174 | B2 | 1/2020 | Al-Ali |
| 10,537,285 | B2 | 1/2020 | Shreim et al. |
| 10,542,903 | B2 | 1/2020 | Al-Ali et al. |
| 10,548,561 | B2 | 2/2020 | Telfort et al. |
| 10,555,678 | B2 | 2/2020 | Dalvi et al. |
| 10,568,514 | B2 | 2/2020 | Wojtczuk et al. |
| 10,568,553 | B2 | 2/2020 | O'Neil et al. |
| RE47,882 | E | 3/2020 | Al-Ali |
| 10,575,779 | B2 | 3/2020 | Poeze et al. |
| 10,582,886 | B2 | 3/2020 | Poeze et al. |
| 10,588,518 | B2 | 3/2020 | Kiani |
| 10,588,553 | B2 | 3/2020 | Poeze et al. |
| 10,588,554 | B2 | 3/2020 | Poeze et al. |
| 10,588,556 | B2 | 3/2020 | Kiani et al. |
| 10,595,747 | B2 | 3/2020 | Al-Ali et al. |
| 10,608,817 | B2 | 3/2020 | Haider et al. |
| D880,477 | S | 4/2020 | Forrest et al. |
| 10,610,138 | B2 | 4/2020 | Poeze et al. |
| 10,617,302 | B2 | 4/2020 | Al-Ali et al. |
| 10,617,335 | B2 | 4/2020 | Al-Ali et al. |
| 10,617,338 | B2 | 4/2020 | Poeze et al. |
| 10,624,563 | B2 | 4/2020 | Poeze et al. |
| 10,624,564 | B1 | 4/2020 | Poeze et al. |
| 10,631,765 | B1 | 4/2020 | Poeze et al. |
| 10,637,181 | B2 | 4/2020 | Al-Ali et al. |
| 10,638,961 | B2 | 5/2020 | Al-Ali |
| 10,646,146 | B2 | 5/2020 | Al-Ali |
| D887,548 | S | 6/2020 | Abdul-Hafiz et al. |
| D887,549 | S | 6/2020 | Abdul-Hafiz et al. |
| 10,667,764 | B2 | 6/2020 | Ahmed et al. |
| 10,687,743 | B1 | 6/2020 | Al-Ali |
| 10,687,744 | B1 | 6/2020 | Al-Ali |
| 10,687,745 | B1 | 6/2020 | Al-Ali |
| D890,708 | S | 7/2020 | Forrest et al. |
| 10,702,194 | B1 | 7/2020 | Poeze et al. |
| 10,702,195 | B1 | 7/2020 | Poeze et al. |
| 10,709,366 | B1 | 7/2020 | Poeze et al. |
| 10,721,785 | B2 | 7/2020 | Al-Ali |
| 10,722,159 | B2 | 7/2020 | Al-Ali |
| 10,736,518 | B2 | 8/2020 | Al-Ali et al. |
| 10,750,984 | B2 | 8/2020 | Pauley et al. |
| 10,779,098 | B2 | 9/2020 | Iswanto et al. |
| 2001/0034477 | A1 | 10/2001 | Mansfield et al. |
| 2001/0034479 | A1 | 10/2001 | Ring et al. |
| 2001/0039483 | A1 | 11/2001 | Brand et al. |
| 2001/0056243 | A1 | 12/2001 | Ohsaki et al. |
| 2002/0010401 | A1 | 1/2002 | Bushmakin et al. |
| 2002/0045836 | A1 | 4/2002 | Alkawwas |
| 2002/0058864 | A1 | 5/2002 | Mansfield et al. |
| 2002/0099279 | A1 | 7/2002 | Pfeiffer et al. |
| 2002/0111546 | A1 | 8/2002 | Cook et al. |
| 2002/0133080 | A1 | 9/2002 | Apruzzese et al. |
| 2002/0188210 | A1 | 12/2002 | Aizawa |
| 2003/0013975 | A1 | 1/2003 | Kiani |
| 2003/0018243 | A1 | 1/2003 | Gerhardt et al. |
| 2003/0036690 | A1 | 2/2003 | Geddes et al. |
| 2003/0078504 | A1 | 4/2003 | Rowe |
| 2003/0088162 | A1 | 5/2003 | Yamamoto et al. |
| 2003/0098969 | A1 | 5/2003 | Katz et al. |
| 2003/0100840 | A1 | 5/2003 | Sugiura et al. |
| 2003/0144582 | A1 | 7/2003 | Cohen et al. |
| 2003/0156288 | A1 | 8/2003 | Barnum et al. |
| 2003/0158501 | A1 | 8/2003 | Uchida et al. |
| 2003/0212312 | A1 | 11/2003 | Coffin, IV et al. |
| 2004/0054290 | A1 | 3/2004 | Chance |
| 2004/0054291 | A1 | 3/2004 | Schulz et al. |
| 2004/0106163 | A1 | 6/2004 | Workman, Jr. et al. |
| 2004/0114783 | A1 | 6/2004 | Spycher et al. |
| 2004/0132197 | A1 | 7/2004 | Zahniser et al. |
| 2004/0133081 | A1 | 7/2004 | Teller et al. |
| 2004/0138568 | A1 | 7/2004 | Lo et al. |
| 2004/0152957 | A1 | 8/2004 | Stivoric et al. |
| 2004/0220738 | A1 | 11/2004 | Nissila |

| | | | |
|---|---|---|---|
| 2005/0020927 | A1 | 1/2005 | Blondeau et al. |
| 2005/0054940 | A1 | 3/2005 | Almen |
| 2005/0055276 | A1 | 3/2005 | Kiani et al. |
| 2005/0075548 | A1 | 4/2005 | Al-Ali et al. |
| 2005/0075553 | A1 | 4/2005 | Sakai et al. |
| 2005/0116820 | A1 | 6/2005 | Goldreich |
| 2005/0192490 | A1 | 9/2005 | Yamamoto et al. |
| 2005/0197555 | A1 | 9/2005 | Mouradian et al. |
| 2005/0234317 | A1 | 10/2005 | Kiani |
| 2005/0276164 | A1 | 12/2005 | Amron |
| 2005/0288592 | A1 | 12/2005 | Yamamoto |
| 2006/0005944 | A1 | 1/2006 | Wang et al. |
| 2006/0009607 | A1 | 1/2006 | Lutz et al. |
| 2006/0009688 | A1 | 1/2006 | Lamego et al. |
| 2006/0020180 | A1 | 1/2006 | Al-Ali |
| 2006/0025659 | A1 | 2/2006 | Kiguchi et al. |
| 2006/0041198 | A1 | 2/2006 | Kondoh et al. |
| 2006/0073719 | A1 | 4/2006 | Kiani |
| 2006/0089557 | A1 | 4/2006 | Grajales et al. |
| 2006/0161054 | A1 | 7/2006 | Reuss et al. |
| 2006/0182659 | A1 | 8/2006 | Unlu et al. |
| 2006/0189871 | A1 | 8/2006 | Al-Ali et al. |
| 2006/0217608 | A1 | 9/2006 | Fein et al. |
| 2006/0226992 | A1 | 10/2006 | Al-Ali et al. |
| 2006/0247531 | A1 | 11/2006 | Pogue et al. |
| 2006/0253010 | A1 | 11/2006 | Brady et al. |
| 2006/0258928 | A1 | 11/2006 | Ortner et al. |
| 2006/0270919 | A1 | 11/2006 | Brenner |
| 2007/0038049 | A1 | 2/2007 | Huang |
| 2007/0055119 | A1 | 3/2007 | Lash et al. |
| 2007/0073116 | A1 | 3/2007 | Kiani et al. |
| 2007/0073117 | A1 | 3/2007 | Raridan |
| 2007/0093786 | A1 | 4/2007 | Goldsmith et al. |
| 2007/0100222 | A1 | 5/2007 | Mastrototaro et al. |
| 2007/0106172 | A1 | 5/2007 | Abreu |
| 2007/0145255 | A1 | 6/2007 | Nishikawa et al. |
| 2007/0149864 | A1 | 6/2007 | Laakkonen |
| 2007/0180140 | A1 | 8/2007 | Welch et al. |
| 2007/0191691 | A1 | 8/2007 | Polanco |
| 2007/0197886 | A1 | 8/2007 | Naganuma et al. |
| 2007/0208395 | A1 | 9/2007 | Leclerc et al. |
| 2007/0238955 | A1 | 10/2007 | Tearney et al. |
| 2007/0244377 | A1 | 10/2007 | Cozad et al. |
| 2007/0249916 | A1 | 10/2007 | Pesach et al. |
| 2007/0260130 | A1 | 11/2007 | Chin |
| 2007/0282178 | A1 | 12/2007 | Scholler et al. |
| 2007/0293792 | A1 | 12/2007 | Sliwa et al. |
| 2008/0004513 | A1 | 1/2008 | Walker et al. |
| 2008/0015424 | A1 | 1/2008 | Bernreuter |
| 2008/0031497 | A1 | 2/2008 | Kishigami et al. |
| 2008/0064965 | A1 | 3/2008 | Jay et al. |
| 2008/0076980 | A1 | 3/2008 | Hoarau |
| 2008/0076993 | A1 | 3/2008 | Ostrowski |
| 2008/0081966 | A1 | 4/2008 | Debreczeny |
| 2008/0094228 | A1 | 4/2008 | Welch et al. |
| 2008/0097172 | A1 | 4/2008 | Sawada et al. |
| 2008/0122796 | A1 | 5/2008 | Jobs et al. |
| 2008/0130232 | A1 | 6/2008 | Yamamoto |
| 2008/0139908 | A1 | 6/2008 | Kurth |
| 2008/0190436 | A1 | 8/2008 | Jaffe et al. |
| 2008/0194932 | A1 | 8/2008 | Ayers et al. |
| 2008/0221418 | A1 | 9/2008 | Al-Ali et al. |
| 2008/0221426 | A1 | 9/2008 | Baker et al. |
| 2008/0221463 | A1 | 9/2008 | Baker |
| 2008/0242958 | A1 | 10/2008 | Al-Ali et al. |
| 2008/0262325 | A1 | 10/2008 | Lamego |
| 2008/0319290 | A1 | 12/2008 | Mao et al. |
| 2009/0024013 | A1 | 1/2009 | Soller |
| 2009/0030327 | A1 | 1/2009 | Chance |
| 2009/0036759 | A1 | 2/2009 | Ault et al. |
| 2009/0043180 | A1 | 2/2009 | Tschautscher et al. |
| 2009/0043687 | A1 | 4/2009 | Telfort et al. |
| 2009/0095926 | A1 | 4/2009 | MacNeish, III |
| 2009/0129102 | A1 | 5/2009 | Xiao et al. |
| 2009/0156918 | A1 | 6/2009 | Davis et al. |
| 2009/0163775 | A1 | 6/2009 | Barrett et al. |
| 2009/0163783 | A1 | 6/2009 | Mannheimer et al. |
| 2009/0163787 | A1 | 6/2009 | Mannheimer et al. |
| 2009/0177097 | A1 | 7/2009 | Ma et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2009/0187085 | A1 | 7/2009 | Pay |
| 2009/0234206 | A1 | 9/2009 | Gaspard et al. |
| 2009/0247885 | A1 | 10/2009 | Suzuki et al. |
| 2009/0247984 | A1 | 10/2009 | Lamego et al. |
| 2009/0259114 | A1 | 10/2009 | Johnson et al. |
| 2009/0270699 | A1 | 10/2009 | Scholler et al. |
| 2009/0275813 | A1 | 11/2009 | Davis |
| 2009/0275844 | A1 | 11/2009 | Al-Ali |
| 2009/0306487 | A1 | 12/2009 | Crowe et al. |
| 2009/0326346 | A1 | 12/2009 | Kracker et al. |
| 2010/0004518 | A1 | 1/2010 | Vo et al. |
| 2010/0030040 | A1 | 2/2010 | Poeze et al. |
| 2010/0030043 | A1 | 2/2010 | Kuhn |
| 2010/0099964 | A1 | 4/2010 | O'Reilly et al. |
| 2010/0113948 | A1 | 5/2010 | Yang et al. |
| 2010/0130841 | A1 | 5/2010 | Ozawa et al. |
| 2010/0210925 | A1 | 8/2010 | Holley et al. |
| 2010/0234718 | A1 | 9/2010 | Sampath et al. |
| 2010/0270257 | A1 | 10/2010 | Wachman et al. |
| 2010/0305416 | A1 | 12/2010 | Bedard et al. |
| 2011/0001605 | A1 | 1/2011 | Kiani et al. |
| 2011/0003665 | A1 | 1/2011 | Burton et al. |
| 2011/0004079 | A1 | 1/2011 | Al-Ali et al. |
| 2011/0004106 | A1 | 1/2011 | Iwamiya et al. |
| 2011/0028806 | A1 | 2/2011 | Merritt et al. |
| 2011/0028809 | A1 | 2/2011 | Goodman |
| 2011/0040197 | A1 | 2/2011 | Welch et al. |
| 2011/0082711 | A1 | 4/2011 | Poeze et al. |
| 2011/0085721 | A1 | 4/2011 | Guyon et al. |
| 2011/0087081 | A1 | 4/2011 | Kiani et al. |
| 2011/0105854 | A1 | 5/2011 | Kiani et al. |
| 2011/0105865 | A1 | 5/2011 | Yu et al. |
| 2011/0118561 | A1 | 5/2011 | Tari et al. |
| 2011/0137297 | A1 | 6/2011 | Kiani et al. |
| 2011/0172498 | A1 | 7/2011 | Olsen et al. |
| 2011/0208015 | A1 | 8/2011 | Welch et al. |
| 2011/0213212 | A1 | 9/2011 | Al-Ali |
| 2011/0230733 | A1 | 9/2011 | Al-Ali |
| 2011/0237911 | A1 | 9/2011 | Lamego et al. |
| 2011/0245697 | A1 | 10/2011 | Miettinen |
| 2012/0059267 | A1 | 3/2012 | Lamego et al. |
| 2012/0078069 | A1 | 3/2012 | Melker |
| 2012/0123231 | A1 | 5/2012 | O'Reilly |
| 2012/0150052 | A1 | 6/2012 | Buchheim et al. |
| 2012/0165629 | A1 | 6/2012 | Merritt et al. |
| 2012/0179006 | A1 | 7/2012 | Jansen et al. |
| 2012/0197093 | A1 | 8/2012 | LeBoeuf et al. |
| 2012/0197137 | A1 | 8/2012 | Jeanne et al. |
| 2012/0209084 | A1 | 8/2012 | Olsen et al. |
| 2012/0226117 | A1 | 9/2012 | Lamego et al. |
| 2012/0227739 | A1 | 9/2012 | Kiani |
| 2012/0283524 | A1 | 11/2012 | Kiani et al. |
| 2012/0296178 | A1 | 11/2012 | Lamego et al. |
| 2012/0319816 | A1 | 12/2012 | Al-Ali |
| 2012/0330112 | A1 | 12/2012 | Lamego et al. |
| 2013/0018233 | A1 | 1/2013 | Cinbis et al. |
| 2013/0023775 | A1 | 1/2013 | Lamego et al. |
| 2013/0041591 | A1 | 2/2013 | Lamego |
| 2013/0045685 | A1 | 2/2013 | Kiani |
| 2013/0046204 | A1 | 2/2013 | Lamego et al. |
| 2013/0060147 | A1 | 3/2013 | Welch et al. |
| 2013/0085346 | A1 | 4/2013 | Lin et al. |
| 2013/0096405 | A1 | 4/2013 | Garfio |
| 2013/0096936 | A1 | 4/2013 | Sampath et al. |
| 2013/0131474 | A1 | 5/2013 | Gu et al. |
| 2013/0190581 | A1 | 7/2013 | Al-Ali et al. |
| 2013/0197328 | A1 | 8/2013 | Diab et al. |
| 2013/0204112 | A1 | 8/2013 | White et al. |
| 2013/0211214 | A1 | 8/2013 | Olsen |
| 2013/0243021 | A1 | 9/2013 | Siskavich |
| 2013/0296672 | A1 | 11/2013 | O'Neil et al. |
| 2013/0324808 | A1 | 12/2013 | Al-Ali et al. |
| 2013/0331670 | A1 | 12/2013 | Kiani |
| 2013/0338461 | A1 | 12/2013 | Lamego et al. |
| 2013/0345921 | A1 | 12/2013 | Al-Ali et al. |
| 2014/0012100 | A1 | 1/2014 | Al-Ali et al. |
| 2014/0034353 | A1 | 2/2014 | Al-Ali et al. |
| 2014/0051953 | A1 | 2/2014 | Lamego et al. |
| 2014/0051955 | A1 | 2/2014 | Tiao et al. |
| 2014/0058230 | A1 | 2/2014 | Abdul-Hafiz et al. |
| 2014/0073887 | A1 | 3/2014 | Petersen et al. |
| 2014/0073960 | A1 | 3/2014 | Rodriguez-Llorente et al. |
| 2014/0077956 | A1 | 3/2014 | Sampath et al. |
| 2014/0081100 | A1 | 3/2014 | Muhsin et al. |
| 2014/0081175 | A1 | 3/2014 | Telfort |
| 2014/0094667 | A1 | 4/2014 | Schurman et al. |
| 2014/0100434 | A1 | 4/2014 | Diab et al. |
| 2014/0107493 | A1 | 4/2014 | Yuen et al. |
| 2014/0114199 | A1 | 4/2014 | Lamego et al. |
| 2014/0120564 | A1 | 5/2014 | Workman et al. |
| 2014/0121482 | A1 | 5/2014 | Merritt et al. |
| 2014/0121483 | A1 | 5/2014 | Kiani |
| 2014/0127137 | A1 | 5/2014 | Bellott et al. |
| 2014/0129702 | A1 | 5/2014 | Lamego et al. |
| 2014/0135588 | A1 | 5/2014 | Al-Ali et al. |
| 2014/0142401 | A1 | 5/2014 | Al-Ali et al. |
| 2014/0163344 | A1 | 6/2014 | Al-Ali |
| 2014/0163402 | A1 | 6/2014 | Lamego et al. |
| 2014/0166076 | A1 | 6/2014 | Kiani et al. |
| 2014/0171146 | A1 | 6/2014 | Ma et al. |
| 2014/0171763 | A1 | 6/2014 | Diab |
| 2014/0180154 | A1 | 6/2014 | Sierra et al. |
| 2014/0180160 | A1 | 6/2014 | Brown et al. |
| 2014/0187973 | A1 | 7/2014 | Brown et al. |
| 2014/0192177 | A1 | 7/2014 | Bartula et al. |
| 2014/0194709 | A1 | 7/2014 | Al-Ali et al. |
| 2014/0194711 | A1 | 7/2014 | Al-Ali |
| 2014/0194766 | A1 | 7/2014 | Al-Ali et al. |
| 2014/0206954 | A1 | 7/2014 | Yuen et al. |
| 2014/0206963 | A1 | 7/2014 | Al-Ali |
| 2014/0213864 | A1 | 7/2014 | Abdul-Hafiz et al. |
| 2014/0221854 | A1 | 8/2014 | Wai |
| 2014/0243627 | A1 | 8/2014 | Diab et al. |
| 2014/0266790 | A1 | 9/2014 | Al-Ali et al. |
| 2014/0275808 | A1 | 9/2014 | Poeze et al. |
| 2014/0275871 | A1 | 9/2014 | Lamego et al. |
| 2014/0275872 | A1 | 9/2014 | Merritt et al. |
| 2014/0275881 | A1 | 9/2014 | Lamego et al. |
| 2014/0276013 | A1 | 9/2014 | Muehlemann et al. |
| 2014/0276116 | A1 | 9/2014 | Takahashi et al. |
| 2014/0288400 | A1 | 9/2014 | Diab et al. |
| 2014/0296664 | A1 | 10/2014 | Bruinsma et al. |
| 2014/0303520 | A1 | 10/2014 | Telfort et al. |
| 2014/0316217 | A1 | 10/2014 | Purdon et al. |
| 2014/0316218 | A1 | 10/2014 | Purdon et al. |
| 2014/0316228 | A1 | 10/2014 | Blank et al. |
| 2014/0323825 | A1 | 10/2014 | Al-Ali et al. |
| 2014/0323897 | A1 | 10/2014 | Brown et al. |
| 2014/0323898 | A1 | 10/2014 | Purdon et al. |
| 2014/0330098 | A1 | 11/2014 | Merritt et al. |
| 2014/0330099 | A1 | 11/2014 | Al-Ali et al. |
| 2014/0333440 | A1 | 11/2014 | Kiani |
| 2014/0336481 | A1 | 11/2014 | Shakespeare et al. |
| 2014/0343436 | A1 | 11/2014 | Kiani |
| 2014/0357966 | A1 | 12/2014 | Al-Ali et al. |
| 2014/0361147 | A1 | 12/2014 | Fei |
| 2014/0378844 | A1 | 12/2014 | Fei |
| 2015/0005600 | A1 | 1/2015 | Blank et al. |
| 2015/0011907 | A1 | 1/2015 | Purdon et al. |
| 2015/0018650 | A1 | 1/2015 | Al-Ali et al. |
| 2015/0032029 | A1 | 1/2015 | Al-Ali et al. |
| 2015/0065889 | A1 | 3/2015 | Gandelman et al. |
| 2015/0073235 | A1 | 3/2015 | Kateraas et al. |
| 2015/0073241 | A1 | 3/2015 | Lamego |
| 2015/0080754 | A1 | 3/2015 | Purdon et al. |
| 2015/0087936 | A1 | 3/2015 | Al-Ali et al. |
| 2015/0094546 | A1 | 4/2015 | Al-Ali |
| 2015/0099950 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0101844 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0106121 | A1 | 4/2015 | Muhsin et al. |
| 2015/0119725 | A1 | 4/2015 | Martin et al. |
| 2015/0173671 | A1 | 6/2015 | Paalasmaa et al. |
| 2015/0196249 | A1 | 7/2015 | Brown et al. |
| 2015/0216459 | A1 | 8/2015 | Al-Ali et al. |

**US 10,912,502 B2**

Page 12

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2015/0255001 | A1 | 9/2015 | Haughav et al. |
| 2015/0257689 | A1 | 9/2015 | Al-Ali et al. |
| 2015/0281424 | A1 | 10/2015 | Vock et al. |
| 2015/0318100 | A1 | 11/2015 | Rothkopf et al. |
| 2015/0351697 | A1 | 11/2015 | Weber et al. |
| 2015/0351704 | A1 | 12/2015 | Kiani et al. |
| 2015/0366472 | A1 | 12/2015 | Kiani |
| 2015/0366507 | A1 | 12/2015 | Blank |
| 2015/0374298 | A1 | 12/2015 | Al-Ali et al. |
| 2015/0380875 | A1 | 12/2015 | Coverston et al. |
| 2016/0000362 | A1 | 1/2016 | Diab et al. |
| 2016/0007930 | A1 | 1/2016 | Weber et al. |
| 2016/0019360 | A1 | 1/2016 | Pahwa et al. |
| 2016/0022160 | A1 | 1/2016 | Pi et al. |
| 2016/0023245 | A1 | 1/2016 | Zadesky et al. |
| 2016/0029932 | A1 | 2/2016 | Al-Ali |
| 2016/0029933 | A1 | 2/2016 | Al-Ali et al. |
| 2016/0038045 | A1 | 2/2016 | Shapiro |
| 2016/0041531 | A1 | 2/2016 | Mackie et al. |
| 2016/0045118 | A1 | 2/2016 | Kiani |
| 2016/0051157 | A1 | 2/2016 | Waydo |
| 2016/0051158 | A1 | 2/2016 | Silva |
| 2016/0051205 | A2 | 2/2016 | Al-Ali et al. |
| 2016/0058302 | A1 | 3/2016 | Raghuram et al. |
| 2016/0058309 | A1 | 3/2016 | Han |
| 2016/0058310 | A1 | 3/2016 | Iijima |
| 2016/0058312 | A1 | 3/2016 | Han et al. |
| 2016/0058338 | A1 | 3/2016 | Schurman et al. |
| 2016/0058356 | A1 | 3/2016 | Raghuram et al. |
| 2016/0058370 | A1 | 3/2016 | Raghuram et al. |
| 2016/0066823 | A1 | 3/2016 | Al-Ali et al. |
| 2016/0066824 | A1 | 3/2016 | Al-Ali et al. |
| 2016/0066879 | A1 | 3/2016 | Telfort et al. |
| 2016/0071392 | A1 | 3/2016 | Hankey et al. |
| 2016/0072429 | A1 | 3/2016 | Kiani et al. |
| 2016/0073967 | A1 | 3/2016 | Lamego et al. |
| 2016/0106367 | A1 | 4/2016 | Jorov et al. |
| 2016/0113527 | A1 | 4/2016 | Al-Ali et al. |
| 2016/0143548 | A1 | 5/2016 | Al-Ali |
| 2016/0154950 | A1 | 6/2016 | Nakajima et al. |
| 2016/0157780 | A1 | 6/2016 | Rimminen et al. |
| 2016/0166210 | A1 | 6/2016 | Al-Ali |
| 2016/0192869 | A1 | 7/2016 | Kiani et al. |
| 2016/0196388 | A1 | 7/2016 | Lamego |
| 2016/0197436 | A1 | 7/2016 | Barker et al. |
| 2016/0213281 | A1 | 7/2016 | Eckerbom et al. |
| 2016/0213309 | A1 | 7/2016 | Sannholm et al. |
| 2016/0256058 | A1 | 9/2016 | Pham et al. |
| 2016/0256082 | A1 | 9/2016 | Ely et al. |
| 2016/0267238 | A1 | 9/2016 | Nag |
| 2016/0270735 | A1 | 9/2016 | Diab et al. |
| 2016/0283665 | A1 | 9/2016 | Sampath et al. |
| 2016/0287107 | A1 | 10/2016 | Szabados et al. |
| 2016/0287181 | A1 | 10/2016 | Han et al. |
| 2016/0287786 | A1 | 10/2016 | Kiani |
| 2016/0296173 | A1 | 10/2016 | Culbert |
| 2016/0296174 | A1 | 10/2016 | Isikman et al. |
| 2016/0310027 | A1 | 10/2016 | Han |
| 2016/0314260 | A1 | 10/2016 | Kiani |
| 2016/0327984 | A1 | 11/2016 | Al-Ali et al. |
| 2016/0367173 | A1 | 12/2016 | Dalvi et al. |
| 2016/0378069 | A1 | 12/2016 | Rothkopf |
| 2016/0378071 | A1 | 12/2016 | Rothkopf |
| 2017/0007183 | A1 | 1/2017 | Dusan et al. |
| 2017/0010858 | A1 | 1/2017 | Prest et al. |
| 2017/0014083 | A1 | 1/2017 | Diab et al. |
| 2017/0024748 | A1 | 1/2017 | Haider |
| 2017/0042488 | A1 | 2/2017 | Muhsin |
| 2017/0055896 | A1 | 3/2017 | Al-Ali et al. |
| 2017/0074897 | A1 | 3/2017 | Mermel et al. |
| 2017/0084133 | A1 | 3/2017 | Cardinali et al. |
| 2017/0086689 | A1 | 3/2017 | Shui et al. |
| 2017/0086742 | A1 | 3/2017 | Harrison-Noonan et al. |
| 2017/0086743 | A1 | 3/2017 | Bushnell et al. |
| 2017/0094450 | A1 | 3/2017 | Tu et al. |
| 2017/0143281 | A1 | 5/2017 | Olsen |
| 2017/0147774 | A1 | 5/2017 | Kiani |
| 2017/0164884 | A1 | 6/2017 | Culbert et al. |
| 2017/0172435 | A1 | 6/2017 | Presura |
| 2017/0172476 | A1 | 6/2017 | Schilthuizen |
| 2017/0173632 | A1 | 6/2017 | Al-Ali |
| 2017/0196464 | A1 | 7/2017 | Jansen et al. |
| 2017/0196470 | A1 | 7/2017 | Lamego et al. |
| 2017/0202505 | A1 | 7/2017 | Kirenko et al. |
| 2017/0209095 | A1 | 7/2017 | Wagner et al. |
| 2017/0228516 | A1 | 8/2017 | Sampath et al. |
| 2017/0245790 | A1 | 8/2017 | Al-Ali et al. |
| 2017/0248446 | A1 | 8/2017 | Gowreesunker et al. |
| 2017/0251974 | A1 | 9/2017 | Shreim et al. |
| 2017/0273619 | A1 | 9/2017 | Alvarado et al. |
| 2017/0281024 | A1 | 10/2017 | Narasimhan et al. |
| 2017/0293727 | A1 | 10/2017 | Klaassen et al. |
| 2017/0311891 | A1 | 11/2017 | Kiani et al. |
| 2017/0325698 | A1 | 11/2017 | Allec et al. |
| 2017/0325744 | A1 | 11/2017 | Allec et al. |
| 2017/0340209 | A1 | 11/2017 | Klaassen et al. |
| 2017/0340219 | A1 | 11/2017 | Sullivan et al. |
| 2017/0340293 | A1 | 11/2017 | Al-Ali et al. |
| 2017/0347885 | A1 | 12/2017 | Tan et al. |
| 2017/0354332 | A1 | 12/2017 | Lamego |
| 2017/0354795 | A1 | 12/2017 | Blahnik et al. |
| 2017/0358239 | A1 | 12/2017 | Arney et al. |
| 2017/0358240 | A1 | 12/2017 | Blahnik et al. |
| 2017/0358242 | A1 | 12/2017 | Thompson et al. |
| 2017/0360306 | A1 | 12/2017 | Narasimhan et al. |
| 2017/0366657 | A1 | 12/2017 | Thompson et al. |
| 2018/0008146 | A1 | 1/2018 | Al-Ali et al. |
| 2018/0014781 | A1 | 1/2018 | Clavelle et al. |
| 2018/0025287 | A1 | 1/2018 | Mathew et al. |
| 2018/0042556 | A1 | 2/2018 | Shahparnia et al. |
| 2018/0049694 | A1 | 2/2018 | Singh Alvarado et al. |
| 2018/0050235 | A1 | 2/2018 | Tan et al. |
| 2018/0055375 | A1 | 3/2018 | Martinez et al. |
| 2018/0055390 | A1 | 3/2018 | Kiani |
| 2018/0055439 | A1 | 3/2018 | Pham et al. |
| 2018/0056129 | A1 | 3/2018 | Narasimha Rao et al. |
| 2018/0064381 | A1 | 3/2018 | Shakespeare et al. |
| 2018/0070867 | A1 | 3/2018 | Smith et al. |
| 2018/0078151 | A1 | 3/2018 | Allec et al. |
| 2018/0078182 | A1 | 3/2018 | Chen et al. |
| 2018/0082767 | A1 | 3/2018 | Al-Ali et al. |
| 2018/0085068 | A1 | 3/2018 | Telfort |
| 2018/0087937 | A1 | 3/2018 | Al-Ali et al. |
| 2018/0103874 | A1 | 4/2018 | Lee et al. |
| 2018/0103905 | A1 | 4/2018 | Kiani |
| 2018/0110469 | A1 | 4/2018 | Maani et al. |
| 2018/0125368 | A1 | 5/2018 | Lamego et al. |
| 2018/0125430 | A1 | 5/2018 | Al-Ali et al. |
| 2018/0132769 | A1 | 5/2018 | Weber et al. |
| 2018/0146901 | A1 | 5/2018 | Al-Ali et al. |
| 2018/0146902 | A1 | 5/2018 | Kiani et al. |
| 2018/0153418 | A1 | 6/2018 | Sullivan et al. |
| 2018/0153442 | A1 | 6/2018 | Eckerbom et al. |
| 2018/0153446 | A1 | 6/2018 | Kiani |
| 2018/0153448 | A1 | 6/2018 | Weber et al. |
| 2018/0164853 | A1 | 6/2018 | Myers et al. |
| 2018/0168491 | A1 | 6/2018 | Al-Ali et al. |
| 2018/0184917 | A1 | 7/2018 | Kiani |
| 2018/0192924 | A1 | 7/2018 | Al-Ali |
| 2018/0192953 | A1 | 7/2018 | Shreim et al. |
| 2018/0196514 | A1 | 7/2018 | Allec et al. |
| 2018/0199871 | A1 | 7/2018 | Pauley et al. |
| 2018/0206795 | A1 | 7/2018 | Al-Ali |
| 2018/0206815 | A1 | 7/2018 | Telfort |
| 2018/0213583 | A1 | 7/2018 | Al-Ali |
| 2018/0214090 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0216370 | A1 | 8/2018 | Ishiguro et al. |
| 2018/0218792 | A1 | 8/2018 | Muhsin et al. |
| 2018/0225960 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0228414 | A1 | 8/2018 | Shao et al. |
| 2018/0238718 | A1 | 8/2018 | Dalvi |
| 2018/0238734 | A1 | 8/2018 | Hotelling et al. |
| 2018/0242853 | A1 | 8/2018 | Al-Ali |
| 2018/0242923 | A1 | 8/2018 | Al-Ali et al. |

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2018/0242926 | A1 | 8/2018 | Muhsin et al. |
| 2018/0247353 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0247712 | A1 | 8/2018 | Muhsin et al. |
| 2018/0256087 | A1 | 9/2018 | Al-Ali et al. |
| 2018/0279956 | A1 | 10/2018 | Waydo et al. |
| 2018/0285094 | A1 | 10/2018 | Housel et al. |
| 2018/0296161 | A1 | 10/2018 | Shreim et al. |
| 2018/0300919 | A1 | 10/2018 | Muhsin et al. |
| 2018/0310822 | A1 | 11/2018 | Lndorf et al. |
| 2018/0310823 | A1 | 11/2018 | Al-Ali et al. |
| 2018/0317826 | A1 | 11/2018 | Muhsin |
| 2018/0317841 | A1 | 11/2018 | Novak, Jr. |
| 2018/0333055 | A1 | 11/2018 | Lamego et al. |
| 2018/0333087 | A1 | 11/2018 | Al-Ali |
| 2019/0000317 | A1 | 1/2019 | Muhsin et al. |
| 2019/0015023 | A1 | 1/2019 | Monfre |
| 2019/0029574 | A1 | 1/2019 | Schurman et al. |
| 2019/0029578 | A1 | 1/2019 | Al-Ali et al. |
| 2019/0058280 | A1 | 2/2019 | Al-Ali et al. |
| 2019/0069813 | A1 | 3/2019 | Al-Ali |
| 2019/0076028 | A1 | 3/2019 | Al-Ali et al. |
| 2019/0082979 | A1 | 3/2019 | Al-Ali |
| 2019/0090760 | A1 | 3/2019 | Kinast et al. |
| 2019/0090764 | A1 | 3/2019 | Al-Ali |
| 2019/0117070 | A1 | 4/2019 | Muhsin et al. |
| 2019/0117139 | A1 | 4/2019 | Al-Ali et al. |
| 2019/0117141 | A1 | 4/2019 | Al-Ali |
| 2019/0117930 | A1 | 4/2019 | Al-Ali |
| 2019/0122763 | A1 | 4/2019 | Sampath et al. |
| 2019/0133525 | A1 | 5/2019 | Al-Ali et al. |
| 2019/0142283 | A1 | 5/2019 | Lamego et al. |
| 2019/0142344 | A1 | 5/2019 | Telfort et al. |
| 2019/0150856 | A1 | 5/2019 | Kiani et al. |
| 2019/0167161 | A1 | 6/2019 | Al-Ali et al. |
| 2019/0175019 | A1 | 6/2019 | Al-Ali et al. |
| 2019/0192076 | A1 | 6/2019 | McHale et al. |
| 2019/0200941 | A1 | 7/2019 | Chandran et al. |
| 2019/0201623 | A1 | 7/2019 | Kiani |
| 2019/0209025 | A1 | 7/2019 | Al-Ali |
| 2019/0214778 | A1 | 7/2019 | Scruggs et al. |
| 2019/0216319 | A1 | 7/2019 | Poeze et al. |
| 2019/0216379 | A1 | 7/2019 | Al-Ali et al. |
| 2019/0221966 | A1 | 7/2019 | Kiani et al. |
| 2019/0223804 | A1 | 7/2019 | Blank et al. |
| 2019/0231199 | A1 | 8/2019 | Al-Ali et al. |
| 2019/0231241 | A1 | 8/2019 | Al-Ali et al. |
| 2019/0231270 | A1 | 8/2019 | Abdul-Hafiz et al. |
| 2019/0239787 | A1 | 8/2019 | Pauley et al. |
| 2019/0239824 | A1 | 8/2019 | Muhsin et al. |
| 2019/0254578 | A1 | 8/2019 | Lamego |
| 2019/0261857 | A1 | 8/2019 | Al-Ali |
| 2019/0269370 | A1 | 9/2019 | Al-Ali et al. |
| 2019/0274627 | A1 | 9/2019 | Al-Ali et al. |
| 2019/0274635 | A1 | 9/2019 | Al-Ali et al. |
| 2019/0290136 | A1 | 9/2019 | Dalvi et al. |
| 2019/0298270 | A1 | 10/2019 | Al-Ali et al. |
| 2019/0304601 | A1 | 10/2019 | Sampath et al. |
| 2019/0304605 | A1 | 10/2019 | Al-Ali |
| 2019/0307377 | A1 | 10/2019 | Perea et al. |
| 2019/0320906 | A1 | 10/2019 | Olsen |
| 2019/0320959 | A1 | 10/2019 | Al-Ali |
| 2019/0320988 | A1 | 10/2019 | Ahmed et al. |
| 2019/0325722 | A1 | 10/2019 | Kiani et al. |
| 2019/0350506 | A1 | 11/2019 | Al-Ali |
| 2019/0357813 | A1 | 11/2019 | Poeze et al. |
| 2019/0357823 | A1 | 11/2019 | Reichgott et al. |
| 2019/0357824 | A1 | 11/2019 | Al-Ali |
| 2019/0358524 | A1 | 11/2019 | Kiani |
| 2019/0365294 | A1 | 12/2019 | Poeze et al. |
| 2019/0374139 | A1 | 12/2019 | Kiani et al. |
| 2019/0374173 | A1 | 12/2019 | Kiani et al. |
| 2019/0374713 | A1 | 12/2019 | Kiani et al. |
| 2019/0386908 | A1 | 12/2019 | Lamego et al. |
| 2019/0388039 | A1 | 12/2019 | Al-Ali |
| 2020/0000338 | A1 | 1/2020 | Lamego et al. |
| 2020/0000415 | A1 | 1/2020 | Barker et al. |
| 2020/0015716 | A1 | 1/2020 | Poeze et al. |
| 2020/0021930 | A1 | 1/2020 | Iswanto et al. |
| 2020/0037453 | A1 | 1/2020 | Triman et al. |
| 2020/0037891 | A1 | 2/2020 | Kiani et al. |
| 2020/0037966 | A1 | 2/2020 | Al-Ali |
| 2020/0046257 | A1 | 2/2020 | Eckerbom et al. |
| 2020/0054253 | A1 | 2/2020 | Al-Ali et al. |
| 2020/0060591 | A1 | 2/2020 | Diab et al. |
| 2020/0060628 | A1 | 2/2020 | Al-Ali et al. |
| 2020/0060629 | A1 | 2/2020 | Muhsin et al. |
| 2020/0060869 | A1 | 2/2020 | Telfort et al. |
| 2020/0074819 | A1 | 3/2020 | Muhsin et al. |
| 2020/0111552 | A1 | 4/2020 | Ahmed |
| 2020/0113435 | A1 | 4/2020 | Muhsin |
| 2020/0113488 | A1 | 4/2020 | Al-Ali et al. |
| 2020/0113496 | A1 | 4/2020 | Scruggs et al. |
| 2020/0113497 | A1 | 4/2020 | Triman et al. |
| 2020/0113520 | A1 | 4/2020 | Abdul-Hafiz et al. |
| 2020/0138288 | A1 | 5/2020 | Al-Ali et al. |
| 2020/0138368 | A1 | 5/2020 | Kiani et al. |
| 2020/0163597 | A1 | 5/2020 | Dalvi et al. |
| 2020/0196877 | A1 | 6/2020 | Vo et al. |
| 2020/0196882 | A1 | 6/2020 | Kiani et al. |
| 2020/0221980 | A1 | 7/2020 | Poeze et al. |
| 2020/0253474 | A1 | 8/2020 | Muhsin et al. |
| 2020/0253544 | A1 | 8/2020 | Belur Nagaraj et al. |
| 2020/0275841 | A1 | 9/2020 | Telfort et al. |
| 2020/0288983 | A1 | 9/2020 | Telfort et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101564290 | 10/2009 |
| CN | 101484065 | 11/2011 |
| CN | 103906468 | 7/2014 |
| EP | 0102816 | 3/1984 |
| EP | 0419223 | 3/1991 |
| EP | 0630208 | 12/1994 |
| EP | 0665727 | 1/1997 |
| EP | 0760223 | 3/1997 |
| EP | 0770349 | 5/1997 |
| EP | 0781527 | 7/1997 |
| EP | 0880936 | 12/1998 |
| EP | 0922432 | 6/1999 |
| EP | 0985373 | 3/2000 |
| EP | 1518494 | 3/2005 |
| EP | 1526805 | 5/2005 |
| EP | 1124609 | 8/2006 |
| EP | 1860989 | 12/2007 |
| EP | 1875213 | 1/2008 |
| EP | 1880666 | 1/2008 |
| EP | 2165196 | 3/2010 |
| EP | 2277440 | 1/2011 |
| GB | 2243691 | 11/1991 |
| JP | 05-325705 | 12/1993 |
| JP | 08-185864 | 7/1996 |
| JP | H09-173322 | 7/1997 |
| JP | H 09257508 | 10/1997 |
| JP | H 10314133 | 12/1998 |
| JP | H 1170086 | 3/1999 |
| JP | 29193262 | 7/1999 |
| JP | H11-197127 | 7/1999 |
| JP | H 11235320 | 8/1999 |
| JP | 2001-066990 | 3/2001 |
| JP | 2001-087250 | 4/2001 |
| JP | 2002-500908 | 1/2002 |
| JP | 2003-024276 | 1/2003 |
| JP | 2003-508104 | 3/2003 |
| JP | 2003-265444 | 9/2003 |
| JP | 2004-329406 | 11/2004 |
| JP | 2004-344668 | 12/2004 |
| JP | 2005-160641 | 6/2005 |
| JP | 2005-270543 | 10/2005 |
| JP | 37411472 | 2/2006 |
| JP | 2006-102164 | 4/2006 |
| JP | 2006-177837 | 7/2006 |
| JP | 2006-198321 | 8/2006 |
| JP | 38033512 | 8/2006 |
| JP | 2006-296564 | 11/2006 |

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2007-389463 | 11/2007 |
| JP | 2007-319232 | 12/2007 |
| JP | 2008-099222 | 4/2008 |
| JP | 2009-106373 | 5/2009 |
| JP | 2011-147746 | 8/2011 |
| JP | 2013-515528 | 5/2013 |
| JP | 5756752 | 6/2015 |
| KR | 20070061122 | 6/2007 |
| KR | 100755079 | 9/2007 |
| KR | 20100091592 | 8/2010 |
| WO | WO 93/012712 | 7/1993 |
| WO | WO 94/23643 | 10/1994 |
| WO | WO 1995/000070 | 1/1995 |
| WO | WO 1996/27325 | 9/1996 |
| WO | WO 1996/41566 | 12/1996 |
| WO | WO 1997/009923 | 3/1997 |
| WO | WO 99/000053 | 1/1999 |
| WO | WO 99/001704 | 7/1999 |
| WO | WO 1999/063883 | 12/1999 |
| WO | WO 00/18290 | 4/2000 |
| WO | WO 00/25112 | 5/2000 |
| WO | WO 2000/028892 | 5/2000 |
| WO | WO 01/09589 | 2/2001 |
| WO | WO 01/50433 | 7/2001 |
| WO | WO 2002/062213 | 8/2002 |
| WO | WO 2005/094667 | 10/2005 |
| WO | WO 2006/016366 | 2/2006 |
| WO | WO 2006/017117 | 2/2006 |
| WO | WO 2006/060949 | 6/2006 |
| WO | WO 2006/079862 | 8/2006 |
| WO | WO 2006/090371 | 8/2006 |
| WO | WO 2006/113070 | 10/2006 |
| WO | WO 2007/004083 | 1/2007 |
| WO | WO 2007/017266 | 2/2007 |
| WO | WO 2007/048039 | 4/2007 |
| WO | WO 2007/144817 | 12/2007 |
| WO | WO 2008/002405 | 1/2008 |
| WO | WO 2008/107238 | 9/2008 |
| WO | WO 2008/149081 | 12/2008 |
| WO | WO 2009/001988 | 12/2008 |
| WO | WO 2009/137524 | 11/2009 |
| WO | WO 2010/003134 | 1/2010 |
| WO | WO 2011/051888 | 5/2011 |
| WO | WO 2011/069122 | 6/2011 |
| WO | WO 2013/030744 | 3/2013 |
| WO | WO 2013/106607 | 7/2013 |
| WO | WO 2013/181368 | 12/2013 |
| WO | WO 2014/115075 | 7/2014 |
| WO | WO 2014/149781 | 9/2014 |
| WO | WO 2014/153200 | 9/2014 |
| WO | WO 2014/158820 | 10/2014 |
| WO | WO 2014/178793 | 11/2014 |
| WO | WO 2014/184447 | 11/2014 |
| WO | WO 2015/187732 | 12/2015 |
| WO | WO 2016/066312 | 5/2016 |

OTHER PUBLICATIONS

A. C. M. Dassel et al., "Reflectance Pulse Oximetry at the Forehead Improves by Pressure on the Probe," Journal of Clinical Monitoring, vol. 11, No. 4, Jul. 1995, pp. 237-244.

A. Tura et al., "A Wearable Device with Wireless Bluetooth-based Data Transmission," Measurement Science Review, vol. 3, Sec. 2, 2003, pp. 1-4.

Akira Sakane et al., "Estimating Arterial Wall Impedance using a Plethysmogram," IEEE 2003, pp. 580-585.

B. McGarry et al., "Reflections on a candidate design of the user-interface for a wireless vital-signs monitor," Proceedings of DARE 2000 on Designing Augmented Reality Environments, Jan. 2000, pp. 33-40.

B.-H. Yang et al., "Development of the ring sensor for healthcare automation," Robotics and Autonomous Systems, 2000, pp. 273-281.

B-H. Yang et al., "A Twenty-Four Hour Tele-Nursing System Using a Ringer Sensor," Proceedings of 1998 IEEE International Conference on Robotics and Automation, May 16-20, 1998, 6 pages.

B-S. Lin et al., "RTWPMS: A Real-Time Wireless Physiological Monitoring System," IEEE Transactions on Information Technology in Biomedicine, vol. 10, No. 4, Oct. 2006, pp. 647-656.

Burritt, Mary F.; Current Analytical Approaches to Measuring Blood Analytes; vol. 36; No. 8(B); 1990.

C. J. Pujary, "Investigation of Photodetector Optimization in Reducing Power Consumption by a Noninvasive Pulse Oximeter Sensor," Worcester Polytechnic Institute, Jan. 16, 2004, 133 pages.

C. Pujary et al.,"Photodetector Size Considerations in the Design of a Noninvasive Reflectance Pulse Oximeter for Telemedicine Applications," Proceedings of IEEE Annual Northeast Bioengineering Conference, 2003, pp. 148-149.

C. W. Mundt et al., "A Multiparameter Wearable Physiologic Monitoring System for Space and Terrestrial Applications," IEEE Transactions on Information Technology in Biomedicine, vol. 9, No. 3, Sep. 2005, pp. 382-391.

D. C. Zheng and Y. T. Zhang, "A ring-type device for the noninvasive measurement of arterial blood pressure," Proceedings of the 25th Annual International Conference of the IEEE Engineering in Medicine and Biology Society (IEEE Cat. No. 03CH37439), Sep. 17-21, 2003, Cancun, pp. 3184-3187 vol. 4.

D. Konstantas et al., "Mobile Patient Monitoring: The MobiHealth System," In Proceedings of International Conference on Medical and Care Compunetics, NCC'04, Feb. 2004, 8 pages.

D. Marculescu et al., "Ready to Ware," IEEE Spectrum, vol. 40, Issue 10, Oct. 2003, pp. 28-32.

E. Higurashi et al., "An integrated laser blood flowmeter," Journal of Lightwave Technology, vol. 21, No. 3, pp. 591-595, Mar. 2003.

Eiji Higurashi et al., "Hybrid integration technologies for optical micro-systems", Proc. SPIE 5604, Optomechatronic Micro/Nano Components, Devices, and Systems, Oct. 25, 2004, pp. 67-73.

European Office Action issued in Application No. 09791157.2, dated Jun. 20, 2016.

European Office Action issued in application No. 10763901.5 dated Jan. 11, 2013.

European Office Action issued in application No. 10763901.5 dated Aug. 6, 2015.

European Office Action issued in application No. 10763901.5 dated Aug. 27, 2014.

Fabio Buttussi et al.,"MOPET: A context-aware and user-adaptive wearable system for fitness training," Artificial Intelligence in Medicine 42, 2008, pp. 153-163.

G. Comtois et al., "A Noise Reference Input to an Adaptive Filter Algorithm for Signal Processing in a Wearable Pulse Oximeter," IEEE, 2007, pp. 106-107.

G. Comtois, "A Comparative Evaluation of Adaptive Noise Cancellation Algorithms for Minimizing Motion Artifacts in a Forehead-Mounted Wearable Pulse Oximeter," Proceedings of the 29th Annual international Conference of the IEEE EMBS, Aug. 23-26, 2007, pp. 1528-1531.

G. Tamannagari, "Power Efficient Design of Finder-Ring Sensor for Patient Monitoring," Master of Science in Electrical Engineering, The University of Texas at San Antonio, College of Engineering, Department of Electrical Engineering, Dec. 2008, 74 pages.

H.H. Asada et al., "Mobile Monitoring with Wearable Photoplethysmographic Biosensors," IEEE Engineering in Medicine and Biology Magazine, May/Jun. 2003, pp. 28-40.

Hall, et al., Jeffrey W.; Near-Infrared Spectrophotometry: A New Dimension in Clinical Chemistry; vol. 38; No. 9; 1992.

http://amivital.ugr.es/blog/?tag+spo2; Monitorizacion de la hemoglobina...y mucho mas, printed on Aug. 20, 2009.

http://blogdeoliveira.blogspot.com/2008_02_01_archive.html; Ricardo Oliveira, printed on Aug. 20, 2009.

http://www.masimo.com/generalFloor/system.htm; Masimo Patient SafetyNet System at a Glance, printed on Aug. 20, 2009.

http://www.masimo.com/partners/GRASEBY.htm; Graseby Medical Limited, printed on Aug. 20, 2009.

http://www.masimo.com/PARTNERS/WELCHALLYN.htm; Welch Allyn Expands Patient Monitor Capabilities with Masimo Pulse Oximetry Technology, printed on Aug. 20, 2009.

(56)          **References Cited**

OTHER PUBLICATIONS

http://www.masimo.com/pulseOximeter/PPO.htm; Masimo Personal Pulse Oximeter, printed on Aug. 20, 2009.
http://www.masimo.com/pulseOximeter/Rad5.htm; Signal Extraction Pulse Oximeter, printed on Aug. 20, 2009.
http://www.masimo.com/rad-57/; Noninvasive Measurement of Methemoglobin, Carboxyhemoglobin and Oxyhemoglobin in the blood. Printed on Aug. 20, 2009.
http://www.masimo.com/rainbow/pronto.htm Noninvasive & Immediate Hemoglobin Testing, printed on Aug. 20, 2009.
http://www.masimo.com/spco/; Carboxyhemoglobin Noninvasive > Continuous > Immediate, printed on Aug. 20, 2009.
International Preliminary Report on Patentability and Written Opinion for International Application No. PCT/US2016/040190, dated Jan. 2, 2018, in 7 pages.
International Preliminary Report on Patentability and Written Opinion of the International Searching Authority issued in Application No. PCT US2009/049638, dated Jan. 5, 2011 in 9 pages.
International Preliminary Report on Patentability and Written Opinion of the International Searching Authority issued in Application No. PCT/US2009/052756, dated Feb. 8, 2011 in 8 pages.
International Search Report and Written Opinion for PCT/US2009/049638, dated Jan. 7, 2010.
International Search Report issued in Application No. PCT/US2009/052756, dated Feb. 10, 2009 in 14 pages.
International Search Report, App. No. PCT/US2010/047899, Date of Actual Completion of Search: Jan. 26, 2011, 4 pages.
J Kraitl et al., "An optical device to measure blood components by a photoplethysmographic method," Journal of Optics A: Pure and Applied Optics. 7, 2005, pp. S318-S324.
J. A. Tamada et al., "Noninvasive Glucose Monitoring: Comprehensive Clinical Results," JAMA, Nov. 17, 1999, vol. 282, No. 19, pp. 1839-1844.
J. C. D. Conway et al., "Wearable computer as a multi-parametric monitor for physiological signals," Proceedings IEEE International Symposium on Bio-Informatics and Biomedical Engineering, Arlington, VA, USA, 2000, pp. 236-242.
Japanese Notice of Allowance, re JP Application No. 2011-516895, dated May 12, 2015, no translation.
Japanese Office Action, re JP Application No. 2011-516895, dated Sep. 2, 2014, with translation.
K. Nakajima et al., "Monitoring of heart and respiratory rates by photoplethysmography using digital filtering technique," Med. Eng. Phy. vol. 18, No. 5, pp. 365-372, 1996.
Kanukurthy et al., "Data Acquisition Unit for an Implantable Multi-Channel Optical Glucose Sensor", Electro/Information Technology Conference, Chicago, IL, USA, May 17-20, 2007, pp. 1-6.
Konig et al., "Reflectance Pulse Oximetry—Principles and Obstetric Application in the Zurich System", Journal of Clinical Monitoring and Computing, vol. 14, No. 6, Aug. 1998, pp. 403-412.
Kuenstner, et al., J. Todd; Measurement of Hemoglobin in Unlysed Blood by Near-Infrared Spectroscopy; vol. 48; No. 4, 1994.
L. Grajales et al., "Wearable multisensor heart rate monitor," International Workshop on Wearable and Implantable Body Sensor Networks (BSN'06), Cambridge, MA, 2006, pp. 4-157.
L. Xu et al., "An integrated wrist-worn routine monitoring system for the elderly using BSN," 2008 5th International Summer School and Symposium on Medical Devices and Biosensors, Hong Kong, 2008, pp. 45-48.
Laukkanen RM et al., "Heart Rate Monitors: State of the Art," Journal of Sports Science, Jan. 1998, pp. S3-S7.
M. Savage et al., "Optimizing Power Consumption in the Design of a Wearable Wireless Telesensor: Comparison of Pulse Oximeter Modes," Proceedings of IEEE 29th Annual Nonheust Bioengineering Conference, 2003, pp. 150-151.
M. Yamashita etal., "Development of a Ring-Type Vital Sign Telemeter," Biotelemetry XIII, Mar. 26-31, 1995, pp. 145-150.
Manzke, et al., B., Multi Wavelength Pulse Oximetry in the Measurement of Hemoglobin Fractions; SPIE, vol. 2676, Apr. 24, 1996.

Mendelson et al., "A Mobile PDA-Based Wireless Pulse Oximeter," Proceedings of the IASTED International Conference Telehealth, Jul. 19-21, 2005, pp. 1-6.
Mendelson et al., "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE EMBS Annual International Conference, Aug. 30-Sep. 3, 2006, pp. 912-915.
Mendelson et al., "Accelerometery-Based Adaptive Noise Cancellation for Remote Physiological Monitoring by a Wearable Pulse Oximeter," Proceedings of the 3rd IASTED International Conference TELEHEALTH, May 31-Jun. 1, 2007, pp. 28-33.
Mendelson et al., "Measurement Site and Photodetector Size Considerations in Optimizing Power Consumption of a Wearable Reflectance Pulse Oximeter," Proceedings of the 25th Annual International Conference of the IEEE EMBS, Sep. 17-21, 2003, pp. 3016-3019.
Mendelson et al., "Minimization of LED Power Consumption in the Design of a Wearable Pulse Oximeter," Proceedings of the IASTED International Conference Biomedical Engineering, Jun. 25-27, 2003, 6 pages.
N. Townsend, "Pulse Oximetry," Medical Electronics, 2001, pp. 32-42.
Naumenko, E. K.; Choice of Wavelengths for Stable Determination of Concentrations of Hemoglobin Derivatives from Absorption Spectra of Erythrocytes; vol. 63; No. 1; pp. 60-66 Jan.-Feb. 1996; Original article submitted Nov. 3, 1994.
Nonin Medical, Inc., "Operator's Manual—Models 8600F0 and 8600F0M Pulse Oximeters," 2005, 25 pages.
Nuria Oliver et al., "HealthGear: A Real-time Wearable System for Monitoring and Analyzing Physiological Signals," Proceedings of the International Workshop on Wearable and Implantable Body Sensor Networks 2006 IEEE, pp. 1-4.
P. Branche et al., "Signal Quality and Power Consumption of a New Prototype Reflectance Pulse Oximeter Sensor," Proceeding of the 31th Annual Northeast Bioengineering Conference, Hoboken, NJ, IEEE, 2005, pp. 1-2.
P. C. Branche et al., "Measurement Reproducibility and Sensor Placement Considerations in Designing a Wearable Pulse Oximeter for Military Applications," IEEE, 2004, pp. 216-217.
P. Celka et al., "Motion Resistant Earphone Located Infrared Based Hearth Rate Measurement Device," In Proceeding of the 2nd International Conference on Biomedical Engineering, Innsbruck, Austria, Feb. 16-18, 2004, pp. 582-585.
P. Lukowicz et al., "AMON: A Wearable Medical Computer for High Risk Patient," Proceedings of the 6th International Symposium on Wearable Computers (ISWC'02), 2002, pp. 1-2.
P. Lukowicz et al., "The WearARM Modular, Low-Power Computing Core," IEEE Micro, May-Jun. 2001, pp. 16-28.
P. Renevey et al., "Wrist-Located Pulse Detection Using IR Signals, Activity and Nonlinear Artifact Cancellation," Proceedings of the 23rd Annual EMBS International Conference, Oct. 25-28, 2001, pp. 3030-3033.
P. Shaltis et al., "Novel Design for a Wearable, Rapidly Depolyable, Wireless Noninvasive Triage Sensor," Proceedings of the 2005 IEEE, Engineering in Medicine and Biology 27th Annual Conference, Sep. 1-4, 2005, pp. 3567-3570.
P. T. Gibbs et al., "Active Motion Artifact Cancellation for Wearable Health Monitoring Sensors Using Collocated MEMS Accelerometers," Proceedings of SPIE Smart Structures and Materials: Sensors and Smart Structures Technologies for Civil, Mechanical, and Aerospace Systems, May 17, 2005, pp. 811-819.
P.S. Pandian et al., "Smart Vest: Wearable Multi-Parameter Remote Physiological Monitoring System," Medical Engineering & Physics 30, 2008. pp. 466-477.
R. Fensli et al., "A Wireless ECG System for Continuous Event Recording and Communication to a Clinical Alarm Station," Conf Proc IEEE Eng Med Biol Soc, 2004, pp. 1-4.
R. P. Dresher et al., "A New Reflectance Pulse Oximeter Housing to Reduce Contact Pressure Effects," IEEE, 2006, pp. 49-50.
R. P. Dresher et al., "Reflectance Forehead Pulse Oximetry: Effects on Contact Pressure During Walking," Proceedings of the 28th IEEE EMBS Annual International Conference, Aug. 30-Sep. 3, 2006, pp. 3529-3532.

(56)                **References Cited**

OTHER PUBLICATIONS

R. Paradiso, "Wearable Health Care System for Vital Signs Monitoring," In Proceedings of IEEE International Conference on Information Technology Applications in Biomedicine, May 2003, pp. 283-286.
Russell Dresher, "Wearable Forehead Pulse Oximetry: Minimization of Motion and Pressure Artifacts," May 3, 2006, 93 pages.
S. Pentland, "Healthwear: Medical Technology Becomes Wearable," IEEE Computer Society, vol. 37, Issue 5, May 2004, pp. 34-41.
S. Rhee et al., "Artifact-Resistant, Power Efficient Design of Finger-Ring Plethysmographic Sensors, Part I: Design and Analysis," 22st Annual International Conference IEEE Engineering in Medicine and Biology Society, Jul. 23-28, 2000, pp. 2792-2795.
S. Rhee et al., "Design of a Artifact-Free Wearable Plethysmographic Sensor," 21st Annual International Conference IEEE Engineering in Medicine and Biology Society, Oct. 13-16, 1999, p. 786.
S. Rhee et al., "The Ring Sensor: a New Ambulatory Wearable Sensor for Twenty-Four Hour Patient Monitoring," Proceedings of the 20th Annual International Conference of the IEEE Engineering in Medicine and Biology Society, Oct. 29-Nov. 1, 1998, 4 pages.
S. Warren et al., "Designing Smart Health Care Technology into the Home of the Future," Workshops on Future Medical Devices: Home Care Technologies for the 21st Century, Apr. 1999, 19 pages.
Schmitt, et al., Joseph M.; Measurement of Blood Hematocrit by Dual-Wavelength near-IR Photoplethysmography; vol. 1641; 1992.
Schmitt, Joseph M.; Simple Photon Diffusion Anaylsis of the Effects of Multiple Scattering on Pulse Oximetry; Mar. 14, 1991; revised Aug. 30, 1991.
Schnapp, et al., L.M.; Pulse Oximetry. Uses and Abuses.; Chest 1990; 98; 1244-1250 DOI 10.1378/Chest.98.5.1244.
Small et al., "Data Handling Issues for Near-Infrared Glucose Measurements"; http://www.ieee.org/organizations/pubs/newsletters/leos/apr98/datahandling.htm, accessed Nov. 27, 2007.
Smith, "The Pursuit of Noninvasive Glucose: 'Hunting the Deceitful Turkey'", 2006.
Sokwoo Rhee et al., "Artifact-Resistant Power-Efficient Design of Finger-Ring Plethysmographic Sensors," IEEE Transactions on Biomedical Engineering, Jul. 2001, pp. 795-805, vol. 48, No. 7.
Sonnia Maria López Silva et al., "Near-infrared transmittance pulse oximetry with laser diodes," Journal of Biomedical Optics vol. 8 No. 3, Jul. 2003, pp. 525-533.
Stephen A. Mascaro et al., "Measurement of Finger Posture and Three-Axis Fingertip Touch Force Using Fingernail Sensors," IEEE International Conference on Robotics and Automation, 2002, pp. 1-11.
Stephen A. Mascaro et al., "Photoplethysmograph Fingernail Sensors for Measuring Finger Forces Without Haptic Obstruction," IEEE Transactions on Robotics and Automation, vol. 17, No. 5, Oct. 2001, pp. 698-708.
T. Kiyokura et al., "Wearable Laser Blood Flowmeter for Ubiquitous Healthcare Service," 2007 IEEE/LEOS International Conference on Optical MEMS and Nanophotonics, Hualien, 2007, pp. 4-5.
T. Martin et al., "Issues in Wearable Computing for Medical Monitoring Applications: A Case Study of a Wearable ECG Monitoring Device," In Proceedings of International Symposium of Wearable Computers (ISWC'00), Feb. 2000, pp. 43-49.
T. Torfs et al., "Body-Heat Powered Autonomous Pulse Oximeter," IEEE Sensors 2006, EXCO, Oct. 22-25, 2006, pp. 427-430.
Takumi Morita et al., "Integrated Blood Flowmeter Using Micromachining Technology," Dec. 2004, pp. 77-80.
Anliker et al., "AMON: A Wearable Multiparameter Medical Monitoring and Alert System," IEEE Transactions on Information Technology in Biomedicine, Jan. 2005, pp. 1-11.
W. Johnston et al., "Extracting Heart Rate Variability from a Wearable Reflectance Pulse Oximeter," IEEE, 2005, pp. 1-2.
W. S. Johnston et al., "Extracting Breathing Rate Information from a Wearable Reflectance Pulse Oximeter Sensor," Proceedings of the 26th Annual International Conference of the IEEE EMBS, Sep. 1-5, 2004, pp. 5388-5391.

W. S. Johnston et al., "Investigation of Signal Processing Algorithms for an Embedded Microcontroller-Based Wearable Pulse Oximeter," Proceedings of the 28th IEEE EMBS Annual International Conference, Aug. 30-Sep. 3, 2006, pp. 5888-5891.
Y-S. Yan et al., An Efficient Motion-Resistant Method for Wearable Pulse Oximeter, IEEE Transactions on Information Technology in Biomedicine, vol. 12, No. 3, May 2008, pp. 399-405.
Yuan-Hsiang Lin et al., "A wireless PDA-based physiological monitoring system for patient transport," IEEE Transactions on Information Technology in Biomedicine, vol. 8, No. 4, pp. 439-447, Dec. 2004.
Jan. 9, 2020 Complaint for (1) Patent Infringement (2) Trade Secret Misappropriation and (3) Ownership of Patents and Demand for Jury Trial, *Masimo Corporation and Cercacor Laboratories, Inc.* v. *Apple Inc.*, Case No. 8:20-cv-00048, 64 pages.
Mar. 25, 2020 First Amended Complaint for (1) Patent Infringement (2) Trade Secret Misappropriation (3) Correction of Inventorship and (4) Ownership of Patents and Demand for Jury Trial, and including Exhibits 13-24 (Exhibits 1-12 and 25-31 comprise copies of publicly available U.S. patents and U.S. patent application publications, and are not included herein for ease of transmission), *Masimo Corporation and Cercacor Laboratories, Inc.* v. *Apple Inc.*, Case No. 8:20-cv-00048, pp. 1-94, 983-1043 (total of 156 pages).
Jul. 24, 2020 Second Amended Complaint for (1) Patent Infringement (2) Trade Secret Misappropriation (3) Correction of Inventorship and (4) Ownership of Patents and Demand for Jury Trial, and including Exhibit 1, *Masimo Corporation and Cercacor Laboratories, Inc.* v. *Apple Inc.*, Case No. 8:20-cv-00048, 182 pages.
Jul. 27, 2020 Plaintiffs' Infringement Contentions, and including Exhibit 1 and Appendices A-P, *Masimo Corporation and Cercacor Laboratories, Inc.* v. *Apple Inc.*, Case No. 8:20-cv-00048, 305 pages.
Sep. 8, 2020 Apple's Preliminary Invalidity Contentions, and including Exhibits A-G, *Masimo Corporation and Cercacor Laboratories, Inc.* v. *Apple Inc.*, Case No. 8:20-cv-00048, 3960 pages. [uploaded in 15 parts].
Petition for Inter Partes Review of U.S. Pat. No. 10,258,265, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01520, dated Aug. 31, 2020, in 114 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,258,265, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01520, dated Aug. 31, 2020, in 138 pages.
Petition for Inter Partes Review of U.S. Pat. No. 10,588,553, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01536, dated Aug. 31, 2020, in 114 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,588,553, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01536, dated Aug. 31, 2020, in 173 pages.
Petition for Inter Partes Review of U.S. Pat. No. 10,588,553, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01537, dated Aug. 31, 2020, in 114 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,588,553, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01537, dated Aug. 31, 2020, in 181 pages.
Petition for Inter Partes Review of U.S. Pat. No. 10,292,628, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01521, dated Sep. 2, 2020, in 107 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,292,628, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01521, dated Sep. 2, 2020, in 133 pages.
Petition for Inter Partes Review of U.S. Pat. No. 10,588,554, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01538, dated Sep. 2, 2020, in 108 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,588,554, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01538, dated Sep. 2, 2020, in 151 pages.

US 10,912,502 B2

Page 17

(56)        **References Cited**

OTHER PUBLICATIONS

Petition for Inter Partes Review of U.S. Pat. No. 10,588,554, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01539, dated Sep. 2, 2020, in 111 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,588,554, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01539, dated Sep. 2, 2020, in 170 pages.
Petition for Inter Partes Review of U.S. Pat. No. 10,624,564, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01713, dated Sep. 30, 2020, in 117 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,624,564, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01713, dated Sep. 30, 2020, in 159 pages.
Petition for Inter Partes Review of U.S. Pat. No. 10,631,765, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01714, dated Sep. 30, 2020, in 113 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,631,765, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01714, dated Sep. 30, 2020, in 122 pages.
Petition for Inter Partes Review of U.S. Pat. No. 10,631,765, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01715, dated Sep. 30, 2020, in 114 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,631,765, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01715, dated Sep. 30, 2020, in 117 pages.
Petition for Inter Partes Review of U.S. Pat. No. 10,702,194, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01716, dated Sep. 30, 2020, in 100 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,702,194, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01716, dated Sep. 30, 2020, in 109 pages.
Petition for Inter Partes Review of U.S. Pat. No. 10,702,195, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01733, dated Sep. 30, 2020, in 105 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,702,195, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01733, dated Sep. 30, 2020, in 108 pages.
Petition for Inter Partes Review of U.S. Pat. No. 10,709,366, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01737, dated Sep. 30, 2020, in 104 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,709,366, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01737, dated Sep. 30, 2020, in 110 pages.
D. Thompson et al., "Pulse Oximeter Improvement with an ADC-DAC Feedback Loop and a Radical Reflectance Sensor," Proceedings of the 28th IEEE EMBS Annual International Conference, 2006, pp. 815-818.
Service Manual: NPB-40 Handheld Pulse Oximeter, Nellcor Puritan Bennett, Inc., Copyright 2001, 55 pages.
J. Bronzino et al., Tthe Biomedical Engineering Handbook, Second Edition, CRC Press LLC, 2000, 21 pages.
J. Bronzino et al., Medical Devices and Systems, The Biomedical Engineering Handbook, Third Edition, Taylor & Francis Group, LLC, Apr. 2006, 20 pages.
J. Webster et al., Nanoparticles—Radiotherapy Accessories, Encyclopedia of Medical Devices and Instrumentation, Second Edition, vol. 5, Wiley-Interscience, 2006, 42 pages.
S. LeGare et al., "A Device to Assess the Severity of Peripheral Edema," IEEE 33rd Annual Northeast Bioengineering Conference, 2007, pp. 257-258.
M. Corcoran et al., "A Humidifier for Olfaction Studies During Functional Magnetic Resonance Imaging," Proceedings of the IEEE 31st Annual Northeast Bioengineering Conference, 2005, pp. 1-2.

Y. Mendelson et al., "A Multiwavelength VIS-NIR Spectrometer for Pulsatile Measurement of Hemoglobin Derivatives in Whole Blood," 18th Annual International Conference of the IEEE Engineering in Medicine and Biology Society, 1996, pp. 134-135.
H. DiSpirito et al., "A Neural Stimulation System Model to Enhance Neural Integrated Circuit Design," 29th Southern Biomedical Engineering Conference, 2013, pp. 9-10.
D. Sen et al., "A New Vision for Preventing Pressure Ulcers: Wearable Wireless Devices Could Help Solve a Common-and Serious-Problem," IEEE Pulse, vol. 9, No. 6, Nov. 2018, pp. 28-31.
N. Selvaraj et al., "A Novel Approach Using Time—Frequency Analysis of Pulse-Oximeter Data to Detect Progressive Hypovolemia in Spontaneously Breathing Healthy Subjects," IEEE Transactions on Biomedical Engineering, vol. 58, No. 8, Aug. 2011, pp. 2272-2279.
S. Salehizadeh et al., "A Novel Time-Varying Spectral Filtering Algorithm for Reconstruction of Motion Artifact Corrupted Heart Rate Signals During Intense Physical Activities Using a Wearable Photoplethysmogram Sensor," Sensors 2016, vol. 16, No. 1, Dec. 2015, pp. 1-20.
A. Gendler et al., "A PAB-Based Multi-Prefetcher Mechanism," International Journal of Parallel Programming, vol. 34, No. 2, Apr. 2006, pp. 171-188.
J. Harvey et al., "A Portable Sensor for Skin Bioimpedance Measurements," International Journal of Sensors and Sensor Networks, vol. 7, No. 1, Aug. 2019, pp. 1-8.
D. Traviglia et al., "A Portable Setup for Comparing Transmittance and Reflectance Pulse Oximeters for Field Testing Applications," Proceedings of the IEEE 30th Annual Northeast Bioengineering Conference, 2004, pp. 212-213.
S. Xie et al., "A Predictive Model for Force-Sensing Resistor Nonlinearity for Pressure Measurement in a Wearable Wireless Sensor Patch," IEEE 61st International Midwest Symposium on Circuits and Systems, 2018, pp. 476-479.
P. Muller et al., "A Preliminary In-Vitro Evaluation and Comparative Study of Various Tissue pH Sensors," Proceedings of the 18th IEEE Annual Northeast Bioengineering Conference, 1992, pp. 158-159.
D. Dao et al., "A Robust Motion Artifact Detection Algorithm for Accurate Detection of Heart Rates From Photoplethysmographic Signals Using Time-Frequency Spectral Features," IEEE Journal of Biomedical and Health Informatics, vol. 21, No. 5, Sep. 2017, pp. 1242-1253.
G. Comtois et al., "A Wearable Wireless Reflectance Pulse Oximeter for Remote Triage Applications," Proceedings of the IEEE 32nd Annual Northeast Bioengineering Conference, 2006, pp. 53-54.
S. Djamasbi et al., "Affect Feedback during Crisis and Its Role in Improving IS Utilization," Proceedings of the 7th International Conference on Information Systems for Crisis Response and Management (ISCRAM), 2010, pp. 1-4.
B. Odegard et al., "An Analysis of Racewalking Styles Using a 2-Dimensional Mathematical Knee Model," Proceedings of the IEEE 23rd Northeast Bioengineering Conference, 1997, pp. 73-74.
S. Patrick et al., "An Electromyogram Simulator for Myoelectric Prosthesis Testing," Proceedings of the IEEE 36th Annual Northeast Bioengineering Conference, 2010, pp. 1-2.
Y. Mendelson et al., "An In Vitro Tissue Model for Evaluating the Effect of Carboxyhemoglobin Concentration on Pulse Oximetry," IEEE Transactions on Biomedical Engineering, vol. 36, No. 6, Jun. 1989, pp. 625-627.
C. Tamanaha et al., "An Inorganic Membrane Filter to Support Biomembrane-Mimetic Structures," Proceedings of 17th International Conference of the Engineering in Medicine and Biology Society, Sep. 1995, pp. 1559-1560.
A. Lader et al., "An Investigative Study of Membrane-Based Biosensors," Proceedings of the IEEE 17th Annual Northeast Bio-engineering Conference, 1991, pp. 253-254.
N. Reljin et al., "Automatic Detection of Dehydration using Support Vector Machines," 14th Symposium on Neural Networks and Applications (NEUREL), Nov. 2018, pp. 1-6.
Y. Mendelson et al., Chapter 9: Biomedical Sensors, Introduction to Biomedical Engineering, Second Edition, Apr. 2005, pp. 505-548.

# US 10,912,502 B2

Page 18

(56)                **References Cited**

OTHER PUBLICATIONS

R. Peura et al, "Biotechnology for Biomedical Engineers," IEEE Engineering in Medicine and Biology, vol. 14, No. 2, Apr. 1995, pp. 199-200.

Y. Mendelson et al., "Blood Glucose Measurement by Multiple Attenuated Total Reflection and Infrared Absorption Spectroscopy," IEEE Transactions on Biomedical Engineering, vol. 37, No. 5, May 1990, pp. 458-465.

Y. Mendelson et al., "Carbon dioxide laser based multiple ATR technique for measuring glucose in aqueous solutions," Applied Optics, vol. 27, No. 24, Dec. 1988, pp. 5077-5081.

J. Harvey et al., "Correlation of bioimpedance changes after compressive loading of murine tissues in vivo," Physiological Measurement, vol. 40, No. 10, Oct. 2019, pp. 1-13.

B. Yocum et al., "Design of a Reflectance Pulse Oximeter Sensor and its Evaluation in Swine," Proceedings of the 15th Annual Northeast Bioengineering Conference, IEEE, 1989, pp. 239-240.

E. Tuite et al., "Design of Individual Balance Control Device Utilized during the Sit-to-Stand Task," ISB 2011 Brussels, 2011, pp. 1-2.

C. E. Darling et al., "Detecting Blood Loss With a Wearable Photoplethysmography Device," Annals of Emergency Medicine, vol. 68, No. 45, Oct. 2016, p. S116.

N. Reljin et al., "Detection of Blood Loss in Trauma Patients using Time-Frequency Analysis of Photoplethysmographic Signal," IEEE-EMBS International Conference on Biomedical and Health Informatics (BHI), 2016, pp. 118-121.

Y. Xu et al., "Drowsiness Control Center by Photoplethysmogram," 38th Annual Northeast Bioengineering Conference (NECBEC), IEEE, 2012, pp. 430-431.

M. Last et al., Chapter 14: Early Warning from Car Warranty Data using a Fuzzy Logic Technique, Scalable Fuzzy Algorithms for Data Management and Analysis: Methods and Design, 2009, pp. 347-364.

W. Johnston et al., "Effects of Motion Artifacts on Helmet-Mounted Pulse Oximeter Sensors," Proceedings of the IEEE 30th Annual Northeast Bioengineering Conference, 2014, pp. 214-215.

A. Nagre et al., "Effects of Motion Artifacts on Pulse Oximeter Readings from Different Facial Regions," Proceedings of the IEEE 31st Annual Northeast Bioengineering Conference, 2005, pp. 1-3.

R. Kasbekar et al., "Evaluation of key design parameters for mitigating motion artefact in the mobile reflectance PPG signal to improve estimation of arterial oxygenation," Physiological Measurement, vol. 39, No. 7, Jul. 2018, pp. 1-12.

Y. Mendelson et al., "Evaluation of the Datascope ACCUSAT Pulse Oximeter in Healthy Adults," Journal of Clinical Monitoring, vol. 4, No. 1, Jan. 1988, pp. 59-63.

C. Tamanaha et al., "Feasibility Study of an Inorganic Membrane Filter as a Support for Biomembrane-Mimetic Structures," Proceedings of the IEEE 21st Annual Northeast Bioengineering Conference, 1995, pp. 99-101.

J. McNeill et al., "Flexible Sensor for Measurement of Skin Pressure and Temperature in a Clinical Setting," 2016 IEEE Sensors, Nov. 2016, pp. 1-3.

P. Bhandare et al., "Glucose determination in simulated blood serum solutions by Fourier transforms infrared spectroscopy: investigation of spectral interferences," Vibrational Spectroscopy, vol. 6, No. 3, Mar. 1994, pp. 363-378.

P. Bhandare et al. "Glucose Determination in Simulated Plasma Solutions Using Infrared Spectrophotometry," 14th Annual International Conference of the IEEE Engineering in Medicine and Biology Society, Nov. 1992, pp. 163-164.

C. Tamanaha et al., "Humidity and Cation Dependency of Purple Membrane Based Biosensors," Proceedings of the 18th IEEE Annual Northeast Bioengineering Conference, Mar. 1992, pp. 107-108.

K. M. Warren et al., "Improving Pulse Rate Measurements during Random Motion Using a Wearable Multichannel Reflectance Photoplethysmograph," Sensors (Basel), vol. 16, No. 3, Mar. 2016, p. 1-18.

P. Bhandare et al., "IR Spectrophotometric Measurement of Glucose in Phosphate Buffered Saline Solutions: Effects of Temperature and pH," Proceedings of the 18th IEEE Annual Northeast Bioengineering Conference, 1992, pp. 103-104.

Y. Mendelson et al., "Multi-channel pulse oximetry for wearable physiological monitoring," IEEE International Conference on Body Sensor Networks, 2013, pp. 1-6.

P. Bhandare et al., "Multivariate Determination of Glucose in Whole Blood Using Partial Least-Squares and Artificial Neural Networks Based on Mid-Infrared Spectroscopy," Society for Applied Spectroscopy, vol. 47, No. 8, 1993, pp. 1214-1221.

E. Morillo et al., "Multiwavelength Transmission Spectrophotometry in the Pulsatile Measurement of Hemoglobin Derivatives in Whole Blood," Proceedings of the IEEE 23rd Northeast Bioengineering Conference, 1997, pp. 5-6.

P. Bhandare et al., "Neural Network Based Spectral Analysis of Multicomponent Mixtures for Glucose Determination," Proceedings of the IEEE, 17th Annual Northeast Bioengineering Conference, 1991, pp. 249-250.

Y. Mendelson et al., "Noninvasive Transcutaneous Monitoring of Arterial Blood Gases," IEEE Transactions on Biomedical Engineering, vol. BME-31, No. 12, Dec. 1984, pp. 792-800.

J. Harvey et al., "OxiMA: A Frequency-Domain Approach to Address Motion Artifacts in Photoplethysmograms for Improved Estimation of Arterial Oxygen Saturation and Pulse Rate," IEEE Transactions on Biomedical Engineering, vol. 66, No. 2, Feb. 2019, pp. 311-318.

J. Chong et al., "Photoplethysmograph Signal Reconstruction Based on a Novel Hybrid Motion Artifact Detection—Reduction Approach. Part I: Motion and Noise Artifact Detection," Annals of Biomedical Engineering, vol. 42, No. 11, Nov. 2014, pp. 2238-2250.

S. M. A. Salehizadeh et al., "Photoplethysmograph Signal Reconstruction based on a Novel Motion Artifact Detection-Reduction Approach. Part II: Motion and Noise Artifact Removal," Annals of Biomedical Engineering, vol. 42, May 2014, pp. 2251-2263.

C. G. Scully et al., "Physiological Parameter Monitoring from Optical Recordings With a Mobile Phone," IEEE Transactions on Biomedical Engineering, vol. 59, No. 2, Feb. 2012, pp. 303-306.

D. Sen et al., "Pressure Ulcer Prevention System: Validation in a Clinical Setting," IEEE Life Sciences Conference (LSC), 2018, pp. 105-108.

Y. Mendelson et al., Pulse Oximetry: Theory and Applications for Noninvasive Monitoring, Clinical Chemistry, vol. 38, No. 9, 1992, pp. 1601-1607.

Y. Mendelson, Pulse Oximetry, PowerPoint, UMass Center for Clinical and Translational Science Research Retreat, 2017, 22 pages.

E. Stohr et al., "Quantitative FT-IR Spectrometry of Blood Constituents," 14th Annual International Conference of the IEEE Engineering in Medicine and Biology Society, 1992, pp. 173-174.

E. Stohr et al., "Quantitative FTIR Spectrophotometry of Cholesterol and Other Blood Constituents and their Interference with the In-Vitro Measurement of Blood Glucose," Proceedings of the 18th IEEE Annual Northeast Bioengineering Conference, 1992, pp. 105-106.

N. Selvaraj et al., "Statistical Approach for the Detection of Motion/Noise Artifacts in Photoplethysmogram," 33rd Annual International Conference of the IEEE EMBS, Sep. 2011, pp. 4972-4975.

C. Tamanaha et al., "Surface Modification of $\gamma$-$Al_2O_3$ Filters by Chemisorption of Alkyltrichlorosilane Molecules," 18th Annual International Conference of the IEEE Engineering in Medicine and Biology Society, 1996, pp. 2069-2070.

D. Sen et al., "Time-Domain-Based Measurement Technique for Pressure Measurement in a Wearable Wireless Sensor Patch," IEEE International Symposium on Circuits and Systems (ISCAS), 2018, pp. 1-5.

N. Reljin et al., "Using support vector machines on photoplethysmographic signals to discriminate between hypovolemia and euvolemia," PLoS One, vol. 13, No. 3, Mar. 2018, pp. 1-14.

Y. Mendelson et al., "Variations in Optical Absorption Spectra of Adult and Fetal Hemoglobins and Its Effect on Pulse Oximetry," IEEE Transactions on Biomedical Engineering, vol. 36, No. 8, Aug. 1989, pp. 844-848.

# US 10,912,502 B2

Page 19

## (56) References Cited

### OTHER PUBLICATIONS

K. Chon et al., "Wearable Wireless Sensor for Multi-Scale Physiological Monitoring," Worcester Polytechnic Institute, Oct. 2014, 82 pages.

K. Chon et al., "Wearable Wireless Sensor for Multi-Scale Physiological Monitoring," Worcester Polytechnic Institute, Oct. 2015, 142 pages.

J. McNeill et al., "Wearable Wireless Sensor Patch for Continuous Monitoring of Skin Temperature, Pressure, and Relative Humidity," IEEE International Symposium on Circuits and Systems (ISCAS), 2017, pp. 1-4.

D. Sen et al., "Wireless Sensor Patch Suitable for Continuous Monitoring of Contact Pressure in a Clinical Setting," 16th IEEE International New Circuits and Systems Conference (NEWCAS), 2018, pp. 91-95.

K. Hickle et al., "Wireless Pressure Ulcer Sensor," Annals of Plastic Surgery, vol. 82, Supplement 3, Apr. 2019, pp. S215-S221.

Y. Mendelson, et al., "Design and Evaluation of a New Reflectance Pulse Oximeter Sensor", Worcester Polytechnic Institute, Biomedical Engineering Program, Worcester, MA 01609, Association for the Advancement of Medical Instrumentation, vol. 22, No. 4, 1988, pp. 167-173.

Definition of "gap", excerpt from Merriam-Webster's Collegiate Dictionary (11th ed.), 2005, 3 pages.

"Acrylic: Strong, stiff, clear plastic available in variety of brilliant colors", Copyright 2020. available at http://www.curbellplastics.com/Research-Solutions/Materials/Acrylic, 5 pages.

QuickSpecs, Version 3, Nov. 20, 2003, HP iPAQ Pocket PC h4150 Series, 8 pages.

"Universal asynchronous receiver-transmitter", Wikipedia, available at https://en.wikipedia.org/wiki/Universal_asynchronous_receiver-transmitter, accessed Aug. 27, 2020, 10 pages.

Y. Mendelson, et al., "Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf", Journal of Clinical Monitoring, vol. 7, No. 1, Jan. 1991, pp. 7-12.

Design of Pulse Oximeters, J.G. Webster, Institution of Physics Publishing Ltd, 1997, 262 pages (uploaded in three parts).

McPherson, "How to Do Everything with Windows Mobile", McGraw Hill, 2006, 431 pages (uploaded in three parts).

B. Landon et al., "Master Visually Windows Mobile 2003", Wiley Publishing, Inc., 2004, 335 pages (uploaded in two parts).

J. Yao, et al., "Stimulating Student Learning with a Novel 'In-House' Pulse Oximeter Design", Proceedings of the 2005 American Society for Engineering Education Annual Conference & Exposition, 2005, 14 pages.

National Instruments LabVIEW User Manual, National Instruments Corporation, Nov. 2001 Edition, Part No. 320999D-01, 293 pages.

Definition of "processor", excerpt from Merriam-Webster's Collegiate Dictionary (10th ed.), 1999, 6 pages.

Y. Mendelson et al., "Noninvasive Pulse Oximetry Utilizing Skin Reflectance Photoplethysmography", IEEE Transactions on Biomedical Engineering, vol. 35, No. 10, Oct. 1988, pp. 798-805.

Oct. 20, 2020 Letter from B. K. Andrea to J. Re et al., Re: *Masimo Corp, et al. v. Apple, Inc.*, C.A. 8:20-cv-00048 (C.D. Cal.), 19 pages.

3 pages of images, identified by bates Nos. "APL-MAS_00057600", "APL-MAS_00057601", and "APL-MAS_00057602".

2 pages of images, identified by bates Nos. "APL-MAS_00057598" and "APL-MAS_00057599". Undated.

Y. Mendelson et al., A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring, PowerPoint, The Bioengineering Institute, Worcester Polytechnic Institute, 18 pages. Undated.

P. C. Branche et al., "A Wearable Wireless Reflectance Pulse Oximeter with Automatic and Remote On-Demand Activation," Annual Fall Meeting of the BMES, 2004, p. 1.

A Wireless Wearable Reflectance Pulse Oximeter Printout, The Bioengineering Institute, Worcester Polytechnic Institute, 1 page. Undated.

Y. Mendelson et al., A Wireless Wearable Reflectance-Based Forehead Pulse Oximeter, PowerPoint, The Bioengineering Institute, Worcester Polytechnic Institute, 8 pages. Undated.

R. J. Duckworth et al., Field Testing of a Wireless Wearable Reflectance Pulse Oximeter Printout, Department of Electrical and Computer Engineering and Department of Biomedical Engineering, Worcester Polytechnic Institute, 1 page. Undated.

V. Floroff, "PDA Interface for the WPI Wireless Physiological Monitor," Directed research, Department of Biomedical Engineering, Worcester Polytechnic Institute, Mar. 2006, 42 pages.

Wireless Wearable Reflectance Pulse Oximeter, PowerPoint, The Bioengineering Institute, Worcester Polytechnic Institute, TATRC, 10 pages. Undated.

V. Floroff, "Remote Pulse Oximetry: The wireless side of the TATRC project." Thesis, Worcester Polytechnic Institute, Feb. 2005, pp. 1-20.

Y. Mendelson et al., "The Feasibility of Measuring SpO₂ from the Head Using a Reflectance Pulse Oximeter: Effect of Motion Artifacts," Proceeding of the 3rd European Medical & Biological Engineering Conference, 2005, 5 pages.

Y. Mendelson, "Wearable, Wireless, Noninvasive Physiological Sensing," The Bioengineering Institute, Worcester Polytechnic Institute, 2005, 2 pages.

Y. Mendelson et al., "Wireless Reflectance Pulse Oximetry for Remote Triage Application," Worcester Polytechnic Institute, 1 page. Undated.

Nov. 12, 2020 Third Amended Complaint for (1) Patent Infringement (2) Trade Secret Misappropriation (3) Correction of Inventorship and (4) Ownership of Patents and Demand for Jury Trial, and including Exhibit 1,*Masimo Corporation and Cercacor Laboratories, Inc. v. Apple Inc.*, Case No. 8:20-cv-00048, 196 pages. [uploaded in 2 parts].

K. Self, Application Note 78—Using Power Management with High-Speed Microcontrollers, Maxim Integrated Products, Inc., Mar. 29, 2001, 25 pages.

Service Manual: Nellcor Symphony N-3000 Pulse Oximeter, Nellcor Puritan Bennett, Inc., Copyright 1996, 110 pages.

Home Use Guide: Nellcor Symphony N-3000 Pulse Oximeter, Nellcor Puritan Bennett, Inc., Copyright 1996, 50 pages.

Operator's Manual: Nellcor N-200 Pulse Oximeter, Nellcor Incorporated, Copyright 2003, 96 pages.

S. Kastle et al., "A New Family of Sensors for Pulse Oximetry," Hewlett-Packard Journal, Article 7, Feb. 1997, pp. 1-17.

M. Nogawa et al., "A Novel Hybrid Reflectance Pulse Oximeter Sensor with Improved Linearity and General Applicability to Various Portions of the Body," Proceedings of the 20th Annual International Conference of the IEEE Engineering in Medicine and Biology Society, vol. 20, No. 4, 1998, pp. 1858-1861.

J. Hodby, "A ratio-measuring detection system for use in pulsed spectroscopic measurements," Journal of Physics E: Scientific Instruments, vol. 3, 1970, pp. 229-233.

K. Li et al., "A Wireless Reflectance Pulse Oximeter with Digital Baseline Control for Unfiltered Photoplethysmograms," IEEE Transactions on Biomedical Circuits and Systems, Nov. 2011, pp. 1-11.

D. Thompson et al., "A Small, High-Fidelity Reflectance Pulse Oximeter," American Society for Engineering Education, 2007, 14 pages.

K. Li et al., "A High-Performance Wireless Reflectance Pulse Oximeter for Photo-Plethysmogram Acquisition and Analysis in the Classroom," American Society for Engineering Education, 2010, 12 pages.

M. J. Hayes, "Artefact Reduction in Photoplethysmography," Doctoral thesis, Department of Electronic and Electrical Engineering, Loughborough University, Nov. 1998, 195 pages. (uploaded in 2 parts).

A. C. M. Dassel et al., "Effect of location of the sensor on reflectance pulse oximetry," British Journal of Obstetrics and Gynaecology, vol. 104, Aug. 1997, pp. 910-916.

RF Cafe, Electronic Warfare and Radar Systems Engineering Handbook, Duty Cycle, available at https://www.rfcafe.com/references/electrical/ew-radar-handbook/duty-cycle.htm, retrieved Jul. 11, 2020, 3 pages.

# US 10,912,502 B2

Page 20

(56)            **References Cited**

OTHER PUBLICATIONS

Y. Shimada et al., "Evaluation of a new reflectance pulse oximeter for clinical applications," Medical & Biological Engineering & Computing, vol. 29, No. 5, Sep. 1991, pp. 557-561.
S. Takatani et al., "Experimental and Clinical Evaluation of a Noninvasive Reflectance Pulse Oximeter Sensor," Journal of Clinical Monitoring, vol. 8, No. 4, Oct. 1992, pp. 257-266.
K. Ono et al., "Fiber optic reflectance spectrophotometry system for in vivo tissue diagnosis," Applied Optics, vol. 30, No. 1, Jan. 1991, pp. 98-105.
M. Barr, "Introduction to Pulse Width Modulation (PWM)," Barr Group, Embedded Systems Programming, Sep. 2001, pp. 1-3.
P. P. Vaidyanathan, "Multirate Digital Filters, Filter Banks, Polyphase Networks, and Applications: A Tutorial," Proceedings of the IEEE, vol. 78, No. 1, Jan. 1990, pp. 56-93.
S. Oshima et al., "Optical Measurement of Blood Hematocrit on Medical Tubing with Dual Wavelength and Detector Model," 31st Annual International Conference of the IEEE EMBS, Sep. 2009, pp. 5891-5896.
Optoelectronics, Data Book 1990, Siemens Components, Inc., 770 pages. (uploaded in 7 parts).
OxiplexTS Near Infrared, Non-Invasive, Tissue Spectrometer Brochure, ISS, Inc., Copyright 2001, 6 pages.
J. A. Pologe, "Pulse Oximetry: Technical Aspects of Machine Design," International Anesthesiology Clinics, vol. 25, No. 3, 1987, pp. 137-153.
B. F. Koegh et al., "Recent findings in the use of reflectance oximetry: a critical review," Current Opinion in Anaesthesiology, vol. 18, 2005, pp. 649-654.
K. Faisst et al., "Reflectance pulse oximetry in neonates," European Journal of Obstetrics & Gynecology and Reproductive Biology, vol. 61, No. 2, Aug. 1995, pp. 117-122.
V. Konig et al., "Reflexions-Pulsoximetrie—Untersuchungen mit eigenem Mess-System," Biomedical Engineering, Biomedizinische Technik, vol. 37. No. s2, 1992, pp. 39-40.
Petition for Inter Partes Review of U.S. Pat. No. 10,299,708, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00193, dated Nov. 20, 2020, in 107 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,299,708, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00193, dated Nov. 20, 2020, in 136 pages.
Petition for Inter Partes Review of U.S. Pat. No. 10,376,190, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00195, dated Nov. 20, 2020, in 109 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,376,190, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00195, dated Nov. 20, 2020, in 139 pages.
Petition for Inter Partes Review of U.S. Pat. No. 10,258,266, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00208, dated Nov. 20, 2020, in 80 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,258,266, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00208, dated Nov. 20, 2020, in 96 pages.
Petition for Inter Partes Review of U.S. Pat. No. 10,376,191, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00209, dated Nov. 20, 2020, in 79 pages.
Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,376,191, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00209, dated Nov. 20, 2020, in 96 pages.
J. Schmitt et al., "An Integrated Circuit-Based Optical Sensor for In Vivo Measurement of Blood Oxygenation," IEEE Transactions on Biomedical Engineering, vol. BME-33, No. 2, Feb. 1986, pp. 98-107.
C. Gutierrez et al, "Non-Invasive Functional Mapping of the Brain Using Cerebral Oximeter," Proceedings of the Second Joint EMBS/BMES Conference, Oct. 2002, pp. 947-948.
R. Gupta et al., "Design and Development of Pulse Oximeter," Proceedings RC IEEE-EMBS & 14th BMESI, 1995, pp. 1.13-1.16.
S. Duun et al., "A Novel Ring Shaped Photodiode for Reflectance Pulse Oximetry in Wireless Applications," IEEE Sensors Conference, 2007, pp. 596-599.

* cited by examiner



FIG. 1



**FIG. 2A**



FIG. 2B

SENSOR
201b

CABLE
212

MONITOR
209b

DISPLAY
210a

CONTROL
BUTTONS
208b

200B

205
Hi
130
Avg
50
Low

120
mg/dL

TEST



FIG. 2C



FIG. 2D



FIG. 3A



FIG. 3B



**FIG. 3C**



# FIG. 3D



**FIG. 3E**



FIG. 3F



## FIG. 4A



## FIG. 4B

## FIG. 4C



FIG. 5



## FIG. 6A



## FIG. 6B



## FIG. 6C

## FIG. 6D



FIG. 6E



**FIG. 7A**



**FIG. 7B**



FIG. 8A

FIG. 8B

FIG. 8C



FIG. 8D



**FIG. 9**



FIG. 10A



FIG. 10B



FIG. 11A



# FIG. 11B



FIG. 11C



FIG. 11D

SUBSTRATE 1108

TOP EMITTING LEDS 1102

THERMISTOR 1120



## FIG. 12A



FIG. 12B



# FIG. 12C



# FIG. 12D



**FIG. 12E**



## FIG. 12F



**FIG. 12G**



**FIG. 12H**



**FIG. 13**



## FIG. 14A



## FIG. 14B



**FIG. 14C**



## FIG. 14D

Stay-Add-724



FIG. 14E



## FIG. 14F



**FIG. 14G**



**FIG. 14H**



FIG. 14I



**FIG. 15A**



FIG. 15B



FIG. 15C



FIG. 15D



FIG. 15E



FIG. 15F



**FIG. 15G**



**FIG. 15H**



FIG. 15I



# FIG. 15J



FIG. 15J (CONT.)



4 PD PER STREAM ARCHITECTURE



1 PD PER STREAM ARCHITECTURE

# FIG. 15K



FIG. 15K (CONT.)



FIG. 15K (CONT.)



FIG. 15L





FIG. 17



**FIG. 18**



FIG. 19



**FIG. 20**

**FIG. 21**



## FIG. 22

US 10,912,502 B2

1

## USER-WORN DEVICE FOR NONINVASIVELY MEASURING A PHYSIOLOGICAL PARAMETER OF A USER

### RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/834,538, filed Mar. 30, 2020, which is a continuation of U.S. patent application Ser. No. 16/725,292, filed Dec. 23, 2019, which is a continuation of U.S. patent application Ser. No. 16/534,949, filed Aug. 7, 2019, which is a continuation of U.S. patent application Ser. No. 16/409, 515, filed May 10, 2019, which is a continuation of U.S. patent application Ser. No. 16/261,326, filed Jan. 29, 2019, which is a continuation of U.S. patent application Ser. No. 16/212,537, filed Dec. 6, 2018, which is a continuation of U.S. patent application Ser. No. 14/981,290 filed Dec. 28, 2015, which is a continuation of U.S. patent application Ser. No. 12/829,352 filed Jul. 1, 2010, which is a continuation of U.S. patent application Ser. No. 12/534,827 filed Aug. 3, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed Aug. 4, 2008, 61/086,108 filed Aug. 4, 2008, 61/086,063 filed Aug. 4, 2008, 61/086,057 filed Aug. 4, 2008, and 61/091,732 filed Aug. 25, 2008. U.S. patent application Ser. No. 12/829,352 is also a continuation-in-part of U.S. patent application Ser. No. 12/497,528 filed Jul. 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed Aug. 4, 2008, 61/086,108 filed Aug. 4, 2008, 61/086,063 filed Aug. 4, 2008, 61/086, 057 filed Aug. 4, 2008, 61/078,228 filed Jul. 3, 2008, 61/078,207 filed Jul. 3, 2008, and 61/091,732 filed Aug. 25, 2008. U.S. patent application Ser. No. 12/497,528 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design patent application Ser. No. 29/323,409 filed Aug. 25, 2008 and Ser. No. 29/323,408 filed Aug. 25, 2008. U.S. patent application Ser. No. 12/829,352 is also a continuation-in-part of U.S. patent application Ser. No. 12/497,523 filed Jul. 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed Aug. 4, 2008, 61/086,108 filed Aug. 4, 2008, 61/086,063 filed Aug. 4, 2008, 61/086,057 filed Aug. 4, 2008, 61/078,228 filed Jul. 3, 2008, 61/078,207 filed Jul. 3, 2008, and 61/091,732 filed Aug. 25, 2008. U.S. patent application Ser. No. 12/497,523 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design patent application Ser. No. 29/323,409 filed Aug. 25, 2008 and Ser. No. 29/323,408 filed Aug. 25, 2008.

This application is related to the following U.S. patent applications:

| App. No. | Filing Date | Title |
|---|---|---|
| 12/497,528 | Jul. 2, 2009 | Noise Shielding for Noninvasive Device |
| 12/497,523 | Jul. 2, 2009 | Contoured Protrusion for Improving Spectroscopic Measurement of Blood Constituents |
| 12/497,506 | Jul. 2, 2009 | Heat Sink for Noninvasive Medical Sensor |
| 12/534,812 | Aug. 3, 2009 | Multi-Stream Sensor Front Ends for Non-Invasive Measurement of Blood Constituents |

2

-continued

| App. No. | Filing Date | Title |
|---|---|---|
| 12/534,823 | Aug. 3, 2009 | Multi-Stream Sensor for Non-Invasive Measurement of Blood Constituents |
| 12/534,825 | Aug. 3, 2009 | Multi-Stream Emitter for Non-Invasive Measurement of Blood Constituents |

The foregoing applications are hereby incorporated by reference in their entirety.

### BACKGROUND

The standard of care in caregiver environments includes patient monitoring through spectroscopic analysis using, for example, a pulse oximeter. Devices capable of spectroscopic analysis generally include a light source(s) transmitting optical radiation into or reflecting off a measurement site, such as, body tissue carrying pulsing blood. After attenuation by tissue and fluids of the measurement site, a photo-detection device(s) detects the attenuated light and outputs a detector signal(s) responsive to the detected attenuated light. A signal processing device(s) process the detector(s) signal (s) and outputs a measurement indicative of a blood constituent of interest, such as glucose, oxygen, met hemoglobin, total hemoglobin, other physiological parameters, or other data or combinations of data useful in determining a state or trend of wellness of a patient.

In noninvasive devices and methods, a sensor is often adapted to position a finger proximate the light source and light detector. For example, noninvasive sensors often include a clothespin-shaped housing that includes a contoured bed conforming generally to the shape of a finger.

### SUMMARY

This disclosure describes embodiments of noninvasive methods, devices, and systems for measuring a blood constituent or analyte, such as oxygen, carbon monoxide, methemoglobin, total hemoglobin, glucose, proteins, glucose, lipids, a percentage thereof (e.g., saturation) or for measuring many other physiologically relevant parameter characteristics. These characteristics can relate, for example, to pulse rate, hydration, trending information and analysis, and the like.

In an embodiment, the system includes a noninvasive sensor and a patient monitor communicating with the non-invasive sensor. The non-invasive sensor may include different architectures to implement some or all of the disclosed features. In addition, an artisan will recognize that the non-invasive sensor may include or may be coupled to other components, such as a network interface, and the like. Moreover, the patient monitor may include a display device, a network interface communicating with any one or combination of a computer network, a handheld computing device, a mobile phone, the Internet, or the like. In addition, embodiments may include multiple optical sources that emit light at a plurality of wavelengths and that are arranged from the perspective of the light detector(s) as a point source.

In an embodiment, a noninvasive device is capable of producing a signal responsive to light attenuated by tissue at a measurement site. The device may comprise an optical source and a plurality of photodetectors. The optical source is configured to emit optical radiation at least at wavelengths between about 1600 nm and about 1700 nm. The photodetectors are configured to detect the optical radiation from

3

said optical source after attenuation by the tissue of the measurement site and each output a respective signal stream responsive to the detected optical radiation.

In an embodiment, a noninvasive, physiological sensor is capable of outputting a signal responsive to a blood analyte present in a monitored patient. The sensor may comprise a sensor housing, an optical source, and photodetectors. The optical source is positioned by the housing with respect to a tissue site of a patient when said housing is applied to the patient. The photodetectors are positioned by the housing with respect to said tissue site when the housing is applied to the patient with a variation in path length among at least some of the photodetectors from the optical source. The photodetectors are configured to detect a sequence of optical radiation from the optical source after attenuation by tissue of the tissue site. The photodetectors may be each configured to output a respective signal stream responsive to the detected sequence of optical radiation. An output signal responsive to one or more of the signal streams is then usable to determine the blood analyte based at least in part on the variation in path length.

In an embodiment, a method of measuring an analyte based on multiple streams of optical radiation measured from a measurement site is provided. A sequence of optical radiation pulses is emitted to the measurement site. At a first location, a first stream of optical radiation is detected from the measurement site. At least at one additional location different from the first location, an additional stream of optical radiation is detected from the measurement site. An output measurement value indicative of the analyte is then determined based on the detected streams of optical radiation.

In various embodiments, the present disclosure relates to an interface for a noninvasive sensor that comprises a front-end adapted to receive an input signals from optical detectors and provide corresponding output signals. In an embodiment, the front-end is comprised of switched-capacitor circuits that are capable of handling multiple streams of signals from the optical detectors. In another embodiment, the front-end comprises transimpedance amplifiers that are capable of handling multiple streams of input signals. In addition, the transimpedance amplifiers may be configured based on the characteristics of the transimpedance amplifier itself, the characteristics of the photodiodes, and the number of photodiodes coupled to the transimpedance amplifier.

In disclosed embodiments, the front-ends are employed in noninvasive sensors to assist in measuring and detecting various analytes. The disclosed noninvasive sensor may also include, among other things, emitters and detectors positioned to produce multi-stream sensor information. An artisan will recognize that the noninvasive sensor may have different architectures and may include or be coupled to other components, such as a display device, a network interface, and the like. An artisan will also recognize that the front-ends may be employed in any type of noninvasive sensor.

In an embodiment, a front-end interface for a noninvasive, physiological sensor comprises: a set of inputs configured to receive signals from a plurality of detectors in the sensor; a set of transimpedance amplifiers configured to convert the signals from the plurality of detectors into an output signal having a stream for each of the plurality of detectors; and an output configured to provide the output signal.

In an embodiment, a front-end interface for a noninvasive, physiological sensor comprises: a set of inputs configured to receive signals from a plurality of detectors in the sensor; a set of switched capacitor circuits configured to convert the

4

signals from the plurality of detectors into a digital output signal having a stream for each of the plurality of detectors; and an output configured to provide the digital output signal.

In an embodiment, a conversion processor for a physiological, noninvasive sensor comprises: a multi-stream input configured to receive signals from a plurality of detectors in the sensor, wherein the signals are responsive to optical radiation from a tissue site; a modulator that converts the multi-stream input into a digital bit-stream; and a signal processor that produces an output signal from the digital bit-stream.

In an embodiment, a front-end interface for a noninvasive, physiological sensor comprises: a set of inputs configured to receive signals from a plurality of detectors in the sensor; a set of respective transimpedance amplifiers for each detector configured to convert the signals from the plurality of detectors into an output signal having a stream for each of the plurality of detectors; and an output configured to provide the output signal.

In certain embodiments, a noninvasive sensor interfaces with tissue at a measurement site and deforms the tissue in a way that increases signal gain in certain desired wavelengths.

In some embodiments, a detector for the sensor may comprise a set of photodiodes that are arranged in a spatial configuration. This spatial configuration may allow, for example, signal analysis for measuring analytes like glucose. In various embodiments, the detectors can be arranged across multiple locations in a spatial configuration. The spatial configuration provides a geometry having a diversity of path lengths among the detectors. For example, the detector in the sensor may comprise multiple detectors that are arranged to have a sufficient difference in mean path length to allow for noise cancellation and noise reduction.

In an embodiment, a physiological, noninvasive detector is configured to detect optical radiation from a tissue site. The detector comprises a set of photodetectors and a conversion processor. The set of photodetectors each provide a signal stream indicating optical radiation from the tissue site. The set of photodetectors are arranged in a spatial configuration that provides a variation in path lengths between at least some of the photodetectors. The conversion processor that provides information indicating an analyte in the tissue site based on ratios of pairs of the signal streams.

The present disclosure, according to various embodiments, relates to noninvasive methods, devices, and systems for measuring a blood analyte, such as glucose. In the present disclosure, blood analytes are measured noninvasively based on multi-stream infrared and near-infrared spectroscopy. In some embodiments, an emitter may include one or more sources that are configured as a point optical source. In addition, the emitter may be operated in a manner that allows for the measurement of an analyte like glucose. In embodiments, the emitter may comprise a plurality of LEDs that emit a sequence of pulses of optical radiation across a spectrum of wavelengths. In addition, in order to achieve the desired SNR for detecting analytes like glucose, the emitter may be driven using a progression from low power to higher power. The emitter may also have its duty cycle modified to achieve a desired SNR.

In an embodiment, a multi-stream emitter for a noninvasive, physiological device configured to transmit optical radiation in a tissue site comprises: a set of optical sources arranged as a point optical source; and a driver configured to drive the at least one light emitting diode and at least one optical source to transmit near-infrared optical radiation at

US 10,912,502 B2

5

sufficient power to measure an analyte in tissue that responds to near-infrared optical radiation.

In an embodiment, an emitter for a noninvasive, physiological device configured to transmit optical radiation in a tissue site comprises: a point optical source comprising an optical source configured to transmit infrared and near-infrared optical radiation to a tissue site; and a driver configured to drive the point optical source at a sufficient power and noise tolerance to effectively provide attenuated optical radiation from a tissue site that indicates an amount of glucose in the tissue site.

In an embodiment, a method of transmitting a stream of pulses of optical radiation in a tissue site is provided. At least one pulse of infrared optical radiation having a first pulse width is transmitted at a first power. At least one pulse of near-infrared optical radiation is transmitted at a power that is higher than the first power.

In an embodiment, a method of transmitting a stream of pulses of optical radiation in a tissue site is provided. At least one pulse of infrared optical radiation having a first pulse width is transmitted at a first power. At least one pulse of near-infrared optical radiation is then transmitted, at a second power that is higher than the first power.

For purposes of summarizing the disclosure, certain aspects, advantages and novel features of the inventions have been described herein. It is to be understood that not necessarily all such advantages can be achieved in accordance with any particular embodiment of the inventions disclosed herein. Thus, the inventions disclosed herein can be embodied or carried out in a manner that achieves or optimizes one advantage or group of advantages as taught herein without necessarily achieving other advantages as can be taught or suggested herein.

## BRIEF DESCRIPTION OF THE DRAWINGS

Throughout the drawings, reference numbers can be re-used to indicate correspondence between referenced elements. The drawings are provided to illustrate embodiments of the inventions described herein and not to limit the scope thereof.

FIG. 1 illustrates a block diagram of an example data collection system capable of noninvasively measuring one or more blood analytes in a monitored patient, according to an embodiment of the disclosure;

FIGS. 2A-2D illustrate an exemplary handheld monitor and an exemplary noninvasive optical sensor of the patient monitoring system of FIG. 1, according to embodiments of the disclosure;

FIGS. 3A-3C illustrate side and perspective views of an exemplary noninvasive sensor housing including a finger bed protrusion and heat sink, according to an embodiment of the disclosure;

FIG. 3D illustrates a side view of another example noninvasive sensor housing including a heat sink, according to an embodiment of the disclosure;

FIG. 3E illustrates a perspective view of an example noninvasive sensor detector shell including example detectors, according to an embodiment of the disclosure;

FIG. 3F illustrates a side view of an example noninvasive sensor housing including a finger bed protrusion and heat sink, according to an embodiment of the disclosure;

FIGS. 4A through 4C illustrate top elevation, side and top perspective views of an example protrusion, according to an embodiment of the disclosure;

6

FIG. 5 illustrates an example graph depicting possible effects of a protrusion on light transmittance, according to an embodiment of the disclosure;

FIGS. 6A through 6D illustrate perspective, front elevation, side and top views of another example protrusion, according to an embodiment of the disclosure;

FIG. 6E illustrates an example sensor incorporating the protrusion of FIGS. 6A through 6D, according to an embodiment of the disclosure;

FIGS. 7A through 7B illustrate example arrangements of conductive glass that may be employed in the system of FIG. 1, according to embodiments of the disclosure;

FIGS. 8A through 8D illustrate an example top elevation view, side views, and a bottom elevation view of the conductive glass that may be employed in the system of FIG. 1, according to embodiments of the disclosure;

FIG. 9 shows example comparative results obtained by an embodiment of a sensor;

FIGS. 10A and 10B illustrate comparative noise floors of various embodiments of the present disclosure;

FIG. 11A illustrates an exemplary emitter that may be employed in the sensor, according to an embodiment of the disclosure;

FIG. 11B illustrates a configuration of emitting optical radiation into a measurement site for measuring blood constituents, according to an embodiment of the disclosure;

FIG. 11C illustrates another exemplary emitter that may be employed in the sensor according to an embodiment of the disclosure;

FIG. 11D illustrates another exemplary emitter that may be employed in the sensor according to an embodiment of the disclosure;

FIG. 12A illustrates an example detector portion that may be employed in an embodiment of a sensor, according to an embodiment of the disclosure;

FIGS. 12B through 12D illustrate exemplary arrangements of detectors that may be employed in an embodiment of the sensor, according to some embodiments of the disclosure;

FIGS. 12E through 12H illustrate exemplary structures of photodiodes that may be employed in embodiments of the detectors, according to some embodiments of the disclosure;

FIG. 13 illustrates an example multi-stream operation of the system of FIG. 1, according to an embodiment of the disclosure;

FIG. 14A illustrates another example detector portion having a partially cylindrical protrusion that can be employed in an embodiment of a sensor, according to an embodiment of the disclosure;

FIG. 14B depicts a front elevation view of the partially cylindrical protrusion of FIG. 14A;

FIGS. 14C through 14E illustrate embodiments of a detector submount;

FIGS. 14F through 14H illustrate embodiment of portions of a detector shell;

FIG. 14I illustrates a cutaway view of an embodiment of a sensor;

FIGS. 15A through 15F illustrate embodiments of sensors that include heat sink features;

FIGS. 15G and 15H illustrate embodiments of connector features that can be used with any of the sensors described herein;

FIG. 15I illustrates an exemplary architecture for a transimpedance-based front-end that may be employed in any of the sensors described herein;

US 10,912,502 B2

7                                                          8

FIG. **15**J illustrates an exemplary noise model for configuring the transimpedance-based front-ends shown in FIG. **15**I;

FIG. **15**K shows different architectures and layouts for various embodiments of a sensor and its detectors;

FIG. **15**L illustrates an exemplary architecture for a switched-capacitor-based front-end that may be employed in any of the sensors described herein;

FIGS. **16**A and **16**B illustrate embodiments of disposable optical sensors;

FIG. **17** illustrates an exploded view of certain components of an example sensor; and

FIGS. **18** through **22** illustrate various results obtained by an exemplary version of the disclosure.

DETAILED DESCRIPTION

The present disclosure generally relates to non-invasive medical devices. In the present disclosure, a sensor can measure various blood constituents or analytes noninvasively using multi-stream spectroscopy. In an embodiment, the multi-stream spectroscopy can employ visible, infrared and near infrared wavelengths. As disclosed herein, the sensor is capable of noninvasively measuring blood analytes or percentages thereof (e.g., saturation) based on various combinations of features and components.

In various embodiments, the present disclosure relates to an interface for a noninvasive glucose sensor that comprises a front-end adapted to receive an input signals from optical detectors and provide corresponding output signals. The front-end may comprise, among other things, switched capacitor circuits or transimpedance amplifiers. In an embodiment, the front-end may comprise switched capacitor circuits that are configured to convert the output of sensor's detectors into a digital signal. In another embodiment, the front-end may comprise transimpedance amplifiers. These transimpedance amplifiers may be configured to match one or more photodiodes in a detector based on a noise model that accounts for characteristics, such as the impedance, of the transimpedance amplifier, characteristics of each photodiode, such as the impedance, and the number of photodiodes coupled to the transimpedance amplifier.

In the present disclosure, the front-ends are employed in a sensor that measures various blood analytes noninvasively using multi-stream spectroscopy. In an embodiment, the multi-stream spectroscopy can employ visible, infrared and near infrared wavelengths. As disclosed herein, the sensor is capable of noninvasively measuring blood analytes, such as glucose, total hemoglobin, methemoglobin, oxygen content, and the like, based on various combinations of features and components.

In an embodiment, a physiological sensor includes a detector housing that can be coupled to a measurement site, such as a patient's finger. The sensor housing can include a curved bed that can generally conform to the shape of the measurement site. In addition, the curved bed can include a protrusion shaped to increase an amount of light radiation from the measurement site. In an embodiment, the protrusion is used to thin out the measurement site. This allows the light radiation to pass through less tissue, and accordingly is attenuated less. In an embodiment, the protrusion can be used to increase the area from which attenuated light can be measured. In an embodiment, this is done through the use of a lens which collects attenuated light exiting the measurement site and focuses onto one or more detectors. The protrusion can advantageously include plastic, including a hard opaque plastic, such as a black or other colored plastic,

helpful in reducing light noise. In an embodiment, such light noise includes light that would otherwise be detected at a photodetector that has not been attenuated by tissue of the measurement site of a patient sufficient to cause the light to adequately included information indicative of one or more physiological parameters of the patient. Such light noise includes light piping.

In an embodiment, the protrusion can be formed from the curved bed, or can be a separate component that is positionable with respect to the bed. In an embodiment, a lens made from any appropriate material is used as the protrusion. The protrusion can be convex in shape. The protrusion can also be sized and shaped to conform the measurement site into a flat or relatively flat surface. The protrusion can also be sized to conform the measurement site into a rounded surface, such as, for example, a concave or convex surface. The protrusion can include a cylindrical or partially cylindrical shape. The protrusion can be sized or shaped differently for different types of patients, such as an adult, child, or infant. The protrusion can also be sized or shaped differently for different measurement sites, including, for example, a finger, toe, hand, foot, ear, forehead, or the like. The protrusion can thus be helpful in any type of noninvasive sensor. The external surface of the protrusion can include one or more openings or windows. The openings can be made from glass to allow attenuated light from a measurement site, such as a finger, to pass through to one or more detectors. Alternatively, some of all of the protrusion can be a lens, such as a partially cylindrical lens.

The sensor can also include a shielding, such as a metal enclosure as described below or embedded within the protrusion to reduce noise. The shielding can be constructed from a conductive material, such as copper, in the form of a metal cage or enclosure, such as a box. The shielding can include a second set of one or more openings or windows. The second set of openings can be made from glass and allow light that has passed through the first set of windows of the external surface of the protrusion to pass through to one or more detectors that can be enclosed, for example, as described below.

In various embodiments, the shielding can include any substantially transparent, conductive material placed in the optical path between an emitter and a detector. The shielding can be constructed from a transparent material, such as glass, plastic, and the like. The shielding can have an electrically conductive material or coating that is at least partially transparent. The electrically conductive coating can be located on one or both sides of the shielding, or within the body of the shielding. In addition, the electrically conductive coating can be uniformly spread over the shielding or may be patterned. Furthermore, the coating can have a uniform or varying thickness to increase or optimize its shielding effect. The shielding can be helpful in virtually any type of noninvasive sensor that employs spectroscopy.

In an embodiment, the sensor can also include a heat sink. In an embodiment, the heat sink can include a shape that is functional in its ability to dissipate excess heat and aesthetically pleasing to the wearer. For example, the heat sink can be configured in a shape that maximizes surface area to allow for greater dissipation of heat. In an embodiment, the heat sink includes a metalicized plastic, such as plastic including carbon and aluminum to allow for improved thermal conductivity and diffusivity. In an embodiment, the heat sink can advantageously be inexpensively molded into desired shapes and configurations for aesthetic and functional purposes. For example, the shape of the heat sink can

US 10,912,502 B2

9

be a generally curved surface and include one or more fins, undulations, grooves or channels, or combs.

The sensor can include photocommunicative components, such as an emitter, a detector, and other components. The emitter can include a plurality of sets of optical sources that, in an embodiment, are arranged together as a point source. The various optical sources can emit a sequence of optical radiation pulses at different wavelengths towards a measurement site, such as a patient's finger. Detectors can then detect optical radiation from the measurement site. The optical sources and optical radiation detectors can operate at any appropriate wavelength, including, as discussed herein, infrared, near infrared, visible light, and ultraviolet. In addition, the optical sources and optical radiation detectors can operate at any appropriate wavelength, and such modifications to the embodiments desirable to operate at any such wavelength will be apparent to those skilled in the art.

In certain embodiments, multiple detectors are employed and arranged in a spatial geometry. This spatial geometry provides a diversity of path lengths among at least some of the detectors and allows for multiple bulk and pulsatile measurements that are robust. Each of the detectors can provide a respective output stream based on the detected optical radiation, or a sum of output streams can be provided from multiple detectors. In some embodiments, the sensor can also include other components, such as one or more heat sinks and one or more thermistors.

The spatial configuration of the detectors provides a geometry having a diversity of path lengths among the detectors. For example, a detector in the sensor may comprise multiple detectors that are arranged to have a sufficient difference in mean path length to allow for noise cancellation and noise reduction. In addition, walls may be used to separate individual photodetectors and prevent mixing of detected optical radiation between the different locations on the measurement site. A window may also be employed to facilitate the passing of optical radiation at various wavelengths for measuring glucose in the tissue.

In the present disclosure, a sensor may measure various blood constituents or analytes noninvasively using spectroscopy and a recipe of various features. As disclosed herein, the sensor is capable of non-invasively measuring blood analytes, such as, glucose, total hemoglobin, methemoglobin, oxygen content, and the like. In an embodiment, the spectroscopy used in the sensor can employ visible, infrared and near infrared wavelengths. The sensor may comprise an emitter, a detector, and other components. In some embodiments, the sensor may also comprise other components, such as one or more heat sinks and one or more thermistors.

In various embodiments, the sensor may also be coupled to one or more companion devices that process and/or display the sensor's output. The companion devices may comprise various components, such as a sensor front-end, a signal processor, a display, a network interface, a storage device or memory, etc.

A sensor can include photocommunicative components, such as an emitter, a detector, and other components. The emitter is configured as a point optical source that comprises a plurality of LEDs that emit a sequence of pulses of optical radiation across a spectrum of wavelengths. In some embodiments, the plurality of sets of optical sources may each comprise at least one top-emitting LED and at least one super luminescent LED. In some embodiments, the emitter comprises optical sources that transmit optical radiation in the infrared or near-infrared wavelengths suitable for detecting blood analytes like glucose. In order to achieve the desired SNR for detecting analytes like glucose, the emitter

10

may be driven using a progression from low power to higher power. In addition, the emitter may have its duty cycle modified to achieve a desired SNR.

The emitter may be constructed of materials, such as aluminum nitride and may include a heat sink to assist in heat dissipation. A thermistor may also be employed to account for heating effects on the LEDs. The emitter may further comprise a glass window and a nitrogen environment to improve transmission from the sources and prevent oxidative effects.

The sensor can be coupled to one or more monitors that process and/or display the sensor's output. The monitors can include various components, such as a sensor front end, a signal processor, a display, etc.

The sensor can be integrated with a monitor, for example, into a handheld unit including the sensor, a display and user controls. In other embodiments, the sensor can communicate with one or more processing devices. The communication can be via wire(s), cable(s), flex circuit(s), wireless technologies, or other suitable analog or digital communication methodologies and devices to perform those methodologies. Many of the foregoing arrangements allow the sensor to be attached to the measurement site while the device is attached elsewhere on a patient, such as the patient's arm, or placed at a location near the patient, such as a bed, shelf or table. The sensor or monitor can also provide outputs to a storage device or network interface.

Reference will now be made to the Figures to discuss embodiments of the present disclosure.

FIG. 1 illustrates an example of a data collection system 100. In certain embodiments, the data collection system 100 noninvasively measure a blood analyte, such as oxygen, carbon monoxide, methemoglobin, total hemoglobin, glucose, proteins, glucose, lipids, a percentage thereof (e.g., saturation) or for measuring many other physiologically relevant patient characteristics. The system 100 can also measure additional blood analytes and/or other physiological parameters useful in determining a state or trend of wellness of a patient.

The data collection system 100 can be capable of measuring optical radiation from the measurement site. For example, in some embodiments, the data collection system 100 can employ photodiodes defined in terms of area. In an embodiment, the area is from about 1 mm$^2$-5 mm$^2$ (or higher) that are capable of detecting about 100 nanoamps (nA) or less of current resulting from measured light at full scale. In addition to having its ordinary meaning, the phrase "at full scale" can mean light saturation of a photodiode amplifier (not shown). Of course, as would be understood by a person of skill in the art from the present disclosure, various other sizes and types of photodiodes can be used with the embodiments of the present disclosure.

The data collection system 100 can measure a range of approximately about 2 nA to about 100 nA full scale. The data collection system 100 can also include sensor front-ends that are capable of processing and amplifying current from the detector(s) at signal-to-noise ratios (SNRs) of about 100 decibels (dB) or more, such as about 120 dB in order to measure various desired analytes. The data collection system 100 can operate with a lower SNR if less accuracy is desired for an analyte like glucose.

The data collection system 100 can measure analyte concentrations, including glucose, at least in part by detecting light attenuated by a measurement site 102. The measurement site 102 can be any location on a patient's body, such as a finger, foot, ear lobe, or the like. For convenience, this disclosure is described primarily in the context of a

Stay-Add-756

US 10,912,502 B2

11

finger measurement site **102**. However, the features of the embodiments disclosed herein can be used with other measurement sites **102**.

In the depicted embodiment, the system **100** includes an optional tissue thickness adjuster or tissue shaper **105**, which can include one or more protrusions, bumps, lenses, or other suitable tissue-shaping mechanisms. In certain embodiments, the tissue shaper **105** is a flat or substantially flat surface that can be positioned proximate the measurement site **102** and that can apply sufficient pressure to cause the tissue of the measurement site **102** to be flat or substantially flat. In other embodiments, the tissue shaper **105** is a convex or substantially convex surface with respect to the measurement site **102**. Many other configurations of the tissue shaper **105** are possible. Advantageously, in certain embodiments, the tissue shaper **105** reduces thickness of the measurement site **102** while preventing or reducing occlusion at the measurement site **102**. Reducing thickness of the site can advantageously reduce the amount of attenuation of the light because there is less tissue through which the light must travel. Shaping the tissue in to a convex (or alternatively concave) surface can also provide more surface area from which light can be detected.

The embodiment of the data collection system **100** shown also includes an optional noise shield **103**. In an embodiment, the noise shield **103** can be advantageously adapted to reduce electromagnetic noise while increasing the transmittance of light from the measurement site **102** to one or more detectors **106** (described below). For example, the noise shield **103** can advantageously include a conductive coated glass or metal grid electrically communicating with one or more other shields of the sensor **101** or electrically grounded. In an embodiment where the noise shield **103** includes conductive coated glass, the coating can advantageously include indium tin oxide. In an embodiment, the indium tin oxide includes a surface resistivity ranging from approximately 30 ohms per square inch to about 500 ohms per square inch. In an embodiment, the resistivity is approximately 30, 200, or 500 ohms per square inch. As would be understood by a person of skill in the art from the present disclosure, other resistivities can also be used which are less than about 30 ohms or more than about 500 ohms. Other conductive materials transparent or substantially transparent to light can be used instead.

In some embodiments, the measurement site **102** is located somewhere along a non-dominant arm or a non-dominant hand, e.g., a right-handed person's left arm or left hand. In some patients, the non-dominant arm or hand can have less musculature and higher fat content, which can result in less water content in that tissue of the patient. Tissue having less water content can provide less interference with the particular wavelengths that are absorbed in a usual manner by blood analytes like glucose. Accordingly, in some embodiments, the data collection system **100** can be used on a person's non-dominant hand or arm.

The data collection system **100** can include a sensor **101** (or multiple sensors) that is coupled to a processing device or physiological monitor **109**. In an embodiment, the sensor **101** and the monitor **109** are integrated together into a single unit. In another embodiment, the sensor **101** and the monitor **109** are separate from each other and communicate one with another in any suitable manner, such as via a wired or wireless connection. The sensor **101** and monitor **109** can be attachable and detachable from each other for the convenience of the user or caregiver, for ease of storage, sterility issues, or the like. The sensor **101** and the monitor **109** will now be further described.

12

In the depicted embodiment shown in FIG. **1**, the sensor **101** includes an emitter **104**, a tissue shaper **105**, a set of detectors **106**, and a front-end interface **108**. The emitter **104** can serve as the source of optical radiation transmitted towards measurement site **102**. As will be described in further detail below, the emitter **104** can include one or more sources of optical radiation, such as LEDs, laser diodes, incandescent bulbs with appropriate frequency-selective filters, combinations of the same, or the like. In an embodiment, the emitter **104** includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation.

In some embodiments, the emitter **104** is used as a point optical source, and thus, the one or more optical sources of the emitter **104** can be located within a close distance to each other, such as within about a 2 mm to about 4 mm. The emitters **104** can be arranged in an array, such as is described in U.S. Publication No. 2006/0211924, filed Sep. 21, 2006, titled "Multiple Wavelength Sensor Emitters," the disclosure of which is hereby incorporated by reference in its entirety. In particular, the emitters **104** can be arranged at least in part as described in paragraphs [0061] through [0068] of the aforementioned publication, which paragraphs are hereby incorporated specifically by reference. Other relative spatial relationships can be used to arrange the emitters **104**.

For analytes like glucose, currently available non-invasive techniques often attempt to employ light near the water absorbance minima at or about 1600 nm. Typically, these devices and methods employ a single wavelength or single band of wavelengths at or about 1600 nm. However, to date, these techniques have been unable to adequately consistently measure analytes like glucose based on spectroscopy.

In contrast, the emitter **104** of the data collection system **100** can emit, in certain embodiments, combinations of optical radiation in various bands of interest. For example, in some embodiments, for analytes like glucose, the emitter **104** can emit optical radiation at three (3) or more wavelengths between about 1600 nm to about 1700 nm. In particular, the emitter **104** can emit optical radiation at or about 1610 nm, about 1640 nm, and about 1665 nm. In some circumstances, the use of three wavelengths within about 1600 nm to about 1700 nm enable sufficient SNRs of about 100 dB, which can result in a measurement accuracy of about 20 mg/dL or better for analytes like glucose.

In other embodiments, the emitter **104** can use two (2) wavelengths within about 1600 nm to about 1700 nm to advantageously enable SNRs of about 85 dB, which can result in a measurement accuracy of about 25-30 mg/dL or better for analytes like glucose. Furthermore, in some embodiments, the emitter **104** can emit light at wavelengths above about 1670 nm. Measurements at these wavelengths can be advantageously used to compensate or confirm the contribution of protein, water, and other non-hemoglobin species exhibited in measurements for analytes like glucose conducted between about 1600 nm and about 1700 nm. Of course, other wavelengths and combinations of wavelengths can be used to measure analytes and/or to distinguish other types of tissue, fluids, tissue properties, fluid properties, combinations of the same or the like.

For example, the emitter **104** can emit optical radiation across other spectra for other analytes. In particular, the emitter **104** can employ light wavelengths to measure various blood analytes or percentages (e.g., saturation) thereof. For example, in one embodiment, the emitter **104** can emit optical radiation in the form of pulses at wavelengths about 905 nm, about 1050 nm, about 1200 nm, about 1300 nm, about 1330 nm, about 1610 nm, about 1640 nm, and about

US 10,912,502 B2

13

1665 nm. In another embodiment, the emitter **104** can emit
optical radiation ranging from about 860 nm to about 950
nm, about 950 nm to about 1100 nm, about 1100 nm to
about 1270 nm, about 1250 nm to about 1350 nm, about 1300 nm
to about 1360 nm, and about 1590 nm to about 1700 nm. Of
course, the emitter **104** can transmit any of a variety of
wavelengths of visible or near-infrared optical radiation.

Due to the different responses of analytes to the different
wavelengths, certain embodiments of the data collection
system **100** can advantageously use the measurements at
these different wavelengths to improve the accuracy of
measurements. For example, the measurements of water
from visible and infrared light can be used to compensate for
water absorbance that is exhibited in the near-infrared wave-
lengths.

As briefly described above, the emitter **104** can include
sets of light-emitting diodes (LEDs) as its optical source.
The emitter **104** can use one or more top-emitting LEDs. In
particular, in some embodiments, the emitter **104** can
include top-emitting LEDs emitting light at about 850 nm to
1350 nm.

The emitter **104** can also use super luminescent LEDs
(SLEDs) or side-emitting LEDs. In some embodiments, the
emitter **104** can employ SLEDs or side-emitting LEDs to
emit optical radiation at about 1600 nm to about 1800 nm.
Emitter **104** can use SLEDs or side-emitting LEDs to
transmit near infrared optical radiation because these types
of sources can transmit at high power or relatively high
power, e.g., about 40 mW to about 100 mW. This higher
power capability can be useful to compensate or overcome
the greater attenuation of these wavelengths of light in tissue
and water. For example, the higher power emission can
effectively compensate and/or normalize the absorption sig-
nal for light in the mentioned wavelengths to be similar in
amplitude and/or effect as other wavelengths that can be
detected by one or more photodetectors after absorption.
However, the embodiments of the present disclosure do not
necessarily require the use of high power optical sources.
For example, some embodiments may be configured to
measure analytes, such as total hemoglobin (tHb), oxygen
saturation (SpO$_2$), carboxyhemoglobin, methemoglobin,
etc., without the use of high power optical sources like side
emitting LEDs. Instead, such embodiments may employ
other types of optical sources, such as top emitting LEDs.
Alternatively, the emitter **104** can use other types of sources
of optical radiation, such as a laser diode, to emit near-
infrared light into the measurement site **102**.

In addition, in some embodiments, in order to assist in
achieving a comparative balance of desired power output
between the LEDs, some of the LEDs in the emitter **104** can
have a filter or covering that reduces and/or cleans the
optical radiation from particular LEDs or groups of LEDs.
For example, since some wavelengths of light can penetrate
through tissue relatively well, LEDs, such as some or all of
the top-emitting LEDs can use a filter or covering, such as
a cap or painted dye. This can be useful in allowing the
emitter **104** to use LEDs with a higher output and/or to
equalize intensity of LEDs.

The data collection system **100** also includes a driver **111**
that drives the emitter **104**. The driver **111** can be a circuit
or the like that is controlled by the monitor **109**. For
example, the driver **111** can provide pulses of current to the
emitter **104**. In an embodiment, the driver **111** drives the
emitter **104** in a progressive fashion, such as in an alternat-
ing manner. The driver **111** can drive the emitter **104** with a
series of pulses of about 1 milliwatt (mW) for some wave-
lengths that can penetrate tissue relatively well and from

14

about 40 mW to about 100 mW for other wavelengths that
tend to be significantly absorbed in tissue. A wide variety of
other driving powers and driving methodologies can be used
in various embodiments.

The driver **111** can be synchronized with other parts of the
sensor **101** and can minimize or reduce jitter in the timing of
pulses of optical radiation emitted from the emitter **104**. In
some embodiments, the driver **111** is capable of driving the
emitter **104** to emit optical radiation in a pattern that varies
by less than about 10 parts-per-million.

The detectors **106** capture and measure light from the
measurement site **102**. For example, the detectors **106** can
capture and measure light transmitted from the emitter **104**
that has been attenuated or reflected from the tissue in the
measurement site **102**. The detectors **106** can output a
detector signal **107** responsive to the light captured or
measured. The detectors **106** can be implemented using one
or more photodiodes, phototransistors, or the like.

In addition, the detectors **106** can be arranged with a
spatial configuration to provide a variation of path lengths
among at least some of the detectors **106**. That is, some of
the detectors **106** can have the substantially, or from the
perspective of the processing algorithm, effectively, the
same path length from the emitter **104**. However, according
to an embodiment, at least some of the detectors **106** can
have a different path length from the emitter **104** relative to
other of the detectors **106**. Variations in path lengths can be
helpful in allowing the use of a bulk signal stream from the
detectors **106**. In some embodiments, the detectors **106** may
employ a linear spacing, a logarithmic spacing, or a two or
three dimensional matrix of spacing, or any other spacing
scheme in order to provide an appropriate variation in path
lengths.

The front end interface **108** provides an interface that
adapts the output of the detectors **106**, which is responsive
to desired physiological parameters. For example, the front
end interface **108** can adapt a signal **107** received from one
or more of the detectors **106** into a form that can be
processed by the monitor **109**, for example, by a signal
processor **110** in the monitor **109**. The front end interface
**108** can have its components assembled in the sensor **101**,
in the monitor **109**, in connecting cabling (if used), combi-
nations of the same, or the like. The location of the front end
interface **108** can be chosen based on various factors includ-
ing space desired for components, desired noise reductions
or limits, desired heat reductions or limits, and the like.

The front end interface **108** can be coupled to the detec-
tors **106** and to the signal processor **110** using a bus, wire,
electrical or optical cable, flex circuit, or some other form of
signal connection. The front end interface **108** can also be at
least partially integrated with various components, such as
the detectors **106**. For example, the front end interface **108**
can include one or more integrated circuits that are on the
same circuit board as the detectors **106**. Other configurations
can also be used.

The front end interface **108** can be implemented using one
or more amplifiers, such as transimpedance amplifiers, that
are coupled to one or more analog to digital converters
(ADCs) (which can be in the monitor **109**), such as a
sigma-delta ADC. A transimpedance-based front end inter-
face **108** can employ single-ended circuitry, differential
circuitry, and/or a hybrid configuration. A transimpedance-
based front end interface **108** can be useful for its sampling
rate capability and freedom in modulation/demodulation
algorithms. For example, this type of front end interface **108**

US 10,912,502 B2

15                                              16

can advantageously facilitate the sampling of the ADCs being synchronized with the pulses emitted from the emitter **104**.

The ADC or ADCs can provide one or more outputs into multiple channels of digital information for processing by the signal processor **110** of the monitor **109**. Each channel can correspond to a signal output from a detector **106**.

In some embodiments, a programmable gain amplifier (PGA) can be used in combination with a transimpedance-based front end interface **108**. For example, the output of a transimpedance-based front end interface **108** can be output to a PGA that is coupled with an ADC in the monitor **109**. A PGA can be useful in order to provide another level of amplification and control of the stream of signals from the detectors **106**. Alternatively, the PGA and ADC components can be integrated with the transimpedance-based front end interface **108** in the sensor **101**.

In another embodiment, the front end interface **108** can be implemented using switched-capacitor circuits. A switched-capacitor-based front end interface **108** can be useful for, in certain embodiments, its resistor-free design and analog averaging properties. In addition, a switched-capacitor-based front end interface **108** can be useful because it can provide a digital signal to the signal processor **110** in the monitor **109**.

As shown in FIG. **1**, the monitor **109** can include the signal processor **110** and a user interface, such as a display **112**. The monitor **109** can also include optional outputs alone or in combination with the display **112**, such as a storage device **114** and a network interface **116**. In an embodiment, the signal processor **110** includes processing logic that determines measurements for desired analytes, such as glucose, based on the signals received from the detectors **106**. The signal processor **110** can be implemented using one or more microprocessors or subprocessors (e.g., cores), digital signal processors, application specific integrated circuits (ASICs), field programmable gate arrays (FPGAs), combinations of the same, and the like.

The signal processor **110** can provide various signals that control the operation of the sensor **101**. For example, the signal processor **110** can provide an emitter control signal to the driver **111**. This control signal can be useful in order to synchronize, minimize, or reduce jitter in the timing of pulses emitted from the emitter **104**. Accordingly, this control signal can be useful in order to cause optical radiation pulses emitted from the emitter **104** to follow a precise timing and consistent pattern. For example, when a transimpedance-based front end interface **108** is used, the control signal from the signal processor **110** can provide synchronization with the ADC in order to avoid aliasing, cross-talk, and the like. As also shown, an optional memory **113** can be included in the front-end interface **108** and/or in the signal processor **110**. This memory **113** can serve as a buffer or storage location for the front-end interface **108** and/or the signal processor **110**, among other uses.

The user interface **112** can provide an output, e.g., on a display, for presentation to a user of the data collection system **100**. The user interface **112** can be implemented as a touch-screen display, an LCD display, an organic LED display, or the like. In addition, the user interface **112** can be manipulated to allow for measurement on the non-dominant side of patient. For example, the user interface **112** can include a flip screen, a screen that can be moved from one side to another on the monitor **109**, or can include an ability to reorient its display indicia responsive to user input or device orientation. In alternative embodiments, the data

collection system **100** can be provided without a user interface **112** and can simply provide an output signal to a separate display or system.

A storage device **114** and a network interface **116** represent other optional output connections that can be included in the monitor **109**. The storage device **114** can include any computer-readable medium, such as a memory device, hard disk storage, EEPROM, flash drive, or the like. The various software and/or firmware applications can be stored in the storage device **114**, which can be executed by the signal processor **110** or another processor of the monitor **109**. The network interface **116** can be a serial bus port (RS-232/RS-485), a Universal Serial Bus (USB) port, an Ethernet port, a wireless interface (e.g., WiFi such as any 802.1x interface, including an internal wireless card), or other suitable communication device(s) that allows the monitor **109** to communicate and share data with other devices. The monitor **109** can also include various other components not shown, such as a microprocessor, graphics processor, or controller to output the user interface **112**, to control data communications, to compute data trending, or to perform other operations.

Although not shown in the depicted embodiment, the data collection system **100** can include various other components or can be configured in different ways. For example, the sensor **101** can have both the emitter **104** and detectors **106** on the same side of the measurement site **102** and use reflectance to measure analytes. The data collection system **100** can also include a sensor that measures the power of light emitted from the emitter **104**.

FIGS. **2A** through **2D** illustrate example monitoring devices **200** in which the data collection system **100** can be housed. Advantageously, in certain embodiments, some or all of the example monitoring devices **200** shown can have a shape and size that allows a user to operate it with a single hand or attach it, for example, to a patient's body or limb. Although several examples are shown, many other monitoring device configurations can be used to house the data collection system **100**. In addition, certain of the features of the monitoring devices **200** shown in FIGS. **2A** through **2D** can be combined with features of the other monitoring devices **200** shown.

Referring specifically to FIG. **2A**, an example monitoring device **200**A is shown, in which a sensor **201**a and a monitor **209**a are integrated into a single unit. The monitoring device **200**A shown is a handheld or portable device that can measure glucose and other analytes in a patient's finger. The sensor **201**a includes an emitter shell **204**a and a detector shell **206**a. The depicted embodiment of the monitoring device **200**A also includes various control buttons **208**a and a display **210**a.

The sensor **201**a can be constructed of white material used for reflective purposes (such as white silicone or plastic), which can increase the usable signal at the detector **106** by forcing light back into the sensor **201**a. Pads in the emitter shell **204**a and the detector shell **206**a can contain separated windows to prevent or reduce mixing of light signals, for example, from distinct quadrants on a patient's finger. In addition, these pads can be made of a relatively soft material, such as a gel or foam, in order to conform to the shape, for example, of a patient's finger. The emitter shell **204**a and the detector shell **206**a can also include absorbing black or grey material portions to prevent or reduce ambient light from entering into the sensor **201**a.

In some embodiments, some or all portions of the emitter shell **204**a and/or detector shell **206**a can be detachable and/or disposable. For example, some or all portions of the

US 10,912,502 B2

17                                                          18

shells **204***a* and **206***a* can be removable pieces. The removability of the shells **204***a* and **206***a* can be useful for sanitary purposes or for sizing the sensor **201***a* to different patients. The monitor **209***a* can include a fitting, slot, magnet, or other connecting mechanism to allow the sensor **201***c* to be removably attached to the monitor **209***a*.

The monitoring device **200***a* also includes optional control buttons **208***a* and a display **210***a* that can allow the user to control the operation of the device. For example, a user can operate the control buttons **208***a* to view one or more measurements of various analytes, such as glucose. In addition, the user can operate the control buttons **208***a* to view other forms of information, such as graphs, histograms, measurement data, trend measurement data, parameter combination views, wellness indications, and the like. Many parameters, trends, alarms and parameter displays could be output to the display **210***a*, such as those that are commercially available through a wide variety of noninvasive monitoring devices from Masimo® Corporation of Irvine, Calif.

Furthermore, the controls **208***a* and/or display **210***a* can provide functionality for the user to manipulate settings of the monitoring device **200***a*, such as alarm settings, emitter settings, detector settings, and the like. The monitoring device **200***a* can employ any of a variety of user interface designs, such as frames, menus, touch-screens, and any type of button.

FIG. 2B illustrates another example of a monitoring device **200**B. In the depicted embodiment, the monitoring device **200**B includes a finger clip sensor **201***b* connected to a monitor **209***b* via a cable **212**. In the embodiment shown, the monitor **209***b* includes a display **210***b*, control buttons **208***b* and a power button. Moreover, the monitor **209***b* can advantageously include electronic processing, signal processing, and data storage devices capable of receiving signal data from said sensor **201***b*, processing the signal data to determine one or more output measurement values indicative of one or more physiological parameters of a monitored patient, and displaying the measurement values, trends of the measurement values, combinations of measurement values, and the like.

The cable **212** connecting the sensor **201***b* and the monitor **209***b* can be implemented using one or more wires, optical fiber, flex circuits, or the like. In some embodiments, the cable **212** can employ twisted pairs of conductors in order to minimize or reduce cross-talk of data transmitted from the sensor **201***b* to the monitor **209***b*. Various lengths of the cable **212** can be employed to allow for separation between the sensor **201***b* and the monitor **209***b*. The cable **212** can be fitted with a connector (male or female) on either end of the cable **212** so that the sensor **201***b* and the monitor **209***b* can be connected and disconnected from each other. Alternatively, the sensor **201***b* and the monitor **209***b* can be coupled together via a wireless communication link, such as an infrared link, radio frequency channel, or any other wireless communication protocol and channel.

The monitor **209***b* can be attached to the patient. For example, the monitor **209***b* can include a belt clip or straps (see, e.g., FIG. 2C) that facilitate attachment to a patient's belt, arm, leg, or the like. The monitor **209***b* can also include a fitting, slot, magnet, LEMO snap-click connector, or other connecting mechanism to allow the cable **212** and sensor **201***b* to be attached to the monitor **209**B.

The monitor **209***b* can also include other components, such as a speaker, power button, removable storage or memory (e.g., a flash card slot), an AC power port, and one or more network interfaces, such as a universal serial bus interface or an Ethernet port. For example, the monitor **209***b* can include a display **210***b* that can indicate a measurement for glucose, for example, in mg/dL. Other analytes and forms of display can also appear on the monitor **209***b*.

In addition, although a single sensor **201***b* with a single monitor **209***b* is shown, different combinations of sensors and device pairings can be implemented. For example, multiple sensors can be provided for a plurality of differing patient types or measurement sites or even patient fingers.

FIG. 2C illustrates yet another example of monitoring device **200**C that can house the data collection system **100**. Like the monitoring device **200**B, the monitoring device **200**C includes a finger clip sensor **201***c* connected to a monitor **209***c* via a cable **212**. The cable **212** can have all of the features described above with respect to FIG. 2B. The monitor **209***c* can include all of the features of the monitor **200**B described above. For example, the monitor **209***c* includes buttons **208***c* and a display **210***c*. The monitor **209***c* shown also includes straps **214***c* that allow the monitor **209***c* to be attached to a patient's limb or the like.

FIG. 2D illustrates yet another example of monitoring device **200**D that can house the data collection system **100**. Like the monitoring devices **200**B and **200**C, the monitoring device **200**D includes a finger clip sensor **201***d* connected to a monitor **209***d* via a cable **212**. The cable **212** can have all of the features described above with respect to FIG. 2B. In addition to having some or all of the features described above with respect to FIGS. 2B and 2C, the monitoring device **200**D includes an optional universal serial bus (USB) port **216** and an Ethernet port **218**. The USB port **216** and the Ethernet port **218** can be used, for example, to transfer information between the monitor **209***d* and a computer (not shown) via a cable. Software stored on the computer can provide functionality for a user to, for example, view physiological data and trends, adjust settings and download firmware updates to the monitor **209***b*, and perform a variety of other functions. The USB port **216** and the Ethernet port **218** can be included with the other monitoring devices **200**A, **200**B, and **200**C described above.

FIGS. 3A through 3C illustrate more detailed examples of embodiments of a sensor **301***a*. The sensor **301***a* shown can include all of the features of the sensors **100** and **200** described above.

Referring to FIG. 3A, the sensor **301***a* in the depicted embodiment is a clothespin-shaped clip sensor that includes an enclosure **302***a* for receiving a patient's finger. The enclosure **302***a* is formed by an upper section or emitter shell **304***a*, which is pivotably connected with a lower section or detector shell **306***a*. The emitter shell **304***a* can be biased with the detector shell **306***a* to close together around a pivot point **303***a* and thereby sandwich finger tissue between the emitter and detector shells **304***a*, **306***a*.

In an embodiment, the pivot point **303***a* advantageously includes a pivot capable of adjusting the relationship between the emitter and detector shells **304***a*, **306***a* to effectively level the sections when applied to a tissue site. In another embodiment, the sensor **301***a* includes some or all features of the finger clip described in U.S. Publication No. 2006/0211924, incorporated above, such as a spring that causes finger clip forces to be distributed along the finger. Paragraphs [0096] through [0105], which describe this feature, are hereby specifically incorporated by reference.

The emitter shell **304***a* can position and house various emitter components of the sensor **301***a*. It can be constructed of reflective material (e.g., white silicone or plastic) and/or can be metallic or include metalicized plastic (e.g., including carbon and aluminum) to possibly serve as a heat sink. The emitter shell **304***a* can also include absorbing opaque mate-

US 10,912,502 B2

19                                                                           20

rial, such as, for example, black or grey colored material, at various areas, such as on one or more flaps 307a, to reduce ambient light entering the sensor 301a.

The detector shell 306a can position and house one or more detector portions of the sensor 301a. The detector shell 306a can be constructed of reflective material, such as white silicone or plastic. As noted, such materials can increase the usable signal at a detector by forcing light back into the tissue and measurement site (see FIG. 1). The detector shell 306a can also include absorbing opaque material at various areas, such as lower area 308a, to reduce ambient light entering the sensor 301a.

Referring to FIGS. 3B and 3C, an example of finger bed 310 is shown in the sensor 301b. The finger bed 310 includes a generally curved surface shaped generally to receive tissue, such as a human digit. The finger bed 310 includes one or more ridges or channels 314. Each of the ridges 314 has a generally convex shape that can facilitate increasing traction or gripping of the patient's finger to the finger bed. Advantageously, the ridges 314 can improve the accuracy of spectroscopic analysis in certain embodiments by reducing noise that can result from a measurement site moving or shaking loose inside of the sensor 301a. The ridges 314 can be made from reflective or opaque materials in some embodiments to further increase SNR. In other implementations, other surface shapes can be used, such as, for example, generally flat, concave, or convex finger beds 310.

Finger bed 310 can also include an embodiment of a tissue thickness adjuster or protrusion 305. The protrusion 305 includes a measurement site contact area 370 (see FIG. 3C) that can contact body tissue of a measurement site. The protrusion 305 can be removed from or integrated with the finger bed 310. Interchangeable, different shaped protrusions 305 can also be provided, which can correspond to different finger shapes, characteristics, opacity, sizes, or the like.

Referring specifically to FIG. 3C, the contact area 370 of the protrusion 305 can include openings or windows 320, 321, 322, and 323. When light from a measurement site passes through the windows 320, 321, 322, and 323, the light can reach one or more photodetectors (see FIG. 3E). In an embodiment, the windows 320, 321, 322, and 323 mirror specific detector placements layouts such that light can impinge through the protrusion 305 onto the photodetectors. Any number of windows 320, 321, 322, and 323 can be employed in the protrusion 305 to allow light to pass from the measurement site to the photodetectors.

The windows 320, 321, 322, and 323 can also include shielding, such as an embedded grid of wiring or a conductive glass coating, to reduce noise from ambient light or other electromagnetic noise. The windows 320, 321, 322, and 323 can be made from materials, such as plastic or glass. In some embodiments, the windows 320, 321, 322, and 323 can be constructed from conductive glass, such as indium tin oxide (ITO) coated glass. Conductive glass can be useful because its shielding is transparent, and thus allows for a larger aperture versus a window with an embedded grid of wiring. In addition, in certain embodiments, the conductive glass does not need openings in its shielding (since it is transparent), which enhances its shielding performance. For example, some embodiments that employ the conductive glass can attain up to an about 40% to about 50% greater signal than non-conductive glass with a shielding grid. In addition, in some embodiments, conductive glass can be useful for shielding noise from a greater variety of directions than non-conductive glass with a shielding grid.

Turning to FIG. 3B, the sensor 301a can also include a shielding 315a, such as a metal cage, box, metal sheet, perforated metal sheet, a metal layer on a non-metal material, or the like. The shielding 315a is provided in the depicted embodiment below or embedded within the protrusion 305 to reduce noise. The shielding 315a can be constructed from a conductive material, such as copper. The shielding 315a can include one or more openings or windows (not shown). The windows can be made from glass or plastic to thereby allow light that has passed through the windows 320, 321, 322, and 323 on an external surface of the protrusion 305 (see FIG. 3C) to pass through to one or more photodetectors that can be enclosed or provided below (see FIG. 3E).

In some embodiments, the shielding cage for shielding 315a can be constructed in a single manufactured component with or without the use of conductive glass. This form of construction may be useful in order to reduce costs of manufacture as well as assist in quality control of the components. Furthermore, the shielding cage can also be used to house various other components, such as sigma delta components for various embodiments of front end interfaces 108.

In an embodiment, the photodetectors can be positioned within or directly beneath the protrusion 305 (see FIG. 3E). In such cases, the mean optical path length from the emitters to the detectors can be reduced and the accuracy of blood analyte measurement can increase. For example, in one embodiment, a convex bump of about 1 mm to about 3 mm in height and about 10 mm$^2$ to about 60 mm$^2$ was found to help signal strength by about an order of magnitude versus other shapes. Of course other dimensions and sizes can be employed in other embodiments. Depending on the properties desired, the length, width, and height of the protrusion 305 can be selected. In making such determinations, consideration can be made of protrusion's 305 effect on blood flow at the measurement site and mean path length for optical radiation passing through openings 320, 321, 322, and 323. Patient comfort can also be considered in determining the size and shape of the protrusion.

In an embodiment, the protrusion 305 can include a pliant material, including soft plastic or rubber, which can somewhat conform to the shape of a measurement site. Pliant materials can improve patient comfort and tactility by conforming the measurement site contact area 370 to the measurement site. Additionally, pliant materials can minimize or reduce noise, such as ambient light. Alternatively, the protrusion 305 can be made from a rigid material, such as hard plastic or metal.

Rigid materials can improve measurement accuracy of a blood analyte by conforming the measurement site to the contact area 370. The contact area 370 can be an ideal shape for improving accuracy or reducing noise. Selecting a material for the protrusion 305 can include consideration of materials that do not significantly alter blood flow at the measurement site. The protrusion 305 and the contact area 370 can include a combination of materials with various characteristics.

The contact area 370 serves as a contact surface for the measurement site. For example, in some embodiments, the contact area 370 can be shaped for contact with a patient's finger. Accordingly, the contact area 370 can be sized and shaped for different sizes of fingers. The contact area 370 can be constructed of different materials for reflective purposes as well as for the comfort of the patient. For example,

Stay-Add-761

US 10,912,502 B2

21 22

the contact area **370** can be constructed from materials having various hardness and textures, such as plastic, gel, foam, and the like.

The formulas and analysis that follow with respect to FIG. **5** provide insight into how selecting these variables can alter transmittance and intensity gain of optical radiation that has been applied to the measurement site. These examples do not limit the scope of this disclosure.

Referring to FIG. **5**, a plot **500** is shown that illustrates examples of effects of embodiments of the protrusion **305** on the SNR at various wavelengths of light. As described above, the protrusion **305** can assist in conforming the tissue and effectively reduce its mean path length. In some instances, this effect by the protrusion **305** can have significant impact on increasing the SNR.

According to the Beer Lambert law, a transmittance of light (I) can be expressed as follows: $I=I_o*e^{-m*b*c}$, where $I_o$ is the initial power of light being transmitted, m is the path length traveled by the light, and the component "b*c" corresponds to the bulk absorption of the light at a specific wavelength of light. For light at about 1600 nm to about 1700 nm, for example, the bulk absorption component is generally around 0.7 mm⁻¹. Assuming a typical finger thickness of about 12 mm and a mean path length of 20 mm due to tissue scattering, then $I=I_o*e^{(-20*0.7)}$.

In an embodiment where the protrusion **305** is a convex bump, the thickness of the finger can be reduced to 10 mm (from 12 mm) for some fingers and the effective light mean path is reduced to about 16.6 mm from 20 mm (see box **510**). This results in a new transmittance, $I_1=I_o*e^{(-16.6*0.7)}$. A curve for a typical finger (having a mean path length of 20 mm) across various wavelengths is shown in the plot **500** of FIG. **5**. The plot **500** illustrates potential effects of the protrusion **305** on the transmittance. As illustrated, comparing I and $I_1$ results in an intensity gain of $e^{(-16.6*0.7)}/e^{(-20*0.7)}$, which is about a 10 times increase for light in the about 1600 nm to about 1700 nm range. Such an increase can affect the SNR at which the sensor can operate. The foregoing gains can be due at least in part to the about 1600 nm to about 1700 nm range having high values in bulk absorptions (water, protein, and the like), e.g., about 0.7 mm⁻¹. The plot **500** also shows improvements in the visible/near-infrared range (about 600 nm to about 1300 nm).

Turning again to FIGS. **3A** through **3C**, an example heat sink **350a** is also shown. The heat sink **350a** can be attached to, or protrude from an outer surface of, the sensor **301a**, thereby providing increased ability for various sensor components to dissipate excess heat. By being on the outer surface of the sensor **301a** in certain embodiments, the heat sink **350a** can be exposed to the air and thereby facilitate more efficient cooling. In an embodiment, one or more of the emitters (see FIG. **1**) generate sufficient heat that inclusion of the heat sink **350a** can advantageously allows the sensor **301a** to remain safely cooled. The heat sink **350a** can include one or more materials that help dissipate heat, such as, for example, aluminum, steel, copper, carbon, combinations of the same, or the like. For example, in some embodiments, the emitter shell **304a** can include a heat conducting material that is also readily and relatively inexpensively moldable into desired shapes and forms.

In some embodiments, the heat sink **350a** includes metalicized plastic. The metalicized plastic can include aluminum and carbon, for example. The material can allow for improved thermal conductivity and diffusivity, which can increase commercial viability of the heat sink. In some embodiments, the material selected to construct the heat sink **350a** can include a thermally conductive liquid crystalline

polymer, such as CoolPoly® D5506, commercially available from Cool Polymers®, Inc. of Warwick, R.I. Such a material can be selected for its electrically non-conductive and dielectric properties so as, for example, to aid in electrical shielding. In an embodiment, the heat sink **350a** provides improved heat transfer properties when the sensor **301a** is active for short intervals of less than a full day's use. In an embodiment, the heat sink **350a** can advantageously provide improved heat transfers in about three (3) to about four (4) minute intervals, for example, although a heat sink **350a** can be selected that performs effectively in shorter or longer intervals.

Moreover, the heat sink **350a** can have different shapes and configurations for aesthetic as well as for functional purposes. In an embodiment, the heat sink is configured to maximize heat dissipation, for example, by maximizing surface area. In an embodiment, the heat sink **350a** is molded into a generally curved surface and includes one or more fins, undulations, grooves, or channels. The example heat sink **350a** shown includes fins **351a** (see FIG. **3A**).

An alternative shape of a sensor **301b** and heat sink **350b** is shown in FIG. **3D**. The sensor **301b** can include some or all of the features of the sensor **301a**. For example, the sensor **301b** includes an enclosure **302b** formed by an emitter shell **304b** and a detector shell **306b**, pivotably connected about a pivot **303a**. The emitter shell **304b** can also include absorbing opaque material on one or more flaps **307b**, and the detector shell **306a** can also include absorbing opaque material at various areas, such as lower area **308b**.

However, the shape of the sensor **301b** is different in this embodiment. In particular, the heat sink **350b** includes comb protrusions **351b**. The comb protrusions **351b** are exposed to the air in a similar manner to the fins **351a** of the heat sink **350a**, thereby facilitating efficient cooling of the sensor **301b**.

FIG. **3E** illustrates a more detailed example of a detector shell **306b** of the sensor **301b**. The features described with respect to the detector shell **306b** can also be used with the detector shell **306a** of the sensor **301a**.

As shown, the detector shell **306b** includes detectors **316**. The detectors **316** can have a predetermined spacing **340** from each other, or a spatial relationship among one another that results in a spatial configuration. This spatial configuration can purposefully create a variation of path lengths among detectors **316** and the emitter discussed above.

In the depicted embodiment, the detector shell **316** can hold multiple (e.g., two, three, four, etc.) photodiode arrays that are arranged in a two-dimensional grid pattern. Multiple photodiode arrays can also be useful to detect light piping (e.g., light that bypasses measurement site **102**). In the detector shell **316**, walls can be provided to separate the individual photodiode arrays to prevent or reduce mixing of light signals from distinct quadrants. In addition, the detector shell **316** can be covered by windows of transparent material, such as glass, plastic, or the like, to allow maximum or increased transmission of power light captured. In various embodiments, the transparent materials used can also be partially transparent or translucent or can otherwise pass some or all of the optical radiation passing through them. As noted, this window can include some shielding in the form of an embedded grid of wiring, or a conductive layer or coating.

As further illustrated by FIG. **3E**, the detectors **316** have a spatial configuration of a grid. However, the detectors **316** can be arranged in other configurations that vary the path length. For example, the detectors **316** can be arranged in a linear array, a logarithmic array, a two-dimensional

23 24

array, a zig-zag pattern, or the like. Furthermore, any number of the detectors 316 can be employed in certain embodiments.

FIG. 3F illustrates another embodiment of a sensor 301*f*. The sensor 301*f* can include some or all of the features of the sensor 301*a* of FIG. 3A described above. For example, the sensor 301*f* includes an enclosure 302*f* formed by an upper section or emitter shell 304*f*, which is pivotably connected with a lower section or detector shell 306*f* around a pivot point 303*f*. The emitter shell 304*f* can also include absorbing opaque material on various areas, such as on one or more flaps 307*f*, to reduce ambient light entering the sensor 301*f*. The detector shell 306*f* can also include absorbing opaque material at various areas, such as a lower area 308*f*. The sensor 301*f* also includes a heat sink 350*f*, which includes fins 351*f*.

In addition to these features, the sensor 301*f* includes a flex circuit cover 360, which can be made of plastic or another suitable material. The flex circuit cover 360 can cover and thereby protect a flex circuit (not shown) that extends from the emitter shell 304*f* to the detector shell 306*f*. An example of such a flex circuit is illustrated in U.S. Publication No. 2006/0211924, incorporated above (see FIG. 46 and associated description, which is hereby specifically incorporated by reference). The flex circuit cover 360 is shown in more detail below in FIG. 17.

In addition, sensors 301*a-f* has extra length—extends to second joint on finger—Easier to place, harder to move due to cable, better for light piping.

FIGS. 4A through 4C illustrate example arrangements of a protrusion 405, which is an embodiment of the protrusion 305 described above. In an embodiment, the protrusion 405 can include a measurement site contact area 470. The measurement site contact area 470 can include a surface that molds body tissue of a measurement site, such as a finger, into a flat or relatively flat surface.

The protrusion 405 can have dimensions that are suitable for a measurement site such as a patient's finger. As shown, the protrusion 405 can have a length 400, a width 410, and a height 430. The length 400 can be from about 9 to about 11 millimeters, e.g., about 10 millimeters. The width 410 can be from about 7 to about 9 millimeters, e.g., about 8 millimeters. The height 430 can be from about 0.5 millimeters to about 3 millimeters, e.g., about 2 millimeters. In an embodiment, the dimensions 400, 410, and 430 can be selected such that the measurement site contact area 470 includes an area of about 80 square millimeters, although larger and smaller areas can be used for different sized tissue for an adult, an adolescent, or infant, or for other considerations.

The measurement site contact area 470 can also include differently shaped surfaces that conform the measurement site into different shapes. For example, the measurement site contact area 470 can be generally curved and/or convex with respect to the measurement site. The measurement site contact area 470 can be other shapes that reduce or even minimize air between the protrusion 405 and/or the measurement site. Additionally, the surface pattern of the measurement site contact area 470 can vary from smooth to bumpy, e.g., to provide varying levels of grip.

In FIGS. 4A and 4C, openings or windows 420, 421, 422, and 423 can include a wide variety of shapes and sizes, including for example, generally square, circular, triangular, or combinations thereof. The windows 420, 421, 422, and 423 can be of non-uniform shapes and sizes. As shown, the windows 420, 421, 422, and 423 can be evenly spaced out in a grid like arrangement. Other arrangements or patterns of

arranging the windows 420, 421, 422, and 423 are possible. For example, the windows 420, 421, 422, and 423 can be placed in a triangular, circular, or linear arrangement. In some embodiments, the windows 420, 421, 422, and 423 can be placed at different heights with respect to the finger bed 310 of FIG. 3. The windows 420, 421, 422, and 423 can also mimic or approximately mimic a configuration of, or even house, a plurality of detectors.

FIGS. 6A through 6D illustrate another embodiment of a protrusion 605 that can be used as the tissue shaper 105 described above or in place of the protrusions 305, 405 described above. The depicted protrusion 605 is a partially cylindrical lens having a partial cylinder 608 and an extension 610. The partial cylinder 608 can be a half cylinder in some embodiments; however, a smaller or greater portion than half of a cylinder can be used. Advantageously, in certain embodiments, the partially cylindrical protrusion 605 focuses light onto a smaller area, such that fewer detectors can be used to detect the light attenuated by a measurement site.

FIG. 6A illustrates a perspective view of the partially cylindrical protrusion 605. FIG. 6B illustrates a front elevation view of the partially cylindrical protrusion 605. FIG. 6C illustrates a side view of the partially cylindrical protrusion 605. FIG. 6D illustrates a top view of the partially cylindrical protrusion 605.

Advantageously, in certain embodiments, placing the partially cylindrical protrusion 605 over the photodiodes in any of the sensors described above adds multiple benefits to any of the sensors described above. In one embodiment, the partially cylindrical protrusion 605 penetrates into the tissue and reduces the path length of the light traveling in the tissue, similar to the protrusions described above.

The partially cylindrical protrusion 605 can also collect light from a large surface and focus down the light to a smaller area. As a result, in certain embodiments, signal strength per area of the photodiode can be increased. The partially cylindrical protrusion 605 can therefore facilitate a lower cost sensor because, in certain embodiments, less photodiode area can be used to obtain the same signal strength. Less photodiode area can be realized by using smaller photodiodes or fewer photodiodes (see, e.g., FIG. 14). If fewer or smaller photodiodes are used, the partially cylindrical protrusion 605 can also facilitate an improved SNR of the sensor because fewer or smaller photodiodes can have less dark current.

The dimensions of the partially cylindrical protrusion 605 can vary based on, for instance, a number of photodiodes used with the sensor. Referring to FIG. 6C, the overall height of the partially cylindrical protrusion 605 (measurement "a") in some implementations is about 1 to about 3 mm. A height in this range can allow the partially cylindrical protrusion 605 to penetrate into the pad of the finger or other tissue and reduce the distance that light travels through the tissue. Other heights, however, of the partially cylindrical protrusion 605 can also accomplish this objective. For example, the chosen height of the partially cylindrical protrusion 605 can be selected based on the size of the measurement site, whether the patient is an adult or child, and so on. In an embodiment, the height of the protrusion 605 is chosen to provide as much tissue thickness reduction as possible while reducing or preventing occlusion of blood vessels in the tissue.

Referring to FIG. 6D, the width of the partially cylindrical protrusion 605 (measurement "b") can be about 3 to about 5 mm. In one embodiment, the width is about 4 mm. In one embodiment, a width in this range provides good penetration

US 10,912,502 B2

25                                    26

of the partially cylindrical protrusion **605** into the tissue to reduce the path length of the light. Other widths, however, of the partially cylindrical protrusion **605** can also accomplish this objective. For example, the width of the partially cylindrical protrusion **605** can vary based on the size of the measurement site, whether the patient is an adult or child, and so on. In addition, the length of the protrusion **605** could be about 10 mm, or about 8 mm to about 12 mm, or smaller than 8 mm or greater than 12 mm.

In certain embodiments, the focal length (f) for the partially cylindrical protrusion **605** can be expressed as:

$$f = \frac{R}{n-1},$$

where R is the radius of curvature of the partial cylinder **608** and n is the index of refraction of the material used. In certain embodiments, the radius of curvature can be between about 1.5 mm and about 2 mm. In another embodiment, the partially cylindrical protrusion **605** can include a material, such as nBK7 glass, with an index of refraction of around 1.5 at 1300 nm, which can provide focal lengths of between about 3 mm and about 4 mm.

A partially cylindrical protrusion **605** having a material with a higher index of refraction such as nSF11 glass (e.g., n=1.75 at 1300 nm) can provide a shorter focal length and possibly a smaller photodiode chip, but can also cause higher reflections due to the index of refraction mismatch with air. Many types of glass or plastic can be used with index of refraction values ranging from, for example, about 1.4 to about 1.9. The index of refraction of the material of the protrusion **605** can be chosen to improve or optimize the light focusing properties of the protrusion **605**. A plastic partially cylindrical protrusion **605** could provide the cheapest option in high volumes but can also have some undesired light absorption peaks at wavelengths higher than 1500 nm. Other focal lengths and materials having different indices of refraction can be used for the partially cylindrical protrusion **605**.

Placing a photodiode at a given distance below the partially cylindrical protrusion **605** can facilitate capturing some or all of the light traveling perpendicular to the lens within the active area of the photodiode (see FIG. **14**). Different sizes of the partially cylindrical protrusion **605** can use different sizes of photodiodes. The extension **610** added onto the bottom of the partial cylinder **608** is used in certain embodiments to increase the height of the partially cylindrical protrusion **605**. In an embodiment, the added height is such that the photodiodes are at or are approximately at the focal length of the partially cylindrical protrusion **605**. In an embodiment, the added height provides for greater thinning of the measurement site. In an embodiment, the added height assists in deflecting light piped through the sensor. This is because light piped around the sensor passes through the side walls of the added height without being directed toward the detectors. The extension **610** can also further facilitate the protrusion **605** increasing or maximizing the amount of light that is provided to the detectors. In some embodiments, the extension **610** can be omitted.

FIG. **6E** illustrates another view of the sensor **301** of FIG. **3**F, which includes an embodiment of a partially cylindrical protrusion **605***b*. Like the sensor **301A** shown in FIGS. **3B** and **3C**, the sensor **301***f* includes a finger bed **310***f*. The finger bed **310***f* includes a generally curved surface shaped generally to receive tissue, such as a human digit. The finger bed **310***f* also includes the ridges or channels **314** described above with respect to FIGS. **3B** and **3C**.

The example of finger bed **310***f* shown also includes the protrusion **605***b*, which includes the features of the protrusion **605** described above. In addition, the protrusion **605***b* also includes chamfered edges **607** on each end to provide a more comfortable surface for a finger to slide across (see also FIG. **14**D). In another embodiment, the protrusion **605***b* could instead include a single chamfered edge **607** proximal to the ridges **314**. In another embodiment, one or both of the chamfered edges **607** could be rounded.

The protrusion **605***b* also includes a measurement site contact area **670** that can contact body tissue of a measurement site. The protrusion **605***b* can be removed from or integrated with the finger bed **310***f*. Interchangeable, differently shaped protrusions **605***b* can also be provided, which can correspond to different finger shapes, characteristics, opacity, sizes, or the like.

FIGS. **7A** and **7B** illustrate block diagrams of sensors **701** that include example arrangements of conductive glass or conductive coated glass for shielding. Advantageously, in certain embodiments, the shielding can provide increased SNR. The features of the sensors **701** can be implemented with any of the sensors **101**, **201**, **301** described above. Although not shown, the partially cylindrical protrusion **605** of FIG. **6** can also be used with the sensors **701** in certain embodiments.

For example, referring specifically to FIG. **7A**, the sensor **701***a* includes an emitter housing **704***a* and a detector housing **706**. The emitter housing **704***a* includes LEDs **104**. The detector housing **706***a* includes a tissue bed **710***a* with an opening or window **703***a*, the conductive glass **730***a*, and one or more photodiodes for detectors **106** provided on a submount **707***a*.

During operation, a finger **102** can be placed on the tissue bed **710***a* and optical radiation can be emitted from the LEDs **104**. Light can then be attenuated as it passes through or is reflected from the tissue of the finger **102**. The attenuated light can then pass through the opening **703***a* in the tissue bed **710***a*. Based on the received light, the detectors **106** can provide a detector signal **107**, for example, to the front end interface **108** (see FIG. **1**).

In the depicted embodiment, the conductive glass **730** is provided in the opening **703**. The conductive glass **730** can thus not only permit light from the finger to pass to the detectors **106**, but it can also supplement the shielding of the detectors **106** from noise. The conductive glass **730** can include a stack or set of layers. In FIG. **7A**, the conductive glass **730***a* is shown having a glass layer **731** proximate the finger **102** and a conductive layer **733** electrically coupled to the shielding **790***a*.

In an embodiment, the conductive glass **730***a* can be coated with a conductive, transparent or partially transparent material, such as a thin film of indium tin oxide (ITO). To supplement electrical shielding effects of a shielding enclosure **790***a*, the conductive glass **730***a* can be electrically coupled to the shielding enclosure **790***a*. The conductive glass **730***a* can be electrically coupled to the shielding **704***a* based on direct contact or via other connection devices, such as a wire or another component.

The shielding enclosure **790***a* can be provided to encompass the detectors **106** to reduce or prevent noise. For example, the shielding enclosure **790***a* can be constructed from a conductive material, such as copper, in the form of a metal cage. The shielding or enclosure a can include an opaque material to not only reduce electrical noise, but also ambient optical noise.

27
28

In some embodiments, the shielding enclosure 790a can be constructed in a single manufactured component with or without the use of conductive glass. This form of construction may be useful in order to reduce costs of manufacture as well as assist in quality control of the components. Furthermore, the shielding enclosure 790a can also be used to house various other components, such as sigma delta components for various embodiments of front end interfaces 108.

Referring to FIG. 7B, another block diagram of an example sensor 701b is shown. A tissue bed 710b of the sensor 701b includes a protrusion 705b, which is in the form of a convex bump. The protrusion 705b can include all of the features of the protrusions or tissue shaping materials described above. For example, the protrusion 705b includes a contact area 370 that comes in contact with the finger 102 and which can include one or more openings 703b. One or more components of conductive glass 730b can be provided in the openings 703. For example, in an embodiment, each of the openings 703 can include a separate window of the conductive glass 730b. In an embodiment, a single piece of the conductive glass 730b can used for some or all of the openings 703b. The conductive glass 730b is smaller than the conductive glass 730a in this particular embodiment.

A shielding enclosure 790b is also provided, which can have all the features of the shielding enclosure 790a. The shielding enclosure 790b is smaller than the shielding enclosure 790a; however, a variety of sizes can be selected for the shielding enclosures 790.

In some embodiments, the shielding enclosure 790b can be constructed in a single manufactured component with or without the use of conductive glass. This form of construction may be useful in order to reduce costs of manufacture as well as assist in quality control of the components. Furthermore, the shielding enclosure 790b can also be used to house various other components, such as sigma delta components for various embodiments of front end interfaces 108.

FIGS. 8A through 8D illustrate a perspective view, side views, and a bottom elevation view of the conductive glass described above with respect to the sensors 701a, 701b. As shown in the perspective view of FIG. 8A and side view of FIG. 8B, the conductive glass 730 includes the electrically conductive material 733 described above as a coating on the glass layer 731 described above to form a stack. In an embodiment where the electrically conductive material 733 includes indium tin oxide, surface resistivity of the electrically conductive material 733 can range approximately from 30 ohms per square inch to 500 ohms per square inch, or approximately 30, 200, or 500 ohms per square inch. As would be understood by a person of skill in the art from the present disclosure, other resistivities can also be used which are less than 30 ohms or more than 500 ohms. Other transparent, electrically conductive materials can be used as the material 733.

Although the conductive material 733 is shown spread over the surface of the glass layer 731, the conductive material 733 can be patterned or provided on selected portions of the glass layer 731. Furthermore, the conductive material 733 can have uniform or varying thickness depending on a desired transmission of light, a desired shielding effect, and other considerations.

In FIG. 8C, a side view of a conductive glass 830a is shown to illustrate an embodiment where the electrically conductive material 733 is provided as an internal layer between two glass layers 731, 835. Various combinations of integrating electrically conductive material 733 with glass

are possible. For example, the electrically conductive material 733 can be a layer within a stack of layers. This stack of layers can include one or more layers of glass 731, 835, as well as one or more layers of conductive material 733. The stack can include other layers of materials to achieve desired characteristics.

In FIG. 8D, a bottom perspective view is shown to illustrate an embodiment where a conductive glass 830b can include conductive material 837 that occupies or covers a portion of a glass layer 839. This embodiment can be useful, for example, to create individual, shielded windows for detectors 106, such as those shown in FIG. 3C. The conductive material 837 can be patterned to include an area 838 to allow light to pass to detectors 106 and one or more strips 841 to couple to the shielding 704 of FIG. 7.

Other configurations and patterns for the conductive material can be used in certain embodiments, such as, for example, a conductive coating lining periphery edges, a conductive coating outlaid in a pattern including a grid or other pattern, a speckled conductive coating, coating outlaid in lines in either direction or diagonally, varied thicknesses from the center out or from the periphery in, or other suitable patterns or coatings that balance the shielding properties with transparency considerations.

FIG. 9 depicts an example graph 900 that illustrates comparative results obtained by an example sensor having components similar to those disclosed above with respect to FIGS. 7 and 8. The graph 900 depicts the results of the percentage of transmission of varying wavelengths of light for different types of windows used in the sensors described above.

A line 915 on the graph 900 illustrates example light transmission of a window made from plain glass. As shown, the light transmission percentage of varying wavelengths of light is approximately 90% for a window made from plain glass. A line 920 on the graph 900 demonstrates an example light transmission percentage for an embodiment in which a window is made from glass having an ITO coating with a surface resistivity of 500 ohms per square inch. A line 925 on the graph 900 shows an example light transmission for an embodiment in which a window is made from glass that includes a coating of ITO oxide with a surface resistivity of 200 ohms per square inch. A line 930 on the graph 900 shows an example light transmission for an embodiment in which a window is made from glass that includes a coating of ITO oxide with a surface resistivity of 30 ohms per square inch.

The light transmission percentage for a window with currently available embedded wiring can have a light transmission percentage of approximately 70%. This lower percentage of light transmission can be due to the opacity of the wiring employed in a currently available window with wiring. Accordingly, certain embodiments of glass coatings described herein can employ, for example, ITO coatings with different surface resistivity depending on the desired light transmission, wavelengths of light used for measurement, desired shielding effect, and other criteria.

FIGS. 10A through 10B illustrate comparative noise floors of example implementations of the sensors described above. Noise can include optical noise from ambient light and electro-magnetic noise, for example, from surrounding electrical equipment. In FIG. 10A, a graph 1000 depicts possible noise floors for different frequencies of noise for an embodiment in which one of the sensors described above included separate windows for four (4) detectors 106. One or more of the windows included an embedded grid of wiring as a noise shield. Symbols 1030-1033 illustrate the

US 10,912,502 B2

29                                                                    30

noise floor performance for this embodiment. As can be seen, the noise floor performance can vary for each of the openings and based on the frequency of the noise.

In FIG. 10B, a graph 1050 depicts a noise floor for frequencies of noise 1070 for an embodiment in which the sensor included separate openings for four (4) detectors 106 and one or more windows that include an ITO coating. In this embodiment, a surface resistivity of the ITO used was about 500 ohms per square inch. Symbols 1080-1083 illustrate the noise floor performance for this embodiment. As can be seen, the noise floor performance for this embodiment can vary less for each of the openings and provide lower noise floors in comparison to the embodiment of FIG. 10A.

FIG. 11A illustrates an example structure for configuring the set of optical sources of the emitters described above. As shown, an emitter 104 can include a driver 1105, a thermistor 1120, a set of top-emitting LEDs 1102 for emitting red and/or infrared light, a set of side-emitting LEDs 1104 for emitting near infrared light, and a submount 1106.

The thermistor 1120 can be provided to compensate for temperature variations. For example, the thermistor 1120 can be provided to allow for wavelength centroid and power drift of LEDs 1102 and 1104 due to heating. In addition, other thermistors can be employed, for example, to measure a temperature of a measurement site. The temperature can be displayed on a display device and used by a caregiver. Such a temperature can also be helpful in correcting for wavelength drift due to changes in water absorption, which can be temperature dependent, thereby providing more accurate data useful in detecting blood analytes like glucose. In addition, using a thermistor or other type of temperature sensitive device may be useful for detecting extreme temperatures at the measurement site that are too hot or too cold. The presence of low perfusion may also be detected, for example, when the finger of a patient has become too cold. Moreover, shifts in temperature at the measurement site can alter the absorption spectrum of water and other tissue in the measurement cite. A thermistor's temperature reading can be used to adjust for the variations in absorption spectrum changes in the measurement site.

The driver 1105 can provide pulses of current to the emitter 1104. In an embodiment, the driver 1105 drives the emitter 1104 in a progressive fashion, for example, in an alternating manner based on a control signal from, for example, a processor (e.g., the processor 110). For example, the driver 1105 can drive the emitter 1104 with a series of pulses to about 1 milliwatt (mW) for visible light to light at about 1300 nm and from about 40 mW to about 100 mW for light at about 1600 nm to about 1700 nm. However, a wide number of driving powers and driving methodologies can be used. The driver 1105 can be synchronized with other parts of the sensor and can minimize or reduce any jitter in the timing of pulses of optical radiation emitted from the emitter 1104. In some embodiments, the driver 1105 is capable of driving the emitter 1104 to emit an optical radiation in a pattern that varies by less than about 10 parts-per-million; however other amounts of variation can be used.

The submount 1106 provides a support structure in certain embodiments for aligning the top-emitting LEDs 1102 and the side-emitting LEDs 1104 so that their optical radiation is transmitted generally towards the measurement site. In some embodiments, the submount 1106 is also constructed of aluminum nitride (AlN) or beryllium oxide (BEO) for heat dissipation, although other materials or combinations of materials suitable for the submount 1106 can be used.

FIG. 11B illustrates a configuration of emitting optical radiation into a measurement site for measuring a blood constituent or analyte like glucose. In some embodiments, emitter 104 may be driven in a progressive fashion to minimize noise and increase SNR of sensor 101. For example, emitter 104 may be driven based on a progression of power/current delivered to LEDs 1102 and 1104.

In some embodiments, emitter 104 may be configured to emit pulses centered about 905 nm, about 1050 nm, about 1200 nm, about 1300 nm, about 1330 nm, about 1610 nm, about 1640 nm, and about 1665 nm. In another embodiment, the emitter 104 may emit optical radiation ranging from about 860 nm to about 950 nm, about 950 nm to about 1100 nm, about 1100 nm to about 1270 nm, about 1250 nm to about 1350 nm, about 1300 nm to about 1360 nm, and about 1590 nm to about 1700 nm. Of course, emitter 104 may be configured to transmit any of a variety of wavelengths of visible, or near-infrared optical radiation.

For purposes of illustration, FIG. 11B shows a sequence of pulses of light at wavelengths of around 905 nm, around 1200 nm, around 1300 nm, and around 1330 nm from top emitting LEDs 1102. FIG. 11B also shows that emitter 104 may then emit pulses centered at around 1630 nm, around 1660 nm, and around 1615 nm from side emitting LEDs 1104. Emitter 104 may be progressively driven at higher power/current. This progression may allow driver circuit 105 to stabilize in its operations, and thus, provide a more stable current/power to LEDs 1102 and 1104.

For example, as shown in FIG. 11B, the sequence of optical radiation pulses are shown having a logarithmic-like progression in power/current. In some embodiments, the timing of these pulses is based on a cycle of about 400 slots running at 48 kHz (e.g. each time slot may be approximately 0.02 ms or 20 microseconds). An artisan will recognize that term "slots" includes its ordinary meaning, which includes a time period that may also be expressed in terms of a frequency. In the example shown, pulses from top emitting LEDs 1102 may have a pulse width of about 40 time slots (e.g., about 0.8 ms) and an off period of about 4 time slots in between. In addition, pulses from side emitting LEDs 1104 (e.g., or a laser diode) may have a pulse width of about 60 time slots (e.g., about 1.25 ms) and a similar off period of about 4 time slots. A pause of about 70 time slots (e.g. 1.5 ms) may also be provided in order to allow driver circuit 105 to stabilize after operating at higher current/power.

As shown in FIG. 11B, top emitting LEDs 1102 may be initially driven with a power to approximately 1 mW at a current of about 20-100 mA. Power in these LEDs may also be modulated by using a filter or covering of black dye to reduce power output of LEDs. In this example, top emitting LEDs 1102 may be driven at approximately 0.02 to 0.08 mW. The sequence of the wavelengths may be based on the current requirements of top emitting LEDs 502 for that particular wavelength. Of course, in other embodiments, different wavelengths and sequences of wavelengths may be output from emitter 104.

Subsequently, side emitting LEDs 1104 may be driven at higher powers, such as about 40-100 mW and higher currents of about 600-800 mA. This higher power may be employed in order to compensate for the higher opacity of tissue and water in measurement site 102 to these wavelengths. For example, as shown, pulses at about 1630 nm, about 1660 nm, and about 1615 nm may be output with progressively higher power, such as at about 40 mW, about 50 mW, and about 60 mW, respectively. In this embodiment, the order of wavelengths may be based on the optical characteristics of that wavelength in tissue as well as the

US 10,912,502 B2

31                                                                                          32

current needed to drive side emitting LEDs **1104**. For example, in this embodiment, the optical pulse at about 1615 nm is driven at the highest power due to its sensitivity in detecting analytes like glucose and the ability of light at this wavelength to penetrate tissue. Of course, different wavelengths and sequences of wavelengths may be output from emitter **104**.

As noted, this progression may be useful in some embodiments because it allows the circuitry of driver circuit **1105** to stabilize its power delivery to LEDs **1102** and **1104**. Driver circuit **1105** may be allowed to stabilize based on the duty cycle of the pulses or, for example, by configuring a variable waiting period to allow for stabilization of driver circuit **1105**. Of course, other variations in power/current and wavelength may also be employed in the present disclosure.

Modulation in the duty cycle of the individual pulses may also be useful because duty cycle can affect the signal noise ratio of the system **100**. That is, as the duty cycle is increased so may the signal to noise ratio.

Furthermore, as noted above, driver circuit **1105** may monitor temperatures of the LEDs **1102** and **1104** using the thermistor **1120** and adjust the output of LEDs **1102** and **1104** accordingly. Such a temperature may be to help sensor **101** correct for wavelength drift due to changes in water absorption, which can be temperature dependent.

FIG. **11C** illustrates another exemplary emitter that may be employed in the sensor according to an embodiment of the disclosure. As shown, the emitter **104** can include components mounted on a substrate **1108** and on submount **1106**. In particular, top-emitting LEDs **1102** for emitting red and/or infrared light may be mounted on substrate **1108**. Side emitting LEDS **1104** may be mounted on submount **1106**. As noted, side-emitting LEDs **1104** may be included in emitter **104** for emitting near infrared light.

As also shown, the sensor of FIG. **11C** may include a thermistor **1120**. As noted, the thermistor **1120** can be provided to compensate for temperature variations. The thermistor **1120** can be provided to allow for wavelength centroid and power drift of LEDs **1102** and **1104** due to heating. In addition, other thermistors (not shown) can be employed, for example, to measure a temperature of a measurement site. Such a temperature can be helpful in correcting for wavelength drift due to changes in water absorption, which can be temperature dependent, thereby providing more accurate data useful in detecting blood analytes like glucose.

In some embodiments, the emitter **104** may be implemented without the use of side emitting LEDs. For example, certain blood constituents, such as total hemoglobin, can be measured by embodiments of the disclosure without the use of side emitting LEDs. FIG. **11D** illustrates another exemplary emitter that may be employed in the sensor according to an embodiment of the disclosure. In particular, an emitter **104** that is configured for a blood constituent, such as total hemoglobin, is shown. The emitter **104** can include components mounted on a substrate **1108**. In particular, top-emitting LEDs **1102** for emitting red and/or infrared light may be mounted on substrate **1108**.

As also shown, the emitter of FIG. **11D** may include a thermistor **1120**. The thermistor **1120** can be provided to compensate for temperature variations. The thermistor **1120** can be provided to allow for wavelength centroid and power drift of LEDs **1102** due to heating.

FIG. **12A** illustrates a detector submount **1200** having photodiode detectors that are arranged in a grid pattern on the detector submount **1200** to capture light at different quadrants from a measurement site. One detector submount **1200** can be placed under each window of the sensors described above, or multiple windows can be placed over a single detector submount **1200**. The detector submount **1200** can also be used with the partially cylindrical protrusion **605** described above with respect to FIG. **6**.

The detectors include photodiode detectors 1-4 that are arranged in a grid pattern on the submount **1200** to capture light at different quadrants from the measurement site. As noted, other patterns of photodiodes, such as a linear row, or logarithmic row, can also be employed in certain embodiments.

As shown, the detectors 1-4 may have a predetermined spacing from each other, or spatial relationship among one another that result in a spatial configuration. This spatial configuration can be configured to purposefully create a variation of path lengths among detectors **106** and the point light source discussed above.

Detectors may hold multiple (e.g., two, three, four, etc.) photodiode arrays that are arranged in a two-dimensional grid pattern. Multiple photodiode arrays may also be useful to detect light piping (i.e., light that bypasses measurement site **102**). As shown, walls may separate the individual photodiode arrays to prevent mixing of light signals from distinct quadrants. In addition, as noted, the detectors may be covered by windows of transparent material, such as glass, plastic, etc., to allow maximum transmission of power light captured. As noted, this window may comprise some shielding in the form of an embedded grid of wiring, or a conductive layer or coating.

FIGS. **12B** through **12D** illustrate a simplified view of exemplary arrangements and spatial configurations of photodiodes for detectors **106**. As shown, detectors **106** may comprise photodiode detectors 1-4 that are arranged in a grid pattern on detector submount **1200** to capture light at different quadrants from measurement site **102**.

As noted, other patterns of photodiodes may also be employed in embodiments of the present disclosure, including, for example, stacked or other configurations recognizable to an artisan from the disclosure herein. For example, detectors **106** may be arranged in a linear array, a logarithmic array, a two-dimensional array, and the like. Furthermore, an artisan will recognize from the disclosure herein that any number of detectors **106** may be employed by embodiments of the present disclosure.

For example, as shown in FIG. **12B**, detectors **106** may comprise photodiode detectors 1-4 that are arranged in a substantially linear configuration on submount **1200**. In this embodiment shown, photodiode detectors 1-4 are substantially equally spaced apart (e.g., where the distance D is substantially the same between detectors 1-4).

In FIG. **12C**, photodiode detectors 1-4 may be arranged in a substantially linear configuration on submount **1200**, but may employ a substantially progressive, substantially logarithmic, or substantially semi-logarithmic spacing (e.g., where distances D1>D2>D3). This arrangement or pattern may be useful for use on a patient's finger and where the thickness of the finger gradually increases.

In FIG. **12D**, a different substantially grid pattern on submount **1200** of photodiode detectors 1-4 is shown. As noted, other patterns of detectors may also be employed in embodiments of the present invention.

FIGS. **12E** through **12H** illustrate several embodiments of photodiodes that may be used in detectors **106**. As shown in these figures, a photodiode **1202** of detector **106** may comprise a plurality of active areas **1204**. These active areas

US 10,912,502 B2

33

204 may be coupled together via a common cathode **1206** or anode **1208** in order to provide a larger effective detection area.

In particular, as shown in FIG. **12**E, photodiode **1202** may comprise two (2) active areas **1204**a and **1204**b. In FIG. **12**F, photodiode **1202** may comprise four (4) active areas **1204**c-f. In FIG. **12**G, photodiode **1202** may comprise three (3) active areas **1204**g-i. In FIG. **12**H, photodiode **1202** may comprise nine (9) active areas **1204**j-r. The use of smaller active areas may be useful because smaller active areas can be easier to fabricate and can be fabricated with higher purity. However, one skilled in the art will recognize that various sizes of active areas may be employed in the photodiode **1202**.

FIG. **13** illustrates an example multi-stream process **1300**. The multi-stream process **1300** can be implemented by the data collection system **100** and/or by any of the sensors described above. As shown, a control signal from a signal processor **1310** controls a driver **1305**. In response, an emitter **1304** generates a pulse sequence **1303** from its emitter (e.g., its LEDs) into a measurement site or sites **1302**. As described above, in some embodiments, the pulse sequence **1303** is controlled to have a variation of about 10 parts per million or less. Of course, depending on the analyte desired, the tolerated variation in the pulse sequence **1303** can be greater (or smaller).

In response to the pulse sequence **1300**, detectors 1 to n (n being an integer) in a detector **1306** capture optical radiation from the measurement site **1302** and provide respective streams of output signals. Each signal from one of detectors 1-n can be considered a stream having respective time slots corresponding to the optical pulses from emitter sets 1-n in the emitter **1304**. Although n emitters and n detectors are shown, the number of emitters and detectors need not be the same in certain implementations.

A front end interface **1308** can accept these multiple streams from detectors 1-n and deliver one or more signals or composite signal(s) back to the signal processor **1310**. A stream from the detectors 1-n can thus include measured light intensities corresponding to the light pulses emitted from the emitter **1304**.

The signal processor **1310** can then perform various calculations to measure the amount of glucose and other analytes based on these multiple streams of signals. In order to help explain how the signal processor **1310** can measure analytes like glucose, a primer on the spectroscopy employed in these embodiments will now be provided.

Spectroscopy is premised upon the Beer-Lambert law. According to this law, the properties of a material, e.g., glucose present in a measurement site, can be deterministically calculated from the absorption of light traveling through the material. Specifically, there is a logarithmic relation between the transmission of light through a material and the concentration of a substance and also between the transmission and the length of the path traveled by the light. As noted, this relation is known as the Beer-Lambert law.

The Beer-Lambert law is usually written as:

Absorbance $A=m*b*c$, where:

m is the wavelength-dependent molar absorptivity coefficient (usually expressed in units of $M^{-1}$ $cm^{-1}$);

b is the mean path length; and

c is the analyte concentration (e.g., the desired parameter).

In spectroscopy, instruments attempt to obtain the analyte concentration (c) by relating absorbance (A) to transmittance (T). Transmittance is a proportional value defined as:

$$T = I/I_o, \text{ where:}$$

34

I is the light intensity measured by the instrument from the measurement site; and

$I_o$ is the initial light intensity from the emitter.

Absorbance (A) can be equated to the transmittance (T) by the equation:

$$A = -\log T$$

Therefore, substituting equations from above:

$$A = -\log(I/I_o)$$

In view of this relationship, spectroscopy thus relies on a proportional-based calculation of $-\log(I/I_o)$ and solving for analyte concentration (c).

Typically, in order to simplify the calculations, spectroscopy will use detectors that are at the same location in order to keep the path length (b) a fixed, known constant. In addition, spectroscopy will employ various mechanisms to definitively know the transmission power ($I_o$), such as a photodiode located at the light source. This architecture can be viewed as a single channel or single stream sensor, because the detectors are at a single location.

However, this scheme can encounter several difficulties in measuring analytes, such as glucose. This can be due to the high overlap of absorption of light by water at the wavelengths relevant to glucose as well as other factors, such as high self-noise of the components.

Embodiments of the present disclosure can employ a different approach that in part allows for the measurement of analytes like glucose. Some embodiments can employ a bulk, non-pulsatile measurement in order to confirm or validate a pulsatile measurement. In addition, both the non-pulsatile and pulsatile measurements can employ, among other things, the multi-stream operation described above in order to attain sufficient SNR. In particular, a single light source having multiple emitters can be used to transmit light to multiple detectors having a spatial configuration.

A single light source having multiple emitters can allow for a range of wavelengths of light to be used. For example, visible, infrared, and near infrared wavelengths can be employed. Varying powers of light intensity for different wavelengths can also be employed.

Secondly, the use of multiple-detectors in a spatial configuration allow for a bulk measurement to confirm or validate that the sensor is positioned correctly. This is because the multiple locations of the spatial configuration can provide, for example, topology information that indicates where the sensor has been positioned. Currently available sensors do not provide such information. For example, if the bulk measurement is within a predetermined range of values, then this can indicate that the sensor is positioned correctly in order to perform pulsatile measurements for analytes like glucose. If the bulk measurement is outside of a certain range or is an unexpected value, then this can indicate that the sensor should be adjusted, or that the pulsatile measurements can be processed differently to compensate, such as using a different calibration curve or adjusting a calibration curve. This feature and others allow the embodiments to achieve noise cancellation and noise reduction, which can be several times greater in magnitude that what is achievable by currently available technology.

In order to help illustrate aspects of the multi-stream measurement approach, the following example derivation is provided. Transmittance (T) can be expressed as:

$$T = e^{-m*b*c}$$

US 10,912,502 B2

35                                                      36

In terms of light intensity, this equation can also be rewritten as:

$$I/I_o = e^{-m*b*c}$$

Or, at a detector, the measured light (I) can be expressed as:

$$I = I_o * e^{-m*b*c}$$

As noted, in the present disclosure, multiple detectors (1 to n) can be employed, which results in $I_1 \ldots I_n$ streams of measurements. Assuming each of these detectors have their own path lengths, $b_1 \ldots b_n$, from the light source, the measured light intensities can be expressed as:

$$I_n = I_o * e^{-m*b_n*c}$$

The measured light intensities at any two different detectors can be referenced to each other. For example:

$$I_1/I_n = (I_o * e^{-mb_1c})/(I_o * e^{-mb_nc})$$

As can be seen, the terms, $I_o$, cancel out and, based on exponent algebra, the equation can be rewritten as:

$$I_1/I_n = e^{-m(b_1 - b_n)c}$$

From this equation, the analyte concentration (c) can now be derived from bulk signals $I_1 \ldots I_n$ and knowing the respective mean path lengths $b_1$ and $b_n$. This scheme also allows for the cancelling out of $I_o$, and thus, noise generated by the emitter **1304** can be cancelled out or reduced. In addition, since the scheme employs a mean path length difference, any changes in mean path length and topological variations from patient to patient are easily accounted. Furthermore, this bulk-measurement scheme can be extended across multiple wavelengths. This flexibility and other features allow embodiments of the present disclosure to measure blood analytes like glucose.

For example, as noted, the non-pulsatile, bulk measurements can be combined with pulsatile measurements to more accurately measure analytes like glucose. In particular, the non-pulsatile, bulk measurement can be used to confirm or validate the amount of glucose, protein, etc. in the pulsatile measurements taken at the tissue at the measurement site(s) **1302**. The pulsatile measurements can be used to measure the amount of glucose, hemoglobin, or the like that is present in the blood. Accordingly, these different measurements can be combined to thus determine analytes like blood glucose.

FIG. **14**A illustrates an embodiment of a detector submount **1400**a positioned beneath the partially cylindrical protrusion **605** of FIG. **6** (or alternatively, the protrusion **605**b). The detector submount **1400**a includes two rows **1408**a of detectors **1410**a. The partially cylindrical protrusion **605** can facilitate reducing the number and/or size of detectors used in a sensor because the protrusion **605** can act as a lens that focuses light onto a smaller area.

To illustrate, in some sensors that do not include the partially cylindrical protrusion **605**, sixteen detectors can be used, including four rows of four detectors each. Multiple rows of detectors can be used to measure certain analytes, such as glucose or total hemoglobin, among others. Multiple rows of detectors can also be used to detect light piping (e.g., light that bypasses the measurement site). However, using more detectors in a sensor can add cost, complexity, and noise to the sensor.

Applying the partially cylindrical protrusion **605** to such a sensor, however, could reduce the number of detectors or rows of detectors used while still receiving the substantially same amount of light, due to the focusing properties of the protrusion **605** (see FIG. **14**B). This is the example situation illustrated in FIG. **14**—two rows **1408**a of detectors **1410**a

are used instead of four. Advantageously, in certain embodiments, the resulting sensor can be more cost effective, have less complexity, and have an improved SNR, due to fewer and/or smaller photodiodes.

In other embodiments, using the partially cylindrical protrusion **605** can allow the number of detector rows to be reduced to one or three rows of four detectors. The number of detectors in each row can also be reduced. Alternatively, the number of rows might not be reduced but the size of the detectors can be reduced. Many other configurations of detector rows and sizes can also be provided.

FIG. **14**B depicts a front elevation view of the partially cylindrical protrusion **605** (or alternatively, the protrusion **605**b) that illustrates how light from emitters (not shown) can be focused by the protrusion **605** onto detectors. The protrusion **605** is placed above a detector submount **1400**b having one or more detectors **1410**b disposed thereon. The submount **1400**b can include any number of rows of detectors **1410**, although one row is shown.

Light, represented by rays **1420**, is emitted from the emitters onto the protrusion **605**. These light rays **1420** can be attenuated by body tissue (not shown). When the light rays **1420** enter the protrusion **605**, the protrusion **605** acts as a lens to refract the rays into rays **1422**. This refraction is caused in certain embodiments by the partially cylindrical shape of the protrusion **605**. The refraction causes the rays **1422** to be focused or substantially focused on the one or more detectors **1410**b. Since the light is focused on a smaller area, a sensor including the protrusion **605** can include fewer detectors to capture the same amount of light compared with other sensors.

FIG. **14**C illustrates another embodiment of a detector submount **1400**c, which can be disposed under the protrusion **605**b (or alternatively, the protrusion **605**). The detector submount **1400**c includes a single row **1408**c of detectors **1410**c. The detectors are electrically connected to conductors **1412**c, which can be gold, silver, copper, or any other suitable conductive material.

The detector submount **1400**c is shown positioned under the protrusion **605**b in a detector subassembly **1450** illustrated in FIG. **14**D. A top-down view of the detector subassembly **1450** is also shown in FIG. **14**E. In the detector subassembly **1450**, a cylindrical housing **1430** is disposed on the submount **1400**c. The cylindrical housing **1430** includes a transparent cover **1432**, upon which the protrusion **605**b is disposed. Thus, as shown in FIG. **14**D, a gap **1434** exists between the detectors **1410**c and the protrusion **605**b. The height of this gap **1434** can be chosen to increase or maximize the amount of light that impinges on the detectors **1410**c.

The cylindrical housing **1430** can be made of metal, plastic, or another suitable material. The transparent cover **1432** can be fabricated from glass or plastic, among other materials. The cylindrical housing **1430** can be attached to the submount **1400**c at the same time or substantially the same time as the detectors **1410**c to reduce manufacturing costs. A shape other than a cylinder can be selected for the housing **1430** in various embodiments.

In certain embodiments, the cylindrical housing **1430** (and transparent cover **1432**) forms an airtight or substantially airtight or hermetic seal with the submount **1400**c. As a result, the cylindrical housing **1430** can protect the detectors **1410**c and conductors **1412**c from fluids and vapors that can cause corrosion. Advantageously, in certain embodiments, the cylindrical housing **1430** can protect the detectors **1410**c and conductors **1412**c more effectively than cur-

US 10,912,502 B2

37                                                                      38

rently-available resin epoxies, which are sometimes applied to solder joints between conductors and detectors.

In embodiments where the cylindrical housing **1430** is at least partially made of metal, the cylindrical housing **1430** can provide noise shielding for the detectors **1410***c*. For example, the cylindrical housing **1430** can be soldered to a ground connection or ground plane on the submount **1400***c*, which allows the cylindrical housing **1430** to reduce noise. In another embodiment, the transparent cover **1432** can include a conductive material or conductive layer, such as conductive glass or plastic. The transparent cover **1432** can include any of the features of the noise shields **790** described above.

The protrusion **605***b* includes the chamfered edges **607** described above with respect to FIG. **6**E. These chamfered edges **607** can allow a patient to more comfortably slide a finger over the protrusion **605***b* when inserting the finger into the sensor **301***f*.

FIG. **14**F illustrates a portion of the detector shell **306***f*, which includes the detectors **1410***c* on the substrate **1400***c*. The substrate **1400***c* is enclosed by a shielding enclosure **1490**, which can include the features of the shielding enclosures **790***a*, **790***b* described above (see also FIG. **17**). The shielding enclosure **1490** can be made of metal. The shielding enclosure **1490** includes a window **1492***a* above the detectors **1410***c*, which allows light to be transmitted onto the detectors **1410***c*.

A noise shield **1403** is disposed above the shielding enclosure **1490**. The noise shield **1403**, in the depicted embodiment, includes a window **1492***a* corresponding to the window **1492***a*. Each of the windows **1492***a*, **1492***b* can include glass, plastic, or can be an opening without glass or plastic. In some embodiments, the windows **1492***a*, **1492***b* may be selected to have different sizes or shapes from each other.

The noise shield **1403** can include any of the features of the conductive glass described above. In the depicted embodiment, the noise shield **1403** extends about three-quarters of the length of the detector shell **306***f*. In other embodiments, the noise shield **1403** could be smaller or larger. The noise shield **1403** could, for instance, merely cover the detectors **1410***c*, the submount **1400***c*, or a portion thereof. The noise shield **1403** also includes a stop **1413** for positioning a measurement site within the sensor **301***f*. Advantageously, in certain embodiments, the noise shield **1403** can reduce noise caused by light piping.

A thermistor **1470** is also shown. The thermistor **1470** is attached to the submount **1400***c* and protrudes above the noise shield **1403**. As described above, the thermistor **1470** can be employed to measure a temperature of a measurement site. Such a temperature can be helpful in correcting for wavelength drift due to changes in water absorption, which can be temperature dependent, thereby providing more accurate data useful in detecting blood analytes like glucose.

In the depicted embodiment, the detectors **1410***c* are not enclosed in the cylindrical housing **1430**. In an alternative embodiment, the cylindrical housing **1430** encloses the detectors **1410***c* and is disposed under the noise shield **1403**. In another embodiment, the cylindrical housing **1430** encloses the detectors **1410***c* and the noise shield **1403** is not used. If both the cylindrical housing **1430** and the noise shield **1403** are used, either or both can have noise shielding features.

FIG. **14**G illustrates the detector shell **306***f* of FIG. **14**F, with the finger bed **310***f* disposed thereon. FIG. **14**H illus-

trates the detector shell **306***f* of FIG. **14**G, with the protrusion **605***b* disposed in the finger bed **310***f*.

FIG. **14**I illustrates a cutaway view of the sensor **301***f*. Not all features of the sensor **301***f* are shown, such as the protrusion **605***b*. Features shown include the emitter and detector shells **304***f*, **306***f*, the flaps **307***f*, the heat sink **350***f* and fins **351***f*, the finger bed **310***f*, and the noise shield **1403**.

In addition to these features, emitters **1404** are depicted in the emitter shell **304***f*. The emitters **1404** are disposed on a submount **1401**, which is connected to a circuit board **1419**. The emitters **1404** are also enclosed within a cylindrical housing **1480**. The cylindrical housing **1480** can include all of the features of the cylindrical housing **1430** described above. For example, the cylindrical housing **1480** can be made of metal, can be connected to a ground plane of the submount **1401** to provide noise shielding, and can include a transparent cover **1482**.

The cylindrical housing **1480** can also protect the emitters **1404** from fluids and vapors that can cause corrosion. Moreover, the cylindrical housing **1480** can provide a gap between the emitters **1404** and the measurement site (not shown), which can allow light from the emitters **1404** to even out or average out before reaching the measurement site.

The heat sink **350***f*, in addition to including the fins **351***f*, includes a protuberance **352***f* that extends down from the fins **351***f* and contacts the submount **1401**. The protuberance **352***f* can be connected to the submount **1401**, for example, with thermal paste or the like. The protuberance **352***f* can sink heat from the emitters **1404** and dissipate the heat via the fins **351***f*.

FIGS. **15**A and **15**B illustrate embodiments of sensor portions **1500**A, **1500**B that include alternative heat sink features to those described above. These features can be incorporated into any of the sensors described above. For example, any of the sensors above can be modified to use the heat sink features described below instead of or in addition to the heat sink features of the sensors described above.

The sensor portions **1500**A, **1500**B shown include LED emitters **1504**; however, for ease of illustration, the detectors have been omitted. The sensor portions **1500**A, **1500**B shown can be included, for example, in any of the emitter shells described above.

The LEDs **1504** of the sensor portions **1500**A, **1500**B are connected to a substrate or submount **1502**. The submount **1502** can be used in place of any of the submounts described above. The submount **1502** can be a non-electrically conducting material made of any of a variety of materials, such as ceramic, glass, or the like. A cable **1512** is attached to the submount **1502** and includes electrical wiring **1514**, such as twisted wires and the like, for communicating with the LEDs **1504**. The cable **1512** can correspond to the cables **212** described above.

Although not shown, the cable **1512** can also include electrical connections to a detector. Only a portion of the cable **1512** is shown for clarity. The depicted embodiment of the cable **1512** includes an outer jacket **1510** and a conductive shield **1506** disposed within the outer jacket **1510**. The conductive shield **1506** can be a ground shield or the like that is made of a metal such as braided copper or aluminum. The conductive shield **1506** or a portion of the conductive shield **1506** can be electrically connected to the submount **1502** and can reduce noise in the signal generated by the sensor **1500**A, **1500**B by reducing RF coupling with the wires **1514**. In alternative embodiments, the cable **1512** does not have a conductive shield. For example, the cable **1512**

39

40

could be a twisted pair cable or the like, with one wire of the twisted pair used as a heat sink.

Referring specifically to FIG. **15**A, in certain embodiments, the conductive shield **1506** can act as a heat sink for the LEDs **1504** by absorbing thermal energy from the LEDs **1504** and/or the submount **1502**. An optional heat insulator **1520** in communication with the submount **1502** can also assist with directing heat toward the conductive shield **1506**. The heat insulator **1520** can be made of plastic or another suitable material. Advantageously, using the conductive shield **1506** in the cable **1512** as a heat sink can, in certain embodiments, reduce cost for the sensor.

Referring to FIG. **15**B, the conductive shield **1506** can be attached to both the submount **1502** and to a heat sink layer **1530** sandwiched between the submount **1502** and the optional insulator **1520**. Together, the heat sink layer **1530** and the conductive shield **1506** in the cable **1512** can absorb at least part of the thermal energy from the LEDs and/or the submount **1502**.

FIGS. **15**C and **15**D illustrate implementations of a sensor portion **1500**C that includes the heat sink features of the sensor portion **1500**A described above with respect to FIG. **15**A. The sensor portion **1500**C includes the features of the sensor portion **1500**A, except that the optional insulator **1520** is not shown. FIG. **15**D is a side cutaway view of the sensor portion **1500**C that shows the emitters **1504**.

The cable **1512** includes the outer jacket **1510** and the conductive shield **1506**. The conductive shield **1506** is soldered to the submount **1502**, and the solder joint **1561** is shown. In some embodiments, a larger solder joint **1561** can assist with removing heat more rapidly from the emitters **1504**. Various connections **1563** between the submount **1502** and a circuit board **1519** are shown. In addition, a cylindrical housing **1580**, corresponding to the cylindrical housing **1480** of FIG. **14**I, is shown protruding through the circuit board **1519**. The emitters **1504** are enclosed in the cylindrical housing **1580**.

FIGS. **15**E and **15**F illustrate implementations of a sensor portion **1500**E that includes the heat sink features of the sensor portion **1500**B described above with respect to FIG. **15**B. The sensor portion **1500**E includes the heat sink layer **1530**. The heat sink layer **1530** can be a metal plate, such as a copper plate or the like. The optional insulator **1520** is not shown. FIG. **15**F is a side cutaway view of the sensor portion **1500**E that shows the emitters **1504**.

In the depicted embodiment, the conductive shield **1506** of the cable **1512** is soldered to the heat sink layer **1530** instead of the submount **1502**. The solder joint **1565** is shown. In some embodiments, a larger solder joint **1565** can assist with removing heat more rapidly from the emitters **1504**. Various connections **1563** between the submount **1502** and a circuit board **1519** are shown. In addition, the cylindrical housing **1580** is shown protruding through the circuit board **1519**. The emitters **1504** are enclosed in the cylindrical housing **1580**.

FIGS. **15**G and **15**H illustrate embodiments of connector features that can be used with any of the sensors described above with respect to FIGS. **1** through **15**F. Referring to FIG. **15**G, the circuit board **1519** includes a female connector **1575** that mates with a male connector **1577** connected to a daughter board **1587**. The daughter board **1587** includes connections to the electrical wiring **1514** of the cable **1512**. The connected boards **1519**, **1587** are shown in FIG. **15**H. Also shown is a hole **1573** that can receive the cylindrical housing **1580** described above.

Advantageously, in certain embodiments, using a daughter board **1587** to connect to the circuit board **1519** can

enable connections to be made more easily to the circuit board **1519**. In addition, using separate boards can be easier to manufacture than a single circuit board **1519** with all connections soldered to the circuit board **1519**.

FIG. **15**I illustrates an exemplary architecture for front-end interface **108** as a transimpedance-based front-end. As noted, front-end interfaces **108** provide an interface that adapts the output of detectors **106** into a form that can be handled by signal processor **110**. As shown in this figure, sensor **101** and front-end interfaces **108** may be integrated together as a single component, such as an integrated circuit. Of course, one skilled in the art will recognize that sensor **101** and front end interfaces **108** may comprise multiple components or circuits that are coupled together.

Front-end interfaces **108** may be implemented using transimpedance amplifiers that are coupled to analog to digital converters in a sigma delta converter. In some embodiments, a programmable gain amplifier (PGA) can be used in combination with the transimpedance-based front-ends. For example, the output of a transimpedance-based front-end may be output to a sigma-delta ADC that comprises a PGA. A PGA may be useful in order to provide another level of amplification and control of the stream of signals from detectors **106**. The PGA may be an integrated circuit or built from a set of micro-relays. Alternatively, the PGA and ADC components in converter **900** may be integrated with the transimpedance-based front-end in sensor **101**.

Due to the low-noise requirements for measuring blood analytes like glucose and the challenge of using multiple photodiodes in detector **106**, the applicants developed a noise model to assist in configuring front-end **108**. Conventionally, those skilled in the art have focused on optimizing the impedance of the transimpedance amplifiers to minimize noise.

However, the following noise model was discovered by the applicants:

$$Noise = \sqrt{aR + bR^2}, \text{ where:}$$

aR is characteristic of the impedance of the transimpedance amplifier; and

$bR^2$ is characteristic of the impedance of the photodiodes in detector **106** and the number of photodiodes in detector **106**.

The foregoing noise model was found to be helpful at least in part due to the high SNR required to measure analytes like glucose. However, the foregoing noise model was not previously recognized by artisans at least in part because, in conventional devices, the major contributor to noise was generally believed to originate from the emitter or the LEDs. Therefore, artisans have generally continued to focus on reducing noise at the emitter.

However, for analytes like glucose, the discovered noise model revealed that one of the major contributors to noise was generated by the photodiodes. In addition, the amount of noise varied based on the number of photodiodes coupled to a transimpedance amplifier. Accordingly, combinations of various photodiodes from different manufacturers, different impedance values with the transimpedance amplifiers, and different numbers of photodiodes were tested as possible embodiments.

In some embodiments, different combinations of transimpedance to photodiodes may be used. For example, detectors 1-4 (as shown, as in FIG. **12**A) may each comprise four photodiodes. In some embodiments, each detector of four photodiodes may be coupled to one or more transimpedance amplifiers. The configuration of these amplifiers may be set according to the model shown in FIG. **15**J.

US 10,912,502 B2

41                                                    42

Alternatively, each of the photodiodes may be coupled to its own respective transimpedance amplifier. For example, transimpedance amplifiers may be implemented as integrated circuits on the same circuit board as detectors 1-4. In this embodiment, the transimpedance amplifiers may be grouped into an averaging (or summing) circuit, which are known to those skilled in the art, in order to provide an output stream from the detector. The use of a summing amplifier to combine outputs from several transimpedance amplifiers into a single, analog signal may be helpful in improving the SNR relative to what is obtainable from a single transimpedance amplifier. The configuration of the transimpedance amplifiers in this setting may also be set according to the model shown in FIG. 15J.

As yet another alternative, as noted above with respect to FIGS. 12E through 12H, the photodiodes in detectors 106 may comprise multiple active areas that are grouped together. In some embodiments, each of these active areas may be provided its own respective transimpedance. This form of pairing may allow a transimpedance amplifier to be better matched to the characteristics of its corresponding photodiode or active area of a photodiode.

As noted, FIG. 15J illustrates an exemplary noise model that may be useful in configuring transimpedance amplifiers. As shown, for a given number of photodiodes and a desired SNR, an optimal impedance value for a transimpedance amplifier could be determined.

For example, an exemplary "4 PD per stream" sensor 1502 is shown where detector 106 comprises four photodiodes 1502. The photodiodes 1502 are coupled to a single transimpedance amplifier 1504 to produce an output stream 1506. In this example, the transimpedance amplifier comprises 10 MO resistors 1508 and 1510. Thus, output stream 1506 is produced from the four photodiodes (PD) 1502. As shown in the graph of FIG. 15J, the model indicates that resistance values of about 10 MO may provide an acceptable SNR for analytes like glucose.

However, as a comparison, an exemplary "1 PD per stream" sensor 1512 is also shown in FIG. 15J. In particular, sensor 1512 may comprise a plurality of detectors 106 that each comprises a single photodiode 1514. In addition, as shown for this example configuration, each of photodiodes 1514 may be coupled to respective transimpedance amplifiers 1516, e.g., 1 PD per stream. Transimpedance amplifiers are shown having 40 MΩ resistors 1518. As also shown in the graph of FIG. 15J, the model illustrates that resistance values of 40 MΩ for resistors 1518 may serve as an alternative to the 4 photodiode per stream architecture of sensor 1502 described above and yet still provide an equivalent SNR.

Moreover, the discovered noise model also indicates that utilizing a 1 photodiode per stream architecture like that in sensor 1512 may provide enhanced performance because each of transimpedance amplifiers 1516 can be tuned or optimized to its respective photodiodes 1518. In some embodiments, an averaging component 1520 may also be used to help cancel or reduce noise across photodiodes 1518.

For purposes of illustration, FIG. 15K shows different architectures (e.g., four PD per stream and one PD per stream) for various embodiments of a sensor and how components of the sensor may be laid out on a circuit board or substrate. For example, sensor 1522 may comprise a "4 PD per stream" architecture on a submount 700 in which each detector 106 comprises four (4) photodiodes 1524. As shown for sensor 1522, the output of each set of four photodiodes 1524 is then aggregated into a single transimpedance amplifier 1526 to produce a signal.

As another example, a sensor 1528 may comprise a "1 PD per stream" architecture on submount 700 in which each detector 106 comprises four (4) photodiodes 1530. In sensor 1528, each individual photodiode 1530 is coupled to a respective transimpedance amplifier 1532. The output of the amplifiers 1532 may then be aggregated into averaging circuit 1520 to produce a signal.

As noted previously, one skilled in the art will recognize that the photodiodes and detectors may be arranged in different fashions to optimize the detected light. For example, sensor 1534 illustrates an exemplary "4 PD per stream" sensor in which the detectors 106 comprise photodiodes 1536 arranged in a linear fashion. Likewise, sensor 1538 illustrates an exemplary "1 PD per stream" sensor in which the detectors comprise photodiodes 1540 arranged in a linear fashion.

Alternatively, sensor 1542 illustrates an exemplary "4 PD per stream" sensor in which the detectors 106 comprise photodiodes 1544 arranged in a two-dimensional pattern, such as a zig-zag pattern. Sensor 1546 illustrates an exemplary "1 PD per stream" sensor in which the detectors comprise photodiodes 1548 also arranged in a zig-zag pattern.

FIG. 15L illustrates an exemplary architecture for a switched-capacitor-based front-end. As shown, front-end interfaces 108 may be implemented using switched capacitor circuits and any number of front-end interfaces 108 may be implemented. The output of these switched capacitor circuits may then be provided to a digital interface 1000 and signal processor 110. Switched capacitor circuits may be useful in system 100 for their resistor free design and analog averaging properties. In particular, the switched capacitor circuitry provides for analog averaging of the signal that allows for a lower smaller sampling rate (e.g., 2 KHz sampling for analog versus 48 KHz sampling for digital designs) than similar digital designs. In some embodiments, the switched capacitor architecture in front end interfaces 108 may provide a similar or equivalent SNR to other front end designs, such as a sigma delta architecture. In addition, a switched capacitor design in front end interfaces 108 may require less computational power by signal processor 110 to perform the same amount of decimation to obtain the same SNR.

FIGS. 16A and 16B illustrate embodiments of disposable optical sensors 1600. In an embodiment, any of the features described above, such as protrusion, shielding, and/or heat sink features, can be incorporated into the disposable sensors 1600 shown. For instance, the sensors 1600 can be used as the sensors 101 in the system 100 described above with respect to FIG. 1. Moreover, any of the features described above, such as protrusion, shielding, and/or heat sink features, can be implemented in other disposable sensor designs that are not depicted herein.

The sensors 1600 include an adult/pediatric sensor 1610 for finger placement and a disposable infant/neonate sensor 1602 configured for toe, foot or hand placement. Each sensor 1600 has a tape end 1610 and an opposite connector end 1620 electrically and mechanically interconnected via a flexible coupling 1630. The tape end 1610 attaches an emitter and detector to a tissue site. Although not shown, the tape end 1610 can also include any of the protrusion, shielding, and/or heat sink features described above. The emitter illuminates the tissue site and the detector generates a sensor signal responsive to the light after tissue absorption, such as absorption by pulsatile arterial blood flow within the tissue site.

US 10,912,502 B2

43                                                    44

The sensor signal is communicated via the flexible coupling **1630** to the connector end **1620**. The connector end **1620** can mate with a cable (not shown) that communicates the sensor signal to a monitor (not shown), such as any of the cables or monitors shown above with respect to FIGS. **2A** through **2D**. Alternatively, the connector end **1620** can mate directly with the monitor.

FIG. **17** illustrates an exploded view of certain of the components of the sensor **301** described above. A heat sink **1751** and a cable **1781** attach to an emitter shell **1704**. The emitter shell attaches to a flap housing **1707**. The flap housing **1707** includes a receptacle **1709** to receive a cylindrical housing **1480/1580** (not shown) attached to an emitter submount **1702**, which is attached to a circuit board **1719**.

A spring **1787** attaches to a detector shell **1706** via pins **1783**, **1785**, which hold the emitter and detector shells **1704**, **1706** together. A support structure **1791** attaches to the detector shell **1706**, which provides support for a shielding enclosure **1790**. A noise shield **1713** attaches to the shielding enclosure **1790**. A detector submount **1700** is disposed inside the shielding enclosure **1790**. A finger bed **1710** provides a surface for placement of the patient's finger. Finger bed **1710** may comprise a gripping surface or gripping features, which may assist in placing and stabilizing a patient's finger in the sensor. A partially cylindrical protrusion **1705** may also be disposed in the finger bed **1710**. As shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783**, **1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/

Liposyn were prepared that ranged from 0-55 mg/dL. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20**, 150 blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21**, 34 blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to attain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclosure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

1. A user-worn device configured to non-invasively measure a physiological parameter of a user, the user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit

Stay-Add-773

US 10,912,502 B2

45       46

light at a first wavelength and an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes arranged on an interior surface of the user-worn device and configured to receive light after attenuation by tissue of the user;

a protrusion comprising:

    a convex surface extending over the interior surface,

    a plurality of openings in the convex surface extending through the protrusion and aligned with the four photodiodes, each opening defined by an opaque surface, and

    a plurality of windows, each of the windows extending across a different one of the openings; and

one or more processors configured to receive one or more signals from at least one of the photodiodes and calculate a measurement of the physiological parameter of the user.

**2**. The user-worn device of claim **1**, wherein the windows comprise glass.

**3**. The user-worn device of claim **1**, wherein the windows comprise plastic.

**4**. The user-worn device of claim **1** further comprising:

a network interface configured to wirelessly communicate the measurement of the physiological parameter to at least one of: a mobile phone or a computer network;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the measurement of the physiological parameter;

a storage device configured to at least temporarily store at least the measurement; and

a strap configured to position the user-worn device on the user.

**5**. The user-worn device of claim **1**, wherein the opaque surface is configured to reduce light piping.

**6**. The user-worn device of claim **1** further comprising:

at least one wall extending between the interior surface and the protrusion,

wherein at least the interior surface, the wall and the protrusion form cavities, wherein the photodiodes are arranged on the interior surface within the cavities.

**7**. The user-worn device of claim **1**, wherein the physiological parameter comprises at least one of: methemoglobin, total hemoglobin, carboxyhemoglobin, or carbon monoxide.

**8**. The user-worn device of claim **1**, wherein the physiological parameter comprises oxygen or oxygen saturation.

**9**. The user-worn device of claim **1**, wherein the physiological parameter comprises trending information.

**10**. The user-worn device of claim **1** further comprising a thermistor.

**11**. The user-worn device of claim **1**, wherein the LEDs and the photodiodes are arranged on a same side of the tissue of the user.

**12**. The user-worn device of claim **1**, wherein the one or more processors are further configured to calculate a bulk measurement responsive to a positioning of the user-worn device.

**13**. The user-worn device of claim **1**, wherein, within each of the first and second sets of LEDs, any one LED is positioned within 2 mm to 4 mm of another.

**14**. The user-worn device of claim **1**, further comprising a third set of LEDs, the third set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength.

**15**. The user-worn device of claim **1**, wherein the four photodiodes comprise first, second, third and fourth photodiodes and wherein the first photodiode and the second photodiode are arranged on the interior surface across from each other on opposite sides of a central point along a first axis, and the third photodiode and the fourth photodiode are arranged across from each other on opposite sides of the central point along a second axis which is different from the first axis.

**16**. The user-worn device of claim **1**, wherein the protrusion further comprises one or more extensions.

**17**. The user-worn device of claim **16**, wherein the one or more extensions surround a perimeter of the convex surface of the protrusion.

**18**. The user-worn device of claim **1**, wherein the protrusion further comprises one or more chamfered edges.

**19**. A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user-worn device comprising:

a plurality of emitters configured to emit light, each of the emitters comprising at least two light emitting diodes (LEDs);

four photodiodes arranged within the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user;

a protrusion comprising a convex surface including separate openings extending through the protrusion and lined with opaque material, each opening positioned over a different one associated with each of the four photodiodes, the opaque material configured to reduce an amount of light reaching the photodiodes without being attenuated by the tissue;

optically transparent material within each of the openings; and

one or more processors configured to receive one or more signals from at least one of the four photodiodes and output measurements responsive to the one or more signals, the measurements indicative of the oxygen saturation of the user.

**20**. The user-worn device of claim **19** further comprising a thermistor.

**21**. The user-worn device of claim **20**, wherein the one or more processors are further configured to receive a temperature signal from the thermistor and adjust operation of the user-worn device responsive to the temperature signal.

**22**. The user-worn device of claim **21**, wherein the plurality of emitters comprise at least four emitters, and wherein each of the plurality of emitters comprises a respective set of at least three LEDs.

**23**. The user-worn device of claim **22**, wherein, within each respective set of at least three LEDs, the LEDs of the set are positioned within 2 mm to 4 mm of each other.

**24**. The user-worn device of claim **19** further comprising:

a network interface configured to wirelessly communicate at least the measurements of oxygen saturation to at least one of: a mobile phone or a computer network;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the measurements of oxygen saturation; and

a memory device configured to at least temporarily store at least the measurements of oxygen saturation.

US 10,912,502 B2

47

48

**25**. The user-worn device of claim **19**, wherein the photodiodes comprise first, second, third and fourth photodiodes and wherein the first photodiode and the second photodiode are arranged across from each other on opposite sides of a central point along a first axis, and the third photodiode and the fourth photodiode are arranged across from each other on opposite sides of the central point along a second axis which is different from the first axis.

**26**. The user-worn device of claim **19**, wherein the optically transparent material is glass.

**27**. The user-worn device of claim **19**, wherein the optically transparent material is plastic.

**28**. A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes arranged in a quadrant configuration on an interior surface of the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user;

a thermistor configured to provide a temperature signal;

a protrusion arranged above the interior surface, the protrusion comprising:

a convex surface;

a plurality of openings in the convex surface, extending through the protrusion, and aligned with the four photodiodes, each opening defined by an opaque surface configured to reduce light piping; and

a plurality of transmissive windows, each of the transmissive windows extending across a different one of the openings;

at least one opaque wall extending between the interior surface and the protrusion, wherein at least the interior surface, the opaque wall and the protrusion form cavities, wherein the photodiodes are arranged on the interior surface within the cavities;

one or more processors configured to receive one or more signals from at least one of the photodiodes and calculate an oxygen saturation measurement of the user, the one or more processors further configured to receive the temperature signal;

a network interface configured to wirelessly communicate the oxygen saturation measurement to at least one of a mobile phone or an electronic network;

a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the oxygen saturation measurement of the user;

a storage device configured to at least temporarily store at least the measurement; and

a strap configured to position the user-worn device on the user.

**29**. The user-worn device of claim **28**, further comprising:

a driver configured to energize the first and second sets of LEDs; and

a front-end interface comprising one or more amplifiers and one or more analog to digital converters (ADCs), wherein the front-end interface receives the signals from the photodiodes, the one or more amplifiers amplify the signals and the one or more ADCs convert the signals to digital information, and wherein the processors receive the converted signals.

**30**. The user-worn device of claim **28**, wherein the protrusion further comprises one or more sidewalls extending at least partially around a perimeter of the convex surface.

\* \* \* \* \*

# EXHIBIT 18



US010945648B2

(12) **United States Patent**
Poeze et al.

(10) **Patent No.:**     **US 10,945,648 B2**
(45) **Date of Patent:**        *Mar. 16, 2021

(54) **USER-WORN DEVICE FOR NONINVASIVELY MEASURING A PHYSIOLOGICAL PARAMETER OF A USER**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventors: **Jeroen Poeze**, Rancho Santa Margarita, CA (US); **Marcelo Lamego**, Cupertino, CA (US); **Sean Merritt**, Lake Forest, CA (US); **Cristiano Dalvi**, Lake Forest, CA (US); **Hung Vo**, Fountain Valley, CA (US); **Johannes Bruinsma**, Opeinde (NL); **Ferdyan Lesmana**, Irvine, CA (US); **Massi Joe E. Kiani**, Laguna Niguel, CA (US); **Greg Olsen**, Lake Forest, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/031,316**

(22) Filed: **Sep. 24, 2020**

(65) **Prior Publication Data**

US 2021/0007635 A1      Jan. 14, 2021

**Related U.S. Application Data**

(60) Continuation of application No. 16/834,538, filed on Mar. 30, 2020, which is a continuation of application
(Continued)

(51) **Int. Cl.**
*A61B 5/1455*      (2006.01)
*A61B 5/145*      (2006.01)
*A61B 5/00*      (2006.01)

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14546* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC . A61B 5/1455; A61B 5/14546; A61B 5/6838; A61B 5/6816; A61B 5/6829;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,452,215  A     6/1969   Alessio
3,760,582  A     9/1973   Thiess et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CA          2264029        3/1998
CN          1270793        10/2000
(Continued)

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)
(Continued)

*Primary Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57)        **ABSTRACT**

The present disclosure relates to noninvasive methods, devices, and systems for measuring various blood constituents or analytes, such as glucose. In an embodiment, a light source comprises LEDs and super-luminescent LEDs. The light source emits light at least wavelengths of about 1610 nm, about 1640 nm, and about 1665 nm. In an embodiment, the detector comprises a plurality of photodetectors arranged in a special geometry comprising one of a substantially linear substantially equal spaced geometry, a substantially linear substantially non-equal spaced geometry, and a substantially grid geometry.

**30 Claims, 65 Drawing Sheets**



**US 10,945,648 B2**

Page 2

### Related U.S. Application Data

No. 16/725,292, filed on Dec. 23, 2019, now Pat. No. 10,624,564, which is a continuation of application No. 16/534,949, filed on Aug. 7, 2019, now Pat. No. 10,588,553, which is a continuation of application No. 16/409,515, filed on May 10, 2019, now Pat. No. 10,376,191, which is a continuation of application No. 16/261,326, filed on Jan. 29, 2019, now Pat. No. 10,292,628, which is a continuation of application No. 16/212,537, filed on Dec. 6, 2018, now Pat. No. 10,258,266, which is a division of application No. 14/981,290, filed on Dec. 28, 2015, now Pat. No. 10,335,068, which is a continuation of application No. 12/829,352, filed on Jul. 1, 2010, now Pat. No. 9,277,880, which is a continuation of application No. 12/534,827, filed on Aug. 3, 2009, now abandoned, and a continuation-in-part of application No. 12/497,528, filed on Jul. 2, 2009, now Pat. No. 8,577,431, which is a continuation-in-part of application No. 29/323,408, filed on Aug. 25, 2008, now Pat. No. Des. 606,659, and a continuation-in-part of application No. 29/323,409, filed on Aug. 25, 2008, now Pat. No. Des. 621,516, and a continuation-in-part of application No. 12/497,523, filed on Jul. 2, 2009, now Pat. No. 8,437,825, said application No. 12/497,523 is a continuation-in-part of application No. 29/323,408, filed on Aug. 25, 2008, now Pat. No. Des. 606,659, and a continuation-in-part of application No. 29/323,409, filed on Aug. 25, 2008, now Pat. No. Des. 621,516.

(60) Provisional application No. 61/086,060, filed on Aug. 4, 2008, provisional application No. 61/086,108, filed on Aug. 4, 2008, provisional application No. 61/086,063, filed on Aug. 4, 2008, provisional application No. 61/086,057, filed on Aug. 4, 2008, provisional application No. 61/091,732, filed on Aug. 25, 2008, provisional application No. 61/078,228, filed on Jul. 3, 2008, provisional application No. 61/078,207, filed on Jul. 3, 2008.

(52) **U.S. Cl.**
CPC ........ *A61B 5/14552* (2013.01); *A61B 5/6816* (2013.01); *A61B 5/6826* (2013.01); *A61B 5/6829* (2013.01); *A61B 5/6838* (2013.01); *A61B 5/6843* (2013.01); *A61B 2562/0233* (2013.01); *A61B 2562/04* (2013.01); *A61B 2562/046* (2013.01); *A61B 2562/146* (2013.01)

(58) **Field of Classification Search**
CPC . A61B 5/6843; A61B 5/6826; A61B 5/14551; A61B 5/14552; A61B 5/14532; A61B 2562/046; A61B 2562/04; A61B 2562/0233; A61B 2562/146
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,789,601 A | 2/1974 | Bergey |
| 3,910,701 A | 10/1975 | Henderson et al. |
| 4,015,595 A | 4/1977 | Benjamin |
| 4,114,604 A | 9/1978 | Shaw et al. |
| 4,129,124 A | 12/1978 | Thalmann |
| 4,224,948 A | 9/1980 | Cramer et al. |
| 4,258,719 A | 3/1981 | Lewyn |
| 4,267,844 A | 5/1981 | Yamanishi |
| 4,409,470 A | 10/1983 | Shepard et al. |
| 4,438,338 A | 3/1984 | Stitt |
| 4,444,471 A | 4/1984 | Ford et al. |
| 4,447,150 A | 5/1984 | Heinemann |
| 4,547,075 A | 10/1985 | Fei |
| 4,653,498 A | 3/1987 | New, Jr. et al. |
| 4,655,225 A | 4/1987 | Dahne et al. |
| 4,684,245 A | 8/1987 | Goldring |
| 4,709,413 A | 11/1987 | Forrest |
| 4,755,676 A | 7/1988 | Gaalema et al. |
| 4,759,369 A | 7/1988 | Taylor |
| 4,781,195 A | 11/1988 | Martin |
| 4,782,836 A | 11/1988 | Alt |
| 4,802,486 A | 2/1989 | Goodman et al. |
| 4,805,623 A | 2/1989 | Jöbsis |
| 4,819,860 A | 4/1989 | Hargrove et al. |
| 4,825,872 A | 5/1989 | Tan et al. |
| 4,859,057 A | 8/1989 | Taylor et al. |
| 4,865,038 A | 9/1989 | Rich et al. |
| 4,867,557 A | 9/1989 | Takatani et al. |
| 4,869,253 A | 9/1989 | Craig, Jr. et al. |
| 4,880,304 A | 11/1989 | Jaeb et al. |
| 4,903,701 A | 2/1990 | Moore et al. |
| 4,928,692 A | 5/1990 | Goodman et al. |
| 4,933,544 A | 6/1990 | Saaski et al. |
| 4,938,218 A | 7/1990 | Goodman et al. |
| 4,941,236 A | 7/1990 | Sherman et al. |
| 4,945,239 A | 7/1990 | Wist et al. |
| 4,955,379 A | 9/1990 | Hall |
| 4,960,128 A | 10/1990 | Gordon et al. |
| 4,960,314 A | 10/1990 | Smith et al. |
| 4,964,408 A | 10/1990 | Hink et al. |
| 5,007,423 A | 4/1991 | Branstetter et al. |
| 5,025,791 A | 6/1991 | Niwa |
| 5,028,787 A | 7/1991 | Rosenthal et al. |
| 5,035,243 A | 7/1991 | Muz |
| 5,041,187 A | 8/1991 | Hink et al. |
| 5,043,820 A | 8/1991 | Wyles et al. |
| 5,069,213 A | 12/1991 | Polczynski |
| 5,069,214 A | 12/1991 | Samaras et al. |
| 5,069,680 A | 12/1991 | Grandjean |
| 5,077,476 A | 12/1991 | Rosenthal |
| 5,086,229 A | 2/1992 | Rosenthal et al. |
| 5,099,842 A | 3/1992 | Mannheimer et al. |
| 5,109,849 A | 5/1992 | Goodman et al. |
| D326,715 S | 6/1992 | Schmidt |
| 5,122,925 A | 6/1992 | Inpyn |
| 5,131,391 A | 7/1992 | Sakai et al. |
| 5,137,023 A | 8/1992 | Mendelson et al. |
| 5,158,082 A | 10/1992 | Jones |
| 5,158,091 A | 10/1992 | Butterfiled et al. |
| 5,159,929 A | 11/1992 | McMillen et al. |
| 5,163,438 A | 11/1992 | Gordon et al. |
| 5,176,137 A | 1/1993 | Erickson et al. |
| 5,190,038 A | 3/1993 | Polson et al. |
| 5,203,329 A | 4/1993 | Takatani et al. |
| 5,218,962 A | 6/1993 | Mannheimer et al. |
| 5,222,295 A | 6/1993 | Dorris, Jr. |
| 5,222,495 A | 6/1993 | Clarke et al. |
| 5,222,496 A | 6/1993 | Clarke et al. |
| 5,228,449 A | 7/1993 | Christ et al. |
| 5,249,576 A | 10/1993 | Goldberger et al. |
| 5,250,342 A | 10/1993 | Lang |
| 5,251,011 A | 10/1993 | Fujiwara et al. |
| 5,254,388 A | 10/1993 | Melby et al. |
| 5,254,992 A | 10/1993 | Keen et al. |
| 5,273,036 A | 12/1993 | Kronberg et al. |
| 5,278,627 A | 1/1994 | Aoyagi et al. |
| 5,297,548 A | 3/1994 | Pologe |
| 5,319,355 A | 6/1994 | Russek |
| 5,333,616 A | 8/1994 | Mills et al. |
| 5,337,744 A | 8/1994 | Branigan |
| 5,337,745 A | 8/1994 | Benaron |
| 5,341,805 A | 8/1994 | Stavridi et al. |
| 5,355,242 A | 10/1994 | Eastmond et al. |
| 5,358,519 A | 10/1994 | Grandjean |
| 5,362,966 A | 11/1994 | Rosenthal et al. |
| D353,195 S | 12/1994 | Savage et al. |
| D353,196 S | 12/1994 | Savage et al. |
| 5,372,135 A | 12/1994 | Mendelson et al. |

**US 10,945,648 B2**

Page 3

(56)             **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,377,676 | A | 1/1995 | Vari et al. |
| D356,870 | S | 3/1995 | Ivers et al. |
| D359,546 | S | 6/1995 | Savage et al. |
| 5,427,093 | A | 6/1995 | Ogawa et al. |
| 5,431,170 | A | 7/1995 | Mathews |
| 5,436,499 | A | 7/1995 | Namavar et al. |
| D361,840 | S | 8/1995 | Savage et al. |
| 5,437,275 | A | 8/1995 | Amundsen et al. |
| 5,441,054 | A | 8/1995 | Tsuchiya |
| D362,063 | S | 9/1995 | Savage et al. |
| 5,452,717 | A | 9/1995 | Branigan et al. |
| D363,120 | S | 10/1995 | Savage et al. |
| 5,456,252 | A | 10/1995 | Vari et al. |
| 5,462,051 | A | 10/1995 | Oka et al. |
| 5,479,934 | A | 1/1996 | Imran |
| 5,482,034 | A | 1/1996 | Lewis et al. |
| 5,482,036 | A | 1/1996 | Diab et al. |
| 5,490,505 | A | 2/1996 | Diab et al. |
| 5,490,506 | A | 2/1996 | Takatani et al. |
| 5,490,523 | A | 2/1996 | Isaacson et al. |
| 5,494,043 | A | 2/1996 | O'Sullivan et al. |
| 5,497,771 | A | 3/1996 | Rosenheimer |
| 5,511,546 | A | 4/1996 | Hon |
| 5,533,511 | A | 7/1996 | Kaspari et al. |
| 5,534,851 | A | 7/1996 | Russek |
| 5,542,146 | A | 8/1996 | Hoekstra et al. |
| 5,551,422 | A | 9/1996 | Simonsen et al. |
| 5,553,614 | A | 9/1996 | Chance |
| 5,553,615 | A | 9/1996 | Carim et al. |
| 5,553,616 | A | 9/1996 | Ham et al. |
| 5,555,882 | A | 9/1996 | Richardson et al. |
| 5,561,275 | A | 10/1996 | Savage et al. |
| 5,562,002 | A | 10/1996 | Lalin |
| 5,564,429 | A | 10/1996 | Bornn et al. |
| 5,581,069 | A | 12/1996 | Shepard et al. |
| 5,584,296 | A | 12/1996 | Cui et al. |
| 5,590,649 | A | 1/1997 | Caro et al. |
| 5,601,079 | A | 2/1997 | Wong et al. |
| 5,601,080 | A | 2/1997 | Oppenheimer |
| 5,602,924 | A | 2/1997 | Durand et al. |
| D378,414 | S | 3/1997 | Allen et al. |
| 5,623,925 | A | 4/1997 | Swenson et al. |
| 5,625,458 | A | 4/1997 | Alfano et al. |
| 5,632,272 | A | 5/1997 | Diab et al. |
| 5,635,700 | A | 6/1997 | Fazekas |
| 5,638,816 | A | 6/1997 | Kiani-Azarbayjany et al. |
| 5,638,818 | A | 6/1997 | Diab et al. |
| 5,645,440 | A | 7/1997 | Tobler et al. |
| 5,671,914 | A | 9/1997 | Kalkhoran et al. |
| 5,676,143 | A | 10/1997 | Simonsen et al. |
| 5,685,299 | A | 11/1997 | Diab et al. |
| 5,687,717 | A | 11/1997 | Halpern et al. |
| 5,699,808 | A | 12/1997 | John |
| 5,702,429 | A | 12/1997 | King |
| D390,666 | S | 2/1998 | Lagerlof |
| 5,719,557 | A | 2/1998 | Rattman et al. |
| 5,726,440 | A | 3/1998 | Kalkhoran et al. |
| 5,729,203 | A | 3/1998 | Oka et al. |
| D393,830 | S | 4/1998 | Tobler et al. |
| 5,743,262 | A | 4/1998 | Lepper, Jr. et al. |
| 5,746,206 | A | 5/1998 | Mannheimer et al. |
| 5,746,697 | A | 5/1998 | Swedlow et al. |
| 5,747,806 | A | 5/1998 | Khalil et al. |
| 5,750,927 | A | 5/1998 | Baltazar |
| 5,750,994 | A | 5/1998 | Schlager |
| 5,752,914 | A | 5/1998 | Delonzor et al. |
| 5,758,644 | A | 6/1998 | Diab et al. |
| 5,760,910 | A | 6/1998 | Lepper, Jr. et al. |
| 5,766,131 | A | 6/1998 | Kondo et al. |
| 5,769,785 | A | 6/1998 | Diab et al. |
| 5,782,757 | A | 7/1998 | Diab et al. |
| 5,785,659 | A | 7/1998 | Caro et al. |
| 5,791,347 | A | 8/1998 | Flaherty et al. |
| 5,792,052 | A | 8/1998 | Isaacson et al. |
| 5,795,300 | A | 8/1998 | Bryars |
| 5,797,841 | A | 8/1998 | Delonzor et al. |
| 5,800,348 | A | 9/1998 | Kaestle |
| 5,800,349 | A | 9/1998 | Isaacson et al. |
| 5,807,247 | A | 9/1998 | Merchant et al. |
| 5,810,734 | A | 9/1998 | Caro et al. |
| 5,817,008 | A | 10/1998 | Rafert et al. |
| 5,823,950 | A | 10/1998 | Diab et al. |
| 5,826,885 | A | 10/1998 | Helgeland |
| 5,830,131 | A | 11/1998 | Caro et al. |
| 5,830,137 | A | 11/1998 | Scharf |
| 5,833,618 | A | 11/1998 | Caro et al. |
| D403,070 | S | 12/1998 | Maeda et al. |
| 5,842,982 | A | 12/1998 | Mannheimer |
| 5,851,178 | A | 12/1998 | Aronow |
| 5,854,706 | A | 12/1998 | Alb |
| 5,860,919 | A | 1/1999 | Kiani-Azarbayjany et al. |
| 5,860,932 | A | 1/1999 | Goto et al. |
| 5,890,929 | A | 4/1999 | Mills et al. |
| 5,891,022 | A | 4/1999 | Pologe |
| 5,893,364 | A | * | 4/1999 | Haar ..................... A61B 5/0059 |
| | | | 356/338 |
| 5,902,235 | A | 5/1999 | Lewis et al. |
| 5,903,357 | A | 5/1999 | Colak |
| 5,904,654 | A | 5/1999 | Wohltmann et al. |
| 5,911,689 | A | 6/1999 | Smith et al. |
| 5,919,134 | A | 7/1999 | Diab |
| 5,923,021 | A | 7/1999 | Dvorkis et al. |
| 5,924,979 | A | 7/1999 | Swedlow et al. |
| 5,934,925 | A | 8/1999 | Tobler et al. |
| 5,936,986 | A | 8/1999 | Cantatore et al. |
| 5,940,182 | A | 8/1999 | Lepper, Jr. et al. |
| 5,957,840 | A | 9/1999 | Terasawa et al. |
| D414,870 | S | 10/1999 | Saltzstein et al. |
| 5,987,343 | A | 11/1999 | Kinast |
| 5,991,467 | A | 11/1999 | Kamiko |
| 5,995,855 | A | 11/1999 | Kiani et al. |
| 5,997,343 | A | 12/1999 | Mills et al. |
| 6,002,952 | A | 12/1999 | Diab et al. |
| 6,010,937 | A | 1/2000 | Karam et al. |
| 6,011,986 | A | 1/2000 | Diab et al. |
| 6,018,403 | A | 1/2000 | Shirakura et al. |
| 6,018,673 | A | 1/2000 | Chin et al. |
| 6,022,321 | A | 2/2000 | Amano et al. |
| 6,027,452 | A | 2/2000 | Flaherty et al. |
| 6,031,603 | A | 2/2000 | Fine et al. |
| 6,035,223 | A | 3/2000 | Baker |
| 6,036,642 | A | 3/2000 | Diab et al. |
| 6,040,578 | A | 3/2000 | Malin et al. |
| 6,041,247 | A | 3/2000 | Weckstrom et al. |
| 6,045,509 | A | 4/2000 | Caro et al. |
| 6,049,727 | A | 4/2000 | Crothall |
| 6,058,331 | A | 5/2000 | King |
| 6,066,204 | A | 5/2000 | Haven |
| 6,067,462 | A | 5/2000 | Diab et al. |
| 6,081,735 | A | 6/2000 | Diab et al. |
| 6,088,607 | A | 7/2000 | Diab et al. |
| 6,102,856 | A | 8/2000 | Groff et al. |
| 6,110,522 | A | 8/2000 | Lepper, Jr. et al. |
| 6,115,673 | A | 9/2000 | Malin et al. |
| 6,122,042 | A | 9/2000 | Wunderman et al. |
| 6,122,536 | A | 9/2000 | Sun et al. |
| 6,124,597 | A | 9/2000 | Shehada |
| 6,126,595 | A | 10/2000 | Amano et al. |
| 6,128,521 | A | 10/2000 | Marro et al. |
| 6,129,675 | A | 10/2000 | Jay |
| 6,133,871 | A | 10/2000 | Krasner |
| 6,144,866 | A | 11/2000 | Miesel et al. |
| 6,144,868 | A | 11/2000 | Parker |
| 6,151,516 | A | 11/2000 | Kiani-Azarbayjany et al. |
| 6,152,754 | A | 11/2000 | Gerhardt et al. |
| 6,157,850 | A | 12/2000 | Diab et al. |
| 6,165,005 | A | 12/2000 | Mills et al. |
| 6,167,258 | A | 12/2000 | Schmidt et al. |
| 6,167,303 | A | 12/2000 | Thompson |
| 6,172,743 | B1 | 1/2001 | Kley et al. |
| 6,175,752 | B1 | 1/2001 | Say et al. |
| 6,178,343 | B1 | 1/2001 | Bindszus et al. |
| 6,181,958 | B1 | 1/2001 | Steuer et al. |
| 6,184,521 | B1 | 2/2001 | Coffin, IV et al. |

**Stay-Add-779**

US 10,945,648 B2

Page 4

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,185,454 | B1 | 2/2001 | Thompson |
| 6,192,261 | B1 | 2/2001 | Gratton et al. |
| 6,198,951 | B1 | 3/2001 | Kosuda et al. |
| 6,198,952 | B1 | 3/2001 | Miesel et al. |
| 6,202,930 | B1 | 3/2001 | Plesko |
| 6,206,830 | B1 | 3/2001 | Diab et al. |
| 6,223,063 | B1 | 4/2001 | Chaiken et al. |
| 6,226,539 | B1 | 5/2001 | Potratz |
| 6,229,856 | B1 | 5/2001 | Diab et al. |
| 6,232,609 | B1 | 5/2001 | Snyder et al. |
| 6,236,872 | B1 | 5/2001 | Diab et al. |
| 6,241,680 | B1 | 6/2001 | Miwa |
| 6,241,683 | B1 | 6/2001 | Macklem et al. |
| 6,241,684 | B1 | 6/2001 | Amano et al. |
| 6,252,977 | B1 | 6/2001 | Salganicoff et al. |
| 6,253,097 | B1 | 6/2001 | Aronow et al. |
| 6,255,708 | B1 | 7/2001 | Sudharsanan et al. |
| 6,256,523 | B1 | 7/2001 | Diab et al. |
| 6,263,222 | B1 | 7/2001 | Diab et al. |
| 6,270,223 | B1 | 8/2001 | Del Bon et al. |
| 6,278,522 | B1 | 8/2001 | Lepper, Jr. et al. |
| 6,278,889 | B1 | 8/2001 | Robinson |
| 6,280,213 | B1 | 8/2001 | Tobler et al. |
| 6,280,381 | B1 | 8/2001 | Malin et al. |
| 6,285,896 | B1 | 9/2001 | Tobler et al. |
| 6,293,915 | B1 | 9/2001 | Amano et al. |
| 6,297,906 | B1 | 10/2001 | Allen et al. |
| 6,297,969 | B1 | 10/2001 | Mottahed |
| 6,301,493 | B1 | 10/2001 | Marro et al. |
| 6,304,766 | B1 | 10/2001 | Colvin, Jr. |
| 6,308,089 | B1 | 10/2001 | von der Ruhr et al. |
| 6,317,627 | B1 | 11/2001 | Ennen et al. |
| 6,321,100 | B1 | 11/2001 | Parker |
| D452,012 | S | 12/2001 | Phillips |
| 6,325,761 | B1 | 12/2001 | Jay |
| 6,334,065 | B1 | 12/2001 | Al-Ali et al. |
| 6,343,223 | B1 | 1/2002 | Chin et al. |
| 6,343,224 | B1 | 1/2002 | Parker |
| 6,345,194 | B2 | 2/2002 | Nelson et al. |
| 6,349,228 | B1 | 2/2002 | Kiani et al. |
| 6,351,217 | B1 | 2/2002 | Kuhn |
| 6,353,750 | B1 | 3/2002 | Kimura et al. |
| 6,356,203 | B1 | 3/2002 | Halleck et al. |
| 6,356,774 | B1 | 3/2002 | Bernstein et al. |
| 6,360,113 | B1 | 3/2002 | Dettling |
| 6,360,114 | B1 | 3/2002 | Diab et al. |
| 6,360,115 | B1 | 3/2002 | Greenwald et al. |
| D455,834 | S | 4/2002 | Donars et al. |
| 6,368,283 | B1 | 4/2002 | Xu et al. |
| 6,371,921 | B1 | 4/2002 | Caro et al. |
| 6,377,829 | B1 | 4/2002 | Al-Ali |
| 6,388,240 | B2 | 5/2002 | Schulz et al. |
| 6,393,311 | B1 | 5/2002 | Edgar et al. |
| 6,396,873 | B1 | 5/2002 | Goldstein et al. |
| 6,397,091 | B2 | 5/2002 | Diab et al. |
| 6,398,727 | B1 | 6/2002 | Bui et al. |
| 6,402,690 | B1 | 6/2002 | Rhee et al. |
| 6,411,373 | B1 | 6/2002 | Garside et al. |
| 6,415,166 | B1 | 7/2002 | Van Hoy et al. |
| 6,415,167 | B1 | 7/2002 | Blank et al. |
| 6,430,423 | B2 | 8/2002 | DeLonzor et al. |
| 6,430,437 | B1 | 8/2002 | Marro |
| 6,430,525 | B1 | 8/2002 | Weber et al. |
| D463,561 | S | 9/2002 | Fukatsu et al. |
| 6,463,187 | B1 | 10/2002 | Baruch et al. |
| 6,463,311 | B1 | 10/2002 | Diab |
| 6,470,199 | B1 | 10/2002 | Kopotic et al. |
| 6,470,893 | B1 | 10/2002 | Boesen |
| 6,473,008 | B2 | 10/2002 | Kelly et al. |
| 6,475,153 | B1 | 11/2002 | Khair et al. |
| 6,487,429 | B2 | 11/2002 | Hockersmith et al. |
| RE37,922 | E | 12/2002 | Sharan |
| 6,491,647 | B1 | 12/2002 | Bridger et al. |
| 6,501,975 | B2 | 12/2002 | Diab et al. |
| 6,505,059 | B1 | 1/2003 | Kollias et al. |
| 6,515,273 | B2 | 2/2003 | Al-Ali |
| 6,516,289 | B2 | 2/2003 | David et al. |
| 6,519,487 | B1 | 2/2003 | Parker |
| 6,522,521 | B2 | 2/2003 | Mizuno et al. |
| 6,525,386 | B1 | 2/2003 | Mills et al. |
| 6,526,300 | B1 | 2/2003 | Kiani et al. |
| 6,527,729 | B1 | 3/2003 | Turcott |
| 6,534,012 | B1 | 3/2003 | Hazen et al. |
| 6,541,756 | B2 | 4/2003 | Schulz et al. |
| 6,542,764 | B1 | 4/2003 | Al-Ali et al. |
| 6,553,242 | B1 | 4/2003 | Sarussi |
| 6,556,852 | B1 | 4/2003 | Schulze et al. |
| 6,580,086 | B1 | 6/2003 | Schulz et al. |
| 6,584,336 | B1 | 6/2003 | Ali et al. |
| 6,587,196 | B1 | 7/2003 | Stippick et al. |
| 6,587,199 | B1 | 7/2003 | Luu |
| 6,595,316 | B2 | 7/2003 | Cybulski et al. |
| 6,596,016 | B1 | 7/2003 | Vreman et al. |
| 6,597,932 | B2 | 7/2003 | Tian et al. |
| 6,597,933 | B2 | 7/2003 | Kiani et al. |
| 6,606,509 | B2 | 8/2003 | Schmitt |
| 6,606,511 | B1 | 8/2003 | Ali et al. |
| D481,459 | S | 10/2003 | Nahm |
| 6,632,181 | B2 | 10/2003 | Flaherty et al. |
| 6,635,559 | B2 | 10/2003 | Greenwald et al. |
| 6,636,759 | B2 | 10/2003 | Robinson |
| 6,639,668 | B1 | 10/2003 | Trepagnier |
| 6,639,867 | B2 | 10/2003 | Shim |
| 6,640,116 | B2 | 10/2003 | Diab |
| 6,640,117 | B2 | 10/2003 | Makarewicz et al. |
| 6,643,530 | B2 | 11/2003 | Diab et al. |
| 6,650,917 | B2 | 11/2003 | Diab et al. |
| 6,650,939 | B2 | 11/2003 | Takpke, II et al. |
| 6,654,624 | B2 | 11/2003 | Diab et al. |
| 6,658,276 | B2 | 12/2003 | Kiani et al. |
| 6,661,161 | B1 | 12/2003 | Lanzo et al. |
| 6,668,185 | B2 | 12/2003 | Toida |
| 6,671,526 | B1 | 12/2003 | Aoyagi et al. |
| 6,671,531 | B2 | 12/2003 | Al-Ali et al. |
| 6,678,543 | B2 | 1/2004 | Diab et al. |
| 6,681,133 | B2 | 1/2004 | Chaiken et al. |
| 6,684,090 | B2 | 1/2004 | Ali et al. |
| 6,684,091 | B2 | 1/2004 | Parker |
| 6,694,157 | B1 | 2/2004 | Stone et al. |
| 6,697,656 | B1 | 2/2004 | Al-Ali |
| 6,697,657 | B1 | 2/2004 | Shehada et al. |
| 6,697,658 | B2 | 2/2004 | Al-Ali |
| RE38,476 | E | 3/2004 | Diab et al. |
| 6,699,194 | B1 | 3/2004 | Diab et al. |
| 6,714,803 | B1 | 3/2004 | Mortz |
| 6,714,804 | B2 | 3/2004 | Al-Ali et al. |
| RE38,492 | E | 4/2004 | Diab et al. |
| 6,721,582 | B2 | 4/2004 | Trepagnier et al. |
| 6,721,585 | B1 | 4/2004 | Parker |
| 6,725,075 | B2 | 4/2004 | Al-Ali |
| 6,728,560 | B2 | 4/2004 | Kollias et al. |
| 6,735,459 | B2 | 5/2004 | Parker |
| 6,738,652 | B2 | 5/2004 | Mattu et al. |
| 6,745,060 | B2 | 6/2004 | Diab et al. |
| 6,748,254 | B2 | 6/2004 | O'Neil et al. |
| 6,751,283 | B2 | 6/2004 | van de Haar |
| 6,760,607 | B2 | 7/2004 | Al-Ali |
| 6,770,028 | B1 | 8/2004 | Ali et al. |
| 6,771,994 | B2 | 8/2004 | Kiani et al. |
| 6,785,568 | B2 | 8/2004 | Chance |
| 6,788,965 | B2 | 9/2004 | Ruchti et al. |
| 6,792,300 | B1 | 9/2004 | Diab et al. |
| 6,801,799 | B2 | 10/2004 | Mendelson |
| 6,811,535 | B2 | 11/2004 | Palti et al. |
| 6,813,511 | B2 | 11/2004 | Diab et al. |
| 6,816,010 | B2 | 11/2004 | Seetharaman et al. |
| 6,816,241 | B2 | 11/2004 | Grubisic et al. |
| 6,816,741 | B2 | 11/2004 | Diab |
| 6,822,564 | B2 | 11/2004 | Al-Ali |
| 6,826,419 | B2 | 11/2004 | Diab et al. |
| 6,830,711 | B2 | 12/2004 | Mills et al. |
| 6,831,266 | B2 | 12/2004 | Paritsky et al. |
| 6,850,787 | B2 | 2/2005 | Weber et al. |
| 6,850,788 | B2 | 2/2005 | Al-Ali |

US 10,945,648 B2

Page 5

(56)              **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,852,083 | B2 | 2/2005 | Caro et al. |
| 6,853,304 | B2 | 2/2005 | Reisman |
| D502,655 | S | 3/2005 | Huang |
| 6,861,639 | B2 | 3/2005 | Al-Ali |
| 6,871,089 | B2 | 3/2005 | Korzinov et al. |
| 6,876,931 | B2 | 4/2005 | Lorenz et al. |
| 6,882,872 | B2 | 4/2005 | Uchida et al. |
| 6,897,788 | B2 | 5/2005 | Khair et al. |
| 6,898,452 | B2 | 5/2005 | Al-Ali et al. |
| 6,912,413 | B2 | 6/2005 | Rantala et al. |
| 6,920,345 | B2 | 7/2005 | Al-Ali et al. |
| D508,862 | S | 8/2005 | Behar et al. |
| 6,931,268 | B1 | 8/2005 | Kiani-Azarbayjany et al. |
| 6,934,570 | B2 | 8/2005 | Kiani et al. |
| 6,939,305 | B2 | 9/2005 | Flaherty et al. |
| 6,943,348 | B1 | 9/2005 | Coffin, IV |
| 6,950,687 | B2 | 9/2005 | Al-Ali |
| D510,625 | S | 10/2005 | Widener et al. |
| 6,956,649 | B2 | 10/2005 | Acosta et al. |
| 6,961,598 | B2 | 11/2005 | Diab |
| 6,970,792 | B1 | 11/2005 | Diab |
| 6,979,812 | B2 | 12/2005 | Al-Ali |
| 6,985,764 | B2 | 1/2006 | Mason et al. |
| 6,990,364 | B2 | 1/2006 | Ruchti et al. |
| 6,993,371 | B2 | 1/2006 | Kiani et al. |
| D514,461 | S | 2/2006 | Harju |
| 6,995,400 | B2 | 2/2006 | Mizuyoshi |
| 6,996,427 | B2 | 2/2006 | Ali et al. |
| 6,997,879 | B1 | 2/2006 | Turcott |
| 6,998,247 | B2 | 2/2006 | Monfre et al. |
| 6,999,685 | B2 | 2/2006 | Kawase et al. |
| 6,999,904 | B2 | 2/2006 | Weber et al. |
| 7,003,338 | B2 | 2/2006 | Weber et al. |
| 7,003,339 | B2 | 2/2006 | Diab et al. |
| 7,015,451 | B2 | 3/2006 | Dalke et al. |
| 7,024,233 | B2 | 4/2006 | Ali et al. |
| 7,026,619 | B2 | 4/2006 | Cranford |
| 7,027,849 | B2 | 4/2006 | Al-Ali |
| 7,030,749 | B2 | 4/2006 | Al-Ali |
| 7,031,728 | B2 | 4/2006 | Beyer, Jr. |
| 7,039,449 | B2 | 5/2006 | Al-Ali |
| 7,041,060 | B2 | 5/2006 | Flaherty et al. |
| 7,044,918 | B2 | 5/2006 | Diab |
| 7,046,347 | B1 | 5/2006 | Amend et al. |
| 7,047,054 | B2 | 5/2006 | Benni |
| 7,048,687 | B1 | 5/2006 | Reuss et al. |
| 7,060,963 | B2 | 6/2006 | Maegawa et al. |
| 7,061,595 | B2 | 6/2006 | Cabuz et al. |
| 7,062,307 | B2 | 6/2006 | Norris et al. |
| 7,067,893 | B2 | 6/2006 | Mills et al. |
| D526,719 | S | 8/2006 | Richie, Jr. et al. |
| 7,088,040 | B1 | 8/2006 | Ducharme et al. |
| 7,092,735 | B2 | 8/2006 | Osann, Jr. |
| 7,092,757 | B2 | 8/2006 | Larson et al. |
| 7,096,052 | B2 | 8/2006 | Mason et al. |
| 7,096,054 | B2 | 8/2006 | Abdul-Hafiz et al. |
| 7,107,706 | B1 | 9/2006 | Bailey, Sr. et al. |
| 7,109,490 | B2 | 9/2006 | Fuchs et al. |
| 7,113,815 | B2 | 9/2006 | O'Neil et al. |
| D529,616 | S | 10/2006 | Deros et al. |
| 7,130,672 | B2 | 10/2006 | Pewzner et al. |
| 7,132,641 | B2 | 11/2006 | Schulz et al. |
| 7,133,710 | B2 | 11/2006 | Acosta et al. |
| 7,142,901 | B2 | 11/2006 | Kiani et al. |
| 7,149,561 | B2 | 12/2006 | Diab |
| D535,031 | S | 1/2007 | Barrett et al. |
| D537,164 | S | 2/2007 | Shigemori et al. |
| 7,186,966 | B2 | 3/2007 | Al-Ali |
| 7,190,261 | B2 | 3/2007 | Al-Ali |
| 7,215,984 | B2 | 5/2007 | Diab |
| 7,215,986 | B2 | 5/2007 | Diab |
| 7,220,254 | B2 | 5/2007 | Altshuler et al. |
| 7,221,971 | B2 | 5/2007 | Diab |
| 7,225,006 | B2 | 5/2007 | Al-Ali et al. |
| 7,225,007 | B2 | 5/2007 | Al-Ali |
| RE39,672 | E | 6/2007 | Shehada et al. |
| 7,227,156 | B2 | 6/2007 | Colvin, Jr. et al. |
| 7,228,166 | B1 | 6/2007 | Kawasaki et al. |
| 7,230,227 | B2 | 6/2007 | Wilcken et al. |
| D547,454 | S | 7/2007 | Hsieh |
| 7,239,905 | B2 | 7/2007 | Kiani-Azarbayjany et al. |
| 7,245,953 | B1 | 7/2007 | Parker |
| 7,251,513 | B2 | 7/2007 | Kondoh et al. |
| D549,830 | S | 8/2007 | Behar et al. |
| 7,252,639 | B2 | 8/2007 | Kimura et al. |
| 7,254,429 | B2 | 8/2007 | Schurman et al. |
| 7,254,431 | B2 | 8/2007 | Al-Ali |
| 7,254,433 | B2 | 8/2007 | Diab et al. |
| 7,254,434 | B2 | 8/2007 | Schulz et al. |
| D550,364 | S | 9/2007 | Glover et al. |
| D551,350 | S | 9/2007 | Lorimer et al. |
| 7,272,425 | B2 | 9/2007 | Al-Ali |
| 7,274,955 | B2 | 9/2007 | Kiani et al. |
| D553,248 | S | 10/2007 | Nguyen |
| D554,263 | S | 10/2007 | Al-Ali |
| 7,280,858 | B2 | 10/2007 | Al-Ali et al. |
| 7,289,835 | B2 | 10/2007 | Mansfield et al. |
| 7,292,883 | B2 | 11/2007 | De Felice et al. |
| 7,295,866 | B2 | 11/2007 | Al-Ali |
| D562,985 | S | 2/2008 | Brefka et al. |
| 7,328,053 | B1 | 2/2008 | Diab et al. |
| 7,332,784 | B2 | 2/2008 | Mills et al. |
| 7,340,287 | B2 | 3/2008 | Mason et al. |
| 7,341,559 | B2 | 3/2008 | Schulz et al. |
| 7,343,186 | B2 | 3/2008 | Lamego et al. |
| D566,282 | S | 4/2008 | Al-Ali et al. |
| D567,125 | S | 4/2008 | Okabe et al. |
| 7,355,512 | B1 | 4/2008 | Al-Ali |
| 7,356,365 | B2 | 4/2008 | Schurman |
| 7,365,923 | B2 | 4/2008 | Hargis et al. |
| D569,001 | S | 5/2008 | Omaki |
| D569,521 | S | 5/2008 | Omaki |
| 7,371,981 | B2 | 5/2008 | Abdul-Hafiz |
| 7,373,193 | B2 | 5/2008 | Al-Ali et al. |
| 7,373,194 | B2 | 5/2008 | Weber et al. |
| 7,376,453 | B1 | 5/2008 | Diab et al. |
| 7,377,794 | B2 | 5/2008 | Al Ali et al. |
| 7,377,899 | B2 | 5/2008 | Weber et al. |
| 7,383,070 | B2 | 6/2008 | Diab et al. |
| 7,395,158 | B2 | 7/2008 | Monfre et al. |
| 7,395,189 | B2 | 7/2008 | Qing et al. |
| 7,415,297 | B2 | 8/2008 | Al-Ali et al. |
| 7,428,432 | B2 | 9/2008 | Ali et al. |
| 7,438,683 | B2 | 10/2008 | Al-Ali et al. |
| 7,440,787 | B2 | 10/2008 | Diab |
| 7,454,240 | B2 | 11/2008 | Diab et al. |
| 7,467,002 | B2 | 12/2008 | Weber et al. |
| 7,469,157 | B2 | 12/2008 | Diab et al. |
| 7,471,969 | B2 | 12/2008 | Diab et al. |
| 7,471,971 | B2 | 12/2008 | Diab et al. |
| 7,483,729 | B2 | 1/2009 | Al-Ali et al. |
| 7,483,730 | B2 | 1/2009 | Diab et al. |
| 7,489,958 | B2 | 2/2009 | Diab et al. |
| 7,496,391 | B2 | 2/2009 | Diab et al. |
| 7,496,393 | B2 | 2/2009 | Diab et al. |
| D587,657 | S | 3/2009 | Al-Ali et al. |
| 7,499,741 | B2 | 3/2009 | Diab et al. |
| 7,499,835 | B2 | 3/2009 | Weber et al. |
| 7,500,950 | B2 | 3/2009 | Al-Ali et al. |
| 7,509,153 | B2 | 3/2009 | Blank et al. |
| 7,509,154 | B2 | 3/2009 | Diab et al. |
| 7,509,494 | B2 | 3/2009 | Al-Ali |
| 7,510,849 | B2 | 3/2009 | Schurman et al. |
| 7,514,725 | B2 | 4/2009 | Wojtczuk et al. |
| 7,519,327 | B2 | 4/2009 | White |
| 7,519,406 | B2 | 4/2009 | Blank et al. |
| 7,526,328 | B2 | 4/2009 | Diab et al. |
| D592,507 | S | 5/2009 | Wachman et al. |
| 7,530,942 | B1 | 5/2009 | Diab |
| 7,530,949 | B2 | 5/2009 | Al Ali et al. |
| 7,530,955 | B2 | 5/2009 | Diab et al. |
| 7,558,622 | B2 | 7/2009 | Tran |
| 7,563,110 | B2 | 7/2009 | Al-Ali et al. |
| 7,593,230 | B2 | 9/2009 | Abul-Haj et al. |

**US 10,945,648 B2**

Page 6

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,596,398 | B2 | 9/2009 | Al-Ali et al. |
| 7,601,123 | B2 | 10/2009 | Tweed et al. |
| 7,606,606 | B2 | 10/2009 | Laakkonen |
| 7,606,608 | B2 | 10/2009 | Blank et al. |
| D603,966 | S | 11/2009 | Jones et al. |
| 7,613,490 | B2 | 11/2009 | Sarussi et al. |
| 7,618,375 | B2 | 11/2009 | Flaherty |
| 7,620,674 | B2 | 11/2009 | Ruchti et al. |
| D606,659 | S | 12/2009 | Kiani et al. |
| 7,629,039 | B2 | 12/2009 | Eckerbom et al. |
| 7,640,140 | B2 | 12/2009 | Ruchti et al. |
| 7,647,083 | B2 | 1/2010 | Al-Ali et al. |
| D609,193 | S | 2/2010 | Al-Ali et al. |
| 7,656,393 | B2 | 2/2010 | King et al. |
| 7,657,294 | B2 | 2/2010 | Eghbal et al. |
| 7,657,295 | B2 | 2/2010 | Coakley et al. |
| 7,657,296 | B2 | 2/2010 | Raridan et al. |
| 7,658,613 | B1 | 2/2010 | Griffin et al. |
| 7,676,253 | B2 | 3/2010 | Raridan, Jr. |
| 7,683,926 | B2 | 3/2010 | Schechterman et al. |
| D614,305 | S | 4/2010 | Al-Ali et al. |
| 7,697,966 | B2 | 4/2010 | Monfre et al. |
| 7,698,105 | B2 | 4/2010 | Ruchti et al. |
| 7,698,909 | B2 | 4/2010 | Hannula et al. |
| RE41,317 | E | 5/2010 | Parker |
| RE41,333 | E | 5/2010 | Blank et al. |
| 7,726,209 | B2 | 6/2010 | Ruotoistenmäki |
| 7,729,733 | B2 | 6/2010 | Al-Ali et al. |
| 7,734,320 | B2 | 6/2010 | Al-Ali |
| 7,740,588 | B1 | 6/2010 | Sciarra |
| 7,740,589 | B2 | 6/2010 | Maschke et al. |
| 7,761,127 | B2 | 7/2010 | Al-Ali et al. |
| 7,761,128 | B2 | 7/2010 | Al-Ali et al. |
| 7,764,982 | B2 | 7/2010 | Dalke et al. |
| 7,764,983 | B2 | 7/2010 | Mannheimer et al. |
| D621,516 | S | 8/2010 | Kiani et al. |
| 7,791,155 | B2 | 9/2010 | Diab |
| 7,801,581 | B2 | 9/2010 | Diab |
| 7,809,418 | B2 | 10/2010 | Xu |
| 7,822,452 | B2 | 10/2010 | Schurman et al. |
| RE41,912 | E | 11/2010 | Parker |
| 7,844,313 | B2 | 11/2010 | Kiani et al. |
| 7,844,314 | B2 | 11/2010 | Al-Ali |
| 7,844,315 | B2 | 11/2010 | Al-Ali |
| 7,862,523 | B2 | 1/2011 | Ruotoistenmaki |
| 7,865,222 | B2 | 1/2011 | Weber et al. |
| 7,869,849 | B2 | 1/2011 | Ollerdessen et al. |
| 7,873,497 | B2 | 1/2011 | Weber et al. |
| 7,880,606 | B2 | 2/2011 | Al-Ali |
| 7,880,626 | B2 | 2/2011 | Al-Ali et al. |
| 7,884,314 | B2 | 2/2011 | Hamada |
| 7,891,355 | B2 | 2/2011 | Al-Ali et al. |
| 7,894,868 | B2 | 2/2011 | Al-Ali et al. |
| 7,899,506 | B2 | 3/2011 | Xu et al. |
| 7,899,507 | B2 | 3/2011 | Al-Ali et al. |
| 7,899,510 | B2 | 3/2011 | Hoarau |
| 7,899,518 | B2 | 3/2011 | Trepagnier et al. |
| 7,904,130 | B2 | 3/2011 | Raridan, Jr. |
| 7,904,132 | B2 | 3/2011 | Weber et al. |
| 7,909,772 | B2 | 3/2011 | Popov et al. |
| 7,910,875 | B2 | 3/2011 | Al-Ali |
| 7,918,779 | B2 | 4/2011 | Haber et al. |
| 7,919,713 | B2 | 4/2011 | Al-Ali et al. |
| 7,937,128 | B2 | 5/2011 | Al-Ali |
| 7,937,129 | B2 | 5/2011 | Mason et al. |
| 7,937,130 | B2 | 5/2011 | Diab et al. |
| 7,941,199 | B2 | 5/2011 | Kiani |
| 7,951,086 | B2 | 5/2011 | Flaherty et al. |
| 7,957,780 | B2 | 6/2011 | Lamego et al. |
| 7,962,188 | B2 | 6/2011 | Kiani et al. |
| 7,962,190 | B1 | 6/2011 | Diab et al. |
| 7,976,472 | B2 | 7/2011 | Kiani |
| 7,988,637 | B2 | 8/2011 | Diab |
| 7,990,382 | B2 | 8/2011 | Kiani |
| 7,991,446 | B2 | 8/2011 | Ali et al. |
| 8,000,761 | B2 | 8/2011 | Al-Ali |
| 8,008,088 | B2 | 8/2011 | Bellott et al. |
| RE42,753 | E | 9/2011 | Kiani-Azarbayjany et al. |
| 8,019,400 | B2 | 9/2011 | Diab et al. |
| 8,028,701 | B2 | 10/2011 | Al-Ali et al. |
| 8,029,765 | B2 | 10/2011 | Bellott et al. |
| 8,036,727 | B2 | 10/2011 | Schurman et al. |
| 8,036,728 | B2 | 10/2011 | Diab et al. |
| 8,040,758 | B1 | 10/2011 | Dickinson |
| 8,044,998 | B2 | 10/2011 | Heenan |
| 8,046,040 | B2 | 10/2011 | Ali et al. |
| 8,046,041 | B2 | 10/2011 | Diab et al. |
| 8,046,042 | B2 | 10/2011 | Diab et al. |
| 8,048,040 | B2 | 11/2011 | Kiani |
| 8,050,728 | B2 | 11/2011 | Al-Ali et al. |
| 8,071,935 | B2 | 12/2011 | Besko et al. |
| RE43,169 | E | 2/2012 | Parker |
| 8,118,620 | B2 | 2/2012 | Al-Ali et al. |
| 8,126,528 | B2 | 2/2012 | Diab et al. |
| 8,126,531 | B2 | 2/2012 | Crowley |
| 8,128,572 | B2 | 3/2012 | Diab et al. |
| 8,130,105 | B2 | 3/2012 | Al-Ali et al. |
| 8,145,287 | B2 | 3/2012 | Diab et al. |
| 8,150,487 | B2 | 4/2012 | Diab et al. |
| 8,165,662 | B2 | 4/2012 | Cinbis et al. |
| 8,175,672 | B2 | 5/2012 | Parker |
| 8,177,720 | B2 | 5/2012 | Nanba et al. |
| 8,180,420 | B2 | 5/2012 | Diab et al. |
| 8,182,443 | B1 | 5/2012 | Kiani |
| 8,185,180 | B2 | 5/2012 | Diab et al. |
| 8,190,223 | B2 | 5/2012 | Al-Ali et al. |
| 8,190,227 | B2 | 5/2012 | Diab et al. |
| 8,203,438 | B2 | 6/2012 | Kiani et al. |
| 8,203,704 | B2 | 6/2012 | Merritt et al. |
| 8,204,566 | B2 | 6/2012 | Schurman et al. |
| 8,219,170 | B2 | 7/2012 | Hausmann et al. |
| 8,219,172 | B2 | 7/2012 | Schurman et al. |
| 8,224,411 | B2 | 7/2012 | Al-Ali et al. |
| 8,228,181 | B2 | 7/2012 | Al-Ali |
| 8,229,532 | B2 | 7/2012 | Davis |
| 8,229,533 | B2 | 7/2012 | Diab et al. |
| 8,233,955 | B2 | 7/2012 | Al-Ali et al. |
| 8,244,325 | B2 | 8/2012 | Al-Ali et al. |
| 8,244,326 | B2 | 8/2012 | Ninomiya et al. |
| 8,255,026 | B1 | 8/2012 | Al-Ali |
| 8,255,027 | B2 | 8/2012 | Al-Ali et al. |
| 8,255,028 | B2 | 8/2012 | Al-Ali et al. |
| 8,260,577 | B2 | 9/2012 | Weber et al. |
| 8,265,723 | B1 | 9/2012 | McHale et al. |
| 8,274,360 | B2 | 9/2012 | Sampath et al. |
| 8,280,473 | B2 | 10/2012 | Al-Ali |
| 8,289,130 | B2 | 10/2012 | Nakajima et al. |
| 8,301,217 | B2 | 10/2012 | Al-Ali et al. |
| 8,306,596 | B2 | 11/2012 | Schurman et al. |
| 8,310,336 | B2 | 11/2012 | Muhsin et al. |
| 8,315,683 | B2 | 11/2012 | Al-Ali et al. |
| RE43,860 | E | 12/2012 | Parker |
| 8,280,469 | B2 | 12/2012 | Baker, Jr. |
| 8,332,006 | B2 | 12/2012 | Naganuma et al. |
| 8,337,403 | B2 | 12/2012 | Al-Ali et al. |
| 8,343,026 | B2 | 1/2013 | Gardiner et al. |
| 8,346,330 | B2 | 1/2013 | Lamego |
| 8,352,003 | B2 * | 1/2013 | Sawada ............... A61B 5/0261 |
| | | | 600/310 |
| 8,353,842 | B2 | 1/2013 | Al-Ali et al. |
| 8,355,766 | B2 | 1/2013 | MacNeish et al. |
| 8,359,080 | B2 | 1/2013 | Diab et al. |
| 8,364,223 | B2 | 1/2013 | Al-Ali et al. |
| 8,364,226 | B2 | 1/2013 | Diab et al. |
| 8,364,389 | B2 | 1/2013 | Dorogusker et al. |
| 8,374,665 | B2 | 2/2013 | Lamego |
| 8,374,825 | B2 | 2/2013 | Vock et al. |
| 8,380,272 | B2 | 2/2013 | Barrett et al. |
| 8,385,995 | B2 | 2/2013 | Al-ali et al. |
| 8,385,996 | B2 | 2/2013 | Smith et al. |
| 8,388,353 | B2 | 3/2013 | Kiani et al. |
| 8,399,822 | B2 | 3/2013 | Al-Ali |
| 8,401,602 | B2 | 3/2013 | Kiani |
| 8,405,608 | B2 | 3/2013 | Al-Ali et al. |

**US 10,945,648 B2**

Page 7

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,414,499 | B2 | 4/2013 | Al-Ali et al. |
| 8,418,524 | B2 | 4/2013 | Al-Ali |
| 8,421,022 | B2 | 4/2013 | Rozenfeld |
| 8,423,106 | B2 | 4/2013 | Lamego et al. |
| 8,428,674 | B2 | 4/2013 | Duffy et al. |
| 8,428,967 | B2 | 4/2013 | Olsen et al. |
| 8,430,817 | B1 | 4/2013 | Al-Ali et al. |
| 8,437,825 | B2 | 5/2013 | Dalvi et al. |
| 8,452,364 | B2 | 5/2013 | Hannula et al. |
| 8,455,290 | B2 | 6/2013 | Siskavich |
| 8,457,703 | B2 | 6/2013 | Al-Ali |
| 8,457,707 | B2 | 6/2013 | Kiani |
| 8,463,349 | B2 | 6/2013 | Diab et al. |
| 8,466,286 | B2 | 6/2013 | Bellot et al. |
| 8,471,713 | B2 | 6/2013 | Poeze et al. |
| 8,473,020 | B2 | 6/2013 | Kiani et al. |
| 8,483,787 | B2 | 7/2013 | Al-Ali et al. |
| 8,487,256 | B2 | 7/2013 | Kwong et al. |
| 8,489,364 | B2 | 7/2013 | Weber et al. |
| 8,496,595 | B2 | 7/2013 | Jornod |
| 8,498,684 | B2 | 7/2013 | Weber et al. |
| 8,504,128 | B2 | 8/2013 | Blank et al. |
| 8,509,867 | B2 | 8/2013 | Workman et al. |
| 8,515,509 | B2 | 8/2013 | Bruinsma et al. |
| 8,515,511 | B2 | 8/2013 | Boutelle |
| 8,515,515 | B2 | 8/2013 | McKenna et al. |
| 8,523,781 | B2 | 9/2013 | Al-Ali |
| 8,529,301 | B2 | 9/2013 | Al-Ali et al. |
| 8,532,727 | B2 | 9/2013 | Ali et al. |
| 8,532,728 | B2 | 9/2013 | Diab et al. |
| D692,145 | S | 10/2013 | Al-Ali et al. |
| 8,547,209 | B2 | 10/2013 | Kiani et al. |
| 8,548,548 | B2 | 10/2013 | Al-Ali |
| 8,548,549 | B2 | 10/2013 | Schurman et al. |
| 8,548,550 | B2 | 10/2013 | Al-Ali et al. |
| 8,560,032 | B2 | 10/2013 | Al-Ali et al. |
| 8,560,034 | B1 | 10/2013 | Diab et al. |
| 8,570,167 | B2 | 10/2013 | Al-Ali |
| 8,570,503 | B2 | 10/2013 | Vo |
| 8,571,617 | B2 | 10/2013 | Reichgott et al. |
| 8,571,618 | B1 | 10/2013 | Lamego et al. |
| 8,571,619 | B2 | 10/2013 | Al-Ali et al. |
| 8,577,431 | B2 | 11/2013 | Lamego et al. |
| 8,581,732 | B2 | 11/2013 | Al-Ali et al. |
| 8,584,345 | B2 | 11/2013 | Al-Ali et al. |
| 8,588,880 | B2 | 11/2013 | Abdul-Hafiz et al. |
| 8,591,426 | B2 | 11/2013 | Onoe et al. |
| 8,600,467 | B2 | 12/2013 | Al-Ali et al. |
| 8,600,494 | B2 | 12/2013 | Schroeppel et al. |
| 8,602,971 | B2 | 12/2013 | Farr |
| 8,606,342 | B2 | 12/2013 | Diab |
| 8,611,095 | B2 | 12/2013 | Kwong et al. |
| 8,615,290 | B2 | 12/2013 | Lin et al. |
| 8,626,255 | B2 | 1/2014 | Al-Ali et al. |
| 8,630,691 | B2 | 1/2014 | Lamego et al. |
| 8,634,889 | B2 | 1/2014 | Al-Ali et al. |
| 8,641,631 | B2 | 2/2014 | Sierra et al. |
| 8,652,060 | B2 | 2/2014 | Al-Ali |
| 8,655,004 | B2 | 2/2014 | Prest et al. |
| 8,663,107 | B2 | 3/2014 | Kiani |
| 8,666,468 | B1 | 3/2014 | Al-Ali |
| 8,667,967 | B2 | 3/2014 | Al-Ali et al. |
| 8,668,643 | B2 | 3/2014 | Kinast |
| 8,670,811 | B2 | 3/2014 | O'Reilly |
| 8,670,814 | B2 | 3/2014 | Diab et al. |
| 8,676,286 | B2 | 3/2014 | Weber et al. |
| 8,682,407 | B2 | 3/2014 | Al-Ali |
| RE44,823 | E | 4/2014 | Parker |
| RE44,875 | E | 4/2014 | Kiani et al. |
| 8,688,183 | B2 | 4/2014 | Bruinsma et al. |
| 8,690,799 | B2 | 4/2014 | Telfort et al. |
| 8,700,111 | B2 | 4/2014 | LeBoeuf et al. |
| 8,700,112 | B2 | 4/2014 | Kiani |
| 8,702,627 | B2 | 4/2014 | Telfort et al. |
| 8,706,179 | B2 | 4/2014 | Parker |
| 8,712,494 | B1 | 4/2014 | MacNeish, III et al. |
| 8,715,206 | B2 | 5/2014 | Telfort et al. |
| 8,718,735 | B2 | 5/2014 | Lamego et al. |
| 8,718,737 | B2 | 5/2014 | Diab et al. |
| 8,718,738 | B2 | 5/2014 | Blank et al. |
| 8,720,249 | B2 | 5/2014 | Al-Ali |
| 8,721,541 | B2 | 5/2014 | Al-Ali et al. |
| 8,721,542 | B2 | 5/2014 | Al-Ali et al. |
| 8,723,677 | B1 | 5/2014 | Kiani |
| 8,740,792 | B1 | 6/2014 | Kiani et al. |
| 8,754,776 | B2 | 6/2014 | Poeze et al. |
| 8,755,535 | B2 | 6/2014 | Telfort et al. |
| 8,755,856 | B2 | 6/2014 | Diab et al. |
| 8,755,872 | B1 | 6/2014 | Marinow |
| 8,760,517 | B2 | 6/2014 | Sarwar et al. |
| 8,761,850 | B2 | 6/2014 | Lamego |
| 8,764,671 | B2 | 7/2014 | Kiani |
| 8,768,423 | B2 | 7/2014 | Shakespeare et al. |
| 8,768,426 | B2 | 7/2014 | Haisley et al. |
| 8,771,204 | B2 | 7/2014 | Telfort et al. |
| 8,777,634 | B2 | 7/2014 | Kiani et al. |
| 8,781,543 | B2 | 7/2014 | Diab et al. |
| 8,781,544 | B2 | 7/2014 | Al-Ali et al. |
| 8,781,549 | B2 | 7/2014 | Al-Ali et al. |
| 8,788,003 | B2 | 7/2014 | Schurman et al. |
| 8,790,268 | B2 | 7/2014 | Al-Ali |
| 8,801,613 | B2 | 8/2014 | Al-Ali et al. |
| 8,821,397 | B2 | 9/2014 | Al-Ali et al. |
| 8,821,415 | B2 | 9/2014 | Al-Ali et al. |
| 8,830,449 | B1 | 9/2014 | Lamego et al. |
| 8,831,700 | B2 | 9/2014 | Schurman et al. |
| 8,838,210 | B2 | 9/2014 | Wood et al. |
| 8,840,549 | B2 | 9/2014 | Al-Ali et al. |
| 8,847,740 | B2 | 9/2014 | Kiani et al. |
| 8,849,365 | B2 | 9/2014 | Smith et al. |
| 8,852,094 | B2 | 10/2014 | Al-Ali et al. |
| 8,852,994 | B2 | 10/2014 | Wojtczuk et al. |
| 8,868,147 | B2 | 10/2014 | Stippick et al. |
| 8,868,150 | B2 | 10/2014 | Al-Ali et al. |
| 8,870,792 | B2 | 10/2014 | Al-Ali et al. |
| 8,886,271 | B2 | 11/2014 | Kiani et al. |
| 8,888,539 | B2 | 11/2014 | Al-Ali et al. |
| 8,888,701 | B2 | 11/2014 | LeBoeuf et al. |
| 8,888,708 | B2 | 11/2014 | Diab et al. |
| 8,892,180 | B2 | 11/2014 | Weber et al. |
| 8,897,847 | B2 | 11/2014 | Al-Ali |
| 8,909,310 | B2 | 12/2014 | Lamego et al. |
| 8,911,377 | B2 | 12/2014 | Al-Ali |
| 8,912,909 | B2 | 12/2014 | Al-Ali et al. |
| 8,920,317 | B2 | 12/2014 | Al-Ali et al. |
| 8,920,332 | B2 | 12/2014 | Hong et al. |
| 8,921,699 | B2 | 12/2014 | Al-Ali et al. |
| 8,922,382 | B2 | 12/2014 | Al-Ali et al. |
| 8,929,964 | B2 | 1/2015 | Al-Ali et al. |
| 8,929,967 | B2 | 1/2015 | Mao et al. |
| 8,942,777 | B2 | 1/2015 | Diab et al. |
| 8,948,834 | B2 | 2/2015 | Diab et al. |
| 8,948,835 | B2 | 2/2015 | Diab |
| 8,965,471 | B2 | 2/2015 | Lamego |
| 8,983,564 | B2 | 3/2015 | Al-Ali |
| 8,989,831 | B2 | 3/2015 | Al-Ali et al. |
| 8,996,085 | B2 | 3/2015 | Kiani et al. |
| 8,998,809 | B2 | 4/2015 | Kiani |
| 9,005,129 | B2 | 4/2015 | Venkatraman et al. |
| 9,028,429 | B2 | 5/2015 | Telfort et al. |
| 9,037,207 | B2 | 5/2015 | Al-Ali et al. |
| 9,060,721 | B2 | 6/2015 | Reichgott et al. |
| 9,063,160 | B2 | 6/2015 | Stamler et al. |
| 9,066,666 | B2 | 6/2015 | Kiani |
| 9,066,680 | B1 | 6/2015 | Al-Ali et al. |
| 9,072,437 | B2 | 7/2015 | Paalasmaa |
| 9,072,474 | B2 | 7/2015 | Al-Ali et al. |
| 9,078,560 | B2 | 7/2015 | Schurman et al. |
| 9,081,889 | B2 | 7/2015 | Ingrassia, Jr. et al. |
| 9,084,569 | B2 | 7/2015 | Weber et al. |
| 9,095,316 | B2 | 8/2015 | Welch et al. |
| 9,106,038 | B2 | 8/2015 | Telfort et al. |
| 9,107,625 | B2 | 8/2015 | Telfort et al. |
| 9,107,626 | B2 | 8/2015 | Al-Ali et al. |

# US 10,945,648 B2

Page 8

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,113,831 | B2 | 8/2015 | Al-Ali |
| 9,113,832 | B2 | 8/2015 | Al-Ali |
| 9,119,595 | B2 | 9/2015 | Lamego |
| 9,131,881 | B2 | 9/2015 | Diab et al. |
| 9,131,882 | B2 | 9/2015 | Al-Ali et al. |
| 9,131,883 | B2 | 9/2015 | Al-Ali |
| 9,131,917 | B2 | 9/2015 | Telfort et al. |
| 9,138,180 | B1 | 9/2015 | Coverston et al. |
| 9,138,182 | B2 | 9/2015 | Al-Ali et al. |
| 9,138,192 | B2 | 9/2015 | Weber et al. |
| 9,142,117 | B2 | 9/2015 | Muhsin et al. |
| 9,153,112 | B1 | 10/2015 | Kiani et al. |
| 9,153,121 | B2 | 10/2015 | Kiani et al. |
| 9,161,696 | B2 | 10/2015 | Al-Ali et al. |
| 9,161,713 | B2 | 10/2015 | Al-Ali et al. |
| 9,167,995 | B2 | 10/2015 | Lamego et al. |
| 9,176,141 | B2 | 11/2015 | Al-Ali et al. |
| 9,186,102 | B2 | 11/2015 | Bruinsma et al. |
| 9,192,312 | B2 | 11/2015 | Al-Ali |
| 9,192,329 | B2 | 11/2015 | Al-Ali |
| 9,192,351 | B1 | 11/2015 | Telfort et al. |
| 9,195,385 | B2 | 11/2015 | Al-Ali et al. |
| 9,210,566 | B2 | 12/2015 | Ziemianska et al. |
| 9,211,072 | B2 | 12/2015 | Kiani |
| 9,211,095 | B1 | 12/2015 | Al-Ali |
| 9,218,454 | B2 | 12/2015 | Kiani et al. |
| 9,226,696 | B2 | 1/2016 | Kiani |
| 9,241,662 | B2 | 1/2016 | Al-Ali et al. |
| 9,245,668 | B1 | 1/2016 | Vo et al. |
| 9,259,185 | B2 | 2/2016 | Abdul-Hafiz et al. |
| 9,267,572 | B2 | 2/2016 | Barker et al. |
| 9,277,880 | B2 | 3/2016 | Poeze et al. |
| 9,289,167 | B2 | 3/2016 | Diab et al. |
| 9,295,421 | B2 | 3/2016 | Kiani et al. |
| 9,307,928 | B1 | 4/2016 | Al-Ali et al. |
| 9,311,382 | B2 | 4/2016 | Varoglu et al. |
| 9,323,894 | B2 | 4/2016 | Kiani |
| D755,392 | S | 5/2016 | Hwang et al. |
| 9,326,712 | B1 | 5/2016 | Kiani |
| 9,333,316 | B2 | 5/2016 | Kiani |
| 9,339,220 | B2 | 5/2016 | Lamego et al. |
| 9,339,236 | B2 | 5/2016 | Frix et al. |
| 9,341,565 | B2 | 5/2016 | Lamego et al. |
| 9,351,673 | B2 | 5/2016 | Diab et al. |
| 9,351,675 | B2 | 5/2016 | Al-Ali et al. |
| 9,357,665 | B2 | 5/2016 | Myers et al. |
| 9,364,181 | B2 | 6/2016 | Kiani et al. |
| 9,368,671 | B2 | 6/2016 | Wojtczuk et al. |
| 9,370,325 | B2 | 6/2016 | Al-Ali et al. |
| 9,370,326 | B2 | 6/2016 | McHale et al. |
| 9,370,335 | B2 | 6/2016 | Al-ali et al. |
| 9,375,185 | B2 | 6/2016 | Ali et al. |
| 9,386,953 | B2 | 7/2016 | Al-Ali |
| 9,386,961 | B2 | 7/2016 | Al-Ali et al. |
| 9,392,945 | B2 | 7/2016 | Al-Ali et al. |
| 9,397,448 | B2 | 7/2016 | Al-Ali et al. |
| 9,408,542 | B1 | 8/2016 | Kinast et al. |
| 9,436,645 | B2 | 9/2016 | Al-Ali et al. |
| 9,445,759 | B1 | 9/2016 | Lamego et al. |
| 9,466,919 | B2 | 10/2016 | Kiani et al. |
| 9,474,474 | B2 | 10/2016 | Lamego et al. |
| 9,480,422 | B2 | 11/2016 | Al-Ali |
| 9,480,435 | B2 | 11/2016 | Olsen |
| 9,489,081 | B2 | 11/2016 | Anzures et al. |
| 9,492,110 | B2 | 11/2016 | Al-Ali et al. |
| 9,497,534 | B2 | 11/2016 | Prest et al. |
| 9,510,779 | B2 | 12/2016 | Poeze et al. |
| 9,517,024 | B2 | 12/2016 | Kiani et al. |
| 9,526,430 | B2 | 12/2016 | Srinivas et al. |
| 9,532,722 | B2 | 1/2017 | Lamego et al. |
| 9,538,949 | B2 | 1/2017 | Al-Ali et al. |
| 9,538,980 | B2 | 1/2017 | Telfort et al. |
| 9,549,696 | B2 | 1/2017 | Lamego et al. |
| 9,553,625 | B2 | 1/2017 | Hatanaka et al. |
| 9,554,737 | B2 | 1/2017 | Schurman et al. |

| | | | |
|---|---|---|---|
| 9,560,996 | B2 | 2/2017 | Kiani |
| 9,560,998 | B2 | 2/2017 | Al-Ali et al. |
| 9,566,019 | B2 | 2/2017 | Al-Ali et al. |
| 9,579,039 | B2 | 2/2017 | Jansen et al. |
| 9,591,975 | B2 | 3/2017 | Dalvi et al. |
| 9,593,969 | B2 | 3/2017 | King |
| 9,622,692 | B2 | 4/2017 | Lamego et al. |
| 9,622,693 | B2 | 4/2017 | Diab |
| D788,312 | S | 5/2017 | Al-Ali et al. |
| 9,636,055 | B2 | 5/2017 | Al-Ali et al. |
| 9,636,056 | B2 | 5/2017 | Al-Ali |
| 9,649,054 | B2 | 5/2017 | Lamego et al. |
| 9,651,405 | B1 | 5/2017 | Gowreesunker et al. |
| 9,662,052 | B2 | 5/2017 | Al-Ali et al. |
| 9,668,676 | B2 | 6/2017 | Culbert |
| 9,668,679 | B2 | 6/2017 | Schurman et al. |
| 9,668,680 | B2 | 6/2017 | Bruinsma et al. |
| 9,668,703 | B2 | 6/2017 | Al-Ali |
| 9,675,286 | B2 | 6/2017 | Diab |
| 9,681,812 | B2 | 6/2017 | Presura |
| 9,684,900 | B2 | 6/2017 | Motoki et al. |
| 9,687,160 | B2 | 6/2017 | Kiani |
| 9,693,719 | B2 | 7/2017 | Al-Ali et al. |
| 9,693,737 | B2 | 7/2017 | Al-Ali |
| 9,697,928 | B2 | 7/2017 | Al-Ali et al. |
| 9,699,546 | B2 | 7/2017 | Qian et al. |
| 9,700,249 | B2 | 7/2017 | Johnson et al. |
| 9,716,937 | B2 | 7/2017 | Qian et al. |
| 9,717,425 | B2 | 8/2017 | Kiani et al. |
| 9,717,448 | B2 | 8/2017 | Frix et al. |
| 9,717,458 | B2 | 8/2017 | Lamego et al. |
| 9,723,997 | B1 | 8/2017 | Lamego |
| 9,724,016 | B1 | 8/2017 | Al-Ali et al. |
| 9,724,024 | B2 | 8/2017 | Al-Ali |
| 9,724,025 | B2 | 8/2017 | Kiani et al. |
| 9,730,640 | B2 | 8/2017 | Diab et al. |
| 9,743,887 | B2 | 8/2017 | Al-Ali et al. |
| 9,749,232 | B2 | 8/2017 | Sampath et al. |
| 9,750,442 | B2 | 9/2017 | Olsen |
| 9,750,443 | B2 | 9/2017 | Smith et al. |
| 9,750,461 | B1 | 9/2017 | Telfort |
| 9,752,925 | B2 | 9/2017 | Chu et al. |
| 9,775,545 | B2 | 10/2017 | Al-Ali et al. |
| 9,775,546 | B2 | 10/2017 | Diab et al. |
| 9,775,570 | B2 | 10/2017 | Al-Ali |
| 9,778,079 | B1 | 10/2017 | Al-Ali et al. |
| 9,781,984 | B2 | 10/2017 | Baranski et al. |
| 9,782,077 | B2 | 10/2017 | Lamego et al. |
| 9,782,110 | B2 | 10/2017 | Kiani |
| 9,787,568 | B2 | 10/2017 | Lamego et al. |
| 9,788,735 | B2 | 10/2017 | Al-Ali |
| 9,788,768 | B2 | 10/2017 | Al-Ali et al. |
| 9,795,300 | B2 | 10/2017 | Al-Ali |
| 9,795,310 | B2 | 10/2017 | Al-Ali |
| 9,795,358 | B2 | 10/2017 | Telfort et al. |
| 9,795,739 | B2 | 10/2017 | Al-Ali et al. |
| 9,801,556 | B2 | 10/2017 | Kiani |
| 9,801,588 | B2 | 10/2017 | Weber et al. |
| 9,808,188 | B1 | 11/2017 | Perea et al. |
| 9,814,418 | B2 | 11/2017 | Weber et al. |
| 9,820,691 | B2 | 11/2017 | Kiani |
| 9,833,152 | B2 | 12/2017 | Kiani et al. |
| 9,833,180 | B2 | 12/2017 | Shakespeare et al. |
| 9,838,775 | B2 | 12/2017 | Qian et al. |
| 9,839,379 | B2 | 12/2017 | Al-Ali et al. |
| 9,839,381 | B1 | 12/2017 | Weber et al. |
| 9,847,002 | B2 | 12/2017 | Kiani et al. |
| 9,847,749 | B2 | 12/2017 | Kiani et al. |
| 9,848,800 | B1 | 12/2017 | Lee et al. |
| 9,848,806 | B2 | 12/2017 | Al-Ali et al. |
| 9,848,807 | B2 | 12/2017 | Lamego |
| 9,848,823 | B2 | 12/2017 | Raghuram et al. |
| 9,861,298 | B2 | 1/2018 | Eckerbom et al. |
| 9,861,304 | B2 | 1/2018 | Al-Ali et al. |
| 9,861,305 | B1 | 1/2018 | Weber et al. |
| 9,866,671 | B1 | 1/2018 | Thompson et al. |
| 9,867,575 | B2 | 1/2018 | Maani et al. |
| 9,867,578 | B2 | 1/2018 | Al-Ali et al. |
| 9,872,623 | B2 | 1/2018 | Al-Ali |

(56)                References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,876,320 | B2 | 1/2018 | Coverston et al. |
| 9,877,650 | B2 | 1/2018 | Muhsin et al. |
| 9,877,686 | B2 | 1/2018 | Al-Ali et al. |
| 9,891,079 | B2 | 2/2018 | Dalvi |
| 9,891,590 | B2 | 2/2018 | Shim et al. |
| 9,895,107 | B2 | 2/2018 | Al-Ali et al. |
| 9,898,049 | B2 | 2/2018 | Myers et al. |
| 9,913,617 | B2 | 3/2018 | Al-Ali et al. |
| 9,918,646 | B2 | 3/2018 | Singh Alvarado et al. |
| 9,924,893 | B2 | 3/2018 | Schurman et al. |
| 9,924,897 | B1 | 3/2018 | Abdul-Hafiz |
| 9,936,917 | B2 | 4/2018 | Poeze et al. |
| 9,943,269 | B2 | 4/2018 | Muhsin et al. |
| 9,949,676 | B2 | 4/2018 | Al-Ali |
| 9,952,095 | B1 | 4/2018 | Hotelling et al. |
| 9,955,937 | B2 | 5/2018 | Telfort |
| 9,965,946 | B2 | 5/2018 | Al-Ali |
| 9,980,667 | B2 | 5/2018 | Kiani et al. |
| D820,865 | S | 6/2018 | Muhsin et al. |
| 9,986,919 | B2 | 6/2018 | Lamego et al. |
| 9,986,952 | B2 | 6/2018 | Dalvi et al. |
| 9,989,560 | B2 | 6/2018 | Poeze et al. |
| 9,993,207 | B2 | 6/2018 | Al-Ali et al. |
| 10,007,758 | B2 | 6/2018 | Al-Ali et al. |
| D822,215 | S | 7/2018 | Al-Ali et al. |
| D822,216 | S | 7/2018 | Barker et al. |
| 10,010,276 | B2 | 7/2018 | Al-Ali et al. |
| 10,024,655 | B2 | 7/2018 | Raguin et al. |
| 10,032,002 | B2 | 7/2018 | Kiani et al. |
| 10,039,080 | B2 | 7/2018 | Miller et al. |
| 10,039,482 | B2 | 8/2018 | Al-Ali et al. |
| 10,039,491 | B2 | 8/2018 | Thompson et al. |
| 10,052,037 | B2 | 8/2018 | Kinast et al. |
| 10,055,121 | B2 | 8/2018 | Chaudhri et al. |
| 10,058,275 | B2 | 8/2018 | Al-Ali et al. |
| 10,064,562 | B2 | 9/2018 | Al-Ali |
| 10,066,970 | B2 | 9/2018 | Gowreesunker et al. |
| 10,076,257 | B2 | 9/2018 | Lin et al. |
| 10,078,052 | B2 | 9/2018 | Ness et al. |
| 10,086,138 | B1 | 10/2018 | Novak, Jr. |
| 10,092,200 | B2 | 10/2018 | Al-Ali et al. |
| 10,092,244 | B2 | 10/2018 | Chuang et al. |
| 10,092,249 | B2 | 10/2018 | Kiani et al. |
| 10,098,550 | B2 | 10/2018 | Al-Ali et al. |
| 10,098,591 | B2 | 10/2018 | Al-Ali et al. |
| 10,098,610 | B2 | 10/2018 | Al-Ali et al. |
| 10,111,591 | B2 | 10/2018 | Dyell et al. |
| D833,624 | S | 11/2018 | DeJong et al. |
| 10,117,587 | B2 | 11/2018 | Han |
| 10,123,726 | B2 | 11/2018 | Al-Ali et al. |
| 10,123,729 | B2 | 11/2018 | Dyell et al. |
| 10,130,289 | B2 | 11/2018 | Al-Ali et al. |
| 10,130,291 | B2 | 11/2018 | Schurman et al. |
| D835,282 | S | 12/2018 | Barker et al. |
| D835,283 | S | 12/2018 | Barker et al. |
| D835,284 | S | 12/2018 | Barker et al. |
| D835,285 | S | 12/2018 | Barker et al. |
| 10,149,616 | B2 | 12/2018 | Al-Ali et al. |
| 10,154,815 | B2 | 12/2018 | Al-Ali et al. |
| 10,159,412 | B2 | 12/2018 | Lamego et al. |
| 10,165,954 | B2 | 1/2019 | Lee |
| 10,188,296 | B2 | 1/2019 | Al-Ali et al. |
| 10,188,331 | B1 | 1/2019 | Kiani et al. |
| 10,188,348 | B2 | 1/2019 | Al-Ali et al. |
| RE47,218 | E | 2/2019 | Ali-Ali |
| RE47,244 | E | 2/2019 | Kiani et al. |
| RE47,249 | E | 2/2019 | Kiani et al. |
| 10,194,847 | B2 | 2/2019 | Al-Ali |
| 10,194,848 | B1 | 2/2019 | Kiani et al. |
| 10,201,286 | B2 | 2/2019 | Waydo |
| 10,201,298 | B2 | 2/2019 | Al-Ali et al. |
| 10,205,272 | B2 | 2/2019 | Kiani et al. |
| 10,205,291 | B2 | 2/2019 | Scruggs et al. |
| 10,213,108 | B2 | 2/2019 | Al-Ali |
| 10,215,698 | B2 | 2/2019 | Han et al. |
| 10,219,706 | B2 | 3/2019 | Al-Ali |
| 10,219,746 | B2 | 3/2019 | McHale et al. |
| 10,219,754 | B1 | 3/2019 | Lamego |
| 10,226,187 | B2 | 3/2019 | Al-Ali et al. |
| 10,226,576 | B2 | 3/2019 | Kiani |
| 10,231,657 | B2 | 3/2019 | Al-Ali et al. |
| 10,231,670 | B2 | 3/2019 | Blank et al. |
| 10,231,676 | B2 | 3/2019 | Al-Ali et al. |
| RE47,353 | E | 4/2019 | Kiani et al. |
| 10,247,670 | B2 | 4/2019 | Ness et al. |
| 10,251,585 | B2 | 4/2019 | Al-Ali et al. |
| 10,251,586 | B2 | 4/2019 | Lamego |
| 10,255,994 | B2 | 4/2019 | Sampath et al. |
| 10,258,265 | B1 | 4/2019 | Poeze et al. |
| 10,258,266 | B1 | 4/2019 | Poeze et al. |
| 10,265,024 | B2 | 4/2019 | Lee et al. |
| 10,271,748 | B2 | 4/2019 | Al-Ali |
| 10,278,626 | B2 | 5/2019 | Schurman et al. |
| 10,278,648 | B2 | 5/2019 | Al-Ali et al. |
| 10,279,247 | B2 | 5/2019 | Kiani |
| 10,285,626 | B1 | 5/2019 | Kestelli et al. |
| 10,292,628 | B1 | 5/2019 | Poeze et al. |
| 10,292,657 | B2 | 5/2019 | Abdul-Hafiz et al. |
| 10,292,664 | B2 | 5/2019 | Al-Ali |
| 10,299,708 | B1 | 5/2019 | Poeze et al. |
| 10,299,709 | B2 | 5/2019 | Perea et al. |
| 10,299,720 | B2 | 5/2019 | Brown et al. |
| 10,305,775 | B2 | 5/2019 | Lamego et al. |
| 10,307,111 | B2 | 6/2019 | Muhsin et al. |
| 10,325,681 | B2 | 6/2019 | Sampath et al. |
| 10,327,337 | B2 | 6/2019 | Triman et al. |
| 10,327,713 | B2 | 6/2019 | Barker et al. |
| 10,332,630 | B2 | 6/2019 | Al-Ali |
| 10,335,033 | B2 | 7/2019 | Al-Ali |
| 10,335,068 | B2 | 7/2019 | Poeze et al. |
| 10,335,072 | B2 | 7/2019 | Al-Ali et al. |
| 10,342,470 | B2 | 7/2019 | Al-Ali et al. |
| 10,342,487 | B2 | 7/2019 | Al-Ali et al. |
| 10,342,497 | B2 | 7/2019 | Al-Ali et al. |
| 10,349,895 | B2 | 7/2019 | Telfort et al. |
| 10,349,898 | B2 | 7/2019 | Al-Ali et al. |
| 10,354,504 | B2 | 7/2019 | Kiani et al. |
| 10,357,206 | B2 | 7/2019 | Weber et al. |
| 10,357,209 | B2 | 7/2019 | Al-Ali |
| 10,366,787 | B2 | 7/2019 | Sampath et al. |
| 10,368,787 | B2 | 8/2019 | Reichgott et al. |
| 10,376,190 | B1 | 8/2019 | Poeze et al. |
| 10,376,191 | B1 | 8/2019 | Poeze et al. |
| 10,383,520 | B2 | 8/2019 | Wojtczuk et al. |
| 10,383,527 | B2 | 8/2019 | Al-Ali |
| 10,388,120 | B2 | 8/2019 | Muhsin et al. |
| 10,390,716 | B2 | 8/2019 | Shimuta |
| 10,398,320 | B2 | 9/2019 | Kiani et al. |
| 10,398,383 | B2 | 9/2019 | van Dinther et al. |
| 10,405,804 | B2 | 9/2019 | Al-Ali |
| 10,406,445 | B2 | 9/2019 | Vock et al. |
| 10,413,666 | B2 | 9/2019 | Al-Ali et al. |
| 10,416,079 | B2 | 9/2019 | Magnussen et al. |
| 10,420,493 | B2 | 9/2019 | Al-Ali et al. |
| D864,120 | S | 10/2019 | Forrest et al. |
| 10,433,776 | B2 | 10/2019 | Al-Ali |
| 10,441,181 | B1 | 10/2019 | Telfort et al. |
| 10,441,196 | B2 | 10/2019 | Eckerbom et al. |
| 10,448,844 | B2 | 10/2019 | Al-Ali et al. |
| 10,448,871 | B2 | 10/2019 | Al-Ali |
| 10,456,038 | B2 | 10/2019 | Lamego et al. |
| 10,463,284 | B2 | 11/2019 | Al-Ali et al. |
| 10,463,340 | B2 | 11/2019 | Telfort et al. |
| 10,470,695 | B2 | 11/2019 | Al-Ali |
| 10,471,159 | B1 | 11/2019 | Lapotko et al. |
| 10,478,107 | B2 | 11/2019 | Kiani et al. |
| 10,503,379 | B2 | 12/2019 | Al-Ali et al. |
| 10,505,311 | B2 | 12/2019 | Al-Ali et al. |
| 10,512,436 | B2 | 12/2019 | Muhsin et al. |
| 10,524,671 | B2 | 1/2020 | Lamego |
| 10,524,706 | B2 | 1/2020 | Telfort et al. |
| 10,524,738 | B2 | 1/2020 | Olsen |
| 10,531,811 | B2 | 1/2020 | Al-Ali et al. |
| 10,531,819 | B2 | 1/2020 | Diab et al. |

**US 10,945,648 B2**

Page 10

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 10,531,835 | B2 | 1/2020 | Al-Ali et al. |
| 10,532,174 | B2 | 1/2020 | Al-Ali |
| 10,537,285 | B2 | 1/2020 | Shreim et al. |
| 10,542,903 | B2 | 1/2020 | Al-Ali et al. |
| 10,548,561 | B2 | 2/2020 | Telfort et al. |
| 10,555,678 | B2 | 2/2020 | Dalvi et al. |
| 10,568,514 | B2 | 2/2020 | Wojtczuk et al. |
| 10,568,553 | B2 | 2/2020 | O'Neil et al. |
| RE47,882 | E | 3/2020 | Al-Ali |
| 10,575,779 | B2 | 3/2020 | Poeze et al. |
| 10,582,886 | B2 | 3/2020 | Poeze et al. |
| 10,588,518 | B2 | 3/2020 | Kiani |
| 10,588,553 | B2 | 3/2020 | Poeze et al. |
| 10,588,554 | B2 | 3/2020 | Poeze et al. |
| 10,588,556 | B2 | 3/2020 | Kiani et al. |
| 10,595,747 | B2 | 3/2020 | Al-Ali et al. |
| 10,608,817 | B2 | 3/2020 | Haider et al. |
| D880,477 | S | 4/2020 | Forrest et al. |
| 10,610,138 | B2 | 4/2020 | Poeze et al. |
| 10,617,302 | B2 | 4/2020 | Al-Ali et al. |
| 10,617,335 | B2 | 4/2020 | Al-Ali et al. |
| 10,617,338 | B2 | 4/2020 | Poeze et al. |
| 10,624,563 | B2 | 4/2020 | Poeze et al. |
| 10,624,564 | B1 | 4/2020 | Poeze et al. |
| 10,631,765 | B1 | 4/2020 | Poeze et al. |
| 10,637,181 | B2 | 4/2020 | Al-Ali et al. |
| 10,638,961 | B2 | 5/2020 | Al-Ali |
| 10,646,146 | B2 | 5/2020 | Al-Ali |
| D887,548 | S | 6/2020 | Abdul-Hafiz et al. |
| D887,549 | S | 6/2020 | Abdul-Hafiz et al. |
| 10,667,764 | B2 | 6/2020 | Ahmed et al. |
| 10,687,743 | B1 | 6/2020 | Al-Ali |
| 10,687,744 | B1 | 6/2020 | Al-Ali |
| 10,687,745 | B1 | 6/2020 | Al-Ali |
| D890,708 | S | 7/2020 | Forrest et al. |
| 10,702,194 | B1 | 7/2020 | Poeze et al. |
| 10,702,195 | B1 | 7/2020 | Poeze et al. |
| 10,709,366 | B1 | 7/2020 | Poeze et al. |
| 10,721,785 | B2 | 7/2020 | Al-Ali |
| 10,722,159 | B2 | 7/2020 | Al-Ali |
| 10,736,518 | B2 | 8/2020 | Al-Ali et al. |
| 10,750,984 | B2 | 8/2020 | Pauley et al. |
| 10,779,098 | B2 | 9/2020 | Iswanto et al. |
| 2001/0034477 | A1 | 10/2001 | Mansfield et al. |
| 2001/0034479 | A1 | 10/2001 | Ring et al. |
| 2001/0039483 | A1 | 11/2001 | Brand et al. |
| 2001/0056243 | A1 | 12/2001 | Ohsaki et al. |
| 2002/0010401 | A1 | 1/2002 | Bushmakin et al. |
| 2002/0045836 | A1 | 4/2002 | Alkawwas |
| 2002/0058864 | A1 | 5/2002 | Mansfield et al. |
| 2002/0099279 | A1 | 7/2002 | Pfeiffer et al. |
| 2002/0111546 | A1 | 8/2002 | Cook et al. |
| 2002/0133080 | A1 | 9/2002 | Apruzzese et al. |
| 2002/0188210 | A1 | 12/2002 | Aizawa |
| 2003/0013975 | A1 | 1/2003 | Kiani |
| 2003/0018243 | A1 | 1/2003 | Gerhardt et al. |
| 2003/0036690 | A1 | 2/2003 | Geddes et al. |
| 2003/0078504 | A1 | 4/2003 | Rowe |
| 2003/0088162 | A1 | 5/2003 | Yamamoto et al. |
| 2003/0098969 | A1 | 5/2003 | Katz et al. |
| 2003/0100840 | A1 | 5/2003 | Sugiura et al. |
| 2003/0144582 | A1 | 7/2003 | Cohen et al. |
| 2003/0156288 | A1 | 8/2003 | Barnum et al. |
| 2003/0158501 | A1 | 8/2003 | Uchida et al. |
| 2003/0212312 | A1 | 11/2003 | Coffin, IV et al. |
| 2004/0054290 | A1 | 3/2004 | Chance |
| 2004/0054291 | A1 | 3/2004 | Schulz et al. |
| 2004/0106163 | A1 | 6/2004 | Workman, Jr. et al. |
| 2004/0114783 | A1 | 6/2004 | Spycher et al. |
| 2004/0132197 | A1 | 7/2004 | Zahniser et al. |
| 2004/0133081 | A1 | 7/2004 | Teller et al. |
| 2004/0138568 | A1 | 7/2004 | Lo et al. |
| 2004/0152957 | A1 | 8/2004 | Stivoric et al. |
| 2004/0220738 | A1 | 11/2004 | Nissila |
| 2005/0020927 | A1 | 1/2005 | Blondeau et al. |
| 2005/0054940 | A1 | 3/2005 | Almen |
| 2005/0055276 | A1 | 3/2005 | Kiani et al. |
| 2005/0075548 | A1 | 4/2005 | Al-Ali et al. |
| 2005/0075553 | A1 | 4/2005 | Sakai et al. |
| 2005/0116820 | A1 | 6/2005 | Goldreich |
| 2005/0192490 | A1 | 9/2005 | Yamamoto et al. |
| 2005/0197555 | A1 | 9/2005 | Mouradian et al. |
| 2005/0234317 | A1 | 10/2005 | Kiani |
| 2005/0276164 | A1 | 12/2005 | Amron |
| 2005/0288592 | A1 | 12/2005 | Yamamoto |
| 2006/0005944 | A1 | 1/2006 | Wang et al. |
| 2006/0009607 | A1 | 1/2006 | Lutz et al. |
| 2006/0009688 | A1 | 1/2006 | Lamego et al. |
| 2006/0020180 | A1 | 1/2006 | Al-Ali |
| 2006/0025659 | A1 | 2/2006 | Kiguchi et al. |
| 2006/0041198 | A1 | 2/2006 | Kondoh et al. |
| 2006/0073719 | A1 | 4/2006 | Kiani |
| 2006/0089557 | A1 | 4/2006 | Grajales et al. |
| 2006/0161054 | A1 | 7/2006 | Reuss et al. |
| 2006/0182659 | A1 | 8/2006 | Unlu et al. |
| 2006/0189871 | A1 | 8/2006 | Al-Ali et al. |
| 2006/0217608 | A1 | 9/2006 | Fein et al. |
| 2006/0226992 | A1 | 10/2006 | Al-Ali et al. |
| 2006/0247531 | A1 | 11/2006 | Pogue et al. |
| 2006/0253010 | A1 | 11/2006 | Brady et al. |
| 2006/0258928 | A1 | 11/2006 | Ortner et al. |
| 2006/0270919 | A1 | 11/2006 | Brenner |
| 2007/0038049 | A1 | 2/2007 | Huang |
| 2007/0055119 | A1 | 3/2007 | Lash et al. |
| 2007/0073116 | A1 | 3/2007 | Kiani et al. |
| 2007/0073117 | A1 | 3/2007 | Raridan |
| 2007/0093786 | A1 | 4/2007 | Goldsmith et al. |
| 2007/0100222 | A1 | 5/2007 | Mastrototaro et al. |
| 2007/0106172 | A1 | 5/2007 | Abreu |
| 2007/0145255 | A1 | 6/2007 | Nishikawa et al. |
| 2007/0149864 | A1 | 6/2007 | Laakkonen |
| 2007/0180140 | A1 | 8/2007 | Welch et al. |
| 2007/0191691 | A1 | 8/2007 | Polanco |
| 2007/0197886 | A1 | 8/2007 | Naganuma et al. |
| 2007/0208395 | A1 | 9/2007 | Leclerc et al. |
| 2007/0238955 | A1 | 10/2007 | Tearney et al. |
| 2007/0244377 | A1 | 10/2007 | Cozad et al. |
| 2007/0249916 | A1 | 10/2007 | Pesach et al. |
| 2007/0260130 | A1 | 11/2007 | Chin |
| 2007/0282178 | A1 | 12/2007 | Scholler et al. |
| 2007/0293792 | A1 | 12/2007 | Sliwa et al. |
| 2008/0004513 | A1 | 1/2008 | Walker et al. |
| 2008/0015424 | A1 | 1/2008 | Bernreuter |
| 2008/0031497 | A1 | 2/2008 | Kishigami et al. |
| 2008/0064965 | A1 | 3/2008 | Jay et al. |
| 2008/0076980 | A1 | 3/2008 | Hoarau |
| 2008/0076993 | A1 | 3/2008 | Ostrowski |
| 2008/0081966 | A1 | 4/2008 | Debreczeny |
| 2008/0094228 | A1 | 4/2008 | Welch et al. |
| 2008/0097172 | A1 | 4/2008 | Sawada et al. |
| 2008/0122796 | A1 | 5/2008 | Jobs et al. |
| 2008/0130232 | A1 | 6/2008 | Yamamoto |
| 2008/0139908 | A1 | 6/2008 | Kurth |
| 2008/0190436 | A1 | 8/2008 | Jaffe et al. |
| 2008/0194932 | A1 | 8/2008 | Ayers et al. |
| 2008/0221418 | A1 | 9/2008 | Al-Ali et al. |
| 2008/0221426 | A1 | 9/2008 | Baker et al. |
| 2008/0221463 | A1 | 9/2008 | Baker |
| 2008/0242958 | A1 | 10/2008 | Al-Ali et al. |
| 2008/0262325 | A1 | 10/2008 | Lamego |
| 2008/0319290 | A1 | 12/2008 | Mao et al. |
| 2009/0024013 | A1 | 1/2009 | Soller |
| 2009/0030327 | A1 | 1/2009 | Chance |
| 2009/0036759 | A1 | 2/2009 | Ault et al. |
| 2009/0043180 | A1 | 2/2009 | Tschautscher et al. |
| 2009/0093687 | A1 | 4/2009 | Telfort et al. |
| 2009/0095926 | A1 | 4/2009 | MacNeish, III |
| 2009/0129102 | A1 | 5/2009 | Xiao et al. |
| 2009/0156918 | A1 | 6/2009 | Davis et al. |
| 2009/0163775 | A1 | 6/2009 | Barrett et al. |
| 2009/0163784 | A1 | 6/2009 | Mannheimer et al. |
| 2009/0163787 | A1 | 6/2009 | Mannheimer et al. |
| 2009/0177097 | A1 | 7/2009 | Ma et al. |
| 2009/0187085 | A1 | 7/2009 | Pav |

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2009/0234206 | A1 | 9/2009 | Gaspard et al. |
| 2009/0247885 | A1 | 10/2009 | Suzuki et al. |
| 2009/0247984 | A1 | 10/2009 | Lamego et al. |
| 2009/0259114 | A1 | 10/2009 | Johnson et al. |
| 2009/0270699 | A1 | 10/2009 | Scholler et al. |
| 2009/0275813 | A1 | 11/2009 | Davis |
| 2009/0275844 | A1 | 11/2009 | Al-Ali |
| 2009/0306487 | A1 | 12/2009 | Crowe et al. |
| 2009/0326346 | A1 | 12/2009 | Kracker et al. |
| 2010/0004518 | A1 | 1/2010 | Vo et al. |
| 2010/0030040 | A1 | 2/2010 | Poeze et al. |
| 2010/0030043 | A1 | 2/2010 | Kuhn |
| 2010/0099964 | A1 | 4/2010 | O'Reilly et al. |
| 2010/0113948 | A1 | 5/2010 | Yang et al. |
| 2010/0130841 | A1 | 5/2010 | Ozawa et al. |
| 2010/0210925 | A1 | 8/2010 | Holley et al. |
| 2010/0234718 | A1 | 9/2010 | Sampath et al. |
| 2010/0270257 | A1 | 10/2010 | Wachman et al. |
| 2010/0305416 | A1 | 12/2010 | Bedard et al. |
| 2011/0001605 | A1 | 1/2011 | Kiani et al. |
| 2011/0003665 | A1 | 1/2011 | Burton et al. |
| 2011/0004079 | A1 | 1/2011 | Al-Ali et al. |
| 2011/0004106 | A1 | 1/2011 | Iwamiya et al. |
| 2011/0028806 | A1 | 2/2011 | Merritt et al. |
| 2011/0028809 | A1 | 2/2011 | Goodman |
| 2011/0040197 | A1 | 2/2011 | Welch et al. |
| 2011/0082711 | A1 | 4/2011 | Poeze et al. |
| 2011/0085721 | A1 | 4/2011 | Guyon et al. |
| 2011/0087081 | A1 | 4/2011 | Kiani et al. |
| 2011/0105854 | A1 | 5/2011 | Kiani et al. |
| 2011/0105865 | A1 | 5/2011 | Yu et al. |
| 2011/0118561 | A1 | 5/2011 | Tari et al. |
| 2011/0137297 | A1 | 6/2011 | Kiani et al. |
| 2011/0172498 | A1 | 7/2011 | Olsen et al. |
| 2011/0208015 | A1 | 8/2011 | Welch et al. |
| 2011/0213212 | A1 | 9/2011 | Al-Ali |
| 2011/0230733 | A1 | 9/2011 | Al-Ali |
| 2011/0237911 | A1 | 9/2011 | Lamego et al. |
| 2011/0245697 | A1 | 10/2011 | Miettinen |
| 2012/0059267 | A1 | 3/2012 | Lamego et al. |
| 2012/0078069 | A1 | 3/2012 | Melker |
| 2012/0123231 | A1 | 5/2012 | O'Reilly |
| 2012/0150052 | A1 | 6/2012 | Buchheim et al. |
| 2012/0165629 | A1 | 6/2012 | Merritt et al. |
| 2012/0179006 | A1 | 7/2012 | Jansen et al. |
| 2012/0197093 | A1 | 8/2012 | LeBoeuf et al. |
| 2012/0197137 | A1 | 8/2012 | Jeanne et al. |
| 2012/0209084 | A1 | 8/2012 | Olsen et al. |
| 2012/0226117 | A1 | 9/2012 | Lamego et al. |
| 2012/0227739 | A1 | 9/2012 | Kiani |
| 2012/0283524 | A1 | 11/2012 | Kiani et al. |
| 2012/0296178 | A1 | 11/2012 | Lamego et al. |
| 2012/0319816 | A1 | 12/2012 | Al-Ali |
| 2012/0330112 | A1 | 12/2012 | Lamego et al. |
| 2013/0018233 | A1 | 1/2013 | Cinbis et al. |
| 2013/0023775 | A1 | 1/2013 | Lamego et al. |
| 2013/0041591 | A1 | 2/2013 | Lamego |
| 2013/0045685 | A1 | 2/2013 | Kiani |
| 2013/0046204 | A1 | 2/2013 | Lamego et al. |
| 2013/0060147 | A1 | 3/2013 | Welch et al. |
| 2013/0085346 | A1 | 4/2013 | Lin et al. |
| 2013/0096405 | A1 | 4/2013 | Garfio |
| 2013/0096936 | A1 | 4/2013 | Sampath et al. |
| 2013/0131474 | A1 | 5/2013 | Gu et al. |
| 2013/0190581 | A1 | 7/2013 | Al-Ali et al. |
| 2013/0197328 | A1 | 8/2013 | Diab et al. |
| 2013/0204112 | A1 | 8/2013 | White et al. |
| 2013/0211214 | A1 | 8/2013 | Olsen |
| 2013/0243021 | A1 | 9/2013 | Siskavich |
| 2013/0296672 | A1 | 11/2013 | O'Neil et al. |
| 2013/0324808 | A1 | 12/2013 | Al-Ali et al. |
| 2013/0331670 | A1 | 12/2013 | Kiani |
| 2013/0338461 | A1 | 12/2013 | Lamego et al. |
| 2013/0345921 | A1 | 12/2013 | Al-Ali et al. |
| 2014/0012100 | A1 | 1/2014 | Al-Ali et al. |
| 2014/0034353 | A1 | 2/2014 | Al-Ali et al. |
| 2014/0051953 | A1 | 2/2014 | Lamego et al. |
| 2014/0051955 | A1 | 2/2014 | Tiao et al. |
| 2014/0058230 | A1 | 2/2014 | Abdul-Hafiz et al. |
| 2014/0073887 | A1 | 3/2014 | Petersen et al. |
| 2014/0073960 | A1 | 3/2014 | Rodriguez-Llorente et al. |
| 2014/0077956 | A1 | 3/2014 | Sampath et al. |
| 2014/0081100 | A1 | 3/2014 | Muhsin et al. |
| 2014/0081175 | A1 | 3/2014 | Telfort |
| 2014/0094667 | A1 | 4/2014 | Schurman et al. |
| 2014/0100434 | A1 | 4/2014 | Diab et al. |
| 2014/0107493 | A1 | 4/2014 | Yuen et al. |
| 2014/0114199 | A1 | 4/2014 | Lamego et al. |
| 2014/0120564 | A1 | 5/2014 | Workman et al. |
| 2014/0121482 | A1 | 5/2014 | Merritt et al. |
| 2014/0121483 | A1 | 5/2014 | Kiani |
| 2014/0127137 | A1 | 5/2014 | Bellott et al. |
| 2014/0129702 | A1 | 5/2014 | Lamego et al. |
| 2014/0135588 | A1 | 5/2014 | Al-Ali et al. |
| 2014/0142401 | A1 | 5/2014 | Al-Ali et al. |
| 2014/0163344 | A1 | 6/2014 | Al-Ali |
| 2014/0163402 | A1 | 6/2014 | Lamego et al. |
| 2014/0166076 | A1 | 6/2014 | Kiani et al. |
| 2014/0171146 | A1 | 6/2014 | Ma et al. |
| 2014/0171763 | A1 | 6/2014 | Diab |
| 2014/0180154 | A1 | 6/2014 | Sierra et al. |
| 2014/0180160 | A1 | 6/2014 | Brown et al. |
| 2014/0187973 | A1 | 7/2014 | Brown et al. |
| 2014/0192177 | A1 | 7/2014 | Bartula et al. |
| 2014/0194709 | A1 | 7/2014 | Al-Ali et al. |
| 2014/0194711 | A1 | 7/2014 | Al-Ali |
| 2014/0194766 | A1 | 7/2014 | Al-Ali et al. |
| 2014/0206954 | A1 | 7/2014 | Yuen et al. |
| 2014/0206963 | A1 | 7/2014 | Al-Ali |
| 2014/0213864 | A1 | 7/2014 | Abdul-Hafiz et al. |
| 2014/0221854 | A1 | 8/2014 | Wai |
| 2014/0243627 | A1 | 8/2014 | Diab et al. |
| 2014/0266790 | A1 | 9/2014 | Al-Ali et al. |
| 2014/0275808 | A1 | 9/2014 | Poeze et al. |
| 2014/0275871 | A1 | 9/2014 | Lamego et al. |
| 2014/0275872 | A1 | 9/2014 | Merritt et al. |
| 2014/0275881 | A1 | 9/2014 | Lamego et al. |
| 2014/0276013 | A1 | 9/2014 | Muehlemann et al. |
| 2014/0276116 | A1 | 9/2014 | Takahashi et al. |
| 2014/0288400 | A1 | 9/2014 | Diab et al. |
| 2014/0296664 | A1 | 10/2014 | Bruinsma et al. |
| 2014/0303520 | A1 | 10/2014 | Telfort et al. |
| 2014/0316217 | A1 | 10/2014 | Purdon et al. |
| 2014/0316218 | A1 | 10/2014 | Purdon et al. |
| 2014/0316228 | A1 | 10/2014 | Blank et al. |
| 2014/0323825 | A1 | 10/2014 | Al-Ali et al. |
| 2014/0323897 | A1 | 10/2014 | Brown et al. |
| 2014/0323898 | A1 | 10/2014 | Purdon et al. |
| 2014/0330098 | A1 | 11/2014 | Merritt et al. |
| 2014/0330099 | A1 | 11/2014 | Al-Ali et al. |
| 2014/0333440 | A1 | 11/2014 | Kiani |
| 2014/0336481 | A1 | 11/2014 | Shakespeare et al. |
| 2014/0343436 | A1 | 11/2014 | Kiani |
| 2014/0357966 | A1 | 12/2014 | Al-Ali et al. |
| 2014/0361147 | A1 | 12/2014 | Fei |
| 2014/0378844 | A1 | 12/2014 | Fei |
| 2015/0005600 | A1 | 1/2015 | Blank et al. |
| 2015/0011907 | A1 | 1/2015 | Purdon et al. |
| 2015/0018650 | A1 | 1/2015 | Al-Ali et al. |
| 2015/0032029 | A1 | 1/2015 | Al-Ali et al. |
| 2015/0065889 | A1 | 3/2015 | Gandelman et al. |
| 2015/0073235 | A1 | 3/2015 | Kateraas et al. |
| 2015/0073241 | A1 | 3/2015 | Lamego |
| 2015/0080754 | A1 | 3/2015 | Purdon et al. |
| 2015/0087936 | A1 | 3/2015 | Al-Ali et al. |
| 2015/0094546 | A1 | 4/2015 | Al-Ali |
| 2015/0099950 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0101844 | A1 | 4/2015 | Al-Ali et al. |
| 2015/0106121 | A1 | 4/2015 | Muhsin et al. |
| 2015/0119725 | A1 | 4/2015 | Martin et al. |
| 2015/0173671 | A1 | 6/2015 | Paalasmaa et al. |
| 2015/0196249 | A1 | 7/2015 | Brown et al. |
| 2015/0216459 | A1 | 8/2015 | Al-Ali et al. |
| 2015/0255001 | A1 | 9/2015 | Haughav et al. |

**US 10,945,648 B2**

Page 12

(56)             **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2015/0257689 A1 | 9/2015 | Al-Ali et al. |
| 2015/0281424 A1 | 10/2015 | Vock et al. |
| 2015/0318100 A1 | 11/2015 | Rothkopf et al. |
| 2015/0351697 A1 | 11/2015 | Weber et al. |
| 2015/0351704 A1 | 12/2015 | Kiani et al. |
| 2015/0366472 A1 | 12/2015 | Kiani |
| 2015/0366507 A1 | 12/2015 | Blank |
| 2015/0374298 A1 | 12/2015 | Al-Ali et al. |
| 2015/0380875 A1 | 12/2015 | Coverston et al. |
| 2016/0000362 A1 | 1/2016 | Diab et al. |
| 2016/0007930 A1 | 1/2016 | Weber et al. |
| 2016/0019360 A1 | 1/2016 | Pahwa et al. |
| 2016/0022160 A1 | 1/2016 | Pi et al. |
| 2016/0023245 A1 | 1/2016 | Zadesky et al. |
| 2016/0029932 A1 | 2/2016 | Al-Ali |
| 2016/0029933 A1 | 2/2016 | Al-Ali et al. |
| 2016/0038045 A1 | 2/2016 | Shapiro |
| 2016/0041531 A1 | 2/2016 | Mackie et al. |
| 2016/0045118 A1 | 2/2016 | Kiani |
| 2016/0051157 A1 | 2/2016 | Waydo |
| 2016/0051158 A1 | 2/2016 | Silva |
| 2016/0051205 A1 | 2/2016 | Al-Ali et al. |
| 2016/0058302 A1 | 3/2016 | Raghuram et al. |
| 2016/0058309 A1 | 3/2016 | Han |
| 2016/0058310 A1 | 3/2016 | Iijima |
| 2016/0058312 A1 | 3/2016 | Han et al. |
| 2016/0058338 A1 | 3/2016 | Schurman et al. |
| 2016/0058356 A1 | 3/2016 | Raghuram et al. |
| 2016/0058370 A1 | 3/2016 | Raghuram et al. |
| 2016/0066823 A1 | 3/2016 | Al-Ali et al. |
| 2016/0066824 A1 | 3/2016 | Al-Ali et al. |
| 2016/0066879 A1 | 3/2016 | Telfort et al. |
| 2016/0071392 A1 | 3/2016 | Hankey et al. |
| 2016/0072429 A1 | 3/2016 | Kiani et al. |
| 2016/0073967 A1 | 3/2016 | Lamego et al. |
| 2016/0106367 A1 | 4/2016 | Jorov et al. |
| 2016/0113527 A1 | 4/2016 | Al-Ali et al. |
| 2016/0143548 A1 | 5/2016 | Al-Ali |
| 2016/0154950 A1 | 6/2016 | Nakajima et al. |
| 2016/0157780 A1 | 6/2016 | Rimminen et al. |
| 2016/0166210 A1 | 6/2016 | Al-Ali |
| 2016/0192869 A1 | 7/2016 | Kiani et al. |
| 2016/0196388 A1 | 7/2016 | Lamego |
| 2016/0197436 A1 | 7/2016 | Barker et al. |
| 2016/0213281 A1 | 7/2016 | Eckerbom et al. |
| 2016/0213309 A1 | 7/2016 | Sannholm et al. |
| 2016/0256058 A1 | 9/2016 | Pham et al. |
| 2016/0256082 A1 | 9/2016 | Ely et al. |
| 2016/0267238 A1 | 9/2016 | Nag |
| 2016/0270735 A1 | 9/2016 | Diab et al. |
| 2016/0283665 A1 | 9/2016 | Sampath et al. |
| 2016/0287107 A1 | 10/2016 | Szabados et al. |
| 2016/0287181 A1 | 10/2016 | Han et al. |
| 2016/0287786 A1 | 10/2016 | Kiani |
| 2016/0296173 A1 | 10/2016 | Culbert |
| 2016/0296174 A1 | 10/2016 | Isikman et al. |
| 2016/0310027 A1 | 10/2016 | Han |
| 2016/0314260 A1 | 10/2016 | Kiani |
| 2016/0327984 A1 | 11/2016 | Al-Ali et al. |
| 2016/0367173 A1 | 12/2016 | Dalvi et al. |
| 2016/0378069 A1 | 12/2016 | Rothkopf |
| 2016/0378071 A1 | 12/2016 | Rothkopf |
| 2017/0007183 A1 | 1/2017 | Dusan et al. |
| 2017/0010858 A1 | 1/2017 | Prest et al. |
| 2017/0014083 A1 | 1/2017 | Diab et al. |
| 2017/0024748 A1 | 1/2017 | Haider |
| 2017/0042488 A1 | 2/2017 | Muhsin |
| 2017/0055896 A1 | 3/2017 | Al-Ali et al. |
| 2017/0074897 A1 | 3/2017 | Mermel et al. |
| 2017/0084133 A1 | 3/2017 | Cardinali et al. |
| 2017/0086689 A1 | 3/2017 | Shui et al. |
| 2017/0086742 A1 | 3/2017 | Harrison-Noonan et al. |
| 2017/0086743 A1 | 3/2017 | Bushnell et al. |
| 2017/0094450 A1 | 3/2017 | Tu et al. |
| 2017/0143281 A1 | 5/2017 | Olsen |
| 2017/0147774 A1 | 5/2017 | Kiani |
| 2017/0164884 A1 | 6/2017 | Culbert et al. |
| 2017/0172435 A1 | 6/2017 | Presura |
| 2017/0172476 A1 | 6/2017 | Schilthuizen |
| 2017/0173632 A1 | 6/2017 | Al-Ali |
| 2017/0196464 A1 | 7/2017 | Jansen et al. |
| 2017/0196470 A1 | 7/2017 | Lamego et al. |
| 2017/0202505 A1 | 7/2017 | Kirenko et al. |
| 2017/0209095 A1 | 7/2017 | Wagner et al. |
| 2017/0228516 A1 | 8/2017 | Sampath et al. |
| 2017/0245790 A1 | 8/2017 | Al-Ali et al. |
| 2017/0248446 A1 | 8/2017 | Gowreesunker et al. |
| 2017/0251974 A1 | 9/2017 | Shreim et al. |
| 2017/0273619 A1 | 9/2017 | Alvarado et al. |
| 2017/0281024 A1 | 10/2017 | Narasimhan et al. |
| 2017/0293727 A1 | 10/2017 | Klaassen et al. |
| 2017/0311891 A1 | 11/2017 | Kiani et al. |
| 2017/0325698 A1 | 11/2017 | Allec et al. |
| 2017/0325744 A1 | 11/2017 | Allec et al. |
| 2017/0340209 A1 | 11/2017 | Klaassen et al. |
| 2017/0340219 A1 | 11/2017 | Sullivan et al. |
| 2017/0340293 A1 | 11/2017 | Al-Ali et al. |
| 2017/0347885 A1 | 12/2017 | Tan et al. |
| 2017/0354332 A1 | 12/2017 | Lamego |
| 2017/0354795 A1 | 12/2017 | Blahnik et al. |
| 2017/0358239 A1 | 12/2017 | Arney et al. |
| 2017/0358240 A1 | 12/2017 | Blahnik et al. |
| 2017/0358242 A1 | 12/2017 | Thompson et al. |
| 2017/0360306 A1 | 12/2017 | Narasimhan et al. |
| 2017/0366657 A1 | 12/2017 | Thompson et al. |
| 2018/0008146 A1 | 1/2018 | Al-Ali et al. |
| 2018/0014781 A1 | 1/2018 | Clavelle et al. |
| 2018/0025287 A1 | 1/2018 | Mathew et al. |
| 2018/0042556 A1 | 2/2018 | Shahparnia et al. |
| 2018/0049694 A1 | 2/2018 | Singh Alvarado et al. |
| 2018/0050235 A1 | 2/2018 | Tan et al. |
| 2018/0055375 A1 | 3/2018 | Martinez et al. |
| 2018/0055390 A1 | 3/2018 | Kiani |
| 2018/0055439 A1 | 3/2018 | Pham et al. |
| 2018/0056129 A1 | 3/2018 | Narasimha Rao et al. |
| 2018/0064381 A1 | 3/2018 | Shakespeare et al. |
| 2018/0070867 A1 | 3/2018 | Smith et al. |
| 2018/0078151 A1 | 3/2018 | Allec et al. |
| 2018/0078182 A1 | 3/2018 | Chen et al. |
| 2018/0082767 A1 | 3/2018 | Al-Ali et al. |
| 2018/0085068 A1 | 3/2018 | Telfort |
| 2018/0087937 A1 | 3/2018 | Al-Ali et al. |
| 2018/0103874 A1 | 4/2018 | Lee et al. |
| 2018/0103905 A1 | 4/2018 | Kiani |
| 2018/0110469 A1 | 4/2018 | Maani et al. |
| 2018/0125368 A1 | 5/2018 | Lamego et al. |
| 2018/0125430 A1 | 5/2018 | Al-Ali et al. |
| 2018/0132769 A1 | 5/2018 | Weber et al. |
| 2018/0146901 A1 | 5/2018 | Al-Ali et al. |
| 2018/0146902 A1 | 5/2018 | Kiani et al. |
| 2018/0153418 A1 | 6/2018 | Sullivan et al. |
| 2018/0153442 A1 | 6/2018 | Eckerbom et al. |
| 2018/0153446 A1 | 6/2018 | Kiani |
| 2018/0153448 A1 | 6/2018 | Weber et al. |
| 2018/0164853 A1 | 6/2018 | Myers et al. |
| 2018/0168491 A1 | 6/2018 | Al-Ali et al. |
| 2018/0184917 A1 | 7/2018 | Kiani |
| 2018/0192924 A1 | 7/2018 | Al-Ali |
| 2018/0192953 A1 | 7/2018 | Shreim et al. |
| 2018/0196514 A1 | 7/2018 | Allec et al. |
| 2018/0199871 A1 | 7/2018 | Pauley et al. |
| 2018/0206795 A1 | 7/2018 | Al-Ali |
| 2018/0206815 A1 | 7/2018 | Telfort |
| 2018/0213583 A1 | 7/2018 | Al-Ali |
| 2018/0214090 A1 | 8/2018 | Al-Ali |
| 2018/0216370 A1 | 8/2018 | Ishiguro et al. |
| 2018/0218792 A1 | 8/2018 | Muhsin et al. |
| 2018/0225960 A1 | 8/2018 | Al-Ali et al. |
| 2018/0228414 A1 | 8/2018 | Shao et al. |
| 2018/0238718 A1 | 8/2018 | Dalvi |
| 2018/0238734 A1 | 8/2018 | Hotelling et al. |
| 2018/0242853 A1 | 8/2018 | Al-Ali |
| 2018/0242923 A1 | 8/2018 | Al-Ali |
| 2018/0242926 A1 | 8/2018 | Muhsin et al. |

**US 10,945,648 B2**

Page 13

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2018/0247353 | A1 | 8/2018 | Al-Ali et al. |
| 2018/0247712 | A1 | 8/2018 | Muhsin et al. |
| 2018/0256087 | A1 | 9/2018 | Al-Ali et al. |
| 2018/0279956 | A1 | 10/2018 | Waydo et al. |
| 2018/0285094 | A1 | 10/2018 | Housel et al. |
| 2018/0296161 | A1 | 10/2018 | Shreim et al. |
| 2018/0300919 | A1 | 10/2018 | Muhsin et al. |
| 2018/0310822 | A1 | 11/2018 | Indorf et al. |
| 2018/0310823 | A1 | 11/2018 | Al-Ali et al. |
| 2018/0317826 | A1 | 11/2018 | Muhsin |
| 2018/0317841 | A1 | 11/2018 | Novak, Jr. |
| 2018/0333055 | A1 | 11/2018 | Lamego et al. |
| 2018/0333087 | A1 | 11/2018 | Al-Ali |
| 2019/0000317 | A1 | 1/2019 | Muhsin et al. |
| 2019/0015023 | A1 | 1/2019 | Monfre |
| 2019/0029574 | A1 | 1/2019 | Schurman et al. |
| 2019/0029578 | A1 | 1/2019 | Al-Ali et al. |
| 2019/0058280 | A1 | 2/2019 | Al-Ali et al. |
| 2019/0069813 | A1 | 3/2019 | Al-Ali |
| 2019/0076028 | A1 | 3/2019 | Al-Ali et al. |
| 2019/0082979 | A1 | 3/2019 | Al-Ali et al. |
| 2019/0090760 | A1 | 3/2019 | Kinast et al. |
| 2019/0090764 | A1 | 3/2019 | Al-Ali |
| 2019/0117070 | A1 | 4/2019 | Muhsin et al. |
| 2019/0117139 | A1 | 4/2019 | Al-Ali et al. |
| 2019/0117141 | A1 | 4/2019 | Al-Ali |
| 2019/0117930 | A1 | 4/2019 | Al-Ali |
| 2019/0122763 | A1 | 4/2019 | Sampath et al. |
| 2019/0133525 | A1 | 5/2019 | Al-Ali et al. |
| 2019/0142283 | A1 | 5/2019 | Lamego et al. |
| 2019/0142344 | A1 | 5/2019 | Telfort et al. |
| 2019/0150856 | A1 | 5/2019 | Kiani et al. |
| 2019/0167161 | A1 | 6/2019 | Al-Ali et al. |
| 2019/0175019 | A1 | 6/2019 | Al-Ali et al. |
| 2019/0192076 | A1 | 6/2019 | McHale et al. |
| 2019/0200941 | A1 | 7/2019 | Chandran et al. |
| 2019/0201623 | A1 | 7/2019 | Kiani |
| 2019/0209025 | A1 | 7/2019 | Al-Ali |
| 2019/0214778 | A1 | 7/2019 | Scruggs et al. |
| 2019/0216319 | A1 | 7/2019 | Poeze et al. |
| 2019/0216379 | A1 | 7/2019 | Al-Ali et al. |
| 2019/0221926 | A1 | 7/2019 | Kiani et al. |
| 2019/0223804 | A1 | 7/2019 | Blank et al. |
| 2019/0231199 | A1 | 8/2019 | Al-Ali et al. |
| 2019/0231241 | A1 | 8/2019 | Al-Ali et al. |
| 2019/0231270 | A1 | 8/2019 | Abdul-Hafiz et al. |
| 2019/0239787 | A1 | 8/2019 | Pauley et al. |
| 2019/0239824 | A1 | 8/2019 | Muhsin et al. |
| 2019/0254578 | A1 | 8/2019 | Lamego |
| 2019/0261857 | A1 | 8/2019 | Al-Ali |
| 2019/0269370 | A1 | 9/2019 | Al-Ali et al. |
| 2019/0274627 | A1 | 9/2019 | Al-Ali et al. |
| 2019/0274635 | A1 | 9/2019 | Al-Ali et al. |
| 2019/0290136 | A1 | 9/2019 | Dalvi et al. |
| 2019/0298270 | A1 | 10/2019 | Al-Ali et al. |
| 2019/0304601 | A1 | 10/2019 | Sampath et al. |
| 2019/0304605 | A1 | 10/2019 | Al-Ali |
| 2019/0307377 | A1 | 10/2019 | Perea et al. |
| 2019/0320006 | A1 | 10/2019 | Olsen |
| 2019/0320959 | A1 | 10/2019 | Al-Ali |
| 2019/0320988 | A1 | 10/2019 | Ahmed et al. |
| 2019/0325722 | A1 | 10/2019 | Kiani et al. |
| 2019/0350506 | A1 | 11/2019 | Al-Ali |
| 2019/0357813 | A1 | 11/2019 | Poeze et al. |
| 2019/0357823 | A1 | 11/2019 | Reichgott et al. |
| 2019/0357824 | A1 | 11/2019 | Al-Ali et al. |
| 2019/0358524 | A1 | 11/2019 | Kiani |
| 2019/0365294 | A1 | 12/2019 | Poeze et al. |
| 2019/0374139 | A1 | 12/2019 | Kiani et al. |
| 2019/0374173 | A1 | 12/2019 | Kiani et al. |
| 2019/0374713 | A1 | 12/2019 | Kiani et al. |
| 2019/0386908 | A1 | 12/2019 | Lamego et al. |
| 2019/0388039 | A1 | 12/2019 | Al-Ali |
| 2020/0000338 | A1 | 1/2020 | Lamego et al. |
| 2020/0000415 | A1 | 1/2020 | Barker et al. |
| 2020/0015716 | A1 | 1/2020 | Poeze et al. |
| 2020/0021930 | A1 | 1/2020 | Iswanto et al. |
| 2020/0037453 | A1 | 1/2020 | Triman et al. |
| 2020/0037891 | A1 | 2/2020 | Kiani et al. |
| 2020/0037966 | A1 | 2/2020 | Al-Ali |
| 2020/0046257 | A1 | 2/2020 | Eckerbom et al. |
| 2020/0054253 | A1 | 2/2020 | Al-Ali et al. |
| 2020/0060591 | A1 | 2/2020 | Diab et al. |
| 2020/0060628 | A1 | 2/2020 | Al-Ali et al. |
| 2020/0060629 | A1 | 2/2020 | Muhsin et al. |
| 2020/0060869 | A1 | 2/2020 | Telfort et al. |
| 2020/0074819 | A1 | 3/2020 | Muhsin et al. |
| 2020/0111552 | A1 | 4/2020 | Ahmed |
| 2020/0113435 | A1 | 4/2020 | Muhsin |
| 2020/0113488 | A1 | 4/2020 | Al-Ali et al. |
| 2020/0113496 | A1 | 4/2020 | Scruggs et al. |
| 2020/0113497 | A1 | 4/2020 | Triman et al. |
| 2020/0113520 | A1 | 4/2020 | Abdul-Hafiz et al. |
| 2020/0138288 | A1 | 5/2020 | Al-Ali et al. |
| 2020/0138368 | A1 | 5/2020 | Kiani et al. |
| 2020/0163597 | A1 | 5/2020 | Dalvi et al. |
| 2020/0196877 | A1 | 6/2020 | Vo et al. |
| 2020/0196882 | A1 | 6/2020 | Kiani et al. |
| 2020/0221980 | A1 | 7/2020 | Poeze et al. |
| 2020/0253474 | A1 | 8/2020 | Muhsin et al. |
| 2020/0253544 | A1 | 8/2020 | Belur Nagaraj et al. |
| 2020/0275841 | A1 | 9/2020 | Telfort et al. |
| 2020/0288983 | A1 | 9/2020 | Telfort et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101564290 | 10/2009 |
| CN | 101484065 | 11/2011 |
| CN | 103906468 | 7/2014 |
| EP | 0102816 | 3/1984 |
| EP | 0419223 | 3/1991 |
| EP | 0630208 | 12/1994 |
| EP | 0665727 | 1/1997 |
| EP | 0760223 | 3/1997 |
| EP | 0770349 | 5/1997 |
| EP | 0781527 | 7/1997 |
| EP | 0880936 | 12/1998 |
| EP | 0922432 | 6/1999 |
| EP | 0985373 | 3/2000 |
| EP | 1518494 | 3/2005 |
| EP | 1526805 | 5/2005 |
| EP | 1124609 | 8/2006 |
| EP | 1860989 | 12/2007 |
| EP | 1875213 | 1/2008 |
| EP | 1880666 | 1/2008 |
| EP | 2165196 | 3/2010 |
| EP | 2277440 | 1/2011 |
| GB | 2243691 | 11/1991 |
| JP | 05-325705 | 12/1993 |
| JP | 08-185864 | 7/1996 |
| JP | H09-173322 | 7/1997 |
| JP | H 09257508 | 10/1997 |
| JP | H 10314133 | 12/1998 |
| JP | H 1170086 | 3/1999 |
| JP | 29193262 | 7/1999 |
| JP | H11-197127 | 7/1999 |
| JP | H 11235320 | 8/1999 |
| JP | 2001-066990 | 3/2001 |
| JP | 2001-087250 | 4/2001 |
| JP | 2002-500908 | 1/2002 |
| JP | 2003-024276 | 1/2003 |
| JP | 2003-508104 | 3/2003 |
| JP | 2003-265444 | 9/2003 |
| JP | 2004-329406 | 11/2004 |
| JP | 2004-344668 | 12/2004 |
| JP | 2005-160641 | 6/2005 |
| JP | 2005-270543 | 10/2005 |
| JP | 37411472 | 2/2006 |
| JP | 2006-102164 | 4/2006 |
| JP | 2006-177837 | 7/2006 |
| JP | 2006-198321 | 8/2006 |
| JP | 38033512 | 8/2006 |
| JP | 2006-296564 | 11/2006 |
| JP | 2007-389463 | 11/2007 |

(56)        **References Cited**

FOREIGN PATENT DOCUMENTS

| JP | 2007-319232 | 12/2007 |
| JP | 2008-099222 | 4/2008 |
| JP | 2009-106373 | 5/2009 |
| JP | 2011-147746 | 8/2011 |
| JP | 2013-515528 | 5/2013 |
| JP | 5756752 | 6/2015 |
| KR | 20070061122 | 6/2007 |
| KR | 100755079 | 9/2007 |
| KR | 20100091592 | 8/2010 |
| WO | WO 93/012712 | 7/1993 |
| WO | WO 94/23643 | 10/1994 |
| WO | WO 1995/000070 | 1/1995 |
| WO | WO 1996/27325 | 9/1996 |
| WO | WO 1996/41566 | 12/1996 |
| WO | WO 1997/009923 | 3/1997 |
| WO | WO 99/000053 | 1/1999 |
| WO | WO 99/001704 | 7/1999 |
| WO | WO 1999/063883 | 12/1999 |
| WO | WO 00/18290 | 4/2000 |
| WO | WO 00/25112 | 5/2000 |
| WO | WO 2000/028892 | 5/2000 |
| WO | WO 01/09589 | 2/2001 |
| WO | WO 01/50433 | 7/2001 |
| WO | WO 2002/062213 | 8/2002 |
| WO | WO 2005/094667 | 10/2005 |
| WO | WO 2006/016366 | 2/2006 |
| WO | WO 2006/017117 | 2/2006 |
| WO | WO 2006/060949 | 6/2006 |
| WO | WO 2006/079862 | 8/2006 |
| WO | WO 2006/090371 | 8/2006 |
| WO | WO 2006/113070 | 10/2006 |
| WO | WO 2007/004083 | 1/2007 |
| WO | WO 2007/017266 | 2/2007 |
| WO | WO 2007/048039 | 4/2007 |
| WO | WO 2007/144817 | 12/2007 |
| WO | WO 2008/002405 | 1/2008 |
| WO | WO 2008/107238 | 9/2008 |
| WO | WO 2008/149081 | 12/2008 |
| WO | WO 2009/001988 | 12/2008 |
| WO | WO 2009/137524 | 11/2009 |
| WO | WO 2010/003134 | 1/2010 |
| WO | WO 2011/051888 | 5/2011 |
| WO | WO 2011/069122 | 6/2011 |
| WO | WO 2013/030744 | 3/2013 |
| WO | WO 2013/106607 | 7/2013 |
| WO | WO 2013/181368 | 12/2013 |
| WO | WO 2014/115075 | 7/2014 |
| WO | WO 2014/149781 | 9/2014 |
| WO | WO 2014/153200 | 9/2014 |
| WO | WO 2014/158820 | 10/2014 |
| WO | WO 2014/178793 | 11/2014 |
| WO | WO 2014/184447 | 11/2014 |
| WO | WO 2015/187732 | 12/2015 |
| WO | WO 2016/066312 | 5/2016 |

OTHER PUBLICATIONS

K. Self, Application Note 78—Using Power Management with High-Speed Microcontrollers, Maxim Integrated Products, Inc., Mar. 29, 2001, 25 pages.

Service Manual: Nellcor Symphony N-3000 Pulse Oximeter, Nellcor Puritan Bennett, Inc., Copyright 1996, 110 pages.

Home Use Guide: Nellcor Symphony N-3000 Pulse Oximeter, Nellcor Puritan Bennett, Inc., Copyright 1996, 50 pages.

Operator's Manual: Nellcor N-200 Pulse Oximeter, Nellcor Incorporated, Copyright 2003, 96 pages.

S. Kastle et al., "A New Family of Sensors for Pulse Oximetry," Hewlett-Packard Journal, Article 7, Feb. 1997, pp. 1-17.

M. Nogawa et al., "A Novel Hybrid Reflectance Pulse Oximeter Sensor with Improved Linearity and General Applicability to Various Portions of the Body," Proceedings of the 20th Annual International Conference of the IEEE Engineering in Medicine and Biology Society, vol. 20, No. 4, 1998, pp. 1858-1861.

J. Hodby, "A ratio-measuring detection system for use in pulsed spectroscopic measurements," Journal of Physics E: Scientific Instruments, vol. 3, 1970, pp. 229-233.

K. Li et al., "A Wireless Reflectance Pulse Oximeter with Digital Baseline Control for Unfiltered Photoplethysmograms," IEEE Transactions on Biomedical Circuits and Systems, Nov. 2011, pp. 1-11.

D. Thompson et al., "A Small, High-Fidelity Reflectance Pulse Oximeter," American Society for Engineering Education, 2007, 14 pages.

K. Li et al., "A High-Performance Wireless Reflectance Pulse Oximeter for Photo-Plethysmogram Acquisition and Analysis in the Classroom," American Society for Engineering Education, 2010, 12 pages.

M. J. Hayes, "Artefact Reduction in Photoplethysmography," Doctoral thesis, Department of Electronic and Electrical Engineering, Loughborough University, Nov. 1998, 195 pages. (uploaded in 2 parts).

A. C. M. Dassel et al., "Effect of location of the sensor on reflectance pulse oximetry," British Journal of Obstetrics and Gynaecology, vol. 104, Aug. 1997, pp. 910-916.

RF Cafe, Electronic Warfare and Radar Systems Engineering Handbook, Duty Cycle, available at https://www.rfcafe.com/references/electrical/ew-radar-handbook/duty-cycle.htm, retrieved Jul. 11, 2020, 3 pages.

Y. Shimada et al., "Evaluation of a new reflectance pulse oximeter for clinical applications," Medical & Biological Engineering & Computing, vol. 29, No. 5, Sep. 1991, pp. 557-561.

S. Takatani et al., "Experimental and Clinical Evaluation of a Noninvasive Reflectance Pulse Oximeter Sensor," Journal of Clinical Monitoring, vol. 8, No. 4, Oct. 1992, pp. 257-266.

K. Ono et al., "Fiber optic reflectance spectrophotometry system for in vivo tissue diagnosis," Applied Optics, vol. 30, No. 1, Jan. 1991, pp. 98-105.

M. Barr, "Introduction to Pulse Width Modulation (PWM)," Barr Group, Embedded Systems Programming, Sep. 2001, pp. 1-3.

P. P. Vaidyanathan, "Multirate Digital Filters, Filter Banks, Polyphase Networks, and Applications: A Tutorial," Proceedings of the IEEE, vol. 78, No. 1, Jan. 1990, pp. 56-93.

S. Oshima et al., "Optical Measurement of Blood Hematocrit on Medical Tubing with Dual Wavelength and Detector Model," 31st Annual International Conference of the IEEE EMBS, Sep. 2009, pp. 5891-5896.

Optoelectronics, Data Book 1990, Siemens Components, Inc., 770 pages. (uploaded in 7 parts).

OxiplexTS Near Infrared, Non-Invasive, Tissue Spectrometer Brochure, ISS, Inc., Copyright 2001, 6 pages.

J. A. Pologe, "Pulse Oximetry: Technical Aspects of Machine Design," International Anesthesiology Clinics, vol. 25, No. 3, 1987, pp. 137-153.

B. F. Koegh et al., "Recent findings in the use of reflectance oximetry: a critical review," Current Opinion in Anaesthesiology, vol. 18, 2005, pp. 649-654.

K. Faisst et al., "Reflectance pulse oximetry in neonates," European Journal of Obstetrics & Gynecology and Reproductive Biology, vol. 61, No. 2, Aug. 1995, pp. 117-122.

V. Konig et al., "Reflexions-Pulsoximetrie—Untersuchungen mit eigenem Mess-System," Biomedical Engineering, Biomedizinische Technik, vol. 37. No. s2, 1992, pp. 39-40.

Petition for Inter Partes Review of U.S. Pat. No. 10,299,708, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00193, dated Nov. 20, 2020, in 107 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,299,708, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00193, dated Nov. 20, 2020, in 136 pages.

Petition for Inter Partes Review of U.S. Pat. No. 10,376,190, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00195, dated Nov. 20, 2020, in 109 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,376,190, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00195, dated Nov. 20, 2020, in 139 pages.

US 10,945,648 B2

Page 15

(56)          **References Cited**

OTHER PUBLICATIONS

Petition for Inter Partes Review of U.S. Pat. No. 10,258,266, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00208, dated Nov. 20, 2020, in 80 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,258,266, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00208, dated Nov. 20, 2020, in 96 pages.

Petition for Inter Partes Review of U.S. Pat. No. 10,376,191, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00209, dated Nov. 20, 2020, in 79 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,376,191, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2021-00209, dated Nov. 20, 2020, in 96 pages.

Nov. 12, 2020 Third Amended Complaint for (1) Patent Infringement (2) Trade Secret Misappropriation (3) Correction of Inventorship and (4) Ownership of Patents and Demand for Jury Trial, and including Exhibit 1, *Masimo Corporation and Cercacor Laboratories, Inc.* v. *Apple Inc.*, Case No. 8:20-cv-00048, 196 pages. [uploaded in 2 parts].

Jan. 9, 2020 Complaint for (1) Patent Infringement (2) Trade Secret Misappropriation and (3) Ownership of Patents and Demand for Jury Trial, *Masimo Corporation and Cercacor Laboratories, Inc.* v. *Apple Inc.*, Case No. 8:20-cv-00048, 64 pages.

Mar. 25, 2020 First Amended Complaint for (1) Patent Infringement (2) Trade Secret Misappropriation (3) Correction of Inventorship and (4) Ownership of Patents and Demand for Jury Trial, and including Exhibits 13-24 (Exhibits 1-12 and 25-31 comprise copies of publicly available U.S. patents and U.S. patent application publications, and are not included herein for ease of transmission), *Masimo Corporation and Cercacor Laboratories, Inc.* v. *Apple Inc.*, Case No. 8:20-cv-00048, pp. 1-94, 983-1043 (total of 156 pages).

Jul. 24, 2020 Second Amended Complaint for (1) Patent Infringement (2) Trade Secret Misappropriation (3) Correction of Inventorship and (4) Ownership of Patents and Demand for Jury Trial, and including Exhibit 1, *Masimo Corporation and Cercacor Laboratories, Inc.* v. *Apple Inc.*, Case No. 8:20-cv-00048, 182 pages.

Jul. 27, 2020 Plaintiffs' Infringement Contentions, and including Exhibit 1 and Appendices A-P, *Masimo Corporation and Cercacor Laboratories, Inc.* v. *Apple Inc.*, Case No. 8:20-cv-00048, 305 pages.

Sep. 8, 2020 Apple's Preliminary Invalidity Contentions, and including Exhibits A-G, *Masimo Corporation and Cercacor Laboratories, Inc.* v. *Apple Inc.*, Case No. 8:20-cv-00048, 3960 pages. [uploaded in 15 parts].

Petition for Inter Partes Review of U.S. Pat. No. 10,258,265, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01520, dated Aug. 31, 2020, in 114 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,258,265, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01520, dated Aug. 31, 2020, in 138 pages.

Petition for Inter Partes Review of U.S. Pat. No. 10,588,553, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01536, dated Aug. 31, 2020, in 114 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,588,553, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01536, dated Aug. 31, 2020, in 173 pages.

Petition for Inter Partes Review of U.S. Pat. No. 10,588,553, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01537, dated Aug. 31, 2020, in 114 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,588,553, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01537, dated Aug. 31, 2020, in 181 pages.

Petition for Inter Partes Review of U.S. Pat. No. 10,292,628, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01521, dated Sep. 2, 2020, in 107 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,292,628, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01521, dated Sep. 2, 2020, in 133 pages.

Petition for Inter Partes Review of U.S. Pat. No. 10,588,554, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01538, dated Sep. 2, 2020, in 108 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,588,554, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01538, dated Sep. 2, 2020, in 151 pages.

Petition for Inter Partes Review of U.S. Pat. No. 10,588,554, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01539, dated Sep. 2, 2020, in 111 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,588,554, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01539, dated Sep. 2, 2020, in 170 pages.

Petition for Inter Partes Review of U.S. Pat. No. 10,624,564, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01713, dated Sep. 30, 2020, in 117 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,624,564, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01713, dated Sep. 30, 2020, in 159 pages.

Petition for Inter Partes Review of U.S. Pat. No. 10,631,765, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01714, dated Sep. 30, 2020, in 113 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,631,765, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01714, dated Sep. 30, 2020, in 122 pages.

Petition for Inter Partes Review of U.S. Pat. No. 10,631,765, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01715, dated Sep. 30, 2020, in 114 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,631,765, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01715, dated Sep. 30, 2020, in 117 pages.

Petition for Inter Partes Review of U.S. Pat. No. 10,702,194, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01716, dated Sep. 30, 2020, in 100 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,702,194, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01716, dated Sep. 30, 2020, in 109 pages.

Petition for Inter Partes Review of U.S. Pat. No. 10,702,195, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01733, dated Sep. 30, 2020, in 105 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,702,195, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01733, dated Sep. 30, 2020, in 108 pages.

Petition for Inter Partes Review of U.S. Pat. No. 10,709,366, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01737, dated Sep. 30, 2020, in 104 pages.

Declaration of Thomas W. Kenny, Ph.D., in support of Petition for Inter Partes Review of U.S. Pat. No. 10,709,366, Ex. 1003, *Apple Inc.* v. *Masimo Corporation*, Inter Partes Review No. IPR2020-01737, dated Sep. 30, 2020, in 110 pages.

D. Thompson et al., "Pulse Oximeter Improvement with an ADC-DAC Feedback Loop and a Radical Reflectance Sensor," Proceedings of the 28th IEEE EMBS Annual International Conference, 2006, pp. 815-818.

Service Manual: NPB-40 Handheld Pulse Oximeter, Nellcor Puritan Bennett, Inc., Copyright 2001, 55 pages.

J. Bronzino et al., The Biomedical Engineering Handbook, Second Edition, CRC Press LLC, 2000, 21 pages.

J. Bronzino et al., Medical Devices and Systems, The Biomedical Engineering Handbook, Third Edition, Taylor & Francis Group, LLC, Apr. 2006, 20 pages.

## US 10,945,648 B2

Page 16

(56)          **References Cited**

OTHER PUBLICATIONS

J. Webster et al., Nanoparticles—Radiotherapy Accessories, Encyclopedia of Medical Devices and Instrumentation, Second Edition, vol. 5, Wiley-Interscience, 2006, 42 pages.

S. LeGare et al., "A Device to Assess the Severity of Peripheral Edema," IEEE 33rd Annual Northeast Bioengineering Conference, 2007, pp. 257-258.

M. Corcoran et al., "A Humidifier for Olfaction Studies During Functional Magnetic Resonance Imaging," Proceedings of the IEEE 31st Annual Northeast Bioengineering Conference, 2005, pp. 1-2.

Y. Mendelson et al., "A Multiwavelength VIS-NIR Spectrometer for Pulsatile Measurement of Hemoglobin Derivatives in Whole Blood," 18th Annual International Conference of the IEEE Engineering in Medicine and Biology Society, 1996, pp. 134-135.

H. DiSpirito et al., "A Neural Stimulation System Model to Enhance Neural Integrated Circuit Design," 29th Southern Biomedical Engineering Conference, 2013, pp. 9-10.

D. Sen et al., "A New Vision for Preventing Pressure Ulcers: Wearable Wireless Devices Could Help Solve a Common—and Serious—Problem," IEEE Pulse, vol. 9, No. 6, Nov. 2018, pp. 28-31.

N. Selvaraj et al., "A Novel Approach Using Time-Frequency Analysis of Pulse-Oximeter Data to Detect Progressive Hypovolemia in Spontaneously Breathing Healthy Subjects," IEEE Transactions on Biomedical Engineering, vol. 58, No. 8, Aug. 2011, pp. 2272-2279.

S. Salehizadeh et al., "A Novel Time-Varying Spectral Filtering Algorithm for Reconstruction of Motion Artifact Corrupted Heart Rate Signals During Intense Physical Activities Using a Wearable Photoplethysmogram Sensor," Sensors 2016, vol. 16, No. 1, Dec. 2015, pp. 1-20.

A. Gendler et al., "A PAB-Based Multi-Prefetcher Mechanism," International Journal of Parallel Programming, vol. 34, No. 2, Apr. 2006, pp. 171-188.

J. Harvey et al., "A Portable Sensor for Skin Bioimpedance Measurements," International Journal of Sensors and Sensor Networks, vol. 7, No. 1, Aug. 2019, pp. 1-8.

D. Traviglia et al., "A Portable Setup for Comparing Transmittance and Reflectance Pulse Oximeters for Field Testing Applications," Proceedings of the IEEE 30th Annual Northeast Bioengineering Conference, 2004, pp. 212-213.

S. Xie et al., "A Predictive Model for Force-Sensing Resistor Nonlinearity for Pressure Measurement in a Wearable Wireless Sensor Patch," IEEE 61st International Midwest Symposium on Circuits and Systems, 2018, pp. 476-479.

P. Muller et al., "A Preliminary In-Vitro Evaluation and Comparative Study of Various Tissue pH Sensors," Proceedings of the 18th IEEE Annual Northeast Bioengineering Conference, 1992, pp. 158-159.

D. Dao et al., "A Robust Motion Artifact Detection Algorithm for Accurate Detection of Heart Rates From Photoplethysmographic Signals Using Time-Frequency Spectral Features," IEEE Journal of Biomedical and Health Informatics, vol. 21, No. 5, Sep. 2017, pp. 1242-1253.

G. Comtois et al., "A Wearable Wireless Reflectance Pulse Oximeter for Remote Triage Applications," Proceedings of the IEEE 32nd Annual Northeast Bioengineering Conference, 2006, pp. 53-54.

S. Djamasbi et al., "Affect Feedback during Crisis and Its Role in Improving Is Utilization," Proceedings of the 7th International Conference on Information Systems for Crisis Response and Management (ISCRAM), 2010, pp. 1-4.

B. Odegard et al., "An Analysis of Racewalking Styles Using a 2-Dimensional Mathematical Knee Model," Proceedings of the IEEE 23rd Northeast Bioengineering Conference, 1997, pp. 73-74.

S. Patrick et al., "An Electromyogram Simulator for Myoelectric Prosthesis Testing," Proceedings of the IEEE 36th Annual Northeast Bioengineering Conference (NEBEC), 2010, pp. 1-2.

Y. Mendelson et al., "An in Vitro Tissue Model for Evaluating the Effect of Carboxyhemoglobin Concentration on Pulse Oximetry," IEEE Transactions on Biomedical Engineering, vol. 36, No. 6, Jun. 1989, pp. 625-627.

C. Tamanaha et al., "An Inorganic Membrane Filter to Support Biomembrane-Mimetic Structures," Proceedings of 17th International Conference of the Engineering in Medicine and Biology Society, Sep. 1995, pp. 1559-1560.

A. Lader et al., "An Investigative Study of Membrane-Based Biosensors," Proceedings of the IEEE 17th Annual Northeast Bioengineering Conference, 1991, pp. 253-254.

N. Reljin et al., "Automatic Detection of Dehydration using Support Vector Machines," 14th Symposium on Neural Networks and Applications (NEUREL), Nov. 2018, pp. 1-6.

Y. Mendelson et al., Chapter 9: Biomedical Sensors, Introduction to Biomedical Engineering, Second Edition, Apr. 2005, pp. 505-548.

R. Peura et al., "Biotechnology for Biomedical Engineers," IEEE Engineering in Medicine and Biology, vol. 14, No. 2, Apr. 1995, pp. 199-200.

Y. Mendelson et al., "Blood Glucose Measurement by Multiple Attenuated Total Reflection and Infrared Absorption Spectroscopy," IEEE Transactions on Biomedical Engineering, vol. 37, No. 5, May 1990, pp. 458-465.

Y. Mendelson et al., "Carbon dioxide laser based multiple ATR technique for measuring glucose in aqueous solutions," Applied Optics, vol. 27, No. 24, Dec. 1988, pp. 5077-5081.

J. Harvey et al., "Correlation of bioimpedance changes after compressive loading of murine tissues in vivo," Physiological Measurement, vol. 40, No. 10, Oct. 2019, pp. 1-13.

B. Yocum et al., "Design of a Reflectance Pulse Oximeter Sensor and its Evaluation in Swine," Proceedings of the 15th Annual Northeast Bioengineering Conference, IEEE, 1989, pp. 239-240.

E. Tuite et al., "Design of Individual Balance Control Device Utilized during the Sit-to-Stand Task," ISB 2011 Brussels, 2011, pp. 1-2.

C. E. Darling et al., "Detecting Blood Loss With a Wearable Photoplethysmography Device," Annals of Emergency Medicine, vol. 68, No. 45, Oct. 2016, p. S116.

N. Reljin et al., "Detection of Blood Loss in Trauma Patients using Time-Frequency Analysis of Photoplethysmographic Signal," IEEE-EMBS International Conference on Biomedical and Health Informatics (BHI), 2016, pp. 118-121.

Y. Xu et al., "Drowsiness Control Center by Photoplethysmogram," 38th Annual Northeast Bioengineering Conference (NECBEC), IEEE, 2012, pp. 430-431.

M. Last et al., Chapter 14: Early Warning from Car Warranty Data using a Fuzzy Logic Technique, Scalable Fuzzy Algorithms for Data Management and Analysis: Methods and Design, 2009, pp. 347-364.

W. Johnston et al., "Effects of Motion Artifacts on Helmet-Mounted Pulse Oximeter Sensors," Proceedings of the IEEE 30th Annual Northeast Bioengineering Conference, 2014, pp. 214-215.

A. Nagre et al., "Effects of Motion Artifacts on Pulse Oximeter Readings from Different Facial Regions," Proceedings of the IEEE 31st Annual Northeast Bioengineering Conference, 2005, pp. 1-3.

R. Rasbekar et al., "Evaluation of key design parameters for mitigating motion artefact in the mobile reflectance PPG signal to improve estimation of arterial oxygenation," Physiological Measurement, vol. 39, No. 7, Jul. 2018, pp. 1-12.

Y. Mendelson et al., "Evaluation of the Datascope Accusat Pulse Oximeter in Healthy Adults," Journal of Clinical Monitoring, vol. 4, No. 1, Jan. 1988, pp. 59-63.

C. Tamanaha et al., "Feasibility Study of an Inorganic Membrane Filter as a Support for Biomembrane-Mimetic Structures," Proceedings of the IEEE 21st Annual Northeast Bioengineering Conference, 1995, pp. 99-101.

J. McNeill et al., "Flexible Sensor for Measurement of Skin Pressure and Temperature in a Clinical Setting," 2016 IEEE Sensors, Nov. 2016, pp. 1-3.

P. Bhandare et al., "Glucose determination in simulated blood serum solutions by Fourier transforms infrared spectroscopy: investigation of spectral interferences," Vibrational Spectroscopy, vol. 6, No. 3, Mar. 1994, pp. 363-378.

(56)         References Cited

OTHER PUBLICATIONS

P. Bhandare et al. "Glucose Determination in Simulated Plasma Solutions Using Infrared Spectrophotometry," 14th Annual International Conference of the IEEE Engineering in Medicine and Biology Society, Nov. 1992, pp. 163-164.

C. Tamanaha et al., "Humidity and Cation Dependency of Purple Membrane Based Biosensors," Proceedings of the 18th IEEE Annual Northeast Bioengineering Conference, Mar. 1992, pp. 107-108.

K. M. Warren et al., "Improving Pulse Rate Measurements during Random Motion Using a Wearable Multichannel Reflectance Photoplethysmograph," Sensors (Basel), vol. 16, No. 3, Mar. 2016, p. 1-18.

P. Bhandare et al., "IR Spectrophotometric Measurement of Glucose in Phosphate Buffered Saline Solutions: Effects of Temperature and pH," Proceedings of the 18th IEEE Annual Northeast Bioengineering Conference, 1992, pp. 103-104.

Y. Mendelson et al., "Multi-channel pulse oximetry for wearable physiological monitoring," IEEE International Conference on Body Sensor Networks, 2013, pp. 1-6.

P. Bhandare et al., "Multivariate Determination of Glucose in Whole Blood Using Partial Least-Squares and Artificial Neural Networks Based on Mid-Infrared Spectroscopy," Society for Applied Spectroscopy, vol. 47, No. 8, 1993, pp. 1214-1221.

E. Morillo et al., "Multiwavelength Transmission Spectrophotometry in the Pulsatile Measurement of Hemoglobin Derivatives in Whole Blood," Proceedings of the IEEE 23rd Northeast Bioengineering Conference, 1997, pp. 5-6.

P. Bhandare et al., "Neural Network Based Spectral Analysis of Multicomponent Mixtures for Glucose Determination," Proceedings of the IEEE, 17th Annual Northeast Bioengineering Conference, 1991, pp. 249-250.

Y. Mendelson et al., "Noninvasive Transcutaneous Monitoring of Arterial Blood Gases," IEEE Transactions on Biomedical Engineering, vol. BME-31, No. 12, Dec. 1984, pp. 792-800.

J. Harvey et al., "OxiMA: A Frequency-Domain Approach to Address Motion Artifacts in Photoplethysmograms for Improved Estimation of Arterial Oxygen Saturation and Pulse Rate," IEEE Transactions on Biomedical Engineering, vol. 66, No. 2, Feb. 2019, pp. 311-318.

J. Chong et al., "Photoplethysmograph Signal Reconstruction Based on a Novel Hybrid Motion Artifact Detection-Reduction Approach. Part I: Motion and Noise Artifact Detection," Annals of Biomedical Engineering, vol. 42, No. 11, Nov. 2014, pp. 2238-2250.

S. M. A. Salehizadeh et al., "Photoplethysmograph Signal Reconstruction based on a Novel Motion Artifact Detection-Reduction Approach. Part II: Motion and Noise Artifact Removal," Annals of Biomedical Engineering, vol. 42, May 2014, pp. 2251-2263.

C. G. Scully et al., "Physiological Parameter Monitoring from Optical Recordings With a Mobile Phone," IEEE Transactions on Biomedical Engineering, vol. 59, No. 2, Feb. 2012, pp. 303-306.

D. Sen et al., "Pressure Ulcer Prevention System: Validation in a Clinical Setting," IEEE Life Sciences Conference (LSC), 2018, pp. 105-108.

Y. Mendelson et al., Pulse Oximetry: Theory and Applications for Noninvasive Monitoring, Clinical Chemistry, vol. 38, No. 9, 1992, pp. 1601-1607.

Y. Mendelson, Pulse Oximetry, PowerPoint, UMass Center for Clinical and Translational Science Research Retreat, 2017, 22 pages.

E. Stohr et al., "Quantitative FT-IR Spectrometry of Blood Constituents," 14th Annual International Conference of the IEEE Engineering in Medicine and Biology Society, 1992, pp. 173-174.

E. Stohr et al., "Quantitative FTIR Spectrophotometry of Cholesterol and Other Blood Constituents and their Interference with the In-Vitro Measurement of Blood Glucose," Proceedings of the 18th IEEE Annual Northeast Bioengineering Conference, 1992, pp. 105-106.

N. Selvaraj et al., "Statistical Approach for the Detection of Motion/Noise Artifacts in Photoplethysmogram," 33rd Annual International Conference of the IEEE EMBS, Sep. 2011, pp. 4972-4975.

C. Tamanaha et al., "Surface Modification of y-Al2O3 Filters by Chemisorption of Alkyltrichlorosilane Molecules," 18th Annual International Conference of the IEEE Engineering in Medicine and Biology Society, 1996, pp. 2069-2070.

D. Sen et al., "Time-Domain-Based Measurement Technique for Pressure Measurement in a Wearable Wireless Sensor Patch," IEEE International Symposium on Circuits and Systems (ISCAS), 2018, pp. 1-5.

N. Reljin et al., "Using support vector machines on photoplethysmographic signals to discriminate between hypovolemia and euvolemia," PLoS One, vol. 13, No. 3, Mar. 2018, pp. 1-14.

Y. Mendelson et al., "Variations in Optical Absorption Spectra of Adult and Fetal Hemoglobins and Its Effect on Pulse Oximetry," IEEE Transactions on Biomedical Engineering, vol. 36, No. 8, Aug. 1989, pp. 844-848.

K. Chon et al., "Wearable Wireless Sensor for Multi-Scale Physiological Monitoring," Worcester Polytechnic Institute, Oct. 2014, 82 pages.

K. Chon et al., "Wearable Wireless Sensor for Multi-Scale Physiological Monitoring," Worcester Polytechnic Institute, Oct. 2015, 142 pages.

J. McNeill et al., "Wearable Wireless Sensor Patch for Continuous Monitoring of Skin Temperature, Pressure, and Relative Humidity," IEEE International Symposium on Circuits and Systems (ISCAS), 2017, pp. 1-4.

D. Sen et al., "Wireless Sensor Patch Suitable for Continuous Monitoring of Contact Pressure in a Clinical Setting," 16th IEEE International New Circuits and Systems Conference (NEWCAS), 2018, pp. 91-95.

K. Hickle et al., "Wireless Pressure Ulcer Sensor," Annals of Plastic Surgery, vol. 82, Supplement 3, Apr. 2019, pp. S215-S221.

Y. Mendelson et al., "Design and Evaluation of a New Reflectance Pulse Oximeter Sensor", Worcester Polytechnic Institute, Biomedical Engineering Program, Worcester, MA 01609, Association for the Advancement of Medical Instrumentation, vol. 22, No. 4, 1988, pp. 167-173.

Definition of "gap", excerpt from Merriam-Webster's Collegiate Dictionary (11th ed.), 2005, 3 pages.

"Acrylic: Strong, stiff, clear plastic available in variety of brilliant colors", Copyright 2020. available at http://www.curbellplastics.com/Research-Solutions/Materials/Acrylic, 5 pages.

QuickSpecs, Version 3, Nov. 20, 2003, HP iPAQ Pocket PC h4150 Series, 8 pages.

"Universal asynchronous receiver-transmitter", Wikipedia, available at https://en.wikipedia.org/wiki/Universal_asynchronous_receiver-transmitter, accessed Aug. 27, 2020, 10 pages.

Y. Mendelson, et al., "Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf", Journal of Clinical Monitoring, vol. 7, No. 1, Jan. 1991, pp. 7-12.

Design of Pulse Oximeters, J.G. Webster, Institution of Physics Publishing, IOP Publishing Ltd, 1997, 262 pages (uploaded in three parts).

McPherson, "How to Do Everything with Windows Mobile", McGraw Hill, 2006, 431 pages (uploaded in three parts).

B. Landon et al., "Master Visually Windows Mobile 2003", Wiley Publishing, Inc., 2004, 335 pages (uploaded in two parts).

J. Yao, et al., "Stimulating Student Learning with a Novel 'In-House' Pulse Oximeter Design", Proceedings of the 2005 American Society for Engineering Education Annual Conference & Exposition, 2005, 14 pages.

National Instruments LabVIEW User Manual, National Instruments Corporation, Nov. 2001 Edition, Part No. 320999D-01, 293 pages.

Definition of "processor", excerpt from Merriam-Webster's Collegiate Dictionary (10th ed.), 1999, 6 pages.

Y. Mendelson et al., "Noninvasive Pulse Oximetry Utilizing Skin Reflectance Photoplethysmography", IEEE Transactions on Biomedical Engineering, vol. 35, No. 10, Oct. 1988, pp. 798-805.

J. Schmitt et al., "An Integrated Circuit-Based Optical Sensor for in Vivo Measurement of Blood Oxygenation," IEEE Transactions on Biomedical Engineering, vol. BME-33, No. 2, Feb. 1986, pp. 98-107.

(56) **References Cited**

OTHER PUBLICATIONS

C. Gutierrez et al, "Non-Invasive Functional Mapping of the Brain Using Cerebral Oximeter," Proceedings of the Second Joint EMBS/BMES Conference, Oct. 2002, pp. 947-948.

R. Gupta et al., "Design and Development of Pulse Oximeter," Proceedings RC IEEE-EMBS & 14th BMESI, 1995, pp. 1.13-1.16.

S. Duun et al., "A Novel Ring Shaped Photodiode for Reflectance Pulse Oximetry in Wireless Applications," IEEE Sensors Conference, 2007, pp. 596-599.

Oct. 20, 2020 Letter from B. K. Andrea to J. Re et al., Re: *Masimo Corp, et al.* v. *Apple, Inc.*, C.A. 8:20-cv-00048 (C.D. Cal.), 19 pages.

3 pages of images, identified by bates Nos. "APL-MAS_00057600", "APL-MAS_00057601", and "APL-MAS 00057602". Undated.

2 pages of images, identified by bates Nos. "APL-MAS_00057598" and "APL-MAS_00057599". Undated.

Y. Mendelson et al., A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring, PowerPoint, The Bioengineering Institute, Worcester Polytechnic Institute, 18 pages. Undated.

P. C. Branche et al., "A Wearable Wireless Reflectance Pulse Oximeter with Automatic and Remote On-Demand Activation," Annual Fall Meeting of the BMES, 2004, p. 1.

A Wireless Wearable Reflectance Pulse Oximeter Printout, The Bioengineering Institute, Worcester Polytechnic Institute, 1 page. Undated.

Y. Mendelson et al., A Wireless Wearable Reflectance-Based Forehead Pulse Oximeter, PowerPoint, The Bioengineering Institute, Worcester Polytechnic Institute, 8 pages. Undated.

R. J. Duckworth et al., Field Testing of a Wireless Wearable Reflectance Pulse Oximeter Printout, Department of Electrical and Computer Engineering and Department of Biomedical Engineering, Worcester Polytechnic Institute, 1 page. Undated.

V. Floroff, "PDA Interface for the WPI Wireless Physiological Monitor," Directed research, Department of Biomedical Engineering, Worcester Polytechnic Institute, Mar. 2006, 42 pages.

Wireless Wearable Reflectance Pulse Oximeter, PowerPoint, The Bioengineering Institute, Worcester Polytechnic Institute, TATRC, 10 pages. Undated.

V. Floroff, "Remote Pulse Oximetry: The wireless side of the TATRC project." Thesis, Worcester Polytechnic Institute, Feb. 2005, pp. 1-20.

Y. Mendelson et al., "The Feasibility of Measuring SpO2 from the Head Using a Reflectance Pulse Oximeter: Effect of Motion Artifacts," Proceeding of the 3rd European Medical & Biological Engineering Conference, 2005, 5 pages.

Y. Mendelson, "Wearable, Wireless, Noninvasive Physiological Sensing," The Bioengineering Institute, Worcester Polytechnic Institute, 2005, 2 pages.

Y. Mendelson et al., "Wireless Reflectance Pulse Oximetery for Remote Triage Application," Worcester Polytechnic Institute, 1 page. Undated.

A. C. M. Dassel et al., "Reflectance Pulse Oximetry at the Forehead Improves by Pressure on the Probe," Journal of Clinical Monitoring, vol. 11, No. 4, Jul. 1995, pp. 237-244.

A. Tura et al., "A Wearable Device with Wireless Bluetooth-based Data Transmission," Measurement Science Review, vol. 3, Sec. 2, 2003, pp. 1-4.

Akira Sakane et al., "Estimating Arterial Wall Impedance using a Plethysmogram," IEEE 2003, pp. 580-585.

B. McGarry et al., "Reflections on a candidate design of the user-interface for a wireless vital-signs monitor," Proceedings of DARE 2000 on Designing Augmented Reality Environments, Jan. 2000, pp. 33-40.

B.-H. Yang et al., "Development of the ring sensor for healthcare automation," Robotics and Autonomous Systems, 2000, pp. 273-281.

B-H. Yang et al., "A Twenty-Four Hour Tele-Nursing System Using a Ringer Sensor," Proceedings of 1998 IEEE International Conference on Robotics and Automation, May 16-20, 1998, 6 pages.

B-S. Lin etal., "RTWPMS: A Real-Time Wireless Physiological Monitoring System," IEEE Transactions on Information Technology in Biomedicine, vol. 10, No. 4, Oct. 2006, pp. 647-656.

Burrit, Mary F.; Current Analytical Approaches to Measuring Blood Analytes; vol. 36; No. 8(B); 1990.

C. J. Pujary, "Investigation of Photodetector Optimization in Reducing Power Consumption by a Noninvasive Pulse Oximeter Sensor," Worcester Polytechnic Institute, Jan. 16, 2004, 133 pages.

C. Pujary et al.,"Photodetector Size Considerations in the Design of a Noninvasive Reflectance Pulse Oximeter for Telemedicine Applications," Proceedings of IEEE Annual Northeast Bioengineering Conference, 2003, pp. 148-149.

C. W. Mundt et al., "A Multiparameter Wearable Physiologic Monitoring System for Space and Terrestrial Applications," IEEE Transactions on Information Technology in Biomedicine, vol. 9, No. 3, Sep. 2005, pp. 382-391.

D. C. Zheng and Y. T. Zhang, "A ring-type device for the noninvasive measurement of arterial blood pressure," Proceedings of the 25th Annual International Conference of the IEEE Engineering in Medicine and Biology Society (IEEE Cat. No. 03CH37439), Sep. 17-21, 2003, Cancun, pp. 3184-3187 vol. 4.

D. Konstantas et al., "Mobile Patient Monitoring: The MobiHealth System," In Proceedings of International Conference on Medical and Care Compunetics, NCC'04, Feb. 2004, 8 pages.

D. Marculescu et al., "Ready to Ware," IEEE Spectrum, vol. 40, Issue 10, Oct. 2003, pp. 28-32.

E. Higurashi et al., "An integrated laser blood flowmeter," Journal of Lightwave Technology, vol. 21, No. 3, pp. 591-595, Mar. 2003.

Eiji Higurashi et al., "Hybrid integration technologies for optical micro-systems", Proc. SPIE 5604, Optomechatronic Micro/Nano Components, Devices, and Systems, Oct. 25, 2004, pp. 67-73.

European Office Action issued in Application No. 09791157.2, dated Jun. 20, 2016.

European Office Action issued in application No. 10763901.5 dated Jan. 11, 2013.

European Office Action issued in application No. 10763901.5 dated Aug. 6, 2015.

European Office Action issued in application No. 10763901.5 dated Aug. 27, 2014.

Fabio Buttussi et al.,"MOPET: A context-aware and user-adaptive wearable system for fitness training," Artificial Intelligence in Medicine 42, 2008, pp. 153-163.

G. Comtois et al., "A Noise Reference Input to an Adaptive Filter Algorithn for Signal Processing in a Wearable Pulse Oximeter," IEEE, 2007, pp. 106-107.

G. Comtois, "A Comparative Evaluation of Adaptive Noise Cancellation Algorithms for Minimizing Motion Artifacts in a Forehead-Mounted Wearable Pulse Oximeter," Proceedings of the 29th Annual international Conference of the IEEE EMBS, Aug. 23-26, 2007, pp. 1528-1531.

G. Tamannagari, "Power Efficient Design of Finder-Ring Sensor for Patient Monitoring," Master of Science in Electrical Engineering, The University of Texas at San Antonio, College of Engineering, Department of Electrical Engineering, Dec. 2008, 74 pages.

H.H. Asada et al., "Mobile Monitoring with Wearable Photoplethysmographic Biosensors," IEEE Engineering in Medicine and Biology Magazine, May/Jun. 2003, pp. 28-40.

Hall, et al., Jeffrey W.; Near-Infrared Spectrophotometry: A New Dimension in Clinical Chemistry; vol. 38; No. 9; 1992.

http://amivital.ugr.es/blog/?tag+spo2; Monitorizacion de la hemoglobina . . . y mucho mas, printed on Aug. 20, 2009.

http://blogderoliveira.blogspot.com/2008_02_01_archive.html; Ricardo Oliveira, printed on Aug. 20, 2009.

http://www.masimo.com/generalFloor/system.htm; Masimo Patient SafetyNet System at a Glance, printed on Aug. 20, 2009.

http://www.masimo.com/partners/GRASEBY.htm; Graseby Medical Limited, printed on Aug. 20, 2009.

http://www.masimo.com/PARTNERS/WELCHALLYN.htm; Welch Allyn Expands Patient Monitor Capabilities with Masimo Pulse Oximetry Technology, printed on Aug. 20, 2009.

http://www.masimo.com/pulseOximeter/PPO.htm; Masimo Personal Pulse Oximeter, printed on Aug. 20, 2009.

(56)         **References Cited**

OTHER PUBLICATIONS

http://www.masimo.com/pulseOximeter/Rad5.htm; Signal Extraction Pulse Oximeter, printed on Aug. 20, 2009.
http://www.masimo.com/rad-57/; Noninvasive Measurement of Methemoglobin, Carboxyhemoglobin and Oxyhemoglobin in the blood. Printed on Aug. 20, 2009.
http://www.masimo.com/rainbow/pronto.htm Noninvasive & Immediate Hemoglobin Testing, printed on Aug. 20, 2009.
http://www.masimo.com/spco/; Carboxyhemoglobin Noninvasive > Continuous > Immediate, printed on Aug. 20, 2009.
International Preliminary Report on Patentability and Written Opinion for International Application No. PCT/US2016/040190, dated Jan. 2, 2018, in 7 pages.
International Preliminary Report on Patentability and Written Opinion of the International Searching Authority issued in Application No. PCT US2009/049638, dated Jan. 5, 2011 in 9 pages.
International Preliminary Report on Patentability and Written Opinion of the International Searching Authority issued in Application No. PCT/US2009/052756, dated Feb. 8, 2011 in 8 pages.
International Search Report and Written Opinion for PCT/US2009/049638, dated Jan. 7, 2010.
International Search Report issued in Application No. PCT/US2009/052756, dated Feb. 10, 2009 in 14 pages.
International Search Report, App. No. PCT/US2010/047899, Date of Actual Completion of Search: Jan. 26, 2011, 4 pages.
J Kraitl et al., "An optical device to measure blood components by a photoplethysmographic method," Journal of Optics A: Pure and Applied Optics. 7, 2005, pp. S318-S324.
J. A. Tamada et al., "Noninvasive Glucose Monitoring: Comprehensive Clinical Results," JAMA, Nov. 17, 1999, vol. 282, No. 19, pp. 1839-1844.
J. C. D. Conway et al., "Wearable computer as a multi-parametric monitor for physiological signals," Proceedings IEEE International Symposium on Bio-Informatics and Biomedical Engineering, Arlington, VA, USA, 2000, pp. 236-242.
Japanese Notice of Allowance, re JP Application No. 2011-516895, dated May 12, 2015, no translation.
Japanese Office Action, re JP Application No. 2011-516895, dated Sep. 2, 2014, with translation.
K. Nakajima et al., "Monitoring of heart and respiratory rates by photoplethysmography using digital filtering technique," Med. Eng. Phy. vol. 18, No. 5, pp. 365-372, 1996.
Kanukurthy et al., "Data Acquisition Unit for an Implantable Multi-Channel Optical Glucose Sensor", Electro/Information Technology Conference, Chicago, IL, USA, May 17-20, 2007, pp. 1-6.
Konig et al., "Reflectance Pulse Oximetry—Principles and Obstetric Application in the Zurich System", Journal of Clinical Monitoring and Computing, vol. 14, No. 6, Aug. 1998, pp. 403-412.
Kuenstner, et al., J. Todd; Measurement of Hemoglobin in Unlysed Blood by Near-Infrared Spectroscopy; vol. 48; No. 4, 1994.
L. Grajales et al., "Wearable multisensor heart rate monitor," International Workshop on Wearable and Implantable Body Sensor Networks (BSN'06), Cambridge, MA, 2006, pp. 4-157.
L. Xu et al., "An integrated wrist-worn routine monitoring system for the elderly using BSN," 2008 5th International Summer School and Symposium on Medical Devices and Biosensors, Hong Kong, 2008, pp. 45-48.
Laukkanen RM et al., "Heart Rate Monitors: State of the Art," Journal of Sports Science, Jan. 1998, pp. S3-S7.
M. Savage et al., "Optimizing Power Consumption in the Design of a Wearable Wireless Telesensor: Comparison of Pulse Oximeter Modes," Proceedings of IEEE 29th Annual Nonheust Bioengineering Conference, 2003, pp. 150-151.
M. Yamashita et al., "Development of a Ring-Type Vital Sign Telemeter," Biotelemetry XIII, Mar. 26-31, 1995, pp. 145-150.
Manzke, et al., B., Multi Wavelength Pulse Oximetry in the Measurement of Hemoglobin Fractions, SPIE, vol. 2676, Apr. 24, 1996.
Mendelson et al., "A Mobile PDA-Based Wireless Pulse Oximeter," Proceedings of the IASTED International Conference Telehealth, Jul. 19-21, 2005, pp. 1-6.

Mendelson et al., "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE EMBS Annual International Conference, Aug. 30-Sep. 3, 2006, pp. 912-915.
Mendelson et al., "Accelerometery-Based Adaptive Noise Cancellation for Remote Physiological Monitoring by a Wearable Pulse Oximeter," Proceedings of the 3rd IASTED International Conference TELEHEALTH, May 31-Jun. 1, 2007, pp. 28-33.
Mendelson et al., "Measurement Site and Photodetector Size Considerations in Optimizing Power Consumption of a Wearable Reflectance Pulse Oximeter," Proceedings of the 25th Annual International Conference of the IEEE EMBS, Sep. 17-21, 2003, pp. 3016-3019.
Mendelson et al., "Minimization of LED Power Consumption in the Design of a Wearable Pulse Oximeter,"Proceedings of the IASTED International Conference Biomedical Engineering, Jun. 25-27, 2003, 6 pages.
Townsend, "Pulse Oximetry," Medical Electronics, 2001, pp. 32-42.
Naumenko, E. K.; Choice of Wavelengths for Stable Determination of Concentrations of Hemoglobin Derivatives from Absorption Spectra of Erythrocytes; vol. 63; No. 1; pp. 60-66 Jan.-Feb. 1996; Original article submitted Nov. 9, 1994.
Nonin Medical, Inc., "Operator's Manual—Models 8600F0 and 8600F0M Pulse Oximeters," 2005, 25 pages.
Nuria Oliver et al., "HealthGear: A Real-time Wearable System for Monitoring and Analyzing Physiological Signals," Proceedings of the International Workshop on Wearable and Implantable Body Sensor Networks 2006 IEEE, pp. 1-4.
P. Branche et al., "Signal Quality and Power Consumption of a New Prototype Reflectance Pulse Oximeter Sensor," Proceeding of the 31th Annual Northeast Bioengineering Conference, Hoboken, NJ, IEEE, 2005, pp. 1-2.
P. C. Branche et al., "Measurement Reproducibility and Sensor Placement Considerations in Designing a Wearable Pulse Oximeter for Military Applications," IEEE, 2004, pp. 216-217.
P. Celka et al., "Motion Resistant Earphone Located Infrared Based Hearth Rate Measurement Device," In Proceeding of the 2nd International Conference on Biomedical Engineering, Innsbruck, Austria, Feb. 16-18, 2004, pp. 582-585.
P. Lukowicz et al., "AMON: A Wearable Medical Computer for High Risk Patient," Proceedings of the 6th International Symposium on Wearable Computers (ISWC'02), 2002, pp. 1-2.
P. Lukowicz et al., "The WearARM Modular, Low-Power Computing Core," IEEE Micro, May-Jun. 2001, pp. 16-28.
P. Renevey et al., "Wrist-Located Pulse Detection Using IR Signals, Activity and Nonlinear Artifact Cancellation," Proceedings of the 23rd Annual EMBS International Conference, Oct. 25-28, 2001, pp. 3030-3033.
P. Shaltis et al., "Novel Design for a Wearable, Rapidly Depolyable, Wireless Noninvasive Triage Sensor," Proceedings of the 2005 IEEE, Engineering in Medicine and Biology 27th Annual Conference, Sep. 1-4, 2005, pp. 3567-3570.
P. T. Gibbs et al., "Active Motion Artifact Cancellation for Wearable Health Monitoring Sensors Using Collocated MEMS Accelerometers," Proceedings of SPIE Smart Structures and Materials: Sensors and Smart Structures Technologies for Civil, Mechanical, and Aerospace Systems, May 17, 2005, pp. 811-819.
P.S. Pandian et al., "Smart Vest: Wearable Multi-Parameter Remote Physiological Monitoring System," Medical Engineering & Physics 30, 2008. pp. 466-477.
R. Fensli et al., "A Wireless ECG System for Continuous Event Recording and Communication to a Clinical Alarm Station," Conf Proc IEEE Eng Med Biol Soc, 2004, pp. 1-4.
R. P. Dresher et al., "A New Reflectance Pulse Oximeter Housing to Reduce Contact Pressure Effects," IEEE, 2006, pp. 49-50.
R. P. Dresher et al., "Reflectance Forehead Pulse Oximetry: Effects on Contact Pressure During Walking," Proceedings of the 28th IEEE EMBS Annual International Conference, Aug. 30-Sep. 3, 2006, pp. 3529-3532.
R. Paradiso, "Wearable Health Care System for Vital Signs Monitoring," In Proceedings of IEEE International Conference on Information Technology Applications in Biomedicine, May 2003, pp. 283-286.

# US 10,945,648 B2

Page 20

(56)         **References Cited**

OTHER PUBLICATIONS

Russell Dresher, "Wearable Forehead Pulse Oximetry: Minimization of Motion and Pressure Artifacts," May 3, 2006, 93 pages.
S. Pentland, "Healthwear: Medical Technology Becomes Wearable," IEEE Computer Society, vol. 37, Issue 5, May 2004, pp. 34-41.
S. Rhee et al., "Artifact-Resistant, Power Efficient Design of Finger-Ring Plethysmographic Sensors, Part I: Design and Analysis," 22nd Annual International Conference IEEE Engineering in Medicine and Biology Society, Jul. 23-28, 2000, pp. 2792-2795.
S. Rhee et al., "Design of a Artifact-Free Wearable Plethysmographic Sensor," 21st Annual International Conference IEEE Engineering in Medicine and Biology Society, Oct. 13-16, 1999, p. 786.
S. Rhee et al., "The Ring Sensor: a New Ambulatory Wearable Sensor for Twenty-Four Hour Patient Monitoring," Proceedings of the 20th Annual International Conference of the IEEE Engineering in Medicine and Biology Society, Oct. 29-Nov. 1, 1998, 4 pages.
S. Warren et al., "Designing Smart Health Care Technology into the Home of the Future," Workshops on Future Medical Devices: Home Care Technologies for the 21st Century, Apr. 1999, 19 pages.
Schmitt, et al., Joseph M.; Measurement of Blood Hematocrit by Dual-Wavelength near-IR Photoplethysmography; vol. 1641; 1992.
Schmitt, Joseph M.; Simple Photon Diffusion Anaylsis of the Effects of Multiple Scattering on Pulse Oximetry; Mar. 14, 1991; revised Aug. 30, 1991.
Schnapp, et al., L.M.; Pulse Oximetry. Uses and Abuses.; Chest 1990; 98; 1244-1250 DOI 10.1378/Chest.98.5.1244.
Small et al., "Data Handling Issues for Near-Infrared Glucose Measurements", http://www.ieee.org/organizations/pubs/newsletters/leos/apr98/datahandling.htm, accessed Nov. 27, 2007.
Smith, "The Pursuit of Noninvasive Glucose: 'Hunting the Deceitful Turkey'", 2006.
Sokwoo Rhee et al., "Artifact-Resistant Power-Efficient Design of Finger-Ring Plethysmographic Sensors," IEEE Transactions on Biomedical Engineering, Jul. 2001, pp. 795-805, vol. 48, No. 7.
Sonnia Maria López Silva et al., "Near-infrared transmittance pulse oximetry with laser diodes," Journal of Biomedical Optics vol. 8 No. 3, Jul. 2003, pp. 525-533.

Stephen A. Mascaro et al., "Measurement of Finger Posture and Three-Axis Fingertip Touch Force Using Fingernail Sensors," IEEE International Conference on Robotics and Automation, 2002, pp. 1-11.
Stephen A. Mascaro et al., "Photoplethysmograph Fingernail Sensors for Measuring Finger Forces Without Haptic Obstruction," IEEE Transactions on Robotics and Automation, vol. 17, No. 5, Oct. 2001, pp. 698-708.
T. Kiyokura et al., "Wearable Laser Blood Flowmeter for Ubiquitous Healthcare Service," 2007 IEEE/LEOS International Conference on Optical MEMS and Nanophotonics, Hualien, 2007, pp. 4-5.
T. Martin et al., "Issues in Wearable Computing for Medical Montioring Applications: A Case Study of a Wearable ECG Monitoring Device," In Proceedings of International Symposium of Wearable Computers (ISWC'00), Feb. 2000, pp. 43-49.
T. Torfs et al., "Body-Heat Powered Autonomous Pulse Oximeter," IEEE Sensors 2006, EXCO, Oct. 22-25, 2006, pp. 427-430.
Takumi Morita et al., "Integrated Blood Flowmeter Using Micromachining Technology," Dec. 2004, pp. 77-80.
U. Anliker et al., "AMON: A Wearable Multiparameter Medical Monitoring and Alert System," IEEE Transactions on Information Technology in Biomedicine, Jan. 2005, pp. 1-11.
W. Johnston et al., "Extracting Heart Rate Variability from a Wearable Reflectance Pulse Oximeter," IEEE, 2005, pp. 1-2.
W. S. Johnston et al., "Extracting Breathing Rate Information from a Wearable Reflectance Pulse Oximeter Sensor," Proceedings of the 26th Annual International Conference of the IEEE EMBS, Sep. 1-5, 2004, pp. 5388-5391.
W. S. Johnston et al., "Investigation of Signal Processing Algorithms for an Embedded Microcontroller-Based Wearable Pulse Oximeter," Proceedings of the 28th IEEE EMBS Annual International Conference, Aug. 30-Sep. 3, 2006, pp. 5888-5891.
Y-S. Yan et al., "An Efficient Motion-Resistant Method for Wearable Pulse Oximeter," IEEE Transactions on Information Technology in Biomedicine, vol. 12, No. 3, May 2008, pp. 399-405.
Yuan-Hsiang Lin et al., "A wireless PDA-based physiological monitoring system for patient transport," IEEE Transactions on Information Technology in Biomedicine, vol. 8, No. 4, pp. 439-447, Dec. 2004.

* cited by examiner



**FIG. 1**



**FIG. 2A**



FIG. 2B



**FIG. 2C**



## FIG. 2D



FIG. 3A



**FIG. 3B**



**FIG. 3C**



# FIG. 3D



**FIG. 3E**



FIG. 3F



## FIG. 4A



## FIG. 4B



## FIG. 4C



FIG. 5



**FIG. 6A**



**FIG. 6B**



**FIG. 6C**

**FIG. 6D**



FIG. 6E



**FIG. 7A**



**FIG. 7B**



FIG. 8A

FIG. 8B



FIG. 8C

FIG. 8D



FIG. 9



FIG. 10A



FIG. 10B



FIG. 11A

Case: 24-1285    Document: 7    Page: 870    Filed: 12/26/2023



**FIG. 11B**

Stay-Add-819



SUBSTRATE
1108

SUBMOUNT
1106

THERMISTOR
1120

SIDE EMITTING LEDS
1104

TOP EMITTING LEDS
1102

FIG. 11C

Stay-Add-820



FIG. 11D

SUBSTRATE 1108

TOP EMITTING LEDS 1102

THERMISTOR 1120



DETECTOR₁

DETECTOR₂

DETECTOR₄

DETECTOR₃

DETECTOR SUBMOUNT
1200

# FIG. 12A



FIG. 12B



**FIG. 12C**



# FIG. 12D



**FIG. 12E**



**FIG. 12F**



**FIG. 12G**



**FIG. 12H**



**FIG. 13**



**FIG. 14A**



FROM EMITTERS

## FIG. 14B



# FIG. 14C

38/65



**FIG. 14D**



FIG. 14E



# FIG. 14F



310f

306f

## FIG. 14G



**FIG. 14H**



**FIG. 14I**



FIG. 15A



FIG. 15B



FIG. 15C



FIG. 15D



FIG. 15E



FIG. 15F



**FIG. 15G**



**FIG. 15H**



FIG. 15I



**FIG. 15J**



**FIG. 15J (CONT.)**



4 PD PER STREAM ARCHITECTURE



1 PD PER STREAM ARCHITECTURE

# FIG. 15K

Stay-Add-851



4 PD PER STREAM ARCHITECTURE

1 PD PER STREAM ARCHITECTURE

# FIG. 15K (CONT.)



4 PD PER STREAM ARCHITECTURE

1 PD PER STREAM ARCHITECTURE

# FIG. 15K (CONT.)



FIG. 15L



FIG.16A

FIG.16B



FIG. 17



## FIG. 18



## FIG. 19



**FIG. 20**



**FIG. 21**



**FIG. 22**

US 10,945,648 B2

**1**

**USER-WORN DEVICE FOR NONINVASIVELY MEASURING A PHYSIOLOGICAL PARAMETER OF A USER**

RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/834,538, filed Mar. 30, 2020, which is a continuation of U.S. patent application Ser. No. 16/725,292, filed Dec. 23, 2019, which is a continuation of U.S. patent application Ser. No. 16/534,949, filed Aug. 7, 2019, which is a continuation of U.S. patent application Ser. No. 16/409, 515, filed May 10, 2019, which is a continuation of U.S. patent application Ser. No. 16/261,326, filed Jan. 29, 2019, which is a continuation of U.S. patent application Ser. No. 16/212,537, filed Dec. 6, 2018, which is a continuation of U.S. patent application Ser. No. 14/981,290 filed Dec. 28, 2015, which is a continuation of U.S. patent application Ser. No. 12/829,352 filed Jul. 1, 2010, which is a continuation of U.S. patent application Ser. No. 12/534,827 filed Aug. 3, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed Aug. 4, 2008, 61/086,108 filed Aug. 4, 2008, 61/086,063 filed Aug. 4, 2008, 61/086,057 filed Aug. 4, 2008, and 61/091,732 filed Aug. 25, 2008. U.S. patent application Ser. No. 12/829,352 is also a continuation-in-part of U.S. patent application Ser. No. 12/497,528 filed Jul. 2, 2009 , which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed Aug. 4, 2008, 61/086,108 filed Aug. 4, 2008, 61/086,063 filed Aug. 4, 2008, 61/086, 057 filed Aug. 4, 2008, 61/078,228 filed Jul. 3, 2008, 61/078,207 filed Jul. 3, 2008, and 61/091,732 filed Aug. 25, 2008. U.S. patent application Ser. No. 12/497,528 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed Aug. 25, 2008 and 29/323,408 filed Aug. 25, 2008. U.S. patent application No. 12/829,352 is also a continuation-in-part of U.S. patent application No. 12/497,523 filed Jul. 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086, 060 filed Aug. 4, 2008, 61/086,108 filed Aug. 4, 2008, 61/086,063 filed Aug. 4, 2008, 61/086,057 filed Aug. 4, 2008, 61/078,228 filed Jul. 3, 2008, 61/078,207 filed Jul. 3, 2008, and 61/091,732 filed Aug. 25, 2008. U.S. patent application No. 12/497,523 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed Aug. 25, 2008 and 29/323,408 filed Aug. 25, 2008.

This application is related to the following U.S. patent applications:

| application No. | Filing Date | Title |
|---|---|---|
| 12/497,528 | Jul. 2, 2009 | Noise Shielding for Noninvasive Device Contoured Protrusion for Improving |
| 12/497,523 | Jul. 2, 2009 | Spectroscopic Measurement of Blood Constituents |
| 12/497,506 | Jul. 2, 2009 | Heat Sink for Noninvasive Medical Sensor |
| 12/534,812 | Aug. 3, 2009 | Multi-Stream Sensor Front Ends for Non-Invasive Measurement of Blood Constituents |
| 12/534,823 | Aug. 3, 2009 | Multi-Stream Sensor for Non-Invasive Measurement of Blood Constituents |

**2**

-continued

| application No. | Filing Date | Title |
|---|---|---|
| 12/534,825 | Aug. 3, 2009 | Multi-Stream Emitter for Non-Invasive Measurement of Blood Constituents |

The foregoing applications are hereby incorporated by reference in their entirety.

BACKGROUND

The standard of care in caregiver environments includes patient monitoring through spectroscopic analysis using, for example, a pulse oximeter. Devices capable of spectroscopic analysis generally include a light source(s) transmitting optical radiation into or reflecting off a measurement site, such as, body tissue carrying pulsing blood. After attenuation by tissue and fluids of the measurement site, a photo-detection device(s) detects the attenuated light and outputs a detector signal(s) responsive to the detected attenuated light. A signal processing device(s) process the detector(s) signal(s) and outputs a measurement indicative of a blood constituent of interest, such as glucose, oxygen, met hemoglobin, total hemoglobin, other physiological parameters, or other data or combinations of data useful in determining a state or trend of wellness of a patient.

In noninvasive devices and methods, a sensor is often adapted to position a finger proximate the light source and light detector. For example, noninvasive sensors often include a clothespin-shaped housing that includes a contoured bed conforming generally to the shape of a finger.

SUMMARY

This disclosure describes embodiments of noninvasive methods, devices, and systems for measuring a blood constituent or analyte, such as oxygen, carbon monoxide, methemoglobin, total hemoglobin, glucose, proteins, glucose, lipids, a percentage thereof (e.g., saturation) or for measuring many other physiologically relevant patient characteristics. These characteristics can relate, for example, to pulse rate, hydration, trending information and analysis, and the like.

In an embodiment, the system includes a noninvasive sensor and a patient monitor communicating with the noninvasive sensor. The non-invasive sensor may include different architectures to implement some or all of the disclosed features. In addition, an artisan will recognize that the non-invasive sensor may include or may be coupled to other components, such as a network interface, and the like. Moreover, the patient monitor may include a display device, a network interface communicating with any one or combination of a computer network, a handheld computing device, a mobile phone, the Internet, or the like. In addition, embodiments may include multiple optical sources that emit light at a plurality of wavelengths and that are arranged from the perspective of the light detector(s) as a point source.

In an embodiment, a noninvasive device is capable of producing a signal responsive to light attenuated by tissue at a measurement site. The device may comprise an optical source and a plurality of photodetectors. The optical source is configured to emit optical radiation at least at wavelengths between about 1600 nm and about 1700 nm. The photodetectors are configured to detect the optical radiation from said optical source after attenuation by the tissue of the

US 10,945,648 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

measurement site and each output a respective signal stream responsive to the detected optical radiation.

In an embodiment, a noninvasive, physiological sensor is capable of outputting a signal responsive to a blood analyte present in a monitored patient. The sensor may comprise a sensor housing, an optical source, and photodetectors. The optical source is positioned by the housing with respect to a tissue site of a patient when said housing is applied to the patient. The photodetectors are positioned by the housing with respect to said tissue site when the housing is applied to the patient with a variation in path length among at least some of the photodetectors from the optical source. The photodetectors are configured to detect a sequence of optical radiation from the optical source after attenuation by tissue of the tissue site. The photodetectors may be each configured to output a respective signal stream responsive to the detected sequence of optical radiation. An output signal responsive to one or more of the signal streams is then usable to determine the blood analyte based at least in part on the variation in path length.

In an embodiment, a method of measuring an analyte based on multiple streams of optical radiation measured from a measurement site is provided. A sequence of optical radiation pulses is emitted to the measurement site. At a first location, a first stream of optical radiation is detected from the measurement site. At least at one additional location different from the first location, an additional stream of optical radiation is detected from the measurement site. An output measurement value indicative of the analyte is then determined based on the detected streams of optical radiation.

In various embodiments, the present disclosure relates to an interface for a noninvasive sensor that comprises a front-end adapted to receive an input signals from optical detectors and provide corresponding output signals. In an embodiment, the front-end is comprised of switched-capacitor circuits that are capable of handling multiple streams of signals from the optical detectors. In another embodiment, the front-end comprises transimpedance amplifiers that are capable of handling multiple streams of input signals. In addition, the transimpedance amplifiers may be configured based on the characteristics of the transimpedance amplifier itself, the characteristics of the photodiodes, and the number of photodiodes coupled to the transimpedance amplifier.

In disclosed embodiments, the front-ends are employed in noninvasive sensors to assist in measuring and detecting various analytes. The disclosed noninvasive sensor may also include, among other things, emitters and detectors positioned to produce multi-stream sensor information. An artisan will recognize that the noninvasive sensor may have different architectures and may include or be coupled to other components, such as a display device, a network interface, and the like. An artisan will also recognize that the front-ends may be employed in any type of noninvasive sensor.

In an embodiment, a front-end interface for a noninvasive, physiological sensor comprises: a set of inputs configured to receive signals from a plurality of detectors in the sensor; a set of transimpedance amplifiers configured to convert the signals from the plurality of detectors into an output signal having a stream for each of the plurality of detectors; and an output configured to provide the output signal.

In an embodiment, a front-end interface for a noninvasive, physiological sensor comprises: a set of inputs configured to receive signals from a plurality of detectors in the sensor; a set of switched capacitor circuits configured to convert the signals from the plurality of detectors into a digital output

signal having a stream for each of the plurality of detectors; and an output configured to provide the digital output signal.

In an embodiment, a conversion processor for a physiological, noninvasive sensor comprises: a multi-stream input configured to receive signals from a plurality of detectors in the sensor, wherein the signals are responsive to optical radiation from a tissue site; a modulator that converts the multi-stream input into a digital bit-stream; and a signal processor that produces an output signal from the digital bit-stream.

In an embodiment, a front-end interface for a noninvasive, physiological sensor comprises: a set of inputs configured to receive signals from a plurality of detectors in the sensor; a set of respective transimpedance amplifiers for each detector configured to convert the signals from the plurality of detectors into an output signal having a stream for each of the plurality of detectors; and an output configured to provide the output signal.

In certain embodiments, a noninvasive sensor interfaces with tissue at a measurement site and deforms the tissue in a way that increases signal gain in certain desired wavelengths.

In some embodiments, a detector for the sensor may comprise a set of photodiodes that are arranged in a spatial configuration. This spatial configuration may allow, for example, signal analysis for measuring analytes like glucose. In various embodiments, the detectors can be arranged across multiple locations in a spatial configuration. The spatial configuration provides a geometry having a diversity of path lengths among the detectors. For example, the detector in the sensor may comprise multiple detectors that are arranged to have a sufficient difference in mean path length to allow for noise cancellation and noise reduction.

In an embodiment, a physiological, noninvasive detector is configured to detect optical radiation from a tissue site. The detector comprises a set of photodetectors and a conversion processor. The set of photodetectors each provide a signal stream indicating optical radiation from the tissue site. The set of photodetectors are arranged in a spatial configuration that provides a variation in path lengths between at least some of the photodetectors. The conversion processor that provides information indicating an analyte in the tissue site based on ratios of pairs of the signal streams.

The present disclosure, according to various embodiments, relates to noninvasive methods, devices, and systems for measuring a blood analyte, such as glucose. In the present disclosure, blood analytes are measured noninvasively based on multi-stream infrared and near-infrared spectroscopy. In some embodiments, an emitter may include one or more sources that are configured as a point optical source. In addition, the emitter may be operated in a manner that allows for the measurement of an analyte like glucose. In embodiments, the emitter may comprise a plurality of LEDs that emit a sequence of pulses of optical radiation across a spectrum of wavelengths. In addition, in order to achieve the desired SNR for detecting analytes like glucose, the emitter may be driven using a progression from low power to higher power. The emitter may also have its duty cycle modified to achieve a desired SNR.

In an embodiment, a multi-stream emitter for a noninvasive, physiological device configured to transmit optical radiation in a tissue site comprises: a set of optical sources arranged as a point optical source; and a driver configured to drive the at least one light emitting diode and at least one optical source to transmit near-infrared optical radiation at sufficient power to measure an analyte in tissue that responds to near-infrared optical radiation.

5

In an embodiment, an emitter for a noninvasive, physiological device configured to transmit optical radiation in a tissue site comprises: a point optical source comprising an optical source configured to transmit infrared and near-infrared optical radiation to a tissue site; and a driver configured to drive the point optical source at a sufficient power and noise tolerance to effectively provide attenuated optical radiation from a tissue site that indicates an amount of glucose in the tissue site.

In an embodiment, a method of transmitting a stream of pulses of optical radiation in a tissue site is provided. At least one pulse of infrared optical radiation having a first pulse width is transmitted at a first power. At least one pulse of near-infrared optical radiation is transmitted at a power that is higher than the first power.

In an embodiment, a method of transmitting a stream of pulses of optical radiation in a tissue site is provided. At least one pulse of infrared optical radiation having a first pulse width is transmitted at a first power. At least one pulse of near-infrared optical radiation is then transmitted, at a second power that is higher than the first power.

For purposes of summarizing the disclosure, certain aspects, advantages and novel features of the inventions have been described herein. It is to be understood that not necessarily all such advantages can be achieved in accordance with any particular embodiment of the inventions disclosed herein. Thus, the inventions disclosed herein can be embodied or carried out in a manner that achieves or optimizes one advantage or group of advantages as taught herein without necessarily achieving other advantages as can be taught or suggested herein.

BRIEF DESCRIPTION OF THE DRAWINGS

Throughout the drawings, reference numbers can be re-used to indicate correspondence between referenced elements. The drawings are provided to illustrate embodiments of the inventions described herein and not to limit the scope thereof.

FIG. **1** illustrates a block diagram of an example data collection system capable of noninvasively measuring one or more blood analytes in a monitored patient, according to an embodiment of the disclosure;

FIGS. **2A-2D** illustrate an exemplary handheld monitor and an exemplary noninvasive optical sensor of the patient monitoring system of FIG. **1**, according to embodiments of the disclosure;

FIGS. **3A-3C** illustrate side and perspective views of an exemplary noninvasive sensor housing including a finger bed protrusion and heat sink, according to an embodiment of the disclosure;

FIG. **3D** illustrates a side view of another example noninvasive sensor housing including a heat sink, according to an embodiment of the disclosure;

FIG. **3E** illustrates a perspective view of an example noninvasive sensor detector shell including example detectors, according to an embodiment of the disclosure;

FIG. **3F** illustrates a side view of an example noninvasive sensor housing including a finger bed protrusion and heat sink, according to an embodiment of the disclosure;

FIGS. **4A** through **4C** illustrate top elevation, side and top perspective views of an example protrusion, according to an embodiment of the disclosure;

FIG. **5** illustrates an example graph depicting possible effects of a protrusion on light transmittance, according to an embodiment of the disclosure;

6

FIGS. **6A** through **6D** illustrate perspective, front elevation, side and top views of another example protrusion, according to an embodiment of the disclosure;

FIG. **6E** illustrates an example sensor incorporating the protrusion of FIGS. **6A** through **6D**, according to an embodiment of the disclosure;

FIGS. **7A** through **7B** illustrate example arrangements of conductive glass that may be employed in the system of FIG. **1**, according to embodiments of the disclosure;

FIGS. **8A** through **8D** illustrate an example top elevation view, side views, and a bottom elevation view of the conductive glass that may be employed in the system of FIG. **1**, according to embodiments of the disclosure;

FIG. **9** shows example comparative results obtained by an embodiment of a sensor;

FIGS. **10A** and **10B** illustrate comparative noise floors of various embodiments of the present disclosure;

FIG. **11A** illustrates an exemplary emitter that may be employed in the sensor, according to an embodiment of the disclosure;

FIG. **11B** illustrates a configuration of emitting optical radiation into a measurement site for measuring blood constituents, according to an embodiment of the disclosure;

FIG. **11C** illustrates another exemplary emitter that may be employed in the sensor according to an embodiment of the disclosure;

FIG. **11D** illustrates another exemplary emitter that may be employed in the sensor according to an embodiment of the disclosure;

FIG. **12A** illustrates an example detector portion that may be employed in an embodiment of a sensor, according to an embodiment of the disclosure;

FIGS. **12B** through **12D** illustrate exemplary arrangements of detectors that may be employed in an embodiment of the sensor, according to some embodiments of the disclosure;

FIGS. **12E** through **12H** illustrate exemplary structures of photodiodes that may be employed in embodiments of the detectors, according to some embodiments of the disclosure;

FIG. **13** illustrates an example multi-stream operation of the system of FIG. **1**, according to an embodiment of the disclosure;

FIG. **14A** illustrates another example detector portion having a partially cylindrical protrusion that can be employed in an embodiment of a sensor, according to an embodiment of the disclosure;

FIG. **14B** depicts a front elevation view of the partially cylindrical protrusion of FIG. **14A**;

FIGS. **14C** through **14E** illustrate embodiments of a detector submount;

FIGS. **14F** through **14H** illustrate embodiment of portions of a detector shell;

FIG. **14I** illustrates a cutaway view of an embodiment of a sensor;

FIGS. **15A** through **15F** illustrate embodiments of sensors that include heat sink features;

FIGS. **15G** and **15H** illustrate embodiments of connector features that can be used with any of the sensors described herein;

FIG. **15I** illustrates an exemplary architecture for a transimpedance-based front-end that may be employed in any of the sensors described herein;

FIG. **15J** illustrates an exemplary noise model for configuring the transimpedance-based front-ends shown in FIG. **15I**;

FIG. **15K** shows different architectures and layouts for various embodiments of a sensor and its detectors;

Stay-Add-864

US 10,945,648 B2

7

FIG. **15**L illustrates an exemplary architecture for a switched-capacitor-based front-end that may be employed in any of the sensors described herein;

FIGS. **16**A and **16**B illustrate embodiments of disposable optical sensors;

FIG. **17** illustrates an exploded view of certain components of an example sensor; and

FIGS. **18** through **22** illustrate various results obtained by an exemplary sensor of the disclosure.

## DETAILED DESCRIPTION

The present disclosure generally relates to non-invasive medical devices. In the present disclosure, a sensor can measure various blood constituents or analytes noninvasively using multi-stream spectroscopy. In an embodiment, the multi-stream spectroscopy can employ visible, infrared and near infrared wavelengths. As disclosed herein, the sensor is capable of noninvasively measuring blood analytes or percentages thereof (e.g., saturation) based on various combinations of features and components.

In various embodiments, the present disclosure relates to an interface for a noninvasive glucose sensor that comprises a front-end adapted to receive an input signals from optical detectors and provide corresponding output signals. The front-end may comprise, among other things, switched capacitor circuits or transimpedance amplifiers. In an embodiment, the front-end may comprise switched capacitor circuits that are configured to convert the output of sensor's detectors into a digital signal. In another embodiment, the front-end may comprise transimpedance amplifiers. These transimpedance amplifiers may be configured to match one or more photodiodes in a detector based on a noise model that accounts for characteristics, such as the impedance, of the transimpedance amplifier, characteristics of each photodiode, such as the impedance, and the number of photodiodes coupled to the transimpedance amplifier.

In the present disclosure, the front-ends are employed in a sensor that measures various blood analytes noninvasively using multi-stream spectroscopy. In an embodiment, the multi-stream spectroscopy can employ visible, infrared and near infrared wavelengths. As disclosed herein, the sensor is capable of noninvasively measuring blood analytes, such as glucose, total hemoglobin, methemoglobin, oxygen content, and the like, based on various combinations of features and components.

In an embodiment, a physiological sensor includes a detector housing that can be coupled to a measurement site, such as a patient's finger. The sensor housing can include a curved bed that can generally conform to the shape of the measurement site. In addition, the curved bed can include a protrusion shaped to increase an amount of light radiation from the measurement site. In an embodiment, the protrusion is used to thin out the measurement site. This allows the light radiation to pass through less tissue, and accordingly is attenuated less. In an embodiment, the protrusion can be used to increase the area from which attenuated light can be measured. In an embodiment, this is done through the use of a lens which collects attenuated light exiting the measurement site and focuses onto one or more detectors. The protrusion can advantageously include plastic, including a hard opaque plastic, such as a black or other colored plastic, helpful in reducing light noise. In an embodiment, such light noise includes light that would otherwise be detected at a photodetector that has not been attenuated by tissue of the measurement site of a patient sufficient to cause the light to

8

adequately included information indicative of one or more physiological parameters of the patient. Such light noise includes light piping.

In an embodiment, the protrusion can be formed from the curved bed, or can be a separate component that is positionable with respect to the bed. In an embodiment, a lens made from any appropriate material is used as the protrusion. The protrusion can be convex in shape. The protrusion can also be sized and shaped to conform the measurement site into a flat or relatively flat surface. The protrusion can also be sized to conform the measurement site into a rounded surface, such as, for example, a concave or convex surface. The protrusion can include a cylindrical or partially cylindrical shape. The protrusion can be sized or shaped differently for different types of patients, such as an adult, child, or infant. The protrusion can also be sized or shaped differently for different measurement sites, including, for example, a finger, toe, hand, foot, ear, forehead, or the like. The protrusion can thus be helpful in any type of noninvasive sensor. The external surface of the protrusion can include one or more openings or windows. The openings can be made from glass to allow attenuated light from a measurement site, such as a finger, to pass through to one or more detectors. Alternatively, some of all of the protrusion can be a lens, such as a partially cylindrical lens.

The sensor can also include a shielding, such as a metal enclosure as described below or embedded within the protrusion to reduce noise. The shielding can be constructed from a conductive material, such as copper, in the form of a metal cage or enclosure, such as a box. The shielding can include a second set of one or more openings or windows. The second set of openings can be made from glass and allow light that has passed through the first set of windows of the external surface of the protrusion to pass through to one or more detectors that can be enclosed, for example, as described below.

In various embodiments, the shielding can include any substantially transparent, conductive material placed in the optical path between an emitter and a detector. The shielding can be constructed from a transparent material, such as glass, plastic, and the like. The shielding can have an electrically conductive material or coating that is at least partially transparent. The electrically conductive coating can be located on one or both sides of the shielding, or within the body of the shielding. In addition, the electrically conductive coating can be uniformly spread over the shielding or may be patterned. Furthermore, the coating can have a uniform or varying thickness to increase or optimize its shielding effect. The shielding can be helpful in virtually any type of non-invasive sensor that employs spectroscopy.

In an embodiment, the sensor can also include a heat sink. In an embodiment, the heat sink can include a shape that is functional in its ability to dissipate excess heat and aesthetically pleasing to the wearer. For example, the heat sink can be configured in a shape that maximizes surface area to allow for greater dissipation of heat. In an embodiment, the heat sink includes a metalicized plastic, such as plastic including carbon and aluminum to allow for improved thermal conductivity and diffusivity. In an embodiment, the heat sink can advantageously be inexpensively molded into desired shapes and configurations for aesthetic and functional purposes. For example, the shape of the heat sink can be a generally curved surface and include one or more fins, undulations, grooves or channels, or combs.

The sensor can include photocommunicative components, such as an emitter, a detector, and other components. The emitter can include a plurality of sets of optical sources that,

US 10,945,648 B2

9 10

in an embodiment, are arranged together as a point source. The various optical sources can emit a sequence of optical radiation pulses at different wavelengths towards a measurement site, such as a patient's finger. Detectors can then detect optical radiation from the measurement site. The optical sources and optical radiation detectors can operate at any appropriate wavelength, including, as discussed herein, infrared, near infrared, visible light, and ultraviolet. In addition, the optical sources and optical radiation detectors can operate at any appropriate wavelength, and such modifications to the embodiments desirable to operate at any such wavelength will be apparent to those skilled in the art.

In certain embodiments, multiple detectors are employed and arranged in a spatial geometry. This spatial geometry provides a diversity of path lengths among at least some of the detectors and allows for multiple bulk and pulsatile measurements that are robust. Each of the detectors can provide a respective output stream based on the detected optical radiation, or a sum of output streams can be provided from multiple detectors. In some embodiments, the sensor can also include other components, such as one or more heat sinks and one or more thermistors.

The spatial configuration of the detectors provides a geometry having a diversity of path lengths among the detectors. For example, a detector in the sensor may comprise multiple detectors that are arranged to have a sufficient difference in mean path length to allow for noise cancellation and noise reduction. In addition, walls may be used to separate individual photodetectors and prevent mixing of detected optical radiation between the different locations on the measurement site. A window may also be employed to facilitate the passing of optical radiation at various wavelengths for measuring glucose in the tissue.

In the present disclosure, a sensor may measure various blood constituents or analytes noninvasively using spectroscopy and a recipe of various features. As disclosed herein, the sensor is capable of non-invasively measuring blood analytes, such as, glucose, total hemoglobin, methemoglobin, oxygen content, and the like. In an embodiment, the spectroscopy used in the sensor can employ visible, infrared and near infrared wavelengths. The sensor may comprise an emitter, a detector, and other components. In some embodiments, the sensor may also comprise other components, such as one or more heat sinks and one or more thermistors.

In various embodiments, the sensor may also be coupled to one or more companion devices that process and/or display the sensor's output. The companion devices may comprise various components, such as a sensor front-end, a signal processor, a display, a network interface, a storage device or memory, etc.

A sensor can include photocommunicative components, such as an emitter, a detector, and other components. The emitter is configured as a point optical source that comprises a plurality of LEDs that emit a sequence of pulses of optical radiation across a spectrum of wavelengths. In some embodiments, the plurality of sets of optical sources may each comprise at least one top-emitting LED and at least one super luminescent LED. In some embodiments, the emitter comprises optical sources that transmit optical radiation in the infrared or near-infrared wavelengths suitable for detecting blood analytes like glucose. In order to achieve the desired SNR for detecting analytes like glucose, the emitter may be driven using a progression from low power to higher power. In addition, the emitter may have its duty cycle modified to achieve a desired SNR.

The emitter may be constructed of materials, such as aluminum nitride and may include a heat sink to assist in heat dissipation. A thermistor may also be employed to account for heating effects on the LEDs. The emitter may further comprise a glass window and a nitrogen environment to improve transmission from the sources and prevent oxidative effects.

The sensor can be coupled to one or more monitors that process and/or display the sensor's output. The monitors can include various components, such as a sensor front end, a signal processor, a display, etc.

The sensor can be integrated with a monitor, for example, into a handheld unit including the sensor, a display and user controls. In other embodiments, the sensor can communicate with one or more processing devices. The communication can be via wire(s), cable(s), flex circuit(s), wireless technologies, or other suitable analog or digital communication methodologies and devices to perform those methodologies. Many of the foregoing arrangements allow the sensor to be attached to the measurement site while the device is attached elsewhere on a patient, such as the patient's arm, or placed at a location near the patient, such as a bed, shelf or table. The sensor or monitor can also provide outputs to a storage device or network interface.

Reference will now be made to the Figures to discuss embodiments of the present disclosure.

FIG. 1 illustrates an example of a data collection system 100. In certain embodiments, the data collection system 100 noninvasively measure a blood analyte, such as oxygen, carbon monoxide, methemoglobin, total hemoglobin, glucose, proteins, glucose, lipids, a percentage thereof (e.g., saturation) or for measuring many other physiologically relevant patient characteristics. The system 100 can also measure additional blood analytes and/or other physiological parameters useful in determining a state or trend of wellness of a patient.

The data collection system 100 can be capable of measuring optical radiation from the measurement site. For example, in some embodiments, the data collection system 100 can employ photodiodes defined in terms of area. In an embodiment, the area is from about 1 mm$^2$-5 mm$^2$ (or higher) that are capable of detecting about 100 nanoamps (nA) or less of current resulting from measured light at full scale. In addition to having its ordinary meaning, the phrase "at full scale" can mean light saturation of a photodiode amplifier (not shown). Of course, as would be understood by a person of skill in the art from the present disclosure, various other sizes and types of photodiodes can be used with the embodiments of the present disclosure.

The data collection system 100 can measure a range of approximately about 2 nA to about 100 nA full scale. The data collection system 100 can also include sensor frontends that are capable of processing and amplifying current from the detector(s) at signal-to-noise ratios (SNRs) of about 100 decibels (dB) or more, such as about 120 dB in order to measure various desired analytes. The data collection system 100 can operate with a lower SNR if less accuracy is desired for an analyte like glucose.

The data collection system 100 can measure analyte concentrations, including glucose, at least in part by detecting light attenuated by a measurement site 102. The measurement site 102 can be any location on a patient's body, such as a finger, foot, ear lobe, or the like. For convenience, this disclosure is described primarily in the context of a finger measurement site 102. However, the features of the embodiments disclosed herein can be used with other measurement sites 102.

In the depicted embodiment, the system 100 includes an optional tissue thickness adjuster or tissue shaper 105, which

US 10,945,648 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

can include one or more protrusions, bumps, lenses, or other suitable tissue-shaping mechanisms. In certain embodiments, the tissue shaper 105 is a flat or substantially flat surface that can be positioned proximate the measurement site 102 and that can apply sufficient pressure to cause the tissue of the measurement site 102 to be flat or substantially flat. In other embodiments, the tissue shaper 105 is a convex or substantially convex surface with respect to the measurement site 102. Many other configurations of the tissue shaper 105 are possible. Advantageously, in certain embodiments, the tissue shaper 105 reduces thickness of the measurement site 102 while preventing or reducing occlusion at the measurement site 102. Reducing thickness of the site can advantageously reduce the amount of attenuation of the light because there is less tissue through which the light must travel. Shaping the tissue in to a convex (or alternatively concave) surface can also provide more surface area from which light can be detected.

The embodiment of the data collection system 100 shown also includes an optional noise shield 103. In an embodiment, the noise shield 103 can be advantageously adapted to reduce electromagnetic noise while increasing the transmittance of light from the measurement site 102 to one or more detectors 106 (described below). For example, the noise shield 103 can advantageously include a conductive coated glass or metal grid electrically communicating with one or more other shields of the sensor 101 or electrically grounded. In an embodiment where the noise shield 103 includes conductive coated glass, the coating can advantageously include indium tin oxide. In an embodiment, the indium tin oxide includes a surface resistivity ranging from approximately 30 ohms per square inch to about 500 ohms per square inch. In an embodiment, the resistivity is approximately 30, 200, or 500 ohms per square inch. As would be understood by a person of skill in the art from the present disclosure, other resistivities can also be used which are less than about 30 ohms or more than about 500 ohms. Other conductive materials transparent or substantially transparent to light can be used instead.

In some embodiments, the measurement site 102 is located somewhere along a non-dominant arm or a non-dominant hand, e.g., a right-handed person's left arm or left hand. In some patients, the non-dominant arm or hand can have less musculature and higher fat content, which can result in less water content in that tissue of the patient. Tissue having less water content can provide less interference with the particular wavelengths that are absorbed in a useful manner by blood analytes like glucose. Accordingly, in some embodiments, the data collection system 100 can be used on a person's non-dominant hand or arm.

The data collection system 100 can include a sensor 101 (or multiple sensors) that is coupled to a processing device or physiological monitor 109. In an embodiment, the sensor 101 and the monitor 109 are integrated together into a single unit. In another embodiment, the sensor 101 and the monitor 109 are separate from each other and communicate one with another in any suitable manner, such as via a wired or wireless connection. The sensor 101 and monitor 109 can be attachable and detachable from each other for the convenience of the user or caregiver, for ease of storage, sterility issues, or the like. The sensor 101 and the monitor 109 will now be further described.

In the depicted embodiment shown in FIG. 1, the sensor 101 includes an emitter 104, a tissue shaper 105, a set of detectors 106, and a front-end interface 108. The emitter 104 can serve as the source of optical radiation transmitted towards measurement site 102. As will be described in

further detail below, the emitter 104 can include one or more sources of optical radiation, such as LEDs, laser diodes, incandescent bulbs with appropriate frequency-selective filters, combinations of the same, or the like. In an embodiment, the emitter 104 includes sets of optical sources that are capable of emitting visible and near-infrared optical radiation.

In some embodiments, the emitter 104 is used as a point optical source, and thus, the one or more optical sources of the emitter 104 can be located within a close distance to each other, such as within about a 2 mm to about 4 mm. The emitters 104 can be arranged in an array, such as is described in U.S. Publication No. 2006/0211924, filed Sep. 21, 2006, titled "Multiple Wavelength Sensor Emitters," the disclosure of which is hereby incorporated by reference in its entirety. In particular, the emitters 104 can be arranged at least in part as described in paragraphs [0061] through [0068] of the aforementioned publication, which paragraphs are hereby incorporated specifically by reference. Other relative spatial relationships can be used to arrange the emitters 104.

For analytes like glucose, currently available non-invasive techniques often attempt to employ light near the water absorbance minima at or about 1600 nm. Typically, these devices and methods employ a single wavelength or single band of wavelengths at or about 1600 nm. However, to date, these techniques have been unable to adequately consistently measure analytes like glucose based on spectroscopy.

In contrast, the emitter 104 of the data collection system 100 can emit, in certain embodiments, combinations of optical radiation in various bands of interest. For example, in some embodiments, for analytes like glucose, the emitter 104 can emit optical radiation at three (3) or more wavelengths between about 1600 nm to about 1700 nm. In particular, the emitter 104 can emit optical radiation at or about 1610 nm, about 1640 nm, and about 1665 nm. In some circumstances, the use of three wavelengths within about 1600 nm to about 1700 nm enable sufficient SNRs of about 100 dB, which can result in a measurement accuracy of about 20 mg/dL or better for analytes like glucose.

In other embodiments, the emitter 104 can use two (2) wavelengths within about 1600 nm to about 1700 nm to advantageously enable SNRs of about 85 dB, which can result in a measurement accuracy of about 25-30 mg/dL or better for analytes like glucose. Furthermore, in some embodiments, the emitter 104 can emit light at wavelengths above about 1670 nm. Measurements at these wavelengths can be advantageously used to compensate or confirm the contribution of protein, water, and other non-hemoglobin species exhibited in measurements for analytes like glucose conducted between about 1600 nm and about 1700 nm. Of course, other wavelengths and combinations of wavelengths can be used to measure analytes and/or to distinguish other types of tissue, fluids, tissue properties, fluid properties, combinations of the same or the like.

For example, the emitter 104 can emit optical radiation across other spectra for other analytes. In particular, the emitter 104 can employ light wavelengths to measure various blood analytes or percentages (e.g., saturation) thereof. For example, in one embodiment, the emitter 104 can emit optical radiation in the form of pulses at wavelengths about 905 nm, about 1050 nm, about 1200 nm, about 1300 nm, about 1330 nm, about 1610 nm, about 1640 nm, and about 1665 nm. In another embodiment, the emitter 104 can emit optical radiation ranging from about 860 nm to about 950 nm, about 950 nm to about 1100 nm, about 1100 nm to about 1270 nm, about 1250 nm to about 1350 nm, about 1300 nm to about 1360 nm, and about 1590 nm to about 1700 nm. Of

Stay-Add-867

US 10,945,648 B2

13                                                14

course, the emitter **104** can transmit any of a variety of wavelengths of visible or near-infrared optical radiation.

Due to the different responses of analytes to the different wavelengths, certain embodiments of the data collection system **100** can advantageously use the measurements at these different wavelengths to improve the accuracy of measurements. For example, the measurements of water from visible and infrared light can be used to compensate for water absorbance that is exhibited in the near-infrared wavelengths.

As briefly described above, the emitter **104** can include sets of light-emitting diodes (LEDs) as its optical source. The emitter **104** can use one or more top-emitting LEDs. In particular, in some embodiments, the emitter **104** can include top-emitting LEDs emitting light at about 850 nm to 1350 nm.

The emitter **104** can also use super luminescent LEDs (SLEDs) or side-emitting LEDs. In some embodiments, the emitter **104** can employ SLEDs or side-emitting LEDs to emit optical radiation at about 1600 nm to about 1800 nm. Emitter **104** can use SLEDs or side-emitting LEDs to transmit near infrared optical radiation because these types of sources can transmit at high power or relatively high power, e.g., about 40 mW to about 100 mW. This higher power capability can be useful to compensate or overcome the greater attenuation of these wavelengths of light in tissue and water. For example, the higher power emission can effectively compensate and/or normalize the absorption signal for light in the mentioned wavelengths to be similar in amplitude and/or effect as other wavelengths that can be detected by one or more photodetectors after absorption. However, the embodiments of the present disclosure do not necessarily require the use of high power optical sources. For example, some embodiments may be configured to measure analytes, such as total hemoglobin (tHb), oxygen saturation (SpO$_2$), carboxyhemoglobin, methemoglobin, etc., without the use of high power optical sources like side emitting LEDs. Instead, such embodiments may employ other types of optical sources, such as top emitting LEDs. Alternatively, the emitter **104** can use other types of sources of optical radiation, such as a laser diode, to emit near-infrared light into the measurement site **102**.

In addition, in some embodiments, in order to assist in achieving a comparative balance of desired power output between the LEDs, some of the LEDs in the emitter **104** can have a filter or covering that reduces and/or cleans the optical radiation from particular LEDs or groups of LEDs. For example, since some wavelengths of light can penetrate through tissue relatively well, LEDs, such as some or all of the top-emitting LEDs can use a filter or covering, such as a cap or painted dye. This can be useful in allowing the emitter **104** to use LEDs with a higher output and/or to equalize intensity of LEDs.

The data collection system **100** also includes a driver **111** that drives the emitter **104**. The driver **111** can be a circuit or the like that is controlled by the monitor **109**. For example, the driver **111** can provide pulses of current to the emitter **104**. In an embodiment, the driver **111** drives the emitter **104** in a progressive fashion, such as in an alternating manner. The driver **111** can drive the emitter **104** with a series of pulses of about 1 milliwatt (mW) for some wavelengths that can penetrate tissue relatively well and from about 40 mW to about 100 mW for other wavelengths that tend to be significantly absorbed in tissue. A wide variety of other driving powers and driving methodologies can be used in various embodiments.

The driver **111** can be synchronized with other parts of the sensor **101** and can minimize or reduce jitter in the timing of pulses of optical radiation emitted from the emitter **104**. In some embodiments, the driver **111** is capable of driving the emitter **104** to emit optical radiation in a pattern that varies by less than about 10 parts-per-million.

The detectors **106** capture and measure light from the measurement site **102**. For example, the detectors **106** can capture and measure light transmitted from the emitter **104** that has been attenuated or reflected from the tissue in the measurement site **102**. The detectors **106** can output a detector signal **107** responsive to the light captured or measured. The detectors **106** can be implemented using one or more photodiodes, phototransistors, or the like.

In addition, the detectors **106** can be arranged with a spatial configuration to provide a variation of path lengths among at least some of the detectors **106**. That is, some of the detectors **106** can have the substantially, or from the perspective of the processing algorithm, effectively, the same path length from the emitter **104**. However, according to an embodiment, at least some of the detectors **106** can have a different path length from the emitter **104** relative to other of the detectors **106**. Variations in path lengths can be helpful in allowing the use of a bulk signal stream from the detectors **106**. In some embodiments, the detectors **106** may employ a linear spacing, a logarithmic spacing, or a two or three dimensional matrix of spacing, or any other spacing scheme in order to provide an appropriate variation in path lengths.

The front end interface **108** provides an interface that adapts the output of the detectors **106**, which is responsive to desired physiological parameters. For example, the front end interface **108** can adapt a signal **107** received from one or more of the detectors **106** into a form that can be processed by the monitor **109**, for example, by a signal processor **110** in the monitor **109**. The front end interface **108** can have its components assembled in the sensor **101**, in the monitor **109**, in connecting cabling (if used), combinations of the same, or the like. The location of the front end interface **108** can be chosen based on various factors including space desired for components, desired noise reductions or limits, desired heat reductions or limits, and the like.

The front end interface **108** can be coupled to the detectors **106** and to the signal processor **110** using a bus, wire, electrical or optical cable, flex circuit, or some other form of signal connection. The front end interface **108** can also be at least partially integrated with various components, such as the detectors **106**. For example, the front end interface **108** can include one or more integrated circuits that are on the same circuit board as the detectors **106**. Other configurations can also be used.

The front end interface **108** can be implemented using one or more amplifiers, such as transimpedance amplifiers, that are coupled to one or more analog to digital converters (ADCs) (which can be in the monitor **109**), such as a sigma-delta ADC. A transimpedance-based front end interface **108** can employ single-ended circuitry, differential circuitry, and/or a hybrid configuration. A transimpedance-based front end interface **108** can be useful for its sampling rate capability and freedom in modulation/demodulation algorithms. For example, this type of front end interface **108** can advantageously facilitate the sampling of the ADCs being synchronized with the pulses emitted from the emitter **104**.

The ADC or ADCs can provide one or more outputs into multiple channels of digital information for processing by

US 10,945,648 B2

15                                                                    16

the signal processor 110 of the monitor 109. Each channel can correspond to a signal output from a detector 106.

In some embodiments, a programmable gain amplifier (PGA) can be used in combination with a transimpedance-based front end interface 108. For example, the output of a transimpedance-based front end interface 108 can be output to a PGA that is coupled with an ADC in the monitor 109. A PGA can be useful in order to provide another level of amplification and control of the stream of signals from the detectors 106. Alternatively, the PGA and ADC components can be integrated with the transimpedance-based front end interface 108 in the sensor 101.

In another embodiment, the front end interface 108 can be implemented using switched-capacitor circuits. A switched-capacitor-based front end interface 108 can be useful for, in certain embodiments, its resistor-free design and analog averaging properties. In addition, a switched-capacitor-based front end interface 108 can be useful because it can provide a digital signal to the signal processor 110 in the monitor 109.

As shown in FIG. 1, the monitor 109 can include the signal processor 110 and a user interface, such as a display 112. The monitor 109 can also include optional outputs alone or in combination with the display 112, such as a storage device 114 and a network interface 116. In an embodiment, the signal processor 110 includes processing logic that determines measurements for desired analytes, such as glucose, based on the signals received from the detectors 106. The signal processor 110 can be implemented using one or more microprocessors or subprocessors (e.g., cores), digital signal processors, application specific integrated circuits (ASICs), field programmable gate arrays (FPGAs), combinations of the same, and the like.

The signal processor 110 can provide various signals that control the operation of the sensor 101. For example, the signal processor 110 can provide an emitter control signal to the driver 111. This control signal can be useful in order to synchronize, minimize, or reduce jitter in the timing of pulses emitted from the emitter 104. Accordingly, this control signal can be useful in order to cause optical radiation pulses emitted from the emitter 104 to follow a precise timing and consistent pattern. For example, when a transimpedance-based front end interface 108 is used, the control signal from the signal processor 110 can provide synchronization with the ADC in order to avoid aliasing, cross-talk, and the like. As also shown, an optional memory 113 can be included in the front-end interface 108 and/or in the signal processor 110. This memory 113 can serve as a buffer or storage location for the front-end interface 108 and/or the signal processor 110, among other uses.

The user interface 112 can provide an output, e.g., on a display, for presentation to a user of the data collection system 100. The user interface 112 can be implemented as a touch-screen display, an LCD display, an organic LED display, or the like. In addition, the user interface 112 can be manipulated to allow for measurement on the non-dominant side of patient. For example, the user interface 112 can include a flip screen, a screen that can be moved from one side to another on the monitor 109, or can include an ability to reorient its display indicia responsive to user input or device orientation. In alternative embodiments, the data collection system 100 can be provided without a user interface 112 and can simply provide an output signal to a separate display or system.

A storage device 114 and a network interface 116 represent other optional output connections that can be included in the monitor 109. The storage device 114 can include any

computer-readable medium, such as a memory device, hard disk storage, EEPROM, flash drive, or the like. The various software and/or firmware applications can be stored in the storage device 114, which can be executed by the signal processor 110 or another processor of the monitor 109. The network interface 116 can be a serial bus port (RS-232/RS-485), a Universal Serial Bus (USB) port, an Ethernet port, a wireless interface (e.g., WiFi such as any 802.1x interface, including an internal wireless card), or other suitable communication device(s) that allows the monitor 109 to communicate and share data with other devices. The monitor 109 can also include various other components not shown, such as a microprocessor, graphics processor, or controller to output the user interface 112, to control data communications, to compute data trending, or to perform other operations.

Although not shown in the depicted embodiment, the data collection system 100 can include various other components or can be configured in different ways. For example, the sensor 101 can have both the emitter 104 and detectors 106 on the same side of the measurement site 102 and use reflectance to measure analytes. The data collection system 100 can also include a sensor that measures the power of light emitted from the emitter 104.

FIGS. 2A through 2D illustrate example monitoring devices 200 in which the data collection system 100 can be housed. Advantageously, in certain embodiments, some or all of the example monitoring devices 200 shown can have a shape and size that allows a user to operate it with a single hand or attach it, for example, to a patient's body or limb. Although several examples are shown, many other monitoring device configurations can be used to house the data collection system 100. In addition, certain of the features of the monitoring devices 200 shown in FIGS. 2A through 2D can be combined with features of the other monitoring devices 200 shown.

Referring specifically to FIG. 2A, an example monitoring device 200A is shown, in which a sensor 201a and a monitor 209a are integrated into a single unit. The monitoring device 200A shown is a handheld or portable device that can measure glucose and other analytes in a patient's finger. The sensor 201a includes an emitter shell 204a and a detector shell 206a. The depicted embodiment of the monitoring device 200A also includes various control buttons 208a and a display 210a.

The sensor 201a can be constructed of white material used for reflective purposes (such as white silicone or plastic), which can increase the usable signal at the detector 106 by forcing light back into the sensor 201a. Pads in the emitter shell 204a and the detector shell 206a can contain separated windows to prevent or reduce mixing of light signals, for example, from distinct quadrants on a patient's finger. In addition, these pads can be made of a relatively soft material, such as a gel or foam, in order to conform to the shape, for example, of a patient's finger. The emitter shell 204a and the detector shell 206a can also include absorbing black or grey material portions to prevent or reduce ambient light from entering into the sensor 201a.

In some embodiments, some or all portions of the emitter shell 204a and/or detector shell 206a can be detachable and/or disposable. For example, some or all portions of the shells 204a and 206a can be removable pieces. The removability of the shells 204a and 206a can be useful for sanitary purposes or for sizing the sensor 201a to different patients. The monitor 209a can include a fitting, slot, magnet, or other connecting mechanism to allow the sensor 201c to be removably attached to the monitor 209a.

US 10,945,648 B2

17                                                          18

The monitoring device 200a also includes optional control buttons 208a and a display 210a that can allow the user to control the operation of the device. For example, a user can operate the control buttons 208a to view one or more measurements of various analytes, such as glucose. In addition, the user can operate the control buttons 208a to view other forms of information, such as graphs, histograms, measurement data, trend measurement data, parameter combination views, wellness indications, and the like. Many parameters, trends, alarms and parameter displays could be output to the display 210a, such as those that are commercially available through a wide variety of noninvasive monitoring devices from Masimo® Corporation of Irvine, Calif.

Furthermore, the controls 208a and/or display 210a can provide functionality for the user to manipulate settings of the monitoring device 200a, such as alarm settings, emitter settings, detector settings, and the like. The monitoring device 200a can employ any of a variety of user interface designs, such as frames, menus, touch-screens, and any type of button.

FIG. 2B illustrates another example of a monitoring device 200B. In the depicted embodiment, the monitoring device 200B includes a finger clip sensor 201b connected to a monitor 209b via a cable 212. In the embodiment shown, the monitor 209b includes a display 210b, control buttons 208b and a power button. Moreover, the monitor 209b can advantageously include electronic processing, signal processing, and data storage devices capable of receiving signal data from said sensor 201b, processing the signal data to determine one or more output measurement values indicative of one or more physiological parameters of a monitored patient, and displaying the measurement values, trends of the measurement values, combinations of measurement values, and the like.

The cable 212 connecting the sensor 201b and the monitor 209b can be implemented using one or more wires, optical fiber, flex circuits, or the like. In some embodiments, the cable 212 can employ twisted pairs of conductors in order to minimize or reduce cross-talk of data transmitted from the sensor 201b to the monitor 209b. Various lengths of the cable 212 can be employed to allow for separation between the sensor 201b and the monitor 209b. The cable 212 can be fitted with a connector (male or female) on either end of the cable 212 so that the sensor 201b and the monitor 209b can be connected and disconnected from each other. Alternatively, the sensor 201b and the monitor 209b can be coupled together via a wireless communication link, such as an infrared link, radio frequency channel, or any other wireless communication protocol and channel.

The monitor 209b can be attached to the patient. For example, the monitor 209b can include a belt clip or straps (see, e.g., FIG. 2C) that facilitate attachment to a patient's belt, arm, leg, or the like. The monitor 209b can also include a fitting, slot, magnet, LEMO snap-click connector, or other connecting mechanism to allow the cable 212 and sensor 201b to be attached to the monitor 209b.

The monitor 209b can also include other components, such as a speaker, power button, removable storage or memory (e.g., a flash card slot), an AC power port, and one or more network interfaces, such as a universal serial bus interface or an Ethernet port. For example, the monitor 209b can include a display 210b that can indicate a measurement for glucose, for example, in mg/dL. Other analytes and forms of display can also appear on the monitor 209b.

In addition, although a single sensor 201b with a single monitor 209b is shown, different combinations of sensors and device pairings can be implemented. For example,

multiple sensors can be provided for a plurality of differing patient types or measurement sites or even patient fingers.

FIG. 2C illustrates yet another example of monitoring device 200C that can house the data collection system 100. Like the monitoring device 200B, the monitoring device 200C includes a finger clip sensor 201c connected to a monitor 209c via a cable 212. The cable 212 can have all of the features described above with respect to FIG. 2B. The monitor 209c can include all of the features of the monitor 200B described above. For example, the monitor 209c includes buttons 208c and a display 210c. The monitor 209c shown also includes straps 214c that allow the monitor 209c to be attached to a patient's limb or the like.

FIG. 2D illustrates yet another example of monitoring device 200D that can house the data collection system 100. Like the monitoring devices 200B and 200C, the monitoring device 200D includes a finger clip sensor 201d connected to a monitor 209d via a cable 212. The cable 212 can have all of the features described above with respect to FIG. 2B. In addition to having some or all of the features described above with respect to FIGS. 2B and 2C, the monitoring device 200D includes an optional universal serial bus (USB) port 216 and an Ethernet port 218. The USB port 216 and the Ethernet port 218 can be used, for example, to transfer information between the monitor 209d and a computer (not shown) via a cable. Software stored on the computer can provide functionality for a user to, for example, view physiological data and trends, adjust settings and download firmware updates to the monitor 209d, and perform a variety of other functions. The USB port 216 and the Ethernet port 218 can be included with the other monitoring devices 200A, 200B, and 200C described above.

FIGS. 3A through 3C illustrate more detailed examples of embodiments of a sensor 301a. The sensor 301a shown can include all of the features of the sensors 100 and 200 described above.

Referring to FIG. 3A, the sensor 301a in the depicted embodiment is a clothespin-shaped clip sensor that includes an enclosure 302a for receiving a patient's finger. The enclosure 302a is formed by an upper section or emitter shell 304a, which is pivotably connected with a lower section or detector shell 306a. The emitter shell 304a can be biased with the detector shell 306a to close together around a pivot point 303a and thereby sandwich finger tissue between the emitter and detector shells 304a, 306a.

In an embodiment, the pivot point 303a advantageously includes a pivot capable of adjusting the relationship between the emitter and detector shells 304a, 306a to effectively level the sections when applied to a tissue site. In another embodiment, the sensor 301a includes some or all features of the finger clip described in U.S. Publication No. 2006/0211924, incorporated above, such as a spring that causes finger clip forces to be distributed along the finger. Paragraphs [0096] through [0105], which describe this feature, are hereby specifically incorporated by reference.

The emitter shell 304a can position and house various emitter components of the sensor 301a. It can be constructed of reflective material (e.g., white silicone or plastic) and/or can be metallic or include metalicized plastic (e.g., including carbon and aluminum) to possibly serve as a heat sink. The emitter shell 304a can also include absorbing opaque material, such as, for example, black or grey colored material, at various areas, such as on one or more flaps 307a, to reduce ambient light entering the sensor 301a.

The detector shell 306a can position and house one or more detector portions of the sensor 301a. The detector shell 306a can be constructed of reflective material, such as white

19

silicone or plastic. As noted, such materials can increase the usable signal at a detector by forcing light back into the tissue and measurement site (see FIG. **1**). The detector shell **306***a* can also include absorbing opaque material at various areas, such as lower area **308***a*, to reduce ambient light entering the sensor **301***a*.

Referring to FIGS. **3**B and **3**C, an example of finger bed **310** is shown in the sensor **301***b*. The finger bed **310** includes a generally curved surface shaped generally to receive tissue, such as a human digit. The finger bed **310** includes one or more ridges or channels **314**. Each of the ridges **314** has a generally convex shape that can facilitate increasing traction or gripping of the patient's finger to the finger bed. Advantageously, the ridges **314** can improve the accuracy of spectroscopic analysis in certain embodiments by reducing noise that can result from a measurement site moving or shaking loose inside of the sensor **301***a*. The ridges **314** can be made from reflective or opaque materials in some embodiments to further increase SNR. In other implementations, other surface shapes can be used, such as, for example, generally flat, concave, or convex finger beds **310**.

Finger bed **310** can also include an embodiment of a tissue thickness adjuster or protrusion **305**. The protrusion **305** includes a measurement site contact area **370** (see FIG. **3**C) that can contact body tissue of a measurement site. The protrusion **305** can be removed from or integrated with the finger bed **310**. Interchangeable, different shaped protrusions **305** can also be provided, which can correspond to different finger shapes, characteristics, opacity, sizes, or the like.

Referring specifically to FIG. **3**C, the contact area **370** of the protrusion **305** can include openings or windows **320**, **321**, **322**, and **323**. When light from a measurement site passes through the windows **320**, **321**, **322**, and **323**, the light can reach one or more photodetectors (see FIG. **3**E). In an embodiment, the windows **320**, **321**, **322**, and **323** mirror specific detector placements layouts such that light can impinge through the protrusion **305** onto the photodetectors. Any number of windows **320**, **321**, **322**, and **323** can be employed in the protrusion **305** to allow light to pass from the measurement site to the photodetectors.

The windows **320**, **321**, **322**, and **323** can also include shielding, such as an embedded grid of wiring or a conductive glass coating, to reduce noise from ambient light or other electromagnetic noise. The windows **320**, **321**, **322**, and **323** can be made from materials, such as plastic or glass. In some embodiments, the windows **320**, **321**, **322**, and **323** can be constructed from conductive glass, such as indium tin oxide (ITO) coated glass. Conductive glass can be useful because its shielding is transparent, and thus allows for a larger aperture versus a window with an embedded grid of wiring. In addition, in certain embodiments, the conductive glass does not need openings in its shielding (since it is transparent), which enhances its shielding performance. For example, some embodiments that employ the conductive glass can attain up to an about 40% to about 50% greater signal than non-conductive glass with a shielding grid. In addition, in some embodiments, conductive glass can be useful for shielding noise from a greater variety of directions than non-conductive glass with a shielding grid.

Turning to FIG. **3**B, the sensor **301***a* can also include a shielding **315***a*, such as a metal cage, box, metal sheet, perforated metal sheet, a metal layer on a non-metal material, or the like. The shielding **315***a* is provided in the depicted embodiment below or embedded within the protrusion **305** to reduce noise. The shielding **315***a* can be constructed from a conductive material, such as copper. The

20

shielding **315***a* can include one or more openings or windows (not shown). The windows can be made from glass or plastic to thereby allow light that has passed through the windows **320**, **321**, **322**, and **323** on an external surface of the protrusion **305** (see FIG. **3**C) to pass through to one or more photodetectors that can be enclosed or provided below (see FIG. **3**E).

In some embodiments, the shielding cage for shielding **315***a* can be constructed in a single manufactured component with or without the use of conductive glass. This form of construction may be useful in order to reduce costs of manufacture as well as assist in quality control of the components. Furthermore, the shielding cage can also be used to house various other components, such as sigma delta components for various embodiments of front end interfaces **108**.

In an embodiment, the photodetectors can be positioned within or directly beneath the protrusion **305** (see FIG. **3**E). In such cases, the mean optical path length from the emitters to the detectors can be reduced and the accuracy of blood analyte measurement can increase. For example, in one embodiment, a convex bump of about 1 mm to about 3 mm in height and about 10 mm$^2$ to about 60 mm$^2$ was found to help signal strength by about an order of magnitude versus other shapes. Of course other dimensions and sizes can be employed in other embodiments. Depending on the properties desired, the length, width, and height of the protrusion **305** can be selected. In making such determinations, consideration can be made of protrusion's **305** effect on blood flow at the measurement site and mean path length for optical radiation passing through openings **320**, **321**, **322**, and **323**. Patient comfort can also be considered in determining the size and shape of the protrusion.

In an embodiment, the protrusion **305** can include a pliant material, including soft plastic or rubber, which can somewhat conform to the shape of a measurement site. Pliant materials can improve patient comfort and tactility by conforming the measurement site contact area **370** to the measurement site. Additionally, pliant materials can minimize or reduce noise, such as ambient light. Alternatively, the protrusion **305** can be made from a rigid material, such as hard plastic or metal.

Rigid materials can improve measurement accuracy of a blood analyte by conforming the measurement site to the contact area **370**. The contact area **370** can be an ideal shape for improving accuracy or reducing noise. Selecting a material for the protrusion **305** can include consideration of materials that do not significantly alter blood flow at the measurement site. The protrusion **305** and the contact area **370** can include a combination of materials with various characteristics.

The contact area **370** serves as a contact surface for the measurement site. For example, in some embodiments, the contact area **370** can be shaped for contact with a patient's finger. Accordingly, the contact area **370** can be sized and shaped for different sizes of fingers. The contact area **370** can be constructed of different materials for reflective purposes as well as for the comfort of the patient. For example, the contact area **370** can be constructed from materials having various hardness and textures, such as plastic, gel, foam, and the like.

The formulas and analysis that follow with respect to FIG. **5** provide insight into how selecting these variables can alter transmittance and intensity gain of optical radiation that has been applied to the measurement site. These examples do not limit the scope of this disclosure.

Stay-Add-871

US 10,945,648 B2

21

Referring to FIG. **5**, a plot **500** is shown that illustrates examples of effects of embodiments of the protrusion **305** on the SNR at various wavelengths of light. As described above, the protrusion **305** can assist in conforming the tissue and effectively reduce its mean path length. In some instances, this effect by the protrusion **305** can have significant impact on increasing the SNR.

According to the Beer Lambert law, a transmittance of light (l) can be expressed as follows: $l = l_o * e^{-m*b*c}$, where lo is the initial power of light being transmitted, m is the path length traveled by the light, and the component "b*c" corresponds to the bulk absorption of the light at a specific wavelength of light. For light at about 1600 nm to about 1700 nm, for example, the bulk absorption component is generally around 0.7 $mm^{-1}$. Assuming a typical finger thickness of about 12 mm and a mean path length of 20 mm due to tissue scattering, then $l = l_o * e^{(-20*0.7)}$.

In an embodiment where the protrusion **305** is a convex bump, the thickness of the finger can be reduced to 10 mm (from 12 mm) for some fingers and the effective light mean path is reduced to about 16.6 mm from 20 mm (see box **510**). This results in a new transmittance, $l_1 = l_o * e^{(-16.6*0.7)}$. A curve for a typical finger (having a mean path length of 20 mm) across various wavelengths is shown in the plot **500** of FIG. **5**. The plot **500** illustrates potential effects of the protrusion **305** on the transmittance. As illustrated, comparing l and $l_1$ results in an intensity gain of $e^{(-16.6*0.7)}/e^{(-20*0.7)}$, which is about a 10 times increase for light in the about 1600 nm to about 1700 nm range. Such an increase can affect the SNR at which the sensor can operate. The foregoing gains can be due at least in part to the about 1600 nm to about 1700 nm range having high values in bulk absorptions (water, protein, and the like), e.g., about 0.7 $mm^{-1}$. The plot **500** also shows improvements in the visible/near-infrared range (about 600 nm to about 1300 nm).

Turning again to FIGS. **3**A through **3**C, an example heat sink **350**a is also shown. The heat sink **350**a can be attached to, or protrude from an outer surface of, the sensor **301**a, thereby providing increased ability for various sensor components to dissipate excess heat. By being on the outer surface of the sensor **301**a in certain embodiments, the heat sink **350**a can be exposed to the air and thereby facilitate more efficient cooling. In an embodiment, one or more of the emitters (see FIG. **1**) generate sufficient heat that inclusion of the heat sink **350**a can advantageously allows the sensor **301**a to remain safely cooled. The heat sink **350**a can include one or more materials that help dissipate heat, such as, for example, aluminum, steel, copper, carbon, combinations of the same, or the like. For example, in some embodiments, the emitter shell **304**a can include a heat conducting material that is also readily and relatively inexpensively moldable into desired shapes and forms.

In some embodiments, the heat sink **350**a includes metalicized plastic. The metalicized plastic can include aluminum and carbon, for example. The material can allow for improved thermal conductivity and diffusivity, which can increase commercial viability of the heat sink. In some embodiments, the material selected to construct the heat sink **350**a can include a thermally conductive liquid crystalline polymer, such as CoolPoly® D5506, commercially available from Cool Polymers®, Inc. of Warwick, Rhode Island. Such a material can be selected for its electrically non-conductive and dielectric properties so as, for example, to aid in electrical shielding. In an embodiment, the heat sink **350**a provides improved heat transfer properties when the sensor **301**a is active for short intervals of less than a full day's use. In an embodiment, the heat sink **350**a can

22

advantageously provide improved heat transfers in about three (3) to about four (4) minute intervals, for example, although a heat sink **350**a can be selected that performs effectively in shorter or longer intervals.

Moreover, the heat sink **350**a can have different shapes and configurations for aesthetic as well as for functional purposes. In an embodiment, the heat sink is configured to maximize heat dissipation, for example, by maximizing surface area. In an embodiment, the heat sink **350**a is molded into a generally curved surface and includes one or more fins, undulations, grooves, or channels. The example heat sink **350**a shown includes fins **351**a (see FIG. **3**A).

An alternative shape of a sensor **301**b and heat sink **350**b is shown in FIG. **3**D. The sensor **301**b can include some or all of the features of the sensor **301**a. For example, the sensor **301**b includes an enclosure **302**b formed by an emitter shell **304**b and a detector shell **306**b, pivotably connected about a pivot **303**a. The emitter shell **304**b can also include absorbing opaque material on one or more flaps **307**b, and the detector shell **306**a can also include absorbing opaque material at various areas, such as lower area **308**b.

However, the shape of the sensor **301**b is different in this embodiment. In particular, the heat sink **350**b includes comb protrusions **351**b. The comb protrusions **351**b are exposed to the air in a similar manner to the fins **351**a of the heat sink **350**a, thereby facilitating efficient cooling of the sensor **301**b.

FIG. **3**E illustrates a more detailed example of a detector shell **306**b of the sensor **301**b. The features described with respect to the detector shell **306**b can also be used with the detector shell **306**a of the sensor **301**a.

As shown, the detector shell **306**b includes detectors **316**. The detectors **316** can have a predetermined spacing **340** from each other, or a spatial relationship among one another that results in a spatial configuration. This spatial configuration can purposefully create a variation of path lengths among detectors **316** and the emitter discussed above.

In the depicted embodiment, the detector shell **316** can hold multiple (e.g., two, three, four, etc.) photodiode arrays that are arranged in a two-dimensional grid pattern. Multiple photodiode arrays can also be useful to detect light piping (e.g., light that bypasses measurement site **102**). In the detector shell **316**, walls can be provided to separate the individual photodiode arrays to prevent or reduce mixing of light signals from distinct quadrants. In addition, the detector shell **316** can be covered by windows of transparent material, such as glass, plastic, or the like, to allow maximum or increased transmission of power light captured. In various embodiments, the transparent materials used can also be partially transparent or translucent or can otherwise pass some or all of the optical radiation passing through them. As noted, this window can include some shielding in the form of an embedded grid of wiring, or a conductive layer or coating.

As further illustrated by FIG. **3**E, the detectors **316** can have a spatial configuration of a grid. However, the detectors **316** can be arranged in other configurations that vary the path length. For example, the detectors **316** can be arranged in a linear array, a logarithmic array, a two-dimensional array, a zig-zag pattern, or the like. Furthermore, any number of the detectors **316** can be employed in certain embodiments.

FIG. **3**F illustrates another embodiment of a sensor **301**f. The sensor **301**f can include some or all of the features of the sensor **301**a of FIG. **3**A described above. For example, the sensor **301**f includes an enclosure **302**f formed by an upper section or emitter shell **304**f, which is pivotably connected

US 10,945,648 B2

23

24

with a lower section or detector shell **306ƒ** around a pivot point **303ƒ**. The emitter shell **304ƒ** can also include absorbing opaque material on various areas, such as on one or more flaps **307ƒ**, to reduce ambient light entering the sensor **301ƒ**. The detector shell **306ƒ** can also include absorbing opaque material at various areas, such as a lower area **308ƒ**. The sensor **301ƒ** also includes a heat sink **350ƒ**, which includes fins **351ƒ**.

In addition to these features, the sensor **301ƒ** includes a flex circuit cover **360**, which can be made of plastic or another suitable material. The flex circuit cover **360** can cover and thereby protect a flex circuit (not shown) that extends from the emitter shell **304ƒ** to the detector shell **306ƒ**. An example of such a flex circuit is illustrated in U.S. Publication No. 2006/0211924, incorporated above (see FIG. **46** and associated description, which is hereby specifically incorporated by reference). The flex circuit cover **360** is shown in more detail below in FIG. **17**.

In addition, sensors **301a-ƒ** has extra length—extends to second joint on finger—Easier to place, harder to move due to cable, better for light piping.

FIGS. **4A** through **4C** illustrate example arrangements of a protrusion **405**, which is an embodiment of the protrusion **305** described above. In an embodiment, the protrusion **405** can include a measurement site contact area **470**. The measurement site contact area **470** can include a surface that molds body tissue of a measurement site, such as a finger, into a flat or relatively flat surface.

The protrusion **405** can have dimensions that are suitable for a measurement site such as a patient's finger. As shown, the protrusion **405** can have a length **400**, a width **410**, and a height **430**. The length **400** can be from about 9 to about 11 millimeters, e.g., about 10 millimeters. The width **410** can be from about 7 to about 9 millimeters, e.g., about 8 millimeters. The height **430** can be from about 0.5 millimeters to about 3 millimeters, e.g., about 2 millimeters. In an embodiment, the dimensions **400**, **410**, and **430** can be selected such that the measurement site contact area **470** includes an area of about 80 square millimeters, although larger and smaller areas can be used for different sized tissue for an adult, an adolescent, or infant, or for other considerations.

The measurement site contact area **470** can also include differently shaped surfaces that conform the measurement site into different shapes. For example, the measurement site contact area **470** can be generally curved and/or convex with respect to the measurement site. The measurement site contact area **470** can be other shapes that reduce or even minimize air between the protrusion **405** and/or the measurement site. Additionally, the surface pattern of the measurement site contact area **470** can vary from smooth to bumpy, e.g., to provide varying levels of grip.

In FIGS. **4A** and **4C**, openings or windows **420**, **421**, **422**, and **423** can include a wide variety of shapes and sizes, including for example, generally square, circular, triangular, or combinations thereof. The windows **420**, **421**, **422**, and **423** can be of non-uniform shapes and sizes. As shown, the windows **420**, **421**, **422**, and **423** can be evenly spaced out in a grid like arrangement. Other arrangements or patterns of arranging the windows **420**, **421**, **422**, and **423** are possible. For example, the windows **420**, **421**, **422**, and **423** can be placed in a triangular, circular, or linear arrangement. In some embodiments, the windows **420**, **421**, **422**, and **423** can be placed at different heights with respect to the finger bed **310** of FIG. **3**. The windows **420**, **421**, **422**, and **423** can also mimic or approximately mimic a configuration of, or even house, a plurality of detectors.

FIGS. **6A** through **6D** illustrate another embodiment of a protrusion **605** that can be used as the tissue shaper **105** described above or in place of the protrusions **305**, **405** described above. The depicted protrusion **605** is a partially cylindrical lens having a partial cylinder **608** and an extension **610**. The partial cylinder **608** can be a half cylinder in some embodiments; however, a smaller or greater portion than half of a cylinder can be used. Advantageously, in certain embodiments, the partially cylindrical protrusion **605** focuses light onto a smaller area, such that fewer detectors can be used to detect the light attenuated by a measurement site.

FIG. **6A** illustrates a perspective view of the partially cylindrical protrusion **605**. FIG. **6B** illustrates a front elevation view of the partially cylindrical protrusion **605**. FIG. **6C** illustrates a side view of the partially cylindrical protrusion **605**. FIG. **6D** illustrates a top view of the partially cylindrical protrusion **605**.

Advantageously, in certain embodiments, placing the partially cylindrical protrusion **605** over the photodiodes in any of the sensors described above adds multiple benefits to any of the sensors described above. In one embodiment, the partially cylindrical protrusion **605** penetrates into the tissue and reduces the path length of the light traveling in the tissue, similar to the protrusions described above.

The partially cylindrical protrusion **605** can also collect light from a large surface and focus down the light to a smaller area. As a result, in certain embodiments, signal strength per area of the photodiode can be increased. The partially cylindrical protrusion **605** can therefore facilitate a lower cost sensor because, in certain embodiments, less photodiode area can be used to obtain the same signal strength. Less photodiode area can be realized by using smaller photodiodes or fewer photodiodes (see, e.g., FIG. **14**). If fewer or smaller photodiodes are used, the partially cylindrical protrusion **605** can also facilitate an improved SNR of the sensor because fewer or smaller photodiodes can have less dark current.

The dimensions of the partially cylindrical protrusion **605** can vary based on, for instance, a number of photodiodes used with the sensor. Referring to FIG. **6C**, the overall height of the partially cylindrical protrusion **605** (measurement "a") in some implementations is about 1 to about 3 mm. A height in this range can allow the partially cylindrical protrusion **605** to penetrate into the pad of the finger or other tissue and reduce the distance that light travels through the tissue. Other heights, however, of the partially cylindrical protrusion **605** can also accomplish this objective. For example, the chosen height of the partially cylindrical protrusion **605** can be selected based on the size of the measurement site, whether the patient is an adult or child, and so on. In an embodiment, the height of the protrusion **605** is chosen to provide as much tissue thickness reduction as possible while reducing or preventing occlusion of blood vessels in the tissue.

Referring to FIG. **6D**, the width of the partially cylindrical protrusion **605** (measurement "b") can be about 3 to about 5 mm. In one embodiment, the width is about 4 mm. In one embodiment, a width in this range provides good penetration of the partially cylindrical protrusion **605** into the tissue to reduce the path length of the light. Other widths, however, of the partially cylindrical protrusion **605** can also accomplish this objective. For example, the width of the partially cylindrical protrusion **605** can vary based on the size of the measurement site, whether the patient is an adult or child, and so on. In addition, the length of the protrusion **605** could

US 10,945,648 B2

25                                                      26

be about 10 mm, or about 8 mm to about 12 mm, or smaller than 8 mm or greater than 12 mm.

In certain embodiments, the focal length (f) for the partially cylindrical protrusion **605** can be expressed as:

$$f = \frac{R}{n-1},$$

where R is the radius of curvature of the partial cylinder **608** and n is the index of refraction of the material used. In certain embodiments, the radius of curvature can be between about 1.5 mm and about 2 mm. In another embodiment, the partially cylindrical protrusion **605** can include a material, such as nBK7 glass, with an index of refraction of around 1.5 at 1300 nm, which can provide focal lengths of between about 3 mm and about 4 mm.

A partially cylindrical protrusion **605** having a material with a higher index of refraction such as nSF11 glass (e.g., n=1.75 at 1300 nm) can provide a shorter focal length and possibly a smaller photodiode chip, but can also cause higher reflections due to the index of refraction mismatch with air. Many types of glass or plastic can be used with index of refraction values ranging from, for example, about 1.4 to about 1.9. The index of refraction of the material of the protrusion **605** can be chosen to improve or optimize the light focusing properties of the protrusion **605**. A plastic partially cylindrical protrusion **605** could provide the cheapest option in high volumes but can also have some undesired light absorption peaks at wavelengths higher than 1500 nm. Other focal lengths and materials having different indices of refraction can be used for the partially cylindrical protrusion **605**.

Placing a photodiode at a given distance below the partially cylindrical protrusion **605** can facilitate capturing some or all of the light traveling perpendicular to the lens within the active area of the photodiode (see FIG. **14**). Different sizes of the partially cylindrical protrusion **605** can use different sizes of photodiodes. The extension **610** added onto the bottom of the partial cylinder **608** is used in certain embodiments to increase the height of the partially cylindrical protrusion **605**. In an embodiment, the added height is such that the photodiodes are at or are approximately at the focal length of the partially cylindrical protrusion **605**. In an embodiment, the added height provides for greater thinning of the measurement site. In an embodiment, the added height assists in deflecting light piped through the sensor. This is because light piped around the sensor passes through the side walls of the added height without being directed toward the detectors. The extension **610** can also further facilitate the protrusion **605** increasing or maximizing the amount of light that is provided to the detectors. In some embodiments, the extension **610** can be omitted.

FIG. **6**E illustrates another view of the sensor **301***f* of FIG. **3**F, which includes an embodiment of a partially cylindrical protrusion **605***b*. Like the sensor **301**A shown in FIGS. **3**B and **3**C, the sensor **301***f* includes a finger bed **310***f*. The finger bed **310***f* includes a generally curved surface shaped generally to receive tissue, such as a human digit. The finger bed **310***f* also includes the ridges or channels **314** described above with respect to FIGS. **3**B and **3**C.

The example of finger bed **310***f* shown also includes the protrusion **605***b*, which includes the features of the protrusion **605** described above. In addition, the protrusion **605***b* also includes chamfered edges **607** on each end to provide a more comfortable surface for a finger to slide across (see

also FIG. **14**D). In another embodiment, the protrusion **605***b* could instead include a single chamfered edge **607** proximal to the ridges **314**. In another embodiment, one or both of the chamfered edges **607** could be rounded.

The protrusion **605***b* also includes a measurement site contact area **670** that can contact body tissue of a measurement site. The protrusion **605***b* can be removed from or integrated with the finger bed **310***f*. Interchangeable, differently shaped protrusions **605***b* can also be provided, which can correspond to different finger shapes, characteristics, opacity, sizes, or the like.

FIGS. **7**A and **7**B illustrate block diagrams of sensors **701** that include example arrangements of conductive glass or conductive coated glass for shielding. Advantageously, in certain embodiments, the shielding can provide increased SNR. The features of the sensors **701** can be implemented with any of the sensors **101**, **201**, **301** described above. Although not shown, the partially cylindrical protrusion **605** of FIG. **6** can also be used with the sensors **701** in certain embodiments.

For example, referring specifically to FIG. **7**A, the sensor **701***a* includes an emitter housing **704***a* and a detector housing **706**. The emitter housing **704***a* includes LEDs **104**. The detector housing **706***a* includes a tissue bed **710***a* with an opening or window **703***a*, the conductive glass **730***a*, and one or more photodiodes for detectors **106** provided on a submount **707***a*.

During operation, a finger **102** can be placed on the tissue bed **710***a* and optical radiation can be emitted from the LEDs **104**. Light can then be attenuated as it passes through or is reflected from the tissue of the finger **102**. The attenuated light can then pass through the opening **703***a* in the tissue bed **710***a*. Based on the received light, the detectors **106** can provide a detector signal **107**, for example, to the front end interface **108** (see FIG. **1**).

In the depicted embodiment, the conductive glass **730** is provided in the opening **703**. The conductive glass **730** can thus not only permit light from the finger to pass to the detectors **106**, but it can also supplement the shielding of the detectors **106** from noise. The conductive glass **730** can include a stack or set of layers. In FIG. **7**A, the conductive glass **730***a* is shown having a glass layer **731** proximate the finger **102** and a conductive layer **733** electrically coupled to the shielding **790***a*.

In an embodiment, the conductive glass **730***a* can be coated with a conductive, transparent or partially transparent material, such as a thin film of indium tin oxide (ITO). To supplement electrical shielding effects of a shielding enclosure **790***a*, the conductive glass **730***a* can be electrically coupled to the shielding enclosure **790***a*. The conductive glass **730***a* can be electrically coupled to the shielding **704***a* based on direct contact or via other connection devices, such as a wire or another component.

The shielding enclosure **790***a* can be provided to encompass the detectors **106** to reduce or prevent noise. For example, the shielding enclosure **790***a* can be constructed from a conductive material, such as copper, in the form of a metal cage. The shielding or enclosure a can include an opaque material to not only reduce electrical noise, but also ambient optical noise.

In some embodiments, the shielding enclosure **790***a* can be constructed in a single manufactured component with or without the use of conductive glass. This form of construction may be useful in order to reduce costs of manufacture as well as assist in quality control of the components. Furthermore, the shielding enclosure **790***a* can also be used

27
28

to house various other components, such as sigma delta components for various embodiments of front end interfaces **108**.

Referring to FIG. **7B**, another block diagram of an example sensor **701***b* is shown. A tissue bed **710***b* of the sensor **701***b* includes a protrusion **705***b*, which is in the form of a raised bump. The protrusion **705***b* can include all of the features of the protrusions or tissue shaping materials described above. For example, the protrusion **705***b* includes a contact area **370** that comes in contact with the finger **102** and which can include one or more openings **703***b*. One or more components of conductive glass **730***b* can be provided in the openings **703**. For example, in an embodiment, each of the openings **703** can include a separate window of the conductive glass **730***b*. In an embodiment, a single piece of the conductive glass **730***b* can used for some or all of the openings **703***b*. The conductive glass **730***b* is smaller than the conductive glass **730***a* in this particular embodiment.

A shielding enclosure **790***b* is also provided, which can have all the features of the shielding enclosure **790***a*. The shielding enclosure **790***b* is smaller than the shielding enclosure **790***a*; however, a variety of sizes can be selected for the shielding enclosure **790**.

In some embodiments, the shielding enclosure **790***b* can be constructed in a single manufactured component with or without the use of conductive glass. This form of construction may be useful in order to reduce costs of manufacture as well as assist in quality control of the components. Furthermore, the shielding enclosure **790***b* can also be used to house various other components, such as sigma delta components for various embodiments of front end interfaces **108**.

FIGS. **8A** through **8D** illustrate a perspective view, side views, and a bottom elevation view of the conductive glass described above with respect to the sensors **701***a*, **701***b*. As shown in the perspective view of FIG. **8A** and side view of FIG. **8B**, the conductive glass **730** includes the electrically conductive material **733** described above as a coating on the glass layer **731** described above to form a stack. In an embodiment where the electrically conductive material **733** includes indium tin oxide, surface resistivity of the electrically conductive material **733** can range approximately from 30 ohms per square inch to 500 ohms per square inch, or approximately 30, 200, or 500 ohms per square inch. As would be understood by a person of skill in the art from the present disclosure, other resistivities can also be used which are less than 30 ohms or more than 500 ohms. Other transparent, electrically conductive materials can be used as the material **733**.

Although the conductive material **733** is shown spread over the surface of the glass layer **731**, the conductive material **733** can be patterned or provided on selected portions of the glass layer **731**. Furthermore, the conductive material **733** can have uniform or varying thickness depending on a desired transmission of light, a desired shielding effect, and other considerations.

In FIG. **8C**, a side view of a conductive glass **830***a* is shown to illustrate an embodiment where the electrically conductive material **733** is provided as an internal layer between two glass layers **731**, **835**. Various combinations of integrating electrically conductive material **733** with glass are possible. For example, the electrically conductive material **733** can be a layer within a stack of layers. This stack of layers can include one or more layers of glass **731**, **835**, as well as one or more layers of conductive material **733**. The stack can include other layers of materials to achieve desired characteristics.

In FIG. **8D**, a bottom perspective view is shown to illustrate an embodiment where a conductive glass **830***b* can include conductive material **837** that occupies or covers a portion of a glass layer **839**. This embodiment can be useful, for example, to create individual, shielded windows for detectors **106**, such as those shown in FIG. **3C**. The conductive material **837** can be patterned to include an area **838** to allow light to pass to detectors **106** and one or more strips **841** to couple to the shielding **704** of FIG. **7**.

Other configurations and patterns for the conductive material can be used in certain embodiments, such as, for example, a conductive coating lining periphery edges, a conductive coating outlaid in a pattern including a grid or other pattern, a speckled conductive coating, coating outlaid in lines in either direction or diagonally, varied thicknesses from the center out or from the periphery in, or other suitable patterns or coatings that balance the shielding properties with transparency considerations.

FIG. **9** depicts an example graph **900** that illustrates comparative results obtained by an example sensor having components similar to those disclosed above with respect to FIGS. **7** and **8**. The graph **900** depicts the results of the percentage of transmission of varying wavelengths of light for different types of windows used in the sensors described above.

A line **915** on the graph **900** illustrates example light transmission of a window made from plain glass. As shown, the light transmission percentage of varying wavelengths of light is approximately 90% for a window made from plain glass. A line **920** on the graph **900** demonstrates an example light transmission percentage for an embodiment in which a window is made from glass having an ITO coating with a surface resistivity of 500 ohms per square inch. A line **925** on the graph **900** shows an example light transmission for an embodiment in which a window is made from glass that includes a coating of ITO oxide with a surface resistivity of 200 ohms per square inch. A line **930** on the graph **900** shows an example light transmission for an embodiment in which a window is made from glass that includes a coating of ITO oxide with a surface resistivity of 30 ohms per square inch.

The light transmission percentage for a window with currently available embedded wiring can have a light transmission percentage of approximately 70%. This lower percentage of light transmission can be due to the opacity of the wiring employed in a currently available window with wiring. Accordingly, certain embodiments of glass coatings described herein can employ, for example, ITO coatings with different surface resistivity depending on the desired light transmission, wavelengths of light used for measurement, desired shielding effect, and other criteria.

FIGS. **10A** through **10B** illustrate comparative noise floors of example implementations of the sensors described above. Noise can include optical noise from ambient light and electro-magnetic noise, for example, from surrounding electrical equipment. In FIG. **10A**, a graph **1000** depicts possible noise floors for different frequencies of noise for an embodiment in which one of the sensors described above included separate windows for four (4) detectors **106**. One or more of the windows included an embedded grid of wiring as a noise shield. Symbols **1030-1033** illustrate the noise floor performance for this embodiment. As can be seen, the noise floor performance can vary for each of the openings and based on the frequency of the noise.

In FIG. **10B**, a graph **1050** depicts a noise floor for frequencies of noise **1070** for an embodiment in which the sensor included separate openings for four (4) detectors **106**

Stay-Add-875

US 10,945,648 B2

29

30

and one or more windows that include an ITO coating. In this embodiment, a surface resistivity of the ITO used was about 500 ohms per square inch. Symbols **1080-1083** illustrate the noise floor performance for this embodiment. As can be seen, the noise floor performance for this embodiment can vary less for each of the openings and provide lower noise floors in comparison to the embodiment of FIG. **10A**.

FIG. **11A** illustrates an example structure for configuring the set of optical sources of the emitters described above. As shown, an emitter **104** can include a driver **1105**, a thermistor **1120**, a set of top-emitting LEDs **1102** for emitting red and/or infrared light, a set of side-emitting LEDs **1104** for emitting near infrared light, and a submount **1106**.

The thermistor **1120** can be provided to compensate for temperature variations. For example, the thermistor **1120** can be provided to allow for wavelength centroid and power drift of LEDs **1102** and **1104** due to heating. In addition, other thermistors can be employed, for example, to measure a temperature of a measurement site. The temperature can be displayed on a display device and used by a caregiver. Such a temperature can also be helpful in correcting for wavelength drift due to changes in water absorption, which can be temperature dependent, thereby providing more accurate data useful in detecting blood analytes like glucose. In addition, using a thermistor or other type of temperature sensitive device may be useful for detecting extreme temperatures at the measurement site that are too hot or too cold. The presence of low perfusion may also be detected, for example, when the finger of a patient has become too cold. Moreover, shifts in temperature at the measurement site can alter the absorption spectrum of water and other tissue in the measurement cite. A thermistor's temperature reading can be used to adjust for the variations in absorption spectrum changes in the measurement site.

The driver **1105** can provide pulses of current to the emitter **1104**. In an embodiment, the driver **1105** drives the emitter **1104** in a progressive fashion, for example, in an alternating manner based on a control signal from, for example, a processor (e.g., the processor **110**). For example, the driver **1105** can drive the emitter **1104** with a series of pulses to about 1 milliwatt (mW) for visible light to light at about 1300 nm and from about 40 mW to about 100 mW for light at about 1600 nm to about 1700 nm. However, a wide number of driving powers and driving methodologies can be used. The driver **1105** can be synchronized with other parts of the sensor and can minimize or reduce any jitter in the timing of pulses of optical radiation emitted from the emitter **1104**. In some embodiments, the driver **1105** is capable of driving the emitter **1104** to emit an optical radiation in a pattern that varies by less than about 10 parts-per-million; however other amounts of variation can be used.

The submount **1106** provides a support structure in certain embodiments for aligning the top-emitting LEDs **1102** and the side-emitting LEDs **1104** so that their optical radiation is transmitted generally towards the measurement site. In some embodiments, the submount **1106** is also constructed of aluminum nitride (AlN) or beryllium oxide (BEO) for heat dissipation, although other materials or combinations of materials suitable for the submount **1106** can be used.

FIG. **11B** illustrates a configuration of emitting optical radiation into a measurement site for measuring a blood constituent or analyte like glucose. In some embodiments, emitter **104** may be driven in a progressive fashion to minimize noise and increase SNR of sensor **101**. For example, emitter **104** may be driven based on a progression of power/current delivered to LEDs **1102** and **1104**.

In some embodiments, emitter **104** may be configured to emit pulses centered about 905 nm, about 1050 nm, about 1200 nm, about 1300 nm, about 1330 nm, about 1610 nm, about 1640 nm, and about 1665 nm. In another embodiment, the emitter **104** may emit optical radiation ranging from about 860 nm to about 950 nm, about 950 nm to about 1100 nm, about 1100 nm to about 1270 nm, about 1250 nm to about 1350 nm, about 1300 nm to about 1360 nm, and about 1590 nm to about 1700 nm. Of course, emitter **104** may be configured to transmit any of a variety of wavelengths of visible, or near-infrared optical radiation.

For purposes of illustration, FIG. **11B** shows a sequence of pulses of light at wavelengths of around 905 nm, around 1200 nm, around 1300 nm, and around 1330 nm from top emitting LEDs **1102**. FIG. **11B** also shows that emitter **104** may then emit pulses centered at around 1630 nm, around 1660 nm, and around 1615 nm from side emitting LEDs **1104**. Emitter **104** may be progressively driven at higher power/current. This progression may allow driver circuit **105** to stabilize in its operations, and thus, provide a more stable current/power to LEDs **1102** and **1104**.

For example, as shown in FIG. **11B**, the sequence of optical radiation pulses are shown having a logarithmic-like progression in power/current. In some embodiments, the timing of these pulses is based on a cycle of about 400 slots running at 48 kHz (e.g. each time slot may be approximately 0.02 ms or 20 microseconds). An artisan will recognize that term "slots" includes its ordinary meaning, which includes a time period that may also be expressed in terms of a frequency. In the example shown, pulses from top emitting LEDs **1102** may have a pulse width of about 40 time slots (e.g., about 0.8 ms) and an off period of about 4 time slots in between. In addition, pulses from side emitting LEDs **1104** (e.g., or a laser diode) may have a pulse width of about 60 time slots (e.g., about 1.25 ms) and a similar off period of about 4 time slots. A pause of about 70 time slots (e.g. about 1.5 ms) may also be provided in order to allow driver circuit **1105** to stabilize after operating at higher current/power.

As shown in FIG. **11B**, top emitting LEDs **1102** may be initially driven with a power to approximately 1 mW at a current of about 20-100 mA. Power in these LEDs may also be modulated by using a filter or covering of black dye to reduce power output of LEDs. In this example, top emitting LEDs **1102** may be driven at approximately 0.02 to 0.08 mW. The sequence of the wavelengths may be based on the current requirements of top emitting LEDs **502** for that particular wavelength. Of course, in other embodiments, different wavelengths and sequences of wavelengths may be output from emitter **104**.

Subsequently, side emitting LEDs **1104** may be driven at higher powers, such as about 40-100 mW and higher currents of about 600-800 mA. This higher power may be employed in order to compensate for the higher opacity of tissue and water in measurement site **102** to these wavelengths. For example, as shown, pulses at about 1630 nm, about 1660 nm, and about 1615 nm may be output with progressively higher power, such as at about 40 mW, about 50 mW, and about 60 mW, respectively. In this embodiment, the order of wavelengths may be based on the optical characteristics of that wavelength in tissue as well as the current needed to drive side emitting LEDs **1104**. For example, in this embodiment, the optical pulse at about 1615 nm is driven at the highest power due to its sensitivity in detecting analytes like glucose and the ability of light at this wavelength to penetrate tissue. Of course, different wavelengths and sequences of wavelengths may be output from emitter **104**.

US 10,945,648 B2

31                                                    32

As noted, this progression may be useful in some embodiments because it allows the circuitry of driver circuit **1105** to stabilize its power delivery to LEDs **1102** and **1104**. Driver circuit **1105** may be allowed to stabilize based on the duty cycle of the pulses or, for example, by configuring a variable waiting period to allow for stabilization of driver circuit **1105**. Of course, other variations in power/current and wavelength may also be employed in the present disclosure.

Modulation in the duty cycle of the individual pulses may also be useful because duty cycle can affect the signal noise ratio of the system **100**. That is, as the duty cycle is increased so may the signal to noise ratio.

Furthermore, as noted above, driver circuit **1105** may monitor temperatures of the LEDs **1102** and **1104** using the thermistor **1120** and adjust the output of LEDs **1102** and **1104** accordingly. Such a temperature may be to help sensor **101** correct for wavelength drift due to changes in water absorption, which can be temperature dependent.

FIG. 11C illustrates another exemplary emitter that may be employed in the sensor according to an embodiment of the disclosure. As shown, the emitter **104** can include components mounted on a substrate **1108** and on submount **1106**. In particular, top-emitting LEDs **1102** for emitting red and/or infrared light may be mounted on substrate **1108**. Side emitting LEDS **1104** may be mounted on submount **1106**. As noted, side-emitting LEDs **1104** may be included in emitter **104** for emitting near infrared light.

As also shown, the sensor of FIG. 11C may include a thermistor **1120**. As noted, the thermistor **1120** can be provided to compensate for temperature variations. The thermistor **1120** can be provided to allow for wavelength centroid and power drift of LEDs **1102** and **1104** due to heating. In addition, other thermistors (not shown) can be employed, for example, to measure a temperature of a measurement site. Such a temperature can be helpful in correcting for wavelength drift due to changes in water absorption, which can be temperature dependent, thereby providing more accurate data useful in detecting blood analytes like glucose.

In some embodiments, the emitter **104** may be implemented without the use of side emitting LEDs. For example, certain blood constituents, such as total hemoglobin, can be measured by embodiments of the disclosure without the use of side emitting LEDs. FIG. 11D illustrates another exemplary emitter that may be employed in the sensor according to an embodiment of the disclosure. In particular, an emitter **104** that is configured for a blood constituent, such as total hemoglobin, is shown. The emitter **104** can include components mounted on a substrate **1108**. In particular, top-emitting LEDs **1102** for emitting red and/or infrared light may be mounted on substrate **1108**.

As also shown, the emitter of FIG. 11D may include a thermistor **1120**. The thermistor **1120** can be provided to compensate for temperature variations. The thermistor **1120** can be provided to allow for wavelength centroid and power drift of LEDs **1102** due to heating.

FIG. 12A illustrates a detector submount **1200** having photodiode detectors that are arranged in a grid pattern on the detector submount **1200** to capture light at different quadrants from a measurement site. One detector submount **1200** can be placed under each window of the sensors described above, or multiple windows can be placed over a single detector submount **1200**. The detector submount **1200** can also be used with the partially cylindrical protrusion **605** described above with respect to FIG. **6**.

The detectors include photodiode detectors **1-4** that are arranged in a grid pattern on the submount **1200** to capture light at different quadrants from the measurement site. As noted, other patterns of photodiodes, such as a linear row, or logarithmic row, can also be employed in certain embodiments.

As shown, the detectors **1-4** may have a predetermined spacing from each other, or spatial relationship among one another that result in a spatial configuration. This configuration can be configured to purposefully create a variation of path lengths among detectors **106** and the point light source discussed above.

Detectors may hold multiple (e.g., two, three, four, etc.) photodiode arrays that are arranged in a two-dimensional grid pattern. Multiple photodiode arrays may also be useful to detect light piping (i.e., light that bypasses measurement site **102**). As shown, walls may separate the individual photodiode arrays to prevent mixing of light signals from distinct quadrants. In addition, as noted, the detectors may be covered by windows of transparent material, such as glass, plastic, etc., to allow maximum transmission of power light captured. As noted, this window may comprise some shielding in the form of an embedded grid of wiring, or a conductive layer or coating.

FIGS. 12B through 12D illustrate a simplified view of exemplary arrangements and spatial configurations of photodiodes for detectors **106**. As shown, detectors **106** may comprise photodiode detectors **1-4** that are arranged in a grid pattern on detector submount **1200** to capture light at different quadrants from measurement site **102**.

As noted, other patterns of photodiodes may also be employed in embodiments of the present disclosure, including, for example, stacked or other configurations recognizable to an artisan from the disclosure herein. For example, detectors **106** may be arranged in a linear array, a logarithmic array, a two-dimensional array, and the like. Furthermore, an artisan will recognize from the disclosure herein that any number of detectors **106** may be employed by embodiments of the present disclosure.

For example, as shown in FIG. 12B, detectors **106** may comprise photodiode detectors **1-4** that are arranged in a substantially linear configuration on submount **1200**. In this embodiment shown, photodiode detectors **1-4** are substantially equally spaced apart (e.g., where the distance D is substantially the same between detectors **1-4**).

In FIG. 12C, photodiode detectors **1-4** may be arranged in a substantially linear configuration on submount **1200**, but may employ a substantially progressive, substantially logarithmic, or substantially semi-logarithmic spacing (e.g., where distances D1>D2>D3). This arrangement or pattern may be useful for use on a patient's finger and where the thickness of the finger gradually increases.

In FIG. 12D, a different substantially grid pattern on submount **1200** of photodiode detectors **1-4** is shown. As noted, other patterns of detectors may also be employed in embodiments of the present invention.

FIGS. 12E through 12H illustrate several embodiments of photodiodes that may be used in detectors **106**. As shown in these figures, a photodiode **1202** of detector **106** may comprise a plurality of active areas **1204**. These active areas **204** may be coupled together via a common cathode **1206** or anode **1208** in order to provide a larger effective detection area.

In particular, as shown in FIG. 12E, photodiode **1202** may comprise two (2) active areas **1204**$a$ and **1204**$b$. In FIG. 12F, photodiode **1202** may comprise four (4) active areas **1204**$c$-$f$. In FIG. 12G, photodiode **1202** may comprise three (3)

33                                             34

active areas **1204***g-i*. In FIG. **12**H, photodiode **1202** may comprise nine (9) active areas **1204***j-r*. The use of smaller active areas may be useful because smaller active areas can be easier to fabricate and can be fabricated with higher purity. However, one skilled in the art will recognize that various sizes of active areas may be employed in the photodiode **1202**.

FIG. **13** illustrates an example multi-stream process **1300**. The multi-stream process **1300** can be implemented by the data collection system **100** and/or by any of the sensors described above. As shown, a control signal from a signal processor **1310** controls a driver **1305**. In response, an emitter **1304** generates a pulse sequence **1303** from its emitter (e.g., its LEDs) into a measurement site or sites **1302**. As described above, in some embodiments, the pulse sequence **1303** is controlled to have a variation of about 10 parts per million or less. Of course, depending on the analyte desired, the tolerated variation in the pulse sequence **1303** can be greater (or smaller).

In response to the pulse sequence **1300**, detectors **1** to n (n being an integer) in a detector **1306** capture optical radiation from the measurement site **1302** and provide respective streams of output signals. Each signal from one of detectors **1**-*n* can be considered a stream having respective time slots corresponding to the optical pulses from emitter sets **1**-*n* in the emitter **1304**. Although n emitters and n detectors are shown, the number of emitters and detectors need not be the same in certain implementations.

A front end interface **1308** can accept these multiple streams from detectors **1**-*n* and deliver one or more signals or composite signal(s) back to the signal processor **1310**. A stream from the detectors **1**-*n* can thus include measured light intensities corresponding to the light pulses emitted from the emitter **1304**.

The signal processor **1310** can then perform various calculations to measure the amount of glucose and other analytes based on these multiple streams of signals. In order to help explain how the signal processor **1310** can measure analytes like glucose, a primer on the spectroscopy employed in these embodiments will now be provided.

Spectroscopy is premised upon the Beer-Lambert law. According to this law, the properties of a material, e.g., glucose present in a measurement site, can be deterministically calculated from the absorption of light traveling through the material. Specifically, there is a logarithmic relation between the transmission of light through a material and the concentration of a substance and also between the transmission and the length of the path traveled by the light. As noted, this relation is known as the Beer-Lambert law.

The Beer-Lambert law is usually written as:

Absorbance $A = m*b*c$, where:

m is the wavelength-dependent molar absorptivity coefficient (usually expressed in units of $M^{-1}$ $cm^{-1}$);

b is the mean path length; and

c is the analyte concentration (e.g., the desired parameter).

In spectroscopy, instruments attempt to obtain the analyte concentration (c) by relating absorbance (A) to transmittance (T). Transmittance is a proportional value defined as:

$T = l/l_o$, where:

l is the light intensity measured by the instrument from the measurement site; and

$l_o$ is the initial light intensity from the emitter.

Absorbance (A) can be equated to the transmittance (T) by the equation:

$A = -\log T$

Therefore, substituting equations from above:

$A = -\log (l/l_o)$

In view of this relationship, spectroscopy thus relies on a proportional-based calculation of $-\log(l/l_o)$ and solving for analyte concentration (c).

Typically, in order to simplify the calculations, spectroscopy will use detectors that are at the same location in order to keep the path length (b) a fixed, known constant. In addition, spectroscopy will employ various mechanisms to definitively know the transmission power ($l_o$), such as a photodiode located at the light source. This architecture can be viewed as a single channel or single stream sensor, because the detectors are at a single location.

However, this scheme can encounter several difficulties in measuring analytes, such as glucose. This can be due to the high overlap of absorption of light by water at the wavelengths relevant to glucose as well as other factors, such as high self-noise of the components.

Embodiments of the present disclosure can employ a different approach that in part allows for the measurement of analytes like glucose. Some embodiments can employ a bulk, non-pulsatile measurement in order to confirm or validate a pulsatile measurement. In addition, both the non-pulsatile and pulsatile measurements can employ, among other things, the multi-stream operation described above in order to attain sufficient SNR. In particular, a single light source having multiple emitters can be used to transmit light to multiple detectors having a spatial configuration.

A single light source having multiple emitters can allow for a range of wavelengths of light to be used. For example, visible, infrared, and near infrared wavelengths can be employed. Varying powers of light intensity for different wavelengths can also be employed.

Secondly, the use of multiple-detectors in a spatial configuration allow for a bulk measurement to confirm or validate that the sensor is positioned correctly. This is because the multiple locations of the spatial configuration can provide, for example, topology information that indicates where the sensor has been positioned. Currently available sensors do not provide such information. For example, if the bulk measurement is within a predetermined range of values, then this can indicate that the sensor is positioned correctly in order to perform pulsatile measurements for analytes like glucose. If the bulk measurement is outside of a certain range or is an unexpected value, then this can indicate that the sensor should be adjusted, or that the pulsatile measurements can be processed differently to compensate, such as using a different calibration curve or adjusting a calibration curve. This feature and others allow the embodiments to achieve noise cancellation and noise reduction, which can be several times greater in magnitude that what is achievable by currently available technology.

In order to help illustrate aspects of the multi-stream measurement approach, the following example derivation is provided. Transmittance (T) can be expressed as:

$$T = e^{-m*b*c}$$

In terms of light intensity, this equation can also be rewritten as:

$$l/l_o = e^{-m*b*c}$$

Or, at a detector, the measured light (l) can be expressed as:

$$l = l_o * e^{-m*b*c}$$

As noted, in the present disclosure, multiple detectors (1 to n) can be employed, which results in $l_1 \ldots l_n$ streams of measurements. Assuming each of these detectors have their

35
36

own path lengths, $b_1 \ldots b_n$, from the light source, the measured light intensities can be expressed as:

$$I_n = I_o {}^* e^{-m {}^* b_n {}^* c}$$

The measured light intensities at any two different detectors can be referenced to each other. For example:

$$I_1/I_n = (I_o {}^* e^{-m b_1 c})/(I_{o1L} {}^* e^{-m b_n c})$$

As can be seen, the terms, $I_o$, cancel out and, based on exponent algebra, the equation can be rewritten as:

$$I_1/I_n = e^{-m(b_1 - b_n)c}$$

From this equation, the analyte concentration (c) can now be derived from bulk signals $I_1 \ldots I_n$ and knowing the respective mean path lengths $b_1$ and $b_n$. This scheme also allows for the cancelling out of $I_o$, and thus, noise generated by the emitter 1304 can be cancelled out or reduced. In addition, since the scheme employs a mean path length difference, any changes in mean path length and topological variations from patient to patient are easily accounted. Furthermore, this bulk-measurement scheme can be extended across multiple wavelengths. This flexibility and other features allow embodiments of the present disclosure to measure blood analytes like glucose.

For example, as noted, the non-pulsatile, bulk measurements can be combined with pulsatile measurements to more accurately measure analytes like glucose. In particular, the non-pulsatile, bulk measurement can be used to confirm or validate the amount of glucose, protein, etc. in the pulsatile measurements taken at the tissue at the measurement site(s) 1302. The pulsatile measurements can be used to measure the amount of glucose, hemoglobin, or the like that is present in the blood. Accordingly, these different measurements can be combined to thus determine analytes like blood glucose.

FIG. 14A illustrates an embodiment of a detector submount 1400a positioned beneath the partially cylindrical protrusion 605 of FIG. 6 (or alternatively, the protrusion 605b). The detector submount 1400a includes two rows 1408a of detectors 1410a. The partially cylindrical protrusion 605 can facilitate reducing the number and/or size of detectors used in a sensor because the protrusion 605 can act as a lens that focuses light onto a smaller area.

To illustrate, in some sensors that do not include the partially cylindrical protrusion 605, sixteen detectors can be used, including four rows of four detectors each. Multiple rows of detectors can be used to measure certain analytes, such as glucose or total hemoglobin, among others. Multiple rows of detectors can also be used to detect light piping (e.g., light that bypasses the measurement site). However, using more detectors in a sensor can add cost, complexity, and noise to the sensor.

Applying the partially cylindrical protrusion 605 to such a sensor, however, could reduce the number of detectors or rows of detectors used while still receiving the substantially same amount of light, due to the focusing properties of the protrusion 605 (see FIG. 14B). This is the example situation illustrated in FIG. 14—two rows 1408a of detectors 1410a are used instead of four. Advantageously, in certain embodiments, the resulting sensor can be more cost effective, have less complexity, and have an improved SNR, due to fewer and/or smaller photodiodes.

In other embodiments, using the partially cylindrical protrusion 605 can allow the number of detector rows to be reduced to one or three rows of four detectors. The number of detectors in each row can also be reduced. Alternatively, the number of rows might not be reduced but the size of the detectors can be reduced. Many other configurations of detector rows and sizes can also be provided.

FIG. 14B depicts a front elevation view of the partially cylindrical protrusion 605 (or alternatively, the protrusion 605b) that illustrates how light from emitters (not shown) can be focused by the protrusion 605 onto detectors. The protrusion 605 is placed above a detector submount 1400b having one or more detectors 1410b disposed thereon. The submount 1400b can include any number of rows of detectors 1410, although one row is shown.

Light, represented by rays 1420, is emitted from the emitters onto the protrusion 605. These light rays 1420 can be attenuated by body tissue (not shown). When the light rays 1420 enter the protrusion 605, the protrusion 605 acts as a lens to refract the rays into rays 1422. This refraction is caused in certain embodiments by the partially cylindrical shape of the protrusion 605. The refraction causes the rays 1422 to be focused or substantially focused on the one or more detectors 1410b. Since the light is focused on a smaller area, a sensor including the protrusion 605 can include fewer detectors to capture the same amount of light compared with other sensors.

FIG. 14C illustrates another embodiment of a detector submount 1400c, which can be disposed under the protrusion 605b (or alternatively, the protrusion 605). The detector submount 1400c includes a single row 1408c of detectors 1410c. The detectors are electrically connected to conductors 1412c, which can be gold, silver, copper, or any other suitable conductive material.

The detector submount 1400c is shown positioned under the protrusion 605b in a detector subassembly 1450 illustrated in FIG. 14D. A top-down view of the detector subassembly 1450 is also shown in FIG. 14E. In the detector subassembly 1450, a cylindrical housing 1430 is disposed on the submount 1400c. The cylindrical housing 1430 includes a transparent cover 1432, upon which the protrusion 605b is disposed. Thus, as shown in FIG. 14D, a gap 1434 exists between the detectors 1410c and the protrusion 605b. The height of this gap 1434 can be chosen to increase or maximize the amount of light that impinges on the detectors 1410c.

The cylindrical housing 1430 can be made of metal, plastic, or another suitable material. The transparent cover 1432 can be fabricated from glass or plastic, among other materials. The cylindrical housing 1430 can be attached to the submount 1400c at the same time or substantially the same time as the detectors 1410c to reduce manufacturing costs. A shape other than a cylinder can be selected for the housing 1430 in various embodiments.

In certain embodiments, the cylindrical housing 1430 (and transparent cover 1432) forms an airtight or substantially airtight or hermetic seal with the submount 1400c. As a result, the cylindrical housing 1430 can protect the detectors 1410c and conductors 1412c from fluids and vapors that can cause corrosion. Advantageously, in certain embodiments, the cylindrical housing 1430 can protect the detectors 1410c and conductors 1412c more effectively than currently-available resin epoxies, which are sometimes applied to solder joints between conductors and detectors.

In embodiments where the cylindrical housing 1430 is at least partially made of metal, the cylindrical housing 1430 can provide noise shielding for the detectors 1410c. For example, the cylindrical housing 1430 can be soldered to a ground connection or ground plane on the submount 1400c, which allows the cylindrical housing 1430 to reduce noise. In another embodiment, the transparent cover 1432 can include a conductive material or conductive layer, such as

US 10,945,648 B2

37                                                          38

conductive glass or plastic. The transparent cover **1432** can include any of the features of the noise shields **790** described above.

The protrusion **605***b* includes the chamfered edges **607** described above with respect to FIG. 6E. These chamfered edges **607** can allow a patient to more comfortably slide a finger over the protrusion **605***b* when inserting the finger into the sensor **301***f*.

FIG. 14F illustrates a portion of the detector shell **306***f*, which includes the detectors **1410***c* on the substrate **1400***c*. The substrate **1400***c* is enclosed by a shielding enclosure **1490**, which can include the features of the shielding enclosures **790***a*, **790***b* described above (see also FIG. **17**). The shielding enclosure **1490** can be made of metal. The shielding enclosure **1490** includes a window **1492***a* above the detectors **1410***c*, which allows light to be transmitted onto the detectors **1410***c*.

A noise shield **1403** is disposed above the shielding enclosure **1490**. The noise shield **1403**, in the depicted embodiment, includes a window **1492***a* corresponding to the window **1492***a*. Each of the windows **1492***a*, **1492***b* can include glass, plastic, or can be an opening without glass or plastic. In some embodiments, the windows **1492***a*, **1492***b* may be selected to have different sizes or shapes from each other.

The noise shield **1403** can include any of the features of the conductive glass described above. In the depicted embodiment, the noise shield **1403** extends about three-quarters of the length of the detector shell **306***f*. In other embodiments, the noise shield **1403** could be smaller or larger. The noise shield **1403** could, for instance, merely cover the detectors **1410***c*, the submount **1400***c*, or a portion thereof. The noise shield **1403** also includes a stop **1413** for positioning a measurement site within the sensor **301***f*. Advantageously, in certain embodiments, the noise shield **1403** can reduce noise caused by light piping.

A thermistor **1470** is also shown. The thermistor **1470** is attached to the submount **1400***c* and protrudes above the noise shield **1403**. As described above, the thermistor **1470** can be employed to measure a temperature of a measurement site. Such a temperature can be helpful in correcting for wavelength drift due to changes in water absorption, which can be temperature dependent, thereby providing more accurate data useful in detecting blood analytes like glucose.

In the depicted embodiment, the detectors **1410***c* are not enclosed in the cylindrical housing **1430**. In an alternative embodiment, the cylindrical housing **1430** encloses the detectors **1410***c* and is disposed under the noise shield **1403**. In another embodiment, the cylindrical housing **1430** encloses the detectors **1410***c* and the noise shield **1403** is not used. If both the cylindrical housing **1403** and the noise shield **1403** are used, either or both can have noise shielding features.

FIG. 14G illustrates the detector shell **306***f* of FIG. 14F, with the finger bed **310***f* disposed thereon. FIG. 14H illustrates the detector shell **306***f* of FIG. 14G, with the protrusion **605***b* disposed in the finger bed **310***f*.

FIG. 14I illustrates a cutaway view of the sensor **301***f*. Not all features of the sensor **301***f* are shown, such as the protrusion **605***b*. Features shown include the emitter and detector shells **304***f*, **306***f*, the flaps **307***f*, the heat sink **350***f* and fins **351***f*, the finger bed **310***f*, and the noise shield **1403**.

In addition to these features, emitters **1404** are depicted in the emitter shell **304***f*. The emitters **1404** are disposed on a submount **1401**, which is connected to a circuit board **1419**. The emitters **1404** are also enclosed within a cylindrical

housing **1480**. The cylindrical housing **1480** can include all of the features of the cylindrical housing **1430** described above. For example, the cylindrical housing **1480** can be made of metal, can be connected to a ground plane of the submount **1401** to provide noise shielding, and can include a transparent cover **1482**.

The cylindrical housing **1480** can also protect the emitters **1404** from fluids and vapors that can cause corrosion. Moreover, the cylindrical housing **1480** can provide a gap between the emitters **1404** and the measurement site (not shown), which can allow light from the emitters **1404** to even out or average out before reaching the measurement site.

The heat sink **350***f*, in addition to including the fins **351***f*, includes a protuberance **352***f* that extends down from the fins **351***f* and contacts the submount **1401**. The protuberance **352***f* can be connected to the submount **1401**, for example, with thermal paste or the like. The protuberance **352***f* can sink heat from the emitters **1404** and dissipate the heat via the fins **351***f*.

FIGS. **15**A and **15**B illustrate embodiments of sensor portions **1500**A, **15008** that include alternative heat sink features to those described above. These features can be incorporated into any of the sensors described above. For example, any of the sensors above can be modified to use the heat sink features described below instead of or in addition to the heat sink features of the sensors described above.

The sensor portions **1500**A, **1500**B shown include LED emitters **1504**; however, for ease of illustration, the detectors have been omitted. The sensor portions **1500**A, **1500**B shown can be included, for example, in any of the emitter shells described above.

The LEDs **1504** of the sensor portions **1500**A, **1500**B are connected to a substrate or submount **1502**. The submount **1502** can be used in place of any of the submounts described above. The submount **1502** can be a non-electrically conducting material made of any of a variety of materials, such as ceramic, glass, or the like. A cable **1512** is attached to the submount **1502** and includes electrical wiring **1514**, such as twisted wires and the like, for communicating with the LEDs **1504**. The cable **1512** can correspond to the cables **212** described above.

Although not shown, the cable **1512** can also include electrical connections to a detector. Only a portion of the cable **1512** is shown for clarity. The depicted embodiment of the cable **1512** includes an outer jacket **1510** and a conductive shield **1506** disposed within the outer jacket **1510**. The conductive shield **1506** can be a ground shield or the like that is made of a metal such as braided copper or aluminum. The conductive shield **1506** or a portion of the conductive shield **1506** can be electrically connected to the submount **1502** and can reduce noise in the signal generated by the sensor **1500**A, **15008** by reducing RF coupling with the wires **1514**. In alternative embodiments, the cable **1512** does not have a conductive shield. For example, the cable **1512** could be a twisted pair cable or the like, with one wire of the twisted pair used as a heat sink.

Referring specifically to FIG. **15**A, in certain embodiments, the conductive shield **1506** can act as a heat sink for the LEDs **1504** by absorbing thermal energy from the LEDs **1504** and/or the submount **1502**. An optional heat insulator **1520** in communication with the submount **1502** can also assist with directing heat toward the conductive shield **1506**. The heat insulator **1520** can be made of plastic or another suitable material. Advantageously, using the conductive shield **1506** in the cable **1512** as a heat sink can, in certain embodiments, reduce cost for the sensor.

US 10,945,648 B2

39                                                40

Referring to FIG. 15B, the conductive shield 1506 can be attached to both the submount 1502 and to a heat sink layer 1530 sandwiched between the submount 1502 and the optional insulator 1520. Together, the heat sink layer 1530 and the conductive shield 1506 in the cable 1512 can absorb at least part of the thermal energy from the LEDs and/or the submount 1502.

FIGS. 15C and 15D illustrate implementations of a sensor portion 1500C that includes the heat sink features of the sensor portion 1500A described above with respect to FIG. 15A. The sensor portion 1500C includes the features of the sensor portion 1500A, except that the optional insulator 1520 is not shown. FIG. 15D is a side cutaway view of the sensor portion 1500C that shows the emitters 1504.

The cable 1512 includes the outer jacket 1510 and the conductive shield 1506. The conductive shield 1506 is soldered to the submount 1502, and the solder joint 1561 is shown. In some embodiments, a larger solder joint 1561 can assist with removing heat more rapidly from the emitters 1504. Various connections 1563 between the submount 1502 and a circuit board 1519 are shown. In addition, a cylindrical housing 1580, corresponding to the cylindrical housing 1480 of FIG. 14I, is shown protruding through the circuit board 1519. The emitters 1504 are enclosed in the cylindrical housing 1580.

FIGS. 15E and 15F illustrate implementations of a sensor portion 1500E that includes the heat sink features of the sensor portion 1500B described above with respect to FIG. 15B. The sensor portion 1500E includes the heat sink layer 1530. The heat sink layer 1530 can be a metal plate, such as a copper plate or the like. The optional insulator 1520 is not shown. FIG. 15F is a side cutaway view of the sensor portion 1500E that shows the emitters 1504.

In the depicted embodiment, the conductive shield 1506 of the cable 1512 is soldered to the heat sink layer 1530 instead of the submount 1502. The solder joint 1565 is shown. In some embodiments, a larger solder joint 1565 can assist with removing heat more rapidly from the emitters 1504. Various connections 1563 between the submount 1502 and a circuit board 1519 are shown. In addition, the cylindrical housing 1580 is shown protruding through the circuit board 1519. The emitters 1504 are enclosed in the cylindrical housing 1580.

FIGS. 15G and 15H illustrate embodiments of connector features that can be used with any of the sensors described above with respect to FIGS. 1 through 15F. Referring to FIG. 15G, the circuit board 1519 includes a female connector 1575 that mates with a male connector 1577 connected to a daughter board 1587. The daughter board 1587 includes connections to the electrical wiring 1514 of the cable 1512. The connected boards 1519, 1587 are shown in FIG. 15H. Also shown is a hole 1573 that can receive the cylindrical housing 1580 described above.

Advantageously, in certain embodiments, using a daughter board 1587 to connect to the circuit board 1519 can enable connections to be made more easily to the circuit board 1519. In addition, using separate boards can be easier to manufacture than a single circuit board 1519 with all connections soldered to the circuit board 1519.

FIG. 15I illustrates an exemplary architecture for front-end interface 108 as a transimpedance-based front-end. As noted, front-end interfaces 108 provide an interface that adapts the output of detectors 106 into a form that can be handled by signal processor 110. As shown in this figure, sensor 101 and front-end interfaces 108 may be integrated together as a single component, such as an integrated circuit. Of course, one skilled in the art will recognize that sensor

101 and front end interfaces 108 may comprise multiple components or circuits that are coupled together.

Front-end interfaces 108 may be implemented using transimpedance amplifiers that are coupled to analog to digital converters in a sigma delta converter. In some embodiments, a programmable gain amplifier (PGA) can be used in combination with the transimpedance-based front-ends. For example, the output of a transimpedance-based front-end may be output to a sigma-delta ADC that comprises a PGA. A PGA may be useful in order to provide another level of amplification and control of the stream of signals from detectors 106. The PGA may be an integrated circuit or built from a set of micro-relays. Alternatively, the PGA and ADC components in converter 900 may be integrated with the transimpedance-based front-end in sensor 101.

Due to the low-noise requirements for measuring blood analytes like glucose and the challenge of using multiple photodiodes in detector 106, the applicants developed a noise model to assist in configuring front-end 108. Conventionally, those skilled in the art have focused on optimizing the impedance of the transimpedance amplifiers to minimize noise.

However, the following noise model was discovered by the applicants:

$$\text{Noise} = \sqrt{aR + bR^2}, \text{ where:}$$

aR is characteristic of the impedance of the transimpedance amplifier; and

$bR^2$ is characteristic of the impedance of the photodiodes in detector and the number of photodiodes in detector 106.

The foregoing noise model was found to be helpful at least in part due to the high SNR required to measure analytes like glucose. However, the foregoing noise model was not previously recognized by artisans at least in part because, in conventional devices, the major contributor to noise was generally believed to originate from the emitter or the LEDs. Therefore, artisans have generally continued to focus on reducing noise at the emitter.

However, for analytes like glucose, the discovered noise model revealed that one of the major contributors to noise was generated by the photodiodes. In addition, the amount of noise varied based on the number of photodiodes coupled to a transimpedance amplifier. Accordingly, combinations of various photodiodes from different manufacturers, different impedance values with the transimpedance amplifiers, and different numbers of photodiodes were tested as possible embodiments.

In some embodiments, different combinations of transimpedance to photodiodes may be used. For example, detectors 1-4 (as shown, e.g., in FIG. 12A) may each comprise four photodiodes. In some embodiments, each detector of four photodiodes may be coupled to one or more transimpedance amplifiers. The configuration of these amplifiers may be set according to the model shown in FIG. 15J.

Alternatively, each of the photodiodes may be coupled to its own respective transimpedance amplifier. For example, transimpedance amplifiers may be implemented as integrated circuits on the same circuit board as detectors 1-4. In this embodiment, the transimpedance amplifiers may be grouped into an averaging (or summing) circuit, which are known to those skilled in the art, in order to provide an output stream from the detector. The use of a summing amplifier to combine outputs from several transimpedance amplifiers into a single, analog signal may be helpful in improving the SNR relative to what is obtainable from a single transimpedance amplifier. The configuration of the

US 10,945,648 B2

41 42

transimpedance amplifiers in this setting may also be set according to the model shown in FIG. **15**J.

As yet another alternative, as noted above with respect to FIGS. **12**E through **12**H, the photodiodes in detectors **106** may comprise multiple active areas that are grouped together. In some embodiments, each of these active areas may be provided its own respective transimpedance. This form of pairing may allow a transimpedance amplifier to be better matched to the characteristics of its corresponding photodiode or active area of a photodiode.

As noted, FIG. **15**J illustrates an exemplary noise model that may be useful in configuring transimpedance amplifiers. As shown, for a given number of photodiodes and a desired SNR, an optimal impedance value for a transimpedance amplifier could be determined.

For example, an exemplary "4 PD per stream" sensor **1502** is shown where detector **106** comprises four photodiodes **1502**. The photodiodes **1502** are coupled to a single transimpedance amplifier **1504** to produce an output stream **1506**. In this example, the transimpedance amplifier comprises 10 MΩ resistors **1508** and **1510**. Thus, output stream **1506** is produced from the four photodiodes (PD) **1502**. As shown in the graph of FIG. **15**J, the model indicates that resistance values of about 10 MΩ may provide an acceptable SNR for analytes like glucose.

However, as a comparison, an exemplary "1 PD per stream" sensor **1512** is also shown in FIG. **15**J. In particular, sensor **1512** may comprise a plurality of detectors **106** that each comprises a single photodiode **1514**. In addition, as shown for this example configuration, each of photodiodes **1514** may be coupled to respective transimpedance amplifiers **1516**, e.g., 1 PD per stream. Transimpedance amplifiers are shown having 40 MΩ resistors **1518**. As also shown in the graph of FIG. **15**J, the model illustrates that resistance values of 40 MΩ for resistors **1518** may serve as an alternative to the 4 photodiode per stream architecture of sensor **1502** described above and yet still provide an equivalent SNR.

Moreover, the discovered noise model also indicates that utilizing a 1 photodiode per stream architecture like that in sensor **1512** may provide enhanced performance because each of transimpedance amplifiers **1516** can be tuned or optimized to its respective photodiodes **1518**. In some embodiments, an averaging component **1520** may also be used to help cancel or reduce noise across photodiodes **1518**.

For purposes of illustration, FIG. **15**K shows different architectures (e.g., four PD per stream and one PD per stream) for various embodiments of a sensor and how components of the sensor may be laid out on a circuit board or substrate. For example, sensor **1522** may comprise a "4 PD per stream" architecture on a submount **700** in which each detector **106** comprises four (4) photodiodes **1524**. As shown for sensor **1522**, the output of each set of four photodiodes **1524** is then aggregated into a single transimpedance amplifier **1526** to produce a signal.

As another example, a sensor **1528** may comprise a "1 PD per stream" architecture on submount **700** in which each detector **106** comprises four (4) photodiodes **1530**. In sensor **1528**, each individual photodiode **1530** is coupled to a respective transimpedance amplifier **1532**. The output of the amplifiers **1532** may then be aggregated into averaging circuit **1520** to produce a signal.

As noted previously, one skilled in the art will recognize that the photodiodes and detectors may be arranged in different fashions to optimize the detected light. For example, sensor **1534** illustrates an exemplary "4 PD per stream" sensor in which the detectors **106** comprise photo-diodes **1536** arranged in a linear fashion. Likewise, sensor **1538** illustrates an exemplary "1 PD per stream" sensor in which the detectors comprise photodiodes **1540** arranged in a linear fashion.

Alternatively, sensor **1542** illustrates an exemplary "4 PD per stream" sensor in which the detectors **106** comprise photodiodes **1544** arranged in a two-dimensional pattern, such as a zig-zag pattern. Sensor **1546** illustrates an exemplary "1 PD per stream" sensor in which the detectors comprise photodiodes **1548** also arranged in a zig-zag pattern.

FIG. **15**L illustrates an exemplary architecture for a switched-capacitor-based front-end. As shown, front-end interfaces **108** may be implemented using switched capacitor circuits and any number of front-end interfaces **108** may be implemented. The output of these switched capacitor circuits may then be provided to a digital interface **1000** and signal processor **110**. Switched capacitor circuits may be useful in system **100** for their resistor free design and analog averaging properties. In particular, the switched capacitor circuitry provides for analog averaging of the signal that allows for a lower smaller sampling rate (e.g., 2 KHz sampling for analog versus 48 KHz sampling for digital designs) than similar digital designs. In some embodiments, the switched capacitor architecture in front end interfaces **108** may provide a similar or equivalent SNR to other front end designs, such as a sigma delta architecture. In addition, a switched capacitor design in front end interfaces **108** may require less computational power by signal processor **110** to perform the same amount of decimation to obtain the same SNR.

FIGS. **16**A and **16**B illustrate embodiments of disposable optical sensors **1600**. In an embodiment, any of the features described above, such as protrusion, shielding, and/or heat sink features, can be incorporated into the disposable sensors **1600** shown. For instance, the sensors **1600** can be used as the sensors **101** in the system **100** described above with respect to FIG. **1**. Moreover, any of the features described above, such as protrusion, shielding, and/or heat sink features, can be implemented in other disposable sensor designs that are not depicted herein.

The sensors **1600** include an adult/pediatric sensor **1610** for finger placement and a disposable infant/neonate sensor **1602** configured for toe, foot or hand placement. Each sensor **1600** has a tape end **1610** and an opposite connector end **1620** electrically and mechanically interconnected via a flexible coupling **1630**. The tape end **1610** attaches an emitter and detector to a tissue site. Although not shown, the tape end **1610** can also include any of the protrusion, shielding, and/or heat sink features described above. The emitter illuminates the tissue site and the detector generates a sensor signal responsive to the light after tissue absorption, such as absorption by pulsatile arterial blood flow within the tissue site.

The sensor signal is communicated via the flexible coupling **1630** to the connector end **1620**. The connector end **1620** can mate with a cable (not shown) that communicates the sensor signal to a monitor (not shown), such as any of the cables or monitors shown above with respect to FIGS. **2**A through **2**D. Alternatively, the connector end **1620** can mate directly with the monitor.

FIG. **17** illustrates an exploded view of certain of the components of the sensor **301**' described above. A heat sink **1751** and a cable **1781** attach to an emitter shell **1704**. The emitter shell attaches to a flap housing **1707**. The flap housing **1707** includes a receptacle **1709** to receive a cylin-

US 10,945,648 B2

43      44

drical housing **1480/1580** (not shown) attached to an emitter submount **1702**, which is attached to a circuit board **1719**.

A spring **1787** attaches to a detector shell **1706** via pins **1783**, **1785**, which hold the emitter and detector shells **1704**, **1706** together. A support structure **1791** attaches to the detector shell **1706**, which provides support for a shielding enclosure **1790**. A noise shield **1713** attaches to the shielding enclosure **1790**. A detector submount **1700** is disposed inside the shielding enclosure **1790**. A finger bed **1710** provides a surface for placement of the patient's finger. Finger bed **1710** may comprise a gripping surface or gripping features, which may assist in placing and stabilizing a patient's finger in the sensor. A partially cylindrical protrusion **1705** may also be disposed in the finger bed **1710**. As shown, finger bed **1710** attaches to the noise shield **1703**. The noise shield **1703** may be configured to reduce noise, such as from ambient light and electromagnetic noise. For example, the noise shield **1703** may be constructed from materials having an opaque color, such as black or a dark blue, to prevent light piping.

Noise shield **1703** may also comprise a thermistor **1712**. The thermistor **1712** may be helpful in measuring the temperature of a patient's finger. For example, the thermistor **1712** may be useful in detecting when the patient's finger is reaching an unsafe temperature that is too hot or too cold. In addition, the temperature of the patient's finger may be useful in indicating to the sensor the presence of low perfusion as the temperature drops. In addition, the thermistor **1712** may be useful in detecting a shift in the characteristics of the water spectrum in the patient's finger, which can be temperature dependent.

Moreover, a flex circuit cover **1706** attaches to the pins **1783**, **1785**. Although not shown, a flex circuit can also be provided that connects the circuit board **1719** with the submount **1700** (or a circuit board to which the submount **1700** is connected). A flex circuit protector **1760** may be provided to provide a barrier or shield to the flex circuit (not shown). In particular, the flex circuit protector **1760** may also prevent any electrostatic discharge to or from the flex circuit. The flex circuit protector **1760** may be constructed from well known materials, such as a plastic or rubber materials.

FIG. **18** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a pure water ex-vivo sample. In particular, ten samples were prepared that ranged from 0-55 mg/dL. Two samples were used as a training set and eight samples were then used as a test population. As shown, embodiments of the sensor **101** were able to obtain at least a standard deviation of 13 mg/dL in the training set and 11 mg/dL in the test population.

FIG. **19** shows the results obtained by an exemplary sensor **101** of the present disclosure that was configured for measuring glucose. This sensor **101** was tested using a turbid ex-vivo sample. In particular, 25 samples of water/glucose/ Liposyn were prepared that ranged from 0-55 mg/dL. Five samples were used as a training set and 20 samples were then used as a test population. As shown, embodiments of sensor **101** were able to obtain at least a standard deviation of 37 mg/dL in the training set and 32 mg/dL in the test population.

FIGS. **20** through **22** shows other results that can be obtained by an embodiment of system **100**. In FIG. **20**, **150** blood samples from two diabetic adult volunteers were collected over a 10-day period. Invasive measurements were taken with a YSI glucometer to serve as a reference measurement. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs and four independent detector streams. As shown, the system **100** obtained a correlation of about 85% and Arms of about 31 mg/dL.

In FIG. **21**, **34** blood samples were taken from a diabetic adult volunteer collected over a 2-day period. Invasive measurements were also taken with a glucometer for comparison. Noninvasive measurements were then taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector streams from detectors **106**. As shown, the system **100** was able to attain a correlation of about 90% and Arms of about 22 mg/dL.

The results shown in FIG. **22** relate to total hemoglobin testing with an exemplary sensor **101** of the present disclosure. In particular, 47 blood samples were collected from nine adult volunteers. Invasive measurements were then taken with a CO-oximeter for comparison. Noninvasive measurements were taken with an embodiment of system **100** that comprised four LEDs in emitter **104** and four independent detector channels from detectors **106**. Measurements were averaged over 1 minute. As shown, the testing resulted in a correlation of about 93% and Arms of about 0.8 mg/dL.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

While certain embodiments of the inventions disclosed herein have been described, these embodiments have been presented by way of example only, and are not intended to limit the scope of the inventions disclosed herein. Indeed, the novel methods and systems described herein can be embodied in a variety of other forms; furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein can be made without departing from the spirit of the inventions disclosed herein. The claims and their equivalents are intended to cover such forms or modifications as would fall within the scope and spirit of certain of the inventions disclosed herein.

What is claimed is:

**1**. A user-worn device configured to non-invasively determine measurements of physiological parameter of a user, the user-worn device comprising:

a plurality of light emitting diodes (LEDs);

four photodiodes configured to receive light emitted by the LEDs, the four photodiodes being arranged to capture light at different quadrants of tissue of a user;

a protrusion comprising a convex surface and a plurality of openings extending through the protrusion, the openings arranged over the photodiodes and configured to allow light to pass through the protrusion to the photodiodes; and

one or more processors configured to receive one or more signals from at least one of the photodiodes and determine measurements of oxygen saturation of the user.

**2**. The user-worn device of claim **1**, wherein the one or more processors are further configured to process the one or

45

more signals to determine a bulk measurement indicating a positioning of the user-worn device.

**3**. The user-worn device of claim **1** further comprising optically transparent glass windows, each window extending across a different one of the openings.

**4**. The user-worn device of claim **1**, wherein the plurality of LEDs and the photodiodes are positioned on a same side of tissue of the user.

**5**. The user-worn device of claim **1**, wherein the protrusion further comprises an opaque material, and wherein the one or more signals are substantially free of noise caused by light piping.

**6**. A user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes arranged on a surface and configured to receive light after at least a portion of the light has been attenuated by tissue of a user;

a protrusion arranged above the surface, the protrusion comprising a convex surface including windows, the windows extending across the four photodiodes, wherein light passes through the protrusion to the four photodiodes via at least the windows;

a thermistor configured to provide a temperature signal; and

one or more processors configured to:

receive one or more signals from at least one of the photodiodes;

receive the temperature signal; and

adjust operation of the user-worn device responsive to the temperature signal.

**7**. The user-worn device of claim **6**, wherein the protrusion further comprises an opaque material, the opaque material extending from the convex surface of the protrusion to an interior surface of the protrusion opposite the convex surface.

**8**. A user-worn device configured to non-invasively determine measurements of a physiological parameter of a user, the user-worn device comprising:

a first set of light emitting diodes (LEDs), the first set comprising at least an LED configured to emit light at a first wavelength and at least an LED configured to emit light at a second wavelength;

a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength;

four photodiodes;

a protrusion comprising a convex surface, at least a portion of the protrusion comprising an opaque material;

a plurality of openings provided through the protrusion and the convex surface, the openings aligned with the photodiodes;

a separate optically transparent window extending across each of the openings;

one or more processors configured to receive one or more signals from at least one of the photodiodes and output measurements of a physiological parameter of a user;

46

a housing; and

a strap configured to position the housing proximate tissue of the user when the device is worn.

**9**. The user-worn device of claim **8** further comprising a network interface configured to wirelessly communicate the measurements of the physiological parameter to at least one of a mobile phone or a computer network.

**10**. The user-worn device of claim **9** further comprising a user interface including a touch-screen display configured to display indicia responsive to the measurements of the physiological parameter.

**11**. The user-worn device of claim **10**, wherein an orientation of the user interface is configurable responsive to a user input.

**12**. The user-worn device of claim **8**, wherein the physiological parameter comprises oxygen or oxygen saturation.

**13**. The user-worn device of claim **8** further comprising a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

**14**. The user-worn device of claim **8**, wherein the physiological parameter comprises pulse rate.

**15**. The user-worn device of claim **8** further comprising a thermistor.

**16**. The user-worn device of claim **8**, wherein the openings are configured to prevent light piping.

**17**. The user-worn device of claim **8**, wherein the housing hermetically seals at least a portion of an interior of the user-worn device.

**18**. The user-worn device of claim **8**, wherein the windows comprise a conductive material.

**19**. The user-worn device of claim **8**, wherein the windows are arranged on the protrusion configured to be in contact with tissue of the user.

**20**. A user-worn device configured to non-invasively determine measurements of a user's tissue, the user-worn device comprising:

a plurality of light emitting diodes (LEDs);

at least four photodiodes configured to receive light emitted by the LEDs, the four photodiodes being arranged to capture light at different quadrants of tissue of a user;

a protrusion comprising a convex surface and a plurality of through holes, each through hole including a window and arranged over a different one of the at least four photodiodes; and

one or more processors configured to receive one or more signals from at least one of the photodiodes and determine measurements of oxygen saturation of the user.

**21**. The user-worn device of claim **20**, wherein the one or more processors are further configured to process the one or more signals to determine a bulk measurement indicating a positioning of the user-worn device.

**22**. The user-worn device of claim **20**, wherein the plurality of LEDs and the photodiodes are positioned on a same side of the user's tissue.

**23**. The user-worn device of claim **20**, wherein the one or more signals are substantially free of noise caused by light piping.

**24**. The user-worn device of claim **20**, wherein the protrusion comprises opaque material configured to substantially prevent light piping.

**25**. The user-worn device of claim **20**, further comprising gaps between the photodiodes and the windows.

**26**. The user-worn device of claim **20**, wherein the photodiodes are arranged in a quadrant configuration.

**27**. The user-worn device of claim **26**, further comprising opaque walls surrounding the photodiodes.

US 10,945,648 B2

47                                                                    48

**28**. The user-worn device of claim **27**, wherein the walls are configured to reduce mixing of light from distinct quadrants of the tissue.

**29**. The user-worn device of claim **20**, wherein the protrusion further comprises one or more extensions.

**30**. The user-worn device of claim **20**, wherein the protrusion further comprises one or more chamfered edges.

\*    \*    \*    \*    \*

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of December, 2023, I caused the Confidential Brief for Appellant Apple Inc.'s Emergency Motion to Stay Enforcement of ITC's Orders Pending Review to be served via email (with written consent) to counsel for the International Trade Commission and Masimo Corporation and Cercacor Laboratories, Inc. at the following email addresses:

| **Office of the General Counsel** **U.S. International Trade Commission** | **Counsel for Masimo Corporation and** **Cercacor Laboratories, Inc.** |
|---|---|
| ronald.traud@usitc.gov | Masimo.AppleITC@knobbe.com. |
| Houda.Morad@usitc.gov | |
| Wayne.Herrington@usitc.gov | |
| Michelle.Klancnik@usitc.gov | |
| Sara.Caniglia@usitc.gov | |
| Dominic.Bianci@usitc.gov | |

/s/ Mark D. Selwyn
MARK D. SELWYN
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA  94306
(650) 858-6000

# CERTIFICATE OF CONFIDENTIAL MATERIAL

The foregoing motion contains 12 unique words (including numbers) marked confidential.

| X | This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A). |
|---|---|
|   | This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. §1516a or 28 U.S.C. §1491(b). |
|   | This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements. |

/s/ Mark D. Selwyn
MARK D. SELWYN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA  94306
(650) 858-6000

December 26, 2023

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.      The filing has been prepared using a proportionally-spaced typeface and includes 5,160 words.

2.      The filing has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Mark D. Selwyn
MARK D. SELWYN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA  94306
(650) 858-6000

December 26, 2023