**No. 2024-1285**

IN THE

# United States Court of Appeals

**FOR THE FEDERAL CIRCUIT**

APPLE INC.,

*Appellant,*

*v.*

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

MASIMO CORPORATION, CERCACOR LABORATORIES, INC.,

*Intervenors.*

Appeal from the United States International Trade Commission
in Investigation No. 337-TA-1276

**INTERVENOR'S OPPOSITION TO ACT | THE APP ASSOCIATION, ET AL.'S MOTION FOR LEAVE TO FILE BRIEF AS AMICI CURIAE IN SUPPORT OF APPELLANT**

Jonathan E. Bachand
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Avenue N.W.
Suite 900
Washington, DC 20006
(202) 640-6400

Joseph R. Re
*Principal Counsel*
Stephen C. Jensen
Sheila N. Swaroop
Brian C. Claassen
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

*Counsel for Intervenors
Masimo Corporation and Cercacor
Laboratories, Inc.*

April 22, 2024

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Intervenors Masimo Corporation *and Cercacor Laboratories, Inc.* certifies the following:

1.     The full name of the parties represented by me is:

Masimo Corporation
52 Discovery
Irvine, CA 92618
Telephone: 949-297-7000

Cercacor Laboratories, Inc.
15750 Alton Pkwy
Irvine, CA 92618
Telephone: 800-610-8522

2.     The name of the real party in interest represented by me is:

N/A

3.     Full name of all parent corporations and all publicly held companies that own 10 percent or more of the stock of the party represented by me are:

Masimo Corporation has no parent corporation.  BlackRock owns at least 10% of Masimo Corporation's stock.

Cercacor Laboratories, Inc. has no parent corporation and no publicly held company owns at least 10% of Cercacor Laboratories, Inc's stock.

4.     Other than those who have already made an appearance in this Appeal, the name of all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this Court are:

Knobbe, Martens, Olson & Bear, LLP: Ted M. Cannon, Brian C. Claassen, Irfan A. Lateef, Alan G. Laquer, Kendall M. Loebbaka, Carol Pitzel Cruz, Douglas B. Wentzel, Daniel C. Kiang, William R. Zimmerman, Karl W. Kowallis, and Matthew S. Friedrichs.

5.      The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal are as follows:

*Apple Inc. v. Masimo Corporation et al.*, 1:22-cv-01378-MN (D. Del).

6.      Information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):

None.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 22, 2024      By: /s/ *Joseph R. Re*
                         Joseph R. Re

                         *Counsel for Intervenors*
                         *Masimo Corporation and Cercacor Laboratories, Inc.*

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ............................................................. 1

II.   APPLE ASSERTS GREAT INFLUENCE OVER  ALL FOUR AMICI  ORGANIZATIONS ........................................................ 2

III.  AMICUS BRIEFS SHOULD BE INDEPENDENT OF  THE PARTIES AND HELPFUL TO THE COURT ............................ 6

IV.  ARGUMENT ................................................................. 7

    A.   Apple Greatly Influences Amici With Its Money and Power ........................................................................ 7

    B.   Amici Do Not Address the Merits of the Domestic Industry Finding Despite Urging Reversal of that Finding ............... 8

    C.   Amici Rely On Apple's Incorrect Position About Masimo to Exaggerate the Significance of the Commission's Decision ......................................................................... 9

V.   CONCLUSION ............................................................. 11

# TABLE OF AUTHORITIES

**Page No.**

*AliveCor Inc. v. ITC*,
    No. 23-1509, Dkt. 93 (Fed. Cir. Mar. 8, 2024)....................................................7

*Amoco Oil Co. v. United States*,
    234 F.3d 1374 (Fed. Cir. 2000) ...........................................................................6

*Epic Games Inc. v. Apple Inc.*,
    No. 21-16506, Dkt. 24-1 (9th Cir. Nov. 30, 2021)...............................................7

*Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*,
    149 F.R.D. 65 (D.N.J. 1993)................................................................................6

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ...........................................................................8

*In re Opprecht*,
    868 F.2d 1264 (Fed. Cir. 1989) ...........................................................................6

*Spansion, Inc. v. Int'l Trade Comm'n*,
    629 F.3d 1331 (Fed. Cir. 2010) ...........................................................................8

*Voices for Choices v. Illinois Bell Tel. Co.*,
    339 F.3d 542 (7th Cir. 2003) ...............................................................................7

*Yip v. Pagano*,
    606 F. Supp. 1566 (D.N.J. 1985), *aff'd*, 782 F.2d 1033
    (3d Cir. 1986)......................................................................................................6

## OTHER AUTHORITIES

Fed. Cir. R. 32 ........................................................................................................8

Fed. R. App. P. 29 ..................................................................................................6

# I. __INTRODUCTION__

Four Apple-backed organizations seek leave to file an amicus brief in favor of Appellant Apple urging reversal of the International Trade Commission's domestic industry finding. The Court should deny the motion for leave for three reasons.

First, the proposed amici organizations are not friends of the Court, but rather very close friends of Apple. Indeed, Apple is not just a member of all four organizations, but supplies the bulk of the $13.6 million budget funding the activities of ACT | The App Association ("ACT"), the lead proposed amicus. Ex. 1 at 1-2, 4; Ex. 9 at 1, line 8. As a large funder of ACT, Apple plays a "dominant behind-the-scenes role shaping the group's policy positions." Ex. 1 at 2. The proposed amici brief reflects this by blindly following Apple's policy positions.

Second, the amici seek ***reversal*** of only the Commission's finding that Intervenor Masimo demonstrated a domestic industry for its patent-practicing products. But the Commission's finding of domestic industry is factually intensive, and the amici do not refer to the record upon which the Commission based its finding. Indeed, the amici do not even have access to the bulk of the record which contains substantial confidential portions. Thus, amici cannot possibly justify seeking reversal of the factual determinations they challenge, namely, whether the

Commission had substantial evidence to find domestic industry. Because the proposed amici brief could not be helpful to this Court, leave should be denied.

Third, amici blindly rely on Apple's false narrative that Masimo had "only a hypothetical article at the time of the complaint." ACT Mot. at 3. Based on this false premise, amici argue that the Commission has relaxed and even ignored the standard for showing a domestic industry, thus giving non-practicing entities too easy a route to access the Commission's exclusionary powers. *Id*. at 5. But nowhere do amici cite any part of the Commission's decisions or orders to show that the Commission changed any aspect of the domestic industry requirement. Nor can they, because the Commission merely made findings of fact that a domestic industry existed based on the unique record before it, most of which amici cannot even access. For these reasons, the brief cannot possibly help the Court.

In short, amici overstate the significance of the Commission's decision in order to bolster Apple's highly publicized legislative and judicial campaign to undermine the Commission's power and jurisdiction. Under these circumstances, the proposed amici brief is entirely improper, and its Rule 29 certification should be seriously questioned.

## II.  **APPLE ASSERTS GREAT INFLUENCE OVER ALL FOUR AMICI ORGANIZATIONS**

In this appeal, Apple challenges a Commission decision that Apple violated 19 U.S.C. § 1337 by infringing five claims of two Masimo patents by unlawfully

importing foreign-made Apple Watches with a Blood Oxygen feature. Apple devotes the majority of its brief to challenging the Commission's finding based on extensive factual evidence that Masimo demonstrated a domestic industry with respect to Masimo's patented articles.

Amici propose to file a brief seeking reversal of only the Commission's domestic industry finding. In certifying the brief complies with Federal Rule of Appellate Procedure 29, amici misleadingly represent that "no party or a party's counsel directly contributed money that was intended to fund preparing or submitting this brief." ACT Br. at vi; ACT Mot. at 4. There, amici drop a footnote and sheepishly admit only that Apple is a member of three of the organizations:

> For clarity, Appellant Apple, Inc., is a member of some of the amici organizations (specifically, ACT | The App Association, Chamber of Progress, and TechNet), and pays member dues in that capacity, but Apple did not participate in those organizations' preparation of amici's brief or this motion.

ACT Br. at vi n.1; ACT Mot. at 4 n.1. But a quick review of public information shows the deceptive nature of this certification.

First, Apple is a member of **_all four_** organizations (which includes NetChoice). On its own website, Apple admits it is a member of all four amici through its "government affairs group." Ex. 2 at 3-4.

Second, Apple does not simply pay "member dues" to each organization. For example, in 2022, Apple contributed to more than half of ACT's $13.6 million

budget. Ex. 1 (Bloomberg article) at 1-2, 4; Ex. 9 at 1, line 8 (Contributions to ACT jumped from $9.8 million in 2021 to $13.6 million in 2022). Former ACT employees acknowledge that Apple's ACT funding has even been "much higher." Ex. 1 at 1-4; *see also* Ex. 3 at 1-2 (Ars Technica Article). Thus, amici misleadingly represented that Apple contributed ***no money*** "intended to fund" the brief. Apple funds practically everything for ACT.[1]

Moreover, because of Apple's great influence over ACT, ACT executives "take Apple's positions into account" when determining policy positions. Ex. 1 at 3. Former ACT employees explain that Apple "plays a dominant behind-the-scenes role shaping the group's policy positions." *Id*. at 2. As The New York Times explains, ACT "claims to give 'a voice to small technology companies' but is funded by big technology companies, including Apple." Ex. 5 at 3. Executives in the app industry have described ACT's lobbying activities for Apple as "pure, shameless deception by a multi trillion dollar corporation" and explained that "[w]hen you pretend to be something that you're not in order to make a point, that's bad for the lawmaking process." Ex. 6 at 2. ACT purports to advocate for small app developers,

---

[1] The U.S. Judicial Conference's Advisory Committee on Appellate Rules has recently recognized the inadequacy of the hyper-technical representation required by Fed. R. App. 29(a)(4)(e). Ex. 4 at 1-2. After lawmakers and others sought to shed light on the extent to which litigants secretly fund amicus briefs, the Committee endorsed a proposal requiring amici to disclose large contributions from litigants. *Id.* at 1. Under such a proposal, amici here would have had to disclose Apple's large contributions.

but really is simply an Apple echo chamber attempting to provide credibility to Apple's positions.

Because of the close association between ACT and Apple, one publisher has satirically suggested that ACT | The App Association should be called ACT "The App(le) Association."    Ex. 7.    Another aptly characterized "the ACT App(le) Association" as a "lobbying front" for Apple.  Ex. 8.

The other amici also echo Apple's messaging.  For example, Apple's principal brief falsely argues that the Commission based its domestic industry finding on a hypothetical article.  Amicus NetChoice appears to have blindly adopted that false position.  On April 15, 2024, NetChoice announced the filing of this proposed amici brief in a press release.  There it falsely represented that Masimo is "a business that does not have actual products in the United States." Ex. 13.  NetChoice is obviously promoting Apple's false narrative that the Commission has rejected multiple times in this case.  And one quick internet search would have informed NetChoice that Masimo not only has numerous products in the United States but is the U.S. (and worldwide) leader in the field of noninvasive patient monitoring.  Ex. 14 at 4 (www.masimo.com) ("9 out of the 10 top hospitals in the United States use Masimo technologies").

The Chamber of Progress is also tied to Apple.  One publication reported that the recent lobbying efforts of the Chamber of Progress "neatly matches the positions of Apple."  Ex. 15 at 2.

### III.  <u>AMICUS BRIEFS SHOULD BE INDEPENDENT OF THE PARTIES AND HELPFUL TO THE COURT</u>

A motion for leave to file an amicus brief must state: "(A) the movant's interest; and (B) the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case."  Fed. R. App. P. 29(a).  "An amicus curiae does not represent the parties, but participates only for the benefit of the court, and thus it is solely within the court's discretion to determine the fact, extent, and manner of participation by the amicus."  4 AM. JUR. 2d *Amicus Curiae* § 6 (Feb. 2024 update); *see In re Opprecht*, 868 F.2d 1264, 1266 (Fed. Cir. 1989) (granting leave for *amicus* filing is discretionary).

"An *amicus curiae,* by definition, is a friend of the court, not of the appellant." *Amoco Oil Co. v. United States*, 234 F.3d 1374, 1377 (Fed. Cir. 2000).  "When the party seeking to appear as *amicus curiae* is perceived to be an interested party or to be an advocate of one of the parties to the litigation, leave to appear *amicus curiae* should be denied."  *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*, 149 F.R.D. 65, 82 (D.N.J. 1993) (citing *United States v. Gotti*, 755 F. Supp. 1157, 1158-59 (E.D.N.Y. 1991)); *see also Yip v. Pagano*, 606 F. Supp. 1566, 1568 (D.N.J. 1985) ("Where a petitioner's attitude toward the litigation is patently partisan, he should

not be allowed to appear as *amicus curiae.*") (internal quotations and citations omitted), *aff'd*, 782 F.2d 1033 (3d Cir. 1986).  The Seventh Circuit recognized that "the filing of an amicus brief is often an attempt to inject interest group politics into the federal appeals process."  *Voices for Choices v. Illinois Bell Tel. Co.*, 339 F.3d 542, 544 (7th Cir. 2003).

Apple has argued that courts should deny leave to file an amicus brief where the movant answered to, or was controlled by, a party to the litigation.  Apple made this exact argument to the Ninth Circuit opposing an amicus filing in *Epic Games Inc. v. Apple Inc.*, No. 21-16506, Dkt. 24-1 at 2 (9th Cir. Nov. 30, 2021) (Ex. 16).  Before this Court, Apple recently argued that bias infects amicus briefs where one amicus merely joining a brief filed by an independent organization was a "major investor" in a party.  *AliveCor Inc. v. ITC*, No. 23-1509, Dkt. 93 at 32 n.5 (Fed. Cir. Mar. 8, 2024) (excerpt attached as Ex. 17).

## IV.  ARGUMENT

### A.  Apple Greatly Influences Amici With Its Money and Power

Here, the public record reveals that Apple has great influence over amici.  *See* Section II.  ACT has little choice but to follow Apple's lead, because ACT depends on Apple's money to fund the bulk of the organization's activities.  Ex. 1 at 1-2, 4.  That Apple never explicitly directed the money for an amicus brief hardly suggests that the brief is free of Apple's great influence.

The close association between Apple and the amici goes beyond funding. For example, ACT's Vice President of Operations is a former member of Apple's government affairs team. Ex. 10. Apple's principal counsel in this appeal also represented ACT as principal counsel before this Court. Exs. 11-12. ACT is hardly an independent voice that can help this Court on this appeal.

Because Apple greatly influences the amici, the amici are participating for the benefit of Apple, not for the benefit of the Court. This Court should not permit these Apple-backed organizations to appear as amici here. Permitting this proposed amicus brief allows Apple to circumvent the page and word limits of Fed. Cir. R. 32(b)(1) and make a mockery of the amicus procedure.

**B.** **Amici Do Not Address the Merits of the Domestic Industry Finding Despite Urging Reversal of that Finding**

Amici attack only the Commission's finding that Masimo established a domestic industry for its patent-practicing articles. Indeed, amici go so far as to "request that the Court *reverse* the Commission's domestic industry findings." ACT Br. at 3, 11 (emphasis added). But that domestic industry finding rests on a factually intensive record that cannot be evaluated on appeal without a thorough review of that record to determine if substantial evidence supports that finding. *See Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1343 (Fed. Cir. 2010); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006). And amici do not have access to large portions of the record upon which the Commission based its

domestic industry finding.  Indeed, amici never refer to any portion of the record to challenge the finding.

Amici ignore the Commission's detailed evaluation of the evidence showing that Masimo's team of U.S. engineers designed, manufactured, tested, and measured oxygen saturation with multiple patent-practicing articles in California before the Complaint.  *See* Final Initial Determination, Inv. No. 337-TA-1276, EDIS Doc ID. 789795 at 59-85 (Feb. 7, 2023) (excerpts attached as Ex. 19).  Amici do not address the factual record showing the Commission had substantial evidence to make its domestic industry finding.  Indeed, amici never even say the finding lacks substantial evidence.  ACT Br. at 6-7, 10.  Because amici do not address the actual merits of the only finding they challenge, their brief cannot be helpful to this Court.  For this reason, this Court should deny leave to file the brief.

## C.    Amici Rely On Apple's Incorrect Position About Masimo to Exaggerate the Significance of the Commission's Decision

Instead of adhering to the record concerning the domestic industry finding, amici blindly rely on Apple's false narrative that Masimo had "only a hypothetical article at the time of the complaint."  ACT Mot. at 3.  Indeed, NetChoice even further exaggerated this false claim in its recent press release that Masimo "does not have actual products in the United States."  Ex. 13.  The press release confirms NetChoice is a shill for Apple because it is publicly known that Masimo is the leading supplier of pulse oximeter monitors in the United States.

Amici leverage this false narrative to exaggerate the significance of this appeal. First, nothing suggests that Masimo is a nonpracticing entity as amici claim. Indeed, the Commission found that Masimo did have patent practicing articles at the time of the complaint, as discussed above. Thus, nothing could possibly support the amici argument that the Commission's decision will cause various types of nonpracticing entities to run to the Commission to surprise other companies with the Commission's broad exclusionary powers. *See* ACT Mot. at 7.

Amici argue this scenario would harm startups and innovators. *See id.* But this parade of horribles is wrongly premised on the mistaken claim that the Commission has been relaxing and even ignoring the domestic industry requirement.[2] The Commission has done no such thing. As explained above, in this case the Commission merely made findings of fact that Masimo had a domestic industry. Amici's unsupported arguments cannot possibly help the Court. All of the significance and interest amici attribute to the Commission's decision is false and beyond hyperbole.

The efforts by the proposed amici to elevate the significance of this appeal is part of Apple's ongoing campaign to undermine the Commission's power and jurisdiction. Apple has been lobbying Congress to pass the Advancing America's

---

[2] *See* Ex. 20 (ITC statistics showing that nonpracticing entities file only a small percentage of Section 337 investigations) (https://www.usitc.gov/intellectual_property/337_statistics_number_section_337_investigations.htm).

Interest Act, which would cut back on the Commission's power to issue exclusion orders under Section 337. *See* Ex. 18 (The New York Times: "Apple Keeps Losing Patent Cases. Its Solution: Rewrite the Rules"). This attack rests on Apple's false claim that non-practicing entities have been flocking to the Commission to bring patent cases. *See* Ex. 21 (Adam Mossoff, "Big Tech's 'patent troll' attacks are a smokescreen — don't let them fool you," THE HILL (Aug. 18, 2023)). Apple has also argued that the Commission acts unconstitutionally when deciding patent cases under Section 337. Dkt. 38-1 at 44 and n.15; *AliveCor Inc. v. ITC*, No. 23-1509, Dkt. 38 at 34-35 (Fed. Cir. Aug. 7, 2023) (excerpt attached as Ex. 22). But Apple's political lobbying attack on the ITC should not infect amici briefs in this Court. Such briefs cannot help this Court. This Court applies the law as it is, not as Apple, its amici, or any other litigant wishes it should be.

## V. <u>CONCLUSION</u>

For the above reasons, this Court should reject the proposed amici brief and thus deny the motion for leave.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 22, 2024

By:/s/ *Joseph R. Re*
Joseph R. Re
Stephen C. Jensen
Sheila N. Swaroop
Jonathan E. Bachand
Brian C. Claassen

*Counsel for Intervenors*

*Masimo Corporation and Cercacor Laboratories, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2).  This brief contains 2,612 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(b) and Federal Circuit Rule 32(b)(2).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point font Times New Roman.


                         KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 22, 2024        By: /s/ *Joseph R. Re*_____
                              Joseph R. Re

                              *Counsel for Intervenors*
                              *Masimo Corporation and Cercacor*
                              *Laboratories, Inc.*

**EXHIBIT LIST**

| Ex. No. | Description |
|---|---|
| 1 | Emily Birnbaum, *Apple Flexes Muscle as Quiet Power Behind App Group*, BLOOMBERG, Sept. 19, 2022, https://www.bloomberg.com/news/articles/2022-09-19/apple-flexes-muscle-as-quiet-power-behind-app-developer-group?sref=zNmRQ0gk |
| 2 | Apple Public Policy Advocacy Website, https://www.apple.com/public-policy-advocacy/ |
| 3 | Jon Brodkin, *Apple Is Top Funder Of Lobby Group That Says It Represents Small Developers*, ARS TECHNICA, Sept. 19, 2022, https://arstechnica.com/tech-policy/2022/09/apple-is-top-funder-of-lobby-group-that-says-it-represents-small-developers/ |
| 4 | Nate Raymon, *US Judicial Panel Proposes Greater Amicus Brief Financial Disclosures*, REUTERS, April 10, 2024, https://www.reuters.com/legal/government/us-judicial-panel-proposes-greater-amicus-brief-financial-disclosures-2024-04-10/ |
| 5 | Jack Nicas, *Why Apple Won Its Legal Settlement With Developers*, NEW YORK TIMES, Aug. 27, 2021, https://www.nytimes.com/2021/08/27/technology/apple-app-settlement-explained.html |
| 6 | Malcolm Owen, *Apple's Guides App Association Direction Through Hefty Funding*, APPLE INSIDER, Sept. 19, 2022, https://appleinsider.com/articles/22/09/19/applesguides-app-association-direction-through-hefty-funding |
| 7 | Florian Müller, *Not A Class ACT: The So-Called App Association Is Simply An Apple Association And Does NOT Represent App Developers' Interests In Fair Distribution Terms*, FOSS PATENTS, Oct. 1, 2021, http://www.fosspatents.com/2021/10/not-class-act-so-called-app-association.html |
| 8 | David L. Cohen, *On Deceptive Apps And Practices: Unmasking The ACT App(Le) Association*, KIDON IP, July 7, 2021, https://kidonip.com/frightful-five/on-deceptive-apps-and-practices-unmasking-the-act-apple-association/ |
| 9 | Excerpt of ACT, The App Association Form 990 for fiscal year ending Dec. 2022. https://projects.propublica.org/nonprofits/organizations/522106531/202312819349300001/full |
| 10 | Actonline, *ACT \| The App Association Announces Hires From Apple, National League of Cities*, March 21, 2016, |

**EXHIBIT LIST**

| Ex. No. | Description |
|---|---|
| | https://actonline.org/2016/03/21/act-the-app-association-announces-hires-from-apple-national-league-of-cities/ |
| 11 | Entry of Appearance for Mark Selwyn, *Koninklijke Philips N.V. v. Thales DIS AIS USA LLC*, Appeal No. 21-2106, Dkt. 21 (Fed. Cir. Sept. 7, 2021) |
| 12 | Entry of Appearance for Mark Selwyn, *Google v. Uniloc 2017 LLC*, Appeal No. 20-2040, Dkt. 11 (Fed. Cir. Sept. 17, 2020) |
| 13 | Krista Chavez, *Court Decision in Apple Watch Case Will Have Serious Questions for U.S. Commerce*, NETCHOICE, April 15, 2024, https://netchoice.org/court-decision-in-apple-watch-case-will-have-serious-consequences-for-u-s-commerce/ |
| 14 | Masimo, www.masimo.com |
| 15 | Jon Brodkin, *Apple And Google Seem Spooked By Bill Requiring More App Stores And Sideloading*, Ars Technica, August 12, 2021, https://arstechnica.com/tech-policy/2021/08/apple-and-google-seem-spooked-by-bill-requiring-more-app-stores-and-sideloading/ |
| 16 | Apple's Response To Motion For Leave To File Amicus Brief, *Epic Games, Inc. v. Apple Inc.*, Appeal No. 21-16506, Dkt. 24-1 (9th Cir. Nov. 30, 2021) |
| 17 | Excerpt of Non-Confidential Reply Brief Of Intervenor–Cross-Appellant Apple Inc., *AliveCor Inc. v. ITC*, Appeal No. 23-1509, Dkt. 93 (Fed. Cir. Mar. 8, 2024) |
| 18 | Tripp Mickle, *Apple Keeps Losing Patent Cases. Its Solution: Rewrite the Rules*, NEW YORK TIMES, March 19, 2024, https://www.nytimes.com/2024/03/19/technology/apple-patents-lobbying.html |
| 19 | Excerpt of Public Final Initial Determination, Inv. No. 337-TA-1276, EDIS Doc ID. 789795 at 59-85 (Feb. 7, 2023) |
| 20 | ITC Website, Section 337 Statistics: Number Of Section 337 Investigations Brought By NPEs (Updated Annually) https://www.usitc.gov/intellectual_property/337_statistics_number_section_337_investigations.htm |
| 21 | Adam Mossoff, *Big Tech's 'Patent Troll' Attacks Are A Smokescreen — Don't Let Them Fool You*, THE HILL (Aug. 18, 2023) https://thehill.com/opinion/technology/4157340-big-techs-patent-troll-attacks-are-a-smokescreen-dont-let-them-fool-you/ |

# EXHIBIT LIST

| Ex. No. | Description |
|---------|-------------|
| 22 | Excerpt of Non-Confidential Opening And Response Brief Of Intervenor–Cross-Appellant Apple Inc., *AliveCor Inc. v. ITC*, No. 23-1509, Dkt. 38 (Fed. Cir. Aug. 7, 2023) |

# EXHIBIT 1



https://www.bloomberg.com/news/articles/2022-09-19/apple-flexes-muscle-as-quiet-power-behind-app-developer-group?sref=zNmRQ0gk

The Company & its Products ▾ | Bloomberg Terminal Demo Request | 🖥 Bloomberg Anywhere Login | Customer Support

☰ **Bloomberg**

Technology

# Apple Flexes Muscle as Quiet Power Behind App Group

- Company funds more than half of group's budget, shapes goals
- Association chief says it backs the interests of developers

    



*Photographer: Chris Delmas/AFP/Getty Images*

By Emily Birnbaum
September 19, 2022 at 5:00 AM EDT
*Updated on September 19, 2022 at 12:38 PM EDT*





The App Association brands itself as the leading voice for thousands of app developers around the world. In reality, the vast majority of its funding comes from Apple Inc.

The tech giant isn't a member of the association. But it plays a dominant behind-the-scenes role shaping the group's policy positions, according to four former App Association employees who asked not to be named discussing internal matters.

In fact, critics note, the association's lobbying agenda tracks closely with Apple's -- even when it's at odds with app developers, the companies that make the individual games and programs that run on Apple's iPhone and other devices.

The group, known as ACT, says it's not beholden to Apple, but confirmed that it derives more than half its funding from the company. The former employees say the actual

percentage is much higher.

The relationship between Apple and ACT illustrates how big companies quietly pour money into outside groups that promote their agenda in Washington. ACT representatives regularly testify in Congress, file court briefs in defense of Apple's positions and host annual "fly-in" meetings for developers with lawmakers.



Rick VanMeter, a former congressional aide who is the head of rival developer group Coalition for App Fairness, said ACT's purported representation of app developers is deceptive, given its relationship with Apple. "When you pretend to be something that you're not in order to make a point, that's bad for the lawmaking process," said VanMeter.

Cupertino, California-based Apple declined to comment for this story, but ACT executives defended the role of the company. ACT President Morgan Reed said in an interview that it "doesn't pass the laugh test" to say the association is fronting for Apple.

"Our job is to make sure we're paying attention to the way that government can have an impact, unintended or otherwise, on all of those small businesses making cool software products," Reed said.

Reed and other ACT executives said that they determine policy positions based on the preferences of their members and don't take direction from Apple, though they take Apple's positions into account.

ACT spokesperson Karen Groppe declined to say how much of the group's funding comes from Apple other than to say it's more than half. Contributions from all donors topped $9 million in 2020, according to the most recently available data from disclosure filings, suggesting Apple makes a multimillion-dollar contribution.

Read more

Tech Antitrust Bill Teeters Near Defeat After Lobbying Spree

What to Know in Washington: Big Tech Steps Up Gifts to Lawmakers 🖥️

Tech Giants Split in Lobbying Brawl Over the App Store's Future

Apple is a major force in the industry. Its App Store is a virtual marketplace for apps, a lucrative business for both the developers and Apple. The company takes a 15% to 30% cut of sales of paid apps and subscriptions -- representing billions of dollars a year.

But many app developers object to the fees and restrictions, which Apple insists it needs so it can vet the systems to ensure the safety of its users.

Proposed antitrust legislation advancing in Congress would loosen Apple's grip over the App Store and enable developers to circumvent the company's cut. The measure, known as the Open App Markets Act, is backed by the Coalition for App Fairness.



But ACT opposes the bill, arguing it would threaten the privacy and security of the App Store, echoing Apple's talking points against the bill.

ACT's executive director, Chelsea Thomas, is a former lobbyist on Apple's government affairs team.

"Understanding what bigger players in the ecosystem are thinking on policy issues is important to us to understand where the conversations are going," Thomas said.

ACT's work has also drawn scrutiny from some of the developer world's biggest players. Tim Sweeney, chief executive officer of Epic Games Inc., called the association "Apple's fake 'small app developer' lobby" in a June tweet.



Epic Games, a member of VanMeter's Coalition for App Fairness, lost an antitrust case against Apple involving the App Store last year, but did win on an unfair competition claim and some counterclaims.

Both sides are appealing. ACT supported Apple in the case.

ACT's website says it represents 5,000 developers and device companies around the world, though Reed said the number of active members is smaller. In addition to Apple, other corporate sponsors listed on its website are Verisign Inc., AT&T Inc., Intel Corp. and Verizon Communications Inc.

The group's annual congressional fly-ins feature policy presentations to the developers by Apple representatives and tech industry experts. People who have attended them said ACT often shared talking points that mirrored Apple's agenda before they met with lawmakers and staff.

Several ACT members said they appreciate the sessions with lawmakers arranged by ACT, even if they don't always agree on the group's positions.

"Is it unreasonable that there is a major donor whose position also aligns and supports all the small contributors in this space?" said Thomas Gorczynski, an ACT member and founder of software development agency DevScale.

But VanMeter, whose coalition's members also include Apple antagonist Spotify Technology SA, said he assumed ACT was "the unified voice of app developers" when he received materials from them during his time in Congress.



"They have sown a lot of confusion," said VanMeter.
*(Updates with details of App Store commission fees in 11th paragraph)*

6

Follow all new stories by **Emily Birnbaum**



＋ Get Alerts

In this Article

APPLE INC
178.05 USD
▲ +1.12%

Context changes
everything.

Have a confidential tip for our reporters? **Get in Touch**

**Before it's here, it's on the Bloomberg Terminal**

# More From Bloomberg



## S&P 500 Tops 5,200 as Yields Fall on Fed-Cut Bets: Markets Wrap
updated 15 minutes ago



## Trump Rules Out Vivek Ramaswamy as Running Mate as He Eyes New Team

 **Sam Bankman-Fried Says 50-Year Sentence Only Suitable for a 'Super Villain'**



Sponsored Content

Sign Up for the Bloomberg Green Newsletter Today.

 **What Happens If Trump Can't Post His $454 Million Bond**

## Top Reads





**Where to Invest $100,000 Right Now**
by Suzanne Woolley



**A Bellwether Pennsylvania Factory Town Is Wary of Bidenomics**
by Akayla Gardner



**How the Top Oil Trader's Brazen Corruption Was Caught on Tape**

by Jack Farchy, Maria Clara Cobo and Patricia Hurtado



**Selling Shohei Ohtani: Can Baseball's Biggest Talent Transform the Sport?**

by Lucas Shaw

Advertisement



# EXHIBIT 2



# Public Policy Advocacy

Apple engages in policy discussions where they matter to our business and customers, in areas including privacy, intellectual property, and the environment. We strive to help policy makers at every level of government understand our products, our innovations, and our business.

This page describes how Apple participates in public debate in the United States through direct and indirect advocacy at the federal, state, and local levels.

---

# Oversight

We carefully manage our engagement in the public policy process and have internal teams that coordinate those efforts. Strategic decisions about advocacy are made at the highest levels, including Apple's Executive Team and CEO Tim Cook. All public policy expenditures are reported to the Apple Board of Directors and reviewed annually by the Audit and Finance Committee of the Board.

# Political Contributions

Apple does not make political contributions to individual candidates or parties, and we do not have a political action committee (PAC).

We occasionally make contributions for ballot measures and initiatives. For example, we have contributed to initiatives in support of public schools in Apple's hometown of Cupertino, California. Each of these contributions is approved by CEO Tim



You can see a **complete contribution history** since January 1, 2012.

Cook and promptly reported on the Apple website. We provide a complete history of contributions made by Apple since January 1, 2012, on the Investor Relations page.

# Direct Advocacy

Apple's government affairs group engages with government officials and policy makers at the federal, state, and local levels on legislation, regulations, and policies that affect us. In addition to advocacy by Apple employees, Apple retains outside consultants to support our engagement with government officials and policy makers.

Federal, state, and local lobbying regulations may require entities and individuals who engage in public policy advocacy to register and disclose relevant activities and expenditures. Some procurement lobbying efforts also require registration and disclosure. Apple complies with all such regulations.

In 2022, Apple used registered advocates at the federal level and in 47 states and the District of Columbia. Disclosure reports are available to the public and, in most cases, posted on government websites. Federal disclosure reports for Apple and its consultants can be found in the U.S. Senate lobbying disclosure database.

## Advocacy by State

See states where Apple, Apple employees, or outside consultants were registered in 2022. Click through to the government disclosure sites for each state and follow the instructions from each state's website. Use the search term "Apple Inc." to view Apple filings.





Choose a state
Choose a state

# Indirect Advocacy

In addition to direct engagement with government officials and policy makers, Apple belongs to trade associations and organizations that are focused on issues that affect us. These organizations operate on national, state, and local levels. Many of them are composed of technology companies or companies linked by region or a specific focus.

These organizations serve to advance the common goals and interests of member companies and their customers. For example, Apple belongs to organizations that work to ensure consistent product standards and promote strong intellectual property protections.

Apple's government affairs group regularly engages with these trade associations and organizations and reevaluates our association memberships annually to make sure that the groups we belong to represent Apple's core interests. The company's membership and participation in these organizations is also reported to Apple's Board of Directors and reviewed annually by the Audit and Finance Committee of the Board.

Many of these organizations engage in advocacy activities for their members and must comply with applicable registration and disclosure laws. U.S. trade associations are generally required under federal law to report to their members the portion of payments used for lobbying, as defined by section 162(e) of the U.S. Internal Revenue Code. We report all such expenditures in our federal disclosure reports.

Apple does not allow its trade association dues to be used for political contributions.

Apple belonged to the following trade associations in 2022 through its government affairs group:

ACT | The App Association ↗

Alliance for Telecommunications Industry Solutions (ATIS) ↗

Brazil-U.S. Business Council ↗

Business Roundtable ↗

Center for Global Regulatory Cooperation ↗

Chamber of Progress ↗

Computer & Communications Industry Association (CCIA) ↗

Compete America

Consumer Technology Association (CTA) ↗

Council of the Americas ↗

CTIA – The Wireless Association ↗

Developers Alliance ↗

Financial Innovation Now

Information Technology Industry Council (ITI) ↗

NetChoice ↗

Portable Rechargeable Battery Association (PRBA) ↗

Reform Government Surveillance Coalition ↗

Repair Done Right ↗

Retail Industry Leaders Association (RILA) ↗

Semiconductor Industry Association (SIA) ↗

Silicon Valley Leadership Group ↗

State Government Affairs Council ↗

Public Policy Advocacy - Apple

TechNet ↗

Technology Coalition ↗

Telecommunications Industry Association (TIA) ↗

Texas Association of Business ↗

The United States ITU Association

United States Council for International Business ↗

United States Information Technology Office (USITO) ↗

U.S.-Africa Business Center ↗

US-ASEAN Business Council ↗

US-China Business Council ↗

US-Egypt Business Council ↗

US-GCC Business Initiative ↗

US-India Business Council ↗

US-Kazakhstan Business Council ↗

US-Korea Business Council ↗

US-Russia Business Council ↗

US-Taiwan Business Council ↗

US-Türkiye Business Council ↗

Washington International Trade Association ↗

The Association of Women in International Trade (WIIT) ↗

 Public Policy Advocacy

**Shop and Learn**
Store
Mac
iPad
iPhone
Watch
Vision
AirPods
TV & Home
AirTag
Accessories
Gift Cards

**Apple Wallet**
Wallet
Apple Card
Apple Pay
Apple Cash

**Account**
Manage Your Apple ID
Apple Store Account
iCloud.com

**Entertainment**
Apple One
Apple TV+
Apple Music
Apple Arcade
Apple Fitness+
Apple News+
Apple Podcasts
Apple Books
App Store

**Apple Store**
Find a Store
Genius Bar
Today at Apple
Apple Camp
Apple Store App
Certified Refurbished
Apple Trade In
Financing
Carrier Deals at Apple
Order Status
Shopping Help

**For Business**
Apple and Business
Shop for Business

**For Education**
Apple and Education
Shop for K-12
Shop for College

**For Healthcare**
Apple in Healthcare
Health on Apple Watch
Health Records on iPhone

**For Government**
Shop for Government
Shop for Veterans and Military

**Apple Values**
Accessibility
Education
Environment
Inclusion and Diversity
Privacy
Racial Equity and Justice
Supplier Responsibility

**About Apple**
Newsroom
Apple Leadership
Career Opportunities
Investors
Ethics & Compliance
Events
Contact Apple

More ways to shop: Find an Apple Store or other retailer near you. Or call 1-800-MY-APPLE.

Copyright © 2024 Apple Inc. All rights reserved.　　Privacy Policy  |  Terms of Use  |  Sales and Refunds  |  Legal  |  Site Map　　United States

# EXHIBIT 3







BIZ & IT   TECH   SCIENCE   **POLICY**   CARS   GAMING & CULTURE   STORE   FORUMS   **SUBSCRIBE**   🔍 ☰   SIGN IN

*THE APP ASSOCIATION —*

# Apple is top funder of lobby group that says it represents small developers

Group claims to "give a voice" to small firms while fighting bills opposed by Apple.

JON BRODKIN - 9/19/2022, 10:52 AM



Enlarge



Apple provides over half the funding for a lobby group that says it represents small app developers, according to a Bloomberg article published today. Apple isn't a member of what's called the App Association, but "it plays a dominant behind-the-scenes role shaping the group's policy positions, according to four former App Association employees who asked not to be named discussing internal matters," Bloomberg wrote.

The App Association says it "gives a voice to small technology companies" and that its "policy priorities reflect the opportunities and challenges today's small business app developers and IoT innovators face in the app ecosystem." But its positions on major legislation have aligned with Apple's. The group's list of policy statements going back to early 2017 include some specifically praising Apple and others opposing legislation that Apple also opposes, such as antitrust bills targeting Big Tech.

One bill opposed by the App Association is the Open App Markets Act, which aimed to help app developers use alternative in-app payment systems and avoid Apple's standard cuts of 15 to 30 percent. The Apple-funded group also opposed the American Innovation and Choice Online Act, which would have prohibited app stores and other large online platforms from giving preference to their own products at the expense of competitors. Both bills have stalled in the face of Big Tech opposition.

According to Bloomberg, the App Association (also known as "ACT") confirmed that over half its funding comes from Apple, but "former employees say the actual percentage is much higher." The group's total funding was over $9 million in 2020.

*ARS VIDEO*
—
**How Lighting Design In The Callisto Protocol Elevates The Horror**



"ACT representatives regularly testify in Congress, file court briefs in defense of Apple's positions and host
annual 'fly-in' meetings for developers with lawmakers," Bloomberg wrote.

## Apple drove increase in group's funding

An App Association spokesperson told Ars that in 2020, "Apple's commitment contributed more than 50
percent of the App Association's sponsorship revenue, making their support one of many contributors for
the year." The App Association did not answer our question about what role Apple plays in shaping its policy.

The group also told Ars it "is proud to represent thousands of independent developers to foster an inclusive
and secure developer ecosystem and app marketplace. Our members drive the organization's policy and
legislative agenda."

Advertisement

"As per our preliminary 2020 [Form] 990 filings, the organization saw an increase in sponsorship revenue to
support our small business members' advocacy efforts such as privacy, broadband, and in helping our
members navigate the early stages of the pandemic, including connected health, workforce
maintenance/development, and access to government funding for ongoing business operations," the App
Association said.

The App Association's website lists about two dozen employees and says the group "represents more than
5,000 app makers and connected device companies in the mobile economy." The "members are located
around the world, in all 27 member countries of the European Union and in all 435 congressional districts of
the United States."

The App Association told Ars that its full member list is proprietary, but 38 that agreed to be named publicly
are listed here. US-based members include Concentric Sky, Startup Health, SheerID, Dogtown Media,
Wellbeyond, Stroll Health, Project Hosts, Colorado Technology Consultants, MotionMobs, Rimidi, Southern
DNA, Devscale, BadVR, CannedSpinach, BitSource, SentryOne, and AirStrip.

We contacted Apple today and will update this article if we get a response.

## Group denies being mere front for Apple

According to Bloomberg, ACT President Morgan Reed "and other ACT executives said that they determine
policy positions based on the preferences of their members and don't take direction from Apple, though they
take Apple's positions into account." Reed told Bloomberg in an interview "that it 'doesn't pass the laugh test'
to say the association is fronting for Apple."

"Our job is to make sure we're paying attention to the way that government can have an impact, unintended
or otherwise, on all of those small businesses making cool software products," he said.

Another group, called the Coalition for App Fairness, whose members include Basecamp, Deezer, Epic
Games, Match Group, Proton, Spotify, and others, has lobbied in favor of Big Tech antitrust legislation. For
example, the group argued that the American Innovation and Choice Online Act would "bar monopolistic
platforms from discriminating against business users in a way that materially harms competition."

The Coalition for App Fairness criticized the App Association in a tweet today. "An association that is funded
primarily by Apple and represents Apple's interests against developers and their customers, is a front group
for Apple no matter how it brands itself," the group said.

Apple has also opposed antitrust legislation in more direct ways. CEO Tim Cook publicly spoke out against
legislation that would require Apple to allow sideloading, and the company ramped up federal lobbying
expenditures and became one of the main funders of a new group called the Chamber of Progress.

READER COMMENTS  70


**JON BRODKIN**
Jon has been a reporter for Ars Technica since 2011 and covers a wide array of telecom and tech policy topics. Jon



graduated from Boston University with a degree in journalism and has been a full-time journalist for over 20 years.

Advertisement

CHANNEL ars



**WATCH**

SITREP: F-16 replacement search a signal of F-35 fail?

SITREP: F-16 replacement search a signal of F-35 fail?

Footage courtesy of Dvids, Boeing, and The United States Navy.



**SITREP: F-16 replacement search a signal of F-35 fail?**



Sitrep: Boeing 707



The F-35's next tech upgrade



⊕ **More videos**

← PREVIOUS STORY

NEXT STORY →

## Related Stories

Sponsored Links by Taboola



**10 Traits You Inherit Only From One Parent**
investing.com

**Twiggy Was a Supermodel & This is Her at 73**
ScienceA2Z                    Read More



**Don't Let Your Nail Become Like My Mom's...**
Swisslip Heavy Duty          Shop Now



**Titanic Movie Mistakes Most Viewers Didn't Catch**
PlayJunkie                    Read More

**Pictures of Jennifer Love Hewitt Leave Fans in Awe**
LifestyleA2Z                  Read More



**This Vintage Picture Wasn't Edited, Look...**
DailyChoices                  Read More

CCPA Notice

## Today on Ars

UK seeks to criminalize creation of sexually explicit AI deepfake images without consent

Russian space chief says new rocket will put Falcon 9 reuse to shame

Why the US government's overreliance on Microsoft is a big problem

NASA says it needs better ideas on how to return samples from Mars










How to keep Earth from being cooked by the ever-hotter Sun


Review: Pitch-perfect *Renegade Nell* is a gem of a series you won't want to miss


US woman arrested, accused of targeting young boys in $1.7M sextortion scheme


Alleged cryptojacking scheme consumed $3.5M of stolen computing to make just $1M

How to keep Earth from being cooked by the ever-hotter Sun

Review: Pitch-perfect *Renegade Nell* is a gem of a series you won't want to miss

US woman arrested, accused of targeting young boys in $1.7M sextortion scheme

Alleged cryptojacking scheme consumed $3.5M of stolen computing to make just $1M

STORE
SUBSCRIBE
ABOUT US
RSS FEEDS
VIEW MOBILE SITE

CONTACT US
STAFF
ADVERTISE WITH US
REPRINTS



NEWSLETTER SIGNUP
Join the Ars Orbital Transmission mailing list to get weekly updates delivered to your inbox. Sign me up →

   

CONDÉ NAST

CNMN Collection
WIRED Media Group
© 2024 Condé Nast. All rights reserved. Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement (updated 1/1/20) and Privacy Policy and Cookie Statement (updated 1/1/20) and Ars Technica Addendum (effective 8/21/2018). Ars may earn compensation on sales from links on this site. Read our affiliate link policy
Your California Privacy Rights | Your Privacy Choices
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Condé Nast.
Ad Choices

# EXHIBIT 4



Exclusive news, data and analytics for financial market professionals    **LSEG**

**REUTERS®**    🔍    **Register**

🔲 My View    👤 Following    🔖 Saved

Government | Judiciary | Litigation | Litigation

# US judicial panel proposes greater amicus brief financial disclosures

By **Nate Raymond**

April 10, 2024 2:39 PM PDT · Updated 7 days ago

🔖  Aa  ⤴



A British banker accused of involvement in bogus Cum-Ex tax reclaims of 440 million euros from the German state, takes out papers from his briefcase at a regional court in Bonn, Germany September 24, 2019. REUTERS/Wolfgang Rattay *Purchase Licensing Rights* ↗

April 10 (Reuters) - A federal judicial panel on Wednesday called for greater transparency requirements for outside groups that file amicus briefs in cases by mandating they disclose when much of their revenue comes from a party involved in the lawsuit or its attorneys.

The U.S. Judicial Conference's Advisory Committee on Appellate Rules endorsed the proposal following calls by Democratic lawmakers and others for changes to shed a light on the extent to which litigants secretly fund efforts to influence cases' outcomes through amicus, or friend-of-the-court, briefs.



Donald Trump's defense lawyers and New York prosecutors on Tuesday took turns challenging prospective jurors who may serve on the former president's hush money criminal trial.

The panel voted in favor of publishing a draft rule for public comment that would require groups like non-profits, charities, or trade associations that file amicus briefs to disclose if a party or its counsel in a given case contributed 25% or more of the organization's annual revenue.

The proposed rule would also require an amicus brief name any donor who contributed more than $100 for preparing, drafting or submitting the brief if that person or entity had only been a member of the organization filing it for less than 12 months.

Advertisement · Scroll to continue



Ad

Get Your Tix
See it live or hear about it forever

X Games 2024    Shop Now

The proposed rule ↗, years in the making, now heads to the Judicial Conference's Committee on Rules of Practice and Procedure, its top rulemaking body, for approval before lawyers, judges and others have an opportunity to comment on it.

Following public comment, the advisory committee could choose to discard, revise or move forward with the rule, which would ultimately need the approval of the U.S. Judicial Conference and the U.S. Supreme Court before being submitted to Congress.

Advertisement · Scroll to continue



Get Your Tix
See it live or hear about it forever

X Games 2024                                                    Shop Now

"We're far from done with this, but this is a big step," said U.S. Circuit Judge Jay Bybee, the appellate rules committee's chair and a judge on the 9th U.S. Circuit Court of Appeal.

The panel began considering amending Rule 29 of the Federal Rules of Appellate Procedure, which governs amicus briefs, after learning about legislation introduced in 2019 by Democratic Senator Sheldon Whitehouse of Rhode Island that would regulate amicus brief filers.

Advertisement · Scroll to continue



**Get Your Tix**
See it live or hear about it forever

X Games 2024                                                    Shop Now

He has long argued for the need to expose how special interest groups secretly advocate in federal court cases by funneling dark money donations through non-profits to disguise their lobbying for causes in cases pending in the courts.

The judicial panel's proposed rule has garnered opposition from the nation's largest business lobbying group the U.S. Chamber of Commerce, which is a major filer of amicus briefs in litigation challenging corporate regulations. The Chamber called concerns over the influence of the supporters of amicus organizations "unfounded" and the rule "unnecessary."

Advertisement · Scroll to continue



**Get Your Tix**
See it live or hear about it forever

X Games 2024                                                    Shop Now

In a March 28 letter, the Chamber also argued that mandatory disclosure of the identities of significant contributors could violate the associational rights of groups that file amicus briefs under the U.S. Constitution's 1st Amendment.

Several panel members on Thursday expressed concern about whether a rule may eventually be challenged in court. Bybee, though, said the panel had acknowledged that concern and that its "opinion on its constitutionality is reflected in the kind of rule that we drafted."

"We hope that we have been sufficiently constrained in our in our deliberations that we have struck the right balance," he said.

Read more:

US judicial panel eyes 'elegant solution' to amicus disclosure rule

U.S. judicial panel zeroes in on tougher amicus disclosure rules

U.S. judiciary panel expresses support for amicus brief financial disclosures

Judiciary panel weighs expanding disclosure rule for amicus filers

Jumpstart your morning with the latest legal news delivered straight to your inbox from The Daily Docket newsletter. Sign up here.

Reporting by Nate Raymond in Boston

Our Standards: The Thomson Reuters Trust Principles.

Purchase Licensing Rights



**Nate Raymond**
Thomson Reuters

 

Nate Raymond reports on the federal judiciary and litigation. He can be reached at nate.raymond@thomsonreuters.com.

## Read Next / Editor's Picks

    

Government
**US judge tosses Republican-led states' challenge to Biden asylum policy**
A federal judge in Louisiana has dismissed a lawsuit by 19 Republican-led states...

World
**US Supreme Court leans toward Jan. 6 rioter in obstruction case, with Trump implications**
Conservative U.S. Supreme Court justices on Tuesday signaled skepticism toward a...

World
**US House sends impeachment of Biden border official to Senate**
The Republican-controlled U.S. House of Representatives on Tuesday delivered two articles...

Litigation
**Judge temporarily blocks Ohio gender-affirming care ban**
An Ohio judge on Tuesday temporarily blocked a Republican-backed state law...

Markets
**Donald Trump's b provider defends i**
The company that pr Donald Trump with a million bond in his Ne

 REUTERS PLUS

**AI and ethics – What to know now**
Produced by Reuters Plus for Ernst & Young
*This content was created by Reuters Plus, the brand marketing studio of Reuters.*



**LSEG Workspace** — The next-generation human interface for financial professionals.

## Sponsored Content
Dianomi



**Leverage TradeStation's platform to trade across asset classes.**

Sponsored by
TradeStation

Find out more



**7 Retirement Income Strategies Once Your Portfolio Reaches $500k**

Sponsored by
Fisher Investments



**California: The List Of The Top Financial Advisor Firms Is Out**

Sponsored by
smartasset

## Sponsored Content                                                 Dianomi ▷

Ask a Pro: "Should I Convert my IRA to a Roth after age 60?"
Sponsored by smartasset


7 Retirement Income Strategies Once Your Portfolio Reaches $500k
Sponsored by Fisher Investments


Leverage TradeStation's platform to trade across asset classes.
Sponsored by TradeStation


Lock in Your CD Before Rates Drop
Sponsored by SavingsAccounts.com


Answer just two questions to see a potential fixed income strategy.
Sponsored by J.P. Morgan Asset Management


Tech Founder Made Dying Prophecy—Now Coming True
Sponsored by Altimetry


## Industry Insight ›

Legal
**Harvard hires law firm King & Spalding amid US House probe**
Mike Scarcella, David Thomas
January 24, 2024


Legal
**Attorneys with disabilities are rare at law firms. It doesn't have to be that way, group says.**
Karen Sloan
December 5, 2023




Industry Insight
**Companies need to integrate climate reporting across functions to comply with California's new law**
Henry Engler
October 20, 2023


Legal
**Cellino, Barnes firms battle former colleagues over fees, years after split**
Diana Novak Jones
September 27, 2023


## Sponsored Content                                                 Dianomi ▷

California: The List Of The Top Financial Advisor Firms Is Out
Sponsored by smartasset


Tech Founder Made Dying Prophecy—Now Coming True
Sponsored by Altimetry


The Tiny, Fast-Growing Company Flying Under the Radar. Don't Miss Out.
Sponsored by The Motley Fool


Investing principles for today's challenges and tomorrow's goals
Sponsored by J.P. Morgan Asset Management


Build wealth solving the single-family housing shortage.
Sponsored by Invest with Upright


10 Lucrative Dividend Stocks With Double Digit Dividend Yields
Sponsored by Liberty Through Wealth


## Sponsored Content



**7 Retirement Income Strategies Once Your Portfolio Reaches $500k**
Sponsored by Fisher Investments

**Leverage TradeStation's platform to trade across asset classes.**
Sponsored by TradeStation

**UEFA Champions League**
Sponsored by Paramount+

**Is This Gold's Final Bull Market? Ex-Investment Banking VP Says Yes.**
Sponsored by Stansberry Research

**Time to Sell NVDA? 50-Yr Wall Street Legend Weighs In**
Sponsored by Chaikin Analytics

**Star Trek: Discovery**
Sponsored by Paramount+

**Latest**

Home
Authors
Topic sitemap

**Browse**

World
Business
Markets
Sustainability
Legal
Breakingviews
Technology
Investigations ⌞⌝
Sports
Science
Lifestyle

**Media**

▢◁ Videos ⌞⌝
⦿ Pictures
▨ Graphics ⌞⌝

**About Reuters**

About Reuters ⌞⌝
Careers ⌞⌝
Reuters News Agency ⌞⌝
Brand Attribution Guidelines ⌞⌝
Reuters Leadership ⌞⌝
Reuters Fact Check ⌞⌝
Reuters Diversity Report ⌞⌝

Stay Informed

Download the App (iOS) ⌞⌝
Download the App (Android) ⌞⌝
Newsletters ⌞⌝

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

    

Thomson Reuters Products

**Westlaw** ⌞⌝
Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**Onesource** ⌞⌝
The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint** ⌞⌝
The industry leader for online information for tax, accounting and finance professionals.

LSEG Products

### Workspace ↗

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

### Data Catalogue ↗

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

### World-Check ↗

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

Advertise With Us ↗    Advertising Guidelines ↗    Coupons ↗    Purchase Licensing Rights ↗

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

Cookies ↗    Terms of Use ↗    Privacy ↗    Digital Accessibility ↗    Corrections ↗    Site Feedback ↗
Do Not Sell or Share My Personal Information and Limit the Use of My Sensitive Personal Information

© 2024 Reuters. All rights reserved

# EXHIBIT 5

The New York Times
https://www.nytimes.com/2021/08/27/technology/apple-app-settlement-explained.html

# Why Apple Won Its Legal Settlement With Developers

Apple said it had made major concessions, but a closer examination suggests that the tech giant and the app makers' lawyers were big winners.

 **By Jack Nicas**

Published Aug. 27, 2021   Updated Oct. 8, 2021

Apple said Thursday that it had reached a legal settlement with app developers who accused it of abusing its control of the mobile-app market.

The settlement of the lawsuit was complex, and various people in the tech industry had widely different reactions to it. Apple and the people who sued it framed the deal as a major concession from Apple and a victory for developers. Some of Apple's critics, including companies that pay it millions of dollars in app fees, called it a "sham" that did little to change Apple's control over apps.

Here is an explanation of the settlement and what it means.

## First of all, what is the controversy all about?

Courts, regulators, lawmakers and developers have been scrutinizing Apple's practice of collecting a commission of up to 30 percent on the sales of other companies in its App Store, a business that generates, according to some estimates, nearly $20 billion a year for Apple.

Many companies that reach their customers through apps don't want to pay Apple a hefty cut, and they are increasingly fighting to change the rules. Apple argues that its commission rewards it for creating the "economic miracle" of the App Store, and it

is fighting to keep the status quo.

Billions of dollars are at stake in one of the most consequential fights over the power of Big Tech.

## So what did Apple give up in the settlement?

Not much. It agreed to keep its commission rates flat for three years and to continue to base search results in its App Store on "objective characteristics" like downloads and user ratings, also for three years.

At a granular level, it said, it will let developers sell their apps at 500 different price points, up from 100. (For instance, now an app could charge $32.99 instead of $29.99 for a subscription.)

And it agreed to create a $100 million fund for small app developers. (More on this later.)

But what is receiving the most attention is a "clarification" in Apple's rules: Companies can now send an email to customers telling them about ways to pay other than in their iPhone (or iPad) app.

## Is that significant?

Apple says so. But it appears to be a minor change to a set of rules that are at the center of complaints about how Apple controls its App Store.

Apple forces companies to use its payment system inside their iPhone apps, which enables it to collect its commission on their sales. Most companies would prefer to direct customers elsewhere to complete transactions so they can avoid Apple's fees. But Apple also generally bars companies from telling customers to pay elsewhere.

Apple has long banned such steering. It has also banned companies from even using emails to tell customers about other ways to pay if the companies got the customers' email addresses from their iPhone app.

Now Apple is saying it is OK for companies to send such emails, if the companies get the customer's permission to do so.

Some companies appear to have already been partly violating Apple's rules. To avoid Apple's commission, the music service Spotify, for instance, doesn't allow people to sign up for a subscription in its iPhone app. Still, after someone creates a free account in app, Spotify emails a link to its website, where it advertises its paid accounts, though the email doesn't explicitly tell users to circumvent Apple's commission.

An Apple spokesman said companies, including Spotify, had complained for years about Apple's restrictions on emailing certain customers.

## What has the reaction been?

There was tentative praise from some lawmakers who have proposed legislation to change App Store rules. Senator Richard Blumenthal, a Connecticut Democrat, said on Twitter that the settlement "marks a significant step forward, but does not rectify the full & vivid range of market abuses & practices still widespread across app markets."

The biggest praise came from the App Association, an organization that claims to give "a voice to small technology companies" but is funded by big technology companies, including Apple. "Our members need Apple to continue to lead on privacy, security and safety to preserve the trust consumers have in platforms," the group said.

Many companies that pay Apple's commission were not as kind. The Coalition for App Fairness, a group of firms fighting Apple's rules, said the settlement "does nothing to address the structural, foundational problems facing all developers, large and small, undermining innovation and competition in the app ecosystem." The group added that Apple's restrictions on what companies could say in private communications with their customers illustrated Apple's inappropriate control over the app marketplace.

David Heinemeier Hansson, an entrepreneur and app developer who is an outspoken critic of Apple's rules, said in a post on Friday that opening a narrow route for companies to steer customers toward other payment options only gives Apple cover to defend its ban on such communication in the places that matter, like the transaction page in an app.

"If the developer community had any hopes riding on this class-action lawsuit, this outcome would have been a dagger in the heart. Far worse than if no suit has been undertaken at all," he wrote. "If anything, this settlement cements the tremendous power that Apple has and wields. Even when a class-action lawsuit gets underway, it can be bought with bromides and bribes."

## Why has this been so confusing?

There was a lot of confusion after the settlement was announced in part because of how Apple announced it. The company told reporters about an evening press briefing two hours before it was set to start and then posted a muddied news release just as the briefing was beginning.

That meant that as an Apple executive described the settlement as a win for developers, reporters were already rushing to tweet and file first drafts of articles. The incentives of digital news today reward those who are first, not those who are more nuanced or accurate. (An Apple public-relations official required reporters to not name or quote the executive in order to hear the briefing.)

As a result, news headlines initially framed the change as a major avenue for companies to avoid Apple's commission. This was good for Apple, as any perception that it was making substantive changes to its App Store rules could help appease developers, the courts, regulators and lawmakers.

In reality, it appears that Apple has paid a small price to get rid of a potentially big legal headache.

# How does this affect Apple's court fight with Epic Games?

Apple is still awaiting a decision from a federal judge in a separate lawsuit that was filed by Epic Games, the maker of the popular game Fortnite. Epic wants to force Apple to allow app developers to avoid App Store commissions altogether.

Thursday's settlement requires approval from Judge Yvonne Gonzalez Rogers of U.S. District Court for the Northern District of California. She is also the arbiter in the Epic Games case.

Apple probably hopes that its rule change could help persuade Judge Rogers that it is meaningfully addressing developers' concerns. She said in May that she hoped to issue a ruling this month.

# Who will receive the $100 million?

Apple is paying $100 million in the settlement. The company said it was not a legal payoff but rather "a fund to assist small U.S. developers, particularly as the world continues to suffer from the effects of Covid-19."

Developers are slated to get $70 million of the money. App makers that made less than $1 million a year in the App Store from June 2015 through April 2021 are eligible for payouts between $250 and $30,000 each.

The plaintiffs' lawyers are requesting the other $30 million.

Steve Berman, one of the lawyers, said in an email that lawyers typically received 25 percent of such settlements, with more money possible if they secured other benefits for their clients. "Due to the host of business changes that will aid developers, we think an upward adjustment is merited," he said.

**Jack Nicas** covers technology from San Francisco. Before joining The Times, he spent seven years at The Wall Street Journal covering technology, aviation and national news. More about Jack Nicas

A version of this article appears in print on , Section B, Page 4 of the New York edition with the headline: Settlement Reached In Apple's Lawsuit With App Developers

# EXHIBIT 6

# Apple's guides App Association direction through hefty funding

*Malcolm Owen | Sep 19, 2022*



While not a member, Apple is providing most of the funding for developer advocacy group App Association, allowing it to shape policy.

Advocacy groups and lobbying parties often make claims to sway public, judicial, and political opinion one way or another, and that has been quite evident for some news stories about the tech giants. The App Association (ACT), which aims to fight for the rights of developers, generally offers favorable opinions about Apple.

Apple is said to be the source of most of the funding of the ACT, according to four former employees speaking to*Bloomberg*. While ACT has confirmed it receives more than half its funding from Apple, the employees claim the percentage received is a lot higher than half.

Figures from 2020 indicate that funding from all donors to ACT reached $9 million.

# Watch the Latest from AppleInsider TV



That funding gives Apple a lot of sway in the group, with the employees believing this provided Apple the opportunity to control the policy positions of the organization. Apple also does this without being a member of the group at all, using only funding to influence it.

Such influence may have led to proclamations that are decidedly pro-Apple. For example, in the aftermath of the Epic-Apple trial, the App Association commented that Apple wasn't a monopolist, benefits developers, and that preventing sideloading was good to block harmful software.

Despite the funding, ACT insists it isn't influenced by Apple's money. ACT executives say that policy positions are based on the opinions of its members and while it doesn't take direction from Apple, it does consider Apple's positions as well.

The extremely pro-Apple nature of ACT, including regular testimonials to Congress and court briefs, has led to criticism from others in the tech industry. This can include attempts to change laws that could affect the App Store commission Apple collects, payment policies, and other limitations.

Head of the Coalition for App Fairness Rick VanMeter said ACT was deceptive in its representation to developers, due to its relationship with Apple. "

When you pretend to be something that you're not in order to make a point, that's bad for the lawmaking process," VanMeter said.

Tim Sweeney, CEO of Epic Games, also referred to ACT in June as a fake "small developer lobby" that used "small app developers as human shields to defend [Apple's] monopoly." To Sweeney, ACT is a "Pure, shameless deception by a multi trillion dollar corporation."

The Coalition for App Fairness is a group that formed to combat Apple's policies, and has supported Epic Games in its App Store fight against Apple. However, an email during the lawsuit revealed Epic planned to spend up to $700,000 over the life of the Coalition as well as intended to exert a high level of control over policies. That was apparently dropped in favor of a more member-democratic organizational effort.

In defense, ACT president Morgan Reid said the accusations that ACT is a front for Apple "doesn't pass the laugh test" at all.

"Our job is to make sure we're paying attention to the way that government can have an impact, unintended or otherwise, on all of those small businesses making cool software products," Reid said.

 Follow AppleInsider on Google News

EXHIBIT 7

[B] [_____] 🔍    **More ▾**          Create Blog   Sign In

# FOSS PATENTS

THIS BLOG COVERS SOFTWARE PATENT NEWS AND ISSUES WITH A PARTICULAR FOCUS ON
WIRELESS, MOBILE DEVICES (SMARTPHONES, TABLET COMPUTERS, CONNECTED CARS) AS WELL
AS SELECT ANTITRUST MATTERS SURROUNDING THOSE DEVICES.

FRIDAY, OCTOBER 1, 2021

## Not a class ACT: the so-called App Association is simply an Apple Association and does NOT represent app developers' interests in fair distribution terms

Enough is enough. While I have previously agreed, and may in the future agree, with ACT | The App(le) Association on *some* patent policy questions, its pro-Apple advocacy in the App Store antitrust context--which I already mentioned in May--gets worse by the month. Judges, policy makers, and journalists should see that lobbying scheme for what it is.

Three months ago, New York-based attorney David Cohen wrote a blog post entitled "On Deceptive Apps and Practices: Unmasking the ACT App(le) Association." Mr. Cohen was rightfully astonished when he saw ACT claiming to speak on small businesses' behalf at a Federal Trade Commission (FTC) hearing. I trust he will not attempt to assert any copyright against me for borrowing the term "App(le) Association" from him, and I appreciate that he quoted me in the aforementioned post.

Our criticism of ACT | The App(le) Association has since been validated by the vaunted New York Times in an August 27, 2021 article that contains the follownig passage:

> "The biggest praise came from the App Association, an organization that **claims** to give 'a voice to small technology companies' but is **funded by big technology companies, including Apple.** 'Our members need Apple to continue to lead on privacy, security and safety to preserve the trust consumers have in platforms,' the group said." (emphases added)

In other words, Apple was using its mouthpiece ACT to tell the media that Apple should continue with its stranglehold on app developers large and small. In reality, there's not a single app developer out there who truly thinks Apple's death grip is that good--and if any make public declarations to the contrary (which are few and far between), it's because they expect (which doesn't necessarily mean they've been promised) Apple to reciprocate that favor in some form or another.

If ACT respected not only itself but also, more generally, human intelligence, it would have realized that when the New York Times exposes an apparent lack of credibility and legitimacy, it's over. I mean, seriously, the NYT paragraph I quoted above should have given them and their other backers pause. Apple stops at nothing to defend its iOS app distribution monopoly, but other companies should be profoundly concerned that this App Store propaganda effort also discredits ACT's work on other issues, such as SEPs, regardless of whether those positions may be correct.

Instead of stopping its App Store crap, ACT even doubled down on its Apple propaganda on September 1, 2021, claiming that South Korea's recently-enacted law--which was a major breakthrough for app developers large and small--"will only benefit global leaders like Spotify, Epic Games, and Tile while also potentially freezing out small business app developers in South Korea and around the world." In reality, small app developers are free to still use Apple's in-app purchasing (IAP) system in South Korea, just like before--they just have the additional option of using other payment systems. It's true that Spotify, Epic Games, and Tile are three of the most active #OpentheAppStore advocates, alongside many others such as Match Group (Tinder). But they don't really have clout in South Korea. In fact, Epic *competes* with major South Korean game makers.

Out of ACT's ten most recent public statements, three related to SEPs and seven to App Store issues. Small app developers don't implement SEPs. What we do is that we create apps for operating systems like iOS and Android that run on devices that implement SEPs. There are startups that implement SEPs, but they make hardware, not software, and apps are software. Another insult to human intelligence.

ACT is not alone in trying to advance Apple and Google's interests in monopoly maintenance. CCIA does the same, and they're a Google

**CONTACT FORM**

BLOG ARCHIVE

► 2023 (231)
► 2022 (432)
▼ 2021 (232)
  ► December (18)
  ► November (16)
  ▼ October (19)
     Creepy patent case involves two unethical business...
     Dutch court rejects Ericsson motion for anti-antis...
     Intellectual Ventures predicted 'IP reckoning' for...
     EU competition chief sought talk on cartels doesn...
     L2 Mobile Technologies claims Qualcomm chips in Fo...
     Germany's chief patent judge: amended injunction s...
     STUNNING: High-ranking German judge publicly state...
     Patent injunctions remain the norm in Germany, jud...
     Nokia's patent assertions against OPPO in India, R...
     Nokia tries to drown OPPO in patent infringement l...
     First four OPPO v. Nokia countersuits over 5G pate...
     OPPO outperformed Daimler and its numerous supplie...
     French industrial conglomerate Thales suing Avanci...
     Japanese patent licensing firm IP Bridge is suing ...
     Restoring the America Invents Act: legislative mea...
     Apple's adamant refusal to reinstate Epic's Fortni...
     Monopolistic patent aggregation can give rise to a...
     Ericsson seeks $5 per iPhone for its 5G standard-e...
     Not a class ACT: the so-called App Association is ...
  ► September (11)
  ► August (11)
  ► July (26)
  ► June (18)
  ► May (10)
  ► April (30)
  ► March (30)
  ► February (26)
  ► January (17)
► 2020 (180)
► 2019 (219)
► 2018 (100)
► 2017 (65)
► 2016 (53)
► 2015 (90)
► 2014 (178)
► 2013 (403)

front in that regard--in their case, like in ACT's, I don't understand why other members, particularly those who have in the *opposite* interests as Google, accept it. **But at least CCIA doesn't claim to speak for app developers.** Whatever they say, they say as a lobby group representing large (and mostly American) tech companies. That's fair.

Google has its own ACT, and its called Developers Alliance (previously "Application Developers Alliance"). The "Developers' Alliance's policy statement on "digital platform competition" (though competition is precisely what they work against) begins with the following sentence: "Healthy companies that invest and innovate are integral to a successful developer ecosystem." No one would dispute that commonplace statement, but that's not the issue: Google and Apple have enough of an incentive and every ability to invest and innovate. What they lack, however, is reasonable competitive constraints with respect to app distribution. Resources alone don't create innovation-- they would just end up being distributed to shareholders (dividends and share buybacks). It takes the combination of resources (*i.e.*, a viable business model) and competitive pressure.

The "Developers' Alliance rarely takes positions on patent enforcement, and unlike ACT they at least appear to focus on patent policy issues that are indeed relevant to small companies, such as access to post-grant review before the Patent Trial and Appeal Board of the USPTO. The "Developers' Alliance's feedback to the European Commission's IP Action Plan discusses the need to protect trade secrets (which is indeed in the interest of companies large *and* small) and " [t]he prevention of potential abusive litigation practices." In that regard, the "Developers' Alliance is more sophisticated and selective than ACT, which will simply parrot Apple's positions on any issue, no matter how irrelevant to small app developers it may be.

That still doesn't make the "Developers" Alliance a legitimate representative of small developers. They're just more careful about not making themselves completely ridiculous.

The fight for app developers' rights has not ended with Apple's victory over Epic, a decision that merely marks the end of the beginning (even in that dispute, which will probably end up being adjudged by the Supreme Court). Apple and Google have every right to state their positions, but app developers (like me) have the right to contradict in no uncertain terms when others falsely claim to represent us.

Share with other professionals via LinkedIn: Share

Share|

EINGESTELLT VON FLORIAN MUELLER UM 10:47 AM

LABELS: ACT | THE APP ASSOCIATION, ANTITRUST, APP DEVELOPERS, APPLE, APPLICATION DEVELOPERS ALLIANCE, CCIA, FEDERAL TRADE COMMISSION, FRAND, STANDARD-ESSENTIAL PATENTS

Newer Post                                    Home                                    Older Post

---

► 2013 (493)
► 2012 (628)
► 2011 (335)
► 2010 (106)

SEARCH THIS BLOG

Search

# EXHIBIT 8

♦Kidon IP®

Home    Services    About    Blog    Contact

Blog



## On Deceptive Apps and Practices: Unmasking the ACT App(le) Association

July 7, 2021  /  In Standard Essential Patents (SEP), Tech's Frightful Five  /  by David L. Cohen, Esq.



Warning: Deceptive Acts or Practices Ahead

On July 1, the Federal Trade Commission (FTC), under the leadership of new Chair Lina Khan, held the first open Commission meeting in a series of announced monthly meetings. It was interesting to watch, and I have high hopes that Chair Khan, an accomplished Columbia University Law professor who was one of the lead authors of last year's House report on Competition in Digital Markets, truly understands Big Tech's market shenanigans. This is why what happened near the end of the meeting surprised me.

The meeting announcement stated that the "Commission will invite members of the public to share feedback on the Commission's work...and bring relevant matters to the Commission's attention." And indeed, invited speakers were mostly small players, like small restaurant owners, independent pharmacy owners, family grocers, family farmers, IT repair providers that electronic companies are trying to kill, etc. Other speakers spoke on behalf of associations that oppose Big Tech practices including Athena, Free Press, and the Parent Coalition for Student Privacy. However, it was surprising to see a speaker for the ACT App Association selected to speak, seemingly on behalf of small business interests.

The ACT App Association should really be called the ACT Apple Association.  It was founded in 1998 by Microsoft as a lobbying arm utilizing smaller player' as a front to support its defense against antitrust charges on both sides of the Atlantic. Over the years, it remained a vehicle for Big Tech interests. Although hard to find (and strategically placed off the members' page), if you scroll all the way down this page you see the ACT App(le) association's main sponsors are Apple, Microsoft, Intel, Verizon, and AT&T (other recent sponsors have included Facebook, Oracle, and eBay).

I have written about this "hide behind a supposed app association" charade last year. Since then, we've seen real app developers fight for their lives in the Epic Games vs. Apple litigation. However, the ACT App Association filed an amicus brief in support of... Apple (!), and its blog similarly takes Apple's side. So why is an "app association" opposed to app developers' interests?

As Florian Mueller recently explained:

"the only organization at the moment that definitely represents developer interests is the Coalition for App Fairness. ... Unfortunately, there are a couple of other organizations pretending to represent app developers, but in reality they're lobbying fronts for large corporations:

- **ACT | The App Association** says it "enjoys the support of top companies in the mobile economy." The first logo that webpage shows (near the bottom of the page I linked to) is Apple's. . . .
- The **Developers Alliance** (previously known as "Application Developers Alliance") is effectively a Google front"

I hope the FTC understands why the association's small app developers supposedly support Apple in the Epic v. Apple litigation, why these app developers supposedly care so strongly about standards essential patents (although app developers are never required to take SEP licenses), or how these app developers have the resources to support a 22-

### NEWS CATEGORIES

- Analysis In-Depth
  - Outsourced In-House Counsel
  - Outsourced Manufacturing
  - Patent Demand Letters
- and NIST call for Public Comments on Standards
- Copyright
- Disclosure and Enforceability of SEPs
- Expert Insights
- Global IPR Enforcement
- Guest Bloggers & Collaborations
- IoT and Patent Wars
- IP Monetization
- IP News
- IP Strategy
- Podcast / Video Show
- Response to DOJ call for comments
- Standard Essential Patents (SEP)
- Tech's Frightful Five
- Trade Secrets
- Video Courses
- Vringo v. ZTE

Search

### SUBSCRIBE TO SEP-RELATED NEWS VIA EMAIL

Enter your email address to subscribe to this blog and receive notifications of new posts by email.

Email Address



### NEWSLETTER SIGNUP



For Email Marketing you can trust.

### FOLLOW US

### LATEST NEWS

Interview on Inspiring Business Podcast February 20, 2024

**employee** trade association. The answer is easy.  It's because the ACT App(le) Association represents Apple, Microsoft, Intel, Verizon and AT&T – not app developers.

Also misleading is the Association's claim at last week's hearing to represent "thousands of small business software application development companies...located across every state in America." The Association's membership page lists thirty entities. Ten of these are European entities surprisingly listed without websites.  The remaining ones include a venture capital company, a marketing company, a design company, and at least one entity that appears to be out of business. It is unclear how the remaining dozen or so entities amount to "thousands of small [app developers] ... located across every state in America."

In short, this group is Big Tech masquerading as small business.  It bears no resemblance to the small businesses and legitimate public interest organizations who spoke at the open meeting.  For the ACT App(le) association to pretend to be an association of little guys is deceptive, at best. Instead of inviting them to speak, maybe the FTC Bureau of Consumer Protection should be investigating them and their sponsors for this misrepresentation.

Tags:   ACT App Association,  Apple,  bigtech,  FTC

Share this entry

You might also like

    

Response to the USPTO, The ITA, and NIST call for Public Comments on Standards, Part 7 of 7
November 7, 2023

Response to the USPTO, The ITA, and NIST call for Public Comments on Standards, Part 6 of 7
November 7, 2023

Response to the USPTO, The ITA, and NIST call for Public Comments on Standards, Part 5 of 7
November 7, 2023

Response to the USPTO, The ITA, and NIST call for Public Comments on Standards, Part 4 of 7
November 7, 2023

PUBLICATIONS

- Outsourcing In-House Counsel: The Case of Trade Secret Services
- Outsourcing In-House Counsel – The Case of Standard Essential Patent Assertion
- The China Paradox: A short history of Vringo v ZTE
- Licensing Standard-Essential Patents on FRAND Terms
- 2017 – Devising International Patent Litigation Strategies
- 2016 – Standard-Essential Patent Monetization and Enforcement
- Copyrighting The Dead Sea Scrolls: Qimron v. Shanks
- Theories Of The Corporation And The Limited Liability Company
- Article 69 And European Patent Integration

**CONTACT**

Kidon IP® Corporation

+1 914-357-5196 • info@kidonip.com

The material on this web site may be considered advertising for legal services.
Prior results do not guarantee a similar outcome.

**CONTACT**

David I. Cohen, P.C.

www.davidicohenpc.com

+1 914-357-5196 • info@davidicohenpc.com

The material on this web site may be considered advertising for legal services.
Prior results do not guarantee a similar outcome.

Copyright Kidon IP - Powered by KB Technical, LLC                    Home    Services    About    Blog    Contact

EXHIBIT 9

efile Public Visual Render | ObjectId: 202312819349300001 - Submission: 2023-10-08 | TIN: 52-2106531

Form **990**

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public.

▶ Go to **www.irs.gov/Form990** for instructions and the latest information.

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0047

**2022**

Open to Public Inspection

**A  For the 2022 calendar year, or tax year beginning 01-01-2022 , and ending 12-31-2022**

**B** Check if applicable:
- ☐ Address change
- ☐ Name change
- ☐ Initial return
- ☐ Final return/terminated
- ☐ Amended return
- ☐ Application pending

**C** Name of organization
Association for Competitive Technolgy
ACT The App Association
% Gerard R Adam

Doing business as
ACT The App Association

Number and street (or P.O. box if mail is not delivered to street address)     Room/suite
1401 K St NW Ste 501

City or town, state or province, country, and ZIP or foreign postal code
Washington, DC  20005

**D** Employer identification number

52-2106531

**E** Telephone number
(202) 331-2130

**G** Gross receipts $ 13,611,724

**F** Name and address of principal officer:
GERARD ADAM
1401 K St NW Ste 501
Washington, DC  20005

**H(a)** Is this a group return for subordinates?  ☐ Yes ☒ No
**H(b)** Are all subordinates included?  ☐ Yes ☐ No
If "No," attach a list. See instructions.
**H(c)** Group exemption number ▶

**I** Tax-exempt status:  ☐ 501(c)(3)  ☒ 501(c) ( 6 ) ◀ (insert no.)  ☐ 4947(a)(1) or  ☐ 527

**J** Website: ▶  www.actonline.org

**K** Form of organization: ☒ Corporation ☐ Trust ☐ Association ☐ Other ▶

**L** Year of formation: 1998    **M** State of legal domicile: DC

### Part I    Summary

| | | | |
|---|---|---|---|
| **1** | Briefly describe the organization's mission or most significant activities: to strive to preserve and enhance competition and entrepreneurial spirit that has been the hallmark of the tehnology industry | | |

**Activities & Governance**

| | | | |
|---|---|---|---|
| **2** | Check this box ▶ ☐ | | |
| **3** | Number of voting members of the governing body (Part VI, line 1a) | **3** | 3 |
| **4** | Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 0 |
| **5** | Total number of individuals employed in calendar year 2022 (Part V, line 2a) | **5** | 22 |
| **6** | Total number of volunteers (estimate if necessary) | **6** | |
| **7a** | Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | 0 |
| **b** | Net unrelated business taxable income from Form 990-T, Part I, line 11 | **7b** | |

| | | **Prior Year** | **Current Year** |
|---|---|---|---|
| **Revenue** | **8** Contributions and grants (Part VIII, line 1h) | 9,785,026 | 13,596,722 |
| | **9** Program service revenue (Part VIII, line 2g) | | 0 |
| | **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d) | | 0 |
| | **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 393,776 | 15,002 |
| | **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 10,178,802 | 13,611,724 |
| **Expenses** | **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | | 0 |
| | **14** Benefits paid to or for members (Part IX, column (A), line 4) | | 0 |
| | **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 3,107,354 | 4,255,147 |
| | **16a** Professional fundraising fees (Part IX, column (A), line 11e) | | 0 |
| | **b** Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| | **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 4,170,785 | 7,896,842 |
| | **18** Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 7,278,139 | 12,151,989 |
| | **19** Revenue less expenses. Subtract line 18 from line 12 | 2,900,663 | 1,459,735 |

| | | **Beginning of Current Year** | **End of Year** |
|---|---|---|---|
| **Net Assets or Fund Balances** | **20** Total assets (Part X, line 16) | 7,168,149 | 8,140,690 |
| | **21** Total liabilities (Part X, line 26) | -812,161 | -1,298,359 |
| | **22** Net assets or fund balances. Subtract line 21 from line 20 | 7,980,310 | 9,439,049 |

### Part II    Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| Sign Here | Signature of officer | 2023-10-08 Date |
|---|---|---|
| | GERARD R ADAM  Mr | |
| | Type or print name and title | |

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date 2023-10-08 | Check ☐ if self-employed | PTIN XXX-XX-XXXX |
|---|---|---|---|---|---|
| | Firm's name ▶ ACT | | | Firm's EIN ▶ 52-2106531 | |
| | Firm's address ▶ 1401 K ST NW  Suite 501  Washington, DC  20005 | | | Phone no. (703) 403-2001 | |

May the IRS discuss this return with the preparer shown above? See Instructions. . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

**For Paperwork Reduction Act Notice, see the separate instructions.**   Cat. No. 11282Y   Form **990** (2022)

---

Page 2

---

Form 990 (2022)                                                                                                    Page **2**

| Part III | **Statement of Program Service Accomplishments** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . . . . ☐

**1** Briefly describe the organization's mission:

to strive to preserve and enhance competition and entrepreneurial spirit that has been the hallmark of the tehnology industry

**2** Did the organization undertake any significant program services during the year which were not listed on the prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

If "Yes," describe these new services on Schedule O.

**3** Did the organization cease conducting, or make significant changes in how it conducts, any program services? . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

If "Yes," describe these changes on Schedule O.

**4** Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses. Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported.

**4a** (Code:              ) (Expenses $                including grants of $                ) (Revenue $                )

n/a

**4b** (Code:              ) (Expenses $                including grants of $                ) (Revenue $                )

**4c** (Code:              ) (Expenses $                including grants of $                ) (Revenue $                )

**4d** Other program services (Describe in Schedule O.)

(Expenses $                including grants of $                ) (Revenue $                )

**4e** **Total program service expenses ▶**

Form **990** (2022)

Form 990 (2022)                                                                                 Page **3**

| Part IV | Checklist of Required Schedules | | | |
|---|---|---|---|---|
| | | | **Yes** | **No** |
| **1** | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes," complete Schedule A* . . . . . . . . . . . . . | **1** | | No |
| **2** | Is the organization required to complete *Schedule B, Schedule of Contributors*? See instructions. . . . | **2** | | No |
| **3** | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If "Yes," complete Schedule C, Part I* | **3** | Yes | |
| **4** | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II* | **4** | | No |
| **5** | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Rev. Proc. 98-19? *If "Yes," complete Schedule C, Part III* . . | **5** | Yes | |
| **6** | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D,Part I* | **6** | | No |
| **7** | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* | **7** | | No |
| **8** | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D, Part III* . . . . . . . . . | **8** | | No |
| **9** | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? *If "Yes," complete Schedule D, Part IV* | **9** | | No |
| **10** | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi endowments? *If "Yes," complete Schedule D, Part V* . . . . . | **10** | | No |
| **11** | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X, as applicable. | | | |
| **a** | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D, Part VI.* | **11a** | | No |
| **b** | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* | **11b** | | No |
| **c** | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* . . . . . . | **11c** | | No |
| **d** | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* . . . . . . . | **11d** | | No |
| **e** | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* | **11e** | Yes | |
| **f** | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* | **11f** | | No |
| **12a** | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* . . . . . . . . . | **12a** | | No |
| **b** | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* | **12b** | | No |
| **13** | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* | **13** | | No |
| **14a** | Did the organization maintain an office, employees, or agents outside of the United States? . . . . . | **14a** | Yes | |
| **b** | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV* . . . . . . . . | **14b** | | No |
| **15** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* . . . . . . | **15** | | No |
| **16** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV* . . . . . | **16** | | No |
| **17** | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I.* See instructions. . . . . . | **17** | | No |
| **18** | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* . . . . . . . . | **18** | | No |
| **19** | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* . . . . . . . . . . | **19** | | No |
| **20a** | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* . . . . | **20a** | | No |
| **b** | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | **20b** | | |
| **21** | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* . . . | **21** | | No |

Form **990** (2022)

Form 990 (2022)    Page **4**

| Part IV | **Checklist of Required Schedules** *(continued)* | | | |
|---|---|---|---|---|
| | | | **Yes** | **No** |
| **22** | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* . . . . . . . . . | **22** | | No |
| **23** | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5, about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* . . . . . . . . . | **23** | Yes | |
| **24a** | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* . . . . . . . . . | **24a** | | No |
| **b** | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . . | **24b** | | |
| **c** | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? . . . . . . . . . | **24c** | | |
| **d** | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . . . | **24d** | | |
| **25a** | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L,* Part I . . . . | **25a** | | No |
| **b** | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L,* Part I . . . . . . . . . | **25b** | | No |
| **26** | Did the organization report any amount on Part X, line 5 or 22 for receivables from or payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part II* . . . . | **26** | | No |
| **27** | Did the organization provide a grant or other assistance to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or employee thereof, a grant selection committee member, or to a 35% controlled entity (including an employee thereof) or family member of any of these persons? *If "Yes," complete Schedule L,* Part III . . . . . . . . . | **27** | | No |
| **28** | Was the organization a party to a business transaction with one of the following parties (see the Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | | |
| **a** | A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . | **28a** | | No |
| **b** | A family member of any individual described in line 28a? *If "Yes," complete Schedule L, Part IV* . . . . . | **28b** | | No |
| **c** | A 35% controlled entity of one or more individuals and/or organizations described in line 28a or 28b? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . | **28c** | | No |
| **29** | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* . . | **29** | | No |
| **30** | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . . . . . . . . . | **30** | | No |
| **31** | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | **31** | | No |
| **32** | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . . . . . . . . . | **32** | | No |
| **33** | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* . . . . . . . . . | **33** | | No |
| **34** | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . . . . . . | **34** | Yes | |
| **35a** | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | **35a** | Yes | |
| **b** | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . . . . | **35b** | Yes | |
| **36** | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . . . . . . . | **36** | | |
| **37** | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* . . | **37** | | No |
| **38** | Did the organization complete Schedule O and provide explanations on Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O. | **38** | Yes | |

| Part V | **Statements Regarding Other IRS Filings and Tax Compliance** | | | |
|---|---|---|---|---|
| | Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . . . ☐ | | | |
| | | | **Yes** | **No** |
| **1a** | Enter the number reported in box 3 of Form 1096. Enter -0- if not applicable . . | **1a** | 8 | |
| **b** | Enter the number of Forms W-2G included on line 1a. Enter -0- if not applicable . | **1b** | 0 | |
| **c** | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming | | | |

| (gambling) winnings to prize winners? . . . . . . . . . . . . . . . . . . | | **1c** | Yes | |

Form **990** (2022)

Form 990 (2022)                                                                                       Page **5**

| Part V | Statements Regarding Other IRS Filings and Tax Compliance *(continued)* | | | |
|---|---|---|---|---|
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return . . . . . . . . . . . . . . . | **2a** 22 | | |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? | | **2b** | Yes |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? . . . | | **3a** | No |
| **b** | If "Yes," has it filed a Form 990-T for this year? *If "No" to line 3b, provide an explanation in Schedule O* . . . | | **3b** | No |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . | | **4a** | Yes |
| **b** | If "Yes," enter the name of the foreign country: ▶_____ See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | | |
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . . | | **5a** | No |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | **5b** | No |
| **c** | If "Yes," to line 5a or 5b, did the organization file Form 8886-T? . . . . . . . . . . . | | **5c** | |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . | | **6a** | No |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . . . . . . . . . . . | | **6b** | |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** | | | |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . . . . | | **7a** | |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . | | **7b** | |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . . . . . . | | **7c** | |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year . . . | **7d** | | |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | **7e** | |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . | | **7f** | |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? . . . . . . . . . . . . . . . . . . | | **7g** | |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? . . . . . . . . . . . . . . . . . | | **7h** | |
| **8** | **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . . | | **8** | |
| **9** | **Sponsoring organizations maintaining donor advised funds.** | | | |
| **a** | Did the sponsoring organization make any taxable distributions under section 4966? . . . . . | | **9a** | |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . | | **9b** | |
| **10** | **Section 501(c)(7) organizations.** Enter: | | | |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 . . . | **10a** | | |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** | | |
| **11** | **Section 501(c)(12) organizations.** Enter: | | | |
| **a** | Gross income from members or shareholders . . . . . . . . . | **11a** | | |
| **b** | Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) . . . . . . | **11b** | | |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | | **12a** | |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year. | **12b** | | |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | |
| **a** | Is the organization licensed to issue qualified health plans in more than one state? . . . . . . . . **Note.** See the instructions for additional information the organization must report on Schedule O. | | **13a** | |
| **b** | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . . | **13b** | | |
| **c** | Enter the amount of reserves on hand . . . . . . . . . . | **13c** | | |
| **14a** | Did the organization receive any payments for indoor tanning services during the tax year? . . . . . | | **14a** | No |
| **b** | If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* . . . | | **14b** | |

| | | | | Yes | No |
|---|---|---|---|---|---|
| 15 | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? If "Yes," see the instructions and file Form 4720, Schedule N. | | 15 | | No |
| 16 | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? . If "Yes," complete Form 4720, Schedule O. | | 16 | | No |
| 17 | **Section 501(c)(21) organizations.** Did the trust, or any disqualified or other person engage in any activities that would result in the imposition of an excise tax under section 4951, 4952, or 4953? . . If "Yes," complete Form 6069. | | 17 | | No |

Form **990** (2022)

---

Page 6

---

Form 990 (2022)                                                                                     Page **6**

Part VI    **Governance, Management, and Disclosure.** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines   8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . . . . . ☑

## Section A. Governing Body and Management

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| **1a** | Enter the number of voting members of the governing body at the end of the tax year | **1a** | 3 | | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | | | |
| **b** | Enter the number of voting members included in line 1a, above, who are independent | **1b** | 0 | | | |
| **2** | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . . | | | **2** | | No |
| **3** | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? . . | | | **3** | | No |
| **4** | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . | | | **4** | | No |
| **5** | Did the organization become aware during the year of a significant diversion of the organization's assets? . | | | **5** | | No |
| **6** | Did the organization have members or stockholders? . | | | **6** | | No |
| **7a** | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? | | | **7a** | | No |
| **b** | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . | | | **7b** | | No |
| **8** | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | | |
| **a** | The governing body? . . . . . . . . . . . . | | | **8a** | Yes | |
| **b** | Each committee with authority to act on behalf of the governing body? . . . . | | | **8b** | Yes | |
| **9** | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses on Schedule O* . . . . . . | | | **9** | | No |

## Section B. Policies *(This Section B requests information about policies not required by the Internal Revenue Code.)*

| | | | | Yes | No |
|---|---|---|---|---|---|
| **10a** | Did the organization have local chapters, branches, or affiliates? . . . . | | **10a** | | No |
| **b** | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | | **10b** | | |
| **11a** | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | | **11a** | Yes | |
| **b** | Describe on Schedule O the process, if any, used by the organization to review this Form 990. . . . | | | | |
| **12a** | Did the organization have a written conflict of interest policy? *If "No," go to line 13* . . . . | | **12a** | Yes | |
| **b** | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? . . . . . . . . . . . . | | **12b** | Yes | |
| **c** | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe on Schedule O how this was done* . . . . . | | **12c** | Yes | |
| **13** | Did the organization have a written whistleblower policy? . . . . | | **13** | Yes | |
| **14** | Did the organization have a written document retention and destruction policy? . . . . | | **14** | Yes | |
| **15** | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | | |
| **a** | The organization's CEO, Executive Director, or top management official . . . . . | | **15a** | Yes | |
| **b** | Other officers or key employees of the organization . . . . . . . | | **15b** | Yes | |
| | If "Yes" to line 15a or 15b, describe the process on Schedule O. See instructions. | | | | |
| **16a** | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . | | **16a** | | No |
| **b** | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . | | | | |

| 16b |

## Section C. Disclosure

**17** List the states with which a copy of this Form 990 is required to be filed▶

**18** Section 6104 requires an organization to make its Form 1023 (1024 or 1024-A, if applicable), 990, and 990-T (section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.

☐ Own website  ☐ Another's website  ☑ Upon request  ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

**20** State the name, address, and telephone number of the person who possesses the organization's books and records:
▶ACT  1401 K St NW Ste 501    Washington, DC 20005 (202) 331-2130

Form **990** (2022)

---

— Page 7 —

---

Form 990 (2022)                                                                                                    Page **7**

**Part VII**  **Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

Check if Schedule O contains a response or note to any line in this Part VII  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ☐

### Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

● List all of the organization's **current** key employees, if any. See the instructions for definition of "key employee."

● List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (box 5 of Form W-2, box 6 of Form 1099-MISC, and/or box 1 of Form 1099-NEC) of more than $100,000 from the organization and any related organizations.

● List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See the instructions for the order in which to list the persons above.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A)<br>Name and title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee; | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) MORGAN REED<br>President | 50.00<br>⋯⋯⋯<br>5.000 | | | | | X | | 534,800 | 0 | 19,400 |
| (2) RENE ADAM<br>CFO | 45.00<br>⋯⋯⋯<br>5.000 | X | | X | | | | 302,225 | 0 | 15,067 |
| (3) CHELSEA THOMAS<br>Executive Director | 45.00<br>⋯⋯⋯<br>5.000 | | | | | X | | 323,600 | 0 | 19,400 |
| (4) GRAHAM DUFAULT<br>Communications Dir | 45.00<br>⋯⋯⋯<br>5.000 | | | | | X | | 283,250 | 0 | 18,747 |
| (5) BRIAN SCARPELLI<br>Legal Counsel | 50.00<br>⋯⋯⋯<br>5.000 | | | | | X | | 283,250 | 0 | 18,747 |
| (6) JONATHAN ZUCK<br>Board Member | 5.00<br>⋯⋯⋯<br>45.00 | X | | | | | | 0 | 24,000 | 720 |
| (7) CALEB WILLIAMSON<br>State Public Pol Assoc | 40.00<br>⋯⋯⋯<br> | | | | | X | | 113,290 | 0 | 4,329 |
| | | | | | | | | | | |
| | | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Form **990** (2022)

Part VII    **Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees** *(continued)*

| **(A)** Name and title | **(B)** Average hours per week (list any hours for related organizations below dotted line) | **(C)** Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | **(D)** Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | **(E)** Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | **(F)** Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee; | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Sub-Total** . . . . . . . . ▶ | | | | | | | | | | |
| **c Total from continuation sheets to Part VII, Section A** . . . ▶ | | | | | | | | | | |
| **d Total (add lines 1b and 1c)** . . . . . . . . ▶ | | | | | | | | 1,840,415 | 24,000 | 96,410 |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 6

| | | Yes | No |
|---|---|---|---|
| **3** Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . | **3** | | No |
| **4** For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . | **4** | Yes | |
| **5** Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* . . . . . . . . | **5** | | No |

**Section B. Independent Contractors**

**Section B. Independent Contractors**

**1**  Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A)<br>Name and business address | (B)<br>Description of services | (C)<br>Compensation |
|---|---|---|
| Innovators Network<br><br>1401 K St NW Ste 501<br>Washington, DC  20005 | contracted service | 2,291,125 |
| Glen Echo Group<br><br>2001 L St NW Ste 901<br>Washington, DC  20036 | contracted services | 444,500 |
| saxnet<br><br>2852 Willamette St Ste 359<br>Eugene, OR  97405 | contracted services | 242,640 |
| Morning Consult llc<br><br>1025 F St NW Ste 800<br>Washington, DC  20004 | contracted services | 150,000 |
| Brisge Street Group<br><br>PO Box 98<br>Basye, VA  22810 | contracted service | 120,000 |

**2**  Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 5

Form **990** (2022)

---

Page 9

---

Form 990 (2022)                                                                    Page **9**

| Part VIII | **Statement of Revenue** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part VIII  . . . . . . . . ☐

| | | (A)<br>Total revenue | (B)<br>Related or exempt function revenue | (C)<br>Unrelated business revenue | (D)<br>Revenue excluded from tax under sections 512 - 514 |
|---|---|---|---|---|---|
| **Contributions, Gifts, Grants, and Other Similar Amounts** | **a** Federated campaigns . . | **1a** | | | |
| | **b** Membership dues  . . | **1b** | | | |
| | **c** Fundraising events  . . | **1c** | | | |
| | **d** Related organizations | **1d** | | | |
| | **e** Government grants (contributions) | **1e** | | | |
| | **f** All other contributions, gifts, grants, and similar amounts not included above | **1f** 550,000 | | | |
| | **g** Noncash contributions included in lines 1a - 1f:$ | **1g** | | | |
| | **h Total.** Add lines 1a-1f  . . . . . . . . ▶ | 13,596,722 | | | |

13,046,722

| **Program Service Revenue** | **2a** | | Business Code | | | | |
|---|---|---|---|---|---|---|---|
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** | | | | | | |
| | **e** | | | | | | |
| | **f** All other program service revenue. | | | | | | |

**9 Total.** Add lines 2a–2f . . . . ▶

**3** Investment income (including dividends, interest, and other similar amounts) . . . . . . . ▶

**4** Income from investment of tax-exempt bond proceeds ▶

**5** Royalties . . . . . . . . . ▶

| | | (i) Real | (ii) Personal |
|---|---|---|---|
| **6a** Gross rents | **6a** | 11,010 | |
| **b** Less: rental expenses | **6b** | | |
| **c** Rental income or (loss) | **6c** | 11,010 | |

**d** Net rental income or (loss) . . . . . ▶    11,010

| | | (i) Securities | (ii) Other |
|---|---|---|---|
| **7a** Gross amount from sales of assets other than inventory | **7a** | | |
| Less: cost or other basis and sales expenses | **7b** | | |
| Gain or (loss) | **7c** | | |

**d** Net gain or (loss) . . . . . . . ▶

**a** Gross income from fundraising events (not including $ _____ of contributions reported on line 1c). See Part IV, line 18    **8a**

**b** Less: direct expenses . . . **8b**

**c** Net income or (loss) from fundraising events . . ▶    0

**9a** Gross income from gaming activities. See Part IV, line 19 . . .    **9a**

**b** Less: direct expenses . . . **9b**

**c** Net income or (loss) from gaming activities . . ▶

**10a** Gross sales of inventory, less returns and allowances . . **10a**

**b** Less: cost of goods sold . . **10b**

**c** Net income or (loss) from sales of inventory . . ▶

| | Business Code | |
|---|---|---|
| **11a** sale of equipment | 541900 | 1,056 |
| **b** unrealized loss | | 2,936 |
| OtherRevenueMiscAmt | | |
| **d** All other revenue . . . . | | |

**e Total.** Add lines 11a–11d . . . . . . ▶    3,992

**12 Total revenue.** See instructions . . . . ▶    13,611,724

Form **990** (2022)

Form 990 (2022)    Page **10**

| Part IX | Statement of Functional Expenses |
|---|---|

Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . ☑

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | (A) Total expenses | (B) Program service expenses | (C) Management and general expenses | (D) Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 | | | | |

| | | (A) | (B) | (C) | (D) |
|---|---|---:|---:|---:|---:|
| | domestic governments. See Part IV, line 21 | | | | |
| **2** | Grants and other assistance to domestic individuals. See Part IV, line 22 . . . . . . | | | | |
| **3** | Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16. . . . . . . . . | | | | |
| **4** | Benefits paid to or for members . . . . . . . | | | | |
| **5** | Compensation of current officers, directors, trustees, and key employees | 2,321,315 | | | |
| **6** | Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) | | | | |
| **7** | Other salaries and wages . . . . . . . | 985,903 | | | |
| **8** | Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) . . . . | 148,504 | | | |
| **9** | Other employee benefits . . . . . . . . | 622,745 | | | |
| **10** | Payroll taxes . . . . . . . . . . | 176,680 | | | |
| **11** | Fees for services (non-employees): | | | | |
| **a** | Management . . . . . . . | | | | |
| **b** | Legal . . . . . . . . . . | 606,503 | | | |
| **c** | Accounting . . . . . . . . | 25,292 | | | |
| **d** | Lobbying . . . . . . . . | 24,000 | | | |
| **e** | Professional fundraising services. See Part IV, line 17 | | | | |
| **f** | Investment management fees . . . . . . | | | | |
| **g** | Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O) | 2,863,306 | | | |
| **12** | Advertising and promotion . . . . . | 1,443,229 | | | |
| **13** | Office expenses . . . . . . . . | 181,430 | | | |
| **14** | Information technology . . . . . . . | 23,900 | | | |
| **15** | Royalties . . | | | | |
| **16** | Occupancy . . . . . . . . . | 577,528 | | | |
| **17** | Travel . . . . . . . . . . | 367,596 | | | |
| **18** | Payments of travel or entertainment expenses for any federal, state, or local public officials . | | | | |
| **19** | Conferences, conventions, and meetings . . . . | 72,749 | | | |
| **20** | Interest . . . . . . . . . | | | | |
| **21** | Payments to affiliates . . . . . . . | 1,373,750 | | | |
| **22** | Depreciation, depletion, and amortization . . | 6,779 | | | |
| **23** | Insurance . . . . | 24,646 | | | |
| **24** | Other expenses. Itemize expenses not covered above (List miscellaneous expenses in line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| **a** | taxes & filing fees | 34,404 | | | |
| **b** | dues & subscriptins | 193,559 | | | |
| **c** | sponsorships | 69,366 | | | |
| **d** | bank fees | 8,805 | | | |
| **e** | All other expenses | | | | |
| **25** | **Total functional expenses.** Add lines 1 through 24e | 12,151,989 | 0 | 0 | 0 |
| **26** | **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ▶ ☐ if following SOP 98-2 (ASC 958-720). | | | | |

Form **990** (2022)

Part X    **Balance Sheet**

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . . . ☐

| | | | (A)<br>Beginning of year | | (B)<br>End of year |
|---|---|---|---|---|---|
| **Assets** | **1** | Cash—non-interest-bearing . . . . . . . . | 3,765,785 | **1** | 4,983,171 |
| | **2** | Savings and temporary cash investments . . . . . | | **2** | |
| | **3** | Pledges and grants receivable, net . . . . . . | | **3** | |
| | **4** | Accounts receivable, net . . . . . . . . | 3,374,729 | **4** | 3,082,057 |
| | **5** | Loans and other receivables from any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons | | **5** | |
| | **6** | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), and persons described in section 4958(c)(3)(B) . . . | | **6** | |
| | **7** | Notes and loans receivable, net . . . . . . | | **7** | |
| | **8** | Inventories for sale or use . . . . . . . | | **8** | |
| | **9** | Prepaid expenses and deferred charges . . . . . | | **9** | |
| | **10a** | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D | **10a** 294,288 | | |
| | **b** | Less: accumulated depreciation | **10b** 294,288 | **10c** | |
| | **11** | Investments—publicly traded securities . | | **11** | |
| | **12** | Investments—other securities. See Part IV, line 11 . . . | | **12** | |
| | **13** | Investments—program-related. See Part IV, line 11 . . . | | **13** | |
| | **14** | Intangible assets . . . . . . . . . | | **14** | |
| | **15** | Other assets. See Part IV, line 11 . . . . . | 27,635 | **15** | 75,462 |
| | **16** | **Total assets.** Add lines 1 through 15 (must equal line 33) . . . | 7,168,149 | **16** | 8,140,690 |
| **Liabilities** | **17** | Accounts payable and accrued expenses . . . . . | 41,912 | **17** | 40,599 |
| | **18** | Grants payable . . . | | **18** | |
| | **19** | Deferred revenue . . . . . . . . . | | **19** | |
| | **20** | Tax-exempt bond liabilities . . . . . . . | | **20** | |
| | **21** | Escrow or custodial account liability. Complete Part IV of Schedule D | | **21** | |
| | **22** | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons . . . . | | **22** | |
| | **23** | Secured mortgages and notes payable to unrelated third parties . | | **23** | |
| | **24** | Unsecured notes and loans payable to unrelated third parties . . | | **24** | |
| | **25** | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17 - 24). Complete Part X of Schedule D | -854,073 | **25** | -1,338,958 |
| | **26** | **Total liabilities.** Add lines 17 through 25 . . . | -812,161 | **26** | -1,298,359 |
| **Net Assets or Fund Balances** | | **Organizations that follow FASB ASC 958, check here ▶** ☑ **and complete lines 27, 28, 32, and 33.** | | | |
| | **27** | Net assets without donor restrictions . . . . . | | **27** | |
| | **28** | Net assets with donor restrictions . . . . . . | | **28** | |
| | | **Organizations that do not follow FASB ASC 958, check here ▶** ☐ **and complete lines 29 through 33.** | | | |
| | **29** | Capital stock or trust principal, or current funds . . . | | **29** | |
| | **30** | Paid-in or capital surplus, or land, building or equipment fund . . . | | **30** | |
| | **31** | Retained earnings, endowment, accumulated income, or other funds | 5,079,648 | **31** | 7,979,311 |
| | **32** | Total net assets or fund balances . . . | 7,980,310 | **32** | 9,439,049 |
| | **33** | Total liabilities and net assets/fund balances . . . . . . . | 7,168,149 | **33** | 8,140,690 |

Form **990** (2022)

---

Page 12

---

| Part XI | **Reconcilliation of Net Assets** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . . . . . ☐

| | | | |
|---|---|---|---|
| **1** | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . . . | **1** | 13,611,724 |
| **2** | Total expenses (must equal Part IX, column (A), line 25) . . . . . . . . | **2** | 12,151,989 |
| **3** | Revenue less expenses. Subtract line 2 from line 1 . . . . . . . . . | **3** | 1,459,735 |
| **4** | Net assets or fund balances at beginning of year (must equal Part X, line 32, column (A)) . . . | **4** | 7,980,310 |

| | | | |
|---|---|---|---|
| 5 | Net unrealized gains (losses) on investments . . . . . . . . . . | 5 | |
| 6 | Donated services and use of facilities . . . . . . . . . . . | 6 | |
| 7 | Investment expenses . . . . . . . . . . . . . . . | 7 | |
| 8 | Prior period adjustments . . . . . . . . . . . . . . | 8 | -1,000 |
| 9 | Other changes in net assets or fund balances (explain in Schedule O) . . . . . . | 9 | |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 32, column (B)) | 10 | 9,439,049 |

| Part XII | Financial Statements and Reporting |
|---|---|

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . . . ☐

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990:  ☐ Cash  ☑ Accrual  ☐ Other _____ <br> If the organization changed its method of accounting from a prior year or checked "Other," explain on Schedule O. | | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? | 2a | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: <br> ☐ Separate basis  ☐ Consolidated basis  ☐ Both consolidated and separate basis | | | |
| b | Were the organization's financial statements audited by an independent accountant? | 2b | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: <br> ☐ Separate basis  ☐ Consolidated basis  ☐ Both consolidated and separate basis | | | |
| c | If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | 2c | | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Uniform Guidance, 2 C.F.R. Part 200, Subpart F? | 3a | | No |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits. | 3b | | |

Form **990** (2022)

---

Form 990 (2022)

## Additional Data

| | | Return to Form |
|---|---|---|

**Software ID:** 22016286

**Software Version:** ta22mefv1.0

**Form 990, Special Condition Description:**

Special Condition Description

efile Public Visual Render | ObjectId: 202312819349300001 - Submission: 2023-10-08 | TIN: 52-2106531

**SCHEDULE C**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Political Campaign and Lobbying Activities

**For Organizations Exempt From Income Tax Under section 501(c) and section 527**

▶Complete if the organization is described below. ▶Attach to Form 990 or Form 990-EZ.
▶Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**2022**

Open to Public
Inspection

**If the organization answered "Yes" on Form 990, Part IV, Line 3, or Form 990-EZ, Part V, line 46 (Political Campaign Activities), then**
* Section 501(c)(3) organizations: Complete Parts I-A and B. Do not complete Part I-C.
* Section 501(c) (other than section 501(c)(3)) organizations: Complete Parts I-A and C below. Do not complete Part I-B.
* Section 527 organizations: Complete Part I-A only.
**If the organization answered "Yes" on Form 990, Part IV, Line 4, or Form 990-EZ, Part VI, line 47 (Lobbying Activities), then**
* Section 501(c)(3) organizations that have filed Form 5768 (election under section 501(h)): Complete Part II-A. Do not complete Part II-B.
* Section 501(c)(3) organizations that have NOT filed Form 5768 (election under section 501(h)): Complete Part II-B. Do not complete Part II-A.
**If the organization answered "Yes" on Form 990, Part IV, Line 5 (Proxy Tax) (see separate instructions) or Form 990-EZ, Part V, line 35c (Proxy Tax) (see separate instructions), then**
* Section 501(c)(4), (5), or (6) organizations: Complete Part III.

| Name of the organization<br>Association for Competitive Technolgy<br>ACT The App Association | Employer identification number<br>52-2106531 |
|---|---|

| Part I-A | Complete if the organization is exempt under section 501(c) or is a section 527 organization. |
|---|---|

| 1 | Provide a description of the organization's direct and indirect political campaign activities in Part IV. See instructions for definition of "political campaign activities." | | |
|---|---|---|---|
| 2 | Political campaign activity expenditures. See instructions ..................................................... ▶ | $ | 88,369 |
| 3 | Volunteer hours for political campaign activities. See instructions .......................................... | | |

| Part I-B | Complete if the organization is exempt under section 501(c)(3). |
|---|---|

| 1 | Enter the amount of any excise tax incurred by the organization under section 4955 ............................... ▶ | $ | |
|---|---|---|---|
| 2 | Enter the amount of any excise tax incurred by organization managers under section 4955 ...................... ▶ | $ | |
| 3 | If the organization incurred a section 4955 tax, did it file Form 4720 for this year? ......................................... | ☐ Yes | ☐ No |
| 4a | Was a correction made? ......................................................................................... | ☐ Yes | ☐ No |
| b | If "Yes," describe in Part IV. | | |

| Part I-C | Complete if the organization is exempt under section 501(c), except section 501(c)(3). |
|---|---|

| 1 | Enter the amount directly expended by the filing organization for section 527 exempt function activities ..... ▶ | $ | |
|---|---|---|---|
| 2 | Enter the amount of the filing organization's funds contributed to other organizations for section 527 exempt function activities ...................................................................................... ▶ | $ | |
| 3 | Total exempt function expenditures. Add lines 1 and 2. Enter here and on Form 1120-POL, line 17b.......... ▶ | $ | |
| 4 | Did the filing organization file **Form 1120-POL** for this year? .................................................. | ☐ Yes | ☑ No |

5  Enter the names, addresses and employer identification number (EIN) of all section 527 political organizations to which the filing organization made payments. For each organization listed, enter the amount paid from the filing organization's funds. Also enter the amount of political contributions received that were promptly and directly delivered to a separate political organization, such as a separate segregated fund or a political action committee (PAC). If additional space is needed, provide information in Part IV.

| **(a)** Name | **(b)** Address | **(c)** EIN | **(d)** Amount paid from filing organization's funds. If none, enter -0-. | **(e)** Amount of political contributions received and promptly and directly delivered to a separate political organization. If none, enter -0-. |
|---|---|---|---|---|
| **1** | | | | |
| **2** | | | | |
| **3** | | | | |
| **4** | | | | |
| **5** | | | | |
| **6** | | | | |

**For Paperwork Reduction Act Notice, see the instructions for Form 990.**     Cat. No. 50084S     **Schedule C (Form 990) 2022**

— Page 2 —

| Part II-A | Complete if the organization is exempt under section 501(c)(3) and filed Form 5768 (election under section 501(h)) |
|---|---|

section 501(h)).

A  Check ▶ ☐ if the filing organization belongs to an affiliated group (and list in Part IV each affiliated group member's name, address, EIN, expenses, and share of excess lobbying expenditures).

B  Check ▶ ☐ if the filing organization checked box A and "limited control" provisions apply.

| **Limits on Lobbying Expenditures**<br>**(The term "expenditures" means amounts paid or incurred.)** | **(a)** Filing organization's totals | **(b)** Affiliated group totals |
|---|---|---|
| **1a** Total lobbying expenditures to influence public opinion (grass roots lobbying) ...................... | | |
| **b** Total lobbying expenditures to influence a legislative body (direct lobbying) ........................ | | |
| **c** Total lobbying expenditures (add lines 1a and 1b) ............................................................ | | |
| **d** Other exempt purpose expenditures ................................................................................ | | |
| **e** Total exempt purpose expenditures (add lines 1c and 1d) .................................................. | | |
| **f** Lobbying nontaxable amount. Enter the amount from the following table in both columns. | | |

| If the amount on line 1e, column (a) or (b) is: | The lobbying nontaxable amount is: |
|---|---|
| Not over $500,000 | 20% of the amount on line 1e. |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000. |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000. |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000. |
| Over $17,000,000 | $1,000,000. |

| | | |
|---|---|---|
| **g** Grassroots nontaxable amount (enter 25% of line 1f) ................................................. | | |
| **h** Subtract line 1g from line 1a. If zero or less, enter -0-. ............................................ | | |
| **i** Subtract line 1f from line 1c. If zero or less, enter -0-. ............................................ | | |

**j** If there is an amount other than zero on either line 1h or line 1i, did the organization file Form 4720 reporting section 4911 tax for this year? ........................................................................ ☐ **Yes** ☐ **No**

**4-Year Averaging Period Under Section 501(h)**
**(Some organizations that made a section 501(h) election do not have to complete all of the five columns below. See the separate instructions for lines 2a through 2f.)**

| Lobbying Expenditures During 4-Year Averaging Period | | | | | |
|---|---|---|---|---|---|
| Calendar year (or fiscal year beginning in) | **(a)** 2019 | **(b)** 2020 | **(c)** 2021 | **(d)** 2022 | **(e)** Total |
| **2a** Lobbying nontaxable amount | | | | | |
| **b** Lobbying ceiling amount (150% of line 2a, column(e)) | | | | | |
| **c** Total lobbying expenditures | | | | | |
| **d** Grassroots nontaxable amount | | | | | |
| **e** Grassroots ceiling amount (150% of line 2d, column (e)) | | | | | |
| **f** Grassroots lobbying expenditures | | | | | |

Schedule C (Form 990) 2022

Schedule C (Form 990) 2022                                                                 Page **3**

| Part II-B | **Complete if the organization is exempt under section 501(c)(3) and has NOT filed Form 5768 (election under section 501(h)).** |
|---|---|

For each "Yes" response on lines 1a through 1i below, provide in Part IV a detailed description of the lobbying activity.

| | **(a)** | | **(b)** |
|---|---|---|---|
| | **Yes** | **No** | **Amount** |

**1** During the year, did the filing organization attempt to influence foreign, national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of:

**a** Volunteers? ........................................................................................

**b** Paid staff or management (include compensation in expenses reported on lines 1c through 1i)? ........

**c** Media advertisements? ........................................................................

**d** Mailings to members, legislators, or the public? ...........................................................

**e** Publications, or published or broadcast statements? .............................................................

| | | | | |
|---|---|---|---|---|
| **f** | Grants to other organizations for lobbying purposes? .......................................... | | | |
| **g** | Direct contact with legislators, their staffs, government officials, or a legislative body? ...................... | | | |
| **h** | Rallies, demonstrations, seminars, conventions, speeches, lectures, or any similar means? ................ | | | |
| **i** | Other activities? ................................................................ | | | |
| **j** | Total. Add lines 1c through 1i ............................................................ | | | |
| **2a** | Did the activities in line 1 cause the organization to be not described in section 501(c)(3)? ..... | | | |
| **b** | If "Yes," enter the amount of any tax incurred under section 4912 ........................................... | | | |
| **c** | If "Yes," enter the amount of any tax incurred by organization managers under section 4912 .................. | | | |
| **d** | If the filing organization incurred a section 4912 tax, did it file Form 4720 for this year? ...................... | | | |

## Part III-A    Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6).

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Were substantially all (90% or more) dues received nondeductible by members? ................................ | **1** | Yes | |
| **2** | Did the organization make only in-house lobbying expenditures of $2,000 or less? ........................... | **2** | | No |
| **3** | Did the organization agree to carry over lobbying and political expenditures from the prior year? ............................... | **3** | | No |

## Part III-B    Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6) and if either (a) BOTH Part III-A, lines 1 and 2, are answered "No" OR (b) Part III-A, line 3, is answered "Yes."

| | | | |
|---|---|---|---|
| **1** | Dues, assessments and similar amounts from members ...................................................... | **1** | |
| **2** | Section 162(e) nondeductible lobbying and political expenditures (**do not include amounts of political expenses for which the section 527(f) tax was paid).** | | |
| **a** | Current year ................................................................. | **2a** | |
| **b** | Carryover from last year ............................................................ | **2b** | |
| **c** | Total ....................................................................... | **2c** | |
| **3** | Aggregate amount reported in section 6033(e)(1)(A) notices of nondeductible section 162(e) dues . | **3** | |
| **4** | If notices were sent and the amount on line 2c exceeds the amount on line 3, what portion of the excess does the organization agree to carryover to the reasonable estimate of nondeductible lobbying and political expenditure next year? ................................................................. | **4** | |
| **5** | Taxable amount of lobbying and political expenditures. See Instructions ........................................ | **5** | |

## Part IV    Supplemental Information

Provide the descriptions required for Part I-A, line 1; Part I-B, line 4; Part I-C, line 5; Part II-A (affiliated group list); Part II-A, lines 1 and 2 (see instructions), and Part II-B, line 1. Also, complete this part for any additional information.

| Return Reference | Explanation |
|---|---|
| | |

**Schedule C (Form 990) 2022**

---

# Additional Data

Return to Form

**Software ID:** 22016286

**Software Version:** ta22mefv1.0

efile Public Visual Render | ObjectId: 202312819349300001 - Submission: 2023-10-08 | TIN: 52-2106531

**SCHEDULE D**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Supplemental Financial Statements

► **Complete if the organization answered "Yes," on Form 990,**
**Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.**
► **Attach to Form 990.**
► **Go to www.irs.gov/Form990 for instructions and the latest information.**

OMB No. 1545-0047

**2022**

Open to Public
Inspection

| **Name of the organization** | **Employer identification number** |
|---|---|
| Association for Competitive Technology ACT The App Association | 52-2106531 |

## Part I  Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.
Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

| | | **(a)** Donor advised funds | **(b)** Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year . . . . . . . . . | | |
| 2 | Aggregate value of contributions to (during year) | | |
| 3 | Aggregate value of grants from (during year) | | |
| 4 | Aggregate value at end of year . . . . . . . . | | |

5   Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control? . . . . . . . . . . . . .   ☐ Yes ☑ No

6   Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible private benefit? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ☐ Yes ☑ No

## Part II  Conservation Easements.
Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1   Purpose(s) of conservation easements held by the organization (check all that apply).

☐ Preservation of land for public use (e.g., recreation or education)   ☐ Preservation of an historically important land area

☐ Protection of natural habitat   ☐ Preservation of a certified historic structure

☐ Preservation of open space

2   Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year.

| | | **Held at the End of the Year** |
|---|---|---|
| a | Total number of conservation easements . . . . . . . . . . . . . . . . . . | 2a |
| b | Total acreage restricted by conservation easements . . . . . . . . . . . . . . . . | 2b |
| c | Number of conservation easements on a certified historic structure included in (a) . . | 2c |
| d | Number of conservation easements included in (c) acquired after July 25, 2006, and not on a historic structure listed in the National Register . . . | 2d |

3   Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ► _____

4   Number of states where property subject to conservation easement is located ► _____

5   Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easements it holds? . . . . . . . . . . . . .   ☐ Yes ☑ No

6   Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
► _____

7   Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
► $ _____

8   Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and section 170(h)(4)(B)(ii)? . . . . . . . . . . . . . . . . . . . . . . . . .   ☐ Yes ☑ No

9   In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements.

## Part III  Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.
Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a   If the organization elected, as permitted under FASB ASC 958, not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIII, the text of the footnote to its financial statements that describes these items.

b   If the organization elected, as permitted under FASB ASC 958, to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items:

   **(i)** Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . . . . . .   ► $ _____

   **(ii)** Assets included in Form 990, Part X . . . . . . . . . . . . . . . . . . . . .   ► $ _____

2   If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under FASB ASC 958 relating to these items:

a   Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . . . . . .   ► $ _____

b   Assets included in Form 990, Part X . . . . . . . . . . . . . . . . . . . . .   ► $ _____

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.**   Cat. No. 52283D   **Schedule D (Form 990) 2022**

Schedule D (Form 990) 2022 | Page **2**

### Part III — Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets *(continued)*

**3** Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply):

**a** ☐ Public exhibition   **d** ☐ Loan or exchange programs

**b** ☐ Scholarly research   **e** ☐ Other ................................................

**c** ☐ Preservation for future generations

**4** Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

**5** During the year, did the organization solicit or receive donations of art, historical treasures or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?  . .  ☐ Yes  ☑ No

### Part IV — Escrow and Custodial Arrangements.

Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

**1a** Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X? . . . . . . . . . . . . . . . . . . ☐ Yes  ☑ No

**b** If "Yes," explain the arrangement in Part XIII and complete the following table:

| | | Amount |
|---|---|---|
| **c** Beginning balance . . . . . . . . . . | **1c** | |
| **d** Additions during the year . . . . . . . | **1d** | |
| **e** Distributions during the year . . . . . . | **1e** | |
| **f** Ending balance . . . . . . . . . . | **1f** | |

**2a** Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? . . . ☐ Yes  ☑ No

**b** If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided in Part XIII  . . . . ☐

### Part V — Endowment Funds.

Complete if the organization answered "Yes" on Form 990, Part IV, line 10.

| | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|
| **1a** Beginning of year balance . . . | | | | | |
| **b** Contributions . . . | | | | | |
| **c** Net investment earnings, gains, and losses | | | | | |
| **d** Grants or scholarships . . . | | | | | |
| **e** Other expenditures for facilities and programs . . . | | | | | |
| **f** Administrative expenses . . . | | | | | |
| **g** End of year balance . . . . . | | | | | |

**2** Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:

**a** Board designated or quasi-endowment ▶ ...................................

**b** Permanent endowment ▶ ...................................

**c** Term endowment ▶ ...................................

The percentages on lines 2a, 2b, and 2c should equal 100%.

**3a** Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

| | | Yes | No |
|---|---|---|---|
| **(i)** Unrelated organizations . . . . . . . . . . . . . . . . . . . . | **3a(i)** | | |
| **(ii)** Related organizations . . . . . . . . . . . . . . . . . . . . | **3a(ii)** | | |
| **b** If "Yes" on 3a(ii), are the related organizations listed as required on Schedule R? . . . . . . . . | **3b** | | |

**4** Describe in Part XIII the intended uses of the organization's endowment funds.

### Part VI — Land, Buildings, and Equipment.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciation | (d) Book value |
|---|---|---|---|---|
| **1a** Land . . . . . . | | | | |
| **b** Buildings . . . . . | | | | |
| **c** Leasehold improvements | | | | |
| **d** Equipment . . . . . | 294,288 | | 294,288 | |
| **e** Other . . . . . . | | | | |

**Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10(c).)* . . . ▶ | | | | |

**Schedule D (Form 990) 2022**

Schedule D (Form 990) 2022                                                                                      Page **3**

## Part VII — Investments – Other Securities.
Complete if the organization answered "Yes" on Form 990, Part IV, line 11b.See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(1)** Financial derivatives . . . . . . . . . | | |
| **(2)** Closely-held equity interests . . . . . . . | | |
| **(3)** Other | | |
| (A) | | |
| (B) | | |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col. (B) line 12.)* ▶ | | |

## Part VIII — Investments – Program Related.
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(1)** | | |
| **(2)** | | |
| **(3)** | | |
| **(4)** | | |
| **(5)** | | |
| **(6)** | | |
| **(7)** | | |
| **(8)** | | |
| **(9)** | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 13.)* ▶ | | |

## Part IX — Other Assets.
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| **(1)** Deposit | 64,202 |
| **(2)** AUL forfieture | -1,855 |
| **(3)** FSA forfieture | -4,712 |
| **(4)** Investment | 50,000 |
| **(5)** Intercompany account | -32,173 |
| **(5)** | |
| **(6)** | |
| **(7)** | |
| **(8)** | |
| **(9)** | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 15.)* . . . . . . . . . . . ▶ | 75,462 |

## Part X — Other Liabilities.
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11e or 11f.See Form 990, Part X, line 25.

| 1. (a) Description of liability | (b) Book value |
|---|---|
| **(1)** Federal income taxes | -355 |
| state income taxes | -239 |
| 401k | -1,274 |

| | |
|---|---:|
| deferred comp | -1,450,000 |
| FSA | 13,544 |
| Dependent care | 45,009 |
| credit card charges | 54,357 |
| | |
| | |
| | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 25.)* ▶ | -1,338,958 |

**2.** Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48 (ASC 740). Check here if the text of the footnote has been provided in Part XIII ☐

**Schedule D (Form 990) 2022**

Page 4

Schedule D (Form 990) 2022                                                              Page **4**

| Part XI | **Reconciliation of Revenue per Audited Financial Statements With Revenue per Return.** |
|---|---|
| | Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a. |

| | | | | |
|---|---|---|---|---|
| **1** | Total revenue, gains, and other support per audited financial statements . . . . . . . | | **1** | |
| **2** | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | | |
| **a** | Net unrealized gains (losses) on investments . . . . . | **2a** | | |
| **b** | Donated services and use of facilities . . . . . . . | **2b** | | |
| **c** | Recoveries of prior year grants . . . . . . . . | **2c** | | |
| **d** | Other (Describe in Part XIII.) . . . . . . . . | **2d** | | |
| **e** | Add lines **2a** through **2d** . . . . . . . . . | | **2e** | |
| **3** | Subtract line **2e** from line **1** . . . . . . . . | | **3** | |
| **4** | Amounts included on Form 990, Part VIII, line 12, but not on line **1**: | | | |
| **a** | Investment expenses not included on Form 990, Part VIII, line 7b . | **4a** | | |
| **b** | Other (Describe in Part XIII.) . . . . . . . | **4b** | | |
| **c** | Add lines **4a** and **4b** . . . . . . . . . . | | **4c** | |
| **5** | Total revenue. Add lines **3** and **4c.** (This must equal Form 990, Part I, line 12.) . . . . . . | | **5** | |

| Part XII | **Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.** |
|---|---|
| | Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a. |

| | | | | |
|---|---|---|---|---|
| **1** | Total expenses and losses per audited financial statements . . . . . . . . | | **1** | |
| **2** | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | |
| **a** | Donated services and use of facilities . . . . . . . | **2a** | | |
| **b** | Prior year adjustments . . . . . . . . . | **2b** | | |
| **c** | Other losses . . . . . . . . . | **2c** | | |
| **d** | Other (Describe in Part XIII.) . . . . . . . . | **2d** | | |
| **e** | Add lines **2a** through **2d** . . . . . . . . . | | **2e** | |
| **3** | Subtract line **2e** from line **1** . . . . . . . . | | **3** | |
| **4** | Amounts included on Form 990, Part IX, line 25, but not on line **1**: | | | |
| **a** | Investment expenses not included on Form 990, Part VIII, line 7b . . | **4a** | | |
| **b** | Other (Describe in Part XIII.) . . . . . . . | **4b** | | |
| **c** | Add lines **4a** and **4b** . . . . . . . . . . | | **4c** | |
| **5** | Total expenses. Add lines **3** and **4c.** (This must equal Form 990, Part I, line 18.) . . . . . . | | **5** | |

| Part XIII | **Supplemental Information** |
|---|---|

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

| Return Reference | Explanation |
|---|---|

**Schedule D (Form 990) 2022**

## Additional Data

Return to Form

**Software ID:** 22016286

**Software Version:** ta22mefv1.0

| efile Public Visual Render | ObjectId: 202312819349300001 - Submission: 2023-10-08 | TIN: 52-2106531 |
|---|---|---|

**Schedule J**
(Form 990)

Department of the Treasury
Internal Revenue Service

**Compensation Information**

**For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**
► Complete if the organization answered "Yes" on Form 990, Part IV, line 23.
► Attach to Form 990.
► Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**2022**

Open to Public Inspection

| Name of the organization | Employer identification number |
|---|---|
| Association for Competitive Technology ACT The App Association | 52-2106531 |

| Part I | Questions Regarding Compensation |
|---|---|

| | | Yes | No |
|---|---|---|---|
| **1a** | Check the appropriate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items. | | |

☐ First-class or charter travel  ☐ Housing allowance or residence for personal use
☐ Travel for companions  ☐ Payments for business use of personal residence
☐ Tax idemnification and gross-up payments  ☐ Health or social club dues or initiation fees
☐ Discretionary spending account  ☐ Personal services (e.g., maid, chauffeur, chef)

| | | | Yes | No |
|---|---|---|---|---|
| **b** | If any of the boxes on Line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain . . . . . | **1b** | | |
| **2** | Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, officers, including the CEO/Executive Director, regarding the items checked on Line 1a? . . . . | **2** | | |
| **3** | Indicate which, if any, of the following the filing organization used to establish the compensation of the organization's CEO/Executive Director. Check all that apply. Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III. | | | |

☐ Compensation committee  ☐ Written employment contract
☐ Independent compensation consultant  ☐ Compensation survey or study
☐ Form 990 of other organizations  ☐ Approval by the board or compensation committee

| | | | Yes | No |
|---|---|---|---|---|
| **4** | During the year, did any person listed on Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization: | | | |
| **a** | Receive a severance payment or change-of-control payment? . . . . . . . . . . . | **4a** | | No |
| **b** | Participate in, or receive payment from, a supplemental nonqualified retirement plan? . . . . . | **4b** | | No |
| **c** | Participate in, or receive payment from, an equity-based compensation arrangement? . . . . . . . . . | **4c** | | No |
| | If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III. | | | |
| | **Only 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5-9.** | | | |
| **5** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of: | | | |
| **a** | The organization? . . . . . . . . . . . . . . . . . . . . . . | **5a** | | No |
| **b** | Any related organization? . . . . . . . . . . . . . . . . . . . | **5b** | | No |
| | If "Yes," on line 5a or 5b, describe in Part III. | | | |
| **6** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of: | | | |
| **a** | The organization? . . . . . . . . . . . . . . . . . . . . . | **6a** | | No |
| **b** | Any related organization? . . . . . . . . . . . . . . . . . . . | **6b** | | No |
| | If "Yes," on line 6a or 6b, describe in Part III. | | | |
| **7** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any nonfixed payments not described in lines 5 and 6? If "Yes," describe in Part III . . . . . . . . . . | **7** | | No |
| **8** | Were any amounts reported on Form 990, Part VII, paid or accrued pursuant to a contract that was subject to the initial contract exception described in Regulations section 53.4958-4(a)(3)? If "Yes," describe in Part III . . . . . . . . . . . . . . . . . . . . . . . | **8** | | No |
| **9** | If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)? . . . . . . . . . . . . . . . . . . . . | **9** | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.**    Cat. No. 50053T    **Schedule J (Form 990) 2022**

---
Page 2
---

Schedule J (Form 990) 2022                                                                                   Page **2**

| Part II | Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees. Use duplicate copies if additional space is needed. |
|---|---|

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii). Do not list any individuals that are not listed on Form 990, Part VII.

**Note.** The sum of columns (B)(i)-(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual.

| (A) Name and Title | | (B) Breakdown of W-2, 1099-MISC compensation, and/or 1099-NEC | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation in column (B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| **1** MORGAN REED President | (i) | 300,000 | 230,000 | 4,800 | 19,400 | 41,889 | 596,089 | |
| | (ii) | | | | | | | |
| **2** RENE ADAM CFO | (i) | 175,000 | 123,427 | 3,798 | 15,067 | 27,223 | 344,515 | |
| | (ii) | | | | | | | |
| **3** CHELSEA THOMAS Executive Director | (i) | 200,000 | 120,000 | 3,600 | 19,400 | 31,846 | 374,846 | |
| | (ii) | | | | | | | |
| **4** GRAHAM DUFAULT Communications Dir | (i) | 195,000 | 85,850 | 2,400 | 18,747 | 31,562 | 333,559 | |
| | (ii) | | | | | | | |

| | | (i) | (ii) | | | | | |
|---|---|---|---|---|---|---|---|---|
| **5** BRIAN SCARPELLI<br>Legal Counsel | (i) | 195,000 | 85,850 | 2,400 | 18,747 | 31,900 | 333,897 | ----- |
| | (ii) | ----- | ----- | ----- | ----- | ----- | ----- - | ----- |
| **6** JONATHAN ZUCK<br>Board Member | (i) | ----- | ----- | ----- | ----- | ----- | ----- | ----- |
| | (ii) | 24,000 | ----- | ----- | 720 | 24,656 | - 49,376 | ----- |
| **7** CALEB WILLIAMSON<br>State Public Pol Assoc | (i) | 93,000 | 20,290 | ----- | 4,329 | 12,038 | 129,657 | ----- |
| | (ii) | ----- | ----- | ----- | ----- | ----- | ----- - | ----- |

Schedule J (Form 990) 2022

---

Page 3

Schedule J (Form 990) 2022                                                                 Page **3**

**Part III**    **Supplemental Information**

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information.

| Return Reference | Explanation |
|---|---|

Schedule J (Form 990) 2022

---

## Additional Data

Return to Form

Software ID:  22016286

Software Version:  ta22mefv1.0

efile Public Visual Render | ObjectId: 202312819349300001 - Submission: 2023-10-08 | TIN: 52-2106531

**SCHEDULE O**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

**Supplemental Information to Form 990 or 990-EZ**
**Complete to provide information for responses to specific questions on**
**Form 990 or 990-EZ or to provide any additional information.**
► **Attach to Form 990 or 990-EZ.**
► **Go to www.irs.gov/Form990 for the latest information.**

OMB No. 1545-0047

**2022**

Open to Public
Inspection

Name of the organization
Association for Competitive Technolgy
ACT The App Association

Employer identification number

52-2106531

| Return Reference | Explanation |
|---|---|
| Part VI Line 8a | the notes of all Board and Executive Committee meetings are documented |
| Part VI Line 8b | the notes of all Board and Executive Committee meetings are documented |
| Part VI Line 11b | forms are completed by the CFO and reviewed by the Executive Director and |
| Part VI Line 11b | at least one other Board Member prior to filing |
| Part VI Line 12c | all employees are made aware of the conflict of interest policy and, if |
| Part VI Line 12c | there are any potential breaches, they are discussed |
| Part VI Line 15a or b | research is performed on current employees salaries for comparison in |
| Part VI Line 15a or b | the non-profit industry |
| Part VI Line 19 | documents are available through government search of non-profit |
| Part VI Line 19 | reports and upon request |
| IX, 11g | Other: Contractors (non-1099) - $919,994, PR - $488,500 |
| IX, 11g | Fellowships - $917,375,Independent contractors (1099) - $153,061 |
| IV, 11b | forms are completed by the CFO and reviewed by the Executive Director and |
| IV, 11b | at least one other Board Member prior to filing |
| IV, 19 | documents are available through government search of non-profit |
| IV, 19 | reports and upon request |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.      Cat. No. 51056K      Schedule O (Form 990) 2022

## Additional Data

Return to Form

**Software ID:** 22016286
**Software Version:** ta22mefv1.0

efile Public Visual Render | ObjectId: 202312819349300001 - Submission: 2023-10-08 | TIN: 52-2106531

| SCHEDULE R (Form 990) | Related Organizations and Unrelated Partnerships | OMB No. 1545-0047 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | ▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or 37. ▶ Attach to Form 990. ▶ Go to www.irs.gov/Form990 for instructions and the latest information. | 2022 Open to Public Inspection |

| Name of the organization | Employer identification number |
|---|---|
| Association for Competitive Technolgy ACT The App Association | 52-2106531 |

**Part I**   **Identification of Disregarded Entities.** Complete if the organization answered "Yes" on Form 990, Part IV, line 33.

| (a) Name, address, and EIN (if applicable) of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| **(1)** Innovators Network 1401 K St NW Ste 501 Washington, DC 20005 27-1413020 | technology advancement | | | | Assoc of Comp Tech |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part II**   **Identification of Related Tax-Exempt Organizations.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related tax-exempt organizations during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity | (g) Section 512(b) (13) controlled entity? | |
|---|---|---|---|---|---|---|---|
| | | | | | | Yes | No |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990.     Cat. No. 50135Y     **Schedule R (Form 990) 2022**

---

— Page 2 —

**Part III**   **Identification of Related Organizations Taxable as a Partnership.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related organizations treated as a partnership during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income(related, unrelated, excluded from tax under sections 512-514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? | | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? | | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Yes | No | | Yes | No | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

**Part IV**   **Identification of Related Organizations Taxable as a Corporation or Trust.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related organizations treated as a corporation or trust during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Type of entity (C corp, S corp, or trust) | (f) Share of total income | (g) Share of end-of-year assets | (h) Percentage ownership | (i) Section 512(b)(13) controlled entity? | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Yes | No |

|  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

**Schedule R (Form 990) 2022**

Page 3

Schedule R (Form 990) 2022

Page **3**

| Part V | **Transactions With Related Organizations.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36. |
|---|---|

**Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule.

| | | Yes | No |
|---|---|---|---|
| **1** During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | | |
| **a** Receipt of **(i)** interest, **(ii)** annuities, **(iii)** royalties, or **(iv)** rent from a controlled entity . . . . . . . . . . . . | **1a** | | No |
| **b** Gift, grant, or capital contribution to related organization(s) . . . . . . . . . . . . . . . . . . . . | **1b** | | No |
| **c** Gift, grant, or capital contribution from related organization(s) . . . . . . . . . . . . . . . . . . | **1c** | | No |
| **d** Loans or loan guarantees to or for related organization(s) . . . . . . . . . . . . . . . . . . . . | **1d** | | No |
| **e** Loans or loan guarantees by related organization(s) . . . . . . . . . . . . . . . . . . . . . | **1e** | | No |
| **f** Dividends from related organization(s) . . . . . . . . . . . . . . . . . . . . . . . . | **1f** | | No |
| **g** Sale of assets to related organization(s) . . . . . . . . . . . . . . . . . . . . . . . | **1g** | | No |
| **h** Purchase of assets from related organization(s) . . . . . . . . . . . . . . . . . . . . . | **1h** | | No |
| **i** Exchange of assets with related organization(s) . . . . . . . . . . . . . . . . . . . . . | **1i** | | No |
| **j** Lease of facilities, equipment, or other assets to related organization(s) . . . . . . . . . . . . . . | **1j** | Yes | |
| **k** Lease of facilities, equipment, or other assets from related organization(s) . . . . . . . . . . . . . | **1k** | | No |
| **l** Performance of services or membership or fundraising solicitations for related organization(s) . . . . . . . . . | **1l** | | No |
| **m** Performance of services or membership or fundraising solicitations by related organization(s) . . . . . . . . | **1m** | | No |
| **n** Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) . . . . . . . . . | **1n** | | No |
| **o** Sharing of paid employees with related organization(s) . . . . . . . . . . . . . . . . . . . | **1o** | Yes | |
| **p** Reimbursement paid to related organization(s) for expenses . . . . . . . . . . . . . . . . . | **1p** | | No |
| **q** Reimbursement paid by related organization(s) for expenses . . . . . . . . . . . . . . . . . | **1q** | Yes | |
| **r** Other transfer of cash or property to related organization(s) . . . . . . . . . . . . . . . . . | **1r** | | No |
| **s** Other transfer of cash or property from related organization(s) . . . . . . . . . . . . . . . . | **1s** | | No |

**2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| **(a)**<br>Name of related organization | **(b)**<br>Transaction type (a-s) | **(c)**<br>Amount involved | **(d)**<br>Method of determining amount involved |
|---|---|---|---|
| **(1)** Innovators Network | J | 38,878 | |
| **(2)** | O | 34,632 | |
| **(3)** Washington | Q | 3,061 | |
| | | | |
| | | | |
| | | | |

**Schedule R (Form 990) 2022**

Page 4

Schedule R (Form 990) 2022

Page **4**

| Part VI | **Unrelated Organizations Taxable as a Partnership.** Complete if the organization answered "Yes" on Form 990, Part IV, line 37. |
|---|---|

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| **(a)**<br>Name, address, and EIN of entity | **(b)**<br>Primary activity | **(c)**<br>Legal domicile (state or foreign country) | **(d)**<br>Predominant income (related, unrelated, excluded from tax under sections 512-514) | **(e)**<br>Are all partners section 501(c)(3) organizations? | | **(f)**<br>Share of total income | **(g)**<br>Share of end-of-year assets | **(h)**<br>Disproportionate allocations? | | **(i)**<br>Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | **(j)**<br>General or managing partner? | | **(k)**<br>Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Yes | No | | | Yes | No | | Yes | No | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

|  |  |  |  |  |  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |

**Schedule R (Form 990) 2022**

Schedule R (Form 990) 2022

Page **5**

| Part VII | **Supplemental Information** |
|----------|------------------------------|

Provide additional information for responses to questions on Schedule R. See instructions.

| Return Reference | Explanation |
|------------------|-------------|

**Schedule R (Form 990) 2022**

## Additional Data

| | |
|--|--|
| | Return to Form |

**Software ID:** 22016286
**Software Version:** ta22mefv1.0

# EXHIBIT 10



About    Membership    News    Initiatives    Join



# ACT | The App Association announces hires from Apple, National League of Cities

"We are happy to announce that Chelsea Thomas and David Maloney are joining the growing team at ACT | The App Association," said executive director Morgan Reed.

Chelsea Thomas, most recently at Apple's government affairs team and former international trade advisor for the Senate Finance Committee, joins the organization as Vice President of Operations. David Maloney, former director of strategic partnerships and innovation at National League of Cities, also joins ACT | The App Association as its new Director of Membership and Strategic Partnerships.

"Chelsea and David bring more than three decades of experience in policy areas impacting the app economy and the tech industry," continued Reed. "They are excellent additions to the App Association as we meet the needs of innovators in a $120 billion marketplace that continues to grow at a dramatic pace.

"Every day, startups and app companies face challenges around data security, privacy, and highly regulated industries. The expertise Chelsea and David bring will help us tackle these issues and provide critical guidance to our members."

By actonline | March 21st, 2016 | Uncategorized

---

Share This Story, Choose Your Platform!



<< Previous    Next >>

### Categories

- Amplify
- App Economy
- Appcon 2020
- Artificial Intelligence/AI
- Blog
- Broadband
- CHI
- Competition
- Connect health
- copyright
- Courts
- COVID-19
- Cybersecurity
- Developed
- Encryption
- European Union
- Events
- FirstNet
- FRAND
- Global
- In the news
- Innovation and IP
- IoT
- Letters
- Manufacturing
- Member Spotlight
  - EU Member Spotlight
  - UK Member Spotlight
- News
  - Press Release
  - Statement
- Open Standards
- Patents

3/20/24, 2:00 PM

Case: 24-1285    Document: 43    Page: 99    Filed: 04/23/2024



- Patents
- Piracy
- Policy
- Privacy
- Publications
  - White Papers
- Spectrum
- Sustainability
- Tech Regulation
  - Encryption
- Trade
- Trends
- TVWS
- Uncategorized
- United Kingdom
- Workforce Development

Search... 

Contact | Privacy Policy | Terms of Service | Careers

chrome-extension://fcbmiimfkmkkkffjlopcpdlgclncnknm/fsCaptured.html

2/2

# EXHIBIT 11

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## ENTRY OF APPEARANCE

**Case Number:** 2021-2106

**Short Case Caption:** Koninklijke Philips N.V. v. Thales DIS AIS USA LLC

**Instructions:** Refer to Fed. Cir. R. 47.3 for requirements governing representation and appearance in this court. Counsel must immediately file an amended Entry of Appearance if contact information changes and update information through PACER's Manage My Account. Non-admitted government counsel should enter N/A in lieu of an admission date. Use the second page to add additional counsel.

**Party Information.** List all parties, intervenors, amicus curiae, or movants represented by below counsel; "et al." is not permitted.

ACT | The App Association

| | |
|---|---|
| **Principal Counsel:** Mark D. Selwyn | Admission Date: 01/28/2004 |

Firm/Agency/Org.: Wilmer Cutler Pickering Hale and Dorr LLP

Address:
2600 El Camino Real, Suite 400, Palo Alto, CA 94306

| | |
|---|---|
| Phone: (650) 858-6000 | Email: Mark.Selwyn@wilmerhale.com |
| **Other Counsel:** Mark C. Fleming | Admission Date: 01/12/2007 |

Firm/Agency/Org.: Wilmer Cutler Pickering Hale and Dorr LLP

Address:
60 State Street, Boston, MA 02109

| | |
|---|---|
| Phone: (617) 526-6000 | Email: Mark.Fleming@wilmerhale.com |

I certify under penalty of perjury that (1) the submitted information is true and accurate and (2) I am authorized to enter an appearance by all other listed counsel.

Date: 9/7/21

Signature: /s/ Mark D. Selwyn

Name: Mark D. Selwyn

FORM 8A. Entry of Appearance

Form 8A (p.2)
July 2020

## [DO NOT SUBMIT THIS PAGE IF IT IS BLANK.]

| Other Counsel: Timothy D. Syrett | Admission Date: 07/08/2013 |
|---|---|
| Firm/Agency/Org.: Wilmer Cutler Pickering Hale and Dorr LLP | |
| Address:  60 State Street, Boston, MA  02109 | |
| Phone: (617) 526-6000 | Email: Timothy.Syrett@wilmerhale.com |
| **Other Counsel:** | Admission Date: |
| Firm/Agency/Org.: | |
| Address: | |
| Phone: | Email: |
| **Other Counsel:** | Admission Date: |
| Firm/Agency/Org.: | |
| Address: | |
| Phone: | Email: |
| **Other Counsel:** | Admission Date: |
| Firm/Agency/Org.: | |
| Address: | |
| Phone: | Email: |
| **Other Counsel:** | Admission Date: |
| Firm/Agency/Org.: | |
| Address: | |
| Phone: | Email: |

# EXHIBIT 12

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## ENTRY OF APPEARANCE

**Case Number:** 2020-2040

**Short Case Caption:** Google LLC v. Uniloc 2017 LLC

**Instructions:** Refer to Fed. Cir. R. 47.3 for requirements governing representation and appearance in this court.  Counsel must immediately file an amended Entry of Appearance if contact information changes and update information through PACER's Manage My Account.  Non-admitted government counsel should enter N/A in lieu of an admission date.  Use the second page to add additional counsel.

**Party Information.** List all parties, intervenors, amicus curiae, or movants represented by below counsel; "et al." is not permitted.

Apple Inc., ACT / The App Association, Computer and Communications Industry Association (CCIA), Engine Advocacy, and High Tech Inventors Alliance

| | |
|---|---|
| **Principal Counsel:** Mark D. Selwyn | Admission Date: 01/28/2004 |
| Firm/Agency/Org.: Wilmer Cutler Pickering Hale and Dorr LLP | |
| Address:   2600 El Camino Real, Suite 400, Palo Alto, CA  94306 | |
| Phone: (650) 858-6000 | Email: Mark.Selwyn@wilmerhale.com |
| **Other Counsel:** David M. Lehn | Admission Date: 10/31/2005 |
| Firm/Agency/Org.: Wilmer Cutler Pickering Hale and Dorr LLP | |
| Address:   1875 Pennsylvania Avenue NW, Washington, DC  20006 | |
| Phone: (202) 663-6000 | Email: David.Lehn@wilmerhale.com |

I certify under penalty of perjury that (1) the submitted information is true and accurate and (2) I am authorized to enter an appearance by all other listed counsel.

Date: 9/17/20

Signature: /s/ Mark D. Selwyn

Name: Mark D. Selwyn

## [DO NOT SUBMIT THIS PAGE IF IT IS BLANK.]

| **Other Counsel:** Catherine M.A. Carroll | Admission Date: 09/12/2006 |
|---|---|
| Firm/Agency/Org.: Wilmer Cutler Pickering Hale and Dorr LLP | |
| Address:<br>1875 Pennsylvania Avenue NW, Washington, DC 20006 | |
| Phone: (202) 663-6000 | Email: Catherine.Carroll@wilmerhale.com |
| **Other Counsel:** Alyson M. Zureick | Admission Date: 08/27/2020 |
| Firm/Agency/Org.: Wilmer Cutler Pickering Hale and Dorr LLP | |
| Address:<br>7 World Trade Center, 250 Greenwich Street, New York, NY 10007 | |
| Phone: (212) 230-8800 | Email: Alyson.Zureick@wilmerhale.com |
| **Other Counsel:** | Admission Date: |
| Firm/Agency/Org.: | |
| Address: | |
| Phone: | Email: |
| **Other Counsel:** | Admission Date: |
| Firm/Agency/Org.: | |
| Address: | |
| Phone: | Email: |
| **Other Counsel:** | Admission Date: |
| Firm/Agency/Org.: | |
| Address: | |
| Phone: | Email: |

# EXHIBIT 13



**Antitrust** 🕐 Posted 04/15/2024 | Amicus Briefs

# Court Decision in Apple Watch Case Will Have Serious Consequences for U.S. Commerce

**Krista Chavez**
Senior Communications Manager

**Share**






WASHINGTON—On Friday, NetChoice joined an amicus brief in the case *Apple v. ITC & Masimo, Inc.* at the U.S. Court of Appeals for the Federal Circuit. In the brief, we and our co-amici, TechNet, ACT │ The App Association and Chamber of Progress, support Apple and ask the court to reverse an ITC decision that would stifle innovation to the detriment of the American public.

In October 2023, the International Trade Commission (ITC) issued a broad order that would prevent Apple from importing its popular product, Apple Watches, based on allegations of patent infringement by Masimo, Inc. – a business that does not have actual products in the United States.

The ITC is limited under a rule to only allow those patentees with actual products and a true domestic market (whether their own or via license) operating in the United States to bring claims. Initiating investigations and issuing orders without this critical statutory safeguard being met, as the ITC did here, creates serious risks for U.S. businesses.

**If the order stands, it would set a worrying precedent for improperly expanding the ITC's authority — ultimately suppressing commerce in the United States.**

In the brief with TechNet, ACT and Chamber of Progress, we make two key points and ask the court to reverse the ITC's decision on the merits and restore the domestic industry requirement to the gatekeeping role it was meant to play:

1. Misuse of the ITC's powerful exclusion remedy would seriously harm domestic markets.

2. Affirming the commission's domestic industry finding would open the floodgates to improper exclusion orders and stifle innovation.

**"If the ITC's order stands, it would set bad precedent supporting unfounded exclusion orders that are counter to the ITC's goal of protecting actual United States markets," said Nicole Saad Bembridge, Associate Director of the NetChoice Litigation Center. "We ask the Court to reverse the Commission's findings and restore the domestic industry requirement to the pro-innovation role it was meant to play."**

You can read our amicus brief submitted to the court here.

Please contact Krista Chavez at press@netchoice.org with inquiries.



About Us

**Contact Us**

NetChoice works to make the Internet safe
for free enterprise and free expression.

©2024 Copyright NetChoice. All Rights Reserved.     Privacy Policy     Terms & Conditions

# EXHIBIT 14

Masimo Named on *Fast Company's* Most Innovative Companies in North America List for 2024



The noninvasive monitoring technology trusted by hospitals, now available for use at home.

# Breakthrough innovations brought to you by the brand doctors trust

Baby & Infant          Health at Home          Hearables & Wearables          Opioid Safety

BABY & INFANT

## Empowering Confident Parenting



SHOP ALL





## Introducing Masimo AAT™

**Denon PerL Pro™ Premium True Wireless Earbuds**

Masimo Adaptive Acoustic Technology™ delivers personalized, lossless sound, creating a unique hearing profile tuned perfectly to your hearing. By measuring each person's hearing sensitivity and tailoring the sound to suit, Masimo AAT ensures no musical detail is left unheard. Experience more distinct and present sound with the Denon PerL Pro.

$349.00

SHOP THE PERL PRO



FEATURED TECHNOLOGIES

# Platform technologies at the core of our products







  

**Masimo SET®**

Masimo devices provide accurate measurements where other pulse oximeters fail by using revolutionary Signal Extraction Technology®.

**HEOS®**

HEOS is our local and cloud computing technology that enables all integrations with music services, voice assistants, third-party and automation companies, Masimo health hub connectivity, device analytics, and software updates.

**Masimo AAT**

The era of one-sound-fits-all is over. AAT automatically personalizes the optimal sound for each individual to cater to your unique ears.







Masimo Stork™ provides continuous tracking of health data to empower confident parenting.

SHOP MASIMO STORK

Masimo Stork™     Masimo W1™ Sport     MightySat®     Opioid Halo™



**200 million**
people are monitored with Masimo's SET® pulse oximetry technology each year*

**30+ years**
of innovation in the pursuit of improving the lives of people worldwide

**9 out of the 10**
top hospitals in the United States use Masimo technologies, as ranked in the 2022-2023 U.S. News and World Report†

To the Underdogs.

Here's to the Underdogs.
The Dreamers.
The Fighters.
The Davids.
The never-say-die Innovators.
The ones who achieve things they weren't supposed to achieve.

They aren't fond of bullies.
And they have no time for naysayers.



They start out in garages, on shoestring budgets.
Working long hours, sacrificing everything.
Taking on big challenges, by thinking bigger.

A lot of us get started this way.
We Invent. Adapt. Create.
Try new things. And if we fail, we try again.
We punch above our weight because we know that's what it takes.

At Masimo, we have never been afraid of roads less travelled.
How else would we have invented modern pulse oximetry that saves the eyesight of NICU babies?
Or, pioneered medical monitoring so that people taking pain medications are alerted to danger?
Or, created the world's first personalized earbud tuned precisely to how you best hear music?

We will never stop inventing things that help people live longer, happier, healthier.
We will never back down from our mission of improving life.

We will live on our grit, standing up for what's right—and for what's rightfully ours.
We will always live by the code of the underdog.
Even if, one day, we're the top dog.



MASIMO TODAY

# At Masimo, we never stop innovating

EXPLORE MORE



Joe Kiani, Chairman and CEO featured in Forbes



Our brands face forward while retaining the innovative vision of our founders



Masimo's research on the impact of skin pigmentation on sensor efficacy and accuracy

*Estimate, Masimo data on file
†https://health.usnews.com/health-care/best-hospitals/articles/best-hospitals-honor-roll-and-overview
Not every device included on this site is a medical device. Read and understand all product specifications, uses, and disclaimers.

PLCO-007219/PLM-14997A-0324



# EXHIBIT 16

Nos. 21-16506 & 21-16695

———————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

———————————————

EPIC GAMES, INC.,

*Plaintiff/counter-defendant,
Appellant/cross-appellee,*

*v.*

APPLE INC.,

*Defendant/counter-claimant,
Appellee/cross-appellant.*

———————————————

On Appeal from the United States District Court
for the Northern District of California (Hon. Yvonne Gonzalez Rogers)
No. 4:20-cv-05640-YGR

———————————————

**RESPONSE TO MOTION FOR LEAVE TO FILE AMICUS BRIEF**

———————————————

Theodore J. Boutrous, Jr.
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Ave.
Los Angeles, CA  90071

Rachel S. Brass
Julian W. Kleinbrodt
GIBSON, DUNN & CRUTCHER LLP
555 Mission St., Suite 3000
San Francisco, CA  94105

Mark A. Perry
Cynthia Richman
Joshua M. Wesneski
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave, NW
Washington, DC  20036
(202) 887-3667
mperry@gibsondunn.com

*Attorneys for Apple Inc.*

The Coalition for App Fairness ("CAF") and four of its members have moved for leave to file an amicus brief opposing Apple's motion to stay the permanent injunction pending resolution of these appeals. Apple frequently consents to amicus filings but is compelled to respond here because CAF has failed to inform the Court that it is *not* an independent non-party. CAF was created by Epic, is controlled by Epic, and answers to Epic, as the district court recognized and the trial evidence confirms. CAF's motion is nothing more than an attempt by Epic to file two responses rather than one to Apple's stay motion.

Under Rule 29(a), only *non-parties* may submit briefs as amicus curiae. *See* Fed. R. App. P. 29(a); *Miller-Wohl Co. v. Comm'r of Labor & Indus.*, 694 F.2d 203, 204 (9th Cir. 1982) ("An amicus curiae is not a party to litigation"). This rule makes good sense: An amicus curiae "does not represent the parties, but participates only for the benefit of the court," and thus must present a perspective *different* from that of the litigants. 4 Am. Jur. 2d Amicus Curiae §§ 1, 6 (2021).

CAF is not independent of Epic. As the district court found, Epic "creat[ed] the Coalition for App Fairness" in 2020 as part of a broader scheme Epic dubbed "Project Liberty." Ex. A, at 22–23. Epic was then in control of CAF, "charg[ing] [it] with generating continuous media and campaign tactic pressure on Apple," even hiring and paying for "a consultant to help to establish a reason for [CAF] to exist (either organic or manufactured)." *Id.* (quotation marks omitted). Evidence

admitted at trial likewise confirms Epic's control of CAF: A July 27, 2020 presentation to Epic's Board of Directors laid out the Project Liberty plan in detail, explaining that Epic would "[f]orm [a] coalition" in July and "lead [that] coalition of other leading tech companies in a PR and policy campaign against [Apple's] 30% [commission]." Ex. B, at .003, .008. CAF is the product of Epic's litigation strategy.

In light of these adjudicated facts, the statement in the proposed brief that CAF "is an *independent* nonprofit organization" (at 2 (emphasis added)) is false. CAF is not independent of Epic. Yet CAF chose not to disclose to this Court even that Epic is a member, much less that Epic created and controls CAF.

According to CAF's motion (at 3), the proposed amicus brief "explains how Apple's anti-steering provisions impact the multi-billion-dollar online application industry, not limited to Epic alone." Yet the four identified CAF members—Tile, Match Group, Basecamp, and Knitrino—all offer *subscription* apps, which "are not part of this case." Ex. A, at 33 n.198; *see id.* at 123 n.571. Indeed, subscription apps are subject to a different anti-steering provision that is unaffected by the injunction. *See id.* at 32 n.194. It does not appear that the four identified CAF members stand to benefit from the injunction any more than Epic itself does.

Moreover, the proposed amicus brief is largely devoted to the purported benefits of alternative "in-app payment systems." Br. 6. The district court clearly explained in its order on Apple's stay motion, however, that Apple's "Developer

Agreement prohibits third party in-app payment systems other than Apple's IAP. *The Court did not enjoin that provision* but rather enjoined the prohibition to communicate external payment alternatives and to allow links to those external sites." Ex. C, at 4 (emphasis added). Nor did the court preclude Apple from charging a commission on purchases of digital content, as CAF appears to assume. *Compare* Br. 6 ("Without being forced into Apple's [IAP] system and paying the required up to 30% fee …"), *with* Ex. A, at 150 ("Even in the absence of IAP, Apple could still charge a commission on developers. It would simply be more difficult for Apple to collect that commission.").

For the foregoing reasons, Apple opposes CAF's motion for leave to file an amicus brief in support of its founding member, Epic.

Dated: November 30, 2021

Respectfully submitted,

/s/ *Mark A. Perry*

Theodore J. Boutrous, Jr.
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Ave.
Los Angeles, CA 90071

Rachel S. Brass
Julian W. Kleinbrodt
GIBSON, DUNN & CRUTCHER LLP
555 Mission St., Suite 3000
San Francisco, CA 94105

Mark A. Perry
Cynthia Richman
Joshua M. Wesneski
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave, NW
Washington, DC 20036
(202) 887-3667
mperry@gibsondunn.com

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Circuit Court Rule 27-1(1)(d) and Circuit Rule 32-3 because it contains 662 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 27(a)(2)(B).

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 27(d) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word 2016.

Dated: November 30, 2021

/s/ *Mark A. Perry*
Mark A. Perry

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **Opposition to Motion for Leave to File Amicus Brief** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 30, 2021.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: November 30, 2021

/s/ *Mark A. Perry*
Mark A. Perry

# EXHIBIT 17

Nos. 23-1509, -1553

IN THE

# United States Court of Appeals for the Federal Circuit

ALIVECOR, INC.,

*Appellant,*

*v.*

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

APPLE INC.,

*Intervenor.*

-------------------------------------------------------

APPLE INC.,

*Appellant,*

*v.*

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

ALIVECOR, INC.,

*Intervenor.*

On Appeal from the United States International Trade Commission
Inv. No. 337-TA-1266

## NON-CONFIDENTIAL REPLY BRIEF OF
## INTERVENOR–CROSS-APPELLANT APPLE INC.

Michael A. Amon
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130

Melanie L. Bostwick
Mark S. Davies
Zachary J. Hennessee
Abigail Colella
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 339-8400

*Additional Counsel Listed on Inside Cover*

Benjamin C. Elacqua
FISH & RICHARDSON P.C.
1221 McKinney Street,
   Suite 2800
Houston, TX  77010

Ruffin B. Cordell
FISH & RICHARDSON P.C.
1000 Maine Ave, SW
Washington, DC  20024

E. Joshua Rosenkranz
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019

Elizabeth R. Moulton
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105

*Counsel for Apple Inc.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.......................................................................iii

INTRODUCTION...................................................................................... 1

ARGUMENT ............................................................................................ 2

    I.    AliveCor Failed To Prove A Domestic Industry. .................... 2

        A.    The Commission erred in finding an existing
             domestic industry under subparagraph (C). ................ 5

        B.    This Court cannot and should not accept AliveCor's
             invitation to find a domestic industry on grounds
             the Commission rejected............................................. 13

    II.    AliveCor Failed To Show Infringement Of Valid Patent
        Claims.................................................................................. 19

        A.    Under the proper claim construction, Apple does
             not infringe the '941 and '731 patents........................ 19

        B.    All asserted claims are obvious. ................................. 25

            1.    The secondary consideration evidence does not
                overcome Apple's strong prima facie
                obviousness showing. ......................................... 25

            2.    Apple showed that all asserted claims are
                prima facie obvious. ........................................... 34

    III.    The Commission Abused Its Discretion In Issuing
        Remedial Orders. ................................................................ 37

CONCLUSION ...................................................................................... 40

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF CONFIDENTIAL MATERIAL

**<u>Statement Regarding Confidential Material Omitted</u>**

Pursuant to Federal Circuit Rule 25.1(e) and the Protective Order issued in the ITC on May 26, 2021, and amended on August 18, 2021, two versions of this brief are being filed with the Court: a confidential version that notes the material marked confidential, and a nonconfidential version containing appropriate redactions.  In the nonconfidential version of this brief, confidential material has been deleted on pages 5 and 7-18. The general nature of the deleted material is confidential business information of AliveCor, Inc., regarding its finances, product information, and agreements with a third party not involved in this litigation.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AliveCor, Inc. v. Apple Inc.*,
No. 4:21-cv-03958, 2024 WL 591864 (N.D. Cal. Feb. 13,
2024) ........................................................................................ 2, 38

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) ........................................................ 27

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) ......................................................... 23

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) ............................................................................ 7

*Certain Integrated Circuit Chips*,
Inv. No. 337-TA-859, 2014 WL 12796437 (Aug. 22, 2014) ........... 11, 12

*In re Comiskey*,
554 F.3d 967 (Fed. Cir. 2009) ......................................................... 14

*Dow Jones & Co. v. Ablaise Ltd.*,
606 F.3d 1338 (Fed. Cir. 2010) ....................................................... 35

*Ecolochem, Inc. v. S. California Edison Co.*,
227 F.3d 1361 (Fed. Cir. 2000) ....................................................... 26

*Helmsderfer v. Bobrick Washroom Equip.*,
527 F.3d 1379 (Fed. Cir. 2008) ....................................................... 21

*Henny Penny Corp. v. Frymaster LLC*,
938 F.3d 1324 (Fed. Cir. 2019) ....................................................... 32

*InterDigital Commc'ns, LLC v. ITC*,
690 F.3d 1318 (Fed. Cir. 2012) ..................................................... 5, 14

*InterDigital Commc'ns, LLC v. ITC*,
707 F.3d 1295 (Fed. Cir. 2013) ......................................................... 8

*Invitrogen Corp. v. Clontech Lab'ys, Inc.*,
   429 F.3d 1052 (Fed. Cir. 2005) ........................................... 15

*John Mezzalingua Assocs., Inc. v. ITC*,
   660 F.3d 1322 (Fed. Cir. 2011) ............................................. 2

*Lelo Inc. v. ITC*,
   786 F.3d 879 (Fed. Cir. 2015) ............................................. 13

*Mittal Steel Point Lisas Ltd. v. United States*,
   542 F.3d 867 (Fed. Cir. 2008) ............................................. 14

*Power Integrations, Inc. v. Lee*,
   797 F.3d 1318 (Fed. Cir. 2015) ....................................... 7, 33

*Process Control Corp. v. HydRe-claim Corp.*,
   190 F.3d 1350 (Fed. Cir. 1999) ........................................... 23

*Roku, Inc., v. ITC*,
   90 F.4th 1367 (Fed. Cir. 2024) ...................................... 6, 12

*S. Alabama Med. Sci. Found. v. Gnosis S.P.A.*,
   808 F.3d 823 (Fed. Cir. 2015) ............................................. 32

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk
   Drilling USA, Inc.*,
   699 F.3d 1340 (Fed. Cir. 2012) .................................... 27, 30

*Volvo Penta of the Ams., LLC v. Brunswick Corp.*,
   81 F.4th 1202 (Fed. Cir. 2023) .................................... 26, 27

*Wi-Lan, Inc. v. Apple Inc.*,
   811 F.3d 455 (Fed. Cir. 2016) ............................................. 23

*Yita LLC v. MacNeil IP LLC*,
   69 F.4th 1356 (Fed. Cir. 2023) ........................................... 32

**Statutes**

5 U.S.C. § 552(b)(4) ......................................................... 28

19 U.S.C. § 1337(a)(2) ......................................................... 3

19 U.S.C. § 1337(a)(3)(B)............................................................... 13, 15, 16

19 U.S.C. § 1337(a)(3)(C)............................................................................3

**Other Authorities**

H.R. Rep. No. 100-40 (1987)........................................................................3

# INTRODUCTION

Apple demonstrated multiple fatal flaws in the Commission's decision to exclude Apple Watch from importation, based on patents that the Patent Trial and Appeal Board has held invalid and on a handful of contractor payments that, in any event, have no connection to AliveCor's discontinued domestic-industry product or its asserted patents.  The Commission and AliveCor have little defense of the Commission's actual rationale for that decision.  Both invent new (and equally flawed) rationales for the Commission's domestic-industry finding.  AliveCor even asks this Court to "affirm" by making new factual findings on separate domestic-industry grounds that the Commission rejected.  Both defend the Commission's claim construction by attacking arguments Apple hasn't made on appeal.  They suggest that the mere length of the public-interest analysis somehow justifies the Commission's arbitrary reasoning.  They even claim that the secondary considerations the Commission relied on to reject Apple's strong obviousness showing were also "strong," when the Commission's ruling unambiguously says otherwise.

AliveCor also argues (RB27-28) that Apple "decided to link" ECG and IRN after AliveCor publicly released KardiaBand with SmartRhythm. The Commission did not cite or credit any such evidence, however. *See* Appx202; OB59-60 & n.4 (AliveCor faulting Commission for "disregard[ing]" this evidence in infringement analysis). Apple affirmatively chose *not* to link the two features, and its separate FDA clearances for ECG app and IRN as "standalone" medical devices depend on that choice. *See* AB53. AliveCor elsewhere insinuates that Apple's "design intention" conflicts with "what Apple told the FDA." RB50 n.12. AliveCor's accusation is baseless. Apple did consider a link, as the cited document reflects. *See* Appx15988; *accord* Appx16365. But it is undisputed that this link "was removed prior to the software release." Appx30859; *see also* Appx30839 (same); Appx30862-30863 (explaining emphasis on keeping the two features separate). And AliveCor's expert conceded that "there's no input from IRN" to the ECG application. Appx30463.

*No industry praise.* The Commission and AliveCor, omitting crucial context, dispute whether the industry-praise evidence was

biased. *See* CB45-46; RB28-29.[5]  But they do not dispute that this praise "generally focus[es] on the ECG function" of KardiaBand. Appx200.  They assert that this should not matter because "ECG functionality is an element of the claimed invention."  CB46; RB29.  But it is undisputed that AliveCor's patents "effectively assume[] [ECG] devices are ordinary" and offer no "information on how to achieve" the reliable ECG measurements praised in industry articles.  Appx187.

AliveCor also argues that praise need not be "precisely limited to the point of novelty" of the claimed invention.  RB30 (citing *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1334 (Fed. Cir. 2019)).  True, but it must at least be directed to *some* novel feature.  *See Yita LLC v. MacNeil IP LLC*, 69 F.4th 1356, 1364 (Fed. Cir. 2023); *S. Alabama Med. Sci. Found. v. Gnosis S.P.A.*, 808 F.3d 823, 827 (Fed. Cir. 2015).  The Commission and AliveCor identify no such praise.  *See, e.g.*, RB29 (stating only that some articles "discuss" SmartRhythm).  The evidence the Commission quotes from (CB44-45) is illustrative.  One

---

[5] There can be no dispute, however, that bias infects the amicus briefs nominally supporting the Commission.  Signatories on both are "[m]ajor investors" in AliveCor.  Appx12212.  Omron Healthcare disclosed its interest.  Dkt. 80 at 3.  Khosla Ventures did not.  Dkt. 84 at 3.

jeopardize ongoing and planned research.  *See* AB95-97.  They argue
that the remedial orders will not prevent studies from enrolling new
participants "that have already purchased Apple Watches."  CB63;
RB60-61.  But at least one of these studies is recruiting participants
who currently "do not own Apple Watches."  Appx2782.  And it is not up
to either the Commission or AliveCor to suggest that new study
participants use "substitute" devices, CB63, RB60-61; as the record and
common sense reflect, redesigning studies whose protocols have been
approved (and funded) based on Apple Watch would be wasteful and
threaten the scientific merit of the research.  *E.g.*, Appx1403.

## CONCLUSION

The Court should reverse the Commission's finding of a Section
337 violation.

March 8, 2024

Michael A. Amon
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130

Benjamin C. Elacqua
FISH & RICHARDSON P.C.
1221 McKinney Street, Suite 2800
Houston, TX 77010

Ruffin B. Cordell
FISH & RICHARDSON P.C.
1000 Maine Ave, SW
Washington, DC 20024

Respectfully submitted,

/s/ Melanie L. Bostwick
Melanie L. Bostwick
Mark S. Davies
Zachary J. Hennessee
Abigail Colella
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 339-8400

E. Joshua Rosenkranz
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

Elizabeth R. Moulton
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

*Counsel for Apple Inc.*

# CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. Cir. R. 28.1(b)(3) because this brief contains 6988 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Melanie L. Bostwick*
Melanie L. Bostwick
*Counsel for Apple Inc.*

## CERTIFICATE OF CONFIDENTIAL MATERIAL

The brief contains 9 unique words and numbers marked confidential, excluding material previously marked confidential in this case's briefing.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Melanie L. Bostwick*
Melanie L. Bostwick
*Counsel for Apple Inc.*

# EXHIBIT 18

*The New York Times*

# *Apple Keeps Losing Patent Cases. Its Solution: Rewrite the Rules.*

After losing two complaints before the U.S. International Trade Commission, Apple has stepped up its lobbying to change the agency's practices.



**By Tripp Mickle**

Tripp Mickle has covered Apple since 2016.

March 19, 2024

Over the past decade, some of Apple's biggest regulatory headaches have come from a little-known federal agency called the U.S. International Trade Commission. The agency's patent judges have found Apple guilty of appropriating innovations in smartphones, semiconductors and smartwatches. And recently, they forced Apple to remove a health feature from Apple Watches.

Now the tech giant is pushing back. While it defends itself from patent complaints before the I.T.C., Apple has begun lobbying lawmakers to help rewrite the agency's rules.

The company has been campaigning across Washington for legislation that would make some patent owners ineligible to bring complaints before the I.T.C. It has sought to influence the language of committee reports that could affect how the agency levels punishments. And it has added to its lobbying might by enlisting one of the agency's former commissioners.

The lobbying effort comes as Apple is enmeshed in a multiyear legal battle with two U.S. medical device makers over technology in the Apple Watch. The companies, AliveCor and Masimo, filed complaints in the I.T.C. against Apple in 2021 for appropriating innovations they had developed to measure the heart's electrical activity and people's blood oxygen levels.

After losing both cases, Apple this year removed the technology to measure blood oxygen in its watches, which infringed on Masimo's patent. It is appealing the I.T.C.'s decision. A similar punishment is on hold as court proceedings continue related to the I.T.C.'s finding that Apple infringed on AliveCor's innovations with the Apple Watch's electrocardiogram feature.

Apple is trying to blunt the agency's signature power. Unlike traditional patent courts, where juries or judges typically issue fines, the I.T.C.'s judges can discipline a company that violates a patent by banning imports of the infringing product.

Because Apple makes all its signature devices overseas, a block on the import of its devices would be perilous to the company. To avoid that penalty in the future, the company says, it wants the agency to put the public interest of a product ahead of a ban. The company is betting that the court would then give more credence to Apple's argument that Americans would be harmed by an import ban because they would lose access to the communication and health features in iPhones and Apple Watches.

An Apple spokeswoman said the existing law requires that the I.T.C. consider how the public interest could be affected before ordering an import ban. But it said public data showed that the agency had made public-interest evaluations in only one-fifth of cases it had heard since 2010. As a result, its lobbyists have been talking with White House and congressional leaders about the I.T.C., as well as other issues such as privacy and domestic manufacturing.

Adam Mossoff, a patent law expert and a professor at George Mason University, said Apple was misinterpreting the law, which requires the I.T.C. to block a product if it finds that it infringes on a patent. An import ban is supposed to be overruled only if there's a proven threat to health or safety, he said. Blocking sales of an Apple device wouldn't qualify as harmful.

"The problem with their lobbying is that they're trying to neuter a well-functioning court by closing its doors to Americans who have had their rights infringed," he said.

When Congress set up what became the I.T.C. in 1916, it wanted to protect American innovation by allowing the U.S. government to ban the import of products with stolen technology. But as manufacturing moved overseas, the federal agency's court system became a forum for disputes between U.S. companies.

The I.T.C.'s judges, who are appointed by the commission, hold hearings with different standards for patent disputes than those that govern District Court cases. The cases are fast and compressed and can culminate with the judge's punishing a patent abuser by blocking its products.

Before a ban is put into effect, a company that's found guilty can appeal to the White House for a reprieve. But it's rare for an administration, which oversees the agency, to go against a judge's recommendation.

Apple has become the pre-eminent example of how the I.T.C. can be used. Because the company manufactures almost all its products overseas, the judges who have found it guilty of infringing on patents in smartphones, semiconductors and smartwatches say it should be punished by blocking the import of iPhones, iPads and Apple Watches.

Apple has largely escaped the import bans. In 2013, the Obama administration vetoed the I.T.C.'s plan to block iPhone imports after the agency determined that Apple had infringed on one of Samsung's smartphone patents. In 2019, Apple agreed to pay Qualcomm a royalty for some wireless technology patents, heading off an I.T.C. ruling that could have blocked iPhone sales. And after losing the Masimo case, Apple agreed to remove the infringing health feature to dodge an Apple Watch ban.

For years, Apple avoided the kind of lobbying that was customary for a large corporation. It kept a small office in Washington staffed by just a few people and employed only one lobbying firm, two people familiar with the company's practices said. But as regulatory challenges to its business have risen, its policy team has swelled to include dozens of people and 11 lobbying firms.

In the face of the patent complaints from AliveCor and Masimo, Apple's team in Washington gave priority to lobbying to change the I.T.C. In 2022, it began working with the ITC Modernization Alliance, a loose-knit coalition of companies that includes Samsung, Intel, Dell, Google, Verizon and Comcast. The group worked with members of Congress as it wrote the Advancing America's Interest Act in 2019 and supported its reintroduction in 2023.

The bill's backers — Representatives David Schweikert, a Republican from Arizona, and Donald S. Beyer Jr., a Democrat from Virginia — have promoted it as a way to curb abuse of the I.T.C. by patent trolls. It would prohibit patent holders from suing unless they manufactured a product that used the patented technology or had licensed the technology to someone else already.

AliveCor and Masimo are medical companies that have focused on selling products to health care providers and consumers more than licensing innovations to consumer technology companies like Apple.

Last year, Apple's lobbyists filed three reports disclosing that it had campaigned on behalf of the bill, according to Open Secrets, a campaign finance research nonprofit. It also added to its lobbying ranks by hiring Deanna Tanner Okun, a former I.T.C. chair who works for the law firm Polsinelli. (The hiring was previously reported by Politico.)

The lobbying campaign coincided with an effort to argue in Washington that an I.T.C. ban on Apple Watch imports would deprive people of a device that was crucial to their health, two people familiar with the lobbying said.

In addition to lobbying directly on legislation, Apple worked with a member of Congress to put language on Page 97 of a committee report for the 2024 Appropriations Bill, said Representative Ken Buck, a Republican from Colorado. The language would require the I.T.C. to review how it determined the value to the public of a product before suggesting a ban and to report to Congress on that process.



Representative Ken Buck said Apple had played a role in adding language to a bill that would affect the I.T.C. Kenny Holston/The New York Times

"To me, this went around the legitimate process," said Mr. Buck, who is leaving Congress this month. He told Representative Thomas Massie, a Republican from Kentucky who is on the Rules Committee, that he had 10 votes and would block the bill unless the language was removed. Mr. Massie's office confirmed that the language had been removed at Mr. Buck's request but declined to comment further.

An Apple spokeswoman disagreed with Mr. Buck's claims that its lobbying circumvented the legitimate legislative process. She said its public federal lobbying reports detailed how it worked on issues important for its products and customers.

The spokeswoman also pointed to the Senate's passage of a committee report with a sentence expressing its support of the I.T.C.'s doing thorough analysis of the public health implications of a product ban before issuing one, which is what Apple wants in the future.

**Tripp Mickle** reports on Apple and Silicon Valley for The Times and is based in San Francisco. His focus on Apple includes product launches, manufacturing issues and political challenges. He also writes about trends across the tech industry, including layoffs, generative A.I. and robot taxis. More about Tripp Mickle

A version of this article appears in print on , Section B, Page 1 of the New York edition with the headline: Apple Aims To Rewrite Patent Rules

# EXHIBIT 19

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## Washington, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN LIGHT-BASED PHYSIOLOGICAL MEASUREMENT DEVICES AND COMPONENTS THEREOF** | **Inv. No.  337-TA-1276** |

## FINAL INITIAL DETERMINATION ON VIOLATION OF SECTION 337

Administrative Law Judge Monica Bhattacharyya

(January 10, 2023)

**Appearances**:

*For Complainants Masimo Corporation and Cercacor Laboratories, Inc.:*

Stephen C. Jensen, Joseph R. Re, Irfan A. Lateef, Sheila N. Swaroop, Ted M. Cannon, Brian C. Claassen, Alan G. Laquer, Kendall M. Loebbaka, Daniel C. Kiang, and Douglas B. Wentzel of Knobbe, Martens, Olson & Bear, LLP in Irvine, CA; William R. Zimmerman and Jonathan E. Bachand of Knobbe, Martens, Olson & Bear, LLP in Washington, DC; Carol Pitzel Cruz of Knobbe, Martens, Olson & Bear, LLP in Seattle, WA; and Karl W. Kowallis and Matthew S. Friedrichs of Knobbe, Martens, Olson & Bear in New York, NY.

*For Respondent Apple Inc.:*

Mark D. Selwyn of Wilmer Cutler Pickering Hale and Dorr LLP in Palo Alto, CA; Joseph J. Mueller, Richard Goldenberg, and Sarah R. Frazier of Wilmer Cutler Pickering Hale and Dorr LLP in Boston, MA; and Michael D. Esch and David Cavanaugh of Wilmer Cutler Pickering Hale and Dorr LLP in Washington, DC.

Pursuant to the Notice of Investigation (EDIS Doc. ID 749538), 86 Fed. Reg. 46275-76 (Aug. 18, 2021), and Commission Rule 210.42, this is the administrative law judge's final initial determination on violation in the matter of *Certain Light-Based Physiological Measurement Devices and Components Thereof,* Commission Investigation No. 337-TA-1276.  19 C.F.R. § 210.42(a)(1)(i).

For the reasons discussed herein, it is the undersigned's final initial determination that there has been a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, and/or the sale within the United States after importation of certain wearable electronic devices with light-based pulse oximetry functionality and components thereof by reason of infringement of certain claims of U.S. Patent No. 10,945,648.

It is also the undersigned's final initial determination that there has been no violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, and/or the sale within the United States after importation of certain wearable electronic devices with light-based pulse oximetry functionality and components thereof with respect to U.S. Patent Nos. 10,912,501, U.S. Patent No. 10,912,502, U.S. Patent No. 10,687,745, and U.S. Patent No. 7,761,127.

TABLE OF CONTENTS

I.    **BACKGROUND**................................................................................. **1**
    A.    Procedural History ................................................................. 1
    B.    The Parties ........................................................................... 3
    C.    Asserted Patents .................................................................. 4
    D.    Products at Issue ................................................................. 4
    E.    Witness Testimony ............................................................. 5
II.    **JURISDICTION AND IMPORTATION**.......................................... **8**
    A.    Personal Jurisdiction .......................................................... 8
    B.    *In Rem* Jurisdiction and Importation .................................. 8
III.    **LEGAL STANDARDS** ..................................................................... **8**
    A.    Infringement........................................................................ 8
    B.    Invalidity ........................................................................... 11
    C.    Inequitable Conduct ......................................................... 16
    D.    Domestic Industry ............................................................ 17
IV.    **POEZE PATENTS** ......................................................................... **19**
    A.    Specification ..................................................................... 20
    B.    Asserted claims ................................................................ 21
    C.    Level of Ordinary Skill in the Art..................................... 25
    D.    Claim Construction ........................................................... 26
    E.    Infringement...................................................................... 33
    F.    Domestic Industry—Technical prong ............................... 55
    G.    Invalidity – Anticipation/Obviousness ............................. 88
    H.    Invalidity – Written Description and Enablement ........... 156
    I.    Prosecution Laches and Unclean Hands .......................... 170
V.    **U.S. PATENT NO. 10,687,745**....................................................... **174**
    A.    Specification ................................................................... 174
    B.    Claims ............................................................................. 176
    C.    Level of Ordinary Skill in the Art................................... 179
    D.    Claim Construction ......................................................... 179
    E.    Infringement.................................................................... 180
    F.    Domestic Industry—Technical Prong .............................. 199
    G.    Invalidity – Obviousness................................................. 209
    H.    Invalidity – Written Description and Enablement ........... 241
    I.    Prosecution Laches .......................................................... 245
VI.    **U.S. PATENT NO. 7,761,127** ........................................................ **246**
    A.    Specification ................................................................... 247
    B.    Claims ............................................................................. 248
    C.    Level of Ordinary Skill in the Art................................... 249
    D.    Claim Construction ......................................................... 250
    E.    Infringement.................................................................... 259
    F.    Domestic Industry—Technical Prong .............................. 273
    G.    Invalidity ......................................................................... 283
VII.    **DOMESTIC INDUSTRY – ECONOMIC PRONG (MASIMO WATCH)** ............. **301**
    A.    The "Masimo Watch" Articles.......................................... 301

B.  Disputed Background Issues Regarding Domestic Industry Investments ...................... 302
C.  Domestic Industry Existing at the Time of the Complaint ............................................ 305
D.  Domestic Industry in the Process of Being Established ................................................ 319
**VIII. DOMESTIC INDUSTRY – ECONOMIC PRONG ('127 PATENT)........................ 324**
A.  Domestic Industry Existing at the Time of the Complaint ............................................ 324
B.  Domestic Industry in the Process of Being Established ................................................ 326
C.  Asserted Domestic Industry Expenditures.................................................................... 327
**IX.     CONCLUSIONS OF LAW................................................................................... 335**

The following abbreviations may be used in this Initial Determination:

| | |
|---|---|
| **Tr.** | Hearing Transcript |
| **Dep. Tr.** | Deposition Transcript |
| **JX** | Joint Exhibit |
| **CX** | Complainants' exhibit |
| **CPX** | Complainants' physical exhibit |
| **CDX** | Complainants' demonstrative exhibit |
| **RX** | Respondents' exhibit |
| **RPX** | Respondents' physical exhibit |
| **RDX** | Respondents' demonstrative exhibit |
| **CPHB** | Complainants' pre-hearing brief (EDIS Doc. ID 770786) |
| **CIB** | Complainants' corrected initial post-hearing brief (EDIS Doc. ID 775422) |
| **CRB** | Complainants' post-hearing reply brief (EDIS Doc. ID 775058) |
| **RPHB** | Respondents' corrected pre-hearing brief (EDIS Doc. ID 770874) |
| **RIB** | Respondents' second corrected initial post-hearing brief (EDIS Doc. ID 779376) |
| **RRB** | Respondents' corrected post-hearing reply brief (EDIS Doc. ID 779379) |

## I.     BACKGROUND

### A.     Procedural History

The Commission instituted this investigation in response to a complaint filed by Complainants Masimo Corporation and Cercacor Laboratories, Inc. on June 30, 2021, with an amended complaint filed on July 12, 2021 (the "Amended Complaint," EDIS Doc. ID 746186), and supplemented on July 19, 2021.  Notice of Investigation at 1, EDIS Doc. No. 749538 (Aug. 13, 2021); 86 Fed. Reg. 46275-76 (Aug. 18, 2021).  The complaint, as amended, alleges violations of section 337 of the Tariff Act of 1930, as amended, by reason of infringement of certain claims of U.S. Patent No. 10,912,501 ("the '501 patent"), U.S. Patent No. 10,912,502 ("the '502 patent"), U.S. Patent 10,945,648 ("the '648 patent"), U.S. Patent No. 10,687,745 ("the '745 patent"), and U.S. Patent No. 7,761,127 ("the '127 patent").  *Id.*  The Commission ordered institution of this investigation to determine "whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products . . . by reason of infringement of one or more of claims 1-9 and 11-30 of the '501 patent; claims 1-2, 4-6, 8-12, 14-22, 24-26, and 28-30 of the '502 patent; claims 1-17 and 19-30 of the '648 patent; claims 1-6, 8-9, 11, 14, 20-24, and 26-27 of the '745 patent; and claims 7-9 of the '127 patent; and whether an industry in the United States exists as required by subsection (a)(2) of section 337."  *Id.* at 2.  The investigation was instituted upon publication of the Notice of Investigation in the *Federal Register* on Monday, August 18, 2021.  86 Fed. Reg. 46275-76.

Respondent Apple Inc. filed a response to the Amended Complaint and Notice of Investigation on September 7, 2021 (the "Response to Complaint"), disputing Complainants'

allegations with respect to infringement and domestic industry and asserting affirmative defenses of invalidity and unenforceability. *See* EDIS Doc. ID 752521.[1]

Pursuant to Order No. 3 (Sept. 1, 2021), the target date of this investigation was set to be December 16, 2022. On September 13, 2021, the investigation was assigned by then Chief Administrative Law Judge Bullock to the undersigned. *See* Notice to the Parties, EDIS Doc. ID 751531 (Sept. 13, 2021). Pursuant to Order No. 5 (Sept. 22, 2021), the target date was extended to January 16, 2023. *See* Comm'n Notice (Oct. 12, 2021), EDIS Doc. ID 754020.

A technology tutorial and *Markman* hearing was held on February 17, 2022. *See* *Markman* Tr., EDIS Doc. ID 763489.[2]

Pursuant to Order No. 25 (Mar. 23, 2022), Complainants withdrew their allegations of infringement with respect to claims 2, 4, 5, 7, 11, 16, 19, 20, and 22-30 of the '501 patent, claims 1-2, 4-6, 8-12, 14-18, 20, 25, and 26 of the '502 patent, claims 3, 4, 6, 7, 9, 10, 13-17, 19, 22, and 25-28 of the '648, and claims 1, 3-6, 8, 11, 14, 20-24, and 26 of the '745 patent. *See* Comm'n Notice, EDIS Doc. ID 768023 (Apr. 12, 2022). Pursuant to Order No. 33 (May 20, 2022), Complainants withdrew their allegations of infringement with respect to claims 1, 3, 6, 8, 9, 13-15, 17, 18, and 21 of the '501 patent, claims 19, 21, 24, 29, and 30 of the '502 patent, claims 1, 2, 5, 8, 11, 20, 21, 23, and 29 of the '648, and claim 2 of the '745 patent. *See* Comm'n Notice, EDIS Doc. ID 772826 (Jun. 10, 2022).

---

[1] The affirmative defenses based on inequitable conduct were stricken pursuant to Order No. 9 (Dec. 20, 2021), and Respondent was subsequently granted leave to add certain inequitable conduct defenses pursuant to Order No. 23 (Mar. 23, 2022).

[2] All of the claim construction disputes raised at the *Markman* hearing were subsequently mooted by the withdrawal of asserted claims or by agreement of the parties. *See infra*.

An evidentiary hearing was held on June 6-10, 2022.  The parties filed initial post-hearing briefs on June 27, 2022, and filed post-hearing reply briefs on July 11, 2022.  Additional exhibits were admitted pursuant to Order No. 50 (Jun. 16, 2022) and Order No. 56 (Aug. 31, 2022).  The hearing transcript was amended pursuant to Order No. 51 (Jun. 23, 2022) and Order No. 52 (Jun. 27, 2022).  The parties' post-hearing briefs were amended pursuant to Order No. 54 (Jul. 14, 2022), Order No. 55 (Jul. 14, 2022), and Order No. 57 (Aug. 31, 2022).

Pursuant to Order No. 58 (Sept. 12, 2022), Order No. 59 (Oct. 24, 2022), and Order No. 61 (Dec. 9, 2022), the target date was extended to May 10, 2023.  *See* Comm'n Notice, EDIS Doc. ID 787448 (Jan. 6, 2023).

### B.    The Parties

#### 1.    Complainants

The Complainants are Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor") (collectively, "Complainants").  Notice of Investigation at 2.  Masimo and Cercacor are both Delaware corporations having their principal places of business in Irvine, California.  Complaint ¶ 9.  Masimo is the owner of the '501 patent (JX-0001), '502 patent (JX-0002), '648 patent (JX-0003), and '745 patent (JX-0009).  *Id*. ¶ 4.  Cercacor is the owner of the '127 patent (JX-0007).  *Id*.  Masimo and Cercacor have rights to each of the asserted patents through a cross-licensing agreement.  *Id*. ¶¶ 4, 77; CX-1612C.

#### 2.    Respondent

The Respondent is Apple Inc. ("Apple").  Notice of Investigation at 2.  Apple is a California corporation having its principal place of business in Cupertino, California.  Response to Complaint ¶ 21.

that the identified protrusion in the Accused Products has a coating and ink that is configured to prevent light piping, as discussed above in the context of the "opaque lateral surface" limitation of '501 patent claim 1. *See* CIB at 82. The evidence of record shows that this limitation is met.

***

Accordingly, because each of the limitations of claims 20 and 24 are satisfied, the undersigned finds that the Accused Products infringe claim 24 of the '648 patent.

### 6.    '648 Patent Claim 30

Claim 30 of the '648 patent depends from claim 20, further requiring that "the protrusion further comprises one or more chamfered edges." There is no dispute that the identified protrusion in the Accused Products has chamfered edges. *See* CIB at 82-83. Dr. Madisetti identified chamfered edges on engineering drawings for the Accused Products. Tr. (Madisetti) at 699:4-19; CX-0063C (Apple Watch Series 7 Engineering Drawings) at 2; *see also* CX-1548C (Apple Watch Series 7 Photographs) at 3; CX-0070C (Apple Watch Series 7 Engineering Drawings) at 1. The evidence of record shows that this limitation is met.

***

Accordingly, because each of the limitations of claims 20 and 30 are satisfied, the undersigned finds that the Accused Products infringe claim 30 of the '648 patent.

### F.    Domestic Industry—Technical prong

The domestic industry products that Complainants rely on for the Poeze patents are the RevA sensor (CPX-0052C), the RevD sensor (CPX-0058C), the RevE sensors (CPX-0019C, CPX-0020C, CPX-0065C), and the Masimo W1 (CPX-0146C). CIB at 26-35. Complainants allege that the RevA, RevD, RevE, and Masimo W1 devices practice claim 12 of the '501 patent and claims 12, 24, and 30 of the '648 patent; and that the RevD, RevE, and Masimo W1 devices

practice claim 28 of the '502 patent. CIB at 85-117. For the reasons discussed below, the evidence shows, by a preponderance, that Complainants have satisfied the technical prong with respect to certain claims of the Poeze patents.

### 1.     Consideration of Post-Complaint Evidence

As an initial matter, the parties dispute whether evidence of post-complaint activities can be considered in the context of the domestic industry requirement. *See* RIB at 18-21; RRB at 17-18, 154; CRB at 11-13.

Apple argues that the only evidence that should be considered with respect to the alleged domestic industry is evidence of activities that pre-date the filing of the complaint, citing Commission precedent requiring that satisfaction of the domestic industry requirement be assessed at the time of the complaint. RIB at 18-21. Apple relies on *Certain Thermoplastic-Encapsulated Electric Motors, Components Thereof, and Products and Vehicles Containing the Same* ("*Thermoplastic-Encapsulated Electric Motors*"), where the Commission stated that "[o]rdinarily, the relevant date at which to determine if the domestic industry requirement of section 337 is satisfied is the filing date of the complaint." Inv. No. 337-TA-1073, Comm'n Op. at 6-7, EDIS Doc. ID 684974 (Aug. 12, 2019). Apple argues that the date of the complaint is the relevant timeframe for evaluating the domestic industry, and that the Commission has held that it "will consider post-complaint evidence regarding domestic industry only in very specific circumstances, *i.e.*, 'when a significant and unusual development has occurred after the complaint has been filed.'" *Certain Collapsible Sockets for Mobile Electronic Devices and Components Thereof*, Inv. No. 337-TA-1056, Comm'n Op. at 15 n.10, EDIS Doc. ID 649819 (July 9, 2018) (quoting *Certain Television Sets, Television Receivers, Television Tuners, and*

*Components Thereof*, Inv. No. 337-TA-910, Comm'n Op. at 72, EDIS Doc. ID 568157 (Oct. 30, 2015)).

With respect to the technical prong, Complainants contend that post-complaint evidence can be considered in this investigation because the Masimo W1 (a post-complaint product) has been shown to practice claims of the asserted patents, in contrast to the post-complaint products in *Thermoplastic-Encapsulated Electric Motors*. CRB at 12. With respect to the economic prong, Complainants also distinguish the facts in *Thermoplastic-Encapsulated Electric Motors* because ███████████████████████████████████████████████████. *Id.* Complainants further argue that Masimo has made certain investments that represent significant and unusual developments, including investments in ████████████████████████████, ████████████████████████ and the acquisition of Sound United. *See* Tr. (Scruggs) at 433:13-15; Tr. (McGavock) at 543:16-544:14, 545:3-17; Tr. (Al-Ali) at 323:18-324:25; Tr. (Muhsin) at 344:14-345:1; CX-1637 (Masimo 2021 Earnings Presentation) at 19-20; Tr. (Young) at 482:14-25.

Consistent with Commission precedent, evidence regarding Complainants' post-complaint activities will not be considered with respect to the domestic industry in this investigation.

The Commission has held that, "as a general matter, the only activities that are relevant to the determination of whether a domestic industry exists or is in the process of being established are those that occurred before the complaint was filed." *Certain Video Game Systems and Controllers*, Inv. No. 337-TA-743, Comm'n Op., 2012 WL 13171643, at *3 (Jan. 20, 2012). However, "in appropriate situations, based on the specific facts and circumstances of an investigation, the Commission may consider activities and investments beyond the filing of the

complaint." *Id.*[12] The Commission has held that such "facts and circumstances" may be shown by "a significant and unusual development" such as circumstances pertaining to "bankruptcy, a change in patent ownership, manufacturing, or licensing activity." *Certain Television Sets, Television Receivers, Television Tuners, and Components Thereof*, Inv. No. 337-TA-910, Comm'n Op., 2015 WL 6755093 (Oct. 30, 2015). Where there has been no showing of significant and unusual developments, the Commission has held that it would be error to "consider[] evidence as of the close of discovery, rather than as of the complaint filing date." *Certain Televisions, Remote Controls, and Components Thereof*, Inv. No. 337-TA-1263, Comm'n Op., 2022 WL 17486245, at *13 (Nov. 30, 2022) ("*Certain Televisions*").

Complainants have not made a showing of significant and unusual developments in the present investigation.[13] Complainants rely on developments with respect to the manufacturing of "Masimo Watch" products, CIB at 289-90, but to the extent that the Commission has considered post-complaint evidence due to unusual developments regarding manufacturing, this has been in circumstances involving the cessation of domestic manufacturing. *See, e.g., Certain Video Graphics Display Controllers, and Products Containing Same,* Inv. No. 337-TA-412, Initial Determination at 12-13, EDIS Doc. ID 172529 (May 17, 1999) (unreviewed in relevant part); *Certain Variable Speed Wind Turbines and Components Thereof*, Inv. No. 337-TA-376,

---

[12] The Federal Circuit has similarly affirmed the Commission's use of the complaint's filing date for assessing domestic industry under the facts and circumstances of the cases at issue. *See Bally/Midway Mfg. v. U.S. Int'l Trade Comm'n*, 714 F.2d 1117, 1120 (Fed Cir. 1983) (holding that, "under the circumstances of this case," the proper date for assessing the domestic "industry" was the filing date of the complaint, where a different position would undercut the purposes of Section 337); *Motiva, LLC v. Int'l Trade Comm'n*, 716 F.3d 596, 601 n.6 (Fed. Cir. 2013) (affirming Commission's use of the complaint's filing date as the relevant date for the domestic industry determination).

[13] Apple argues that Complainants have waived any contention regarding "significant and unusual developments" because this argument was not raised in Complainants' pre-hearing brief. *See* RRB at 154. Complainants did not waive this argument. *See* CPHB at 229-231.

Comm'n Op. 4, 10-13, EDIS Doc. ID 44138 (Aug. 21, 1997). Masimo's post-complaint progress towards the manufacture of "Masimo Watch" products appears to be consistent with Masimo's pre-complaint plans and projections for these products—there is nothing significant or unusual about these developments. *See* RIB at 19. Accordingly, post-complaint evidence regarding the alleged domestic industry will not be considered. *Cf. Certain Televisions*, 2022 WL 17486245, Comm'n Op. at *13 (holding that, in the context of considering whether the technical prong of the domestic industry had been shown, the ID erred to the extent post-complaint evidence was considered).[14]

Masimo's asserted pre-complaint domestic industry products are the RevA (CPX-0052C), RevD (CPX-0058C), and RevE prototypes (CPX-0019C, CPX-0020C, CPX-0065C). There is no dispute that the RevA and RevD sensors were made before the filing of the complaint—Mr. Scruggs explained that Masimo built the RevA sensor in November 2020, and the RevD sensor in April 2021. Tr. (Scruggs) at 396:2-13, 397:7-24. Masimo contends that two of the RevE prototypes were created pre-complaint. *See* CRB at 31-32.[15]

The undersigned will not consider any evidence regarding the Masimo W1 product, because this product made in December 2021, several months after the complaint was filed. *See* Tr. (Kiani) at 124:5-24; Tr. (Scruggs) at 398:24-399:400:2.

---

[14] The underlying Initial Determination reviewed by the Commission, like the investigation here, included a claim for a domestic industry in the process of being established. *See Certain Televisions, Remote Controls, and Components Thereof*, Inv. No. 337-TA-1263, Initial Determination, at 89-92, 144-145 (June 28, 2022) (EDIS Doc. ID 775506).

[15] Apple contends that the software installed on the RevD sensor has a most recent date of July 30, 2021, and that the software installed on the RevE sensors was not loaded until September and October 2021, with an earliest "known date" of July 9, 2021—after the filing of the complaint. *See* RIB at 42-43. This issue is discussed *infra* in the context of whether a domestic industry existed at the time of the complaint.

A limitation-by-limitation analysis for the RevA, RevD, and RevE devices is set forth below.

### 2.    '501 Patent Claim 12

#### a.    Element [1 preamble]: "A user-worn device configured to noninvasively measure a physiological parameter of a user, the user-worn device comprising:"

The preamble of '501 patent claim 1 requires "[a] user-worn device configured to non-invasively measure a physiological parameter of a user." Complainants submit that the RevA, RevD, and RevE devices meet this limitation because they are configured to measure the oxygen saturation and pulse rate of a user. CIB at 86-87; *see also* CIB at 30-35. Complainants rely on testimony from Mr. Scruggs and Mr. Muhsin describing the functionality of each of the Masimo devices. Tr. (Scruggs) at 407:22-408:4, 410:1-4, 405:8-406:11; Tr. (Muhsin) at 346:6-15. Dr. Madisetti observed a demonstration of the RevA, RevD, and RevE by Mr. Scruggs and determined that these devices each calculate oxygen saturation. Tr. (Madisetti) at 715:20-716:21; CDX-0011C.054. Mr. Al-Ali described internal testing of the oxygen saturation measurements of Masimo's prototype sensors that was presented in October 2020. Tr. (Al-Ali) at 272:16-277:13; CX-0378C at 32. He described this presentation as relating to a sensor with a design consistent with the RevA device (CPX-0052C). *See* Tr. (Al-Ali) at 270:17-22 (referencing *id*. at 260:11-25:14 (discussing CX-0375C; CPX-0052C)). He also described testing of other prototype Masimo Watch devices in early 2021. Tr. (Al-Ali) at 265:15-268:21, 276:12-278:3; CX-0433C. Mr. Al-Ali further described testing of RevE devices in June 2021. Tr. (Al-Ali) at 316:2-317:20; CX-0494C. Masimo submits that the test results for the domestic industry products show a degree of accuracy that is consistent with FDA guidance. CIB at 85 (citing CX-0269).

Apple argues that Complainants have not met their burden to show that any of the domestic industry products measure oxygen saturation. RIB at 46-52. Apple submits that Complainants failed to identify the source code in the domestic industry products that calculates any physiological parameter. *Id*. at 47-48; *see* Tr. (Sarrafzadeh) at 1124:24-1125:11. Apple's experts testified that their observations of demonstrations of the domestic industry products were insufficient to determine whether oxygen saturation or pulse rate were being measured. Tr. (Warren) at 1254:8-1256:25; Tr. (Sarrafzadeh) at 1122:20-1126:20. They further testified that certain measurements of blood oxygen relied upon by Complainants were "inconsistent" with reference measurements from another Masimo device. Tr. (Sarrafzadeh) at 1126:7-20; Tr. (Warren) at 1256:2-25; RDX-0008.149C.

With respect to the RevA and RevD sensors, Apple disputes whether these are "user-worn" devices, because the devices were produced without a strap or any other means for being worn by a user. RIB at 45-46. Complainants submit that each of these sensors includes mechanisms for attaching a strap, and Mr. Scruggs testified that they each had straps "at one point in time." Tr. (Scruggs) at 405:8-406:3, 406:23-407:18; CIB at 89.

In consideration of this evidence, the undersigned finds that Complainants have shown by a preponderance of the evidence that the RevA, RevD, and RevE devices measure blood oxygen saturation. The testimony of Masimo's witnesses is credible regarding the design and testing of these products with respect to measuring blood oxygen, and is supported by the results of the testing described in Masimo's documents. In particular, Mr. Al-Ali explicitly identified testing of blood oxygen functionality conducted in 2020 using prototype designs consistent with the RevA sensor, additional testing in the timeframe of the RevD devices in early 2021, and further testing of RevE devices in June 2021. Tr. (Al-Ali) at 260:11-25:14, 265:15-268:21, 270:17-22,

276:12-278:3, 315:16-316:18; CX-0375C; CX-0378C; CX-0433C; CX-0494C.[16]  Dr. Madisetti

observed a demonstration of the RevA, RevD, and RevE by Mr. Scruggs and determined that

these devices each calculate oxygen saturation.  Tr. (Madisetti) at 715:20-716:21; CDX-

0011C.054.[17]  Apple's experts also attended a demonstration of the RevA, RevD, and RevE by

Mr. Scruggs, although their observations were inconclusive.  Tr. (Warren) at 1254:4-1256:25;

Tr. (Sarrafzadeh) at 1122:20-1126:20; RDX-0007C.154; RX-1470; *see* Tr. (Warren) at 1258:9-

17 ("My opinion is that these DI articles do not implement the functionality in that's in the

claims, because I was not able to establish that they were producing physiological

parameters.").[18]  The testimony of Mr. Ali-Ali regarding Masimo's internal testing, together with

Dr. Madisetti's testimony, credibly indicate that Masimo's sensors are configured to make

oxygen saturation measurements.  *See* Tr. (Ali-Ali) at 272:16-275:12, 276:12-278:3, 318:15-22;

---

[16] This testing included a ███████████████ that, Mr. Ali-Ali explained, provided measurements "well
within acceptable numbers for a hospital product."  *See* Tr. (Ali-Ali) at 274:11-275:3.  Apple argues that
this testing is not clearly linked to the specific domestic industry prototypes produced, CRB at 41-42, but
the timing of these testing results matches with the development of the RevA, RevD, and RevE devices,
and the fact that Masimo was able to test the blood oxygen functionality of multiple prototypes during
this time is strong circumstantial evidence that the RevA, RevD, and RevE devices were capable of
measuring blood oxygen, particularly given the evidence that these devices were not separate products,
but part of an iterative design process.  *See, e.g.*, Tr. (Scruggs) at 394:13-398:23.  Moreover, as discussed
*infra*, a domestic industry in the process of being established does not require the current existence of a
physical article.  Thus, this testing also strongly supports a finding that Masimo had, at the time of filing
the complaint, taken necessary tangible steps to develop a product that will practice this limitation of the
patent and a significant likelihood of success in doing so.

[17] Apple cites the fact that Dr. Madisetti was unable to identify the correct Masimo source code at
hearing.  *See* CRB at 33-34.  This does not undercut the demonstrated evidence that Masimo tested its
devices to measure blood oxygen saturation.

[18] Apple's experts identified differences in the oxygen saturation measurements of a commercially
available pulse oximeter in comparison to the Masimo W1, but this post-complaint device is not being
considered as part of the asserted domestic industry.  *See* RDX-0008.149C.  Moreover, the variation in
the measurements appears to be consistent with FDA guidance regarding pulse oximetry—an FDA
document identified by Complainants states: "For example, if an FDA-cleared pulse oximeter reads 90%,
then the true oxygen saturation in the blood is generally between 86%-94%."  CX-0269 (FDA Safety
Communication) at 4.

CX-0378C at 32; CX-0494C; Tr. (Madisetti) at 715:20-716:20; CDX-0011C.054. The evidence of record is sufficient to show, by a preponderance, that the RevA, RevD, and RevE sensors measure blood oxygen.

With respect to the "user-worn" limitation, there is no dispute that the RevE sensors have straps that allow these devices to be worn. *See* Tr. (Scruggs) at 408:20-409:14; CPX-0019C; CPX-0020C; CPX-0065C. The RevA and RevD sensors produced in discovery do not have straps, but these devices have attachment mechanisms for a strap, and Mr. Scruggs testified that these devices had straps "at one point in time." Tr. (Scruggs) at 405:8-406:3, 406:23-407:18, 460:13-17. Moreover, as discussed above, Mr. Al-Ali described testing relating to the Masimo's RevA and RevD sensors in the fall of 2020 and early 2021. Tr. (Al-Ali) at 260:11-25:14, 265:15-268:21, 270:17-22, 276:12-278:3. His description of this testing suggests that the devices were "user-worn." *See Id*. at 278:5-13 (describing placement of devices on user's wrist).[19] The evidence is sufficient to show, by a preponderance, that the RevA, RevD, and RevE sensors meet the "user-worn" limitation.

Accordingly, a preponderance of the evidence of record shows that the RevA, RevD, and RevE sensors meet the limitations of the preamble of '501 patent claim 1.

**b.    Element [1A]: "at least three light emitting diodes (LEDs)"**

There is no dispute that the RevA, RevD, and RevE devices each contain a sensor module with at least three LEDs. *See* CIB at 89-91; RIB at 45-54. Dr. Madisetti identified two clusters of LEDs in each of these devices, with each cluster containing four or five LEDs. Tr. (Madisetti) at 711:14-712:4, 712:20-713:15; CDX-0011C.09 (citing CX-1111C (RevA CAD); CX-1124C

---

[19] The testing data for the sensor consistent with the RevA device includes "Motion Analysis," including "Walking/Running." CX-0378C at 27.

(RevD CAD); CX-1125C (RevE CAD); *see* CPX-0052C (RevA); CPX-0058C (Rev D); CPX-0019C, CPX-0020C, CPX-0065C (RevE).  The evidence of record shows that this limitation is met by the RevA, RevD, and RevE devices.

        **c.**        **Element [1B]: "at least three photodiodes arranged on an interior surface of the user-worn device and configured to receive light attenuated by tissue of the user"**

Dr. Madisetti identified at least three photodiodes on an interior surface in each of the RevA, RevD, and RevE devices.  Tr. (Madisetti) at 712:5-19.  He relied on photographs and schematics of the devices to identify the photodiodes.  *Id.*; CDX-0011C.050 (for RevA citing CPX-0052C; CX-0661C (photo)); CX-0473C (schematic) at 1, 3; CX-1111C (CAD) at 3, 5, 6; for RevD citing CPX-0058C; CX-0389C (schematic) at 1, 3; CX-1124C (CAD) at 3-4, 8; for RevE citing CPX-0019C, CPX-0020C, CPX-0065C; CX-0653C, CX-0655C, CX-0676C (photos); CX-0390C (schematic) at 1, 3; CX-1125C (CAD) at 2, 6, 7; *see generally* CIB at 91-92.

Apple argues that the evidence produced by Complainants is insufficient to show that these devices each have at least three photodiodes, because these elements are not visible from the outside of the devices and the schematics and technical drawings are allegedly unreliable.  RIB at 52-54.  Mr. Scruggs admitted that there were certain discrepancies between Masimo's CAD files and the actual RevA, RevD, and RevE sensors, recognizing that the devices represented "what we were able to manufacture at the time."  RX-1209C (Scruggs Dep. Tr.) at 91:18-92:24; *see also* Tr. (Scruggs) at 465:2-467:18 (confirming "there are some differences" between the CAD files and the prototype products).  Dr. Warren was unable to confirm whether the devices had photodiodes through a visual inspection.  Tr. (Warren) at 1259:12-23.

In consideration of the parties' arguments, the undersigned finds that Complainants have shown by a preponderance of the evidence that the RevA, RevD, and RevE devices each have at least three photodiodes meeting this claim limitation. Although there are some discrepancies between the physical prototypes and Masimo's schematics and technical drawings, there is no evidence that the layout of the photodiodes is inaccurate. Mr. Scruggs testified that "the essential meat and potatoes stuff, like the sensor, it's very accurately reflected" by the CAD drawings, because "that's very important for the devices." Tr. (Scruggs) at 467:2-7, 477:9-478:8; *see also* Tr. (Al-Ali) at 313:144-314:7 (confirming the accuracy of the CAD drawings for the RevE sensors).

Accordingly, the evidence shows, by a preponderance, that each of the RevA, RevD, and RevE devices meet the "at least three photodiodes" limitation of '501 patent claim 1.

> ### d. Element [1C]: "a protrusion arranged over the interior surface, the protrusion comprising a convex surface"

There is no dispute that the RevA, RevD, and RevE devices each contain a convex protrusion. *See* CIB at 92-93. Dr. Madisetti identified convex protrusions in each of these devices, relying on photographs and the physical devices. Tr. (Madisetti) at 713:16-714:7; CDX-0011C.051 (citing CX-0813C (RevA); CX-0815C (RevD); CX-0812C (RevE); *see* CPX-0052C (RevA); CPX-0058C (Rev D); CPX-0019C, CPX-0020C, CPX-0065C (RevE). The evidence of record shows that this limitation is met by the RevA, RevD, and RevE devices.

> ### e. Element [1D]: "a plurality of openings extending through the protrusion and positioned over the three photodiodes"

In the convex protrusion of the RevA, RevD, and RevE devices, Dr. Madisetti identified openings with transparent windows, relying on technical drawings and the physical devices. Tr. (Madisetti) at 714:8-24; CDX-0011C.052 (citing CX-1111C (RevA); CX-1124C (RevD); CX-

1125C (RevE)); *see* CPX-0052C (RevA); CPX-0058C (Rev D); CPX-0019C, CPX-0020C, CPX-0065C (RevE); CIB at 93-95. Apple argues that these features are not "openings," referencing its non-infringement arguments for this limitation. RRB at 43. This argument is inconsistent with the claim construction for "openings" adopted above, and accordingly, the evidence shows that the RevA, RevD, and RevE devices meet the plurality of openings" limitation of '501 patent claim 1.

> **f.      Element [1E]: "the openings each comprising an opaque lateral surface, the plurality of openings configured to allow light to reach the photodiodes, the opaque lateral surface configured to avoid light piping through the protrusion"**

Mr. Scruggs described a "light barrier" present in the RevA, RevD, and RevE devices that is a "black feature that surrounds the emitters so it separates the LEDs from the photodiodes." Tr. (Scruggs) at 400:3-24; CDX-005C.002. He explained that the light barrier was configured "so that light would travel only into the skin and . . . to minimize light traveling within the sensor." *Id.* Dr. Madisetti identified these features in technical drawings for the RevA, RevD, and RevE devices and testified that these were opaque lateral surfaces configured to allow light to reach the photodiodes and to avoid light piping through the protrusion. Tr. (Madisetti) at 714:25-19; CDX-0011C.053 (citing CX-1111C (RevA); CX-1124C (RevD); CX-1125C (RevE)).

Apple argues that the evidence produced by Complainants is insufficient to show that these devices have the claimed opaque lateral surfaces, because these features are not visible from the outside of the devices, and the schematics and technical drawings are allegedly unreliable. RIB at 52-54; RRB at 43-44. For the same reasons discussed above in the context of the "at least three photodiodes" limitation, Complainants have shown by a preponderance of the evidence that the RevA, RevD, and RevE devices each have opaque lateral surfaces meeting this

claim limitation. The undersigned finds Mr. Scruggs's testimony regarding these features to be credible and Masimo's CAD drawings to be reliable with respect to these features.

Accordingly, the evidence shows by a preponderance that each of the RevA, RevD, and RevE devices meet the "opaque lateral surface" limitation of '501 patent claim 1.

> **g.** **Element [1F]: "one or more processors configured to receive one or more signals from the photodiodes and calculate a measurement of the physiological parameter of the user"**

Dr. Madisetti identifies processors in the RevA, RevD, and RevE devices that receive signals from photodiodes and calculate oxygen saturation. Tr. (Madisetti) at 715:20-716:21. Dr. Madisetti relies on documentation for each of these products. *Id.*; CDX-0011C.054 (for RevA: CX-0701C at 2, CPX-012C, and CX-0836C at 4; for RevD: CX-0710C at 2-3, CX-1062C at 48, and CX-1074C; for RevE: CX-0705C at 2-3, CX-1062C at 30, 35). Mr. Scruggs described the measurement of oxygen saturation and pulse rate in each iteration of the Masimo Watch. Tr. (Scruggs) at 393:17-394:3. He described the sensor board of the RevA device including two processors on the sensor board responsible for calculating the pulse oximetry measurement. *Id.* at 406:4-11. He also identified two processors on the sensor board of the RevD device. *Id.* at 408:11-19.

As discussed above in the context of the preamble, Apple argues that Complainants have not met their burden to show that any of the domestic industry products measure oxygen saturation. RIB at 46-52. For the reasons discussed above, however, the undersigned finds that Complainants have met their burden to show, by a preponderance, that the RevA, RevD, and RevE devices calculate oxygen saturation. The record evidence further shows, by a preponderance, that the RevA, RevD, and RevE each contain processors for receiving signals from the photodiodes and calculating oxygen saturation.

Accordingly, the evidence shows that each of the RevA, RevD, and RevE devices meet the "one or more processors" limitation of '501 patent claim 1.

> **h.    Element [12]: "wherein the convex surface of the protrusion is an outermost surface configured to contact the tissue of the user and conform the tissue into a concave shape"**

Claim 12 of the '501 patent depends from claim 1, further requiring that "the convex surface of the protrusion is an outermost surface configured to contact the tissue of the user and conform the tissue into a concave shape." There is no dispute that this limitation is practiced by the RevA, RevD, and RevE devices. *See* CIB at 102. As discussed above, Dr. Madisetti identified a convex protrusion in these products, and his analysis confirms that the protrusion is designed to contact a user's wrist and conform the skin into a concave shape. *See* Tr. (Madisetti) at 716:24-717:13; CDX-0011C.055 (citing CX-0813C (RevA); CX-0815C (RevD); CX-0812C (RevE)).

***

Accordingly, because each limitation of claims 1 and 12 are satisfied by a preponderance of the evidence, the undersigned finds that the RevA, RevD, and RevE devices practice claim 12 of the '501 patent.

> **3.    '502 Patent Claim 28**

> **a.    Element [28 preamble]: "A user-worn device configured to non-invasively measure an oxygen saturation of a user, the user worn device comprising:"**

The preamble of '502 patent claim 28 requires "[a] user-worn device configured to non-invasively measure an oxygen saturation of a user." The parties' disputes with respect to this preamble are the same as those addressed above in the context of the preamble of '501 patent claim 1. *See* CIB at 102; RIB at 54. As discussed above in the context of the preamble of '501

patent claim 1, Complainants have shown by a preponderance of the evidence that the RevD and RevE devices are user-worn devices that measure blood oxygen saturation, meeting the limitations of the preamble of '502 patent claim 28.[20]

> **b.     Element [28A]: "a first set of light emitting diodes (LEDs), the first set of LEDs comprising at least an LED configured to emit light at a first wavelength and an LED configured to emit light at a second wavelength"**

There is no dispute that the RevD and RevE devices contain LEDs, as discussed above in the context of the "LEDs" limitation of '501 patent claim 1. *See* CIB at 103. Dr. Madisetti identified two clusters of LEDs in each of these devices, with each cluster containing four or five LEDs. Tr. (Madisetti) at 711:14-712:4, 712:20-713:15; CDX-0011C.09 (citing CX-1111C (RevA CAD); CX-1124C (RevD CAD); CX-1125C (RevE CAD); CX-1128C (Masimo W1 CAD); *see* CPX-0052C (RevA); CPX-0058C (Rev D); CPX-0019C, CPX-0020C, CPX-0065C (RevE)). Complainants rely on the testimony of Mr. Scruggs with respect to the wavelengths of light in these LEDs, identifying clusters of four LEDs in the RevD and RevE devices with wavelengths of ██████████████████████████ Tr. (Scruggs) at 406:23-407:18, 408:20-409:14. Apple argues that Dr. Madisetti did not identify any evidence of these wavelengths and that the arrangement of the LEDs could not be confirmed by a visual inspection, RIB at 55, but Mr. Scruggs's testimony and Masimo's schematics are sufficient to show, by a preponderance, that the RevD and RevE devices meet this limitation of '502 patent claim 28.

---

[20] Complainants do not assert that the RevA device practices claim 28 of the '502 patent. *See* CIB at 102-112.

     c.     **Element [28B]: "a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising at least an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength"**

As discussed above in the context of the "LEDs" limitation of '501 patent claim 1 and the "first set of LEDs" limitation of '502 patent claim 28, the evidence shows that the RevD and RevE devices each have two separate clusters of LEDs, and Mr. Scruggs described these clusters as having the same sets of wavelengths. *See* Tr. (Scruggs) at 406:23-407:18, 408:20-409:14, 410:5-24. Accordingly, the evidence shows, by a preponderance, that the RevD and RevE devices meet the "second set of LEDs" limitation of '502 patent claim 28.

     d.     **Element [28C]: "four photodiodes arranged in a quadrant configuration on an interior surface of the user-worn device and configured to receive light after at least a portion of the light has been attenuated by tissue of the user"**

With respect to the "four photodiodes" limitation of '502 patent claim 28, Complainants rely on the same evidence discussed above in the context of the "at least three photodiodes" limitation of '501 patent claim 1. *See* CIB at 103-04. Complainants identify a "quadrant configuration" in schematics of these products that were reviewed by Dr. Madisetti. *Id.* (citing CDX-0011C.050; CX-1111C; CX-1124C; CX-1125C; CX-1128C). Apple argues that Complainants' evidence with respect to this limitation is unreliable, *see* RIB at 54-55, but for the same reasons discussed above in the context of the "at least three photodiodes" limitation of '501 patent claim 1, the undersigned finds that Complainants have shown by a preponderance of the evidence that the RevD and RevE devices each have four photodiodes arranged in a quadrant configuration that meet this claim limitation.

e.   **Element [28D]: "a thermistor configured to provide a temperature signal"**

Dr. Madisetti identified thermistors in the RevD and RevE devices, relying on schematics and technical drawings. Tr. (Madisetti) at 720:21-721:5; CDX-0011C.059 (for RevD citing CX-1124C (CAD) at 3, 8; CX-0536C (schematic) at 1, 3; CX-0710C (schematic) at 3, 7; for RevE citing CX-1125C (CAD) at 2, 7; CX-0705C (schematic) at 3, 7; CX-0390C (schematic) at 3). Mr. Scruggs identified two thermistors in the RevD and RevE devices. Tr. (Scruggs) at 406:23-407:18 (RevD), 408:20-409:14 (RevE); *see generally* CIB at 104-106.

Apple argues that the evidence produced by Complainants is insufficient to show that these devices have the claimed thermistors, because these features are not visible from the outside of the devices, and the schematics and technical drawings are allegedly unreliable. RIB at 54-55. For the same reasons discussed above in the context of the photodiode limitations of '501 patent claim 1, the undersigned finds Mr. Scruggs's testimony regarding these features to be credible and Masimo's CAD drawings to be reliable with respect to these features.

Accordingly, the undersigned finds that each of the RevD and RevE devices meet the "thermistor" limitation of '502 patent claim 28.

f.   **Element [28E]: "a protrusion arranged above the interior surface, the protrusion comprising: a convex surface"**

There is no dispute that each of the RevD and RevE devices contain a protrusion comprising a convex surface that is arranged above the interior surface, as discussed above in the context of the "protrusion" limitation of '501 patent claim 1. *See* CIB at 106. The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

g.    **Element [28F]: "a plurality of openings in the convex surface, extending through the protrusion, and aligned with the four photodiodes, each opening defined by an opaque surface configured to reduce light piping"**

There is no dispute that each of the RevD and RevE devices have a "plurality of openings" extending through the protrusion and aligned with the photodiodes, as discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1, and these openings are defined by opaque surfaces, as discussed above in the context of the "opaque lateral surface" limitation of '501 patent claim 1. *See* CIB at 106. The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

h.    **Element [28G]: "a plurality of transmissive windows, each of the transmissive windows extending across a different one of the openings"**

There is no dispute that each of the RevD and RevE devices have a "plurality of transmissive windows," as discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1. *See* CIB at 106-07. The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

i.    **Element [28H]: "at least one opaque wall extending between the interior surface and the protrusion, wherein at least the interior surface, the opaque wall and the protrusion form cavities, wherein the photodiodes are arranged on the interior surface within the cavities"**

There is no dispute that each of the RevD and RevE devices contain an opaque wall between the interior surface and the protrusion, as discussed above in the context of the "opaque lateral surface" limitation of '501 patent claim 1. *See* CIB at 107-08. Dr. Madisetti further identifies cavities formed by the opaque wall and the protrusion, relying on schematics and technical drawings. Tr. (Madisetti) at 721:6-25; CDX-0011C.060 (for RevD citing CX-1124C (CAD); CX-0666C (schematic); for RevE citing CX-1125C (CAD); CX-1038C (schematic)).

72

The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

j.   **Element [28I]: "one or more processors configured to receive one or more signals from at least one of the photodiodes and calculate an oxygen saturation measurement of the user, the one or more processors further configured to receive the temperature signal"**

There is no dispute that each of the RevD and RevE devices contain processors that receive signals from the photodiodes, as discussed above in the context of the "processors" limitation of '501 patent claim 1. *See* CIB at 108. Apple disputes whether these processors calculate oxygen saturation, RIB at 54, but as discussed above in the context of the preamble of the '501 patent claim 1, a preponderance of the evidence shows that the RevD and RevE devices measure and calculate oxygen saturation. Moreover, there is no dispute that the processors receive a temperature signal, as discussed above in the context of the "thermistor" limitation. *See id.* at 104-108. The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

k.   **Element [28J]: "a network interface configured to wirelessly communicate the oxygen saturation measurement to at least one of a mobile phone or an electronic network"**

There is no dispute that the RevD and RevE devices contain network interfaces that can communicate with a mobile device via Bluetooth. *See* CIB at 108-110. Dr. Madisetti identified evidence that these devices have a network interface. Tr. (Madisetti) at 722:1-24; CDX-0011C.061 (citing CX-0709C (RevD and RevE sensor board schematic); CX-0836C (RevE demonstration photographs) at 9, 12, 13). Mr. Scruggs described the wireless communication capability of the RevD and RevE devices. Tr. (Scruggs) at 406:23-407:18, 408:20-409:14. The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

l.     **Element [28K]: "a user interface comprising a touch-screen display, wherein the user interface is configured to display indicia responsive to the oxygen saturation measurement of the user"**

There is no dispute that the RevD and RevE devices have a touch-screen display that shows oxygen saturation measurements. *See* CIB at 111. Dr. Madisetti identified evidence that these devices have touch-screen displays that can show an SpO2 measurement. Tr. (Madisetti) at 722:1-24; CDX-0011C.061 (citing CPX-058C (RevD device); CX-1062C (photographs); CPX-019C, CPX-020C, CPX-065C (RevE devices); CX-1068C, CX-1069C, CX-1072C (RevE device videos)). The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

m.     **Element [28L]: "a storage device configured to at least temporarily store at least the measurement"**

There is no dispute that the RevD and RevE devices store the blood oxygen measurement in memory. *See* CIB at 111. Dr. Madisetti identified evidence that these devices have memory to store the SpO2 measurement. Tr. (Madisetti) at 722:1-24; CDX-001C.061 (citing CX-0709C (RevD and RevE sensor board schematic)). The evidence shows, by a preponderance, that this limitation is met by the RevD and RevE devices.

n.     **Element [28M]: "a strap configured to position the user-worn device on the user"**

There is no dispute that the RevE have straps for a user's wrist. *See* CIB at 112; CPX-019C, CPX-020C, CPX-065C. With respect to the RevD device, Complainants identify a mechanism for attaching a strap and rely on Mr. Scruggs's testimony that it had a strap "at some point." *See* Tr. (Scruggs) at 406:23-407:18. As discussed above in the context of the preamble of '501 patent claim 1, the undersigned finds that a preponderance of the evidence shows that the RevD device also had a strap.

\*\*\*

Accordingly, because each limitation of the claim is satisfied, the undersigned finds that the RevD and RevE products practice claim 28 of the '502 patent.

### 4.     '648 Patent Claim 12

#### a.     Element [8 preamble]: "A user-worn device configured to non-invasively determine measurements of a physiological parameter of a user, the user-worn device comprising:"

The preamble of '648 patent claim 8 requires "[a] user-worn device configured to non-invasively determine measurements of a physiological parameter of a user."  The parties' disputes with respect to this preamble are the same as those addressed above in the context of the preamble of '501 patent claim 1.  *See* CIB at 112; RIB at 55-56.  As discussed above in the context of the preamble of '501 patent claim 1, the undersigned finds that Complainants have shown by a preponderance of the evidence that the RevA, RevD, and RevE devices are user-worn devices that measure blood oxygen saturation, meeting the limitations of the preamble of '502 patent claim 28.

#### b.     Element [8A]: "a first set of light emitting diodes (LEDs), the first set comprising at least an LED configured to emit light at a first wavelength and at least an LED configured to emit light at a second wavelength"

There is no dispute that the RevA, RevD, and RevE devices each contain LEDs, as discussed above in the context of the "LEDs" limitation of '501 patent claim 1.  *See* CIB at 112-13.  Apple disputes whether the LEDs meet each of these limitations, *see* RIB at 56, but as discussed in the context of the "first set of LEDs" limitation of '502 patent claim 28, the evidence shows that the LEDs are arranged in clusters in the RevD and RevE devices and have a first and second wavelength.  In addition, the evidence shows that the LEDs in the RevA device

have wavelengths that are the same as the RevD and RevE devices, as discussed by Mr. Scruggs. *See* Tr. (Scruggs) at 405:8-406:3.

> c.    **Element [8B]: "a second set of LEDs spaced apart from the first set of LEDs, the second set of LEDs comprising an LED configured to emit light at the first wavelength and an LED configured to emit light at the second wavelength"**

There is no dispute that the RevA, RevD, and RevE devices each contain clusters of LEDs, as discussed above in the context of the "LEDs" limitation of '501 patent claim 1. *See* CIB at 112-13. Moreover, the undersigned finds that there is a second set of LEDs in the RevD and RevE devices meeting his limitation, as discussed in the context of the "second set of LEDs" limitation of '502 patent claim 28. *See* CIB at 113. In addition, the evidence shows that there is a second set of LEDs in the RevA device with the same wavelengths as the first set, as discussed by Mr. Scruggs. *See* Tr. (Scruggs) at 405:8-406:3.

> d.    **Element [8C]: "four photodiodes"**

Complainants identify four photodiodes in each of the RevA, RevD, and RevE devices, citing the same evidence discussed above in the context of the "photodiodes" limitation of '501 patent claim 1. *See* CIB at 113. Apple disputes whether the evidence is sufficient to show the presence of these photodiodes, *see* RIB at 56, but the evidence shows, by a preponderance, that the RevA, RevD, and RevE devices each contain four photodiodes, for the reasons discussed above in the context of the "photodiodes" limitation of '501 patent claim 1.

> e.    **Element [8D]: "a protrusion comprising a convex surface, at least a portion of the protrusion comprising an opaque material"**

There is no dispute that the RevA, RevD, and RevE devices each contain a protrusion comprising a convex surface, which includes a portion with opaque material, as discussed above in the context of the "protrusion" and "openings" limitations of '501 patent claim 1. *See* CIB at

113.  The evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

f.    **Element [8E]: "a plurality of openings provided through the protrusion and the convex surface, the openings aligned with the photodiodes"**

Complainants identify a "plurality of openings" in the RevA, RevD, and RevE devices, citing the same evidence discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1. *See* CIB at 113. Apple disputes this limitation based on its erroneous construction for the term "openings." *See* RRB at 46. As discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1, the evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

g.    **Element [8F]: "a separate optically transparent window extending across each of the openings"**

There is no dispute that the RevA, RevD, and RevE devices each contain optically transparent windows extending across each of the identified openings, as discussed above in the context of the "plurality of openings" limitation of '501 patent claim 1. *See* CIB at 113-14. The evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

h.    **Element [8G]: "one or more processors configured to receive one or more signals from at least one of the photodiodes and output measurements of a physiological parameter of a user"**

There is no dispute that the RevA, RevD, and RevE devices each contain processors that receive signals from the photodiodes, as discussed above in the context of the "processors" limitation of '501 patent claim 1. *See* CIB at 114. Apple disputes whether these processors calculate oxygen saturation, RIB at 56, but as discussed above in the context of the preamble of the '501 patent claim 1, a preponderance of the evidence shows that the RevA, RevD, and RevE

devices measure and calculate oxygen saturation. The evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

### i.    Element [8H]: "a housing"

There is no dispute that the RevA, RevD, and RevE devices each have a housing. *See* CIB at 114-15. Dr. Madisetti identified photographs of the housing for the RevA, RevD, and RevE devices. Tr. (Madisetti) at 725:19-726:1; CDX-0011C.066 (citing CX-0661C; CX-1058C; CX-1415C; CX-0784C); *see also* CPX-052C; CPX-058C; CPX-019C; CPX-020C; CPX-065C. Mr. Scruggs also testified that the RevA, RevD, and RevE devices each have a housing. Tr. (Scruggs) at 405:8-06:3, 406:23-407:18, 408:20-409:14. The evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

### j.    Element [8I]: "a strap configured to position the housing proximate tissue of the user when the device is worn"

There is no dispute that the RevE devices have straps for a user's wrist. *See* CIB at 115; CPX-019C, CPX-020C, CPX-065C. In addition, as discussed above in the context of the preamble of '501 patent claim 1, the undersigned finds that the record evidence is sufficient to find that the RevA and RevD devices had straps.

### k.    Element [12]: "the physiological parameter comprises oxygen or oxygen saturation"

Claim 12 of the '648 patent depends from claim 8 and requires that "the physiological parameter comprises oxygen or oxygen saturation." There is no dispute with respect to this limitation, except to the extent that Apple disputes the satisfaction of the preamble limitation regarding the measurement of a physiological parameter. *See* CIB at 115; RIB at 56. The undersigned finds that the RevA, RevD, and RevE devices are configured to determine

measurements of blood oxygen for the same reasons discussed above in the context of the preamble and the "physiological parameter" limitation of '501 patent claim 1.

***

Accordingly, because each limitation of the claim is satisfied, the undersigned finds that the RevA, RevD, and RevE devices practice claim 12 of the '648 patent.

### 5.     '648 Patent Claim 24

#### a.     Element [20 preamble]: "A user-worn device configured to non-invasively determine measurements of a user's tissue, the user-worn device comprising:"

The preamble of '648 patent claim 20 requires "[a] user-worn device configured to non-invasively determine measurements of a user's tissue." The parties' disputes with respect to this preamble are the same as those addressed above in the context of the preamble of '501 patent claim 1. *See* CIB at 115; RIB at 55-56. As discussed above in the context of the preamble of '501 patent claim 1, Complainants have shown by a preponderance of the evidence that the RevA, RevD, and RevE devices are user-worn devices that measure blood oxygen saturation, meeting the limitations of the preamble of '648 patent claim 20.

#### b.     Element [20A]: "a plurality of light emitting diodes (LEDs)"

There is no dispute that the RevA, RevD, and RevE devices each contain LEDs, as discussed above in the context of the "LEDs" limitation of '501 patent claim 1. *See* CIB at 115.

#### c.     Element [20B]: "at least four photodiodes configured to receive light emitted by the LEDs, the four photodiodes being arranged to capture light at different quadrants of tissue of a user"

With respect to the "four photodiodes" limitation of '648 patent claim 20, Complainants rely on the same evidence discussed above in the context of the "four photodiodes" limitation of '502 patent claim 28 for the RevD and RevE devices. *See* CIB at 115-16. Complainants further

79

submit that the RevA has four photodiodes arranged in a quadrant configuration, citing a

photograph and technical drawings. *See* CX-0661C (photo); CX-0473C (schematic) at 1, 3; CX-

1111C (CAD). Apple argues that Complainants' evidence with respect to this limitation is

unreliable, *see* CIB at 56, but for the same reasons discussed above in the context of the "at least

three photodiodes" limitation of '501 patent claim 1, Complainants have shown by a

preponderance of the evidence that the RevA, RevD, and RevE devices each have four

photodiodes arranged in a quadrant configuration that meet this claim limitation.

        d.       **Element [20C]: "a protrusion comprising a convex surface"**

There is no dispute that the RevA, RevD, and RevE devices each contain a protrusion

comprising a convex surface, which includes a portion with opaque material, as discussed above

in the context of the "protrusion" limitation of '501 patent claim 1. *See* CIB at 116. The

evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE

devices.

        e.       **Element [20D]: "a plurality of through holes, each through hole including a window and arranged over a different one of the at least four photodiodes"**

Complainants identify "through holes" in the RevA, RevD, and RevE devices, citing the

same evidence discussed above in the context of the "plurality of openings" limitation of '501

patent claim 1. *See* CIB at 116. Apple disputes this limitation based on its erroneous

construction for the term "openings." *See* RRB at 46. As discussed above in the context of the

"plurality of openings" limitation of '501 patent claim 1, the evidence shows, by a

preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

f.    **Element [20E]: "one or more processors configured to receive one or more signals from at least one of the photodiodes and determine measurements of oxygen saturation of the user"**

There is no dispute that the RevA, RevD, and RevE devices each contain processors that receive signals from the photodiodes, as discussed above in the context of the "processors" limitation of '501 patent claim 1. *See* CIB at 116-17. Apple disputes whether these processors calculate oxygen saturation, RIB at 56, but as discussed above in the context of the preamble of the '501 patent claim 1, a preponderance of the evidence shows that the RevA, RevD, and RevE devices measure and calculate oxygen saturation. The evidence shows, by a preponderance, that this limitation is met by the RevA, RevD, and RevE devices.

g.    **Element [24]: "wherein the protrusion comprises opaque material configured to substantially prevent light piping"**

Claim 24 of the '648 patent depends from claim 20, further requiring that "the protrusion comprises opaque material configured to substantially prevent light piping." There is no dispute that the identified protrusion in the RevA, RevD, and RevE devices meets this limitation, as discussed above in the context of the "opaque lateral surface" limitation of '501 patent claim 1. *See* CIB at 117.

\*\*\*

Accordingly, because each of the limitations of claims 20 and 24 are satisfied, the undersigned finds that the RevA, RevD, and RevE devices practice claim 24 of the '648 patent.

**6.    '648 Patent Claim 30**

Claim 30 of the '648 patent depends from claim 20, further requiring that "the protrusion further comprises one or more chamfered edges." There is no dispute that the identified protrusions in the RevA, RevD, and RevE devices have chamfered edges. *See* CIB at 117. Dr. Madisetti identified chamfered edges on engineering drawings for the RevA, RevD, and

RevE. Tr. (Madisetti) at 726:2-14; CDX-0011C.067 (citing CX-1111C (RevA); CX-1124C

(RevD); CX-1125C (RevE)).

***

Accordingly, because each of the limitations of claims 20 and 30 are satisfied, the

undersigned finds that the RevA, RevD, and RevE devices practice claim 30 of the '648 patent.

### 7.    Domestic Industry Existing at the Time of the Complaint

Apple argues that no patent-practicing domestic industry article existed at the time of the

complaint. RIB at 42-45; RRB at 12-14. Complainants dispute Apple's contentions. CRB at

30-32. As discussed above, Complainants have shown by a preponderance of the evidence that

the RevA, RevD, and RevE devices practice claim 12 of the '501 patent and claims 12, 24, and

30 of the '648 patent, and that the RevD and RevE devices also practice claim 28 of the '502

patent.

With respect to a domestic industry that is alleged to exist at the time of the complaint,

the Commission has held that a domestic industry article must exist at that time. *See*

*Thermoplastic-Encapsulated Electric Motors*, Comm'n Op. at 9, EDIS Doc. ID 684974 ("Both

Federal Circuit law and Commission precedent require the existence of actual 'articles protected

by the patent' in order to find that a domestic industry exists.") (citing *Microsoft Corp. v. Int'l*

*Trade Comm'n*, 731 F.3d 1354 (Fed. Cir. 2013) ("[a] company seeking section 337 protection

must . . . provide evidence that . . . relates to an actual article that practices the patent")); *id.* at 10

(finding that no domestic industry "exists" relating to the articles protected by the patent where

evidence failed to show "the presence of an article protected by the patent at the time of the

complaint").

In consideration of the parties' arguments, the undersigned finds that the RevA, RevD, and RevE devices have been shown to be articles protected by claims of the Poeze patents existing at the time of the complaint. As discussed *supra*, although the RevA and RevD devices were produced in discovery without a strap, a preponderance of the evidence shows that these devices were user-worn devices before the filing of the complaint. *See* Tr. (Scruggs) at 405:8-406:3, 406:23-407:18, 460:13-17; Tr. (Al-Ali) at 260:11-25:14, 265:15-268:21, 270:17-22, 276:12-278:3; CX-0378C at 27.

Apple further argues that the laptop Mr. Scruggs used to display the oxygen saturation measurement from the RevA sensor during discovery was not used with this sensor before the filing of the complaint, RIB at 43-44, but this laptop is not part of the domestic industry article protected by the identified claims of the Poeze patents (Complainants do not assert that the RevA practices claim 22 of the '502 patent, which requires a display). *See* CRB at 30-31. Mr. Scruggs's laptop was part of the demonstration showing that the RevA sensor was configured as required by the claims, *see* Tr. (Madisetti) at 757:16-23; CX-0836C (demonstration photos) at 4, but the laptop is not part of the domestic industry article—the RevA had the required configuration even in the absence of the laptop.[21]

With respect to the RevD sensor, Apple argues that software was loaded on this device on July 30, 2021, after the complaint was filed. RIB at 42-43; *see* Tr. (Scruggs) at 459:4-460:7; Tr. (Sarrafzadeh) at 1121:9-24; RX-1183C.0035-39. As discussed above, however, Mr. Al-Ali described testing of RevD sensors in early 2021—before the filing of the complaint. Tr. (Al-Ali)

---

[21] As described by Mr. Al-Ali, an October 2020 presentation describes internal testing of the oxygen saturation measurements of prototype sensors consistent with the RevA design. Tr. (Al-Ali) at 272:16-277:13; CX-0378C at 32.

at 276:17-278:13. A preponderance of the evidence thus shows that the RevD existed prior to the complaint.[22]

With respect to the RevE devices, Apple argues that the software installed on these devices has a "known date" of July 9, 2021, and this software was loaded on these devices in September and October 2021. *See* RIB at 42-43; Tr. (Scruggs) at 457:12-25, 458:1-459:2, 460:23-461:16; Tr. (Sarrafzadeh) at 1121:9-24; RX-1183C.0035-39. At the hearing, Mr. Scruggs could not specifically identify a date when the RevE devices were made, stating that they were "built between May and September 2021," a range of dates that includes the date the complaint was filed. Tr. (Scruggs) at 398:20-23; *see id.* at 458:1-459:3 (admitting that CPX-0020C was created in September 2021). The evidence shows that at least one of the RevE devices produced (CPX-0019C) existed at the time of the complaint—the evidence shows that software was loaded on this device on July 9, 2021,[23] which pre-dates the filing date of the amended complaint, July 12, 2021, as recognized in the Commission's Notice of Institution. 86 Fed. Reg. 46275.[24] Moreover, Mr. Al-Ali described testing of RevE devices (though not the

---

[22] Apple's arguments focus on the physical devices produced in discovery, *e.g.*, CPX-0058C, which were loaded with specific software, but the circumstantial evidence regarding testing shows, by a preponderance of the evidence, that prototype devices with designs that are consistent with the asserted domestic industry products were operational before the filing of the complaint and subject to testing. *See* Tr. (Ali-Ali) at 272:16-275:12, 276:12-278:3, 318:15-22; CX-0378C at 32; CX-0494C; n.16 *supra*.

[23] Complainants acknowledge that these devices were altered after the filing of the complaint with "different firmware versions prior to and subsequent to that version for development," but have represented that the July 9 version of the software was restored in October 2021. *See* RX-1183C.0037-.0039; Tr. (Scruggs) at 457:9-21 (software was installed on physical 19 on July 9, 2021).

[24] The original complaint was filed on June 30, 2021, with a redacted public version of an amended complaint filed July 7, 2021, a full confidential version of the amended complaint filed on July 12, 2021, and a supplement to the complaint filed on July 19, 2021. *See* EDIS Doc. ID 745713, 746186, 746514, 747244. *See In re Samsung Electronics Co., Ltd.*, 2 F.4th 1371, 1376 (Fed. Cir. 2021) (amended complaints supersede the original complaint); *Nolen v. Lufkin Indus., Inc.*, 466 Fed. Appx. 895, 898 (Fed. Cir. 2012) ("Generally, an amended pleading supersedes the original for all purposes").

specific devices produced) in June 2021.  Tr. (Al-Ali) at 316:2-317:20 (citing CX-0494C and explaining "that data was collected on June 29th).  This record is sufficient to show, by a preponderance of the evidence, that RevE devices existed and practiced asserted claims of Poeze patents at the time the complaint was filed.

* * *

Accordingly, Complainants have shown that the technical prong of the domestic industry requirement is satisfied with respect to a domestic industry existing at the time of the complaint for the Poeze patents.

### 8.    Domestic Industry in the Process of Being Established

Complainants have separately alleged that there is a domestic industry in the process of being established.  CIB at 305-09; *see* Amended Complaint ¶ 86.  In *Certain Stringed Musical Instruments & Components Thereof* ("*Stringed Instruments*"), the Commission held that a domestic industry is in the process of being established when (1) a complainant takes "the necessary tangible steps to establish such an industry in the United States," and (2) there is a "significant likelihood that the industry requirement will be satisfied in the future."  Inv. No. 337-TA-586, Comm'n Op. at 14-17, EDIS Doc. ID 300615 (May 16, 2008).  The Commission recently declined to adopt an ID's finding that a currently existing article must exist at the time of the complaint to show a domestic industry in the process of being established.  *Certain Televisions, Remote Controls, and Components Thereof*, Comm'n Op., Inv. No. 337-TA-1263, 2022 WL 17486245, at *15 (Nov. 30, 2022) ("The Commission, however, does not adopt the ID's finding that a currently existing physical article must exist at the time of the complaint filing to show a domestic industry in the process of being established.").  The Commission further found that a domestic industry in the process of being established had not been shown because

the record lacked sufficient evidence of a future physical article that would practice the patent. *See id.* (Roku failed to produce "sufficient evidence of how . . . [the] domestic industry device . . . *will operate* so as to allow the parties to probe in discovery, and the Commission to make a determination, as to whether Gazelle *will practice* the '875 patent") (emphasis added).[25] The Commission's discussion indicates that a physical article practicing the patent need not yet exist to prove a "process of being established claim."[26]

Following this guidance, the evidence of record shows, by a preponderance, that the technical prong of the domestic industry requirement is satisfied based on an industry in the process of being established. As discussed *supra*, the evidence shows that the RevA device practices claim 12 of the '501 patent and claims 12, 24, and 30 of the '648 patent. Similarly, the RevD and RevE devices meet all of the limitations of claim 12 of the '501 patent, claim 28 of the '502 patent, and claims 12, 24, and 30 of the '648 patent.

Even if certain of the Masimo Watch prototypes were missing limitations of the Poeze patents, *e.g.*, the "user-worn" limitation in the claim preambles, the evidence shows that at the

---

[25] *See also id.* ("'Respondents have had no opportunity to evaluate . . . whether Roku's future promised product actually would practice the claims of the '875 patent'") (quoting ID with approval); *id.* (finding that Roku failed to meet its burden of showing "that there was a significant likelihood that the Gazelle Remote (or any other physical article) would practice one or more claims of the '875 patent in the future"); *id.* ("Evidence of a complainant's progress towards an article that will practice one or more claims of the asserted patent as of the complaint filing date is relevant to whether the complainant has taken the necessary tangible steps to establish an industry, and whether there is a significant likelihood that the domestic industry requirement will be satisfied in the future").

[26] At the time the parties filed their post-hearing briefs, the Commission had not yet addressed in this manner "the circumstances, if any, in which a complainant can demonstrate a domestic industry in the process of being established absent the existence of a protected article." *Thermoplastic-Encapsulated Motors*, Comm'n Op. at 11-12, 2019 WL 9596564, at *7 (EDIS Doc. ID 684974); *cf. Certain Mobile Devices with Multifunction Emulators*; Inv. No. 337-TA-1170, Initial Determination at 148-52, EDIS Doc. ID 738549 (Mar. 16, 2021) (finding satisfaction of the technical prong in the absence of a physical article based on complainants' "tangible and necessary steps to practice the claim" and a "significant likelihood that the practice will occur."), *reviewed and taking no position on this issue*, Comm'n Notice, EDIS 747056 (July 16, 2021).

time of the complaint, Masimo had taken necessary "tangible steps" in engineering and research and development towards a product that practiced claims of the Poeze patents. As described above, Masimo's design documents and testing results show that the Masimo Watch prototypes in development meet the limitations of the Poeze patents.[27] Mr. Scruggs described the development process for Masimo Watch prototypes as an iterative process. *See id.* at 393:12-20 ("we've designed, built, and tested many iterations of the Masimo Watch"), 402:2-12 (describing "the progression of the different sensor designs"); *see also* Tr. (Muhsin) at 342:25-343:7 (describing "many iterations of wrist sensors"), 345:2-7 (describing "[m]any iterations on the watch through the design phases"); Tr. (Al-Ali) at 275:13-276:11 (describing ongoing testing of sensor designs, and with each subsequent design, "[i]t gets a little bit better"). Thus, even if the evidence were insufficient to show that the RevA, RevD, and RevE devices existing at the time of the complaint practiced each of the limitations of the asserted claims, the evidence would be sufficient to show a domestic industry in the process of being established.

Accordingly, the undersigned finds that Complainants have satisfied the technical prong with respect to claim 12 of the '501 patent, claim 28 of the '502 patent, and claims 12, 24, and 30 of the '648 patent, for a domestic industry in the process of being established based on the RevA, RevD, and RevE devices.

---

[27] Apple argues that its experts were not allowed certain access to the prototypes (*see* RIB at 48-49), but Complainants produced schematics, source code, and the data from Masimo's testing regarding these prototypes in discovery, and provided witnesses for deposition. *See* CRB at 29-30, 33-34. Many of Apple's complaints regarding domestic industry discovery were addressed in the context of Apple's motion for sanctions and Apple's motion to strike domestic industry contentions. *See* Order No. 31 (Apr. 8, 2022); Order No. 32 (May 5, 2022). The record shows that Apple was provided a reasonable opportunity to evaluate whether Masimo's development activities would result in a product practicing the asserted claims. *See Certain Televisions, Remote Controls, and Components Thereof*, Inv. No. 337-TA-1263, Comm'n Op., 2022 WL 17486245, at *15 (Nov. 30, 2022) (noting that respondents should be given an "opportunity to evaluate in fact or expert discovery whether [complainant]'s future promised product actually would practice the claims").

The undersigned hereby certifies the record in this investigation to the Commission with the undersigned's final initial determination. Pursuant to Commission Rule 210.38, the record further comprises the complaint and exhibits thereto, and the exhibits attached to the parties' summary determination motions and the responses thereto. 19 C.F.R. § 210.38(a).

Pursuant to Commission Rule 210.42(h)(2), this initial determination shall become the determination of the Commission 60 days after the service thereof, unless a party files a petition for review pursuant to Commission Rule 210.43(a), the Commission orders its own review pursuant to Commission Rule 210.44. 19 C.F.R. § 210.42(h)(2).

This initial determination is being issued with a confidential designation pursuant to Commission Rule 210.5 and the protective order in this investigation. Within 10 days of the date of this document, the parties shall submit a joint statement as to whether or not they seek to have any portion of this document deleted from the public version. If the parties do seek to have portions of this document deleted from the public version, they must submit a single proposed public version of this final initial determination with any proposed redactions consistent with the manner specified by Ground Rule 1.9.[138] The submission shall be made by email to Bhattacharyya337@usitc.gov and need not be filed with the Commission Secretary.

**SO ORDERED.**

Monica Bhattacharyya
Administrative Law Judge

---

[138] Redactions should be limited to avoid obscuring the reasoning underlying the decision. Parties who submit excessive redactions may be required to provide an additional written statement, supported by declarations from individuals with personal knowledge, explaining why each proposed redaction meets the definition for confidential business information in 19 C.F.R. § 201.6(a).

Certain Light-Based Physiological Measurement Devices and Components Thereof; Inv.
No. 337-TA-1276 (Violation)                                                            337-1276 Violation

## CERTIFICATE OF SERVICE

I, Katherine M. Hiner, hereby certify that the parties listed have entered an appearance in the above captioned
investigation, and a copy of the PUBLIC CERTIFICATE OF SERVICE was served upon the following parties
via first class mail and air mail where necessary.

| Document | Security | Document Type | Official Rec'd Date | Title |
|----------|----------|---------------|---------------------|-------|
| 789795 | Public | ID/RD - Final on Violation | 02/07/2023 04:52 PM | Final Initial Determination on Violation of Section 337 |

Service Date:          February 07, 2023

/s/

Katherine M. Hiner

U.S. International Trade Commission

500 E Street, S.W.

Suite 112

Washington, D.C. 20436

Certain Light-Based Physiological Measurement Devices and Components Thereof; Inv.
No. 337-TA-1276 (Violation)                                                    337-1276 Violation

## CERTIFICATE OF SERVICE

**On behalf of Complainant Cercacor Laboratories,
Inc.;Masimo Corporation:**

Joseph R. Re, Lead Representative

**Knobbe, Martens, Olson & Bear**

2040 Main St.

14th Floor

Irvine, California 92614, United States

949-760-0404 -- voice

949-760-9502 -- fax

joe.re@knobbe.com

Electronic Service

**On behalf of Respondent Apple Inc.:**

Sarah  Frazier, Lead Representative

**Wilmer Cutler Pickering Hale and Dorr LLP**

1875 Pennsylvania Avenue, NW

Washington, District of Columbia 20006, United States

202-663-6000 -- voice

202-663-6383 -- fax

sarah.frazier@wilmerhale.com

Electronic Service

Service Date:     February 07, 2023              PDF Generated on:     February 07, 2023

# EXHIBIT 20

 An official website of the United States government. Here's how you know



Search www.usitc.gov for... | go

☰

Home / Investigations / Section 337
/ Section 337 Statistics: Number of Section 337 Investigations Brought by NPEs (Updated Annually)

# SECTION 337 STATISTICS: NUMBER OF SECTION 337 INVESTIGATIONS BROUGHT BY NPES (UPDATED ANNUALLY)

USITC.gov will be periodically unavailable between 1:00 pm – 4:00 pm EDT on Sunday, April 21, 2024, to conduct system maintenance.
[Click to learn more]

CONTACT US ▾                                                    📞

*Updated: 01/12/24*

No commonly accepted definition of an NPE exists. For analytical purposes, the Commission has gathered data using the following categories [1]:

- *Category 1 NPEs*. Entities that do not manufacture products that practice [2] the asserted patents, including, e.g., inventors who may have conducted R&D or built prototypes but do not make a product covered by the asserted patents and therefore rely on licensing to



meet the domestic industry requirement; research institutions, such as universities and laboratories, that do not make products covered by the patents, and therefore rely on licensing to meet the domestic industry requirement; start-ups that possess IP rights but do not yet manufacture products that practice the patent; and manufacturers whose own products do not practice the asserted patents.

- *Category 2 NPEs*. Entities that do not manufacture products that practice the asserted patents and whose business model primarily focuses on purchasing and asserting patents.

Number of Section 337 Investigations Brought by NPEs (Updated Annually)

| Calendar Year | Total # Invs. | Non-NPE Invs. | Category 1 NPE | Category 2 NPE |
|---|---|---|---|---|
| 5/16/2006 through 12/31/2006 | 15 | 14 | 1 | 0 |
| 2007 | 35 | 30 | 4 | 1 |
| 2008 | 41 | 34 | 6 | 1 |
| 2009 | 31 | 23 | 4 | 4 |
| 2010 | 56 | 46 | 6 | 4 |
| 2011 | 69 | 56 | 4 | 9 |
| 2012 | 40 | 27 | 6 | 7 |
| 2013 | 42 | 33 | 3 | 6 |
| 2014 | 39 | 36 | 0 | 3 |
| 2015 | 36 | 34 | 0 | 2 |
| 2016 | 54 | 49 | 4 | 1 |
| 2017 | 59 | 49 | 7 | 3 |
| 2018 | 50 | 43 | 6 | 1 |
| 2019 | 47 | 40 | 4 | 3 |
| 2020 | 48 | 38 | 7 | 3 |
| 2021 | 52 | 42 | 3 | 7 |
| 2022 | 59 | 40 | 8 | 11 |
| 2023 | 37 | 26 | 10 | 1 |

[1] The Commission's categories draw from the analysis and definitions adopted by the Federal Trade Commission. *See* Federal Trade Commission, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition* at 8 n.5 (March 2011); Federal Trade Commission, *Patent Assertion Entity Activity* at 15-17 (October 2016).

[2] To "practice" the patent in the context of section 337 means that a product exists that satisfies at least one claim of each patent asserted in the investigation.



Source: *USITC, Budget Justifications,* FY 2008–FY 2016; *USITC, Performance and Accountability Report, FY* 2006–FY 2010; *USITC, Annual Performance Report*, FY 2011–FY 2012; *USITC, Annual Performance Plan* FY2014–2015 and *Annual Performance Report*, FY 2013; *USITC, Annual Performance Plan* FY 2015–2016 and *Annual Performance Report*, FY 2014; USITC, *Year in Review*, for Fiscal Years 2006–2010; *U.S. International Trade Commission FY 2011 At A Glance*; *U.S. International Trade Commission FY 2012 At A Glance*; and *U.S. International Trade Commission FY 2013 At A Glance*; the USITC's Electronic Docket Information System (EDIS); USITC, 337Info.

A flowchart is provided here demonstrating decision points employed by the Commission in classifying an entity as a Category 1 NPE, as a Category 2 NPE, or non-NPE solely for purposes of the statistics provided here.

---

## CONTACT INFORMATION

U.S. International Trade Commission
500 E Street, SW
Washington, D.C., 20436
202.205.2000 TDD 202.205.1810

Contact Us
Hours & Directions
Organizational Chart
Media Inquiries

## INDEPENDENT REPORTING

Office of Inspector General
Office of Inspector General Hotline

## SITE HELP

Acronyms
FAQs
Glossary
Site Guide

## GOVERNMENT

U.S. Customs and Border Protection
Office of the U.S. Trade Representative
Export.gov

## POLICY & GUIDANCE

Accessibility
Disclaimer
Ethics
FOIA
No FEAR Act
Open Data
Plain Writing
Privacy Policy
Vulnerability Disclosure

## CAREERS

Jobs
Internships



# EXHIBIT 21

OPINION   >   TECHNOLOGY

**THE VIEWS EXPRESSED BY CONTRIBUTORS ARE THEIR OWN AND NOT THE VIEW OF THE HILL**

## Big Tech's 'patent troll' attacks are a smokescreen — don't let them fool you

BY ADAM MOSSOFF, OPINION CONTRIBUTOR - 08/18/23 11:00 AM ET

Share        Post        • • •    More



Getty Images

For many years, Big Tech companies with their legions of DC lobbyists have been on a crusade to weaken the International Trade Commission (ITC), a little-known, independent, nonpartisan federal agency tasked with protecting the United States from imports that violate U.S. laws, including U.S. patent laws. These companies are now at it again, lobbying for a bill that was recently re-introduced in Congress: the Advancing America's Interests Act (AAIA).

The AAIA would severely restrict the ITC's ability to block imports manufactured in China that violate U.S. patents. The bill's title, of course, is classic Washington Orwellian double-speak — this legislation would significantly undermine American innovators and U.S. interests.

ADVERTISEMENT

A dirty little secret about Big Tech companies is that they profit handsomely from taking the patented ideas of other American innovators. They incorporate these inventions into their products and then they refuse to pay the innovators who created them. It's called "predatory infringement." Two recent lawsuits by American startups, Sonos v. Google and Masimo v. Apple, highlight this practice and reveal the tip of the massive IP piracy iceberg by Big Tech companies.

To make matters worse, instead of manufacturing those infringing products in the United States, Big Tech long ago moved manufacturing and supply chains to places like China to take advantage of cheaper labor. Almost every iPhone and iPad, for example, is manufactured in China. Tim Cook, who was first in charge of Apple's supply chain before he became CEO, is legendary for having built China's high-tech manufacturing and supply chain capacity over the last several decades.

So the last thing these Big Tech companies want is a federal agency with the authority to protect intellectual property rights by preventing infringing goods cheaply manufactured in China from being imported into the country. That is why they are fighting so hard to stop the ITC from doing its job.

After the ITC ruled that Google infringed Sonos's patents, Google then argued that the ITC should permit it to infringe Sonos's patents and not stop its infringing imports because of the "public interest" in buying Google's infringing products. Google thinks what is good for Google's profit is good for America.

To the contrary, it is clearly in the public interest to block infringing imports. If we allow patent-infringing products to be imported, we undermine the legal engine that has driven the U.S. innovation economy for over two centuries: the patent system. American inventors and the venture capitalists and investors who fund them need to know that their patents will be enforced, even when infringed by a large, powerful tech company.

In their campaign to close the doors at the ITC to American innovators, Big Tech companies and their backers have promoted arguments again and again that so-called "patent trolls" are using the ITC to hurt U.S. companies. It's self-serving, false rhetoric that aids their predatory infringement.

ADVERTISEMENT

×

In fact, there is no evidence that the ITC is over-run by "patent trolls." The ITC investigates about 45 to 60 patent infringement cases each year, which is tiny compared to the 3,500 to 4,000 patent cases filed in federal courts. Even if one accepts the "patent troll" moniker, the ITC notes that, among its 59 patent cases in 2022, only 11 were brought by companies that might be called "trolls." With over 3 million U.S. patents in force and thousands of court cases, this number is paltry and insignificant.

But the AAIA would close the door at the ITC to almost all American innovators. It would impose higher costs on patent owners seeking protection of their rights and it would outright prohibit some patent owners from filing ITC cases at all. And for those able to get past the barrier to entry created by the AIAA, there would be added procedural hurdles creating more time and expenses. Denying patent owners suffering predatory infringement from having their day in court in this way is wrong.

What Big Tech companies want is clear: a free pass to pirate inventions they didn't invent and to import infringing products manufactured in China. This fuels their massive profit margins. Applying rules of evidence and due process, the ITC has consistently rejected Big Tech's rhetoric. Congress should do the same and reject the AAIA, a bill that would serve only to hurt American innovators and bolster China.

---

ADVERTISEMENT

---

*Adam Mossoff is a patent law expert and professor at George Mason University's Antonin Scalia Law School. He is chair of the Forum for IP at the Hudson Institute and a visiting intellectual property fellow at the Heritage Foundation.*

**TAGS**  BIG TECH   CHEAP LABOR   CHINA   INTERNATIONAL TRADE COMMISSION
PATENT TROLLS   SUPPLY CHAINS   TIM COOK

---

Copyright 2024 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

# EXHIBIT 22

Nos. 23-1509, -1553

I N  T HE
## United States Court of Appeals for the Federal Circuit

A LIVE C OR , I NC .

*Appellant,*

*v.*

I NTERNATIONAL  T RADE  C OMMISSION

*Appellee,*

A PPLE  I NC .,

*Intervenor.*

--------------------------------------------------------

A PPLE  I NC .,

*Appellant,*

*v.*

I NTERNATIONAL  T RADE  C OMMISSION

*Appellee,*

A LIVE C OR , I NC .

*Intervenor.*

On Appeal from the United States International Trade Commission
Inv. No. 337-TA-1266

## NON-CONFIDENTIAL OPENING AND RESPONSE BRIEF OF
INTERVENOR–CROSS-APPELLANT APPLE INC.

Michael A. Amon
F ISH  &  R ICHARDSON  P.C.
12860 El Camino Real, Suite 400
San Diego, CA  92130

Melanie L. Bostwick
Mark S. Davies
Zachary J. Hennessee
Abigail Colella
O RRICK ,  H ERRINGTON  &
  S UTCLIFFE  LLP
1152 15th Street, NW
Washington, DC  20005
(202) 339-8400

*Additional Counsel Listed on Inside Cover*

Betty H. Chen
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 400
Redwood City, CA  94063

Benjamin C. Elacqua
FISH & RICHARDSON P.C.
1221 McKinney Street,
   Suite 2800
Houston, TX  77010

Ruffin B. Cordell
FISH & RICHARDSON P.C.
1000 Maine Ave, SW
Washington, DC  20024

E. Joshua Rosenkranz
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019

Elizabeth R. Moulton
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105

Kristina McKenna
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
222 Berkeley Street, Suite 2000
Boston, MA 02116

*Counsel for Apple Inc.*

## INTRODUCTION

According to Apple's customers, Apple Watch has saved lives—"[l]iterally, not figuratively," as one customer took pains to point out. Appx1616-1617. With multiple FDA-cleared cardiac-monitoring functions—among many other industry-leading health and wellness features—the Apple Watches at issue are helping users both manage known conditions and discover potential problems that warrant a doctor visit. Millions of American consumers have activated these features on their Apple Watches. And many more stand to benefit, as researchers at renowned institutions across the country are investigating how Apple Watch can be used to do even more to improve health.

These benefits to the American public are now in jeopardy, however, because of the International Trade Commission's ruling that these Apple Watches infringe two patents held by a company that long since stopped offering a product protected by those patents. That ruling would be bad enough if the Commission's bases for finding a Section 337 violation were valid. That is because the Commission is meant to protect American industry and the public interest, not just to serve as an alternative forum for patent assertion. The Commission wields the

construction is ultimately an issue of law," *Techtronic Indus. Co. v. ITC*, 944 F.3d 901, 906 (Fed. Cir. 2019), while infringement is a factual determination, *Cisco Sys., Inc. v. ITC*, 873 F.3d 1354, 1361 (Fed. Cir. 2017).  Obviousness and patent eligibility are both questions of law with underlying factual issues.  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).  The Commission's issuance of a remedy must be set aside if it is "legally erroneous, arbitrary and capricious, or constitutes an abuse of discretion."  *Fuji Photo Film Co. v. ITC*, 386 F.3d 1095, 1106 (Fed. Cir. 2004).

## ARGUMENT

## I.    There Is No Section 337 Violation Because AliveCor Failed To Prove The Existence Of A Domestic Industry.

The Commission is not merely an alternative forum to an Article III district court.  It is "fundamentally a trade forum, not an intellectual property forum."  *Mezzalingua*, 660 F.3d at 1328.  To obtain the injunctive relief provided by Section 337, therefore, a complainant in a patent dispute bears the burden of proving not just patent infringement but "the existence of a domestic industry 'relating to the articles protected by the patent.'"  *Microsoft Corp. v. ITC*, 731 F.3d 1354, 1361 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1337(a)(2)-(3)); *see Mezzalingua*,

CONFIDENTIAL MATERIAL OMITTED

660 F.3d at 1331 (complainant bears the "burden of proof"). A complainant may satisfy this burden by showing that such an industry either "exists" or "is in the process of being established." 19 U.S.C. § 1337(a)(2).

The Commission rightly rejected AliveCor's attempt to show that a domestic industry "is in the process of being established" based on

Confidential product information

████████████ or the ████████████████, given AliveCor's lack of progress and "unclear" future intent for developing them. Appx11; Appx289-293.[1] And it likewise rejected AliveCor's attempt to show an existing domestic industry in the discontinued KardiaBand based on investments in plant and equipment or employment of labor and capital. Appx11; *see* 19 U.S.C. § 1337(a)(3)(A)-(B). AliveCor's evidence of such an industry was "not reliable." Appx264. According to the Commission, AliveCor failed to show how its activities related to the

Confidential product information

only "existing" product—KardiaBand—as opposed to the ████████ or ██████ products. Appx264-265. And the numbers AliveCor offered were compiled by its founder, Dr. Albert, "solely from memory."

---

[1] AliveCor has not appealed that finding and cannot now dispute the Commission's finding of a domestic industry based on KardiaBand alone. *See, e.g.*, Appx19 n.17.

CONFIDENTIAL MATERIAL OMITTED

Appx266.  Despite consulting no documents or other people, Dr. Albert generated percentages for how much time thirteen different employees spent on the KardiaBand project over five years.  Appx267.  The Commission rightly concluded there was "more reason to doubt than to trust this critical allocation."  Appx268; *see also* Appx277-281; Appx16-17.

But the Commission nonetheless went out of its way to find a domestic industry—a finding it has made in 80% of recent patent-based investigations.[2]  The Commission plucked two tabs of data from a spreadsheet to find that $⬛⬛⬛ in "payments made to R&D contractors," Appx281, somehow amounted to "substantial investment" in exploiting the asserted patents through "engineering, research and development, or licensing," 19 U.S.C. § 1337(a)(3)(C).  *See* Appx17; Appx11709-11725; Appx11654; Appx11655.

The Commission reached that conclusion through a patchwork of logical errors and evidentiary gap-filling that cannot withstand scrutiny.  No witness testified about the contents of these spreadsheet

---

[2] Jonathan J. Engler et al., *Domestic Industry Alive and Well at ITC* (Feb. 1, 2022), https://tinyurl.com/DIAliveAndWell.

CONFIDENTIAL MATERIAL OMITTED

tabs.  Appx281-282; Appx16-17.  And the $ [Dollar amount] of payments drawn

from these tabs includes more than $ [Dollar amount] that plainly relates to

[Confidential product information], not KardiaBand.  *Infra* Part I.A.  The Commission

further found that these research and development expenses related to

the asserted patents, even while acknowledging that AliveCor

intentionally refused to demonstrate that link.  *Infra* Part I.B.  And it

determined that $ [Dollar amount], over five years, amounts to a "substantial"

investment for a company whose revenues across the same five-year

period totaled $ [Dollar amount].  Appx11929 (Total Revenue, 2016 through

2020).  *Infra* Part I.C.

If that is enough to constitute a domestic industry, then the

requirement is essentially meaningless.  The Commission becomes just

another patent-litigation forum—though a forum with extensive

remedial powers unchecked by the limits applicable in district court.

That outcome would not only be contrary to Section 337, it would

threaten the constitutionality of the Commission's proceedings.

Without the critical role of protecting "an industry in the United

States," 19 U.S.C. § 1337(a)(2), the Commission's resolution of patent-

infringement disputes without a jury would likely be in violation of the

Seventh Amendment. *See Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1379 (2018) (reserving ruling on "whether other patent matters, such as infringement actions, can be heard in a non-Article III forum").[3]  This Court should not permit the clear statutory overreach that AliveCor invited and the Commission undertook in this case.

### A.   The Commission erred in crediting expenditures unrelated to any "articles protected by the patent."

Whatever statutory path a complainant takes to satisfy the domestic-industry requirement, there is one common denominator: the investments must relate to "articles protected by the patent." *InterDigital Commc'ns, LLC v. ITC*, 707 F.3d 1295, 1298 (Fed. Cir. 2013); *see also* Appx12 n.16; *Certain Integrated Circuit Chips*, Inv. No. 337-TA-859, Comm'n Op., 2014 WL 12796437, at *27 (Aug. 22, 2014). The Commission recognized that the only qualifying "articles" are AliveCor's former product, the so-called KardiaBand "system."[4]  *See,*

---

[3] Apple reserves the right to raise this and other constitutional challenges directly at a future point in this litigation.

[4] The Commission used this "system" terminology because AliveCor's KardiaBand accessory and associated software do not, by themselves,

CONFIDENTIAL MATERIAL OMITTED

*e.g.*, Appx19 n.17 (noting that the "DI product for each of the three asserted patents is the [KardiaBand System]").

But the vast majority of the expenditures the Commission relied on were instead directed to [Confidential product information ████████]—which "ha[s] not been shown to practice any of the asserted patents at the time of the complaint." Appx264; *see also* Appx153, Appx245 (deeming it "essentially undisputed" that [Confidential product information ████████] "did not exist in any hardware-sense at the time of the complaint"). Of the $[Dollar amount ████] in research and development contractor expenses that the Commission credited, $[Dollar amount ████] was associated with [Confidential product information ████████]. *See* Appx281-282; Appx1224-1225; Appx11927. These expenditures on potential future products cannot be said to relate to a domestic industry that "exists," as the Commission found. And the Commission's rationale for treating them that way is neither sufficient under the statute nor supported by any evidence. It simply stated, without citation, that AliveCor's "continuing R&D investments" in potential

---

practice the asserted patent claims; they require Apple Watch to do so. Appx111; Appx152-157; Appx214-215; Appx245.

CONFIDENTIAL MATERIAL OMITTED

future products somehow "benefit [KardiaBand system] users."

Appx17; *see also* Appx16.

Confidential product information

     The Commission did not explain how research into ███████████

Confidential product information

███, a potential product that still does not exist, could benefit any

remaining users of KardiaBand, a product discontinued years before

AliveCor filed its complaint. The cases it cited for support involved very

different circumstances. Appx16. In one, the Commission credited pre-

complaint investments in a marine sonar module that had since been

discontinued because the complainant showed significant continuing

investments in *that product*, including ongoing technical-support and

warranty-service spending. *Certain Marine Sonar Imaging Devices*,

Inv. No. 337-TA-921, Comm'n Op., 2016 WL 10987364, at *38 (Jan. 6,

2016). Similarly, this Court has credited an ATM manufacturer's pre-

complaint research and development expenditures on a module that

provided one of the patented features; those investments were directly

linked to ongoing expenditures in servicing ATMs containing that

module and the complainant's continued installation of that module "in

harm "ongoing studies that are recruiting" now and in the future, and it quantified those needs.  Appx1470; *see* Appx2781-2782.  Participants who join ongoing and planned Apple Watch studies will require Apple Watches that are under the cloud of the Commission's remedial orders.

The Commission had no basis to conclude that all this critical and publicly supported research will be "unaffected" by exclusion.  Appx71.

## CONCLUSION

For the foregoing reasons, the Court should reverse the Commission's finding of a Section 337 violation as to the '941 and '731 patents as well as its issuance of remedial orders.  The Court should affirm the Commission's finding of no Section 337 violation as to the '499 patent.

August 7, 2023

Michael A. Amon
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA  92130

Betty H. Chen
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 400
Redwood City, CA  94063

Benjamin C. Elacqua
FISH & RICHARDSON P.C.
1221 McKinney Street,
  Suite 2800
Houston, TX  77010

Ruffin B. Cordell
FISH & RICHARDSON P.C.
1000 Maine Ave, SW
Washington, DC  20024

Respectfully submitted,

*/s/ Melanie L. Bostwick*
Melanie L. Bostwick
Mark S. Davies
Zachary J. Hennessee
Abigail Colella
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, NW
Washington, DC  20005
(202) 339-8400

E. Joshua Rosenkranz
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019

Elizabeth R. Moulton
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105

Kristina McKenna
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
222 Berkeley Street, Suite 2000
Boston, MA 02116

*Counsel for Apple Inc.*

# CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because this brief contains 16,480 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Melanie L. Bostwick*
Melanie L. Bostwick
*Counsel for Apple Inc.*