2024-1285

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

APPLE INC.,

*Appellant*

v.

INTERNATIONAL TRADE COMMISSION,

*Appellee*

MASIMO CORPORATION, CERCACOR LABORATORIES, INC.,

*Intervenors*

---

Appeal from the United States International Trade Commission in
Investigation No. 337-TA-1276

---

**CORRECTED BRIEF OF ACT | THE APP ASSOCIATION, CHAMBER OF PROGRESS, NETCHOICE, AND TECHNET AS *AMICI CURIAE* IN SUPPORT OF APPELLANT**

---

Tara L. Kurtis
PERKINS COIE LLP
110 N. Wacker Drive, Suite 3400
Chicago, Illinois 60606
Phone:  (312) 324–8607
E-mail: TKurtis@perkinscoie.com

Amanda Tessar
PERKINS COIE LLP
1900 Sixteenth St., Suite 1400
Denver, Colorado 80202
Phone:  (303) 291–2357
E-mail:  ATessar@perkinscoie.com

COUNSEL FOR *AMICI CURIAE*

May 20, 2024

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

| | |
|---:|:---|
| **Case Number** | 2024-1285 |
| **Short Case Caption** | Apple Inc. v. ITC |
| **Filing Party/Entity** | ACT \| The App Association, Chamber of Progress, NetChoice, TechNet |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/20/2024

Signature: /s/Amanda Tessar

Name: Amanda Tessar

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| ACT \| The App Association | | |
| Chamber of Progress | | |
| NetChoice | | |
| TechNet | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
March 2023

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)    ☐  No    ☑  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

Table Of Authorities ............................................................................. ii

Statement Of Interest ...........................................................................iv

Introduction ......................................................................................... 1

Argument .............................................................................................. 3

I.     Misuse Of The ITC's Powerful Exclusion Remedy Would Seriously
       Harm Domestic Markets ............................................................... 3

       A.     Section 337 Authorizes The Extraordinary Remedy Of Excluding
              Imports Only Where A Domestic Industry Exists ................. 3

       B.     Increased Access To ITC Exclusion Orders Would Be Detrimental
              To American Innovation ....................................................... 5

II.    Affirming The Commission's Domestic Industry Finding Would Open
       The Floodgates To Improper Exclusion Orders And Stifle Innovation ........... 8

       A.     The Commission Erred By Not Applying More Rigor To The
              Domestic Industry Inquiry ................................................... 8

       B.     The Commission's Ruling Will Stifle Innovation, To The
              Detriment Of The American Public ...................................... 9

Conclusion ........................................................................................ 11

Certificate of Compliance with Type-Volume Limitation

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Certain Digital Satellite Sys. (DSS) Receivers & Components Thereof*,
  Inv. No. 337-TA-392, Initial and Recommended Determinations,
  1997 WL 696255 (ITC Oct. 20, 1997), *vacated on other grounds*,
  2001 WL 535427 (ITC Apr. 1, 2001)...................................................................1

*Certain Percussive Massage Devices*,
  Inv. No. 337-TA-1206, Comm'n Op. (ITC Jan. 3, 2022) ...................................1

*Certain Short-Wavelength Light Emitting Diodes, Laser Diodes &
  Prods. Containing Same*,
  Inv. No. 337-TA-640, Order No. 72, 2009 WL 1640140 (ITC May
  8, 2009) .................................................................................................................1

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)...............................................................................................3

*Hyosung TNS Inc. v. Int'l Trade Comm'n*,
  926 F.3d 1353 (Fed. Cir. 2019) .............................................................................4

*Microsoft Corp. v. Int'l Trade Comm'n*,
  731 F.3d 1354 (Fed. Cir. 2013) .............................................................................4

*Motiva, LLC v. Int'l Trade Comm'n*,
  716 F.3d 596 (Fed. Cir. 2013) ...............................................................................4

*Spansion, Inc. v. Int'l Trade Comm'n*,
  629 F.3d 1331 (Fed. Cir. 2010) .............................................................................3

## STATUTES

19 U.S.C. § 1337(a)(1)................................................................................................3

19 U.S.C. § 1337(a)(2)................................................................................................4

19 U.S.C. § 1337(d)(1)................................................................................................3

TABLE OF AUTHORITIES
(CONTINUED)

PAGE(S)

OTHER AUTHORITIES

Colleen V. Chien & Mark A. Lemley, *Patent Holdup, the ITC, and the Public Interest*, 98 CORNELL L. REV. 1 (2012) ........................................7, 11

Colleen Chien, *Startups and Patent Trolls*, 17 STAN. TECH. L. REV. 461 (2014)..............................................................................6, 7, 10

Daniel E. Valencia, *Celebrating Twenty-Five Years of A Liberal Domestic Industry Requirement in Section 337 Cases: Would A Qualitative Analysis of Statutory "Exploitation" Activities Put the Trade Back in International Trade Commission?*, 40 AIPLA Q.J. 267 (2012) ..........................................................................................10

Mark A. Lemley & A. Douglas Melamed, *Missing the Forest for the Trolls*, 113 COLUM. L. REV. 2117 (2013) ............................................6

S. Alex Lasher, *The Evolution of the Domestic Industry Requirement in Section 337 Investigations Before the United States International Trade Commission*, 18 U. BALT. INTELL. PROP. L.J. 157 (2010)............................................................................................1

Sapna Kumar, *Innovation Nationalism*, 51 CONN. L. REV. 205 (2019) ...................3

Taras M. Czebiniak, *When Congress Gives You Two Hats, Which Do You Wear? Choosing Between Domestic Industry Protection and IP Enforcement in § 337 Investigations*, 26 Berkeley Tech. L.J. 93 (2011) ...........................................................................................6

### STATEMENT OF INTEREST

ACT | The App Association ("ACT") is an international not-for-profit grass-roots advocacy and education organization representing more than 5,000 small business software application developers and technology firms that create the apps used on mobile devices and in enterprise systems around the globe. Today, ACT represents an ecosystem valued at approximately $1.7 trillion and responsible for 5.9 million American jobs. ACT members lead in developing innovative applications and products across consumer and enterprise use cases.

Chamber of Progress is a tech industry coalition devoted to a progressive society, economy, workforce, and consumer climate. It backs public policies that will build a fairer, more inclusive country in which all people benefit from technological advances. Its work is supported by corporate partners, including in the finance/crypto, retail, high-tech, and transportation/automotive industries, many of whom will be subject to the law at issue.

NetChoice is a national trade association of online businesses that share the goal of promoting free enterprise and free expression on the Internet. NetChoice's members operate a variety of popular websites, apps, and online services, including Meta (formerly Facebook), YouTube, and Etsy. NetChoice's guiding principles are (1) promoting consumer choice, (2) continuing the successful policy of "light-touch"

Internet regulation, and (3) fostering online competition to provide consumers with an abundance of services.

TechNet is the national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating a targeted policy agenda at the federal and 50-state level. TechNet's diverse membership includes dynamic American businesses ranging from startups to the most iconic companies on the planet and represents over 4.4 million employees and countless customers in the fields of information technology, artificial intelligence, e-commerce, the sharing and gig economies, advanced energy, transportation, cybersecurity, venture capital, and finance.

The ITC is a trade forum with the power to wholesale exclude imports of entire products or product lines, including from United States companies, but without requiring the showing of irreparable harm that would be demanded in district courts for analogous types of injunctive relief. The power to exclude is extraordinary: it can, in many instances, shut companies entirely out of the United States market. There are therefore statutory safeguards in place to limit the exercise of this power to specific circumstances. The domestic industry analysis is one of the primary statutory checks on the ITC's authority. If the ITC is permitted to ignore or relax that requirement, such that it need not identify any real United States market in need of

the ITC's protection before issuing exclusion orders, then the ITC fails in its fundamental mission. More importantly to amici, such an outcome serves to harm innovation and economic leadership the United States economy—precisely the opposite of what the ITC is meant to do.

Amici collectively represent thousands of member companies across a broad range of industries, including high-tech, manufacturing, automotive, pharmaceutical, financial, and telecommunications. They are concerned that the precedent set by the Commission's order permits a complainant to access the ITC's extraordinary remedy with only a hypothetical article at the time of the complaint. Lowering the bar on the domestic industry requirement in a way not contemplated by statute will have impacts that go beyond this case and will ultimately stifle American innovation, harm domestic markets, and cause significant job losses for American workers.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(e), no party's counsel authored this brief in whole or in part, no party nor a party's counsel directly contributed money that was intended to fund preparing or submitting this brief,[1] and no person—other than the amici curiae, their members, or their counsel—contributed money that was intended to fund preparing or submitting the brief.

---

[1]    For clarity, Appellant Apple, Inc., is a member of some of the amici organizations (specifically, ACT, Chamber of Progress, and TechNet), and pays member dues in that capacity, but Apple did not participate in those organizations' preparation of amici's brief.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(D), amici state that they filed a motion for leave to file this amicus brief in light of Intervenors Masimo Corp.'s and Cercacor Laboratories, Inc.'s opposition, which the Court granted pending amici's filing of a corrected brief, Dkt. 49, and that Appellant Apple, Inc., and Appellee ITC consented to amici's filing of this brief.

## INTRODUCTION

The Administrative Law Judge's ("ALJ's") Initial Determination, and the Commission's adoption of portions thereof, resulted in an exclusion order based on questionable, limited, and unreliable domestic industry information.[2] This continues a long-standing trend where the Commission has been relaxing the requirements for proof of domestic industry over a period of decades.[3]

The Commission here initiated and continued an investigation with domestic industry allegations based largely on a hypothetical article that did not exist when the complaint was filed. Worse, the Commission permitted the articles on which it

---

[2]  For convenience, this brief refers to the ALJ and the Commission collectively as the "Commission."

[3]  *See* S. Alex Lasher, *The Evolution of the Domestic Industry Requirement in Section 337 Investigations Before the United States International Trade Commission*, 18 U. BALT. INTELL. PROP. L.J. 157, 172 (2010) ("It is impossible to dispute the critical role played by the relaxed domestic industry standard in the resurgence of Section 337 as a viable trade statute."); *Certain Digital Satellite Sys. (DSS) Receivers & Components Thereof*, Inv. No. 337-TA-392, Initial and Recommended Determinations, 1997 WL 696255, at *8 (ITC Oct. 20, 1997) (finding domestic industry based on five employees seeking licensees), *vacated on other grounds*, 2001 WL 535427 (ITC Apr. 1, 2001); *Certain Short-Wavelength Light Emitting Diodes, Laser Diodes & Prods. Containing Same*, Inv. No. 337-TA-640, Order No. 72, 2009 WL 1640140, at *3 (ITC May 8, 2009) ("The domestic industry analysis under subsection (C), 'subsumes within it the technical-prong aspect' and, thus, only the economic prong needs to be proven." (emphasis omitted)); *Certain Percussive Massage Devices*, Inv. No. 337-TA-1206, Comm'n Op. at *5-7 & n.10 (ITC Jan. 3, 2022) (finding domestic industry based on growth in number of IP development employees and growth of research and development expenses even though those expenditures were primarily made several years before the filing of the complaint and complainant's limited domestic activities were akin to those of a mere importer).

relied to be changed midway through the investigation, despite the obvious prejudice caused by this approach, and then it failed to conduct a disciplined analysis of any of the articles involved.  These findings substantially, and problematically, lower the threshold for a complainant to meet the domestic industry requirement—and allow the target to move during an investigation.  The domestic industry requirement is fundamental to the Commission's mission.  The Commission is intended to protect domestic industry; if no domestic industry exists, it is unclear what the Commission is acting to protect.

Amici, who represent a broad swath of a wide range of industries and a substantial percentage of the United States economy as a whole, are deeply concerned about the Commission's order.  If the order stands, it could open the floodgates to unfounded exclusion orders that are divorced from the ITC's goal of protecting actual United States markets, to the detriment of American innovators and the public. The domestic industry requirement, importantly, limits the ITC's extraordinary exclusion powers to only those patentees with actual products and a true domestic market (whether their own or via license).  Initiating investigations and issuing exclusion orders without this critical statutory safeguard being met, as the Commission did here, creates substantial risks for United States markets, putting the ITC directly at

odds with its statutory mandate to protect domestic industry. Amici respectfully request that the Court reverse the Commission's domestic industry findings and restore the domestic industry requirement to the gatekeeping role it was meant to play.

ARGUMENT

## I.    Misuse Of The ITC's Powerful Exclusion Remedy Would Seriously Harm Domestic Markets

### A.    Section 337 Authorizes The Extraordinary Remedy Of Excluding Imports Only Where A Domestic Industry Exists

The ITC is an attractive forum for patentees—both domestic and foreign—because Section 337 of the Tariff Act provides for the injunctive relief of an exclusion order without any of the showing of irreparable harm required by the courts under *eBay*. 19 U.S.C. § 1337(a)(1), (d)(1); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1358-59 (Fed. Cir. 2010).  Exclusion orders are not based on traditional "equitable concerns" as is required for injunctive relief in federal court and, historically, the Commission has denied an exclusion order based on the statutory public interest factors in only ***three*** investigations ever.  *See id.* at 1359-60; Sapna Kumar, *Innovation Nationalism*, 51 CONN. L. REV. 205, 237 n.216 (2019).

Not all patent owners can initiate an investigation in the ITC.  Congress limited access to the agency's unique exclusion powers to only those patentees who

– 3 –

have proven that they are part of the domestic industry—*i.e.*, the industry and markets that the ITC is meant to protect. That is, a Section 337 action requires a domestic industry "relating to the articles protected by the patent" that "exists or is in the process of being established." 19 U.S.C. § 1337(a)(2); *see Microsoft Corp. v. Int'l Trade Comm'n*, 731 F.3d 1354, 1361-62 (Fed. Cir. 2013). Patentees who cannot satisfy this standard are not without relief, of course: the federal district courts of the United States are available for patent suits brought under 35 U.S.C. § 271 and do not require any showing of domestic industry.

Because an exclusion order is such a serious sanction, the domestic industry requirement is supposed to set a high bar: a patentee must have (itself or via license) an actual article that practices its patent in the United States (the technical prong) in meaningful volumes or after making significant investments (the economic prong) *at the time of its complaint*. *See Microsoft*, 731 F.3d at 1361-62; *Motiva, LLC v. Int'l Trade Comm'n*, 716 F.3d 596, 600-01 (Fed. Cir. 2013); *Hyosung TNS Inc. v. Int'l Trade Comm'n*, 926 F.3d 1353, 1361-62 (Fed. Cir. 2019). Without an existing article and associated significant domestic investments into that article, a patentee could exclude *real* products (even those of domestic companies, as here) without having a domestic market of its own to protect. Especially given the near-certainty of injunctive relief for a successful patentee, the role of the domestic industry requirement is critical to ensure that a productive company does not have to go through

– 4 –

an investigation, much less have products excluded for good at the conclusion of the investigation, when there is no real domestic industry at risk.

### B. Increased Access To ITC Exclusion Orders Would Be Detrimental To American Innovation

In today's era of global supply chain and logistics, allowing unfettered access to the ITC can imperil United States industries. Even the largest companies in the world, as in this case, can suffer impactful consequences from an exclusion order. But this remedy can be even more severe for smaller companies, companies with more limited product offerings, companies with vast amounts of revenue tied to the excluded products, and companies simultaneously defending against multiple ITC investigations covering several product lines. Amici represent companies threatened by all of these scenarios.

Lowering the domestic industry threshold not only makes no sense in light of the purposes of the ITC, but it also affirmatively disincentivizes innovation in the United States, particularly for American companies that design and sell products that rely on components made overseas. Patentees can and do sit back silently while such domestic companies build the market for their technologies. Then, only at the most inopportune moment (e.g., just in time for the holiday buying season here, for Apple), such patentees can and do spring an investigation on the company, take advantage of the company's work to building the market, and use this unfair leverage to extract supra-competitive royalties, or ultimately win an exclusion order to keep

that company completely out of the market.  That is no incentive for a company to invest in the United States market.  In fact, exclusion orders often "cut[] domestic employment of labor and capital and reduce[] investment in plant and equipment." *See* Taras M. Czebiniak, *When Congress Gives You Two Hats, Which Do You Wear? Choosing Between Domestic Industry Protection and IP Enforcement in § 337 Investigations*, 26 BERKELEY TECH. L.J. 93, 131 (2011).  Here, for instance, Apple noted the "more than 450,000 jobs through U.S.-based suppliers" at risk because of the exclusion order.  Appellant Apple Inc.'s Non-Confidential Emergency Mot. to Stay Enf't of ITC's Orders Pending Review at 22 (Dec. 26, 2023), ECF No. 7.  Thus, exclusion orders must only issue when a patentee has a real domestic industry; otherwise, an unwarranted exclusion order would upset the careful balance that should exist between protecting the patentee's domestic market and harming importers and their employees and partners.

Opening the floodgates to ITC investigations by further relaxing the domestic industry requirement would be particularly harmful for start-ups and small businesses.  An exclusion order could ruin such a company whether they are just getting off the ground or are more established.  *See* Colleen Chien, *Startups and Patent Trolls*, 17 STAN. TECH. L. REV. 461, 464 (2014) (hereinafter, "*Startups*").  Startups have increasingly been the targets of litigation, particularly by patentees who do not make a product.  *See* Mark A. Lemley & A. Douglas Melamed, *Missing the Forest*

*for the Trolls*, 113 COLUM. L. REV. 2117, 2124 (2013); Chien, *Startups*, 17 STAN.
TECH. L. REV. at 464.  And because of the already "relaxed [] domestic industry
requirement, nearly every patentee can bring an ITC complaint, and nearly every
accused infringer is a potential ITC defendant."  Colleen V. Chien & Mark A. Lem-
ley, *Patent Holdup, the ITC, and the Public Interest*, 98 CORNELL L. REV. 1, 14-15
(2012) (hereinafter, "*Patent Holdup*").  Even just the ***threat*** of an exclusion order
more substantially impacts small businesses and startups, who often have to delay
reinvestment in the business, put off hiring additional workers, or even shut down
completely.  Chien, *Startups*, 17 STAN. TECH. L. REV. at 465.

The heightened risk of an exclusion order based on a relaxed domestic indus-
try requirement is particularly unfair where an investigation was initiated based on
a nonexistent product.  One could easily imagine circumstances in which a respond-
ent would even be oblivious to the risk of an investigation and, ultimately, an exclu-
sion order, because there is no competitive product to be wary of and no way at all
to avoid a surprise ITC attack.  If this blindsiding style of litigation persists, busi-
nesses will have to hold significant resources in reserve to defend themselves, taking
investment away from the innovative, job-creating segments of the economy.  In
short, it would turn the ITC's mission—protecting domestic industry and trade—on
its head.

II.  **Affirming The Commission's Domestic Industry Finding Would Open The Floodgates To Improper Exclusion Orders And Stifle Innovation**

A.  **The Commission Erred By Not Applying More Rigor To The Domestic Industry Inquiry**

The Commission erred in its analysis of the domestic industry inquiry. If permitted to stand, the precedent set by the Commission would have negative consequences for United States markets. Namely, the Commission's order would go beyond the statutory confines of the domestic industry requirement and improperly increase access to the ITC's extraordinary exclusion powers.

The Commission's ruling is antithetical to the domestic industry requirement's gatekeeping role. As discussed above, the domestic industry requirement restricts the ITC's use of its exclusion powers to protect only a true domestic industry. For the technical prong, the existence of an actual article practicing the patent at the time of the complaint ensures that there is more than just a ***hypothetical*** market for the ITC to protect. The ITC risks undermining the domestic industry requirement entirely if it does not conduct a robust evaluation of the products put forth to satisfy the domestic industry requirement.

Additionally, the ITC allowed the patentee to change its domestic industry articles midstream, relied on only circumstantial evidence for portions of its analysis, and referred to products that were not in existence when the investigation began.

That approach undercuts the entire premise and foundation of an investigation, which is supposed to be focused on protecting an existing United States market.[4]

## B.    The Commission's Ruling Will Stifle Innovation, To The Detriment Of The American Public

At bottom, the Commission's ruling harms America's true innovators to the benefit of those who choose to sit on their patent rights.  Of course, a patentee is not obligated to practice its patent or to license others to do so.  But if a patent is not practiced, or the patentee or licensee fails to create a domestic industry in the process, it is not within the ITC's authority to protect that patentee by issuing an exclusion order, eliminating competition from a market that does not exist in the first place.

Without the protection of a robust domestic industry requirement, a patentee could simply wait to see whether another company builds up a customer base and market for a given technology, as seemed to have happened here.  If the market gets big enough, the patentee could follow the example of this case and initiate an investigation before it has ever made use of its patent to develop a product (or licensed others to do so), then exclude the first-mover company from the very market it

---

[4]    A complainant can satisfy the domestic industry requirement by showing that a domestic industry "is in the process of being established" where significant pre-production or similar activities are ongoing.  The Commission's ultimate ruling expressly declined to rely on this theory, however.  Appx426.

worked so hard to create. The patentee could take over the now-vacant market space built by the first-mover *and* ensure that it will not have meaningful competition. This is not a legitimate use of the ITC, and it will harm American innovation and the American economy.

Offloading market-building costs onto innovators, only to then punish them for their efforts, pulls resources away from other productive and job-creating segments like research, development, and manufacturing, reducing opportunities for innovation overall. Further, as discussed above, even increasing just the *risk* of an ITC investigation following the Commission's relaxed domestic industry ruling here could stifle innovation. For instance, companies may need to hold more capital in reserve in case it is needed to fund their defense. *See* Chien, *Startups*, 17 STAN. TECH. L. REV. at 465. The Commission's ruling directly invites these consequences by making it too easy to satisfy both prongs of the domestic industry requirement with fictitious products and markets that do not represent any investment at all (much less the statutorily required significant investment) by the patentee.

Finally, whether intentionally or not, the Commission's ruling makes the ITC more accessible to patent trolls, who by design will *never* have an article that practices their patent. ITC investigations initiated by these and other non-practicing entities have already long been on the rise. Daniel E. Valencia, *Celebrating Twenty-Five Years of A Liberal Domestic Industry Requirement in Section 337 Cases: Would*

*A Qualitative Analysis of Statutory "Exploitation" Activities Put the Trade Back in International Trade Commission?*, 40 AIPLA Q.J. 267, 272 (2012) (hereinafter, "*Celebrating*").  In fact, patent trolls and other patent-assertion entities are "flocking to the ITC," in part "because of the relaxed domestic industry requirement."  Chien & Lemley, *Patent Holdup*, 98 CORNELL L. REV. at 26.  The Commission's ruling here only further relaxes the domestic industry requirement, making the ITC that much more attractive to such entities.  Once a patent troll initiates an investigation, its odds of winning a powerful exclusion order are almost the same as for any other complainant under the Commission's ruling.  This is backwards—the Commission has put domestic innovators who import their products at substantial risk in order to "protect" patentees without any real domestic market.

## CONCLUSION

Amici respectfully request that the Court reverse the Commission's erroneous domestic industry finding.

Respectfully submitted,

PERKINS COIE LLP

/s/Amanda Tessar
Amanda Tessar

**COUNSEL FOR AMICI CURIAE**
**ACT | THE APP ASSOCIATION, CHAMBER OF PROGRESS, NETCHOICE, AND TECHNET**

– 11 –

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

1.      This brief complies with the type-volume limitation of Federal Circuit Rules 29(b) and 32(b)(1). Excluding the portions exempted by rule, the brief contains 3,306 words as counted by the word-processing software used to prepare it.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word and 14-point Times New Roman type.

Dated: May 20, 2024                          /s/Amanda Tessar
                                                              Amanda Tessar