**No. 2024-1285**

United States Court of Appeals
for the Federal Circuit

APPLE INC.,
*Appellant,*

v.

INTERNATIONAL TRADE COMMISSION,
*Appellee,*

MASIMO CORPORATION, CERCACOR LABORATORIES, INC.
*Intervenors.*

On Appeal from the International Trade Commission in Investigation No. 337-TA-1276

**BRIEF OF THE COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, THE SOFTWARE & INFORMATION INDUSTRY ASSOCIATION, AND THE ITC MODERNIZATION ALLIANCE IN SUPPORT OF APPLE AND THE PETITION FOR REHEARING**

Adam Acosta
PIERSON FERDINAND LLP
601 Pennsylvania Ave., NW
Suite 900
Washington, DC 20004
(771) 244-2815
Adam.Acosta@pierferd.com

*Counsel for Amici Curiae*

May 18, 2026

**CERTIFICATE OF INTEREST**

Pursuant to Federal Circuit Rules 29(a) and 47.4, counsel for amici certifies that:

1.  The full names of the parties that I represent are the Computer & Communications Industry Association, the Software & Information Industry Association, and the ITC Modernization Alliance

2.  There are no real parties in interest of parties that I represent

3.  There are no parent corporations or publicly held companies that own ten percent or more of the stock of the parties that I represent

4.  No other law firms, partners, or associates who have not entered an appearance in this appeal either appeared for the parties that I represent in the originating court or are expected to so appear in this Court

5.  I do not know of any case in this or any other court or agency that will directly affect or be directly affected by this Court's decision in this case

6.   No disclosure regarding organizational victims in criminal cases or debtors or trustees in bankruptcy cases is required under Fed. R. App. P. 26.1(b) or (c).

May 18, 2026                                              /s/ *Adam Acosta*

ii

TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..................................................ii

**INTEREST OF AMICI CURIAE** ...............................................iii

**STATUTORY PROVISIONS** .....................................................1

**ARGUMENT**.......................................................................2

I.   **The Tariff Act is a *trade* law that protects making, developing, or licensing *actual articles* covered by a patent.**......................................................................2

   A. **"Domestic industry" must be met by articles that are protected by the patent.** ...............................................3

   B. **The nature of the ITC remedy confirms that it protects a market in the sale or importation of actual products.** ......6

II.  **"Employment of labor and capital" has a limited meaning that does not subsume the rest of the statute.** .................9

**CONCLUSION** .....................................................................14

# TABLE OF AUTHORITIES

## *Cases*

*Apple Inc. v. ITC*, 169 F.4th 1363 (Fed. Cir. 2026)....................... 2, 5

*Bio-Technology General Corp. v. Genentech, Inc.*, 80 F.3d 1553 (Fed. Cir. 1996)................................................................................ 6

*Certain Airtight Cast-Iron Stoves*, Inv. No. 337-TA-69, USITC GC-D-416 (Dec. 31, 1980) ................................................................... 10

*Crocs, Inc. v. ITC*, 598 F.3d 1294 (Fed. Cir. 2010) .......................... 4

*In re United States*, 166 F.4th 1001 (Fed. Cir. 2026) ..................... 13

*InterDigital Commc'ns, LLC v. ITC*, 707 F.3d 1295 (Fed. Cir. 2013) 10

*Jam v. International Finance Corporation*, 586 U.S. 199 (2019) 12-13

*John Mezzalingua Associates, Inc. v. ITC*, 660 F.3d 1322 (Fed. Cir. 2011) ...................................................................................... 9

*Mitek Sys., Inc. v. USAA*, 139 F.4th 1340 (Fed. Cir. 2025)............... 6

*Motorola Mobility, LLC v. ITC*, 737 F.3d 1345 (Fed. Cir. 2013) ..... 5, 6

*NTP Inc. v. Research in Motion, Ltd.*, No. 3:01-cv-00767-JRS (E.D. Va. 2001) ............................................................................... 7

*Schaper Mfg. Co. v. ITC*, 717 F.2d 1368 (Fed. Cir. 1983) ... 10, 11, 12

*Zircon Corp. v. ITC*, 101 F.4th 817 (Fed. Cir. 2024) ........................ 4

## *Statutes and Regulations*

19 U.S.C. § 1337(a)(3) .......................................................... passim

35 U.S.C. § 271(c) .................................................................... 6

## INTEREST OF AMICI CURIAE

The Computer & Communications Industry Association is an international, not-for-profit trade association that represents a broad cross section of communications and technology firms and promotes open markets, open systems, and open networks.[1]

The Software & Information Industry Association is the principal trade association for the software and digital information industries.

The ITC Modernization Alliance is a coalition of leaders in the technology, telecom, and automotive industries dedicated to modernizing the International Trade Commission and promoting trade practices that safeguard American industry, workforce, and consumers.

Amici's members are frequent targets of patent assertions via ITC investigations. In many cases, the complainant does not make a product that practices the claimed invention and has no manufacturing or research and development industries in the United States to protect—it seeks an exclusion order simply for the disruption that it would cause to the defendant's business and to increase settlement

---

[1] A list of CCIA members is available at https://www.ccianet.org/members.

values.  Amici's members have a strong interest in ensuring that ITC exclusion orders are restricted to complainants with an actual domestic industry to protect.[2]

---

[2] No counsel for any party wrote any part of this brief.  No party other than amici curiae's members contributed money that was intended to fund the preparation or submission of this brief.  (Although Apple is a member of amici trade associations, it did not participate in the decision to file this brief or provide funding intended for this brief.)  This brief is accompanied by a motion seeking leave to file.

## STATUTORY PROVISIONS

Paragraph (3) of § 337(a) of the Tariff Act of 1930 (19 U.S.C. § 1337(a)(3)) defines the "domestic industry" that must "exist" for relief to be available at the ITC:

> (3) For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned—
>
> (A) significant investment in plant and equipment;
>
> (B) significant employment of labor or capital; or
>
> (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3).

## ARGUMENT

### I.    The Tariff Act is a *trade* law that protects making, developing, or licensing *actual articles* covered by a patent.

The panel acknowledged that the technical prong of Tariff Act § 337(a)'s domestic-industry requirement necessitates the existence of an "actual article" that "actually practices" the asserted claims. *Apple Inc. v. ITC*, 169 F.4th 1363, 1372 (Fed. Cir. 2026) (citations omitted).  But it held that to satisfy the *economic* prong of the domestic-industry requirement, the ITC in this case properly relied on two prototypes that concededly do *not* practice the asserted claims.  *See id.* at 1378-79.  These prototypes had been cited by the complainant with respect to *other* patents in the case that were ultimately found *not* to be infringed.  *See* Petition at 6-7.

The panel held that it is enough if the articles cited by the complainant "relate[] to an actual article that practices the patent," *id.* at 1379, and that this standard was met by the Commission's finding that "the development of these [non-practicing] prototypes led to the development of" subsequent patent-practicing prototypes, *id.* at 1378—there was no need for the relied-upon prototypes themselves to directly or indirectly practice the patent.

2

The panel's interpretation of the statute is contrary to this Court's precedent, which emphasizes that the ITC is a *trade* tribunal that protects the complainant's market in goods that actually practice the patent—indeed, such a market is the only thing that the ITC's exclusionary remedies *can* protect.

## A. "Domestic industry" must be met by articles that are protected by the patent.

The panel's approach departs from the statute and its emphasis on activities relating to "articles protected by the patent." Although this Court's jurisprudence refers to both a "technical prong" and an "economic prong," there is only one requirement in the Tariff Act that "an industry in the United States" must "exist . . . with respect to the articles protected by the patent." § 337(a)(3). Paragraph (3) provides that such an industry can be demonstrated via manufacturing, research and development, or licensing, but it confirms that each such activity must occur "with respect to the articles protected by the patent." *See id.*

Thus if a complainant relies on manufacturing activity, it must show that it produces articles "protected by the patent." *Id.* And if it relies on research and development, such development must be of

articles "protected by the patent." *See id.*; *see also Crocs, Inc. v. ITC*, 598 F.3d 1294, 1307 (Fed. Cir. 2010) ("Put simply, the complainant must practice its own patent.").

The two prototypes that the Commission relied on were made by the complainant and are in the same class of products as those covered by the patent, but that is not enough for them to constitute "articles protected by the patent." The fact that a patent reads on one product does not mean that it "protects" every successive product or prototype that a company makes; infringement is an individualized analysis that requires comparing each patent to each product. Indeed, this Court has recognized that when the complainant's products "practice different patents," "separate domestic industries" must be established with respect to each set of patent-practicing products. *Zircon Corp. v. ITC*, 101 F.4th 817, 824 (Fed. Cir. 2024). At a minimum, the activities relied on by the complainant—whether manufacturing or tentative "establishment" of an industry—must be directed to features of the product that practice the relevant patent claims.

Although the 1988 Amendments to the Tariff Act broadened the definition of a domestic industry, they "retain[ed] the requirement that a domestic industry exist." S. Rep. 100-71, at 20 (1987). As the

Senate Report for the legislation notes, this requirement is essential to the ITC's role as a forum for protecting *trade*:

> The ITC is to adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad. Retention of the requirement that the statute be utilized on behalf of an industry in the United States retains that essential nexus.

*Id.* at 129.

The panel relied on *Motorola Mobility, LLC v. ITC*, 737 F.3d 1345, 1351 (Fed. Cir. 2013), for its more liberal approach, *see* 169 F.4th at 1379, but that precedent is consistent with the requirement that the "article protected" that supports a "domestic industry" must be protected by the patent. *Motorola Mobility* affirmed the satisfaction of the domestic-industry requirement by a patent-protected mobile device based on the complainant's development of an operating system that was "specially tailored" for use in that device. *Id.* at 1351. The Court emphasized that the protected article may consist of "significant components, specifically tailored for use in an article protected by the patent." *Id.* Of course, the sale or importation of a "component" that is known to be "especially made or especially adapted for use" in the protected article (and that lacks "substantial noninfringing use") may be an act of contributory infringement of the patent

5

that covers the larger article.  35 U.S.C. § 271(c); *see Mitek Sys., Inc. v. USAA,* 139 F.4th 1340, 1351 (Fed. Cir. 2025).

*Motorola Mobility* thus confirms that a component can support the existence of a domestic industry for the protected article—*if* the component is "specially tailored for use" in the protected article and thus *itself* infringes the patent under § 271(c).  A prototype that does *not* infringe the patent (as is the case here) is not equivalent to a component that *does* practice the asserted patent.

## B. The nature of the ITC remedy confirms that it protects a market in the sale or importation of actual products.

The remedies that are available in an ITC investigation are limited to the exclusion of the infringing articles, cease and desist orders, and seizure orders.  *See Bio-Technology General Corp. v. Genentech, Inc.,* 80 F.3d 1553, 1564 (Fed. Cir. 1996).  "Importantly, however, the ITC does not have the power to award damages for patent infringement."  *Id.*

The limited nature of the ITC remedy confirms that the Commission is a trade forum whose purpose is to protect a market participant's trade in its patent-practicing goods.  This is why the statute

requires the existence of a "domestic industry"—and why the activities that are used to show the existence of such an industry (whether manufacturing and repair, research and development, or licensing) must be "with respect to the articles protected by the patent." § 337(a)(3).

A complainant whose activities do *not* result in the production and sale of a protected product has no legitimate use for an exclusion order. The breadth of the panel's decision and its dramatic departure from the ITC's mission as a trade forum is particularly apparent with respect to non-practicing entities that are engaged in the business of patent monetization. When such exclusionary relief is awarded to a non-practicing entity, it is inevitably "sold back" to the accused infringer for a grossly inflated amount—one that reflects the damage that the remedy would do to the defendant's business rather than the value of the claimed invention.[3] While such exchanges serve the

---

[3] The Blackberry litigation of the early 2000s is illustrative. The jury in that case had found the patents infringed and awarded damages of $23,188,570.90. *See NTP Inc. v. Research in Motion, Ltd.*, No. 3:01-cv-00767-JRS (E.D. Va. Nov. 21, 2001) (docket no. 260). But after an injunction was issued, the defendant settled the case for $612,500,000, *see id.* at docket nos. 463 and 464 (Mar. 3, 2006)—an amount approximately 25 times the assessed value of the invention.

private interests of the complainant, they do not serve any public purpose embodied in the Tariff Act. The fact that the only legitimate purpose of the ITC's exclusionary remedies is to protect a supplier's market confirms that the statute's domestic-industry provision requires the presence of actual products that are protected by the asserted patents.

## II.    "Employment of labor and capital" has a limited meaning that does not subsume the rest of the statute.

The panel decision incorrectly interprets subparagraph (B)'s category of § 337(a)(3)'s "domestic industry"—"significant employment of labor or capital"—as including any expenditure for anything related to the protected article.  *See* Petition at 11-14.

Contrary to the panel decision, this Court's precedent recognizes that subparagraphs (A) and (B) of § 337(a)(3) are a codification of earlier precedents of the Commission and this Court—and that it is only subparagraph (C) that expands the definition of "domestic industry" beyond those precedents.

*John Mezzalingua Associates, Inc. v. ITC*, 660 F.3d 1322 (Fed. Cir. 2011), noted that the Senate and House Reports for the 1988 Amendments indicate that "the first two ways of showing the existence of a domestic industry—by showing a significant investment in manufacturing facilities or a significant employment of labor or capital—*were already being considered* by the Commission."  *Id.* at 1327 (emphasis added).  The Committee Report that the Court cited states that "[t]he first two factors in this definition [subparagraphs (A) and (B)] have been relied on in *prior Commission decision*s finding that an

9

industry exists in the United States." S. Rep. No. 100-71 at 129 (emphasis added).

The Committee Report goes on to note that it is only "[t]he third factor [that] . . . goes beyond the ITC's recent decisions in this area," making "activities of the type enumerated" in subparagraph (C) a basis for a domestic industry. *Id.*; *see also InterDigital Commc'ns, LLC v. ITC*, 707 F.3d 1295, 1304 (Fed. Cir. 2013) ("[It is] [t]hrough subparagraph 337(a)(3)(C) [that] Congress provided for the [ITC] to offer a remedy to those industries that . . . imported goods infringed by valid rights" but did not make investments "entailing domestic production of the goods").

The earlier decisions defining the "employment of labor and capital" that are codified by the 1988 Amendments include the Commission's decision in *Certain Airtight Cast-Iron Stoves*, Inv. No. 337-TA-69, USITC GC-D-416 (Dec. 31, 1980),[4] and this Court's decision in *Schaper Mfg. Co. v. ITC*, 717 F.2d 1368 (Fed. Cir. 1983). *Cast-Iron Stoves* concluded that although the term "domestic industry" had

---

[4] Available at https://www.usitc.gov/publications/337/pub1126.pdf.

previously been limited to "domestic facilities . . . devoted to the pro-duction of the patented product," *id.* at 8, "the law was not intended to be limited to the protection of manufacturing activity." *Id.* at 9. The articles at issue in that case had been manufactured abroad but were repaired, tested, and installed in the United States. The Commission concluded that "[t]he repair and installation aspects" of the domestic business are "clearly a significant employment of land, labor, and capital for the creation of value." *Id.* at 6.

In *Schaper*, this Court commented on *Cast-Iron Stoves* and affirmed its conclusion that "in proper cases 'industry' may encompass more than manufacturing of the patented item." 717 F.2d at 1373. In that case, however, the Court rejected the complainant's argument that its expenditures on advertising and promotion, or its monitoring and inspection of goods—which were "[n]ot shown to be substantially different from that of an ordinary importer," *id.* n.10—qualified as the employment of "labor and capital" for purposes of supporting a domestic industry. The Court noted that the Commission "has not adopted" such a "general definition" of "employment of American land, labor and capital," *id.* at 1373, and emphasized the need for

11

"significant value added domestically" to the protected article *itself*, and the importance of "production and servicing in this country." *Id.*

In light of this statutory history—and this Court's precedents—the "employment of labor and capital" must be construed as a term of art with a limited meaning. These words expand "domestic industry" beyond manufacturing to include repair, installation, or other industrial activities that add significant value to the protected article. But they do not encompass *all* expenditures in relation to the goods. *See Schaper*, 717 F.2d at 1373; S. Rep. No. 100-71 at 129 (even under the 1988 Amendment's expanded definition of "domestic industry," "[m]arketing and sales in the United States alone would not . . . be sufficient").

Between the enactment of the Tariff Act of 1930 and the adoption of the 1988 Amendments, the statute did not define "domestic industry"—its meaning was established through decisions of the Commission and reviewing courts, which adopted interpretations such as "employment of labor and capital" and elaborated on their meaning.

"[Courts] ordinarily presume that Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Jam*

12

*v. Int'l Fin. Corp.*, 586 U.S. 199, 211 (2019) (internal quotes omitted). "When a statute covers an issue previously governed by the common law, we must presume that Congress intended to retain the substance of the common law." *In re United States*, 166 F.4th 1001, 1012 (Fed. Cir. 2026) (internal quotes and alterations omitted).

In the case of § 337(a)(3), this interpretive canon is reinforced by the fact that extending subparagraph (B) to expenditures on anything at all in relation to the goods renders the rest of the statutory definition superfluous. *See* Petition at 11-14. The term "employment of labor and capital," shorn of its common-law origins, could encompass every disbursement that a business might make. Absent the limiting construction supplied by the decisions that subparagraph (B) codifies, it would be unnecessary for any complainant to ever rely on subparagraphs (A) and (C)'s definitions of "domestic industry"—anything that they describe would already be captured by the panel's expansive interpretation of subparagraph (B).

## CONCLUSION

This Court should rehear this case en banc and refine its interpretation of "domestic industry."

Respectfully submitted,

/s/ *Adam Acosta*

Adam Acosta
PIERSON FERDINAND LLP
601 Pennsylvania Ave., NW
Suite 900
Washington, DC 20004
(771) 244-2815
Adam.Acosta@pierferd.com

*Counsel for Amici Curiae*

Dated:  May 18, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel for amici curiae certifies that this brief:

(1)    complies with the type-volume limitation of Federal Circuit Rule 40(i)(3) because it contains 2,589 words, including footnotes and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b); and

(2)    complies with the typeface and style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because this document has been prepared using Microsoft Office Word and is set in the Bookman Old Style font in a size equivalent to 14 points or larger.

Dated:  May 18, 2026                    /s/ *Adam Acosta*